Daniel W. Levy
dlevy@mckoolsmith.com
McKool Smith P.C.
One Manhattan West
395 Ninth Avenue, 50th Floor
New York, New York  10001-8603
Telephone: (212) 402-9400

*Attorney for Plaintiffs Matthew Stein
and Jerome Lhote*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MATTHEW STEIN and JEROME LHOTE,

                    Plaintiffs,

       v.

SKATTEFORVALTNINGEN,

                    Defendant.

23 Civ. _____ (_____)

---

## SEALED COMPLAINT

Plaintiffs Matthew Stein and Jerome Lhote, by and through their undersigned attorneys, for their Complaint against Defendant Skatteforvaltningen hereby allege, on knowledge as to themselves and on information and belief with respect to facts that are peculiarly within the possession and control of the Defendant and where the belief is based on factual information that makes the inference of liability plausible, as follows:

## NATURE OF THE ACTION

1.      This is an action for breach of a settlement agreement between Plaintiffs, two finance professionals, and Defendant, the taxation authority of the Kingdom of Denmark.

2.      The settlement agreement resolved a dispute over the payment of certain tax refunds by the Danish taxation authority.

3.      In the first phase of obligations under the settlement agreement, Plaintiffs paid Defendant more than $140 million and, as a result, Defendant recouped a substantial portion of the tax refunds that it had paid out to various pension plans in the United States.  In exchange for these payments, Defendant released any and all claims that it might have against Plaintiffs, among others, thereby completing the parties' performance of their obligations under the first phase of the settlement agreement

4.      In the second phase of obligations under the settlement agreement, the Danish taxation authority was required to communicate promptly upon execution of the settlement agreement and in writing with Danish criminal prosecutors regarding: (a) how the settlement agreement was the result of Plaintiffs' good faith negotiation with the Danish taxation authority; (b) how substantial funds had been repaid to the Danish taxation authority; and (c) how, because Plaintiffs were required to continue to cooperate with the Danish taxation authority in the second phase of the settlement agreement, the Danish taxation authority might recoup even further funds.

5.      The Danish taxation authority was also required to use its best efforts to maintain the confidentiality of the settlement agreement consistent with the settlement agreement's terms. These obligations -- a prompt, written communication to the Danish criminal prosecutors and of confidentiality -- were virtually the only forms of consideration provided by the Danish taxation authority in the second phase of the settlement agreement.  The second phase of the obligations under the settlement agreement required further payments by Plaintiffs and other parties to the settlement agreement and their extensive cooperation.  During the second phase, Plaintiffs paid Defendant more than approximately $5.71 million and produced more than 90,000 documents to assist Defendant's efforts to recoup dividend tax refunds that it had paid out.

6.      The requirement of a prompt writing from the Danish taxation authority to the Danish criminal prosecutors was a material and, indeed, crucial element of the settlement agreement.  One of the principal purposes and motivations of Plaintiffs' settlement with the Danish taxation authority, and the reason it was so important that the Danish taxation authority communicate in writing to the Danish criminal prosecutors the taxation authority's official position about the settlement agreement and the process of reaching it, was to maximize Plaintiffs' chances of avoiding criminal charges in Denmark.

7.      As set forth more fully below, Defendant breached the clear and simple requirement of the settlement agreement that it promptly communicate in writing with the Danish criminal prosecutors on the matters specified in the settlement agreement.

8.      By this action, Plaintiffs seek, among other remedies: (a) to have Plaintiffs and Defendant restored to the position in which they were as of the completion of the parties' performance under the first phase of the settlement agreement; and (b) rescission of, and discharge from, the unperformed obligations of the second phase of the settlement agreement.

9.      As part of the first phase of the settlement agreement, Plaintiffs were required to provide an affidavit of confession of judgment to facilitate Defendant's collection of contractually required payments to be made during the second phase of the settlement agreement and in the event of a breach during the second phase.  The second phase of the settlement agreement also required Plaintiffs to later provide a further affidavit of confession of judgment because, under applicable New York law, an affidavit of confession of judgment may not be filed more than three years after its execution.

10.     By the time that Plaintiffs provided a further affidavit of confession of judgment in 2021, Plaintiff Lhote was no longer a resident of the State of New York.  He does not

3

currently have any residence in the State of New York and has no present intention to establish any residence in the State of New York.

11.     Under New York law in effect since late August 2019, an affidavit of confession of judgment may only be filed in the county within the State of New York where the debtor resided when the affidavit was executed or where the debtor resides at the time of the filing.

12.     Because Plaintiff Lhote did not reside in any county in the State of New York when the further affidavit of confession of judgment was executed in 2021, does not presently reside in any county in New York, and has no present intention to reside in any county in New York, it is invalid as to him.  In addition, the further confession of judgment provided in 2021 does not meet the requirements of New York law and, as such, is unenforceable for an additional reason.

13.     By this action, Plaintiffs seek a declaration that the 2021 affidavit of confession of judgment is invalid as to them so that they can avoid irreparable harm as a result of unlawful collection efforts that Defendant might otherwise take in the absence of declaratory relief.

## **PARTIES**

14.     Plaintiff Matthew Stein ("Stein") is a citizen of the State of New York and, since approximately 1995, has resided in New York County.

15.     Plaintiff Jerome Lhote ("Lhote") is a citizen of the State of Florida and, since approximately the middle of 2020, has resided in Orange County, Florida.  Plaintiff Lhote currently has no residence in the State of New York and has no present intention to establish any residence in the State of New York.

16.     Defendant Skatteforvaltningen ("Defendant" or "SKAT") is the authority of the Kingdom of Denmark charged with the assessment and collection of Danish taxes.  Defendant is

an agency or instrumentality of the Kingdom of Denmark within the meaning of 28 U.S.C.

§ 1603(b) and, as a result, a foreign state within the meaning of 28 U.S.C. § 1603(a).

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction over this action, under 28 U.S.C.

§§ 1330(a), 1605(a)(1), because Defendant explicitly submitted to the jurisdiction of this Court

and, thereby, waived its immunity from the jurisdiction of the courts of the United States and of

the State of New York with respect to any dispute arising out of, in connection with or relating to

the settlement agreement, as described below.

18.     This Court has subject matter jurisdiction over Defendant, under 28 U.S.C.

§§ 1330(a), 1605(a)(2), because this action is based upon a commercial activity carried on in the

United States or upon an act outside the United States in connection with a commercial activity

outside of the United States that caused a direct effect in the United States.

19.     This Court has personal jurisdiction over Defendant pursuant to 28 U.S.C.

§ 1330(b) because Plaintiff asserts a claim for relief over which the Court has original

jurisdiction under 28 U.S.C. § 1330(a).

20.     Venue in this District is proper under 28 U.S.C. § 1391(f) because a substantial

part of the events or omissions giving rise to the claim occurred in the Southern District of New

York, including the negotiation and execution of the settlement agreement, and because

Defendant is doing business in this District.

21.     Venue in this District is proper because Defendant contractually waived any

objection to the laying of venue in this District with respect to any dispute arising out of, in

connection with or relating to the settlement agreement.

## FACTUAL ALLEGATIONS

**Background**

22.     Under Danish law, Danish companies are required to withhold, that is, deduct at the source by the payer of income, 27% of the dividends paid to shareholders.

23.     The double-taxation treaty between the United States and Denmark provides, in general, for the refund of tax withheld on dividend payments to shareholders that are U.S. pension plans, which are exempt from taxation.

24.     Starting in or about mid to late 2015, Defendant began to investigate the manner in which it had paid out billions of Danish kroner in tax refunds, the equivalent of billions of U.S. dollars, to U.S. pension plans.

**Plaintiffs' Proactive Efforts to Resolve Their
Civil and Criminal Liability to Danish Authorities**

25.     In or about Fall 2015, Plaintiffs became aware that Defendant was investigating their roles with respect to several dozen U.S. pension plans that had received dividend tax refunds.  Plaintiffs also became aware that Defendant was investigating the roles of many others, both in the United States and elsewhere, in claims for dividend tax refunds paid by Defendant.

26.     Plaintiffs determined that they would make efforts to initiate discussions with Defendant with the goal of assisting Defendant in recouping tax refunds that had been paid by Defendant.

27.     Starting in or about early 2017, Plaintiffs proactively began to negotiate with Defendant to resolve Defendant's contentions that dividend tax refunds paid to pension plans associated with Plaintiffs were obtained improperly and to repay, and cause to be repaid, dividend tax refunds paid by Defendant and obtained by these pension plans.  The negotiations

6

occurred over multiple years and ultimately resulted in the settlement agreement described below.

28.     While Plaintiffs and Defendant were engaged in these good faith negotiations, and beginning in 2018, Defendant began to bring many lawsuits relating to Defendant's contention that dividend tax refunds had been improperly obtained from Defendant.  Defendant initiated hundreds of lawsuits in the Southern District of New York, the United Kingdom, Germany, Malaysia, Dubai, and Canada with the goal of recouping tax refunds.

29.     Defendant's litigation efforts have been made substantially more difficult because of the "revenue rule."  In general, the revenue rule prohibits courts from hearing claims by foreign sovereigns that seek direct or indirect enforcement of their tax laws.

30.     Because Plaintiffs and Defendant were engaged in good faith negotiations to resolve Defendant's claims with respect to Plaintiffs, it was not necessary for Defendant to initiate any litigation with respect to Plaintiffs, the vast majority of the pension plans with which Plaintiffs were associated, and the vast majority of individuals associated with those pension plans.

31.     Even before the negotiations between Plaintiffs and Defendant began, Plaintiffs were concerned that Danish criminal authorities, specifically, the Danish Public Prosecutor for Serious Economic and International Crime ("SØIK"), might initiate a criminal investigation of them and others as a result of dividend tax refund applications made by pension plans associated with Plaintiffs and, ultimately, criminal charges against them in Denmark.  SØIK is a component of the government of the Kingdom of Denmark and is separate from Defendant.

32.     Plaintiffs' concerns about criminal investigation and prosecution were significantly heightened when, in or about the middle of 2017, a bank associated with the tax

7

refund claims that Defendant claimed were improperly obtained as a result of Plaintiffs' conduct was searched by German authorities acting at the request of Danish authorities.

33.     Accordingly, beyond ensuring that Defendant recouped tax refunds that it had paid out and that it contended were improperly paid and obtaining a civil resolution of any claims that Defendant might have, Plaintiffs' substantial motivation in negotiating with Defendant was the goal of resolving any possible criminal liability on the part of Plaintiffs.

34.     Indeed, for some time, Plaintiffs were discussing with Defendant a resolution that would involve, as a condition precedent, an undertaking by SØIK not to initiate criminal charges against Plaintiffs.  Ultimately, in or about early 2019, Plaintiffs determined that they would continue the negotiations with Defendant without any such undertaking from SØIK.

35.     Nonetheless, Plaintiffs' focus on minimizing the chances that SØIK would initiate criminal charges remained a substantial motivation in continuing the negotiations with Defendant, and Defendant's recognition of this, are reflected in the final terms of the settlement agreement that were ultimately agreed to by both Plaintiffs and Defendant.

**The Settlement Agreement**

36.     On or about May 28, 2019, Plaintiffs and others entered into a settlement agreement with Defendant (collectively, the "Settlement Agreement").  Besides Plaintiffs, more than 70 pension plans and more than 50 other individuals associated with those pension plans entered into the Settlement Agreement.  That these other parties entered into the Settlement Agreement was largely the result of the efforts of Plaintiffs.

37.     The Settlement Agreement reflects that Defendant believed that it had claims against Plaintiffs and others relating to the payment of tax refund claims and that, for their part, Plaintiffs and others had meritorious defenses to those claims.

8

38.     The Settlement Agreement also reflects the desire of Plaintiffs and others and Defendant to fully and finally settle those claims without litigation.

39.     The Settlement Agreement further reflects that Plaintiffs and others had "expressed a willingness to use their best efforts and full cooperation to assist [Defendant] in various proceedings related to" dividend tax refund claims paid out by Defendant.

40.     At or about the time of execution of the Settlement Agreement, Plaintiffs and other individuals entered into a letter agreement, dated May 28, 2019 (the "Letter Agreement"). The Letter Agreement supplements the Settlement Agreement and largely adopts the terms defined in the Settlement Agreement.  The Letter Agreement concerns, in general, the time and manner in which Plaintiffs would liquidate certain assets in order to make payments required in the second phase of the Settlement Agreement, as described more fully below.

41.     The Settlement Agreement and the Letter Agreement are governed by New York law.

42.     In general, it was the intent of the parties to divide the obligations of the Settlement Agreement and the Letter Agreement, and performance of those obligations, into two phases.

**Phase I of the Settlement Agreement**

43.     Under the first phase of the obligations under the Settlement Agreement ("Phase I"), Plaintiffs and others were required to make to Defendant an initial cash payment of 950 million Danish kroner ("DKK").

44.     Upon the payment of the initial cash payment of DKK 950 million, Defendant "forever and finally generally release[d], waive[d] and discharge[d]" Plaintiffs and others from all claims broadly associated with the dividend tax refund applications.

45.     Under the Settlement Agreement, Defendant's release of all claims broadly associated with the dividend tax refund obligations is not dependent upon the satisfaction of any conditions other than the initial cash payment of DKK 950 million and is not affected by the parties' conduct thereafter.

46.     By on or about August 8, 2019, the initial cash payment was completed.  At or about the time of the Settlement Agreement, DKK 950 million was the approximate U.S. dollar equivalent of $142.6 million.  As a result, Defendant is bound by its release of Plaintiffs.

47.     Phase I also required that, simultaneously with the initial cash payment of DKK 950 million, Plaintiffs and one other person provide to Defendant an affidavit of confession of judgment.  The purpose of the affidavit of confession of judgment was to facilitate Defendant's collection of payments to be made during the second phase of the settlement agreement ("Phase II").

48.     On or about August 8, 2019, Plaintiffs provided an Affidavit of Confession of Judgment (the "2019 Affidavit of Confession of Judgment").

49.     The parties' performance of the Phase I obligations is complete.

**Phase II of the Settlement Agreement**

50.     Plaintiffs had an extensive series of obligations under the second phase of the Settlement Agreement ("Phase II").  For its part, Defendant had limited and discrete obligations under Phase II.

51.     In Phase II of the Settlement Agreement, Plaintiffs and others were required to make a further payment of at least approximately DKK 600 million, subject to various adjustments, on or before three years from the effective date of the Settlement Agreement, which was extended by an additional year by operation of the Letter Agreement.  Thus, the Settlement

Agreement provides that a further payment of at least approximately DKK 600 million, subject to further adjustments, be made on or before May 28, 2023.

52.     Plaintiffs and others were also required to "fully cooperate with the investigation by [Defendant] of third parties" who were not released by operation of the Settlement Agreement.  The cooperation obligations included, in general, the provision of documents and information by Plaintiffs and also required that Plaintiffs' use of "their best efforts to ensure that their cooperation with [Defendant] is meaningful and productive."

53.     In performing their obligations under Phase II of the Settlement Agreement, Plaintiffs made several substantial payments.  The payments by Plaintiffs started in or around June 2020.  These payments totaled approximately DKK 37.8 million, the approximate U.S. dollar equivalent of $5.71 million.

54.     Also as a part of their Phase II performance and pursuant to the Letter Agreement, Plaintiffs provided approximately ten quarterly reports regarding the efforts by them to liquidate certain agreed-upon assets and, thereby, generate cash to be able to make the further payments required under Phase II of the Settlement Agreement.  Plaintiffs began to provide these reports beginning on or about August 26, 2019.

55.     As a further part of their Phase II performance, Plaintiffs produced over 90,000 documents to facilitate Defendant's litigation efforts in the United States.  Plaintiffs also researched and answered numerous substantive questions posed by Defendant in connection with Defendant's prosecution of its claims against others.  Plaintiffs also expended substantial time and resources supporting Defendant's requests for assistance in its prosecution of claims against other parties in actions that Defendant initiated in Dubai, the United Kingdom, and the United States.

4882-9415-2529

56.     As alleged above, payments to be made during Phase II of the Settlement Agreement could be subject to various adjustments.  In the event there was a "claim, controversy or dispute" "arising out of or relating to" these adjustments that amounted to less than DKK 20 million, the approximate U.S. dollar equivalent of $2.85 million, the parties to the Settlement Agreement agreed to arbitrate such claim, controversy, or dispute before an arbitrator identified in the Settlement Agreement.  The parties also had the right, but not the obligation, to arbitrate claims, controversies, or disputes relating to the payment adjustments that amounted to more than DKK 20 million.

57.     In exchange for what Plaintiffs promised to do under Phase II of the Settlement Agreement, Defendant had only limited and discrete obligations under Phase II.  Substantially all of the consideration provided by Defendant for the obligations in Phase II is contained in Sections 8 and 9 of the Settlement Agreement.  Each of these obligations reflected the paramount concern of Plaintiffs about the possibility of being criminally charged by SØIK, Plaintiffs' desire to minimize the chances that SØIK would initiate criminal charges against them in Denmark, and Defendant's recognition of these motivations.

58.     First, Defendant and Plaintiffs agreed that the Settlement Agreement "is, and is intended to be maintained as, confidential to the fullest extent possible under Danish law, New York law or the law applicable in any jurisdiction in which [Defendant] seeks to use" information provided by Plaintiffs as a result of Plaintiffs' obligation to cooperate with Defendant.  As a result, Defendant and Plaintiffs "agree[d] to use their respective best efforts to maintain such confidentiality consistent with the terms set forth in" Section 8.

59.     Second, Defendant promised that it would limit disclosure of the Settlement Agreement, or its contents, to only the Danish Ministry of Taxation and to various other

12

components of the Danish government, with disclosure being solely for the "purpose of seeking authority for the entry into th[e Settlement] Agreement by [Defendant] or if compelled by operation of law or regulation."

60.     Defendant was also permitted to publicly disclose limited aspects of the Settlement Agreement.  Those aspects that could be disclosed did not include the identity of Plaintiffs or the other parties to the Settlement Agreement.

61.     Third, Defendant promised to give prompt, written notice to SØIK of certain exact matters specified in detail in Section 8(f) of Settlement Agreement.  Specifically, Defendant promised that:

> Notwithstanding the confidentiality obligations of this Section 8, promptly upon the execution of this Agreement, Skatteforvaltningen will, in writing, bring to the attention of the Danish Public Prosecutor for Serious Economic and International Crime ("SØIK") this Agreement and its terms, and represent, in writing, that this Agreement reflects good-faith negotiation by the Covered Parties, that the Covered Parties' cooperation may result in the recovery by Skatteforvaltningen of additional funds from third parties and that this Agreement is in the best interests of Skatteforvaltningen. Upon request by SØIK, Skatteforvaltningen may provide and/or disclose the entirety of this Agreement to SØIK.

62.     The requirements of Section 8(f) of the Settlement Agreement, including the writing requirement, were material.

63.     Because Plaintiffs were concerned of the possibility of criminal charges in Denmark and sought to minimize the chances that SØIK would initiate criminal charges against them in Denmark, which Defendant recognized, it was of the utmost importance to Plaintiffs that Defendant itself -- which claimed to be the victim of a fraudulent scheme -- and not anyone else, including Plaintiffs themselves, promptly communicate to SØIK Plaintiffs' good faith efforts to make Defendant whole, their cooperation with Defendant, the substantial payments made under

the Settlement Agreement, and the requirement that there be further payments under the Settlement Agreement, among other things.

64.     The writing required by Section 8(f) ensured that SØIK was informed of Plaintiffs' efforts and the terms of the Settlement Agreement via an official, written statement of the views of Defendant.  Without a writing, Plaintiffs:

(a)     could not be assured that SØIK was informed of Plaintiffs' efforts;

(b)     could not be assured that any information imparted to SØIK would become part of the official records and institutional memory of SØIK; and

(c)     could not be assured that the information imparted would be available in precisely the words agreed to by the parties to the Settlement Agreement to influence new and different actors within SØIK that might ultimately play a role in the decision whether to criminally charge Plaintiffs.

65.     The requirements of Section 8(f) were also material because, among other reasons, it was important that the Danish prosecutor, SØIK, be made aware promptly and in writing that the understanding of the parties to the Settlement Agreement and a "fundamental principle" on which it was based was that Plaintiffs and others were paying to Defendant the full amount of proceeds that Plaintiffs and others received directly or indirectly as a result of tax refund applications that were made to Defendant and that were the basis of Defendant's claims against Plaintiffs and others.  Beyond that, it was important, and was reflected in the Settlement Agreement, that SØIK be made aware promptly and in writing that Plaintiffs, among others, "ha[d] expressed a willingness to use their best efforts and full cooperation to assist [Defendant] in various proceedings related to the subject matter" of the dividend tax refund applications at issue.

14

66.     Finally, the Settlement Agreement contained in Section 9 a non-disparagement clause that, in general, precluded Defendant, among others, from making statements that were "disparaging, derogatory or defamatory of or reasonably likely to damage" Plaintiffs, their reputations, business or affairs, nor could Defendant induce any person or entity to do so.

**Defendant Breaches the Phase II Obligations of the Settlement Agreement**

67.     Despite the simplicity of complying with these obligations and the ease with which it could have done so, Defendant did not fulfill, and breached the obligations in Section 8(f) of the Settlement Agreement to "promptly upon the execution of the Settlement Agreement":

(a)     "in writing" "bring to the attention of SØIK "th[e Settlement] Agreement and its terms"; and

(b)     "represent, in writing, that th[e Settlement] Agreement reflects good-faith negotiation by [Plaintiffs and others], that . . . cooperation [by Plaintiffs and others] may result in the recovery by [Defendant] of additional funds from third parties and that th[e Settlement Agreement] is in the best interests of [Defendant]."

68.     Defendant's breach of its obligations under Section 8(f) of the Settlement Agreement was willful and so substantial and fundamental as to strongly tend to defeat the object of the parties in entering into the Settlement Agreement.

69.     Defendant's breach of its obligations under Section 8(f) of the Settlement Agreement does not comport with basic standards of good faith and fair dealing.

70.     Defendant's breach of its obligations under Section 8(f) of the Settlement Agreement further frustrated the intent of the parties in agreeing to Section 8(f) because of extensive leaks of the Settlement Agreement that occurred in the months after the May 2019

Settlement Agreement, which created an environment that was deeply antithetical to any result other than that Plaintiffs should be criminally charged in Denmark and that continued for years after the leaks began in or around September 2019.  These leaks eviscerated one of the two primary forms of consideration that Plaintiffs obtained in Phase II of the Settlement Agreement.

71.     For example:

(a)     In or about late September 2019, Plaintiffs' names were disclosed in the Danish media as, in substance, the "previously unknown masterminds of the dividends case."

(b)     The Danish media obtained a copy of the Settlement Agreement and publicized extensive criticisms of its terms, including from persons claiming to be experts in Danish law, suggesting that the terms of the Settlement Agreement were not favorable to Denmark and were excessively favorable to Plaintiffs and other parties to the Settlement Agreement.

(c)     A former Danish Minister of Taxation publicly stated, in substance and in part, that, in Denmark, it was impossible to make a settlement to escape criminal prosecution if illegal conduct has been committed and that the Settlement Agreement did not alter SØIK's efforts in relation to Danish criminal law, such that SØIK could still prosecute Plaintiffs, the fair inference of which was that SØIK might, and should, criminally prosecute Plaintiffs.

(d)     An official of Defendant indicated, in substance and in part, that, while the terms of the settlement were good, he thought that everyone across the country of Denmark, including himself, was deeply outraged by what had happened in the case.

72.     These leaks, and many others, made it all the more important, and the obligation to do so became more material, that Defendant communicate in writing to SØIK the terms of the Settlement Agreement and memorialize, and communicate in writing, its official positions that

the Settlement Agreement represents Plaintiffs' good-faith negotiation, Plaintiffs' cooperation might result in additional recovery beyond what was to be paid under the Settlement Agreement, and the Settlement Agreement was in the best interests of Defendant.

**Plaintiffs Are Charged in Denmark**

73.     As part of their efforts to cooperate with the investigation of SØIK and to avoid criminal charges in Denmark, Plaintiffs each participated in a voluntary interview with SØIK. Plaintiffs' interviews occurred over multiple days.  Plaintiff Lhote's interview occurred on or about March 3 through March 5, 2021, and Plaintiff Stein's interview occurred on or about March 10 through March 12, 2021.  Over the course of the multi-day interviews and as part of their efforts to cooperate, Plaintiffs answered numerous questions about the conduct that SØIK was investigating.  These interviews occurred nearly two years after the Settlement Agreement had been entered into.

74.     During the interviews, the representatives of SØIK did not ask substantially any questions of either of the Plaintiffs about the Settlement Agreement, its terms, Plaintiffs' good faith negotiations with Defendant, Plaintiffs' past and ongoing cooperation with Defendant, or Plaintiffs' efforts to ensure that Defendant recouped all of the tax refunds that had been paid out to pension plans associated with Plaintiffs.  During the interviews, a representative of SØIK confirmed, in substance and in part, that SØIK did not even have a copy of the Settlement Agreement and, further, that SØIK would like to have a copy of the Settlement Agreement.

75.     Several weeks later, on or about April 13, 2021, SØIK indicted Plaintiffs, among others, for fraud of a particularly aggravated nature under Sections 88(1), 279, and 286(2) of the Danish Criminal Code.  Under Danish criminal law, Plaintiffs face a term of imprisonment of up to twelve years for a violation of these provisions.

17

76.     Plaintiffs were charged together with three other individuals who had not proactively cooperated with Defendant, had not negotiated in good faith with Defendant, and had not been part of any efforts to ensure that Defendant was repaid any tax refunds that it had paid. Plaintiffs were charged with precisely the same criminal offense and using the same charging language as the three other individuals who had not made any of the efforts that Plaintiffs had. The fair inference is that SØIK considered Plaintiffs identically situated to these three other criminal defendants.

77.     In the period immediately following the indictment, U.S. counsel for Defendant was repeatedly requested to provide the written communication from Defendant to SØIK required by Section 8(f) of the Settlement Agreement.

78.     On or about June 9, 2021, each of Plaintiffs provided an updated affidavit of confession of judgment concerning, in general, payments to be made during Phase II of the Settlement Agreement (the "2021 Affidavit of Confession of Judgment").  Doing so was a requirement of Phase II of the Settlement Agreement and was designed to facilitate Defendant's collection of payments to be made as required by Phase II of the Settlement Agreement in the event of a failure to make those payments or another breach of Phase II of the Settlement Agreement.

79.     Despite repeated requests, U.S. counsel for Defendant never provided to Plaintiffs the written communication from Defendant to SØIK required by Section 8(f) of the Settlement Agreement.  Nor, despite repeated requests, has U.S. counsel for Defendant ever indicated, confirmed, or even suggested that the required written communication to SØIK was provided by Defendant.

18

80.     Defendant was required by Section 8(f) of the Settlement Agreement to provide the writing specified in that section "promptly upon the execution of th[e Settlement] Agreement," which occurred on or about May 28, 2019.  In light of the passage of time and the criminal charges that SØIK has brought, Defendant has no ability to cure its failure to perform its obligations under Section 8(f) and doing so now would not serve any of the purposes intended by the parties in agreeing to Section 8(f).  For the same reasons, it would be futile for Plaintiffs to request that Defendant cure Defendant's non-compliance with its obligations under Section 8(f) of the Settlement Agreement.

**The 2021 Affidavit of Confession of Judgment Is Invalid and Unenforceable**

81.     As alleged above, Plaintiffs were required by the Settlement Agreement to provide, and did provide, the 2019 Affidavit of Confession of Judgment and, approximately two years later, the 2021 Affidavit of Confession of Judgment.

82.     The 2019 Affidavit of Confession of Judgment was provided in the form attached to the Settlement Agreement.

83.     The 2019 Affidavit of Confession of Judgment stated, and Lhote swore under oath in it, that he "resides in New York County."  At the time that he executed the 2019 Affidavit of Confession of Judgment, Lhote resided in New York County.

84.     The Settlement Agreement also attached a form for the Updated Affidavit of Confession of Judgment to be provided approximately two years after execution of the Settlement Agreement.  The form updated affidavit of confession of judgment attached to the Settlement Agreement stated, and proposed that Plaintiff Lhote swear under oath, that he "resides in New York County."

19

85.     In or about late August 2019, approximately three months after execution of the

Settlement Agreement, CPLR 3218, which governs judgments by confession, was amended.

CPLR 3218 was amended to preclude the use of affidavits of confession of judgment with

respect to those residing outside of the State of New York at the time of execution of the

affidavit of confession of judgment or at the time of filing.  The amendment also eliminated the

ability of a non-resident of the State of New York to authorize the entry of judgment in any

county in New York and the ability of a non-resident to designate the county in New York in

which an affidavit of confession of judgment may be filed.  The amendment took effect

immediately and applied to affidavits of confession of judgment executed on or after the

effective date of the late August 2019 amendment.

86.     Under the version of CPLR 3218 in effect since approximately late August 2019,

an affidavit of confession of judgment may only be filed in the county in New York "where the

defendant's affidavit stated that the defendant resided when it was executed or where the

defendant resided at the time of filing."

87.     By the time that Plaintiffs were required under the Settlement Agreement to

provide the updated affidavit of confession of judgment in or about June 2021, Plaintiff Lhote

resided outside of the State of New York.  As a result, the form of updated affidavit of

confession of Judgment attached to the Settlement Agreement was amended to reflect his true

residence.  The 2021 Affidavit of Confession of Judgment that Plaintiff Lhote, in fact, executed,

stated, and Plaintiff Lhote swore in it, that he "resides in Orange County, Florida."

88.     Failure to make the payments required in Phase II of the Settlement Agreement on

or before May 28, 2023, is an event of default that would, if the Settlement Agreement remained

in effect, permit Defendant to file the 2021 Affidavit of Confession of Judgment and, thereafter, take steps to collect any judgment that might be entered as a result.

89.     The 2021 Affidavit of Confession of Judgment is unenforceable as against Plaintiff Lhote because Plaintiff Lhote was not a resident of New York at the time that the 2021 Affidavit of Confession of Judgment was executed, does not currently have any residence in the State of New York, and has no present intention to establish residence in the State of New York. Accordingly, there is no county in the State of New York in which Defendant can file the 2021 Affidavit of Confession of Judgment.

90.     In addition, the 2021 Affidavit of Confession of Judgment does not state a sum for which a judgment may be entered, but rather is predicated upon facts, and an extraordinarily complicated series of calculations, that are reasonably disputable and, indeed, are actually in dispute between Plaintiffs and Defendant.  To determine the amount of any judgment would require consideration of facts and documents that are external to the 2021 Affidavit of Confession of Judgment and would also require credibility determinations and complex valuations to calculate the amount of any judgment.  The 2021 Affidavit of Confession of Judgment also misstates the facts out of which the claimed debt might arise and the legal basis for any such debt.  In addition, as a result of Defendant's breach of its obligations under Phase II of the Settlement Agreement, no debt by Plaintiffs to Defendant is justly due or to become due.

91.     The 2021 Affidavit of Confession of Judgment is, therefore, invalid, null and void, and unenforceable.

## FIRST CAUSE OF ACTION
### (Breach of Contract)

92.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 to 91 as if fully set forth herein.

93.     Plaintiffs and Defendant entered into the Settlement Agreement and the Letter Agreement on or about May 28, 2019.

94.     To date, Plaintiffs have substantially performed their obligations under the Settlement Agreement and the Letter Agreement.

95.     Defendant breached its obligations under Phase II of the Settlement Agreement.

96.     Defendant's breach was material.

97.     Defendant's breach was willful and so substantial and fundamental as to strongly tend to defeat the object of the parties in entering into the Settlement Agreement.

98.     Defendant's breach does not comport was basic standards of good faith and fair dealing.  Defendant's breach cannot be cured.

99.     By reason of Defendant's breach, Plaintiffs were deprived of the benefit of the bargain under Phase II of the Settlement Agreement.

100.    Having paid approximately $5.71 million to Defendant in compliance with its obligations under Phase II of the Settlement Agreement, but not having received the benefit of the bargain under Phase II of the Settlement Agreement, Plaintiffs have been damaged as a result of Defendant's breach of its obligations under Phase II of the Settlement Agreement.

101.    No debt by Plaintiffs to Defendant is justly due or to become due.

4882-9415-2529

## SECOND CAUSE OF ACTION
### (28 U.S.C. § 2201 *et seq.*, Declaratory Judgment)

102.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 to 91 as if fully set forth herein.

103.    The Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, permits this Court to declare the rights and other legal relations of the parties to this dispute.

104.    An actual controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment in favor of Plaintiffs has arisen.

105.    A judicial declaration is necessary and appropriate so that Plaintiffs can avoid imminent damage from the filing of the 2021 Affidavit of Confession of Judgment.

106.    Therefore, Plaintiffs are entitled to a declaration that the 2021 Affidavit of Confession of Judgment is unenforceable, void, null and void and should be vacated and set aside.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request judgment against Defendant as follows:

i.    Finding that Defendant breached its obligations under Phase II of the Settlement Agreement;

ii.    Finding that Defendant's breach was material;

iii.    Finding that Defendant's breach was willful;

iv.    Finding that Defendant's breach does not comport with basic standards of good faith and fair dealing;

v.    Awarding Plaintiffs the remedy of rescission of Phase II of the Settlement Agreement and the Letter Agreement;

4882-9415-2529

      vi.     Discharging Plaintiffs from any further obligations under Phase II of the Settlement Agreement and the Letter Agreement, including any further payment obligations;

      vii.     Voiding, setting aside, vacating, and otherwise declaring invalid and null and void the 2021 Affidavit of Confession of Judgment as to Plaintiffs;

      viii.     Disgorging, or restituting, to Plaintiffs payments made by Plaintiffs to Defendant during Phase II of the Settlement Agreement plus pre- and post-judgment interest under New York law;

      ix.     Restoring Plaintiffs and Defendant to the condition in which they were as of the completion of the parties' performance with the Phase I obligations;

      x.     Awarding Plaintiffs damages in an amount to be determined for breach of Phase II of the Settlement Agreement; and

      xi.     Granting such other, further, and different relief as the Court deems just and proper.

Dated: New York, New York
      March 24, 2023

                           MCKOOL SMITH P.C.

                           By:                        
                                Daniel W. Levy
                                dlevy@mckoolsmith.com
                                One Manhattan West
                                395 Ninth Avenue, 50th Floor
                                New York, New York  10001-8603
                                Telephone: (212) 402-9400

                                *Attorney for Plaintiffs Matthew Stein
and Jerome Lhote*