O5LHSteO

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  MATTHEW STEIN, *et al.*,

4           Plaintiffs/Counterclaim
             Defendants,
5
                 v.                          23 Civ. 2508 (NRB)
6
   SKATTEFORVALTNINGEN, *et al.*,
7                                            Oral Argument

8           Defendants/Counterclaim
             Plaintiffs,
9
                 v.
10 LUKE McGEE

11           Counterclaim Defendant.

12 ------------------------------x
                                             New York, N.Y.
13                                           May 21, 2024
                                             3:05 p.m.
14
   Before:
15
                    HON. NAOMI REICE BUCHWALD,
16
                                             District Judge
17
                         APPEARANCES
18
   MCKOOL SMITH & HENNIGAN
19      Attorneys for Plaintiffs/Counterclaim Defendants Matthew
   Stein and Jerome Lhote
20 BY:  DANIEL W. LEVY

21 HUGHES HUBBARD & REED LLP
        Attorneys for Defendant/Counterclaim Plaintiff SKAT
22 BY:  MARC WEINSTEIN
        GREGORY CHARLES FARRELL
23      WILLIAM R. MAGUIRE

24 BROAD AND CASSEL
        Attorneys for Counterclaim Defendant Luke McGee
25 BY:  DANIEL S. NEWMAN

O5LHSteO

```
 1              (Case called)
 2              THE COURT:  Good afternoon.  You may be seated.
 3              THE LAW CLERK:  This is Stein v. SKAT, 23 Civ. 2508.
 4    Is the plaintiff present and ready to proceed?
 5              MR. LEVY:  Good afternoon, your Honor.
 6              Daniel Levy for Matthew Stein and Jerome Lhote,
 7    L-h-o-t-e, and Mr. Stein is in the rear of the courtroom.
 8              THE COURT:  Wait.  Hi, Mr. ——
 9              MR. LEVY:  The gentleman in the light-colored suit and
10    the green tie.
11              THE COURT:  All right.
12              THE LAW CLERK:  And is the defendant SKAT present and
13    ready to proceed?
14              MR. WEINSTEIN:  Yes, your Honor.  Marc Weinstein, Bill
15    McGuire, and Gregory Farrell from Hughes, Hubbard & Reed on
16    behalf of SKAT.
17              THE LAW CLERK:  And finally, is counsel for Mr. McGee
18    present and ready to proceed?
19              MR. NEWMAN:  Yes.  Good afternoon, your Honor.
20              Daniel Newman on behalf of Luke M. McGee from Broad
21    and Cassel.
22              THE COURT:  All right.  I asked you to come in because
23    of the pending correspondence and because I have several
24    questions, and I'm hoping that your answers are fulsome since I
25    have a sense that there are major portions of this story that
```

O5LHSteO

1    have not been shared with the Court.

2            Let me make it clear that I'm not saying that any

3    lawyer has been unethical, but, rather, that the gaps are

4    leading to serious skepticism about what I'm being told.

5            So let's just begin with this question:  What is the

6    status of the criminal case in Denmark?

7            MR. LEVY:  Sure, your Honor.  The criminal case has

8    been pending for some time Mr. Lhote, Mr. McGee, and Mr. Stein

9    were originally charged in about April of 2021.  They were

10   charged with several other people.  None of those people has

11   appeared in the Danish criminal case.  They're at large.

12           As the initial discussions between Mr. Stein and

13   Mr. Lhote and Mr. McGee with the Danish prosecutors concerned

14   making sure that there was some security that they would appear

15   when necessary and they had a number of discussions with the

16   Danish prosecutors about providing the Danish prosecutors with

17   their passports to ensure that they would appear when

18   necessary, and as of now they've not needed to appear for

19   trial.

20           There's a related criminal case going on against

21   someone named Sanjay Shah.  He's charged in a separate charging

22   instrument in Denmark.  And the hearings —— the trial of him is

23   ongoing and is expected to continue for some time.  I believe

24   into the first quarter of 2025.  The way that criminal trials

25   unfold in Denmark is it's not like here where it continues day

O5LHSteO

1   to day and then it's done.  There's a couple of days here, a

2   couple of days there, and they are scheduled long in advance.

3        THE COURT:  Are there no juries?  Do you know?  That's

4   just a curious question.

5        MR. LEVY:  I think there's a — the decision is made

6   by a panel of individuals.  I don't think it would be quite

7   what you and I would call a jury, but that recollection is a

8   little bit fuzzy.  It's been explained to me, but I don't have

9   immediate recall of exactly how the decisions are made.

10       But, again, there's another defendant who is, in

11  effect, on trial, and that trial is expected to occur — I

12  believe that the dates have been scheduled as far out as

13  sometime in early 2025.  I have the schedule somewhere.  If the

14  courts want it, I can provide it, or I can provide more detail

15  in another manner.

16       THE COURT:  From what you said, would I be correct in

17  understanding that neither Mr. Stein, Mr. Lhote, nor Mr. McGee

18  have ever made a physical appearance in Denmark?

19       MR. LEVY:  They have not had to make a physical

20  appearance.  They've not been required to make a physical

21  appearance.  They're not fugitives.  The lawyers had an

22  arrangement with the prosecutor in Denmark about ensuring that

23  they would come to court when necessary, but it's not like here

24  where someone needs to make an initial appearance in order to

25  sort of start the ball rolling.  They've had productive and

O5LHSteO

| | |
|---|---|
| 1 | professional discussions with the prosecutor in Denmark that |
| 2 | they will appear when necessary, and their passports —— they've |
| 3 | surrendered their passport so that they cannot go anywhere. |
| 4 | THE COURT:  They're confined to the United States? |
| 5 | MR. LEVY:  Effectively confined to the United States. |
| 6 | That's my understanding. |
| 7 | And there's been no schedule set for further |
| 8 | proceedings, like a trial, in their criminal case. |
| 9 | THE COURT:  OK. |
| 10 | MR. LEVY:  There's aspects of the Danish criminal case |
| 11 | that are complicated.  They've been complicated for me to |
| 12 | understand as well. |
| 13 | THE COURT:  No.  Honestly, it was a fairly |
| 14 | straightforward question, which is what's going on there? |
| 15 | That's all. |
| 16 | MR. LEVY:  Yeah. |
| 17 | THE COURT:  If anything. |
| 18 | MR. LEVY:  Yeah.  And hopefully, you now have an |
| 19 | answer, and if there's some aspect you'd like me to get further |
| 20 | information on, please let me know. |
| 21 | THE COURT:  I think I'm OK. |
| 22 | But Mr. Weinstein has stood up, so maybe there's |
| 23 | something he wants me to know. |
| 24 | MR. WEINSTEIN:  Just to add, your Honor, to give your |
| 25 | Honor as much information as we have, there were two others who |

O5LHSteO

1    were charged.  One by the name of Guenther Grant Klar, who went

2    to trial and was convicted, and then another individual,

3    Anthony Mark Patterson, who pled guilty before his trial and, I

4    think, shortly before Mr. Shah went on trial.  My understanding

5    is that after Mr. Shah's trial is when Mr. Stein, Mr. Lhote,

6    and Mr. McGee would go to trial.

7         MR. LEVY:  Just so it's clear, might as well fill in

8    the details, those two defendants whose guilt has already been

9    determined, they are not charged together with Mr. Stein and

10   Mr. Lhote and Mr. McGee.  They're charged in a separate

11   charging instrument, as is Mr. Shah, the Mr. Shah who's on

12   trial.  And the timing of Mr. McGee and Mr. Lhote and

13   Mr. Stein's trial will in part depend on whether some of the

14   defendants, who have not engaged with the prosecutor at all,

15   are somehow located.

16        THE COURT:  OK.

17        MR. LEVY:  Again, I don't have visibility into sort of

18   the next stage of the case.

19        THE COURT:  That's fine.

20        All right.  So with respect to the amended —— or

21   proposed amended complaint, I really hadn't quite intended to

22   set off this level of almost kerfuffle.

23        Let me say that as far as the law goes on whether a

24   stipulation containing a date to file an amended pleading is

25   sufficient to constitute consent to an amended pleading, I can

O5LHSteO

1    appreciate both sides of the argument, both types of cases.

2    And I'd say that if I needed to apply the law, I would say it

3    depends on the nature of the amendment proposed, but I'm not

4    sure that we have to get there.

5            So let me ask a couple of questions.  So, first, other

6    than re-denominating Mr. McGee as a nominal defendant, does the

7    proposed amended complaint do anything else of significance?

8            MR. LEVY:  It depends on the meaning of

9    "significance."

10           THE COURT:  Tell me what it does.

11           MR. LEVY:  I'm perfectly happy to provide to the Court

12    sort of a comparison of the original complaint against the

13    amended complaint if it would help the Court.

14           THE COURT:  We maybe should have asked for that

15    already.

16           MR. LEVY:  I happen to have one copy.

17           THE COURT:  Could I borrow it?

18           MR. LEVY:  You can.

19           THE COURT:  I'll give it back.

20           MR. LEVY:  OK.  And I apologize, I anticipated ——

21           THE COURT:  It's my fault.  We tend to ask for that.

22           MR. LEVY:  Most of the changes —— before your Honor

23    sort of wades into it, most of the changes sort of just

24    identify the parties a little bit differently, just to make it

25    a little more concise and not full of so many words.  There are

O5LHSteO

1    some additional factual allegations about communications by

2    SØIK to the Department of Justice that confirm that SØIK did

3    not have visibility into the settlement agreement.  And I

4    can ——

5              THE COURT:  I'm familiar with that from something

6    else.

7              MR. LEVY:  But in general, it doesn't change the

8    nature of the legal theories that are articulated.  The biggest

9    substantive change is ensuring that Mr. McGee is a party to the

10   cause of action by which we seek rescission so that there's no

11   doubt that the Court can, if it gets there, provide for full

12   relief.  Again, we explain the reason for this in our letter.

13             THE COURT:  OK.  Well ——

14             MR. LEVY:  But that's essentially it.

15             THE COURT:  All right.  Let me first ask Mr. Weinstein

16   a question.

17             Is SKAT still pursuing the defense that plaintiffs

18   have failed to join a necessary party?

19             MR. WEINSTEIN:  Certainly not with respect to

20   Mr. McGee, so I'll explain that.

21             We agree that the fact that we had named Mr. McGee as

22   a counterclaim defendant takes care of any issue that he's not

23   a party to the case and therefore the Court may not be able to

24   address the rescission claim.  We have it still in our answer

25   really as a belt-and-suspenders because there are other parties

O5LHSteO

1    to the settlement agreement.  It's not just these three

2    individuals.  There were many settling parties.

3         Be up front with the Court.  We do not expect there to

4    be a need to press that defense, but at the outset of the case

5    we put it in because you can't anticipate where they're

6    necessarily going with everything.  But we don't see that as an

7    issue in the case as to whether the parties necessary here are

8    really joined so that the Court can address it.

9         THE COURT:  But the other parties have paid whatever

10   they were required to pay, correct?

11        MR. WEINSTEIN:  Correct, correct.

12        THE COURT:  So there's no relief that you could be

13   seeking from them, right?

14        MR. WEINSTEIN:  We're certainly not seeking relief

15   from them in this case.  The issue is they were seeking

16   rescission of the settlement agreement, the plaintiffs were.

17   We think for sure Mr. McGee is a necessary party for the Court

18   to address rescission because he still has obligations under

19   the agreement.  The other parties don't.  We had it in there as

20   a defense, in case somehow it became an issue, but we do not

21   see that as an issue for the Court.  We do not think that an

22   amendment here is necessary to add Mr. McGee as a nominal

23   defendant at this point.

24        THE COURT:  Well, is it like chicken soup; you know,

25   it can't hurt?

O5LHSteO

```
 1              MR. WEINSTEIN:  I'm not sure that's why one would

 2    amend a complaint.  Can it hurt?  No.  Should the Court permit

 3    an amendment?  No.  And I can explain that.

 4              THE COURT:  In other words, if Mr. Levy had sent you

 5    this redline and said:  Mr. Weinstein — maybe address you by

 6    your first name — would you consent to us filing this?  What

 7    would you have — you would have said no?

 8              MR. WEINSTEIN:  The only issue it raises, your Honor,

 9    is it's unnecessary to the case.  It's not clear why they need

10    this amended complaint.

11              THE COURT:  We don't always know why the other side

12    wants whatever it is that they want.

13              MR. WEINSTEIN:  True.  But putting aside they don't

14    need the nominal defendant — I think it sounds as though

15    everyone agrees on that — the only other real amendments in

16    here are some facts, for example, as Mr. Levy said, regarding

17    SØIK's, not SKAT's, communication with the Department of

18    Justice.  They're facts unnecessary in the complaint, for sure.

19    If they want to bring them to trial or — the prejudice at this

20    point is (1) we should be closing the pleadings.  So this an

21    unnecessary amendment that requires answers by people.  We're

22    extending pleadings unnecessarily.  They have argued now — we

23    put in a pre-motion conference letter to your Honor on a

24    judgment to the pleadings.  One of their arguments is —

25              THE COURT:  We'll talk about that later.
```

O5LHSteO

1          MR. WEINSTEIN:  Right, but their argument is it's

2     premature.  At least that's one of their argument.  So that is

3     a prejudice to why are we going through another set of

4     pleadings that have no real purpose to move this case along?

5          Putting that aside, is there additional prejudice?

6     No, I can't tell you there's more prejudice than that.

7          THE COURT:  I guess one of the things that I'm

8     actually most curious about is the following:

9          Mr. Levy, or perhaps Mr. Newman, is there an

10    explanation that can be shared with the Court as to why

11    Mr. McGee is not one of the named plaintiffs, since he seems to

12    be similarly situated to the others?

13         MR. NEWMAN:  So, Judge, I can't answer that because we

14    were not part of the filing of the complaint.  We were not a

15    party to that.

16         THE COURT:  I would have guessed that you were asked,

17    but I'm not seeking attorney-client privileged information.

18         MR. NEWMAN:  I can't answer that for myself.  I can

19    tell you that this attorney was not part of that.  So that

20    would —— I can't answer that question as to whether any other

21    attorney was.  Our firm was not, and we were not part of the

22    complaint.

23         THE COURT:  And would I gather that you've not sought

24    to be joined as an actual plaintiff?

25         MR. NEWMAN:  Yes, your Honor.  We did not request to

1    be joined as an actual plaintiff.

2            THE COURT:  So am I going to go out of this conference

3    as uninformed as I came in as to why there is this rather odd

4    structure in this complaint?  That may be where I'm going to

5    be.  I'm not saying that that's unacceptable.  It doesn't

6    certainly satisfy my curiosity.

7            MR. LEVY:  Fair enough.  I'd be happy to explain *ex*

8    *parte* a little bit more why sort of this series of events

9    occurred in the way that it did.  We want to make sure that

10   SKAT does not say at some later date either that person or that

11   set of people need to be parties to this case in a certain way,

12   otherwise the Court cannot order rescission.

13           Mr. Weinstein said we're not intending to press that,

14   and that's all well and good, but without a little more

15   definitiveness, I don't know if that's quite good enough.  This

16   is the reason why we were a little bit confused, because in the

17   initial letter briefs that were filed early on, SKAT said

18   Mr. McGee needed to be a party for the Court to be able to

19   order rescission.  If we didn't amend, they would make him a

20   party.  They did make him a party, and then they continued to

21   assert this failure to join an indispensable party defense.

22           So we're thinking what is going on?  We're not going

23   to stand by and get to the end of the case and have someone

24   say:  Excuse me, Mr. McGee is not either here or here in the

25   way that we say he should be here.  Therefore, you're out.  We

1    were not going to have that.

2              There was a little bit of —— I would be sort of

3    characterizing it gently to say an equivocation on the part of

4    SKAT, so we fixed it on our own.  And that's the reason why we

5    did it this way.  We weren't trying to create extra work for

6    anyone.  We were trying to make sure, if there comes a time

7    that the Court finds in it that it should order rescission,

8    everyone necessary to do that is before the Court.

9              It was helping helpful to hear Mr. Weinstein confirm

10   that the remaining parties to the settlement agreement don't

11   have any further obligations, and as a result, they don't need

12   to be here.  That's helpful, but I'm not sure it quite goes all

13   the way.

14             THE COURT:  All right.

15             MR. LEVY:  And that's the reason we sought to do it

16   this way.

17             MR. NEWMAN:  And, Judge, I should add, I don't recall

18   whether we were asked to be part of it, but I do know that we

19   were never a part of it.  When this thing was filed, it was a

20   while ago.  I do not recall us being asked to be a part of it,

21   but that could be incorrect.  It's been probably a year since

22   it was filed.  I don't want to say something that's incorrect

23   based on timing, but I do not recall this being something that

24   Mr. McGee certainly initiated.

25             MR. LEVY:  Maybe if I could sort of speak

O5LHSteO

1    hypothetically, maybe I could fill in some of the

2    considerations that someone in the position of Mr. Stein or

3    Mr. Lhote or Mr. McGee might have that might drive their

4    decision-making.

5              THE COURT:  OK.

6              MR. LEVY:  No one wants to antagonize the prosecutor,

7    right, the prosecutor in Denmark?  And you could imagine

8    different people might have different views about whether

9    taking this step to rescind this settlement agreement would

10   provoke the prosecutor in Denmark.  No one wanted to do that.

11   The question is sort of what could do that?  And you could

12   envision that reasonable people would differ about whether

13   that's the right thing to do.

14             I think that's as much as I could say, and hopefully,

15   that helps the Court understand why different people who are

16   arguably identically situated might come to a different view

17   about whether to be on one side of the V or on the other side

18   of the V.

19             THE COURT:  Well, let me say that I don't see any

20   meaningful basis on which I could deny the plaintiffs' request

21   to file the amended pleading, so you have my permission to do.

22             MR. LEVY:  Just, logistically, it's already been

23   filed.  If you order ──

24             THE COURT:  OK.  Then it's OK.  Then it should be

25   answered.

O5LHSteO

1          MR. LEVY:  Thank you, your Honor.

2          THE COURT:  So let's turn to the 2B letters.

3          Let me say at the outset I have deep skepticism about

4    the proposed motion because it seems that if I accepted this

5    position, that it would eliminate the consideration that the

6    plaintiffs bargained for.  But further, the suggestion of this

7    motion at this stage comes across as virtually an admission

8    that SKAT did not make the communications with SØIK that it was

9    required to do.

10          Is that a conclusion that I should be drawing from the

11   proposal?

12          MR. WEINSTEIN:  No, your Honor, that certainly wasn't

13   the intent.

14          THE COURT:  Well, if you did what you're supposed to

15   do, why do you come up with this argument that just seems

16   contrary to every kind of basic notion of fairness that it's a

17   "heads I win, tails you lose" argument?

18          MR. WEINSTEIN:  Well, with respect to the

19   consideration, the key consideration in the agreement, which

20   was provided, released us from the lawsuit.  That's not in

21   dispute that we released the settling parties from being able

22   to bring any claims once they made an initial payment.  So they

23   got the consideration.  In the settlement agreement, that's a

24   key consideration, for sure.

25          With respect to the concession, it is not meant to be

O5LHSteO

1    a concession at all.  The argument is it really does not matter

2    under the agreement whether or not SKAT complied with 8(f).

3    It's in there, but it's not deemed to be an event of default.

4    It cannot be material, ultimately.

5         THE COURT:  How can it not be material?  This type of

6    negotiation is typical, or at least not uncommon, in cases in

7    the United States all the time where the fraud is of a

8    financial nature, whether it's tax fraud or something else, and

9    the prospective defendant is in the position of being able to

10   make the defrauded party or parties whole and tries to pay a

11   ton of money to avoid being criminally prosecuted.  It is not

12   an uncommon fact pattern.

13        This seems to be essentially the same thing.  We've

14   paid the money.  You know, Denmark should find that sufficient,

15   and please let the prosecutor know that.  I don't see how that

16   is insignificant.

17        MR. WEINSTEIN:  So for two reasons, your Honor:  One

18   is I think one answer lies in even your initial question and

19   the answer by Mr. Levy about Danish procedure versus —— Danish

20   criminal procedure versus U.S. criminal procedure.  What may be

21   commonplace in the United States is not necessarily the case in

22   Denmark.  In Denmark, the prosecutors, the criminal

23   prosecutors, cannot bargain that away.  They can't take it into

24   consideration in whether to charge a defendant.  The only time

25   it could be used —— and it's not the prosecutor who makes any

O5LHSteO

1   of that decision —— is if the person gets convicted, it is

2   something, ultimately, that the judge can take into account at

3   sentencing.

4           These folks have not yet been convicted, much less

5   sentenced.  So even assuming there was a breach —— and I'll get

6   to that in a moment, whether there was a breach —— but even

7   assuming there was a breach, not only is it not too late, the

8   only time it could be relevant is perhaps still years away from

9   now.  So the sentencing judge, if they get to that point, can

10  certainly take all this into account.

11          THE COURT:  So that means that when you included this

12  provision in this the agreement, it was illusory at the outset.

13  And you, being the Danish side of it, understood that whatever

14  SKAT said to SØIK was just immaterial.  That SØIK could not

15  consider, as part of its charging decision, the fact that the

16  country had been either made whole or close to whole or

17  significantly better by virtue of the moneys that the

18  wrongdoers had paid over and would pay over.

19          MR. WEINSTEIN:  It's a term that, if my recollection

20  is correct, was something that they wanted.  As you say, no

21  harm, no foul if there wasn't a disagreement to put it in.  But

22  my understanding is that under Danish law that is not something

23  that a prosecutor can take into account in a charging decision.

24          THE COURT:  That seems a little hard to totally

25  comprehend because every charging decision involves many

1     factors.  So why would paying back the stolen moneys, returning

2     the crown jewels, or whatever, why would that not count?  Why

3     would any prosecutor be so limited?

4             What if the family of the victim said:  You know,

5     really, we don't want to go through a trial.  It's over.  We're

6     sad, but we're true forgiving religious people.  We don't want

7     you to do this.  We've forgiven this fellow who killed our

8     family member.  We don't want you to.  You're telling me the

9     prosecutor can't consider more than the fact of the crime?

10    Otherwise, that's just mechanical.

11            MR. WEINSTEIN:  I can't answer that question or

12    hypothetical with any certainty because it's an issue of Danish

13    law.  I understand where your Honor is coming from, and

14    obviously under U.S. law it's a factor that a prosecutor may

15    take into account.  But my understanding is —— there may be an

16    exception or two.  I don't think they would be applicable to

17    our case, but I'm not sure what they are.  So in the case of

18    your Honor's example, I don't know if there would be some kind

19    of exception.

20            But my understanding is they are to —— when they are

21    investigating a case and determining whether to charge, they

22    base it on the facts and the evidence of whether they have

23    enough evidence to bring ——

24            THE COURT:  The logic of what you said is they should

25    never have paid anything because it doesn't matter.  In other

O5LHSteO

 1    words, they might be acquitted, and they could pay after they

 2    were — or if they were convicted, they'd pay it later, and

 3    then the judge would consider it then.

 4          MR. WEINSTEIN:  Well, I think two things:  One is what

 5    would potentially be helpful for them in a criminal case.  The

 6    other is why would they pay at all up front?  It's two

 7    different considerations.  If the issue is how are we going to

 8    convince a sentencing judge, if we ever get there, that the

 9    sentencing judge should go light?  I think there's a good

10    reason to pay up front than to wait to see if you're convicted.

11          THE COURT:  I agree with that.

12          MR. WEINSTEIN:  Right.  That's potentially a

13    motivation if all you care about is your criminal exposure.

14          There's good reason to pay up front because they

15    didn't get — two thing:  They didn't get sued at the time.  I

16    mean, actually, I don't want to go into what their motivations

17    may have been — not being named in public suits, not having

18    the exposure of — the amount they paid back is a subset, less

19    than 50 percent of the losses caused, and they got releases.

20    And the releases are effective, and no one's arguing that the

21    releases are not effective.  So putting aside what they thought

22    about criminal exposure, there was good reason to make the

23    settlement regardless of what Danish criminal law might be.

24          So I don't think there is a reason that they would

25    have just said:  Well, unless you're promising something on the

1    criminal side, we're just not going to settle.

2              They also, I should say, were very, very well lawyered

3    up here, both on the U.S. side and on the Danish side.  This is

4    not an issue of SKAT's just trying to get these three

5    individuals to settle.  They don't have counsel.  They had a

6    bevy of sophisticated lawyers on both sides of the ocean.  So I

7    assume they got advice on all these issues, took that advice

8    into account, and decided to settle.

9              I do want to go back, if it's appropriate at this

10   point, your Honor, to the issue of the breach, why we would

11   bring this motion.

12             THE COURT:  Well, not just why would you bring it, but

13   why do you bring it now?  Why didn't you bring it at the very

14   beginning of the case?

15             MR. WEINSTEIN:  Because it's a judgment on the

16   pleadings.  That's partly why I was saying ──

17             THE COURT:  Well, you had pleadings.

18             MR. WEINSTEIN:  But the pleadings had to be closed.

19   Our understanding of the rule is until the pleadings are

20   closed, meaning ──

21             THE COURT:  Wasn't there the original complaint and

22   you answered it?

23             MR. WEINSTEIN:  There were counterclaims that needed

24   to be answered.  We asserted counterclaims.

25             THE COURT:  Right.

O5LHSteO

1              MR. WEINSTEIN:  They hadn't answered yet.

2              THE COURT:  OK.

3              MR. WEINSTEIN:  That was the only reason we waited.

4    Our understanding of the rule, we simply couldn't file it until

5    all the pleadings were closed.

6              With respect to the breach, there are a number of

7    arguments to make.  I can walk you through the evidence.  I

8    don't have each document at my disposal, but SKAT made SØIK

9    aware of these terms.  I think your Honor had seen the email

10   at, perhaps, our first conference in court where they literally

11   sent to SØIK 8(f), the actual words of 8(f), before it was even

12   —— before the agreement was even signed, in part —— and we

13   produced these documents so it's going to come out —— because

14   SØIK itself, anything that had to do with anything criminal,

15   they wanted to see what it was.  So they fully understood that

16   provision, they were fine with it, and it went into the

17   settlement agreement.  SØIK was fully aware of what was going

18   on with the settlement agreement.

19             There's another email after the settlement agreement

20   was executed that re-sends them the actual language of 8(f).

21   They go back and forth on press releases that were to be issued

22   about the settlement agreement which contain —— I don't know if

23   it's each element of 8(f), but certainly some of the elements

24   of 8(f), like this is in the interest of SKAT to have settled

25   this case, things like that.  They were certainly made aware in

1    writing.

2           The only reason, frankly, to make that motion, in

3    part, because a key issue in the case is whether they breached

4    something that was absolute and unconditional, is the fact that

5    SØIK was informed, ultimately, I don't think can be in dispute.

6    They were also informed orally.  One could take the position

7    that the various writings, taken together and orally, weren't

8    entirely sufficient or ⸺ I'm sorry.  That the settlement

9    agreement provision says it has to be in writing, right?

10          We would say, first of all, they got various documents

11   in writing that informed them of these terms, but there were

12   also discussions, oral discussions, with the highest levels at

13   SØIK.  You could argue, well, the oral discussions don't

14   technically comply with 8(f) because it says "in writing."  OK.

15   But it's immaterial.  That's why I got to materiality before,

16   your Honor.  It's immaterial because, at the end of the day,

17   SØIK knew the information.  The fact that it's not perhaps in

18   the type of letter that Mr. Levy would like it to be in can't

19   be considered a material breach because SØIK knew the

20   information.  So if the point is we needed SØIK to know the

21   information, they knew it.  So a technical breach would not be

22   material.

23          Then we get back to that their obligation was absolute

24   and unconditional.  The term speaks for itself, but ⸺ in any

25   event, so that's why the combination of things is why we

O5LHSteO

1    decided to make a motion.  And the reason we waited is as I've

2    said.  It's our understanding, under the law, we just couldn't

3    bring that sooner.

4            Look, sort of cut to the chase, because we are not

5    trying to make this case harder for the Court.

6            If your Honor thinks there's factual pieces that go

7    into that, right, at the moment at least, we are hoping that

8    the case is decided certainly by December 10, one way or the

9    other.  If it's going to cause too many separate pieces to be

10   done, we can just deal with all of it at once, not make the

11   motion.  It would be part of whatever it is your Honor's going

12   to do to decide this case.  We are certainly not trying to make

13   this case harder, but it was never intended and shouldn't be

14   conceived as an admission that we had an issue with complying

15   with 8(f).

16           THE COURT:  Well, first of all, my reaction has

17   nothing to do with whether we will have one more motion on our

18   docket than not.  That was not remotely on my mind.

19           It really was what I said.  To me it has an

20   unattractive quality because it doesn't seem fair and didn't

21   seem that there was a lot of good law on your side.  I'm well

22   aware that under New York law that —— because it came up in one

23   of the cases earlier this year —— that absolute and

24   unconditional language has purchase in the context of

25   guaranties, but this is not a guaranty.

O5LHSteO

```
1          As I said, if you believe you can really win on the

2   merits, that you did what you were supposed to do, it doesn't

3   seem to me that establishing that you did perform your

4   obligations in terms of SØIK should be that difficult to put on

5   paper, and therefore, it struck me that perhaps it was to avoid

6   the merits.

7          And I certainly was aware of Mr. Levy's submission of

8   a document, I guess, between SØIK and the Department of Justice

9   that indicated that SØIK was unaware.  I have no idea whether

10  that's meaningful.  I don't know who is writing it.  There are

11  chains of authority, and some people know and some people don't

12  know, and that's not necessarily dispositive as to whether SKAT

13  did what it was supposed to do at the level it was supposed to

14  do.  And it may just be that this is a very high-level

15  conversation and that the person who is writing was just —— it

16  was above their pay grade, as it were.

17         MR. WEINSTEIN:  May I pick up on that point, your

18  Honor?

19         THE COURT:  Yes.

20         MR. WEINSTEIN:  So one of the amendments to the

21  complaint, if your Honor —— I don't know if your Honor ——

22         THE COURT:  I still have it.  I've got it here.

23         MR. WEINSTEIN:  So if you look at paragraph —— it

24  would be the new paragraph 67.  I think it's on page 19.

25         THE COURT:  Yes.
```

O5LHSteO

1          MR. WEINSTEIN:  Just to make sure we're on the same,

2     it starts with "The writing required by Section 8(f)"

3          THE COURT:  Yes, I have it.  It's on page 17 on my

4     copy.

5          MR. WEINSTEIN:  Yes.

6          If you look at the next section, your Honor, they made

7     some interesting tweaks to this paragraph.  It says:  "Without

8     a writing, Stein owed McGee (a)," it used to say "could not be

9     assured that SØIK was informed of plaintiffs' efforts."  The

10    amendment says "could not be assured that SØIK, including all

11    of its various components, was informed," and it goes on.

12         And then if you look at (c) —— I'm sorry, (b) they've

13    added another clause.  It used to say "could not be assured

14    that any information imparted to SØIK would become part of the

15    official records and institutional memory of SØIK."  They've

16    added "and would be communicated widely within SØIK."

17         Why are those interesting?  For the very reason your

18    Honor just said.  The communications that SKAT had with SØIK

19    from the very outset were at the very top of SØIK.  Per Fiig

20    was the head of SØIK.  That's who they were communicating this

21    information do.  He signed their indictment.  He knew exactly

22    what he was doing when he signed that indictment.  How they

23    communicated internally within SØIK, we have no idea.  We don't

24    have insight into that.  It doesn't matter.  There's nothing in

25    the settlement agreement that says, as they have now added to

this complaint, "make sure it was communicated widely within

SØIK or that the various components of SØIK would know the

information."

        Can we explain why a low-level SØIK prosecutor in

early 2021 sent a communication to the Department of Justice

asking —— or indicating they didn't know about the settlement

agreement?  No, because that's not us, and certainly their

bosses knew.  So I think it does come —— and that's why they're

tweaking this complaint in that way, because they knew ——

they've now seen the discovery.  The communications happened

between the top levels at SKAT and the top levels at SØIK.

        THE COURT:  Mr. Levy, do you want to say something?

        MR. LEVY:  Just a couple of things.

        Mr. Weinstein said they got the consideration, and I

think your Honor picked up on it.  This was their lifeline.

This was their ability, promptly upon signing the settlement

agreement, to influence the prosecutor in a positive way.  And

I know we've had some back and forth with the Court on that,

but all of the things required by 8(f) would inure to their

benefit in the eyes of the prosecutor:  They settled.  The

settlement was the result of good faith negotiation.  Their

cooperation would assist SKAT in recovering funds from others.

To know the terms of the settlement agreement, all of that, on

balance, would put them in a more positive light and not,

certainly, in a more negative light.

1          That's what they bargained for, and they didn't get

2     that.  That's a factual dispute, and all of the facts will be

3     put before the Court as to whether SKAT did what it was

4     required to do under 8(f).  But this was their lifeline, and

5     they didn't get that consideration.

6          Mr. Weinstein said that the prosecutor cannot take all

7     of these facts, everything that was required to be represented

8     in 8(f), into consideration.  We expect to put before the Court

9     an opinion of a Danish criminal law professor to explain why

10     that's just wrong; that the prosecutor absolutely could have

11     taken this into account and that SKAT's breach is a material

12     one.

13          THE COURT:  Exactly what is the breach, then?

14          MR. LEVY:  The breach is the failure to comply with

15     8(f).

16          THE COURT:  But Mr. Weinstein says we communicated and

17     some of it is in writing, and that, in fact, the prosecutors

18     saw 8(f) before it was born, in a sense.  That's ——

19          MR. LEVY:  I'm perfectly happy to walk through the

20     whole chronology and tell you all the instances in which it's

21     obvious that SØIK didn't know.  Let me give you an example

22     beyond the one —— or let me give you a little bit more context

23     to the communications that we've previously provided to the

24     Court about the interactions between SØIK and the Department of

25     Justice.  This is one of the things we added into the

O5LHSteO

1    complaint.

2           THE COURT:  Just let me ask you a question.

3           MR. LEVY:  Sure.

4           THE COURT:  SØIK filed the criminal charges on ——

5           MR. LEVY:  April 2021.

6           THE COURT:  And the communications with the Department

7    of Justice were when?

8           MR. LEVY:  In 2020.  And the settlement agreement was

9    in May of 2019.

10          So with that structure in mind, in April of 2020, the

11   Danish prosecutor went to the court to get a seizure order, an

12   order permitting that Mr. Stein and Mr. Lhote and Mr. McGee's

13   assets be seized.  In doing so, the Danish prosecutor did not

14   tell the Court —— repeat, did not tell the court —— that

15   Mr. Stein and Mr. Lhote and Mr. McGee had settled.

16          THE COURT:  From which court?

17          MR. LEVY:  A local court in Denmark.  They got a

18   seizure order.  They didn't tell the court this was —— and this

19   is the kind of thing that a Danish lawyer would expect to be

20   told to the court, and we'll explain that through an expert.

21   And they got a seizure order, and they began to have

22   communications with the Department of Justice about getting the

23   Department of Justice to enforce that seizure order.

24          There's a federal statute that allows a U.S. court to

25   enforce a foreign seizure order under certain circumstances.

O5LHSteO

1    And all of the — that string of emails that we previously

2    provided to the Court is part of the back and forth between the

3    Department of Justice and SØIK about whether we, the Department

4    of Justice, can enforce this order.

5          THE COURT:  I don't understand what — why would the

6    failure of SØIK to tell a Danish court about the settlement

7    agreement be material in any way?  In other words —

8          MR. LEVY:  It tends to show that they did not know.

9          THE COURT:  Or that they knew and SØIK had already

10    decided that it was going after your guys and that the first

11    step to do that was the seizure order, and they weren't —

12          MR. LEVY:  But as you saw in that email, a

13    representative of SØIK said to the Department of Justice:  We

14    don't know anything about it.

15          THE COURT:  All right.

16          MR. LEVY:  So, again, I'm perfectly happy to walk

17    through all the facts, but they'll ultimately be put before

18    you, and you'll have to make a determination about whether SKAT

19    complied with the requirement or not.  And all of these emails

20    will be before you, and you'll be able to decide.

21          I'm happy to walk through numerous other examples, but

22    I don't think it's important now because it's just a factual

23    dispute that you'll ultimately have to decide.  But I wanted to

24    make it clear that it is material.  The timing is also

25    material, the fact that it was — that whatever communications

O5LHSteO

1    there were were not promptly upon the execution of the

2    settlement agreement.  We expect to put in some expert

3    testimony on that subject so that the Court understands the

4    Danish law that Mr. Weinstein said would be relevant to this.

5    He's wrong.  A prosecutor can consider it.  And I think your

6    Honor's common sense inclination that it would be an incredibly

7    odd system if the prosecutor could not consider a settlement

8    between the entity that claims it's the victim and the people

9    that it claims to have been defrauded.  And as you might

10   imagine, you're right on this one.  The prosecutor can

11   consider.

12        MR. WEINSTEIN:  Your Honor, if I may, maybe I can cut

13   a little of this short, because this is prompted by our letter

14   motion.

15        THE COURT:  Right.

16        MR. WEINSTEIN:  We will withdraw the letter motion

17   because we want to make clear we have no interest in avoiding

18   the facts of the case or establishing with your Honor that

19   there's not a breach, and certainly, if there is a technical

20   breach, it couldn't have been material for a number of reasons.

21   We would have expected that would have had to come before your

22   Honor anyway because they still would have a claim for breach,

23   but let's shortcut the process.  We will withdraw the letter

24   motion, and let's set dates to get this case to where it needs

25   to be.

1          THE COURT:  All right.  So you guys want to ——

2          MR. LEVY:  So I think the first date that we would

3     need to set is the date for SKAT and Mr. McGee to answer the

4     complaint that the Court has deemed filed, and we believe they

5     should have whatever amount of time they would like.

6          THE COURT:  OK.  You guys want to talk about a

7     schedule?  I don't know if you're assuming summary judgment

8     motions or you're assuming —— I would think a nonjury trial, I

9     would think.

10          MR. LEVY:  The jurisdictional provision provides for a

11     nonjury trial.

12          THE COURT:  Right.  That makes sense.

13          I don't know what's between an answer and whatever

14     mechanism you want to use to resolve the merits.

15          MR. LEVY:  There's some discovery-related deadlines

16     that it would be helpful to have some guidance from the Court,

17     but I think the first one in time —— first one logically is

18     just the time to answer the complaint that the Court has deemed

19     to have been properly filed.

20          MR. WEINSTEIN:  From SKAT's perspective, we can answer

21     within a week.  It should not delay any aspect of this case.

22          THE COURT:  OK.

23          MR. NEWMAN:  So, Judge, we would ask for two weeks,

24     but we can do that within two weeks.

25          THE COURT:  By the way, Mr. Newman, do you anticipate

O5LHSteO

1   in any way objecting to Mr. McGee being named as a nominal

2   defendant?

3           MR. NEWMAN:  At this time, your Honor, I don't

4   anticipate us being —— objecting to that.  I mean, quite

5   frankly, if he is named as a nominal defendant, it brings all

6   the parties officially before the Court for purposes of

7   resolving the rescission claim.  So I don't envision us

8   objecting to that.

9           THE COURT:  OK.

10          MR. LEVY:  The Court had previously set a date to

11  complete fact depositions.  We've had some scheduling issues.

12  I got COVID and had to cancel a deposition.

13          THE COURT:  Is that where the beard came from?  No,

14  OK.

15          MR. LEVY:  I have a back and forth with my wife about

16  whether a beard should be had or should not be had.  Next time

17  you see me, it will not be had.  I can promise you that.

18          THE COURT:  OK.

19          MR. LEVY:  Sometimes just things pile up, and it's the

20  last thing to go is shaving.

21          THE COURT:  OK.

22          MR. LEVY:  But we've now been able to work out some

23  scheduling, and the parties had agreed that the fact deposition

24  should be completed by June 10 and that the interrogatories and

25  requests for admission should be completed by June 14 ——

O5LHSteO

1    served.

2              THE COURT:  Served.

3              MR. LEVY:  Yes.  I'll send to your Honor's law clerk a

4    proposed order that sets all this out.

5              THE COURT:  OK.

6              MR. LEVY:  Hopefully, we can work it out.

7              On the issue of expert discovery, I had some

8    discussion with Mr. Weinstein.  I'm not quite sure we bottomed

9    out on that.  SKAT was expecting to submit an expert report

10   about a lot of the true-up numbers, and we've been in

11   discussions with SKAT to hopefully obviate that.  I expect that

12   we'll be able to avoid SKAT's having to put in an expert report

13   by stipulating to some of the math and then reserving for the

14   Court some of the conceptual matters that will drive the math.

15             THE COURT:  OK.

16             MR. LEVY:  If that makes sense.

17             THE COURT:  I'll learn.  Someday it will.

18             MR. LEVY:  I think it will become relatively clear in

19   due course.  So I'm hoping to avoid SKAT's having to do that.

20             The current deadline to serve expert reports is

21   June 24.  And the expert on matters of Danish criminal law, he

22   and I spoke this morning, and he's hoping to be able to have

23   until July 10 to complete his report.  That's about —— it's

24   about two weeks after June 24.  I propose that date.  I hadn't

25   been able to obtain Mr. Weinstein's agreement to that.

O5LHSteO

```
1    Hopefully, we can.
2              And then, if we can work that out, then I think we can
3    work out the date for rebuttal reports and the completion of
4    expert discovery.  Mr. Weinstein has a great number of Danish
5    lawyers at his disposal.
6              MR. WEINSTEIN:  I'm not sure what that means, but ──
7              MR. LEVY:  I could clarify what it means.  The entire
8    weight of the Danish government is on Mr. Weinstein's side.
9              THE COURT:  Well, that makes some sense.
10             MR. WEINSTEIN:  You know, when I was a prosecutor
11   here, your Honor, in the U.S. and the other side used to say,
12   "You have all the resources of the federal government at your
13   disposal," it didn't mean a lot, because you don't have a lot
14   of resources in that office, I must say.  I think it goes the
15   same way.
16             THE COURT:  Right.
17             MR. WEINSTEIN:  Look, I generally hate to argue with
18   ── and I don't want to do it before the Court with extending
19   deadlines ── but there is a timing issue in this case, and my
20   concern has always been ── it's easy for us to say we're going
21   to keep extending discovery deadlines, which all that means is
22   it's potentially compressing the time for the Court to consider
23   the ultimate merits.
24             THE COURT:  I think really what you have to work out
25   between you is your mechanism to resolve the ultimate merits.
```

O5LHSteO

1          MR. WEINSTEIN:  Yes.

2          THE COURT:  If you let me know what that mechanism is

3     going to be, then I can schedule that.

4          MR. WEINSTEIN:  I think I can do that now.  I believe

5     there is agreement that it would just be a trial, a nonjury

6     trial before your Honor.  I think you had indicated at a prior

7     conference that you would want any direct testimony for sure by

8     affidavit.

9          THE COURT:  By affidavit.

10         MR. WEINSTEIN:  Which makes sense.  You would want it

11    well before the trial starts.  So I don't see this being

12    summary judgment.

13         THE COURT:  OK.

14         MR. WEINSTEIN:  I think both sides agree that that's

15    sort of just a waste of an extra set of papers.  But there may

16    be some briefing.  I think the only issue is whether your Honor

17    wants any briefing before the trial on legal issues or would it

18    just be posttrial briefing.

19         MR. LEVY:  On that subject, it may help for us to come

20    back a little bit later, maybe after some of the discovery has

21    been completed, to talk about that again.  There's also ——

22         THE COURT:  Let me just say that it sort of does, I

23    think, matter what the legal issues are because, just like *in*

24    *limine* motions in a criminal case, it tells you something about

25    how the trial's going to go, and that may be relevant here.  I

O5LHSteO

```
 1   don't know what you're talking about, so it's hard to respond.
 2   But I generally really like to go into a trial as informed as I
 3   can possibly be.  So I think I would want to know what the
 4   legal issues were that the trial might have impact on.
 5           Look, I think ——
 6           MR. LEVY:  Sorry.
 7           THE COURT:  —— what I would like is for you to work
 8   together as much as you can.  If you can't work out a proposal
 9   that has a timing that gives me enough time, I will work out
10   one for you, but I sort of always prefer to let counsel do
11   their best on their own.
12           MR. LEVY:  You will recall previously that the parties
13   had entered into a stipulation tolling the last date for the
14   filing of an affidavit of confession of judgment.  We've always
15   said we would consider entering into another one so that the
16   Court has sufficient time for it to conduct a trial and then
17   consider —— and have either posttrial briefing, proposed
18   findings of fact and ——
19           THE COURT:  If I don't have a drop-dead date in front
20   of me, which is what I thought I had, I'm obviously more
21   flexible.
22           MR. LEVY:  And I just wanted to make the Court —— have
23   the Court be perfectly clear that we are not looking to cause
24   the Court agita by having a drop-dead date that can be easily
25   extended.  We would agree to —— we can talk about that with
```

O5LHSteO

1    opposing counsel, but I think we can —— let's hope that we can

2    work out the next set of deadlines.  I think we've worked out

3    some of them, and we've gotten, hopefully, most of the way

4    there for at least this next stage.

5              THE COURT:  Sounds good.

6              MR. NEWMAN:  Judge, I would second that we're not ——

7    we're willing to extend any drop-dead dates.  We don't want an

8    undue burden on the Court.  That's not the purpose of this to

9    lead everyone up to a deadline.

10             THE COURT:  Well, that's fine.

11             I think this has been very useful, and thank you for

12   coming.

13             MR. LEVY:  Thank you, your Honor.

14             MR. WEINSTEIN:  Thank you.

15             (Adjourned)

16

17

18

19

20

21

22

23

24

25