LETTER TO THE HONORABLE
NAOMI REICE BUCHWALD,
dated December 26, 2024

# Exhibit A

4911-8942-9257

## A. SKAT's Knowledge of the 2019 Amendment to CPLR 3218
### Plaintiffs' RFAs 17-21/McGee's RFAs 21-23

**Plaintiffs' RFA No. 17/McGee's RFA No. 21:**

Admit that, prior to the execution of the Updated Affidavit of Confession of Judgment, SKAT's outside counsel had knowledge of the August 2019 amendment to CPLR 3218.

**SKAT's Response to Plaintiffs' RFA No. 17/McGee's RFA No. 21:**

Request No. 17 [or 21] concerns SKAT's counsel's legal knowledge and assessment of issues relevant to this litigation, which is an improper and privileged subject.

**Plaintiffs' RFA No. 18:**

Admit that, prior to the execution of the Updated Affidavit of Confession of Judgment, SKAT's outside counsel had knowledge that the August 2019 amendment to CPLR 3218 might impact the enforceability of the Updated Affidavit of Confession of Judgment as to Lhote and/or McGee.

**SKAT's Response to Plaintiffs' RFA No. 18:**

Request No. 18 concerns SKAT's counsel's legal knowledge and assessment of issues relevant to this litigation, which is an improper and privileged subject.

**Plaintiffs' RFA No. 19/McGee's RFA No. 22:**

Admit that, prior to the execution of the Updated Affidavit of Confession of Judgment, SKAT's outside counsel did not have knowledge of the August 2019 amendment to CPLR 3218.

**SKAT's Response to Plaintiffs' RFA No. 19/McGee's RFA No. 22:**

Request No. 19 [or 22] concerns SKAT's counsel's legal knowledge and assessment of issues relevant to this litigation, which is an improper and privileged subject.

**Plaintiffs' RFA No. 20:**

Admit that, prior to the execution of the Updated Affidavit of Confession of Judgment, SKAT's outside counsel did not have knowledge that the August 2019 amendment to CPLR 3218 might impact the enforceability of the Updated Affidavit of Confession of Judgment as to Lhote and/or McGee.

**Exhibit A to Letter,<br>dated December 26, 2024<br>Page 2**

**SKAT's Response to Plaintiffs' RFA No. 20:**

Request No. 20 concerns SKAT's counsel's legal knowledge and assessment of issues relevant to this litigation, which is an improper and privileged subject.

**Plaintiffs' RFA No. 21/McGee's RFA No. 23:**

Admit that, prior to the execution of the Updated Affidavit of Confession of Judgment, SKAT's outside counsel had knowledge that it was necessary to update the residences of Lhote and/or McGee in order to execute the Updated Affidavit of Confession of Judgment in or about June 2021.

**SKAT's Response to Plaintiffs' RFA No. 21/McGee's RFA No. 23:**

Request No. 21 [or 23] concerns SKAT's counsel's legal knowledge and assessment of issues relevant to this litigation, which is an improper and privileged subject.

### B. SKAT's Obligations Under Phase II of the Settlement Agreement
### Plaintiffs' Interrogatory No. 21

**Plaintiffs' Interrogatory No. 21:**

Identify all of SKAT's contractual obligations under the Settlement Agreement that required any actions by SKAT, or SKAT's refraining from any actions, after its receipt of the Initial Cash Payment.

**SKAT's Response to Plaintiffs' Interrogatory No. 21:**

SKAT incorporates by reference Objections 1, 3, 4, and 5. SKAT objects to Interrogatory No. 21 as premised on an incorrect understanding of the Settlement Agreement belied by its unambiguous and expressly stated terms. SKAT states that its contractual obligations under the Settlement Agreement are not specifically triggered by its receipt of the Initial Cash Payment, with the exception of: (i) release of the Covered Parties upon completion of the Initial Cash Payment (§ 4) and (ii) dismissal of claims against Adam LaRosa (§ 3.a).

**Plaintiffs' Amended Complaint ¶¶ 46-52:**

46. Under the first phase of the obligations under the Settlement Agreement ("Phase I"), Stein, Lhote, McGee, and others were required to make to SKAT an initial cash payment of 950 million Danish kroner ("DKK").

47. Upon the payment of the initial cash payment of DKK 950 million, SKAT "forever and finally generally release[d], waive[d] and discharge[d]" Stein, Lhote, McGee, and others from all claims broadly associated with the dividend tax refund applications.

48. Under the Settlement Agreement, SKAT's release of all claims broadly associated with the dividend tax refund obligations is not dependent upon the satisfaction of any conditions other than the initial cash payment of DKK 950 million and is not affected by the parties' conduct thereafter.

49. By on or about August 8, 2019, the initial cash payment was completed. At or about the time of the Settlement Agreement, DKK 950 million was the approximate U.S. dollar equivalent of $142.6 million. As a result on the initial cash payment, SKAT is bound by its release of Stein, Lhote, McGee, and others.

50. Phase I also required that, simultaneously with the initial cash payment of DKK 950 million, Stein, Lhote, and McGee provide to SKAT an affidavit of confession of judgment. The purpose of the affidavit of confession of judgment was to facilitate SKAT's collection of payments to be made during the second phase of the settlement agreement ("Phase II").

51. On or about August 8, 2019, Stein, Lhote, and McGee provided an Affidavit of Confession of Judgment (the "2019 Affidavit of Confession of Judgment").

52. The parties' performance of the Phase I obligations is complete.

**Plaintiffs' Amended Complaint ¶¶ 53-69:**

53. Stein, Lhote, and McGee had an extensive series of obligations under the second phase of the Settlement Agreement ("Phase II"). For its part, SKAT had limited and discrete obligations under Phase II.

54. In Phase II of the Settlement Agreement, Stein, Lhote, and McGee were required to make a further payment of at least approximately DKK 600 million, subject to various adjustments, on or before three years from the effective date of the Settlement Agreement, which was extended by an additional year by operation of the Letter Agreement. Thus, the Settlement Agreement provides that a further payment of at least approximately DKK 600 million, subject to further adjustments, be made on or before May 28, 2023.

55. Stein, Lhote, and McGee were also required to "fully cooperate with the investigation by [SKAT] of third parties" who were not released by operation of the Settlement Agreement. The cooperation obligations included, in general, the provision of documents and information by Stein, Lhote, and McGee and also required that Stein, Lhote, and McGee's use of "their best efforts to ensure that their cooperation with [SKAT] is meaningful and productive."

56. In performing their obligations under Phase II of the Settlement Agreement, Stein, Lhote, and McGee made several substantial payments. The payments by Stein, Lhote, and McGee started in or around June 2020. These payments totaled more than approximately DKK 57.7 million, or the approximate U.S. dollar equivalent of $8.66 million.

57. Also as a part of their Phase II performance and pursuant to the Letter Agreement, Stein, Lhote, and McGee provided approximately ten quarterly reports regarding the efforts by them to liquidate certain agreed-upon assets and, thereby, generate cash to be able to make the further payments required under Phase II of the Settlement Agreement. Stein, Lhote, and McGee began to provide these reports beginning on or about August 26, 2019.

58. As a further part of their Phase II performance, Stein, Lhote, and McGee produced over 90,000 documents to facilitate SKAT's litigation efforts in the United States. Stein, Lhote, and McGee also researched and answered numerous substantive questions posed by SKAT in connection with SKAT's prosecution of its claims against others. Stein, Lhote, and McGee also expended substantial time and resources supporting SKAT's requests for assistance in its prosecution of claims against other parties in actions that SKAT initiated in Dubai, the United Kingdom, and the United States.

59. As alleged above, payments to be made during Phase II of the Settlement Agreement could be subject to various adjustments. In the event there was a "claim, controversy or dispute" "arising out of or relating to" these adjustments that amounted to less than DKK 20 million, the approximate U.S. dollar equivalent of $2.85 million, the parties to the Settlement Agreement agreed to arbitrate such claim, controversy, or dispute before an arbitrator identified in the Settlement Agreement. The parties also had the right, but not the obligation, to arbitrate

claims, controversies, or disputes relating to the payment adjustments that amounted to more than DKK 20 million.

60. In exchange for what Stein, Lhote, and McGee promised to do under Phase II of the Settlement Agreement, SKAT had only limited and discrete obligations under Phase II. Substantially all of the consideration provided by SKAT for the obligations in Phase II is contained in Sections 8 and 9 of the Settlement Agreement. Each of these obligations reflected the paramount concern of Stein, Lhote, and McGee about the possibility of being criminally charged by SØIK, their desire to minimize the chances that SØIK would initiate criminal charges against them in Denmark, and SKAT's recognition of these motivations.

61. First, SKAT and Stein, Lhote, and McGee agreed that the Settlement Agreement "is, and is intended to be maintained as, confidential to the fullest extent possible under Danish law, New York law or the law applicable in any jurisdiction in which [SKAT] seeks to use" information provided by Stein, Lhote, and McGee as a result of their obligation to cooperate with SKAT. As a result, SKAT and Stein, Lhote, and McGee "agree[d] to use their respective best efforts to maintain such confidentiality consistent with the terms set forth in" Section 8.

62. Second, SKAT promised that it would limit disclosure of the Settlement Agreement, or its contents, to only the Danish Ministry of Taxation and to various other components of the Danish government, with disclosure being solely for the "purpose of seeking authority for the entry into th[e Settlement] Agreement by [SKAT] or if compelled by operation of law or regulation."

63. SKAT was also permitted to publicly disclose limited aspects of the Settlement Agreement. Those aspects that could be disclosed did not include the identity of Stein, Lhote, McGee, or the other parties to the Settlement Agreement.

64. Third, SKAT promised to give prompt, written notice to SØIK of certain exact matters specified in detail in Section 8(f) of Settlement Agreement. Specifically, SKAT promised that:

> Notwithstanding the confidentiality obligations of this Section 8, promptly upon the execution of this Agreement, Skatteforvaltningen will, in writing, bring to the attention of the Danish Public Prosecutor for Serious Economic and International Crime ("SØIK") this Agreement and its terms, and represent, in writing, that this Agreement reflects good-faith negotiation by the Covered Parties, that the Covered Parties' cooperation may result in the recovery by Skatteforvaltningen of additional funds from third parties and that this Agreement is in the best interests of Skatteforvaltningen. Upon request by SØIK, Skatteforvaltningen may provide and/or disclose the entirety of this Agreement to SØIK.

65. The requirements of Section 8(f) of the Settlement Agreement, including the writing requirement, were material.

66. Because Stein, Lhote, and McGee were concerned of the possibility of criminal charges in Denmark and sought to minimize the chances that SØIK would initiate criminal charges against them in Denmark, which SKAT recognized, it was of the utmost importance to Stein, Lhote, and McGee that SKAT itself -- which claimed to be the victim of a fraudulent scheme -- and not anyone else, including Stein, Lhote, and McGee themselves, promptly communicate to SØIK Stein, Lhote, and McGee's good faith efforts to make SKAT whole, their cooperation with SKAT, the substantial payments made under the Settlement Agreement, and the requirement that there be further payments under the Settlement Agreement, among other things.

67. The writing required by Section 8(f) ensured that SØIK was informed of Stein, Lhote, and McGee's efforts and the terms of the Settlement Agreement via an official, written statement of the views of SKAT. Without a writing, Stein, Lhote, and McGee:

    (a)    could not be assured that SØIK, including all of its various components, was informed of Stein, Lhote, and McGee's payments, contractual, commitments and efforts;

    (b)    could not be assured that any information imparted to SØIK would become part of the official records and institutional memory of SØIK and would be communicated widely within SØIK; and

    (c)    could not be assured that the information imparted pursuant to Section 8(f) would be available in precisely the words agreed to by the parties to the Settlement Agreement to influence new and different actors within SØIK that might ultimately play a role in the decision whether to criminally charge Stein, Lhote, and McGee.

68. The requirements of Section 8(f) were also material because, among other reasons, it was important that the Danish prosecutor, SØIK, be made aware promptly upon execution of the Settlement Agreement and in writing that the understanding of the parties to the Settlement Agreement and a "fundamental principle" on which it was based was that Stein, Lhote, and McGee were paying to SKAT the full amount of proceeds that Stein, Lhote, and McGee received directly or indirectly as a result of tax refund applications that were made to SKAT and that were the basis of SKAT's claims against Stein, Lhote, and McGee, which SKAT was releasing in the Settlement Agreement. Beyond that, it was important, and was reflected in the Settlement Agreement, that SØIK be made aware promptly and in writing that Stein, Lhote, and McGee "ha[d] expressed a willingness to use their best efforts and full cooperation to assist [SKAT] in various proceedings related to the subject matter" of the dividend tax refund applications at issue.

69. Finally, the Settlement Agreement contained in Section 9 a non-disparagement clause that, in general, precluded SKAT, among others, from making statements that were "disparaging, derogatory or defamatory of or reasonably likely to damage" Stein, Lhote, and McGee, their reputations, business or affairs, nor could SKAT induce any person or entity to do so.

**Exhibit A to Letter,
dated December 26, 2024
Page 7**

**SKAT's Answer and Affirmative Defenses to First Amended Complaint ¶ 53:**

   53. To the extent Paragraph 53 characterizes or summarizes the Settlement Agreement, SKAT respectfully refers the Court to the Settlement Agreement, which speaks for itself. SKAT specifically denies that the Settlement Agreement divides SKAT's and the Covered Parties' obligations into two phases and denies any remaining allegations in Paragraph 53.

Exhibit A to Letter,
dated December 26, 2024
Page 8

## C. SKAT's Communications With SØIK
**Plaintiffs' Interrogatory No. 6**

**Plaintiffs' Interrogatory No. 6:**

Explain in detail the nature of the telephone call between Per Fiig and Gry Ahlefeld-Engel referred to in STEIN_LHOTE0008977, including date and time of any such telephone call and the substance of any such telephone call.

**SKAT's Response to Plaintiffs' Interrogatory No. 6:**

SKAT incorporates by reference Objections 2 and 3. SKAT objects as Interrogatory No. 6 is inconsistent with the Court's ruling that the time period for discovery in this action is "between March 2019 to June 2021 . . . given that this time period meaningfully encompasses the sole claim of breach alleged in plaintiffs' complaint." (ECF 88 at 4.) The cited correspondence in STEIN_LHOTE0008977 refers to a phone call on or about February 3, 2022, which is well outside the date range established by the Court and is irrelevant. In addition, the email chain referenced in Interrogatory No. 6 appears to relate to an inquiry by SØIK about information concerning Guenther Klar, Rajen Shah, Anupe Dhorajiwala, and Graham Horn, none of whom are parties to this action or to the Settlement Agreement. The Court previously ruled that "since movants are criminal defendants in proceedings commenced by SØIK, movants may not use this case to obtain discovery for use in the criminal case which may not be available to them in that proceeding." (ECF 88 at 5.). Based on these objections, SKAT will not respond to Interrogatory No. 6.

SKAT further objects as Interrogatory No. 6 is vague to the extent it seeks information concerning the "nature" of the telephone conversation.

**Plaintiffs' Amended Complaint ¶ 70:**

70.     Despite the simplicity of complying with these obligations and the ease with which it could have done so, SKAT did not fulfill, and breached the obligations in Section 8(f) of the Settlement Agreement to "promptly upon the execution of the Settlement Agreement":

(a)     "in writing" "bring to the attention of SØIK "th[e Settlement] Agreement and its terms"; and

(b)     "represent, in writing, that th[e Settlement] Agreement reflects good-faith negotiation by [Stein, Lhote, and McGee], that . . . cooperation [Stein, Lhote, and McGee] may result in the recovery by [SKAT] of additional funds from third parties and that th[e Settlement Agreement] is in the best interests of [SKAT]."

**Exhibit A to Letter,
dated December 26, 2024
Page 9**

## D. Residences for Purposes of CPLR 3218
### Plaintiffs' RFAs 23-30/McGee's RFAs 25-32

**Plaintiffs' RFA No. 23/McGee's RFA No. 25:**

Admit that, as of June 8, 2021, there is no evidence that Lhote intended to maintain a permanent place of abode in the State of New York.

**SKAT's Response to Plaintiffs' RFA No. 23/McGee's RFA No. 25:**

Deny knowledge or information sufficient to admit or deny Request No. 23 [or 25].

**Plaintiffs' RFA No. 24/McGee's RFA No. 26:**

Admit that, as of June 8, 2021, Lhote's children were enrolled in school in the State of Florida.

**SKAT's Response to Plaintiffs' RFA No. 24/McGee's RFA No. 26:**

Deny knowledge or information sufficient to admit or deny Request No. 24 [or 26], except admit only that Plaintiffs have produced a document that purports to be an invoice from a school.

**Plaintiffs' RFA No. 25/McGee's RFA No. 27:**

Admit that, as of June 8, 2021, Lhote's vehicle was registered in the State of Florida.

**SKAT's Response to Plaintiffs' RFA No. 25/McGee's RFA No. 27:**

Deny knowledge or information sufficient to admit or deny Request No. 25 [or 27], except admit only that Plaintiffs have produced a document that purports to be a vehicle registration from Florida.

**Plaintiffs' RFA No. 26/McGee's RFA No. 28:**

Admit that, as of June 8, 2021, Lhote's driver's license was issued by the State of Florida.

**SKAT's Response to Plaintiffs' RFA No. 26/McGee's RFA No. 28:**

Deny knowledge or information sufficient to admit or deny Request No. 26 [or 28], except admit only that Plaintiffs have produced a document that purports to be a Florida driver's license.

**Plaintiffs' RFA No. 27/McGee's RFA No. 29:**

Admit that, as of June 8, 2021, Lhote maintained a permanent place of abode in the State of Florida.

**SKAT's Response to Plaintiffs' RFA No. 27/McGee's RFA No. 29:**

Deny knowledge or information sufficient to admit or deny this Request as to whether Lhote's Florida residence was a "permanent place of abode."

**Plaintiffs' RFA No. 28/McGee's RFA No. 30:**

Admit that, as of June 9, 2021, there is no evidence that McGee intended to maintain a permanent place of abode in the State of New York.

**SKAT's Response to Plaintiffs' RFA No. 28/McGee's RFA No. 30:**

Denied.

**Plaintiffs' RFA No. 29/McGee's RFA No. 31:**

Admit that, as of June 9, 2021, McGee's vehicle was registered in the State of Pennsylvania.

**SKAT's Response to Plaintiffs' RFA No. 29/McGee's RFA No. 31:**

Deny knowledge or information sufficient to admit or deny Request No. 29 [or 31], except admit only that McGee has produced a document that purports to be a Pennsylvania vehicle registration.

**Plaintiffs' RFA No. 30/McGee's RFA No. 32:**

Admit that, as of June 9, 2021, McGee maintained a permanent place of abode in Pennsylvania.

**SKAT's Response to Plaintiffs' RFA No. 30/McGee's RFA No. 32:**

Deny knowledge or information sufficient to admit or deny Request No. 30 [or 32].

**Plaintiffs' Amended Complaint ¶¶ 9-12:**

9.      As part of the first phase of the settlement agreement, Stein, Lhote, and McGee were required to provide an affidavit of confession of judgment to facilitate SKAT's collection of contractually required payments to be made during the second phase of the settlement agreement and in the event of a breach during the second phase. The second phase of the settlement agreement also required Stein, Lhote, and McGee to later provide a further affidavit of confession of judgment because, under applicable New York law, an affidavit of confession of judgment may not be filed more than three years after its execution.

10.     By the time that Stein, Lhote, and McGee provided a further affidavit of confession of judgment in 2021, Lhote was no longer a resident of the State of New York. He does not currently have any residence in the State of New York and has no present intention to

establish any residence in the State of New York. And, at the time that McGee provided the initial affidavit of confession of judgment in 2019 and in 2021 when McGee provided a further affidavit of confession of judgment, McGee did not have any residence in the State of New York.

11.     Under New York law in effect since late August 2019, an affidavit of confession of judgment may only be filed in the county within the State of New York where the debtor resided when the affidavit was executed or where the debtor resides at the time of the filing.

12.     Because Lhote and McGee did not reside in any county in the State of New York when the further affidavit of confession of judgment was executed in 2021, do not presently reside in any county in New York, and have no present intention to reside in any county in New York, it is invalid as to them. In addition, the further confession of judgment provided in 2021 does not meet the requirements of New York law and, as such, is unenforceable as to Stein, Lhote, and McGee for that additional reason.

### E. SKAT's NCB Allegations
### Plaintiffs' Interrogatories 18-20; McGee's Interrogatories 13-14
### Plaintiffs' RFA 38/McGee's RFA 40

**Plaintiffs' Interrogatory No. 18/McGee's Interrogatory No. 13:**

Describe, in detail, the basis for the allegation that "[t]he Covered Parties' obligations under the settlement agreement to return the Bank Fees is not dependent on the realization through a sale of their interest in North Channel Bank," including in light of paragraphs 7 and 11 of the Letter Agreement and Section 2(e) of the Settlement Agreement.

**SKAT's Response to Plaintiffs' Interrogatory No. 18/McGee's Interrogatory No. 13:**

SKAT incorporates by reference Objection 3. Subject to and without waiving any objections, SKAT responds that, pursuant to Whereas Clause F of the Settlement Agreement, it is a "fundamental principle" of the Agreement that the Covered Parties are paying to SKAT the full amount of Net Proceeds, as defined in the Settlement Agreement, that the Covered Parties received directly or indirectly from Reclaim Applications made to SKAT. Section 2(e) of the Settlement Agreement defines Net Proceeds, and identifies categories of expenses the Covered Parties could deduct from Gross Reclaims, but only to the extent such expenses "were not otherwise subsequently provided to any other Covered Party." Section 2(e)(i) requires the Covered Parties to use their best efforts to provide SKAT with documentation "sufficient to establish the total amount of Net Proceeds received by the Covered Parties directly or indirectly from the Reclaim Applications." Section 2(f) of the Settlement Agreement requires the Covered Parties Designees to represent that "(A) the Preliminary Settlement Amount plus the True-Up Amount equals or exceeds the Net Proceeds received by the Covered Parties, directly or indirectly, from the Reclaim Applications and (B) on payment of the full amount of the Subsequent Cash Payment Amount, the Covered Parties will have paid back to Skatteforvaltningen the Net Proceeds that they received, directly or indirectly, from the Reclaim Applications."

**Plaintiffs' Interrogatory No. 19:**

Describe, in detail, the basis for the allegation that "[t]he settlement agreement does not provide for the windfall that would arise if the Covered Parties' Designees kept the value of the Bank Fees, which would violate the guiding principle of the settlement agreement that the Covered Parties return all the proceeds from the fraud they perpetrated on SKAT," including in light of paragraphs 7 and 11 of the Letter Agreement and Section 2(e) of the Settlement Agreement.

**SKAT's Response to Plaintiffs' Interrogatory No. 19:**

SKAT incorporates by reference Objection 3. Subject to and without waiving any objections, SKAT responds by referring to its Response to Interrogatory No. 18.

**Plaintiffs' Interrogatory No. 20/McGee's Interrogatory No. 14:**

Explain, in detail, the basis in the Settlement Agreement for why DKK 55 million of fees paid to North Channel Bank should be included in Net Proceeds, as alleged in paragraph 158 of SKAT's First Amended Answer, Affirmative Defenses, and Counterclaims.

**SKAT's Response to Plaintiffs' Interrogatory No. 20/McGee's Interrogatory No. 14:**

SKAT incorporates by reference Objection 3. Subject to and without waiving any objections, SKAT responds by referring to its Response to Interrogatory No. 18. In addition, in the calculation of Net Proceeds provided by the Covered Parties to SKAT, the Covered Parties deducted fees paid to North Channel Bank from Gross Reclaims. Such deductions include payments made directly by the settling plans to North Channel Bank, in the amount of DKK 24,966,021, and fees paid by the settling plans to counter-parties in their purported stock purchase, stock loan, and forward transactions, which counter-parties then paid fees to North Channel Bank.

**Plaintiffs' RFA No. 38/McGee's RFA No. 40:**

Admit that North Channel Bank generated more than €1 million in revenue in both 2014 and 2015 as a result of its activities associated with the financing of life insurance policies.

**SKAT's Response to Plaintiffs' RFA No. 38/McGee's RFA No. 40:**

Deny knowledge or information sufficient to admit or deny Request No. 38 [or 40].

**Letter Agreement § 7:**

Letter Agreement Parties shall ask the management of North Channel Bank to certify the amount of the fees (the "Bank Fees") that North Channel Bank received arising from or related to dividend tax reclaim applications submitted to Skatteforvaltningen. Upon the sale of North Channel Bank, fifty million (50,000,000) DKK or the amount of the Bank Fees, whichever amount is greater, of the sale proceeds shall be used to make a separate payment, (the "Payment of Fees") on behalf of the Letter Agreement Parties to Skatteforvaltningen, representing disgorgement of the fees received by North Channel Bank arising from or related to the dividend tax reclaim applications submitted to Skatteforvaltningen; this Payment of Fees shall not be counted towards the payment of the Final Settlement Amount or any other payment required under the Settlement Agreement. The Letter Agreement Parties agree to promptly pay the remaining proceeds of the sale of North Channel Bank, after the Payment of Pees, North Channel Bank's sale-related fees and costs and agreed-upon payments to be made to Belgian governmental authorities, to Skatteforvaltningen to satisfy the payment of the Final Settlement Amount.

**Letter Agreement § 11:**

11.     This Letter Agreement constitutes the entire agreement among the Letter Agreement Parties with respect to the subject matter hereof and supersedes any previous agreements or understandings among the Letter Agreement Parties, express or implied, with respect to the same subject matter, except that all prior confidentiality agreements among the Parties shall remain in full force and effect. No amendment, supplement or modification of this Letter Agreement, or waiver of rights hereunder, shall be binding unless executed in writing by all Letter Agreement Parties and specifically referencing this Letter Agreement.

**SKAT's Amended Answer, Affirmative Defenses & Counterclaims ¶¶ 158-160:**

158.     First, the Covered Parties improperly deducted DKK 55 million paid as fees to North Channel Bank, notwithstanding that the Bank subsequently returned to the Covered Parties that DKK 55 million in the form of dividends. Over the course of 2014 and 2015, North Channel Bank collected DKK 55 million in fees from its participation in the fraud on SKAT, during which time it had little to no other business. During that same period, North Channel Bank issued more than € 9.2 million (well over DKK 55 million) in dividends to its shareholders, including to Stein, Lhote, and McGee. North Channel Bank did not issue dividends in any other year during which the Covered Parties' Designees had a controlling interest in the bank.

159.     On the same day the settlement agreement was executed, SKAT entered into a side letter agreement with Stein, Lhote, McGee, and other Covered Parties. The side letter provided that these individuals would liquidate certain assets, and the proceeds would be paid to SKAT. In the side letter, the Covered Parties that executed it represented to SKAT that they expected North Channel Bank would be sold by December 2021 for approximately DKK 320 million. And they further agreed to provide SKAT with quarterly progress reports on the liquidation of their interests in North Channel Bank and the other assets specified therein. The side letter set out a series of payments to be made when North Channel Bank was sold. First, SKAT would receive the greater of DKK 50 million or the amount of fees North Channel Bank received from the refunds paid by SKAT (the "Bank Fees"), which North Channel Bank subsequently admitted, in pleading guilty to fraud in Denmark, totaled DKK 55 million. After payment of the Bank Fees and North Channel Bank's sale-related fees and costs, the remaining proceeds of the sale were to be split proportionally between SKAT, in at least partial satisfaction of the amounts due under the settlement agreement, and the Belgian governmental authorities based on the amount of fraudulent refunds each paid to the pension plans based on false dividend credit advices issued by North Channel Bank, which split was approximately 87 percent to SKAT and 13 percent to Belgium.

160.     Contrary to the representation in the letter agreement, North Channel Bank has not been sold and the letter agreement parties failed to provide SKAT with all the quarterly reports they were obligated to provide. North Channel Bank entered into insolvent administration in Germany in January 2023. The Covered Parties' obligations under the settlement agreement to return the Bank Fees is not dependent on the realization through a sale of their interest in North

**Exhibit A to Letter,
dated December 26, 2024
Page 15**

Channel Bank. The settlement agreement does not provide for the windfall that would arise if the Covered Parties' Designees kept the value of the Bank Fees, which would violate the guiding principle of the settlement agreement that the Covered Parties return all the proceeds from the fraud they perpetrated on SKAT.

### F. SKAT's Compliance with the Settlement Agreement
### Plaintiffs' RFAs 2-4; McGee's RFAs 2-4

**Plaintiffs' RFA No. 2/McGee's RFA No. 2:**

Admit that SKAT_MAPLEPOINT_00000027 was not sent promptly upon execution of the Settlement Agreement.

**SKAT's Response to Plaintiffs' RFA No. 2/McGee's RFA No. 2:**

Admitted that the correspondence in SKAT_MAPLEPOINT_00000027 is dated May 15, 2019, which was not after May 28, 2019, the date of execution of the Settlement Agreement.

**Plaintiffs' RFA No. 3/McGee's RFA No. 3:**

Admit that SKAT_MAPLEPOINT_00000040 was not sent promptly upon execution of the Settlement Agreement.

**SKAT's Response to Plaintiffs' RFA No. 3/McGee's RFA No. 3:**

Admitted that the correspondence in SKAT_MAPLEPOINT_00000040 is dated May 21, 2019, which was not after May 28, 2019, the date of execution of the Settlement Agreement.

**Plaintiffs' RFA No. 4/McGee's RFA No. 4:**

Admit that SKAT_MAPLEPOINT_00000072-73 was not sent promptly upon execution of the Settlement Agreement.

**SKAT's Response to Plaintiffs' RFA No. 4/McGee's RFA No. 4:**

Admitted that the correspondence in SKAT_MAPLEPOINT_00000072-73 is dated May 21, 2019 and May 23, 2019, which were not after May 28, 2019, the date of execution of the Settlement Agreement.

**Plaintiffs' Amended Complaint ¶ 70:**

70.   Despite the simplicity of complying with these obligations and the ease with which it could have done so, SKAT did not fulfill, and breached the obligations in Section 8(f) of the Settlement Agreement to "promptly upon the execution of the Settlement Agreement":

(a)   "in writing" "bring to the attention of SØIK "th[e Settlement] Agreement and its terms"; and

(b)   "represent, in writing, that th[e Settlement] Agreement reflects good-faith negotiation by [Stein, Lhote, and McGee], that . . . cooperation [Stein, Lhote, and McGee] may

**Exhibit A to Letter,<br>dated December 26, 2024<br>Page 17**

result in the recovery by [SKAT] of additional funds from third parties and that th[e Settlement Agreement] is in the best interests of [SKAT]."