# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

## CASE NO. 1:23-CV-02508-NRB

MATTHEW STEIN and JEROME
LHOTE,

                          Plaintiffs,

        v.

SKATTEFORVALTNINGEN,

                          Defendant,

        and

LUKE MCGEE,

                  Nominal Defendant.

---

SKATTEFORVALTNINGEN,

            Counterclaim Plaintiff,

        v.

MATTHEW STEIN, JEROME LHOTE,
and LUKE MCGEE,

            Counterclaim Defendants.

# NOMINAL DEFENDANT/COUNTERCLAIM
# DEFENDANT LUKE MCGEE'S WITNESS STATEMENT

**A.**    **Preliminary Matters.**

1.    I swear to this Witness Statement as my direct testimony in this matter.

2.    This Witness Statement is my independent testimony.

**B.**    **Personal and Professional Background.**

3.    I am the middle child of two educators. My mother spent most of her career teaching English as a Second Language in community colleges in and around Philadelphia and Central New Jersey; and my father was an inner-city middle school principal, primarily in Philadelphia.

4.    I am married; and my wife and I have three young children under the age of seven.

5.    I graduated Duke University in 2005 with a Bachelor of Science Degree in Economics.

6.    After obtaining my degree, I worked at Merrill Lynch, Pierce, Fenner & Smith ("Merrill Lynch") from 2005 to 2009. I started as an analyst in Merrill Lynch's financial institutions group in the investment banking division. In 2008, I was promoted to associate in the same group.

7.    In early 2009, I left Merrill Lynch to work at Deutsche Bank as an investment banking associate. I remained this position for approximately 15 to 16 months before leaving for a different opportunity, as I found the work generally unfulfilling.

8.    In 2010, I joined Quadrant Management, Inc. ("Quadrant"), a small family office where I was a junior team member. Among my first tasks was to liquidate unsold medical devices owned by a company in which Quadrant had invested in 2005. It was through the foregoing that I learned about how the medical device sales industry operates.

9.    Thereafter, I suggested to Quadrant's principals that Quadrant purchase a small home medical device supplier, which it did. I ultimately became that medical supply company's CEO in 2014 and oversaw its annual revenue grow from $4 million in 2012 to $2.2 billion in 2021. The public company, now known as AdaptHealth, went from employing 55 people to more than 10,000 by 2021.

2

10.  My work at AdaptHealth led me discover a passion for healthcare-related work.

11.  While at AdaptHealth, and consistent with the values with which I was raised, I pursued various philanthropic causes, which are important to both to me and to my wife, who was raised by a single mother that worked as a nurse.   My wife and I met at a fundraiser for the Leukemia and Lymphoma Society; and we are patrons of various charitable organizations.

12.  The vast majority of my time from 2012 to 2021 was directed towards my work in the healthcare industry and related philanthropic activity, rather than investment banking or securities trading.

## C.  <u>Activities Related to Dividend Arbitrage and Danish Reclaim Applications.</u>

13.  In 2011, while working for Quadrant, I became acquainted with Matthew Stein ("Matt") and Jerome Lhote ("Jerome") because they, along with two other partners, rented office space from Quadrant in the location where I worked.

14.  I was 27 years old at the time and starting my career.  Matt and Jerome are about fifteen years older than I am, were more established, and appeared to be successful, but also philanthropic family men—something I hoped to emulate.

15.  I came to learn that they had significant experience in the financial industry, generally, and specifically concerning international tax and complex financial products and transactions.

16.  Through my conversations with Matt and Jerome, I came to learn that, among other things, they engaged in dividend arbitrage trading strategies and were actively looking to purchase a bank.

17.  At some point in 2011, Matt and Jerome invited me to work as an analyst for their bank acquisition. I agreed to do so without pay, hoping that I would learn from them.  I maintained my relationship with Quadrant during this period and continued to work on the healthcare pursuits.

18.  About a year later in 2012, Matt and Jerome approached me about working with them in their dividend arbitrage trading activities.

19.  At the time they approached me, I had little to no understanding of how

dividend arbitrage worked.

20.    I came to learn that dividend arbitrage is a securities trading strategy.  It involves purchasing both derivatives on a company and an equivalent amount of that company's stock in advance of the record date set for determining which shareholders are entitled to receive dividends.

21.    Matt and Jerome explained to me that part of their dividend arbitrage trading strategy involved holding foreign equities and applying for refunds of taxes withheld by foreign governments on dividends paid by the foreign public companies to their shareholders ("Reclaim Applications").

22.    Matt and Jerome explained that certain entities, including U.S. pension plans, were able to submit these Reclaim Applications.

23.    At the time, I understood that both Matt and Jerome were trained lawyers, had significant experience in international tax, and had received opinion letters from multiple reputable law firms attesting to the validity and legality of their dividend arbitrage strategy and use of Reclaim Applications.  I knew Matt and Jerome also worked with various law firms that Quadrant also used for various corporate work, and that gave me comfort.  As a result, I had no reason to believe that the dividend arbitrage strategy that they intended to employ was not entirely legal.

24.    In or about June 2013, Matt and Jerome were in the early process of forming a new entity, Maple Point, LLC ("Maple Point") for the stated purpose of investing in banks and insurance companies.  They invited me to join them in doing so.  I agreed.

25.    Maple Point, however, was not my sole professional endeavor.  I retained my relationship with Quadrant and eventually became the CEO of a medical supply company during the period of my involvement with Maple Point.

26.    I came to own a seventeen point six percent (17.6%) ownership interest in Maple Point, with Matt and Jerome owning the rest.  My lesser ownership interest reflected my more junior role in the venture, given that I had less experience in the industry than Matt and Jerome.

27.    Maple Point ultimately came to be involved in dividend arbitrage.

28.    I had never previously engaged in that type of trading activity; but I did not suspect that it was illegal.

**D.**    **Danish Government Investigation and Settlement Negotiations**.

29.    In August 2015, I became aware that the taxation authority of Denmark, Skatteforvaltningen ("SKAT"), was investigating Reclaim Applications that U.S. pension plans had made to it while engaging in dividend arbitrage trading strategies involving Danish public companies.

30.    Upon learning of SKAT's investigation, Matt, Jerome, and I immediately ceased engaging in further dividend arbitrage or Reclaim Applications out of caution even though I believed the activity to be legal.

31.    I came to understand at some point thereafter that SKAT was investigating Matt's, Jerome's, and my activities related to Reclaim Applications, as well as those of others.

32.    I eventually came to believe that my best course of action was, if the Reclaim Applications were in any way wrong under Danish law, to engage in discussions with SKAT to resolve the emerging dispute without litigation and to assist SKAT in recovering funds that it had paid in response to Reclaim Applications made by pensions plans with which I was associated.

33.    Through legal counsel, Matt, Jerome, and I participated in negotiations with SKAT to resolve allegations by SKAT related to the Reclaim Applications.

34.    The negotiations began sometime in 2017 and lasted through approximately May 2019.  The law firm Wachtell, Lipton, Rosen & Katz ("Wachtell") represented me and others in this process and eventually came to take the lead in the settlement negotiations.  Starting in 2018, in addition to Wachtell, I was individually represented by the law firm Akin, Gump, Strauss, Hauer & Feld LLP.

35.    I know that SKAT initiated many lawsuits all around the world to recover funds.  SKAT never had to incur the costs of engaging in litigation with me because I engaged in settlement discussions at an early stage to avoid litigation.

36.    My goal when entering negotiations with the Danish government was to fully resolve all civil and criminal disputes between the Danish government and myself, as well as others, related to Reclaim Applications.

37.    Despite believing that the dividend arbitrage strategies involving Danish Reclaim Applications were lawful, my most significant concern throughout

my negotiations with SKAT was potential criminal exposure in Denmark, even though in my view such criminal exposure seemed, and still seems, wholly unreasonable, given that I was under the impression that the dividend arbitrage strategies were lawful.

38. Going into the settlement discussions, during them, and after a settlement agreement was entered into, my most significant concern was potential criminal exposure.

39. My negotiations with SKAT initially and for quite some time thereafter involved seeking both civil and criminal releases.

40. For example, an early draft settlement agreement exchanged with SKAT in late 2017 conditioned the payment and cooperation obligations upon commitments by SØIK, the Danish Public Prosecutor for Serious Economic and International Crime, and all other Danish government agencies not to bring any criminal, civil, or regulatory claims or charges arising from Danish Reclaim Applications against me and others. *See* Pl. Exh. 2 (draft settlement agreement sent to SKAT in or about December 2017).

41. The draft further expressly permitted SØIK to satisfy that condition by provision of a written statement signed by an authorized SØIK official confirming that it had concluded no criminal, civil, or regulatory claims were justified against me and others covered under the agreement, along with a commitment binding on SØIK and any other agency of the Danish government not to bring any claims or charges against those covered by the agreement. *Id.* at Clause 3.

42. Language conditioning settlement upon SØIK agreeing not to bring criminal charges remained in draft settlement agreements that were being circulated with SKAT through at least around the middle of 2018.

43. Additionally, early drafts of the settlement agreement required that SKAT share certain information related to the agreement with SØIK.

44. As one example, the draft settlement agreement shared with SKAT in late 2017 required that SKAT:

    a.    Inform SØIK of the settlement;

    b.    Advise SØIK of the settlement's terms; and

    c.     Represent to SØIK that the settlement reflected good-faith negotiations, that mine and others' cooperation in compliance with that agreement might result in SKAT's recovery of additional funds from unrelated third parties, and that the agreement was in SKAT's best interest. *See* Pl. Exh. 2.

45.    Towards the end of 2018 or the beginning of 2019, however, SKAT stated that it would no longer continue settlement discussions that involved obtaining a commitment by SØIK relating to criminal charges. The provisions of the agreement requiring SKAT to share information with SØIK, however, remained an important aspect of negotiations after this point.

46.    I decided to continue the negotiations with SKAT out of a desire to solve any problems with the Danish government and to mitigate any criminal liability by showing my desire to return money to, and cooperate with, Danish authorities.

47.    It was crucially important to me to obtain assurances from SKAT that SKAT would provide SØIK with information concerning my cooperation.

48.    If the settlement was not going to require SKAT to share the information laid out in Clause 2.3 above, I would not have continued settlement discussions and would not have settled with SKAT.

## E.    The Settlement and Letter Agreements.

49.    On or about May 28, 2019, I, along with others, entered into a settlement agreement with SKAT (the "Settlement Agreement"). *See* Pl. Exh. 104 (copy of the Settlement Agreement and exhibits thereto).

50.    Matt, Jerome, and I strongly advocated that numerous pension plans, and other individuals enter into the Settlement Agreement, which they ultimately did. This resulted in a meaningful benefit to SKAT by increasing its potential monetary recovery because it increased the size of the agreed upon recovery to SKAT and reduced the cost SKAT would have incurred litigating against each individual party.

    a.     The group of individuals and entities that entered into the Settlement Agreement are referred to in the Settlement Agreement as the "Covered Parties." *Id.* at § 1(i). The Covered Parties are listed in Exhibits 1 and 2 to the Settlement Agreement.

b.   The Covered Parties include myself, Matt, Jerome, and various pension plans associated with us, as well as other pension plans, entities, and individuals.  *See id.* at Ex. 1-2.

51.   Matt, Jerome, and I are referred to in the Settlement Agreement as the "Covered Parties' Designees."  *Id.* at § 1(j).  This was because Matt, Jerome, and I were undertaking a series of obligations that the rest of the Covered Parties were not.

52.   As expressly set forth in the Settlement Agreement, it was the parties' understanding and a fundamental principal on which the Agreement is based that the Covered Parties would be repaying to SKAT the full amount of the net proceeds that they received from Danish Reclaim Applications. *See* Pl. Exh. 104.

53.   At the time that I entered into the Settlement Agreement, I, along with Matt, Jerome, and two others also entered into a letter agreement (the "Letter Agreement").  Pl. Exh. 109 (copy of the Letter Agreement).

54.   My intent in entering into the Settlement Agreement and the Letter Agreement—which is reflected in the terms of both agreements—was that the parties' obligations would be divided into two phases ("Phase I" and "Phase II").

55.   This phased approach was a function of overarching business realities at the time.  At the time the Settlement Agreement and Letter Agreement were executed, I fully believed that that the sums required to be paid would likely be able to be satisfied from liquidation of the assets described in the Letter Agreement, as set forth more fully below.  Doing so, however, would take time.

56.   Moreover, the parties could not calculate the net proceeds the Covered Parties received from Danish Reclaim Applications at the time the Settlement and Letter Agreements were executed.  Doing so would also take time.

57.   As a result, the Settlement Agreement contemplated the potential payment of any additional net proceeds identified following the execution of the Settlement Agreement.  The Settlement Agreement referred to this potential additional payment as the "True-Up" amount.

58.   The parties thus preliminarily estimated that the total settlement amount to be paid to SKAT would be  DKK1,500,000,000 (the "Preliminary Settlement

Amount"). *See* Pl. Exh. 104.

59. Sixty-one percent (DKK 950 million) of the Preliminary Settlement Amount was to be paid in Phase I, referred to as the "Initial Cash Payment," and the remaining thirty-nine percent (DKK 600 million) was to be paid in Phase II, referred to as the "Additional Cash Payment." *Id.* I contributed additional monies before this payment to make sure the Additional Cash Payment could be timely made.

60. It would take some time to sell assets necessary to pay the amount to be paid in Phase II. The liquidation efforts were to occur in Phase II. The assets to be sold, the requirement to sell them, and other provisions associated with their sale are described in the Letter Agreement and Annex A.

   a. The assets to be sold were, as SKAT and the Covered Parties' Designees were well aware, illiquid and varied in nature. Each of them would require considerable efforts to monetize.

   b. The assets included in Annex A include my, Matt's, and Jerome's interests in North Channel Bank, a German bank with a then-expected net realizable value of $49 million.

   c. Annex A included additional assets belonging primarily to Matt and Jerome.

61. Division of the obligations into two phases accounted for the fact that, at the time that the Settlement Agreement and Letter Agreement were executed, the final amount to be paid to SKAT was not, and could not be, determined. As a result, the Parties estimated that the amount ultimately to be paid was DKK 1.55 billion but might be adjusted depending on facts discovered and agreed upon during Phase II.

62. Finally, under the phased approach of the Settlement Agreement, SKAT's remedies for any future failures to make payments were limited once Phase I was complete. In short, once Phase I was complete, all covered parties except me, Matt, and Jerome would be released from further liability.

63. At the close of Phase I, I and the other Covered Parties' Designees were required to provide affidavits of confession of judgment to SKAT in the form attached to the Settlement Agreement (the "2019 Affidavit of Confession of Judgment"). *See* Pl. Exh. 104 at § 4(c) & Exh. 4.

64.  SKAT's only remedy against me, Matt, and Jerome for non-payment of the amount due under Phase II was to utilize the 2019 Affidavit of Confession of Judgment that we provided to SKAT

### 1. General Material Obligations Under the Settlement and Letter Agreements.

65.  Notwithstanding the multi-phase nature of the Settlement and Letter Agreements, the parties agreed to certain material terms that were not tied to either Phase I or Phase II. I identify what I believe to be those terms below.

66.  Subject to certain exceptions, the parties agreed that the Settlement and Letter Agreements would be kept confidential subject to a limited exception designed to benefit the Covered Parties set forth in Section 8(f) of the Settlement Agreement. *See* Pl. Exh. 104 at § 8; Pl. Exh. 109 at § 2.

67.  The parties also agreed to not disparage each other, with certain exceptions. *See* Exhibit Pl. Exh. 104 at § 9.

68.  In addition, the parties agreed to various formal and informal dispute resolution mechanisms, how notices would be provided, where any disputes would be litigated, and the application of New York law to the agreement. *See id.* at § 10, 11, 12, 20.

### 2. The Parties' Obligations in Phase I and Results of Compliance

69.  During Phase I, an initial cash payment ("Initial Cash Payment") of DKK 950 million was to be made within sixty (60 days after the Settlement Agreement's effective date. *See id.* at § 2(a).

70.  Upon Payment of the Initial Cash Payment, SKAT broadly released the Covered Parties from "any and all claims" that SKAT "has or may have against the Covered Parties in any way arising from or relating to [Danish] Reclaim Applications and the related trading by the Covered Parties in Danish company shares. . . including any administrative claims [SKAT] has brought or could bring in Denmark. . ." *See id.* at §§ 1(bb), 4(a).

71.  As described above, Matt, Jerome, and I were required to provide the 2019 Affidavits of Confession of Judgment at the time of the Initial Cash Payment. Matt, Jerome, and I provided these affidavits on August 8, 2019.

72.  The purpose of the 2019 Affidavit of Confession of Judgment was to provide

security for the further payments required under Phase II. Apart from Matt and Jerome, none of the other Covered Parties provided an affidavit of confession of judgment or other security. The Affidavit of Confession of Judgment thus referred only to payments that were required to be made after the Initial Cash Payment, but not to the Initial Cash Payment itself.

73. It is my understanding that, if the Covered Parties made the Initial Cash Payment in a timely manner under Phase I of the Settlement Agreement, SKAT's sole remedy for the failure to pay the remainder of the amounts required to be paid under the Settlement Agreement was the filing of the Affidavit of Confession of Judgment against the Covered Parties' Designees only. *See id.* at § 2(c).

74. It is my understanding that SKAT had, and has, no remedy to seek payment from the remaining Covered Parties.

75. Besides agreeing not to sue the Covered Parties between the date that the Settlement Agreement was signed and the date for making the Initial Cash Payment, *see* Pl. Exh. 104 at § 4(e), SKAT had substantially no other obligations specific to Phase I of the Settlement Agreement.

76. There is no dispute about completion of the Initial Cash Payment, provision of the 2019 Affidavit of Confession of Judgment, or the effectiveness of the releases by either SKAT or the Covered Parties. Records of the payment of the Initial Cash Payment are marked as Pl. Exh. 3.

### 3. The Covered Parties' and Covered Parties' Designees' Obligations in Phase II.

77. Phase II began once the Initial Cash Payment had been made and the releases by SKAT of the Covered Parties had been triggered. Phase II required additional actions on the part of the Covered Parties and more significant actions on the part of Matt, Jerome, and me as the Covered Parties' Designees.

78. The Covered Parties were required to fully cooperate with SKAT in its investigation of others who were not released as a result of the Settlement Agreement. They did so. SKAT made multiple requests for cooperation. Matt, Jerome, and I complied with them and, therefore, provided SKAT with a benefit that I believe was substantial. I describe our cooperation efforts below.

79.  The Covered Parties were required to make the Additional Cash Payment of DKK 600 million.  *See* Pl. Exh. 104 at §§ 1(a), 2(b).

80.  The Covered Parties' Designees were required to pay the True-Up amount . The purpose of the payment of the True-Up amount was, as noted above, to account for the fact that the precise amount to be paid could not be, determined when the Settlement Agreement was signed.  The settlement required the Covered Parties to use their best efforts to provide SKAT with information necessary to determine the True-Up amount.

81.  The Settlement Agreement required that all payments be made by 36 months after May 28, 2019.  The date was modified by the Letter Agreement, as set out below.

82.  The Letter Agreement also set out various Phase II obligations, mostly imposed upon me, Matt, and Jerome as the Covered Parties' Designees.

83.  Jerome, Matt, and I were required to use our best efforts to liquidate certain assets described in the Letter Agreement.  Of these assets, I personally had ownership interest in North Channel Bank and the Foreign Insurance Company.  The other assets identified belonged to Matt and Jerome.

84.  The total expected realizable value of all assets identified in the Letter Agreement was approximately DKK 565 million, which, if realized, would allow for payment of nearly all of the Additional Cash Payment.  Pl. Exh. 109 at §§ 3, 5 & Annex A.

85.  Pursuant to the Letter Agreement, the final payments required by the Settlement Agreement were to be made by May 28, 2023.  *Id.* at §§ 1(r), 2(d).

86.  The most valuable asset to be liquidated to complete the payments required under the Settlement Agreement were interests in North Channel Bank, a bank located in Germany that was associated with Reclaim Applications.  At the time of the Settlement Agreement, I expected that the value to be realized from its sale would be DKK 322 million.  My expectation is reflected in the Letter Agreement.  *Id.*, Annex A.  Ultimately, we were unable to monetize North Channel Bank for anything approaching that amount, as discussed below.

### 4. SKAT's Obligations Under Section 8(f) of the Settlement Agreement.

87.   SKAT had few obligations as part of Phase II, but what it was obligated to do was of paramount importance to me.

88.   For me, SKAT's most important Phase II obligations were set forth in Section 8 of the Settlement Agreement. Pl. Exh. 104 at § 8(f). The obligations laid out in Section 8 were the only substantive benefit that I was to obtain from SKAT relating to Phase II.

89.   Section 8(f) provides: "Notwithstanding the confidentiality obligations of this Section 8, promptly upon the execution of this Agreement, [SKAT] will, in writing, bring to the attention of [SØIK] this Agreement and its terms, and represent, in writing, that this Agreement reflects good-faith negotiation by the Covered Parties, that the Covered Parties' cooperation may result in the recovery by Skatteforvaltningen of additional funds from third parties and that this Agreement is in the best interests of Skatteforvaltningen. Upon request by SØIK, Skatteforvaltningen may provide and/or disclose the entirety of this Agreement to SØIK."

90.   This term was the most important provision of the Settlement Agreement. As a practical matter, it was the only significant promise that SKAT made that might have helped me avoid being prosecuted by SØIK, which was my primary purpose in entering into the Settlement Agreement.

91.   As explained above, I had initially insisted that the Settlement Agreement be conditioned on the Danish government agreeing not to indict me. When that provision was no longer possible, I settled for the promises SKAT made in Section 8(f). Section 8(f) is in essence what I bargained for when I entered into the Settlement Agreement. Without its inclusion, I would not have entered into the Settlement Agreement or the Letter Agreement. SKAT's failure to comply with Section 8(f) meant that I received substantially no material benefit in Phase II.

92.   While I recognize that SKAT's good faith compliance with Section 8(f) of the Settlement Agreement would not guarantee that SØIK would not charge me criminally, it was my understanding that SKAT's compliance with Section 8(f) would have increased the chances that I would not be prosecuted.

93.   Each element of Section 8(f) was important to me and SKAT's failure to

comply with each aspect of what was required of Section 8(f) deprived me of a benefit that I contracted to receive, expected to receive, and should have received, under Section 8(f).

### i. Timing of SKAT's Obligation

94. SKAT was required to "promptly upon the execution of [the Settlement] Agreement" communicate in writing the terms of the Settlement Agreement to SØIK. SKAT's compliance with this provision was material to me. I expected that SKAT would communicate with SØIK as soon as the Settlement Agreement was executed or at the very latest promptly after the Initial Cash Payment was made.

95. The timing of when SKAT fulfilled its communication obligations was important to me because it was my understanding at the time I executed the Settlement Agreement that the earlier that SØIK learned of the settlement, the more likely it would have been that SKAT's communication would positively influence SØIK's investigation.

96. For example, had SØIK known that I had agreed to repay an amount greater than I have been accused of benefiting from Danish Reclaim Applications, that a substantial amount of additional funds were to be returned to the Danish treasury, and that I agreed to fully cooperate, SØIK might have determined that the civil resolution was sufficient and further determined that its extensive, multi-national investigation could have been expedited by leveraging my cooperation and not charging me.

97. If SKAT failed to timely comply with its obligations under Section 8(f) of the Settlement Agreement by failing to promptly communicate with SØIK it likely would result in SØIK expending more time, energy, and resources in its investigation, making it more likely that SØIK would charge me.

98. A communication from SØIK of the type required by Section 8(f) in August 2019, after the Initial Cash Payment, would be more impactful than a communication made, for example, *after* SØIK had determined to proceed against me.

### ii. Requirement of Communication "In Writing"

99. That SKAT communicate in writing was also material to me for multiple reasons.

100. For example, the writing requirement ensured that the information disclosed to SØIK would become part of SØIK's official records and could be easily and widely disseminated within SØIK. SØIK is a government agency with various functions and ensuring that anyone who might be working on matters relating to its investigation was the intent of the writing requirement.

101. The writing requirement also ensured that it would be possible to assess whether and to what extent SKAT complied with Section 8(f).

### iii. Disclosure of the Settlement Agreement and its Terms

102. It was also material to me that SKAT bring to SØIK's attention not just the fact that I and others had entered into the Settlement Agreement, but also the Settlement Agreement's terms, as Section 8(f) required.

103. This is because the Settlement Agreement contains many terms that bear on many different topics and the extent of the obligations that Matt, Jerome, and I, among others, undertook which demonstrate the great benefits that SKAT was obtaining under the Settlement Agreement. We specifically bargained for that disclosure to SØIK to maximize the chances that we would not be prosecuted.

104. It was incredibly important that SØIK be made aware of the Covered Parties' Designees' payment obligations. I have reviewed the deposition of a SKAT official taken in this case in June 2024; and based on my review, I am aware that, since the inception of its efforts to recoup funds that it contends were improperly paid out due to Danish Reclaim Applications, SKAT has recovered DKK 1.8 billion from various parties. More than 55% of the amount recouped was the result of payments made under the Settlement Agreement. The same SKAT official testified that SKAT had spent an estimated DKK 2.5 billion on legal fees to recover that DKK 1.8 billion.

105. It was my understanding at that time that the ability to recover such a substantial percentage of SKAT's total alleged losses through Settlement Agreement without having to incur attorneys' fees and costs associated with litigation was a factor that SØIK would likely take into consideration when determining whether to prosecute me and the other Covered Parties.

106. In addition, it was important for SØIK to know that: (i) the Covered Parties were required to use their best efforts to ensure that their cooperation is meaningful and productive; (ii) SKAT could require attorneys for the Covered

Parties to provide cooperation information; and (iii) the Covered Parties were required to provide information about themselves in addition to information about anyone or anything on a broad range of subjects. *See* Pl. Exh. 104 at § 7(b), 7(g); *id.* at § 1(g) (defining "Cooperation Information").

107. I believed at the time I executed the Settlement Agreement and Letter Agreement that it was important for SØIK to know that if it chose to indict me, Jerome, and Matt, the cooperation that we were obligated to provide to SKAT might not be available, which might impact SKAT's efforts to recover in any cases against third parties.

108. Nor, as another example, would it have been sufficient to only inform SØIK of the Covered Parties' identities because it would not identify who the Covered Parties' Designees were (including me) given that we undertook special obligations under the Settlement Agreement, including the obligations to (i) make the Subsequent Cash Payment, (ii) pay interest if necessary, (iii) certify certain information relating to the True-Up Amount, and (v) liquidate assets to ensure that the Covered Parties' payment obligations were met; and (vi) that Matt, Jerome. *See* Pl. Exh. 104 at §§ 2(c), 2(d)(iii), 2(e)(iii), 4(c); Pl. Exh. 109 at § 5.

109. In addition, SØIK would not learn that Matt, Jerome, and I agreed to provide an Affidavit of Confession of Judgment and an Updated Affidavit of Confession of Judgment—meaning that without disclosure of the foregoing, SØIK would not be made aware that SKAT's remedy for any failure to make payments was against us and us alone (as opposed to all the Covered Parties).

110. It was similarly material to me that SKAT communicate to SØIK the timing of payments and the way the Covered Parties' Designees were required to liquidate assets to make those payments. It was important for SØIK to know, for example, that a decision to indict might bear significantly on the Covered Parties' Designees' ability to complete the required payments and that an indictment might jeopardize my, Jerome's, or Matt's ability to make the Additional Cash Payment or pay the True-Up Amount.

### iv. Specific Written Representations Required by Section 8(f).

111. Under Section 8(f), SKAT was required to make specific written representations to SØIK, including that: (i) the Settlement Agreement "reflects good-faith negotiation by the Covered Parties"; (ii) "the Covered

16

Parties' cooperation may result in the recovery by [SKAT] of additional funds from third parties"; and (iii) the Settlement Agreement "is in the best interests of [SKAT]." Pl. Exh. 104 at § 8(f).

112. It was important factor in fulfilling the intent of Section 8(f) that SKAT make each of these representations in order to provide information that might have placed me in a more positive light in front of SØIK.

113. I specifically bargained for SKAT (as opposed to me or my lawyers) to make these representations to SØIK because SØIK would naturally give more credit to SKAT than if I, or my lawyers, made these representations.

114. As noted above, by the time of the Settlement Agreement, SKAT had initiated many lawsuits against others. The cooperation obligation set out in the Settlement Agreement was not limited to assisting SKAT in the existing cases; it was unlimited and encompassed any cases against third parties.

115. That our cooperation might result in SKAT's recovery of additional funds from third parties would demonstrate that SKAT could have the reasonable expectation that the information we were required to provide would positively impact SKAT's efforts to recover funds from others.

116. As noted, it was important for SØIK to know that, if it chose to indict me, Matt, and Jerome, we might be unable to cooperate without risking criminal exposure, which could jeopardize SKAT's efforts to recover in other proceedings.

117. Significantly, it also was important for SØIK to know that an indictment of me, Matt, and Jerome might jeopardize our ability to pay the DKK 600 million required in Phase II. If SKAT did not explain the payment mechanisms built into the Settlement Agreement and the Letter Agreement, then SØIK would not be aware that an indictment of me, Matt, and Jerome might impact the amounts ultimately recovered by the Danish treasury.

118. The fact that SKAT represented to SØIK that the Settlement Agreement "is in the best interests of [SKAT]" was also material. SKAT regards itself as the victim of a fraud arising from Danish Reclaim Applications submitted by many persons around the world. A representation from the victim (SKAT) would state to the authority responsible for making determinations about whom to prosecute (SØIK) that the Settlement Agreement is in the alleged victim's best interests.

### *v. Disclosure of Settlement Agreement Upon Request*

119. The last sentence of Section 8(f) provides that "Upon request by SØIK, [SKAT] may provide and/or disclose the entirety of the [Settlement] Agreement to SØIK." *See* Pl. Exh. 104.

120. This was important to me because it ensured that SØIK merely had to ask SKAT to obtain the full Settlement Agreement and learn of my, Jerome's, and Lhote's obligations thereunder.

121. For example, this provision ensured that the full Settlement Agreement could become part of SØIK's official records and could be easily and widely disseminated within SØIK.

### F.  **My Compliance with the Settlement Agreement**

122. I complied with every obligation the Settlement Agreement imposed upon me before I learned that SKAT was in default of the Agreement.

123. Until I was sued as a Third-Party Defendant in this action, I maintained confidentiality of the Settlement Agreement and its terms.

124. I also have not disparaged SKAT.

125. Pursuant to the terms of the Settlement Agreement, I timely executed the required Affidavit of Confession of Judgment dated May 28, 2019, at which time I resided in Pennsylvania. Pl. Exh. 10a (copy of the 2019 Affidavit of Confession of Judgment).

126. I also executed the Updated Affidavit of Confession of Judgment dated June 10, 2021. A few months after that, I moved to Florida with the intention to remain a resident of Florida indefinitely. I continue to reside in Florida as of April 2025; and it has been my sole residence since 2021. A true and accurate copy of the Updated Affidavit of Confession of Judgment that I executed is attached. *See* Pl. Exh. 129.

### *i. Cooperation*

127. As noted above, Matt, Jerome, and I, together with the other Covered Parties, undertook substantial cooperation obligations under the Settlement Agreement, beginning in 2019 and continuing thereafter.

128. At significant personal expense, through at least 2021, Jerome, Matt, and I, and our lawyers acting at our direction, responded to multiple requests made by SKAT. Among other things, we: (a) Reviewed and produced over 90,000 thousand documents in SKAT's pending suits against non-settling parties in the United States; (b) Reviewed and approved SKAT's requests to use documents of the Covered Parties' Designees in SKAT's litigation against other parties in Dubai and the United Kingdom; (c) Performed research and made proffers to U.S. counsel for SKAT to answer factual questions that SKAT raised in connection with its prosecution of claims against other parties; and (d) Addressed other substantive and procedural questions and requests from U.S. counsel for SKAT lawyers to facilitate SKAT's prosecution of its civil actions across multiple jurisdictions, including, the United States, the United Kingdom, Malaysia, and Dubai.

129. I am not aware of SKAT ever seeking any remotely comparable cooperation from any of the other Covered Parties.

130. In addition to the foregoing, I also provided substantial cooperation to SØIK in furtherance of its broader investigation into alleged fraud related to Reclaim Applications.

131. During the summer of 2020, I became aware that SØIK was formally investigating whether to bring a criminal action against me related to the Danish Reclaim Applications.

132. As part of my cooperative efforts required under the Settlement Agreement, I voluntarily made myself available for a formal, three-day interview with prosecutors from SØIK that took place from January 6, 2021, through January 8, 2021.

133. During my interview with SØIK, I answered all questions to the best of my knowledge, including regarding various entities, pension funds, and individuals associated with the Danish Reclaim Trading, and otherwise about the conduct that SØIK was investigating.

134. I also re-affirmed my commitment to cooperate with the Danish government, including by describing the extent of my efforts to achieve the Settlement Agreement and my continued commitment to make payments to the Danish government under the Settlement Agreement.

### *ii.  Payment Towards the Settlement Agreement*

135.  I contributed DKK 55,189,028 to the Initial Cash Payment under Phase I of the Settlement Agreement.  McGee's Exhibit 27 is a true and accurate copy of a letter dated April 8, 2021, that contains details related to my payments under the Settlement Agreement as of April 2021.

136.  In addition, in March 2021 I also timely contributed approximately DKK 19,916,383.95 towards the Additional Cash Payment, which I understand to be more than half of the total amounts paid towards the Additional Cash Payment.  *See* McGee Exh. 27.

137.  It was my genuine belief that Matt, Jerome, and I would apportion the Additional Cash Payment amongst ourselves according to how much we each personally benefitted from the dividend trading and Danish Reclaim Applications.  I understood that I would be responsible for paying back the funds I received from the dividend trading and Danish Reclaim Applications.

138.  In fact, I have paid more to SKAT more than the total amount that I received from all Danish Reclaim Applications with which I may have been associated, including a substantial amount that I separately repaid to Maple Point to retire debt used to purchase North Channel Bank. I did this for the purpose of increasing the bank's value so that when it was liquidated, the proceeds would be sufficient to meet the Settlement Agreement's Phase II payment obligations.

139.  As a result, I understood and in good faith believed that SKAT would receive the benefit of that payment.  The bank's sale has not taken place, for reasons discussed below.

140.  Though I believed as of April 2021 that the payments I made pursuant to the Settlement Agreement effectively repaid to the Danish government all of the net proceeds I received or benefitted from through the Danish Reclaim Applications and more, I remained fully committed to making additional payments under the Settlement Agreement to the extent required until SKAT sued me in 2023.

141.  Including the payments that I made, it is my understanding that the Covered Parties repaid more than DKK 1 billion to the Danish government related to Danish Reclaim Applications.

142.  It is my understanding that, of the Covered Parties Designees (Matt, Jerome, and I), I am the only one who as I understand it paid out monies in excess of what I received, as I have described.

### G. SØIK Indictment and Resulting Consequences

143.  On April 12, 2021, SØIK indicted Matt, Jerome, me, and others for crimes under Danish law arising from the dividend arbitrage activity.

  a.  SØIK alleges that I and others committed fraud against the Danish taxing authority in connection with the Danish Reclaim Applications.

  b.  SØIK asserts that my activity caused a loss of DKK 1,135,775,447.99.

  c.  SØIK contends that the alleged fraud was particularly serious; and it accordingly carries with it a maximum sentence of 12 years in prison.

  d.  For the avoidance of doubt, I deny that I committed the crime of which I have been accused or any other crime under Danish law.

  e.  At no time have I ever believed that I was engaging in anything other than lawful behavior.  To the contrary, I understood based on information provided by Matt and Jerome and the legal opinions obtained that the trading at issue complied with applicable law.  The topics of the legal advice on which I relied included substantive Danish law and the operation of pension plans.

144.  As of that time, despite the indictment, I remained committed to making a full repayment to SKAT under the Settlement Agreement, as it continued to be my understanding that the Settlement Agreement had been and was being honored and complied with by both sides of the agreement, including by SKAT.

145.  Through my attorneys, I accordingly continued to cooperate with the Danish government regarding inquiries related to the Reclaim Applications and sought to continue my compliance with the Settlement Agreement.

146.  It quickly became clear, however, the that the indictment frustrated the Covered Parties' ability to satisfy their Subsequent Payment obligations in Phase II of the Settlement Agreement.

147.  As described above, the Letter Agreement specifically contemplated that the

Covered Parties would liquidate North Channel Bank, which was worth an estimated DKK 322 million at the date of execution of the Settlement Agreement, in order to satisfy the Subsequent Payment obligation. Matt, Jerome, and I had specifically considered the value of North Channel Bank in our negotiations surrounding the Settlement Agreement.

148. After Matt, Jerome, and I were indicted and the indictments became public knowledge, however, liquidation of North Channel Bank became increasingly difficult. Any potential buyers had significant leverage in any negotiations knowing that a sale needed to occur. Further, the indictments negatively affected the relationship between bank management and Matt, Jerome, and me, making a sale even more difficult.

149. The indictments had the effect of ensuring that North Channel Bank would either not be sold or not be sold for anything close to the DKK 322 million that, as of the date of the Settlement Agreement, it was expected to realize upon sale.

150. North Channel Bank was ultimately placed into liquidation in Germany. I am not aware of whether the liquidation has been completed and whether SKAT may ultimately see some recovery from the liquidation.

151. Being indicted also caused severe reputational and financial harm for me personally. For example, from 2014 to 2019, I served as an officer for AdaptHealth LLC. Following a merger between AdaptHealth LLC, and other entities in November 2019, I became an officer and director of the surviving entity, AdaptHealth until June 11, 2021.

152. Upon learning of my indictment, AdaptHealth's board of directors placed me on unpaid administrative leave and subsequently removed me as officer and director of the company on June 11, 2021. As a result, I lost my annual compensation from that position, as well as forfeited millions of dollars of unvested, but "in-the-money" options and restricted stock of AdaptHealth.

153. AdaptHealth's shareholders thereafter filed a federal securities class action lawsuit against me, AdaptHealth, and others, in part based on allegations related to SØIK's criminal investigation. Although the parties to that litigation formally settled their disputes in July 2024, the litigation caused me further financial and reputational harm. Specifically, I personally had to contribute One Million Dollars ($1,000,000) towards the settlement.

154. The public nature of the indictment has frustrated my ability to gain

comparable employment since 2021.

155. The net result of these outcomes is that my ability to earn money has been substantially diminished.

### H. SKAT's Breach of the Settlement Agreement, My Discovery of Same, and the Effects of the Breach

156. When Matt and Jerome filed this action, I became aware for the first time of allegations that SKAT failed to comply with its obligations under the Settlement Agreement, including its obligations under Section 8(f) of the Settlement Agreement.

157. SKAT's failure to comply with Section 8(f) meant that I received substantially none of the benefits that I was to obtain in Phase II, effectively depriving me of the chance to potentially avoid indictment that I had bargained for.

158. Notwithstanding, I still chose not to join the action as a plaintiff out of respect for the Danish government and a desire to reach a reasonable resolution of both this matter and the ongoing criminal proceedings. I continue to fully cooperate with the Danish government with respect to the criminal action against me. I continue to believe a reasonable resolution is in the best interests of all parties.

159. Notwithstanding the foregoing, based on what I now know, I believe that SKAT did breach Section 8(f) of the Settlement Agreement. As a result, I seek the same relief as a defense to SKAT's claims against me as Matt and Jerome do in their claims against SKAT.

### I. My Residence and the 2021 Affidavit of Confession of Judgment

160. When the Settlement Agreement was executed, I resided, together with my wife and son in Philadelphia, Pennsylvania. I had lived in Philadelphia since January 2019.

161. I had previously lived in New York County, but permanently left my residence in the state of New York when my family moved to Pennsylvania.

162. In or about early June 2021, I executed an Updated Affidavit of Confession of Judgment, which reflects that I was residing in Philadelphia, Pennsylvania. Pl. Ex. 129

163. In September 2021, my family and I moved to Florida after purchasing a home in Palm Beach, Florida.

164. When my wife, children, and I moved to Florida, I had no intention of continuing to reside in the State of Pennsylvania and no intention to re-establish residence there. That remains true today.

165. We continue to reside in that home and our children are enrolled in school in West Palm Beach, Florida, in our efforts to become permanent members of the Palm Beach community.

166. I obtained a Florida driver's license upon moving to Florida, which is where I have voted since 2021.

167. My wife and I continue to own through an LLC a vacation property in New York that we purchased in November 2014. This property, however, is not and never has been our residence.

## J.    **Concluding Remarks**

168. Because this Witness Statement is being submitted for a limited purpose, it does not include all of the facts associated with the issues described above and of which I am aware.

169. Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury under the laws of the United States that the foregoing is true and correct.


Executed on April 7, 2025, at Palm Beach, Florida.


_____
Luke McGee