UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MATTHEW STEIN and JEROME LHOTE,

                Plaintiffs,

      v.

SKATTEFORVALTNINGEN,

               Defendant,
      and

LUKE MCGEE,

          Nominal Defendant.

23 Civ. 2508 (NRB)

---

SKATTEFORVALTNINGEN,

      Counterclaim Plaintiff,

      v.

MATTHEW STEIN, JEROME LHOTE, and
LUKE MCGEE,

      Counterclaim Defendants.

---

## JOINT PRELIMINARY PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Daniel S. Newman
Justin B. Kaplan
Edgar A. Neely IV
NELSON MULLINS RILEY &
SCARBOROUGH LLP
One Biscayne Tower, 21st Floor
Miami, Florida  33131
Telephone: (305) 373-9400

*Attorneys for Counterclaim Defendant
Luke McGee*

Daniel W. Levy
Olivia G. Visconti
MCKOOL SMITH P.C.
1301 Avenue of the Americas
32nd Floor
New York, New York  10019
Telephone: (212) 402-9400

*Attorneys for Plaintiffs-Counterclaim
Defendants Matthew Stein and
    Jerome Lhote*

# TABLE OF CONTENTS

**Paragraphs**

**Proposed Findings of Fact**

The Parties ................................................................................ 1

Events Leading Up to the May 2019 Settlement With SKAT ..................... 10

The Settlement Agreement and the Letter Agreement ................................. 28

Initial Performance by the Parties .................................................... 35

Obligations After the Initial Cash Payment
and the 2019 Affidavit of Confession of Judgment ....................................44

Section 8(f) of the Settlement Agreement .................................................... 56

SKAT's Written Communications with SØIK............................................. 60

Stein, Lhote, and McGee's Performance After the Initial Cash
Payment ...................................................................................... 69

The Efforts to Obtain Information from SKAT About
Compliance with Section 8(f) and SKAT's Failure to Provide It ............... 84

The Indictment and the Further Efforts to Obtain
Information About SKAT's Compliance With Section 8(f) ...................... 114

**Proposed Conclusions of Law**

The Claims and Defenses ................................................................. 1

Stein and Lhote's Count I............................................................. 7

SKAT Breached Section 8(f) of the Settlement Agreement ........................ 13

The Strong Circumstantial Evidence of A Breach of Section 8(f).............. 43

The "Absolute and Unconditional" Provision
Does Not Excuse SKAT's Breach of Section 8(f) ........................................54

SKAT's Contract Claims Fail For Another Reason......................................65

## **TABLE OF CONTENTS (cont'd)**

**Paragraphs**

SKAT's Breach Was Material ...................................................................... 71

Stein and Lhote Sought Rescission Within A Reasonable Period
of Time ........................................................................................................ 80

The Remedies of Rescission and Rescissory Damages Are
Appropriate ................................................................................................. 98

The Settlement Agreement Is Divisible ...................................................... 103

Stein and Lhote's Count II -- Declaratory Judgment
As to The 2021 Affidavit of Confession of Judgment .............................. 109

Conclusion .................................................................................................. 138

## <u>TABLE OF AUTHORITIES</u>

**Paragraph(s) of Proposed
Conclusions of Law**

CASES

*Apfel v. Prudential-Bache Sec. Inc.*,
    81 N.Y. 2d 470 (1993) ................................................................................ 75(h)

*Ballow Brasted O'Brien & Rusin P.C. v. Logan*,
    435 F.3d 235 (2d Cir. 2006) ....................................................................... 10, 82

*Bank of America, N.A. v. Greuner Med. P.C.*,
    2024 WL 182408 (S.D.N.Y. Jan. 17, 2024) ................................................ 57, 58

*Banque Arabe et Internationale D'Investissement v. Maryland Nat. Bank*,
    850 F. Supp. 1199 (S.D.N.Y. 1994) .................................................................. 83

*Caisse Nationale de Credit Agricole-CNCA, N.Y. Branch v. Valcorp, Inc.*,
    28 F.3d 259 (2d Cir. 1994) ......................................................................... 75(h)

*Caremark, L.L.C. v. New York Cancer & Blood Specialists*,
    740 F. Supp. 3d 340 (S.D.N.Y. 2024) ............................................................... 99

*CBS Broad. Inc. v. Jones*,
    460 F. Supp. 2d 500 (S.D.N.Y. 2006) ............................................................... 70

*Century City Mall, LLC v. Waxman*,
    193 A.D.3d 499 (1st Dep't 2021) ..................................................................... 59

*Chapman v. Davis*,
    165 N.Y.S.3d 818 (Pleasant Valley Town Ct. 2022) .................................... 71, 72

*CIT Grp./Commercial Servs., Inc. v. Prisco*,
    640 F. Supp. 2d 401 (S.D.N.Y. 2009) ............................................................... 58

*Cont'l Cas. Co. v. Marshall Granger & Co., LLP*,
    6 F. Supp. 3d 380 (S.D.N.Y. 2014) ............................................................ 83, 84

*Express Trade Capital, Inc. v. Horowitz*,
    198 A.D.3d 529 (1st Dep't 2021) ................................................... 116, 118-120

## <u>TABLE OF AUTHORITIES (cont'd)</u>

**Paragraph(s) of Proposed
Conclusions of Law**

*F & K Supply Inc. v. Willowbrook Dev't Co.*,
    288 A.D.2d 713 (3d Dep't 2001)....................................................................137

*Faunus Grp. Intern., Inc. v. Ramsoondar*,
    2014 WL 2038884 (S.D.N.Y. May 16, 2014)....................................................61

*Gimbel Bros., Inc. v. Brook Shopping Ctrs., Inc.*,
    118 A.D.2d 532 (2d Dep't 1986)....................................................................133

*Ginett v. Computer Task Grp., Inc.*,
    962 F.2d 1085, 1098 (2d Cir. 1992) ...............................................................106

*Gleit v. Francois-Bodine*,
    2018 U.S. Dist. LEXIS 85038 (S.D.N.Y. May 18, 2018) ...................................98

*Great Am. Ins. Co. v. Zelik*,
    2020 WL 85102 (S.D.N.Y. Jan. 6, 2020) ...........................................................12

*Harbinger v. F&G, LLC v. OM Grp. (UK) Ltd.*,
    2015 WL 1334039 (S.D.N.Y. Mar. 18, 2015)....................................................31

*Indep. Energy Corp. v. Trigen Energy Corp.*,
    944 F. Supp. 1184 (S.D.N.Y. 1996) ............................................................60, 61

*Int'l Motor Sports Grp., Inc. v. Gordon*,
    1999 WL 619633 (S.D.N.Y. Aug. 16, 1999)......................................................87

*J. D'Addario & Co., Inc. v. Embassy Indus., Inc.*,
    20 N.Y.3d 113 (2012) ........................................................................................70

*Katzman v. Helen of Troy Texas Corp.*,
    2013 WL 1496952 (S.D.N.Y. Apr. 11, 2013) ....................................................68

*KJ Roberts & Co. Inc. v. MDC Partners, Inc.*,
    2014 WL 1013828 (S.D.N.Y. Mar. 14, 2014).................................................137

*Lazard Freres & Co. v. Crown Sterling Mgmt., Inc.*,
    901 F. Supp. 133 (S.D.N.Y. 1995) ..........................................................104, 106

iv

<u>**TABLE OF AUTHORITIES (cont'd)**</u>

**Paragraph(s) of Proposed
Conclusions of Law**

*Lenel Sys. Intl., Inc. v. Smtih*,
  34 A.D.3d 1284 (4th Dep't 2006).........................................................................8

*Lipsky v. Commonwealth United Corp.*,
  551 F.2d 887 (2d Cir. 1976) ...............................................................................73

*Mackinder v. Schawk, Inc.*,
  2005 WL 1832385 (S.D.N.Y. Aug. 2, 2005).......................................................74

*Maloul v. Berkowitz*,
  2008 WL 2876532 (S.D.N.Y. July 23, 2008).......................................................84

*Martinez v. Rockwood*,
  2025 WL 459893 (S.D.N.Y. Feb. 11, 2025) .......................................................124

*Matter of Gaied v. New York State Tax Appeals Trib.*,
  22 N.Y.3d 592 (2014) ........................................................................................114

*Matter of Obus v. New York State Tax Appeals Trib.*,
  206 A.D.3d 1511 (3d Dep't 2022)......................................................................114

*Medinol Ltd. v. Bos. Sci. Corp.*,
  346 F. Supp. 2d 575 (S.D.N.Y. 2004) ..................................................................63

*Metro. Life Ins. Co. v. Noble Lowndes Intl.*,
  84 N.Y.2d 430 (1994).........................................................................................68

*Nomura Home Equity Loan, Inc., Series 2006-FM2 v. Nomura Credit &
  Capital, Inc.*,
  30 N.Y.3d 572 (2017) ....................................................................................68, 70

*Orlander v. Staples, Inc.*,
  802 F.3d 289 (2d Cir. 2015) ................................................................................74

*Pyskaty v. Wide World of Cars, LLC*,
  856 F.3d 216 (2d Cir. 2017) ................................................................................98

**TABLE OF AUTHORITIES (cont'd)**

**Paragraph(s) of Proposed
Conclusions of Law**

*Rebecca Broadway L.P. v. Hotton*,
    143 A.D.3d 71 (1st Dep't 2016) ........................................................89

*Republic Ins. Co. v. Masters, Mates & Pension Plan*,
    77 F.3d 48 (2d Cir. 1996) ................................................................84

*Reilly v. Natwest Mkts. Grp. Inc.*,
    181 F.3d 253 (2d Cir. 1999) ...........................................................100

*Samba Enters., LLC v. iMesh, Inc.*,
    2009 WL 705537 (S.D.N.Y. Mar. 19, 2009) ....................................104

*Sapon v. Hanbat Rest., Inc.*,
    2021 WL 621170 (S.D.N.Y. Feb. 16, 2021) .....................................124

*Sasson v. Mann*,
    2019 WL 3532155 (S.D.N.Y. Aug. 2, 2019) ...................... 103, 105, 108

*Syncora Guar. Inc. v. Countrywide Home Loans, Inc.*,
    935 N.Y.S.2d 858 (Sup. Ct. N.Y. Cty. 2012) .....................................99

*Torres v. Monsalve*,
    2021 N.Y. Misc. LEXIS 29744 (Sup. Ct. Queens Cty. Mar. 31, 2021) ...........123

*Treasure Chest Themed Value Mail, Inc. v. David Morris Int'l, Inc.*,
    2018 WL 3130601 (S.D.N.Y. June 26, 2018) ....................................63

*Unanue v. Unanue*,
    141 A.D.2d 31 (2d Dep't 1988) ......................................................114

*United States ex rel. Taylor v. Gabelli*,
    2005 WL 2978921 (S.D.N.Y. Nov. 4, 2005) .......................................99

*United States Liab. Ins. Co. v. WW Trading Co.*,
    813 F. App'x 636 (2d Cir. 2020) ................................................10, 82

*Upfront Megatainment, Inc. v. Thiam*,
    235 A.D.3d 516 (1st Dep't 2025) .............................................119, 123

## <u>TABLE OF AUTHORITIES (cont'd)</u>

**Paragraph(s) of Proposed
Conclusions of Law**

*V.S. Int'l, S.A. v. Boyden World Corp.*,
862 F. Supp. 1188 (S.D.N.Y. 1994) ..................................................89

*Walcutt v. Clevite Corp.*,
13 N.Y.2d 48 (1963) ..........................................................................59

*Wechsler v. Hunt Health Sys.*,
330 F. Supp. 2d 383 (S.D.N.Y. 2004) ...............................................72

*Wells Fargo Bank Minn., N.A. v. Nassau Broad. Partners, L.P.*,
2003 WL 22339299 (S.D.N.Y. Oct. 10, 2003)....................................57

*Xerox Corp. v. Bus-Let, Inc.*,
2019 WL 2514855 (W.D.N.Y. June 18, 2019)............................56, 57

STATUTES AND OTHER AUTHORITIES

28 U.S.C. § 2201 *et seq.*...................................................................1

5 Corbin on Contracts § 1068 ...............................................................68

CPLR 3213.................................................................115, 118, 120, 123

CPLR 3218....................................................................................*passim*

Dillon, C3218:3, McKinney's Practice Commentary (2021)................111

Dobbs, Law of Remedies: Damages, Equity, Restitution § 4.3(6) (2d ed.
1993) ..................................................................................................99

FARNSWORTH ON CONTRACTS (3d ed.) § 8.16 ........................................71

Fed. R. Civ. P. 44.1 ................................................................................78

RESTATEMENT (SECOND) CONTRACTS § 241, cmt. d......................72, 75(i)

In advance of the trial before the Court, currently scheduled to begin on Tuesday, April 29, 2025, Plaintiffs-Counterclaim Defendants Matthew Stein and Jerome Lhote and Counterclaim Defendant Luke McGee respectfully submit these Joint Preliminary Proposed Findings of Fact and Conclusions of Law.

Because these Joint Preliminary Proposed Findings of Fact and Conclusions of Law are submitted prior to, and without the benefit of, having seen the witness statements, exhibits, and any other materials to be submitted on behalf of Defendant-Counterclaim Plaintiff Skatteforvaltningen ("SKAT") and prior to actual trial testimony, they substantially focus on the factual and legal issues to be raised in Plaintiffs' case-in-chief, although there are some factual and legal issues common to Plaintiff's case-in-chief and SKAT's expected case in chief.

Stein, Lhote, and McGee accordingly respectfully request that, following the trial, they be permitted to amend or supplement these Joint Preliminary Proposed Findings of Fact and Conclusions of Law in light of the actual trial testimony and evidence admitted at trial.

Nothing in these Joint Preliminary is intended to be a waiver of any factual or legal argument Stein, Lhote, or McGee may make.

## **PROPOSED FINDINGS OF FACT**

### **The Parties**

1. Matthew Stein ("Stein") is a citizen of the State of New York and, since about 1995, has resided in Manhattan.

   *See* Stein ¶¶ 2, 5.[1]

---

[1] References to "[NAME]" are to the witness statements of the named witness filed with the Court on April 7, 2025.

References to "Pl. Exh." are to Exhibits filed jointly by Stein, Lhote, and McGee with the Court on April 7, 2025.

References to "Madsen Report" are to Plaintiffs' Exhibit 300, the expert report prepared by Lasse Lund Madsen, dated September 6, 2024. References to "Madsen Rebuttal Report" are to Plaintiffs' Exhibit 301, the rebuttal expert report prepared by Madsen, dated October 15, 2024.

2.     Jerome Lhote ("Lhote") is a citizen of the State of Florida. Since approximately the middle of 2020, Lhote has resided in the city of Winter Park, which is in Orange County, Florida.

*See* Lhote ¶¶ 59-65.

3.     Prior to the middle of 2020, Lhote resided in Manhattan. In about the middle of 2020, Lhote abandoned his residence in New York and ceased to be a resident of the State of New York for all purposes.

*See* Lhote ¶¶ 56-58, 59-65.

4.     Luke McGee ("McGee") is a citizen of the State of Florida and, since approximately the middle of 2021, has resided in Palm Beach County, Florida.

*See* McGee ¶¶ 163-66.

5.     He was a citizen of the State of Pennsylvania between 2019 and 2021 when he and his family moved to Florida towards the end of 2021.

*See* McGee ¶¶ 160-62.

6.     Prior to January 2019, McGee was a citizen of the State of New York. However, McGee abandoned his residence in New York and ceased to be a resident of New York for all purposes when he moved to Pennsylvania.

*See* McGee ¶¶ 161-62.

7.     Since around 2014, McGee indirectly holds a 50% interest a vacation home in Suffolk County, New York, but he has never had any intention of using it as his permanent and primary residence. He is not a resident of New York for any purpose.

*See* McGee ¶¶ 167.

8.     Stein, Lhote, and McGee are finance professionals who hold university and/or post-university educations. McGee has extensive experience in the healthcare field.

*See* Stein ¶¶ 3-6; Lhote ¶¶ 3-6; McGee ¶¶ 5-12.

2

9.    Skatteforvaltningen ("SKAT") is the taxation authority of Denmark.

    *See* Pl. Exh. 104 at § 1(cc).

## Events Leading Up to the May 2019 Settlement With SKAT

10.    Starting in about 2012, Stein and Lhote and, later on, McGee began to be involved with an investment strategy known as dividend arbitrage.

    *See* Stein ¶ 13; Lhote ¶ 13; McGee ¶¶ 17-28.

11.    These activities started while Stein and Lhote were affiliated with Argre Management LLC ("Argre Management"). These activities continued after they separated from the other principals of Argre Management in 2013. These activities continued through 2015 while Stein, Lhote, and McGee were affiliated with Maple Point LLC ("Maple Point"). Stein, Lhote, and McGee's percentage ownership interests in Maple Point were 46%, 36%, and 18%, respectively.

    *See* Stein ¶¶ 11-12; Lhote ¶¶ 11-12; McGee ¶ 26.

12.    These activities and the investment strategy known as dividend arbitrage were unknown to McGee before 2012, when Stein and Lhote first approached him regarding an opportunity to establish and administer a pension plan for such a company in order to engage in dividend arbitrage. McGee gained his initial understanding of dividend arbitrage from Stein and Lhote, including information and opinion letters supporting the validity and legality of the strategy, which he then became involved in through 2015 while affiliated with Maple Point as noted above. It was Stein, Lhote, and McGee's understanding that this strategy was legal.

    *See* McGee ¶¶ 17-27; Stein ¶¶ 14-15; Lhote ¶¶ 14-15.

13.    This activity resulted in applications for tax refunds withheld on dividends paid by Danish companies made on behalf of U.S. pension plans ("Reclaim Applications") to SKAT and payments by SKAT to these pension plans.

    *See* Stein ¶¶ 14(a); Lhote ¶¶ 14(a); McGee ¶ 21; Pl. Exh. 104 at § 1(z).

14.    SKAT alleges that the activity of Stein, Lhote, McGee, and others in relation to dividend arbitrage trading and the Reclaim Applications was a fraud perpetrated on SKAT. Stein, Lhote, and McGee dispute that there was a fraud. For the purposes of resolving the claims and defenses of Stein, Lhote,

McGee, and SKAT (collectively, the "Parties") in this action, no resolution of whether Stein, Lhote, and McGee engaged in fraud is necessary.

*See* Stein ¶¶ 14-15; Lhote ¶¶ 14-15; Pl. Exh. 104 at Recital B, § 1(e).

15. In late summer 2015, Stein, Lhote, and McGee became aware that SKAT was investigating Reclaim Applications, including their involvement with them. Upon learning of the investigation, Stein, Lhote, and McGee ceased engaging in further dividend arbitrage or Reclaim Applications even though they had previously not had any reason to believe that engaging in this activity was improper.

*See* Stein ¶ 16; Lhote ¶ 16; McGee ¶¶ 29-30.

16. Through counsel, Stein, Lhote, and McGee approached SKAT in about 2017 in order to attempt to resolve matters being investigated by SKAT via a settlement.

*See* Stein ¶¶ 17-19; Lhote ¶ 17-19; McGee ¶¶ 32-34.

17. They retained lawyers in the United States and Denmark to do so.

*See* Stein ¶ 18; Lhote ¶ 18; McGee ¶¶ 34.

18. Many others who might be parties to a settlement participated in the settlement discussions, also through U.S. and Danish counsel.

*See* Stein ¶ 18; Lhote ¶ 18; McGee ¶¶ 33-34.

19. In connection with the settlement discussions, Stein, Lhote, and McGee were motivated substantially by the possibility of criminal exposure in Denmark. It was around the second half of 2015 that they became concerned about the possibility of a criminal investigation in Denmark.

*See* Stein ¶ 21; Lhote ¶ 21; McGee ¶¶ 36-38.

20. From the beginning, the settlement under discussion involved as a condition that the prosecutor in Denmark, the Danish Public Prosecutor for Serious Economic and International Crime ("SØIK"), not initiate criminal charges against any of the parties to the settlement then under discussion.

*See* Pl. Exh. 2; Stein ¶¶ 22; Lhote ¶¶ 22; McGee ¶¶ 40-44.

21.    Towards the end of 2018 or the beginning of 2019, SKAT determined that it would not agree to any such condition.

*See* Stein ¶ 22(c); Lhote ¶ 22(c); McGee ¶ 45.

22.    Stein, Lhote, and McGee nonetheless continued the settlement discussions, but were determined to obtain in any settlement some protection in relation to the possibility of criminal charges by SØIK, even if this was not the best option.

*See* Stein ¶ 22(d); Lhote ¶ 22(d); McGee ¶¶ 45-46.

23.    Their intent and principal goal in proceeding with the settlement negotiations was to ensure that any settlement agreement with SKAT would mitigate potential criminal liability and provide them some protection or assistance in relation to the possibility of criminal proceedings that might be initiated by SØIK.

*See* Stein ¶ 22(e); Lhote ¶ 22(e); McGee ¶¶ 45-48.

24.    During these initial settlement negotiations, in addition to conditioning settlement on a commitment from SØIK not to initiate criminal charges, the Parties also discussed that SKAT would bring certain facts to the attention of SØIK and that SKAT would make certain specific representations to SØIK.

*See* Stein ¶¶ 22(e-f); Lhote ¶¶ 22(e-f); McGee ¶¶ 40-44.

25.    Reflecting the importance of this to Stein, Lhote, and McGee, this concept was ultimately included in the settlement that was agreed to in May 2019 and is at the heart of this dispute.

*See* Pl. Exh. 104 at § 8(f).

26.    If the ultimate settlement did not include at least these obligations for SKAT, Stein, Lhote, and McGee would not have continued the settlement discussions and would not have ultimately settled with SKAT.

*See* Stein ¶ 22(h); Lhote ¶ 22(h); McGee ¶ 48.

27.    In the closing weeks of the negotiation of the settlement, SKAT believed that Stein, Lhote, and McGee were hoping that their cooperation in the civil track would have a mitigating effect in connection in the criminal track.

*See* Pl. Exh. 101; Pl. Exh. 400 at 67:2-9.

**The Settlement Agreement and the Letter Agreement**

28.    On or about May 28, 2019, Stein, Lhote, McGee, and others (collectively, the "Covered Parties") entered into a settlement agreement with SKAT.  The settlement agreement had several exhibits to it and is referred to collectively as the "Settlement Agreement."

   *See* Pl. Exh. 104.

29.    The group of individuals and entities that entered into the Settlement Agreement and that are released by SKAT are referred to in the Settlement Agreement as the "Covered Parties."

   *See* Pl. Exh. 104 at § 1(i) & Exh. 1 & 2; Stein ¶ 23(c); Lhote ¶ 23(c); McGee ¶ 50.

30.    Stein, Lhote, and McGee are Covered Parties, but they undertook special obligations under the Settlement Agreement that the remaining Covered Parties did not.  They are referred to in the Settlement Agreement as the "Covered Parties' Designees."

   *See* Pl. Exh. 104 at § 1(j); Stein ¶ 23(d); Lhote ¶ 23(d); McGee ¶ 51.

31.    Stein, Lhote, and McGee expended considerable effort to cause others to enter into the Settlement Agreement and such efforts created a substantial benefit for SKAT because it increased SKAT's recovery and the number of pension plans, individuals, and entities with which SKAT had resolved its claims, absolving SKAT's need to initiate litigation against them.  Indeed, as of the end of 2023, more than 55% of SKAT's recovery related to the Reclaim Applications is the result of payments made under the Settlement Agreement.

   *See* Stein ¶¶ 23(a-b), 33(d)(iv)(b); Lhote ¶¶ 23(a-b), 33(d)(iv)(b); McGee ¶¶ 50, 103.

32.    A considerable number pension plans, individuals, and entities who were initially part of the settlement negotiations ultimately did not consummate a settlement with SKAT.  SKAT has been continuously litigating with many of them since 2018.  It has also litigated in the United Kingdom, Dubai, and elsewhere against parties that did not settle.

   *See* Stein ¶ 20; Lhote ¶ 20; McGee ¶ 35.

33.   On or about the same day as they entered into the Settlement Agreement, Stein, Lhote, McGee, and others executed a letter agreement, which has one attachment (collectively, the "Letter Agreement").

      *See* Pl. Exh. 109; Stein ¶ 24; Lhote ¶ 24; McGee ¶ 53.

34.   The Settlement Agreement and Letter Agreement are both governed by New York law.

      *See* Pl. Exh. 104 at § 12; Pl. Exh. 109 at § 10.

**Initial Performance by the Parties**

35.   Within a short period of the Settlement Agreement's Effective Date, the Covered Parties' were required to pay SKAT 950 million Danish kroner ("DKK") (the "Initial Cash Payment").

      *See* Pl. Exh. 104 at § 2(a);

36.   The Covered Parties made the Initial Cash Payment by on or about August 8, 2019.

      *See* Pl. Exh. 3; Stein ¶ 26(g); Lhote ¶ 26(g); McGee ¶ 71.

37.   In exchange for the Initial Cash Payment, SKAT broadly released the Covered Parties and others from "any and all claims" that SKAT "has or may have against the Covered Parties in any way arising from or relating to [Danish] Reclaim Applications and the related trading by the Covered Parties in Danish company shares. . . including any administrative claims [SKAT] has brought or could bring in Denmark. . . ."

      *See* Pl. Exh. 104 at § 4(a).

38.   Simultaneously with the Initial Cash Payment, the Covered Parties' Designees were required to provide an affidavit of confession of judgment in a form specified in the Settlement Agreement.

      *See* Pl. Exh. 104 at § 4(c) & Exh. 4.

39.   On August 8, 2019, the Covered Parties' Designees provided this document (the "2019 Affidavit of Confession of Judgment").

      *See* Pl. Exh. 10a; Stein ¶ 26(e); Lhote ¶ 26(e); McGee ¶ 71.

40. The purpose of requiring the 2019 Affidavit of Confession of Judgment was to provide to SKAT security for payment of the remaining amounts to be paid under the Settlement Agreement, specifically, the "Additional Cash Payment," the "True-Up Amount," if any, and interest, if any. The sum of those payments was defined in the Settlement Agreement as the "Subsequent Cash Payment."

   *See* Pl. Exh. at §§ 1(dd), 2(b), 2(e), 4(c); Exhibits 4-5; Stein ¶ 26(e)(ii); Lhote ¶ 26(e)(ii); McGee ¶ 72; Pl. Exh. 400 at 157:2-9.[2]

41. Once the Covered Parties made the Initial Cash Payment, the Settlement Agreement afforded SKAT with one sole remedy for the failure to make the Subsequent Cash Payment, once the Initial Cash Payment was made: "[SKAT's] sole remedy for the Covered Parties' failure to pay the remainder of the Final Settlement Amount shall be the filing of the Affidavit of Confessions of Judgment against the Covered Parties' Designees as set forth in Section 5(c)."

   *See* Pl. Exh. § 2(c); Stein ¶ 26(e)(iv); Lhote ¶ 26(e)(iv); McGee ¶¶ 73-74.

42. SKAT concedes that, once the Initial Cash Payment was made, only the Covered Parties' Designees, and not the other Covered Parties, had any payment obligation to SKAT.

   *See* Pl. Exh. 400 at 188:15-20, 22, 188:24-189:6, 189:8-12, 189:19-25.

43. The 2019 Affidavit of Confession of Judgment accurately reflected the residences of Stein, Lhote, and McGee at the time it was executed.

   *See* Pl. Exh. 10a; Stein ¶¶ 2, 5; Lhote ¶¶ 57-58; McGee ¶¶ 125-126, 160-62.

**Obligations After the Initial Cash Payment**
**and the 2019 Affidavit of Confession of Judgment**

44. After the Initial Cash Payment and the provision of the 2019 Affidavit of Confession of Judgment, the Settlement Agreement and the Letter Agreement imposed a second series of obligations that were almost entirely upon the Covered Parties, and mostly upon, the Covered Parties' Designees.

---

[2] A graphical representation of the various payments required under the Settlement Agreement is set out in ECF No. 54 at 9.

8

There was comparatively very little that SKAT was required to do after receiving the Initial Cash Payment.

*See* Stein ¶ 27; Lhote ¶ 27; McGee ¶¶ 78-88.

45.    The obligations imposed after the Initial Cash Payment and the 2019 Affidavit of Confession of Judgment included: (a) cooperation with SKAT; (b) making the Additional Cash Payment of DKK 600 million; (c) paying interest, if any; (d) determining and paying the "True-Up Amount"; and (e) dismissal by SKAT of one specific civil case that SKAT had brought against one of the Covered Parties, Adam LaRosa.

*See* Pl. Exh. 104 at §§ 1(a), 2(b), 2(d)(ii), 2(e), 3(a), 7; Stein ¶ 27; Lhote ¶ 27; McGee ¶¶ 78-80.

46.    The "True-Up Amount" represented, in general, the difference between the "Preliminary Settlement Amount" of DKK 1.55 billion and what was defined in the Settlement Agreement as the "Net Proceeds."

*See* Pl. Exh. 104 at §§ 1(a), 2(b), 2(d)(ii), 2(e), 3(a), 7; Stein ¶¶ 25(f), 27(a)(iii-v), 58-60.

47.    The need for any True-Up Amount reflected that the total amount to be paid under the Settlement Agreement could only be estimated at the time that the Settlement Agreement was executed for numerous reasons including that the Parties intended for a substantial amount of the Covered Parties' payment obligations to be satisfied from the liquidation of certain assets and the amount to be realized could only be estimated at the time.

*See* Stein ¶ 27(a)(iii); Lhote ¶ 27(a)(iii); McGee ¶ 80.

48.    Calculation of the True-Up Amount is the subject of a series of disputes between the parties that are legal in nature that relate to how, under the Settlement Agreement, Net Proceeds is to be interpreted.  The Settlement Agreement defines Net Proceeds as:

>    For the purposes of this Agreement, "Net Proceeds" shall be (A) Gross Reclaims less (B) all of the Covered Parties' expenses associated with Reclaim Applications for which Skatteforvaltningen made payments, specifically as follows: (1) reclaim agent fees, (2) tax reclaim advisory service fees, (3) brokerage fees and commissions, (4) custodial and clearing fees, (5) trading expenses, and (6) financial institution account charges and less (C) any other portion of Gross

Reclaims received by parties excluded from the releases as set forth in Section 4 herein, including without limitation, those parties listed on Exhibit 3 ('Non-exhaustive list of parties excluded from release'), that were not otherwise subsequently provided to any Covered Party.

Pl. Exh. 104 at § 2(e).

49.   Only the Covered Parties' Designees, and not the remainder of the Covered Parties, were obligated to make payments as part of the second series of obligations, including the True-Up Amount, if any.

*See id.* at § 2(d)(i); Pl. Exh. 400 at 188:15-189:6, 189:8-12, 189:19-25.

50.   The further payments that were part of the second series of obligations were to be made by May 28, 2023.  This is because the original 36-month period in which to make the payments that was set out in the Settlement Agreement was, in effect, extended by operation of the Letter Agreement.

*See* Pl. Exh. 104 at §§ 1(r), 2(d); Pl. Exh. 109 at § 6; Stein ¶ 27(b)(ii); Lhote ¶ 27(b)(ii); McGee ¶ 81.

51.   The Letter Agreement also imposed a series of special obligations on the Covered Parties' Designees, primarily that: (a) they liquidate certain assets and provide the proceeds to SKAT; (b) they provide quarterly progress reports to SKAT about the liquidation efforts.

*See* Pl. Exh. 109 at §§ 3, 4, 5, 7 & Annex A; Stein ¶ 27(b)(i, iii-vi); Lhote ¶ 27(b)(i, iii-vi); McGee ¶¶ 83-86.

52.   The most valuable of the assets to be liquidated were interests in North Channel Bank, which the Covered Parties' Designees expected to generate DKK 322 million. This amount would have been more than half of the Additional Cash Payment.

*See* Pl. Exh. 109 at § 7, Annex A; Stein ¶ 27(b)(iii); Lhote ¶ 27(b)(iii); McGee ¶ 86.

53.   The Settlement Agreement also had a confidentiality provision.

*See* Pl. Exh. 104 at § 8; Stein ¶¶ 28(a); Lhote ¶¶ 28(a); McGee ¶ 89.

54.    There were various exceptions to the confidentiality provision, including one to permit SKAT to announce the Settlement Agreement, which SKAT did in late May 2019.

    *See* Pl. Exh. 104 at § 8(b); Pl. Exh. 106; Stein ¶ 28(a)(ii-iii); Lhote ¶ 28(a)(ii-iii); McGee ¶¶ 89-90.

55.    The confidentiality provision did not permit publication of the names of any of the parties that entered into the Settlement Agreement.

    *See* Pl. Exh. 104 at § 8(b); Stein ¶ 28(a)(iv); Lhote ¶ 28(a)(iv); McGee ¶¶ 66, 89, 123.

## Section 8(f) of the Settlement Agreement

56.    One exception to the confidentiality provision is contained in Section 8(f) of the Settlement Agreement required SKAT to take certain actions with respect to SØIK:

> Notwithstanding the confidentiality obligations of this Section 8, promptly upon the execution of this Agreement, [SKAT] will, in writing, bring to the attention of [SØIK] this Agreement and its terms, and represent, in writing, that this Agreement reflects good-faith negotiation by the Covered Parties, that the Covered Parties' cooperation may result in the recovery by Skatteforvaltningen of additional funds from third parties and that this Agreement is in the best interests of Skatteforvaltningen. Upon request by SØIK, Skatteforvaltningen may provide and/or disclose the entirety of this Agreement to SØIK.

    Pl. Exh. 104 at § 8(f).

57.    Compliance with Section 8(f) was essentially SKAT's only material obligation under the Settlement Agreement after receiving the Initial Cash Payment, which triggered the releases. Stein, Lhote, and McGee believed that this was the only substantial benefit that they were to obtain under the Settlement Agreement after the Initial Cash Payment was made. And, according to McGee, if SØIK had known that he agreed to repay an amount greater than he had been accused of benefitting from the Reclaim Applications, that a substantial amount of additional funds were to be returned to the Danish treasury, and that McGee agreed to cooperate, SØIK might have determined that the civil resolution was sufficient and that its

extensive, multi-national investigation could have been expedited by leveraging his cooperation and not charging McGee.

*See* Stein ¶¶ 30, 32; Lhote ¶¶ 30, 32; McGee ¶¶ 87-93.

58.    After Stein and Lhote's names were revealed in the Danish press, there was no other meaningful benefit received by Stein and Lhote after making the Initial Cash Payment and obtaining the releases from SKAT.

*See* Pl. Exh. 5; Stein ¶ 30; Lhote ¶ 30.

59.    Section 8(f) was of such importance to Stein, Lhote, and McGee that, without its inclusion in the Settlement Agreement, they would not have entered into it.

*See* Stein ¶ 32; Lhote ¶ 32; McGee ¶ 91.

## SKAT's Written Communications with SØIK

60.    Whether SKAT fulfilled its obligations under Section 8(f) is at the heart of this dispute.

*See* Stein ¶¶ 29, 32; Lhote ¶¶ 29, 32; McGee ¶¶ ¶56-59.

61.    SKAT asserts that it complied with Section 8(f) as a result of a series of written communications leading up to, and culminating with, the public announcement of the Settlement Agreement.

*See* Pl. Exh. 103, 105, 106, 107, 108, 110; Pl. Exh. 400 at 110:16-111:9, 111:11, 111:21-112:15, 112:17-19.

62.    There was a May 15, 2019, e-mail, dated May 15, 2019, from Gry Ahlefeld Engel ("Ahlefeld Engel"), a SKAT official, to Per Fiig ("Fiig"), a senior SØIK official, by which SKAT communicated, among other things, part of what would become the final text of Section 8(f).  The final sentence of Section 8(f) -- "Upon request by SØIK, [SKAT] may provide and/or disclose the entirety of this Agreement to SØIK" -- was *not* provided to SØIK.  Ahlefeld-Engel's e-mail did not include the final sentence.  As noted below, SØIK was unaware that SKAT was permitted to disclose the Settlement Agreement upon request.

Pl. Exh. 104, 105, 122; Pl. Exh. 400 at 135:8-17, 138:4-11, 337:11-338:20.

63.    There was an e-mail, dated May 20, 2019, from Bechmann sent the next day to Jacobsen whereby SKAT sent SØIK a further draft press release that SKAT intended to issue to announce the settlement and a set of principles that SKAT intended as guides for its minister in publicly commenting on the settlement.

       *See* Pl. Exh. 107; Pl. Exh. 400 at 163:10-13, 163:25-164:13.

64.    There was an e-mail, dated May 21, 2019, from Bechmann to Jacobsen by which SKAT sent to SØIK the text of Section 9 of the Settlement Agreement, which, in general, prohibits the parties to the Settlement Agreement from making disparaging remarks about any other party, subject to certain exceptions.

       *See* Pl. Exh. 104 at § 9; Pl. Exh. 110; Pl. Exh. 400 at 183:17-184:10.

65.    There was an e-mail, dated May 21, 2019, from Ahlefeld-Engel to Fiig by which SKAT sent to SØIK a draft list of the Covered Parties that SKAT expected at the time would not change.

       *See* Pl. Exh. 108; Pl. Exh. 400 at 114:18-22, 114:24-115:5, 174:21-25, 175:24-176:11.

66.    There was a second e-mail, dated May 21, 2019, from Bechmann to Jacobsen by which SKAT sent to SØIK an edited version of the principles that SKAT intended as guides for its minister in publicly commenting on the settlement.

       *See* Pl. Exh. 110; Pl. Exh. 400 at 183:17-184:10.

67.    There was the final press release SKAT issued on May 29, 2019, by which SKAT announced the Settlement Agreement.

       *See* Pl. Exh. 106; Pl. Exh. 400 at 172:4-11.

68.    Though SKAT had oral communications with SØIK related to the Settlement Agreement, SKAT concedes that any oral communications that it may have had with SØIK do not comply with Section 8(f).

       *See* Pl. Exh. 400 at 114:6-115:9.

**Stein, Lhote, and McGee's Performance After the Initial Cash Payment**

69. After making the Initial Cash Payment and providing the 2019 Affidavit of Confession of Judgment, Stein , Lhote, and McGee made further payments to SKAT over time.  McGee understood that he, Stein, and Lhote had agreed to apportion further payments according to their relative benefit from the Reclaim Applications.

    *See* Pl. Exh. 6; Stein ¶ 37; Lhote ¶ 37; McGee ¶ 137.

70. Specifically, between about June 3, 2020 and April 19, 2022, Stein and Lhote paid SKAT a total of approximately DKK 37,849,584.

    *See* Pl. Exh. 6; Stein ¶ 37; Lhote ¶ 37.

71. In March 2021, McGee paid SKAT approximately DKK 19,916 383.95.  In the end, McGee has contributed more towards paying back SKAT than he personally received.

    *See* Pl. Exh. 6; Stein ¶ 38; Lhote ¶ 38; McGee ¶¶ 136, 138.

72. By April 2022, SKAT had been paid more than DKK 1 billion.

    *See* Pl. Exh. 3, 6; Stein ¶ 40; Lhote ¶ 40; McGee ¶ 141.

73. Stein, Lhote, and McGee went to great lengths to cooperate with SKAT as required by the Settlement Agreement, including to aid SKAT in its litigation efforts against those who had not settled with SKAT.  Together with their counsel and among other things, they reviewed and produced many thousands of documents, responded to requests to use documents that they had produced to aid SKAT's litigation efforts against those who had not settled, and responded to specific factual questions from SKAT.

    *See* Pl. Exh. 200; Stein ¶ 35(a-d); Lhote ¶ 35 (a-d); McGee ¶¶ 78, 127-34.

74. Stein, Lhote, and McGee provided quarterly progress reports to SKAT pursuant to the Letter Agreement up to late January 2022.

    *See* Stein ¶¶ 27(b)(iv), 47(i); Lhote ¶¶ 27(b)(iv), 47(j).

75. The first quarterly report that Stein, Lhote, and McGee did not provide was due to be provided at the end of April 2022.

    *See* Stein ¶¶ 27(b)(iv), 47(i); Lhote ¶¶ 27(b)(iv), 47(j).

14

76. Earlier in April 2022, however, Stein retained a Columbia Law School professor to evaluate whether there was a basis to initiate an action against SKAT.

   *See* Stein ¶ 27(b)(v); Lhote ¶ 27(b)(v).

77. Starting at the end of June 2022, Stein began searching for litigation counsel to represent Stein and Lhote with respect to seeking relief against SKAT with respect to the Settlement Agreement and the Letter Agreement.

   *See* Stein ¶ 27(b)(vi).

78. Stein and Lhote initiated this litigation towards the end of March 2023. McGee decided not to proceed as a plaintiff on Stein and Lhote's claims in the hope to be able to reach a reasonable resolution of the civil and criminal disputes with the Danish government.  McGee is a nominal defendant to Stein and Lhote's claims for rescissionary remedies.

   *See* Stein ¶ 51; Lhote ¶ 51; McGee ¶ 158; ECF Nos. 93, 123.

79. Counsel for Stein, Lhote, and McGee had provided to SKAT, pursuant to the obligations under Section 2(e)(i), many spreadsheets containing information about each of the Pension Plans covered by the releases in the Settlement Agreement.  They did so between about September 2019 and June 2020. They were provided under certain conditions.

   *See* Pl. Exh. 201; Stein ¶ 71(b).

80. The purpose of these spreadsheets was to determine the amount of Net Proceeds and whether that amount was greater than the Preliminary Settlement Amount of DKK 1.55 billion, such that there was, under the Settlement Agreement, a True-Up Amount to be paid.

   *See* Pl. Exh. 201; Stein ¶¶ 67, 69, 71(b)(ii)(a).

81. The Settlement Agreement provided for a process by which the parties would cooperate such there would be an agreed upon "Final Net Proceeds List" and, thereafter, the Covered Parties' Designees would certify the Final Net Proceeds List.

   *See* Stein ¶¶ 66-67.

82.    Despite considerable efforts to arrive at a final calculation of Net Proceeds, this process was never completed and there never was a Final Net Proceeds List certified by Stein, Lhote, and McGee.

    *See* Stein ¶¶ 68, 71-74.

83.    SKAT never treated the spreadsheet provided by Stein, Lhote, and McGee as final.

    *See* Stein ¶¶ 72-73.

**The Efforts to Obtain Information from SKAT About**
**Compliance with Section 8(f) and SKAT's Failure to Provide It**

84.    At the latest, starting in November 2020, Stein, Lhote, and McGee's counsel was pressing SKAT to disclose to them the nature of SKAT's communications with SØIK regarding Stein, Lhote, and McGee's cooperation with SØIK.

    *See* Pl. Exh. 7; Stein ¶ 41; Lhote ¶ 41.

85.    By that point, Stein, Lhote, and McGee had been "charged" by SØIK, meaning that, under Danish criminal procedure, they had been informed that they were under investigation for a specific offense and informed of certain rights.

    *See* Pl. Exh. 1, 17; Stein ¶ 33(a)(iv); Lhote ¶ 33(a)(iv); Madsen Report at 2, Att. C at 14.

86.    SØIK was, around this time, seeking to interview Stein, Lhote, and McGee.

    *See* Pl. Exh. 1, 17; Stein ¶¶ 43, 44; Lhote ¶¶ 44, 45; Miller ¶ 8.

87.    It was important, as a matter of strategy and from their counsel's perspective, that Stein, Lhote, and McGee appear to SØIK in the best possible light prior to the interviews.

    *See* Miller ¶ 9.

88.    For example, it was important that SØIK be aware of the nature of their cooperation to SKAT.  Counsel for Stein, Lhote, and McGee's informed

view was that it was important that the information about cooperation come from SKAT itself and that a communication of this information from SKAT -- as opposed to a communication from Stein, Lhote, and McGee's counsel -- would be meaningfully more effective.

*See id.* ¶¶ 9(a-c); Stein ¶ 33(d)(vi); Lhote ¶ 33(d)(vi).

89.   On November 10, 2020, Marshall Miller ("Miller") asked U.S. counsel for SKAT about what SØIK knew about the Settlement Agreement.  U.S. counsel for SKAT disclaimed detailed knowledge about the nature of SKAT's communications with SØIK, but offered to provide more information.

*See* Miller ¶ 10; Stein ¶ 41; Lhote ¶ 41.

90.   Miller's colleague, Christopher Le Coney, followed up later in November 2020, and U.S. counsel for SKAT indicated that it was working on the request and hope to have an update shortly.

*See* Pl. Exh. 7; Miller ¶ 10(b); Stein ¶ 41; Lhote ¶ 41.

91.   In mid-January 2021, Miller again attempted to ensure that SKAT had communicated with SØIK about the Settlement Agreement and the cooperation provided pursuant to it.

*See* Pl. Exh. 7; Miller ¶ 11; Stein ¶ 41; Lhote ¶ 41.

92.   He went so far as to draft a proposed communication for SKAT to sent to SØIK.  SKAT did not do so.

*See* Pl. Exh. 7; Miller ¶¶ 11(b-d).

93.   In about mid-February 2021, Miller against sought to obtain information about whether SKAT would be open to sending a written communication to SØIK confirming the level of cooperation that had been provided by Stein, Lhote, and McGee pursuant to the Settlement Agreement.

*See* Miller ¶ 13; Stein ¶ 41; Lhote ¶ 41.

94.   U.S. counsel for SKAT indicated that SKAT was not comfortable with such a communication and that such a communication is not something that SKAT would consider no matter who was making the request.

*See* Miller ¶ 13.

17

95. By this point in mid-February 2021, SØIK had written to SKAT multiple times asking SKAT numerous questions about the Settlement Agreement and related matters, including asking about cooperation provided pursuant to the Settlement Agreement. The letters made many requests for information.

   *See* Pl. Exh. 118, 124.

96. These letters by which SØIK asked these questions began on January 6, 2021 -- the same day that McGee began participating in a voluntary interview with SØIK and during which he mentioned the Settlement Agreement and the return of funds to SKAT pursuant to it.

   *See* Pl. Exh. 118; McGee ¶¶ 132-34.

97. The questions asked in SØIK's letters are basic questions about the Settlement Agreement, including: (a) who the parties are; (b) what refunds are covered; (c) what comprises the settlement sum; (d) whether SKAT had been provided with security for the payments to be made; (e) what the nature of resolution between the parties and SKAT is.

   *See* Pl. Exh. 118.

98. SØIK also inquired about the nature of confidentiality clauses in the Settlement Agreement.

   *See* Pl. Exh. 118.

99. SØIK also asked whether the parties to the Settlement Agreement "helped contribute documents for use in the prosecution of the [SKAT]'s claims against individuals or entities not covered by the settlement" and whether they "helped contribute information and answer questions from the [SKAT] for the identification of and prosecution of the [SKAT]'s claims against individuals or entities not covered by the settlement."

   *See* Pl. Exh. 123, 131.

100. By that point, SKAT had provided written responses to SØIK's prior letters, but the responses provided very little detail about the nature of the Covered Parties' Designees' cooperation.

   *See* Pl. Exh. 121, 124, 131, 141.

101.  At no time did U.S. counsel for SKAT inform Miller about these communications, either SØIK's questions or SKAT's answers.

*See* Miller ¶¶ 15-16.

102.  In one of the communications that SØIK made to SKAT, dated January 22, 2021, SØIK requested that SKAT provide a copy of the Settlement Agreement.  In the request, SØIK noted that it had obtained several seizure orders that it surmised were directed towards individuals who were part of the Settlement Agreement and that those seizure orders have now been appealed "with reference to the [S]ettlement [A]greement."

*See* Pl. Exh. 131.

103.  SØIK's reference to an appeal of seizure orders concerned seizure orders that SØIK had obtained *ex parte* in about April 2020 that permitted seizure of fifty percent interests in Stein and Lhote's homes, as well as bank accounts associated with Stein, Lhote, and McGee.

*See* Pl. Exh. 14, 131; Stein ¶¶ 48-50; Lhote ¶¶ 48, 50.

104.  There is strong circumstantial evidence that SØIK did not inform the court that granted the seizure orders about the Settlement Agreement or payments that Stein, Lhote, or McGee made pursuant to it.  There also exists strong circumstantial evidence that, only when the seizure orders were appealed, was any Danish court informed about the Settlement Agreement or payments made under it.

*See* Pl. Exh. 14; Madsen Report at 8-10.

105.  Several months before, in November 2020, SØIK, referring to itself by the acronym of its name translated into English ("SEIC") sought assistance of the United States Department of Justice in enforcing the seizure orders.

*See* Pl. Exh. 12.

106.  In the course of doing so, SØIK inquired about the impact of the Settlement Agreement on U.S. enforcement of the seizure orders.  SØIK wrote to the United States Department of Justice:

> The State Prosecutor for Serious Economic and International Crime (SEIC) investigates a number of cases concerning presumed fraud committed against the Danish tax authorities (SKAT).  The total

amount that has been defrauded from SKAT is more than DKK 12.000.000.000 (~ USD 1,912,000,000). *SEIC is aware that SKAT has reached a settlement with an unknown number of parties regarding the amount of DKK 2.900.000.000 (~ USD 462,000,000) related to 61 US pension plans. SEIC are not in possession of the settlement and has no knowledge of any details in it, including who is involved, besides the amount and the number of pension plans.* The reason for this is a non-disclosure clause in the settlement. Is the settlement an obstacle in relation to our request for seizure made against the suspects in the US? It should be noted that if/when the case goes to court, SKAT will have to present the claim for compensation, including the amount thereof. If they have received money from the defendants, the claim will be deducted accordingly.

*See id.* (11/20/2020 email) (emphasis added).

107. SKAT responded to SØIK's January 22, 2021, request for the Settlement Agreement referred to above in paragraph 100 by indicating that, among other things, SKAT cannot "share the material without informing the parties to the agreement."

Pl. Exh. 141.

108. This was false. The Settlement Agreement expressly provides that "[u]pon request by SØIK, [SKAT] may provide and/or disclose the entirety of this Agreement to SØIK," but SKAT never informed SØIK of this. Under the Settlement Agreement, SKAT was permitted to provide the Settlement Agreement to SØIK.

*See* Pl. Exh. 104 at § 8(f); Gry testimony.

109. SØIK sought still more information from SKAT at the end of February 2021. Specifically, SØIK indicated that, based on SKAT's response to SØIK's January 28, 2021 letter, it appeared that "the three main shareholders in North Channel Bank have assisted in obtaining documents for use in the prosecution of the [SKAT]'s claims against individuals or entities that are not included in the settlement." The "three main shareholders" reference was to Stein, Lhote, and McGee.

Pl. Exh. 123, 125.

110.    After noting this observation, SØIK requested "all materials concerning," among other people, "Rajen Shah, Anupe Dhorajiwala, and Graham Horn that [SKAT] or [SKAT]'s counsel might be in possession of."

Pl. Exh. 125.

111.    SØIK's request for information concerned, among others, three people who were eventually indicted together with Stein, Lhote, and McGee in April 2021. The clear inference is that SØIK was seeking information to assist it in bringing charges against these three people.

*See id.*; Stein ¶ 14(e); Lhote ¶ 14(e).

112.    Starting in March 2021, Stein and Lhote were interviewed over multiple days. During their interviews, it became apparent to them and to their U.S. counsel that SØIK did not have a copy of the Settlement Agreement.

*See* Stein ¶¶ 46-47; Lhote ¶¶ 46-47; Miller ¶¶ 17-18.

113.    In fact, SKAT did not end up providing SØIK a copy of the Settlement Agreement until after this litigation was initiated in late March 2023.

*See* Pl. Exh. 400 at 90:3-22.

**The Indictment and the Further Efforts to Obtain**
**Information About SKAT's Compliance With Section 8(f)**

114.    SØIK indicted Stein, Lhote, and McGee in early April 2021 together with Rajen Shah, Anupe Dhorajiwala, and Graham Horn, the three people about whom SØIK, earlier in 2021, had asked SKAT for information that SØIK understood, from SKAT's responses in 2021, "the three main shareholders in North Channel Bank" had provided.

*See* Pl. Exh. 123, 125; Stein ¶ 14(e); Lhote ¶ 14(e); McGee ¶ 143.

115.    The indictment asserted that Stein, Lhote, and McGee were responsible for losses of about DKK 1.135 billion.

*See* Stein ¶ 14(b); Lhote ¶ 14(b).

116. By the time of the indictment, Stein, Lhote, and McGee had paid DKK more than DKK 1 billion pursuant to the Settlement Agreement and the Letter Agreement.

Pl. Exh. 3, 6; McGee ¶ 141

117. By the time of the indictment, Stein, Lhote, and McGee had at least another DKK 540 million to pay under the Settlement Agreement.

*See* Pl. Exh. 104 at § 2(a-b).

118. The indictment had a severe negative indictment on, among other things, Stein, Lhote, and McGee's ability to liquidate the most valuable of the assets required to be liquidated under the Letter Agreement, interests in North Channel Bank. North Channel Bank was, at the time of the Settlement Agreement and the Letter Agreement, expected to realize approximately DKK 322 million. In fact, in entering the Settlement Agreement, Stein, Lhote, and McGee expected these assets to be sold in order to make the Additional Cash Payment. To this day, North Channel Bank has not been sold and is in liquidation.

*See* Stein ¶¶ 28(a)(viii)(a-c); Lhote ¶¶ 28(a)(viii)(a-c); McGee ¶¶ 86, 147, 149; Pl. Exh. 109 at Annex A.

119. The indictment also had a severe negative impact on McGee's ability to earn money to make payments under the Settlement Agreement. For example, the indictment resulted in McGee losing his position as an officer and director of AdaptHealth LLC, depriving him of substantial compensation. The indictment similarly frustrated McGee's ability to gain comparable employment since 2021. The indictment also negatively impacted Lhote's income earning possibilities.

*See* McGee ¶¶ 151-54; *see* Lhote ¶ 29(a)(viii)(d).

120. The indictment caused Miller to be immediately concerned that Stein and Lhote might be extradited to Denmark and detained there.

*See* Miller ¶ 21.

121. As a result, it was important to be able to demonstrate to a Danish court that Stein and Lhote had made commitments under the Settlement Agreement and were abiding by those commitments, such that extradition and, if

extradition occurred, pre-trial detention were not warranted under the circumstances.

*See* Miller ¶ 22(a).

122. Accordingly, starting very shortly after the April 2021 indictment, Miller repeatedly sought to have U.S. counsel for SKAT respond to the following two specific questions, among others:

> "1.    First, can you send us a copy of the written communication that SKAT sent to SØIK in conformity with its obligations under Section 8f of the Settlement Agreement?  That would be helpful for us to understand the record on this issue.
>
> 2.    Relatedly, based on our conversation, it's unclear to us whether a request was ever made by SØIK to SKAT for a copy of the full agreement, as contemplated in Section 8f.  Can you confirm whether such a request was made by SØIK, and if so, by whom, so that we know where to direct our conversations within SØIK?"

*See* Miller ¶¶ 23-28; Pl. Exh. 127.

123. A few weeks after Miller began to ask these questions, in early June 2021, Stein, Lhote, and McGee provided SKAT with an updated affidavit of confession of judgment (the "2021 Affidavit of Confession of Judgment").

*See* Miller ¶ 29; Lhote ¶ 67; McGee ¶¶ 126, 162; Pl. Exh. 129.

124. The 2021 Affidavit of Confession of Judgment reflects that, by that point, McGee resided in Philadelphia and Lhote resided in Florida.

*See* Lhote ¶ 67; McGee ¶¶ 126, 162; Pl. Exh. 129; *see also* Pl. Exh. 104 at Exh. 5.

125. By this point, New York law regarding the enforceability of affidavits of confession of judgment executed by persons who were not-residents of New York had changed such that, in general, such affidavits of confessions of judgment were not effective.

*See* CPLR 3218; Siegel, N.Y. Practice § 300 (6th ed. & Supp.).

126.   U.S. counsel for SKAT did not raise the impact of the change in law with U.S. counsel for Stein or Lhote.

*See* Miller ¶ 29.

127.   The Settlement Agreement contained a requirement that the Parties negotiate in good faith to modify the Settlement Agreement in accordance with the original intent of the parties if any aspect of the Settlement Agreement was held by a court or other authority to be "invalid, void, or unenforceable."

Pl. Exh. 104 at § 17.

128.   SKAT itself, as distinct from its U.S. counsel, had no knowledge of the change in law.

*See* Pl. Exh. 400 at 362:13-19, 362:25-363:13, 364:13-20.

129.   In late June 2021, SKAT responded to Miller's e-mail about SKAT's compliance with Section 8(f):

> We can confirm that Skattestyrelsen informed SØIK on a senior level immediately after the signing of the Maya [sic] 2019 settlement agreement of all relevant sections of the agreement including the sections on good faith negotiations and the obligation to provide information and cooperation. Subsequently, SKAT has briefed SØIK on a rolling basis on the settling parties' fulfillment of their obligations under the settlement agreement, including the extent to which they have until now provided information and cooperation. This briefing has taken place both in meetings and in phone conversations.

Miller ¶ 30(a); Pl. Exh. 128; Pl. Exh. 401 at Request Nos. 14, 15; Pl. Exh. 402 at Request Nos. 18, 19; Pl. Exh. 403 at Interrogatory Nos. 16, 17; Pl. Exh. 404 at Request No. 12.

130.   SKAT's late June 2021 answer is fundamentally inconsistent with its sworn testimony regarding the manner that it claimed at deposition to have complied with Section 8(f), which largely is based on a handful of written communications that occurred in the weeks culminating with the execution of the Settlement Agreement and its announcement by SKAT.

*See* Pl. Exh. 128; Pl. Exh. 400 at 110:16-111:9, 111:11, 111:21-112:15, 112:17-19.

131.  SKAT's late June 2021 answer is also fundamentally inconsistent with a communication that it sent after this litigation was initiated.  On April 21. 2023, U.S. counsel for SKAT wrote to counsel for Stein and Lhote and asserted that two specific pieces of correspondence established that SKAT made the representations required of Section 8(f).

*See* Pl. Exh. 9, 11, 128.

132.  One of the writings to which U.S. counsel for SKAT referred was one of the letters that SKAT wrote to SØIK in January 2021, more than 18 months after execution of the Settlement Agreement, and only after SØIK began to inquire about the Settlement Agreement.

*See* Pl. Exh. 9, 11, 118.

133.  SKAT disclaims and does not contend that its 2021 written communications to SØIK satisfy Section 8(f).

*See* Pl. Exh. 400 at 110:16-111:9, 111:11, 111:21-112:15, 112:17-19.

134.  The other is the May 15, 2019, e-mail from Ahlefeld-Engel to SØIK by which SKAT communicated, among other things, part of what would become the final text of Section 8(f).

*See* Pl. Exh. 103; Pl. Exh. 400 at 109:11-110:5.

## **PROPOSED CONCLUSIONS OF LAW**

### **The Claims and Defenses**

1.  Stein and Lhote allege two causes of action in the First Amended Complaint (the "Stein FAC").  They allege causes of action for: (a) breach of contract, specifically breach of the obligations under Section 8(f) of the Settlement Agreement; and (b) a declaratory judgment under 28 U.S.C. § 2201 *et seq.* in relation to the 2021 Affidavit of Confession of Judgment.

ECF No. 94 at ¶¶ 103-117.

2.  On Count I, Stein and Lhote seek the remedy of rescission of the unperformed obligations of the Settlement Agreement and the Letter Agreement and rescissory damages in the amount of the funds that were paid after the Initial Cash Payment, approximately DKK 57,765,968.  McGee raises various affirmative defenses to SKAT's claims that are consistent with

Stein and Lhote's assertions that SKAT breached its obligation under the Settlement Agreement. All parties necessary for the Court to order the rescissionary remedies sought by Stein and Lhote are present before the Court.

*Id.* at ¶¶ 103-112 & pp.28-29; Pl. Exh. 6; PSOF ¶¶ 68-69; ECF No. 93 at pp.8-9 (asserting, among other things, affirmative defense of SKAT's breach of Section 8(f)); ECF No. 123 at ¶¶ 104-17; 5/21/24 Tr. at 8-14.

3.  On Count II, Stein and Lhote seek a declaration that the 2021 Affidavit of Confession of Judgment is unenforceable. McGee asserts an affirmative defense to SKAT's claims that seeks, in effect, the same relief.

    ECF No. 94 at ¶¶ 113-117; Pl. Exh. 129; ECF No. 93 at pp.8-9 (asserting, among other things, that the 2021 Affidavit of Confession of Judgment is unenforceable).

4.  If the Court orders that the provisions of the Settlement Agreement and Letter Agreement containing unperformed obligations should be rescinded, then it need not resolve Stein and Lhote's Count II or either of SKAT's causes of action.

5.  SKAT alleges two causes of action in its First Amended Answer, Affirmative Defenses & Counterclaims ("SKAT Counterclaims" or "SKAT Countercl."). SKAT alleges causes of action for: (a) breach of contract in relation to the unpaid portion of the Additional Cash Payment plus interest on this amount; and (b) breach of contract in relation to the True-Up amount plus interest on this amount.

    ECF No. 48 at ¶¶ 174-187.

6.  With respect to both breach of contract claims, SKAT seeks relief in the form of entry of the 2021 Affidavit of Confession of Judgment in an amount to be determined by the Court and, as alternative relief, contract damages in the same amount.

    ECF No. 48 at ¶¶ 188-189.

**Stein and Lhote's Count I**

7.    In order to resolve Stein and Lhote's Count I, the claim for rescission, the Court must resolve several issues. The Court first describes them briefly and then resolves each.

8.    First, the Court must determine whether SKAT *breached* the Settlement Agreement, in particular, whether SKAT failed to comply with Section 8(f).

    *See Lenel Sys. Intl., Inc. v. Smtih*, 34 A.D.3d 1284, 1285 (4th Dep't 2006).

9.    Second, the Court must determine whether SKAT's breach, if any, was *material*.

    *See id.*

10.    Third, the Court must determine whether the requirements for the remedy of rescission have been met. This requires the Court to resolve whether Stein and Lhote sought rescission for a material breach within a *reasonable period of time* after performance under the Settlement Agreement and the Letter Agreement was suspended.

    *See United States Liab. Ins. Co. v. WW Trading Co.*, 813 F. App'x 636, 638-39 (2d Cir. 2020); *Ballow Brasted O'Brien & Rusin P.C. v. Logan*, 435 F.3d 235, 238 (2d Cir. 2006).

11.    Stein and Lhote do not seek rescission of the entire Settlement Agreement and Letter Agreement. For example, they do not seek to upset the releases that were granted in the Settlement Agreement or the return of the Initial Cash Payment of DKK 950 million. Rather, Stein and Lhote seek rescission of the unperformed obligations of the Settlement Agreement and the Letter Agreement.

    *See* ECF No. 94 at ¶ 111 & p. 29.

12.    In determining whether this relief is available, the Court must determine whether the obligations are *divisible*.

    *See Great Am. Ins. Co. v. Zelik*, 2020 WL 85102, at *4-5 (S.D.N.Y. Jan. 6, 2020), *on reconsideration in part*, 439 F. Supp. 3d 284 (S.D.N.Y. 2020).

**SKAT Breached Section 8(f) of the Settlement Agreement**

13.  Section 8(f) required that SKAT communicate with SØIK in a specific *timeframe*, in a specific *manner*, and about specific *subject matters*.

   *See* Exh. 104 at § 8(f).

14.  The Court finds that SKAT breached its obligations under Section 8(f) of the Settlement Agreement.

15.  First, SKAT was required to make the required communications "promptly" upon the execution of the Settlement Agreement. In this context, the Court interprets the requirement of promptness to mean that SKAT had to have completed the representations required by Section 8(f) when it had received the Initial Cash Payment.

   *See* Exh. 104 at §§ 2(a), 8(f); PSOF ¶ 55.

16.  The Parties could not have expected that SKAT would, for example, make the representations required by Section 8(f), if the Covered Parties did not even take the most basic initial step associated with the Settlement Agreement -- payment of the Initial Cash Payment -- and if the Covered Parties did not even obtain the releases provided for by Section 4 of the Settlement Agreement, which were triggered only by the Initial Cash Payment. After all, if the Initial Cash Payment had not been made, there would have been no releases and, in effect, no settlement. And Stein, Lhote, and McGee could not have believed themselves entitled to the benefit of Section 8(f) if they did not make the Initial Cash Payment.

   *See* PSOF ¶ 55; Stein ¶ 33(a)(i); Lhote ¶ 33(a)(i).

17.  This interpretation of the temporal requirement of promptness is consistent with the short timetable required for the payment of the Initial Cash Payment and the timetable for provision of the 2019 Affidavit of Confession of Judgment.

   *See* Pl. Exh. 104 at §§ 2(a)(i-ii), 4(c); Pl. Exh. 10A.

18.  None of SKAT's communications *prior* to execution of the Settlement Agreement were made promptly *upon execution* of the Settlement Agreement.  Communications made in contemplation that there would be an executed settlement are not *promptly upon* execution of the Settlement Agreement.  And these were not made after the main point of the Settlement Agreement -- or, indeed, the main point of any settlement agreement -- was achieved, specifically, the release of claims against Stein, Lhote, McGee, and the other parties.

*See* Pl. Exh. 103, 105, 106, 107, 108, 110.

19.  SKAT's communications with SØIK starting in January 2021, Pl. Exh. 121, 124, 131, 141, which were in response to SØIK's written questions about the Settlement Agreement, Pl. Exh. 118, 123, 125, 131, clearly do not satisfy the timing requirement of Section 8(f).

*See* Pl. Exh. 104 at § 8(f).

20.  Communications sent more than 19 months after execution of the Settlement Agreement in late May 2019, and about 17 months after the Initial Cash Payment was completed, cannot reasonably be characterized as "promptly" upon execution of the Settlement Agreement.

*See* Pl. Exh. 3, 121, 124, 131, 141; Pl. Exh. 104 at § 8(f).

21.  What Stein, Lhote, and McGee bargained for was a communication that would be made sufficiently early that it would have a greater chance of positively influencing SØIK's investigation.  Communications made so much later were *not* what they bargained for.

*See* Pl. Exh. 104 at § 8(f); Stein ¶¶ 33(a)(ii)(a-e), 33(a)(iii); Lhote ¶¶ 33(a)(ii)(a-e), 33(a)(iii).

22.  Stein, Lhote, and McGee also bargained for SKAT's communication with SØIK to be in a specific manner, that is, "in writing" and that the communication come from SKAT, not from anyone else, even Stein, Lhote, or McGee, which would not, in any event, have had the same effect as a communication from SKAT.

Pl. Exh. 104 at § 8(f); Matt, Jerome, Luke, Marshall.

23.  To the extent SKAT relies on oral communications to satisfy Section 8(f), such reliance is misplaced.  SKAT was required to bring to the attention of SØIK *in writing* the Settlement Agreement and its terms.  And SKAT was required to make several specific representations to SØIK and also to do so *in writing*.  Stein, Lhote, and McGee bargained for written communications.  Section 8(f) emphatically provided for communications "in writing."

*See id.*; Pl. Exh. 2.

24.  While it is possible to envision a circumstance in which an oral communication could constitute substantial compliance with a requirement of a writing, the factual circumstances present here do not allow for the finding of substantial compliance with the writing requirement in Section 8(f).  Any oral communications to which SKAT might point are not compliance with Section 8(f).

*See* Pl. Exh. 104 at § 8(f); Stein ¶¶ 33(b)(i-vi); Lhote ¶¶ 33(b)(i-vi); McGee ¶¶ 99-101.

25.  SKAT has presented no reliable evidence concerning its purported oral communications.  SKAT has virtually no recollection of *what* was represented orally to SØIK, *by whom*, and *when*.  And SKAT has almost no notes, records of telephone calls, or meetings to pinpoint who said what to whom and when.

Pl. Exh. 113, 114, 128; Pl. Exh. 400 at 240:8-11; Pl. Exh. 403 at Interrogatory Nos. 4, 16, 17; Pl. Exh. 404 at Interrogatory Nos. 1, 12.

26.  The requirement of a writing ensured that the information imparted by SKAT to SØIK would become part of the official records of SØIK and could be communicated easily and widely within SØIK.  Such a writing would also ensure that any new or different SØIK personnel would have access to the same information regarding our obligations and the representations required by Section 8(f).  A writing is also undeniable evidence of the communication, unlike an oral communication.  An oral communication is not, and could not be, a reasonable a substitute.

*See* Stein ¶¶ 33(b)(i-vi); Lhote ¶¶ 33(b)(i-vi); McGee ¶¶ 99-101.

27.  Third, SKAT's communications with SØIK, such as they are, fail to bring to the attention of SØIK the Settlement Agreement *and* its terms.  SKAT's communications with SØIK about the fact of the Settlement Agreement, for

example, in sending SØIK drafts of a press release, Pl. Exh. 107, and in sending SØIK the final press release, Pl. Exh. 106, cannot satisfy the requirement to bring to the attention of SØIK the *terms* of the Settlement Agreement.

28.  Given the final sentence of Section 8(f), the Court does not find that, to comply with the obligation to bring the terms of the Settlement Agreement to the attention of SØIK, SKAT was required to provide the actual Settlement Agreement.

*See* Pl. Exh. 104 at § 8(f).

29.  The Court does conclude that the requirement that SØIK bring to the attention of SØIK the terms of the Settlement Agreement requires that SØIK have communicated with SØIK at least the following terms of the Settlement Agreement, which were the ones most central to the nature of the bargain:

a.  the payments to be made and the timeframe in which they would be made;

b.  the nature of the cooperation obligations undertaken in the Settlement Agreement, including the great extent of the information to be provided, the manner in which the cooperation obligations would be invoked (primarily by a mere request of SKAT), and the requirement that Stein, Lhote, and McGee use best efforts to ensure that their cooperation was meaningful and productive, with best efforts having a known legal meaning under New York law;

c.  the nature of the security that Stein, Lhote, and McGee provided to SKAT in the form of the 2019 Affidavit of Confession of Judgment and the requirement to provided an updated affidavit of confession of judgment;

d.  the special payment obligations that Stein, Lhote, and McGee, as distinct from the remainder of the Covered Parties, undertook, for example to pay interest and additional interest in the event of a default; and

e.  the requirement that Stein, Lhote, and McGee produce records sufficient to establish the Net Proceeds and that they certify the accurate of the Final Net Proceeds List.

*See* Pl. Exh. 104 at §§ 2(a), 2(b), 2(c), 2(d), 2(e)(i), 4(c), 5(d)(iii).

30. The Court further concludes that the reference to "this Agreement and its terms" necessarily includes the most central terms of the Letter Agreement. The Letter Agreement was "intended to and [did] *supplement and amend* the terms of the Settlement Agreement with respect to the subject matter" of the Letter Agreement

   *See* Pl. Exh. 104 at § 18 (emphasis added); Pl. Exh. 109 at § 1.

31. Accordingly, SKAT was required under Section 8(f) to the attention of SØIK the terms most central to the nature of the bargain embodied by the Letter Agreement, including:

   a.  the best efforts obligations that Stein, Lhote, and McGee undertook to liquidate certain illiquid assets to make the Additional Cash Payment;

   b.  the requirement to provide quarterly progress reports regarding their efforts to liquidate assets;

   c.  the requirement to apply the proceeds of liquidation of the such assets to the Final Settlement Amount; and

   d.  the requirements that proceeds of the sale of North Channel Bank be made to SKAT, which, to the detriment of Stein, Lhote, and McGee, would not be applied to the payments required by the Settlement Agreement.

   *See* Pl. Exh. 109 at §§ 3-8 & Annex A; *Harbinger v. F&G, LLC v. OM Grp. (UK) Ltd.*, 2015 WL 1334039, at *28 (S.D.N.Y. Mar. 18, 2015) ("The term 'best efforts' has been interpreted to require that a party use all reasonable means to achieve the contractual object at issue.").

32. The Court concludes that Section 8(f)'s requirement to bring the terms of the Settlement Agreement, including the terms of the Letter Agreement, to the attention of SØIK required SKAT to identify to SØIK in writing the Covered Parties *and* the Covered Parties' Designees.

   *See* Pl. Exh. 104 at § 8(f).

33.  For example, if SØIK were not informed who the Covered Parties' Designees were, then SØIK would not be informed which specific individuals -- Stein, Lhote, and McGee -- had undertaken all of the special obligations that only apply to the Covered Parties' Designees.

*See* Pl. Exh. 104 at §§ 1(j), 2(c), 2(d), 2(e)(i), 2(f), 2(h), 4(c), 5, 7(c); Pl. Exh. 109 at §§ 3, 4, 5, 7.

34.  In addition to bringing the terms of the Settlement Agreement to SØIK's attention, there is a requirement of Section 8(f) that SKAT make a set of representations to SØIK, specifically, that:

a.  "this Agreement reflects good-faith negotiation by the Covered Parties";

b.  "the Covered Parties' cooperation may result in the recovery by [SKAT] of additional funds from third parties"; and

c.  "this Agreement is in the best interests of [SKAT]."

Pl. Exh. 104 at § 8(f).

35.  None of the writings to which SKAT might point, either individually or collectively, satisfies these standards for *what* SKAT was supposed to communicate to SØIK.  There is far too little about the terms of the Settlement Agreement and the Letter Agreement to satisfy the requirements of Section 8(f).  SKAT has not satisfied its obligations under Section 8(f).

*See* Pl. Exh. 103, 105, 106, 107, 108, 110.

36.  Some specific comments on a few of the communications that SKAT might seek to rely upon are in order.

37.  Though SKAT did provide to SØIK a list of the Covered Parties about eight days before execution of the Settlement Agreement, crucially, neither that document, nor any other writing, identified the Covered Parties' Designees. This communication did not satisfy Section 8(f) on its own and, together with the other communications relied upon by SKAT, did not satisfy Section 8(f).

*See* PSOF ¶¶ 47, 49; Pl. Exh. 103, 105, 106, 107, 108, 110.

38.  SKAT provided to SØIK most of the text that would come to be embodied in Section 8(f), which was then contained in Section 8(d) of the then-existing draft settlement agreement, about two weeks before execution of the Settlement Agreement.  At most, however, this communication can be seen as an indication that, at some point after the Settlement Agreement would be executed, SKAT would make certain representations to SØIK.  It was not in and of itself the required representations.

PSOF ¶¶ 60, 132; Pl. Exh. 105.

39.  This communication did not satisfy the requirement that SKAT actually make these representations.  The Court cannot, on the record before it, conclude that sending this text and, at best, informing SØIK of what SKAT was committed to saying in the future is functionally the same as actually making the representation.

40.  Beyond that, the timing of the communication of the text of what would become Section 8(f) was before execution of the Settlement Agreement and before the making of the Initial Cash Payment.  There is little reason to believe that, had the Initial Cash Payment never been made and the broad releases in the Settlement Agreement never triggered, SKAT would have made any of the representations required by Section 8(f).  This renders an e-mail like Plaintiffs' Exhibit 105 even further removed from actual from compliance with Section 8(f).

*See* Pl. Exh. 104 at § 8(f); Pl. Exh. 105; PSOF ¶ 55.

41.  Finally, there are the e-mails with SØIK regarding the press release that SKAT intended to issue when the Settlement Agreement would be executed and the actual press release itself.

*See* PSOF ¶¶ 61, 65; Pl. Exh. 106, 107, 110.

42.  Individually and taken together with everything else that SKAT might cobble together as evidence of compliance with Section 8(f), these e-mails and draft and final press releases contain, for example, very little detail about the terms of the Settlement Agreement, nothing about who the Covered Parties' Designees are, no sense of the breadth of the cooperation obligations of the Covered Parties, nothing about the obligations of the Covered Parties' Designees with respect to the True-Up Amount, no meaningful detail about the Letter Agreement, and, in generally, are far removed from the several specific representations required by Section 8(f),

such as the one about good faith negotiations.

*See* Pl. Exh. 104 at § 8(f); Pl. Exh. 103, 105, 106, 107, 110.

## The Strong Circumstantial Evidence of A Breach of Section 8(f)

43.  A review of the writings between SKAT and SØIK confirms that SKAT did not comply with Section 8(f).

*See* Pl. Exh. 104 at § 8(f); Pl. Exh. 103, 105, 106, 107, 110.

44.  There is, in addition, very strong circumstantial evidence that SØIK was not aware of many aspects of the Settlement Agreement, which supports the conclusion that SKAT failed to comply with Section 8(f).

45.  First, there is the fact that, in obtaining from a Danish court orders to seize real property and bank accounts of Stein, Lhote, and McGee in April 2020, SØIK did not mention the Settlement Agreement or payments that Stein, Lhote, or McGee had made pursuant to it.

*See* PSOF ¶ 102.

46.  Under applicable Danish law procedure, it is likely that, had SØIK known of the Settlement Agreement and the Initial Cash Payment, it would have so indicated in seeking the seizure orders.

*See* Madsen Report at 10.

47.  And SØIK itself stated in a November 2020 communication to the United States Department of Justice that SØIK is "not in possession of the settlement and has no knowledge of any details in it, including who is involved, besides the amount and the number of pension plans."

Pl. Exh. 12; PSOF ¶¶ 103-04.

48.  Finally, beginning on the very day that McGee mentioned the Settlement Agreement to SØIK in his interview, SØIK began asking SKAT a series of very basic questions about the Settlement Agreement that, had SKAT complied with Section 8(f)'s requirement that it inform SØIK of the terms of the Settlement Agreement and the Letter Agreement, SØIK would not have had to ask.

*See* PSOF ¶ 94; Pl. Exh. 118.

35

49.    The questions indicate just how little SØIK knew of the terms of the
       Settlement Agreement and, as a result, the extent to which SKAT had
       breached Section 8(f):

       1.    Which natural or legal persons has the Danish Tax Agency
             entered into the referenced settlement with?

       2.    Which refunds are covered by the settlement (for example by
             indication of SKAT's batch number)?

       3.    How is the settlement sum composed (does it include for
             example reimbursement of expenses other than the received
             dividend refunds)?

       4.    How much of the total settlement sum of DKK 1.6 billion has
             been paid to the Danish Tax Agency, and when does the
             remaining amount fall due for payment?

       5.    Which claims are the payments written off against [sic]

       6.    Are claims beyond the settlement amount waived, and if so in
             what manner?

       7.    Is the settlement an expression of a final decision in the civil
             case, or will further compensation claims against the settlement
             parties arise later?

       8.    Has the Danish Tax Agency been provided with security for
             fulfillment of the settlement, including guarantees, collateral or
             the like? In such event, has the Danish Tax Agency undertaken
             any form of perfection in this regard?

       9.    Has the Danish Tax Agency pursued a compensation claim in
             the case, and if so, against whom and for what amount?

       *See* Pl. Exh. 118; PSOF ¶ 94.

50.    The questions posed in the letters from SØIK from January 2021 and into
       February 2021 strongly indicate that, prior to these questions and answers,
       SØIK did not have the knowledge of the Settlement Agreement or the Letter
       Agreement that compliance with Section 8(f) would have caused it to have.
       Conversely, if SØIK did have the knowledge of the Settlement Agreement
       and the Letter Agreement that compliance with Section 8(f) would have

resulted in its having, SØIK would not have had to ask these questions, many of which sought very basic information about the nature of the settlement.

*See* Pl. Exh. 123, 125, 131; PSOF ¶¶ 94-108.

51.    In addition to SØIK's questions, there is the affirmative statement that a SØIK official made to the United States Department of Justice in 2020 in which the official disclaimed knowledge of the Settlement Agreement that, had SKAT complied with Section 8(f), SØIK would have had.

Pl. Exh. 12.

52.    And there is also the lack of any mention of the payments made pursuant to the Settlement Agreement in SØIK's efforts to obtain seizures of property of Stein, Lhote, and McGee.

See Pl. Exh. 14; Madsen Report at 8-10.

53.    This circumstantial evidence strongly supports a finding of breach.

**The "Absolute and Unconditional" Provision**
**Does Not Excuse SKAT's Breach of Section 8(f)**

54.    During this litigation, SKAT has suggested that the claim for rescission fails as a matter of law because whether SKAT breached Section 8(f) does not matter.  The argument here is that because "[t]he Covered Parties' obligation to pay the Final Settlement Amount is absolute and unconditional," SKAT's performance under Section 8(f) is irrelevant.

*See* ECF Nos. 116, 118-19 (letter-briefing on SKAT's prospective motion for judgment on the pleadings); Pl. Exh. 104 at § 2(c).

55.    SKAT is wrong as a matter of law.  "Absolute and unconditional" clauses are emphatically not a license for the party asserting such clauses to breach a contract and, notwithstanding the breach, demand that the other party still perform.  In this case, SKAT cannot have breached Section 8(f) and demand that Stein, Lhote, and McGee still pay under the Settlement Agreement.

56.    "Absolute and unconditional" language is also known as a "hell or high water clause."

    *See, e.g.*, *Xerox Corp. v. Bus-Let, Inc.*, 2019 WL 2514855, at \*2, \*4 (W.D.N.Y. June 18, 2019).

57.    "Hell or high water" clauses may be enforceable.

    *See Bank of America, N.A. v. Greuner Medical P.C.*, 2024 WL 182408, at \*5 (S.D.N.Y. Jan. 17, 2024); *Xerox Corp.*, 2019 WL 2514855, at \*4; *Wells Fargo Bank Minn., N.A. v. Nassau Broad. Partners, L.P.*, 2003 WL 22339299, at \*7 (S.D.N.Y. Oct. 10, 2003).

58.    However, such clauses are not enforceable over a claim that the party seeking to enforce the clause has failed to perform, that is, when it has failed to provide the consideration required by the applicable agreement.

    *Greuner Med. P.C.*, 2024 WL 182408, at \*5 (citing *CIT Grp./Commercial Servs., Inc. v. Prisco*, 640 F. Supp. 2d 401, 410 (S.D.N.Y. 2009) (noting that under New York law, the only affirmative defenses that are not waived by an absolute and unconditional guaranty are payment and lack of consideration)).

59.    Under well-established New York law, when there is a breach by the party seeking to enforce "absolute and unconditional" language, the clause is unenforceable if there has been a "failure of consideration."

    *See Century City Mall, LLC v. Waxman*, 193 A.D.3d 499, 499 (1st Dep't 2021) (reversing grant of motion for summary judgment because guaranty was not "absolute and unconditional" plaintiff failed to deliver leased premises to tenant, *i.e.*, failure of consideration); *Walcutt v. Clevite Corp.*, 13 N.Y.2d 48, 56 (1963) ("Where the consideration fails, either partially or entirely, neither the principal nor the guarantor is accountable for anything which has not been received.").

60.    "[F]ailure of consideration exists wherever one who has promised to give some performance fails without his or her fault to receive in some material respect the agreed quid pro quo for that performance.  Failure of consideration gives the disappointed party the right to rescind the contract."

    *Indep. Energy Corp. v. Trigen Energy Corp.*, 944 F. Supp. 1184, 1199 (S.D.N.Y. 1996).

61.    "An action for rescission based on failure of consideration lies '[w]here a plaintiff has received little or nothing of value'" because the breaching party did not perform.

   *Faunus Grp. Intern., Inc. v. Ramsoondar*, 2014 WL 2038884, at *3 (S.D.N.Y. May 16, 2014) (quoting *Indep. Energy*, 944 F. Supp. at 1199)).

62.    SKAT failed to comply with its obligation under Section 8(f), which was the most important provision of the Settlement Agreement to Stein, Lhote, and McGee and the key consideration that they bargained for.  Because SKAT breached Section 8(f), that is, it did not provide the bargained-for consideration, SKAT cannot enforce the "absolute and unconditional" language in the Settlement Agreement.

   *See* PSOF ¶¶ 26, 57.

63.    For the same reasons, a finding of a breach by SKAT necessarily means that SKAT cannot recover on either of its two breach of contract claims.  A plaintiff in a contract action *must* prove that it performed.

   *See Treasure Chest Themed Value Mail, Inc. v. David Morris Int'l, Inc.*, 2018 WL 3130601, at *3 (S.D.N.Y. June 26, 2018), *aff'd*, 785 F. App'x 1 (2d Cir. 2019); *Medinol Ltd. v. Bos. Sci. Corp.*, 346 F. Supp. 2d 575, 618 (S.D.N.Y. 2004) ("As a general principle of contract law, a material breach excuses the other party's nonperformance.").

64.    SKAT has not performed and cannot so demonstrate; it has breached.  Its contract claims fail as a result.

## SKAT's Contract Claims Fail For Another Reason

65.    Another reason that SKAT's contract claims fail is because, in the Settlement Agreement, SKAT bargained away the right to assert a breach of contract claim.

66.    The Settlement Agreement's terms are clear and unambiguous: SKAT's "sole remedy for the Covered Parties' failure to pay the remainder of the Final Settlement Amount shall be the filing of the Affidavit of Confessions of Judgment against the Covered Parties' Designees as set forth in Section 5(c)."

39

Pl. Exh. 104 at § 2(c); *see also id.* at §§ 5(c), 10(e) (contemplating same sole remedy of filing of affidavit of confession of judgment).

67.   "Sole remedy" provisions, such as the one that the parties to the Settlement Agreement bargained for, are fully enforceable under New York law and, indeed, are routinely enforced.

68.   They are enforced because "sole remedy" provisions are "sufficiently clear to establish that no other remedy was contemplated by the parties at the time the contract was formed, for purposes of that portion of the transaction."

*Nomura Home Equity Loan, Inc., Series 2006-FM2 v. Nomura Credit & Capital, Inc.*, 30 N.Y.3d 572, 581-582, 584 (2017) (explaining that sole remedy "provisions represent the parties' [bargained-for] agreement on the allocation of risk" associated with a potential breach of the contract and holding "sole remedy" provision was enforceable and precluded general contract damages); *see Katzman v. Helen of Troy Texas Corp.*, 2013 WL 1496952, at *6 (S.D.N.Y. Apr. 11, 2013) (distinguishing situations where parties "expressly anticipated a particular form of breach . . . and agreed upon an exclusive remedy for that breach" from those in which a party "did not unmistakably manifest an intent" to limit its available remedy); *see generally Metro. Life Ins. Co. v. Noble Lowndes Intl.*, 84 N.Y.2d 430, 436 (1994) (in case involving contractual limitation on type of damages that non-breaching party could obtain, noting that "[p]arties sometimes make agreements and expressly provide that they shall not be enforceable at all, by any remedy legal or equitable. They may later regret their assumption of the risks of non-performance in this manner; but the courts let them lie on the bed they made.") (quoting 5 Corbin on Contracts § 1068 at p. 386).

69.   The parties to the Settlement Agreement, including SKAT, were all represented by able counsel and the final text of the Settlement Agreement was the result of "extensive and good faith negotiations."

Pl. Exh. 104 at pp. 2, 19-29.

70.   These factors confirm what the unambiguous language already demonstrates, *i.e.*, that the "sole remedy" provision in Section 2(c) is fully enforceable.

*See* Pl. Exh. 104 at § 2(c); *Nomura*, 30 N.Y.3d at 582 ("Contract terms providing for a 'sole remedy' are sufficiently clear to establish that no other

remedy was contemplated by the parties at the time the contract was formed, for purposes of that portion of the transaction, 'especially when entered into at arm's length by sophisticated contracting parties.'") (internal citations omitted); *J. D'Addario & Co., Inc. v. Embassy Indus., Inc.*, 20 N.Y.3d 113, 116-19 (2012) (affirming that "sole remedy" provision, negotiated at "arm's length" with each party represented by counsel, was enforceable); *CBS Broad. Inc. v. Jones*, 460 F. Supp. 2d 500, 505 (S.D.N.Y. 2006) (dismissing complaint for breach of contract damages because agreement provided only for termination of future payments, not additional damages).

## SKAT's Breach Was Material

71.     A breach of contract is material if it "substantially defeats the purpose of an agreement in such a fundamental way as to defeat the object of the parties in making the contract," and occurs where the breaching party fails to perform a substantial part of the agreement that induced the non-breaching party to enter the agreement.

*See Chapman v. Davis*, 165 N.Y.S.3d 818, 826 (Pleasant Valley Town Ct. 2022) (cleaned up); FARNSWORTH ON CONTRACTS (3d ed.) § 8.16 ("In order for a breach to justify the injured party's suspension of performance, the breach must be significant enough to amount to the nonoccurrence of a constructive condition of exchange.  Such a breach is termed 'material.'").

72.     To determine if a breach is material, courts typically consider the factors set out in Section 241(a) of the Restatement (Second) of Contracts:

a.      the purpose of the contract;

b.      the extent to which the injured party will be deprived of the benefit it reasonably expected or damaged by the lack of full performance;

c.      the extent to which the injured party can be adequately compensated for the part of the benefit that it will not receive;

d.      the extent to which the party failing to perform will suffer forfeiture;

e.      the likelihood that the party failing to perform will cure its failure, taking into account all of the circumstances including any reasonable assurances; and

f.      the extent to which the behavior of the party failing to perform comports with the standards of good faith and fair dealing.

41

*Chapman*, 165 N.Y.S.3d at 826 (citing *Wechsler v. Hunt Health Sys.*, 330 F. Supp. 2d 383, 415 (S.D.N.Y. 2004)); *see generally* RESTATEMENT (SECOND) OF CONTRACTS § 241(a).

73. Stated another way, the relevant question is: "Would the [non-breaching] party have agreed to enter the contract without the inclusion of the disputed clause?"  If the answer is no, the breach is material.

   *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 895 (2d Cir. 1976).

74. Materiality of a breach is ordinarily a question of fact.

   *Orlander v. Staples, Inc.*, 802 F.3d 289, 298 (2d Cir. 2015); *Mackinder v. Schawk, Inc.*, 2005 WL 1832385, at *9 (S.D.N.Y. Aug. 2, 2005).

75. Applying the standard under New York law for materiality, the Court finds that, as a matter of fact, SKAT's breach of Section 8(f) of the Settlement Agreement was material.  Substantially all of the factors that must be considered favor a finding of materiality:

   a.   It is uncontestable that Stein, Lhote, and McGee would not have entered into the Settlement Agreement without the inclusion of Section 8(f).  Their testimony on this subject is clear.

        *See* Stein ¶ 32; Lhote ¶ 32; McGee ¶ 92.

   b.   Stein, Lhote, and McGee were motivated to seek provisions substantially identical to those that came to be embodied in Section 8(f) long before the Settlement Agreement was even entered into. They were even more motivated to obtain such protections when SKAT would not agree to a settlement that had, as a condition, that SØIK would not charge them.

        *See* Pl. Exh. 2; PSOF ¶¶ 20-26; Stein ¶¶ 22(a-h); Lhote ¶¶ 22(a-h); McGee ¶¶ 45-47.

   c.   Stein and Lhote would not have continued the settlement discussions in late 2018 or early 2019 if provisions like Section 8(f) were not going to be included in the ultimate agreement.

        *See* PSOF ¶ 26; Stein ¶ 22(h); Lhote ¶ 22(h).

d.    The same is true of McGee, although he is not a plaintiff on Count I of the Stein FAC.

See McGee ¶ 47.

e.    Stein, Lhote, and McGee were entirely deprived of the benefit of Section 8(f) when SKAT failed to perform.

f.    There is no possible cure now for SKAT's failure to comply with Section 8(f).  There is simply no way to wind back the clock on SØIK's investigation to August 2019, have SØIK consider the Section 8(f) information as if it were still August 2019, and then have SØIK decide anew whether to charge, and then indict, Stein, Lhote, and McGee.

See PSOF ¶ 21; Stein ¶¶ 33(a)(ii)(a-e), 33(a)(iii); Lhote ¶¶ 33(a)(ii)(a-e), 33(a)(iii); Madsen Report at 2 & Att. C at 14.

g.    In Section 8(f), Stein, Lhote, and McGee bargained for the possible impact that SKAT's performance would have on SØIK.  The apt analogy that Stein and Lhote used in their Witness Statements was to a life-saving medicine that has some chance of having the desired effect.  SKAT deprived them of that chance.

See Stein ¶ 32(c); Lhote 32 ¶ (c).

h.    In determining whether a material breach has occurred, courts do not look at whether the consideration exchanged is of equal monetary value or whether the consideration of which a party has been deprived is of great monetary value.  There is no requirement that what Stein, Lhote, and McGee agreed to pay after the Initial Cash Payment -- at least DKK 600 million -- be equal in value to the consideration provided by Section 8(f) by any measure.

Caisse Nationale de Credit Agricole-CNCA, N.Y. Branch v. Valcorp, Inc., 28 F.3d 259, 265 (2d Cir. 1994) ("It is well established that the 'slightest consideration is sufficient to support the most onerous obligation;'" "courts are not to inquire into the adequacy of consideration."); Apfel v. Prudential-Bache Sec. Inc., 81 N.Y. 2d 470, 475 (1993) ("[P]arties to a contract are free to make their bargain, even if the consideration exchanged is grossly unequal or of dubious value.").

43

i.     Whether SKAT would suffer forfeiture depends on the remedy to be provided. Discharging Stein, Lhote, and McGee from the remaining obligations under the Settlement Agreement and the Letter Agreement and ordering SKAT to return the amounts paid after the Initial Cash Payment do not qualify as "forfeitures" under this Restatement factor. The equitable unwinding of an agreement that one side has breached, rather, returns the parties to the *status quo ante*.

RESTATEMENT (SECOND) CONTRACTS § 241, cmt. d.

76.   In opposing a finding of materiality, SKAT has suggested in this litigation that the consideration that it agreed to provide in the form of Section 8(f) was worthless such that a breach of Section 8(f) could not have been material. More specifically, they have suggested that the criminal prosecutors in Denmark could not have taken into account the information that SKAT was required to communicate under Section 8(f), and that SKAT only included it in the Settlement Agreement because Stein, Lhote, and McGee wanted it.

*See* 5/21/24 Tr. at 16-20.

77.   The Court has previosuly expressed serious doubt about this as a matter of commonsense.

*Id.*

78.   The Court's initial impression has been confirmed by the expert testimony. The Court's determination of Danish law is a matter of law that the Court must determine. Having considered the expert reports, the Court finds that, under Danish law, SØIK had considerable discretion to consider the information to be provided under Section 8(f), as well as other factors, in deciding whether to indict Stein, Lhote, and McGee. As Stein, Lhote, and McGee's Danish criminal law expert explains:

There is no doubt that section 721, subsection 1, no. 4 of the Administration of Justice Act provides the legal basis for the prosecution, in exercising its discretion, to drop, or not indict, a case based on its balancing of difficulties, costs, or processing times as against the significance of the case and the penalty that can be expected to be imposed.

There can also be no doubt that, in this assessment, the prosecution can consider whether the accused has compensated the victim or has cooperated with the authorities. This is because the difficulties, costs, or processing times in conducting the case must be weighed against the expected punishment, and since these considerations (compensation and cooperation) will, all else being equal, lead to a more lenient sentencing, the prosecution must already take this into account before indicting to make a fair and usable estimate of the expected punishment.

It is quite common for the prosecution to make significant reductions in the case based on the considerations set forth in section 721, subsection 1, no. 4. This often happens based on plea bargaining-like agreements with the defense attorney. As stated in Report No. 1066 of 1986, p. 192 (cited in Madsen Rep. 15), it is assumed that there may be prunings that converted into a percentage corresponds to the case being cut by 50-75%.

Although it is not typical for the prosecution to drop a case in its entirety, even though the law allows for this possibility, there is nothing typical about this case when it comes to difficulties, costs, and processing times, which can easily be described as exorbitant and unprecedented in Denmark.

> . . . .

Ultimately, it is solely up to the prosecution to decide whether or not to indict. But to claim in this case that they had no options other than to indict is incorrect. The prosecution in this case could have chosen another solution. It is established that there is a legal basis for this in section 721, subsection 1, no. 4 of the Administration of Justice Act.

Madsen Rebuttal Report at 13-15; *see also* Madsen Report at 23-25; *see* Fed. R. Civ. P. 44.1 ("The court's determination [of foreign law] must be treated as a ruling on a question of law.").

79.     The Court does not credit the contrary view advanced by SKAT's Danish
        criminal law expert, Per Justesen, for the reasons that Madsen explains.
        Justesen does not discuss what, as a matter of Danish law, could have
        happened if SKAT had complied with Section 8(f).  And what Stein, Lhote,
        and McGee bargained for is the chance to impact SØIK's decision-making.

        *See, e.g.,* Madsen Rebuttal Report at 9 ("The furthest that Mr. Justesen could
        reasonably go is to indicate that, based on what he knows about the case and
        his experience, he **would have** proceeded to indict Stein, *et al.*  But, as
        mentioned above, it is simply incorrect to state that "the investigation and
        eventual charges against Stein, Lhôte and McGee **could not** have been
        dropped under" section 721, subsection 1, no. 4.") (emphasis added).

## Stein and Lhote Sought Rescission Within A Reasonable Period of Time

80.     The Court must now determine whether Stein and Lhote sought rescission
        with a reasonable time period.

81.     The Court finds that, under the applicable standards, they did.

82.     The party seeking rescission for a material breach must do so within a
        reasonable period of time after learning of the grounds for rescission.  The
        determination of reasonableness depends on the unique facts and
        circumstances present.

        *See United States Liab. Ins.*, 813 F. App'x at 638-39; *Ballow*, 435 F.3d at
        240.

83.     Upon learning information that the defendant may have breached a contract,
        the suspecting party is entitled to a reasonable period of time to investigate.

        *See Cont'l Cas. Co. v. Marshall Granger & Co., LLP*, 6 F. Supp. 3d 380,
        394 (S.D.N.Y. 2014); *Banque Arabe et Internationale D'Investissement v.
        Maryland Nat. Bank*, 850 F. Supp. 1199, 1211 (S.D.N.Y. 1994).

84.     There is no bright-line rule as to what length of time is reasonable for an
        investigation by the non-breaching party.  Courts consider the difficulty
        associated with determining grounds for rescission.

        *See Cont'l Cas. Co.*, 6 F. Supp. 3d at 396 (collecting cases) (citing *Republic
        Ins. Co. v. Masters, Mates & Pension Plan*, 77 F.3d 48, 53-54 (2d Cir.
        1996)); *Maloul v. Berkowitz*, 2008 WL 2876532, at *2 (S.D.N.Y. July 23,
        2008).

85. If and when the non-breaching party obtains knowledge of facts sufficient to conclude there are grounds for rescission, only then does the non-breaching party have to seek a remedy within a reasonable time.

    *See Cont'l Cas. Co.*, 6 F. Supp. 3d at 394.

86. There are events that may suspend the reasonable time by which the non-breaching party must seek rescission.

    *See Banque*, 850 F. Supp. at 1211.

87. For example, where the parties are discussing a resolution, rescission need not be sought until the negotiations collapse, even if the non-breaching party has knowledge sufficient to conclude there are grounds for rescission.

    *See id.*; *Int'l Motor Sports Grp., Inc. v. Gordon*, 1999 WL 619633, at *5 (S.D.N.Y. Aug. 16, 1999).

88. In determining whether Stein and Lhote sought rescission within a reasonable time after suspending performance, the Court consider the purpose of the requirement.

89. The purpose of requiring the non-breaching party to act within a reasonable period of time under the circumstances is to ensure that the non-breaching party (Stein and Lhote) does not continue to receive benefits from the breaching party (SKAT) and, after continuing to receive those benefits for an unreasonably long period of time, only *then* bring an action for rescission.

    *See V.S. Int'l, S.A. v. Boyden World Corp.*, 862 F. Supp. 1188, 1196 (S.D.N.Y. 1994); *Rebecca Broadway L.P. v. Hotton*, 143 A.D.3d 71, 80-81 (1st Dep't 2016).

90. Stein and Lhote suspended their performance around the end of April 2022. It was at that time that they made their last payment and ceased providing quarterly progress reports.

    *See Pl. Exh. 6; PSOF ¶¶ 68, 69, 72, 73.*

91. The next time that SKAT raised the issue of the quarterly progress reports under the Letter Agreement was in February 2023, which tends to show their relative unimportance. Indeed, SKAT itself did not review them.

   *See* Stein ¶ 27(b)(iv); Lhote ¶ 27(b)(iv); Pl. Exh. 400 at 275:20-276:11, 276:22-277:22.

92. Stein and Lhote initiated this action about 11 months later.

   *See* PSOF ¶ 76; Stein ¶ 51; Lhote ¶ 51.

93. No further payments were required under the Settlement Agreement during this period and the final payment under the Settlement Agreement was not required until May 2023.

   *See* Pl. Exh. 104 at §§ 1(r), 2(d); Pl. Exh. 109 at § 6.

94. During this 11-month period, there were no benefits under either the Settlement Agreement or the Letter Agreement provided to Stein or Lhote, or even McGee. This case cannot be analogized to a person who, for example, rents a piece of equipment, suspends his or her performance and ceases to pay, but keeps the equipment. Here, there was no benefit that SKAT was providing to Stein, Lhote, or McGee during the period between April 2022 and May 2023, at which point Stein and Lhote sued.

95. Because the difficulty of investigating whether SKAT had breached Section 8(f) must be assessed, the Court considers the behavior of SKAT's U.S. counsel in responding to Stein and Lhote's requests for information related to its compliance with Section 8(f), which bore on what they knew in April 2022 when they ceased performing.

96. The behavior was troubling and it extended over a lengthy period of time. The behavior of SKAT's U.S. counsel consisted of evasiveness in responding to inquiries and, ultimately, outright falsehoods that misled Stein and Lhote about what SKAT had communicated to SØIK:

   a.  Marshall L. Miller, Stein and Lhote's U.S. counsel, and himself a former experienced prosecutor, began to inquire from U.S. counsel for SKAT about the nature of SKAT's communications with SØIK in November 2020.

      *See* Miller ¶ 10(a-b); Pl. Exh. 7.

b.     Over the course of two months, U.S. counsel for SKAT did not provide any meaningful information, despite promising to do so and the likely ease with which U.S. counsel for SKAT could have obtained such information.

       *See* Miller ¶ 10(c-e); Pl. Exh. 7.

c.     In January 2021, Miller again pressed for SKAT to communicate with SØIK about Stein and Lhote's cooperation with SKAT and the terms of the Settlement Agreement.

       *See* Miller ¶ 11; Pl. Exh. 7.

d.     U.S. counsel for SKAT did not respond.

       *See* Miller ¶ 12.

e.     When U.S. counsel for SKAT did respond to Miller's proposal, U.S. counsel for SKAT falsely stated, among other things, that SKAT would not communicate to SØIK in writing on the subject of Stein, Lhote, and McGee's cooperation provided pursuant to the Settlement Agreement.

       *Compare id.* ¶ 13 *with, e.g.*, Pl. Exh. 124 (SKAT's answers to questions 20 and 22 from SØIK*).*

f.     U.S. counsel for SKAT did not disclose, either because it did not know or because it chose not to, that as of mid-February, SØIK had, in fact, been responding to SØIK's written inquiries about the terms of the Settlement Agreement and cooperation pursuant to it.

       *See* Pl. Exh. 118, 121, 123, 124, 131 141.

g.     After Stein, Lhote, and McGee were indicted in April 2021, the stakes for their being able to obtain visibility into SKAT's communications with SØIK, and the resulting need for that information, were raised considerably.  Miller now asked U.S. counsel for SKAT point blank how SKAT had complied with Section 8(f):

In connection with our discussion of the confidentiality/disclosure provisions of the Settlement Agreement, we wanted to follow up with you on a few items:

1.    First, can you send us a copy of the written communication that SKAT sent to SØIK in conformity with its obligations under Section 8f of the Settlement Agreement?  That would be helpful for us to understand the record on this issue.

2.    Relatedly, based on our conversation, it's unclear to us whether a request was ever made by SØIK to SKAT for a copy of the full agreement, as contemplated in Section 8f. Can you confirm whether such a request was made by SØIK, and if so, by whom, so that we know where to direct our conversations within SØIK?

*See* Miller ¶¶ 23-28; Pl. Exh. 127.

h.    U.S. counsel did not respond until mid-June 2021.  When that response was provided, U.S. counsel for SKAT did not refer to *any* of the writings on which it now relies as evidence of its compliance with Section 8(f), did not mention any of those writings, and did not mention the series of letters by which SKAT answered SØIK's rather basic questions about the Settlement Agreement in January and February 2021, let alone the timing of them, that is, that SØIK first wrote to SKAT on January 6, 2021, the first day of McGee's interview, during which he mentioned the Settlement Agreement as a substantial mitigating factor.

*See* Miller ¶¶ 26-30; Pl. Exh. 118, 128.

i.    Nor did U.S. counsel for SKAT inform Miller, in response to his direct question about whether SØIK had asked SKAT for a full copy of the Settlement Agreement that, indeed, SØIK had asked for a copy and that SKAT had falsely indicated that it was unable to provide it.

*See* Miller ¶ 24; Pl. Exh. 141; Pl. Exh. 400 at 90:3-22.

50

97. Under the circumstances present here, including the difficulty that Stein and Lhote had encountered in obtaining truthful information about SKAT's compliance with Section 8(f) and the fact that Stein and Lhote were not receiving meaningful benefits under the Settlement Agreement during this period, the Court finds that the period of time from late April 2022 when they suspended performance until late March 2023 when they sued for rescission was not unreasonable.

## The Remedies of Rescission and Rescissory Damages Are Appropriate

98. New York law provides for the remedy of rescission arising from either fraud or breach of contract, but only where the breach is found to be material and willful, or, if not willful, so substantial and fundamental as to strongly tend to defeat the object of the parties in making the contract.

   *See Pyskaty v. Wide World of Cars, LLC*, 856 F.3d 216, 227 (2d Cir. 2017); *Gleit v. Francois-Bodine*, 2018 U.S. Dist. LEXIS 85038, at *21 (S.D.N.Y. May 18, 2018).

99. New York courts are also authorized to award rescissory damages, in essence, the disgorgement of benefits conferred under a contract prior to rescission. The purpose of doing so is to restore the parties to the *status quo ante*. Where rescission cannot completely return a party to the *status quo ante*, rescissory damages may also be awarded.

   *See Caremark, L.L.C. v. New York Cancer & Blood Specialists*, 740 F. Supp. 3d 340, 361-62 (S.D.N.Y. 2024); *United States ex rel. Taylor v. Gabelli*, 2005 WL 2978921, at *5 n.10 (S.D.N.Y. Nov. 4, 2005) (citing Dobbs, Law of Remedies: Damages, Equity, Restitution § 4.3(6) (2d ed. 1993); *Syncora Guar. Inc. v. Countrywide Home Loans, Inc.*, 935 N.Y.S.2d 858, 869-70 (Sup. Ct. N.Y. Cty. 2012).

100. Rescission of a contract extinguishes it as if it had never been made.

   *See Reilly v. Natwest Mkts. Grp. Inc.*, 181 F.3d 253, 264 (2d Cir. 1999) ("A rescission amounts to the unmaking of a contract, or an undoing of it from the beginning, and not merely a termination.") (cleaned up).

101. In light of the importance of Section 8(f) to the decisions of Stein, Lhote, and McGee to enter into the Settlement Agreement and the Letter Agreement, and the manner in which SKAT's conduct frustrated the intent of the parties, the Court finds that rescission is appropriate and that an award

to Stein, Lhote, and McGee of rescissory damages in the amount that they paid after the Initial Cash Payment is appropriate.

102.  That amount is determinable by reference to the records of payments after August 2019.  The amount is approximately DKK 57,765,968.

*See* Pl. Exh. 6.

## **The Settlement Agreement Is Divisible**

103.  Whether a contract is divisible is a question of intent, determined from the language of the contract and the circumstances under which it was made.

*Sasson v. Mann*, 2019 WL 3532155, at *11 (S.D.N.Y. Aug. 2, 2019).

104.  This is typically a matter of law.

*Samba Enters., LLC v. iMesh, Inc.*, 2009 WL 705537, at *5 (S.D.N.Y. Mar. 19, 2009); *Lazard Freres & Co. v. Crown Sterling Mgmt., Inc.*, 901 F. Supp. 133, 136-37 (S.D.N.Y. 1995).

105.  If the parties' intent is not clear from the contract itself, however, it is a question of fact to be determined after discovery.

*Sasson*, 2019 WL 3532155, at *11.

106.  "A contract is divisible where '(1) the parties' performances can be apportioned into corresponding pairs of partial performances, and (2) the parts of each pair can be treated as agreed equivalents.'"

*Lazard Freres*, 901 F. Supp. at 136 (quoting *Ginett v. Computer Task Grp., Inc.*, 962 F.2d 1085, 1098 (2d Cir. 1992)).

107.  The Settlement Agreement's terms show that it is divisible:

  a.   There was a clear demarcation of what consideration was exchanged because of the initial series of obligations under the Settlement Agreement: in exchange for the Initial Cash Payment of DKK 950 million, SKAT broadly released the Covered Parties from claims relating generally to Reclaim Applications.

    *See* Pl. Exh. 104 at § 4(a).

b.    After that, the Covered Parties had no payment obligations, further separating the performance of the parties.

*See* Pl. Exh. 400 at 188:15-20, 188:22, 188:24-189:6, 189:8-12, 189:19-25, 190:2-11.

c.    Only the Covered Parties' Designees had payment obligations thereafter and only the Covered Parties' Designees were required to liquidate assets under the Letter Agreement.  And only the Covered Parties' Designees had the obligation to finalize and certify the True-Up Amount, and only the Covered Parties' Designees' to pay the Final Settlement Amount.

*See* PSOF ¶¶ 40, 47, 49-50.

108.    If there is any question of divisibility from the text of the Settlement Agreement and the Letter Agreement, the Court can resort to Stein, Lhote, and McGee's uncontradicted testimony on this subject.  Stein's, Lhote's, and McGee's testimony on this subject and their understanding of the manner in which performance of the Parties' obligations was divided is uncontroverted. This testimony supports the Court's finding of divisibility.

*See* Stein ¶¶ 25-27, 37-39; Lhote ¶¶ 25-27, 37-39; McGee ¶¶ 54-64; *see Sasson*, 2019 WL 3532155, at *11.

### Stein and Lhote's Count II -- Declaratory Judgment
### As to The 2021 Affidavit of Confession of Judgment

109.    If the Court does not rescind the unperformed obligations of the Settlement Agreement and the Letter Agreement, then it must decide whether the 2021 Affidavit of Confession of Judgment is enforceable.

110.    Given the strength of the evidence on Stein and Lhote's Count I for rescission and the relief granted on Stein and Lhote's Count I, and McGee's defense in the form of the assertion of SKAT's prior breach, the Court need not decide this complicated issue of first impression in federal court.

111.    Pursuant to CPLR 3218(b), an affidavit of confession of judgment may be only filed "with the clerk of the county where the defendant's affidavit stated that the defendant resided when it was executed or where the defendant resided at the time of filing."  CPLR 3218 was amended, effective as of the end of August 2019, to preclude the use of affidavits of confession

of judgment with respect to those residing outside of the State of New York at the time of execution of the affidavit of confession of judgment or at the time of filing. The amendment also eliminated the ability of a non-resident of the State of New York to authorize the entry of judgment in any county in New York and the ability of a non-resident to designate any county in New York in which an affidavit of confession of judgment may be filed.

*Dillon*, C3218:3, McKinney's Practice Commentaries (2021).

112. CPLR 3218 does not define residence.

*See id.*

113. By June 2021, when the 2021 Affidavit of Confession of Judgment was executed, Lhote had abandoned his New York residence.

*See* Pl. Exh. 129; Lhote ¶¶ 59-65.

114. McGee, through an entity, has owned a second home in New York since about 2014. Since September 2021, he has maintained his permanent and primary home in Florida. He was not a resident of New York under various New York law definitions of resident when the 2021 Affidavit of Confession of Judgment was executed.

McGee ¶¶ 162, 167; *Matter of Obus v. New York State Tax Appeals Trib.*, 206 A.D.3d 1511, 1514 (3d Dep't 2022) (vacation home did not result in residency for purposes of New York tax law); *Matter of Gaied v. New York State Tax Appeals Trib.*, 22 N.Y.3d 592, 597 (2014) (discussing domicile and residence); *Unanue v. Unanue*, 141 A.D.2d 31, 40-41 (2d Dep't 1988) (considering various factors such as school attendance, payment of taxes, maintenance of bank accounts, and driver's license issuance in determining residence for purposes of New York Domestic Relations Law).

115. The Court has previously considered, without deciding, whether CPLR 3218(b)'s provisions apply in connection with enforcing an affidavit of confession of judgment by means of an action under CPLR 3213, a state court procedure by which a plaintiff can seek summary judgment in lieu of complaint that does not exist in federal court.

*See* ECF No. 87 at 16-18; CPLR 3213.

54

116. In doing so, the Court relied on *Express Trade Capital, Inc. v. Horowitz* to suggest that, if a party seeking to enforce an affidavit of confession of judgment brings an action, the filing limitation of CPLR 3218(b) to the New York county of residence of the affiant is inapplicable.

   *See* ECF No. 87 at 17-18 (citing *Express Trade Capital, Inc. v. Horowitz*, 198 A.D.3d 529, 530 (1st Dep't 2021).

117. The Second Circuit has not yet decided this question.  Nor has the New York Court of Appeals.

118. And no court has considered whether *Express Trade*'s holding would apply in an action under CPLR 3213 where, for example, an out-of-state defendant does not appear, which would be a substantial loophole in the protection put in place by the New York Legislature in amending CPLR 3218(b) in the first place.

119. *Express Trade* has not been uniformly followed.

   *See, e.g.*, *Upfront Megatainment, Inc. v. Thiam*, 235 A.D.3d 516, 516 (1st Dep't 2025) (refusing to enforce affidavit of confession of judgment against non-resident where an action had been brought).

120. *Express Trade* did not concern an affidavit of confession of judgment that was executed *after* the effective date of the amendment to CPLR 3218(b) and, as such, by its terms, CPLR 3218(b) was not applicable.  The 2019 amendment to CPLR 3218, by its terms, only applies "to judgments by confession filed on or after the [August 2019] effective date" of the amendment.  *Express Trade*'s holding about the manner that CPLR 3218(b) may be avoided by bringing an action under CPLR 3213 was classically *dicta*.

121. The Court also considered, but did not decide, whether Lhote and McGee had waived the protections of CPLR 3218.

   *See* ECF No. 87 at 17.

122. No court has held that the protections of CPLR 3218(b) are waivable.  A finding of a waiver in the absence of any provision of CPLR 3218(b) or legislative history of the change to CPLR 3218 suggesting waivability would be an exercise of the Court's equitable authority.

123. One New York state court that has interpreted the 2019 amendment to CPLR 3218 where there was an action under CPLR 3213 and *denied* the entry of a confession of judgment that was executed by a non-New York resident. *See Torres v. Monsalve*, 2021 N.Y. Misc. LEXIS 29744, at *1, *3 (Sup. Ct. Queens Cty. Mar. 31, 2021). Notably, that court did *not* find that authorizing entry of the confession of judgment in "Queens County, New York" was a waiver of the residency requirement imposed by the 2019 amendment to CPLR 3218. *Id.* at *3; *see also Upfront Megatainment*, 235 A.D.3d at516. The waivability of CPLR 3218(b) is, at the very least, an unsettled question that no court has definitively answered.

124. But even if the protections were waivable, the waiver would have to be knowing and voluntary.

*See Martinez v. Rockwood*, 2025 WL 459893, at *4 (S.D.N.Y. Feb. 11, 2025) (federal court "'has the power to enter a confession of judgment where subject matter jurisdiction exists and the confession of judgment was made knowingly and voluntarily'") (citing *Sapon v. Hanbat Rest., Inc.*, 2021 WL 621170, at *1 (S.D.N.Y. Feb. 16, 2021)).

125. There is little, if anything, in the record to establish that Lhote and McGee knowingly and voluntarily waived the protections of CPLR 3218.

126. Beyond that, it can be inferred that SKAT knowingly accepted the risk that the 2021 Affidavit of Confession of Judgment was not be enforceable. As such, SKAT would not be entitled to the benefit of a waiver, as a matter of the Court's exercise of equitable authority to find a waiver of a benefit under CPLR 3218 that is not, by the terms of CPLR 3218, waivable.

127. Leading up to Stein, Lhote, and McGee's provision of the 2021 Affidavit of Confession of Judgment in early June 2021, Miller was in the midst of pressing U.S. counsel for SKAT to explain whether and how SKAT had complied with Section 8(f). At no point did SKAT raise the issue of how the change in law bore on an important aspect of the Settlement Agreement, specifically, the security that SKAT had for the payment obligations of Stein, Lhote, and McGee.

*See* Miller ¶¶ 27-30.

128. SKAT could have initiated a discussion about how to proceed in light of the uncertainty generated by the amendment or availed itself of the remedy of Section 17 of the Settlement Agreement by initiating a discussion about how

to resolve the uncertainty associated with CPLR 3218(b)'s impact on the affidavit of confession of judgment.

129. Section 17 of the Settlement Agreement provides a remedy if any aspect of the Settlement Agreement is rendered void or unenforceable. It requires the parties to negotiate in good faith for a mutually acceptable alternative provision.

*See* Pl. Exh. 104 at 17.

130. SKAT did not do so, and the reasons for its failure to do so are not well developed, in part, because discovery on whether U.S. counsel for SKAT even knew about the change in law was not taken. For the Court to determine whether to exercise the Court's equitable authority to find waiver by Lhote and/or McGee, the Court would need to consider SKAT's knowledge of the change in CPLR 3218 and SKAT's reasons for its conduct and whether, all things considered, equitable considerations should result in a benefit for SKAT and a detriment to Lhote and/or McGee.

*See* ECF Nos. 136, 138-40, 143.

131. SKAT itself, as distinct from its U.S. counsel, had no knowledge of the change in law and admitted that *only* its U.S. counsel had such knowledge.

*See* Pl. Exh. 400 at 362:4-19, 362:23-363:13, 364:13-20.

132. As a result, the factual record to determine whether SKAT is entitled to the equitable relief of a finding that Lhote and McGee waived the protections of CPLR 3218 is not well developed.

133. And, if SKAT's U.S. counsel did not know about the change in law, then the Court's exercise of its equitable authority in favor of SKAT to find that Lhote and McGee waived some protection would be foreclosed. Mistakes of law do not entitle a party to equitable relief.

*See Gimbel Bros., Inc. v. Brook Shopping Ctrs., Inc.*, 118 A.D.2d 532, 535-36 (2d Dep't 1986).

134. As for the enforceability of the 2021 Affidavit of Confession of Judgment against Stein, who was a New York resident at the time of its execution, it is infirm for a different reason.

135.  The Court has suggested, but not decided, that the 2021 Affidavit of
      Confession of Judgment does, in compliance with CPLR 3218, state a sum
      certain because parties can "fill in exact amounts at a later date in
      accordance with calculations or methodology to which they agreed."

      *See* ECF No. 87 at 18.

136.  In this case, there is not, as the Court previously suggested, "a precise
      methodology for determining the Judgment Amount."  There are
      considerable disputes about the methodology for determining the amount
      that would be filled into the 2021 Affidavit of Confession of Judgment.

      ECF No. 87 at 18-19; Stein ¶¶ 57-97.

137.  Indeed, there is a substantial question about the enforceability of some of the
      terms comprising the definition of Net Proceeds and, as a result, about the
      calculability of True-Up Amount.

      *KJ Roberts & Co. Inc. v. MDC Partners, Inc.*, 2014 WL 1013828, at *9-*10
      (S.D.N.Y. Mar. 14, 2014) ("[W]here missing or indefinite terms cannot be
      substituted by reference to an objective standard, [an] agreement leaves no
      room for legal construction or resolution of ambiguity therefore is
      unenforceable.") (cleaned-up), *aff'd*, 605 F. App'x 6 (2d Cir. 2015); *F & K
      Supply Inc. v. Willowbrook Dev't Co.*, 288 A.D.2d 713 (3d Dep't 2001)
      (ambiguous payment terms resulted "in only an unenforceable agreement to
      agree").

## Conclusion

138.  For the reasons set forth above, the Court finds that the unperformed
      obligations of the Settlement Agreement and the Letter Agreement should be
      rescinded and that Stein, Lhote, and McGee are entitled to rescissory
      damages in the amount of the payments that were made to SKAT after the
      Initial Cash Payment with interest thereon.

139.  Based on the foregoing, the Court need not decide whether SKAT is entitled
      to judgment on its Counts I and II because the contractual provisions under
      which it sues are rescinded.  Those counts are to be dismissed with
      prejudice.

Dated:     New York, New York
          April 7, 2025

Respectfully submitted,

McKool Smith P.C.

/s/

By: _____

Daniel W. Levy
dlevy@mckoolsmith.com
Olivia G. Visconti
ovisconti@mckoolsmith.com
1301 Avenue of the Americas
New York, New York  10019
Telephone: (212) 402-9400

*Attorneys for Plaintiffs-Counterclaim*
*Defendants Matthew Stein and*
   *Jerome Lhote*

NELSON MULLINS RILEY &
SCARBOROUGH LLP

/s/

By: _____

Daniel S. Newman
dan.newman@nelsonmullins.com
Justin B. Kaplan
justin.kaplan@nelsonmullins.com
Edgar A. Neely IV
edgar.neely@nelsonmullins.com
One Biscayne Tower, 21st Floor
2 South Biscayne Boulevard
Miami, Florida  33131
Telephone: (305) 373-9400

*Attorneys for Counterclaim Defendant*
*Luke McGee*

## CERTIFICATE OF SERVICE

DANIEL W. LEVY, pursuant to Title 28, United States Code, Section 1746,
declares under the penalty of perjury:

1.      I am an attorney licensed to practice law in the State of New York and
admitted to practice before this Court.  I am principal in the law firm of McKool
Smith P.C. and counsel of record for Matthew Stein and Jerome Lhote.

2.      On April 7, 2025, I caused a true and correct copy of the foregoing
JOINT PRELIMINARY PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW and the accompanying WITNESS STATEMENT OF
MATTHEW STEIN, WITNESS STATEMENT OF JEROME LHOTE, WITNESS
STATEMENT OF LASSE LUND MADSEN, WITNESS STATEMENT OF
MARSHALL MILLER, and WITNESS STATEMENT OF
SKATTEFORVALTNINGEN, and the accompanying  EXHIBITS to be served via
ECF, upon the following attorneys, who are filing users in connection with the
above-referenced case:

> William R. Maguire
> Marc Alan Weinstein
> Neil John Oxford
> John Thomas McGoey
> Dustin Philip Smith

Gregory C. Farrell
Kiran H. Rosenkilde
Hughes Hubbard & Reed LLP

*Attorneys for Defendant-Counterclaim*
*Plaintiff Skatteforvaltningen*

Robert H. Pees
Anne M. Evans
Ilana R. Roberts
Akin Gump Strauss Hauer & Feld LLP

Daniel S. Newman
Justin B Kaplan
Edgar A. Neely IV
Nelson Mullins Riley & Scarborough LLP

*Attorneys for Counterclaim Defendant*
*Luke McGee*

I declare under penalty of perjury under the laws of the United States of

America that the foregoing is true and correct.  Executed on April 7, 2025, at New

York, New York.

/s/
_____
Daniel W. Levy

2