UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MATTHEW STEIN and JEROME LHOTE,<br><br>Plaintiffs,<br><br>v.<br><br>SKATTEFORVALTNINGEN,<br><br>Defendant. | 23 Civ. 2508 (NRB) |
| SKATTEFORVALTNINGEN,<br><br>Counterclaim Plaintiff,<br><br>v.<br><br>MATTHEW STEIN, JEROME LHOTE, and LUKE MCGEE,<br><br>Counterclaim Defendants. | |

## WITNESS STATEMENT OF MARSHALL L. MILLER

### Professional Background

1. Since approximately March 2025, I have been a partner at the law firm Hecker Fink LLP ("Hecker Fink").

2. Prior to that and from approximately June 2022 through December 2024, I served in the U.S. Department of Justice as Principal Associate Deputy Attorney General. During that time, I served in the senior leadership of the Department of Justice and oversaw all of its components, including the United States Attorneys' Offices, the National Security Division, the Criminal Division, the Antitrust Division, the Federal Bureau of

      Investigation, and the Department's Congressional and public affairs offices. I reported to the Deputy Attorney General, the second-most senior official in the Department of Justice.

3. Prior to that and from approximately January 2020 until June 2022, I was a partner at the law firm Kaplan Hecker & Fink LLP ("Kaplan Hecker"), a predecessor of my current firm, and before that, Of Counsel to the law firm Wachtell, Lipton, Rosen & Katz ("Wachtell") from approximately April 2016 until January 2020.

4. Prior to that, I served as Principal Deputy Assistant Attorney General & Chief of Staff in the Criminal Division of the Department of Justice from approximately 2014 to 2015, and from approximately 1999 through 2014—with the exception of a period from approximately June 2003 through February 2006—I served in various roles in the United States Attorney's Office for the Eastern District of New York, including as Chief of the Office's Criminal Division.

**The Representation of Matthew Stein and Jerome Lhote**

5. Starting in approximately June 2020, Kaplan Hecker began representing Matthew Stein ("Stein"), Jerome Lhote ("Lhote"), Luke McGee ("McGee"), and Maple Point LLC ("Maple Point").

    a. At the time, I was the principal lawyer at Kaplan Hecker who acted in connection with the firm's representation of them. I was assisted by a Kaplan Hecker colleague, Christoper Le Coney ("Le Coney").

    b. I am aware that Wachtell had represented Stein, Lhote, McGee, and Maple Point, including during the time that I was previously employed at that firm. I had no role in representing Stein, Lhote, McGee, and Maple Point during that time. I succeeded other attorneys at Wachtell as counsel after I came to Kaplan Hecker.

    c. McGee had previously been represented by the law firm Akin, Gump, Strauss, Hauer & Feld LLP, and that firm remained involved in representing McGee after Kaplan Hecker's representation began. There were certain matters related to McGee on which my firm did not represent McGee.

2

6. At the outset, the scope of Kaplan Hecker's representation included, in general, representing Stein, Lhote, McGee, and Maple Point in connection with, among other things, a settlement agreement that they had previously entered into with Skatteforvaltningen ("SKAT") in May 2019 (the "Settlement Agreement") and a related letter agreement (the "Letter Agreement") relating to obligations that they undertook pursuant to those agreements. Exhibit 104 is the Settlement Agreement, and Exhibit 109 is the Letter Agreement.

7. Kaplan Hecker's representation of Stein and Lhote also included advising on matters of U.S. law in connection with a criminal investigation in Denmark into matters addressed by the Settlement Agreement and the Letter Agreement.

    a. The investigation was being conducted by the Danish Public Prosecutor for Serious Economic and International Crime, widely known by the acronym "SØIK."

**The Period Prior to Stein and Lhote's Interviews with SØIK**

8. In about September 2020, SØIK was requesting that Stein and Lhote agree to be interviewed by SØIK.

    a. Stein's and Lhote's respective interviews with SØIK eventually occurred in March 2021 via teleconference. My firm represented Stein and Lhote in preparation for their interviews and attended the interviews by video as counsel. Their Danish counsel also assisted in the preparation and attended the interviews by video.

    b. McGee was represented by other counsel in connection with his interview.

9. It was important to the representation that Stein and Lhote appear to SØIK in the best possible light prior to and during the interviews.

    a. Among other things, it was important that SØIK be aware of the extensive cooperation that Stein and Lhote had provided to SKAT pursuant to the Settlement Agreement.

    b.    By this point, Stein, Lhote, McGee, and Maple Point had provided extensive cooperation to SKAT pursuant to Section 7 of the Settlement Agreement.

    c.    It was also important that the information about Stein and Lhote's cooperation come from SKAT itself. SKAT's communication of this information—as opposed to Stein, Lhote, and McGee's communication of the same information—would be, in my judgment and based on my experience, considerably more impactful.

10.    As we proceeded towards the interviews with SØIK, my firm inquired of U.S. counsel for SKAT about the extent of the information that SKAT had already provided to SØIK regarding Stein and Lhote's payments under the Settlement Agreement and their cooperation with SKAT following the Settlement Agreement. The summary of my firm's inquiries to and responses from U.S. counsel for SKAT, set forth in the following paragraphs, are based in part on records my firm has kept of the engagement.

    a.    According to records, together with Le Coney, I spoke with U.S. counsel for SKAT on November 10, 2020. Neil Oxford ("Oxford") participated in the telephone call on behalf of SKAT. The conversation largely concerned cooperation being provided by Stein, Lhote, McGee, and Maple Point to SKAT pursuant to the Settlement Agreement. During the conversation, I inquired about SØIK's level of knowledge about the Settlement Agreement. Oxford responded, in substance and in part that:

        i.    He understood that SKAT had informed SØIK of the Settlement Agreement, but he did not have detailed knowledge about the extent of communications between SKAT and SØIK on the question of SØIK's level of knowledge about the Settlement Agreement and compliance with the cooperation obligations.

        ii.    He offered to inquire in Denmark for more detail on the level of information that SØIK had been provided about the Settlement Agreement and the subsequent cooperation efforts.

        iii.    He agreed to get back to me once he found out more.

4

b. On November 30, 2020, Le Coney wrote to U.S. counsel for SKAT:

> "To follow up on our last call, we also wanted to check in to see what your team has learned about the level of information SKAT has provided to SOIK regarding our clients' payments to Denmark and their cooperation with SKAT following the Settlement Agreement."

c. By email dated December 1, 2020, U.S. counsel for SKAT responded that they were "working on [our] request and hope[d] to have an update shortly."

d. Exhibit 7 is a true and correct copy of these email exchanges.

e. As reflected in Exhibit 7, despite several follow-up requests in December 2020 and January 2021, I did not receive an answer to my inquiry from U.S. counsel for SKAT on this email exchange from November 30, 2020 through January 18, 2021.

11. Based on records, on January 18, 2021, I spoke by telephone with SKAT's U.S. counsel about whether, and the extent to which, SKAT would communicate with SØIK about Stein and Lhote's performance of their obligations under the Settlement Agreement and, in particular, their cooperation with SKAT.

a. Marc Weinstein ("Weinstein") and Oxford participated in the telephone call on behalf of SKAT.

b. Following the telephone call, I drafted a proposed communication from SKAT to SØIK that summarized the cooperation that Stein, Lhote, and McGee had provided through January 2021.

c. By email dated January 18, 2021, I proposed to SKAT that it consider sending this communication to SØIK.

d. My proposed communication was that SKAT tell SØIK the following:

> "Since entering the May 28, 2019 Settlement Agreement, the Covered Parties' Designees—Matthew Stein, Jerome Lhote, and Luke McGee—have complied with their obligations under

5

the agreement and provided substantial cooperation to SKAT in support of SKAT's actions to recover funds obtained by other parties involved in dividend reclaim applications. At the Covered Parties' Designees' direction, their lawyers have:

- Reviewed and produced tens of thousands of documents in SKAT's pending suits against non-settling parties in the United States;

- Reviewed and approved SKAT's requests to use the Covered Parties' Designees' documents in SKAT's litigation against other parties in Dubai and the United Kingdom;

- Performed research and made proffers to SKAT's U.S. lawyers over the past 18 months to address factual questions SKAT raised in connection with its prosecution of claims against other parties; and

- Addressed other substantive and procedural questions and requests from SKAT's lawyers to help facilitate SKAT's prosecution of its civil actions across multiple jurisdictions.

In addition to these cooperation efforts, to date the Covered Parties have, through the Covered Parties' Designees, paid SKAT 985,307,682 DKK in installments on their obligation to repay SKAT the full amount of the net proceeds that the Covered Parties received directly or indirectly from reclaim applications. To facilitate expeditious repayment to SKAT, the Covered Parties' Designees are engaged in significant, ongoing efforts to sell certain illiquid assets. Those asset liquidation efforts have been documented and explained in regular updates provided to SKAT's counsel.

Once the Covered Parties pay the remainder of the settlement amount, as well as any additional "true-up" amount that SKAT determines is necessary to ensure full repayment of the net proceeds received from reclaim applications, the Covered Parties will have satisfied their obligations under the Settlement Agreement and fully resolved SKAT's claims relating to them."

    e.    Exhibit 7 contains a true and correct copy of the e-mail that I sent on January 18, 2021.

12. I do not recall that U.S. counsel for SKAT responded to my proposal and, to the best of my recollection, U.S. counsel for SKAT did not do so.

13. Based on records, on or about February 11, 2021, together with Le Coney, I spoke by telephone with U.S. counsel for SKAT to follow up on my January 18, 2021, written proposal, contained in Exhibit 7. Weinstein and Oxford participated in the telephone call on behalf or SKAT. Based on records, we discussed, among other things, SKAT's openness to sending a written communication to SØIK confirming the level of cooperation that had been provided by Stein, Lhote, and McGee pursuant to the Settlement Agreement. Based on records, during the call, they stated, in substance and in part, the following:

    a.    Weinstein indicated that, as a general matter, SKAT is uncomfortable making a written communication to SØIK of the kind that I had proposed.

    b.    Weinstein further indicated that communication on the subject of my proposed e-mail to SØIK is not something that SKAT would consider no matter who was making the request.

    c.    Weinstein further indicated that I should be cautious in communicating with SØIK about the level of cooperation that had been provided because SKAT might disagree with my characterization of the cooperation that had been provided.

            i.    I indicated that this was concerning to me because Stein and Lhote had put considerable resources into complying with the Settlement Agreement and providing assistance for SKAT's cases in New York, the United Kingdom, and Dubai.

            ii.    Stein and Lhote (and McGee) had been, in my view, responsive to SKAT's requests for information, and U.S. counsel for SKAT had not previously suggested to me that they had not fully cooperated as required by the Settlement Agreement.

    d.    I asked U.S. counsel for SKAT whether U.S. counsel for SKAT would confirm to SØIK the accuracy of a letter to be written by me that would detail the cooperation efforts of Stein, Lhote, and McGee.

        i.    This was an inferior option, as compared to my prior proposal, because a communication of this sort would, in my experience, be more effective if it came from SKAT, as opposed to from me on behalf of Stein and Lhote.

    e.    Oxford acknowledged that this was a reasonable request from a U.S. perspective, and he and Weinstein indicated that they would confer with SKAT about the request, but Oxford was unsure that SKAT would be receptive to such a communication.

14.    By email dated March 4, 2021, U.S. counsel for SKAT requested that I speak with them as a follow-up to our prior discussion. Exhibit 8 is a true and correct copy of their e-mail request. According to records, we spoke on March 5, 2021.

    a.    Weinstein and Oxford participated in the telephone call on behalf of SKAT. Le Coney was also on the call.

    b.    During that conversation, to the best of my recollection, we discussed whether SKAT would confirm to SØIK some form of factual summary of Stein and Lhote's cooperation, but U.S. counsel for SKAT were non-committal.

15.    To the best of my recollection, I am not aware:

    a.    whether SØIK had inquired of SKAT regarding the provision of documents by Stein, Lhote, or any other party to the Settlement Agreement to SKAT for SKAT's use in prosecuting claims against persons not parties to the Settlement Agreement;

    b.    whether SØIK had inquired of SKAT whether Stein, Lhote, or any other party to the Settlement Agreement consented to the use of materials provided to SKAT pursuant to the Settlement Agreement in SKAT's prosecution of claims against persons not parties to the Settlement Agreement;

    c.    whether SØIK had inquired of SKAT whether Stein, Lhote, or any other party to the Settlement Agreement had helped contribute information and answer questions from SKAT for the identification and prosecution of SKAT's claims against persons not parties to the Settlement Agreement; or

    d.    whether SØIK had requested that SKAT provide to SØIK any materials provided by Stein, Lhote, and McGee to SKAT on any subject.

16. To the best of my recollection, U.S. counsel for SKAT did not inform me that SØIK made any inquiries of the type described in paragraph 15 above, at any time before, during, or after the sequence of events described in paragraphs 10 through 14.

**Interviews of Lhote and Stein**

17. I attended by videoconference SØIK's video interview of Lhote from about March 3 through 5, 2021, and of Stein from about March 10 through 12, 2021.

18. During the interviews, it was unclear to me whether SØIK had been made aware of the terms of the Settlement Agreement.

    a.    Among other things, this is because, towards the end of the interview of Stein, a representative of SØIK indicated, in substance and in part, that SØIK did not have a copy of the Settlement Agreement.

    b.    Towards the end of the interview, Stein's Danish counsel asked various questions of Stein about the nature of the settlement agreement in order to provide some information about it to SØIK in that format.

19. In the weeks after Stein's and Lhote's interviews and to the best of my recollection, I do not recall SØIK seeking any information to follow up on the six or so days of questioning of Stein and Lhote.

**Immediate Concerns Following the Indictment of Stein, Lhote, McGee, and Others**

20. On or about April 13, 2021, SØIK filed charges against Stein, Lhote, McGee and others.

21. One immediate concern arising out of the indictment was whether SØIK would seek the arrest, detention, and extradition of the U.S.-based defendants named in the indictment, including Stein and Lhote.

22. Based on records, on or about April 16, 2021, I spoke by telephone with U.S. counsel for SKAT. During the call:

    a. I informed U.S. counsel for SKAT, in substance and in part, that it was important to be able to show that Stein and Lhote had made commitments under the Settlement Agreement and were fulfilling those commitments, such that extradition and, if extradition occurred, pre-trial detention would not be warranted under the circumstances.

    b. We also discussed whether it was permissible for Stein and Lhote to file the Settlement Agreement in court in light of the Agreement's confidentiality provisions.

23. By email dated April 17, 2021, I followed up on the call of the prior day and wrote to U.S. counsel for SKAT:

    "Thanks for the call yesterday. In connection with our discussion of the confidentiality/disclosure provisions of the Settlement Agreement, we wanted to follow up with you on a few items:

    1. First, can you send us a copy of the written communication that SKAT sent to SØIK in conformity with its obligations under Section 8f of the Settlement Agreement? That would be helpful for us to understand the record on this issue.

    2. Relatedly, based on our conversation, it's unclear to us whether a request was ever made by SØIK to SKAT for a copy of the full agreement, as contemplated in Section 8f. Can you confirm whether such a request was made by SØIK, and if so, by whom, so that we know where to direct our conversations within SØIK?

    3. Finally, as SØIK is a "law enforcement authority investigating Reclaim Applications or related matters," Section 8e(ii) of the

>> Settlement Agreement permits the Covered Parties to disclose the Settlement Agreement to SØIK, "even if such disclosure is not compelled by operation of law or regulation or by a final non-appealable order." If we can't resolve whether SØIK has already been provided the Settlement Agreement, we wanted to let you know that we are planning to provide the Agreement to SØIK pursuant to that provision.
>
> Let us know if you would like to discuss any of the above."

Exhibit 127 contains a true and correct copy of this e-mail.

24. To the best of my recollection, U.S. counsel for SKAT never informed me whether SØIK had ever requested the Settlement Agreement or whether SKAT had ever provided a copy of the Settlement Agreement to SØIK.

25. Consistent with my email dated April 17, 2021, to U.S. counsel for SKAT, Exh. 127, I arranged to provide a copy of the Settlement Agreement to SØIK on April 21, 2021. I sent the letter to SØIK through Danish criminal defense counsel.

    a. Exhibit 13 is a true and correct copy of the letter that I sent to SØIK, together with Exhibit B to the letter.

    b. As indicated in Exhibit 13, Exhibit A to the letter was a copy of the Settlement Agreement, Exhibit 104.

26. By email dated April 23, 2021, I informed U.S. counsel for SKAT that I had provided the Settlement Agreement to SØIK because I had not been able to resolve the factual question of whether SØIK had requested or received a copy of it.

    a. I also reiterated that I was still seeking answers to questions (1) and (2) set out in paragraph 23, above.

    b. Exhibit 127 contains a true and correct copy of my April 23, 2021, e-mail.

27. By email dated April 30, 2021, U.S. counsel for SKAT reached out to me to discuss documents that were being produced in compliance with the cooperation provisions of the Settlement Agreement.

      a. In setting up that call, I requested in writing by email that U.S. counsel for SKAT get back to me about the two questions that I had previously posed to SKAT regarding SKAT's interactions with SØIK and that are reflected in paragraph 23.[1]

      b. In responding by writing in email, U.S. counsel for SKAT noted on May 3, 2021, that they were working on these questions and hoped to have something soon.

28. Based on records, I spoke again by telephone with U.S. counsel for SKAT on or about May 4, 2021. To the best of my recollection, we discussed cooperation under the Settlement Agreement, and I asked for an update about the inquiries in my e-mail described in paragraph 23. I do not remember U.S. counsel for SKAT providing any specific information in response.

29. On or about June 11, 2021, I provided to U.S. counsel for SKAT an updated Affidavit of Confession of Judgment executed by Stein, Lhote, and McGee on June 9 and 10, 2021.

      a. Prior to that and to the best of my recollection, U.S. counsel for SKAT never raised with me, either orally or in writing, any question about the enforceability of an affidavit of confession of judgment to be executed by someone who was not a resident of the State of New York, such as Lhote.

30. To the best of my recollection, I did not receive any further information about the questions set out in paragraph 23 until on or about June 18, 2021.

      a. On or about that day, I received an e-mail from U.S. counsel for SKAT that included the following paragraph:

> "We can confirm that Skattestyrelsen informed SØIK on a senior level immediately after the signing of the Maya [sic] 2019 settlement agreement of all relevant sections of the

---

[1] Although my April 30, 2021 email references questions that I asked on "April 13," upon review of firm records, I believe that is a typographical error and that I instead intended to reference my April 17, 2021 email discussed in paragraph 23. In preparing this statement, I was unable to identify an email or other communication with questions that I sent to U.S. counsel for SKAT on April 13, 2021.

   agreement including the sections on good faith negotiations and the obligation to provide information and cooperation. Subsequently, SKAT has briefed SØIK on a rolling basis on the settling parties' fulfillment of their obligations under the settlement agreement, including the extent to which they have until now provided information and cooperation. This briefing has taken place both in meetings and in phone conversations."

  b. Exhibit 128 is a true and correct copy of this e-mail.

## Concluding Matters

31. In connection with the testimony set forth above, I relied upon, and my recollection was refreshed by review of, the following records:

  a. a summary of the portion of the November 10, 2020, telephone call described in paragraph 10(a) that was prepared on November 11, 2020;

  b. a summary of the February 11, 2021, telephone call described in paragraph 13 that was prepared on February 16, 2021;

  c. my firm's billing records reflecting the occurrence of the relevant events on November 10, 2020; January 18, 2021; February 11, 2021; February 15-16, 2021; March 5, 2021; April 12, 2021; April 13, 2021; April 16, 2021; April 17, 2021; April 20, 2021; April 21, 2021; April 23, 2021; April 30, 2021; and May 4, 2021, that are described above; and

  d. E-mails that I exchanged with U.S. counsel for SKAT, including Exhibits 7, 8, 13, 127, and 128, and emails exchanged on April 30, 2021, and May 3, 2021.

33. Nothing in this Witness Statement is intended to waive any applicable privilege.

34. Because this Witness Statement is being submitted for a limited purpose, it does not include all of the facts associated with the issues described above and of which I am aware.

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury that the foregoing is true and correct.

Executed on April 7, 2025, at New York, New York.

_____
Marshall L. Miller