UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MATTHEW STEIN and JEROME LHOTE,

                Plaintiffs,

      v.

SKATTEFORVALTNINGEN,

                Defendant,
     and

LUKE MCGEE,

         Nominal Defendant.

23 Civ. 2508 (NRB)

SKATTEFORVALTNINGEN,

       Counterclaim Plaintiff,

      v.

MATTHEW STEIN, JEROME LHOTE, and
LUKE MCGEE,

       Counterclaim Defendants.

**<u>WITNESS STATEMENT OF JEROME LHOTE</u>**

## **TABLE OF CONTENTS**

**Paragraphs**

My Personal and Professional Background ................................................. 1

Preliminary Matters.......................................................................... 8

My Professional Activities Since Approximately 2005 ......................... 11

Events Leading Up to the May 2019 Settlement With SKAT............................... 16

The Settlement Agreement and the Letter Agreement ...........................23

Section 8(f) of the Settlement Agreement ...........................................29

Cooperation ................................................................................. 34

Payments Made During Phase II....................................................... 37

Efforts to Obtain Information from SKAT
Regarding Communications with SØIK ............................................... 41

SOIK's Investigation....................................................................... 43

Seizure....................................................................................... 48

Events Occurring After the Filing of This Litigation ........................... 51

North Channel Bank....................................................................... 53

My Residence and the 2021 Affidavit of Confession of Judgment....................... 56

Concluding Matters......................................................................... 69

## My Personal and Professional Background

1.    I am 51 years old.

2.    I was born in Essey-les-Nancy, France.  I am a dual national of France and the United States.

3.    I obtained an undergraduate degree (a diploma) from the Institut d'Etudes Politiques de Grenoble in 1994.

4.    I obtained a master of international business administration degree from the Université Paris-Daupine in 1995 and a business law degree from the Unversité Paris I Sorbonne in 1996.

5.    Since 1998, I have been a certified Luxembourg tax adviser, a professional certification.

6.    From 1996 through 2006, I worked for KPMG LLP ("KPMG") in a variety of roles, including as: (a) a tax and financial consultant in Luxembourg; (b) a tax manager in New York; (c) head of the component of KPMG in New York that focused on matters of Luxembourg tax; and (d) senior manager in the structured finance area of KPMG in New York.

7.    I have been married to the same woman for about 19 years.  We have two children, ages 12 and 16.

## Preliminary Matters

8.    I swear to this Witness Statement as my direct testimony in this matter.

9.    I have reviewed the Witness Statement of Matthew Stein ("Matt") in this matter.  I acknowledge that the testimony in paragraphs 11-26, 29-41, 43-46, 48, and 50-52 of Matt's Witness Statement is, in large respects, identical to the testimony in paragraphs 11-26, 29-41, 43-46, 48, and 50-52 of my Witness Statement.

10.    This Witness Statement is my independent testimony.

**My Professional Activities Since Approximately 2005**

11.  Between approximately 2005 and 2013, I was a member of Argre Management LLC ("Argre Management"). One of the other members came to be Matt, whom I knew from KPMG. The principal business of Argre Management was investments in non-U.S. captive reinsurance businesses.

12.  In about June 2013, Matt and I separated from the other members of Argre Management and formed Maple Point LLC ("Maple Point"). Luke McGee ("Luke") also became a member of Maple Point. The principal business of Maple Point was investing in banks and insurance companies.

13.  Starting in about 2012 and while at Argre Management, the other members and I began investing through a type of transaction known as dividend arbitrage. These activities continued at Maple Point through around 2015. Dividend arbitrage is, in general, a trading strategy that involves transactions to hedge the difference in value between shares with (in Latin, *cum*) and without (in Latin, *ex*) the dividends.

14.  Matt, Luke, and I have been accused by the Danish Public Prosecutor for Serious Economic and International Crime, widely known by the acronym "SØIK," of fraud in Denmark in connection with this dividend arbitrage activity. Some time well after we were indicted, SØIK came to be known by the acronym "NSK." For ease of reference, I refer to it throughout this Witness Statement as SØIK. We were indicted on about April 12, 2021.

   a.  In general, SØIK alleges that I committed fraud in connection with applications by certain U.S. pension plans for refunds of taxes withheld on dividends paid by Danish companies ("Reclaim Applications"), which were associated with the dividend arbitrage trading.

   b.  SØIK asserts that the activity of me, Matt, Luke, and another person who was also charged caused a loss of 1,135,775,447.99 Danish kroner ("DKK").

   c.  Over the past ten years, the ratio of Danish kroner to U.S. dollars has been somewhere between approximately 6 to 1 and 7 to 1.

2

d.     Because SØIK contends that my fraud was particularly serious, the maximum sentence for the crime of which I have been accused is increased from 8 years to 12 years in prison.

e.     Matt, Luke, and I were charged in the same indictment as Rajen Shah, Anupe Dhorajiwala, and Graham Horn.

15.    The claims that Matt and I have brought in this action and the claims asserted against me, Matt, and Luke are civil in nature.  The claims largely concern whether contracts have been breached.

a.     These claims do not depend on whether I engaged in the crime alleged by SØIK.  Indeed, the agreement that is at the center to this case releases all civil claims against me, including claims of fraud.

b.     For the avoidance of doubt, however, I deny categorically that I committed the crime of which I have been accused or any other crime under Danish law.  I further deny that I defrauded anyone with respect to this activity and that I had any criminal intent whatsoever.

c.     At no time have I ever believed that I was engaging in anything other than lawful behavior.

d.     For example, others involved in the dividend arbitrage trading and I sought out, received, and relied upon extensive legal advice that the trading at issue complied with applicable law.  There were a variety of topics of the legal advice on which I relied.

## Events Leading Up to the May 2019 Settlement With SKAT

16.    In or about Fall 2015, I became aware that the taxation authority of Denmark, Skatteforvaltningen ("SKAT"), was investigating Reclaim Applications.  As I came to understand SKAT's investigation, this included my role, and the roles of many others, with the Reclaim Applications, including Matt and Luke.

17.    I eventually determined that the best course of action was to initiate discussions with SKAT to resolve the emerging dispute about the validity of Reclaim Applications associated with me and others without litigation and to

assist SKAT in recovering funds that it had paid out on Reclaim Applications to pensions plans associated with me.

18. I eventually retained U.S. counsel to conduct these discussions. Matt, Luke, and others participated in these discussions through counsel. There were a considerable number of U.S. law firms involved in the settlement process on behalf of various parties. Danish counsel were also retained to assist in the negotiations.

19. Through counsel, I approached SKAT in about 2017 to begin these negotiations. These negotiations lasted through about May 2019. The law firm Wachtell, Lipton, Rosen & Katz eventually came to take the lead in the settlement negotiations. By the end of the process leading up to the settlement, I was represented by Milbank, Tweed, Hadley & McCloy LLP and Luke was represented by Akin, Gump, Strauss, Hauer & Feld LLP.

20. While these negotiations were ongoing, SKAT began initiating more than 100 separate lawsuits against others who were not engaged in continuing efforts to resolve the dispute via a negotiated resolution. These lawsuits were initiated in the United States, the United Kingdom, Dubai, and elsewhere. SKAT never had to sue me, my wife, or pension plans associated with us because I engaged in settlement discussions to avoid litigation at an early stage. The same is true for Matt, Luke, and pension plans associated with them, plus many others who ended up entering into the settlement with SKAT.

21. Going into the settlement discussions, during them, and after the settlement agreement was entered into, my most significant concern has been possible criminal exposure in Denmark as a result of the Reclaim Applications. I don't recall the specific date when I became aware that there was the possibility of a criminal investigation in Denmark, but I remember that it was in the latter half of 2015.

22. Because of the concern about criminal exposure in Denmark, for a significant period, the negotiations regarding a resolution with SKAT involved conditioning a settlement on an undertaking by SØIK not to initiate criminal charges against me and others.

4

a.    For example, Plaintiffs' Exhibit 2 is a true and correct copy of a draft settlement agreement sent to SKAT in or about December 2017.  It contained the following language:

> Section 2.3   SØIK is not a party to this agreement and SKAT cannot and will not influence the decision whether to bring charges or not.  Nevertheless, SKAT will bring to the attention of SØIK the Agreement and its terms, and represent that the Agreement reflects good faith negotiations by the Pension Plans, that the Pension Plans' cooperation may result in the recovery by SKAT of additional funds from unrelated third parties, and that the Agreement is in the best interests of SKAT.

> **Clause 3: Condition to the Undertakings and Obligations of the Pension Plans**

> The undertakings and obligations of the Pension Plans under this Agreement, including Clause 1, are expressly conditioned, inter alia, on a commitment by SØIK, and any other agency of the Danish Government with authority or jurisdiction in this matter, not to bring any criminal, civil or regulatory claims, charges, requests or proceedings of any kind or nature, in any forum or venue, or before any authority in Denmark, or cause or assist in bringing, such claims, charges, requests or proceedings by any foreign government or government agency, in any way arising from or related to the Pension Plans' reclaim applications, whether paid or unpaid, or from any related activities, against the Covered Parties. . . . .

b.    Language concerning this condition, *i.e.*, that aspects of the settlement was predicated on the condition that SØIK not bring criminal charges, remained in the draft settlement agreements that were being exchanged with SKAT through at least around the middle of 2018.

c.    Towards the end of 2018 or the beginning of 2019, SKAT would no longer continue settlement discussions that involved conditioning the settlement on a commitment by SØIK relating to criminal charges.

d.    I was determined to continue the settlement negotiations with SKAT nonetheless.  Matt and Luke continued the negotiations as well.  I did

so, however, determined to obtain in any settlement agreement some measure of protection in relation to the possibility of criminal charges by SØIK, even if it was not the ideal scenario and was, in effect, a second best option.

e.     Accordingly, my intent in proceeding with the negotiations, and my principal goal, was to ensure that any settlement agreement with SKAT provide some protection or assistance to me in relation to the possibility of criminal proceedings that might be initiated by SØIK.

f.     Reflecting my continued intent in proceeding with the negotiations, the language in Section 2.3 set out above (beginning after "Nevertheless . . .") came to be substantially reflected in the settlement agreement that is the subject of the claims that Matt and I assert in this action.  Over time, the phrase "promptly upon the execution" of the agreement came to be added to the language that was under discussion.

g.     Reflecting my continued intent in proceeding with the negotiations, the language "SØIK is not a party to this agreement and SKAT cannot and will not influence the decision whether to bring charges or not" was not part of the continuing discussions, which continued in early 2019.

h.     If the settlement was not going to require SKAT to do at least substantially what is set out in Section 2.3 above, I would not have continued the settlement discussions and would not have settled with SKAT.

**The Settlement Agreement and the Letter Agreement**

23.     On or about May 28, 2019, I entered into a settlement agreement with SKAT (the "Settlement Agreement").  The Settlement Agreement had several exhibits (Exhibits 1A, 1B, 1C, 2, 3A, 3B, 3C, 4, and 5).  Plaintiffs' Exhibit 104 is a true and correct copy of the Settlement Agreement together with its exhibits.  Besides me, Matt, Luke, numerous pension plans, and other individuals entered into the Settlement Agreement.

a.     It was largely because of the efforts by me, Matt, and Luke that so many others entered into the Settlement Agreement.  Those efforts

6

involved a considerable expenditure of time and effort on the part of me, Matt, and Luke.

b.    The fact that that a considerable number of additional pension plans and individuals entered into the Settlement Agreement was a meaningful benefit to SKAT.  It increased the size of the agreed-upon recovery to SKAT under the Settlement Agreement and the number of pension plans, individuals, and entities that became Covered Parties under the Settlement Agreement.  It benefitted SKAT that SKAT would not need to sue these additional plans, individuals, or entities.

c.    The entire group of individuals and entities that entered into the Settlement Agreement and that are released by SKAT are referred to in the Settlement Agreement as the "Covered Parties."  *See* Pl. Exh. 104 at § 1(i).  They are listed in Exhibits 1 and 2 to the Settlement Agreement.

d.    Matt, Luke, and I are referred to the in Settlement Agreement as the Covered Parties' Designees.  *See id.* at § 1(j).  This reflects the business reality overarching the settlement discussions, which was that we were acting in the lead and were undertaking a series of obligations that the rest of the Covered Parties did not.

e.    Two other people involved with Argre Management, Richard Markowitz ("Markowitz") and John van Merkensteijn ("van Merkensteijn"), and many pension plans and individuals associated with them, did not proceed with settlement discussions after some time in around 2018.  SKAT continued its litigation against them. Only in February 2025 -- after about seven years of litigation -- did SKAT complete a trial against them and only some of the pension plans associated with them.  SKAT still has much more litigation to pursue against others.

    i.    To reflect that Markowitz and van Merkensteijn did not continue with the settlement discussions, they and pension plans associated with them were, in the end, excluded from the settlement.

24.   At the time that I entered into the Settlement Agreement, I also entered into
a letter agreement (the "Letter Agreement").  Matt, Luke, and two others
also entered into the Letter Agreement.  Plaintiffs' Exhibit 109 is a true and
correct copy of the Letter Agreement.

25.   My intent in entering into the Settlement Agreement and the Letter
Agreement, which is reflected in the terms of the two agreements, was that
the obligations would be divided into two phases ("Phase I" and "Phase II").

a.   The intent to divide the obligations into two Phases was a function of
overarching business realities that informed both the Settlement
Agreement and the Letter Agreement.

b.   At the time that the Settlement Agreement and Letter Agreement were
entered into, it was possible to pay most -- but not all -- of the amount
to be paid under the Settlement Agreement.  The payment of only
some of the ultimate amount to be paid could be, and would be, made
in Phase I.

c.   Of the estimated DKK 1.55 billion to be paid under the Settlement
Agreement, DKK 950 million, or about 61% (= DKK 950 million /
DKK 1.55 billion), was to be paid in Phase I and the remainder, about
DKK 600 million, or about 39% (= DKK 600 million / DKK 1.55
billion), was to be paid in Phase II.  *See* Pl. Exh. 104 at §§ 1(dd), 2(a-
b, d).

d.   It would take some time to liquidate assets necessary to pay the
amount to be paid in Phase II.  The liquidation efforts were to occur in
Phase II.  The assets to be liquidated, the requirement to liquidate
them, and other provisions associated with their liquidation are
described in the Letter Agreement and Annex A to it.

i.   The assets to be liquidated were, as SKAT and the Covered
Parties' Designees were well aware, illiquid and varied in
nature.

ii.   Each of them would require considerable efforts, and different
types of effort, to liquidate.  Liquidating interests in a German
bank with a then-expected net realizable value of $49 million

8

was one of the assets to be liquidated.   So were three privately-
held liquor stores with a combined value of $6 million.

e.      However, it was also important to obtain releases from SKAT of me,
Matt, Luke, and the other parties to the Settlement Agreement as part
of Phase I.  The alternative was to have hanging over all of us the
possibility of civil litigation during the several years that it would take
to liquidate assets to pay the amount due under Phase II of the
Settlement Agreement.  This explains why just the first payment to be
made under the Settlement Agreement of DKK 950 million triggered
the releases.

f.      Division of the obligations into two phases was also reflective of
another overarching business reality.  At the time that the Settlement
Agreement and Letter Agreement were executed, the final amount to
be paid to SKAT was not, and could not, be determined.  As a result,
the Parties estimated that the amount ultimately to be paid was DKK
1.55 billion, but might be adjusted depending on facts to be agreed
upon during Phase II.  The final amount to be paid under the
Settlement Agreement was to be determined later on through the
Phase II obligations.

g.      Finally, the intent to divide the obligations into two phases is reflected
in the fact that, once Phase I was complete, SKAT's remedies for any
future failures to make payments were limited.  As set out below, the
form of the remedy that SKAT was limited and the people against
whom the remedy could be had was limited.  In short, once Phase I
was complete, SKAT could only proceed against me, Matt, and Luke
and could only do so by utilizing the security that we had provided to
them.  The two-phase structure provides that once we made the
required Phase I payment, all Covered Parties except me, Matt, and
Luke would be released from further liability and SKAT's only
remedy against me, Matt, and Luke for non-payment of the amount
due under Phase II was to utilize the Affidavit of Confession of
Judgment that we provided to SKAT and that I describe below.

9

26. The end of Phase I revolved, in general, around payment of DKK 950 million and what it triggered.

    a. The payment of DKK 950 million was defined in the Settlement Agreement as the "Initial Cash Payment." *See* Pl. Exh. 104 at § 2(a).

    b. The Initial Cash Payment automatically triggered broad releases by SKAT of the Covered Parties and, in the other direction, broad releases by the Covered Parties of SKAT. *Id.* at §§ 4(a), 4(b).

    c. The Covered Parties included me, Matt, and Luke.

    d. The Covered Parties also included our wives, pension plans associated with us, and many other pension plans, entities, and associated individuals, including friends, family members, business partners, and other associates. *See id.* at Exh. 1-2.

    e. Simultaneously with the execution of the Initial Cash Payment and as part of Phase I, Matt, Luke, and I were required to provide an affidavit of confession of judgment to SKAT in the form attached to the Settlement Agreement. *See* Pl. Exh. 104 at § 4(c) & Exh. 4. We did so on August 8, 2019.

        i. Plaintiffs' Exhibit 10a is a true and correct copy of the Affidavit of Confession of Judgment provided in 2019 (the "2019 Affidavit of Confession of Judgment") together with the acknowledgment of receipt of the 2019 Affidavit of Confession of Judgment by U.S. counsel for SKAT.

        ii. The purpose of the 2019 Affidavit of Confession of Judgment was to facilitate SKAT's collection of further payments to be made as part of Phase II. None of the other Covered Parties provided an affidavit of confession of judgment or other security.

        iii. This is why the 2019 Affidavit of Confession of Judgment refers only to payments to be made after the Initial Cash Payment, but not to the Initial Cash Payment.

      iv.     In the event that the Covered Parties timely completed the Initial Cash Payment, SKAT's sole remedy for the failure to pay the remainder of the amounts required to be paid under the Settlement Agreement was the filing of the Affidavit of Confession of Judgment against the Covered Parties' Designees only. *See id.* at § 2(c).

      v.     I am unaware that SKAT has made any effort to obtain payment of amounts unpaid under the Settlement Agreement from any Covered Party other than me, Matt, and Luke.

   f.    Other than agreeing not to sue the Covered Parties between the date that the Settlement Agreement was signed and the date for making the Initial Cash Payment, *see* Plaintiffs' Exhibit 104 at § 4(e), SKAT had substantially no other obligations that are specific to Phase I of the Settlement Agreement.

      i.     For all practical purposes, once SKAT received the Initial Cash Payment, thereby triggering the releases, SKAT's performance under Phase I was complete.

   g.    There is no dispute about completion of the Initial Cash Payment, provision of the 2019 Affidavit of Confession of Judgment, or the effectiveness of the releases by SKAT or the Covered Parties. Plaintiffs' Exhibit 3 is a collection of true and correct copies of the records of the payment of the Initial Cash Payment.

27.    Phase II commenced once the Initial Cash Payment had been made and the releases by SKAT of the Covered Parties and the releases by the Covered Parties of SKAT had been triggered. Phase II required additional actions on the part of the Covered Parties and more significant actions on the part of the Covered Parties' Designees. The Letter Agreement also created obligations for me, Matt, and Luke, and the two other parties to the Letter Agreement, during Phase II. There was very little required of SKAT in Phase II. The principal obligations of Phase II are set out below:

a.   In Phase II, the following, in general, was required by the Settlement Agreement:

i.   **Cooperation with SKAT:**  The Covered Parties were required to fully cooperate with SKAT in its investigation of others who were not released as a result of the Settlement Agreement.  The cooperation obligations were largely triggered by a simple request by SKAT.  *See* Pl. Exh. 104 at § 7.  SKAT was not required to make such requests.  SKAT made multiple requests for cooperation.  Matt, Luke, and I complied with them and, therefore, provided SKAT with a substantial benefit in the form of documents and information.  I describe our cooperation efforts below.

ii.   **Making A Further Payment:**  A further payment of DKK 600 million, defined as the "Additional Cash Payment," was required.  *See id.* at §§ 1(a), 2(b).  There is no obligation imposed upon SKAT with respect to the Additional Cash Payment.

iii.   **Determining and Paying the True-Up Amount:**  The purpose of the payment of the True-Up amount was, in general, to account for the overarching business reality of the Settlement Agreement that the precise amount to be paid was not, and could not be, determined when the Settlement Agreement was signed; it was only estimated to be DKK 1.55 billion.  As such, the True-Up Amount had not been determined at the time of the execution of the Settlement Agreement or by the time of the Initial Cash Payment, such that it was not a Phase I obligation.  Rather, the Covered Parties were required, in general, to use their best efforts to provide SKAT with information necessary to determine it and all parties to the Settlement Agreement, including SKAT, were required to cooperate to establish the amounts necessary to determine the True-Up amount.  The expectation was that the process of providing the information would be completed within six months of the effective date of the Settlement Agreement.  The True-Up process took considerably longer than that.  The end of the True-Up process envisioned under the Settlement Agreement was that Matt, Luke, and I would certify a Final List of Net Proceeds that

12

would allow for a determination of the True-Up Amount, if any. *See id.* at § 2(e)(i).

iv.    The True-Up process was never completed because the parties to the Settlement Agreement never agreed upon the requisite amounts. The True-Up Amount that SKAT contends is owed is the subject of Count II of their Counterclaims.

v.    **Payment of Interest, If Any:** The Settlement Agreement also required the payment of interest under certain circumstances. *See id.* at § 2(d)(ii). This did not create any obligation for SKAT.

vi.    **Payments By A Specific Date:** The Settlement Agreement required that all payments be made by 36 months after May 28, 2019. The date was modified by the Letter Agreement, as set out below. This provision created no obligation for SKAT.

vii.    **Dismissal of One Specific Case filed by SKAT:** Within a short period after the Initial Cash Payment, SKAT was required to dismiss the claims that it had alleged against Adam LaRosa ("LaRosa") in one specific case that it had, as of the time, filed against him. *See* Pl. Exh. 104 at § 3(a). Adam LaRosa was a person who played a role in some of the dividend arbitrage trading. Plaintiffs' Exhibit 4 is a true and correct copy of the complaint filed in that case.

b.    The Letter Agreement also set out various Phase II obligations, mostly imposed upon me, Matt, and Luke, the Covered Parties' Designees. The most important of those obligations were:

i.    **Liquidation of Assets:** Matt, Luke, and I were required to use our best efforts to liquidate certain assets described in the Letter Agreement. The purpose of the liquidation of these assets was to make the Subsequent Cash Payment. As Section 3 of the Letter Agreement indicates: "Pursuant to Section 2(d) of the Settlement Agreement" [governing the "[t]iming of payment of the Subsequent Cash Payment Amount and interest"], the Subsequent Cash Payment Amount shall be paid over time; as deadlines for payment occur and as certain 'Illiquid Assets' are

liquidated." The "Illiquid Assets" were described in the Letter Agreement. The expected realizable value of those assets was about DKK 565 million, which, if realized, would allow for payment of nearly all of amount to be paid under the Settlement Agreement (= DKK 950 million + DKK 565 million = DKK 1.515 billion). Pl. Exh. 109 at §§ 3, 5 & Annex A. This created no meaningful obligations for SKAT.

ii.   **Modification of Time Period for Payments:** The Letter Agreement, in effect, extended, under certain conditions, the period for the completion of payments under the Settlement Agreement from three years to four years. *Id.* at § 6. As a result, the final payments required by the Settlement Agreement were required to be made by May 28, 2023. *See* Pl. Exh. 104 at §§ 1(r), 2(d).

iii.   **Various Matters Relating to North Channel Bank:** The most valuable of the assets to be liquidated to complete the payments required under the Settlement Agreement were interests in North Channel Bank, a bank located in Germany that was associated with Reclaim Applications. At the time of the Settlement Agreement, we expected that the value to be realized from its sale would be DKK 322 million. Our expectation is reflected in the Letter Agreement. *Id.*, Annex A. I describe issues concerning North Channel Bank below. SKAT was not required to do anything related to North Channel Bank.

iv.   **Quarterly Progress Reports:** Matt, Luke, and I were required to provide quarterly progress reports to SKAT about the efforts to liquidate assets covered by in the Letter Agreement. We did so until late January 2022. After we stopped doing so, SKAT did not inquire about the status of quarterly progress reports or claim any failure to provide the quarterly progress reports until around late January 2023.

v.   Around April 2022, Matt retained counsel, a Columbia Law School professor, to evaluate whether there was a basis for an action against SKAT.

14

28. There were a few general requirements of the Settlement Agreement and the Letter Agreement that bore on both SKAT and the Covered Parties that were not specifically tied to Phase I or Phase II. There is no need to describe all of them. However, the principal ones are:

    a. **Confidentiality:** Subject to certain exceptions, the parties to the Settlement Agreement agreed that it was intended to be confidential. *See* Pl. Exh. 104 at § 8. The Letter Agreement was similarly to be kept confidential. *See* Pl. Exh. 109 at § 2.

        i. There were several exceptions to the confidentiality requirement.

        ii. One exception permitted limited disclosures by SKAT to facilitate its public announcement of the Settlement Agreement. *Id.* at § 8(b).

        iii. SKAT announced the Settlement Agreement in late May 2019. Exhibit 106 is a true and correct copy of the press release that it issued and a translation of it prepared on behalf of SKAT.

        iv. The Settlement Agreement did not permit disclosure of the names of any of the parties to the Settlement Agreement.

        v. Despite the obligations of confidentiality contained in the Settlement Agreement and the Letter Agreement, my name and Matt's name emerged in the press as what the Danish press called the "masterminds" of what was described in the media as a fraud. There came to be other disclosures about the Settlement Agreement and there was considerable criticism of the Settlement Agreement in the Danish media.

        vi. Plaintiffs' Exhibit 5 is a true and correct copy of an example of the press via the major Danish media outlet TV2.

        vii. I am not a Danish speaker and read the press about matters relating to Denmark, including matters related to me, by typically utilizing Google Translate, which is the manner in which Plaintiffs' Exhibit 5 was prepared.

viii.   Disclosure of my name in the press and the manner in which it was disclosed caused great complications for me and Matt, both in our personal lives and in our business affairs.  For example, it made it more difficult for us to sell some of the assets that were required to be liquidated by the Letter Agreement.  These difficulties were compounded by the indictment of Matt, Luke, and me in April 2021.

  a.   The indictment negatively impacted the ability to sell the most significant asset that was required to be liquidated under the Letter Agreement, the interests in North Channel Bank.

  b.   The indictment had the practical effect of ensuring that North Channel Bank would either not be sold or not be sold for anything close to the DKK 322 million that, as of the date of the Settlement Agreement, it was expected to realize upon sale.

  c.   Eventually, North Channel Bank was not able to be sold and has been placed into liquidation in Germany.

  d.   The disclosure of my name and of the subsequent indictment had the effect of preventing me from starting the intended position at the investment firm that had led me to move to Florida.

ix.   Disclosure of my name as one of the settling parties frustrated my intent in entering into the Settlement Agreement.  It rendered the consideration that I had received from SKAT pursuant to the confidentiality provisions of the Settlement Agreement basically worthless.

x.   I describe another important exception to the general confidentiality requirement below.

b.   **Non-Disparagement:**  The parties agreed to not disparage each other.  This was subject to exceptions for SKAT in its litigation efforts against others and subject to complying with subpoenas, responding to government inquiries or investigations, or in connection with legal proceedings.  *See* Pl. Exh. 104 at § 9.

c.   **Other Matters:**  Among other things, the parties agreed to various formal and informal dispute resolution mechanisms, how notices would be provided, where any disputes would be litigated, and the application of New York law to the agreement.  *See id.* at § 10, 11, 12, 20.

## Section 8(f) of the Settlement Agreement

29.   For me, the most important Phase II obligation of SKAT was stated as an exception to the confidentiality obligations set out in Section 8 of the Settlement Agreement.  *Id.* at § 8(f).  It forms the basis for the claims that Matt and I have asserted in this action.

30.   Other than confidentiality, it is substantially the only benefit that I was to obtain from SKAT in Phase II.  And after my name was disclosed to the press in September 2019, it was virtually the only thing that provided me *any* benefit in Phase II.

31.   Section 8(f) provides:

> Notwithstanding the confidentiality obligations of this Section 8, promptly upon the execution of this Agreement, [SKAT] will, in writing, bring to the attention of [SØIK] this Agreement and its terms, and represent, in writing, that this Agreement reflects good-faith negotiation by the Covered Parties, that the Covered Parties' cooperation may result in the recovery by Skatteforvaltningen of additional funds from third parties and that this Agreement is in the best interests of Skatteforvaltningen.  Upon request by SØIK, Skatteforvaltningen may provide and/or disclose the entirety of this Agreement to SØIK.

Pl. Exh. 104 at § 8(f).

32.   The inclusion of this term was, to me, the most important provision of the Settlement Agreement because it was, as a practical matter, the only significant promise that SKAT made that held out any prospect of helping me avoid being charged or indicted by SØIK.  It was the most important thing that anyone else could do in that regard.  As explained above, Matt, Luke, and I had initially insisted that the Settlement Agreement be conditioned on our not being indicted.  When that was no longer possible,

we literally settled for the promises that SKAT made in Section 8(f). Section 8(f) goes to the very heart of why I entered into the Settlement Agreement. Section 8(f) was of such importance that, without its inclusion, I would never have entered into the Settlement Agreement or the Letter Agreement. SKAT's failure to comply with Section 8(f) meant that I received substantially no material benefit in Phase II.

    a.    I recognized then, and recognize now, of course, that SKAT's compliance with Section 8(f) would not guarantee that Matt, Luke, or I would not be charged by SØIK.

    b.    But, in my view, Section 8(f) increased the chances that I would not be charged or indicted by SØIK, even if SØIK was otherwise inclined to charge or indict.

    c.    It was much like a potentially life-saving medicine. It was not guaranteed to have the desired effect, but it represented an important chance to achieve a result that was favorable and extraordinarily important to me.

    d.    SKAT's failure to comply with Section 8(f) stole from me that chance, which was practically the only thing that I was to receive in Phase II.

33.    Each element of Section 8(f) was important to me and SKAT's failure to comply with each aspect of what was required of Section 8(f) deprived me of any benefit that I contracted to receive, expected to receive, and should have received, under Section 8(f).

    a.    Timing

        i.    The timing of the communication required by Section 8(f) by SKAT to SØIK was that it be "promptly upon the execution of th[e Settlement] Agreement." I expected that, as a result of this obligation, SKAT would complete its compliance with Section 8(f) shortly after the Initial Cash Payment was made. For example, I did not expect, and could not have reasonably expected, that SKAT would make the representations required by Section 8(f) to SØIK *after* the Settlement Agreement was signed, but *prior* to the Initial Cash Payment. After all, if

SKAT was required to communicate with SØIK *immediately* upon execution of the Settlement Agreement or before the Initial Cash Payment was made in the manner required by Section 8(f), I would, in essence, be able to get the benefit of Section 8(f) without having to make the Initial Cash Payment.

ii.    The requirement that SKAT communicate with SØIK in the time frame described above was important to me when I entered into the Settlement Agreement because, in my view, the earlier that, via a communication from SKAT, SØIK learned: (a) that Matt, Luke, and I had settled with SKAT; (b) the terms of the Settlement Agreement; and (c) the extent of our cooperation and other obligations, the more likely it would be that SKAT's communication to SØIK would influence SØIK's investigation and its deliberations about whether to charge or indict in a way that was positive for me, Matt, and Luke.

a.    For example, had SØIK learned from SKAT that a substantial amount of funds had been returned to the Danish treasury, SØIK might have determined that the civil resolution was sufficient and not continued its investigation.

b.    As another example, had SØIK learned from SKAT that Matt, Luke, and I were cooperating, SØIK might have determined that its investigation of extensive, multi-national conduct could have been greatly expedited by leveraging our cooperation for its benefit and not charging me, Matt, or Luke.

c.    Conversely, SKAT's not communicating promptly with SØIK meant that SØIK would have expended more time, energy, and resources in the investigation and would be hesitant to deviate from the trajectory towards charging me, Matt, and Luke, if that is where it ended up.

d.    What I believed at the time was that, in effect, the later that SKAT communicated with SØIK, the greater the chance that, by the time SKAT communicated with SØIK, the proverbial train would have left the station. That is, the more investigation SØIK would have done

19

before learning what was required to be communicated under Section 8(f), the greater the chance that SØIK might have come to the conclusion that Matt, Luke, and I should be charged.

e.  Similarly, I believed at the time that, if SKAT communicated within the time frame described above, SØIK might have directed its investigative and prosecutorial resources elsewhere.

iii.  A communication from SØIK of the type required by Section 8(f) in August 2019, after the Initial Cash Payment, would be more impactful than a communication made, for example, *after* SØIK had determined that Matt, Luke, and I should be charged under Danish law or a communication made *after* SØIK had determined that Matt, Luke, and I should be indicted under Danish law.

a.  As I understand it, to be "charged" under Danish law means, in general, to be informed that one is being investigated for having committed a specific offense.

iv.  I was not "charged" under Danish law until some time around May 2020.  Plaintiffs' Exhibit 17 is a true and correct copy of an e-mail from SØIK that was received by my U.S. counsel and that indicates approximately when I was charged by SØIK.

b.  Written Communication

i.  Section 8(f) requires that the content of what SKAT was required to bring to SØIK's attention be in writing.

ii.  The writing requirement was important for many reasons.

iii.  For example, the writing requirement ensured that the information imparted by SKAT to SØIK would become part of the official records of SØIK and could be communicated easily and widely within SØIK.  Such a writing would also ensure that any new or different SØIK personnel would have access to the same information regarding our obligations and the

20

representations required by Section 8(f).  SØIK is, I have come to understand, a government agency with various functions and ensuring that anyone who might be working on matters relating to the investigation of me, Matt, and Luke was the obvious intent of the writing requirement.

iv.   It is self-evident that an e-mail or other written document setting out the required information could be transmitted to many people in a way that an oral communication could not be.

v.    And a written communication creates a record of precisely what was said to SØIK in a way that an oral communication does not.

vi.   The writing requirement also ensured that SKAT's compliance with Section 8(f) was verifiable.  If there were ever a dispute over SKAT's compliance with Section 8(f), SKAT would easily be able to prove compliance, thereby eliminating any uncertainty that Matt, Luke, and I might otherwise have about whether SKAT fully complied with its obligations under Section 8(f).

c.   The Settlement Agreement *and* Its Terms

i.    Section 8(f) requires that SKAT bring to the attention of SØIK "this [Settlement] Agreement and its terms."

ii.   The obvious intent of this provision is that SKAT would go beyond merely informing SØIK that a settlement had been reached, but would also bring to the attention of SØIK the terms of the Settlement Agreement.  Section 8(f) plainly distinguishes between the Settlement Agreement and the terms of the Settlement Agreement.

iii.  The terms of the Settlement Agreement are many.  They demonstrate the extent of the obligations that Matt, Luke, and I, among others, undertook, and the great benefits that SKAT obtained from our performance of those obligations under the Settlement Agreement.  We explicitly bargained for SKAT's disclosure of the terms of the Settlement Agreement to SØIK

21

and SKAT's performance of its obligation to us was important to ensure that the full disclosure of our obligations under the Settlement Agreement maximized the chances that SOIK would not charge or indict us.

a.  For example, it would not be sufficient to inform SØIK solely that the Covered Parties were assisting, or cooperating with, SKAT.  Doing so would not adequately describe the extent of the cooperation required of the Covered Parties under Section 7 of the Settlement Agreement.  For example, disclosure to SØIK of mere cooperation would not include that: (i) the Covered Parties were required to use their best efforts to ensure that their cooperation is meaningful and productive; (ii) SKAT could require attorneys for the Covered Parties to provide cooperation information; and (iii) the Covered Parties were required to provide information about themselves in addition to information about anyone or anything on a broad range of subjects.  *See* Pl. Exh. 104 at § 7(b), 7(g); *id.* at § 1(g) (defining "Cooperation Information").

b.  As another example, it would not be sufficient to inform SØIK of the identities of the Covered Parties because doing so would not identify who the *Covered Parties' Designees* are.  It is the Covered Parties' Designees -- Matt, Luke, and I -- who undertook special obligations under the Settlement Agreement.

i.  Specifically, we, the Covered Parties' Designees, undertook the obligation to make the Subsequent Cash Payment, the obligation to pay interest, and the obligation to certify certain information relating to the True-Up amount.  *See* Pl. Exh. 104 at §§ 2(c), 2(d)(iii), 2(e)(iii), 4(c).  And we, the Covered Parties' Designees, undertook special obligations under the Letter Agreement, such as the liquidation of assets.  *See* Pl. Exh. 109 at § 5.

22

      ii.     In addition, it is the obligation of me, Matt, and Luke to provide an affidavit of confession of judgment and an updated affidavit of confession of judgment. That is, SKAT's sole remedy for any failure to make payments was against us and us alone.

    c.     As another example, it was important that SØIK know of the timing of the payments to be made under the Settlement Agreement and, more specifically, the manner in which we, the Covered Parties' Designees, were required to liquidate assets in order to make those payments. It was important for SØIK to know, for example, that a decision to indict might bear significantly on the ability of the Covered Parties' Designees to complete the payments required by the Settlement Agreement. Naturally, it was important for SØIK to know that an indictment might jeopardize the ability of me, Matt, and Luke to pay at least an additional DKK 600 million. This is why Section 8(f) requires SKAT to bring to SØIK's attention the *terms* of the resolution, not just the *fact* of the resolution.

d.    Written Representations Required by Section 8(f)

    i.     SKAT was required to make certain representations to SØIK in writing, specifically that: (i) the Settlement Agreement "reflects good-faith negotiation by the Covered Parties"; (ii) "the Covered Parties' cooperation may result in the recovery by [SKAT] of additional funds from third parties"; and (iii) the Settlement Agreement "is in the best interests of [SKAT]."

    ii.    Each of these was crucial in order for Section 8(f) to serve its sole purpose, *i.e.*, to provide information to SØIK that would have the natural effect of putting us in a more positive light with SØIK and reducing the chances that we would be charged or indicted.

    iii.    It reflected positively on me, Matt, and Luke that we, and others, engaged in good faith negotiations. To me, this meant,

and I believe that this is a natural interpretation of the term "good faith," that we had conducted ourselves honestly, sincerely, and in a forthright manner during the negotiations leading to the Settlement Agreement, something that was important that SKAT convey to SØIK.

iv.    It reflected positively on me, Matt, and Luke that the cooperation of us and others might result in SKAT's recovery of additional funds from third parties. Such a representation coming from SKAT demonstrated that SKAT could have the reasonable expectation that the information that Matt, Luke, and I, among others, were required to provide would positively impact SKAT's efforts to recover funds from others.

a.    As noted above and as of about April 2022, the Covered Parties have collectively paid SKAT more than DKK 1 billion.

b.    This is a staggering amount in context. I have reviewed the deposition of a SKAT official taken in this case in June 2024. Based on my review of that testimony, I am aware that, since the inception of its efforts to recoup funds that it contends were improperly paid out, SKAT has recovered DKK 1.8 billion and had expended an estimated DKK 2.5 billion as of the end of 2023 to recoup DKK 1.8 billion. More than 55% of the amount recouped was the result of payments made under the Settlement Agreement. I am also aware, based on my review of that testimony, that, as of June 2024, SKAT has allocated an additional DKK 1.9 billion to expend on its efforts to recoup additional funds.

c.    As noted above, by the time of the Settlement Agreement, SKAT had initiated many lawsuits against others. The cooperation obligation set out in the Settlement Agreement was not limited to assisting SKAT in the existing cases; it was unlimited and encompassed any cases against third parties.

24

d.  It was important for SØIK to know that, if it chose to indict me, Matt, and Luke, the cooperation that Matt, Luke, and I would be obligated to provide to SKAT might not be available and, as a result, might jeopardize SKAT's efforts to recover in other proceedings.

e.  And it was important for SØIK to know that an indictment of me, Matt, and Luke might jeopardize our ability to pay the DKK 600 million required in Phase II. If SKAT did not explain the payment mechanisms built into the Settlement Agreement and the Letter Agreement, then SØIK would never know how an indictment of me, Matt, and Luke would impact the Danish treasury.

v.  It reflected positively on me, Matt, and Luke that SKAT would represent to SØIK that the Settlement Agreement "is in the best interests of [SKAT]."

a.  With respect to this matter, SKAT regards itself as the victim of a fraud.

b.  As such, it was obviously of benefit to me, Matt, and Luke that the entity claiming to be the victim of a fraud (SKAT) would state to the authority responsible for making determinations about whom to prosecute (SØIK) that the Settlement Agreement is in the claimed victim's best interests.

c.  Such a representation would also naturally be comparative, that is, the benefit obtained by SKAT through the Settlement Agreement would have to be compared to any other alternative to a negotiated resolution available to SKAT, such as years of litigation, with the attendant expense.

vi.  Finally, it would be more effective, and it was what I bargained for, that these representations would come from SKAT -- not from me or my lawyers.  In short, such representations would be more readily credited by SØIK coming from SKAT itself, rather than if I, or my lawyers, made these representations.

     e.      Disclosure of Settlement Agreement Upon Request

          i.     The final sentence of Section 8(f) provides that "Upon request by SØIK, [SKAT] may provide and/or disclose the entirety of the[ Settlement] Agreement to SØIK."

         ii.    This was important to me because it ensured that, in order to obtain the full Settlement Agreement, SØIK merely had to ask SKAT, which would then be permitted to provide the full Settlement Agreement to SØIK.

        iii.   Assuming SKAT comported itself in good faith under the Settlement Agreement, as required, I am not aware of any reason why SKAT would not have agreed to provide the Settlement Agreement if SØIK asked.

## Cooperation

34.    As noted above, Matt, Luke, and I, together with the other Covered Parties, undertook substantial cooperation obligations under the Settlement Agreement.  Our cooperation began in 2019 and continued thereafter.

35.    Pursuant to those obligations, at significant personal expense, and through at least 2021, Matt, Luke, and I, and our lawyers acting at our direction, responded to multiple requests made by SKAT.  We:

     a.     reviewed and produced over 90,000 documents in SKAT's pending suits against non-settling parties in the United States;

     b.     reviewed and approved SKAT's requests to use documents of the Covered Parties' Designees in SKAT's litigation against other parties in Dubai and the United Kingdom;

     c.     performed research and made proffers to U.S. counsel for SKAT to answer factual questions that SKAT raised in connection with its prosecution of claims against other parties; and

d.     addressed other substantive and procedural questions and requests from U.S. counsel for SKAT to facilitate SKAT's prosecution of its civil actions across multiple jurisdictions, including, the United States, the United Kingdom, Malaysia, and Dubai.

36.     I am not aware that SKAT ever sought any remotely comparable cooperation from any of the other Covered Parties.

## Payments Made During Phase II

37.     During Phase II, Matt and I proceeded to liquidate some assets required to be liquidated under the Letter Agreement.  As a result, between early June 2020 and mid-April 2022, Matt and I paid to SKAT a total of approximately DKK 37,849,584.

38.     In about March 2021, Luke paid SKAT $3.195 million, then the Danish kroner equivalent of DKK 19,916,383.95.

39.     Records of those payments are included in Plaintiffs' Exhibit 6, which are true and correct copies of the payment records.

a.     These are the funds that should be returned to Matt, Luke, and me in order to restore us to the position that we were in as of the date when SKAT breached Section 8(f) of the Settlement Agreement.

40.     All told, the Covered Parties have collectively returned to Denmark more than DKK 1 billion.

## Efforts to Obtain Information from SKAT
## Regarding Communications with SØIK

41.     I am aware that, starting in late 2020 and through 2021, my U.S. counsel at the time, Kaplan, Hecker & Fink LLP, sought from SKAT, via its U.S. counsel, information regarding its communications with SØIK and the cooperation provided by me, Matt, and Luke with SKAT.

42.     [Intentionally omitted]

**SOIK's Investigation**

43. As noted above, I was charged, that is, informed that I was under investigation and informed of my rights under Danish law, in around May 2020.

44. SØIK requested that I submit to an interview.

45. I agreed to be interviewed in connection with SØIK's investigation. I was not compelled to speak to SØIK. My decision to agree to an interview was influenced by my expectation that SKAT had complied with Section 8(f).

46. I spent three days in March 2021 answering all of SØIK's questions on every aspect of my conduct and the conduct of others about which SØIK inquired.

47. On multiple days during the interview, when I mentioned the existence of the Settlement Agreement and details about it, such as the amounts involved, the SØIK representatives in attendance had no reactions and no questions about it.

   a. My impression was that they were surprised by this information, which suggested to me that they had no knowledge of the Settlement Agreement.

   b. At the time, I felt that SKAT had breached the Settlement Agreement because it had not provided a copy of the Settlement Agreement to SØIK.

   c. I learned after that my belief that SKAT had breached the Settlement Agreement was based on an incorrect understanding of the Settlement Agreement at the time. SKAT was not, by the terms of the Settlement Agreement, required to provide a copy of the Settlement Agreement to SØIK.

   d. At the time, I also believed that further analysis of SKAT's conduct was required.

   e. A few short weeks after the interview, SØIK indicted me, Matt, Luke, and others.

f.    Shortly after that, my U.S. counsel inquired of SKAT about its compliance with Section 8(f) and its communications with SØIK, as set out in Plaintiffs' Exhibit 127.

g.    In the week or so after that, my U.S. counsel provided to SØIK a copy of the Settlement Agreement and further information about our cooperation under it, as set out in Plaintiffs' Exhibit 13.

h.    The information that my U.S. counsel received back from SKAT about the manner that it claims to have complied with Section 8(f) is set out in Plaintiffs' Exhibit 128.

i.    After the April 2021 indictment, Matt, Luke, and I continued to make payments to satisfy the obligations of the Settlement Agreement.  The last payment was made towards the end of April 2022, as set out in Plaintiffs' Exhibit 6.

j.    We also continued to provide quarterly progress reports through the end of January 2022.

## <u>Seizure</u>

48.    I obtained in discovery during my Danish criminal case documents relating to efforts by SØIK to seize assets associated with me, Matt, and Luke. SØIK's efforts started in early 2020.  SØIK was seeking to seize an interest in my home and various bank accounts.

49.    [Intentionally omitted]

50.    Under Danish criminal law procedure, I was not permitted to learn about these attempted seizures or even about my Danish attorney's efforts to appeal the seizure orders until after the appeal was resolved and the seizure orders had been overturned by the appellate court.

**Events Occurring After the Filing of This Litigation**

51.    My present U.S. counsel filed this action in late March 2023, approximately two months before the date required for payment of the Final Settlement Amount required by the Settlement Agreement.  *See* Pl. Exh. 104 at § 1(g).

52.    Plaintiffs' Exhibit 137 is a true and correct copy of a document, dated April 12, 2023, that SKAT produced in discovery in this action together with the translation included as part of the same document, which SKAT also provided.

    a.    In this letter, SKAT makes various statements about what it claims that it did.

    b.    If this is an intent by SKAT to cure its prior failure to comply with Section 8(f), it is nearly four years too late.  The Initial Cash Payment was made by early August 2019.  That is when SKAT should have communicated with SØIK pursuant to Section 8(f).

    c.    Beyond that, SKAT's letter does not even comply with Section 8(f). For example, it does not bring to SKAT's attention the terms of the Settlement Agreement or identify who the Covered Parties are.

    d.    Indeed, there is no cure that SKAT could have provided in 2023 for its failure to comply with Section 8(f).  It is simply impossible to go back in time in order to have the information and representations required to be provided by SKAT pursuant to Section 8(f) be considered as part of SØIK's investigation as of around August 2019.  And there is no way to go back in time to influence SØIK's decision-making as of around August 2019, when SKAT should have complied with Section 8(f).  The train long ago left the station.

    e.    For the same reasons, once Matt, Luke, and I were indicted in April 2021, it would have been useless and futile to provide SKAT with notice of its failure to comply with Section 8(f) and an opportunity to cure, as provided for in Section 11 of the Settlement Agreement. There was, at that point and as a practical matter, nothing that SKAT could do to remedy its failure to comply with Section 8(f).

## North Channel Bank

53. I am familiar with aspects of the business and financial affairs of North Channel Bank.

54. Some accounts associated with the dividend arbitrage trading were held at North Channel Bank in the name of U.S. pension plans and the proceeds of Reclaim Applications were paid into these accounts. Expenses paid by the U.S. pension plans and associated with the Reclaim Applications are discussed in the Witness Statement of Matthew Stein.

55. The core business of North Channel Bank was lending to the purchasers of life settlements. This activity has nothing to do with dividend arbitrage trading or the accounts of U.S. pension plans that came to be held at North Channel Bank.

## My Residence and the 2021 Affidavit of Confession of Judgment

56. When the Settlement Agreement was executed, I resided, together with my wife and children, in Manhattan. I had lived in Manhattan since around 2001.

57. As a result, the 2019 Affidavit of Confession of Judgment indicated that I lived in New York County, that is, Manhattan.

58. For the same reason, the form of Updated Affidavit of Confession of Judgment attached as Exhibit 5 to the Settlement Agreement indicated that I lived in New York County.

59. A few months after the Covid-19 pandemic began in 2020, my family and I moved to Winter Park, Florida. We moved because of a professional opportunity for me. The movers came to our New York City apartment at the end of June 2020. My and my family's move to Florida was a permanent abandonment of my residence in the State of New York. I had been intending to move to Florida starting in around the middle or latter part of 2019.

60. Initially, upon our arrival in Florida, we lived in a rented a home in Winter Park, Florida.

61. In about February or March 2020, I enrolled my children in schools near our new home in Winter Park, Florida.  Since the 2020-2021 school year, they have attended school near my home in Winter Park, Florida.

62. In July 2020, I surrendered the New York State license plates on my car and re-registered the same car in Florida.

63. In July 2020, I obtained a Florida driver's license.

64. In May 2021, my wife and I purchased a home in Winter Park, Florida.

65. When my wife, children, and I moved to Florida in 2020, I had no intention of continuing to reside in the State of New York and no intention to re-establish residence in the State of New York.

66. During the time that my wife, children, and I resided in the State of New York, we lived in an apartment in Manhattan.  My wife and I owned that apartment and an adjacent one.

    a. About ten months before my wife, children, and I moved to Florida in June 2020, my wife and I had put the two apartments on the market because of our impending move to Florida.

    b. Because of the Covid-19 pandemic, it took some time for the apartments to be purchased.  It was some months before contracts for the sale of the apartments were executed.

    c. The closings on the apartments occurred in April 2021 and June 2021.

67. In or about early June 2021, I executed an Updated Affidavit of Confession of Judgment, which reflects that I was, by then, residing in Orange County, Florida.  Plaintiffs' Exhibit 129 is a true and correct copy of that document.

68. Exhibit 104 reflects that both the form of updated affidavit of confession of judgment attached as Exhibit 5 to the Settlement Agreement and the 2019 Affidavit of Confession of Judgment were updated because I had moved to Florida.  *Compare* Pl. Exh. 104 at Exh. 5, *with* Pl. Exh. 10a, *with* Pl. Exh. 129.

## **Concluding Matters**

69.  Because this Witness Statement is being submitted for a limited purpose, it
     does not include all of the facts associated with the issues described above
     and of which I am aware.

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury that the
foregoing is true and correct.

Executed on April 7, 2025, at Winter Park, Florida.

_____
Jerome Lhote