UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MATTHEW STEIN and JEROME LHOTE,                    23 Civ. 2508 (NRB)

                          Plaintiffs,

            v.

SKATTEFORVALTNINGEN,

                                    Defendant,
                          and

LUKE MCGEE,

                          Nominal Defendant.

SKATTEFORVALTNINGEN,

                          Counterclaim Plaintiff,

            v.

MATTHEW STEIN, JEROME LHOTE, and
LUKE MCGEE,

                          Counterclaim Defendants.

## WITNESS STATEMENT OF MATTHEW R. STEIN

## <u>TABLE OF CONTENTS</u>

**Paragraphs**

My Personal and Professional Background ................................................. 1

Preliminary Matters ............................................................................. 8

My Professional Activities Since Approximately 2005 ........................... 11

Events Leading Up to the May 2019 Settlement With SKAT ................. 16

The Settlement Agreement and the Letter Agreement ........................... 23

Section 8(f) of the Settlement Agreement ............................................. 29

Cooperation ....................................................................................... 34

Payments Made During Phase II .......................................................... 37

Efforts to Obtain Information from SKAT
Regarding Communications with SØIK .............................................. 41

SOIK's Investigation .......................................................................... 43

Seizure .............................................................................................. 48

Events Occurring After the Filing of This Litigation ............................ 51

Documents Received In Discovery In Denmark .................................... 55

SKAT's Claim for the True-Up Amount ............................................... 57

Net Proceeds Formula ......................................................................... 62

Summary of the Net Proceeds Process and the
True-Up, if Any, Under the Settlement Agreement ............................... 66

SKAT Does Not Calculate Net Proceeds .............................................. 68

The Course of the True-Up Process ...................................................... 71

SKAT's Counterclaims Related to Net Proceeds .................................... 75

Gross Reclaims ................................................................................... 77

## TABLE OF CONTENTS (cont'd)

**Paragraphs**

True-Up Dispute 1 - Fees Paid After SKAT
Stopped Making Payments on Reclaim Applications ............................................. 78

True-Up Dispute 2 - Allocation of Account-Level Fees
for Accounts Where There Was Danish and Belgian Trading ............................... 89

True-Up Dispute 3 - Allocation of Covered
Parties' Expenses by Ownership Percentage ........................................................... 92

True-Up Dispute 4 - Overlapping Adjustments ....................................................... 95

True-Up Dispute Exhibits ......................................................................................... 96

Concluding Matters .................................................................................................. 98

## My Personal and Professional Background

1.    I am 57 years old.

2.    I was born in New York, New York.

3.    I obtained a Bachelor of Arts degree from Franklin & Marshall College in Lancaster, Pennsylvania, in 1989.

4.    I obtained a Juris Doctor degree from the University of Minnesota Law School in 1993.

5.    Starting in about 1994, I became employed by KPMG LLP ("KPMG") in the international corporate services tax group. In 2001, I was promoted to partner. I remained at KPMG until around 2004. During my employment at KPMG, I advised foreign companies on matters of U.S. tax law and, to a lesser extent, advised U.S. companies on matters of U.S. tax law in relation to their non-U.S. operations.

6.    While I was employed at KPMG, I obtained a Master of Laws degree in taxation from New York University School of Law.

7.    I have been married to the same woman for 30 years. We have four children, presently between 19 and 26 years of age. I have lived in Manhattan since about 1995.

## Preliminary Matters

8.    I swear to this Witness Statement as my direct testimony in this matter.

9.    I have reviewed the Witness Statement of Jerome Lhote ("Jerome") in this matter. I acknowledge that the testimony in paragraphs 11-26, 29-41, 43-46, 48, and 50-52 of Jerome's Witness Statement is substantively identical to the testimony in paragraphs 11-26, 29-41, 43-46, 48, and 50-52 of my Witness Statement.

10.    This Witness Statement is my independent testimony.

## My Professional Activities Since Approximately 2005

11.    Between approximately 2005 and 2013, I was a member of Argre Management LLC ("Argre Management").  One of the other members came to be Jerome, whom I knew from KPMG.  The principal business of Argre Management was investments in non-U.S. captive reinsurance businesses.

12.    In about June 2013, Jerome and I separated from the other members of Argre Management and formed Maple Point LLC ("Maple Point").  Luke McGee ("Luke") also became a member of Maple Point LLC.  The principal business of Maple Point was investing in banks and insurance companies.

13.    Starting in about 2012, and while at Argre Management, the other members and I began investing through a type of transaction known as dividend arbitrage.  These activities continued at Maple Point through around 2015.  Dividend arbitrage is, in general, a trading strategy that involves transactions to hedge the difference in value between shares with (in Latin, *cum*) and without (in Latin, *ex*) the dividends.

14.    Jerome, Luke, and I have been accused by the Danish Public Prosecutor for Serious Economic and International Crime, widely known by the acronym "SØIK," of fraud in Denmark in connection with this dividend arbitrage activity.  Some time well after we were indicted, SØIK came to be known by the acronym "NSK."  For ease of reference, I refer to it throughout this Witness Statement as SØIK.  We were indicted on about April 12, 2021.

    a.    In general, SØIK alleges that I committed fraud in connection with applications by certain U.S. pension plans for refunds of taxes withheld on dividends paid by Danish companies ("Reclaim Applications"), which were associated with the dividend arbitrage trading.

    b.    SØIK asserts that the activity of me, Jerome, Luke, and another person who was also charged caused a loss of 1,135,775,447.99 Danish kroner ("DKK").

    c.    Over the past ten years, the ratio of Danish kroner to U.S. dollars has been somewhere between approximately 6 to 1 and 7 to 1.

d.   Because SØIK contends that my fraud was particularly serious, the maximum sentence for the crime of which I have been accused is increased from 8 years to 12 years in prison.

e.   Jerome, Luke, and I were charged in the same indictment as Rajen Shah, Anupe Dhorajiwala, and Graham Horn.

15.   The claims that Jerome and I have brought in this action and the claims asserted against me, Jerome, and Luke are civil in nature.  The claims largely concern whether contracts have been breached.

a.   These claims do not depend on whether I engaged in the crime alleged by SØIK.  Indeed, the agreement that is at the center to this case releases all civil claims against me, including claims of fraud.

b.   For the avoidance of doubt, however, I deny categorically that I committed the crime of which I have been accused or any other crime under Danish law.  I further deny that I defrauded anyone with respect to this activity and that I had any criminal intent whatsoever.

c.   At no time have I ever believed that I was engaging in anything other than lawful behavior.

d.   For example, others involved in the dividend arbitrage trading and I sought out, received, and relied upon extensive legal advice that the trading at issue complied with applicable law.  There were a variety of topics of the legal advice on which I relied.

## Events Leading Up to the May 2019 Settlement With SKAT

16.   In or about Fall 2015, I became aware that the taxation authority of Denmark, Skatteforvaltningen ("SKAT"), was investigating Reclaim Applications.  As I came to understand SKAT's investigation, this included my role, and the roles of many others, with the Reclaim Applications, including Jerome and Luke.

17.   I eventually determined that the best course of action was to initiate discussions with SKAT to resolve the emerging dispute about the validity of Reclaim Applications associated with me and others without litigation and to

assist SKAT in recovering funds that it had paid out on Reclaim Applications to pensions plans associated with me.

18.    I eventually retained U.S. counsel to conduct these discussions. Jerome, Luke, and others participated in these discussions through counsel. There were a considerable number of U.S. law firms involved in the settlement process on behalf of various parties. Danish counsel were also retained to assist in the negotiations.

19.    Through counsel, I approached SKAT in about 2017 to begin these negotiations. These negotiations lasted through about May 2019. The law firm Wachtell, Lipton, Rosen & Katz eventually came to take the lead in the settlement negotiations. By the end of the process leading up to the settlement, Jerome was represented by Milbank, Tweed, Hadley & McCloy LLP and Luke was represented by Akin, Gump, Strauss, Hauer & Feld LLP.

20.    While these negotiations were ongoing, SKAT began initiating more than 100 separate lawsuits against others who were not engaged in continuing efforts to resolve the dispute via a negotiated resolution. These lawsuits were initiated in the United States, the United Kingdom, Dubai, and elsewhere. SKAT never had to sue me, my wife, or pension plans associated with us because I engaged in settlement discussions to avoid litigation at an early stage. The same is true for Jerome, Luke, and pension plans associated with them, plus many others who ended up entering into the settlement with SKAT.

21.    Going into the settlement discussions, during them, and after the settlement agreement was entered into, my most significant concern has been possible criminal exposure in Denmark as a result of the Reclaim Applications. I don't recall the specific date when I became aware that there was the possibility of a criminal investigation in Denmark, but I remember that it was in the latter half of 2015.

22.    Because of the concern about criminal exposure in Denmark, for a significant period, the negotiations regarding a resolution with SKAT involved conditioning a settlement on an undertaking by SØIK not to initiate criminal charges against me and others.

4

a.   For example, Plaintiffs' Exhibit 2 is a true and correct copy of a draft settlement agreement sent to SKAT in or about December 2017.  It contained the following language:

> Section 2.3   SØIK is not a party to this agreement and SKAT cannot and will not influence the decision whether to bring charges or not.  Nevertheless, SKAT will bring to the attention of SØIK the Agreement and its terms, and represent that the Agreement reflects good faith negotiations by the Pension Plans, that the Pension Plans' cooperation may result in the recovery by SKAT of additional funds from unrelated third parties, and that the Agreement is in the best interests of SKAT.

> **Clause 3: Condition to the Undertakings and Obligations of the Pension Plans**

> The undertakings and obligations of the Pension Plans under this Agreement, including Clause 1, are expressly conditioned, inter alia, on a commitment by SØIK, and any other agency of the Danish Government with authority or jurisdiction in this matter, not to bring any criminal, civil or regulatory claims, charges, requests or proceedings of any kind or nature, in any forum or venue, or before any authority in Denmark, or cause or assist in bringing, such claims, charges, requests or proceedings by any foreign government or government agency, in any way arising from or related to the Pension Plans' reclaim applications, whether paid or unpaid, or from any related activities, against the Covered Parties. . . . .

b.   Language concerning this condition, *i.e.*, that aspects of the settlement was predicated on the condition that SØIK not bring criminal charges, remained in the draft settlement agreements that were being exchanged with SKAT through at least around the middle of 2018.

c.   Towards the end of 2018 or the beginning of 2019, SKAT would no longer continue settlement discussions that involved conditioning the settlement on a commitment by SØIK relating to criminal charges.

d.   I was determined to continue the settlement negotiations with SKAT nonetheless.  Jerome and Luke continued the negotiations as well.  I

5

did so, however, determined to obtain in any settlement agreement some measure of protection in relation to the possibility of criminal charges by SØIK, even if it was not the ideal scenario and was, in effect, a second best option.

e.      Accordingly, my intent in proceeding with the negotiations, and my principal goal, was to ensure that any settlement agreement with SKAT provide some protection or assistance to me in relation to the possibility of criminal proceedings that might be initiated by SØIK.

f.      Reflecting my continued intent in proceeding with the negotiations, the language in Section 2.3 set out above (beginning after "Nevertheless . . .") came to be substantially reflected in the settlement agreement that is the subject of the claims that Jerome and I assert in this action. Over time, the phrase "promptly upon the execution" of the agreement came to be added to the language that was under discussion.

g.      Reflecting my continued intent in proceeding with the negotiations, the language "SØIK is not a party to this agreement and SKAT cannot and will not influence the decision whether to bring charges or not" was not part of the continuing discussions, which continued in early 2019.

h.      If the settlement was not going to require SKAT to do at least substantially what is set out in Section 2.3 above, I would not have continued the settlement discussions and would not have settled with SKAT.

**The Settlement Agreement and the Letter Agreement**

23.     On or about May 28, 2019, I entered into a settlement agreement with SKAT (the "Settlement Agreement"). The Settlement Agreement had several exhibits (Exhibits 1A, 1B, 1C, 2, 3A, 3B, 3C, 4, and 5). Plaintiffs' Exhibit 104 is a true and correct copy of the Settlement Agreement together with its exhibits. Besides me, Jerome, Luke, numerous pension plans, and other individuals entered into the Settlement Agreement.

a.     It was largely because of the efforts by me, Jerome, and Luke that so many others entered into the Settlement Agreement. Those efforts involved a considerable expenditure of time and effort on the part of me, Jerome, and Luke.

b.     The fact that that a considerable number of additional pension plans and individuals entered into the Settlement Agreement was a meaningful benefit to SKAT. It increased the size of the agreed-upon recovery to SKAT under the Settlement Agreement and the number of pension plans, individuals, and entities that became Covered Parties under the Settlement Agreement. It benefitted SKAT that SKAT would not need to sue these additional plans, individuals, or entities.

c.     The entire group of individuals and entities that entered into the Settlement Agreement and that are released by SKAT are referred to in the Settlement Agreement as the "Covered Parties." *See* Pl. Exh. 104 at § 1(i). They are listed in Exhibits 1 and 2 to the Settlement Agreement.

d.     Jerome, Luke, and I are referred to the in Settlement Agreement as the Covered Parties' Designees. *See id.* at § 1(j). This reflects the business reality overarching the settlement discussions, which was that we were acting in the lead and were undertaking a series of obligations that the rest of the Covered Parties did not.

e.     Two other people involved with Argre Management, Richard Markowitz ("Markowitz") and John van Merkensteijn ("van Merkensteijn"), and many pension plans and individuals associated with them, did not proceed with settlement discussions after some time in around 2018. SKAT continued its litigation against them. Only in February 2025 -- after about seven years of litigation -- did SKAT complete a trial against them and only some of the pension plans associated with them. SKAT still has much more litigation to pursue against others.

    i.     To reflect that Markowitz and van Merkensteijn did not continue with the settlement discussions, they and pension plans associated with them were, in the end, excluded from the settlement.

24.    At the time that I entered into the Settlement Agreement, I also entered into a letter agreement (the "Letter Agreement"). Jerome, Luke, and two others also entered into the Letter Agreement. Plaintiffs' Exhibit 109 is a true and correct copy of the Letter Agreement.

25.    My intent in entering into the Settlement Agreement and the Letter Agreement, which is reflected in the terms of the two agreements, was that the obligations would be divided into two phases ("Phase I" and "Phase II").

   a.    The intent to divide the obligations into two Phases was a function of overarching business realities that informed both the Settlement Agreement and the Letter Agreement.

   b.    At the time that the Settlement Agreement and Letter Agreement were entered into, it was possible to pay most -- but not all -- of the amount to be paid under the Settlement Agreement. The payment of only some of the ultimate amount to be paid could be, and would be, made in Phase I.

   c.    Of the estimated DKK 1.55 billion to be paid under the Settlement Agreement, DKK 950 million, or about 61% (= DKK 950 million / DKK 1.55 billion), was to be paid in Phase I and the remainder, about DKK 600 million, or about 39% (= DKK 600 million / DKK 1.55 billion), was to be paid in Phase II. *See* Pl. Exh. 104 at §§ 1(dd), 2(a-b, d).

   d.    It would take some time to liquidate assets necessary to pay the amount to be paid in Phase II. The liquidation efforts were to occur in Phase II. The assets to be liquidated, the requirement to liquidate them, and other provisions associated with their liquidation are described in the Letter Agreement and Annex A to it.

      i.    The assets to be liquidated were, as SKAT and the Covered Parties' Designees were well aware, illiquid and varied in nature.

       ii.    Each of them would require considerable efforts, and different types of effort, to liquidate.  Liquidating interests in a German bank with a then-expected net realizable value of $49 million was one of the assets to be liquidated.   So were three privately-held liquor stores with a combined value of $6 million.

e.    However, it was also important to obtain releases from SKAT of me, Jerome, Luke, and the other parties to the Settlement Agreement as part of Phase I.  The alternative was to have hanging over all of us the possibility of civil litigation during the several years that it would take to liquidate assets to pay the amount due under Phase II of the Settlement Agreement.  This explains why just the first payment to be made under the Settlement Agreement of DKK 950 million triggered the releases.

f.    Division of the obligations into two phases was also reflective of another overarching business reality.  At the time that the Settlement Agreement and Letter Agreement were executed, the final amount to be paid to SKAT was not, and could not, be determined.  As a result, the Parties estimated that the amount ultimately to be paid was DKK 1.55 billion, but might be adjusted depending on facts to be agreed upon during Phase II.  As set forth more fully below, the final amount to be paid under the Settlement Agreement was to be determined later on through the Phase II obligations.  I describe this below in discussing the "True-Up Amount."

g.    Finally, the intent to divide the obligations into two phases is reflected in the fact that, once Phase I was complete, SKAT's remedies for any future failures to make payments were limited.  As set out below, the form of the remedy that SKAT was limited and the people against whom the remedy could be had was limited.  In short, once Phase I was complete, SKAT could only proceed against me, Jerome, and Luke and could only do so by utilizing the security that we had provided to them.  The two-phase structure provides that once we made the required Phase I payment, all Covered Parties except me, Jerome, and Luke would be released from further liability and SKAT's only remedy against me, Jerome, and Luke for non-payment of the amount due under Phase II was to utilize the Affidavit of Confession of Judgment that we provided to SKAT and that I describe below.

26. The end of Phase I revolved, in general, around payment of DKK 950 million and what it triggered.

    a. The payment of DKK 950 million was defined in the Settlement Agreement as the "Initial Cash Payment." *See* Pl. Exh. 104 at § 2(a).

    b. The Initial Cash Payment automatically triggered broad releases by SKAT of the Covered Parties and, in the other direction, broad releases by the Covered Parties of SKAT. *Id.* at §§ 4(a), 4(b).

    c. The Covered Parties included me, Jerome, and Luke.

    d. The Covered Parties also included our wives, pension plans associated with us, and many other pension plans, entities, and associated individuals, including friends, family members, business partners, and other associates. *See id.* at Exh. 1-2.

    e. Simultaneously with the execution of the Initial Cash Payment and as part of Phase I, Jerome, Luke, and I were required to provide an affidavit of confession of judgment to SKAT in the form attached to the Settlement Agreement. *See* Pl. Exh. 104 at § 4(c) & Exh. 4. We did so on August 8, 2019.

        i. Plaintiffs' Exhibit 10A is a true and correct copy of the Affidavit of Confession of Judgment provided in 2019 (the "2019 Affidavit of Confession of Judgment") together with the acknowledgment of receipt of the 2019 Affidavit of Confession of Judgment by U.S. counsel for SKAT.

        ii. The purpose of the 2019 Affidavit of Confession of Judgment was to facilitate SKAT's collection of further payments to be made as part of Phase II. None of the other Covered Parties provided an affidavit of confession of judgment or other security.

        iii. This is why the 2019 Affidavit of Confession of Judgment refers only to payments to be made after the Initial Cash Payment, but not to the Initial Cash Payment.

iv.    In the event that the Covered Parties timely completed the Initial Cash Payment, SKAT's sole remedy for the failure to pay the remainder of the amounts required to be paid under the Settlement Agreement was the filing of the Affidavit of Confession of Judgment against the Covered Parties' Designees only. *See id.* at § 2(c).

v.    I am unaware that SKAT has made any effort to obtain payment of amounts unpaid under the Settlement Agreement from any Covered Party other than me, Jerome, and Luke.

f.    Other than agreeing not to sue the Covered Parties between the date that the Settlement Agreement was signed and the date for making the Initial Cash Payment, *see* Plaintiffs' Exhibit 104 at § 4(e), SKAT had substantially no other obligations that are specific to Phase I of the Settlement Agreement.

i.    For all practical purposes, once SKAT received the Initial Cash Payment, thereby triggering the releases, SKAT's performance under Phase I was complete.

g.    There is no dispute about completion of the Initial Cash Payment, provision of the 2019 Affidavit of Confession of Judgment, or the effectiveness of the releases by SKAT or the Covered Parties. Plaintiffs' Exhibit 3 is a collection of true and correct copies of the records of the payment of the Initial Cash Payment.

27.    Phase II commenced once the Initial Cash Payment had been made and the releases by SKAT of the Covered Parties and the releases by the Covered Parties of SKAT had been triggered. Phase II required additional actions on the part of the Covered Parties and more significant actions on the part of the Covered Parties' Designees. The Letter Agreement also created obligations for me, Jerome, and Luke, and the two other parties to the Letter Agreement, during Phase II. There was very little required of SKAT in Phase II. The principal obligations of Phase II are set out below:

a.  In Phase II, the following, in general, was required by the Settlement Agreement:

    i.  **Cooperation with SKAT:**  The Covered Parties were required to fully cooperate with SKAT in its investigation of others who were not released as a result of the Settlement Agreement.  The cooperation obligations were largely triggered by a simple request by SKAT.  *See* Pl. Exh. 104 at § 7.  SKAT was not required to make such requests.  SKAT made multiple requests for cooperation.  Jerome, Luke, and I complied with them and, therefore, provided SKAT with a substantial benefit in the form of documents and information.  I describe our cooperation efforts below.

    ii.  **Making A Further Payment:**  A further payment of DKK 600 million, defined as the "Additional Cash Payment," was required.  *See id.* at §§ 1(a), 2(b).  There is no obligation imposed upon SKAT with respect to the Additional Cash Payment.

    iii.  **Determining and Paying the True-Up Amount:**  The purpose of the True-Up amount was, in general, to account for the overarching business reality of the Settlement Agreement that the precise amount to be paid was not, and could not be, determined when the Settlement Agreement was signed; it was only estimated to be DKK 1.55 billion.  As such, the True-Up Amount had not been determined at the time of the execution of the Settlement Agreement or by the time of the Initial Cash Payment, such that it was not a Phase I obligation.  Rather, the Covered Parties were required, in general, to use their best efforts to provide SKAT with information necessary to determine it and all parties to the Settlement Agreement, including SKAT, were required to cooperate to establish the amounts necessary to determine the True-Up amount.  The expectation was that the process of providing the information would be completed within six months of the effective date of the Settlement Agreement.  The True-Up process took considerably longer than that.  The end of the True-Up process envisioned under the Settlement Agreement was that Jerome, Luke, and I would certify a Final List of Net Proceeds that

would allow for a determination of the True-Up Amount, if any. *See id.* at § 2(e)(i).

iv.    The True-Up process was never completed because the parties to the Settlement Agreement never agreed upon the requisite amounts. The True-Up Amount that SKAT contends is owed is the subject of Count II of their Counterclaims.

v.    Events relating to the True-Up process are described more fully below.

vi.    **Payment of Interest, If Any:** The Settlement Agreement also required the payment of interest under certain circumstances. *See id.* at § 2(d)(ii). This did not create any obligation for SKAT.

vii.    **Payments By A Specific Date:** The Settlement Agreement required that all payments be made by 36 months after May 28, 2019. The date was modified by the Letter Agreement, as set out below. This provision created no obligation for SKAT.

viii.    **Dismissal of One Specific Case filed by SKAT:** Within a short period after the Initial Cash Payment, SKAT was required to dismiss the claims that it had alleged against Adam LaRosa ("LaRosa") in one specific case that it had, as of the time, filed against him. *See* Pl. Exh. 104 at § 3(a). Adam LaRosa was a person who played a role in some of the dividend arbitrage trading. Plaintiffs' Exhibit 4 is a true and correct copy of the complaint filed in that case.

b.    The Letter Agreement also set out various Phase II obligations, mostly imposed upon me, Jerome, and Luke, the Covered Parties' Designees. The most important of those obligations were:

i.    **Liquidation of Assets:** Jerome, Luke, and I were required to use our best efforts to liquidate certain assets described in the Letter Agreement. The purpose of the liquidation of these assets was to make the Subsequent Cash Payment. As Section 3 of the Letter Agreement indicates: "Pursuant to Section 2(d) of the Settlement Agreement [governing the "[t]iming of

payment of the Subsequent Cash Payment Amount and interest"], the Subsequent Cash Payment Amount shall be paid over time; as deadlines for payment occur and as certain 'Illiquid Assets' are liquidated."  The "Illiquid Assets" were described in the Letter Agreement.  The expected realizable value of those assets was about DKK 565 million, which, if realized, would allow for payment of nearly all of amount to be paid under the Settlement Agreement (= DKK 950 million + DKK 565 million = DKK 1.515 billion).  Pl. Exh. 109 at §§ 3, 5 & Annex A.  This created no meaningful obligations for SKAT.

ii.   **Modification of Time Period for Payments:**  The Letter Agreement, in effect, extended, under certain conditions, the period for the completion of payments under the Settlement Agreement from three years to four years.  *Id.* at § 6.  As a result, the final payments required by the Settlement Agreement were required to be made by May 28, 2023.  *See id.*; Pl. Exh. 104 at §§ 1(r), 2(d).

iii.   **Various Matters Relating to North Channel Bank:**  The most valuable of the assets to be liquidated to complete the payments required under the Settlement Agreement were interests in North Channel Bank, a bank located in Germany that was associated with Reclaim Applications.  At the time of the Settlement Agreement, we expected that the value to be realized from its sale would be DKK 322 million.  Our expectation is reflected in the Letter Agreement.  *See* Pl. Exh. 109, Annex A.  SKAT was not required to do anything related to North Channel Bank.

iv.   **Quarterly Progress Reports:**  Jerome, Luke, and I were required to provide quarterly progress reports to SKAT about the efforts to liquidate assets covered by in the Letter Agreement.  We did so until late January 2022.  After we stopped doing so, SKAT did not inquire about the status of quarterly progress reports or claim any failure to provide the quarterly progress reports until around late January 2023.

v.   Expressly reserving all privileges, around early April 2022, I retained counsel, a Columbia Law School professor, to perform

14

an analysis of whether there was a basis for me to initiate an action against SKAT, which I received at the end of June 2022.

vi. Starting at the end of June 2022, I began searching for litigation counsel to represent me and Jerome with respect to seeking relief against SKAT with respect to the Settlement Agreement and the Letter Agreement.

28. There were a few general requirements of the Settlement Agreement and the Letter Agreement that bore on both SKAT and the Covered Parties that were not specifically tied to Phase I or Phase II. There is no need to describe all of them. However, the principal ones are:

a. **Confidentiality:** Subject to certain exceptions, the parties to the Settlement Agreement agreed that it was intended to be confidential. *See* Pl. Exh. 104 at § 8. The Letter Agreement was similarly to be kept confidential. *See* Pl. Exh. 109 at § 2.

i. There were several exceptions to the confidentiality requirement.

ii. One exception permitted limited disclosures by SKAT to facilitate its public announcement of the Settlement Agreement. Pl. Exh. 104 at § 8(b).

iii. SKAT announced the Settlement Agreement in late May 2019. Plaintiffs' Exhibit 106 is a true and correct copy of the press release that it issued and a translation of it prepared on behalf of SKAT.

iv. The Settlement Agreement did not permit disclosure of the names of any of the parties to the Settlement Agreement.

v. Despite the obligations of confidentiality contained in the Settlement Agreement and the Letter Agreement, my name and Jerome's name emerged in the press as what the Danish press called the "masterminds" of what was described in the media as a fraud. There came to be other disclosures about the Settlement Agreement and there was considerable criticism of the Settlement Agreement in the Danish media.

vi.    Plaintiffs' Exhibit 5 is a true and correct copy of an example of the press via the major Danish media outlet TV2. Danish press followed me near my home in Manhattan and published the photo contained in Plaintiffs' Exhibit 5 after they chased me down the street.

vii.    I am not a Danish speaker and read the press about matters relating to Denmark, including matters related to me, by typically utilizing Google Translate, which is the manner in which Plaintiffs' Exhibit 5 was prepared.

viii.    Disclosure of my name in the press and the manner in which it was disclosed caused great complications for me and Jerome, both in our personal lives and in our business affairs. For example, it made it more difficult for us to sell some of the assets that were required to be liquidated by the Letter Agreement. These difficulties were compounded by the indictment of Jerome, Luke, and me in April 2021.

  a.    The indictment negatively impacted the ability to sell the most significant asset that was required to be liquidated under the Letter Agreement, the interests in North Channel Bank.

  b.    The indictment had the practical effect of ensuring that North Channel Bank would either not be sold or not be sold for anything close to the DKK 322 million that, as of the date of the Settlement Agreement, it was expected to realize upon sale.

  c.    Eventually, North Channel Bank was not able to be sold and has been placed into liquidation in Germany.

ix.    Disclosure of my name as one of the settling parties frustrated my intent in entering into the Settlement Agreement. It rendered the consideration that I had received from SKAT pursuant to the confidentiality provisions of the Settlement Agreement basically worthless.

x.    I describe another important exception to the general confidentiality requirement below.

b.   **Non-Disparagement:**  The parties agreed to not disparage each other. This was subject to exceptions for SKAT in its litigation efforts against others and subject to complying with subpoenas, responding to government inquiries or investigations, or in connection with legal proceedings.  *See* Pl. Exh. 104 at § 9.

c.   **Other Matters:**  Among other things, the parties agreed to various formal and informal dispute resolution mechanisms, how notices would be provided, where any disputes would be litigated, and the application of New York law to the agreement.  *See id.* at § 10, 11, 12, 20.

## Section 8(f) of the Settlement Agreement

29.   For me, the most important Phase II obligation of SKAT was stated as an exception to the confidentiality obligations set out in Section 8 of the Settlement Agreement.  *Id.* at § 8(f).  It forms the basis for the claims that Jerome and I have asserted in this action.

30.   Other than confidentiality, it is substantially the only benefit that I was to obtain from SKAT in Phase II.  And after my name was disclosed to the press in September 2019, it was virtually the only thing that provided me *any* benefit in Phase II.

31.   Section 8(f) provides:

> Notwithstanding the confidentiality obligations of this Section 8, promptly upon the execution of this Agreement, [SKAT] will, in writing, bring to the attention of [SØIK] this Agreement and its terms, and represent, in writing, that this Agreement reflects good-faith negotiation by the Covered Parties, that the Covered Parties' cooperation may result in the recovery by Skatteforvaltningen of additional funds from third parties and that this Agreement is in the best interests of Skatteforvaltningen.  Upon request by SØIK, Skatteforvaltningen may provide and/or disclose the entirety of this Agreement to SØIK.

Pl. Exh. 104 at § 8(f).

17

32.    The inclusion of this term was, to me, the most important provision of the Settlement Agreement because it was, as a practical matter, the only significant promise that SKAT made that held out any prospect of helping me avoid being charged or indicted by SØIK.  It was the most important thing that anyone else could do in that regard.  As explained above, Jerome, Luke, and I had initially insisted that the Settlement Agreement be conditioned on our not being indicted.  When that was no longer possible, we literally settled for the promises that SKAT made in Section 8(f).  Section 8(f) goes to the very heart of why I entered into the Settlement Agreement.  Section 8(f) was of such importance that, without its inclusion, I would never have entered into the Settlement Agreement or the Letter Agreement.  SKAT's failure to comply with Section 8(f) meant that I received substantially no material benefit in Phase II.

a.    I recognized then, and recognize now, of course, that SKAT's compliance with Section 8(f) would not guarantee that Jerome, Luke, or I would not be charged by SØIK.

b.    But, in my view, Section 8(f) increased the chances that I would not be charged or indicted by SØIK, even if SØIK was otherwise inclined to charge or indict.

c.    It was much like a potentially life-saving medicine.  It was not guaranteed to have the desired effect, but it represented an important chance to achieve a result that was favorable and extraordinarily important to me.

d.    SKAT's failure to comply with Section 8(f) stole from me that chance, which was practically the only thing that I was to receive in Phase II.

33.    Each element of Section 8(f) was important to me and SKAT's failure to comply with each aspect of what was required of Section 8(f) deprived me of any benefit that I contracted to receive, expected to receive, and should have received, under Section 8(f).

a.     Timing

i.     The timing of the communication required by Section 8(f) by SKAT to SØIK was that it be "promptly upon the execution of th[e Settlement] Agreement."  I expected that, as a result of this obligation, SKAT would complete its compliance with Section 8(f) shortly after the Initial Cash Payment was made.  For example, I did not expect, and could not have reasonably expected, that SKAT would make the representations required by Section 8(f) to SØIK *after* the Settlement Agreement was signed, but *prior* to the Initial Cash Payment.  After all, if SKAT was required to communicate with SØIK *immediately* upon execution of the Settlement Agreement or before the Initial Cash Payment was made in the manner required by Section 8(f), I would, in essence, be able to get the benefit of Section 8(f) without having to make the Initial Cash Payment.

ii.     The requirement that SKAT communicate with SØIK in the time frame described above was important to me when I entered into the Settlement Agreement because, in my view, the earlier that, via a communication from SKAT, SØIK learned: (a) that Jerome, Luke, and I had settled with SKAT; (b) the terms of the Settlement Agreement; and (c) the extent of our cooperation and other obligations, the more likely it would be that SKAT's communication to SØIK would influence SØIK's investigation and its deliberations about whether to charge or indict in a way that was positive for me, Jerome, and Luke.

a.     For example, had SØIK learned from SKAT that a substantial amount of funds had been returned to the Danish treasury, SØIK might have determined that the civil resolution was sufficient and not continued its investigation.

b.     As another example, had SØIK learned from SKAT that Jerome, Luke, and I were cooperating, SØIK might have determined that its investigation of extensive, multi-national conduct could have been greatly expedited by leveraging our cooperation for its benefit and not charging me, Jerome, or Luke.

19

     c.     Conversely, SKAT's not communicating promptly with SØIK meant that SØIK would have expended more time, energy, and resources in the investigation and would be hesitant to deviate from the trajectory towards charging me, Jerome, and Luke, if that is where it ended up.

     d.     What I believed at the time was that, in effect, the later that SKAT communicated with SØIK, the greater the chance that, by the time SKAT communicated with SØIK, the proverbial train would have left the station. That is, the more investigation SØIK would have done before learning what was required to be communicated under Section 8(f), the greater the chance that SØIK might have come to the conclusion that Jerome, Luke, and I should be charged.

     e.     Similarly, I believed at the time that, if SKAT communicated within the time frame described above, SØIK might have directed its investigative and prosecutorial resources elsewhere.

iii.     A communication from SØIK of the type required by Section 8(f) in August 2019, after the Initial Cash Payment, would be more impactful than a communication made, for example, *after* SØIK had determined that Jerome, Luke, and I should be charged under Danish law or a communication made *after* SØIK had determined that Jerome, Luke, and I should be indicted under Danish law.

     a.     As I understand it, to be "charged" under Danish law means, in general, to be informed that one is being investigated for having committed a specific offense.

iv.     I was not "charged" under Danish law until some time around May 2020. Plaintiffs' Exhibit 1 is a true and correct copy of an e-mail from SØIK that was received by my U.S. counsel and that indicates approximately when I was charged by SØIK.

20

b.    Written Communication

i.    Section 8(f) requires that the content of what SKAT was required to bring to SØIK's attention be in writing.

ii.    The writing requirement was important for many reasons.

iii.    For example, the writing requirement ensured that the information imparted by SKAT to SØIK would become part of the official records of SØIK and could be communicated easily and widely within SØIK.  Such a writing would also ensure that any new or different SØIK personnel would have access to the same information regarding our obligations and the representations required by Section 8(f).  SØIK is, I have come to understand, a government agency with various functions and ensuring that anyone who might be working on matters relating to the investigation of me, Jerome, and Luke was the obvious intent of the writing requirement.

iv.    It is self-evident that an e-mail or other written document setting out the required information could be transmitted to many people in a way that an oral communication could not be.

v.    And a written communication creates a record of precisely what was said to SØIK in a way that an oral communication does not.

vi.    The writing requirement also ensured that SKAT's compliance with Section 8(f) was verifiable.  If there were ever a dispute over SKAT's compliance with Section 8(f), SKAT would easily be able to prove compliance, thereby eliminating any uncertainty that Jerome, Luke, and I might otherwise have about whether SKAT fully complied with its obligations under Section 8(f).

c.    The Settlement Agreement *and* Its Terms

i.    Section 8(f) requires that SKAT bring to the attention of SØIK "this [Settlement] Agreement and its terms."

ii.    The obvious intent of this provision is that SKAT would go beyond merely informing SØIK that a settlement had been reached, but would also bring to the attention of SØIK the terms of the Settlement Agreement.  Section 8(f) plainly distinguishes between the Settlement Agreement and the terms of the Settlement Agreement.

iii.   The terms of the Settlement Agreement are many.  They demonstrate the extent of the obligations that Jerome, Luke, and I, among others, undertook, and the great benefits that SKAT obtained from our performance of those obligations under the Settlement Agreement.  We explicitly bargained for SKAT's disclosure of the terms of the Settlement Agreement to SØIK and SKAT's performance of its obligation to us was important to ensure that the full disclosure of our obligations under the Settlement Agreement maximized the chances that SOIK would not charge or indict us.

a.    For example, it would not be sufficient to inform SØIK solely that the Covered Parties were assisting, or cooperating with, SKAT.  Doing so would not adequately describe the extent of the cooperation required of the Covered Parties under Section 7 of the Settlement Agreement.  For example, disclosure to SØIK of mere cooperation would not include that: (i) the Covered Parties were required to use their best efforts to ensure that their cooperation is meaningful and productive; (ii) SKAT could require attorneys for the Covered Parties to provide cooperation information; and (iii) the Covered Parties were required to provide information about themselves in addition to information about anyone or anything on a broad range of subjects.  *See* Pl. Exh. 104 at § 7(b), 7(g); *id.* at § 1(g) (defining "Cooperation Information").

b.    As another example, it would not be sufficient to inform SØIK of the identities of the Covered Parties because doing so would not identify who the *Covered Parties' Designees* are.  It is the Covered Parties' Designees --

22

Jerome, Luke, and I -- who undertook special obligations under the Settlement Agreement.

    i.    Specifically, we, the Covered Parties' Designees, undertook the obligation to make the Subsequent Cash Payment, the obligation to pay interest, and the obligation to certify certain information relating to the True-Up amount. *See* Pl. Exh. 104 at §§ 2(c), 2(d)(iii), 2(e)(iii), 4(c). And we, the Covered Parties' Designees, undertook special obligations under the Letter Agreement, such as the liquidation of assets. *See* Pl. Exh. 109 at § 5.

    ii.    In addition, it is the obligation of me, Jerome, and Luke to provide an affidavit of confession of judgment and an updated affidavit of confession of judgment. That is, SKAT's sole remedy for any failure to make payments was against us and us alone.

c.    As another example, it was important that SØIK know of the timing of the payments to be made under the Settlement Agreement and, more specifically, the manner in which we, the Covered Parties' Designees, were required to liquidate assets in order to make those payments. It was important for SØIK to know, for example, that a decision to indict might bear significantly on the ability of the Covered Parties' Designees to complete the payments required by the Settlement Agreement. Naturally, it was important for SØIK to know that an indictment might jeopardize the ability of me, Jerome, and Luke to pay at least an additional DKK 600 million. This is why Section 8(f) requires SKAT to bring to SØIK's attention the *terms* of the resolution, not just the *fact* of the resolution.

d.    Written Representations Required by Section 8(f)

    i.    SKAT was required to make certain representations to SØIK in writing, specifically that: (i) the Settlement Agreement "reflects

23

good-faith negotiation by the Covered Parties"; (ii) "the Covered Parties' cooperation may result in the recovery by [SKAT] of additional funds from third parties"; and (iii) the Settlement Agreement "is in the best interests of [SKAT]."

ii.    Each of these was crucial in order for Section 8(f) to serve its sole purpose, *i.e.*, to provide information to SØIK that would have the natural effect of putting us in a more positive light with SØIK and reducing the chances that we would be charged or indicted.

iii.    It reflected positively on me, Jerome, and Luke that we, and others, engaged in good faith negotiations.  To me, this meant, and I believe that this is a natural interpretation of the term "good faith," that we had conducted ourselves honestly, sincerely, and in a forthright manner during the negotiations leading to the Settlement Agreement, something that was important that SKAT convey to SØIK.

iv.    It reflected positively on me, Jerome, and Luke that the cooperation of us and others might result in SKAT's recovery of additional funds from third parties.  Such a representation coming from SKAT demonstrated that SKAT could have the reasonable expectation that the information that Jerome, Luke, and I, among others, were required to provide would positively impact SKAT's efforts to recover funds from others.

a.    As noted above and as of about April 2022, the Covered Parties have collectively paid SKAT more than DKK 1 billion.

b.    This is a staggering amount in context.  I have reviewed the deposition of a SKAT official taken in this case in June 2024.  Based on my review of that testimony, I am aware that, since the inception of its efforts to recoup funds that it contends were improperly paid out, SKAT has recovered DKK 1.8 billion and had expended an estimated DKK 2.5 billion as of the end of 2023 to recoup DKK 1.8 billion.  More than 55% of the amount recouped was the result of payments made under the

Settlement Agreement. I am also aware, based on my review of that testimony, that, as of June 2024, SKAT has allocated an additional DKK 1.9 billion to expend on its efforts to recoup additional funds.

c. As noted above, by the time of the Settlement Agreement, SKAT had initiated many lawsuits against others. The cooperation obligation set out in the Settlement Agreement was not limited to assisting SKAT in the existing cases; it was unlimited and encompassed any cases against third parties.

d. It was important for SØIK to know that, if it chose to indict me, Jerome, and Luke, the cooperation that Jerome, Luke, and I would be obligated to provide to SKAT might not be available and, as a result, might jeopardize SKAT's efforts to recover in other proceedings.

e. And it was important for SØIK to know that an indictment of me, Jerome, and Luke might jeopardize our ability to pay the DKK 600 million required in Phase II. If SKAT did not explain the payment mechanisms built into the Settlement Agreement and the Letter Agreement, then SØIK would never know how an indictment of me, Jerome, and Luke would impact the Danish treasury.

v. It reflected positively on me, Jerome, and Luke that SKAT would represent to SØIK that the Settlement Agreement "is in the best interests of [SKAT]."

a. With respect to this matter, SKAT regards itself as the victim of a fraud.

b. As such, it was obviously of benefit to me, Jerome, and Luke that the entity claiming to be the victim of a fraud (SKAT) would state to the authority responsible for making determinations about whom to prosecute (SØIK) that the Settlement Agreement is in the claimed victim's best interests.

c. Such a representation would also naturally be comparative, that is, the benefit obtained by SKAT through the Settlement Agreement would have to be compared to any other alternative to a negotiated resolution available to SKAT, such as years of litigation, with the attendant expense.

vi. Finally, it would be more effective, and it was what I bargained for, that these representations would come from SKAT -- not from me or my lawyers. In short, such representations would be more readily credited by SØIK coming from SKAT itself, rather than if I, or my lawyers, made these representations.

e. Disclosure of Settlement Agreement Upon Request

i. The final sentence of Section 8(f) provides that "Upon request by SØIK, [SKAT] may provide and/or disclose the entirety of the[ Settlement] Agreement to SØIK."

ii. This was important to me because it ensured that, in order to obtain the full Settlement Agreement, SØIK merely had to ask SKAT, which would then be permitted to provide the full Settlement Agreement to SØIK.

iii. Assuming SKAT comported itself in good faith under the Settlement Agreement, as required, I am not aware of any reason why SKAT would not have agreed to provide the Settlement Agreement if SØIK asked.

## Cooperation

34. As noted above, Jerome, Luke, and I, together with the other Covered Parties, undertook substantial cooperation obligations under the Settlement Agreement. Our cooperation began in 2019 and continued thereafter.

35. Pursuant to those obligations, at significant personal expense, and through at least 2021, Jerome, Luke, and I, and our lawyers acting at our direction, responded to multiple requests made by SKAT. We:

a. reviewed and produced over 90,000 documents in SKAT's pending suits against non-settling parties in the United States;

b. reviewed and approved SKAT's requests to use documents of the Covered Parties' Designees in SKAT's litigation against other parties in Dubai and the United Kingdom;

c. performed research and made proffers to U.S. counsel for SKAT to answer factual questions that SKAT raised in connection with its prosecution of claims against other parties; and

d. addressed other substantive and procedural questions and requests from U.S. counsel for SKAT to facilitate SKAT's prosecution of its civil actions across multiple jurisdictions, including, the United States, the United Kingdom, Malaysia, and Dubai.

36.   I am not aware that SKAT ever sought any remotely comparable cooperation from any of the other Covered Parties.

## Payments Made During Phase II

37.   During Phase II, Jerome and I proceeded to liquidate some assets required to be liquidated under the Letter Agreement.  As a result, between early June 2020 and mid-April 2022, Jerome and I paid to SKAT a total of approximately DKK 37,849,584.

38.   In about March 2021, Luke paid SKAT $3.195 million, then the Danish kroner equivalent of DKK 19,916,383.95.

39.   Records of those payments are included in Plaintiffs' Exhibit 6, which are true and correct copies of the payment records.

a. These are the funds that should be returned to Jerome, Luke, and me in order to restore us to the position that we were in as of the date when SKAT breached Section 8(f) of the Settlement Agreement.

40.   All told, the Covered Parties have collectively returned to Denmark more than DKK 1 billion.

**Efforts to Obtain Information from SKAT**
**Regarding Communications with SØIK**

41. I am aware that, starting in late 2020 and through 2021, my U.S. counsel at the time, Kaplan, Hecker & Fink LLP, sought from SKAT, via its U.S. counsel, information regarding its communications with SØIK and the cooperation provided by me, Jerome, and Luke with SKAT.

42. Plaintiffs' Exhibits 7, 8, 127, and 128 are true and correct copies of, respectively:

    a. A string of e-mails between November 30, 2020, and February 6, 2021;

    b. An e-mail, dated March 4, 2021;

    c. A string of e-mails between April 7, 2021, and April 23, 2021; and

    d. An e-mail, dated June 18, 2021.

**SOIK's Investigation**

43. As noted above, I was charged, that is, informed that I was under investigation and informed of my rights under Danish law, in around May 2020.

44. SØIK requested that I submit to an interview.

45. I agreed to be interviewed in connection with SØIK's investigation. I was not compelled to speak to SØIK. My decision to agree to an interview was influenced by my expectation that SKAT had complied with Section 8(f).

46. I spent three days in March 2021 answering all of SØIK's questions on every aspect of my conduct and the conduct of others about which SØIK inquired.

47. Towards the end of the third day of questioning, my Danish counsel was permitted to ask me some questions. She asked me some questions about the Settlement Agreement.

a.  During the subsequent discussion, it became clear to me that SØIK did not have a copy of the Settlement Agreement.  Specifically, when I mentioned some aspect of the Settlement Agreement, I observed a quizzical look from the principal prosecutor in attendance and asked him, in substance and in part, whether SØIK had a copy of the Settlement Agreement.

b.  He responded, in substance, that SØIK did not have a copy of the Settlement Agreement.

c.  SØIK was again asked, in substance and in part, by my Danish counsel whether it wished to have a copy and responded, in substance and in part, that, yes, SØIK would like to have the Settlement Agreement.

d.  A few short weeks after the interview, SØIK indicted me, Jerome, Luke, and others.

e.  Shortly after that, my U.S. counsel inquired of SKAT about its compliance with Section 8(f) and its communications with SØIK, as set out in Plaintiffs' Exhibit 127.

f.  In the week or so after that, my U.S. counsel provided to SØIK a copy of the Settlement Agreement and further information about our cooperation under it, as set out in Plaintiffs' Exhibit 13.

g.  The information that my U.S. counsel received back from SKAT about the manner that it claims to have complied with Section 8(f) is set out in Plaintiffs' Exhibit 128.

h.  After the April 2021 indictment, Jerome, Luke, and I continued to make payments to satisfy the obligations of the Settlement Agreement.  The last payment was made in April 2022, as set out in Plaintiffs' Exhibit 6.

i.  We also continued to provide quarterly progress reports through the end of January 2022.

j.  Around April 2022, I retained counsel, a Columbia Law School professor, to evaluate whether there was a basis for me to initiate an action against SKAT.

**Seizure**

48.  I obtained in discovery during my Danish criminal case documents relating to efforts by SØIK to seize assets associated with me, Matt, and Luke. SØIK's efforts started in early 2020.  SØIK was seeking to seize an interest in my home and various bank accounts.

49.  I describe those documents further in paragraph 55.

50.  Under Danish criminal law procedure, I was not permitted to learn about these attempted seizures or even about my Danish attorney's efforts to appeal the seizure orders until after the appeal was resolved and the seizure orders had been overturned by the appellate court.

**Events Occurring After the Filing of This Litigation**

51.  My present U.S. counsel filed this action in late March 2023, approximately two months before the date required for payment of the Final Settlement Amount required by the Settlement Agreement.  *See* Pl. Exh. 104 at § 1(g).

52.  Plaintiffs' Exhibit 137 is a true and correct copy of a document, dated April 12, 2023, that SKAT produced in discovery in this action together with the translation included as part of the same document, which SKAT also provided.

    a.  In this letter, SKAT makes various statements about what it claims that it did.

    b.  If this is an intent by SKAT to cure its prior failure to comply with Section 8(f), it is nearly four years too late.  The Initial Cash Payment was made by early August 2019.  That is when SKAT should have communicated with SØIK pursuant to Section 8(f).

    c.  Beyond that, SKAT's letter does not even comply with Section 8(f).  For example, it does not bring to SKAT's attention the terms of the Settlement Agreement or identify who the Covered Parties are.

    d.  Indeed, there is no cure that SKAT could have provided in 2023 for its failure to comply with Section 8(f).  It is simply impossible to go back in time in order to have the information and representations required

to be provided by SKAT pursuant to Section 8(f) be considered as part of SØIK's investigation as of around August 2019. And there is no way to go back in time to influence SØIK's decision-making as of around August 2019, when SKAT should have complied with Section 8(f). The train long ago left the station.

e.     For the same reasons, once Jerome, Luke, and I were indicted in April 2021, it would have been useless and futile to provide SKAT with notice of its failure to comply with Section 8(f) and an opportunity to cure, as provided for in Section 11 of the Settlement Agreement. There was, at that point and as a practical matter, nothing that SKAT could do to remedy its failure to comply with Section 8(f).

53.    My present U.S. counsel received from U.S. counsel for SKAT the correspondence, dated April 21, 2023, a true and correct copy of which is Plaintiffs' Exhibit 9.

54.    My present U.S. counsel received from U.S. counsel for SKAT the e-mail, dated April 26, 2023, a true and correct copy of which is Plaintiffs' Exhibit 11.

## Documents Received In Discovery In Denmark

55.    In connection with the criminal case in Denmark, my attorneys and I were provided with various documents by SØIK. The following Plaintiffs' Exhibits are true and correct copies of the indicated documents that were obtained in connection with the criminal case in Denmark:

a.     Plaintiffs' Exhibit 12: A series of e-mails between the United States Department of Justice and SØIK.

b.     Plaintiffs' Exhibit 13: A letter and attachment B to the letter from my U.S. counsel at Kaplan, Hecker & Fink, Marshall L. Miller, to SØIK.

c.     Plaintiffs' Exhibit 14: Various documents related to asset seizures.

d.     Plaintiffs' Exhibit 15: E-mails between SKAT and SØIK.

e.     Plaintiffs' Exhibit 16: An e-mail relating to my criminal case in Denmark.

     f.     I have included with each document a machine translation of any document that was originally in Danish.

56.    These documents set out the activities of SØIK in connection with its investigation and prosecution of me, Jerome, Luke, and others.  These documents typically have a number in red in the upper-right hand corner that corresponds to record-maintenance system of SØIK.  In some instances, the number is crossed-out and is replaced by a different number in red.  In some instances, there is a watermark on the document reflecting, among other things, my e-mail address.  I am permitted to use these documents for any purpose.

## SKAT's Claim for the True-Up Amount

57.    As set forth in the Settlement Agreement, "it [was] the Parties' understanding and a fundamental principle on which [the Settlement] Agreement [was] based that the Covered Parties are paying to Skatteforvaltningen the full amount of the Net Proceeds . . . that the Covered Parties received directly or indirectly from Reclaim Applications . . . made to Skatteforvaltningen."  Pl. Exh. 104 at p.1, Recital F.

58.    Reflecting that stated intent, the Parties agreed that SKAT would ultimately be paid DKK 1.55 billion.  That amount was an estimate made at the time of the execution of the Settlement Agreement of the funds received by the Covered Parties as a result of the Reclaim Applications.  The Settlement Agreement also provided for a potential upward adjustment if it was determined that the funds received by the Covered Parties as a result of Reclaim Applications after expenses was greater than DKK 1.55 billion.

     a.     The amount of DKK 1.55 billion was defined in the Settlement Agreement as the "Preliminary Settlement Amount."  *See id.* at §§ 1(y), 2(a-b).

     b.     The funds received by the Covered Parties as a result of Reclaim Applications after expenses was defined in the Settlement Agreement as "Net Proceeds."  *Id.* at §§ 1(u), 2(e).

59.    If Net Proceeds turned out to be *less* than DKK 1.55 billion, there would not be a downward adjustment of the amount to be paid to SKAT.  SKAT would *still* be entitled to receive DKK 1.55 billion.  *Id.* at § 2(e)(i-iii).

60. The Settlement Agreement sets out a definition of Net Proceeds and a process to determine whether the Net Proceeds were greater than the Preliminary Settlement Amount and, as a result, whether a payment of any difference would be necessary. *Id.* at § 2(e).

61. I address each of these in turn. After discussing these, I address the disputes that the Court must resolve related to the interpretation and calculation of Net Proceeds.

## Net Proceeds Formula

62. Section 2(e) of the Settlement Agreement defines Net Proceeds as a formula that specifies how to calculate it:

> For the purposes of this Agreement, "**Net Proceeds**" shall be
>
> (A) **Gross Reclaims**
>
> **less**
>
> (B) **all of the Covered Parties' expenses associated with Reclaim Applications** for which Skatteforvaltningen made payments, specifically as follows:
>
> (1) reclaim agent fees,
>
> (2) tax reclaim advisory service fees,
>
> (3) brokerage fees and commissions,
>
> (4) custodial and clearing fees,
>
> (5) trading expenses, and
>
> (6) financial institution account charges and
>
> **less**

(C) **any other portion of Gross Reclaims received by parties excluded from the releases as set forth in Section 4 herein**, including without limitation, those parties listed on Exhibit 3 ('Non-exhaustive list of parties excluded from release'), that were not otherwise subsequently provided to any Covered Party.

*See* Pl. Exh. 104 at § 2(e) (emphasis added).  In setting out the exact text of the Settlement Agreement, I have broken it up so that it easier to see the manner in which the definition constitutes a formula.

63.  Written out as a more simplified mathematical formula, this is:

Net Proceeds = [A] Gross Reclaims – [B] Covered Parties' Expenses – [C] Gross Reclaims Received by Non-Covered Parties

64.  This formula requires the calculation of three elements or items:

a.  **[A] Gross Reclaims**, which is the total amount paid by SKAT to the Covered Parties for Reclaim Applications.

   i.  Gross Reclaims is defined as "all reclaim amounts from [SKAT] received by or on behalf of the Pension Plans in respect of applications to reclaim taxes withheld or allegedly withheld from dividends paid on Danish company shares the Pension Plans owned or allegedly owned between 2012 and 2015."  *Id.* at § 1(s).

   ii.  The Pension Plans were listed in Exhibits 1A and 2 to the Settlement Agreement.  *Id.* at § 1(x).

b.  **[B] Covered Parties' Expenses**, which is defined as "all of the Covered Parties expenses associated with Reclaim Applications for which [SKAT] made payments, specifically as follows: (1) reclaim agent fees, (2) tax reclaim advisory service fees, (3) brokerage fees and commissions, (4) custodial and clearing fees, (5) trading expenses, and (6) financial institution account charges."  *Id.* at § 2(e)(B).

   i.  These six categories are not separately defined in the Settlement

Agreement and there is no methodology provided in the Settlement Agreement to determine them.

ii. The only requirement is that they be expenses of the Covered Parties and that they be "associated with Reclaim Applications for which [SKAT] made payments."  *Id.* at § 2(e)(B).

c. **[C] Gross Reclaims Received by Non-Covered Parties**, which is the "portion of Gross Reclaims received by parties excluded from the releases as set forth in Section 4 [of the Settlement Agreement], including without limitation, those parties listed in Exhibit 3 . . . , that were not otherwise subsequently provided to any Covered Party."  Pl. Exh. 104 at § 2(e)(C).

i. Understanding item [C] requires some greater understanding of the business arrangement reflected in the Settlement Agreement.

ii. Section 4 excluded from the broad release that SKAT was granting under the Settlement Agreement various people, pension plans, and other entities.

iii. Those people and entities were listed in Exhibit 3 to the Settlement Agreement and included, among others, Richard Markowitz, John van Merkensteijn, their wives, and 39 pension plans associated with them.  Although they were initially involved in settlement discussions, at some point, they ceased participating and continued to litigate against SKAT.

iv. The business reality reflected in the deduction of Item [C], Gross Reclaims Received by Non-Covered Parties, was that there were some plans for which Jerome and I, and also Markowitz and van Merkensteijn, received portions of the Gross Reclaims, but Markowitz and van Merkensteijn did not participate in the Settlement Agreement.

v. Accordingly, in calculating Net Proceeds, the portion of Gross Reclaims received by Markowitz and van Merkensteijn was to be deducted under the Settlement Agreement.

65.     If Items [A], [B], and [C] of Net Proceeds are not calculated, then whether there is to be any additional payment of any difference between Net Proceeds and the Preliminary Settlement Amount of DKK 1.55 billion is impossible to determine.

**Summary of the Net Proceeds Process and the**
**True-Up, if Any, Under the Settlement Agreement**

66.     The Settlement Agreement outlines a multi-step process to determine Net Proceeds:

   a.     The Covered Parties would "use their best efforts to provide [SKAT] with documentation sufficient to establish the total amount of Net Proceeds received by the Covered Parties directly or indirectly from the Reclaim Applications, with the expectation that such exchange and review shall be completed no later than six (6) months after the Effective Date" of May 28, 2019;

   b.     The Parties would "cooperate to establish the Gross Reclaims and the Net Proceeds received by each Pension Plan"; and

   c.     "At the end of this process, the Covered Parties' Designees" -- Jerome, Luke, and I -- were required to "provide and certify the accuracy of a final list of Net Proceeds received by each Covered Party with respect to each Pension Plan" in the form of a "Final Net Proceeds List."

          *See* Pl. Exh. 104 at §§ 1(n) (defining Effective Date), 1(p), 2(e)(i).

67.     If the Final Net Proceeds List established that Net Proceeds was greater than the estimated DKK 1.55 billion, the Preliminary Settlement Amount, the Covered Parties agreed to pay SKAT the difference.  This amount, if any, is the "True-Up Amount."  *See id.* at § 2(e)(iii).

## SKAT Does Not Calculate Net Proceeds

68.  This process was never completed.  The Parties never established the Net Proceeds received by each Pension Plan because there was never an agreed-upon or certified Final Net Proceeds List.

69.  Under these circumstances, to establish that there is a True-Up Amount, if any, Net Proceeds must be established to be greater than the Preliminary Settlement Amount of DKK 1.55 billion.  *See id.* at § 2(e)(iii).

70.  I have reviewed the September 6, 2024 Report of Marc R. Landy (the "Landy Report").  The Landy Report does not calculate Items [A], [B], and [C].  Nor does the Landy Report:

   a.  specify an amount of Gross Reclaims, item [A] in the formula for Net Proceeds;

   b.  calculate or provide an amount representing the Covered Parties' Expenses, item [B] in the formula for Net Proceeds;

   c.  calculate an amount representing Gross Reclaims Received by Non-Covered Parties, item [C] in the formula for Net Proceeds.

## The Course of the True-Up Process

71.  As part of the negotiation process and as part of Jerome, Luke, and my cooperation obligations under the Settlement Agreement:

   a.  Maple Point conducted an extensive search and review of documents and produced nearly 100,000 documents (the "MPSKAT Documents") between about August 2019 and about July 2021.  A true and correct copy of the final letter by which counsel transmitted the MPSKAT Documents to SKAT is attached as Plaintiffs' Exhibit 200.

   b.  Counsel for the Covered Parties' Designees provided to SKAT more than 100 spreadsheets (the "True-Up Spreadsheets") containing information about each of the Pension Plans covered by the releases in the Settlement Agreement.  They did so between about September 2019 and June 2020.  A true and correct copy of the final letter by

which counsel transmitted True-Up Spreadsheets to SKAT is attached as Plaintiffs' Exhibit 201.

    i.      The Parties never certified the True-Up Spreadsheets as the Final Net Proceeds List for each Covered Party.

    ii.     In addition, the True-Up Spreadsheets were provided under certain agreed-upon conditions, including:

          a.    The True-Up Spreadsheets were exchanged solely for the purpose of providing information that would contribute to an accurate determination of Net Proceeds;

          b.    The True-Up Spreadsheets were to be treated as strictly confidential and not to be used for any purpose other than to determine the True-Up Amount or in any proceeding, without the Covered Parties Designees' express written consent.

        *See* Pl. Exh. 201.

72.    After receiving the True-Up Spreadsheets, SKAT hired an accounting firm to audit the True-Up Spreadsheets.

73.    As contemplated by the Settlement Agreement, there were extensive and protracted discussions of many issues raised by the True-Up Spreadsheets.

    a.    Those discussions, which occurred between counsel, involved many different disputed adjustments associated with calculation of Net Proceeds.

    b.    I have reviewed correspondence between counsel about the disputed adjustments and understand SKAT raises some, but not all, of the disputed adjustments in its Counterclaims.

74.    SKAT's audit of the True-Up Spreadsheets is what informs SKAT's Counterclaims and the Landy Report on which SKAT relies to establish the True-Up Amount.

a.    The Landy Report states "AlixPartners reviewed the True-Up Spreadsheets (as well as supporting and related documentation, the vast majority of which . . . was produced by the Covered Parties) to determine whether Net Proceeds was calculated correctly." *See* Landy Report at ¶ 12.

b.    The Landy Report discusses only a subset of the disputes about the Net Proceeds calculation that were under discussion during the True-Up process. SKAT has abandoned the remainder.

c.    The Landy Report asserts that "[i]t is my understanding, however, that current counsel for Stein, Lhote and McGee have recently repudiated certain portions of the True-Up Spreadsheets." Landy Report at ¶ 16. The Landy Report uses this same formulation elsewhere. *Id.* at ¶¶ 53, 72 & nn. 42, 45, 72, 90. The Landy Report provides no source for this "understanding."

d.    This is not an accurate characterization of what has occurred. The True-Up Spreadsheets were provided at the beginning of the process and were to be followed by discussions among the Parties in order to arrive at final numbers, something that was contemplated by the Settlement Agreement. Those discussions occurred over a long period of time, but no final agreed-upon numbers were arrived at and no numbers were certified by me, Jerome, or Luke.

## **SKAT's Counterclaims Related to Net Proceeds**

75.    Even if the Landy Report had provided a calculation of Items [A], [B], and [C] of Net Proceeds, its calculations are disputed.

a.    SKAT alleges that Jerome, Luke, and I agree that the True-Up Amount should be at least DKK 26,008,293, referring to the True-Up Spreadsheets. *See* Countercl. at ¶¶ 127, 156. Those spreadsheets were never finalized and never certified.

76.    There are four main areas of the Landy Report or Count II of SKAT's Counterclaims that are incorrect under the Settlement Agreement and for which SKAT cannot satisfy its burden:

a.   **True-Up Dispute 1 - Fees Paid After SKAT Stopped Making Payments on Reclaim Applications.**  SKAT alleges that "the Covered Parties wrongly deducted DKK 19,625,360 in monthly custodial fees paid to North Channel Bank, Indigo or Lindisfarne incurred after SKAT paid the respective plan's last refund application. Pursuant to Section 2(e) of the settlement agreement, the Covered Parties' Designees can only deduct 'expenses associated with Reclaim Applications for which [SKAT] made payments.'"  Countercl. at ¶ 161.

   i.   The Landy Report calculates this amount at DKK 19,624,912.18.  *See* Landy Report at ¶ 23.

   ii.   In doing so, its notes that "[i]t is SKAT's position that Post-Reclaim Custodian Fees may not be deducted under Section 2(e)(B) of the Settlement Agreement."  Landy Report at ¶ 20.

   iii.   The dispute here is whether fees paid after SKAT paid the last Reclaim Application are "expenses *associated with* Reclaim Applications for which [SKAT] made payments."

   iv.   As set forth more fully below and under any rational interpretation of the term "associated with," they are.

b.   **True-Up Dispute 2 - Allocation of Account-Level Fees for Accounts Where There Was Danish and Belgian Trading.**  SKAT alleges that fees associated with accounts where there was trading in Danish and Belgian securities should be split up, or allocated, between the two countries and that only a portion of the fees should be deducted as Covered Parties' Expenses under item [B] of Net Proceeds.  *See* Countercl. at ¶¶ 163-64.

   i.   This dispute concerns how to treat fees paid on accounts where there was Danish and Belgian trading, for example, a quarterly fee paid to North Channel Bank to maintain an account that was associated with both Danish and Belgian trading.  I refer to these expenses as "account-level" fees because they were paid for the account and *not* for specific assets, trading, or activity in the account.

      ii.     The Landy Report sets out various methodologies to allocate account-level fees between Denmark and Belgium.  *See* Landy Report at ¶¶ 33-73.

      iii.    The Settlement Agreement provides that "all of the Covered Parties' expenses associated with Reclaim Applications for which Skatteforvaltningen made payments, specifically as follows: . . . (4) custodial and clearing fees, . . . and (6) financial institution account charges" may be deducted.  The Settlement Agreement does not provide any allocation principle for account-level fees.

c.    **True-Up Dispute 3 - Allocation of Net Proceeds by Ownership Percentage.**  SKAT makes a fundamental error in its applications of the Net Proceeds formula.  SKAT asserts that Item [C] of Net Proceeds is equal to the portion of Gross Reclaims after the Covered Parties' Expenses are deducted that is attributed to Non-Covered Parties.

      i.      This dispute concerns how to determine Item [C] of Net Proceeds, which is the "portion of *Gross Reclaims* received by parties excluded from the releases . . . ."  Pl. Exh. 104 at § 2(e)(C) (emphasis added).

      ii.     The Landy Report does not address this dispute.

d.    **True-Up Dispute 4 - Overlapping Adjustments.**  There is a factual dispute between the Parties about whether, to the extent the Court finds that there are or are not adjustments to the calculation of Net Proceeds, any of the adjustments are overlapping, such that there needs to be further adjustments to the Net Proceeds calculation.

      i.      As set forth more fully below, for example, True-Up Dispute 1 and True-Up Dispute 2 concern, at least in part, some of the same account-level fees.

**Gross Reclaims**

77.    Net Proceeds cannot be calculated without first calculating Gross Reclaims.

    a.    I have not identified anywhere in the Landy Report where a calculation of Item [A] Gross Reclaims is provided.

    b.    SKAT has in its possession extensive documents and information that would allow them to do so, including the MPSKAT Documents.

**True-Up Dispute 1 - Fees Paid After SKAT
Stopped Making Payments on Reclaim Applications**

78.    I am unable to locate any provision in the Settlement Agreement that provides that fees paid after SKAT paid the last Reclaim Application are not "expenses associated with Reclaim Applications for which [SKAT] made payments" (the "Post-Reclaim Fees").

    a.    Section 2(e)(B)(4) provides that the Covered Parties may deduct all of these "custodial and clearing fees" as part of Item [B], the Covered Parties' Expenses.  *See* Pl. Exh. 104 at § 2(e)(b)(4).

79.    Custody accounts with North Channel Bank, Indigo and/or Lindisfarne were maintained by each of the Covered Parties for the Pension Plans.  I am familiar with how these accounts operated.

    a.    These accounts were opened in order to receive payments to the Pension Plans from SKAT for the Reclaim Applications.

    b.    North Channel Bank, Indigo, and Lindisfarne charged custodial fees for maintaining these accounts.  The amount and frequency varied depending on the policies of the custodian.

    c.    The custodial fees were charged regardless of whether the account was active.  In some cases, this meant that custodial fees were incurred on custody accounts that were opened, but had not yet received any proceeds from SKAT for Reclaim Applications.

    d.    In fact, some of these accounts remained open well after SKAT paid the final Reclaim Applications to hold the remaining proceeds derived

from those applications, and, as a result, continued to pay custodial fees. *See* Landy Report at ¶ 19.

80.    For example, ███████████████ a Covered Party, held a custody account with North Channel Bank that was opened on October 27, 2014 (the "███ Custody Account"). *See* Pl. Exh. 104 at Exh. 1. The ███ Custody Account was opened to receive payments from SKAT for the Reclaim Applications. A true and correct copy of the letter received by ███ memorializing that it was opened is attached as Plaintiffs' Exhibit 202.

    a.    The account had a zero cash account balance in January and February, and a negative cash account balance in March and April.

    b.    The cash account balance was negative in March and April because the account was incurring significant North Channel Bank fees. I have prepared a chart that reflects the Cash Account Balance from January to April of 2015, which is derived from a true and correct copy of a spreadsheet attached as Plaintiffs' Exhibit 203.

| Month | Cash Account Balance of ███ Custody Account (€) |
|---|---|
| January 2015 | 0 |
| February 2015 | 0 |
| March 2015 | (53,530) |
| April 2015 | (76,834.82) |

81.    It was North Channel Bank's policy to charge a quarterly €1,500 custodial fee on open accounts.

    a.    On April of 2015, the ███ Custody Account was charged €1,500. *See* Pl. Exh. 203. At this point, ███ had not received any payments from SKAT for Reclaim Applications.

82.    ▉▉▉ received two payments from SKAT for Reclaim Applications:

    a.    €4,763,248.19 on May 13, 2015; and

    b.    €129,993.27 on June 8, 2015.

*See id.*; Pl. Exh. 204.

83.    The cash account balance in the ▉▉▉ Custody Account was derived entirely from these two payments from SKAT for the Reclaim Applications. *See* Pl. Exh. 203.  I have prepared a chart below that reflects the net cash account balance after receiving the Reclaim Applications.

| Month | Cash Account Balance of ▉▉▉ Custody Account (€) |
|---|---|
| May 2015 | 4,631,619.65 |
| June 2015 | 4,220,677.73 |

*See* Pl. Exh. 203; Pl. Exh. 204.

84.    Between January 2015 and June 8, 2015, the only custodial fee paid by ▉▉▉ was in April of 2015.  *See* Pl. Exh. 203.  This custodial fee was incurred *before* ▉▉▉ received any payments from SKAT for Reclaim Applications.

85.    After June 8, 2015, the date ▉▉▉ received the last payment for Reclaim Applications from SKAT, ▉▉▉ incurred eight custodial fees, totaling €12,000.  *See* Pl. Exh. 2.03-207.

    a.    These custodial fees were paid with the remaining proceeds from the Reclaim Applications that were being held in the ▉▉▉ Custody Account.  ▉▉▉ did not receive any deposits into the ▉▉▉ Custody Account and did not make any withdrawals from the ▉▉▉ Custody Account.  *See* Pl. Exh. 203, 205, 206, and 207.

    b.    I have compiled in the chart below the date these eight custodial fees were incurred, the amount of the custodial fee, and the remaining cash account balance at the end of the quarter.

      i.     There were significant fees incurred between July 22, 2015 and October 22, 2015 because trading was still going on, up to and until about September 2015 when SKAT announced it would no longer be paying Reclaim Applications.  As a result, ███ paid, in addition the €1,500 custodial fee, fees to third parties. *See* Pl. Exh. 203.

| Date of Custodial Fee | Amount of Custodial Fee (€) | Remaining Balance at End of Month (€) |
|---|---|---|
| 7/22/2015 | (1,500) | 2,698,229.17 |
| 10/22/2015 | (1,500) | 2,274,970.43 |
| 1/28/2016 | (1,500) | 2,273,370.43 |
| 4/22/2016 | (1,500) | 2,271,770.43 |
| 7/22/2016 | (1,500) | 2,270,170.43 |
| 10/24/2016 | (1,500) | 2,268,570.43 |
| 1/30/2017 | (1,500) | 2,266,935.43 |
| 4/24/2017 | (1,500) | 2,265,335.43 |
| **Total** | **(12,000)** | |

86.    As reflected in the chart above, after October 2015, the only activity on the ███ Custody Account were charges for the €1,500 custodial fee, along with monthly North Channel Bank cash account charges of between €35 and €65.

    a.    North Channel Bank memorialized the lack of activity through letters to ███.

      i.     On April 25, 2016, North Channel Bank wrote: "we noticed that you had no trading activities on your custody account for the last six month [sic]," *i.e.*, since in or about November 2015. A true and correct copy of the letter is attached as Plaintiffs' Exhibit 208.

      ii.    Eight months later, on December 15, 2016, North Channel Bank wrote that it had been "over a year," since in or about October 2015, "that neither [███s] custody account nor [███'s] cash account has had any transactions . . . (except [North Channel Bank's] fees)."  A true and correct copy of the letter is attached as Plaintiffs' Exhibit 209.

     iii.    North Channel Bank informed ▆▆▆ that they were continuing to charge "a minimum fee of €1,500. – per quarter," which was going to be charged again for the fourth quarter of 2016. *Id.*

87.    The reason the ▆▆▆ Custody Account, along with other custody accounts, were kept open through 2017 was for SKAT's potential benefit.  Jerome, Luke, and I, along with the other Covered Parties, were aware that, in or around August 2015, SKAT stopped making payments on Reclaim Applications.

    a.    The accounts holding the proceeds from the Reclaim Applications were kept open so that we could potentially return the funds to SKAT if we ever had to.

    b.    In February 2017, a Danish court ordered that the remaining proceeds from the Reclaim Applications that were being held in the ▆▆▆ Custody Account, along with several other custody accounts, were to be seized.  A true and correct copy of the original Danish court order and an English translation is attached as Plaintiffs' Exhibit 210.

    c.    On May 3, 2017, a German court permitted Denmark to seize the remaining proceeds in the ▆▆▆ Custody Account.  A true and correct copy of the original German court order is attached as Plaintiffs' Exhibit 211.

    d.    As a result, the accounts could not be closed.

88.    The issue for the Court to decide is whether custodial fees paid after SKAT made the last payment to a Pension Plan for a Reclaim Application are "associated with" the Reclaim Applications for which SKAT made payments.  *See* Pl. Exh. 104 at § 2(e)(B).

**True-Up Dispute 2 - Allocation of Account-Level Fees
for Accounts Where There Was Danish and Belgian Trading**

89.    I am unable to locate any provision in the Settlement Agreement that provides that fees associated with accounts where there was trading in Danish and Belgian securities should be allocated between Denmark and Belgium such that only a portion of the fees should be deducted as Covered Parties' Expenses.

    a.    Section 2(e)(B)(4) provides that the Covered Parties may deduct *all* of the Covered Parties' Expenses, including account-level "custodial and clearing fees," "broker fees and commissions," "trading expenses," and "financial institution account charges" as part of Item [B].  *See* Pl. Exh. 104 at § 2(e)(b)(3)-6.

    b.    The Landy Report states that "[c]onceptually, fees that are not attributable solely to either Denmark or Belgium – such as [ ] monthly custody fees, in this case – would be the only fees that are allocated on a pro rata basis (i.e., using a percentage)."  Landy Report at ¶ 35.

    c.    I am unable to locate any provision of the Settlement Agreement that provides for the concept to which the Landy Report refers.

90.    Some, but not all, of the Covered Parties conducted trading involving Danish and Belgian securities through custody accounts held at Solo Capital, North Channel Bank, or Lindisfarne.

    a.    Account-level fees were incurred whether these plans traded in only Danish, or both Danish and Belgian securities, and regardless of the source of the funds in the account or activity on the account.

    b.    These account-level fees include, for example:

        i.    the €1,500 custodial fee charged quarterly by North Channel Bank (*see* Pl. Exh. 203);

        ii.    a €2,000 custodial fee charged monthly by Lindisfarne; and

        iii.    a €1,250 custodial fee charged monthly by Solo Capital.

c.    True and correct copies of documents reflecting the €2,000 Lindisfarne custodial fee and the €1,250 Solo Capital fee are attached as Plaintiffs' Exhibit 212.

91.    The issue for the Court to decide is whether the Settlement Agreement requires that account-level fees must be allocated in some proportion between Belgian and Danish trading or assets and, if so, what methodology, if any, the Settlement Agreement provides to determine the proper allocation.

**True-Up Dispute 3 - Allocation of Covered Parties' Expenses by Ownership Percentage**

92.    I am unable to locate in the Landy Report any calculation of Item [C], the portion of Gross Reclaims Received by Non-Covered Parties.

a.    The Settlement Agreement provides the Covered Parties may deduct: the "portion of *Gross Reclaims* received by parties excluded from the releases as set forth in Section 4 herein, including without limitation, those parties listed on Exhibit 3 ('Non-exhaustive list of parties excluded from release'), that were not otherwise subsequently provided to any Covered Party." *Id.* at § 2(e)(C) (emphasis added).

i.    The definition of "Gross Reclaims" in the Settlement Agreement is "all reclaim amounts from Skatteforvaltningen received by or on behalf of the Pension Plans in respect of applications to reclaim taxes withheld or allegedly withheld from dividends paid on Danish company shares the Pension Plans owned or allegedly owned between 2012 and 2015." *Id.* at § 1(s).

93.    Item [C] applies only to a subset of Pension Plans that are partially owned by Non-Covered Parties including, for example, Markowitz and van Merkensteijn.

a.    The Landy Report identifies the Pension Plans that are affected by Item [C] in Exhibit 04 on page 2. *See* Landy Report at Exhibit 04. They are the Pension Plans where the amount in the "Net Proceeds (Covered Parties' Portion)" column is less than the "Net Proceeds (including Non-Covered Parties' Portion)."

b.   These Pension Plans, who are Covered Parties, received payments from SKAT for Reclaim Applications.  The distribution of those payments after the payment of fees was divided according to the ownership percentage.

  i.   For example, the ███████████████████ (the "██████ Plan") maintained a custody account with Solo Capital (the "██████Custody Account").  The ██████ Custody Account, on behalf of the ██████ Plan, received payments from SKAT for Reclaim Applications.  A true and correct copy of an example of a ██████ Plan account is attached as Plaintiffs' Exhibit 213.

  ii.   I am familiar with the ownership structure of the ██████ Plan.  The ██████Plan was 50% owned by Covered Parties and 50% owned by Non-Covered Parties.  Accordingly, the amounts received from the Reclaim Applications were distributed 50/50.

  iii.   The account statements for the ██████Plan show that payments for the Reclaim Applications were received, fees were paid, and only then was a portion of the remaining amount distributed pursuant to the owners.  *See, e.g.*, *id.*

  iv.   On January 2, 2014, the ██████ Plan received a payment of DKK 1,274,091.41 for a Reclaim Application from SKAT.  After receiving this amount, the fees were paid from that amount related to the trading.  *See id.*

  v.   On January 8, 2014, the remaining DKK 424,654.66 was converted to $77,644.14 and was transferred to a U.S. dollars account.  Two days later, on January 10, 2014, a $1,587 credit was applied for an overpayment of invoices.  This left a total of $79,231.14.  *See id.*

  vi.   In accordance with the 50/50 ownership, on January 15, 2014, a payment from the ██████Custody Account was made of $39,718.99.  This is almost exactly half of the $79,231.14 that

remained from SKAT's payment of the Reclaim Application. *See id.*

    vii.    With respect to this example, Item [C] would be 50% of the amount received for the Reclaim Application, DKK 1,274,091.41.  This is "the portion of the Gross Reclaims" received by the Non-Covered Parties that had an interest in the ▮▮▮▮ Plan.  *See* Pl. Exh. 104 at § 2(e)(C).

94.    The issue for the Court to decide is how to interpret Item [C] of Net Proceeds and how to calculate it accordingly.  *See* Pl. Exh. 104 at §2(e)(C).

## True-Up Dispute 4 - Overlapping Adjustments

95.    There is a factual dispute as to whether any of the adjustments to Net Proceeds are overlapping, such that there needs to be further adjustments to the Net Proceeds calculation.

    a.    For example, if the Court finds that True-Up Dispute 2 is resolved in favor of applying an allocation percentage based on Danish and Belgian trading/assets, and True-Up Dispute 1 is resolved such that the Covered Parties' Expenses include the Post-Reclaim Custodian Fees, the allocation percentage would have to be applied to the Post-Reclaim Custodian Fees.

    i.    Using ▮▮▮▮ as an example, if the Court finds the additional €12,000 in custodial fees incurred after June 8, 2015 should be deducted as Covered Parties' Expenses, and those custodial fees should be allocated between Danish and Belgian trading, then an allocation percentage would need to be applied.

    ii.    I am unable to locate in the Landy Report any material addressing the potential impact of these overlapping adjustments on Net Proceeds.

**True-Up Dispute Exhibits**

96.    I am familiar with the record-keeping practices of Maple Point.

97.    The documents attached as Plaintiffs' Exhibits 200 to 213 are business records of Maple Point.  They (a) were made at or near the time by, or from information transmitted by, someone with knowledge; (b) were kept in the course of a regularly conducted activity of Maple Point; and (c) were made as a result of regular practice of the regularly conducted activity of Maple Point; or (d) were integrated into the records of Maple Point and were relied upon by Maple Point in its day-to-day operations.

**Concluding Matters**

98.    Because this Witness Statement is being submitted for a limited purpose, it does not include all of the facts associated with the issues described above and of which I am aware.

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury that the foregoing is true and correct.

Executed on April 7, 2025, at New York, New York

_____
Matthew R. Stein