

# HØJESTERETS DOM

**afsagt mandag den 20. november 2023**

---

**Sag BS-20331/2022-HJR**
(1. afdeling)

Skatteforvaltningen
(advokat Boris Frederiksen og advokat Steffen Sværke)

mod

Bech-Bruun I/S
(advokat Ole Spiermann og advokat Jakob Lentz)

I tidligere instans er afsagt dom af Østre Landsrets 12. afdeling den 28. april 2022 (BS-26436/2020-OLR).

I pådømmelsen har deltaget fem dommere: Jens Peter Christensen, Ole Hasselgaard, Rikke Foersom, Peter Mørk Thomsen og Mohammad Ahsan.

**Påstande**
Appellanten, Skatteforvaltningen, har nedlagt påstand om, at (1) indstævnte, Bech-Bruun I/S, skal betale 705.821.108,92 kr. med renter fra den 28. september 2023, at (2) Bech-Bruun skal betale 446.605.946,27 kr., og at (3) Bech-Bruun skal betale 201.954.297,55 kr.

Skatteforvaltningen har endvidere nedlagt påstand om, at (4) Bech-Bruun skal tilbagebetale 6.189.953,70 kr., som Skatteforvaltningen har betalt til opfyldelse af landsrettens dom, med procesrente fra den 24. maj 2022.

Skatteforvaltningen har subsidiært nedlagt påstand om, at Bech-Bruun skal anerkende at være erstatningsansvarlig for rådgivningen til North Channel Bank. Mere subsidiært skal Bech-Bruun anerkende at være erstatningsansvarlig for Skatteforvaltningens tab som følge af ansøgninger om refusion af indeholdt



23 Civ. 2508 (NRB)
PLAINTIFFS' EXHIBIT
**130**



EXHIBIT
130
Skatte
KB.5-31-24

udbytteskat dateret i perioden 12. maj 2014 til 22. juli 2015 baseret på Credit Advices udstedt af North Channel Bank, subsidiært i en kortere periode.

Bech-Bruun har over for Skatteforvaltningens påstande 1-3 påstået stadfæstelse, over for påstand 4 påstået frifindelse, over for den subsidiære påstand påstået afvisning, subsidiært frifindelse, og over for den mere subsidiære påstand påstået frifindelse.

**Supplerende sagsfremstilling**
For Højesteret er der fremkommet yderligere materiale om bl.a. North Channel Banks forhold, tab, forlig og opgørelse af krav samt SKATs forhold.

**Forklaringer**
Der er for Højesteret afgivet supplerende forklaring af A.

**Anbringender**
Skatteforvaltningen har anført navnlig, at Bech-Bruun er erstatningsansvarlig for Skatteforvaltningens tab på 1.135.775.442,18 kr., som opstod ved, at en række pensionsplaner, banker, finansfolk, betalingsagenter og advokater med forskellig involvering konstruerede et kriminelt setup, der forledte SKAT (i dag Skatteforvaltningen) til at udbetale det nævnte beløb. Setuppet gik i sin essens ud på, at skattefrie, amerikanske pensionsplaner fremstod som modtagere af dansk beskattet udbytte baseret på udbyttenotaer fra en tysk bank, North Channel Bank, selv om de aldrig havde modtaget udbytte, og de fik dermed refusion af udbytteskat med urette.

Bech-Bruun påtog sig at udarbejde en legal opinion om, at North Channel Bank ikke burde være erstatningsansvarlig eller strafansvarlig for sin deltagelse i setuppet. Ved at afgive den nævnte legal opinion medvirkede Bech-Bruun til, at North Channel Bank udstedte ægte, men indholdsmæssigt forkerte udbyttenotaer. Bech-Bruun var bekendt med, at ansøgning om refusion af udbytteskat krævede bankdokumentation for modtagelse af udbytte (udbyttenota), og at North Channel Bank ville udstede den pågældende dokumentation. Bech-Bruun vidste, at hvis Bech-Bruun afgav en "should-opinion" om, at banken ikke ville ifalde ansvar, så ville banken deltage i setuppet og udstede udbyttenotaer. Bech-Bruuns afgivelse af en legal opinion med den ønskede konklusion var en aktiv handling fra Bech-Bruuns side. Handlingen var culpøs. Bech-Bruun kunne have afstået fra at rådgive eller afgivet sin legal opinion med den modsatte – og dermed korrekte – konklusion.

Bech-Bruun fik gennem et transaktionsdiagram mulighed for at få fuld indsigt i den model, der skulle anvendes til svindlen. Bech-Bruun vidste derfor, at North Channel Bank havde fuld indsigt i, hvad der foregik. Når North Channel Bank samtidig deltog som depotbank ved at udstede udbyttenotaer, ville banken

3

være ansvarlig, hvis ansøgningerne var uretmæssige, uanset om bankens rolle var stor eller lille.

Bech-Bruun var bevidst om risikoen og dermed de potentielle konsekvenser af rådgivningen – nemlig statens tab – og skulle derfor i sin rådgivning have sikret sig, at man ikke medvirkede til, at der ville ske uretmæssig refusion. Den forpligtelse levede Bech-Bruun ikke op til.

I selskabstømmersagerne fastslog domstolene, at rådgiverne for sælgerne havde pligt til at varetage skattevæsenets interesser, ligesom også sælgerne havde. Den pligt har Bech-Bruun også. Til forskel fra selskabstømmersagerne var Bech-Bruun imidlertid opmærksom på risikoen for, at skattemyndighederne led tab, og det var selve kernen af det, som Bech-Bruun udtalte sig om. Bech-Bruuns ansvar er strengere, end hvad der følger af selskabstømmersagerne, idet Bech-Bruuns klient, North Channel Bank, ikke svarer til sælgerne i selskabstømmersagerne, men til de kriminelle købere. Bech-Bruun rådgav den bedrageridømte bank.

Ansvaret for Bech-Bruun skal bedømmes som et ansvar for medvirken. Bech-Bruuns ansvar skal bedømmes ud fra den skadegørende handling uden inddragelse af, hvad skadevolderen eventuelt måtte have aftalt med øvrige aktører i setuppet.

Bech-Bruun blev advaret om risikoen for dobbeltrefusion og såvel uretmæssige som kriminelle refusioner. Det er yderst sjældent i erstatningssager, at skadevolderen er blevet så direkte advaret om de potentielle skadevirkninger af handlingerne. Mailen af 3. februar 2014 fra advokatfirmaet Jones Day indeholdt klare faresignaler, selv om der blev taget forbehold for, at man endnu ikke havde set et "structure paper". Der er intet i sagen, som understøtter, at en sådan mail skulle være sædvanlig. Jones Days mail burde have givet ekstra anledning til forsigtighed, da det fremgik, at Jones Day var villig til at rådgive banken, selv om banken vidste, at dens kunder ville lave potentielt kriminelle transaktioner, dobbeltrefusion, skattesvindel og udbyttearbitrage. Jones Days eneste fokus var, om banken ville risikere ansvar for dette og ikke, om svindel mv. kunne undgås. Dette forhold, der må betegnes som en advarsel, skærper således kravene til Bech-Bruun. Derfor burde Bech-Bruun have sikret sig imod, at deres rådgivning ville kunne bruges til strafbare forhold, når Jones Day gjorde eksplicit opmærksom på risikoen herfor.

Bech-Bruun forstod, at der var risiko for uretmæssig refusion på grund af cum/ex. Henset til advarslen og forståelsen heraf burde Bech-Bruun i sin rådgivning have sikret sig, at der ikke blev skabt mulighed for at ansøge om uretmæssig refusion, men selv om Bech-Bruun straks indså denne risiko for uberet-

tiget refusion, blev det ikke håndteret. Bech-Bruun endte i stedet med at god-
kende, at North Channel Bank udstedte udbyttenotaer i netop en cum/ex-mo-
del.

Bech-Bruun accepterede brug af den kriminelle cum/ex-model, der ikke tjente et
legitimt formål. Bech-Bruun kunne se, at der ikke var noget forretningsmæssigt
formål. Det eneste indsete formål var udbyttearbitrage, men modellen var kon-
traproduktiv til at søge udbytterefusion. Den var derimod egnet til svindel. Det
gav ingen mening, at handlerne blev struktureret som cum/ex, hvis der var tale
om almindelige handler eller udbyttearbitrage. I givet fald kunne man handle
på sædvanlige vilkår. Derimod gav det god mening, hvis formålet var at opnå
uretmæssig refusion. Bech-Bruun var klar over, at cum/ex var en fravigelse af
sædvanlige markedsvilkår, der kunne bruges til kriminelle handlinger. Bech-
Bruun valgte således at rådgive om transaktioner uden forretningsmæssigt for-
mål, hvor der gælder strenge krav til rådgivers agtpågivenhed henset til risi-
koen for misbrug eller kriminelle formål.

Sammen og hver for sig var cum/ex-modellen, udbyttenotaen uden modtagelse
af udbytte og kompensationsbetalinger under aktielån uforklarlige, hvis formå-
let var at lave skattearbitrage. Hvis aktørerne i modellen havde en aktiepost,
havde det været simpelt blot at overføre aktierne til pensionsplanen, der ville
fremstå som ejer, modtage udbytte og udbyttenota samt ansøge om refusion.
De uforklarlige forhold gav derimod mening, hvis formålet var at søge refusion
uden aktier.

Bech-Bruun kunne se og accepterede, at der ville blive udstedt to udbyttenotaer
for ét udbytte, og at der dermed blev udstedt urigtig dokumentation for inde-
holdelse af udbytteskat. Bech-Bruun undlod bevidst at sætte sig ind i det tyske
transaktionsdiagram, der viste svindelmodellen i klartekst. Transaktionsdia-
grammet, som Bech-Bruun modtog, viste, hvordan svindlen skulle struktureres
med bogføringsposteringer, der udlignede hinanden, og hvor der alligevel
skulle udstedes udbyttenotaer. Selv på overfladen var det tydeligt af transakti-
onsdiagrammet, at handlerne var proforma, og ved nærmere gennemsyn frem-
går det, at "handlerne" foregik uden aktier, penge og dermed udbytter. Bech-
Bruun havde henset til omstændighederne pligt til at forstå modellen som hel-
hed, før Bech-Bruun udtalte sig herom, og Bech-Bruun kunne ikke ved sin råd-
givning vælge efter aftale med klienten at se bort fra viden, som Bech-Bruun var
i besiddelse af.

Bech-Bruun burde have indset, at udbyttenotaerne ville stride mod straffelo-
vens § 163, idet North Channel Bank ikke vidste, om notaen (erklæringen) var
korrekt. Hvis gerningsindholdet i § 163 realiseres, og der samtidig er berigelses-

forsæt, er der overhængende risiko for bedrageri efter straffelovens § 279, hvilket North Channel Bank er blevet dømt for. Bech-Bruun havde oplysningerne til at indse denne risiko.

Bech-Bruun vidste, at North Channel Banks udbyttenotaer skulle bruges til at søge om refusion af dansk udbytteskat. Bech-Bruun burde derfor under alle omstændigheder have sikret sig, at pensionsplanen var skatteretlig ejer, idet North Channel Banks udbyttenotaer kendeligt skulle bruges over for de danske skattemyndigheder i en model, som banken var en del af og havde fuld indsigt i. Bech-Bruun kunne netop se, at pensionsplanen ikke var skatteretlig ejer af udbyttet.

Bech-Bruun var ekspert i udbyttebeskatning og havde omfattende praktisk erfaring, herunder med udenlandske aktionærer. Bech-Bruuns forsvar består i synspunkter om begrænsninger i opdrag, forudsætninger og forbehold. Man kan ikke skrive sig ud af et professionsansvar over for tredjemand. Advokater er tværtimod forpligtede til at udvise kritisk sans og undersøge mistænkelige forhold, inden rådgivning ydes. Bech-Bruun har således begået grove og klare, ansvarspådragende fejl.

Bech-Bruuns legal opinion blev sendt mandag den 5. maj 2014. Fredag den 9. maj 2014 afgav Jones Day sin legal opinion baseret på bl.a. Bech-Bruuns legal opinion. Mandag den 12. maj 2014 modtog SKAT de første refusionsansøgninger baseret på udbyttenotaer fra North Channel Bank. Bech-Bruun vidste, at udbyttenotaerne skulle føre til udbetaling af udbytterefusion fra den danske statskasse. North Channel Bank og de andre i bedrageriet involverede aktører anmodede selvfølgelig om Bech-Bruuns rådgivning, fordi de skulle bruge den. Udbetalingen af udbytterefusion er således en forsætlig følge af rådgivningen, og refusionen er en kausal følge af denne rådgivning.

Den nære tidsmæssige sammenhæng mellem Bech-Bruuns indholdsmæssigt endelige legal opinion og de første uberettigede refusionsansøgninger med udbyttenotaer fra North Channel Bank er tydelig. Det var en konkret formuleret opgave, at Bech-Bruuns legal opinion skulle indhentes. Da den første positive konklusion fra Bech-Bruun forelå, kunne de første forberedelseshandlinger iværksættes, og da den endelige rådgivning forelå, kunne refusionsansøgningerne indgives.

Konkret beviser Bech-Bruuns opdrag, rådgivningsforløbet, gennemførelsen af transaktionerne, som Bech-Bruun rådgav om, den efterfølgende anvendelse af Bech-Bruuns rådgivning og Bech-Bruuns senere bekræftelser af rådgivningen sammen og hver for sig, at der er årsagssammenhæng mellem Bech-Bruuns ansvarspådragende rådgivning af North Channel Bank og Skatteforvaltningens tab.

Årsagssammenhængen mellem Bech-Bruuns ansvarspådragende rådgivning og Skatteforvaltningens tab følger endvidere af, at der ikke er relevante forskelle – hvis nogen overhovedet – på beskrivelsen i Bech-Bruuns legal opinion og de bogførte transaktioner.

Skatteforvaltningens tab var en adækvat følge af Bech-Bruuns ansvarspådragende rådgivning. Bech-Bruun kunne se, at der ville blive søgt om refusion på grundlag af de udbyttenotaer, som Bech-Bruun godkendte, at North Channel Bank kunne udstede, og Bech-Bruun interesserede sig ikke for størrelsen på ansøgningerne og dermed Skatteforvaltningens tab, før der blev gjort et erstatningskrav gældende imod Bech-Bruun.

Det var også påregneligt for Bech-Bruun, at udbyttenotaer fra North Channel Bank kunne blive brugt i forbindelse med uberettigede refusionsansøgninger, der ville medføre et tab for Skatteforvaltningen, såfremt Bech-Bruun godkendte setuppet. Hvorvidt disse udbyttenotaer ville have et urigtigt indhold, fordi setuppet blev gennemført med proforma-transaktioner eller uden reelle aktie- og pengestrømme, er uden betydning, men Bech-Bruun var faktisk i besiddelse af oplysninger til at indse, at det skulle være uden aktier og penge. Eftersom setuppet skulle gennemføres uden aktier og penge, var Skatteforvaltningens potentielle tab som følge af uberettigede refusionsansøgninger med udbyttenotaer fra North Channel Bank svært at afgrænse. Det var således ikke upåregneligt for Bech-Bruun, at Skatteforvaltningens tab kunne blive meget stort, og Bech-Bruun kan derfor ikke under henvisning til tabets størrelse undsige sig ansvar. Bech-Bruun vidste endda, at en enkelt refusionsansøgning kunne angå et meget stort beløb.

Skatteforvaltningen har bevist tabet. Det er ubestridt, at Skatteforvaltningen har lidt et tab på 1.135.775.442,18 kr. ved at udbetale refusion i henhold til uretmæssige refusionsansøgninger vedlagt udbyttenotaer fra North Channel Bank. Skatteforvaltningen har reduceret sit krav med de betalinger, som Skatteforvaltningen har modtaget fra andre skadevoldere. Reduktionen er sket forholdsmæssigt, da betalingerne er modtaget fra skadevoldere, der havde medvirket til såvel North Channel Bank-delen som øvrige uretmæssige refusionsansøgninger. Hovedstolen udgør herefter 705.821.108,92 kr.

Tabet er forvoldt af North Channel Bank, Bech-Bruun og øvrige, der har medvirket til de uretmæssige refusionsansøgninger. Når der er flere skadevoldere, der alle er ansvarlige for et tab, hæfter disse solidarisk, hvorefter skadelidte frit kan vælge, hvilken skadevolder denne vil gå efter.

Bech-Bruun gør gældende, at deres erstatningsansvar skal bortfalde som følge af Skatteforvaltningens egen skyld og accept af risiko. Det er Bech-Bruuns bevisbyrde, og det er ikke bevist.

Skatteforvaltningen har været udsat for et enestående groft bedrageri, hvor en gruppe af bank- og finansfolk koordinerede et internationalt, komplekst og omfangsrigt svindelsetup. Dette bedrageri kan ikke bebrejdes Skatteforvaltningen. Det kan alene bebrejdes de personer, virksomheder og rådgivere, der deltog og rådgav. Ingen hos Skatteforvaltningen var bekendt med, at der blev svindlet i udbyttesagen.

Synspunktet om accept af risiko giver ikke mening. At der er risiko for uretmæssige refusionsansøgninger, er et grundvilkår, som SKAT deler med alle andre, der udbetaler penge. Det gælder særligt på områder med masseadministration, f.eks. moms og sociale ydelser. Der er i øvrigt risici forbundet med alle dele af skatteforvaltningen, og ressourcefordelingen er et prioriteringsspørgsmål – ikke en accept af risiko.

SKATs administration af udbytterefusionsområdet var i overensstemmelse med hjemmelsgrundlaget. Det underliggende finansielle system, som SKAT skulle foretage kontrol med refusion på baggrund af, er enkelt og standardiseret, særligt når der er tale om børsnoterede selskaber. Systemets robusthed bekræftes videre af, hvor kompliceret et setup svindlerne i den danske udbyttesag skulle etablere for, at de kunne lykkes med svindlen.

SKAT har foretaget både formel og materiel kontrol, før der skete udbetaling. Det er således konstateret, at de "nødvendige oplysninger samt foreskrevne underbilag og dokumentationer" foreligger, og at "satser og beregninger" er korrekte. Det er herved også kontrolleret, at "oplysningerne er sandsynlige", idet en udenlandsk skattemyndighed og en uafhængig troværdig part – en bank – har erklæret det.

Den 16. juni 2015 modtog Særlig Kontrol i SKAT anmeldelse om formodet svindel med refusion af udbytteskat. Der var ikke grundlag for på dette tidspunkt i juni 2015 at indstille samtlige udbetalinger på området. Henvendelserne nævnte "en formodet svindel" for op til 500 mio. kr., og de indeholdt ikke konkrete beviser. Først med oplysningerne fra de engelske skattemyndigheder kunne oplysningerne fra den første anmeldelse bekræftes i sådant omfang, at det kunne vurderes, om der var tilstrækkeligt grundlag for at gribe ind. Den 6. august 2015, samme dag som SKAT modtog oplysningerne fra de engelske skattemyndigheder, blev udbetalingerne af refusion stoppet.

Skatteforvaltningens krav er ikke forældet. Forældelsesfristen var suspenderet, indtil Skatteforvaltningen modtog tilstrækkelige faktiske oplysninger til at vurdere, at der var grundlag for at udtage stævning mod Bech-Bruun, jf. forældelseslovens § 3, stk. 2. Sådanne faktiske oplysninger modtog Skatteforvaltningen tidligst den 29. juni 2018, hvor Skatteforvaltningen fik Bech-Bruuns legal opinion. Da stævningen er udtaget under tre år fra denne dato, er kravet ikke forældet.

Mailen af 10. oktober 2016 fra Finanzamt für Steuerstrafsachen und Steuerfahndung Wuppertal til Skatteforvaltningen gav ikke anledning til at igangsætte undersøgelser af Bech-Bruun med den konsekvens, at Skatteforvaltningen på et – ukendt – tidspunkt i den efterfølgende periode "burde have fået kendskab" til erstatningskravet mod Bech-Bruun. Mailen gav ikke Skatteforvaltningen grundlag for at rejse et erstatningskrav mod Bech-Bruun.

Selv hvis der måtte være en videregående undersøgelsespligt, kan den i hvert fald ikke indebære, at Skatteforvaltningen burde have skaffet sig indsigt i Bech-Bruuns rådgivning forud for den 8. juni 2017. Indtræden af en undersøgelsespligt ophæver ikke suspensionsperioden. Suspensionen ophører først, når kreditor fik eller burde have fået tilstrækkelige oplysninger til at vurdere sit krav. Suspensionen ophører alene, hvis kreditors uvidenhed kan bebrejdes kreditor. Det kan derfor aldrig være på tidspunktet, hvor en eventuel undersøgelsespligt begynder.

Skatteforvaltningens krav skal i henhold til rentelovens § 3, stk. 5, forrentes fra udbetalingstidspunktet, idet skaden er påført ved retsstridig adfærd, og Skatteforvaltningen har været afskåret fra at rejse kravet på et tidligere tidspunkt.

Hvis Højesteret finder, at kravet ikke kan opgøres på det foreliggende grundlag, skal Bech-Bruun dømmes til at anerkende sit erstatningsansvar i henhold til Skatteforvaltningens subsidiære eller mere subsidiære påstand.

Bech-Bruun har anført navnlig, at der ikke foreligger et ansvarsgrundlag. Under omstændigheder som de foreliggende, hvor en advokat ubestridt ikke var bekendt med klientens bedrageri, kræver ansvar over for tredjemand i overensstemmelse med retspraksis i det mindste, at advokaten har været konkret involveret og begået en klar fejl af en vis grovhed, som advokaten kan bebrejdes i en sådan grad, at advokaten skal bære tabet. Disse grundlæggende betingelser for brud på ansvarsnormen er på ingen måde opfyldt.

En legal opinion er en retlig vurdering af et givet faktum afgivet til en klient. Klientens formål med en legal opinion er at få afdækket en retlig risiko, mens advokaten i sin legal opinion vil gøre sig umage for ikke at udtale sig om andet

end det faktum, der forelægges, eller påtage sig anden risiko end fornødent efter advokatens opdrag. Faktum i en legal opinion er fastlagt sammen med klienten, hvortil kommer forudsætninger og kvalifikationer, som ligeledes er aftalt med klienten. Faktum og forudsætninger hverken efterprøves eller verificeres. Generelt kræver advokatansvar over for tredjeparter noget særligt, og det gælder i særdeleshed for en legal opinion, der efter sit indhold alene kan påberåbes af klienten.

Bech-Bruuns legal opinion af 4. august 2014 havde til formål at bedømme "ansvarsmæssige konsekvenser for NCB af at fungere som depotbank" efter dansk ret. Emnet var en hypotetisk situation, som var opstillet med henblik på vurdering af bankens risici ud fra nærmere angivne forudsætninger og forbehold. En sådan risikovurdering er et typeeksempel på anvendelsesområdet for legal opinion, og det er helt almindeligt i en risikovurdering at inddrage "worst case". Bech-Bruun udtalte sig ikke i legal opinion om, hvorvidt bankens kunde ville opfylde de skatteretlige betingelser for refusion af udbytteskat. Tværtimod tog de juridiske risici, som Bech-Bruun bedømte, udgangspunkt i den hypotetiske situation, at SKAT efterfølgende måtte finde, at betingelserne i dansk skatteret ikke var opfyldt, herunder ikke mindst betingelsen om retmæssigt ejerskab. For at statuere ansvarsgrundlag ville det være nødvendigt, men ikke tilstrækkeligt, at Bech-Bruun i forbindelse med udarbejdelsen af legal opinion burde have indset, at North Channel Bank ville begå bedrageri. Det er der intet grundlag for.

Vurderingen af ansvarsgrundlag må tage udgangspunkt i Bech-Bruuns opdrag. Opdraget angik en legal opinion, og det fremgik, at "det spørgsmål, der skal besvares i min opinion er, om klienten ud fra et dansk skatteretligt perspektiv kan gøres ansvarlig eller endda retsforfølges for at støtte/facilitere en skatteunddragelse begået af en af de andre aktører i denne transaktion (hvilket var årsagen til, at vi anmodede om at få udleveret den danske tax opinion)". Bekymringen gik således på opfyldelse af almindelige betingelser for refusion af udbytteskat og knyttede sig ikke til banken, men til bankens kunde og transaktion.

Som situationen blev fremstillet for Bech-Bruun, var der et legitimt behov for rådgivning, og det var fuldt ud berettiget for Bech-Bruun at påtage sig opdraget. Ethvert andet dansk advokatfirma med de fornødne kompetencer ville have gjort det samme. Bech-Bruun antog naturligvis, i overensstemmelse med Bjørnholms tax opinion og ligesom Jones Day, at der ville være aktier, og at der ville blive modtaget udbytte efter indeholdelse af udbytteskat. Det forhold, at A ikke kendte til andre forretningsmæssige formål end kundens skattefordel, og at bankens kunde således øjensynligt engagerede sig i udbyttearbitrage, ændrede ikke noget.

Skatteforvaltningen har lagt meget betydelig vægt på den tyske transaktions-
oversigt, som ifølge Skatteforvaltningen skulle vise, at transaktionen alene be-
stod af tre parter og ville være cirkulær. Imidlertid kunne A ikke forstå den ty-
ske transaktionsoversigt, og den udgik efter aftale af rådgivningen og blev på
Jones Days ansvar erstattet med den engelske transaktionsbeskrivelse.

Bech-Bruun konkluderede i legal opinion, at "NCB bør ikke være underlagt
dansk civilretligt ansvar, som indebærer pligt til at kompensere den danske stat
for eventuelle tab som følge af bankens rolle i den påtænkte transaktion", og at
"NCB bør ikke være underlagt dansk strafferetligt ansvar som følge af sin rolle i
den påtænkte transaktion". Der var således tale om en såkaldt "should"-opi-
nion, idet brugen af ordet "should" ("bør") angav en vis usikkerhed i vurderin-
gen og dermed en vis risiko. Det fremgår udtrykkeligt, at Bech-Bruun ikke nær-
mere efterprøvede, endsige "blåstemplede" transaktionsbeskrivelsen eller for-
udsætningerne. Ydermere blev der formuleret tre udtrykkelige forbehold i til-
knytning til konklusionen om erstatningsansvar.

Skatteforvaltningen søger i sin argumentation i denne sag at se bort fra de
nævnte forhold og omgøre den faste forståelse af legal opinions. Argumentatio-
nen bygger på ukendte konstruktioner om, at en advokat, der afgiver en legal
opinion, skulle have pligt til at efterprøve faktum og forudsætninger, ligesom
advokaten ikke skulle kunne tage forbehold, og det skulle i særdeleshed gælde i
forhold til tredjeparter.

De tre forbehold og legal opinion i sin helhed efterlader ikke tvivl om, hvordan
Bech-Bruun havde bedømt en situation, hvor North Channel Banks kunder slet
ikke ville eje nogen aktier, således at der ville være tale om bedrageri. A havde
fra begyndelsen gjort det klart, at udbytteskat ikke kunne blive refunderet mere
end én gang. Han fik senere lejlighed til at understrege, at bankens kunde ikke
kunne søge refusion af udbytteskat uden ejerskab til aktier med ret til udbytte
på tidspunktet for udlodningen.

Det bestrides, at "T+3" var markedspraksis. Der er ikke grundlag for at hævde,
at afvigelse fra dette eller andre påståede markedsvilkår skulle have været
usædvanligt eller ubegrundet, endsige mistænkeligt, ligesom en eventuel mis-
tanke ikke ville vedrøre banken som depotvirksomhed. Særligt hvad angår
"cum/ex" og Skatteforvaltningens sammenligninger til Tyskland, har skatte-
myndighederne generelt oplyst, at sagen ikke havde lighed med de tidligere be-
givenheder i Tyskland.

Ansvarsspørgsmål i tilfælde af andres bedrageri melder sig undertiden for revi-
sorer, og Højesteret har her udvist tilbageholdenhed med at pålægge erstat-
ningsansvar, jf. f.eks. UfR 2014.1346 H.

Retspraksis i sagerne om selskabstømning viser, at positiv viden om en over-dragelse, som ikke er en normal forretningsmæssig disposition, og som indbe-fatter et betydeligt "merprovenu", ikke i sig selv begrunder ansvar efter dansk rets almindelige erstatningsregler. Hertil kræves yderligere konkret deltagelse af en vis væsentlighed (medvirken). Til forskel fra selskabstømmersagerne an-befalede Bech-Bruun ikke kunder i North Channel Bank at gennemføre transak-tioner, ligesom Bech-Bruun ingen dialog havde med banken og slet ikke ban-kens kunder. Bech-Bruun bistod heller ikke ved gennemførelsen af konkrete transaktioner, og Bech-Bruun havde ingen rolle med hensyn til de konkrete an-søgninger, som påførte SKAT tab.

I den foreliggende sag er der ikke grundlag for en skærpet ansvarsnorm. At bankkunders deltagelse i udbyttearbitrage skulle begrunde skærpelse af an-svarsnormen, kan ikke gælde for den advokat, som i overensstemmelse med sit opdrag afgiver legal opinion til banken om bankens, modsat bankkundens, ret-lige stilling. For den advokat, der rådgiver en bank, kan det ikke begrunde skærpelse af ansvarsnormen, at også en anden bank efter omstændighederne kan udstede nota i anledning af samme udbytte. Tværtimod må det være al-mindeligt, særligt ved kompensationsbetalinger. Ydermere angik legal opinion den hypotetiske situation, at SKAT efterfølgende fandt, at bankens kunde ikke var berettiget til refusion af udbytteskat, og hvor det ville være forventeligt, at en anden kunde i en anden bank kunne være berettiget hertil.

Anbefalingerne i Skatteministeriets rapport fra november 2014 om styrket råd-giver- og branchesamarbejde til imødegåelse af grænseoverskridende skatte-unddragelse – hvoraf flere med virkning fra juli 2019 er afspejlet i nye bestem-melser i de advokatetiske regler – ville ikke give grundlag for kritik af Bech-Bruun, selv hvis de havde foreligget tidligere, og selv hvis Bech-Bruun konkret havde ydet skatterådgivning.

Bech-Bruun kan ikke ifalde solidarisk ansvar med de kriminelle personer og selskaber, som har handlet konkret og forsætligt i et bedrageri.

De fiktive transaktioner i North Channel Bank var i direkte modstrid med Bech-Bruuns legal opinion på talrige punkter, herunder udtrykkelige forudsætninger og forbehold.

Der mangler både årsagssammenhæng og påregnelighed. Bedrageriet med for-sætlig udstedelse af urigtige notaer var i gang, inden Jones Day og Bech-Bruun afgav sine legal opinions. Der er al mulig grund til at antage, at bedrageriet ville have været begået, selv om de nævnte legal opinions ikke forelå. Den eneste eventuelle brug af legal opinions var over for revisionen og myndighederne i Tyskland, som imidlertid ikke krævede legal opinions, og som i øvrigt først ville henvende sig lang tid efter, at udbyttenotaer var udstedt til kunder.

Skatteforvaltningen har bevisbyrden for årsagssammenhæng. Årsagssammen-hæng kræver grundlæggende, at North Channel Bank ikke ville have begået be-drageri i fravær af Bech-Bruuns legal opinion. Der er ikke den mindste bevis-mæssige støtte herfor.

Hvis North Channel Bank teoretisk havde anset en eller flere legal opinions for at have betydning for, om banken ville begå bedrageri ved registrering af fik-tive aktie- og pengebevægelser og forsætlig udstedelse af urigtige notaer, ville banken forinden have haft Jones Days og Bech-Bruuns legal opinions på plads i endelig, underskreven form. Det skete ikke. Endelige legal opinions blev først efterspurgt i juli 2014 og alene afgivet i august og september 2014.

Mulig brug af legal opinion havde at gøre med bankens regulatoriske forhold i Tyskland. Bech-Bruuns legal opinion skulle og kunne ikke bruges i Danmark. Med hensyn til Tyskland er der ingen dokumentation for, at Jones Days eller Bech-Bruuns legal opinions blev anvendt internt i North Channel Bank som be-slutningsgrundlag eller andet. En eventuel ekstern anvendelse over for eksem-pelvis en myndighed krævede færdiggørelse og underskrift. Udkastene af 2. maj og 9. maj 2014 (om dansk, tysk og belgisk ret) udgjorde ikke rådgivning, som en advokat kan ifalde ansvar for. Udkastene af 2. maj og 9. maj 2014 lå i tid godt nok forud for indgivelsen af refusionsansøgningerne til SKAT i Danmark, men ikke forud for registreringer og udstedelse af udbyttenotaer i Tyskland. Det er afgørende, idet registreringer og udstedelse af udbyttenotaer involverede banken, mens ansøgninger om refusion af udbytteskat ikke gjorde det. Faktisk havde udbyttenotaerne forladt banken lang tid inden indgivelsen af refusions-ansøgningerne, og udbyttenotaerne var herefter undergivet andres kontrol. Ud-kastene til legal opinion fra februar 2014 lå ganske rigtigt forud også for regi-streringer og udstedelse af udbyttenotaer i Tyskland, men begrunder ikke år-sagssammenhæng. Udkastene udgjorde endnu mindre end maj-udkastene råd-givning, som en advokat ville kunne ifalde ansvar for.

Det hævdede tab er ikke en påregnelig følge af Bech-Bruuns legal opinion. Grundlæggende har Bech-Bruuns afgivelse af legal opinion til North Channel Bank ikke øget den fare eller risiko, som var forbundet med SKATs forvaltning af ansøgninger om refusion af udbytteskat.

Det var ikke påregneligt for Bech-Bruun, at kunden i North Channel Bank ville indgå i en "transaktion", som ikke var forenelig med transaktionsbeskrivelsen i Bech-Bruuns legal opinion, eller at banken ville indtage en anden rolle end som depotvirksomhed, endsige at banken ville begå bedrageri ved at registrere fik-tive aktie- og pengebevægelser og forsætligt udstede urigtige notaer.

Det var heller ikke påregneligt, at refusionerne angik påståede aktiebesiddelser, som var både enorme og helt urealistiske, såvel bedømt ud fra pensionsplanernes som North Channel Banks karakter.

Et eventuelt krav er fortabt ved forældelse. Forældelsesfristen skal regnes senest fra den 10. oktober 2016, hvor SKAT af de tyske myndigheder fik oplyst, at Bech-Bruun havde udstedt "erklæring" om, at en tysk bank involveret i "udbyttesagen" som depotbank havde forholdt sig "lovligt". Hvis SKAT dengang retligt havde ment, at der kunne være et ansvarsgrundlag for en dansk rådgiver, fik SKAT med mailen det faktuelle grundlag. Den eneste tyske bank, som optrådte i "udbyttesagen", var North Channel Bank, og de oplyste volumener i mailen svarede til udbyttenotaerne udstedt af denne bank, som SKAT selv havde indsamlet og analyseret. Dette havde ført til en politianmeldelse af banken i august 2016, hvilket var kort forinden modtagelsen af mailen af 10. oktober 2016. På tidspunktet for udtagelse af stævning i juni 2020 var kravet således forældet.

Skatteforvaltningen har bevisbyrden for suspension af forældelsesfristen, og den bevisbyrde har Skatteforvaltningen ikke løftet.

Det ligger i den 3-årige forældelsesfrist, at kreditor kan have et arbejde at udføre, mens forældelsesfristen løber. Forældelsesfristen løber således ikke først fra det tidspunkt, hvor kravstiller har fuldt overblik over sagsforløbet eller kommer i besiddelse af et bevis, som kravstiller tillægger særlig betydning.

Der foreligger accept af risiko og egen skyld. I 2007 valgte SKAT og Skatteministeriet med fuldt overlæg ikke at udføre nogen materiel kontrol med ansøgninger om refusion af udbytteskat, og dette valg blev fastholdt, uagtet at Skatteministeriet i 2012 oplyste det modsatte til Folketinget, og uagtet at SKAT fra 2012 til 2015 udbetalte stadigt stigende milliardbeløb på grundlag af ansøgninger fra ukendte amerikanske pensionsplaner. Det kom bag på alle og selvfølgelig også på Bech-Bruun, at der var tale om bedrageri. SKAT kunne og burde have opdaget, at refusionsansøgningerne indgivet i 2014 vedlagt udbyttenotaer udstedt af North Channel Bank var usædvanlige. SKAT burde meget hurtigt have konstateret, at noget var rivravruskende galt.

Den af SKAT udviste accept af risiko forhindrer ikke Skatteforvaltningen i at gennemføre krav mod de personer, der forsætligt har begået eller medvirket til bedrageri, men den udelukker erstatningskrav mod Bech-Bruun.

Forvaltningen af udbytteområdet har været uforsvarlig, hvilket kan tilregnes SKAT (nu Skatteforvaltningen) som egen skyld. Det var en direkte følge af den uforsvarlige forvaltning, at refusioner blev udbetalt i overensstemmelse med

ansøgninger vedlagt notaer fra North Channel Bank, og det ville være uantageligt at pålægge Bech-Bruun at bære konsekvenserne heraf. I en sag som den foreliggende, hvor det er myndigheden selv, der er kravstiller, er det uden betydning, at offentligretlige forpligtelser til kontrol ikke i udgangspunktet søger at beskytte skattepligtige eller rådgivere. Skatteforvaltningens mulighed for at prioritere ressourcer giver ikke adgang til at spare alle ressourcer væk og derved uddelegere den forudsatte kontrol til private rådgivere.

Endvidere er det udtryk for egen skyld, at SKAT først den 6. august 2015 satte behandlingen af ansøgninger om refusion af udbytteskat i bero, selv om SKAT allerede den 16. juni 2015 modtog den første henvendelse fra en dansk skatteadvokat om den formodede svindel.

SKAT har ikke lidt noget tab. Det bestrides ikke, at SKAT uberettiget udbetalte i alt 1.135.775.442,18 kr. i refusion af udbytteskat på grundlag af ansøgninger vedlagt udbyttenotaer udstedt af North Channel Bank. En tabsopgørelse skal begrænses til den relevante periode, hvorfor der skal ses bort fra notaer for samlet mindst 600.228.186,33 kr., hvortil kommer, at modtagne betalinger fra andre skal fradrages. Skatteforvaltningen har oplyst at have modtaget 1.010.424.596,73 kr. i henhold til den hemmelige forligsaftale fra maj 2019 med blandt andre bankens ejere og kunder, men trods editionspålæg har Skatteforvaltningen undladt at dokumentere, hvilke betalinger der skal henføres til udbyttenotaer udstedt af North Channel Bank. Skatteforvaltningen kan ikke undskylde sig med eventuel selvskabt bevisnød, og et tab er herefter ikke godtgjort.

Det følger af almindelig obligationsret, at skadelidte i tilfælde, hvor der er tale om flere skadeforhold, hvert med sine skadevoldere, og hvor en skadelidt modtager delvise betalinger fra nogle skadevoldere, er forpligtet til at fordele betalingerne på de skadeforhold, som betalingerne angår.

Der er ikke noget i vejen for, at den samlede betaling i henhold til forligsaftalen på 1.010.424.596,73 kr. kan stamme fra forligsparter, der er ansvarlige for "NCB-andelen". Uden dokumentation for, om de modtagne betalinger angår "NCB-andelen", er der ikke anden mulighed, end at den fulde betaling må fradrages i kravet mod Bech-Bruun.

Hertil kommer, at Skatteforvaltningen har forsømt at iagttage sin tabsbegrænsningspligt og også af den grund er afskåret fra at gøre krav gældende mod Bech-Bruun. Tilbagesøgning af de beløb, som skattemyndighederne uberettiget har udbetalt, må i det hele gå forud for et erstatningskrav mod Bech-Bruun, og et krav mod Bech-Bruun må forudsætte, at Skatteforvaltningen dokumenterer, at tilbagesøgning ikke har været mulig.

Skatteforvaltningens højst usædvanlige rentekrav bestrides i det hele. Tværtimod gælder, at et rentekrav i en sag som den foreliggende skal bortfalde, subsidiært skal rentesatsen reduceres, jf. rentelovens § 3, stk. 5, og § 5, stk. 3. I alle tilfælde er der intet grundlag for at forrente et eventuelt erstatningskrav fra et tidligere tidspunkt end sagens anlæg, jf. § 3, stk. 4.

**Højesterets begrundelse og resultat**

*1. Sagens baggrund og problemstillinger*
Bech-Bruun I/S rådgav i 2014 den tyske bank, North Channel Bank, om bankens mulige ansvar ved at medvirke i transaktioner med danske børsnoterede aktier. Transaktionerne indebar, at North Channel Bank udstedte udbyttenotaer (Dividend Credit Advice), der kunne anvendes ved indgivelse af ansøgninger til SKAT (nu Skatteforvaltningen) om refusion af udbytteskat.

I løbet af 2014 og 2015 udstedte North Channel Bank udbyttenotaer, der i perioden fra den 12. maj 2014 til den 22. juli 2015 af såkaldte reclaim agents blev vedlagt ansøgninger til SKAT om refusion af udbytteskat til amerikanske pensionsplaner, der som følge af dobbeltbeskatningsoverenskomst mellem USA og Danmark havde en fordelagtig udbytteskatteposition. På baggrund af de modtagne ansøgninger udbetalte SKAT i alt 1.135.775.442,18 kr. Refusionsansøgningerne viste sig efterfølgende i det hele at være uberettigede. Parterne er i den forbindelse enige om, at refusionsansøgningerne var baseret på fiktive transaktioner, idet der hverken var aktier, udbytter eller pengestrømme.

North Channel Bank vedtog den 23. september 2019 i Retten i Glostrup en bøde på 110 mio. kr. for bedrageri af særlig grov beskaffenhed. Ved bødevedtagelsen erkendte North Channel Bank sig skyldig i, at banken i perioden 2014-2015 havde registreret fiktive aktie- og pengebevægelser og udstedt udbyttenotaer, som indeholdt urigtige oplysninger om udbetaling af udbytte af danske aktier, og som bankens medgerningsmænd på vegne af amerikanske pensionsplaner anvendte til uberettiget at få udbetalt ikke under 1,1 mia. kr. fra danske skattemyndigheder. Banken opnåede herved en uberettiget berigelse på ikke under 55 mio. kr.

Sagens hovedspørgsmål er, om Bech-Bruun på baggrund af rådgivningen af North Channel Bank er erstatningsansvarlig for det tab, som Skatteforvaltningen har lidt som følge af de nævnte uberettigede refusioner af udbytteskat.

Sagen angår beløbsmæssigt lidt over 700 mio. kr. med tillæg af renter, idet Skatteforvaltningen har reduceret kravet på i alt ca. 1,135 mia. kr. med betalinger, som Skatteforvaltningen har modtaget gennem forlig indgået med forskellige aktører, der har deltaget ved indgivelse af uberettigede refusionsansøgninger, herunder refusioner baseret på udbyttenotaer udstedt af North Channel Bank.

Der er under sagen rejst spørgsmål om ansvarsgrundlag, årsagsforbindelse, adækvans, tabsopgørelse, egen skyld og accept af risiko, forældelse og renter.

*2. Generelt om ansvarsvurderingen*
Ved vurderingen af, om en advokat ved sin rådgivning af en klient har handlet ansvarspådragende over for skattemyndighederne, er det afgørende, om advokaten på uforsvarlig måde har tilsidesat skattemyndighedernes interesser. Om dette er tilfældet, beror på en samlet vurdering af omstændighederne på tidspunktet for advokatens rådgivning.

I vurderingen indgår som et centralt element, om de dispositioner, som advokaten har rådgivet om, havde et forretningsmæssigt formål, og om dispositionerne havde en usædvanlig karakter.

Herudover indgår det nærmere indhold af advokatens opdrag samt den rådgivning, som advokaten har ydet i det enkelte tilfælde.

*3. Den konkrete ansvarsvurdering*
*3.1. Rådgivningsforløbet*
Advokatfirmaet Jones Day i Tyskland rettede den 3. februar 2014 ved mail henvendelse til Bech-Bruun. Af en dansk oversættelse af mailen fremgår bl.a., *at* North Channel Bank ikke selv skulle være part i den omhandlede transaktion, men alene levere tjenesteydelser, *at* parterne i transaktionen "vil realisere en skattefordel i Danmark, som formentlig består i dobbelt refusion af indeholdt udbytteskat", *at* North Channel Bank var bekymret for, om man skulle være opmærksom på "problemer" i Danmark, f.eks. "skattesvig", og *at* der indtil for nylig havde været smuthuller i den tyske skattelovgivning, som gav mulighed for dobbelt refusion, men at de tyske skattemyndigheder "undersøger nu disse transaktioner og forsøger at gøre gældende, at de er misbrug eller endda strafbare forhold". Af svar samme dag til advokatfirmaet Jones Day fra advokat A, der forestod Bech-Bruuns rådgivning af North Channel Bank, fremgår bl.a., *at* transaktioner som de beskrevne "kan indebære mulighed for, at to aktionærer kan ansøge om refusion af den samme kildeskat … ('cum/ex-transaktioner')", og *at* sådanne transaktioner er "generelt problematiske set ud fra et juridisk perspektiv, og oftest er det ikke muligt at give den form for opinion om juridiske og ansvarsmæssige spørgsmål, som de involverede parter normalt ansøger om".

Den 5. februar 2014 anførte Jones Day bl.a., at North Channel Bank gerne ville have et salærtilbud, og at bankens rolle "vil være begrænset til at levere tjenester som depotbank til parterne i cum/ex-transaktionen". Hertil svarede Bech-Bruun samme dag bl.a., at salæret ville være omkring 6.000-7.000 euro, og at "disse strukturer typisk er problematiske i henhold til dansk ret".

Jones Day spurgte den 6. februar 2014 Bech-Bruun, om en legal opinion kunne være en begrundet "should-opinion", "(dvs. 'NCB [North Channel Bank] bør ikke være genstand for strafferetlig forfølgning mv.') med visse rimelige forudsætninger (f.eks. at handle i god tro, henholde sig til en ekspert-opinion, ingen deltagelse i – potentielt – uberettiget skattefordel mv.) og forbehold (ingen præcedens/retspraksis mv.)". I et svar af 7. februar 2014 gentog Bech-Bruun, at den omhandlede transaktion er "problematisk fra et dansk juridisk synspunkt", at "bør-niveau kan ikke loves", og at "For at foretage denne vurdering skal vi have et fuldt overblik over transaktionen og klientens rolle, herunder hvad der foregår i Danmark".

I de følgende dage var der yderligere mailveksling mellem Jones Day og Bech-Bruun bl.a. på grundlag af en "tax opinion" af 27. juni 2012, som Bech-Bruun modtog den 10. februar 2014. Denne "tax opinion" var udarbejdet af bl.a. advokat B og angik spørgsmålet om de danske skattemæssige konsekvenser for en amerikansk pensionsplans deltagelse i transaktioner med danske børsnoterede aktier. I Jones Days mail af 13. februar 2014 anføres bl.a., at advokatfirmaet ikke har behov for en "genbekræftelse … ud fra et skattemæssigt perspektiv, men en begrundet skatteanalyse af den risiko, som vores klient kan være eksponeret for, hvis de handler som depotbank i dette projekt", og at det relevante spørgsmål er, om North Channel Bank efter dansk skatteret "kan gøres ansvarlig eller endda retsforfølges for at støtte/facilitere en skatteunddragelse begået af en af de andre aktører i denne transaktion...".

I tiden herefter fortsatte dialogen mellem Bech-Bruun og Jones Day, og Bech-Bruun modtog den 10. april 2014 et transaktionsdiagram, der var udarbejdet på tysk. Den 15. april 2014 modtog Bech-Bruun et resumé på engelsk af de påtænkte transaktioner og den 22. april 2014 et revideret engelsk resumé. I forlængelse af modtagelsen af det første engelske resumé skrev Bech-Bruun den 16. april 2014 til Jones Day bl.a., at man havde læst den nye "faktuelle beskrivelse", at "der faktisk er en indikation af, at transaktionen er en cum/ex-transaktion, hvilket var vores oprindelige bekymring, men som vi følte, at vi kunne udelukke efter at have læst tax opinion", og at den nye faktuelle beskrivelse "synes … under alle omstændigheder at udelukke, at vi beholder forudsætning 5 i vores udkast til opinion, da USPF [amerikansk pensionsplan] erhverver cum udbytteaktier fra en Sælger, som ikke ejer (eller leverer) cum udbytteaktier, og USPF kan derfor pr. definition ikke være ejer af cum udbytteaktier på udbyttegodkendelsesdatoen".

Bech-Bruun afgav under rådgivningsforløbet flere udkast til legal opinion. Bech-Bruun afgav det første udkast til legal opinion den 18. februar 2014, det andet udkast den 20. februar 2014, det tredje udkast den 15. april 2014, det fjerde udkast den 23. april 2014 og det femte udkast den 2. maj 2014.

I det femte udkast anføres det i pkt. 2 ("Scope") i en dansk oversættelse af legal opinion, at den angår "om NCB er skattepligtig i Danmark, NCB's civilretlige ansvar for et tab lidt af den danske stat og danske strafferetlige spørgsmål for NCB som følge af transaktionen …".

I pkt. 3 ("Påtænkte transaktioner") beskrives de påtænkte transaktioner i form af køb, salg og lån af aktier samt North Channel Banks udstedelse af udbytte-nota.

I konklusionen i pkt. 5 ("Opinion") anføres bl.a., *at* "NCB bør ikke være under-lagt dansk civilretligt ansvar, som indebærer pligt til at kompensere den danske stat for eventuelle tab som følge af bankens rolle i den påtænkte transaktion", men *at* en række nærmere angivne omstændigheder "forhindrer os dog i at nå frem til en mere definitiv vurdering af NCB's position". I pkt. 5 anføres det også, at "NCB bør ikke være underlagt dansk strafferetligt ansvar som følge af sin rolle i den påtænkte transaktion".

Den 4. august 2014 sendte Bech-Bruun en underskrevet legal opinion til Jones Day, der i alt væsentligt svarede til det femte udkast af 2. maj 2014.

*3.2. Ansvarsvurderingen*
Højesteret finder, at advokat A – på baggrund af dialogen med Jones Day, ind-holdet af det tyske transaktionsdiagram, de engelske resuméer af de påtænkte transaktioner og transaktionsbeskrivelserne i legal opinion – måtte indse, at der var en nærliggende risiko for, at North Channel Bank sammen med andre var involveret i at udarbejde en model for uberettiget refusion af udbytteskat.

I den forbindelse har Højesteret lagt vægt på, at advokat A allerede efter Jones Days mail af 3. februar 2014, hvor han blev gjort opmærksom på risikoen for dobbelt refusion af udbytteskat, havde særlig anledning til at være opmærksom på risikoen for tilsidesættelse af skattemyndighedernes interesser ved, at der blev søgt om uberettiget refusion. Der var anledning til yderligere at skærpe op-mærksomheden på grund af de transaktionsbeskrivelser, som han efterfølgende modtog under rådgivningsforløbet. Advokat A befandt sig således i et skærpet ansvarsmiljø.

Endvidere har Højesteret lagt vægt på, at de påtænkte transaktioner – der ind-gik i en såkaldt cum/ex-model – fremstod uden forretningsmæssig begrundelse.

Advokat A havde under rådgivningsforløbet flere gange udtalt sin bekymring over, at transaktionsmodellen fremstod som en cum/ex-model, og at modellen generelt var problematisk. Alligevel undlod han efter sin forklaring at sætte sig nærmere ind i indholdet af det tyske transaktionsdiagram. Hertil kommer, at

han vidste, at en udbyttenota udgjorde et vigtigt dokument som grundlag for refusion af udbytteskat.

Da advokat A som anført måtte indse, at der var en nærliggende risiko for, at North Channel Bank sammen med andre var involveret i at udarbejde en model for uberettiget refusion af udbytteskat, har han på uforsvarlig måde tilsidesat skattemyndighedernes interesser ved at rådgive banken som sket, herunder ved i sin legal opinion at anføre, at banken "ikke bør være underlagt" et civilretligt eller strafferetligt ansvar for sin deltagelse. Advokat A har således handlet ansvarspådragende over for Skatteforvaltningen.

Det kan under de foreliggende omstændigheder ikke føre til en anden vurdering, at advokat A havde indsat en række forudsætninger og forbehold i sin legal opinion.

Det kan heller ikke føre til en anden vurdering, at den model for uberettiget refusion af udbytteskat, som advokat As rådgivning angik, blev anvendt uden brug af aktier eller udbytte.

*4. Årsagsforbindelse*
Bech-Bruun har anført bl.a., at det begåede bedrageri ville have været gennemført, selv hvis Bech-Bruuns legal opinion ikke havde foreligget, og at der derfor ikke er den fornødne årsagsforbindelse mellem Bech-Bruuns rådgivning og det tab, som Skatteforvaltningen led som følge af uretmæssig refusion af udbytteskat.

Ved vurderingen af, om der foreligger årsagsforbindelse, finder Højesteret af de grunde, som landsretten har anført, at indholdet af Bech-Bruuns rådgivning lå fast allerede den 5. maj 2014, hvor Jones Day videresendte Bech-Bruuns legal opinion af 2. maj 2014 til North Channel Bank. Banken modtog den 9. maj 2014 Jones Days legal opinion. De første refusionsansøgninger vedlagt bankens udbyttenotaer blev indgivet til SKAT den 12. maj 2014. Der foreligger således en nær tidsmæssig forbindelse mellem Bech-Bruuns afgivelse af legal opinion den 5. maj 2014 og indgivelsen af de første uberettigede refusionsansøgninger.

På den anførte baggrund finder Højesteret, at det må lægges til grund, at der foreligger den fornødne årsagsforbindelse mellem Bech-Bruuns ansvarspådragende rådgivning og det forhold, at Skatteforvaltningen har lidt et tab som følge af uretmæssig refusion af udbytteskat.

*5. Adækvans*
Ved vurderingen af, om Bech-Bruuns erstatningsansvar bør begrænses ud fra betragtninger om manglende adækvans, må der på ene side lægges vægt på, at Bech-Bruun som nævnt ovenfor måtte indse, at der var en nærliggende risiko

for, at North Channel Bank sammen med andre var involveret i at udarbejde en model for uberettiget refusion af udbytteskat. Bech-Bruun vidste således, at banken deltog aktivt i udarbejdelsen af modellen, og Bech-Bruun måtte indse det som en nærliggende mulighed, at banken ikke var i god tro. Uanset dette anførte Bech-Bruun i sin legal opinion, at banken "ikke bør være underlagt" et civilretligt eller strafferetligt ansvar for sin deltagelse.

På den anden side må der lægges vægt på, at den uberettigede refusion af udbytteskat, der skete på grundlag af udbyttenotaer udstedt af North Channel Bank, foregik ved, at der blev bogført fiktive transaktioner, sådan at størrelsen af Skatteforvaltningens tab var uafhængig af reelle aktier og udbytter.

Højesteret finder herefter, at Bech-Bruuns erstatningsansvar ikke kan omfatte det fulde beløb på 705.821.108,92 kr., der fremgår af Skatteforvaltningens påstand 1, jf. nærmere pkt. 8 nedenfor.

*6. Skatteforvaltningens tab*
Bech-Bruun har fremsat indsigelser mod Skatteforvaltningens tabsopgørelse, herunder at den er foretaget uden hensyn til, hvad der som følge af det forlig, der blev indgået den 28. maj 2019 mellem på den ene side Skatteforvaltningen og på den anden side et stort antal pensionsplaner og andre aktører, som deltog i de uberettigede refusionsansøgninger, er betalt *af* de pensionsplaner, hvis ansøgninger om refusion var baseret på udbyttenotaer udstedt af North Channel Bank.

Af det nævnte forlig fremgår, at forligsparterne hæfter solidarisk *for* nærmere angivne beløb, som de enkelte pensionsplaner har fået udbetalt. Skatteforvaltningens fradrag i kravet mod Bech-Bruun er derfor sket ud fra, i hvilket omfang indbetalingerne fra forligsparterne forholdsmæssigt kan henføres til de pensionsplaner, der har anvendt udbyttenotaer fra North Channel Bank og ikke ud fra, hvad der er betalt *af* den enkelte pensionsplan.

Højesteret finder, at det i den foreliggende situation var velbegrundet, at Skatteforvaltningen indgik de omhandlede forlig, herunder forliget af 28. maj 2019, og at Skatteforvaltningen under de foreliggende omstændigheder var berettiget til at foretage fradrag af forligsparternes indbetalinger som sket.

*7. Egen skyld og accept af risiko*
Højesteret finder, at der ikke foreligger forhold, der kan begrunde, at Bech-Bruuns erstatningsansvar bortfalder eller begrænses ud fra betragtninger om egen skyld eller accept af risiko.

*8. Størrelsen af Skatteforvaltningens krav*

Efter det anførte om ansvarsgrundlag, årsagsforbindelse, tabsopgørelse, egen skyld og accept af risiko kan Skatteforvaltningens krav mod Bech-Bruun opgøres til 705.821.108,92 kr.; i overensstemmelse med Skatteforvaltningens påstand 1.

På baggrund af det, der er anført under pkt. 5 om adækvans, finder Højesteret, at Bech-Bruuns erstatningsansvar ud fra en samlet vurdering alene bør omfatte et beløb på 400 mio. kr.

*9. Forældelse*
Højesteret finder, at forældelsesfristen ikke løb fra tidspunkterne for Skatteforvaltningens udbetalinger til pensionsplanerne (skadens indtræden), jf. forældelseslovens § 2, stk. 4. Forældelsesfristen var således suspenderet og ville herefter først løbe fra det tidspunkt, hvor Skatteforvaltningen fik eller burde have fået kendskab til fordringen eller skyldneren.

Skatteforvaltningen har anlagt sagen den 8. juni 2020, og det er derfor afgørende, om suspensionen af forældelsesfristen var ophørt den 8. juni 2017, idet Skatteforvaltningens krav i givet fald vil være forældet ved sagens anlæg på grund af den 3-årige forældelsesfrist.

Bech-Bruun har gjort gældende navnlig, at suspensionen af forældelsesfristen ophørte med den mail af 10. oktober 2016, som Skatteforvaltningen modtog fra de tyske myndigheder. Højesteret finder, at Skatteforvaltningen på baggrund af indholdet af den pågældende mail ikke fik eller burde have fået kendskab til, at Bech-Bruun var ansvarlig skadevolder (skyldner), jf. forældelseslovens § 3, stk. 2.

Højesteret finder, at der heller ikke i øvrigt foreligger omstændigheder, der kan begrunde, at suspensionen af forældelsesfristen var ophørt den 8. juni 2017. Skatteforvaltningens krav mod Bech-Bruun var således ikke forældet ved sagens anlæg den 8. juni 2020.

*10. Rente*
Højesteret finder, at der ikke er grundlag for at forrente Skatteforvaltningens krav fra et tidligere eller senere tidspunkt end den dag, hvor sagen blev anlagt, jf. rentelovens § 3, stk. 2, 4 og 5, eller for, at forrentningen skal ske med en lavere rentesats, jf. lovens § 5, stk. 3.

Skatteforvaltningens krav skal derfor forrentes med procesrente fra sagens anlæg den 8. juni 2020.

*11. Samlet konklusion*

Bech-Bruun skal til Skatteforvaltningen betale 400 mio. kr. med procesrente fra den 8. juni 2020. Højesteret tager således Skatteforvaltningens påstand 1 og 3 delvist til følge og frifinder Bech-Bruun for Skatteforvaltningens påstand 2.

Højesteret tager endvidere Skatteforvaltningens påstand 4 om tilbagebetaling af sagsomkostninger for landsretten til følge.

*12. Sagsomkostninger*
Efter sagens karakter, omfang og udfald finder Højesteret, at Bech-Bruun skal betale delvise sagsomkostninger for landsret og Højesteret med i alt 12.394.000 kr. til Skatteforvaltningen. Heraf er 12 mio. kr. til dækning af advokatudgift, og 394.000 kr. er til dækning af retsafgift.

### THI KENDES FOR RET:

Bech-Bruun I/S skal betale 400.000.000 kr. til Skatteforvaltningen med procesrente fra den 8. juni 2020.

Bech-Bruun I/S skal til Skatteforvaltningen tilbagebetale 6.189.953,70 kr. med procesrente fra den 24. maj 2022.

I sagsomkostninger for landsret og Højesteret skal Bech-Bruun I/S betale i alt 12.394.000 kr. til Skatteforvaltningen.

De idømte beløb skal betales inden 14 dage efter denne højesteretsdoms afsigelse.

Sagsomkostningsbeløbet forrentes efter rentelovens § 8 a.



# HIGH THE VERDICT OF THE ESTER

### delivered on Monday, November 20 2023

---

**Case BS-20331/2022-HJR**
(1st section)

Tax administration
(Attorney Boris Frederiksen and Attorney Steffen Sværke)

v.

Bech-Bruun I/S
(Attorney Ole Spiermann and Attorney Jakob Lentz)

In a previous instance, a judgment was handed down by the 12th Chamber of the Eastern High Court on April 28, 2022 (BS-26436/2020-OLR).

Five judges have participated in the judgment: Jens Peter Christensen, Ole Hasselgaard, Rikke Foersom, Peter Mørk Thomsen and Mohammad Ahsan.

**Claims**

The Appellant, the Danish Tax Administration, claims that (1) the Respondent, Bech-Bruun I/S, must pay DKK 705,821,108.92 with interest from September 28, 2023, that (2) Bech-Bruun must pay DKK 446,605,946.27, and that (3) Bech-Bruun must
pay DKK 201,954,297.55.

The Tax Administration has also claimed that (4) Bech-Bruun must repay DKK 6,189,953.70, which the Tax Administration has paid to comply with the High Court's judgment, with interest from May 24, 2022.

In the alternative, the Danish Tax Administration has claimed that Bech-Bruun must acknowledge that it is liable to pay damages for the advice to North Channel Bank. In the further alternative, Bech-Bruun must acknowledge that it is liable for the Tax Administration's losses as a result of applications for reimbursement of withheld

dividend withholding tax dated in the period May 12, 2014 to July 22, 2015 based on Credit Advices issued by North Channel Bank, alternatively for a shorter period.

Bech-Bruun has claimed confirmation of the Tax Administration's claims 1-3, claim 4 claimed acquittal, the alternative claim claim claimed dismissal, alternatively acquittal, and the further alternative claim claim claimed acquittal.

**Supplementary case presentation**
Additional material has been submitted to the Supreme Court on, among other things, North Channel Bank's circumstances, losses, settlements and calculation of claims as well as SKAT's circumstances.

**Explanations**
A has submitted a supplementary statement to the Supreme Court.

**Submitter**
The Danish Tax Administration has stated in particular that Bech-Bruun is liable for the Tax Administration's loss of DKK 1,135,775,442.18, which arose when a number of pension plans, banks, financiers, paying agents and lawyers with various involvements constructed a criminal setup that misled SKAT (now the Danish Tax Administration) into paying the aforementioned amount. In essence, the setup was that tax-exempt American pension plans appeared as recipients of Danish taxed dividends based on dividend notes from a German bank, North Chan- nel Bank, even though they had never received dividends, and they were thus wrongfully refunded dividend tax.

Bech-Bruun undertook to prepare a legal opinion that North Channel Bank should not be liable for damages or criminally liable for its participation in the set-up. By providing the said legal opinion, Bech-Bruun contributed to North Channel Bank issuing genuine but materially incorrect dividend notes. Bech-Bruun was aware that the application for a dividend tax refund required bank documentation for the receipt of dividends (dividend note) and that North Channel Bank would issue such documentation. Bech-Bruun knew that if Bech-Bruun gave a "should-opinion" that the bank would not incur liability, then the bank would participate in the set-up and issue dividend notes. Bech-Bruun's issuance of a legal opinion with the desired conclusion was an active act on Bech-Bruun's part. The action was culpable. Bech-Bruun could have refrained from advising or issued its legal opinion with the opposite - and thus correct - conclusion.

Through a transaction diagram, Bech-Bruun was able to gain full insight into the model to be used for the fraud. Bech-Bruun therefore knew that North Channel Bank had full insight into what was going on. When North Channel Bank also participated as a custodian bank by issuing dividend notes, the bank would

be liable if the applications were improper, regardless of whether the bank's role was large or small.

Bech-Bruun was aware of the risk and thus the potential consequences of the advice - namely the state's loss - and should therefore have ensured in its advice that it did not contribute to unlawful reimbursement. Bech-Bruun did not live up to this obligation.

In the corporate tax cases, the courts ruled that the advisors to the sellers had a duty to protect the interests of the tax authorities, as did the sellers. Bech-Bruun also has that duty. However, unlike the corporate veil piercing cases, Bech-Bruun was aware of the risk of the tax authorities suffering losses, and that was the very essence of what Bech-Bruun opined on. Bech-Bruun's response is stricter than what follows from the corporate raider cases, as Bech-Bruun's client, North Channel Bank, does not correspond to the sellers in the corporate raider cases, but to the criminal buyers. Bech-Bruun advised the bank convicted of fraud.

The liability of Bech-Bruun shall be assessed as a liability for contributory negligence. Bech-Bruun's liability must be assessed on the basis of the damaging act without taking into account what the perpetrator may have agreed with other actors in the set-up.

Bech-Bruun was warned about the risk of double reimbursement and both wrongful and criminal reimbursements. It is extremely rare in tort cases that the tortfeasor has been so directly warned of the potential adverse effects of their actions. The email of February 3, 2014, from the law firm Jones Day contained clear warning signs, even though it made the caveat that a structure paper had not yet been seen. There is nothing in the case to support that such an email would be customary. Jones Day's email should have given extra cause for caution, as it appeared that Jones Day was willing to advise the bank even though the bank knew that its customers would engage in potentially criminal transactions, double refunds, tax fraud and dividend arbitrage. Jones Day's sole focus was whether the bank would risk liability for this and not whether fraud, etc. could be avoided. This fact, which must be described as a warning, thus tightens the requirements for Bech-Bruun. Therefore, Bech-Bruun should have ensured that their advice could not be used for criminal offenses when Jones Day explicitly pointed out the risk of this.

Bech-Bruun understood that there was a risk of undue reimbursement due to cum/ex. In view of the warning and the understanding thereof, Bech-Bruun should have ensured in its advice that no opportunity was created to apply for undue reimbursement, but even though Bech-Bruun immediately realized this risk of undue reimbursement, Bech-Bruun

refund, it was not handled. Instead, Bech-Bruun ended up approving that North Channel Bank issued dividend notes in a cum/ex-mo part.

Bech-Bruun accepted the use of the criminal cum/ex model that did not serve a legitimate purpose. Bech-Bruun could see that there was no business purpose. The only realized purpose was dividend arbitrage, but the model was counter-productive for seeking dividend refunds. It was, however, suitable for fraud. It made no sense for trades to be structured as cum/ex if they were ordinary trades or dividend arbitrage. In that case, you could trade o n   normal terms. However, it made sense if the purpose was to obtain a wrongful refund. Bech-Bruun was aware that cum/ex was a deviation from normal market conditions that could be used for criminal acts. Bech-Bruun thus chose to advise on transactions with no commercial purpose, where strict requirements apply to the adviser's due diligence in view of the risk of abuse or criminal purposes.

Together and separately, the cum/ex model, the dividend note without receiving dividends and compensation payments under stock loans were inexplicable if the purpose was tax arbitrage. If the actors in the model had a shareholding, it would have been simple to just transfer the shares to the pension plan, which would appear as the owner, receive the dividend and dividend note, and apply for a refund.
The unexplained circumstances, on the other hand, made sense if the purpose was to seek reimbursement without shares.

Bech-Bruun could see and accepted that two dividend notes would be issued for one dividend and that incorrect documentation for withholding tax would be issued. Bech-Bruun deliberately failed to familiarize itself with the German transaction diagram, which showed the fraud model in plain text. The transaction diagram Bech-Bruun received showed how the fraud was to be structured with offsetting accounting entries where dividend notes were to be issued anyway. Even on the surface, it was clear from the transaction diagram that the trades were pro forma, and a closer look revealed that the "trades" took place without shares, money and thus dividends. In view of the circumstances, Bech-Bruun had a duty to understand the model as a whole before Bech-Bruun gave an opinion on it, and Bech-Bruun could not, in its advice, choose, by agreement with the client, to disregard knowledge that Bech-Bruun possessed.

Bech-Bruun should have realized that the dividend notes would violate section 163 of the Criminal Code, as North Channel Bank did not know whether the note (declaration) was correct. If the offense content of section 163 is realized and at the same time there is enrichment

intent, there is an imminent risk of fraud under section 279 of the Danish Criminal Code, for which North Channel Bank has been convicted. Bech-Bruun had the information to recognize this risk.

Bech-Bruun knew that North Channel Bank's dividend notes were to be used to apply for a refund of Danish dividend tax. Bech-Bruun should therefore in any event have ensured that the pension plan was the tax law owner, as North Channel Bank's dividend notes were knowingly to be used towards the Danish tax authorities in a model that the bank was part of and had full insight into i. Bech-Bruun could see that the pension plan was not the tax owner of the exchange.

Bech-Bruun was an expert in dividend taxation and had extensive practical experience, including with foreign shareholders. Bech-Bruun's defense consists of points of view on limitations in assignments, assumptions and reservations. You cannot write yourself out of a professional responsibility towards third parties. On the contrary, lawyers are obliged to exercise a critical sense and investigate suspicious circumstances before providing advice. Bech-Bruun has thus committed gross and clear errors that are liable to prosecution.

Bech-Bruun's legal opinion was broadcast on Monday, May 5, 2014. On Friday, May 9, 2014, Jones Day issued its legal opinion based on, among other things, Bech-Bruun's legal opinion. On Monday, May 12, 2014, SKAT received the first refund applications based on dividend notes from North Channel Bank. Bech-Bruun knew that the dividend notes would lead to the payment of a dividend refund from the Danish state. North Channel Bank and the other actors involved in the fraud obviously requested Bech-Bruun's advice because they needed it.
Thus, the payment of the dividend refund is an intentional consequence of the advice and the refund is a causal consequence of that advice.

The close temporal connection between Bech-Bruun's final legal opinion and the first unjustified reimbursement applications with exchange notes from North Channel Bank is clear. It was a specifically formulated task that Bech-Bruun's legal opinion was to be obtained. When the first positive conclusion from Bech-Bruun was available, the first preparatory actions could be initiated, and when the final advice was available, the reimbursement application could be submitted.

Specifically, Bech-Bruun's engagement, the course of the advice, the execution of the transactions on which Bech-Bruun advised, the subsequent use of Bech-Bruun's advice, and Bech-Bruun's subsequent confirmations of the advice, together and separately, prove a causal link between Bech-Bruun's unconscionable advice to North Channel Bank and the Tax Administration's losses.

The causal link between Bech-Bruun's negligent advice and the Tax Administration's loss also follows from the fact that there are no relevant differences - if any - between the description in Bech-Bruun's legal opinion and the booked transactions.

The tax authorities' loss was an adequate consequence of Bech-Bruun's negligent advice. Bech-Bruun could see that reimbursement would be sought on the basis of the dividend notes that Bech-Bruun authorized North Channel Bank to issue, and Bech-Bruun did not care about the size of the claims and thus the Tax Administration's loss until a claim for damages was asserted against Bech-Bruun.

It was also foreseeable to Bech-Bruun that dividend notes from North Channel Bank could be used in connection with unjustified refund applications that would result in a loss for the Tax Administration if Bech-Bruun approved the set-up. Whether these dividend notes would be false because the set-up was carried out with pro forma transactions or without real share and cash flows is irrelevant, but Bech-Bruun did have the information to realize that it was to be carried out without shares and cash. Since the set-up was to be carried out without shares and money, the Tax Administration's potential loss as a result of unjustified refund applications with dividend income from North Channel Bank was difficult to delineate. Thus, it was not unforeseeable to Bech-Bruun that the Tax Administration's loss could be very large, and Bech-Bruun cannot therefore, by reference to the size of the loss, avoid liability. Bech-Bruun even knew that a single refund application could concern a very large amount.

The Tax Administration has proven the loss. It is undisputed that the Tax Administration has suffered a loss of DKK 1,135,775,442.18 by paying refunds in accordance with improper refund applications attached to dividend notes from North Channel Bank. The Tax Administration has reduced its claim by the payments that the Tax Administration has received from other claimants. The reduction has been made proportionally, as the payments have been received from tortfeasors who had contributed to both the North Channel Bank part and other wrongful reimbursement claims. The principal amount is now DKK 705,821,108.92.

The loss is caused by North Channel Bank, Bech-Bruun and others who have contributed to the wrongful reimbursement claims. When there are several tortfeasors who are all liable for a loss, they are jointly and severally liable, after which the injured party is free to choose which tortfeasor to pursue.

Bech-Bruun argues that their liability for damages should lapse as a result of the Tax Administration's own fault and acceptance of risk. This is Bech-Bruun's burden of proof and has not been proven.

The Danish Tax Administration has been the victim of an unprecedented fraud, where a group of bankers and financiers coordinated an international, complex and extensive fraud scheme. This fraud cannot be blamed on the Tax Administration. It can only be blamed on the individuals, companies and advisors who participated and advised. No one at the Tax Administration was aware of the fraud in the dividend case.

The viewpoint of accepting risk does not make sense. The risk of unjustified refund applications is a basic condition that SKAT shares with everyone else who pays out money. This is especially true in areas with mass administration, such as VAT and social benefits. There are risks associated with all parts of tax administration, and resource allocation is a prioritization issue - not an acceptance of risk.

SKAT's administration of the dividend refund area was in accordance with the legal basis. The underlying financial system on the basis of which SKAT was to carry out refund checks is simple and standardized, especially when it comes to listed companies. The robustness of the system is further confirmed by how complicated a setup the fraudsters in the Danish dividend case had to establish in order to succeed with the fraud.

SKAT has carried out both formal and substantive checks before payment was made. Thus, it has been established that the "necessary information and prescribed attachments and documentation" are available and that "rates and calculations" are correct. It is also verified that the "information is plausible", as a  foreign tax authority and an independent credible party - a bank - have declared it.

On June 16, 2015, Special Control in SKAT received a report of suspected fraud with refund of dividend tax. At this point in June 2015, there was no basis for suspending all payments in this area. The inquiries mentioned "suspected fraud" of up to DKK 500 million and did not contain concrete evidence. Only with the information from the UK tax authorities could the information from the first report be confirmed to such an extent that it could be assessed whether there was sufficient basis for taking action. On August 6, 2015, the same day that SKAT received the information from the UK tax authorities, the refund payments were stopped.

The Tax Administration's claim is not time-barred. The limitation period was suspended until the Tax Administration received sufficient factual information to assess that there was a basis for issuing a summons against Bech-Bruun, cf. section 3(2) of the Limitation Act. Such factual information was received by the Tax Administration at the earliest on June 29, 2018, when the Tax Administration received Bech-Bruun's legal opinion. As the summons was issued less than three years from this date, the claim is not time-barred.

The email of October 10, 2016 from Finanzamt für Steuerstrafsachen und Steuerfahn- dung Wuppertal to the Tax Administration did not give reason to initiate an investigation of Bech-Bruun with the consequence that the Tax Administration "should have become aware" of the claim for damages against Bech-Bruun at an - unknown - time in the subsequent period. The email did not provide the Tax Administration with a basis for raising a claim for damages against Bech-Bruun.

Even if there may be a further duty to investigate, it cannot in any case imply that the Tax Administration should have obtained insight into Bech-Brun's advice prior to June 8, 2017. The commencement of a duty to investigate does not lift the suspension period. The suspension will only end when the creditor received or should have received sufficient information to assess its claim. The suspension only ends if the creditor's ignorance can be blamed on the creditor. It can therefore never be at the time when any duty to investigate begins.

According to section 3(5) of the Danish Interest Act, the Tax Administration's claim must bear interest from the time of payment, as the damage has been caused by unlawful conduct and the Tax Administration has been prevented from raising the claim at an earlier date.

If the Supreme Court finds that the claim cannot be assessed on the present basis, Bech-Bruun must be ordered to recognize its liability for damages according to the Tax Administration's alternative or more alternative claim.

Bech-Bruun has argued in particular that there is no basis for liability. In circumstances such as the present case, where it is undisputed that a lawyer was not aware of the client's fraud, liability towards third parties requires, in accordance with case law, at least that the lawyer has been specifically involved and committed a clear error of a certain seriousness for which the lawyer can be blamed to such an extent that the lawyer must bear the loss. These basic conditions for a breach of the standard of liability are by no means met.

A legal opinion is a legal assessment of a given fact given to a client. The client's purpose of a legal opinion is to uncover a legal risk, while the lawyer in his legal opinion will make every effort not to express an opinion on anything else

than the facts presented, or assume risks other than those required by the lawyer's assignment. The facts in a legal opinion are determined together with the client, to which are added assumptions and qualifications, which are also agreed with the client. The facts and assumptions are neither checked nor verified. In general, legal liability towards third parties requires something special, and this applies in particular to a legal opinion, which according to its content can only be invoked by the client.

The purpose of Bech-Bruun's legal opinion of August 4, 2014, was to assess the "consequences for NCB of acting as a custodian bank" under Danish law. The subject was a hypothetical situation, which was set up for the purpose of assessing the bank's risks based on specified assumptions and reservations. Such a risk assessment is a typical example of the scope of application of legal opinion, and it is quite common in a risk assessment to include the "worst case". Bech-Bruun did not provide a legal opinion on whether the bank's client would meet the tax law conditions for refund of dividend tax. On the contrary, the legal risks that Bech-Bruun assessed were based on the hypothetical situation that SKAT subsequently found that the conditions of Danish tax law were not met, including not least the condition of beneficial ownership. In order to establish liability, it would be necessary, but not sufficient, that Bech-Bruun, in connection with the preparation of the legal opinion, should have realized that North Channel Bank would commit fraud. There is no basis for this.

The assessment of the basis for liability must be based on Bech-Bruun's assignment. The assignment concerned a legal opinion, and it was stated that "the question to be answered in my opinion is whether the client, from a Danish tax law perspective, can be held liable or even prosecuted for supporting/facilitating a tax evasion committed by one of the other actors in this transaction (which was the reason why we requested the Danish tax opinion)". The concern was thus related to the fulfillment of general conditions for refund of dividend tax and was not related to the bank, but to the bank's customer and transaction.

As the situation was presented to Bech-Bruun, there was a legitimate need for advice, and it was fully justified for Bech-Bruun to take on the assignment. Any other Danish law firm with the necessary competencies would have done the same. Bech-Bruun naturally assumed, in accordance with Bjørnholm's tax opinion and like Jones Day, that there would be shares and that dividends would be received after withholding of dividend tax. The fact that A did not know of any business purposes other than the client's tax advantage, and that the bank's client thus apparently engaged in dividend arbitrage, did not change anything.

The Tax Administration has placed very considerable emphasis on the German transaction summary, which, according to the Tax Administration, should show that the transaction consisted of only three parties and would be circular. However, A could not understand the German transaction summary, and it was removed by agreement from the advice and replaced by the English transaction description at Jones Day's responsibility.

In the legal opinion, Bech-Bruun concluded that "NCB should not be subject to Danish civil liability, which entails an obligation to compensate the Danish state for any losses resulting from its role in the contemplated transaction", and that "NCB should not be subject to Danish criminal liability as a result of its role in the contemplated transaction". This was thus a so-called "should" opinion, as the use of the word "should" indicated a certain uncertainty in the assessment and thus a certain risk. It is explicitly stated that Bech-Bruun did not verify, let alone "rubber stamp" the transaction description or the assumptions. Furthermore, three express reservations were formulated in connection with the conclusion on liability.

In its argumentation in this case, the tax administration seeks to disregard the above-mentioned circumstances and reverse the fixed understanding of legal opinions. The argumentation is based on unfamiliar constructions that a lawyer giving a legal opinion should have a duty to verify facts and assumptions, just as the lawyer should not be able to make reservations, and this should apply in particular in relation to third parties.

The three caveats and the legal opinion in its entirety leave no doubt as to how Bech-Bruun would have assessed a situation where North Channel Bank's customers would not own any shares at all, thus constituting fraud. A had made it clear from the outset that dividend tax could not be refunded more than once. He later had the opportunity to emphasize that the bank's customer could not claim a dividend tax refund without owning shares with dividend rights at the time of the distribution.

It is disputed that "T+3" was market practice. There is no basis for claiming that deviation from this or other alleged market conditions would have been unusual or unjustified, let alone suspicious, just as any misconception would not concern the bank as a custodian. Particularly with regard to "cum/ex" and the Tax Administration's comparisons to Germany, the tax authorities have generally stated that the case was not similar to the previous circumstances in Germany.

Liability issues in cases of fraud by others sometimes arise for auditors, and the Supreme Court has shown restraint in imposing liability for damages, see e.g. UfR 2014.1346 H.

Case law in the cases on the emptying of companies shows that positive knowledge of a transfer which is not a normal business transaction and which involves significant "additional proceeds" does not in itself justify liability under Danish law's general rules on damages. This requires further specific participation of a certain materiality (complicity). Unlike the corporate racketeering cases, Bech-Bruun did not instruct customers of North Channel Bank to carry out transactions, just as Bech-Bruun had no dialog with the bank and certainly not the bank's customers. Nor did Bech-Bruun assist in the execution of specific transactions, and Bech-Bruun had no role in the specific applications that caused losses to SKAT.

In the present case, there is no basis for a stricter liability standard. That bank customers' participation in dividend arbitrage should justify a stricter standard of liability cannot apply to the lawyer who, in accordance with his assignment, gives a legal opinion to the bank on the legal position of the bank, as opposed to the bank customer. For the lawyer who advises a bank, it cannot justify a stricter standard of liability that another bank may also issue notes in connection with the same dividend. On the contrary, it must be commonplace, especially in the case of compensation payments. Furthermore, the legal opinion concerned the hypothetical situation where SKAT subsequently found that the bank's customer was not entitled to a refund of dividend tax, and where it would be expected that another customer in another bank could be entitled to such a refund.

The recommendations in the Danish Ministry of Taxation's report from November 2014 on strengthened advisor and industry cooperation to counter cross-border tax evasion - several of which, with effect from July 2019, are reflected in new provisions in the rules of professional ethics - would not provide a basis for criticism of Bech-Bruun, even if they had existed earlier and even if Bech-Bruun had specifically provided tax advice.

Bech-Bruun cannot be held jointly and severally liable with the criminal individuals and companies that have acted specifically and intentionally in a fraud.

The fictitious transactions in North Channel Bank directly contradicted Bech-Brun's legal opinion on numerous points, including explicit assumptions and reservations.

Both causation and foreseeability are lacking. The fraudulent issuance of false notes was in progress before Jones Day and Bech-Bruun issued their legal opinions. There is every reason to believe that the fraud would have been committed even in the absence of the legal opinions. The only possible use of legal opinions was with the auditors and the authorities in Germany, who, however, did not require legal opinions and who, moreover, would only approach them long after the dividend notes had been issued to customers.

The tax administration has the burden of proving causation. Causation basically requires that North Channel Bank would not have committed fraud in the absence of Bech-Bruun's legal opinion. There is not the slightest evidentiary support for this.

If North Channel Bank had theoretically considered one or more legal opinions to be material to whether the bank would commit fraud by recording fictitious stock and money movements and willfully issuing false notes, the bank would have had Jones Day's and Bech-Bruun's legal opinions in place in final, signed form beforehand. This did not happen. Final legal opinions were not requested until July 2014 and were only issued in August and September 2014.

The possible use of legal opinion had to do with the bank's regulatory environment in Germany. Bech-Bruun's legal opinion should not and could not be used in Denmark. With regard to Germany, there is no documentation that Jones Day's or Bech-Bruun's legal opinions were used internally in North Channel Bank as a basis for decision-making or otherwise. Any external use, e.g. to an authority, required finalization and signature. The drafts of May 2 and May 9, 2014 (on Danish, German and Belgian law) did not constitute advice for which a lawyer may be liable. The drafts of May 2 and May 9, 2014, were in time prior to the submission of the refund applications to SKAT in Denmark, but not prior to the registration and issuance of dividend notes in Germany.

This is crucial, as the registration and issuance of dividend notes involved the bank, while dividend tax refund applications did not. In fact, the dividend notes had left the bank long before the refund applications were filed, and the dividend notes were then subject to the control of others. The drafts of the legal opinion from February 2014 did indeed also precede the regulation and issuance of dividend notes in Germany, but do not establish a causal link. The drafts constituted even less than the May drafts advice for which a lawyer could be liable.

The claimed loss is not a foreseeable consequence of Bech-Bruun's legal opinion. Basically, Bech-Bruun's provision of legal opinion to North Channel Bank has not increased the danger or risk associated with SKAT's management of applications for refund of dividend tax.

It was not foreseeable to Bech-Bruun that the client of North Channel Bank would enter into a "transaction" that was inconsistent with the transaction description in Bech-Bruun's legal opinion, or that the bank would assume a role other than custodian, or that the bank would commit fraud by recording fictitious stock and cash movements and intentionally issuing false notes.

Nor was it foreseeable that the refunds related to alleged shareholdings that were both enormous and completely unrealistic, both in terms of the nature of the pension plans and North Channel Bank.

Any claim is forfeited by limitation. The limitation period must be calculated from October 10, 2016, at the latest, when SKAT was informed by the German authorities that Bech-Bruun had issued a "declaration" that a German bank involved in the "dividend case" as a custodian bank had acted "legally". If SKAT at the time had rightfully believed that there could be a basis for liability for a Danish advisor, the email provided SKAT with the factual basis. The only German bank that appeared in the "dividend case" was North Channel Bank, and the volumes stated in the email corresponded to the dividend notes issued by this bank, which SKAT had collected and analyzed. This had led to a police report against the bank in August 2016, which was shortly before the receipt of the email of October 10, 2016. At the time of issuing the summons in June 2020, the claim was thus time-barred.

The tax administration has the burden of proof for suspension of the limitation period, and the tax administration has not met that burden.

It is inherent in the 3-year limitation period that the creditor may have work to do while the limitation period is running. Thus, the limitation period does not only run from the time when the claimant has a full overview of the case or comes into possession of evidence that the claimant attaches particular importance to.

There is acceptance of risk and own fault. In 2007, SKAT and the Ministry of Taxation deliberately chose not to carry out any substantive control of applications for refund of dividend tax, and this choice was maintained, despite the fact that in 2012 the Ministry of Taxation informed the Danish Parliament to the contrary, and despite the fact that from 2012 to 2015 SKAT paid out ever-increasing billions of dollars on the basis of applications from unknown American pension plans. It came as a surprise to everyone, including Bech-Bruun, that this was fraud. SKAT could and should have realized that the refund applications submitted in 2014 with dividend notes issued by North Channel Bank were unusual. SKAT should have realized very quickly that something was seriously wrong.

The acceptance of risk by SKAT does not prevent the Tax Administration from pursuing claims against the persons who have intentionally committed or contributed to fraud, but it does preclude claims for damages against Bech-Bruun.

The management of the dividend area has been irresponsible, which can be attributed to SKAT (now the Tax Administration) as its own fault. It was a direct consequence of the irresponsible management that refunds were paid out in accordance with

applications enclosed notes from North Channel Bank, and it would be disadvantageous to order Bech-Bruun to bear the consequences of this. In a case such as the one in question, where the authority itself is the claimant, it is irrelevant that public law obligations to control do not generally seek to protect taxpayers or advisors. The tax administration's ability to prioritize resources does not provide access to save all resources and thereby delegate the required control to private advisors.

Furthermore, it is an expression of their own fault that SKAT did not suspend the processing of applications for refund of dividend tax until August 6, 2015, even though SKAT received the first inquiry from a Danish tax advisor about the suspected fraud as early as June 16, 2015.

SKAT has not suffered any loss. It is not disputed that SKAT unjustifiably paid a total of DKK 1,135,775,442.18 in refund of dividend tax on the basis of applications attached to dividend notes issued by North Channel Bank. A loss statement must be limited to the relevant period, which is why notes totaling at least DKK 600,228,186.33 must be disregarded, in addition to which payments received from others must be deducted. The Tax Administration has stated that it has received DKK 1,010,424,596.73 in accordance with the secret settlement agreement from May 2019 with, among others, the bank's owners and customers, but despite a discovery order, the Tax Administration has failed to document which payments are to be attributed to exchange notes issued by North Channel Bank. The Tax Administration cannot be excused for any self-created lack of evidence, and a loss has therefore not been established.

It follows from the general law of obligations that in cases where there are several causes of damage, each with its tortfeasors, and where an injured party receives partial payments from some tortfeasors, the injured party is obliged to allocate the payments to the causes of damage to which the payments relate.

There is nothing to prevent the total payment under the Settlement Agreement of DKK 1,010,424,596.73 from originating from Settling Parties responsible for the "NCB Share". Without documentation as to whether the payments received relate to the "NCB-
share", there is no other option than that the full payment must be deducted from the claim against Bech-Bruun.

In addition, the Tax Administration has failed to observe its duty to limit losses and is therefore also precluded from asserting a claim against Bech-Bruun. Recovery of the amounts wrongfully paid by the tax authorities must in general take precedence over a claim for damages against Bech-Bruun, and a claim against Bech-Bruun must presuppose that the Tax Administration documents that recovery has not been possible.

The tax administration's highly unusual interest claim is disputed in its entirety. On the contrary, an interest claim in a case such as the case at hand must be dropped, or, alternatively, the interest rate must be reduced, cf. Sections 3(5) and 5(3) of the Interest Act. In any case, there is no basis for interest on any claim for damages from a time earlier than the commencement of the case, cf. section 3(4).

**Reasoning and result of the Supreme Court**

*1. Background and issues of the case*
In 2014, Bech-Bruun I/S advised the German bank, North Channel Bank, on the bank's possible liability by participating in transactions with Danish listed shares. The transactions involved North Channel Bank issuing dividend advice notes (Divi- dend Credit Advice) that could be used when submitting applications to SKAT (now the Danish Tax Administration) for refund of dividend tax.

During 2014 and 2015, North Channel Bank issued dividend notes which, in the period from May 12, 2014 to July 22, 2015, were attached by so-called reclaim agents to applications to SKAT for refund of dividend tax to US pension plans that had a favorable dividend tax position as a result of a double tax treaty between the US and Denmark. Based on the applications received, SKAT paid a total of DKK 1,135,775,442.18. The refund applications subsequently turned out to be unjustified. In this connection, the parties agree that the refund applications were based on fictitious transactions, as there were no shares, dividends or cash flows.

On September 23, 2019, North Channel Bank was fined DKK 110 million by the Court of Glostrup for fraud of a particularly serious nature. In connection with the fine, North Channel Bank pleaded guilty to having registered fictitious share and money movements and issued dividend notes in the period 2014-2015, which contained false information about the payment of dividends on Danish shares, and which the bank's accomplices used on behalf of US pension plans to obtain unauthorized payments of no less than DKK 1.1 billion from Danish tax authorities. The bank thereby obtained unjust enrichment of no less than DKK 55 million.

The main issue in the case is whether Bech-Bruun, on the basis of its advice to North Channel Bank, is liable for the loss suffered by the Tax Administration as a result of the aforementioned unjustified refunds of dividend tax.

The case concerns an amount of just over DKK 700 million plus interest, as the Danish Tax Administration has reduced the claim totaling approx. DKK 1.135 billion with payments received by the Danish Tax Administration through settlements reached with various players who have participated in the submission of unjustified refund applications, including refunds based on dividend notes issued by North Channel Bank.

During the case, questions have been raised about the basis of liability, causation, equivalence, loss calculation, own fault and acceptance of risk, limitation of actions and interest.

*2. General about the liability assessment*

When assessing whether a lawyer has acted in a way that has caused liability to the tax authorities when advising a client, the decisive factor is whether the lawyer has disregarded the interests of the tax authorities in a reckless manner. Whether this is the case depends on an overall assessment of the circumstances at the time of the lawyer's advice.

A key element in the assessment is whether the transactions advised by the lawyer had a commercial purpose and whether the transactions were of an unusual nature.

In addition, the specific content of the lawyer's assignment and the advice that the lawyer has provided in the individual case are also included.

*3. The concrete assessment of responsibility*

*3.1. The counseling process*

On February 3, 2014, the law firm Jones Day in Germany sent an email to Bech-Bruun. A Danish translation of the email states, among other things *that* North Channel Bank should not be a party to the transaction in question, but only provide services, *that the* parties to the transaction "will realize a tax advantage in Denmark, which probably consists of a double refund of withheld dividend tax", *that* North Channel Bank was concerned about whether to be aware of "problems" in Denmark, e.g. "tax fraud", and that North Channel Bank was concerned about whether to be aware of "problems" in Denmark, e.g. "tax fraud", and e.g. "tax fraud" and *that* until recently there had been loopholes in German tax law that allowed for double refunds, but that the German tax authorities "are now investigating these transactions and trying to claim that they are abusive or even criminal offenses". A response on the same day to law firm Jones Day from lawyer A, who advised Bech-Bruun on North Channel Bank, states, inter alia, *that* transactions such as those described "may involve the possibility of two shareholders applying for a refund of the same withholding tax ... ('cum/ex transactions')" and *that* such transactions are "generally problematic from a legal perspective and it is often not possible to provide the kind of opinion on legal and liability issues that the parties involved usually seek".

On February 5, 2014, Jones Day stated, inter alia, that North Channel Bank would like a fee offer and that its role "will be limited to providing custodial services to the parties to the cum/ex transaction". To this, Bech-Bruun responded the same day that the fee would be around EUR 6,000-7,000 and that "these structures are typically problematic under Danish law".

On February 6, 2014, Jones Day asked Bech-Bruun whether a legal opinion could be a reasoned "should-opinion", "(i.e. 'NCB [North Channel Bank] should not be subject to criminal prosecution, etc.') with certain reasonable assumptions (e.g. acting in good faith, relying on an expert opinion, no participation in - potentially - unjustified tax benefit, etc.) and qualifications (no precedent/ case law, etc.)". In a response dated February 7, 2014, Bech-Bruun reiterated *that* the transaction in question is "problematic from a Danish legal point of view", *that* "should-level cannot be promised", and *that* "In order to make this assessment, we need a full overview of the transaction and the client's role, including what is going on in Denmark".

In the following days, there was further email exchange between Jones Day and Bech-Bruun, among other things on the basis of a tax opinion of June 27, 2012, which Bech-Bruun received on February 10, 2014. This tax opinion was prepared by, among others, Attorney B and concerned the question of the Danish tax consequences of a US pension plan's participation in transactions with Danish listed shares. Jones Day's email of February 13, 2014, states, among other things, *that the* law firm does not need a "reaffirmation ... from a tax perspective, but a reasoned tax analysis of the risk that our client may be exposed to if they act as a custodian bank in this project", and *that* the relevant question is whether North Channel Bank under Danish tax law "can be held liable or even prosecuted for supporting/facilitating a tax evasion committed by one of the other players in this transaction ...".

Thereafter, the dialog between Bech-Bruun and Jones Day continued, and on April 10, 2014, Bech-Bruun received a transaction diagram prepared in German. On April 15, 2014, Bech-Bruun received an English summary of the contemplated transactions and on April 22, 2014, a revised English summary. Further to the receipt of the first English summary, Bech-Bruun wrote to Jones Day on April 16, 2014, inter alia, *that* it had read the new "factual description", *that* "there is indeed an indication that the transaction is a cum/ex transaction, which was our initial concern, but which we felt we could exclude after reading the tax opinion", and *that the* new factual description "seems
... in any event, preclude us from retaining premise 5 of our draft opinion because USPF [U.S. pension plan] acquires cum dividend shares from a Seller that does not own (or deliver) cum dividend shares, and therefore, by definition, USPF cannot be the owner of cum dividend shares on the dividend approval date."

During the advisory process, Bech-Bruun submitted several draft legal opinions. Bech-Bruun submitted the first draft legal opinion on February 18, 2014, the second draft on February 20, 2014, the third draft on April 15, 2014, the fourth draft on April 23, 2014 and the fifth draft on May 2, 2014.

The fifth draft states in section 2 ("Scope") in a Danish translation of the legal opinion that it concerns "whether NCB is taxable in Denmark, NCB's civil liability for a loss suffered by the Danish state and Danish criminal law issues for NCB as a result of the transaction...".

Section 3 ("Proposed transactions") describes the proposed transactions in the form of purchase, sale and loan of shares and the issuance of a dividend note by North Channel Bank.

The conclusion in section 5 ("Opinion") states, among other things, *that* "NCB should not be subject to Danish civil liability, which entails an obligation to compensate the Danish State for any losses resulting from its role in the proposed transaction", but *that* a number of specified circumstances "prevent us from reaching a more definitive assessment of NCB's position". Section 5 also states that "NCB should not be subject to Danish criminal liability as a result of its role in the proposed transaction".

On August 4, 2014, Bech-Bruun sent a signed legal opinion to Jones Day that was substantially similar to the fifth draft dated May 2, 2014.

*3.2. The liability assessment*
The Supreme Court finds that Attorney A - based on the dialog with Jones Day, the content of the German transaction diagram, the English summaries of the intended transactions and the transaction descriptions in the legal opinion - had to realize that there was an imminent risk that North Channel Bank, together with others, was involved in preparing a model for unjustified refund of dividend tax.

In this connection, the Supreme Court has emphasized that already after Jones Day's email of 3 February 2014, in which he was made aware of the risk of double refund of dividend tax, Attorney A had particular reason to be aware of the risk of disregarding the interests of the tax authorities by applying for an unjustified refund. There was reason to be even more vigilant due to the transaction descriptions that he subsequently received during the advisory process. Lawyer A thus found himself in a heightened responsibility environment.

Furthermore, the Supreme Court has emphasized that the intended transactions - which were part of a so-called cum/ex model - appeared to have no commercial justification.

During the advisory process, Attorney A had several times expressed his concern that the transaction model appeared to be a cum/ex model and that the model was generally problematic. Nevertheless, according to his explanation, he failed to familiarize himself with the content of the German transaction diagram. In addition, that

He knew that a dividend note was an important document as a basis for a dividend tax refund.

Since, as stated, Attorney A must have realized that there was an obvious risk that North Channel Bank, together with others, was involved in preparing a model for unjustified refund of dividend tax, he has recklessly disregarded the interests of the tax authorities by advising the bank as he did, including by stating in his legal opinion that the bank "should not be subject" to civil or criminal liability for its participation. Thus, Attorney A has acted in a way that is detrimental to the Danish Tax Administration.

Under the circumstances, it cannot lead to a different assessment that Attorney A had included a number of assumptions and reservations in his legal opinion.

Nor can it lead to a different assessment that the model for unjustified re-fusion of dividend tax, which Attorney A's advice concerned, was applied without the use of shares or dividends.

*4. Causal connection*

Bech-Bruun has stated, among other things, that the fraud committed would have been carried out even if Bech-Bruun's legal opinion had not been available, and that there is therefore no causal link between Bech-Bruun's advice and the loss suffered by the Tax Administration as a result of the unlawful refund of dividend tax.

When assessing whether there is a causal connection, the Supreme Court finds, for the reasons stated by the High Court, that the content of Bech-Bruun's advice was already established on May 5, 2014, when Jones Day forwarded Bech-Bruun's legal opinion of May 2, 2014, to North Channel Bank. The bank received Jones Day's legal opinion on May 9, 2014. The first refund applications enclosed with the bank's exchange notes were submitted to SKAT on May 12, 2014. There is thus a close temporal connection between Bech-Bruun's submission of the legal opinion on 5. May 2014 and the submission of the first unjustified reimbursement requests.

Against the stated background, the Supreme Court finds that it must be assumed that there is the necessary causal link between Bech-Bruun's negligent advice and the fact that the Tax Administration has suffered a loss as a result of unlawful refund of dividend tax.

*5. Adequacy*

When assessing whether Bech-Bruun's liability should be limited on the basis of considerations of lack of adequacy, emphasis must be placed on the one hand on the fact that Bech-Bruun, as mentioned above, had to realize that there was an obvious risk

that North Channel Bank, together with others, was involved in preparing a model for unjustified refund of dividend tax. Bech-Bruun thus knew that the bank was actively participating in the preparation of the model, and Bech-Bruun had to recognize it as an obvious possibility that the bank was not acting in good faith. Notwithstanding this, Bech-Bruun stated in its legal opinion that the bank "should not be subject" to civil or criminal liability for its participation.

On the other hand, it must be emphasized that the unjustified refund of dividend tax, which was based on dividend notes issued by North Channel Bank, took place by means of fictitious transactions being booked, so that the amount of the Tax Administration's loss was independent of actual shares and dividends.

The Supreme Court then finds that Bech-Bruun's liability for damages cannot include the full amount of DKK 705,821,108.92 stated in the Tax Administration's claim 1, cf. section 8 below.

*6. Tax administration losses*

Bech-Bruun has objected to the Tax Administration's loss calculation, including that it has been made without taking into account what, as a result of the settlement reached on May 28, 2019 between, on the one hand, the Tax Administration and, on the other hand, a large number of pension plans and other actors who participated in the unjustified refund applications, has been paid *by the* pension plans whose refund applications were based on dividend notes issued by North Channel Bank.

The settlement states that the parties to the settlement are jointly and severally liable *for* specified amounts paid to the individual pension plans. The Tax Administration's deduction in the claim against Bech-Bruun is therefore based on the extent to which the payments from the settlement parties can be proportionally attributed to the pension plans that have used dividend notes from North Channel Bank and not on what has been paid *by the* individual pension plan.

The Supreme Court finds that in the situation at hand, it was well-founded that the Tax Administration entered into the settlements in question, including the settlement of May 28, 2019, and that the Tax Administration under the circumstances was entitled to deduct the settlement parties' payments as made.

*7. Self-blame and risk acceptance*

The Supreme Court finds that there are no circumstances that can justify that Bech-Bruun's liability for damages is void or limited based on considerations of own fault or acceptance of risk.

*8. The size of the Tax Administration's claim*

In accordance with the stated basis of liability, causal link, statement of loss, own fault and acceptance of risk, the Tax Administration's claim against Bech-Bruun can be assessed at DKK 705,821,108.92; in accordance with the Tax Administration's claim 1.

Based on what has been stated in section 5 on adequacy, the Supreme Court finds that Bech-Bruun's liability for damages, based on an overall assessment, should only include an amount of DKK 400 million.

*9. Statute of limitations*

The Supreme Court finds that the limitation period did not run from the time of the Tax Administration's payments to the pension plans (the occurrence of the damage), cf. section 2(4) of the Limitation Act. The limitation period was thus suspended and would then only run from the time when the Tax Administration became or should have become aware of the claim or the debtor.

The Tax Administration has brought the case on June 8, 2020, and it is therefore decisive whether the suspension of the limitation period had expired on June 8, 2017, as the Tax Administration's claim will, if so, be time-barred at the commencement of the case due to the 3-year limitation period.

Bech-Bruun has argued in particular that the suspension of the limitation period ended with the email of October 10, 2016, which the Tax Administration received from the German authorities. The Supreme Court finds that, based on the content of the email in question, the Tax Administration did not become aware or should not have become aware that Bech-Bruun was the liable tortfeasor (debtor), cf. section 3(2) of the Limitation Act.

The Supreme Court finds that there are no other circumstances that can justify that the suspension of the limitation period had ended on June 8, 2017. Thus, the Danish Tax Administration's claim against Bech-Bruun was not time-barred when the case was filed on June 8, 2020.

*10. Pension*

The Supreme Court finds that there is no basis for charging interest on the Tax Administration's claim from an earlier or later date than the date on which the case was brought, see section 3(2), (4) and (5) of the Interest Act, or for charging interest at a lower interest rate, see section 5(3) of the Act.

The Danish Tax Administration's claim must therefore be subject to interest from the filing of the case on June 8, 2020.

*11. Overall conclusion*

Bech-Bruun must pay the Tax Administration DKK 400 million with interest from June 8, 2020. The Supreme Court thus upholds the Tax Administration's claims 1 and 3 in part and acquits Bech-Bruun of the Tax Administration's claim 2.

The Supreme Court also upholds the Tax Administration's claim 4 for repayment of legal costs before the High Court.

*12. Legal costs*

Based on the nature, scope and outcome of the case, the Supreme Court finds that Bech-Bruun must pay partial legal costs before the High Court and the Supreme Court totaling DKK 12,394,000 to the Danish Tax Administration. Of this amount, DKK 12 million is to cover legal fees, and
DKK 394,000 is to cover legal fees.

## T H I K E N E S F O R R E T :

Bech-Bruun I/S must pay DKK 400,000,000 to the Danish Tax Administration with interest from June 8, 2020.

Bech-Bruun I/S must repay the Danish Tax Administration DKK 6,189,953.70 with interest from May 24, 2022.

Bech-Bruun I/S must pay a total of costs before the High Court and the Supreme Court
DKK 12,394,000 to the Tax Administration.

The sums ordered must be paid within 14 days of this Supreme Court judgment.

The amount of legal costs is subject to interest in accordance with section 8a of the Interest Act.