21-01-00-17

Amtsgericht Koblenz
30 Gs 3989/17
2001 AR 228/17

56068 Koblenz, 30.05.2017

## B e s c h l u s s



In dem Ermittlungsverfahren
g e g e n

1. █████████████████████████████████

2. ██████████████████████████

und andere

w e g e n  Betrugs (Art. 496 des belgischen Strafgesetzbuchs), Urkundenfälschung
(Art. 193 und 196 des belgischen Strafgesetzbuchs), Gebrauchs von
falschen Unterlagen (Art. 197 des belgischen Strafgesetzbuchs), krimi-
neller Organisation (Art. 324 – 326 des belgischen Strafgesetzbuchs) und
Steuerhinterziehung (Art. 449 und 450 des belgischen Einkommensteuer-
gesetzbuchs)

wird die Durchsuchung der Geschäftsräume der

I  █████████████████████████████████

II. ███████████████████████████

III ██████████████████████████████

IV ████████████████████████████████

V. ███████████████████████

zur Auffindung nachstehender Beweismittel angeordnet:

Unterlagen, die im Zusammenhang mit folgenden Pensionsfonds stehen:

1.  ████████████████

-   ████████████████████████

2.  ███████████████

-   ████████████████████████

3.  █████████████████

23 Civ. 2508 (NRB)
**PLAINTIFFS' EXHIBIT**
**211**

CONFIDENTIAL

STEIN_LHOTE0014088

2

-   ████████████████████████

4.  █████████████████

-   ████████████████████████

5.  ███████

-   █████████████████████████

6.  ████████████

-   █████████████████████████

7.  ████████████

-   █████████████████████████

8.  █████████████████

-   █████████████████████████

9.  █████████████████

-   ████████████████████████

10. ██████████████

-   ████████████████████████

11. ███████████████████

-   ████████████████████████

12. ██████████████████

-   █████████████████████

13. ████████████

-   ████████████████████████

14. ██████████

-   ████████████████████████

15. ███████████████

-   ████████████████████████

16. ████████████

-   ██████████████████████████

STEIN_LHOTE0014089

3



17. ▮▮▮▮▮▮▮▮▮▮▮
-   ▮▮▮▮▮▮▮▮▮▮▮
18. ▮▮▮▮▮▮▮▮
-   ▮▮▮▮▮▮▮▮▮▮
19. ▮▮▮▮▮▮▮▮
-   ▮▮▮▮▮▮▮▮▮▮
20. ▮▮▮▮▮
-   ▮▮▮▮▮▮▮▮▮▮
21. ▮▮▮▮▮
-   ▮▮▮▮▮▮▮▮▮▮
22. ▮▮▮▮▮▮▮▮▮▮
-   ▮▮▮▮▮▮▮▮▮▮
23. ▮▮▮▮▮
-   ▮▮▮▮▮▮▮▮▮▮
24. ▮▮▮▮▮▮
-   ▮▮▮▮▮▮▮▮▮
25. ▮▮▮▮▮
-   ▮▮▮▮▮▮▮▮▮▮
26. ▮▮▮▮▮▮▮▮
-   ▮▮▮▮▮▮▮▮▮▮
27. ▮▮▮▮▮▮▮▮▮▮▮
-   ▮▮▮▮▮▮▮▮▮

Die  genannten Gegenstände, die als Beweismittel für das Ermittlungsverfahren von
Bedeutung sein können, sind in Verwahrung zu nehmen oder in anderer Weise
sicherzustellen. Wird die freiwillige Herausgabe verweigert, so sind sie zu beschlagnahmen,
§ 98 StPO.

Weiterhin wird gemäß §§ 94, 98 StPO die Beschlagnahme folgender Beweismittel
angeordnet hinsichtlich folgender Gesellschaften, bei denen es sich allesamt um Kunden der

STEIN_LHOTE0014090

4

NORTH CHANNEL BANK handelt und welche in die oben geschilderten Geschäfte involviert
waren:

| Kunde | Depoteröffnung / Beginn der Geschäftsbeziehung | Sitzland | Kontonummer | Kontonummer |
|---|---|---|---|---|
| | 24.10.2014 | USA | | |
| | 13.03.2014 | USA | | |
| | 23.02.2015 | USA | | |
| | 07.03.2014 | Großbritannien | | |
| | 24.04.2014 | USA | | |
| | 08.08.2014 | USA | | |
| | 23.02.2015 | USA | | |
| | 24.02.2015 | USA | | |
| | 1.03.2014 | British Virgin Islands | | |
| | 5.03.2014 | USA | | |
| | 5.03.2014 | Belize | | |
| | 5.03.2014 | USA | | |
| | 7.03.2014 | USA | | |
| | 1.03.2014 | USA | | |
| | 8.03.2014 | USA | | |
| | 5.04.2014 | USA | | |
| | 2.04.2014 | USA | | |
| | 5.03.2014 | USA | | |

CONFIDENTIAL

5

| | | |
|---|---|---|
| 21.10.2014 | | |
| 01.04.2014 | USA | |
| 02.03.2015 | USA | |
| 17.03.2014 | British Virgin Islands | |
| 27.01.2014 | USA | |
| 16.03.2015 | USA | |
| 17.03.2014 | USA | |
| 17.03.2014 | USA | |
| 24.04.2014 | British Virgin Islands | |
| 27.02.2015 | USA | |
| 17.03.2014 | USA | |
| 17.03.2014 | USA | |
| 10.03.2014 | Cayman Islands | |
| 01.04.2014 | USA | |
| 17.03.2014 | USA | |
| 17.03.2014 | USA | |
| 24.04.2014 | British Virgin Islands | |
| 02.04.2014 | USA | |
| 23.02.2015 | USA | |

CONFIDENTIAL

STEIN_LHOTE0014092

6

sowie die Beschlagnahme der Kontoeröffnungsunterlagen, Unterlagen zur Identifizierung
der Wirtschaftlich Berechtigten ("know your customer"), der Verfügungsberechtigungen, aller
Kontounterlagen inklusive der Einzelbelege, den Unterlagen zu den durchgeführten
Depotgeschäften, den Anweisungen zur Durchführung der Aktientransaktionen und
Geldüberweisungen, insbesondere den Erhalt der Steuerrückerstattungen und den
möglichen weiteren Geldfluss inklusive der Identifikation der Zielkonten, den
Zahlungsvorgängen zu den gemäß den „Dividend Credit Advices" erhaltenen
Dividendengutschriften und vorgenommenen Abzugsbesteuerung sowie der zugehörigen
Buchhaltung, den in das Handelssystem der dwpbank (WP2) eingegebenen Daten, die
Anweisungen und den Schriftverkehr zur Übermittlung der „Dividend Credit Advices" sowie
die Unterlagen und die Anweisungen der Eigentümer der Bank zur Aufnahme und
gegebenenfalls Auflösung von Geschäftsbeziehungen zu den „Pension Plans" bzw. deren
Wirtschaftlich Berechtigten, in schriftlicher und elektronischer Form ab Eröffnung der Konten
bzw. Depots fortlaufend bis zum Durchsuchungszeitpunkt umfasst, anzuordnen.

Weiterhin wird die Beschlagnahme (nötigenfalls elektronische Sicherung) angeordnet von

- Unterlagen, Verträgen, Korrespondenz mit den Geschäftspartnern ███████████
███████████████████████████████████████████

- Unterlagen betreffend die Jahresabschlüsse der NORTH CHANNEL BANK für die
Geschäftsjahre 2012 bis 2015, deren Eigentümerstruktur, inklusiver der Unterlagen zu den
Gesellschaften OBAN Luxembourg Company S.a.r.l und ████████████████ die
Geschäftsverteilung in der Bank sowie der im Zusammenhang mit den Geschäften stehende
E-Mail-Verkehr, insbesondere zu ███████████████████████████████ den
sogenannten Tax Reclaim Agents ███████████████████████████
████████ und sämtliche in dem Zusammenhang bestehende Verträge, Notizen,
Rechnungen, Sitzungsprotokolle der Organe der Bank sowie sonstige mit den konkreten
Geschäften in Zusammenhang stehenden Unterlagen in schriftlicher und elektronischer
Form.

- rechtlichen Stellungnahmen der beauftragten Kanzleien zur rechtlichen Einschätzung der
beabsichtigten Aktiengeschäfte und

- Korrespondenzen und E-Mail-Verkehr der diesbezüglich benutzten E-Mail-Postfächer,
insbesondere auch des Postfachs „depot@northchannelbank.de

gemäß §§ 94, 98 StPO.


Gründe:

Die Durchsuchung war auf Antrag der Staatsanwaltschaft Koblenz vom 18.05.2017
anzuordnen, da bestimmte Tatsachen erwarten lassen, dass die Untersuchungshandlung zur
Auffindung der genannten Beweismittel führen wird (§§ 94, 103, 105, 162 StPO).

Nach den Erkenntnissen der Staatsanwaltschaft Brüssel besteht gegen die Beschuldigten
der Verdacht des Betrugs (Art. 496 des belgischen Strafgesetzbuchs), der
Urkundenfälschung (Art. 193 und 196 des belgischen Strafgesetzbuchs), des Gebrauchs von

CONFIDENTIAL

STEIN_LHOTE0014093

7

falschen Unterlagen (Art. 197 des belgischen Strafgesetzbuchs), der kriminellen Organisation (Art. 324 - 326 des belgischen Strafgesetzbuchs) und der Steuerhinterziehung (Art. 449 und 450 des belgischen Einkommensteuergesetzbuchs).

Bei der NORTH CHANNEL BANK GmbH & Co. KG, Erthalstr. 1, 55118 Mainz werden Konten verschiedener US-amerikanischer Pensionsfonds geführt. Hinsichtlich dieser Pensionsfonds wurden durch drei Servicegesellschaften, sogenannten „Tax Reclaim Agents" (in der Folge: TRA) bei den Belgischen Finanzbehörden unberechtigter Weise die Auszahlung von Quellensteuer auf Dividenden Belgisch Aktienwerte beantragt. Begründet wurde dieser Steuerrückerstattungsanspruch mit einem Belgisch-Amerikanischen Doppelbesteuerungsabkommen. Die Beantragungen der Rückerstattungen fußten jeweils auf der Vorlage von Bescheinigungen der NORTH CHANNEL BANK, sogenannten Dividend Credit Advices" (in der Folge: DCA).

Nach derzeitiger Verdachtslage handelt es sich bei den den Anträgen zugrundeliegenden Geschäften um abgesprochene Aktiengeschäfte (in Form gedeckter Leerverkäufe), bei denen um den Dividendenstichtag der jeweiligen Aktiengesellschaft außerhalb der Börsen („over the counter") gehandelt wird.

Unter Vortäuschung eines an (angeblich) ausgezahlter Dividende vorgenommenen Quellensteuerabzugs werden durch die Servicegesellschaften für die US-Pensionsfonds zum Nachteil der belgischen Steuerbehörden unter dem Doppelbesteuerungsabkommen Steuerrückzahlungen beantragt. Dabei besteht der Verdacht, dass mindestens 27 US-Pensionsfonds, die Kunden der NORTH CHANNEL BANK GmbH & Co. KG sind, Steuerrückforderungen für die angeblich gezahlten Steuern auf Dividendenausschüttungen zu Unrecht beantragt haben.

Insgesamt wurden in diesem Zusammenhang im Zeitraum 2014/2015 in Belgien Rückerstattungen für diese 27 Pensionsfonds in einer Gesamthöhe von € 48.283.936,86 beantragt, von denen € 22.849.284,25 zur Auszahlung gelangten. Im Hinblick auf den Differenzbetrag blieb es jeweils beim Versuch, da die Belgischen Behörden die Auszahlungen stoppen konnten. Hinsichtlich der bei der NORTH CHANNEL BANK geführten Konten verteilen sich diese Anträge / Rückerstattungen wie folgt:

| Name des Pensionsfonds | beantragte Rückerstattung | tatsächliche Auszahlung | Anzahl Anträge |
|---|---|---|---|
| | | | |

                                                      STEIN_LHOTE0014094

8



CONFIDENTIAL

9



Der im Rechtshilfeersuchen hinsichtlich der NORTH CHANNEL BANK beschriebene
Sachverhalt ist Teilkomplex eines größeren, international organisierten Betrugskomplexes,
der insgesamt schwerpunktmäßig aus dem Vereinigten Königreich heraus organisiert wurde
und Schäden in Belgien von ca. 500 Millionen Euro verursachte. In Dänemark, wo ein
Parallelverfahren geführt wird, wurden Schäden in Höhe von über 1,67 Milliarden Euro
verursacht.

Die Ermittlungen der Staatsanwaltschaft Brüssel richten sich sowohl gegen natürliche als
auch -nach belgischem Recht- gegen juristische Personen und zwar gegen:



III. NORTH CHANNEL BANK GmbH & Co. KG (Mainz)
Erthalstr. 1
55118 Mainz

und / oder deren Geschäftsführer und Anteilseigner in persona als Verantwortliche der
Gesellschaft



und / oder deren Geschäftsführer und Anteilseigner in persona als Verantwortliche der
Gesellschaft



und / oder deren Geschäftsführer und Anteilseigner in persona als Verantwortliche der
Gesellschaft



CONFIDENTIAL

21-01-00-26

10

und / oder deren Geschäftsführer und Anteilseigner in persona als Verantwortliche der Gesellschaft



und / oder deren Geschäftsführer und Anteilseigner in persona als Verantwortliche der Gesellschaft



und / oder deren Geschäftsführer und Anteilseigner in persona als Verantwortliche der Gesellschaft

IX. die betroffenen oben aufgeführten US Pension Plans

und / oder deren Geschäftsführer und Anteilseigner in persona als Verantwortliche

Weitere Personen und Gesellschaften konnten nach Einschätzung der Staatsanwaltschaft Brüssel an der Einrichtung des Betrugssystems beteiligt sein:



- 
- 
- 
- 
- 

NORTH CHANNEL  BANK

-

NORTH CHANNEL BANK

-   Jerome LHOTE, als Wirtschaftlich Berechtigter der NORTH CHANNEL BANK

-   Matthew STEIN, als Wirtschaftlich Berechtigter der NORTH CHANNEL BANK

Im vorliegenden Komplex wurden Pensionsfonds, sogenannte „US Pension Plans" zum Dividendenstichtag als Besitzer der Aktien benannt. Die Ermittlungen der belgischen Behörden ergaben, dass wahrscheinlich fiktive Geschäfte mit nicht existierenden Aktien belgischer Börsenwerte durchgeführt wurden. Unter Bezug auf das Doppelbesteuerungsabkommen wurden durch die US Pension Plans Steuerrückerstattungen bei den belgischen Finanzbehörden beantragt und ausgezahlt. Sämtliche Pensionsfonds, die bei der NORTH CHANNEL BANK Konten und Depots unterhielten, wurden durch den US-amerikanischen Anwalt ▇▇▇▇▇▇▇▇ vertreten.

CONFIDENTIAL

11

Durch den ███████████████ wurden in Belgien Rückerstattungsanträge für die bei der NORTH CHANNEL BANK kontenmäßig geführten US Pension Plans in einer Gesamthöhe von € 8.963.491,- gestellt. Hierzu wurden die auf Briefbogen der NORTH CHANNEL BANK gefertigten "DCA" übermittelt. Die Anträge wurden auf Grund längerer Bearbeitungszeit bei den Finanzbehörden und den in der Zwischenzeit begonnenen Ermittlungen nicht komplett ausgezahlt. Insgesamt kam es hier zu Auszahlungen in Höhe von € 8.164.991,-.

Von ███████████ wurden an die nachfolgenden US Pension Plans auf deren bei der NORTH CHANNEL BANK geführten Konten Gelder eingezahlt:



An die belgischen Finanzbehörden wurden weitere Rückerstattungsanträge für die bei der NORTH CHANNEL BANK geführten US Pension Plans vom ████████████████ in einer Gesamthöhe von € 27.652.569,03 gestellt, wiederum unter Verwendung der "DCA"-Bescheinigungen der NORTH CHANNEL BANK. Die Anträge wurden auf Grund längerer Bearbeitungszeit bei den Finanzbehörden und den in der Zwischenzeit begonnenen Ermittlungen nicht komplett ausgezahlt. Insgesamt kam es hier zu Auszahlungen in Höhe von € 14.684.293,25.

Von ███████████ wurden an die nachfolgenden US Pension Plans auf deren bei der NORTH CHANNEL BANK geführten Konten Gelder eingezahlt:



Vom ███████████ wurden Anträge über eine Gesamtsumme von € 9.602.395,88 bezüglich bei der NORTH CHANNEL BANK mit Konto und Depot geführter US Pension Plans gestellt. Hier wurden alle Auszahlungen rechtzeitig angehalten. Auch der TRA KOI Associates legte bei Antragstellung auf Briefbogen der NORTH CHANNEL BANK gefertigte "DCA" vor.

Welche Auszahlungen in welcher Höhe an die unterschiedlichen US Pension Plans erfolgten, ergibt sich aus der tabellarischen Auflistung.

Im Gesamtkomplex wurden in Belgien insgesamt Rückerstattungsanträge in Höhe von 519.254.375,60 Euro gestellt (unter Einbindung der NORTH CHANNEL BANK hiervon die bereits erwähnten 46.283.936,86 Euro). Seitens der belgischen Behörden wurden nach

CONFIDENTIAL

12

Einleitung der Ermittlungen Anträge in einer Höhe von insgesamt ca. 319 Millionen Euro (davon über 25 Millionen bei den bei der NORTH CHANNEL BANK geführten US Pension Plans) abgelehnt. Zu diesen Ablehnungsbescheiden erfolgte keinerlei Widerspruch. Außerdem verweisen die belgischen Behörden darauf, dass ab Ende 2015 keinerlei gleichartigen Anträge mehr gestellt wurden.

Die Involvierung der North Channel Bank in das geschilderte Vorgehen wird bestätigt und ergänzt durch einen von der Abteilung Bankenaufsicht der BaFin gemäß § 44 Abs.1 KWG in Auftrag gegebenen Sonderprüfungsbericht der Wirtschaftsprüfungsgesellschaft KPMG vom 29.07.2016 zur NORTH CHANNEL BANK GmbH & Co.KG (im Folgenden: NCB).

Die Prüfung de▇▇▇▇▇bezog sich auf die Umstände von im Jahr 2014 vorgenommenen Wertpapiertransaktionen (Prüfungszeitraum war das Jahr 2014). Insgesamt wurden 567 Kundentransaktionen in Aktien dänischer, belgischer, japanischer und deutscher Emittenten untersucht. Die ▇▇▇▇stellte fest, dass das Geschäftsfeld Wertpapiernebendienstleistungen im Jahr 2014 neu bei der NCB aufgenommen wurde. Es wurden großvolumige Aktientransaktionen ausländischer AGs in unmittelbarer zeitlicher Nähe zum Dividendenstichtag durchgeführt. Die Transaktionen folgten dabei einem regelmäßigen Muster und hatten für sich gesehen keinen wirtschaftlich erkennbaren Nutzen.

So wurde generell zu einem Zeitpunkt von einem Kunden der Bank eine bestimmte Anzahl von Aktien einer Gattung als Festpreisgeschäft von einem Broker gekauft, während ein anderer Kunde der Bank die gleiche Anzahl an Aktien derselben Gattung per Festpreisgeschäft an den Broker verkaufte. Bei den Käufer handelte es sich immer um einen Pension Plan mit Sitz in den USA, die Verkäufer hatten ihren Sitz in Belize oder den British Virgin Islands. Der Broker unterhielt jeweils ein Depot und ein Konto bei der NCB.

Zum selben Zeitpunkt schlossen der Käufer und der Verkäufer mit einem Dritten, der ebenfalls über eine Geschäftsbeziehung bei der NCB verfügte, Wertpapierleihe-Geschäfte ab. Dies bedeutete, dass der Käufer die erworbenen Wertpapiere an den Dritten verlieh und der Verkäufer sich die Wertpapiere lieh. Am Valutatag wiesen die Depots damit keinen Bestand auf.

Zu einem späteren Zeitpunkt wurden vom Käufer und Verkäufer die Aktien über den Broker als Festpreisgeschäfte verkauft bzw. gekauft und die Wertpapierleihe-Geschäfte beendet. Aufgrund von zwischen den Käufern bzw. Verkäufern und dem Dritten geschlossenen OTC-Forward-Geschäften, die ein cash settlement vorsahen, entstanden keine Kursgewinne bzw. -verluste aus den Wertpapiertransaktionen. Wirtschaftliche Gründe für diese Transaktionen bestanden demnach offenkundig nicht. Aufgrund der abgeschlossenen OTC Forward-Geschäfte bestand für die Käufer und Verkäufer auch kein Kursrisiko aus den Wertpapierkäufen bzw. -verkäufen.

Die NCB fungierte im Rahmen der Geschäfte nicht als Partei der Kauf- und Verkaufsverträge, sondern ausschließlich als Depotbank. Gegenkonto für die Gutschriften bzw. Belastungen in Höhe der (Netto-)Dividenden war ein NCB-Konto. Die Lagerstelle für die Aktien war ab April 2014 immer die NCB. Da sich die zu erhaltenen und zu liefernden Aktien aus den Käufen, Verkäufen und Wertpapierleihe-Geschäften in Aktiengattung und Menge immer ausgeglichen haben, lag auf Tagesendbasis nie ein Bestand in der Lagerstelle NCB vor.

Der Kauf- bzw. Verkaufszeitpunkt der Aktien lag jeweils kurz vor dem Dividendenstichtag der jeweiligen Aktiengattung, das Settlement nach dem Dividendenstichtag. Entsprechend der zum Dividendenstichtag bestehenden Aktienbestände wurden für die Kunden der Bank schriftliche Bestätigungen „Dividend Credit for non-resident tax payer status" (Dividend Credit Advice) über Gutschriften bzw. Belastungen in Höhe der Nettodividende erstellt.

13

Die Gutschrift der Beträge bzw. Belastungen in Höhe der Nettodividenden erfolgt in einen automatisierten Prozess über das Wertpapierabwicklungssystem WP2 der dwpbank. Auf Basis der Kundenbestände und der systemseitig hinterlegten Dividendendaten der einzelnen Aktiengattungen erstellt die dwpbank die Dividend Credit Advices, die auf Geschäftspapier der NCB ausgedruckt und der Bank bereitgestellt werden.

Die Dividendenabrechnung erfolgt durch die dwpbank automatisch, auf Grundlage der in WP2 gebuchten Aktienbestände, unabhängig von der Lagerstelle der Aktien. Der Versand an die Kunden bzw. die empfangsberechtigte Person erfolgt durch die NCB selbst.

Gemäß Hinweis auf den Dividend Credit Advices handelte es sich dabei nicht um Steuerbescheinigungen, Format und Darstellung der Dividend Credit Advices ist allerdings denen von Steuerbescheinigungen sehr ähnlich sind.

Gemäß Weisung des für die Pension Plans in 2014 vertretungsberechtigten ▆▆▆▆ vom 27. Mai 2014, wurden alle für die Pension Plans erstellten Dividend Credit Advices von der Bank an Indigo Securities Ltd., London, Großbritannien, einem Dienstleister im Rahmen von Quellensteuererstattungsverfahren, verschickt."

Die Dividend Credit Advices enthalten u. a. folgende Angaben:

- Name des Kunden, Kundennummer und Depotnummer,

- Aktiengattung und Anzahl der Stücke,

- Zahltag, Ex-Tag, Dividendenstichtag,

- Bruttodividende, Nettodividende, ausländische Quellensteuer („oversea tax deducted at source")

Diese Dividend Credit Advices wurden dann dazu verwendet, bei den dänischen Steuerbehörden den (falschen) Eindruck hervorzurufen, es sei bei einer tatsächlichen Dividendenzahlung zu einem Quellensteuerabzug gekommen und dass zur Vermeidung einer Doppelbesteuerung ein Rückerstattungsanspruch bestehe.

Hierfür spricht auch der ermittelte Umfang der Depotgeschäfte:

Der ▆▆▆▆ – Bericht stellt den Umfang der Volumina von Käufen und Verkäufen gemäß den jeweiligen Kurswerten bezogen auf die Kunden der NCB dar. Insgesamt wurden 564 von 567 Kundengeschäften in diese Betrachtung einbezogen. (282 Käufe und 282 Verkäufe).

Die beiden ersten Geschäfte (Anzahl Aktien (Daimler) insgesamt 200 Stück, Transaktionsvolumen 4.000 €) wurden am 14. März 2014 durchgeführt. Es ist davon auszugehen, dass es sich hierbei um einen „Testlauf" handelte. Die darauf folgenden Geschäfte am 18. März 2014 hatten dann ein Stückevolumen von insgesamt 10.220.000 und ein Transaktionsvolumen von insgesamt EUR 493 Mio. Die KPMG kommt in ihrem Gutachten zu dem Ergebnis, dass die festgestellte durchschnittliche Transaktionshöhe und Transaktionszahl im Vergleich zum tatsächlichen Geschäft nicht angemessen war. Art und Umfang der Anforderungen an Auf- und Ablauforganisation, IT- Systeme, Kontrollkonzepte sowie die Einbindung in Risikomanagement-Prozesse wurden durch die KPMG in Frage gestellt. Vor Durchführung der Wertpapierkauftransaktionen wiesen die Konten der Pension Plans bzw. der Gesellschaften keine Guthaben aus. Die Belastung des Kaufpreises erfolgte mit der gleichen Valuta, mit der die Sicherheitenleistung (Stock Loan Cash Collateral) für die Wertpapierleihe-Geschäfte geleistet wurde. Die Konten waren damit ausgeglichen

CONFIDENTIAL

14

Wie bereits oben dargelegt, erfolgte die für die Abwicklung der Clearing-Geschäfte notwendige technische Nachbildung der bereits erfolgten Wertpapiergeschäfte durch den Bereich Wertpapierservice im System WP2 der dwpbank. Die Verarbeitung der Transaktionen in WP2 erfolgte täglich in einem nachgelagerten Batchlauf, in dem die Stückebuchungen und die Erstellung der Wertpapierabrechnungen (Kauf/Verkauf) erzeugt werden. Die Dividendenabrechnung erfolgte durch die dwpbank automatisch, auf Grundlage der in WP2 gebuchten Aktienbestände, unabhängig von der Lagerstelle der Aktien und ohne Prüfung, ob die gemeldeten Geschäfte tatsächlich ausgeführt wurden und ob entsprechende Dividenden tatsächlich ausgezahlt wurden.

Es ist daher davon auszugehen, dass die Wertpapiertransaktionen mit ausländischen Aktien für die Pension Plans steuerlich motiviert waren und auf die unberechtigte Erstattung einer möglichen ausländischen Quellensteuer ausgerichtet waren. Es ist weiterhin davon auszugehen, dass die vorgenommenen Wertpapiertransaktionen insgesamt lediglich fingiert waren, eine tatsächliche Belieferung der Wertpapiergeschäfte also nicht stattgefunden hat.

Die genannten Gesellschaften stehen in Zusammenhang mit der North Channel Bank, sodass zu erwarten ist, dass in den Geschäftsräumen für die weiteren Ermittlungen erforderliche Beweismittel aufgefunden werden können.

Die Verflechtung zwischen der North Channel Bank und den OBAN-Gesellschaften stellt sich wie folgt dar:

Die NORTH CHANNEL BANK GmbH & Co KG wurde am 06.04.2010 im Handelsregister des Amtsgerichts Mainz in Abteilung A unter der Nummer HRA 41054 eingetragen und hat ihren Sitz seitdem in Mainz (zuvor: Sitz in Berlin).

Komplementärin der Bank ist die North Channel GmbH, Mainz (AG Mainz HRB 42622). Kommanditistin ist die OBAN Beteiligungsgesellschaft mbH, Mainz (AG Mainz HRB 46269).

Die Geschäftsleitung der Bank erfolgte in den Jahren 2010 bis 2016 durch die Geschäftsführer der persönlich haftenden Gesellschafterin North Channel GmbH ████████
████████

Am 18.01.2017 erfolgte beim Handelsregister Mainz die Eintragung, dass die bisherigen Geschäftsführer der NORTH CHANNEL BANK GmbH, ████████████████████ ausgeschieden sind. Als neuer Geschäftsführer wurde der ████████████        geb. ████████, wh. in Hofheim am Taunus bestellt.

Gemäß einer Pressemitteilung der NORTH CHANNEL BANK erfolgte der Geschäftsführerwechsel zum 01.01.2016. Die bisherigen Geschäftsführer wechselten demnach „auf Wunsch der Gesellschafter in die Holding und übernehmen künftig Mandatsfunktionen in anderen Unternehmen der international ausgerichteten Firmengruppe."

Bei der Kommanditistin der Bank, der OBAN Beteiligungsgesellschaft mbH, Erthalstr. 1, 55118 Mainz, sind ████████████████████ unverändert seit dem 22.07.2015 als Geschäftsführer eingetragen. Weiterhin ist ████████████ unverändert Geschäftsführer der ████████████ die ihrerseits als persönlich haftende Gesellschafterin einzelvertretungsberechtigt ist für die ████████. Weiterer persönlich haftender Gesellschafter (ohne Vertretungsvollmacht) ist die ████████████

Das Gesellschaftskapital der Kommanditistin beträgt 20.000,- €, das Gesellschaftskapital der Komplementärin 23.530.000,- €

CONFIDENTIAL

21-01-00-31

15

Der Geschäftszweck der North Channel GmbH besteht in der Beteiligung als persönlich haftende Gesellschafterin und der Übernahme der Geschäftsführung bei der NORTH CHANNEL BANK GmbH & Co. KG, die ihrerseits die Bankgeschäfte und Finanzdienstleistungen erbringt. Ab 2010 bis zu einer Satzungsänderung am 05.12.2014 hatte die Gesellschaft einen Aufsichtsrat.

Am 10.12.2014 wurde zwischen der North Channel GmbH und der OBAN Germany Holding GmbH (Mainz) ein Gewinnabführungsvertrag geschlossen. Die ███████████████ GmbH fungierte als Kommanditist und wurde zum 20.08.2015 auf die █████████████ & Co. KG verschmolzen. Diese Gesellschaft wiederum ging nach Umwandlung im Wege des Formwechsels am 29.08.2016 in die ██████████████.

Die Anordnung war gemäß § 33 Abs. 4 StPO ohne vorherige Anhörung d. Beschuldigten zu treffen, um den Zweck der Untersuchungsmaßnahme nicht zu gefährden. Die Maßnahme ist verhältnismäßig, denn sie ist zur Erreichung des angestrebten Zwecks geeignet und erforderlich, wobei der mit ihr verbundene Grundrechtseingriff nicht außer Verhältnis zur Bedeutung der Sache und zur Stärke des Tatverdachts steht. Es wird darauf hingewiesen, dass der Beschluss nur binnen 6 Monaten nach seinem Erlass vollstreckt werden darf.


Marker
Richterin am Amtsgericht

Ausgefertigt

Justizbeschäftige
als Urkundsbeamtin der Geschäftsstelle des Amtsgerichts

STEIN_LHOTE0014102

21-01-00-32

Ausfertigung

Aktenzeichen:
**30 Gs 3968/17**
Staatsanwaltschaft:
**2001 AR 229/17**



## Amtsgericht
## Koblenz

## Beschluss

In dem Rechtshilfevorgang der Staatsanwaltschaft Koblenz, eingeleitet aufgrund eines justiziellen Rechtshilfeersuchens der Staatsanwaltschaft Kopenhagen in einem Ermittlungsverfahren der dänischen Strafverfolgungsbehörden



1.

2.

3.

wegen Anfangsverdachts des besonders schweren Betrugs gemäß §§ 279, 286 Abs. 2 des dänischen Strafgesetzbuchs

hat das Amtsgericht Koblenz durch die Richterin am Amtsgericht - als die ständige Vertreterin des Direktors - Griesar am 30.05.2017 beschlossen:

Die Durchsuchung der Geschäftsräume



wird zur Auffindung von nachstehenden Beweismitteln angeordnet:

CONFIDENTIAL

STEIN_LHOTE0014103

30 Gs 3968/17                          - Seite  2 -

- Unterlagen, die im Zusammenhang mit folgenden Pensionsfonds stehen und auf die Zahlungen der erlangten Steuerrückerstattungen erfolgten:



30 Gs 3986/17 — Seite 3 —



17.

18.

19.

20.

21.

22.

23.

24.

25.

26.

27.

- alle Unterlagen betreffend die Jahresabschlüsse der NORTH CHANNEL BANK für die Geschäftsjahre 2012 bis 2015, deren Eigentümerstruktur, die Geschäftsverteilung in der Bank sowie der im Zusammenhang mit den Geschäften stehende E-Mail-Verkehr, insbesondere zu ███████████████ den sogenannten Tax Reclaim Agents ████ den Beschuldigten im dänischen Hauptverfahren, ██████████ und sämtliche in dem Zusammenhang bestehende Verträge, Notizen, Rechnungen, Sitzungsprotokolle der Organe der Bank sowie sonstige mit den konkreten Geschäften in Zusammenhang stehenden Unterlagen in schriftlicher und elektronischer Form

Gegenstände, die als Beweismittel im vorgenannten Sinn für das Ermittlungsverfahren von Bedeutung sein können, sind in Verwahrung zu nehmen oder in anderer Weise sicherzustellen. Wird die freiwillige Herausgabe verweigert, so sind sie zu beschlagnahmen, § 98 StPO.

### Gründe:

Nach den Erkenntnissen der Staatsanwaltschaft Kopenhagen besteht gegen die Beschuldigten der Verdacht des besonders schweren Betruges gemäß §§ 279, 286 Abs. 2 des dänischen Straf-

CONFIDENTIAL

STEIN_LHOTE0014105

30 Gs 3956/17                              - Seite  4  -

gesetzbuches.

Es besteht der Verdacht, dass in den Jahren 2012 bis 2015 Betrugshandlungen zum Nachteil
der dänischen Finanzverwaltung mit einer Gesamtschadenssumme von ca. 12,4 Milliarden
DKK (umgerechnet ca. 1,67 Milliarden Euro) begangen wurden. Der Betrug wurde so began-
gen, dass gegenüber der Dänischen Steuerbehörde (SKAT) durch Vorlage unrichtiger Dokumen-
te der Irrtum erregt wurde, dass in den USA registrierte Pensionsfonds am Dividendenstichtag Ei-
gentümer von dänischen börsennotierten Wertpapieren gewesen seien. Bei Auszahlung der Divi-
denden für die Aktien wurden die (Netto-) Dividenden an die Aktionäre über die Depotbanken aus-
gezahlt und ein Anteil von 27 % als Quellensteuerabzug an die Finanzbehörde SKAT abgeführt.

Im vorliegenden Komplex wurden Pensionsfonds, sogenannte „US Pension Plans" zum Dividen-
denstichtag als Besitzer der Aktien benannt. Die Ermittlungen der dänischen Behörden ergaben,
dass wahrscheinlich fiktive Geschäfte mit nicht existierenden Aktien dänischer Börsenwerte
durchgeführt wurden. Es handelte sich tatsächlich um abgesprochene Aktiengeschäfte (in Form
gedeckter Leerverkäufe), bei denen um den Dividendenstichtag der jeweiligen Aktiengesell-
schaft außerhalb der Börsen („over the counter") gehandelt wird.

Unter Vortäuschung eines an (angeblich) ausgezahlter Dividende vorgenommenen Quellensteu-
erabzugs werden durch Servicegesellschaften für US-Pensionsfonds zum Nachteil der däni-
schen Steuerbehörden unter den jeweiligen Doppelbesteuerungsabkommen Steuerrückzahlun-
gen bei der SKAT beantragt und ausgezahlt.

Die Ermittlungen der Staatsanwaltschaft Kopenhagen haben bei der Überprüfung des gesamten
Aktienbestands einer großen dänischen Aktiengesellschaft ergeben, dass Anträge auf Steuer-
rückerstattung bei SKAT eingereicht wurden, die auf einem Eigentum von etwa 2,6 Millionen Akti-
en basierten, was etwa 1,7 Millionen mehr Aktien sind, als sich theoretisch maximal im Eigen-
tum ausländischer Aktionäre befinden konnten. Dies stellt nach Auffassung der dänischen Behör-
den ein klares Indiz dar, dass betrügerisch gehandelt wurde.

Der Verdacht richtet sich gegen verschiedene Personen und Gesellschaften, u.a. den dort Be-
schuldigten Sanjay Shah sowie sogenannte Tax Reclaim Agents (Dienstleister, die sich mit Steu-
errückerstattungsanträgen befassen) und Custodians (Depothalter bzw. Depotbanken), hierun-
ter die NORTH CHANNEL BANK GmbH & Co. KG in Mainz sowie eine Reihe amerikanische Pen-
sionsfonds.

Die Staatsanwaltschaft Kopenhagen verdächtigt insgesamt 212 amerikanische Pensionsfonds
des besonders schweren Betrugs im Zusammenhang mit der Rückerstattung von Dividenden-
steuern in Höhe von etwa DKK 10,9 Milliarden (etwa 1,47 Milliarden Euro). Von diesen 212 ver-
dächtigten amerikanischen Pensionsfonds haben 27 Pensionsfonds Konten bei der NORTH
CHANNEL BANK GmbH & Co KG.

Die NORTH CHANNEL BANK GmbH & Co. KG (gemäß dänischem Recht wird gegen die juristi-
sche Person ermittelt) wird verdächtigt, weil über die vier Tax Reclaim Agents ███████████
████████████████████████████████████████████████████ Anträge auf Rück-
erstattung von DKK 1.135.775.448 (entsprechend ca. 153 Millionen Euro) im Namen der 27 ame-
rikanischen Pensionsfonds gestellt wurden.

Wenn diese 27 amerikanischen Pension Plans zur Rückerstattung der Abgeltungssteuern (27
%) in Höhe von etwa DKK 1,1 Milliarden berechtigt gewesen wären, wäre somit eine Auszah-
lung über insgesamt etwa 4,2 Milliarden DKK an Bruttodividende erfolgt. Hiervon hätten die 27
amerikanischen Pensionsfonds etwa DKK 3,1 Milliarden (entsprechend 417 Millionen Euro) an

CONFIDENTIAL

STEIN_LHOTE0014106

30 Gs 3966/17                          - Seite  5  -

Nettodividende von den dänischen Gesellschaften ausgezahlt bekommen.

Die 27 amerikanischen Pensions Plans hätten dementsprechend dänische Aktien im Werte von etwa DKK 185 Milliarden (etwa 24,9 Milliarden Euro) besitzen müssen, um einen Dividendenanspruch i.H.v. DKK 4,2 Milliarden an Bruttodividende erhalten zu können.

Die Staatsanwaltschaft Kopenhagen vertritt die Auffassung, dass es den 27 amerikanischen Pensionsfonds unmöglich gewesen ist, dänische Aktien in einem so enormen Wert zu besitzen. Die 27 amerikanischen Pensionsfonds wurden erst Anfang 2014 errichtet. Sie haben 2-3 Monate nach der Errichtung Konten bei der NORTH CHANNEL BANK GmbH & Co. KG eröffnet und sollten somit in sehr kurzer Zeit in den Besitz enormen Kapitals für Aktientransaktionen in dänischen Aktien gelangt sein.

Darüber ergibt sich für die Staatsanwaltschaft Kopenhagen der Verdacht, dass die 27 amerikanischen Pensionsfonds keine Nettodividenden in Höhe von etwa 417 Millionen Euro bekommen haben. In dem Fall sollte die Auszahlung der Nettodividende aus den Konten der Pensionsfonds hervorgehen, was seitens der Staatsanwaltschaft in Kopenhagen als unwahrscheinlich erachtet wird. Es ist vielmehr davon auszugehen, dass keine Dividenden ausgezahlt wurden und dementsprechend auch kein Quellensteuerabzug zugunsten der Dänischen Steuerbehörde vorgenommen wurde. Es wurden also Steuerrückforderungen für angeblich gezahlten Steuern auf Dividendenausschüttungen zu Unrecht beantragt und auch ausgezahlt.

Nach Erkenntnissen der Staatsanwaltschaft Kopenhagen bestehen zwischen allen 27 amerikanischen Pensionsfonds Zusammenhänge. So werden diese von einem ▮▮▮▮▮▮▮▮▮ und einem Adam LaRosa vertreten. Außerdem waren alle Zahlungsanweisungen für die amerikanischen Pensionsfonds von ▮▮▮▮▮▮▮▮ ausgestellt. Diese beiden Personen sind auch in die Ermittlungen betreffend die übrigen 187 amerikanischen Pensionsfonds involviert.

Die Involvierung der North Channel Bank in das geschilderte Vorgehen wird bestätigt und ergänzt durch einen von der Abteilung Bankenaufsicht der BaFin gemäß § 44 Abs.1 KWG in Auftrag gegebenen Sonderprüfungsbericht der Wirtschaftsprüfungsgesellschaft KPMG vom 29.07.2016 zur NORTH CHANNEL BANK GmbH & Co.KG (im Folgenden: NCB).

Die Prüfung der ▮▮▮▮▮ bezog sich auf die Umstände von im Jahr 2014 vorgenommenen Werpapiertransaktionen (Prüfungszeitraum war das Jahr 2014). Insgesamt wurden 567 Kundentransaktionen in Aktien dänischer, belgischer, japanischer und deutscher Emittenten untersucht. Die ▮▮▮▮▮▮ stellte fest, dass das Geschäftsfeld Wertpapiernebendienstleistungen im Jahr 2014 neu bei der NCB aufgenommen wurde. Es wurden großvolumige Aktientransaktionen ausländischer AGs in unmittelbarer zeitlicher Nähe zum Dividendenstichtag durchgeführt. Die Transaktionen folgten dabei einem regelmäßigen Muster und hatten für sich gesehen keinen wirtschaftlich erkennbaren Nutzen.

So wurde generell zu einem Zeitpunkt von einem Kunden der Bank eine bestimmte Anzahl von Aktien einer Gattung als Festpreisgeschäft von einem Broker gekauft, während ein anderer Kunde der Bank die gleiche Anzahl an Aktien derselben Gattung per Festpreisgeschäft an den Broker verkaufte. Bei dem Käufer handelte es sich immer um einen Pension Plan mit Sitz in den USA, die Verkäufer hatten ihren Sitz in Belize oder den British Virgin Islands. Der Broker unterhielt jeweils ein Depot und ein Konto bei der NCB.

Zum selben Zeitpunkt schlossen der Käufer und der Verkäufer mit einem Dritten, der ebenfalls über eine Geschäftsbeziehung bei der NCB verfüge, Wertpapierleihe-Geschäfte ab. Dies bedeutete, dass der Käufer die erworbenen Wertpapiere an den Dritten verlieh und der Verkäufer sich

CONFIDENTIAL                                                        STEIN_LHOTE0014107

21-01-00-37

30 Gs 3966/17                          - Seite 6 -

die Wertpapiere lieh. Am Valutatag wiesen die Depots damit keinen Bestand auf.

Zu einem späteren Zeitpunkt wurden vom Käufer und Verkäufer die Aktien über den Broker als Festpreisgeschäfte verkauft bzw. gekauft und die Wertpapierleihe-Geschäfte beendet. Aufgrund von zwischen den Käufern bzw. Verkäufern und dem Dritten geschlossenen OTC-Forward-Geschäften, die ein cash settlement vorsahen, entstanden keine Kursgewinne bzw. -verluste aus den Wertpapiertransaktionen. Wirtschaftliche Gründe für diese Transaktionen bestanden demnach offenkundig nicht. Aufgrund der abgeschlossenen OTC Forward-Geschäfte bestand für die Käufer und Verkäufer auch kein Kursrisiko aus den Wertpapierkäufen bzw. -verkäufen.

Die NCB fungierte im Rahmen der Geschäfte nicht als Partei der Kauf- und Verkaufsverträge, sondern ausschließlich als Depotbank. Gegenkonto für die Gutschriften bzw. Belastungen in Höhe der (Netto-)Dividenden war ein NCB-Konto. Die Lagerstelle für die Aktien war ab April 2014 immer die NCB. Da sich die zu erhaltenden und zu liefernden Aktien aus den Käufen, Verkäufen und Wertpapierleihe-Geschäften in Aktiengattung und Menge immer ausgeglichen haben, lag auf Tagesendbasis nie ein Bestand der Lagerstelle NCB vor.

Der Kauf- bzw. Verkaufszeitpunkt der Aktien lag jeweils kurz vor dem Dividendenstichtag der jeweiligen Aktiengattung, das Settlement nach dem Dividendenstichtag. Entsprechend der zum Dividendenstichtag bestehenden Aktienbestände wurden für die Kunden der Bank schriftliche Bestätigungen „Dividend Credit for non-resident tax payer status" (Dividend Credit Advice) über Gutschriften bzw. Belastungen in Höhe der Nettodividende erstellt.

Die Gutschrift der Beträge bzw. Belastungen in Höhe der Nettodividenden erfolgt in einen automatisierten Prozess über das Wertpapierabwicklungssystem WP2 der dwpbank. Auf Basis der Kundenbestände und der systemseitig hinterlegten Dividendendaten der einzelnen Aktiengattungen erstellt die dwpbank die Dividend Credit Advices, die auf Geschäftspapier der NCB ausgedruckt und der Bank bereitgestellt werden.

Die Dividendenabrechnung erfolgt durch die dwpbank automatisch, auf Grundlage der in WP2 gebuchten Aktienbestände, unabhängig von der Lagerstelle der Aktien. Der Versand an die Kunden bzw. die empfangsberechtigte Person erfolgt durch die NCB selbst.

Gemäß Hinweis auf den Dividend Credit Advices handelte es sich dabei nicht um Steuerbescheinigungen, Format und Darstellung der Dividend Credit Advices ist allerdings denen von Steuerbescheinigungen sehr ähnlich sind.

Gemäß Weisung des für die Pension Plans in 2014 vertretungsberechtigten ▮▮▮▮▮▮ vom 27. Mai 2014, wurden alle für die Pension Plans erstellten Dividend Credit Advices von der Bank an ▮▮▮▮▮▮▮▮▮▮ Großbritannien, einem Dienstleister im Rahmen von Quellensteuererstattungsverfahren, verschickt.

Die Dividend Credit Advices enthalten u. a. folgende Angaben:

- Name des Kunden, Kundennummer und Depotnummer,
- Aktiengattung und Anzahl der Stücke,
- Zahltag, Ex-Tag, Dividendenstichtag,
- Bruttodividende, Nettodividende, ausländische Quellensteuer („oversea tax deducted at source").

Diese Dividend Credit Advices wurden dann dazu verwendet, bei den dänischen Steuerbehörden den (falschen) Eindruck hervorzurufen, es sei bei einer tatsächlichen Dividendenzahlung zu

STEIN_LHOTE0014108

30 Gs 3966/17                        - Seite 7 -

einem Quellensteuerabzug gekommen und dass zur Vermeidung einer Doppelbesteuerung ein Rückerstattungsanspruch bestehe.

Hierfür spricht auch der ermittelte Umfang der Depotgeschäfte:

Der ▊▊▊▊ - Bericht stellt den Umfang der Volumina von Käufen und Verkäufen gemäß den jeweiligen Kurswerten bezogen auf die Kunden der NCB dar. Insgesamt wurden 564 von 567 Kundengeschäften in diese Betrachtung einbezogen. (282 Käufe und 282 Verkäufe).

Die beiden ersten Geschäfte (Anzahl Aktien (Daimler) insgesamt 200 Stück, Transaktionsvolumen 4.000 €) wurden am 14. März 2014 durchgeführt. Es ist davon auszugehen, dass es sich hierbei um einen „Testlauf" handelte. Die darauf folgenden Geschäfte am 18. März 2014 hatten dann ein Stückevolumen von insgesamt 10.220.000 und ein Transaktionsvolumen von insgesamt EUR 493 Mio. Die KPMG kommt in ihrem Gutachten zu dem Ergebnis, dass die festgestellte durchschnittlichen Transaktionshöhe und Transaktionszahl im Vergleich zum tatsächlichen Geschäft nicht angemessen war. Art und Umfang der Anforderungen an Auf- und Ablauforganisation, IT- Systeme, Kontrollkonzepte sowie die Einbindung in Risikomanagement-Prozesse wurden durch die KPMG in Frage gestellt. Vor Durchführung der Wertpapierkauftransaktionen wiesen die Konten der Pension Plans bzw. der Gesellschaften keine Guthaben aus. Die Belastung des Kaufpreises erfolgte mit der gleichen Valuta, mit der die Sicherheitenleistung (Stock Loan Cash Collateral) für die Wertpapierleihe-Geschäfte geleistet wurde. Die Konten waren damit ausgeglichen.

Wie bereits oben dargelegt, erfolgte die für die Abwicklung der Clearing-Geschäfte notwendige technische Nachbildung der bereits erfolgten Wertpapiergeschäfte durch den Bereich Wertpapierservice im System WP2 der dwpbank. Die Verarbeitung der Transaktionen in WP2 erfolgte täglich in einem nachgelagerten Batchlauf, in dem die Stückbuchungen und die Erstellung der Wertpapierabrechnungen (Kauf/Verkauf) erzeugt werden. Die Dividendenabrechnung erfolgte durch die dwpbank automatisch, auf Grundlage der in WP2 gebuchten Aktienbestände, unabhängig von der Lagerstelle der Aktien und ohne Prüfung, ob die gemeldeten Geschäfte tatsächlich ausgeführt wurden und ob entsprechende Dividenden tatsächlich ausgezahlt wurden.

Es ist daher davon auszugehen, dass die Wertpapiertransaktionen mit ausländischen Aktien für die Pension Plans steuerlich motiviert waren und auf die unberechtigte Erstattung einer möglichen ausländischen Quellensteuer ausgerichtet waren. Es ist weiterhin davon auszugehen, dass die vorgenommenen Wertpapiertransaktionen insgesamt lediglich fingiert waren, eine tatsächliche Belieferung der Wertpapiergeschäfte also nicht stattgefunden hat.

Die genannten Gesellschaften stehen in Zusammenhang mit der North Channel Bank, sodass zu erwarten ist, dass in den Geschäftsräumen für die weiteren Ermittlungen erforderliche Beweismittel aufgefunden werden können.

Die Verflechtung zwischen der North Channel Bank und der ▊▊▊▊ stellt sich wie folgt dar:

Die NORTH CHANNEL BANK GmbH & Co KG wurde am 06.04.2010 im Handelsregister des Amtsgerichts Mainz in Abteilung A unter der Nummer HRA 41054 eingetragen und hat ihren Sitz seitdem in Mainz (zuvor: Sitz in Berlin).

Komplementärin der Bank ist die North Channel GmbH, Mainz (AG Mainz HRB 42622). Kommanditistin ist die ▊▊▊▊

CONFIDENTIAL                                          STEIN_LHOTE0014109

30 Gs 3986/17                        - Seite  8  -

Die Geschäftsleitung der Bank erfolgte in den Jahren 2010 bis 2016 durch die Geschäftsführer der persönlich haftenden Gesellschafterin North Channel GmbH ██████████████.

Am 18.01.2017 erfolgte beim Handelsregister Mainz die Eintragung, dass die bisherigen Geschäftsführer der NORTH CHANNEL BANK GmbH ██████████████ ausgeschieden sind. Als neuer Geschäftsführer wurde der ██████████████ wh. in Hofheim am Taunus bestellt.

Gemäß einer Pressemitteilung der NORTH CHANNEL BANK erfolgte der Geschäftsführerwechsel zum 01.01.2016. Die bisherigen Geschäftsführer wechselten demnach „auf Wunsch der Gesellschafter in die Holding und übernehmen künftig Mandatsfunktionen in anderen Unternehmen der international ausgerichteten Firmengruppe."

Bei der Kommanditistin der Bank, der OBAN Beteiligungsgesellschaft mbH, Erthalstr. 1, 55118 Mainz, sind ██████████████ unverändert seit dem 22.07.2015 als Geschäftsführer eingetragen. Weiterhin ist ██████████████ unverändert Geschäftsführer der ██████████████ die ihrerseits als persönlich haftende Gesellschafterin einzelvertretungsberechtigt ist für die ██████████████ Weiterer persönlich haftender Gesellschafter (ohne Vertretungsvollmacht) ist die ██████████████.

Das Gesellschaftskapital der Kommanditistin beträgt 20.000.- €, das Gesellschaftskapital der Komplementärin 23.630.000,- €.

Der Geschäftszweck der North Channel GmbH besteht in der Beteiligung als persönlich haftende Gesellschafterin und der Übernahme der Geschäftsführung bei der NORTH CHANNEL BANK GmbH & Co. KG, die ihrerseits die Bankgeschäfte und Finanzdienstleistungen erbringt. Ab 2010 bis zu einer Satzungsänderung am 05.12.2014 hatte die Gesellschaft einen Aufsichtsrat.

Am 10.12.2014 wurde zwischen der North Channel GmbH und der ██████████████ ein Gewinnabführungsvertrag geschlossen. Die ██████████████ fungierte als Kommanditist und wurde zum 20.08.2015 auf die ██████████████ verschmolzen. Diese Gesellschaft wiederum ging nach Umwandlung im Wege des Formwechsels am 29.08.2016 in die ██████████████.

Die Anordnung war gemäß § 33 Abs. 4 StPO ohne vorherige Anhörung der Beschuldigten zu treffen, um den Zweck der Untersuchungsmaßnahme nicht zu gefährden. Die Maßnahme ist verhältnismäßig, denn sie ist zur Erreichung des angestrebten Zwecks geeignet und erforderlich, wobei der mit ihr verbundene Grundrechtseingriff nicht ausser Verhältnis zur Bedeutung der Sache und zur Stärke des Tatverdachts steht. Es wird darauf hingewiesen, dass der Beschluss nur binnen 6 Monaten nach seinem Erlass vollstreckt werden darf.

Griesar
Richterin am Amtsgericht - als die ständige Vertreterin des Direktors -

21-01-00-40

30 Gs 3066/17                    - Seite 9 -



Ausgefertigt:

(Deinig), Justizbeschäftigte Stein
als Urkundsbeamtin der Geschäftsstelle

District Court of Koblenz                    56068 Koblenz, 30.05.2017
30 Gs 3989/17
2001 TO 228/17


Decision



In the preliminary proceedings
against

1. ███████████████████████████

2. █████████████████████████

and others

for fraud (Art. 496 of the Belgian Criminal Code), forgery of documents
(Arts 193 and 196 of the Belgian Criminal Code), use of
false documents (Art. 197 of the Belgian Criminal Code), criminal organisation
(Art. 324 -- 326 of the Belgian Criminal Code) and tax evasion (Art. 449 and 450
of the Belgian Income Tax Code).
Code)

the search of the business premises of the



I.

II

II

I

V

for the discovery of the following evidence:

Documents relating to the following pension funds:

1.

-

2.

-

3.



3



17.

18.

19.

20.

21.

22.

23.

24

25.

26.

27.

The above-mentioned objects, which may be of importance as evidence for the investigation proceedings, are to be taken into custody or seized in some other way. If voluntary surrender is refused, they shall be confiscated,
§ 98 StPO.

Furthermore, in accordance with §§ 94, 98 of the Code of Criminal Procedure, the seizure of the following evidence is ordered with regard to the following companies, all of which are customers of the

STEIN_LHOTE0014090

4

NORTH CHANNEL BANK and which is involved in the transactions described above
goods:



| :where | Opening of a securities account / start of the Business relation | Country of residence |
|---|---|---|
| | 24.10.2014 | USA |
| | 3.03.2014 | JSA |
| | 23.02.2015 | LISA |
| | 07.03.2014 | Great Britain |
| anagement | | |
| | **104.21** **USA** | |
| | 08.08.2014 | |
| | 24.02.2015 | USA |
| | 11.03.2014 | British Virgin Islands |
| | 15.03.2014 | USA |
| | 15.03.2014 | Belize |
| | 15.03.2014 | USA |
| | 17.03.2014 | USA |
| | 1.03.2014 | USA |
| | 28.03.2014 | USA |
| | 25.04.2014 | USA |
| | 2.04.2014 | USA |
| | 15.03.2014 | JSA |

STEIN_LHOTE0014091



| Date | Country |
|---|---|
| 10.2014 | |
| 01.04.2014 | USA |
| 2.03.2015 | USA |
| 7.03.2014 | British Virgin Islands |
| nsion Newco | USA |
| 6.03.2015 | USA |
| .03.2014 | USA |
| 6.04.2014 | Virgin 5 04.21 8561 |
| 7.02.2015 | USA |
| .03.2011 | |
| 7.03.2014 | USA |
| 0.03.2014 | Cayman Islands |
| .04.2014 | USA |
| .03.2014 | USA |
| 03.2014 | USA |
| 04.2014 | British Virgin Islands |
| 04.2014 | USA |
| .02.2015 | USA |

CONFIDENTIAL

6

as well as the seizure of the account opening documents, documents for the identification of the beneficial owners ("know your customer"), the authorizations to dispose of them, all account documents including the individual receipts, the documents on the custody transactions carried out, the instructions for carrying out the share transactions and money transfers, in particular the receipt of tax refunds and the possible further flow of money including the identification of the target accounts, the Transactions relating to the dividend credits received and withholding taxation carried out pursuant to the Dividend Credit Advices, as well as the associated accounts, the data entered into the trading system of dwpbank (WP2), the instructions and correspondence for the transmission of the Dividend Credit Advices, as well as the documents and instructions of the Bank's owners on the initiation and, where appropriate, termination of business relationships with the Pension Plans or their economic entitled persons, in written and electronic form from the opening of the accounts or custody accounts continuously until the time of the search.

Furthermore, the confiscation (and, if necessary, electronic security) is ordered by

- Documents, contracts, correspondence with business partners█████████████

████████████████████████████████ in written and electronic form,

- documents relating to the annual financial statements of NORTH CHANNEL BANK for the financial years 2012 to 2015, their ownership structure, including the documents relating to the companies OBAN Luxembourg Company S.a.r.l. and OBAN Holdings LLC, the allocation of responsibilities within the Bank and the e-mail correspondence relating to the transactions, in particular to█████████████████████████████████████ and all contracts, notes, invoices, minutes of meetings of the bank's governing bodies and other documents relating to the specific transactions in written and electronic form.


- legal statements of the commissioned law firms on the legal assessment of the intended share transactions and

- Correspondence and e-mail correspondence of the e-mail accounts used in this regard, in particular also the mailbox "depot@northchannelbank.de

pursuant to §§ 94, 98 StPO.



Reasons:

The search had to be ordered at the request of the Koblenz Public Prosecutor's Office on 18.05.2017, as certain facts suggest that the investigative act will lead to the discovery of the aforementioned evidence (§§ 94, 103, 105, 162 StPO).

According to the findings of the Brussels Public Prosecutor's Office, the accused are suspected of fraud (Art. 496 of the Belgian Criminal Code), forgery of documents (Art. 193 and 196 of the Belgian Criminal Code), the use of

CONFIDENTIAL

21-01-00-23

7

false documents (Art. 197 of the Belgian Criminal Code), criminal organisation
(Art. 324 - 326 of the Belgian Criminal Code) and tax evasion (Art. 449 and 450 of the
Belgian Income Tax Code).

NORTH CHANNEL BANK GmbH & Co. KG, Erthalstrasse 1, 55118 Mainz, Germany, holds accounts of
various U.S. pension funds. With regard to these pension funds, three service companies, so-called "Tax
Reclaim Agents" (hereinafter: TRA), have unjustifiably applied to the Belgian tax authorities for the
payment of withholding tax on dividends on Belgian share values. This tax refund claim was based on a
Belgian-American double taxation agreement. The applications for refunds were based on the
submission of certificates from NORTH CHANNEL BANK, so-called "Dividend Credit Advices"
(hereinafter: DCA).

According to current suspicions, the transactions on which the applications are based are agreed share
transactions (in the form of covered short sales), in which the dividend record date of the respective stock
corporation is traded outside the stock exchanges ("over the counter").

to the

Under the pretense of a withholding tax deduction made on (allegedly) paid dividends, the
service companies for the US pension funds apply for tax refunds under the double taxation
treaty to the detriment of the Belgian tax authorities. There is a suspicion that at least 27 US
pension funds that are customers of NORTH CHANNEL BANK GmbH & Co. KG are seeking
tax refunds for the taxes allegedly paid on dividend distributions.

wrongly claimed.

In this context, in the period 2014/2015, reimbursements totalling € 48,283,936.86 were
requested in Belgium for these 27 pension funds, of which € 22,849,284.25 were paid out. With
regard to the difference, it remained an attempt in each case, as the Belgian authorities were

able to stop the disbursements. With regard to the accounts held with NORTH CHANNEL BANK,
these requests/refunds are distributed as follows:



| Pension Name | Requested Restitution | Actual Payment | Number of applications |
|---|---|---|---|
| | € 888.377,14 | 0 .- | 7 |
| | 1.672.490,00 | € 1.672.490,00 | 5 |
| | € 898.544,05 | 0 .- | 7 |
| | 885.811,22 | 0- | 7 |
| | 1.272.481,22 | or.- | 7 |
| | 872.159,47 | 0 .- | 17 |

STEIN_LHOTE0014094

8



| | 885.337,47 | 10 .- | | 4 |
| €  | 3.015.273,50 € | 2.217.773,50 | 6 |
| | 3.487.232,06 € | 2.594.606,25 | 13 |
| € | 3.524.074,14 ¥€ | 1.995.047,50 | 12 |
| € | 921.209,72 | 0 .- | | 7 |
| | 869.543,22 | 10 .- | | 7 |
| | 880.400,47 | 0 .- | | 7 |
| | 879.690,72 | 0 .- | | 7 |
| € | 3.934.205,39 € | 3.055.221,25 | 13 |
| | 874.911,22 | 0 .- | | 4 |
| | 881.976,31 | 10 .- | | 4 |
| | 881.806,97 € | 0 .- | | 7 |
| | 1.974.774,47 € | 750.625,00 | 9 |
| | 875.417,89 | 10.- | | 7 |
| | 3.409.833,72 € | 2.545.339,25 | 12 |
| | 3.447.618,72 € | 2.568.903,75 | 10 |
| | 877.210,14 | already .- | | 7 |
| € | 3.522.715,56 € | 2.627.688,75 | 13 |
| | 2.821.589,00 € | 2.821.589,00 | 16 |



| 872.373,81 | 0 · | 7 |
| 891.398,31 | or.- | 7 |
| 48.283.936,86 € | 22.849.284.25 | |

The facts described in the request for mutual legal assistance with regard to NORTH CHANNEL BANK are part of a larger, internationally organised fraud complex, which was organised primarily from the United Kingdom and caused damage in Belgium of around 500 million euros. In Denmark, where parallel proceedings are being conducted, damages amounting to over 1.67 billion euros were caused.

The investigations of the Brussels Public Prosecutor's Office are directed against both natural persons and, under Belgian law, legal persons, namely:



III. NORTH CHANNEL BANK GmbH & Co. KG (Mainz)
Erthalstr. 1
55118 Mainz

and/or their managing directors and shareholders in persona as controllers of the Society



and/or their managing directors and shareholders in person as responsible persons of the company



and/or their managing directors and shareholders in person as responsible persons of the company



CONFIDENTIAL

21-01-00-26

10

and/or their managing directors and shareholders in person as responsible persons of the company



and/or their managing directors and shareholders in person as responsible persons of the company



and/or their directors and shareholders          in persona as the person responsible for the

Pension Plans

and/or their directors, shareholders in person as controllers. Other people and G&
NORESTETrades Betrugssystems beteiligt
Brussels Nordkanalbank

According to the public prosecutor's office,

sem

- CHANNEL GmbH (Mainz, HRB 42622)

- ▬▬▬▬▬▬▬▬▬▬▬▬▬▬

- ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

- ▬▬▬▬▬▬▬▬▬

- ▬▬▬▬▬▬▬▬▬▬▬▬▬▬

  NORTH CHANNEL BANK

- ▬▬▬▬▬▬▬▬▬▬▬

  NORTH CHANNEL BANK

- Jerome LHOTE, as Beneficial Owner of NORTH CHANNEL BANK

- Matthew STEIN, as Beneficial Owner of NORTH CHANNEL BANK

In the present complex, pension funds, so-called "US Pension Plans", were named as the owners of the shares as of the dividend record date. The investigations of the Belgian authorities revealed that fictitious transactions were probably carried out with non-existent shares of Belgian stock market securities. With reference to the double taxation treaty, the US Pension Plans applied for and paid tax refunds to the Belgian tax authorities. All pension funds that had accounts and custody accounts with NORTH CHANNEL BANK were represented by the US lawyer▬▬▬▬▬▬▬▬

CONFIDENTIAL

STEIN_LHOTE0014097

21-01-00-27

11

███████████████ has submitted reimbursement applications in Belgium for the US Pension Plans held by NORTH CHANNEL BANK in the total amount of € 8,963,491. For this purpose, the "DCA" produced on letterhead of the NORTH CHANNEL BANK were transmitted. The applications were not paid out in full due to longer processing time at the tax authorities and the investigations that had begun in the meantime. In total, there were payouts of

from € 8.164.991 ,-.

███████████████ has deposited funds into the following US Pension Plans accounts held with NORTH CHANNEL BANK:

- ████████████
- ███████████████
- ████████
- █████████████

Further refund applications for the US Pension Plans managed by NORTH CHANNEL BANK were submitted to the Belgian tax authorities by ███████████████ in the total amount of € 27,652,569 03, again using the "DCA"
NORTH CHANNEL BANK certificates. Due to the longer processing time of both tax authorities and the investigations that had begun in the meantime, the applications were not completely processed in the amount of€ paid. In total, there were payouts of
14,684,293.25.



Funds have been deposited by GOAL TAXBACK Ltd. into the following US Pension Plans accounts held with NORTH CHANNEL BANK:

- ███████████
- █████████████████
- ██████████████
- █████████████
- ██████████████████
- ████████████████

███████████ has submitted applications for a total amount of € 9,602,395.88 regarding US Pension Plans held with NORTH CHANNEL BANK with an account and custody account. Here, all payouts were stopped in time. ███████████████ also submitted prepared "DCA" when applying for letterhead from NORTH CHANNEL BANK.

The payouts made to the various US Pension Plans and in what amount can be found in the tabular list.

In the overall complex, a total of EUR 519,254,375.60 of refund applications were submitted in Belgium (including NORTH CHANNEL BANK, of which EUR 48,283,936.86 mentioned above). On the part of the Belgian authorities,

STEIN_LHOTE0014098

21-01-00-28

12

Initiation of the investigations, applications totaling approximately EUR 319 million (of which more than EUR 25 million were for the US Pension Plans managed by NORTH CHANNEL BANK) were rejected. In addition, the Belgian authorities point out that from the end of 2015

no more similar applications were submitted.

The involvement of North Channel Bank in the described procedure is confirmed and supplemented by a special audit report of the auditing firm████ dated 29 July 2016 on NORTH CHANNEL BANK GmbH & Co.KG (hereinafter: NCB) commissioned by the Banking Supervision Department of BaFin in accordance with Section 44 (1) of the German Banking Act (KWG).

████'s audit related to the circumstances of securities transactions carried out in 2014 (the audit period was 2014). A total of 567 customer transactions in shares of Danish, Belgian, Japanese and German issuers were examined. ████ noted that the Ancillary Securities Services business segment was newly added to NCB in 2014. Large-volume share transactions of foreign corporations were carried out in the immediate vicinity of the dividend record date. The transactions followed a regular pattern and had no economically recognizable benefit in themselves.

For example, at one point in time, a client of the bank bought a certain number of shares of a class as a fixed-price transaction from a broker, while another client of the bank sold the same number of shares of the same class to the broker via a fixed-price transaction. The buyer was always a pension plan based in the USA, the sellers were based in Belize or the British Virgin Islands. The broker maintained a custody account and an account with NCB.

At the same time, the buyer and the seller entered into securities lending transactions with a third party who also had a business relationship with NCB. This meant that the buyer lent the acquired securities to the third party and the seller borrowed the securities. On the value date, the securities accounts thus had no stock.

At a later date, the shares were sold or bought by the buyer and seller through the broker as fixed-price transactions and the securities lending transactions were terminated. Due to OTCForward transactions concluded between the buyers or sellers and the third party, which provided for cash settlement, no price gains or losses were incurred from the securities transactions. Accordingly, there were obviously no economic reasons for these transactions. Due to the OTC forward transactions concluded, there was also no price risk for the buyers and sellers from the purchases or sales of securities.

NCB did not act as a party to the purchase and sale contracts in the course of the transactions, but exclusively as a custodian bank. The offsetting account for the credits or debits in the amount of the (net) dividends was an NCB account. From April 2014 onwards, the depository for the shares was always the NCB. Since the shares to be received and delivered from the purchases, sales and securities lending transactions have always balanced each other out in terms of share class and quantity, there was never any stock in the NCB deposit on a day-end basis.

The time of purchase or sale of the shares was shortly before the dividend record date of the respective share class, and settlement after the dividend record date. In accordance with the stock holdings existing at the dividend record date, written confirmations of "Dividend Credit for non-resident tax payer status" (Dividend Credit Advice) were issued for the Bank's clients on credits or debits in the amount of the net dividend.

STEIN_LHOTE0014099

13

The amounts or debits in the amount of the net dividends are credited in an automated process via dwpbank's WP2 securities settlement system. On the basis of the customer portfolios and the dividend data of the individual share classes stored by the system, dwpbank prepares the dividend credit advices, which are printed out on NCB's business paper and made available to the bank.

The dividend settlement is carried out automatically by dwpbank on the basis of the share holdings booked in WP2, regardless of the storage location of the shares. The shipment to the customers or the authorized recipient is carried out by the NCB itself.

According to the reference to the Dividend Credit Advices, these were not tax certificates, but the format and presentation of the Dividend Credit Advice is very similar to that of tax certificates.

In accordance with the instructions of ▮▮▮▮▮ who is authorised to represent the Pension Plans in 2014, dated 27 May 2014, all dividend credit advice issued for the Pension Plans has been sent by the Bank to Indigo Securitites Ltd., London, UK, a service provider in the context of withholding tax refund procedures.

The Dividend Credit Advice includes the following information:

- Name of the customer, Kennnummer

- Class of shares and number of shares,

- Payday, ex-date, dividend record date,

 - Gross dividend, net dividend, foreign withholding tax ("oversea tax deducted at source").

This dividend credit advice was then used to give the Danish tax authorities the (false) impression that there had been a withholding tax deduction on an actual dividend payment and that there was

a right to a refund in order to avoid double taxation.

This is also supported by the determined volume of custody account transactions:

The KPMG report presents the volume of purchases and sales according to the respective market values in relation to NCB's clients. A total of 564 out of 567 customer transactions were included in this analysis. (282 purchases and 282 sales).

The first two transactions (total number of shares (Daimler) 200 shares, transaction volume € 4,000) were carried out on March 14, 2014. It can be assumed that this was a "test run". The subsequent transactions on 18 March 2014 then had a total volume of 10,220,000 units and a total transaction volume of EUR 493 million. In its report, ▮▮▮▮ comes to the conclusion that the average transaction size and number of transactions determined was not appropriate compared to the actual transaction. The nature and scope of the requirements for organizational structure and processes, IT systems, control concepts and integration into risk management processes were questioned by KPMG. Before the securities purchase transactions were carried out, the accounts of the Pension Plans or the companies did not show any balances. The purchase price was charged with the same value value as the stock loan cash collateral for the securities lending transactions. The accounts were thus balanced.

CONFIDENTIAL

14

As already explained above, the technical replica of the securities transactions that had already taken place, which was necessary for the settlement of the clearing transactions, was carried out by the securities service division in the WP2 system of dwpbank. The transactions in WP2 were processed daily in a downstream batch run, in which the piece entries and the creation of the securities settlements (purchase/sale) are generated. The dividend settlement was carried out automatically by dwpbank on the basis of the share holdings booked in WP2, regardless of the storage location of the shares and without checking whether the reported transactions were actually carried out and whether corresponding dividends were actually paid out.

It can therefore be assumed that the securities transactions with foreign shares for the Pension Plans were tax-motivated and aimed at the unjustified refund of a possible foreign withholding tax. It can also be assumed that the securities transactions carried out were only fictitious overall, i.e. that there was no actual delivery of the securities transactions.

The companies mentioned are associated with North Channel Bank, so it is to be expected that evidence necessary for further investigations can be found at the business premises.

The interdependence between North Channel Bank and the ███ companies is as follows:

NORTH CHANNEL BANK Gmbh & Co KG was listed in the commercial register on 06.04.2010 of the Mainz Local Court in Section A under the number HRA 41054 and has since had its registered office in Mainz (previously: seat in Berlin).

The bank's general partner is North Channel GmbH, Mainz (AG Mainz, HRB 42622), the limited partner is███████████████████████).

The management of the bank was carried out in the years 2010 to 2016 by the managing directors of the general partner North Channel GmbH████████████████████████
████████████ in Emsdetten.

On 18.01.2017, the entry was made in the Mainz Commercial Register that the previous managing directors of NORTH CHANNEL BANK GmbH,████████████████, had resigned.████
████████████, wh. in Hofheim am Taunus.

According to a press release from NORTH CHANNEL BANK, the change of managing director took place on 01.01.2016. The previous managing directors will therefore "move to the holding company at the request of the shareholders and will take on mandate functions in other companies of the internationally oriented group of companies in the future."

At the limited partner of the bank,███████████████████████████████,
██████████████████ have been registered as managing directors unchanged since 22.07.2015. Furthermore,████████████ continues to be the managing director of███
████████. which in turn is the sole representative of████████████████
████████████ as a personally liable partner. Another personally liable partner (without power of attorney) is████████████████████.

The limited partner's share capital is € 20,000, the general partner's share capital is € 23,530,000

STEIN_LHOTE0014101

21-01-00-31

15

The business purpose of North Channel GmbH is to participate as a general partner and to take over the management of NORTH CHANNEL BANK GmbH & Co. KG, which in turn provides banking and financial services. From 2010 until an amendment to the Articles of Association on 05.12.2014, the company had a Supervisory Board.

On 10.12.2014, a profit transfer agreement was concluded between North Channel GmbH and ▇▇▇▇ ▇▇▇▇▇▇ ). ▇▇▇▇▇▇▇▇▇▇▇ acted as a limited partner and was merged into OBAN Holding GmbH & Co. KG on 20.08.2015. This company, in turn, was merged into OBAN Holding Gmbh & Co. KGaA on 29.08.2016 after conversion by way of a change of legal form.

Pursuant to § 33.4 of the Code of Criminal Procedure, the order had to be issued without prior hearing of the accused in order not to jeopardise the purpose of the investigative measure. The measure is proportionate because it is suitable and necessary to achieve the intended purpose, whereby the encroachment on fundamental rights associated with it is not disproportionate to the importance of the matter and the strength of the suspicion of the offence. It should be noted that the order may only be enforced within 6 months of its issuance.

Marker
Judge at the Amtsgeri

**105**

Engrossed:

**9**

els L wind officer of the Gest
... guille of the district court

STEIN_LHOTE0014102

Copy

Reference number:
30 Gs 3966/17 Public
Prosecutor's Office:
2001 AR 229/17



## District Court
## of Koblenz

meschluss

In the legal assistance procedure of the Staalsamment.

Koblenz, initiated on the basis of a request for judicial assistance from the Kepenhagen Public Prosecutor's Office in an investigation by the Danish prosecution authority

1. ▮▮▮▮▮▮▮

2. ▮▮▮▮▮▮▮

3 ▮▮▮▮▮▮▮



on the basis of initial suspicion of particularly serious fraud pursuant to Sections 279, 286 (2) of the Danish Criminal Code

the Local Court of Koblenz, through the judge at the Local Court - as the permanent representative of the Director - Griesar decided on 30.05.2017:

**The search of the business premises**



is ordered to find the following evidence:

CONFIDENTIAL

21-01-00-33

30 Gs 3966/17                    - Page 2 -

Documents related to the following pension funds on which the tax refunds obtained were paid:



1.

2.

3.

4.

5.

6.

7.

8.

9.

10.

11.

12.

13.

14.

15.

16.

CONFIDENTIAL

30 Gs 3956/17                                    - Page 3 -

17.

18.

19.

20.

21.

22.

23.

24.

25.

26.

27.



all documents relating to the annual financial statements of NORTH CHANNEL BANK for the financial years 2012 to 2015, their ownership structure, the distribution of responsibilities in the bank and the e-mail correspondence in connection with the transactions, in particular with regard to ████ ████ ████ ████, the so-called Tax Reclaim Agents ████ the accused in the Danish main proceedings, Sanjay SHAH and all contracts, notes, invoices, minutes of meetings of the bank's governing bodies and other documents related to the specific transactions in written and electronic form

Objects that may be of importance for the investigation proceedings as evidence in the above-mentioned sense are to be taken into custody or secured in some other way. If voluntary surrender is refused, they are to be confiscated, § 98 StPO.

Reasons:

According to the findings of the Copenhagen Public Prosecutor's Office, the accused are suspected of particularly serious fraud pursuant to Sections 279 and 286 (2) of the Danish Criminal Code.

CONFIDENTIAL

STEIN_LHOTE0014105

30 Gs 3966/17                          -Page 4 -

Code.

There is a suspicion that in the years 2012 to 2015 acts of fraud were committed to the detriment of the Danish tax authorities with a total damage amount of approx. DKK 12.4 billion (equivalent to approx. 1.67 billion euros). The fraud was committed in such a way that the Danish Tax Authority (SKAT) was misled by submitting incorrect documents into believing that pension funds registered in the USA were the owners of Danish listed securities on the dividend record date. When the dividends for the shares were paid out, the (net) dividends were paid to the shareholders via the custodian banks and a share of 27% was paid to the tax authority SKAT as withholding tax.

In the present complex, pension funds, so-called "US Pension Plans", were named as the owners of the shares as of the dividend record date. The investigations of the Danish authorities revealed that fictitious transactions were probably carried out with non-existent shares of Danish stock market securities. These were actually agreed share transactions (in the form of covered short sales), in which the dividend record date of the respective stock corporation is traded outside the stock exchanges ("over the counter").

Under the pretense of a withholding tax deduction made on (allegedly) paid dividends, service companies for US pension funds apply for and pay tax refunds to SKAT under the respective double taxation treaties to the detriment of the Danish tax authorities.

The investigations of the Copenhagen Public Prosecutor's Office have revealed during the examination of the entire stock of shares of a large Danish public limited company that applications for tax refunds were submitted to SKAT based on an ownership of about 2.6 million shares, which is about 1.7 million more shares than theoretically could theoretically be owned by foreign shareholders. According to the Danish authorities, this is a clear indication that fraudulent action has taken place.

The suspicion is directed against various persons and companies, including Sanjay Shah, who is accused there, as well as so-called tax reclaim agents (service providers who deal with tax refund applications) and custodians (custodians or custodian banks), including NORTH CHANNEL BANK GmbH & Co. KG in Mainz as well as a number of American penalists. Fund.

The Copenhagen public prosecutor's office suspects a total of 212 American pension funds of particularly serious fraud in connection with the refund of dividend taxes amounting to about DKK 10.9 billion (about 1.47 billion euros). Of these 212 suspected American pension funds, 27 pension funds have accounts with NORTH CHANNEL BANK GmbH & Co KG.

NORTH CHANNEL BANK GmbH & Co. KG (the legal entity is under investigation under Danish law) is suspected of having submitted claims for reimbursement of DKK 1,135,775,448 (equivalent to approximately EUR 153 million) on behalf of the 27 American pension funds through the four tax reclaim agents ▮▮▮▮▮▮▮▮▮

If these 27 American Pension Plans had been entitled to a refund of the final withholding taxes (27%) amounting to approximately DKK 1.1 billion, a total payment of approximately DKK 4.2 billion in gross dividends would have been made. Of this, the 27 American pension funds would have received about DKK 3.1 billion (equivalent to EUR 417 million) in

30 Gs 3966/17                          - Page 5 -

net dividend paid by the Danish companies.

Accordingly, the 27 American pension plans would have had to own Danish shares worth about DKK 185 billion (about 24.9 billion euros) in order to be able to receive a dividend entitlement of DKK 4.2 billion in gross dividends.

**The Copenhagen public prosecutor's office believes that it was impossible for the 27 American pension funds to own Danish shares of such an enormous value. The** 27 American pension funds were only established at the beginning of 2014. You have opened accounts with NORTH CHANNEL BANK GmbH & Co. KG 2-3 months after the establishment and should therefore have come into possession of enormous capital for share transactions in Danish shares in a very short time.

This gives rise to the suspicion for the Copenhagen public prosecutor's office that the 27 American pension fund did not receive net dividends of around 417 million euros. In this case, the payment of the net dividend should emerge from the accounts of the pension funds, which the public prosecutor's office in Copenhagen considers unlikely. Rather, it must be assumed that no dividends were paid out and, accordingly, no withholding tax was deducted in favour of the Danish tax authority. Tax refunds for allegedly paid taxes on dividend distributions were wrongly applied for and also paid out.

According to the Copenhagen public prosecutor's office, there are connections between all 27 American pension funds. They are represented by a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ In addition, all payment orders for the American pension funds were issued by Donald ▮▮▮▮▮▮▮▮. These two people are also involved in the investigation into the remaining 187 American pension funds.

The involvement of North Channel Bank in the described procedure is confirmed and supplemented by a special audit report of the auditing firm KPMG dated 29.07.2016 on NORTH CHANNEL BANK GmbH & Co.KG (hereinafter: NCB) commissioned by the Banking Supervision Department of BaFin in accordance with Section 44 (1) of the German Banking Act (KWG)

KPMG's audit related to the circumstances of securities transactions carried out in 2014 (the audit period was 2014). A total of 567 customer transactions in shares of Danish, Belgian, Japanese and German issuers were examined. KPMG noted that the Ancillary Securities Services business segment was newly added to NCB in 2014. Large-volume share transactions of foreign corporations were carried out in the immediate vicinity of the dividend record date. The transactions followed a regular pattern and had no economically recognizable benefit in themselves.

For example, at one point in time, a client of the bank bought a certain number of shares of a class as a fixed-price transaction from a broker, while another client of the bank sold the same number of shares of the same class to the broker via a fixed-price transaction. The buyer was always a pension plan based in the USA, the sellers were based in Belize or the British Virgin Islands. The broker maintained a custody account and an account with NCB

At the same time, the buyer and the seller entered into securities lending transactions with a third party who also had a business relationship with NCB. This meant that the buyer lent the acquired securities to the third party and the seller

30 Gs 3966/17                              - Page 6 -

borrowed the securities. On the value date, the securities accounts thus had no stock.

At a later date, the shares were sold or bought by the buyer and seller through the broker
as fixed-price transactions and the securities lending transactions were terminated. Due to
OTC forward transactions concluded between the buyers or sellers and the third party,
which provided for cash settlement, no price gains or losses were incurred from the
securities transactions. Accordingly, there were obviously no economic reasons for these
transactions. Due to the OTC forward transactions concluded, there was also no price risk
for the buyers and sellers from the purchases or sales of securities.

In the context of the transactions, NCB did not act as a broker of the purchase and sale contracts,
but exclusively as a custodian bank. The offsetting account for the credits or debits in the amount
of the (net) dividends was an NCB account. From April 2014 onwards, the depository for the
shares was always the NCB. Since the shares to be received and delivered from the purchases.
sales and securities lending transactions in the class and quantity of shares, there was never a
stock in the depository (CB) on a day-end basis.

The time of purchase or sale of the shares was shortly before the dividend record date of the
respective share class, and settlement after the dividend record date. In accordance with the
stock holdings existing at the dividend record date, written confirmations of "Dividend Credit for
non-resident tax payer status" (Dividend Credit Advice) were issued for the Bank's clients on
credits or debits in the amount of the net dividend.

The amounts or debits in the amount of the net dividends are credited in an automated process
via dwpbank's WP2 securities settlement system. On the basis of the customer portfolios and the
dividend data of the individual share classes stored by the system, dwpbank prepares the
dividend credit advices, which are printed out on NCB's business paper and made available to the
bank.

The dividend settlement is carried out automatically by dwpbank on the basis of the share holdings
booked in WP2, regardless of the storage location of the shares. The shipment to the customers or
the authorized recipient is carried out by the NCB itself.

According to the reference to the Dividend Credit Advices, these were not tax certificates, but the
format and presentation of the Dividend Credit Advice is very similar to that of tax certificates.

In accordance with the instructions of ▮▮▮▮▮▮▮, who is authorised to represent the Pension
Plans in 2014, dated 27 May 2014, all dividend credit advice issued for the Pension Plans has been
sent by the Bank to Indigo Securities Ltd., London, UK, a service provider in the context of
withholding tax refund procedures.

The Dividend Credit Advice includes the following information:

- Name of the customer, customer number and custody account number,

- Class of shares and number of shares,

- Payday, ex-date, dividend record

-date, gross dividend, net dividend, foreign withholding tax ("oversea tax deducted at sour-
ce").

This dividend credit advice was then used to give the Danish tax authorities the (false)
impression that an actual dividend payment would be too

CONFIDENTIAL

withholding tax and that there was a claim for reimbursement in order to avoid double taxation.

This is also supported by the determined volume of custody account transactions:

The ▮▮▮▮ report presents the volume of purchases and sales according to the respective market values in relation to NCB's clients. A total of 564 out of 567 customer transactions were included in this analysis. (282 purchases and 282 sales).

The first two transactions (number of shares (Daimler) total: 200 shares, transaction volume € 4,000) were carried out on March 14, 2014. It can be assumed that this was a "test run". The subsequent transactions on 18 March 2014 then had a total volume of 10,220,000 units and a total transaction volume of EUR 493 million. In its report, KPMG comes to the conclusion that the average transaction size and number of transactions determined was not appropriate compared to the actual transaction. The nature and scope of the requirements for organizational structure and processes, IT systems, control concepts and integration into risk management processes were questioned by KPMG. Before the securities purchase transactions were carried out, the accounts of the Pension Plans or the companies did not show any balances. The purchase price was charged with the same value value as the stock loan cash collateral for the securities lending transactions. The accounts were thus balanced.

As already explained above, the technical replica of the securities transactions that had already taken place, which was necessary for the settlement of the clearing transactions, was carried out by the securities service division in the WP2 system of dwpbank. The transactions in WP2 were processed daily in a downstream batch run, in which the piece entries and the creation of the securities settlements (purchase/sale) are generated. The dividend settlement was carried out automatically by dwpbank on the basis of the share holdings booked in WP2, regardless of the storage location of the shares and without checking whether the reported transactions were actually executed and whether corresponding divisions were actually paid out.

It can therefore be assumed that the securities transactions with foreign shares for the Pension Plans were tax-motivated and aimed at the unjustified refund of a possible foreign withholding tax. It can also be assumed that the securities transactions carried out were only fictitious overall, i.e. that there was no actual delivery of the securities transactions.

The companies mentioned are associated with North Channel Bank, so it is to be expected that evidence necessary for further investigations can be found at the business premises.

The interdependence between North Channel Bank and the ▮▮▮▮▮▮▮▮ is as follows:

NORTH CHANNEL BANK GmbH & Co KG was entered in the commercial register of the Mainz District Court on 06.04.2010 in Department A under the number HRA 41054 and has since had its registered office in Mainz (previously: registered office in Berlin).

The bank's general partner is North Channel GmbH, Mainz (AG Mainz HRB 42622). The limited partner is ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

30 Gs 3966/17                    - Page 8 -

The management of the bank was carried out in the years 2010 to 2016 by the managing
directors of the general partner North Channel GmbH █████████████████ in
Riegelsberg and █████████████████ in Emsdetten.

On 18.01.2017, the entry was made in the Mainz Commercial Register that the previous
managing directors of NORTH CHANNEL BANK GmbH, ██████████████
had resigned. ████████████████, wh. in Hofheim am Taunus.

According to a press release from NORTH CHANNEL BANK, the change of managing director took place
on 01.01.2016. The previous managing directors will therefore "move to the holding company at the
request of the shareholders and will take on mandate functions in other companies of the internationally
oriented group of companies in the future."

At the limited partner of the bank, ████████████████
████████████ have been registered as managing directors
unchanged since 22.07.2015. Furthermore, ███████████ continues to be the managing
director of ████████████, which in turn is entitled to
represent ████████████████ as a personally liable partner. Erthalstr. 1, 55118
Mainz. Another personally liable partner (without power of attorney) is OBAN Luxemburg
Company S.agl ., in Luxembourg.

The share capital of the limited partner amounts to €  20,000, the share capital of the
Komplementäri

The business purpose of North Channel GmbH is to participate as a general partner
and to take over the management of NORTH CHANNEL BANK GmbH & Co. KG, which
in turn provides banking and financial services. From 2010 until an amendment to the
Articles of Association on 05.12.2014, the company had a supervisory
advice.

On 10.12.2014, a profit transfer agreement was concluded between North Channel GmbH
and █████████████ acted as a
limited partner and was merged into OBAN Holding GmbH & Co. KG on 20.08.2015. This
company, in turn, was merged into OBAN Holding Gmbh & Co. KGaA on 29.08.2016 after
conversion by way of a change of legal form.

Pursuant to § 33.4 of the Code of Criminal Procedure, the order had to be issued without prior
hearing of the accused in order not to jeopardise the purpose of the investigative measure. The
measure is proportionate because it is suitable and necessary to achieve the intended purpose,
whereby the encroachment on fundamental rights associated with it is not disproportionate to the
importance of the matter and the strength of the suspicion. It should be noted that the order may
only be enforced within 6 months of its issuance.

Griesar
Judge at the District Court - as the permanent representative of the Director -

CONFIDENTIAL
STEIN_LHOTE0014110

21-01-00-40

30 Gs 3966/17                                    - Page 9 -

Engrossed:                                           Amregericht

(Dienstsiegel)

(Baulig), Senior Secretary of                        Koblenz
Justice as Registrar of the Registry

mstein@maplept.com

104.218.138.98

CONFIDENTIAL                                    STEIN_LHOTE0014111