# Fagligt etiske problemer
x
## i strafferetsplejen

Betænkning afgivet af
Specialgruppen under
DJØFs fagligt etiske arbejdsgruppe



April 1994

88

3

# 1. Indledning

DJØFs hovedbestyrelse besluttede i december 1991 at nedsætte en fagligt etisk arbejdsgruppe med følgende kommissorium:

»At undersøge, om der kan fastsættes fagligt etiske regler dels gældende for alle DJØFs medlemmer, dels gældende for grupper af medlemmer/for funktionsområder, og for så vidt disse spørgsmål besvares bekræftende, at afgive indstilling om indholdet af sådanne regler.

At fremkomme med indstillinger om foranstaltninger med henblik på at fremme en debat blandt DJØFs medlemmer om fagligt etiske spørgsmål - såvel under som efter den ovennævnte del af udvalgsarbejdet, og at medvirke ved sådanne foranstaltnings gennemførelse.

Det forudsættes, at arbejdsgruppen ved høringer eller nedsættelse af specialgrupper inddrager sagkyndige uden for arbejdsgruppens medlemskreds i sit arbejde«.

Arbejdsgruppen fik som formand professor Lars Nordskov Nielsen. Arbejdsgruppens sammensætning i øvrigt fremgår af bilag 1.

I forbindelse med arbejdsgruppens nedsættelse blev det forudsat, at arbejdsgruppen skulle sammensættes af personer, der kunne fungere som uafhængige såvel af DJØFs hovedbestyrelse og forbundets afdelingsbestyrelser som af offentlige myndigheder/institutioner.

Den fagligt etiske arbejdsgruppe afgav i slutningen af september måned 1993 en betænkning om fagligt etiske principper i offentlig administration. Betænkningen er udgivet på Jurist- og Økonomforbundets Forlag, og et sammendrag af betænkningen er optrykt i DJØFbladet nr. 21 i 1993.

Den fagligt etiske arbejdsgruppe nedsatte i starten af 1993 en specialgruppe vedrørende strafferetsplejen.

Fra den fagligt etiske arbejdsgruppe indtrådte:

| | |
|---|---|
| Generalsekretær Ole Stig Andersen | Advokatsamfundet |
| Politimester Arne Baun (formand) | Politimesteren i Gentofte |
| Advokat Henrik Viltoft | |
| Professor Henrik Zahle | Københavns Universitet |

I øvrigt indtrådte følgende personer:

| | |
|---|---|
| Advokat Thomas Peter Rørdam | |
| Advokat Merethe Stagetorn | |
| Landsdommer Holger Kallehauge | Østre Landsret |
| Adm. dommer Claus Larsen | Frederiksberg Ret |
| Adm. dommer Niels Viltoft | Lyngby Ret |
| Statsadvokat Erik Bjørn Merlung | Statsadvokaten for Sjælland |
| Politimester Jørn Peter Clausen | Politimesteren i Næstved |
| Politimester Paul Wilken Kühl | Politimesteren i Silkeborg |
| Vicepolitimester Jacob Skov | Politimesteren i Odense |

Henrik Viltoft udtrådte af specialgruppen i marts måned 1993 i forbindelse med, at han blev udpeget til anklager i rigsretssagen mod fhv. justitsminister Erik Ninn-Hansen.

Henrik Zahle udtrådte af arbejdsmæssige grunde af specialgruppen i september måned 1993.

Claus Larsen blev 1. september 1993 udnævnt til byretspræsident i Københavns Byret.

Advokat Karsten West, Svendborg, indtrådte i efteråret 1993 i specialgruppen.

Konsulent Povl-Christian Jensen, DJØF, har fungeret som sekretær for gruppen.

Kommissoriet for specialgruppen fremgår af referatet af specialgruppens 1. møde den 8. februar 1993, hvori formanden for hovedarbejdsgruppen, Lars Nordskov Nielsen, deltog. Nordskov Nielsen anførte bl.a.:

> At objektet for specialgruppens undersøgelse var at få en holdning til straffeprocessuelle problemer set ud fra en dommervinkel, en anklager/politivinkel samt en forsvarervinkel.

klageren modstå enhver fristelse til privat drøftelse og uden vaklen give til kende, at spørgsmålet i givet fald må rejses under domsforhandlingen. Vedrører henvendelsen sagen uvedkommende emner, må det være op til den enkelte anklager efter sin natur at finde et passende påskud til at bringe »mødet« til afslutning.

Hvis henvendelsen fra den læge dommer har drejet sig om sagen og herudover har antydet/afsløret en eklatant og relevant misforståelse af sagens faktum og/eller jus eller værre endnu den læge dommers stillingtagen til sagen, må det være uomgængeligt, at anklager snarest belejligt gør retten opmærksom på det passerede.

Om omgangsformen imellem anklager og forsvar, når dommeren ikke er til stede, altså typisk før og efter et retsmøde, er der vel kun etik i dette at sørge for, at ingen tilstedeværende i øvrigt - med rette eller urette - kan få det indtryk, at forsvarer og anklager konspirerer om sagen, det være sig dens behandling eller udfald.

At dette naturligvis ikke indebærer, at enhver kontakt imellem anklager og forsvarer bør undgås, turde være selvforståeligt, og anden rettesnor end at, anklager og forsvarer prøver at være opmærksomme på, at helst ingen får »noget galt i halsen«, kan næppe gives.

Om anklagerens omgangsform i relation til den tiltalte, eller hvordan anklageren behandler tiltalte, må det siges, at meget naturligvis må afhænge af sagens art og tiltaltes person, men helt generelt må det gamle udsagn: En anklager må aldrig benytte sin rolle/udnytte sin magtposition i forhold til den tiltalte *alene* med det formål at forøge den ydmygelse, der implicit ligger i at »sidde foran retten«, stadig være vejledende for enhver anklager.

Sagens art og den tiltaltes person må i øvrigt sætte rammerne for, hvordan en anklager kan behandle en tiltalt. Respekten for anklagerens opgave i straffeprocessen er det nødvendigt at fastholde, og i konsekvens heraf må der gives anklageren en betydelig margin i valg af fremgangsmåde og form over for tiltalte. Det er under alle omstændigheder en svær balancegang, og i kampens hede er den ikke nemmere at håndtere. Går anklageren åbenbart over stregen, er det rettens opgave at skride ind.

### 5.6. Kontakt uden for retten

Kontakt imellem anklager og forsvarer uden for retten er såvel uundgåelig som højst ønskværdig af hensyn til sagernes fremme. Hvordan denne kon-

takt foregår bør i almindelighed ikke påkalde nogen interesse fra omverdenen. Sagernes og personernes forskellighed giver meget vide rammer for form og indhold i kontakten mellem anklager og forsvarer, uden at det, set fra anklagerens synspunkt, giver anledning til fagligt-etiske overvejelser/anfægtelser.

Om kontakt uden for retten med dommeren henvises til afsnit 3.4.

### 5.7. Specielt om drøftelse med forsvareren af tilskæring af sagen

F.s.v. angår drøftelser med forsvareren af tilskæring af sagen, navnlig med henblik på sagens fremme som tilståelsessag, er der behov for at overveje etikken. Sådanne drøftelser kan minde om det, der i angelsaksisk ret benævnes plea-bargaining. Det kaldes i fagjargonen undertiden »studehandler«. Spørgsmål kan rejses, om det går an at indgå aftaler, og om andre, navnlig retten, når en aftale måtte være indgået, i givet fald skal gøres bekendt med den. Sammenlign herved foran under afsnit 4.6.

Hvad menes fra en anklagers synspunkt med studehandel i denne forbindelse? Herved forstås en aftale med forsvareren om en bestemt fremgangsmåde ved behandlingen af sagen, en fremgangsmåde som fra begge sider indebærer, at der både gives noget og fås noget, hvor man må erkende med sig selv, at éns disposition isoleret set næppe er fagligt forsvarlig og rimelig.

Følgende situationer forekommer i praksis:

1) Aftalen går ud på, at anklagemyndigheden undlader at rejse tiltale for nogle i øvrigt bevisholdbare forhold, og at tiltalte herefter erkender sig skyldig i resten.

2) Aftalen går ud på, at tiltalte undlader at anke byretsdommen, mod at anklagemyndigheden undlader at rejse yderligere tiltale for nogle forhold, der hidtil har været udskilt af sagen.

3) Aftalen går ud på, at tiltalte forklarer om andres medvirken til forbrydelsen, mod at anklageren begrænser sin strafpåstand.

Det må være i orden at indgå aftalerne nævnt under 1) - 2).

I 1) og 2) kan der ikke være behov for særskilt orientering af retten. Eventuel underretning af anmeldere i de forhold, der ikke bliver til noget, behøver næppe at indeholde oplysning om sammenhængen med aftalen.

I 3) er det åbenbart, at retten skal underrettes. Dette følger allerede af, at forholdet skal iagttages ved strafudmålingen, jf. straffelovens § 80. Men underretningen må gives straks ved domsforhandlingens start af hensyn til forsvaret for medgerningsmanden. Der er desuden grund til overvejelse af spørgsmålet, om den overordnede anklagemyndighed bør give sin tilslutning. Foran i afsnit 4.6 antages denne type aftale at være betænkelig, når den tiltaltes forklaring skal anvendes som bevis, hvilket jo er grunden til anklagemyndighedens interesse i aftalen. Spørgsmålet om denne praksis' tilladelighed bør nok afklares gennem lovgivning.

### 5.8. Henvendelse fra overordnet myndighed i konkrete straffesager

Retsplejelovens § 98, stk. 3, fastslår, at »justitsministeren kan give de offentlige anklagere pålæg vedrørende behandlingen af konkrete sager, herunder om at påbegynde eller fortsætte, undlade eller standse forfølgning«.

Under Folketingets behandling af lovforslaget, der førte til lov nr. 385 af 20. maj 1992 om ændring af retsplejeloven (anklagemyndighedens struktur m.v.), blev i retsudvalget stillet flg. spørgsmål til justitsministeren:

»Har det ikke altid været Justitsministeriets principielle opfattelse, at der ikke bør gives tjenestebefalinger i kraft af det almindelige over- og underordnelsesforhold, når det drejer sig om politimesteres og statsadvokaters stilling til konkrete straffesager ?«.

I besvarelse af dette spørgsmål anføres bl.a.:

»Justitsministeriet har i hidtidig praksis udvist tilbageholdenhed med i kraft af det almindelige over- og underordnelsesforhold at gribe ind i konkrete sager. Denne tilbageholdende linie må forventes fortsat, også efter en gennemførelse af lovforslaget om anklagemyndighedens struktur. Ikke blot mere principielle grunde, men også praktiske grunde taler herfor.

Begrænsningen af klageadgangen til Justitsministeriet og Rigsadvokaten medfører imidlertid ikke, at mere betydelige og principielle sager ikke kan behandles af disse myndigheder. Der vil således efter forslaget fortsat være adgang for Justitsministeriet og Rigsadvokaten til at gribe ind i konkrete sager, herunder i sager, som indeholder principielle spørgsmål, eller som af andre grunde findes at burde undergives fornyet behandling.«

Det er sket i nogle tilfælde, at en kontorchef i Justitsministeriet har henvendt sig telefonisk til en anklager og - næst efter at meddele, at man jo ikke blandede sig i behandlingen af konkrete sager - meddelte, at ministeren mente/fandt det rigtigt, at sagen blev fremmet til tiltalerejsning. Der tænkes på sager, som efter anklagerens vurdering ikke var af principiel karakter. Efter anklagerens forelæggelse af spørgsmålet ad tjenestevejen for Rigsadvokaten og af denne for ministeriet, er »henvendelserne« trukket tilbage.

### 5.9. Fagligheden under pres fra medarbejdere

Ved hovedarbejdsgruppens høring af politimestre og politifuldmægtige nævnte flere deltagere, at de havde oplevet loyalitetskonflikter mellem på den ene side hensynet til almindelige retssikkerhedsgarantier og på den anden side hensynet til et godt samarbejde med politipersonalet.

Hvis kriminalpolitiet under en efterforskning anmodede juristen om at søge en aflytnings- eller en ransagningskendelse indhentet i retten, ville det kunne give anledning til skuffelse, hvis juristen efter en vurdering af grundlaget afslog at gå i retten. Det var lettere for juristen i sådanne tilfælde at gå i retten med sagen og overlade til dommeren at afslå, fordi der nu engang efter en fagjurists vurdering ikke var tilstrækkeligt grundlag.

En politijurist havde været ude for, at kriminalpolitiet ønskede en anholdelse forlænget i 3 gange 24 timer for at få tid til nogle undersøgelser. Juristen var overbevist om, at undersøgelserne uden besvær kunne udføres inden 24-timersfristens udløb. Han oplevede her et problem ikke alene i forholdet til kriminalpolitiet kontra den anholdte, men også til dommeren, som næppe ville være i stand til at fastslå, at undersøgelsen kunne klares inden for de første 24 timer.

Når en politijurist beslutter at fremsætte anmodning om kendelse om ransagning, aflytning, opretholdelse af anholdelse eller om varetægtsfængsling, skal det naturligvis ske efter en overvejelse på sagligt grundlag. Overvejelserne vedrører spørgsmålet, om lovens betingelser med den fornødne grad af sikkerhed må antages at være opfyldt. I overvejelserne indgår desuden, om der er en saglig efterforskningsmæssig interesse i at opnå beslutningen. Politiet begærer ikke kendelser, blot fordi betingelserne må være opfyldt. Men det må anses for at være usagligt at tillægge ønsker eller forventninger hos efterforskere eller andre politimedabrejdere selvstændig vægt ved afvejningen af, om lovens betingelser for sådanne tvangsindgreb er opfyldt. Det er tænkeligt, at oplevelsen af at beslutte under et pres specielt er den yngre jurists erfaring. Beslutning om indhentelse af de nævnte retslige

**U.1982.1027H**

**H. K. K. 13. september 1982 i sag 351/1982**

*Rigsadvokaten*
mod
*T1 (adv. Gregersen e.o.), T2 (adv. Gregersen e.o.), T3 (adv. Jørgen Bang) og T4 (adv. Unmack Larsen e.o.).*

*International ret 14.1*
**Vidneførelse af i USA bosiddende person, der var omfattet af plea bargain, fundet betænkelig.**

♦ I en sag om overtrædelse af strfl. § 191 ønskede anklagemyndigheden som vidne at føre en person, som såvel i U.S.A., hvor han opholdt sig, som i Danmark var sigtet for overtrædelse af narkotikalovgivningen. Den pågældende havde i U.S.A. i overværelse af repræsentanter for den danske anklagemyndighed afgivet forklaring under edsaflæggelse om sine og andres aktiviteter med hensyn til import af narkotika i U.S.A. og Danmark. Der var indgået aftale om, at der ikke i Danmark ville blive iværksat yderligere retsforfølgning, og at en udleveringsbegæring ville blive trukket tilbage, såfremt han i U.S.A. blev dømt for de forhold, hvori han havde erkendt sig skyldig, og indgik på sandfærdigt at afgive forklaring under domsforhandling i Danmark om disse forhold. - Da den pågældende efter indholdet af aftalen havde en åbenbar interesse i under domsforhandlingen at forklare som under efterforskningen og under hensyn til de omstændigheder, hvorunder forklaringerne var tilvejebragt, fandtes det uanset sagens omfang og karakter betænkeligt at tillade vidneførslen.

## Østre Landsret

### Østre Landsrets kendelse 25. juni 1982 (5. afd.).

De tiltalte T1, - - -, T2, T3 og T4 har påkæret Københavns byrets kendelse af 10. juni 1982 (sag nr. 2. afd. 1257, 1334, 1335 og 1336/1982), hvorved det bestemtes, at anklagemyndighedens begæring om vidneførsel af A tages til følge, med påstand om, at den begærte vidneførsel ikke tillades.

Anklagemyndigheden har påstået kendelsen stadfæstet.

Kæremålet har været forhandlet mundtligt.

Det hedder i den danske oversættelse af det omhandlede »Plea Agreement«, der rettelig er dateret den 20. maj 1981, bl.a.:

»A går - - - ind på over for repræsentanter for De Forenede Staters justitsministerium og Danmark at give en åben og sandfærdig redegørelse for sin viden vedrørende egne aktiviteter såvel som vedrørende andres, som han kender til, angående importen, besiddelsen og fordelingen af narkotika og farlige stoffer, der er underkastet kontrolbestemmelser, samt alle øvrige sager, som disse repræsentanter vil rette forespørgsel til ham om.

Det aftales, at hvis A erkender sig skyldig i de ovenfor beskrevne sigtelser og dømmes derfor samt fuldstændigt opfylder de øvrige bestemmelser i nærværende aftale, vil De Forenede Stater ikke retsforfølge A for andre mulige sigtelser baseret på oplysninger givet af ham i medfør af nærværende aftale.

Det aftales, at såfremt A erkender sig skyldig i de ovenfor beskrevne sigtelser og dømmes derfor samt fuldstændigt opfylder de øvrige bestemmelser i nærværende aftale, vil den danske regering med præjudice hæve sin igangværende strafferetslige forfølgNag mod A og trække sin nuværende udleveringsanmodning - - - tilbage.

Det aftales endvidere, at Danmark heller ikke vil iværksætte nogen yderligere retsforfølgning mod A for eventuelle kriminelle handlinger begået af ham

**1028**

forud den 19. januar 1981 vedrørende hans indførsel, fordeling eller besiddelse af nogen narkotiske stoffer eller farlige stoffer, der er underkastet kontrolbestemmelser.

A skal til enhver tid give fuldstændige, sandfærdige og nøjagtige oplysninger og udsagn. Skulle det konstateres, at A med forsæt har afgivet falske, ufuldstændige eller vildledende udsagn eller oplysninger eller på anden måde har krænket nogen bestemmelse i nærværende aftale, skal nærværende aftale blive ugyldig, og A skal derefter underkastes retsforfølgning for enhver strafbar lovovertrædelse i forhold til lovene i De Forenede Stater og Danmark, - - -«

Efter indholdet af denne aftale, hvorved der er givet A et betinget løfte om straffrihed i Danmark, må det antages, at han, der agtes afhørt med en sigtets retsstilling, vil have en åbenbar interesse i under domsforhandlingen at forklare i overensstemmelse med de forklaringer, han har afgivet under efterforskningen.

Det fremgår imidlertid af sagen, at A som et led i anklagemyndighedens bevisførelse ønskes afhørt om omstændigheder, der må anses for at være af afgørende betydning for sagens oplysning.

Herefter og under hensyn til karakteren og omfanget af den tiltale, der er rejst under sagen, findes anklagemyndigheden ikke at burde afkæres fra under domsforhandlingen at foretage den begærte vidneførsel, der vil være underkastet de almindelige regler om bevisbedømmelse.

## Højesteret

### Højesterets kæremålsudvalgs kendelse.

Den i denne sag af Østre Landsret afsagte kendelse er med Justitsministeriets tilladelse indbragt for Højesteret af de tiltalte med påstand om, at anklagemyndighedens begæring om førelse af A som vidne ikke tages til følge.

Anklagemyndigheden har påstået stadfæstelse.

I påkendelsen af kæremålet, der er forhandlet mundtligt, har deltaget tre dommere: Bangert, Funch Jensen og Pontoppidan.

I den danske oversættelse af den plea agreement, der er omtalt i den påkærede kendelse, bestemmes det om A's forpligtelser yderligere:

»A går endvidere ind på sandfærdigt at afgive vidneudsagn for enhver storjury, ved domsforhandling, under eventuelle (skriftlige)vidneforklaringer eller enhver anden retsforhandling eller retslig handling i De Forenede Stater eller Danmark om ethvert af de ovenfor nævnte forhold i sagen. A går ind på efter anmodning at fremskaffe et hvilket som helst dokument, der er relevante for de ovennævnte forhold i sagen, og som er i hans besiddelse, eller som han har rådighed over, til repræsentanter for De Forenede Stater og Danmark.«

Af en retsbogsudskrift fra United States District Court for the Northern District of California fremgår det, at A den 26. maj 1981 bl.a. til repræsentanter for det danske politi afgav forklaring om en lang række overtrædelser af lovgivningen om euforiserende stoffer, herunder om adskillige af de forhold, som er omfattet af tiltalen i den foreliggende sag. Forklaringen blev optaget på videobånd, og hovedpunkterne i forklaringen blev den 27. maj 1981 gentaget under et retsmøde i the District Court. Såvel den udenretlige som den indenretlige forklaring blev afgivet under edsaflæggelse.

Som anført i den påkærede kendelse vil A efter indholdet af den indgåede aftale have en åbenbar interesse i under domsforhandlingen at forklare i overensstemmelse med de forklaringer, som han har afgivet under efterforskningen.

Copyright © 2022 Karnov Group Denmark A/S

side 1

Når endvidere henses til de omstændigheder, hvorunder disse forklaringer efter de foreliggende oplysninger er tilvejebragt, findes det uanset sagens omfang og karakter betænkeligt at tillade den begærede vidneførsel.

**Thi bestemmes:**

*Anklagemyndighedens begæring om førelse af A som vidne kan ikke tages til følge.* [1]

---

1    Forsvarersalærer 2.000 kr.

Copyright © 2022 Karnov Group Denmark A/S

side 7

**U.1993B.44**

*Strafferet 3.9 Strafferet 31.1*

# Tilståelsens betydning for strafudmålingen

*Resumé Hvad har en person, som har deltaget i organiseret kriminalitet ud af at tilstå sig skyldig og navnlig forklare om andre medgerningsmænds forhold? Ved gennemgang af en række nyere utrykte domme fra by- og landsretten, påvises, at domstolene i disse situationer er villige til at udmåle straffene væsentlig mildere. »Rabat« på et år eller mere er ikke usædvanligt. Endvidere omtales i artiklen retstilstanden i Tyskland, Sverige og Norge.*

*Af politiadvokat Carsten Egeberg Christensen*

Det hænder i den praktiske hverdag, at en person fra en kriminel organisation, hyppigt indenfor narkoområdet, ønsker at lægge kortene på bordet og fortælle både om egne - og navnlig om medgerningsmænds kriminelle handlinger. For politiet og anklagemyndigheden er det naturligvis en særdeles ønskværdig situation, da det må erkendes, at megen, for ikke at sige det meste af den alvorlige organiserede kriminalitet, kun opklares til bunds gennem forklaringer fra de personer, som har deltaget. At forklare belastende om andres kriminalitet, er imidlertid langt fra risikofrit. Den åbenmundede må i mange tilfælde påregne direkte hævn aktioner fra medsigtede eller regne med grove chikaner under afsoning fra såkaldte solidariske medfanger. Når sådanne ubehageligheder kan forventes, må den sigtede nødvendigvis rejse spørgsmål om, hvad han har ud af at tilstå. Svaret må efter min opfattelse helt klart være, at en væsentlig strafnedsættelse. Dels har samfundet en åbenbar interesse i at komme organiseret kriminalitet til livs og ud fra en almen menneskelig betragtning, siger det næsten sig selv, at den der påtænker at tale og derved udsætte sig selv for ubehageligheder, ikke motiveres, hvis hans forklaring ingen indflydelse har på den forventede straf. Jeg er klar over, at mit synspunkt kan være forbundet med visse retssikkerhedsmæssige betænkeligheder, der dog er til at overvinde. Imidlertid har jeg i nærværende artikel valgt at lade denne del af problematikken ligge og udelukkende koncentrere mig om hjemmelsspørgsmålet, retspraksis samt retstilstanden i vore nærmeste nabolande. Endvidere gør jeg opmærksom på, at de situationer, som omhandles her, alene er de tilfælde, hvor det er åbenbart, at det er den sigtedes valg af at afgive forklaring, som er hovedårsagen til, at medgerningsmænd har kunnet retsforfølges. Anklagemyndigheden kan ikke give tilsagn om mildere straf, da straffens længde fastsættes af retten og ikke anklagemyndigheden. Der er imidlertid intet til hinder for, at man som anklager over for den sigtede og dennes forsvarer, under efterforskningen kan tilkendegive, at såfremt den sigtede, under et indenretligt forhør eller under domsforhandlingen, vil lægge »kortene på bordet«, til anklagemyndigheden under domsforhandling overfor retten fremhæve, hvilke konsekvenser det har haft for den videre efterforskning. I samme forbindelse er der heller intet til hinder for, at anklagemyndigheden overfor retten henstiller, at der idømmes den tiltalte en mildere straf. Hjemlen for domstolene til i sådanne tilfælde at udmåle straffen mildere findes i den almindelige regel om straffens fastsættelse i straffelovens § 80. Ifølge denne bestemmelse kan retten ved straffens udmåling bl.a. lægge vægt på gerningsmandens forhold »efter gerningen«, hvilket indebærer, at retten kan tage hensyn til omstændigheder, som indtræder i nærværende artikel. Mere specifikt er der også adgang til strafnedsættelse i ovennævnte type sager efter straffelovens § 84, nr.9, hvorefter straffen kan nedsættes, når gerningsmanden frivilligt har angivet sig selv og aflagt fuld tilståelse. Bestemmelsens rækkevidde kan give anledning til tvivl. Kræves det, at man selv er mødt op hos politiet og lagt alle kortene på bordet, eller er det tilstrækkeligt, at sigtede, efter at være

blevet pågrebet, fuldstændig frivilligt fortæller om forhold, som politiet intet kundskab har om. I U 86 side 284 H citerede Højesteret ved strafudmålingen i en volds- og narkosag strfl. § 84 stk. 1 nr.9 vedr. et parti amfetamin på 120 gram alene hvilede på tiltaltes tilståelse. Retstilstanden burde herefter være afklaret, således at begrebet frivillig kan fortolkes i overensstemmelse med straffelovens § 22 - uden hensyn til, om forklaringen forekommer før eller efter en pågribelse. Et lignende tilfælde forelå i Hillerød Kriminalrets dom af 10.1.89 (ss 79/83):

En mand, født i 1942, var under en § 925 sag tiltalt for overtrædelse af straffelovens § 191 i forbindelse med indførsel af 210 til 235 kg hash. Pgl. var tidligere straffet med fængsel i 1 år for overtrædelse af strfl. § 191, og i den aktuelle sag forelå en § 89-situation m.h.t. den tidligere dom.

Under sagen påberåbte forsvareren sig strfl. § 84 stk. 1

**45**

nr. 9 og henviste til tiltaltes detaillerede erkendelse under sagen, herunder hans inddragelse af et betydeligt antal personer, som politiet ellers ikke ville have afsløret.

Retten afviste forsvarerens påstand. Det siges i dommen:

»at tiltalte efter foreholdelse af medsigtedes erkendelse i hovedforholdet har erkendt dette og derpå yderligere forhold, gør ikke straffelovens § 89 stk. 1 nr.9 anvendelig«.

Det fremgår senere i dommen, at retten dog »i mindre omfang« ved straffens udmåling tog hensyn til de påberåbte omstændigheder (samt til nogle særlige personlige forhold). Men dette er ikke sket med hjemmel i strfl. § 84 stk. 1 nr.9.

Straffen blev fastsat til en tillægsstraf af fængsel i 3 år.

Hvorfor retten m.h.t. anvendelse af § 84 stk. 1 nr.9, kom frem til det modsatte af, hvad Højesteret tidligere var kommet frem til, lader sig ikke læse ud af dommen. Men måske har retten ment, at forklaringen om de mange yderligere forhold ikke var frivillig, da tiltalte var § 89 mand og derfor var motiveret til at forklare af en frygt for, at politiet alligevel på et tidspunkt opdagede det hele og så kunne man ligeså godt nu få gjort rent bord«. I de fleste tilfælde er det formentlig ligegyldigt for straffens udmåling om man søger hjemlen til at mildne straffen i § 80 eller i § 84 stk. 1 nr.9. Men i enkeltstående tilfælde kan hjemlen dog have stor betydning, idet retten kun i § 84 har adgang til at gå under straframmen, mens man i § 80 må holde sig indenfor rammerne. Næste spørgsmål bliver så, i hvilket omfang domstolene udenfor de i § 84 nævnte tilfælde i praksis kan forventes at ville lægge vægt på, at tiltalte har optrådt, som ovenfor nævnt. I U 1978, side 155, var dette problem fremme. Sagen angik en centralt placeret narkohandler, som i byretten aflagde fuld tilståelse, og under sagens efterforskning bidrog han med oplysninger, der gjorde det muligt at optrævle forhandlerorganisationen. Byretten lagde ved strafudmålingen vægt på tiltaltes medvirken til sagens opklaring og fastsatte straffen til fængsel i 6 år. Sagen blev anket af anklagemyndigheden med påstand om skærpelse. Det lader sig

desværre ikke idag oplyse, hvad baggrunden for denne anke var, men der har formentlig ikke været tilstrækkeligt »fodslag« mellem anklagemyndigheden i 1. og 2. instans. Resultatet i landsretten var ihvertfald nedslående for domfældte, der fik fængsel i 8 år. Spørgsmålet om betydningen af den aflagte tilståelse blev overhovedet ikke berørt af flertallet af rettens dommere. To dissentierende dommere, der ville give fængsel i 6 år, nævnte intet om tilståelsens betydning. Sagen endte i Højesteret, hvor flertallet på 4 dommere stemte for at stadfæste dommen. En dommer ville dog alene idømme fængsel i 6 år under henvisning til byrettens begrundelse om tiltaltes medvirken til sagens opklaring. Såfremt U 1978, side 155, ikke blot skal ses som en konkret begrundet afgørelse, men også skal ses som udtryk for en generel holdning fra domstolenes side i sager af denne art, er det naturligvis ikke meget den tiltalte kan forvente, hvis han lægger kortene på bordet. Følgende nyere tilfældigt udvalgte domme, dog ikke fra Højesteret, viser imidlertid, at tilståelsen har væsentlig betydning for strafudmålingen. *Københavns Byrets dom af 19.juni 1990 (9061799):*

En 24-årig person var tiltalt for overtrædelse af straffelovens § 191 ved sammen med andre i 2 tilfælde at have medvirket til indførsel at henholdsvis 90 kg hash og 70,6 kg hash, som han modtog fra en hollandsk kurerbil. I det første tilfælde bragte han hashen til et sommerhus på Sjælland og i det andet tilfælde blev han anholdt af politiet ved hashoverleveringen. Under sagen havde han givet oplysninger, som var at afgørende betydning for, at politiets mulighed for at retsforfølge en række personer, som havde været impliceret i hashaffæren omkring den første sending på 90 kg.

Tiltalte blev idømt *fængsel* i 2 år. Retten henviste til at tiltalte på afgørende måde, i forbindelse med overdragelsen af de 90 kg hash, havde medvirket til forholdets opklaring.

Under normale omstændigheder ville straffen sådanne tilfælde have ligget på *fængsel i 3 år.*

*Københavns Byrets dom af 14. november 1989 (3843/83):*

En 26-årig englænder bistod i april måned 1989 en hollandsk hovedmand med dels at overdrage 3,4 kg amfetamin og dels med at forsøge at overdrage yderligere 1 kg.

Han gav under bl.a. et indenretligt forhør så væsentlige oplysninger, at en række personer kunne domfældes for deltagelse i forbrydelsen. Specielt vedrørende hovedmanden, skal jeg bemærke, at denne, som fra

**46**

anholdelsen af havde bestridt alt, »gav op« efter han fik foreholdt englænderens forklaring.

Straffen blev for englænderens vedkommende fastsat til *fængsel i 4 år* bl.a. under henvisning til, at han havde afgivet udførlige forklaringer om sin virksomhed og på den måde medvirket til sagskompleksets opklaring.

Den pågældende, som havde haft en ren »stik i rend dreng«-rolle, ville under normale omstændigheder være blevet anset med *fængsel i 5-6 år.*

*Københavns Byrets dom af 9.juli 1990 (nr. 9006451):*

Sagen angik en 24-årig mand, der var tiltalt for på sit loftrum for andre at have *opbevaret* 200 kg hash.

Byretten anså ham med *fængsel i 1½år.* Ved straffens udmåling blev der lagt vægt på, at domfældte havde aflagt fuld tilståelse og *i et vist omfang medvirket til sagens oplysning.*

Denne medvirken, som ikke omtales nærmere i dommen, bestod nærmere i, at tiltalte forklarede, hvem det var, han opbevarede hashpartiet for.

Straffen ville under normale omstændigheder have ligget på *fængsel i 3 år.*
*Københavns Byrets dom af 24.august 1990 (nr. 9068616):*

Sagen angik en 27-årig udenlandsk kvinde, som havde indført ca. 200 gram heroin til Danmark.

Efter anholdelsen erklærede hun sig villig til at samarbejde med politiet, sådan at en af de personer, som havde sendt hende afsted til stoffet kunne pågribes og domfældes.

Hun blev idømt fængsel i *1 år og 3 måneder.*

Det fremgår af dommen, at anklagemyndigheden under domsforhandlingen fremhævede, at tiltalte havde aflagt fuld tilståelse og hjulpet med opklaring af sagen. hvorfor straffen burde udmåles under hensyn hertil.

Ved udmåling at straffen henviste retten til de at anklagemyndigheden påberåbte omstændigheder.

Under normale omstændigheder ville straffen have været *fængsel i omkring 2 år.*

*Københavns Byrets dom af 1. november 1990 (nr. 9073076):*

En 26-årig mandlig udlænding dømtes for indsmugling at 105 gram heroin og 102 gram kokain. Begge dele at meget høj styrke. Pgl. blev idømt *fængsel i 1 år og 3 måneder.* Straffen blev fastsat under hensyn til hans medvirken til sagens opklaring. Normalstraffen havde været *fængsel i omkring 2 år.*

*Københavns Byrets dom af 18. april 1989 (nr. 1208/89):*

En 38-årig mandlig udlænding blev for indførsel af ca. 1 kg kokain at høj styrke idømt *fængsel i 2 år og 6 måneder.* Strafudmålingen blev begrundet med hans medvirken til sagens opklaring. Normalstraffen havde været *fængsel i minimum 4 år.*

*Østre Landsrets ankedom af 13. maj 1990 (2. afdeling a.s.nr. 651/89):*

En 22-årig kvindelig herboende udlænding medvirkede til overdragelse at 1 kg heroin og indførsel at yderligere 300 gram. Under et indenretligt forhør afgav hun belastende forklaringer om 4 andre personer, som man ikke havde fået dømt uden hendes forklaring.

Under byretsbehandlingen blev der afgivet følgende erklæring til retsbogen: »Anklageren erklærede, at man fra anklagemyndighedens side er enig i, at denne sag, der markant adskiller sig fra andre sager vedrørende overtrædelse at straffelovens § 191, strafudmålingsmæssigt vurderes efter straffelovens § 85 og § 85, stk. 5 og nr.9.

Byretten fastsatte under henvisning til anklagemyndighedens tilkendegivelse straffen til fængsel i 1 år og 6 måneder, der blev gjort betinget at *200 timers samfundstjeneste* under henvisning til straffelovens § 85 og § 84 stk. 1, nr.5 og 9. Henvisningen til nr.5 skyldtes, at domfældte havde været kæreste med hovedmanden, som hun også belastede ved sin forklaring.

Statsadvokaten var dog ikke enig i den milde strafudmåling og påankede dommen, der af Østre Landsret blev *ændret til fængsel i 2 år*, idet retten udtalte, at straffen efter forbrydelsens karakter burde forhøjes.

Endvidere fandt landsretten ikke, at der forelå sådanne omstændigheder, at der var grundlag for at gøre straffen betinget.

Med denne ændring stadfæstede landsretten dommen, d.v.s. man tog ikke afstand fra de synspunkter, der lå til grund for byrettens strafudmåling.

Normalstraffen havde været *fængsel i omkring 5 år.*

*Østre Landsrets ankedom af 15.november 1991:*

Sagen angik en 26-årig tysk statsborger uden tilknytning til Danmark. I forening med en anden indsmuglede han 8 kg amfetamin fra Tyskland via Danmark til Sverige. Den sigtede, som var blevet anholdt og varetægtsfængslet her i landet i anledning at en relativ beskeden narkosigtelse, fortalte at egen drift under varetægtsfængslingen, at han havde deltaget i ovennævnte forhold, som politiet ingen anelse havde haft om. Han kunne endvidere fortælle, at stoffet var skjult på et bestemt hotelværelse in Stockholm. hvor det svenske politi ganske rigtigt fandt amfetaminpartiet, skjult bag et spejl.

**47**

Byretten fastsatte straffen til *fængsel i 7 år*, idet man anførte, at der ved udmålingen af straffen på den ene side var lagt vægt på omfanget af tiltaltes aktiviteter og på den side, at tiltalte i væsentligt omfang havde bidraget til sagens opklaring. Han havde udover stoffets eksistens og placering også forklaret om sagens medgerningsmænd.

Landsretten stadfæstede dommen.

Hovedmanden fik fængsel i 8 år. Så nogen stor »rabat« var der ikke tale om. Det kan undre, at ingen under landsretsbehandlingen kom ind på § 84 stk. 1 nr.9. Sagen var på mange måder identisk med den ovenciterede Højesteretsdom, som citerede § 84.

*Hillerød kriminalrets dom af 17.juni 1988 (nr. SS 34/1986):*

En 38-årig mand, der over en 4 årig periode havde købt 40 kg hash, hvoraf han fik videresolgt 36 kg.

Copyright © 2011 Karnov Group Danmark A/S

Endvidere havde han over en 4 årig periode indkøbt ca. 4,1 kg amfetamin og heraf videresolgt 3,5 kg.

Straffen blev fastlagt til *fængsel i 4 år og 3 måneder.*

Retten udtalte, at man havde tilsagt det afgørende betydning i formildende retning, at tiltalte ved sine forklaringer ikke blot havde bevirket opklaring af forbrydelser, som ellers næppe var kommet til kundskab, hvorved han har medvirket til opklaring af egen sag, men også afstedkommet mulighed for opklaring af de at mange andre personer begåede overtrædelser.

Det er vanskeligt at angive nogen sikker normalstrafteposition i dette tilfælde, da dommen er afsagt før Højesteret skærpede amfetaminpraksis i 1988, men jeg skønner, at normalstraffen på daværende tidspunkt lå på 5 år.

*Hillerød kriminalrets dom af 30.august 1988 (SS nr.34/86):*

Sagen angik en 33-årig mand, der var tiltalt for over en 10 årig periode at have indkøbt 145 kg hash, hvoraf han fik videresolgt 138 kg. Endvidere forsøgte han at medvirke til at fremstille ca. 750 gram amfetamin, idet han skulle skaffe en kemiker.

Straffen fastsattes til *fængsel i 3 år og 6 måneder.* Som grunde, der talte i formildende retning, henvistes til en ringe fortjeneste i hashforholdet, en lidet betydningsfuld medvirken i amfetaminforholdet *samt* til, at domfældte havde afgivet meget udførlige forklaringer, der i væsentlig grad havde medvirket til opklaring at andre dele at sagskomplekset. Straffen ville i normaltilfælde have ligge på omkring *fængsel 4-4½ år.*

I *tysk ret* er der i sager vedrørende overtrædelse af narkotikalovgivningen en direkte hjemmel til at nedsætte straffen i medfør af § 31 i BetDubungsmittelgesetz. I bestemmelsen hedder det, at: »Retten kan efter eget skøn nedsætte straffen - - - eller frafalde straf - - - såfremt gerningsmanden 1) ved frivilligt at oplyse om sin viden i væsentlig grad har bidraget til, at det strafbare forhold har kunnet opklares udover hans eget gerningsbidrag, eller 2) frivilligt har oplyst om sin viden til et tjenestested (politiet) så rettidigt, at det strafbare forhold - - - hvis planlægning han kender til, endnu kan forhindres. Hjemlen bliver ofte benyttet. Når en person anholdes i en alvorligere narkosag i Tyskland vil man som regel se, at han allerede på dette tidlige stadium vejledes om indholdet af § 31. Oplysning om at denne vejledning har fundet sted anføres i rapporten på linie med, hvad vi kender i danske politirapporter vedrørende iagttagelse af retsplejelovens § 752. Det har ikke været muligt for mig at finde nyere statistik vedr. det omfang bestemmelsen benyttes. Den tyske regering oplyste nogle år efter bestemmelsens ikrafttræden, at den var blevet benyttet i ca. 500 tilfælde i perioden fra 1.1.82 til 30.6.1983, jfr. H.H. Kvrner, BetDubungsmittelgesetz, 3. Auflage. i *svensk ret* er der teoretisk set ikke mulighed for at lempe straffene fordi den sigtede har forklaret om andre, idet »rabat« ifølge den svenske Brottsbalkens kap. 29 § 5 stk. 3 kun kan gives »om den tiltalade frivilligt angett *sig*«. I samme bestemmelses stk. 8 hjemles der dog adgang til strafnedsættelse »om någon annan omstdndighet fvreligger som påkaller att den tiltalade får ett längare straf«. Ordlyden af bestemmelsen er tilsyneladende ikke til hinder for, at retten i disse tilfælde udmåler straffen mildere. Højesteret har imidlertid i en sag fra 1991 afvist at benyttet bestemmelsen overfor 2 personer, som havde købt 95 gram heroin og under straffesagen fortalt, hvem der var leverandøren. Noget tyder imidlertid på, at praksis ikke er helt i overensstemmelse med den svenske højesteret. Ifølge oplysninger, som fremkom under et fælles nordisk komparativt seminar om retspraksis i narkotikasager i Sigtuna den 27. og 28.11.1990, ser det ud til, at der gives »rabat« til den der gennem sin forklaring er med til at afsløre andres meddelagtighed i forbrydelsen. Ved samtaler med svenske kolleger har jeg forstået, at den mildere

**48**

strafudmåling da sker på baggrund at de almindelige generelle regler i Brottsbalkens kap.29 § 1-4 om domstolenes udmåling af straffen. I *Norge* har Højesteret ifølge oplysninger, som ligeledes fremkom på ovennævnte seminar, anerkendt »rabat-princippet« i de tilfælde, hvor

den tiltalte ved sin forklaring har medvirket til opklaring af en større sag.

Copyright © 2011 Karnov Group Danmark A/S

**U.1998.1317H**

### *Nedsættelse af straf for narkotikaforbrydelse under hensyn til medvirken ved sagens oplysning.*

*Strafferet 262.2 Strafferet 31.1*

♦ En på gerningstidspunktet 34-årig iransk statsborger T var fundet skyldig i overtrædelse af straffelovens § 191, stk. 2, jf. stk. 1, 2. pkt., ved i juni 1997 med henblik på overdragelse af have indført 2.206 g heroin fra Sverige til Frederikshavn. Landsretten idømte T fængsel i 6 år med henvisning til, at han alene havde virket som kurer. Der var for Højesteret mellem parterne enighed om, at denne straf var i overensstemmelse med praksis. Højesteret udtalte, at der i medfør af straffelovens § 80, stk. 1, bør kunne tages hensyn til oplysninger fra anklagemyndigheden om, at tiltalte har ydet politiet og anklagemyndigheden bistand under efterforskningen, herunder ved afgivelse af forklaring om medgerningsmænd, uanset de principielle og retssikkerhedsmæssige betænkeligheder, der kan være forbundet med en sådan ordning. I den foreliggende sag havde anklagemyndigheden oplyst, at tiltalte havde bidraget med værdifulde oplysninger af betydning for efterforskningen, og under henvisning hertil nedsattes straffen til fængsel i 5 år. (Dissens).[1]

**H.D. 17. juni 1998 i sag I 11/1998**

*Rigsadvokaten*
mod
*T (adv. Thomas Rørdam, Kbh., e.o.).*

### Vestre Landsret

### *Vestre Landsrets dom 16. december 1997 (6. afd.).*

(Jochimsen, Fabrin, Michael Lynge Jensen (kst.) med nævninger).

Under denne sag, der er behandlet under medvirken af nævninger, er T ved anklageskrift af 3. september 1997 fra Statsadvokaten i Aalborg som berigtiget under domsforhandlingen sat under tiltale til straf for overtrædelse af straffelovens § 191, stk. 2, jf. stk. 1, 2. pkt., ved i strid med lovgivningen om euforiserende stoffer med henblik på overdragelse at have indført en betydelig mængde særligt farligt eller skadeligt stof, idet tiltalte den 9. juni 1997 indførte 2.206 gram heroin til Frederikshavn fra Sverige.

Anklagemyndigheden har i medfør af straffelovens § 75, stk. 2, nr. 1, nedlagt påstand om konfiskation af 2.218 gram heroin.

Endvidere har anklagemyndigheden i medfør af udlændingelovens § 22, nr. 3 og 4, jf. § 32, stk. 1, nedlagt påstand om, at tiltalte udvises af Danmark med indrejseforbud for bestandig.

Tiltalte har nægtet sig skyldig, men har erkendt sig skyldig i overtrædelse af straffelovens § 191, stk. 2, jf. stk. 1, 1. pkt., ved indførsel af ½ kg heroin med henblik på overdragelse, idet hans forsæt kun har omfattet dette kvantum. Han har endvidere påberåbt sig straffelovens § 84, stk. 1, nr. 4 og nr. 9. Tiltalte har anerkendt konfiskationspåstanden, men har påstået frifindelse for påstanden om udvisning.

Tiltalte er født den — — — 1962 i Iran og er ikke tidligere straffet.

Der er stillet nævningerne et hovedspørgsmål i overensstemmelse med tiltalen. Der er endvidere stillet nævningerne et subsidiært hovedspørgsmål om, hvorvidt tiltalte er skyldig i overtrædelse af straffelovens § 191, stk. 2, jf. stk. 1, 1. pkt., ved under de i anklageskriftet i øvrigt anførte omstændigheder at have indført ½ kg heroin.

Nævningerne har besvaret det principale hovedspørgsmål bekræftende.

Retten har lagt nævningernes fældende kendelse til grund.

Udlændingestyrelsen har den 15. juli 1997 afgivet følgende udtalelse:

»Udlændingestyrelsen skal oplyse, at T indrejste i Danmark den 17. maj 1990 og ansøgte om asyl.

Ved Udlændingestyrelsens (tidligere Direktoratet for Udlændinge) resolution af 12. marts 1993 meddeltes T opholdstilladelse i Danmark med henblik på varigt ophold i henhold til udlændingelovens § 7, stk. 2. Tilladelsen meddeltes foreløbigt indtil den 17. maj 1996 og er senest den 28. april 1997 forlænget gyldig så længe fast ophold i Danmark bevares.

Pågældende opholder sig således her i landet som flygtning med de facto status i henhold til udlændingelovens § 7, stk. 2 og hjemmelen til udvisning skal herefter søges i udlændingelovens § 22. Det fremgår af sagen, at den pågældende er sigtet for overtrædelse af straffelovens § 171 for forhold begået i 1995-1996 og § 191, stk. 2, for et forhold, der er begået den 9. juni 1997.

Ved lov nr. 1052 af den 11. december 1996 blev § 22, nr. 4 om udvisning på grund af narkotikakriminalitet indsat i udlændingeloven. Loven trådte i kraft den 13. december 1996. Efter almindelige principper, jfr. straffelovens § 3, finder bestemmelsen alene anvendelse på lovovertrædelser, der begås efter lovens ikrafttræden.

T opholder sig her i landet som flygtning og hjemmelen

**1318**

til udvisning skal grundet den forventede straf, lovovertrædelsernes karakter samt tidspunkterne herfor søges i udlændingelovens § 22, nr. 3 og § 22, nr. 4.

Ifølge § 22, nr. 3 kan en udlænding med opholdstilladelse efter § 7 udvises, hvis udlændingen idømmes ubetinget straf af mindst 6 års fængsel eller anden strafferetlig retsfølge af frihedsberøvende karakter og udlændingen under hensyn til den idømte straf samt arten og grovheden af den begåede kriminalitet ikke bør forblive her i landet.

Ifølge § 22, nr. 4 kan en udlænding med opholdstilladelse efter udlændingelovens § 7 udvises, hvis udlændingen efter lov om euforiserende stoffer eller straffelovens § 191 eller 191 a er idømt en ubetinget frihedsstraf eller anden strafferetlig retsfølge af frihedsberøvende karakter.

Ifølge udlændingelovens § 26, stk. 1 skal der ved en afgørelse om udvisning tages hensyn til, om udvisning må anses for at være særligt belastende. Der er i denne bestemmelse opregnet en række forhold, som navnlig skal indgå i denne vurdering, herunder udlændingens tilknytning til Danmark.

Det fremgår af § 26, stk. 2, at en udlænding kan udvises efter § 22, nr. 4, medmindre de i stk. 1 nævnte forhold taler afgørende derimod.

Det fremgår af bemærkningerne til lovforslaget, at narkotikaforbrydelser må anses for at være af en så grov og samfundsfarlig karakter, at hensynene nævnt i § 26 kun undtagelsesvis skal tillægges afgørende betydning ved en afgørelse om udvisning efter § 22, nr. 4.

1 U 1978.155 H, Anklagemyndighedens Årsberetning 1983 s. 108, Juristen 1994 s. 265 ff (betænkning afgivet af DJØF's faglig etiske arbejdsgruppe), Forhandlingerne på det 34. Nordiske Juristmøde (1996), del I s. 289 ff, 304 ff, Elsebeth Rasmussen i U 1980 B s. 153 ff, samme i U 1983 B s. 311 ff, John Peter Andersen i Juristen 1985 s. 167 ff, Egeberg Christensen i U 1993 B s. 44 ff, Gammeltoft-Hansen: Strafferetspleje I (1997) s. 202 ff, Norsk Rt. 1995 s. 238, 242 og 1975, Andenæs: Alminnelig Strafferett (4. udg.) s. 424 f.

Copyright © 2022 Karnov Group Denmark A/S

Ifølge sagens oplysninger har T ikke nogen familiemæssig tilknytning til Danmark, ligesom der iøvrigt ikke er oplysninger om forhold som nævnt i udlændingelovens § 26, der kan tale for, at påstand om udvisning bør undlades.

Under hensyn til arten og grovheden af den begåede kriminalitet sammenholdt med den manglende tilknytning til Danmark, skal Udlændingestyrelsen henstille, at der af anklagemyndigheden nedlægges påstand om udvisning, jfr. Udlændingelovens § 22, nr. 3 og nr. 4.

Såfremt betingelserne for udvisning af den pågældende iøvrigt måtte være opfyldt, skal det bemærkes, at det følger af udlændingelovens § 32, stk. 1, at der til udvisningen skal knyttes et indrejseforbud, og at tidsbestemt indrejseforbud skal fastsættes således, at det udløber en 1. januar eller en 1. juli.

Det vil være i overensstemmelse med retspraksis at nedlægge påstand om udvisning gældende for bestandigt, såfremt der samtidig nedlægges påstand om frihedsstraf af mere end 1 års varighed, for 10 år, dersom der nedlægges påstand om frihedsstraf fra 4 måneder til 1 år, og for 5 år, hvis påstanden om frihedsstraf er under 4 måneder.

. . .«

Flygtningenævnet har i en skrivelse af 22. juli 1997 udtalt følgende:

»Det fremgår af sagen, at T, født den ――― 1962, indrejste i Danmark den 17. maj 1991. Den 25. september 1992 blev han af Direktoratet for Udlændinge (nu Udlændingestyrelsen) meddelt afslag på opholdstilladelse i medfør af udlændingelovens § 7. Afgørelsen blev påklaget til Flygtningenævnet, hvorefter Direktoratet for Udlændinge genoptog sagens behandling ood afhøring. Den 12. marts 1993 meddelte den pågældende opholdstilladelse i medfør af udlændingelovens § 7, stk. 2.

Som asylmotiv henviste T til, at han i 1986 blev kortvarigt anholdt og afhørt på grund af en fotoserie, som han havde lavet. Den 1. marts 1990 blev han anholdt af SEPAH efter deltagelse i en demonstration, der opstod efter en fodboldkamp. Under en efterfølgende ransagning af hans bopæl fandt man tre billeder af Shahen og en videofilm fra Shahens begravelse. T var fængslet i 14 måneder, hvor han vedvarende blev udsat for forskellige former for fysisk og psykisk tortur blandt andet i forbindelse med afhøring. Han blev ved hjælp af kaution og bestikkelse løsladt den 25. april 1991 med meldepligt hver 14. dag. Han udrejste få dage efter løsladelsen illegalt over grænsen til Pakistan og videre til Danmark og overholdt således ikke meldepligten, hvorfor han blev eftersøgt i hjemlandet. Han har aldrig haft noget politisk tilhørsforhold eller udøvet politiske aktiviteter i Iran.

Flygtningenævnet skal for så vidt angår det asylretlige oplyse, at det grundlag, der oprindeligt førte til, at der meddeltes T opholdstilladelse i medfør af udlændingelovens § 7 stk. 2, også i dag kan antages, at ville kunne begrunde opholdstilladelse i medfør af udlændingelovens § 7.

Det må således på baggrund af udlændingemyndighedernes praksis og henset til den langvarige tilbageholdelse og den tortur, som T har været udsat for, sammenholdt med den pågældendes manglende overholdelse af den pålagte meldepligt, antages, at man også i dag ville finde, at det ikke bør kræves, at T vender tilbage til Iran.

Såfremt T udvises ved en dom med den virkning, at hans opholdstilladelse efter § 7, stk. 2, bortfalder, jf. udlændingelovens § 32, stk. 1, følger det imidlertid af udlændingelovens § 31, stk. 1, at han ikke kan udsendes til hjemlandet, eller til et land, hvor han ikke er beskyttet mod videresendelse til hjemlandet, hvis han på udsendelsestidspunktet risikerer forfølgelse i hjemlandet af de i flygtningekonventionen af 28. juli 1951, artikel 1, A, nævnte grunde. Må T

på udsendelsestidspunktet anses for omfattet af udlændingelovens § 31, stk. 2, 1. pkt., idet det af lignende grunde som anført i konventionen eller andre tungtvejende grunde ikke bør kræves, at han udrejser til hjemlandet, jf. udlændingelovens § 7, stk. 2, vil han dog alligevel kunne udsendes til hjemlandet, såfremt der skønnes at foreligge grunde, som er omtalt i

**1319**

udlændingelovens § 31, stk. 2, 2. pkt. Flygtningenævnet finder ikke på nuværende tidspunkt at burde udtale sig herom.

Det tilføjes, at forhold i udlændingens hjemland, der på domstidspunktet kan være til hinder for udvisning, efter Flygtningenævnets opfattelse skal vurderes af den ret, der træffer afgørelse om udvisningsspørgsmålet, jf. udlændingelovens § 26, nr. 5. Dette gælder også forhold af asylretlig karakter, jf. herved udlændingelovens § 57, stk. 1, og bemærkningerne hertil i betænkningen nr. 968/82, side 230-231. Der kan desuden henvises til betænkningen side 57-58 og side 177. En vurdering af, om der trods en eventuel fældende dom alligevel ikke bør ske udvisning på grund af ændringer i domfældtes forhold, herunder også i asylretlig henseende, må derfor ligeledes afgøres af domstolene i overensstemmelse med reglen i udlændingelovens § 50.

Såfremt T efter en eventuel udvisningsdom ikke ønsker at udrejse af landet frivilligt, drager politiet omsorg for udrejsen. Såfremt politiet agter at udsende den pågældende til Iran, vil han på det pågældende tidspunkt kunne påberåbe sig beskyttelsen efter udlændingelovens § 31. Udlændingestyrelsen må herefter som 1. instans tage stilling til, om § 31 er til hinder for udsendelsen. Man skal anmode om, at T gøres bekendt hermed, såfremt han udvises ved en dom.«

Straffen fastsættes efter straffelovens § 191, stk. 2, jf. stk. 1, 2. pkt.

Der er afgivet 19 stemmer for at fastsætte straffen til fængsel i 6 år og 5 stemmer for at fastsætte straffen til fængsel i 5 år.

Der afsiges dom efter stemmeflertallet, således at straffen fastsættes til fængsel i 6 år. Ved straffastsættelsen er der på den ene side lagt vægt på det indsmuglede stofs mængde og art og på den anden side på, at tiltalte alene har virket som kurer.

I medfør af straffelovens § 75, stk. 2, nr. 1, tages den nedlagte konfiskationspåstand til følge ―

Vedrørende udvisningsspørgsmålet finder voterende med i alt 20 stemmer, at betingelserne for udvisning i medfør af udlændingelovens § 22, nr. 3 og 4, er opfyldt, og at ingen af bestemmelserne i udlændingelovens § 26 kan føre til, at udvisning undlades. Herefter, og da tiltalte vil have mulighed for senere at påberåbe sig udlændingelovens § 50 og § 31, finder disse voterende, at tiltalte i medfør af udlændingelovens § 49, stk. 1, jf. § 32, jf. § 22, nr. 3 og 4, bør udvises med indrejseforbud for bestandig.

Voterende med 4 stemmer finder ikke, at betingelserne for udvisning er opfyldt, og stemmer derfor for, at den nedlagte påstand om udvisning ikke tages til følge.

Herefter tages den nedlagte påstand om udvisning med indrejseforbud for bestandig til følge.

――――

Tiltalte skal betale sagens omkostninger.

## Højesteret

### Højesterets dom.

I tidligere instans er afsagt dom af Vestre Landsrets 6. afdeling den 16. december 1997.

I pådømmelsen har deltaget fem dommere: Pontoppidan, Hermann, Marie-Louise Andreasen, Wendler Pedersen og Lene Pagter Kristensen.

Vestre Landsrets dom er anket af tiltalte med påstand om formildelse.

Anklagemyndigheden har påstået stadfæstelse.

Der er mellem parterne enighed om, at en straf på fængsel i 6 år er i overensstemmelse med praksis for en kurérvirksomhed som den foreliggende.

Forsvareren har til støtte for påstanden om formildelse gjort gældende, at der ikke ved straffastsættelsen er taget hensyn til, at tiltalte i betydelig grad har hjulpet politiet med sagens opklaring, jf. herved straffelovens § 80, stk. 1. Forsvareren har endvidere henvist til tiltaltes personlige forhold, herunder at han handlede under pres, jf. straffelovens § 84, stk. 1, nr. 5. Forsvareren har ikke for Højesteret påberåbt sig straffelovens § 84, stk. 1, nr. 4 og 9.

Anklagemyndigheden har med henvisning til det nedenfor omtalte notat og referat anført, at det efter omstændighederne ikke bør være udelukket, at der ved strafudmålingen kan tages hensyn til tiltaltes medvirken til oplysning af sagen.

Under domsforhandlingen i landsretten forklarede kriminalassistent Carl Johan Andersen, Frederikshavn Politi, blandt andet, at tiltalte fra starten har været samarbejdsvillig. Ved tiltaltes beskrivelse har man været i stand til at identificere de to bagmænd i sagen. Det var blandt andet oplysninger fra tiltalte, der førte til anholdelse af den ene bagmand, og der er afsagt fængslingskendelse over den anden bagmand, som dog ikke opholder sig i landet i øjeblikket. Han ved, at en bekendt til tiltalte er blevet opsøgt af nogle personer med tilknytning til en af bagmændene.

I et notat af 13. december 1994 udarbejdet af rigsadvokaten om adgangen til »plea-bargaining« hedder det bl.a.:

»På den anførte baggrund synes problemerne vedrørende »plea-bargaining« at se således ud for anklagemyndigheden:

. . .

B) *Tilståelse, der omfatter medgerningsmænd.*

1) Her kan der heller ikke »handles« vedrørende strafudmålingen, der bestemmes af retten.

En tilkendegivelse om, at anklagemyndigheden i retten vil fremhæve tiltaltes omfattende forklaringer om medgerningsmænd som strafnedsættende faktor, anser forsvarerne i DJØF's etiske gruppe og de fleste teoretikere for utilstedelig på grund af risikoen for urigtige forklaringer.

De fleste praktikere i anklagemyndigheden vil formentlig være uenige heri, idet den manglende mulighed for en sådan tilkendegivelse (vel navnlig i narkosager)

**1320**

kan indebære en væsentlig begrænsning i opklaringsmulighederne. Retspraksis i byretterne og måske også landsretterne synes da også forudsætningsvis at acceptere sådanne tilbud, hvorimod dette ikke synes at være tilfældet for så vidt angår Højesteret, jf. U 1978.155 H. På grund af denne doms alder kunne der være grund til ved lejlighed at forelægge dette strafudmålingselement for Højesteret på ny.

Den anførte risiko for urigtige forklaringer kan næppe ganske afvises. På den anden side vil dette moment, der åbent bliver lagt frem i retten i sagerne mod medgerningsmændene, ligesom mange andre forhold, kunne indgå i rettens frie bevisbedømmelse. Når der henses til, at virkningen heraf helt overlades til retten, der er bekendt med bl.a. U 1978.155 H, kunne noget tale for, at fremgangsmåden bør kunne anvendes. De mange usikkerhedsmomenter i virkningen bør dog formentlig medføre, at sådanne aftaler ikke indgås. En ren omtale af bestemmelsen i straffelovens § 84, stk. 1, nr. 9, med den usikkerhedsfaktor i virkningen, der er anført ovenfor, er dog næppe uacceptabel.

2) Tilbud om påtalebegrænsning som modydelse for forklaringer om medgerningsmænd bør ikke afgives . . . Her er risikoen for urigtige forklaringer nok for stor.

Det samme gælder helt klart løfter om at undlade at nedlægge påstande om rettighedsfrakendelse og konfiskation. Disse retsfølger har andet formål end straffen.«

Af et referat fra et statsadvokatmøde afholdt i januar 1998 fremgår det bl.a., at rigsadvokatens notat af 13. december 1994 er sendt til Justitsministeriet, der imidlertid ikke generelt har taget stilling til de problemer med hensyn til »plea-bargaining«, der er nævnt i notatet. Det hedder videre i referatet:

»Der var efter drøftelse enighed om, at der bør være adgang til efter en helt konkret vurdering at fremsætte tilkendegivelser som de nævnte [notatets pkt. B 1)]. Behovet vil formentlig oftest foreligge i større narkotikasager.

Under hensyn til, at en sådan tilkendegivelse indebærer en disposition i forhold til anklagerens behandling af sagen, forudsættes det, at spørgsmålet altid forelægges for en chargeret jurist. Det skal endvidere meget klart tilkendegives over for den sigtede, at der ikke er sikkerhed for, at forklaringer om medgerningsmænd vil føre til strafnedsættelse.

Statsadvokaterne underretter Rigsadvokaturen om eventuelle domme, der tager stilling til tilfælde som det nævnte.«

**Højesterets bemærkninger:**

Der er ikke grundlag for at nedsætte straffen i medfør af straffelovens § 84, stk. 1, nr. 5.

Fire dommere - Pontoppidan, Hermann, Wendler Pedersen og Lene Pagter Kristensen - udtaler herefter:

Straffelovens § 80, stk. 1, giver mulighed for ved strafudmålingen at tage hensyn til, at tiltalte har medvirket ved sagens oplysning, herunder ved afgivelse af forklaring om medgerningsmænd.

Det er efter vores opfattelse af væsentlig betydning for efterforskningen af større narkotikasager og visse andre alvorlige sager, hvor efterforskningen erfaringsmæssigt er særlig vanskelig og problemfyldt, at der er mulighed for at motivere en sigtet til at medvirke til sagens oplysning. En sådan motivation kan være ulastelse for den sigtede til, at hans egen straf reduceres. Vi finder under hensyn hertil, at der ved strafudmålingen bør kunne tages hensyn til oplysninger fra anklagemyndigheden om, at sigtede har ydet politiet og anklagemyndigheden bistand under efterforskningen, uanset de principielle og retssikkerhedsmæssige betænkeligheder, der kan være forbundet med en sådan ordning. Vi bemærker i den forbindelse, at det under en eventuel straffesag mod personer, der af den sigtede er udpeget som medgerningsmænd, kan indgå i vurderingen af den sigtedes oplysninger, at disse har medført eller vil kunne medføre, at hans egen straf nedsættes.

Anklagemyndigheden har oplyst, at tiltalte under sagen har bidraget ved værdifulde oplysninger af betydning for efterforskningen.

Under henvisning til det anførte stemmer vi for at nedsætte straffen til fængsel i 5 år.

Dommer Marie-Louise Andreasen udtaler:

En almindelig adgang til strafnedsættelse for tiltalte, der afgiver forklaring til politiet om medgerningsmænd, indebærer en så betydelig risiko for, at der vil blive afgivet urigtige forklaringer, der kan føre til forkerte domfældelser, at man - uanset de efterforskningsmæssige hensyn - efter min mening bør afstå fra at lade sådan bistand til politiet få indflydelse på strafudmålingen. Dette gælder, selv om det under en eventuel straffesag mod medgerningsmændene oplyses, at straffen for angiveren med anklagemyndighedens accept er nedsat på grund af sådan forklaring.

Jeg stemmer derfor for at stadfæste dommen.

Afgørelsen træffes efter stemmeflertallet.

Det følger heraf, at henvisningen i landsrettens dom til udlændingelovens § 22, nr. 3, udgår, således at anklagemyndighedens påstand tages til følge i medfør af udlændingelovens § 49, stk. 1, jf. § 32, jf. § 22, nr. 4.

Tiltalte har fortsat været fængslet under anken.

**Thi kendes for ret:**

*Landsrettens dom ændres, således at T straffes med fængsel i 5 år.*
*Sagens omkostninger for Højesteret skal betales af statskassen.*

Vestre Landsret holdt den 26. juni 2008 kl. 9.00 møde på tingstedet i Viborg.

Som dommer fungerede landsdommer Lars E. Andersen.

Som retssekretær fungerede Medarbejder ved retten.

V.L. S-2475-07

Anklagemyndigheden
mod
Tiltalte 1
Tiltalte 2
og
Tiltalte 3

Landsretten afsagde følgende af dommerne Lars E. Andersen, Annette Dellgren og Niels Toft-Vandborg (kst.) vedtagne

K e n d e l s e:

Ved anklageskrift af 30. august 2007 blev der ved Retten i Århus rejst tiltale mod Tiltalte 1, Tiltalte 2 og Tiltalte 3 for overtrædelse af bl.a. straffe-lovens § 191, stk. 1, 2. pkt. og stk. 2, jf. stk. 1, 2. pkt. I anklageskriftets forhold 1-3 er anført:

> "1.
> de tiltalte Tiltalte 1 og Tiltalte 2
>
> **straffelovens § 191, stk. 1, 2. pkt. og stk. 2, jf. stk. 1, 2. pkt,** ved i sommeren 2000 i forening med Person 1 og Person 2, med fortsæt til overdragelse til en større personkreds eller mod betydeligt vederlag, mod særskilt veder-lag, i henhold til indbyrdes aftaler i forening at have modtaget og indført eller ladet ca. 50.000

- 2 -

ecstacytabletter indføre fra Holland til Danmark,
og her ompakket og videresendt eller ladet tablet-
terne ompakke og videresende, fra Århus til Atlan-
ta, Georgia, USA, og der overdraget eller ladet
ecstacytabletterne overdrage til et større antal
personer eller mod betydeligt vederlag eller med
henblik på en sådan overdragelse, idet

- ████ Tiltalte 1 ████ i USA indgik aftale med
  ███ Person 2 ███ om forsendelse og forsendelsesme-
  tode af ecstacytabletter fra Holland via Danmark
  til Atlanta, USA, mod et vederlag på 1 dollar
  pr. leveret tablet, hvorpå

- ████ Tiltalte 1 ████ og ███ Tiltalte 2 ███ i forening
  med ████ Person 2 ████ afhentede eller lod ca.
  50.000 ecstacytabletter, indkøbt af ███ Person 1 ███
  ████████, afhente og transportere fra Amster-
  dam, Holland, til Danmark, hvor

- ███ Tiltalte 2 ███, som led i aftalen med
  ███ Tiltalte 1 ███, i sit sommerhus, ███ Adresse 1 ███,
  ██ By 1 ██, opbevarede og pakkede eller lod tabletter-
  ne opbevare og pakke i tilvejebragte møbelben,
  hvorefter

- ████ Tiltalte 1 ████ og ███ Tiltalte 2 ███ videre-
  sendte eller lod tabletterne videresende fra År-
  hus til Atlanta, Georgia, USA, adresseret til et
  opdigtet møbelfirma, i hvilken forbindelse
  ██ Person 2 ██ som led i aftalerne afhentede tabletterne
  hos et speditionsfirma med henblik på videre
  overdragelse med et samlet udbytte for de til-
  talte på ikke under 1 dollar pr. ecstacytablet

2.
alle de tiltalte

**straffelovens § 191, stk. 1, 2. pkt. og stk. 2,
jf. stk. 1, 2. pkt,** ved i perioden omkring septem-
ber - november 2000 i forening med ███ Person 1 ███
████ og ███ Person 2 ███, med fortsæt til over-
dragelse til en større personkreds eller mod bety-
deligt vederlag, mod særskilt vederlag, i henhold
til indbyrdes aftaler i forening at have modtaget
og indført eller ladet ca. 150.000 ecstacytablet-
ter indføre fra Holland til Danmark, og her ompak-
ket og videresendt eller ladet tabletterne ompakke
og videresende, fra Århus til Atlanta, Georgia,
USA, og der overdraget eller ladet ecstacytablet-
terne overdrage til et større antal personer eller
mod betydeligt vederlag eller med henblik på en
sådan overdragelse, idet

- 3 -

- ████ Tiltalte 1 ████ i USA indgik aftale med
  ████ Person 2 ████ om forsendelse og forsendelsesme-
  tode af ecstacytabletter fra Holland via Danmark
  til Atlanta, USA, mod et vederlag på 1 dollar
  pr. leveret tablet, hvorpå

- alle de tiltalte i forening med ████ Person 2 ████
  afhentede eller lod ca. 150.000 ecstacytablet-
  ter, indkøbt af ████ Person 1 ████, afhente og
  transportere fra Amsterdam, Holland, til Dan-
  mark, hvorunder ████ Tiltalte 3 ████ kørte
  ████ Person 2 ████ fra Århus til Hamborg for at modtage
  tabletterne, og hvorpå

- ████ Tiltalte 2 ████, som led i aftalen med
  ████ Tiltalte 1 ████, i sit sommerhus, ████ Adresse 1 ████,
  ██ By 1 ██, opbevarede og pakkede eller lod tabletter-
  ne opbevare og pakke i tilvejebragte møbelben,
  hvorefter

- ████ Tiltalte 1 ████ og ████ Tiltalte 2 ████ videre-
  sendte eller lod tabletterne videresende fra År-
  hus til Atlanta, Georgia, USA, hvor

- ████ Tiltalte 2 ████ som fortsat led i den fælles af-
  tale afhentede tabletterne fra et lagerlokale og
  overdrog dem til ████ Person 2 ████ med henblik på vide-
  reoverdragelse med et samlet udbytte for de til-
  talte på ikke under 1 dollar pr. ecstacytablet

3.
alle de tiltalte

**straffelovens § 191, stk. 1, 2. pkt. og stk. 2,
jf. stk. 1, 2. pkt,** ved i tiden fra januar 2001
til december 2001 i forening med ████ Person 2 ████
med fortsæt til overdragelse til en større person-
kreds eller mod betydeligt vederlag, mod særskilt
vederlag, i henhold til indbyrdes aftaler i for-
ening at have modtaget og indført eller ladet ca.
50.000 ecstacytabletter indføre fra Holland til
Danmark, og her ompakket og videresendt eller la-
det tabletterne ompakke og videresende, fra Århus
til Atlanta, Georgia, USA, og der overdraget eller
ladet ecstacytabletterne overdrage til et større
antal personer eller mod betydeligt vederlag eller
med henblik på en sådan overdragelse, idet

- ████ Tiltalte 1 ████ efter aftale med og betaling
  fra ████ Person 2 ████ indkøbte ca. 50.000 ecsta-
  cytabletter i Holland af en uidentificeret per-
  son, hvorpå

- 4 -

- de tiltalte afhentede eller lod ecstacytablet-
  terne afhente og transportere fra Amsterdam,
  Holland, til Danmark, hvor

- ██Tiltalte 2██, som led i aftalen med
  ██Tiltalte 1██, i sit sommerhus, ██Adresse 1██,
  ██By 1,██ opbevarede og pakkede eller lod tabletter-
  ne opbevare og pakke i tilvejebragte møbelben,
  hvorefter

- ██Tiltalte 1██ og ██Tiltalte 2██ videre-
  sendte eller lod tabletterne videresende fra År-
  hus til Atlanta, Georgia, USA, hvor

- ██Tiltalte 3██ i henhold til aftale med
  de øvrige afhentede tabletterne fra et lager lo-
  kale i Atlanta, og hvor

- ██Tiltalte 3██ sammen med ██Tiltalte 1██
  ██████ overdrog ecstacytabletterne til ██Person 2██
  på et hotelværelse, hvor tabletterne blev optalt
  i de tiltaltes tilstedeværelse inden anbringelse
  i et af ██Person 2██ og ████Tiltalte 3████ lejet
  opbevaringsrum med henblik på ██Person 2's██ videre
  overdragelse med et samlet udbytte for de til-
  talte på ikke under 2 dollar pr. ecstacytablet."

Under hovedforhandlingen i byretten protesterede de tiltal-
tes forsvarere mod, at det tillodes anklagemyndigheden at
føre ██Person 2██, ██Person 1██, ██Person 3██ og
██Person 4██ som vidner, idet disse havde indgået "plea-
bargain-aftaler" med de amerikanske myndigheder.

Den 20. november 2007 afsagde byretten følgende kendelse:

"Det er domsmandsrettens opfattelse, at de af vid-
nerne ██Person 2██ ██Person 1██ ██Person 3██ og ██Person 4██indgåede
"plea agreement" aftaler i realiteten er identiske
med de aftaler, som omtales i højesteretsdommen
Ufr. 1982/1027. Ganske vist står den danske ankla-
gemyndighed ikke som medunderskriver på de i denne
sag omhandlede aftale, men anklagemyndigheden har
efterfølgende tiltrådt disse ved at give tilsagn
om, at vidnerne ikke vil bliver retsforfulgt i
Danmark vedrørende denne sag.

Vidnerne har forpligtet sig til at afgive sandfær-
dige forklaringer i det af myndighederne krævede

- 5 -

omfang og har i Atlanta afgivet forklaringer under
videooptagelse og under edsaflæggelse i retten.

Den danske anklagemyndighed har forpligtet sig til
efterfølgende at give de amerikanske myndigheder
orientering om vidnernes adfærd og afgivne forkla-
ringer i Danmark. Dette vil kunne have direkte be-
tydning for, om vidnerne i USA kan opnå strafre-
duktion/yderligere strafreduktion. Vidnerne må
derfor antages at have en helt åbenbar interesse i
under denne hovedforhandling at forklare i over-
ensstemmelse med de forklaringer, som de har afgi-
vet under efterforskningen.

Uanset sagens omfang og alvorlige karakter, er det
herefter domsmandsrettens opfattelse, at førelsen
af de nævnte fire vidner er forbundet med sådanne
retssikkerhedsmæssige betænkeligheder, at vidne-
førslerne ikke bør tillades."

Ved dom afsagt af Retten i Århus den 3. december 2007 blev
████ Tiltalte 1 ████ , ████ Tiltalte 2 ████ og ████ Tiltalte 3 ████
herefter frifundet i sagens forhold 1-3. Dommen blev umid-
delbart efter domsafsigelsen anket af anklagemyndigheden med
påstand om domfældelse i overensstemmelse med anklageskiftet
samt til skærpelse.

Sagen er berammet til foretagelse i landsretten i perioden
fra den 8. september til den 25. september 2008.

Landsretten besluttede den 7. april 2008 at udskille spørgs-
målet om, hvorvidt anklagemyndigheden kan føre ████ Person 2 ████
████ , ████ Person 1 ████ , ████ Person 3 ████ og ████ Person 4 ████ som
vidner under hovedforhandlingen i landsretten.

Spørgsmålet har været mundtligt forhandlet.

Anklagemyndigheden har nedlagt påstand om, at det tillades
at føre ████ Person 2 ████ , ████ Person 1 ████ , ████ Person 3 ████

- 6 -

og ███Person 4███    som vidner under hovedforhandlingen i lands-
retten.

De tiltalte ████Tiltalte 1████, ████Tiltalte 2████ og
███Tiltalte 3███, har nedlagt påstand om, at det ikke tillades
anklagemyndigheden at føre de 4 vidner.

Vedrørende sagens nærmere oplysninger har anklagemyndigheden
henvist til en resumerapport af 29. april 2007 udarbejdet af
Østjyllands Politi, Narkotikaafdelingen. I rapporten er det
anført:

> "...
>
> **Anonyme oplysninger til Århus Politi**
> Kriminalpolitiet i Århus modtog den 14. og 20. no-
> vember 2000 anonyme oplysninger fra en kilde, som
> fortalte, at ████Tiltalte 3████ og ██Person 5 (P5)██
> ████████ havde planlagt indsmugling af 4-5 kilo ko-
> kain fra en Caribisk ø, muligt Aruba til Danmark.
> I samme forbindelse blev det endvidere oplyst, at
> ██Tiltalte 3██ og ██P5██ havde forbindelser til en russisk
> født amerikaner ved navn ██Person 2██. ██Person 2██ havde på da-
> værende tidspunkt - altså november 2000 - netop
> være i Danmark en uges tid, i hvilken forbindelse
> indsmuglingen af kokainen blev planlagt.
> Under opholdet i Danmark boede ██Person 2██ i et sommer-
> hus i ██By 2██, der ejes af en mand, der hedder
> ██Tiltalte 2██.
> Kokainen skulle ved indsmuglingen til Danmark gem-
> mes i et surfbræt, som så skulle fragtes til lan-
> det enten via skibscontainer eller i et fly om-
> kring årsskiftet 2000/2001.
> Meddeleren oplyste videre, at ██Tiltalte 3██ "i nær frem-
> tid" skulle overtage et kurérjob i forbindelse med
> indsmuglingen af kokain og ecstacy fra Amsterdam,
> Holland, der skulle køres til Danmark i store ud-
> lejningsbiler, som politiet ikke kunne følge med.
>
> Meddeleren fortalte igen ved sin henvendelse den
> 20. november 2000 om ████Tiltalte 3████ og
> ██P5's██ indsmugling af kokain fra Caribien.
> Meddeleren fortalte også, at bestyreren af ██"Sted 1"██

- 7 -

██, ██Tiltalte 2██, er involveret i den nævnte handel med
narkotika.
Meddeleren oplyste, at det var ██Person 2██ som finansie-
rede narkohandlen.
...
En søgning i politiets restaurationskartotek vid-
ste, at "██Sted 1██" stod registreret med bevillings-
haver som værende
██Virksomhed ApS 1██
Bestyreren var identisk med ██Tiltalte 2██.

...

██Tiltalte 3██ blev den 5. december 2002
afhørt af Århus Politi i forbindelse med en anden
sag. Han oplyste i den forbindelse, at han i en
periode på et par måneder havde boet hos en be-
kendt fra Amerika i dennes hus i Marbella, Spani-
en.
██Tiltalte 3██ forklarede, at amerikaneren vist nok var
efterlyst af DEA (Drug Enforcement Agency), og
havde virket paranoid.
...
Ovenstående oplysninger til politiet viste sig se-
nere yderst interessante, idet DEA's områdekontor
i Atlanta, USA, gennem en længere periode har fo-
retaget efterforskning mod en narkoorganisation
med ██Person 2██ og ██Person 1██ som
nogle af hovedmændene.

NEC, som er Dansk Politis "Nationale Efterforsk-
ningsstøtteCenter", modtog i 2002 oplysninger fra
DEA i USA. Oplysningerne dannede grundlag for mis-
tanke om organiseret smugling af narkotika fra
Danmark til USA/Canada, styret af en amerikansk
bosiddende russer ved navn ██Person 2██ og en
persongruppe i Århus.
Det blev oplyst, at smuglingen foregik ved at
skjule ecstacy i forsendelser i møbler.

DEA oplyste i juli 2002, at ██Person 2██ ved indrejse
i USA var blevet kontrolleret af toldvæsnet. I den
forbindelse var ██Person 2██ i besiddelse af en kvit-
tering på et lejet lagerrum i USA. Kvitteringen
var udstedt til ██Tiltalte 3██.

Samtidig kopierede toldvæsnet ██Person 2's██ personli-
ge telefonbog. I den var der telefonnumre og e-
mailadresse, som kunne sættes i forbindelse med
bla. ██Tiltalte 3██ ██Tiltalte 1██ og
██Tiltalte 2██.

...

- 8 -

Århus Politi har efterfølgende modtaget det ameri-
kanske rapportmateriale vedr. ovennævnte kontrol
af ████Person 2████, som var foregået i Chicago
Lufthavn den 6. juli 2002.

Efter at have sikret en kopi af den ovennævnte le-
jekontrakt rettede agenter fra DEA henvendelse ved
firmaet Storage Spot, hvor lagerlokalet var lejet
af ████Tiltalte 3████.
DEA fik udleveret lejekontrakten med ███Tiltalte 3's███
████████ underskrift og en kopi af hans danske
pas.

...

████Person 2████ har flere gange forklaret til
myndighederne omkring det lagerlokale, som var le-
jet af ████Tiltalte 3████ hos firmaet Storage
Spot i Atlanta. Senest i den indenretslige forkla-
ring foretaget af den danske anklagemyndighed i
februar 2007.

████Person 2████ forklarede hvordan han kørte
████Tiltalte 3████ ud til Storage Spot. Mens ███Person 2███
ventede udenfor, gik ███Tiltalte 3███ selv ind og
oprettede lejemålet. ███Tiltalte 3███ havde ecsta-
cypillerne fra den 3. forsendelse med sig, gemt i
en taske.

████Tiltalte 3████ placerede efterfølgende tasken med
pillerne i det lejede lagerlokale.
...

Telefonbogen indeholdt som nævnt diverse numre og
e-mail adresse, som kunne sættes i forbindelse med
████Tiltalte 1████, ████Tiltalte 2████ og
████Tiltalte 3████.
Desuden var der anført web-adressen ███Hjemmeside 1███
...
Efterforskning og afhøringer har efterfølgende
vist, at ████Firma 1████ er navnet på det firma,
som har produceret de møbler, som er blevet an-
vendt til smuglingen af ecstacy fra Danmark til
Atlanta, USA.

**Anholdelse af amerikanske bagmænd**
Spansk Politi foretog den 31. januar 2003 anhol-
delse af ████Person 2████ og ██████Person 1██████
i Spanien.

- 9 -

I den forbindelse blev de 2 fundet i besiddelse af
en lejekontrakt på en Ford Focus, lejet i Spanien
af den danske statsborger [Person 6].
[Person 2] var desuden i besiddelse af et
dansk hævekort i sit eget navn.
...
Efterforskningen viste, at [Person 2] havde
oprettet en konto i Danske Bank, Kannikegade,Århus
den 19. september 2000. Der var knyttet en boks
til kontoen.

Ud over oprettelsen af kontoen var den eneste
transaktion på selve kontoen en pengeoverførsel
den 4. oktober 2000 på 500 $ til en konto i Impex-
bank i Rusland.
...
**Afhøringer i USA, foretaget af Dansk Politi**
Dansk Politi foretog i august 2005 rejse til At-
lanta, Georgia, USA, hvor [Person 1] og
[Person 2] blev afhørt til sagen.
Afhøringerne var meget detaljerede og af belasten-
de karakter for [Tiltalte 3], |
[Tiltalte 1] og [Tiltalte 2].
De forklarede hvordan de 3 danskere i forening
havde sørget for, at afhente ecstacypiller i Hol-
land og transportere disse til Danmark. I Danmark
blev pillerne pakket ned i hule bordben, hvorefter
de blev afsendt til Atlanta, USA.
De forklarede detaljeret om 3 "forsendelser".

Ved de 2 først forsendelser var der afsendt hen-
holdsvis ca. 50.000 ecstacypiller og ca. 150.000
ecstacypiller.
Ved disse forsendelser stod danskerne kun for
transporten, mens [Person 2] og
[Person 1] stod for indkøbet og distributionen.
Ved den 3. forsendelse blev der afsendt ca. 50.000
tabletter, og ved denne forsendelse var
[Tiltalte 1] ansvarlig for indkøbet af pillerne i
Holland.
Transporten var igen udført af danskerne.
[Person 1] forklarede, at han selv hav-
de været i Danmark i 2002, hvor han i maj-juni
havde opholdt sig i 1½-2 måneder. Han havde boet
en del af tiden i [Tiltalte 2's] sommerhus, men i
en kort periode, hvor [Person 1's] kæreste kom på besøg
fra USA, havde [Person 1] lejet et værelse på Hotel
Marselis i Århus.
...

- 10 -

Efterforskningen ved Hotel Helnan Marselis i Århus
viste, at ███ Person 1 ███ var indlogeret på
hotellet i perioden 30. maj 2002-5. juni 2002.
...
███ Person 1 ███ tegnede desuden en meget præ-
cis skitse over ██ Tiltalte 2's ██ sommerhus på
██ Adresse 1 ██ i ██ By 2 ██ ved Århus. På skitsen
havde █Person 1█ indtegnet et skjult rum i gulvet, som
angiveligt var anvendt til opbevaring af ecstacy-
pillerne efter, at de var afhentet i Holland, men
før de var blevet skjult i hule bordben og afsendt
til USA.

█Tiltalte 2█ havde vist det skjulte rum til █Person 1█ og
forklaret ham, at det var der pillerne blev opbe-
varet, før de blev ompakket og videresendt til
USA.
█Tiltalte 2█ havde fortalt, at ved 1. og 2. forsendelse
havde pillerne kun været i rummet i kort tid, men
ved 3. forsendelse havde pillerne været så længe i
sommerhuset, at █Tiltalte 2█ til sidst blev bekymret og
flyttede pillerne.
Da █Person 1█ fik det skjulte rum forevist var der no-
get marihuana samt 50-100 stk. ecstacypiller i
rummet.
...
Myndighederne i USA foretog den 6. februar 2003
ransagning hos ███ Person 1's ███ kæreste i
USA. Ved den lejlighed blev der fundet en række
fotografier, som efterfølgende er overdraget til
Århus Politi.
På billederne ses ███ Person 1 ███ på lokali-
teter i Århus, bl.a. på Hotel Marselis, i selskab
med bl.a. ██ Tiltalte 1 ██, ██ Tiltalte 2 ██ og
██ Tiltalte 3 ██.
...
███ Person 1 ███ forklarede ligeledes til
Dansk Politi, at han på et tidspunkt under sit op-
hold i Danmark i løbet af sommeren 2002 løb tør
for penge. Han fik en bekendt i USA ved navn
██ Person 7 ██ til at overføre 12.500 $ til ██ Tiltalte 2's ██
konto i dennes bank i Århus.
█Person 1█ tegnede en skitse over bankens placering på
en stor plads i Århus centrum.
...
Efterforskningen viste, at ██ Tiltalte 2 ██ havde
sin konto i BG Bank på Store Torv i Århus C, og at
der den 6. juni 2002 var indsat 102.533,85 kroner
på kontoen. Beløbet svarende til 13.050 $. Pengene
var indsat/overført af en person ved navn

- 11 -

██Person 7██ fra Houston, Texas, via BANK OF AMERICA
N.A.

…

██████Person 1██████ forklarede, at han efter endt
ophold i Danmark i sommeren 2002 blev kørt til
sydspanien af ████Tiltalte 3's████ onkel. De var
kørt i onklens Audi.

…

Vidnet ██████P5██████ har til Århus Politi be-
kræftet, at han er i familie med ████Tiltalte 3████
██████, og at han i 2002 kørte ██Tiltalte 3██
█ og ██████Person 1██████ til Sydspanien, og at
de var kørende i ██████P5's██████ Audi.

…

██████Person 1██████ forklarede, at han under sit
ophold i Spanien i 2002 havde besøg af bl.a.
██████Tiltalte 3██████.
På et tidspunkt, formentlig i september, bad
██████Person 1██████ ██████Tiltalte 3██████ om at fly-
ve til USA for at hente 19.500 dollars hos en be-
kendt af ██Person 1██.
Under denne rejse til USA blev ██Tiltalte 3██ standset af
myndighederne og tilbageholdt i flere timer. …

**ANHOLDELSE AF** ██████Tiltalte 2██████ **OG** ██████Tiltalte 1██████

Den 30. maj 2006 foretog Århus Politi anholdelse
af ██████Tiltalte 1██████ og ██████Tiltalte 2██████. De blev
begge anholdt, da de sammen ankom til ██Tiltalte 2's██
██████ sommerhus i ██By 2██.
Ved anholdelsen var ██████Tiltalte 1██████ i besid-
delse af 7 salgsposer med kokain samt et narko-
regnskab (lå sammen i en bukselomme).

…

Der blev samme dag foretaget ransagning af
██████Tiltalte 1's██████ ejendele, som befandt sig hos ██Tiltalte 1's██
██forældre på██ ██████Adresse 2██████ i ██By 3██.
I ██████Tiltalte 1's██████ toilettaske blev der fundet
2 salgsposer indeholdende ca. 2 gram kokain og 1
stk. ecstacypille.

…

En ransagning af ██████Tiltalte 2's██████ sommerhus viste,
at der var et skjult rum under gulvet på nøjagtig
den position, som var indtegnet af ██████Person 1.██████

- 12 -

I det skjulte hulrum blev fundet en æske med
salgsposer. Oprindeligt indhold i æsken var 1000
poser. Der var ca. 200 poser tilbage i æsken.
I hulrummet var også en sort toilettaske indehol-
dende en plastpose med 128 gram hvidt pulver.

...

De fundne effekter fra anholdelsen og ransagnin-
gerne blev efterfølgende testet på Retskemisk In-
stitut. Det blev konstateret, at det kokain, som
var i de 7 salgsposer fundet i forbindelse med an-
holdelsen af ███████ Tiltalte 1 ███████, var fortyndet
med Kreatin. Poserne (2 stk.) som blev fundet i
███████ Tiltalte 1's ███████ toilettaske var også kokain.
Den ene pose indeholdt meget stærkt stof, og den
anden var kokain fortyndet med kreatin.
De 128 gram hvide pulver, som blev fundet i det
skjulte rum under gulvet i ███ Tiltalte 2's ███ sommer-
hus, viste sig ligeledes at være kreatin.

...

Det lykkedes ikke for Århus Politi at foretage an-
holdelse af ███████ Tiltalte 3 ███████, hvorfor han
den 31. maj 2006 blev efterlyst.

███ Tiltalte 2 ███ blev afhørt til sagen den 30. maj
2006. Han bekræftede sit kendskab til ███ Person 2 ███
███ og ███ Person 1 ███.

...

███████ Tiltalte 1 ███████ blev afhørt til sagen den 21.
juni 2006. Han bekræftede, at han havde boet i USA
i flere omgange. Sidst fra foråret 1999 til for-
året 2000, hvor han arbejdede for et amerikansk
møbelfirma i Atlanta ved navn ███ Firma 2 ███.

███ Tiltalte 2's ███ bror, ███ Person 8 ███, blev afhørt til
sagen den 6. juni 2006. Han oplyste efter afhørin-
gen uopfordret, at han tidligere havde ejet et
firma ved navn ███ Firma 1 ███, som producerede TV- og ste-
reomøbler. Firmaet havde haft adresse på
███ Vej 1 ███ i ███ By 4 ███ ved Århus.
███ Person 8 ███ indleverede kort efter 2 brochurer til
Århus Politi, som indeholdt de varer, som firmaet
havde produceret og solgt.

...

Som beskrevet senere i denne rapport er den i USA
dømte, ███ Person 3 ███, afhørt indenretsligt i USA af
den danske anklagemyndighed og forsvarsadvokaterne
Hans Kjellund og Bjarne Frøberg.

I den forbindelse blev ███ Person 3 ███ forevist de
brochurer, som Århus Politi havde fået udleveret

- 13 -

af [Person 8] . Brochurer visende de møbler, som
blev produceret af [Firma 1] .

[Person 3] genkendte den ene brochure med 100 %
sikkerhed.

Han forklarede, hvordan han indledningsvis i USA
havde fået en tilsvarende brochure udleveret enten
af [Person 2] eller af [Tiltalte 1] . Det var
meningen, at han skulle rette henvendelse hos
[Tiltalte 1's] firma, [Firma 2] , Atlanta og
bestille varer fra kataloget.

Disse varer ville så blive sendt fra Danmark til
Atlanta indeholdende ecstacypiller.
[Person 3] var i [Firma 2] for at foretage en
indledende forhøring, om forretningen ville be-
stille møblerne hjem til USA.
[Person 2] og [Tiltalte 1] besluttede
dog efterfølgende at benytte en anden fremgangsmå-
de til forsendelsen af møblerne.
...
[Tiltalte 3] blev anholdt, sigtet og va-
retægtsfængslet den 3. august 2006.

Den i USA dømte [Person 3] indleverede den 1.
april 2003 2 stk. metalbordben til DEA i USA. Han
oplyste, at disse bordben var en del af en møbel-
forsendelse, som var ankommet til Atlanta indehol-
dende ecstacy.
Dansk Politi har modtaget DEA's rapportmateriale
vedr. denne overdragelse. Rapportmaterialet er
vedlagt fotos af bordbenene.
...
Vidnet [Person 9] blev afhørt til sa-
gen den 3. januar 2007. Han oplyste, at han var
tidligere ejer af [Firma 3] . Dette
firma var en videreførsel af [Firma 1] , som
[Person 9] overtog fra [Person 8] .
[Person 8] fortsatte i firmaet som sælger, og
hans bror [Tiltalte 2] havde også sin gang i
firmaet, hvortil han havde haft sin egen nøgle.
[Person 9] fik forevist de billeder af bord-
ben, som var optaget af DEA i USA. Han genkendte
dem med 100 % sikkerhed som værende bordben produ-
ceret hos [Firma 1] / [Firma 3] . De var en
del af et TV-bord, [Model 1] .
...
[Person 9] oplyste, at han havde afhændet
[Firma 3] . Bl.a. havde han solgt [Firma 1]

- 14 -

produkterne til et firma ved navn ███ Firma 4 ███ i
███ By 5 ███.

De 3 fakturaer overdraget fra ███ Person 9 ███
███ til Århus Politi viste, at firmaet ███ Firma 5 ███
███ i alt havde indkøbt 22 stk. TV-borde,
███ Model 1 ███ og 2 stk. stereorack, ███ Model 2 ███.

Der var tale om 2 fakturaer fra den 3. august 2000
og 1 faktura fra den 3. oktober 2000.

███ Person 9 ███ var forundret over at se,
at ███ Firma 5 ███ havde adresse på
███ Adresse 3 ███ i ███ By 5 ███, da han mente, at det var
en bekendt ███ Person 10's ███ bopæl.

███ Person 9 ███ vidste, at ███ Person 10 ███
███ kendte ███ Tiltalte 2 ███, og at Person 10 på et
tidspunkt havde investeret nogle penge i
███ Tiltalte 2's ███ Pool-sted i Århus ved navn ███ Sted 1 ███.
...

Vidnet ███ Person 11 ███ blev afhørt til sagen den 5.
januar 2007. Han oplyste, at han var medejer og
direktør for ███ Firma 4 ███.
Han oplyste endvidere, at han tidligere havde væ-
ret ansat i ███ Person 8's ███ firma, som havde produce-
ret ███ Firma 1 ███ produkterne.
På et tidspunkt omkring 2001 havde Firma 4 overtaget
rettighederne til ███ Firma 1 ███ produkterne fra
███ Person 9's ███ ███ Firma 3 ███
███ Person 11 ███ blev forevist de billeder, som var
tilsendt Dansk Politi fra DEA i Atlanta, USA.
███ Person 11 ███ genkendte bordbenene med 100 % sikkerhed,
som værende det bagerste af i alt 3 bordben fra et
TV-bord fra ███ Firma 1 ███, ███ Model 1 ███.
...

Vidnet ███ Person 10 ███ blev afhørt til sa-
gen den 9. januar 2007 af politiet i Torshavn på
Færøerne.
███ Person 10 ███ oplyste, at han nu var bosiddende
på Færøerne. Han var flyttet fra ███ Adresse 3 ███
██, ███ By 5 ███ i løbet af sommeren 2001. Han var
ejer af ███ Firma 5 ███, som var op-
rettet udelukkende mhp. på indkøb af undervis-
ningsmateriale fra udlandet.
███ Person 10 ███ vidste, at en bekendt ved navn
███ Person 8 ███ var involveret i ███ Firma 1 ███.

114

- 15 -

███████ Person 10 ███ var på et tidspunkt i bestyrelsen i
███ Virksomhed ApS 1 ██████ .Det samme var ██ Person 7 ███
██ og dennes bror ███ Tiltalte 2 ████ .
Sidstnævnte var medejer og direktør af selskabet.
Selskabet drev en cafe eller beværtning på ██ Vej 2 ███
████████ i Århus.

████ Person 10 ███████ havde aldrig foretaget forsendelser
til USA. Han havde heller ikke indkøbt møbler hos
███████ Firma 1 ██████ i Danmark.

Forespurgt oplyste ██████ Person 10 ██████ , at han ikke
kunne udelukke, at han af nogen af de personer,
som han havde samarbejdet med omkring
████ Virksomhed ApS 1 ██████ , er blevet spurgt, om man kunne
anvende ██ Person 10's ██ selskabs navn i forbindelse med
ind- og eksport af varer. Han kunne dog ikke huske
konkrete situationer.

Østjyllands Politi modtog den 24. januar 2007 1
stk. bordben fra myndighederne i USA. Bordbenet
var identisk med det bordben, som var sikret af
DEA og fotograferet i bilag …
Myndighederne i USA har fortsat 1 bordben tilbage.
…

**Leje af bil hos** ███████ Biludlejningsfirma 1 ████████ .
Efterforskning viste, at der var foretaget følgen-
de udleje af biler hos ████ Biludlejningsfirma 1 ██████ i Århus:

**Lejet af** ██████ Tiltalte 1 ███████ :
18. september 2000-21. september 2000
Peugeot 406        kørt 851 kilometer
21. september 2000-25. september 2000
Fiat Punto         kørt 1234 kilometer
30. september 2000-4. oktober 2000
Audi A4            kørt 2909 kilo meter
3. november 2000-3. november 2000
Renault Megane     kørt 401 kilo  meter

**Lejet af** ████████ Person 2 ████████
25. juli 2000-26. juli 2000        Alfa 156 kørt
392 kilo-

                                   meter

…

███████ Person 2 ████████ har forklaret til sagen, at han
var i Danmark i forbindelse med forsendelse nr. 1.
Det passer tidsmæssigt med, at han lejede en bil
hos ██████ Biludlejningsfirma 1 ████████ i tidsrummet 25.-26.
juli 2000.

- 16 -

███████ Person 2 ███████ har tidligere forklaret til myn-
dighederne, at han i forbindelse med den anden
forsendelse af ecstacy var i Danmark forud for af-
hentningen af piller i Amsterdam. Han forklarede,
at han blev kørt af ████████ Tiltalte 3 ████████ fra Dan-
mark til Hamburg. Det foregik i en lille bil. Han
bekræftede denne køretur i en indenretlig afhøring
i Atlanta den 5. februar 2007.

Denne køretur passer både tidsmæssigt og kilome-
termæssigt fint med den Fiat Punto, som
███ Tiltalte 1 ███ lejede den 21. september 2000. Bilen
havde kørt 1234 kilometer, da den blev tilbagele-
veret den 25. september.

Af de samme afhøringer af ██████ Person 2 ██████ fremgår
det, at ███ Person 2 ███, efter at have afleveret den 2.
forsendelse til en chauffør i Amsterdam, blev af-
hentet af ████████ Tiltalte 1 ████████ i en personbil.
███ Tiltalte 1 ███ og ████ Person 2 ████ kørte sammen
i denne personbil til Danmark.
Denne køretur passer både tidsmæssigt og kilome-
termæssigt med, at ████████ Tiltalte 1 ████████ den 30.
september 2000 lejede en Audi A4, som ved tilbage-
leveringen den 4. oktober 2000 havde kørt 2909 ki-
lometer.
...
Fra Århus til Hamburg er der jf. KRAK 338 kilome-
ter
Fra Århus til Amsterdam er der jf. KRAK 790 kilo-
meter.
...

**Indenretslige afhøringer i Atlanta, Georgia, USA**
Østjyllands Politi og anklagemyndighed rejste i
februar 2007 til Atlanta, Georgia, USA, hvor
███ Person 2 ███, ████████ Person 1 ████████, ███ Person 3 ███ og
███ Person 4 ███ blev afhørt indenretsligt.
De 4 vidner er alle dømte i sagen i USA. ███ Person 2 ███
██████ har afsonet sin straf og er løsladt. De
øvrige afsoner fortsat de idømte fængselsstraffe.

Med på turen til USA var forsvarsadvokaterne Hans
Kjellund og Bjarne Frøberg, som repræsenterede
henholdsvis ████ Tiltalte 2 ████ og ████ Tiltalte 3 ████
███. Advokat Michael Juul Eriksen var ikke med på
turen til Atlanta, idet han meldte sig syg forin-
den afrejsen.
...

- 17 -

De fire amerikanere forklarede detaljeret om 3
forsendelser af ecstacy, som var transporteret fra
Holland til Danmark, hvor de var blevet ompakket
og skjult i hule bordben, hvorefter de var blevet
sendt til Atlanta i USA.
De 3 ture var foregået med den første forsendelse
i løbet af sommeren 2000, anden forsendelse i ef-
teråret 2000 og den tredje forsendelse omkring de-
cember 2001.


I forbindelse med disse afhøringer forklarede
Person 3 og          Person 2           samstemmende om, hvor-
dan de i januar 2001 mødte          Tiltalte 1            i
Europa.
...


I forbindelse med vores ophold i USA fik vi fore-
vist det bordben, som myndighederne fik overdraget
af      Person 3     , og som fortsat er i de amerikanske
myndigheders besiddelse.
Bordbenet var lig det ene af de bordben, som var
udleveret til Østjyllands Politi af vidnet
Person 11 ,       Firma 4        i    By 5     ved Århus. Der
var tale om det bagerste bordben fra et TV-bord
fra  Firma 1 ,    Model 1     .

Fra bordbenet var der sikret nogle gule plastfibre
/ plastmateriale, som var sikret i en kosterpose.
Der var formentlig tale om tørt fuge-skum, som var
anvendt til at forsegle pillerne inden i bordbene-
ne i forbindelse med forsendelserne.

I forbindelse med de ovennævnte indenretslige af-
høringer i USA fik vidnerne    Person 2   ,  Person 3  og
Person 4  forevist omhandlede bordben.
        Person 2          fik forevist bordbenet, som dog
var indpakket i tyk klar plastik og omviklet med
tape af den amerikanske kosterforvaltning, da han
fik det forevist.


   Person 2   udtalte, at det kunne være et sådant
bordben, som var anvendt til smuglingen af ecsta-
cy. Han var dog noget usikker i sin genkendelse.


Efterfølgende fik Person 4 og  Person 3  forevist bordbe-
net. På det tidspunkt var bordbenet blevet pakket
ud af plastic og tape.

- 18 -

███ Person 3 ███ genkendte bordbenet. Han genkendte bordbenet som værende lig det han selv havde overdraget til myndighederne. Han udtalte, at det var i et sådant bordben, at ecstacypillerne var blevet bragt ind.

███ Person 4 ███ genkendte ligeledes bordbenet. Han genkendte det, som værende lig de bordben, som han var blevet anmodet om at skaffe af vejen for ███ Person 2 ███. Bordben som lå sammen med ecstasypiller i ███ Person 2's ███ lagerlokale. (lejet af ███ Tiltalte 3 ███.)

███ Person 4 ███ genkendte ligeledes de førnævnte plaststykker, som var sikret fra bordbenet (fugeskum). Han forklarede, at plaststykker som disse, havde han fundet blandt de ecstacypiller, som han havde modtaget fra bagmændene i sagen.

...″

Det fremgår af sagen, at ███ Person 1 ███ i en tilståelsesaftale af 31. marts 2004, erkendte sig skyldig i det amerikanske anklageskifts forhold 2 og 3. I den danske oversættelse af tilståelsesaftalen, der er indgået mellem Den Føderale Offentlige Anklager i Georgias Nordlige Distrikt og ███ Person 1 ███ samt dennes advokat, er anført:

″...

4. Den føderale offentlige anklager for Georgias nordlige distrikt indvilliger i at afvise de øvrige forhold i det Forudgående Anklageskrift på tidspunktet for strafudmålingen. ...
5. ... Dog vil Regeringen ikke være forpligtet til at anbefale ansvarspåtagelse, hvis tiltalte, efter indgåelse af denne Tilståelsesaftale, udviser adfærd i uoverensstemmelse med påtagelsen af ansvaret. ... Selv om dette ikke er bindende for Retten eller for Tilsynsværgen, er Regeringen og tiltalte enige om at anbefale, at den mængde af 3,4 methylendioxymethamfetamin (også kaldet MDMA), der kan tilskrives tiltalte som relevant adfærd, mindst er 1.500.000 tabletter. ...
7. Tiltalte indvilliger i at samarbejde med Regeringen, sandfærdigt og fuldstændigt, i alle sager

- 19 -

med relation til denne retsforfølgelse, i andre
efterforskninger, samt i alle sager med relation
til konfiskationen forbundet med de kendsgerninger
og omstændigheder, som har foranlediget denne
restforfølgelse, herunder at medvirke til afhørin-
ger og udtale sig sandfærdigt ved enhver proces,
der udspringe af eller er beslægtet med dette sam-
arbejde. Tiltalte indvilliger også i at fortælle
om eksistensen af, samt at forsyne Regeringen med,
samtlige bøger, papirer og dokumenter og enhver
genstand med værdi som bevismateriale, som han
måtte være i besiddelse af eller have under sin
kontrol. Tiltalte forstår, at det ene og alene er
Regeringen som vil afgøre, hvilke typer samarbejde
tiltalte vil blive bedt om at deltage i, og til-
talte indvilliger i ikke at medvirke til nogen ef-
terforskning, som ikke er specifikt godkendt af
Regeringen.
8. I henhold til Retningslinierne, §1B1.8, indvil-
liger Regeringen i, at alle eventuelle oplysning,
som kan belaste tiltalte selv og som Regeringen
ikke tidligere har kendt til, og som videregives
til Regeringen af tiltalte i forbindelse med sam-
arbejdet og som et resultat af denne Tilståelses-
aftale, ikke vil blive brugt ved fastsættelsen af
det anvendelige interval, jfr. Retningslinierne,
selv om sådanne oplysninger kan blive viderebragt
til Tilsynsværgen og til Retten. Regeringen ind-
villiger også i ikke at anklage tiltalte for yder-
ligere forhold baseret på enhver oplysning videre-
givet af tiltalte i forbindelse med samarbejdet,
som Regeringen ikke var bekendt med forud for sam-
arbejdet. Undtaget herfra er forhold, som er et
resultat af, eller relaterer sig til voldelige
strafbare aktiviteter. Derudover gælder det, hvis
Regeringen fastslår, at tiltalte ikke har været
fuldt ud ærlig og åben i sit samarbejde med Rege-
ringen, at tiltalte evt. kan blive retsforfulgt
for mened, for afgivelse af falsk forklaring, for
at have forhindret retfærdigheden i at ske fyl-
dest, og for enhver anden hensigtsmæssig anklage,
og alle oplysninger, tiltalte har afgivet, vil
kunne bruges imod ham i en sådan retsforfølgning.
...
12. Hvis tiltalte, som nævnt ovenfor, på nogen må-
de undlader at opfylde hver enkelt af sine for-
pligtelser i henhold til denne Tilståelsesaftale,
kan Regeringen vælge at blive frigjort for sine
forpligtelser i henhold til Tilståelsesaftalen.
Regeringen kan derefter retsforfølge tiltalte for

- 20 -

enhver af de føderale lovovertrædelser, som til-
talte har begået i relation til denne sag, herun-
der alle anklager afvist i henhold til Tilståt-
sesaftalen, og Regeringen vil kunne anbefale Ret-
ten en hvilken som helst straf, op til og med den
maksimale straf, for de pågældende lovovertrædel-
ser. Tiltalte giver udtrykkeligt afkald på enhver
indsigelse mod en sådan restforfølgning med påbe-
råbelse af en forældelsesfrist samt på enhver for-
fatningsmæssig eller lovmæssig indsigelse baseret
på hurtig sagsbehandling i retten, undtagen i det
omfang der eksisterer grundlag for en sådan indsi-
gelse pr. den dato, hvor tiltalte underskriver
denne Tilståelsesaftale. Herudover indvilliger
tiltalte i, at det i en sådan retsforfølgning vil
være muligt at bruge alle tilståelser og andre op-
lysninger, han nogensinde er fremkommet med, her-
under alle forklaringer, han har afgivet, og alle
beviser fremlagt af tiltalte under møder vedrøren-
de tilbudte oplysninger, afhøringer, afgivelse af
vidnesbyrd, og ved andre lejligheder, imod ham. …"

Det fremgår af sagen, at ▇▇▇ Person 2 ▇▇▇ , ▇▇ Person 3 ▇▇ og
▇▇ Person 4 ▇▇ tillige har indgået tilståelsesaftaler, der i
hvert fald i det væsentlige er i overensstemmelse med den,
som ▇▇▇▇ Person 1 ▇▇▇▇ har indgået.

I en begæring fra den amerikanske regering "om en fravigelse
nedad af det anvendelige interval, jf. retningslinierne for
tiltalte ▇▇▇▇ Person 1 ▇▇▇▇ væsentlige bidrag" er i pkt. 3
henvist til, at Person 1 har samarbejdet i en efterforskning
under ledelse af det danske politi af flere personer, som
der ikke er rejst tiltale mod, og at Person 1 medvirkede i sam-
taler, der blev optaget på anmodning fra Regeringen. I pkt.
4 er det anført, at Regeringen forventer, at Person 1 fortsat
vil samarbejde omkring restforfølgningen af andre personer,
som endnu ikke er tiltalt, som deltog i narkorelateret ad-
færd.

- 21 -

████████ Person 1 ████████ blev ved en dom afsagt den 4. januar
2006 fundet skyldig i anklageskriftets forhold 2 og 3 i
overensstemmelse med sin tilståelse og idømt fængsel i 204
måneder (17 år).


I transskriptionen af retsforhandlingen den 4. januar 2006
fremgår, at dommeren bl.a. udtalte følgende:

> "Lad mig ydermere gøre det klart, at min – at fra-
> vigelsen baseret på samarbejde og bidrag var en
> fravigelse baseret på tiltaltes samarbejde som pr.
> dags dato.
>     Og Hr. ██Advokat 1██, hvis din klient fortsætter med
> at samarbejde og yde et væsentligt bidrag, så vil
> jeg med glæde overveje en yderligere reduktion,
> hvis Regeringen begærer det således.
> ..."

Det fremgår endvidere af sagen, at den danske anklagemyndig-
hed har meddelt såvel den amerikanske anklagemyndighed som
████████ Person 1 ████████, at der ikke i Danmark vil blive ind-
ledt strafforfølgning mod ham for forhold, som pågældende er
eller må blive dømt for i den verserende straffesag i USA,
ligesom der ikke vil blive indledt strafforfølgning for for-
hold i Danmark vedrørende de euforiserende stoffer, som er
omfattet af en for pågældende i USA afsagt dom.


████ Person 2 ████, ████ Person 3 ████ og ████ Person 4 ████ har fået samme
meddelelse.


Også i sagen mod ████ Person 2 ████ fremsatte den amerikanske
regering (anklagemyndighed) begæring om strafreduktion med
henvisning til, at tiltalte havde samarbejdet med regeringen
i efterforskningen af andre personer og derved ydet et væ-
sentligt bidrag over for regeringen, f.eks. var tiltalte
fremkommet med væsentlige detaljer omkring sine medtiltaltes

- 22 -

indførsel af MDMA til USA ved at skjule dette i møbler, som
var blevet importeret fra Danmark. Ved dom afsagt den 9. no-
vember 2004 blev ▇▇▇Person 2▇▇▇ fundet skyldig i anklageskiftets
forhold 2 i overensstemmelse med sin tilståelse og idømt
fængsel i 52 måneder (4 år og 4 måneder).

▇▇▇Person 3▇▇▇ blev ved dom afsagt den 16. maj 2005 fundet
skyldig i anklageskiftets forhold 2 i overensstemmelse med
sin tilståelse og idømt fængsel i 151 måneder (12 år og 7
måneder). Han fik ingen strafnedsættelse, hvilket skyldtes
hans fortsatte brug af narkotika efter hans arrest og efter,
at han havde erkendt sig skyldig.

I en e-mail af 2. april 2007 til kriminalassistent
▇▇▇Person 12▇▇▇ har anklageren i sagen i USA ▇▇Anklager 1▇▇ anført, at
regeringen endnu ikke har fremsat begæring om strafnedsæt-
telse i relation til ▇▇▇Person 3▇▇▇, idet han ikke har været
god nok til at samarbejde. På den baggrund afventer man i
USA danske politis vurdering af ▇Person 3's▇ bidrag til den dan-
ske efterforskning. Hvis han hjælper en masse, vil der blive
fremsat begæring om nedsættelse.

Vedrørende sagen mod ▇▇▇Person 4▇▇▇ er det oplyst, at regeringen
fremsatte begæring om en fravigelse nedad i det anvendelige
interval for ▇▇▇Person 4's▇▇▇ væsentlige bidrag til efterforsk-
ningen og retsforfølgningen af andre, men sagen mod dansker-
ne var ikke specifikt nævnt. Ved dom afsagt den 5. juli 2005
blev ▇▇▇Person 4▇▇▇ fundet skyldig i anklagekriftets forhold 2,
3 og 17 i overensstemmelse med sin tilståelse og idømt fæng-
sel i 113 måneder (9 år og 5 måneder).

- 23 -

Anklagemyndigheden og forsvarerne har i det væsentlige gen-
taget deres procedure for byretten, således som disse er
gengivet i retsbog af 19. november og 20. november 2007.

**Landsrettens begrundelse og resultat:**

I kendelse af 13. september 1982, gengivet i Ugeskrift for
Retsvæsen 1982 side 1027, tog Højesteret ikke anklagemyndig-
hedens begæring om vidneførelse af en i USA bosiddende per-
son, der var omfattet af plea bargain, til følge.

Der er ikke grundlag for at fastslå, at der er forskelle af
væsentlig betydning på den aftale, som var indgået med det
vidne, der var omfattet af sagen for Højesteret i 1982, og
de tilståelsesaftaler, som ████ Person 2 ████ , ████ Person 1 ████
████ , ████ Person 3 ████ og ████ Person 4 ████ har indgået med den ameri-
kanske anklagemyndighed i denne sag.

Ved afgørelsen af, om anklagemyndighedens begæring om tilla-
delse til at føre de nævnte 4 vidner, har landsretten lagt
vægt på, at Højesterets flertal i en dom af 17. juni 1998,
gengivet i Ugeskrift for Retsvæsen 1998 side 1317 i en sag
vedrørende nedsættelse af straf for narkotikaforbrydelse un-
der hensyn til medvirken ved sagens oplysning har udtalt
følgende:

> "Det er efter vores opfattelse af væsentlig betyd-
> ning for efterforskningen af større narkotikasager
> og visse andre alvorlige sager, hvor efterforsk-
> ningen erfaringsmæssigt er særlig vanskelig og
> problemfyldt, at der er mulighed for at motivere
> en sigtet til at medvirke til sagens oplysning. En
> sådan motivation kan være udsigten for den sigtede
> til, at hans egen straf reduceres. Vi finder under
> hensyn hertil, at der ved strafudmålingen bør kun-
> ne tages hensyn til oplysninger fra anklagemyndig-
> heden om, at sigtede har ydet politiet og anklage-

- 24 -

> myndigheden bistand under efterforskningen, uanset
> de principielle og retssikkerhedsmæssige betænke-
> ligheder, der kan være forbundet med en sådan ord-
> ning. Vi bemærker i den forbindelse, at det under
> en eventuel straffesag mod personer, der af den
> sigtede er udpeget som medgerningsmænd, kan indgå
> i vurderingen af den sigtedes oplysninger, at dis-
> se har medført eller vil kunne medføre, at hans
> egen straf nedsættes. ..."

Ved lov nr. 218 af 31. marts 2004 blev der indsat en ny §
82, nr. 10 i straffeloven, hvorefter det ved straffens fast-
sættelse i almindelighed skal indgå som formildende omstæn-
dighed, at gerningsmanden har givet oplysninger, som er af-
gørende for opklaringen af strafbare handlinger begået af
andre. I bemærkningerne til bestemmelsen (Folketingstidende
2003-2004, Tillæg A, side 3325) er der anført følgende:

> " I § 82, nr. 10, angives som formildende omstæn-
> dighed, at gerningsmanden har givet oplysninger,
> som er afgørende for opklaringen af strafbare
> handlinger begået af andre. Med denne bestemmelse
> lovfæstes den retstilstand, som har udviklet sig
> på baggrund af Højesterets dom offentliggjort i
> Ugeskrift for Retsvæsen 1998, side 1317. Bestem-
> melsen er ikke begrænset til bestemte sagstyper,
> herunder sager, som gerningsmanden selv har været
> involveret i. Bestemmelsen må efter ordlyden for-
> ventes at få størst praktisk betydning i sager om
> grovere kriminalitet, f.eks. større narkotikasa-
> ger, sager om alvorlig voldskriminalitet og drab
> eller sager om omfattende eller alvorlig økonomisk
> kriminalitet, hvor efterforskningen erfaringsmæs-
> sigt er særlig vanskelig eller problemfyldt."

På denne baggrund, og da forklaringerne fra de 4 nævnte vid-
ner må antages at have væsentlig betydning for sagens afgø-
relse, finder landsretten ikke, at anklagemyndigheden - uan-
set de foreliggende omstændigheder, hvorunder forklaringerne
er afgivet - bør afskæres fra at føre de pågældende som vid-
ner under hovedforhandlingen.

- 25 -

Landsretten har ikke herved taget stilling til den bevismæs-
sige værdi af forklaringerne og har heller ikke i øvrigt ta-
get stilling til, om oplysningerne i den resumerapport, der
er udarbejdet af Østjyllands Politi, kan lægges til grund
ved en dom i sagen.

### T h i   b e s t e m m e s:

Det tillades anklagemyndigheden at føre ███ Person 2 ███,
███ Person 1 ███, ███ Person 3 ███ og ███ Person 4 ███ som vidner
under hovedforhandlingen.

Landsretten fastsatte herefter frist til den 4. august 2008
for forsvarerne til at oplyse, om kendelsen vil blive søgt
indbragt for Højesteret.

Landsretten fastsatte endvidere frist til samme dato for
Statsadvokaten og forsvarerne til at udtale sig om, hvorvidt
byrettens dom - for det tilfælde at vidnerne kan føres under
hovedforhandlingen - bør ophæves, og sagen hjemvises til ny
behandling ved byretten.

Sagen udsat.

Lars E. Andersen

UDSKRIFT

AF

**HØJESTERETS ANKE- OG KÆREMÅLSUDVALGS DOMBOG**

# HØJESTERETS KENDELSE
## afsagt fredag den 9. januar 2009

**Sag 297/2008**

Rigsadvokaten

mod

Tiltalte 1

(advokat Michael Juul Eriksen, beskikket),

Tiltalte 2

(advokat Lars Henriksen, beskikket) og

Tiltalte 3

(advokat Troels Lind Pedersen, beskikket)

Den påkærede kendelse er afsagt af Vestre Landsrets 1. afdeling den 26. juni 2008.

I påkendelsen har deltaget syv dommere: Torben Melchior, Poul Sørensen, Peter Blok, Per Walsøe, Børge Dahl, Jytte Scharling og Michael Rekling.

**Påstande**

De kærende, Tiltalte 1, Tiltalte 2 og Tiltalte 3, har nedlagt påstand om, at det ikke tillades anklagemyndigheden at føre Person 2, Person 1, Person 3 og Person 4 som vidner under hovedforhandlingen.

Anklagemyndigheden har påstået stadfæstelse.

**Supplerende sagsfremstilling**

Om sagens forløb fremgår følgende af Rigsadvokatens udtalelse i kæresagen:

"… [Det] bemærkes, at de beskrevne "plea agreements" samt de efterfølgende fremsatte forslag om strafnedsættelse er tilblevet uden medvirken af danske myndigheder.

…

Ved dom af 3. december 2007 afsagt af Retten i Århus blev Tiltalte 1, Tiltalte 2 og Tiltalte 3 frifundet i sagens hovedforhold (forhold 1-3), der vedrører modtagelse og indførelse af ecstacytabletter fra Holland via Danmark til USA. Retten lagde ved sin afgørelse vægt på, at der ikke var ført bevis for tiltalens rig-tighed i disse forhold. Der skete domfældelse i sagens øvrige forhold. Tiltalte 1 og Tiltalte 2 blev således hver idømt fængsel i 5 måneder samt mindre tillægsbøder for bl.a. overdragelse af kokain samt besiddelse heraf med henblik på overdragelse. Tiltalte 3 blev idømt fængsel i 40 dage samt en mindre til-lægsbøde og førerretsfrakendelse for bl.a. spirituskørsel og besiddelse af amfetamin.

Tiltalte 1 og Tiltalte 2, der under sagen havde været varetægtsfængslet siden den 21. maj 2006, og Tiltalte 3, som havde været fængslet siden den 3. august 2006, blev alle løsladt umiddelbart efter domsafsigelsen."

Anklagemyndigheden og de tiltalte har tilkendegivet over for Vestre Landsret, at der ikke vil blive protesteret mod hjemvisning af sagen til fornyet behandling i byretten, såfremt vidne-førslen tillades.

I afgørelse af 25. maj 2004 i sag 994/03 (Arnold G. Cornelis mod Nederlandene) har Den Europæiske Menneskeretsdomstol bl.a. udtalt følgende:

"The Court appreciates that the use of statements made by witnesses in exchange for immunity or other advantages forms an important tool in the domestic authorities' fight against serious crime. However, the use of such statements may put in question the fair-ness of the proceedings against the accused and is capable of raising delicate issues as, by their very nature, such statements are open to manipulation and may be made purely in order to obtain the advantages offered in exchange, or for personal revenge. The sometimes ambiguous nature of such statements and the risk that a person might be ac-cused and tried on the basis of unverified allegations that are not necessarily disinte-rested must not, therefore, be underestimated (see, mutatis mutandis, Labita v. Italy [GC], no. 26772/95, § 157, ECHR 2000 IV). However, the use of these kinds of state-ments does not in itself suffice to render the proceedings unfair (see Lorsé v. the Netherlands (dec.), no. 44484/98, 27 January 2004; and Verhoek v. the Netherlands (dec.), no. 54445/00, 27 January 2004). This depends on the particular circumstances in each case.

In the instant case the public prosecution service concluded an arrangement with Mr Z. and statements obtained from him were used in evidence against the applicant. The Court observes that, from the outset, the applicant and the domestic courts were aware of this arrangement and extensively questioned Mr Z. in order to test his reliability and credibility. Moreover, the domestic courts showed that they were well aware of the dan-gers, difficulties and pitfalls surrounding arrangements with criminal witnesses. In the

judgments handed down in the applicant's case, all aspects of the agreements were extensively and carefully scrutinised, with due attention being paid to the numerous objections raised by the defence.

The Court concludes therefore that it cannot be said that the applicant's conviction was based on evidence in respect of which he was not, or not sufficiently, able to exercise his defence rights under Article 6 § 1 of the Convention. Moreover, the applicant's con-viction was not only based on the statements given by Mr Z., but also on statements given by co-suspects and other witnesses, on several official (foreign and domestic) po-lice reports, on findings of the Forensic Laboratory, and on statements given by the ap-plicant. Consequently, this part of the application must also be rejected under Article 35 §§ 3 and 4 of the Convention as being manifestly ill-founded."

**Anbringender**

Tiltalte 1, Tiltalte 2 og Tiltalte 3 har gjort gældende, at de faktiske forhold i den foreliggende sag er sammenlignelige med forholdene i Højesterets ken-delse af 13. september 1982 i UfR 1982.1027. Vidnerne i den foreliggende sag har således ved deres "guilty plea and plea agreements" opnået betingede tiltalefrafald og betinget straf-nedsættelse, som kan bortfalde, såfremt vidnerne ikke fastholder de forklaringer, de har af-givet under ed forud for de danske forsvareres indtræden i sagen. Omvendt kan vidnerne opnå genoptagelse af deres sager i USA med henblik på yderligere strafnedsættelse, hvis de forkla-rer som ønsket af den danske anklagemyndighed.

Kendelsen i UfR 1982.1027 er fortsat gældende ret, og straffelovens § 82, nr. 10, har ikke ændret denne retstilstand, da bestemmelsen hverken vedrører tiltalefrafald eller betinget straf-nedsættelse.

Betænkelighederne ved "plea bargaining" er, at der er risiko for, at en person for at få fordel i egen sag afgiver en urigtig forklaring om andre med en urigtig domfældelse til følge. Fordele kan derfor ikke loves, jf. også retsplejelovens § 752, stk. 3, 2. pkt., om forbud mod anvendelse af løfter, urigtige foregivender eller trusler.

Der er ikke hjemmel i retsplejelovens § 721 eller § 722 til tiltalefrafald på grund af samarbej-de. Der er derfor heller ikke hjemmel til, at den danske anklagemyndighed i forbindelse med afhøringen af vidnerne i USA først sigtede disse for overtrædelse af straffelovens § 191 for umiddelbart efter at frafalde sigtelserne.

Domstolene skal kontrollere anklagemyndighedens overskridelse af sine beføjelser ved at nægte vidneførsel i de sager, hvor der er givet et usagligt tiltalefrafald, eller hvor tiltalefrafal-det er betinget af vidnets forklaring mod andre. Såfremt vidneførslen tillades i den foreliggen-de sag, vil det medføre, at anklagemyndigheden kan love en sigtet eller tiltalt påtaleopgivel-se/tiltalefrafald mod, at denne forklarer belastende om andre, selv om retsplejeloven ikke in-deholder hjemmel hertil.

Det har ingen betydning, at aftalerne i den foreliggende sag er gyldige efter amerikansk ret. I Danmark kan anklagemyndigheden ikke indgå aftaler om straffen, fordi strafudmålingen er domstolenes kompetence, men i den foreliggende sag er det kun på begæring af anklage-myndigheden, at den amerikanske domstol kan tage stilling til spørgsmålet om strafnedsættel-se. Den amerikanske anklagemyndighed bestemmer således suverænt, om vidnerne bidrager nok til, at der er mulighed for yderligere strafnedsættelse, og vil herved tage hensyn til den danske anklagemyndigheds evaluering af samarbejdet.

Konkurrencelovens § 23 a åbner ikke for "plea bargaining" ud over det, der var kendt før be-stemmelsens indførelse, idet der altid i medfør af retsplejelovens § 722, stk. 1, nr. 1, har kun-net gives tiltalefrafald i bødesager, og idet påtalemyndigheden i bødesager i et vist omfang kan råde over udmålingen, hvad påtalemyndigheden ikke kan i sager om frihedsstraf.

Anklagemyndigheden har anført, at udgangspunktet i dansk ret er, at bevisførelsen er fri, så-ledes at anklagemyndigheden og tiltalte kan føre de beviser, som er relevante for sagen. Prin-cippet om fri bevisførelse hviler på et grundlæggende princip om, at bevisførelse og bevis-bedømmelse skal ske med henblik på at konstatere sagens materielle sandhed. Der er derfor som udgangspunkt fri adgang for begge parter til at føre ethvert lovligt indhentet og relevant bevis. Dertil kommer, at der efter dansk ret også er en vis adgang til at føre beviser, der ikke er lovligt indhentet. Efter en konkret vurdering afskæres bevis ikke, selv om der måtte fore-ligge mangler og fejl i forbindelse med bevisets tilblivelse. Ulovligt tilvejebragte beviser kan tillades ført af domstolene, der herefter afgør, hvilken konsekvens den ulovlige tilvejebringel-se skal have på bevisvurderingen.

De indgåede "guilty plea and plea agreements" (tilståelsesaftaler) er lovlige i USA. Beviser, der er lovligt tilvejebragt af udenlandske myndigheder i et andet land end Danmark, må kunne anvendes i en dansk straffesag, uanset om det efter dansk ret ville være muligt at tilvejebringe

beviserne på tilsvarende betingelser. Danmark indgår i et meget omfattende samarbejde med andre landes myndigheder om bekæmpelse af international kriminalitet. Det forekommer der-for i vidt omfang, at beviser, der er tilvejebragt i andre lande, har betydning for straffesager, der behandles i Danmark. Det vil medføre en betydelig vanskeliggørelse af strafforfølgningen af kriminalitet med international rækkevidde, hvis det i de enkelte tilfælde skal vurderes, om de pågældende beviser ville kunne tilvejebringes efter danske strafferetlige og processuelle regler, og hvis det ikke er muligt i danske straffesager at anvende beviser, der tilvejebringes i udlandet på andre vilkår end dem, der gælder i Danmark.

Tilståelsesaftalerne strider ikke mod grundlæggende danske retsprincipper. Afgørelsen i UfR 1982.1027 er ikke længere udtryk for gældende ret, og den foreliggende sag adskiller sig des-uden fra den tidligere højesteretssag derved, at danske myndigheder ikke har været involveret i indgåelsen af aftalerne eller har givet andre tilsagn. De danske myndigheder har alene til-kendegivet, at man ikke vil indlede retsforfølgning mod vidnerne for forhold, som er omfattet af dommene i USA. Denne tilkendegivelse er kun udtryk for princippet om "ne bis in idem" .

Det kan anføres, at vidnerne i den foreliggende sag har en åbenbar interesse i at forklare sig i overensstemmelse med de forklaringer, som de har afgivet i USA. Noget tilsvarende kendes imidlertid også i dansk ret, idet Højesterets dom af 17. juni 1998 i UfR 1998.1317 og den ef-terfølgende indsættelse af § 82, nr. 10, i straffeloven betyder, at det kan indgå som en formil-dende omstændighed, at en gerningsmand har givet oplysninger, som er afgørende for opkla-ringen af strafbare handlinger begået af andre. Der kan også henvises til konkurrencelovens § 23 a, hvorefter deltagere i et kartel kan opnå tiltalefrafald eller strafnedsættelse ved at sam-arbejde med myndighederne.

### Højesterets begrundelse og resultat
De fire personer, som anklagemyndigheden ønsker at føre som vidner i retssagen mod <u>Tiltalte 1</u>, <u>Tiltalte 2</u> og <u>Tiltalte 3</u>, er i USA dømt i samme sagskompleks, efter at de med den amerikanske anklagemyndighed havde indgået såkaldte tilståelsesaftaler ("plea bargains"). Disse aftaler indebærer bl.a., at de pågældende har for-pligtet sig til at samarbejde med myndighederne ved at afgive forklaring i sager mod med-gerningsmænd, og at en tilsidesættelse af denne forpligtelse kan medføre bortfald af de for-dele i form af påtalefrafald og strafnedsættelse, som er opnået eller stillet i udsigt.

- 6 -

Aftaler om tiltalefrafald og/eller strafnedsættelse, der er betinget på denne måde, er lovlige og sædvanlige i USA. Derimod kan sådanne aftaler som udgangspunkt ikke anses for lovlige i dansk ret.

Den danske anklagemyndighed er ikke deltager i de tilståelsesaftaler, der er indgået i denne sag, og kan heller ikke – som det ellers er anført i byrettens kendelse af 20. november 2007 – anses for at have tiltrådt aftalerne. Tilkendegivelsen om, at de pågældende ikke vil blive straf-forfulgt i Danmark for de samme forhold som dem, der er omfattet af sagerne i USA, har alene karakter af en oplysning om, hvad der følger af princippet om, at ingen må strafforføl-ges to gange for det samme forhold.

Selv om tilståelsesaftaler som de omhandlede ikke lovligt kan indgås af en dansk anklage-myndighed, kan de dog ikke anses for stridende mod grundlæggende danske retsprincipper. Ordninger, som i et vist omfang har samme karakter og formål som de amerikanske til-ståelsesaftaler, kendes også i dansk ret. Således indeholder straffelovens § 82, nr. 10, en be-stemmelse om strafnedsættelse i tilfælde, hvor gerningsmanden har givet oplysninger, som er afgørende for opklaringen af strafbare handlinger begået af andre. Efter konkurrencelovens § 23 a kan en virksomhed, der deltager i et kartel, opnå tiltalefrafald eller strafnedsættelse, hvis den samarbejder med myndighederne om opklaringen.

På denne baggrund, og da der ved behandlingen af sager om international kriminalitet må tages hensyn til, at andre lande kan have straffeprocessuelle regler, som adskiller sig fra de danske, kan de retssikkerhedsmæssige betænkeligheder, som er baggrunden for, at tilståelses-aftaler som de foreliggende ikke anerkendes i dansk ret, ikke føre til, at anklagemyndigheden afskæres fra at føre de fire personer som vidner i den danske straffesag. Ved vurderingen af forklaringernes bevisværdi må det imidlertid tages i betragtning, at forklaringerne kan være usande, fordi de er motiverede af de lovede fordele.

Højesteret stadfæster herefter landsrettens kendelse.

## **Thi bestemmes :**

Landsrettens kendelse stadfæstes.



JON FRIDRIK KJØLBRO

DEN EUROPÆISKE
MENNESKERETTIGHEDS
KONVENTION    6. UDGAVE

FOR PRAKTIKERE

Djøf Forlag

Jon Fridrik Kjølbro

# Den Europæiske Menneskerettighedskonvention – for praktikere

## 6. udgave



Djøf Forlag
2023

## Kapitel 13. En rettergang inden en rimelig frist (artikel 6, stk. 1)

### 13.1. Indledning

Det følger af artikel 6, stk. 1, at *enhver har ret til en rettergang inden en "rimelig frist"* ("reasonable time" på engelsk og "délai raisonnable" på fransk), når der skal træffes afgørelse i en civil sag eller en straffesag, der er omfattet af bestemmelsen[1].

Ved at kræve, at retssager afgøres inden en rimelig frist, understreger konventionen vigtigheden af, at et retssystem administreres uden unødige forsinkelser, der vil kunne undergrave systemets effektivitet og troværdighed[2].

Når det skal vurderes, om der foreligger en krænkelse af retten til en rettergang inden en rimelig frist, er det nødvendigt først at fastlægge den relevante periode og dernæst foretage en konkret vurdering af, om den er udtryk for en rimelig frist.

### 13.2. Fastlæggelse af den relevante periode

#### 13.2.1. Straffesager

I straffesager *begynder* den relevante periode på det tidspunkt, hvor der foreligger en *"anklage for en forbrydelse"*, det vil sige fra det tidspunkt, hvor klager må anses for "anklaget" ("charged" på engelsk) i konventionens forstand. Der er tale om et *selvstændigt konventionsbegreb*. Domstolen har defineret begrebet "anklage" som en *officiel tilkendegivelse* over for en person fra en dertil kompetent myndighed, der indeholder en beskyldning om, at vedkommende har begået en strafbar handling, ligesom den har udtalt, at denne definition svarer til en vurdering af, om den mistænktes situation er blevet *påvirket mærkbart*[3].

Det tidspunkt kan meget vel – og vil som oftest – ligge *forud for sagens indbringelse for domstole*. Fristen vil almindeligvis begynde at løbe fra det tidspunkt, hvor klager anholdes, eller afhøres som sigtet, eller hvor der rejses tiltale[4]. Fristen vil begynde at løbe på det tidspunkt, hvor der foretages strafprocessuelle tvangsindgreb, herunder ransagning, forudsat at indgrebet vedrører klagers personligt, og denne er bekendt hermed. Hvis en person, der anholdes, ikke er bekendt med politiets forudgående efterforskning, sigtelse og anholdelsesbeslutning, regnes fristen som udgangspunkt først fra faktisk anholdelse[5]. Det samme gælder, hvis en person, der afhøres og sigtes af politiet,

---

[1] For så vidt angår spørgsmålet om, hvorvidt der foreligger en civil sag eller en straffesag i artikel 6's forstand, henvises til gennemgangen ovenfor.

[2] Se Moreira de Azevedo mod Portugal, dom af 23.10.90, § 74, Katte Klitsche de la Grange mod Italien, dom af 27.10.94, § 61.

[3] Se Eckle mod Tyskland, dom af 15.07.82, § 73, Reinhardt og Slimane-Kaïd mod Frankrig, dom af 31.03.98, § 93, Hozee mod Grækenland, dom af 22.05.98, § 43, Simeonovi mod Bulgarien, dom af 12.05.17, § 110.

[4] Se Simeonovi mod Bulgarien, dom af 12.05.17, § 111. Se Abboud mod Belgien, dom af 02.07.19, § 40, hvor fristen regnes fra første afhøring som sigtet.

[5] Se klagesag 14169/88, Zvi Goll mod Danmark, afgørelse af 07.03.90. Se Etcheveste og Bidart mod Frankrig, dom af 21.03.02, hvor klager var flygtet, hvorfor en anholdelsesbeslutning ikke kunne gennemføres, og hvor der gik ca. 4 år inden klager blev anholdt og gjort bekendt med sigtelsen. Se klagesag 57861/00, Absandze mod Georgien, afgørelse af 15.10.02, hvor der var truffet beslutning om anholdelse af klager, der var flygtet. Se Popov mod Bulgarien, dom af 01.12.05, § 82. Se dog Hamdi Sari mod Danmark og Tyrkiet, dom af 08.11.01, § 68, hvor klager, der var sigtet for mord, var flygtet til udlandet på det tidspunkt, hvor der blev afsagt anholdelsesbeslutning, og hvor klager mere end to år senere blev anholdt i

Frank Kjetbry  9785 9 939564
Downloaded fra Jurabibliotek.dk, 02/16/2025 01:56:10PM by landmadsen@law.au.dk
via Lasse Madsen

ikke har været bekendt med politiets forudgående efterforskning, der ikke har påvirket klagers situation[6]. Den relevante periode begynder ikke nødvendigvis at løbe, blot fordi politiet indleder efterforskning, og klager er bekendt hermed, hvis klager ikke er blevet sigtet, og hvis klagers situation ikke er blevet påvirket mærkbart[7]. Hvis en fysisk person driver virksomhed i selskabsform, og politiet indleder efterforskning i anledning af forhold, der vedrører selskabet, betyder det ikke nødvendigvis, at der også foreligger en straffesag i forhold til den fysiske person, idet det afgørende er, om den fysiske person er "anklaget"[8]. Hvis der indledes efterforskning i anledning af forhold vedrørende et selskab, og klager er tilknyttet selskabet og flere gange afhøres som vidne, uden formelt at sigtes, men hvor myndigheder ikke desto mindre har mistanke, kan klager være "anklaget", selv om klager først sigtes og tiltales flere år senere[9]. Hvis der indledes undersøgelseskommission om forhold, der vedrører klager, og der efterfølgende indledes straffesag vedrørende samme forhold, kan perioden anses for begyndt, da klager blev bekendt med kommissionens opgave og blev indkaldt som vidne[10]. Hvis sagen mod klager først er behandlet af administrative myndigheder, herunder toldmyndigheder, og efterfølgende overgår til politiet og anklagemyndighed, vil den forudgående administrative behandling som udgangspunkt ikke være omfattet, medmindre klagers situation har været påvirket mærkbart[11]. Det samme gælder sager, hvor skattemyndighederne undersøger klagers forhold, og efterfølgende anmoder anklagemyndigheden om at rejse tiltalte på grund af skatteunddragelse[12]. Hvis den administrative behandling af en skattesag,

---

udlandet, og hvor Domstolen regnede fristen fra anholdelsesbeslutningen, men den mellemliggende periode kunne ikke lægges Danmark til last.

[6] Se klagesag 38986/97, P.W. mod Danmark, afgørelse af 15.06.99. Se Martins og Garcia Alves mod Portugal, dom af 16.11.00, hvor perioden begynder på det tidspunkt, hvor klager afhøres af politiet, uanset at sagen på det tidspunkt havde været efterforsket i mere end et år. Se George-Laviniu Ghiurau mod Rumænien, dom af 16.06.20, § 50.

[7] Se klagesag 43196/98, Holm-Hansen mod Danmark, afgørelse af 09.11.00, hvor en kurator kontaktede politiet, idet kurator i forbindelse med bobehandlingen blev opmærksom på uregelmæssigheder. Politiet indledte efterforskning og foretog afhøringer m.v. Omkring 10 måneder senere blev klager afhørt af politiet og sigtet. Domstolen lagde til grund, at klager først på dette tidspunkt var "anklaget" i konventionens forstand. Se ligeledes Pedersen og Baadsgaard mod Danmark, dom af 17.12.04, § 44, hvor klagerne var bekendt med, at der var indgivet anmeldelse, men hvor politiet først sigtede klagerne 6 måneder senere, og hvor fristen begyndte at løbe fra sigtelsen for sigtelsen. Se klagesag 23523/02, Jan Wallin Karlsen mod Danmark, afgørelse af 01.02.05, om en "selskabstømmersag", hvor klageren gennem medierne var bekendt med, at skattemyndighederne havde indgivet anmeldelse til politiet mod to personer, som klageren havde købt selskaber af, men hvor perioden først begyndte, da klageren senere blev sigtet, anholdt og genstand for ransagning. Se dog Subinski mod Slovenien, dom af 18.01.07, §§ 65-68, hvor udgangspunktet synes at være, at hvis anklagemyndigheden beslutter, at der skal indledes efterforskning, fordi der er begrundet mistanke om, at en person har begået en strafbar handling, foreligger der en "anklage", så den relevante periode begynder at løbe. Se Hasslund mod Danmark, dom af 11.12.08, § 26, hvor klager i avis kunne læse, at han var genstand for efterforskning i en selskabstømmersag, men hvor fristen først begyndte at løbe, da klager blev sigtet og anholdt.

[8] Se Hozee mod Holland, dom af 22.05.98, § 45.

[9] Se Kaleja mod Letland, dom af 05.10.17, §§ 36-41.

[10] Se klagesag 28972/95, Erik Ninn-Hansen mod Danmark, afgørelse af 18.05.99, om undersøgelsesret og efterfølgende rigsretssag.

[11] Se Bertin-Mourot mod Frankrig, dom af 02.08.00, §§ 52-53.

[12] Se klagesag 43519/98, Andersen mod Danmark, afgørelse af 07.12.00, hvor Domstolen lagde til grund, at den relevante periode først begyndte på det tidspunkt, hvor politiet, efter at have modtaget en henvendelse fra skattemyndighederne, foretog afhøring af klager. Se klagesag 23012/02, Frederiksen mod Danmark, afgørelse af 16.09.04, hvor der gik ca. 11 måneder fra skattemyndighederne indgav anmeldelse, til politiet til politiet foretog ransagning og sigtede klageren, og hvor perioden begyndte på tidspunktet for ransagningen og sigtelsen. Se Moesgaard Petersen mod Danmark, dom af 11.12.08, §§ 27-29, om "sel-

Jcc Frank Kjelbro - 97557/059694
Downloaded from ... 02/18/2025 01:56:10PM by lindmadsen@law.au.dk
via Lasse Madsen

der er en straffesag i konventionens forstand, er en nødvendig forudsætning for tvistens indbringelse for domstole, vil perioden begynde at løbe allerede på det tidlige tidspunkt[13]. Hvis en stat indleder strafforfølgning mod en person, der tidligere har været strafforfulgt i en anden stat i anledning af samme forbrydelse, medregnes den forudgående strafforfølgning ikke, idet staten ikke er ansvarlig for den anden stats behandling af sagen[14]. Hvis der er tale om genoptagelse af en tidligere afsluttet straffesag, begynder den relevante periode på tidspunktet for genoptagelse[15]. Hvis der er tale om genoptagelse af en straffesag, der er endt med påtaleopgivelse, uden at der foreligger endelig afgørelse, idet beslutningen kan omgøres, begynder perioden allerede ved starten af den første periode, idet de to perioder vil blive behandlet samlet[16]. Hvis klager er indtrådt i straffesag mod tredjemand, typisk forurettede med krav om erstatning, vil perioden begynde at løbe fra det tidspunkt, hvor klager er indtrådt og har udnyttet sine rettigheder[17].

I straffesager *ender* perioden, når der foreligger endelig afgørelse. Det vil i almindelighed sige, når appelmuligheder er udtømt, og der foreligger en endelig afgørelse[18]. For så vidt angår dansk ret ender den relevante periode som udgangspunkt på det tidspunkt, hvor Procesbevillingsnævnet har meddelt afslag på ansøgning om tilladelse til anke. Hvis anklagemyndigheden opgiver påtale eller meddeler tiltalefrafald, uden at sagen har været indbragt for domstole, ender perioden på det tidspunkt[19]. Perioden ender således, når der foreligger endelig afgørelse af anklagen eller strafforfølgning afbrydes[20]. Hvis strafforfølgning opgives, ender perioden som udgangspunkt først, når anklagede gøres bekendt med afgørelsen, idet usikkerheden for klager derved ophører, men det kan tænkes, at anklagede, selv uden underretning, er tilstrækkelig informeret om, at vedkommende ikke længere er anklaget for en forbrydelse[21].

I praksis kan det i nogle gange give anledning til tvivl, om der er tale om *en periode eller flere adskilte perioder*. I sådanne tilfælde lægger Domstolen vægt på, om formålet med processerne har været det samme, og i bekræftende fald vil de som udgangspunkt

---

skabstømmersag", hvor perioden ikke begyndte, da skattemyndigheder meddelt, at klagers forhold ville blive undersøgt nærmere, at der på et senere tidspunkt ville blive taget stilling til, om der var begået strafbare forhold, og endvidere indgav anmeldelse til politiet. Perioden begyndte først, da politiet efterfølgende foretog ransagning hos klager.

[13] Se Vegotex International S.A. mod Belgien, dom af 03.11.22, §§ 153-154, om en tvist om for lidt betalt skat samt et skattetillæg på 10 % af restskatten (en straf i konventionens forstand), der blev behandlet administrative, inden indbringelse for domstole.

[14] Se klagesag 44829/98, Hendriks mod Holland, afgørelse af 05.03.02.

[15] Se Löffler mod Østrig, dom af 03.10.00.

[16] Se Stoianova og Nedelcu mod Rumænien, dom af 04.08.05, §§ 19-21, hvor der gik 1 år og 6 måneder fra en anklager opgav påtale til anklagemyndigheden genoptog sagen med den begrundelse, at den tidligere efterforskning var ufuldstændig.

[17] Se Petrella mod Italien, dom af 18.03.21, § 39.

[18] Se Kalashnikov mod Rusland, dom af 15.07.02, § 124, Schumacher mod Luxembourg, dom af 25.11.03, § 28.

[19] Se Maj mod Italien, dom af 19.02.91, §§ 13-15. Se Viezzer mod Italien, dom af 19.02.91, §§ 15-17. Se klagesag 59493/00, Withey mod Storbritannien, afgørelse af 26.08.03, med henvisning til praksis, hvor det samtidig lægges til grund, at sagen endte på det tidspunkt, hvor sagen blev henlagt, selv om der var mulighed for, at sagen, under visse betingelser, kunne genoptages. Se Schumacher mod Luxembourg, dom af 25.11.03, § 28, hvor sagen mod klageren aldrig var indbragt for domstolene, og hvor den relevante periode endte på det tidspunkt, hvor nationale myndigheder konstaterede, at et eventuelt strafansvar var forældet, og dermed bragte strafforfølgningen til ophør.

[20] Se Rokhlina mod Rusland, dom af 07.04.05, § 81, Nakhmanovich mod Rusland, dom af 02.03.06, §§ 88-89.

[21] Se klagesag 71591/17, Gröning mod Tyskland, afgørelse af 20.10.20, §§ 38-54.

791

blive opfattet som én samlet periode[22]. Hvis tiltalte dømmes, og der herefter verserer sag om straffens fastsættelse, ender perioden først på det tidspunkt, hvor der foreligger endelig afgørelse, herunder straffastsættelse[23]. På samme måde kan en straffesag, der ender med frifindelse, og en efterfølgende proces om erstatning af sagsomkostninger i visse tilfælde anses for en samlet periode[24]. Hvis klager dømmes, og der efterfølgende verserer en proces om konfiskation i anledning af den pådømte kriminalitet, vil perioden først ende, når der foreligger en endelig afgørelse i sagen om konfiskation[25].

Hvis klager *unddrager sig strafforfølgning*, kan klager som udgangspunkt ikke klage over den periode, hvor vedkommende har været på flugt[26]. Hvis straffesagen er uafsluttet på grund af flugt, ender perioden, når anklagede flygter[27]. Hvis en straffesag i en periode har ligget stille på grund af anklagedes unddragelse, men efterfølgende genoptages og afsluttes, må man se bort fra den del af sagsbehandlingstiden, hvor sagen har ligget stille på grund af flugten.

### 13.2.2. Civile sager

I civile sager *begynder* den relevante periode som hovedregel på det tidspunkt, hvor klager *indbringer tvisten for domstole*[28]. Hvis klager indleverer ufuldstændig stævning, der først må berigtiges eller suppleres, vil perioden som udgangspunkt først begynde at løbe på det tidspunkt, hvor stævningen kan danne grundlag for sagens behandling[29]. Hvis en person *indtræder i en verserende retssag*, begynder fristen for denne persons vedkommende først fra tidspunktet for indtrædelse[30]. Hvis en civil part indtræder i en straffesag og nedlægger krav om erstatning (adhæsionsproces), regnes fristen fra tidspunktet for indtrædelse, og det tidspunkt kan ligge forud for sagens behandling for domstole med den virkning, at også straffesagens efterforskning m.v. bliver relevant for vurdering af sagsbehandlingstiden[31]. Hvis en forening anlægger sag, men de individuelle sagsøgere først identificeres under sagens behandling, kan sidstnævnte først anses for ofre fra tidspunktet for indtrædelse[32]. Hvad enten der er tale om en civil sag eller en straffesag, kan den relevante periode først begynde at løbe fra det tidspunkt, medlems-

---

[22] Se Garyfallou AEBE mod Grækenland, dom af 24.09.97, § 40.

[23] Se Eckle mod Tyskland, dom af 15.07.82, § 77.

[24] Se Mamic mod Slovenien (nr. 2), dom af 27.07.06, §§ 26-31.

[25] Se Piper mod Storbritannien, dom af 21.04.15, §§ 53-54.

[26] Se Vayic mod Tyrkiet, dom af 20.06.06, § 44.

[27] Se Vayic mod Tyrkiet, dom af 20.06.06, § 44.

[28] Se Stamoulakatos mod Grækenland (nr. 2), dom af 26.11.97, § 32, Doustaly mod Frankrig, dom af 23.04.98, § 37.

[29] Se Dachar mod Frankrig, dom af 10.10.00.

[30] Se Dattel m.fl. mod Luxembourg, dom af 04.08.05, § 44, med henvisning til praksis og hvor Domstolen samtidig fremhævede, at hvis en person indtræder i en verserende sag i egenskab af arving, kan den pågældende klage over den samlede sagsbehandlingstid. Se Scordino mod Italien (nr. 1), dom af 29.03.06, § 220, hvor Domstolen fremhævede, at når en person indtræder på egne vegne, regnes fristen fra tidspunktet for indtræden, hvorimod der kan klages over den samlede sagsbehandlingstid, når personen tilkendegiver at ville fortsætte behandlingen af en retssag som arving. Se Olivieri m.fl. mod Italien, dom af 25.02.16, §§ 35-36.

[31] Se Codarcea mod Rumænien, dom af 02.06.09, § 78, Nicolae Virgiliu Tanase mod Rumænien, dom af 25.06.19, §§ 207-208.

[32] Se A. m.fl. mod Danmark, dom af 08.02.96, § 64. Se samtidig Christensen mod Danmark, dom af 22.01.09, § 79, hvor sag var anlagt mod en behandlende læge, og efterfølgende blev sagsøgte ændret til det amt, der var ansvarlig for hospitalet, og perioden blev regnet fra sagsanlægget mod lægen, da substansen i retssagen var uændret.

## Documents Referenced in Expert Report and Rebuttal Expert Report
## Prepared by Lasse Lund Madsen

1.    Announcement No. 2549 of December 17, 2021

2.    Administration of Justice Council's report 1194/1990

3.    Bill No. 13 (Feb. 23, 2005)

4.    GORM TOFTEGAARD NIELSEN & NICOLAJ SIVAN HOLST, THE COURSE OF THE CRIMINAL CASE (7th ed. 2020)

5.    Legislative History (Bill No. 96 (Nov. 26, 2003))

6.    JAN PEDERSEN, TAX & DUTY CRIMINAL LAW (4th ed. 2019)

7.    Attorney General's notice on cooperation with special authorities in specialized cases

8.    HANS GAMMELTOFT-HANSEN, CRIMINAL PROCEDURE I (1st ed. 1991)

9.    MICHAEL KISTRUP ET AL., THE CRIMINAL PROCESS (4th ed. 2023)

10.   STEPHAN HURWITZ, THE DANISH CRIMINAL PROCEDURE (3rd ed. 1959)

11.   BERNHARD GOMARD, STUDIES IN THE DANISH CRIMINAL PROCESS (1976)

12.   Bill No. 184 (Jan. 1992)

13.   LASSE LUND MADSEN & JENS RØN, CRIMINAL LAW II – SANCTIONS (5th ed. 2024)

14.   UfR 2016.1236 H

15.   Act no. 658 of June 11, 2024

16.   Bill No. 34 (Oct. 8, 1986)

17.   Law No. 385 on June 10, 1987

18.   Report on Professional Ethical Problems in Criminal Justice issued by a special committee under DJØF (1994)

19.   UfR 1982.1027 H

20.   UfR 1993B.44

21.   U 1998.1317 H

22.   Western High Court Decision (June 26, 2008) in case concerning ecstasy tablets

23.   Supreme Court Decision (January 9, 2009) in case concerning ecstasy tablets

24.   European Convention on Human Rights

# Executive Order 2021-12-17 no. 2549
## on the distribution of business between the public prosecutors

Pursuant to section 103(1) of the Criminal Code. 1 of the Administration of Justice Act, cf. Statutory Order no. 1835 of 15. September 2021, the following is determined:

## § 1. The distribution of business among the regional public prosecutors is as follows:

1) In the Eastern High Court district, the Public Prosecutor in Copenhagen handles the business of the Copenhagen Police, the Copenhagen Vestegns Police, the North Zealand Police, the Central and West Zealand Police, the South Zealand and Lolland-Falster Police and the Bornholm Police. The office of the Public Prosecutor in Copenhagen is in Copenhagen.

2) The Public Prosecutor in Viborg handles the business of the Funen Police and the Western High Court district in the Eastern High Court district the Central and Middle Ages, West Jutland Police, North Jutland Police, East Jutland Police, South-East Jutland Police and South and South Jutland Police. The office of the public prosecutor in Viborg is in Viborg.

§ 2. The State Prosecutor for Serious Crime is responsible for the whole country in the business relating to the National Unit for Serious Crime, cf. Section 110a of the Administration of Justice Act.

(2) If doubt arises as to whether a case falls within the remit of the State Prosecutor for Serious Crime, the matter is decided by the Director of Public Prosecutions.

(3) The office of the Public Prosecutor for Special Crimes is in Copenhagen.

§ 3. The executive order will enter into force on 1 October. January 2022. (2) Executive Order no. 1177 of 6. December 2012 on the distribution of business between the public prosecutors is repealed.

Copyright @ 2021 Karnov Group Denmark A/S

Handbag 2

# Report on the

# structure

Submitted by the Danish Council for the Administration of Justice



ex.2

THE LEGAL

LABORATORY

UNIVERSITY OF COPENHAGEN

REPORT NO. 1194

1990

Stk. 1, 2. Pkt. In cases subject to the Public Prosecutor's power to prosecute, the Chief of Police is obliged to submit the case to the Public Prosecutor after the investigation has been completed with a recommendation as to whether the prosecution should be dropped or charges brought, unless the case can be brought under Section 925 of the Administration of Justice Act as a confession case without the indictment being issued. In addition, in a number of cases, it is stipulated that the Chief of Police must submit a case that is subject to his prosecution authority to the Public Prosecutor before charges are brought or before it is decided whether an appeal of a district court judgment should be dispensed with (acquiescence). e.g. The Ministry of Justice's circular letter of 29. June 1984 on the referral to the Public Prosecutors, which is reproduced as Appendix 4.

The prosecution service is subordinate to the Minister of Justice and is under the supervision of the Minister of Justice with regard to the performance of the prosecution duties, cf. § 106.

Pursuant to section 712, the Minister of Justice has the right to issue general guidelines as well as to issue orders to the prosecution service with regard to specific cases, as the Minister of Justice may, in individual cases, order the prosecutor in question to commence or continue, refrain from or stop prosecution, to assert legal remedies, etc. According to long-standing practice, the provision is only used in exceptional cases to reverse the Director of Public Prosecutions' decision to prosecute or appeal, whereas the right for the Minister of Justice to reverse a decision not to prosecute has been used to a somewhat wider extent.

Pursuant to section 723(1) of the Administration of Justice Act, it is the responsibility of the District Attorney's Office. 2, the Director of Public Prosecutions may, in case of doubt, submit questions of non-prosecution to the Minister of Justice.

Furthermore, public prosecution pursuant to section 722(1) of the Criminal Code is not a public prosecution. 1, no. 1, and under certain provisions of the Criminal Code, conditional on the decision of the Minister of Justice, cf. see page 38.

1.3. The recourse system.

In accordance with the organisational structure of the public prosecutor's office, a number of decisions taken by the subordinate public prosecutor's office may be appealed to the superior public prosecutor's offices and to the Minister of Justice. This applies not least to the Chief of Police's decision not to prosecute, but also to decisions concerning, for example, the police's actions in connection with a criminal case.

Cases concerning compensation in connection with criminal prosecution are dealt with in accordance with the rules in Chapter 93a of the Administration of Justice Act. The question of whether a claim for compensation should be granted is, in principle, decided by the Ministry of Justice after prior consultation.

Proposal for an Act amending the Administration
of Justice Act

(Notification and formal requirements for the Minister of Justice's order to the Public Prosecutor's Office in criminal cases)

Tabled on 23. February 2005 by the Minister of Justice (Lene Espersen) § 729 c. 1, make it required, notification can be deferred.

§ 1. In the Administration of Justice Act, cf. Statutory Order no. 961 of 21. September 2004, as amended by Section 2 of Act No. 1436 of 22. December 2004, the following amendments are made:

1. In Paragraph 98(1) of the Constitution. 3 , inserted as new 2 - 4. Clause: "An order pursuant to this provision to commence or continue, refrain or cease prosecution must be in writing, and accompanied by a justification. In addition, the Speaker of the Danish Parliament shall: shall be notified of the order in writing. If the considerations mentioned in

In relation to access to documents pursuant to sections 729 a-d, the order is considered to be material that the police have provided for use in the case."

2. In Paragraph 99(1) of the Convention. 2 , and 101 pcs. 2 is replaced by "Section 98(1). 2 and 3." to: "§ 98 pcs. 2 and pcs. 3, 1. pt.".

§ 2. The Act enters into force on the day following the announcement in the Official Gazette.

§ 3. The Act does not apply to Greenland or the Faroe Islands.

(2) However, the Act may, by Royal Decree, in whole or in part: shall enter into force for the Faroe Islands, with the derogations provided for in the Faroese conditions dictate.

---

## Comments on the bill

## General comments

### 1. Introduction

#### 1.1 Purpose and background of the bill

The bill aims to introduce special notification and formal requirements in cases where the Minister of Justice pursuant to the Section 98(1) of the Administration of Justice Act. 3, the Public Prosecutor's Office orders the specific criminal cases about starting, continuing, omitting or stopping persecution. The aim is to ensure greater openness and transparency in the use of this power;

regardless of the fact that in practice the power is used extremely rarely. After The Government's view is that the proposed scheme will be able to contribute to prevent the formation of myths about, for example, the The reasons why an indictment has been brought or has not been brought.

In November 2003, members of the Socialist People's Party, The Social Liberal Party and the Red-Green Alliance have a proposal for Parliamentary resolution on the abolition of the powers of the Minister of Justice in specific criminal cases (B 46).

From the report of the Committee on Legal Affairs of 29. April 2004 over The motion for a resolution states that:

"The Committee notes that the Minister of Justice in his answer to questions 1 has stated, inter alia, that the Minister should always be extremely reluctant to interfere with the prosecution's decisions in individual cases. In the Minister's view, it must be such openness and transparency must be essential; if the Minister of Justice exercises the power that no myth-making about the reasons why an indictment has been brought or not has been raised. And later in the answer it appears that after The Ministry of Justice's view with a view to ensuring a greater openness and transparency would be relevant to consider a model inspired by the elements of the Norwegian and Dutch which concerns documentation requirements and a more direct parliamentary scrutiny. It may therefore be considered to lay down in of the Administration of Justice Act, that an order from the Minister of Justice to the public prosecutors relating to specific criminal cases must be in writing, and include a detailed justification. Such a written order will be included in the files of any criminal proceedings. It can also be considered to stipulate in the law that the Folketing must always be informed in writing,

If the Minister of Justice gives an order in a specific criminal case, e.g. by sending a copy of the Minister of Justice's decision.

The Committee calls on the Minister to at the next Folketing session after consultation of the organisations concerned, etc., to submit a bill to amend the Administration of Justice Act in accordance with the guidelines outlined In question no. 1."

The bill is a re-presentation in an unchanged form of the Bill no. L 146, tabled on 15 December. December 2004; Folketingstidende 2004-2005, 1. Appendix A, p. 4243 et seq., and which has lapsed as a result of elections to the Folketing.

#### 1.2 Main points of the bill

The bill lays down some special notification and formal requirements to be complied with if the Minister of Justice pursuant to the The provision in section 98(1) of the Administration of Justice Act. 3, will provide the prosecution service to begin, continue, refrain from or stop prosecution .

First, such orders from the Minister of Justice must be in writing and include a justification. The order and the reasons This will thus be included in the criminal case file. It proposal that the order will be subject to public access to the pursuant to sections 729 a to d of the Administration of Justice Act.

Secondly, according to the proposal, the Minister of Justice must inform The Speaker of the Folketing, if an order is given to begin, continue, refrain from or stop prosecution. This will have the greatest in cases where the injunction is to prosecute must be omitted or stopped so that the case is not processed by the courts. The Speaker of the Folketing will be able to pass on the notification to e.g. Committee on Legal Affairs. The proposal thus creates a more direct parliamentary control.

### 2. Applicable law

2.1. The tasks and organisation of the Danish Public Prosecutor's Office is described in Chapter 10 of the Administration of Justice Act (Sections 95-107). They, public prosecutors are the Director of Public Prosecutions, the Public Prosecutors and the police chiefs (the police director).

The Public Prosecutor's Office is subordinate to the Minister of Justice, who supervises with the public prosecutors, cf. Section 98(1) of the Administration of Justice Act. 1. The relationship between the Minister of Justice and the Public Prosecutor's Office is thus a relationship of subordination. Section 98 (1) of the Constitution of the Philippines 2, it is expressly provided that the Minister of Justice

may lay down rules on the conduct of public prosecutors; 3. 3.1 Norway of their duties, and in

paragraph 3.1 of the Constitution of Norway. The Norwegian Prosecution Service is hierarchically structured and consists of the Minister of Justice being able to issue orders to the public prosecutors regarding the police chiefs, the public prosecutors and the prosecutor general. The Director of Public Prosecutions the handling of specific cases, including to commence or continue, is subordinate to the King in Council of State (the Government).
refrain from or stop prosecutions.

The preparatory works do not contain further guidance on what is to be understood by "order". However, in accordance with the general linguistic understanding of the word, "order" must be understood as an official order to do something specific in a specific criminal case. 2.2. According to established practice, the Ministers of Justice are extremely reluctant to intervene in specific criminal cases dealt with by the Public Prosecutor's Office. In recent years, only one example is known of the Minister of Justice using the power in section 98(1) of the Administration of Justice Act. 3.

On 27. March 1995, the court decided to drop charges against three police assistants in connection with the police operation in Nørrebro on the night between 18. and on 19. May 1993. In the opinion of the Public Prosecutor, further prosecution could not be expected to lead to the persons in question being found guilty of punishment. This decision was reversed by the Director of Public Prosecutions. The Ministry of Justice informed the Danish Police Association, which appealed against the decision, that it considered the Director of Public Prosecutions' decision to be a 2. decision that was covered by the general rules on limitation of appeals. Furthermore, the admissibility of the case was refused pursuant to section 98(1) of the Administration of Justice Act. 3. However, the Parliamentary Ombudsman found that the Office of the Director of Public Prosecutions as an authority had to be regarded as disqualified, as it was the then Director of Public Prosecutions who, in connection with an investigation of the events of 18 December, had decided to dismiss the case. and 19. May 1993 had asked the Public Prosecutor to bring charges against the persons concerned.

On the basis of the Ombudsman's opinion, the Ministry of Justice found that there were such very special or extraordinary circumstances that could justify the Minister of Justice's use of the power in section 98(1) of the Criminal Code. 3. The Minister of Justice then decided to drop the prosecution of the three officers.

The Minister of Justice's ability to issue an order    Til

The prosecution service in specific criminal cases has also given rise to debate in connection with a few other cases. In the so-called Skalafjall case concerning the mortgage of ships, where the Faroese Court on 5. December 1995, the Director of Public Prosecutions decided on 15. December 1995 that the judgment should not be appealed. In this connection, the question arose in the Folketing as to whether the Minister of Justice should intervene in the case and reverse the Director of Public Prosecutions' decision with a view to reopening the criminal case. Later it emerged that the judge had participated in the

a trip to China with the defence of the defendants in the case, after which the Director of Public Prosecutions, on the basis of this information, on 19. January 1996 decided to appeal the judgment with a request for the judgment of the Faroese Court to be set aside due to the judge's disqualification.

Thus, in this case, there was a discussion as to whether
The Minister of Justice should have issued an order to the Director of Public Prosecutions, but the decision to appeal was made by the Director of Public Prosecutions on his own initiative.

2.3. If the Minister of Justice issues an order to the public prosecutors pursuant to section 98(1) of the Administration of Justice Act. 3, there are currently no special formal requirements, including that the order must be in writing. Furthermore, there is no requirement that the order must be reasoned.

Nor is there any requirement that the Minister of Justice must: inform the Folketing or the public in general that there is an issued an order to the prosecution service pursuant to section 98(1) of the Administration of Justice Act. 3.

The Norwegian Ministry of Justice has the overall management of the country's police with regard to administrative and police matters. The Ministry of Justice is also the superior authority in relation to the police in terms of administrative law. The competence of the Ministry of Justice is essentially vested in a directorate of the Ministry.

On the other hand, indictment and other criminal prosecution tasks do not fall within the competence or responsibility of the Norwegian Ministry of Justice. In this regard, the supreme head of the Norwegian Public Prosecutor's Office is instead the King in Council of State (the unified government). The Government has therefore issued instructions for    Og

the power of reversal vis-à-vis the Norwegian Director of Public Prosecutions. If the Norwegian Minister of Justice disagrees with the Director of Public Prosecutions' decision, the Minister cannot intervene himself, but must have the matter dealt with in the Council of State. If the government exercises powers    on

the prosecution service's area, it will be    Af

government minutes that the Storting can demand to be submitted. The Norwegian Government's power to instruct the Director of Public Prosecutions means, in principle, that the Government may decide that charges are to be brought in a specific case. However, there is a tradition that the government very rarely intervenes against decisions made by the Director of Public Prosecutions. On the other hand, the Government's power to issue general orders to the Public Prosecutor's Office is of great practical importance.

3.2 The
Netherlands In the Netherlands, too, the Minister of Justice has the power to intervene in specific criminal cases, but in practice this is only done in exceptional cases.

If the Dutch Minister of Justice wants to issue an order to the public prosecutor's office in a specific case, there are some special formal requirements. The Minister must therefore address the management of the Public Prosecutor's Office (which is a special collective body),

And the management must then have the opportunity to express its views to the minister. If the Minister does not agree with the views of the Public Prosecutor's Office, the Minister must explain his reasons to the management of the Public Prosecutor's Office. Any order to the prosecution service must then be given in writing and contain a reason.

If the order is for charges to be brought, the position of both the Minister and the Public Prosecutor's Office must be stated in the criminal case, unless this is contrary to the State's interests. The prosecutor explains the disagreeing views during the criminal proceedings.

If the order is to refrain from prosecution, the Minister must inform Parliament of this, unless this is contrary to the interests of the State.

4. Drafting of the bill In drafting
the bill, the Ministry of Justice has, in accordance with the report of the Committee on Legal Affairs    On motion for a resolution B 46, emphasis has been placed on ensuring greater openness and transparency, which can counteract myths about the reasons why an indictment has or has not been brought. In drafting the bill, the Ministry of Justice has thus assumed that it is crucial that the defence counsel in the specific criminal case and the Folketing are informed that the Minister of Justice has used its power to issue orders to the public prosecutor's office.

# PENALTY

# THE CASE

GANG

BY NICOLAJ SIVAN HOLST

DJØF PUBLISHING

Gorm Toftegaard Nielsen

# CRIMINAL PROCEEDINGS

### 7th Edition
### by Nicolaj Sivan Holst



Djøf Publishing House

2020

Gorm Toftegaard Nielsen -677198482F

8

According to section 110 f of the Danish Criminal Code, violations of Chapter 12 on crimes against the independence and security of the state are prosecuted only by order of the Minister of Justice. In J 1994.154, Jørn Vestergaard explains that a committee set up by the Minister of Justice in its report in 1949 found that this prosecution rule reduces the misgivings about using descriptions of offences that have a lower level of precision than usual. Conversely, based on a traditional criminal procedural approach, it can probably be argued that the misgivings about loose penal provisions increase when politicians make the decision.141 Their decisions cannot be expected to possess the same qualities of legal certainty as interpretations made by the usual officials of the prosecution service. With reservations about these special cases, in which Hurwitz accepts the competence of the Minister of Justice, he states in the above-mentioned Yearbook, p. 180, that it is "objectionable in principle that such interference should take place."

**The Folketing's interference**

Hurwitz clearly wants the system changed, especially so that the Minister of Justice cannot formlessly - as an ordinary superior authority - influence the prosecutor's decisions. GammeltoftHansen I, p. 159 et seq., is also critical of the powers of the Minister of Justice, but states that the system has hardly been abused in recent decades. Among other arguments, it is stated that "the possibility of asserting political and parliamentary responsibility against the Minister of Justice, if necessary, will probably be sufficient means of correction against the risk of political abuse". The belief that parliamentary responsibility protects against political interference in the prosecution's actions seems somewhat unrealistic in a society where the main problem is perhaps that the Folketing puts pressure on the Minister of Justice to get him to interfere in the prosecution's decisions. Thus, several members of the Folketing's business committee almost pressured the minister to ask the Director of Public Prosecutions to reconsider whether an acquittal in a well-known case in the Faroe Islands should be appealed after the Director of Public Prosecutions had decided not to appeal the decision. The Minister of Justice invited the Director of Public Prosecutions to consider the matter, and the latter announced that he had already

141. Cf. Gammeltoft-Hansen I, p. 158.

9

from [Retsplejeloven] ...

download ... landsholdbook.dk, 02/14/2025 05:14:12PM by landmodern-law.en.dk

LaneNilsen

decided to appeal the case. 142 Peter Garde discusses in U 1996B.363 et seq. 143 He too agrees with the desire for increased independence of the prosecution service. The reaction of the Director of Public Prosecutions in the Faroe Islands case shows the system's obvious weakness. The Director of Public Prosecutions knows that the Minister of Justice is the boss. The "real" civil servant does not only comply with the boss's explicit and publicly announced orders, but perhaps also according to the boss's wishes. In any case, in our system, there is a considerable risk of underhand messages from the minister to the prosecutor. That the problem exists is clear from the report on professional ethical problems in criminal justice submitted by a special group under Djøf's professional ethics working group. It is reported here how it has happened in several cases that a head of department in the Ministry of Justice has telephoned a prosecutor and first said that he would not interfere in the handling of specific cases, and then announced that the minister believed or considered it most appropriate for charges to be brought in a given case. If the case has then been sent by the prosecutor via the official chain of command via the Director of Public Prosecutions to the Ministry, the Minister has had no wishes for the processing of the case. According to the minutes, it has not been a matter of principle, J 1994.292 et seq. 1194.1990 on the structure of the prosecution service, p. 20, it is mentioned that the Minister of Justice has only in exceptional cases reversed the Director of Public Prosecutions' decisions to bring charges or to appeal, but to a somewhat greater extent has reversed decisions not to bring charges. In a report submitted by the Constitutional Commission of 1937, 1946, p. 49, a minority (the Liberal Party) proposes a thorough treatment of, among other things, the question of the independence of the prosecution service from the administration. As is well known, no provisions on this were included in the 1953 Constitution.

By Act no. 368 of 24.5.2005, a certain limitation was introduced in the Minister's power to interfere in specific criminal offences.

142. See the editorial in Information on 23.1.1996 and in Jyllands-Posten on 30.5.1996.
143. In the article 'Separate prosecution and politics' in Lov & Ret 2003, no. 4, pp. 10-12, Ole Espersen emphasizes that out of 10 other Baltic Sea countries, only Poland has a system similar to ours. In the Criminal Procedure p. 100, it is stated with reference to Gammeltoft-Hansen that there is no practical problem.

116

Sager. According to section 98(1) of the Constitution. 3, such an order must be in writing and justified, and the Speaker of the Folketing must be informed of the order. The Folketing has thus secured a certain control over such an intervention, but has - not surprisingly - found it difficult to see that the danger to a large extent is also the Folketing's desire to interfere in pending criminal cases.

Neither the Swedish nor the Norwegian Minister of Justice can interfere with themselves in the issue of indictment. In Norway, the government (the King in the Council of State) can make such decisions.144 The decision on the issue of indictment is a very important decision from the point of view of legal certainty. Formally, an indictment can be described simply as a referral of the case to the courts. In reality, however, it is obviously burdensome, just as it triggers a duty to appear in court for the accused. A duty to attend that in larger cases covers several months. The indictment is often more intrusive than various coercive measures that are specially regulated, usually with built-in judicial control. In English law, the charge is also tried by the courts. In Nordic law, there is no such review. It is probably worth noting that the preparatory work for the Administration of Justice Act contains a very detailed account of the question of judicial review with regard to whether there is an evidentiary basis for accepting the indictment in a number of European countries, cf. The 1875 motifs, p. 103 ff.

Norway, Sweden

According to section 254(2) of the proposal. 1, no. 2, the accused could request that the main hearing be refused if there were no reasonable grounds for suspicion against the accused in terms of evidence. In the 1899 motifs sp. 140 f this preliminary examination of the case was rejected because it would delay the proceedings and would only rarely be of benefit to the accused and could unfortunate risk prejudice the final determination of guilt.

Politicians have special protection against being prosecuted. It is well known that only the King and the Folketing can indict ministers before the Court of Impeachment for their conduct of office. This system has its special

Politicians' protection

144. See, for example, Director of Public Prosecutions Dorenfeldt: Påtalemyndigheten og de politisk myndigheten, Lov og Frihet, Festskrift til Johs. Andenæs, Oslo 1982, pp. 91-98 and Andenæs p. 38 ff. There is no corresponding statement from Danish Director of Public Prosecutions.

117

__ 02/4/2125014 :2P\ B. lundmadsenj.w.dk

The question of indictment

A pre-parliamentary form of government. It has been discussed in the constitutional law literature whether the public prosecutor's office before the ordinary courts may, in certain cases, indict a minister for simple crimes in the performance of his duties, cf. J.P. Christensen et al. Danish State Law p. 99 et seq. It has been mentioned above on p. 22 et seq. that the police are probably not always aware that it is not a given that the police have the competence to investigate these cases and decide whether charges should be brought. Article 57 of the Constitution protects members of the Folketing from being prosecuted without the consent of the Folketing. This protection applies to all infringements. Of course, the rule is not intended to ensure their right to a parallel criminal career, and can only be explained by a fear that the prosecution service could otherwise use its right to bring charges to harass or even fight certain politicians. The rule is understandable in a system where the Minister of Justice and thus the government have the indictment.

## The case is dismissed - Prosecution

Baseless charge

As mentioned above, on page 41, Sections 718a-718b were introduced in 2008 to ensure a speedy consideration of the question of whether charges should be brought, or whether the case should be dropped or charges dropped. 145 In some cases, investigations will show that the charge is unfounded, for example in the case of a criminal offence. The analysis of a blood sample from a driver shows that the blood alcohol level alone was 0.2. A possible charge of drunk driving is thus groundless, as the offence is only punishable under section 53 of the Road Traffic Act if the blood alcohol level exceeds 0.5. In these cases, the police chief abandons the case - it is dismissed. The Commissioner of Police always has the authority to make a decision in this case, cf. Section 721 (1) of the Constitution. 1, no. 1, cf. Stk. 2.

Status of the evidence

Even if the charge is not unfounded, it may well be that the evidence is not of such a nature that further prosecution can be is expected to lead to the accused being found guilty. In these cases, too, the case is abandoned - it is dismissed on the basis of the status of the evidence. It

145. Hammerum, pp. 103-175, contains a thorough review of waivers of prosecution and prosecution limitations.

118

12 Download fra karnovgroup.dk, 10/16/2023 09:44:14 PM by lindmasow@hotmail.dk
Dette Tidsskrift Sektion +9087:17084528
og Lars Madsen.

The decisive factor is not whether it is highly probable that the accused is guilty, but whether such strong evidence can be adduced that it is beyond reasonable doubt that he is guilty. This principle, which is essential to the criminal process, is often referred to as in dubio pro reo (in case of doubt for the accused). In the vast majority of cases, the Chief of Police is competent to dismiss a case for this reason, cf. Section 721 (1) of the Constitution. 1, no. 2, cf. Stk. 2, cf. § 719. However, a few crimes are exempt from the competence of the Chief of Police, so that only the Chief Public Prosecutor can drop prosecution. This applies first and foremost to appeals before the High Court, cf.

Section 719 (1) of the Constitution. 2.

The decision to abandon prosecution is in the sense of the Public Administration Act a decision made by an administrative authority, cf. Section 2(2) 1. The closed cases are thus covered by the Act. However, in several respects, the rules of the Public Administration Act have been deviated from in the Administration of Justice Act. Section 18 of the Public Administration Act contains rules on the parties' access to the documents in a criminal case decided by a special authority, e.g. by SKAT by means of a fine notice. For the criminal cases handled by the police and the prosecution service, the rules on the accused's access to documents can be found in the rpl. Section 729 d and for injured parties in

**Duty to state reasons and right of appeal**

Section 41 d. According to section 724, the accused, injured party and others with a reasonable interest in this must be notified of the abandonment of the charges. According to sections 22 and 25 of the Public Administration Act, the decision must be reasoned in relation to the injured party and contain guidance that it can be appealed, typically to the public prosecutor and with an indication of time limits. Here, a general appeal deadline is 4 weeks after the complainant has been informed of the decision, cf. § 102. In addition, in the interests of the former accused, section 724(1) of the Criminal Code of Criminal Procedure and the Criminal Code of Criminal Procedure for the District of Columbia and the Criminal Investigation Act of the Criminal Procedure Act of the 2, stipulates a time limit for reversal, according to which the former accused must have been notified of any reversal no later than 2 months after the decision. In U 2012.1788 H, the Supreme Court did not find that the time limit had begun to run when the police discontinued the investigation because the later defendants had neither been charged nor questioned with the rights of an accused. Nor had there been such a concrete suspicion directed at the persons concerned that they could be regarded as charged. The fact that the complainant may have special reasons for exceeding the deadline is important in

119

Cium Tongued Marleen- 9788771984828

The question of indictment

in relation to the 4-week deadline, but not in relation to the 2-month deadline. After 2 months, the decision stands. 146

Recent
case law

Legitimate
expectations

There are concerns. The protection of the accused has developed significantly since the 1960s. In U 1989.116 H, the police were looking for a motorist due to an insurance problem in connection with a traffic accident. It was stated that the person in question would not be charged. The person in question turned himself in and was questioned without charge, but later received an indictment regarding the murder. violation of the Road Traffic Act and even with a request for conditional disqualification of the right to drive. The Supreme Court placed decisive emphasis on the fact that the prosecution's handling of the case had given the person in question a legitimate expectation that precluded a later indictment. In U 1989.1105 H, a drunk driver had received a statement147 only with a conditional disqualification. The disqualification should have been unconditional, which was also stated in the enclosed written instructions. The defendant understandably wanted to maintain that only conditional disqualification could be claimed. The prosecution stated that there was a handling error on the part of the police and that this could not be binding. The Supreme Court ruled in favour of the prosecution, but this was done precisely with reference to the fact that the error was obvious to the defendant. Thus, the Supreme Court (now) attaches a lot of importance to how the case is seen from the defendant's point of view.

A complaint
option

The decision can only be appealed once. The injured party can therefore appeal against the decision of the Chief of Police, but not against the decision of the Public Prosecutor on the complaint. However, the Director of Public Prosecutions may, independently of complaints, on his own initiative, reverse the decisions of the Director of Police and the Public Prosecutor within the 2-month time limit.

146. See, however, Paragraph 724(1) of the Constitution. 2, last indent.

147. A statement is used under Paragraph 119a of the Road Traffic Act in some of the cases where both a fine and a disqualification from driving are to be imposed. The statement is a letter to the accused stating that the case can be decided without having to go to court if he pleads guilty and accepts the fine and disqualification. In popular terms, it is a fine with disqualification.

120

Even if the prosecutor finds that the case can be carried out in terms of evidence, the prosecution may, however, according to section 721(1). 1, no. 3, is abandoned if the implementation 'will entail difficulties, costs or processing times that are not proportionate to the importance of the case and the sentence that can be expected to be imposed'. The purpose of the provision is to prevent the prosecution service, especially in cases of complicated economic crimes, from feeling pressured into a costly court procedure, which at best can end in a disproportionately small sentence. The provision is likely to be used to a limited extent, as the prosecution service probably also in these cases to a large extent uses the general provision described above on the position of the evidence.

**Resource-based provision**

## Charges dropped

If the prosecutor considers that there is evidentiary coverage for the charge, he will generally have to bring charges. In theory, the term legality principle (criminal procedure and not criminal and administrative law) is often used to refer to a system in which the prosecution service must bring charges if there is evidence to cover, and the principle of opportunity to refer to the system in which the prosecution service does not have such a duty but can consider whether it is opportune to bring charges or not to do so. The fact that charges are dropped, even though there is evidentiary coverage, is described as dropping the charges as opposed to dropping the charges. Dropping of charges is, like dropping charges, an administrative decision, and the rule on notification mentioned above, p. 119, also applies to dropping charges. However, the injured party and others with a reasonable interest cannot complain about a dismissal of charges. Only the accused can do that. This is because a dismissal of charges - as opposed to a relinquishment of the charge - is a finding of guilt. Normally, it is stated that the Danish system is based on the principle of opportunity. Section 722(1) 2, contains a very broadly worded possibility of dropping charges "if there are special mitigating circumstances or other special circumstances and prosecution cannot be considered necessary in the public interest". On the basis of this rule, it can be argued that the prosecution is not subject to a principle of legality, but to bring charges according to a principle of opportunity. There is no point in discussing which

**Duty to Travel indictment**

121

Gemi Poured Nielsen - 9788771984828
nieud Ica Law Library. Dk. fr                 121     by  Other
via Lasse Madsen

15

Proposal for an

# Act on Legal Security in the Administration's Use of Coercive Measures and Disclosure Obligations

Tabled on 26. November 2003 by the Minister of Justice (Lene 3) Espersen)

## Chapter 1

Scope of the Act

§ 1. Chapters 2 and 3 of the Act apply to coercive measures, carried out by the public administration outside criminal procedure, consisting of:

1)  house search, or
2)  examination or seizure of letters and other papers.

(2) Chapter 3 of the Act also applies to coercive measures, by the public administration outside the criminal procedure, which consists of

1)  examination of other sites;
2)  the search or seizure of other objects;
3)  breach of the confidentiality of the message, or
4)  inspection or other examination of persons.

(3) Chapter 4 of the Act shall apply in cases where: legislation, etc. obligation to provide information to the public administration.

(4) The Minister concerned may, after negotiation with the the Minister of Justice shall lay down rules stating that the Act shall, in whole or in part, apply to specified companies, institutions, associations, etc., which cannot be attributed to the general government, to the extent that: the powers conferred on them by or by law; to use coercive measures or information obligations as mentioned in the Stk. 1-3.

(5) Subsections (1) and (2) do not apply to coercive measures carried out after obtained a court order.

## Chapter 2

Implementation of coercive measures

Principle of proportionality

§ 2. Coercive measures may only be used if less intrusive measures are not sufficient and if the intervention is in line with the reasonable proportion to the purpose of the intervention.

The procedure

§ 3. In the case of decisions on the implementation of coercive measures, Sections 3-10, 12-18 and 22-26 of the Public Administration Act apply.

§ 4. In cases concerning the implementation of coercive measures, an authority which orally receives information concerning the facts of the case of relevance to the decision to implement coercive measures, or which is otherwise aware of such information, shall make a note of the content of the information. However, this does not apply if the information is otherwise stated in the case documents.

§ 5. Prior to the implementation of a decision to implement of a coercive measure, the party must be informed of the decision.

(2) The notification must be made in writing no later than 14 days before the coercive measure is carried out and must contain information on the

1)  time and place of the procedure,
2)  the right to be represented or assisted by others
     Section 8 of the Public Administration Act,

The main purpose of the intervention and
4)   cf. the factual and legal basis for the intervention, cf. Section 24 of the Public Administration Act

(3) The party may object to the decision within a time limit set by the authority. Maintained decision, this must be justified in writing to the party, cf. cf. Section 24 of the Public Administration Act. The Notice on the Retention of The decision must be given before or at the latest at the same time as the implementation of the coercive measure.

(4) The rules in subsection 1-3 may be deviated from in whole or in part if:

1)   purpose of the coercive measure would: shall be forfeited if prior notification should be given,
2)   consideration for the party itself speaks in favour of it, or the party's rights should give way to decisive considerations for other private individuals or public interest;
3)   it is necessary for the sake of the kingdom's foreign policy or economic interests, including relations with the EU,
4)   immediate implementation of the coercive measure after the specific nature of the relationship is required, or prior notification proves impossible or is Disproportionately difficult..

(5) If a decision to implement coercive measures is carried out without prior notification, cf. Stk. 4, shall the decision is communicated at the same time as the implementation of the intervention; party in writing and contain the provisions of subsection (1) of the 2, no. 1-4, mentioned information.

The decision must also state the reasons for this The derogation from subsection 1-3, cf. cf. Section 24 of the Public Administration Act.

(6). The decision in paragraph 5 may be communicated orally if the to the party itself or to other private or public interests argue that a coercive measure should be carried out before the The authority has had the opportunity to prepare a written justification. A person who has been notified of the decision orally may: subsequently demand that the decision be notified in writing. An application to this effect must be made to the authority before 14 days after the coercive intervention has been carried out. The authority shall: reply to the application as soon as possible. If the request has not been answered within 14 days of receipt of the application by the authority; the authority must inform the party of the reason for this and of when the request can be expected to be answered.

§ 6. Coercive measures carried out outside the official premises of the authorities may only be carried out on presentation of identification. (2) The provision in subsection. Paragraph 1 may exceptionally be departed from in whole or in part if there are overriding reasons for doing so.

§ 7. The coercive measure must be carried out as gently as the circumstances allow, including, as far as possible, without causing damage or inconvenience, and without the intervention giving rise to unnecessary attention due to the time of the action or the manner in which it is carried out.

§ 8. If, during the implementation of a coercive measure, the authority considers that the person against whom the interference is directed has infringed the rules of the legislation, etc., the authority must prepare a report on the execution of the intervention. The report must be handed over as soon as possible to the person in question

(2) In cases other than those referred to in paragraph 1. 1 mentioned above, the authority shall prepare and provide a report on the performance of the procedure if: a party requests it. An application to this effect must be submitted to the Authority within 14 days of the

The coercive intervention has been carried out. The authority must respond to the request as soon as possible. If the application is not answered within 14 days after the authority has received the application, the

the authority shall inform the party of the reason for this and of when the application can be expected to be answered.

## Chapter 3

Relationship with criminal procedure in the implementation of coercive measures

§ 9. If an individual or legal person is reasonably suspected of having committed a criminal offence, coercive measures against the suspect in order to obtain information about the fact(s) to which the suspicion relates may only be carried out in accordance with the rules of the Code of Civil Procedure on Criminal Procedure.

(2) The rule in subsection 1 does not apply if the coercive measure is carried out solely for the purpose of obtaining information for the purpose of dealing with issues other than the determination of punishment. (3) The rules in subsection 1-2 applies correspondingly if a coercive measure is directed against someone other than the suspect in the case. (4) The suspect may give consent to a derogation from subsection (1) of the Criminal Code. 1 and 3. The consent must be in writing and must be given on a voluntary, specific and informed basis. Consent can be revoked at any time. If the suspect gives consent to the derogation from subsection (1) of the Criminal Code, the Tribunal shall be entitled to the 1 and 3, the rules in Sections 2-8 shall apply correspondingly to the provisions of Section 1(1). 1, mentioned coercive measures.

## Chapter 4

The right not to incriminate oneself, etc.

§ 10. If there is a concrete suspicion that an individual or legal person has committed an offence that may result in a penalty, provisions in the legislation, etc. apply. on the duty to provide information to the authority does not apply in relation to the suspect, unless it can be excluded that the information sought may be of importance to the assessment of the suspected offence.

(2) In relation to others than the suspect, provisions of the legislation, etc. apply. on the obligation to provide information to the extent that the information is only sought to be obtained for the purpose of dealing with issues other than

the determination of the penalty.

(3) An authority must advise the suspect that he or she is not obliged to provide information that may be of importance to the assessment of the suspected offence. If the suspect gives consent to provide information, the rules in section 9(1) apply. 4, 2. and 3. Paragraph ., similar application. (4) The suspect may consent to the use of a duty to provide information to others in order to obtain information for the purpose of criminal proceedings against the suspect. The rules in section 9(1) 4, 2. and 3. paragraph shall apply mutatis mutandis.

## Chapter 5

Repeal, etc. of certain control provisions in the legislation

§ 11. Section 28 of Act no. 319 of 14. May 1997 on debt collection, as amended most recently by Act no. 467 of 7. June 2001, is repealed.

§ 12. In the Act on the Use of Denmark's Subsoil, cf. Statutory Order no. 526 of 11. June 2002, the following amendment is made:

  1. Section 27(1) 1, is replaced by the following:

'Where there is an imminent risk of inappropriate use or exploitation of the subsoil, the employees of the supervisory authority shall, without a court order, access to all parts of the undertaking.'

§ 13. In Act no. 364 of 18. May 1994 on product safety, as amended by Act no. 458 of 10. June 2003, the following amendment is made:

  1. Section 22(1) 1, 2. paragraph is replaced by the following:

'Where there is a suspected risk that a product may endanger the health and safety of consumers, the supervisory authority shall, without a court order, without proper identification, have access to manufacturing, sales and storage premises, etc. and means of transport belonging to persons covered by

Paragraphs 4 and 5 of that law.'

§ 14. In Act no. 314 of 5. May 2000, as amended by Act no. 458 by 10 June 2003 on the authorisation of electrical installers, the following amendment is made:

  1. Section 14(1) 1, is replaced by the following:

'The Danish Safety Technology Authority shall, upon prior notification, without a court order and on presentation of proper identification, have access to public or private property for the purpose of examining or having electrical installation work carried out by an electrician examined if there is a suspected risk that the electrical installation poses a danger to life or fire, or for the purpose of investigating or having investigated whether an undertaking has established and maintains a safety quality management system in the in accordance with the requirements thereof.'

§ 15. In Act no. 251 of 6. May 1993 on Electrical High-Current Installations and Electrical Equipment, as amended most recently by Act No. 458 of 10. June 2003, the following amendment is made:

  1. Section 24(1) 5, is repealed

§ 16. In the Act on Hunting and Game Management, cf. Statutory Order no. 114 of 28. January 1997, the following amendment is made:

  1. In Paragraph 50, the following subsection is inserted: 2:

'(2) Paragraph 1 shall not apply to buildings or parts of buildings used exclusively for private habitation.'

§ 17. In the Act on Watercourses, cf. Statutory Order no. 632 of 23. June 2001, as amended most recently by Act no. 391 of 28. May 2003, the following amendments shall be made:

  1. In Paragraph 61, the following is inserted after subsection: 1 as a new piece:

'(2) Paragraph 1 shall not apply to buildings or parts of buildings used exclusively for private residence.' Subsections (2) to (4) shall hereafter become subsections. 3-5.

§ 18. In Act no. 180 of 8. May 1985 on ochre, as amended by Act no. 466 of 7. June 2001, the following amendments shall be made:

  1. In section 10, after subsection: 1 as a new piece:

'(2) Paragraph 1 shall not apply to buildings or parts of buildings used exclusively for private residence.' Paragraph 2 shall hereafter become subparagraph. 3

§ 19. In the Act on Mineral Resources, cf. Statutory Order no. 569 of 30. June 1997, as amended most recently by Act No. 1055 of 17. December 2002, the following amendments are made :

  1. In section 32, the following is inserted after subsection: 1 as a new piece:

'(2) Subsection (1) does not apply to buildings or parts of buildings used exclusively for private residence. Correspondingly, subsection (1) shall not apply to rooms on ships which are used exclusively for private habitation.' Subsections (2) to (3) shall hereafter become subsections. 3-4.

§ 20. In Act no. 111 of 12. March 1988 on the protection of the outer boils in the Tønder Marsh, as amended by Act no. 392 of 28. May 2003, the following amendments shall be made:

  1. In Paragraph 49, the following is inserted after subsection: 1 as a new piece:

Copyright © 2021 Karnov Group Denmark A/S

provision in the legislation on limitations on administrative information about the fact(s) that the suspicion covers, if the authorities' right to exercise powers of control in cases where there is a concrete suspicion of a criminal offence. This applies regardless of whether it is a case of coercive measures directed against the suspect or against others.

The majority states as an overall argument that the consideration of not circumventing the rules of criminal procedure in the Administration of Justice Act - which contains rules for access to searches, seizures, etc. in connection with the investigation of criminal offences - implies that there should be restrictions on the possibilities for public authorities to carry out coercive measures outside the criminal procedure if there is a concrete suspicion that a person has committed a criminal offence.

The majority of the Commission considers that the powers of control of the administrative authorities should be limited from the moment when a person is 'reasonably suspected of having committed a criminal offence'. In this connection, the majority of the Commission has emphasised that this 'cut-off date' is more important than, for example, the European Union. The time when an authority submits a police report to the police takes into account the legal security of citizens. Thus, in the opinion of the[n] majority, an arrangement under which an administrative authority up to the time of filing a police report would be able to carry out coercive measures on the basis of the administrative control provisions without any special restrictions would, among other things, be associated with a risk of circumvention, as an authority would be able to deliberately postpone the date of filing the report. According to the majority, the fact that it must be a case of "a person with reasonable grounds being suspected of having committed a criminal offence" means that the suspicion must be based on the necessary concrete, objective information in the specific case. In this connection, an authority that suspects that 'something is wrong' may be entitled, without special restrictions, to carry out or continue an inspection visit, etc., until certain specific information has been obtained as to the nature and extent of the circumstance(s) to which the suspicion relates.

The majority of the Commission has considered whether the specific restrictions in the right to carry out inspections, etc. In cases where a person is reasonably suspected of having committed a criminal offence, it should be designed in such a way that a coercive measure cannot be carried out in such cases, unless it can be excluded that i nformation of importance to the assessment of the presumed offence will be obtained.

However, the majority considers that such a provision would lead to a legal situation that does not appear to be acceptable, since, for example, the United States would not be able to provide a legal position. the occupational health and safety, environmental and food authorities in cases where a citizen or a company is suspected of a criminal offence, would be prevented from carrying out inspections in order to issue an injunction etc. in connection with the same circumstance. For example. to stop dangerous work or pollution in progress or, for example, to prevent the use of the Marine Corps. to avoid the sale of unhealthy food. Against this background, the majority of the Commission proposes instead a provision according to which, in cases where a person is reasonably suspected of having committed a criminal offence in accordance with the above, an administrative authority will be entitled to take coercive measures outside the scope of criminal procedure, to the extent that this is done with a view to obtaining information for the purpose of dealing with issues other than the determination of a penalty. This limitation means that in the cases mentioned, the authorities will not be able to carry out an inspection visit, etc., if the purpose of this would be to obtain information for use in criminal proceedings. On the other hand, even in cases where a person is reasonably suspected of having committed a criminal offence, the authorities may carry out or continue a coercive measure and thus bring about the

The purpose is to provide the information for use in other than determining the penalty. The proposed provision must apply regardless of whether it is a question of coercive measures directed against the suspect or against others.

In addition, the majority of the Commission proposes a provision that the suspect may consent to a derogation from the proposed restrictions. In this connection, the majority notes that the proposed restrictions are based on the consideration of the suspect's legal certainty, so that the suspect should be able to lift the said restrictions with his consent.

Reference is made to pages 145 et seq. of the report.

As mentioned under item. Paragraph 1 cannot be supported by one member of the Commission in its entirety. Regarding the majority's proposal for rules on the relationship to criminal procedure in connection with the implementation of coercive measures, the member states that the proposed rules are too far-reaching and will limit and complicate the authorities' ability to carry out their supervisory and control tasks compared to today. In the member's opinion, the consequences may be that the Working Environment Authority will to a large extent be forced to involve the police and prosecution authorities at a much earlier stage of the case, also in small cases that today can often be handled administratively. In this connection, the member states that in the worst case, this may result in cases not being sufficiently informed or being abandoned for resource reasons.

### 3.6.3. The Ministry of Justice's considerations

The Ministry of Justice agrees with the majority of the Commission that the consideration of not circumventing the rules of criminal procedure means that special restrictions should apply to the authorities' possibilities to carry out coercive measures outside the scope of criminal procedure if there is a concrete suspicion that a person has committed a criminal offence. If there is such a suspicion, a coercive measure should, as a general rule, be carried out in accordance with the rules of the Administration of Justice Act on access to searches, seizures, etc. In connection with the investigation of criminal offences The Ministry of Justice can also agree with the majority's choice of 'cut-off time'. For the reasons stated by the majority of the Commission, it is therefore also the opinion of the Ministry of Justice that the administrative authorities' powers to carry out coercive measures must be limited from the time when a person is reasonably suspected of having committed a criminal offence. Reference is made to section 9(1) of the bill. 1. In accordance with the view of the majority of the Commission, that suspicion must be based on the concrete, objective evidence necessary in the case in question. The Ministry of Justice thus agrees that it may be justified to carry out or continue an inspection visit, etc., until certain specific information has been obtained about the nature and extent of the circumstance(s) to which the suspicion relates. In this connection, it is assumed that it is generally the supervisory authority in question, etc., that must assess whether there are reasonable grounds for suspecting a criminal offence. Questions about this should therefore not normally be left to the police's decision.

Furthermore, the Ministry of Justice agrees with the majority of the Commission that it would lead to an unacceptable legal situation if an administrative authority in cases where there is the above-mentioned suspicion of a criminal offence, were to be prevented from performing a number of tasks of significant or decisive importance for the administration and control of legislation, etc. in the area concerned.

The Ministry of Justice can therefore agree with the majority's proposal that violation of the legislation in the individual administrative area should be violated. an administrative authority in cases where a person with reasonable grounds suspected of having committed a criminal offence, will be entitled to carry out a coercive measure to the extent that it is to provide information for the use of the treatment of issues other than the determination of penalties.

Supervisory authorities, etc. will thus - regardless of the fact that a person with reasonable grounds are suspected of having committed a criminal offence - be able to carry out a coercive measure if it is done solely for the purpose of to provide information for the treatment of other issues other than the determination of punishment. Reference is made to the bill's Section 9(2).

The above implies that an authority - even if there is reasonable grounds for suspecting a criminal offence - can implement or continue an inspection or other coercive measure and thus provide information relating to the possible criminal offence; if the sole purpose is to provide the information for the use of e.g. questions about issuing an injunction or prohibition pursuant to legislation in each area, issues of revocation of a permit, etc., or other issues that are not concerns the determination of the penalty.

If the purpose is not to provide information for the use of a criminal proceedings, administrative authorities may thus with the performance of their supervisory and control tasks, etc. make inspections and other coercive measures, regardless of the fact that this information that will also have an impact on the consideration of any questions relating to the determination of penalties; including for the authority's assessment of whether, for example. by filing a police report is the basis for further criminal law prosecution of the case.

Against this background, the Ministry of Justice is of the opinion that the bill will result in supervisory authorities, etc. continued to a very large extent carry out inspections and other coercive measures, even if there are there are reasonable grounds to suspect a criminal offence. They Various authorities will thus be able to comply with the legislation on the individual area in general have the task of managing a a number of tasks that do not relate to the determination of penalties, and As stated, the bill will not prevent the implementation of the coercive measures, the sole purpose of which is to resolve such control and supervisory tasks, etc.

Furthermore, the bill only concerns restrictions on access to to carry out coercive measures. With the bill, there is nothing prevents the supervisory authority concerned, etc. Makes other procedural steps aimed at dealing with issues on the determination of the penalty. Accordingly, the bill does not propose any change in the practice that exist in the individual areas with regard to the division of labour; between supervisory authorities, etc. and the police. Also in cases where The bill will prevent a supervisory authority from carrying out its own a coercive measure - and where a coercive measure must therefore be be carried out by the police (often with the approval of the court) in accordance with the rules of the Administration of Justice Act - it is thus assumed that no displacement of the rest of the division of labour between the supervisory authorities, etc. and the police.

The fact that questions relating to the implementation of coercive measures in certain should therefore not be left to the police in general, change the extent to which the different supervisory authorities, etc. - according to the practice that applies to the Individual areas - eg. investigate and prepare a case before the case may be handed over to the police for a decision whether charges should be brought. It should be noted in this connection that it will often be supervisory authorities that possess the special professional expertise needed in the handling of criminal cases concerning

For this reason, it is also assumed that in cases where a police officer is in possession of a Coercive measures under the bill can only be carried out according to the rules of the Administration of Justice Act, will normally have to be accompanied by representatives of the for the relevant supervisory authority, etc. Furthermore, the case in cases where the coercive measure has been carried out - to the extent that there is practice for this in the individual administrative area - could be returned to the relevant control authority, etc. with a view to further case processing also of matters relating to any subsequent imposition of penalty.

The Ministry of Justice agrees with the majority of the Commission that proposed restrictions on access to Coercive measures should apply, whether they are coercive measures directed at the suspect or at others. The Ministry of Justice has In this connection, the majority of the Commission has emphasised that the consideration of not circumventing the rules of the Administration of Justice Act on criminal procedure - which contains provisions on searches, etc. both to suspects and to non-suspects - advocates that limit the ability of managing administrative take coercive measures not only in relation to a suspect, but also in relation to non-suspects who are involved in the case. Reference is made to section 9(1) of the bill. 3

Furthermore, the Ministry of Justice agrees with the majority's proposal: that the suspect must be able to consent to the lifting of the proposed restrictions. Reference is made to section 9(1) of the bill. 4.

As stated above under item. 3.1.2.2 The Ministry of Justice finds that: the proposed rules on the relationship with criminal procedure in the the implementation of coercive measures should not only cover the types of coercive measures covered by Article 72 of the Constitution. The Ministry of Justice therefore considers that the mentioned rules should also apply for coercive measures consisting of the examination of other sites; and objects, seizure of other objects or inspections and other examination of persons.

The proposed provisions may in certain cases entail: that an authority which, in connection with an inspection visit, etc. sheep suspicion of a criminal offence, will be prevented from using the a possible legal basis for the immediate seizure of relevant means of evidence (e.g. accounting documents, other documents etc.). In such cases, the authority must seek to obtain the person's consent to - regardless of the suspicion of a criminal offence - to seize the items in question, cf. The provision of Section 9(1) of the Bill. 3. If such consent cannot be obtained, it is assumed that the authority - if it considers that the to immediately call the police for implementation seizure under the rules of criminal procedure in Administration of Justice Act - will have the right to remain on site to ensure any evidence until the police arrive. Among other things, because it suspects may consent to the relevant authority in seized evidence, etc., it must be expected that only in relatively few cases - where the suspicion relates to more serious offences - may be grounds for calling the police.

Special information about checks by maritime authorities following maritime legislation is noted that in practice it will often not be possible to police may take coercive measures in accordance with the rules of the Administration of Justice Act on ships that, for example, are not in the United States, at sea, or in Danish ships in foreign ports. In addition, it is may be particularly intrusive in the case of the ship, if its further voyage is to await the arrival of the police to the ship and examines it. The Minister for Economic Affairs and Business Affairs will therefore, after discussion with the Minister of Justice, consider whether there is a may be grounds for proposing amendments to maritime legislation, which allows maritime authorities to in certain cases

carry out coercive measures on ships, although the conditions also
Section 9 of the Bill is not met. .

In connection with this, it should be noted that the Marine Environment Act provides a legal basis for:
that the Minister of Defence and the Minister of the Environment or the person they authorize
In addition, in the event of an oil spill, coercive measures may be taken after the
The rules of the Administration of Justice Act on ships and platforms. The Minister of the Environment will

After discussion with the Minister of Justice, consider whether there may be
to propose amendments to the Marine Environment Act that give
authorities also in certain other cases to carry out
coercive measures on ships, etc., even though the conditions in the
Section 9 is not met.

Similarly, special circumstances may apply to

fisheries authorities. The Minister for Food, Agriculture and Fisheries will therefore, after discussion,
with the Minister of Justice consider whether there may be reason to
propose amendments to fisheries legislation that provide for fisheries control;
the possibility of carrying out coercive measures on ships in certain cases,
even if the conditions in section 9 of the bill are not met.

As mentioned under item. 1 and 3.6.2 above, a member of the
The Commission did not agree with the majority's proposal in its entirety. In the
connection, the member particularly emphasizes that the proposed rules
goes too far and will limit and
make it difficult for the authorities to carry out their
supervisory and control tasks.

the Ministry of Justice must in this connection refer to what is stated
appears, among other things, that the Ministry of Justice in the
line with the opinion of the majority of the Commission
considers that specific restrictions should apply to access to
carry out inspections, etc. outside criminal proceedings if there is
there are reasonable grounds to suspect a criminal offence.
The provisions of the bill do not imply that supervisory authorities
etc. are prevented from carrying out inspections if the sole purpose of the
is to carry out supervisory and control tasks in the area in question.
In addition, as mentioned, it is assumed that the proposed rules - which
is in line with current rules in a number of areas -
may result in a shift in the rest of the case processing from the
individual supervisory authorities to the police.

## 4. Duty of disclosure and the right not to incriminate oneself
Selv

### 4.1. Applicable law
The principle of self-incrimination implies that a person who is
accused of a criminal offence, has the right not to comment on
the alleged crime and not to be coerced into complicity
to solve the alleged criminal offence.        .

The principle is protected in the European
Article 6 of the Human Rights Convention, which precludes, among other things,
that administrative authorities apply sanctioned
information obligations to a person 'accused' in order to make the citizen himself
disclose the alleged 'crime'. This applies whether there is
giving evidence or about the person's
Obtaining documents, etc.

The concept of 'indictment' in Article 6 is an autonomous
convention concept. European Court of Human Rights
has defined 'accusation' as an official statement in its practice;
from the competent authority to a person who contains
an accusation that the person concerned has committed a criminal offence
relationships.

In that context, the Court, in interpreting the expression
'crime' has placed particular emphasis on whether the provisions laid down in the
constitutes the basis for the prosecution, in the legal system in question
are considered to be of a disciplinary nature;
administrative or other non-criminal nature. A

take into account the nature of the offence in question, in particular:
whether there are infringements of regulations which are subject to certain
groups of persons, or violations of general standards applicable to
for everyone. Finally, emphasis is placed on the character and intensity
of the sanction that may be imposed. The actual                    ;
A sanction is therefore not in itself decisive. The Court has often
indicated that the latter two criteria are given the greatest emphasis.

It has not been clarified in convention practice whether the prohibition against
self-incrimination in Article 6 precludes administrative
authorities continue to deal with a civil case, for example in the case of a criminal offence. with
order to issue an injunction or injunction, and in connection with
hereby using the duty of disclosure under threat of punishment, etc.,
whether criminal proceedings have been initiated in connection with the same
conditions, e.g. for carrying on an activity without compliance with the
relevant legislation. To the extent that the information relates to the
the circumstances that have given rise to criminal prosecution are
reasonable to assume that the 'accused' may rely on the
the prohibition of self-incrimination in Article 6.

On the other hand, the prohibition of self-incrimination laid down in Article 6 cannot
is likely to prevent administrative authorities from
requires a person to provide information that could incriminate
other people.

It is not clarified in convention practice whether and to what extent
legal persons may invoke the right to remain silent and above. Here it
It follows from the case-law of the Court of Justice that legal persons are at least in a
may invoke Article 6 to a certain extent in other contexts;
including the so-called presumption of innocence, the right to a trial
within a reasonable time and the right of access to a court.

In those circumstances, it cannot be ruled out that the Court will apply
that legal persons may also rely on the right not to
pronunciation and the prohibition of self-incrimination. It can be in the
It should be added that the Court of Justice, in judgment of 16 December, ruled that the Court of Justice of the European Communities had decided to give a new lease of life to the October
2002
(C-238/99P and Others, Limburgse Vinyl Maatschappij and Others) In the
case in question allows a self-incrimination prohibition to apply in relation to
to legal persons; Paragraph 279 et seq. of that judgment.

In a number of cases, the principle of self-incrimination has been
is dealt with by the Danish courts and is to a certain extent enshrined in Danish
law. Thus, the rules of the Code of Civil Procedure on criminal procedure
laid down rules stating that an accused or accused person is not obliged to make a statement
the matter(s) covered by the charge or indictment.

As regards police interrogations in connection with investigations
of criminal offences, it is stated in section 752(1) of the Administration of Justice Act. 1, that
An accused person, before being questioned by the police, must expressly
be made aware of the charge and that the person in question has not
obligation to make a statement. In court hearings, the
Section 752 applies mutatis mutandis; § 754. During the court's proceedings
of a criminal case, the defendant must be asked whether he or she is willing to
to explain in more detail the facts to which the indictment relates, cf.
Sections 868 and 928 of the Administration of Justice Act.

Furthermore, it is stated in section 171 of the Administration of Justice Act on the duty to testify that:
the obligation to give evidence as a witness in court does not exist, among other things,
if the testimony is assumed to expose the witness himself to punishment, or
loss of welfare.

Outside criminal procedure, on the other hand, there are no general
legal provisions on the prohibition of self-incrimination, but it may be
in the legislation in the individual administrative areas could be added to the
administrative authorities must refrain from using the
information obligations, if at the time of use there is
Suspicion of criminal offences.

As an example of legislative history where this view is reflected,
Mention can be made of, inter alia, section 1, no. 2 in L 62, 27. October 1999 amending
of the Aviation Act (adopted as Act No 346 of 17 May 2000), which

Copyright © 2021 Karnov Group Denmark A/S                    .: J. 11

# JAN PEDERSEN

# TAX

# PENALTIES

# RET

## 4TH EDITION

THE NORWEGIAN ASSOCIATION OF LAWYERS AND ECONOMISTS PUBLISHING HOUSE

21

Jan Pedersen

# Tax and duty criminal law

## 4th Edition



The Norwegian Association of Lawyers and Economists

2019

22  Download fra Juridika.dk, 02/13/2025 04:59:11PM by Jan Pedersen - 9788273137005

# CHAPTER 5

# Tax fraud of a particularly serious nature

- Section 289 of the Criminal Code

Since 1972, Section 289 of the Criminal Code has criminalised tax offences of a particularly serious nature. Originally, the provision only covered tax fraud and smuggling of a particularly serious nature, but the scope has been expanded several times, most recently by L 2005.366. In practice, the provision now covers all cases of deliberate tax, VAT, tax and customs fraud of a particularly serious nature. From a legal point of view, the provision is worded in such a way that the provisions of section 289(2) of the Criminal Code 1, covers all cases of particularly serious violations of tax, customs, excise or subsidy legislation where the offender has had the intention of enrichment and provided that reference has been made to the provision in the underlying substantive tax and duty criminal law.

The provision reads as follows:

§ 289. A person shall be punished with imprisonment of up to 8 years who, in order to obtain unjustified gain for himself or others, is guilty of a particularly serious violation of the tax, customs, duties or subsidy legislation or of section 289a.

(2) The provision in subsection. Paragraph 1 shall apply only if the provisions of paragraph 1. 1 That legislation is referred to in that provision,

(3) When calculating an additional fine pursuant to section 50(3). 2, in connection with a violation of subsection 2. 1, emphasis must be placed on whether the crime is of a particularly serious nature, in particular because of the method of execution, or because the crime has been committed by several people together, or when a large number of crimes have been committed.

The provision is placed in the Penal Code's chap. 28 on property crimes among traditional property crimes such as theft, fraud, embezzlement, etc. The existence and classification of the provision as a property crime is an expression of the legislative's stricter criminal policy assessment of more serious cases of tax and duty fraud.

343

23     Downloaded ra Jurabibliotek.dk, 020 42025 01:00:51PM by linden.th:esi@g.wu.nl

Car Padersan - 950957319×0067

via LESse Madsen

Title III - Chapter 5

The wording of Section 289 of the Criminal Code is remarkable in that it differs from other provisions of the Danish Criminal Code in that the content of the offence is not apparent from the wording, but only appears through reference to other provisions on intentional tax, VAT and duty fraud in the substantive tax and duty criminal legislation, which can be classified as being of a particularly

serious nature.

According to the wording, Section 289 of the Criminal Code appears to be only a special sentencing provision that applies to the assessment of a sentence exceeding a maximum of 1 year and 6 months' imprisonment, as provided for in the substantive

legislation on tax, VAT and duty fraud.

However, the present case law has always applied Section 289 of the Criminal Code to a much wider extent, so that it is only in exceptional cases that a penalty is imposed that could not have been included in the maximum penalty for 'ordinary' tax, duty and VAT fraud in Sections 82-83 of the Income Tax Act, Section 81(81) of the Income Tax Act. 3, etc. It also follows from the preparatory work for section 289 that the provision is not only to be applied in cases where the prosecution considers that a sentence exceeding the maximum sentence of 1 year and 6 months' imprisonment in the underlying tax criminal legislation should be considered, but that it is aimed at all cases of tax fraud of such a serious nature. that society's reaction should be reflected in the application of the Criminal Code. The provision thus has an independent content of the offence that must be kept separate from sections 82-83 of the Danish Tax Act, section 81(81) of the Danish Tax Act. 3, and all other provisions on tax and duty fraud, which is reflected in the fact that the provisions of Section 21 of the Criminal Code on experiments and Section 23 of the Criminal Code can of course be applied in connection with the Criminal Code

§ 289.

The main problem in describing the scope of Section 289 is the indication of the requirements for tax evasion to be of a 'particularly serious nature'. Since the guidelines for this delimitation between the fraud provisions in the tax and VAT legislation and Section 289 of the Criminal Code of Criminal Procedure do not appear in the wording of the provision or in the preparatory works, it can only be deduced from practice.2 A review of the present case law shows that the size of the evasion is crucial for the application of the provision.3

1. Folketingstidende 1971-72 Appendix A, sp. 237.
2. During the Folketing's consideration of section 289 of the Criminal Code, it was discussed whether the provision should be formulated in such a way that it contained elements to clarify when a tax fraud should be classified as being of a particularly serious nature, e.g. the amount of the amount forfeited, the number of criminal offences or the like. However, the conclusion of those considerations was only that 'the scope of the provision can best be determined.

344

Jan Pedersen - 978-87-574-3027
Downloaded fra Jurabibliotek.dk 07/12/2028 01:03:04 Fra Jan Pedersen en dk
en Lasse Mulvad

It is clear from the wording of the provision and the preparatory work that the content of the offence contains a legal standard, which is why the delimitation between the fraud provisions in the tax and duty criminal legislation and Section 289 of the Criminal Code cannot or should not be determined once and for all. Instead, the distinction must follow the development of society, especially with regard to tax and criminal policy. Since 1988, the provision has been applied in particular when the tax evaded or deliberately evaded exceeds DKK 500,000.4

Cf. TfS 1992.306 V: evasion of DKK 500,900 and conviction pursuant to Section 289 of the Criminal Code and TfS 1992.355 V: evasion of DKK 440,885 and conviction pursuant to Section 13(13) of the SKL in force at the time. 1, and TfS 1997.436 Ø: evasion of DKK 457,583 and conviction pursuant to section 13(1) of the SKL in force at the time. 1. In TfS 1999.866 Ø, a charge was brought for violation of Section 289 of the Criminal Code for evasion of DKK 610,368. However, as the evasion was assumed to be something less than DKK 500,000, the defendant was only convicted of violation of section 13(1) of the SKL in force at the time. 1.

The past depreciation of funds since 1988 has therefore expanded the scope of the provision, so that a larger proportion of cases of tax fraud are classified under Section 289 of the Criminal Code.

As mentioned, the provision also covers VAT and tax fraud of a particularly serious nature, where it is correspondingly decisive whether the evasion exceeds DKK 500,000. However, since Section 289 of the Criminal Code qualifies the various types of tax, VAT and duty fraud, these are prosecuted individually, and when calculating whether an evasion exceeds DKK 500,000, this is determined for each evasion separately. If a turnover has been withheld and income tax has been evaded by DKK 400,000, VAT evaded by DKK 200,000 and perhaps other taxes by DKK 250,000, it is of no significance that the total evasion exceeds DKK 500,000. Thus, section 289 of the Criminal Code only applies to the extent that the evasion exceeds DKK 500,000.

In determining whether an evaded tax exceeds DKK 500,000, according to practice, a substantial aggregation is made, partly of similar evasions relating to several income years and partly of evasions that are the result of

is to be incorporated into a case-law which is formed without regard to a list of examples of qualified facts', cf. Folketingstidende 1971-72 Appendix A, sp. 237. Cf.

3.  Jan Pedersen U 1984B.30 et seq.
4.  See also the Director of Public Prosecutions' letter of 28. March 1988 to the Directorate of State Taxation, where the then limit was increased from DKK 200,000 to DKK 500,000, cf. Søren Vilhelmsen in TfS 1989,144 and TfS 1989.150 Ø.

345

25  Downloaded from ... by ...

Title III - Chapter 5

withholding of various forms of taxable income. In this connection, it is immaterial whether the criminal liability for the evasion in question follows from section 83 or section 83 of the SKL, as long as the evasions that have taken place are the result of

similar exclusions and have a certain temporal connection.

TfS 1993.232 Ø, where a large number of minor evasions arising from withholdings of various forms of taxable income in several income years exceeded the then applicable DKK 200,000 limit and were therefore allocated under section 289 of the Income Tax Act.

SKM 2012.287 V, where salary income and bonuses had been withheld for the income years 20052009, and where it was established that there was a continuous and consistent withholding of income from the same source of income, which is why the total sum of the evaded taxes and labour market contributions amounted to more than DKK 500,000.

SKM 2015.35 V, where a number of different incomes were withheld for several income years. The High Court found that, based on the nature of the circumstances and the extent of the evasions, the circumstances were collectively classified under section 289 of the Criminal Code.

This is also justified where the evasions involve a recurring income, when the withholdings are particularly systematic, uniform or are otherwise of a serious nature. However, it should be argued that Section 289 of the Criminal Code cannot be applied to clearly separated exclusions, as in that case there are two or more separate crimes covered by the fraud provisions of the tax and duty criminal legislation. This will be the case, in particular, if the withholdings do not relate to the same income activities and are separated by intervening income years in which no withholdings are made. Similarly, the question may be raised as to whether, for the purposes of the classification under section 289 of the Criminal Code, the evasions can be aggregated when the accused has contributed to the evasion of several taxpayers. In that respect, too, the offences of complicity must be assessed in terms of whether they form part of a single evasion or whether they constitute independent and separate evasions. It is debatable to what extent an overall calculation can be made of the evasions in several companies owned by the same principal shareholder and where the latter is personally liable for this, cf. see p. 140.

A merger seems obvious if the exclusions originate from the same income-generating activity that has been continuously carried out in several companies. The principal shareholder who withholds an income in one company and continues to do so in another company when the first company has ceased to exist by bankruptcy may

346

LAP Isen - 9788771983067

Download fra Jura.baseret_S_II_020106928 00100510134 by Justine Isen Tax web
via Lasse Madsen

thus expect that the companies' total evasion will be used as a basis for determining whether the DKK 500,000 limit has been exceeded.

In SKM 2008.647 V, a principal shareholder was held liable pursuant to Section 289 of the Criminal Code for infringements which had occurred consecutively in several individual companies, each of which did not exceed »500,000 kroner's limit«.

Until now, practice has only exceptionally imposed a penalty for violation of section 289 of the Criminal Code, which exceeded the maximum penalty under the underlying legislation on tax and duty fraud, which until 2005 was 2 years' imprisonment. By L 2005.1000, the maximum sentence was reduced to a maximum of 1 year and 6 months' imprisonment, so that the scope of Section 289 of the Criminal Code has been expanded.

Although the size of the evasion is generally decisive for whether an intentional tax evasion can be classified as serious tax fraud covered by the STRL Section 289, it is a given, however, that other factors may be included in the qualification. Aggravating circumstances such as the clarity of the evasion, the strength of the intent, the nature of the evasion, the execution of the evasion, the number of evasions, etc., may be given particular weight. This is stated directly in the Director of Public Prosecutions' letter of 28.3.1988, cf. TfS 1989.144. It follows from this that Section 289 of the Criminal Code is relevant in particular if the evasion has been carried out systematically or in a way that makes the discovery particularly difficult. In practice, however, the courts have been reluctant to attach importance to such other circumstances, as it has been decisive whether the evasions exceed DKK 500,000.

In TfS 1989.150 Ø, the prosecution's application for a conviction pursuant to section 289 of the Criminal Code was not upheld, as the court did not find that the offences were of such seriousness that section 289 of the Criminal Code was applicable. The defendant was then convicted of violation of section 13(1) of the SKL in force at the time. 1. It is not clear from the judgment whether that assessment was due to a general assessment of the nature of the offences or to the fact that the evasion at the time of the offence was covered by the then applicable practice for the application of the STRL § 289.

Similarly, TfS 1997.436 Ø, where the withholding amounted to DKK 457,583, and where the prosecution was also dismissed in the application of section 289 of the Criminal Code.

Conversely, the realised tax or duty fraud may be of such a less serious nature that it cannot be described as serious tax or duty fraud, even if the evasion exceeds DKK 500,000. Lower degrees of intent, individual exclusions, exclusions of doubtful taxable income, exclusions encouraged by others, etc., may, depending on the circumstances, be factors that indicate that tax fraud should be considered to be covered by the rules for 'ordinary' tax fraud. Also in this area

347

## Title III - Chapter 5

However, the courts have been reluctant to attach importance to specific circumstances.

The DKK 500,000 limit is also generally decisive for whether an accomplice relationship can be qualified under Section 289 of the Criminal Code. Thus, if you contribute to the evasion of more than DKK 500,000, the liability is imposed pursuant to section 289 of the Criminal Code. However, there is little doubt that the classification of contributory liability under section 289 of the Criminal Code is to a greater extent individual based on an overall assessment of the contributor's circumstances. It is recalled that the liability for complicity may be imposed pursuant to Section 289 of the Criminal Code, even if the principal (the taxpayer) has not incurred criminal liability or is convicted under another provision, e.g. SKL § 82.5

In TfS 1992.471 Ø, a state-authorised public accountant had given incorrect information about the right to depreciate to a number of limited partners, thereby enabling them to evade more than DKK 1 million. kr. The auditor was found guilty of complicity in the limited partners' tax evasion, but the Eastern High Court did not uphold the prosecution's claim that the auditor's tax fraud was covered by section 289 of the Criminal Code. The auditor was then convicted of violation of section 13(1) of the SKL in force at the time. 1, cf. Section 23 of the Criminal Code, among other things, with reference to the fact that, according to an overall assessment, the matter was not of such a serious nature that it could be attributed to Section 289 of the Criminal Code. In addition, emphasis was placed on a varying practice with regard to the

depreciation rules.

Sanction pursuant to Section 289 of the

Criminal Code Section 289 of the Criminal Code provides for a prison sentence of up to 8 years, and the sentencing is based on the general criteria of criminal law following a specific assessment, cf. Section 80 of the Criminal Code. In practice, the size of the evasion in particular determines the length of the prison sentence, cf. see p. 178.

According to practice, an additional fine is also imposed pursuant to Section 50(1) of the Criminal Code. 2, which is generally assessed as 1 x the evaded tax. By L 2012.431, subsection 3 inserted, according to which, in special cases, an increased additional fine may be imposed when the crime is of a particularly serious nature, in particular because of the method of execution, or because the crime was committed by several people together, or when a larger number of crimes were committed. It appears from the travaux préparatoires that the usual additional fine is increased by 20%. It is also apparent that the circumstances of the evasion committed which are included in the assessment for the purposes of calculating the additional fine are, for example, the circumstances of the evasion committed. method of execution by means of planning which is intended to make it more difficult to solve the evasion. Placement of deposits in foreign banks, etc., which the tax authorities cannot

5. See above, p. 106.

348

28   Downloaded ... 02/01/2025 04:00:51PM ...

Lei Pedersen - 975077180059p9

via Lasse Madsen

obtain information from must be regarded as a manoeuvre intended to make the investigation more difficult. Other important aggravating circumstances can be mentioned that there are several perpetrators, e.g. in connection with straw man activities, talk about special planning in general or talk about violation of several tax and duty laws.6

6. FT 2011-12, Bill no. 109 Special comments Re § 5.

Jon Police 9798771943063
Txoplod 1 Jurabibliotek.dk. 02/14/2025 MMfitch 1PM by lundmadsen@@lav.au. Dk



# Special Act - Cooperation with special authorities in special law cases

Source: The Announcement of the Director of Public Prosecutions

Topics: customs tax, moms, etc; prosecution and non-prosecution; competence submission notification; business conditions; Fishing Environment Agriculture Hunting

Date: 16.7.2014

- Publicly available: Yes

Status: Applicable

Published: 14.2.2025

# Table of Contents

Cooperation with special authorities in special law cases      3

 1. Overview and checklist      3

2. Police investigation and case processing      3

3. Preparation      3

3.1. Notification submitted by the Specialised Authority      3

3.1.1. Referral to the Public Prosecutor in the event of disagreement on the issue of charges      3

3.2. Notification not submitted by the Specialised Authority      3

3.2.1. Referral to the Specific Authority      3

3.2.2. Referral to the Public Prosecutor in the event of disagreement on the issue of charges      4

3.3. Prosecution competence, including the power to abandon prosecution      4

4. Law      4

5. Penalties and other legal consequences      4

6. After judgment      4

6.1. Notification of the Assignment      4

6.2. Notification of the Public Prosecutor      4

7. Laws and preparatory works      5

Cooperation with special authorities in special law cases

Version 16. July 2014

## 1. Overview and checklist

# 2. Police investigation and case processing

## 3. Preparation

## 3.1. Notification submitted by the Specialised Authority

### 3.1.1. Referral to the Public Prosecutor in the event of disagreement on the issue of charges

When a police report is filed in a case concerning a violation of a special law by the public authority which has been assigned supervisory tasks or which is otherwise responsible for the legislation in the area in question, it should be noted that if there is disagreement between the police and the special authority about the decision on the issue of charges or on the formulation of the charges, the case must be submitted to the Public Prosecutor. The case is then presented by means of a reasoned recommendation on the question of indictment.

The special authority must be given the opportunity to give an opinion before the case is referred to the public prosecutor. In practice, this can be done by sending a letter of intent to the special authority and giving it an appropriate period of time to give an opinion.

If, after a notification has been submitted, new information comes to light in the case, if necessary. During an interrogation or otherwise during the investigation, and the authority cannot be assumed to be aware of the information, the authority must be given the opportunity to comment on this before the police district makes a decision on the question of charges. See about referral to the special authority item. 3.2.1.

## 3.2. Notification not submitted by the Specialised Authority

## 3.2.1. Referral to the Specific Authority

In cases that have been reported or otherwise come to the attention of the police outside the relevant special authority, a statement must be obtained from the special authority before a decision is made on the issue of charges.

When hearing the special authority, the prosecution service must specify the topic of the consultation, including which specific questions it wishes to answer. The questions must relate to the facts of the case, and questions must not be asked that invite an assessment of evidence.

If, after the opinion of the special authority, new information comes to light in the case, if necessary. During an interrogation or otherwise during the investigation, and the authority cannot be assumed to be aware of this new information, the authority must be given the opportunity to comment again before the police district makes a decision on the question of charges.

32

See also the section of the Announcement of the Director of Public Prosecutions on Submission and reporting, etc.

## 3.2.2. Referral to the Public Prosecutor in the event of disagreement on the issue of charges

If, on the basis of the opinion obtained from the special authority, it can be established that there is disagreement between the police and the special authority on the decision on the issue of indictment or on the formulation of the indictment, the case must be submitted to the Public Prosecutor. See also section. 3.1.1.

## 3.3. Prosecution competence, including the power to abandon prosecution

However, in the event of disagreement between the Chief of Police and the Special Authority regarding the abandonment of prosecutions, it is the Public Prosecutor who has the authority to dismiss the case.

It is the police commissioner who generally has the power to prosecute. However, the Public Prosecutor may have the power to prosecute in certain cases under special legislation.

## 4. Law

### 5. Penalties and other legal consequences

## 6. After judgment

## 6.1. Notification of the Assignment

As soon as possible after the conclusion of a case that has been raised following a notification from a special authority, the authority must be informed of the outcome of the case. The same applies in cases where the prosecution service has otherwise obtained an opinion from the special authority.

The notification must be made in sufficient time to give the authority in question the opportunity to decide on the question of appeal before the expiry of the appeal period.

It should be noted that in various areas there may be special arrangements/guidelines regarding the notification of an (appointing) authority, including guidelines on the reporting of judgments that revoke the right to engage in activities that require a special public authorisation or approval. For more information on such arrangements, see the sections on each case category.

See also the section of the Announcement of the Director of Public Prosecutions on Submission and reporting, etc.

## 6.2. Notification of the Public Prosecutor

If a case has been submitted to the Public Prosecutor before the indictment is brought, the public prosecutor must always be informed of the outcome of the case before the expiry of the time limit for appeal or the deadline for submitting an application for leave to appeal with a recommendation on the appeal.

## 7. Laws and preparatory works

HANS GAMMELTOFT-HANSEN

# Criminal justice

In

## Basic concepts - Proof

## The courts - Prosecution

THE NORWEGIAN ASSOCIATION OF LAWYERS AND ECONOMISTS PUBLISHING HOUSE

That the prosecutor must assess the question of prosecution or prosecution abandonment during this point of view, means that he must think in the judge's place in general. Thus, there is no room for his own perceptions of what is punishable or not, if they deviate from the court's expected assessment. Similarly, the prosecutor must anticipate the application of the standard of proof 'in dubio pro reo' and include that principle in his own assessment of the evidence in the case.

That the prosecutor must think in the judge's place also means that he - like a judge - must arrive at a certain result of his assessment; He cannot merely state that there are circumstances that indicate that the accused should be convicted, but others (of similar strength) that point to acquittal. Discussing whether there is a duty to prosecute the prosecution service in such cases of doubt is therefore meaningless to that extent. The rule that the prosecutor must assess the prosecution as if he were sitting in judgment - and applying the rule of evidence in dubio pro reo - means, in principle, that his assessment should not end as an unresolved question, even if the case is otherwise complicated.

In some cases, however, there may be grounds for advancing the case, even if there is so much doubt in the prosecution that a conviction appears only as a possibility. This applies above all in cases where a decision based on public deliberations is particularly necessary, for example in the case of a public hearing. criminal proceedings against the police or other officials. But other cases can also be mentioned. For example, if it is a very serious crime, where the whole case stands or falls on a difficult question of self-defence, or on whether or not a decisive piece of evidence should be accepted, the case should be brought forward for judgment - even if this verdict is acquitted. A fair division of powers between the public prosecutor's office and the courts dictates that decisions with far-reaching consequences or on very difficult issues fall within the competence of the courts. This also means that particularly complex or unresolved questions about the interpretation of the penal provisions (subsumption issues) should be brought before the courts. In the case of new and perhaps less precisely formulated legislation, it will even be the rule that the prosecution service brings a number of cases before the courts - and often seeks to bring them through to the Supreme Court - in order to clarify the detailed understanding and scope of the provisions.

By Act no. 385/1987 on the fight against economic crime, it was possible to use prosecution to a somewhat wider extent than the
principles outlined above. According to section 723 (1) of the Criminal Code. 3, (in whole or in part) prosecution may be dropped if the difficulties, costs and processing times of the case are not proportionate to the importance of the case and the foreseeable punishment. The provision is discussed in more detail I, p.



572as, schalthough the provision also covers the dropping of charges, it will (and should) in practice is particularly reflected in the abandonment of prosecution. This is due to the fact that the prosecution service often has to decide at a fairly early stage whether the investigation should be limited to certain circumstances in order to speed up the processing of the case. In this phase, where there is normally no sufficient investigative basis for charges to have been brought, dismissal of charges may be used, not dismissal of charges with the presumption of guilt of the accused in the circumstances covered by the dismissal of prosecution (cf. I, p. 190).

## C. Dismissal of charges (principle of opportunity)

To the extent that the prosecution is not to be abandoned, it could be assumed that the prosecution service was obliged to bring all cases before the courts. If there were mitigating circumstances, etc., the court could take this into account in the sentencing, possibly let the sentence lapse completely, cf. strfl. cape. 10, in particular Paragraph 84. Such a system does not allow the public prosecutor to exercise any discretion as to the reasonableness or appropriateness of criminal proceedings; It can be said to rest on a principle of legality (cf. I, p. 62). The principle of legality exists in both a positive and a negative form.

In state and administrative law, the expression is used in the positive sense that the actions of the authorities, and in particular the legally binding decisions, must be based on law; In criminal procedure, this legal basis is known in particular in the area of coercive measures (cf. Chapter II. 5). In its negative form, the principle of legality means that a legal basis is required for the authorities' failure to intervene in cases where the law otherwise normally prescribes intervention. In the doctrine of reprimand, the principle of legality is applied.

in this negative form.

In contrast to the principle of legality, Danish criminal procedure is based on a system according to which the prosecution service has quite extensive powers to include considerations of expediency and fairness in the decision of the indictment. In contrast to the principle of legality, we are talking here about a principle of opportunism (cf. I, p. 63).

When the two principles are set up as opposites, it must be taken with the proviso that in practice no very sharp distinction can be drawn between legality and opportunity (absolute versus relative prosecution). Even in cases where the reprimand is abandoned because of its expected impracticability,



The decision includes more discretionary assessments, and the question of the appropriateness of the prosecution cannot be excluded from this. So it is not a question of something clear either/or. However, this does not provide any justification for a broader and more far-reaching consideration of what is appropriate. The justification for the principle of opportunity must be sought on other
Fronts.

For the assessment of legal policy, the decisive dividing line is hardly so much between the absolute and the duty to prosecute, modified by certain exceptions. Where such exceptions are clearly delimited in the Act (see, for example, Section 723(1)(2) and (3)), they in reality constitute only a special part of the provisions on sanctions under substantive criminal law;
See also,
above, about the principle of legality in its negative form. The significant deviation from the general principles governing the division of jurisdiction between courts and prosecutors arises only when the public prosecutor's office is given a discretionary power to drop the charges. Such powers include an acceptance that criminal prosecution may be the subject of considerations of expediency and fairness to a much greater extent than is already laid down in the substantive criminal law.
provisions.

As a single hierarchy, the powers of the Public Prosecutor's Office are to a considerable extent of such a discretionary nature. - Terminologically, the principle of opportunity/legality is therefore a more adequate term than relative and absolute duty to prosecute, which rather brings to mind the completely exempt ctr. the modified duty to prosecute. On the other hand, the principle of opportunity refers to the fact that considerations of expediency and fairness may be decisive for the prosecution of the penalty; This term is therefore also more comprehensive - and in any case better incorporated - than the term optional indictment.

## A proposal has also been made.

The application of the principle of opportunity in criminal procedure is one of the areas in which the connection between the process and the theories of punishment in substantive law is most apparent. A repressive conception of the purpose and function of punishment is historically linked to the principle of legality. The retribution of punishment must be the consequence of the crime, without taking into account considerations of expediency. - On the other hand, it is precisely this repressive concept that leaves room for the special group of charges to be dropped in view of the fact that the course of events themselves has already caused the accused considerable suffering (for example, because his loved ones die or he himself is disabled in connection with a traffic offence).

A strongly accentuated view of the general preventive function of punishment may also lead to scepticism towards an extensive application of the principle of opportunity. On the other hand, special preventive considerations will support the principle, especially when the dropping of charges is linked to the right to impose conditions (cf. I, p. 201 ff). This makes it possible to take individualised measures already in the prosecution phase. The advantages of the principle of opportunity are partly of criminal policy and partly of a procedural economy nature. As an instrument of criminal policy, the dismissal of charges can be used for general adjustments to the area of the person who is convicted. Decriminalisation or decriminalisation by legislative means

188

Experience has shown that the process is a complicated and lengthy process. Similar changes through the courts' practice can only be difficult and rarely implemented. On the other hand, the dropping of charges has proved to be a flexible and appropriate way of adapting the prosecution in line with changes in the general view of the criminality of certain acts.

At the same time, as mentioned, the dropping of charges can be used to achieve equitable and individualisation in the reaction system already at the early stages of the criminal prosecution. Special reactions to certain groups of offenders (e.g. young people) and consideration of general humanity in the specific case can also be implemented in the courts, in particular in the form of suspended sentences; Humanitarian considerations can also subsequently lead to pardon. However, the use of dismissal of charges achieves an even greater degree of flexibility and leniency, since the persons concerned are exempted not only from the sentence but also from the most onerous part of the criminal proceedings, as well as from the possible subsequent repetition

effect of the conviction.

Together with the summary forms of decision (see III, Chapters 3 and 4), the principle of opportunity is of the greatest importance in terms of procedural economy. The separation of minor offences contributes to a better use of judicial resources. The same applies to the separation of incidental offences which would not affect the content or scope of a penalty which is nevertheless imposed (see Article 1 of the Criminal Code). I, p. 207). - Views of this kind are given increasing weight in both civil and criminal proceedings. An extended right to use dismissal of charges (and dismissal of prosecution) for reasons of procedural economy and resources is authorised by section 723 (1) of the Criminal Code. 3, according to which the Public Prosecutor (and in some cases the Chief of Police) may wholly or partially refrain from prosecuting if the conduct of the case will entail difficulties, costs or processing times that are not proportionate to the importance of the case and the punishment that can be expected to be imposed, see further I, p. 195 et seq.

Extensive application of the principle of opportunity has certain drawbacks. First, the fact that the Public Prosecutor's Office can be said to be exercising judicial functions in a sense, but without operating under the usual judicial guarantees, creates a risk of undue decisions. To that extent, the mere assumption that such a thing can take place is a disadvantage, regardless of whether the reality corresponds to the assumption. Another objection is the risk of significant disparity in prosecution practices among the

various prosecutors.

However, none of the objections mentioned should be overstated. Impartial decisions in the form of personal favoritism could far rather be conceived within the area of prosecution abandonment, where the prosecution's specific assessment of evidence probably escapes scrutiny to a greater extent than the reasons for the announced dismissal of charges. Of course, inconsistencies in prosecution practices can occur, especially in police cases; But it is limited by the chief prosecution service's instructive regulations and on the whole hardly shows greater fluctuations than the district court proceedings can occasionally do. However, there remains a clear need to balance the extensive application of the principle of opportunity with possibilities for control and correction that limit the risk of unjustified dismissal of charges to a minimum.

37

The main guarantee is the rules of competence and the hierarchical concurrence of the rules of competence.

in conjunction with the official tradition itself (in Norway, the possibility of strengthening this form of control by making the prosecution service a collegial body has been discussed).

gan). The structure of the prosecution service - combined with the rules on complaint guidance and recourse - means that decisions on dismissal of charges in doubtful cases will often have passed through several instances. Already in this way, the practical possibilities for impartiality and favoritism are considerably limited. The fact that the head of the prosecution service is formally the politically appointed Minister of Justice could probably in extreme cases reduce the positive influence of the official tradition itself; At the same time, however, it opens up the

possibility of ultimately asserting political and parliamentary responsibility.

To this is added the Ombudsman's supervisory authority. As stated (I, p. 153), the activities of the Public Prosecutor's Office may also be subject to investigation and control by the Ombudsman.

There is no actual judicial review in Danish law, except in cases where conditions are set for the dismissal of charges pursuant to section 723a. Nor has the unjustified (or others) any power to bring a case decided by the public prosecutor with dismissal of charges before the court.

An important part of the control of prosecution practice is the opportunity to familiarise oneself with the decisions in general. In order to take this into account, the prosecutor The authority published in annual reports the most important elements of the current practice of dropping charges.

A particular problem - of more fundamental than practical importance - may be linked to the dropping of charges. Similar to a conviction, dismissal of charges means that the person in question is found guilty of the intended offence. Since the dropping of charges does not require any actual consent from the accused, it could happen that persons who consider themselves not guilty and want this to be proven through an acquittal are forced to drop the charges with the underlying presumption of guilt. However, as mentioned, the problem is not very practical. In the event of dismissal of charges with conditions pursuant to section 723a, the accused's confession is required, cf. Section 723a para. 3. In other cases, it is assumed in practice that the guilt of the accused is undoubted (possibly in the form of a confession) or that all the facts of the crime have nevertheless been acknowledged; Normally, it is unlikely that charges will be dropped without the accused's agreement to this decision. However, the problem has existed, at least in one case from recent years (April 1982), when the Minister of Justice dropped charges for an alleged violation of the Criminal Code. § 108. In this case, the presumption of guilt was clearly stated, as the Minister of Justice stated in the press release that "even though it must be assumed that N.N. has shown circumstances that in principle fall under the description in section 108 of the Danish Criminal Code, the Ministry of Justice, after an overall assessment of all the above, has not found that Danish interests have been harmed to such an extent that there are sufficient grounds for bringing charges." The person concerned claimed his innocence and wanted a public criminal case to be conducted (see the Criminal Code). UfR 1982B, p. 362).

Both from a point of view of principle and with a view to the few cases in which the problem arises, a legal basis should be introduced for the accused to apply for the prosecution of the accused in such cases.

The leave has been brought before the courts. Such a rule - which is contained in the Norwegian Code of Criminal Procedure - would be preferable to a provision on the

10

mandatory judicial review of all dismissals of charges corresponding to the rules that apply pursuant to section 723a for dismissal of charges on conditions (cf. I, p. 202 ff). It appears that the legal policy concerns about the principle of opportunity are linked to the failure to bring charges; It is in this context that the need for control of the decisions of the public prosecutor's office arises. - However, it has also been argued that, depending on the circumstances, it may be necessary to hold the prosecution service responsible for bringing charges in certain specific cases, or at least by a court decision to overrule the prosecution service's decision to bring charges. In certain extreme cases, the initiation of charges could conceivably incur liability if the charge should clearly have been dropped; If the accused is clearly innocent, bringing charges would be a breach of the duty under section 711. It is also obvious that the prosecution's decision to bring a case to court instead of abandoning the prosecution may be overruled as the court acquits. However, to claim that there could be a similarly question of liability or dismissal in the form of acquittal because the prosecution service - contrary to its own practice - has brought charges instead of announcing a drop of charges, is based on an untenable view of the nature of the drop of charges. The dropping of charges is a special form of sanction in the same way as, for example, the Criminal Investigation Board. suspended sentence. If the court finds that a case should have been settled with a drop of charges, it may set aside the sentence or apply a lighter sentencing, possibly a suspended sentence with the conditions that would have been customary under section 723a in a case of the type in question. On the other hand, the court will not be able to resort to acquittal on the grounds that the accusation

20

authority, contrary to its own practice, has brought charges instead of dropping it, thereby establishing a use of the general principles of equality under administrative law. such thing as to render the indictment null and void. An acquittal would have to require that

The prosecution service, by adopting a fixed practice of dropping the charges in certain categories of cases, should thus have made a (binding) restriction of the scope of the substantive offence. Such a premiss would not be consistent with the justification of the principle of opportunity, nor has it been accepted by the case-law; see UfR 1974.604 V: A group of farmers in the Horsen area were charged with violation of the Road Traffic Act and the Police Regulations because they - as part of a protest action - had blocked off an intersection by parking their tractors at the intersection. The fact that no charges were brought in other police districts for similar actions could not lead to acquittal; Nor was the sentence waived by the court, which instead applied a very mild sentence (fine of DKK 100). The same view was taken into account in UfR 1975.874 Ø, where the prosecution's failure to prosecute violations of a number of provisions relating to restaurant operations in Christiania was not given significance in connection with the conviction of similar offences of three defendants who had no connection to Christiania. Similarly, UfR 1980.1065 V on violation of strfl. Section 266b in the case of discriminatory press statements about foreign workers. - See also UfR 1962.218 Ø and the High Court judgment referred to in UfR 1977 B, p.

140 (lapse of sentence).

no

152

Michael Kistrup Jakob
Lund Poulsen Jens

Røn

Thomas Rørdam

# Criminal procedure

4th Edition

39

**IIIKARNOV**
GROUP

may decide whether the case should be decided by dropping charges pursuant to section 721 or by dropping charges pursuant to section 722.51

> According to the former section 719(1). 2, the Public Prosecutor had the power to prosecute in certain specified cases. Firstly, it was district court cases that were to be brought forward as jury trials or as magistrate cases because the defendant has opted out of jury trials under section 687. The Public Prosecutor also had the power to prosecute certain specified criminal offences, cf. cf. the former section 719(1). 2, no. 3. The list included crimes relating to attacks on the independence and security of the State and against the Constitution of the State, certain crimes against public authority and public order, crimes in the public service or office, etc., certain crimes of false testimony, certain crimes of public danger, including qualified arson and hijacking of aircraft and ships, the intentional crimes of murder, qualified deprivation of liberty and certain delicts of peace and defamation. For some of these crimes, according to the Director of Public Prosecutions' administrative guidelines, the issue of indictment must still be presented, cf. above.

The Public Prosecutor also has the power to prosecute criminal cases against police personnel, cf. § 1020 d.52

The right of the Minister of Justice and the Director of Public Prosecutions to intervene in specific cases or to lay down general rules for prosecution, as discussed above in

4.2.1. and 4.2.2 ., are not affected by section 719.53

### 4.4.2. The principle of objectivity

Section 96(1) of the Constitution of the Philippines (EC) 2, is an important basic principle for the work of the prosecution service. The prosecution service must not only ensure that those guilty are held accountable, but also ensure that the prosecution of innocent people does not take place. The prosecution service is thus subject to a principle of objectivity.54 According to its wording, section 96(1) of the Criminal Code of Criminal Procedure. 2, only for the prosecution service, but the principle can only be meaningfully implemented if corresponding requirements apply to the police in connection with the investigation. It is therefore assumed that

the principle also applies to the police.55

The principle of objectivity means, as one part of it, that the prosecution service cannot, as a general rule, refrain from taking steps to punish persons who the prosecution service considers to be guilty of a criminal offence. In these cases, charges must normally either be brought or charges dropped pursuant to section 722. Thus, there is no general rule about not doing anything in connection with a confirmed crime, but section 721(1) of the Criminal Code of Criminal Procedure. 1, no. 4, however, authorises the possibility of abandoning prosecution for reasons of resources, even if there is a presumption of guilt, cf. see 4.5.3 below. The principle of objectivity also implies that the police and the prosecution service must not only investigate clues and secure evidence, etc., that points to the suspect or accused as the perpetrator, but also have a duty to pursue information that points to the innocence of the person in question in

a similar manner. The requirement for objectivity for the prosecution service is similar to, but not the same as, the requirement imposed on judges in criminal cases.56 A requirement for uniform assessments is not possible, as the prosecution service's and especially the police's assessment of the case takes place at an earlier stage, where the defendant's views have not necessarily been formulated in their final form, and where the presentation of evidence has not yet taken place during a trial. The requirement for the prosecution service can probably - as formulated by Hurwitz - best be described as a requirement that the prosecution service

'Neither in the preparation of the case, nor in the indictment or in the exercise of the charge before the court ... must suppress something in favor of the accused speaking relevant moment ... '57 The requirement of objectivity thus applies to all aspects of the activities of the Public Prosecutor's Office, both in the determination of charges and in the conduct of criminal proceedings in court. Thus, the prosecution cannot bring charges in situations where there is an expectation that an acquittal will be made. If, after the presentation of evidence at the main hearing, it is clear that the defendant must be acquitted, the prosecution service must accordingly amend its claim accordingly, after which the court will issue a judgment of acquittal, cf. Sections 728 and 883(1) of the Criminal Code. 2, no. 2.58 After shedding

---

51. Cf. the section of the Announcement of the Director of Public Prosecutions on submission and reporting, etc., item 1. 3.1.2. and 3.1.3.

52. See also below under 14.3.

53. See Act No. 1194/1990, p. 211, and Bill No. L 48 of 11. November 2015 (special comments on section 719).

54. Section 96(1) 2, is a continuation of a similar and now repealed provision in § 711. Section 96 was amended by Act no. 385 of 20. May 1992, and apart from linguistic modernization, there has been no change in the content of the principle of objectivity.

55. See Gammeltoft-Hansen, Criminal Procedure I, p. 62.

56. See Hurwitz, Criminal Procedure, 3. ed., p. 141.

57. See Hurwitz, Criminal Procedure, 3. ed., p. 141.

58. As stated in the Administration of Justice Act, note to section 728, it has, with reference to U 1921.468 H and U 1979.912 V, it has been assumed that the provision applies only at first instance and that the court should therefore not be obliged to give a judgment on the application in an appeal by abandoning the proceedings on appeal. However, this is not in accordance with the principle of accusation, cf. above under 1.2. Section 883, including subsection. 2, no. 2 also applies on appeal, cf. Section 917 (1) of the Constitution. 1, and this must mean that prosecution can also be dropped during the main hearing in the appeal, with the necessary acquittal as a result, cf. see also Hammerum, The Charge, p. 152f.

Unconditional disqualification pursuant to section 126(1) of the Criminal Code. 1, no. 4, on particularly reckless driving, etc. Similar decision in U 2020.2104 V, where the prosecution could not claim the offence under the Traffic Act. Section 125 (1) 1, no. 1.

The fact that a person has not previously applied for a conditional disqualification as a result of three penalty offences, by mistake, does not mean that previous clips lapse, and a conditional suspension may therefore be made as a result of a new clip. cf. U 2020.3216 H, U 2020.490 Ø and U 2020.802 Ø. Another situation existed in TfK 2017.224 Ø, where a prosecutor had decided that a case of violation of the Aliens Act (assistance for illegal entry) could be settled with a fine notice, which was immediately served on the accused. There was a binding limitation on prosecution, so that a prison sentence could not be applied for when the case was brought before the court 9 months later.

### 4.5.4. Dismissal of charges

Dismissal of charges is a sanction issued by the Public Prosecutor's Office. Dropping charges has similarities with a warning or suspended sentence, cf. Section 723, and is considered a very mild sanction. The possibility for the prosecution service to decide cases by dropping charges means that the prosecution service may, after considerations of reasonableness and resources, conclude certain cases - dismissal of charges without conditions - with a sanction, without it having been necessary to refer the case to a court. This expresses the so-called principle of opportunity, which is in contrast to the principle of legality, which does not give the prosecution the right to such considerations.156 To that extent, it can be said to be contrary to the

division of tasks in the Danish criminal procedure that the prosecution service in these cases is given criminal jurisdiction without the requirement of judicial review. However, there are a significant number of cases that are not appropriately settled in a public and costly court process. An administrative decision on such cases brings advantages both to the accused and to the court system, which is not burdened with many trivial cases or cases which, by their nature, should be decided outside the courtroom. Dropping charges has a negative effect on res judicata, and no subsequent conviction can be made

for matters covered by the dismissal of charges, cf. U 2006.1013 V, unless the case is reopened due to breaches of terms, cf. Section 723(1) 4. Since a dismissal of charges is a sanction, it is a prerequisite that the accused is guilty of the charge that forms the basis for the dismissal of charges.157 The guilt of the accused must therefore be unquestionable. This certainty of guilt can be obtained through the confession of the accused. However, it is assumed that this certainty of guilt can be obtained by other means. In these exceptional cases, it should probably be required that the facts are admitted.158 The need for the undoubted certainty of guilt is linked to the fact that, as stated, the dismissal of charges is an expression of guilt and punishment, and that there is no possibility of judicial review of the prosecution's assessment and thus of acquittal. In practice, it is normally unlikely that charges will be dropped unless the accused himself agrees to this.159 Section 722 stipulates in which cases

charges may be dropped. This can happen when the expected sanction is modest. Thus, there may be less need to punish and more to indicate society's disapproval of the intended behaviour. Section 722(1) 1, lists some groups of cases in which charges may be dropped, which are supplemented by the District Attorney's Office. no. 792 of 18. June 2018 (with subsequent amendments) on the right of police directors and public prosecutors to drop charges. Except for a catch-up provision in section 722(1) of the Criminal Code. 2, here is an exhaustive list of the situations in which charges may be dropped.

Section 722(1) of the Constitution of the Land Registry of the District of Columbia states that the Constitution of the United States of America is not the 1, no. 1-4, that charges can be dropped

- where the intended offence cannot result in a higher penalty than a fine under the law, and the offence is of poor punitive value,
- where, pursuant to section 723(1) 1, stipulates as a condition that the accused is subject to remedial measures pursuant to section 52 of the Act on Social Services, where the
- accused was under 18 years of age at the time of the offence, and conditions are stipulated pursuant to section 723(1). 1, and

---

157. In principle, there is nothing to prevent a charge from being reduced to more trivial matters by dropping the prosecution or limiting the prosecution. Section 721, according to which charges are dropped for the rest, cf. § 722.

158. Cf. presumably Gammeltoft-Hansen, Criminal Justice I, p. 186, and AÅ 1977.91f. This is stated in the section of the Attorney General's Notice on, for example. Young offenders, pt. 5.2.1 ., and on mentally deviant criminals, pt. 5.6 that "It is a prerequisite for dismissing charges that the accused is undoubted or that all the facts in the content of the crime have been acknowledged." 159. See

Gammeltoft-Hansen, Criminal Procedure I, p. 186.

See, however, Gammeltoft-Hansen and Peter Blume in U 1982B.362, which mentions a controversial case from the 1980s, where a charge of violation of strfl. Section 108 was settled with a drop of charges by the Minister of Justice, even though the accused claimed his innocence and wanted a trial.

---

156. On the principle of legality, see Gammeltoft-Hansen, Criminal Procedure I, pp. 59et seq. and p. 183. A more detailed review and discussion of the application of dismissal of charges and the principle of opportunity can be found in Smith, Criminal Procedure, pp. 115ff.

STEPHAN HURWITZ

# THE DANISH
# CRIMINAL PROCEDURE

4th edition

G. E. C. GADS PUBLISHING HOUSE

COPENHAGEN 1966

1st edition 1937-1940
2nd edition 1949
3rd edition 1959
4th edition 1966

## PREFACE TO 3. EDITION

In this 3. In the first edition of the Danish Criminal Procedure, significant abbreviations have been made of the text and notes. This has met a wish from students who will use the work or parts of it as a textbook. The abbreviations have been provided in particular by the postponement of material of minor practical importance and by references to foreign legislation and literature. Where there is special reason to do so, reference is made in this edition to the more detailed account in 2. edition.

On the other hand, it has been necessary to supplement the material included in the presentation with references to the Danish case law and literature of considerable interest to the subjects dealt with during the last decade, just as the text and notes have also been revised and kept up to

date.

June 1958.

Stephan Hurwitz.

that a prosecution in which only extrajudicial investigative steps have been carried out has been (definitively) abandoned.19

Section 975 only makes new proceedings before the court dependent on the condition imposed. On the other hand, it must be possible to carry out a new out-of-court investigation when there are special indications that the new investigations required by Section 975 will be obtained

evidence.

B. If a verdict of acquittal has been handed down pursuant to section 728, reopening may take place in accordance with the rules in section 976, which sets out even stricter conditions for reopening than section 975. However, if the acquittal is based on an unappealed lower court judgment, there will be no question of reopening, but this judgment may be appealed outside the ordinary time limit for appeal pursuant to section 949.

## 2, cf. § 963, 3. Stk.

---

### Chapter III.

THE PROSECUTION'S DISPOSAL OF THE PROSECUTION

#### §28.

Absolute and relative duty of
prosecution (principles of legality and opportunity)1).

I. Content of the principle of legality and opportunism. The

principle of legality is an expression of the view that in the exercise of the prosecution, questions of the appropriateness of the criminal prosecution should be disregarded. A prosecution must be brought when the evidentiary prerequisites are present to assume that a conviction can take place under the conditions of substantive criminal law. Strictly speaking, therefore, it constitutes a breach of the principle of legality if procedural law provides for exceptions to the duty to prosecute. However, as long as these exceptions are of a certain limited nature that does not allow for a freer discretion for the prosecution as to the appropriateness of the prosecution, the principle is considered to be retained as a principle. If, on the other hand, the legislation allows for such a freer discretion, the principle of opportunity is deemed to be recognised. The prosecution is then in principle subject to a balancing of interests: the interest of society in criminal prosecution must, depending on the circumstances, give way to opposing "opportune" considerations.

The usual terms for the opposing views are unfortunate. Possibility, as opposed to legality, gives the former principle a poor linguistic position. Also according to the principle of opportunity, the dismissal of prosecution must have a legal basis. And the considerations which may justify the apostasy are not merely considerations of convenience or opportunism in the pejorative sense of the word, but a number of various considerations of social and individual interest.

---

19) Cf. what was noted above in note 10 on § 826; Cfr. Deviating Th. Roepstorff in Juristen 1939, p. 55.

1) In addition to those in 2. edition p. 310 given literature references The negotiations at the annual meeting of the Swedish Criminal Association, N. K. Å. 1951-52, p. 2 ff.

Viduel value. The principles of legality and opportunism should therefore be replaced by more neutral designations. As such, the principles of absolute and relative prosecution have been chosen in this presentation.

## II. Argumentation. Problem.

A. The principle of legality has a certain connection with the absolute theory of punishment of substantive criminal law. If the criminal claim is perceived as a demand for retribution to atone for the wrong committed by the crime, this non-profit demand must be consistently implemented without regard to substantive or procedural considerations. If, on the other hand, a relative theory of punishment is followed, according to which punishment seeks its justification as a means in the service of practical ends, the principle of legality is no longer a necessary consequence of substantive criminal law. However, this is not to say that it has lost its ideal reasoning. No matter what the equipment. Theory of punishment that is used as a basis, it can be said, · that the principle of legality is most in line with the idea of justice, the demand for equal rights for all. Any possibility of dropping prosecution that is not bound to very fixed criteria opens up the possibility of deviations from this requirement. In addition, there are considerations of a more practical nature. A weakening or abandonment of the principle of legality may have a detrimental effect on the general preventive function of criminal law. The right to a discretionary waiver of prosecution may then have a weakening effect on the authority of the prosecution, whose impartiality can easily be called into question when the principle of legality is abandoned. Furthermore, it can create inconsistency in the application of the law and thus legal uncertainty when substantive criminal law is corrected through procedural means.

B. In support of the principle of opportunity, the following is argued in support of the principle of opportunity: The requirement for the unconditional and mandatory enforcement of the Criminal Code cannot be invoked in isolation as a requirement of justice, but must be weighed against other conflicting interests of society.2 As such, the

---

2) In addition to the considerations highlighted in the text, it may also be stated: the consideration of the injured party who wishes to avoid the public presentation of the case, which is particularly practical in cases of morality, cf. Kjerschow, N. T. f. s. 1928, p. 130.

political interest that may be linked to avoiding a trial that is dangerous to the internal or external security of the State, and the interest of society in avoiding a pedantic prosecution of trivial offences.

Furthermore, the public interest in criminal prosecution is violated by the same individual considerations that usually underlie the The Pardon Institute. When there are particularly mitigating circumstances that may justify a pardon, the situation will often be such that these circumstances strongly suggest that forbearance is already in favour of the criminal prosecution itself, since this in itself causes damage to the accused which the pardon will not be able to cause.

See Atre
218

To these reasons already emphasized in the older theory for not making the duty to prosecute absolute can be added that the development of criminal law has created a number of individualizing measures, especially of an educational nature towards young offenders, which often for both social and individual reasons must be preferred to punitive measures. The non-existence or waiver of criminal prosecution in return for the submission of such measures is an important part of modern criminal policy. C. Legal systems seeking to implement the principle of legality have not been able to avoid recognising exceptions. Although these exceptions are made dependent on special legal authority ('legal opporunitet'), they nevertheless break the abstract idea of justice in the principle of legality, which thus proves to be practically impracticable. On the other hand, the principle of opportunity does not open the way for arbitrariness in the prosecution, but seeks in various ways to regulate the prosecution's disposal of the prosecution. There is no real gulf between the two conceptions. When it is recognized that the principle of legality cannot and should not be asserted as an absolute axiom, the main practical problem becomes which interests can justify the abandonment of prosecution and, on the other hand, how guarantees can be created against arbitrariness in the prosecution, while at the same time making it to a certain extent dependent on considerations of expediency and equity. This is discussed in more detail below. It should only be emphasized here that such guarantees can be conceivably created in various ways, namely 1) through control exercised by the prosecutor's higher

and supreme bodies (hierarchical control), (2) through judicial control, (3) through the control of the injured party (or the granting of an actio popularis).3 In Denmark, where the prosecution has a wider control over the prosecution than is the case in the legal constitutions in general, control is generally limited to the first of these possibilities. Neither the courts nor the injured party usually have any legal influence on the execution of the prosecution. - On the other hand, at the ombudsman institution, see Act no. 203, 11: June 1954, established some control over the prosecution through a body independent of the prosecution service and the Ministry of Justice.

## III. Positive law.

As far as current Danish law is concerned, the position of principle is established in rpl. § 723, 2. paragraph 1, which provides for a general right to refrain from prosecution in particularly mitigating circumstances, and the omission may be made 'without prejudice to any public interest'. However, since the decision, apart from a number of specific limited exceptional cases, cf. section 29 below, is reserved to the Director of Public Prosecutions and the Minister of Justice, it has been thought to be possible to say that the principle of legality is, however, established as the norm for the prosecution authority of the public prosecutors.4 However, this formal view is misleading. In fact, the public prosecutors' power to waive prosecution is so far-reaching that it is most appropriate to characterize the duty to prosecute as relative.

### $29.
Dropping of prosecution1).

I. Police Matters.

In accordance with previous practice, rpl. added

The Chief of Police (the Commissioner of Police) a far-reaching discretionary authority to waive prosecution in police cases.

---

3) On the desirability of this, see in detail the 2nd chapter of this book. edition, pp. 359 et seq.

4) Cf. thus K. U. 1875, mot. pp. 31-32.

1) See the proceedings at the annual meeting of the Danish Criminal Association, 1938 (N. K. A. 1938, p. 169 et seq.), Knud Waaben, Conditional Criminal Judgments, 1948, p. 77 ff., Trolle in Juristen 1948, p. 317 ff., H. Olafsson and A. Bach in Juristen, 1949, 1. ff. N. K. A. 1951-52, pp. 2 ff., Kirchheiner in N. T. f. K. 1953, pp. 193 ff.

- Decisions of principle are reported in the Director of Public Prosecutions' Announcement Sheet.

The detailed rules are contained in rpl. Section 721, last paragraph 2). A distinction is then made between (1) cases where the case could be decided by the judge with a warning under Section 937 and (2) cases where such a decision 'is excluded'. Whereas in the former group of cases the Chief of Police is presumed to be able to waive prosecution on his own, in the latter cases he must obtain the consent of the Public Prosecutor. The distinction is at present of no practical interest, since under the current legislation, as far as can be seen, there are no examples of a police case being ruled out by means of a warning.3 The general rule will then be, · that the Chief of Police has an independent, unrestricted authority to refrain from prosecution in police cases, cf. hereby Decree no. 199, 13. July 19274).

However, the Chief of Police's decision is not binding on the superior prosecuting authorities, cf. section 27, III, A above. Section 931, as well as on the decision of police cases in court by decision to impose a fine or warning, rpl. SS 936 and 937, reference is made to a later place in the presentation (§ 39).

## II. State Litigation.

Regarding the dropping of prosecution in these cases, detailed rules are given in rpl. § 723, cf. Order. no. 244, 24. September 1957. In contrast to what applies in police cases, the subordinate prosecutors' offices do not have any discretionary access to drop prosecutions. As a rule, police chiefs have no power to independently waive prosecution in these cases.5 And as for

---

2) The provision has been inserted in accordance with the Bill of Justice 1914, R. T. 1913-14 A 3669.

3) Cf. the now repealed rule in Criminal Code Appendix no. 63, 1. April 1911 § 2 (certain cases of violence). On the other hand, the Act on Occupational Safety and Health of 1954 § 73, an example of a decision by warning being conditional on the consent of a special administrative body

4) According to Section A of the Order, police cases are to be submitted to the Public Prosecutor only in cases where this is required by special statutory provisions or specifically required either by an ordinary order covering certain cases or by a special order relating to a single case.

5) Cf. hereby rpl. § 720, last sentence, and § 808. The consent of the Public Prosecutor referred to in Section 720 must be bound by the conditions of Section 723.

WRITINGS FROM
THE DEPARTMENT OF LAW

# 22

BERNHARD GOMARD

Studies in the Danish

CRIMINAL PROCEDURE



THE NORWEGIAN ASSOCIATION OF LAWYERS PUBLISHERS

1976

BERNHARD GOMARD

Studies in the Danish

CRIMINAL PROCEDURE



JURISTFORBUNDETS FORLAG

COPENHAGEN