**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

MATTHEW STEIN and JEROME LHOTE,

    Plaintiffs/Counterclaim-Defendants,

            *v.*

LUKE MCGEE,

    Nominal Defendant,

SKATTEFORVALTNINGEN,

    Defendant/Counterclaim-Plaintiff,

            *v.*

LUKE MCGEE,

    Counterclaim-Defendant.

No. 23-CV-02508 (NRB)

---

**DEFENDANT/COUNTERCLAIM PLAINTIFF SKATTEFORVALTNINGEN'S**
**PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

HUGHES HUBBARD & REED LLP
William R. Maguire
Marc A. Weinstein
Neil J. Oxford
Gregory C. Farrell
One Battery Park Plaza
New York, New York 10004
(212) 837-6000

*Counsel for Defendant / Counterclaim*
*Plaintiff Skatteforvaltningen*

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ....................................................................................1

PROCEDURAL HISTORY........................................................................................4

PROPOSED FINDINGS OF FACT ............................................................................6

    I.      The Parties .................................................................................................6

    II.     The underlying fraudulent scheme...........................................................6

    III.    The settlement agreement and the letter agreement.................................8

            A.      The Final Settlement Amount ......................................................9

            B.      The Final Settlement Amount payment deadline......................10

            C.      Interest on the Final Settlement Amount ..................................11

            D.      Event of Default .......................................................................11

            E.      The Confessions of Judgment ...................................................13

    IV.    The true-up process.................................................................................13

            A.      Post-reclaim custodial fees .......................................................15

            B.      Incorrect calculation of Ganymede fees ...................................16

            C.      Allocation of Solo Capital fees between Danish and Belgian
                   trading .......................................................................................17

            D.      Allocation of Lindisfarne and North
                   Channel Bank fees between Danish and Belgian trading ..........17

            E.      Use of inaccurate foreign exchange rates ..................................18

            F.      Double-counted expenses ..........................................................19

    V.     Stein, Lhote, and McGee's confessions of judgment .............................19

    VI.    SKAT performed under section 8(f) of the settlement agreement.........21

    VII.   Stein and Lhote decided to stop performing
          under the settlement agreement without notice ......................................29

    VIII.  Stein, Lhote, and McGee failed to pay the Final Settlement
          Amount. ...................................................................................................33

IX.      Stein, Lhote, and McGee defaulted under the settlement agreement ................... 34

PROPOSED CONCLUSIONS OF LAW .................................................................. 36

I.      Counterclaim defendants are liable for breach of the settlement
agreement. ..................................................................................................... 36

     A.      SKAT did not breach section 8(f) of the settlement agreement ................ 37

     B.      Any breach of the settlement agreement by SKAT was immaterial .......... 39

     C.      Counterclaim defendants are obligated to pay SKAT the full
final settlement amount even if SKAT materially breached the
agreement. ............................................................................................. 42

II.      SKAT is entitled to entry of the 2021 Confession of Judgment. ........................... 43

     A.      CPLR § 3218's residency requirement does not apply
in this action and if it did, Lhote and McGee waived it ............................ 44

     B.      The 2021 Confession of Judgement
states the sum for which judgment may be entered. ................................. 46

     C.      The 2021 Confession of Judgment states the facts out of which the
debt arose. ............................................................................................. 47

III.      The True-Up Amount. ...................................................................................... 48

IV.      Even if the confession of judgment were invalid,
the Court should enter judgment in the same amount .......................................... 50

V.      Even if counterclaim defendants' interpretation of the sole remedy
provision were right, the Court should still enter judgment in
SKAT's favor. ................................................................................................. 53

VI.      Stein and Lhote's request for partial rescission
of the settlement agreement is in any event meritless ......................................... 55

     A.      The settlement agreement is not divisible ................................................ 56

     B.      Stein and Lhote failed to promptly seek rescission. ................................. 59

     C.      Stein and Lhote cannot rescind their
absolute and unconditional payment obligation. ...................................... 60

CONCLUSION .................................................................................................... 61

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ballow Brasted O'Brien & Rusin P.C. v. Logan*, 435 F.3d 235 (2d Cir. 2006) ...........................59

*Banque Arabe Et Internationale D'Investissement v. Maryland Nat'l Bank*, 850 F. Supp. 1199 (S.D.N.Y. 1994)...................................................................................59

*Barton Grp., Inc. v. NCR Corp.*, 796 F. Supp. 2d 473 (S.D.N.Y. 2011) ......................................37

*Brooklyn Union Gas Co. v. City of New York*, 104 Misc.2d 441 (Sup. Ct. N.Y. Cnty. 1980) .......................................................................................................................45

*CCR Int'l, Inc. v. Elias Grp., LLC*, No. 15 Civ. 6563 (PAE), 2020 WL 7629325 (S.D.N.Y. Dec. 22, 2020)..................................................................................................50

*Cherniak v. Trans-High Corp.*, No. 18 Civ. 7734 (AT), 2020 WL 1047884 (S.D.N.Y. Mar. 4, 2020) .................................................................................................39

*Deutsche Alt-A Secs. Mortg. Loan Trust, Series 2006-OA1 v. DB Structured Prods, Inc.*, 958 F. Supp. 2d 488 (S.D.N.Y. 2013)...................................................................54

*Deutsche Bank Nat'l Trust Co. v. Morgan Stanley Mortg. Cap. Holdings LLC*, 289 F. Supp. 3d 484 (S.D.N.Y. 2018)......................................................................................53

*Express Trade Cap., Inc. v. Horowitz*, 198 A.D.3d 529 (1st Dep't 2021).............................44, 45

*Flynn v. McGraw Hill LLC*, 120 F.4th 1157 (2d Cir. 2024)........................................................47

*Frank Felix Assocs., Ltd. v. Austin Drugs, Inc.*, 111 F.3d 284 (2d Cir. 1997) ...........................39

*GEM Holdco, LLC v. RDX Techs. Corp.*, No. 653694/2015, 2017 WL 1281811 (Sup. Ct. N.Y. Cnty. Apr. 6, 2017) .................................................................................53, 54

*Ginett v. Computer Task Grp., Inc.*, 962 F.2d 1085 (2d Cir. 1992)..............................................56

*Gonzalez v. Trees R US Inc.*, No. CV 14-7487 (AKT), 2021 WL 7283081 (E.D.N.Y. Mar. 31, 2021) ...............................................................................................43

*Great Am. Ins. Co. v. Zelik*, No. 19-cv-1805 (JSR), 2020 WL 85102 (S.D.N.Y. Jan. 6, 2020)...................................................................................................................55, 57

*Hadden v. Consol. Edison Co. of N.Y.*, 312 N.E.2d 445 (N.Y. 1974) ..........................................39

*Ace Secs. Corp. Home Equity Loan Trust, Series 2007-HE3 ex rel. HSBC Bank USA, Nat'l Ass'n v. DB Structured Prods., Inc.*, 5 F. Supp. 3d 543 (S.D.N.Y. 2014) ....................................................................................................................54

*Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274 (2d Cir. 1989).....................................47

*Jiras v. McKay*, 202 A.D.2d 640 (2d Dep't 1994)..........................................................................46

*Katzman v. Helen of Troy Texas Corp.*, No. 12 Civ. 4220(PAE), 2013 WL 1496952 (S.D.N.Y. Apr. 11, 2013)..................................................................................52

*Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133 (2d Cir. 2000) ...........................................50, 54

*Landmark Ventures, Inc. v. Wave Sys. Corp.*, No. 11 Civ. 8440(PAC), 2012 WL 3822624 (S.D.N.Y. Sept. 4, 2012)................................................................................52

*Levy v. Young Adult Inst., Inc.*, No. 13-CV-2861 (JPO), 2017 WL 1929505 (S.D.N.Y. May 9, 2017)........................................................................................42

*MASTR Adjustable Rate Mortgs. Trust 2006-OA2 v. UBS Real Estate Secs. Inc.*, No. 12 Civ. 7322(HB), 2013 WL 4399210 (S.D.N.Y. Aug. 15, 2013)....................54

*Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171 (2d Cir. 2007).......................37

*Metro. Life Ins. Co. v. Noble Lowndes Int'l, Inc.*, 643 N.E.2d 504 (1994) ..................................52

*Moreno-Godoy v. Kartagener*, 7 F.4th 78 (2d Cir. 2021)...............................................................36

*MQDC, Inc. v. Steadfast Ins. Co.*, No. 12-CV1424 (ERK), 2013 WL 6388624 (E.D.N.Y. Dec. 6, 2013) .........................................................................................45

*Mun. Cap. Appreciation Partners, I, L.P. v. Page*, 181 F. Supp. 2d 379 (S.D.N.Y. 2002) .........................................................................................................................56

*New Tech Cabling LLC v. Hyper 30 Inc.*, No. 651675/2023, 2024 WL 2982076 (Sup. Ct. N.Y. Cnty. June 11, 2024).......................................................................45

*New Windsor Volunteer Ambulance Corps, Inc. v. Meyers*, 442 F.3d 101 (2d Cir. 2006) .........................................................................................................................39

*Nimbus Therapeutics, LLC v. Celgene Corp.*, 570 F. Supp. 3d 100 (S.D.N.Y. 2021) .........................................................................................................................59

*Nomura Home Equity Loan, Inc., Series 2006-FM2 v. Nomura Credit & Cap., Inc.*, 133 A.D.3d 96 (1st Dep't 2015) ....................................................................53

*NSI Int'l, Inc. v. Mustafa*, No. CV 12-5528 (AKT), 2014 WL 12539347 (E.D.N.Y. Feb. 25, 2014)........................................................................................40

*Orix Real Estate Cap. Mkt., LLC v. Superior Bank, FSB*, 127 F. Supp. 2d 981
(N.D. Ill. 2000) ............................................................................................................53

*PaineWebber Inc. v. Bybyk*, 81 F.3d 1193 (2d Cir. 1996) ............................................50

*Postlewaite v. McGraw-Hill, Inc.*, 411 F.3d 63 (2d Cir. 2005) ...................................48

*PrecisionWorks MFG, LLC v. Union Funding Source*, No. 22 Civ. 8290 (LGS),
2022 WL 16857360 (S.D.N.Y. Oct. 25, 2022) ...........................................................50

*Pyskaty v. Wide World of Cars, LLC*, 856 F.3d 216 (2d Cir. 2017) ............................55

*Ream v. Berry-Hill Galleries, Inc.*, No. 16 Civ. 7462 (SLC), 2020 WL 5836437
(S.D.N.Y. Oct. 1, 2020) ..............................................................................................43

*Regency Club at Wallkill LLC v. Bienish*, 95 A.D.3d 879 (2d Dep't 2012) .................47

*Rodrigues v. Corona Advances, Inc.*, No. 15-CV-6815 (BCM), 2018 WL 4043149
(S.D.N.Y. Aug. 24, 2018) ............................................................................................43

*Samba Enter., LLC v. iMesh, Inc.*, No. 06 Civ. 7660(DC), 2009 WL 705537
(S.D.N.Y. Mar. 19, 2009) ................................................................................55, 56, 58

*Sasson v. Mann*, No. 15-CV-6601 (CS), 2019 WL 3532155 (S.D.N.Y. Aug. 2,
2019) ............................................................................................................................37

*Schatz v. Cellco P'ship*, 842 F. Supp. 2d 594 (S.D.N.Y. 2012) ....................................45

*Stein v. Skatteforvaltningen*, No. 23 Civ. 2508 (NRB), 2024 WL 382091
(S.D.N.Y. Feb. 1, 2024) ....................................................................................... *passim*

*Times Mirror Mags., Inc. v. Field & Stream Licenses Co.*, 103 F. Supp. 2d 711
(S.D.N.Y. 2000) ...........................................................................................................40

*Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89 (2d Cir.
2007) ............................................................................................................................36

*Wechsler v. Hunt Health Sys., Ltd.*, 330 F. Supp. 2d 383 (S.D.N.Y. 2004) .................40

*Wells Fargo Bank Minnesota, N.A. v. Nassau Broad. Partners, L.P.*, No. 01 Civ.
11255(HB), 2003 WL 22339299 (S.D.N.Y. Oct. 10, 2003) .......................................60

*Wells Fargo Bank, N.A. v. BrooksAmerica Mortg. Corp.*, 419 F.3d 107 (2d Cir.
2005) ............................................................................................................................42

*Xerox Corp. v. Bus-Let, Inc.*, No. 18-CV-6725-FPG, 2019 WL 2514855
(W.D.N.Y. June 18, 2019) ......................................................................................42, 60

*Xerox Corp. v. W. Coast Litho, Inc.*, 251 F. Supp. 3d 534 (W.D.N.Y. 2017) .........46, 47

v

**Statutes and Rules**

CPLR § 3218.................................................................................................20, 43, 44, 47

CPLR § 3218(a) ........................................................................................ *passim*

CPLR § 3218(b)...........................................................................................20, 44

U.C.C. § 2-719(2) .............................................................................................53

**Legislative and Administrative Proceedings**

2019-2020 Reg. Sess. (N.Y. 2019) ..................................................................20

Defendant/counterclaim plaintiff Skatteforvaltningen ("SKAT") respectfully submits its proposed findings of fact and conclusions of law, in advance of the bench trial scheduled to begin April 29, 2025.

## PRELIMINARY STATEMENT

Matthew Stein and Jerome Lhote pulled off a years' long, two-pronged fraud against SKAT. First, along with their business partners and a U.K. custodian called Solo Capital Partners, they used false certificates from Solo Capital to make fraudulent claims to SKAT, seeking refunds of tax purportedly withheld on dividends that their pension plans purportedly earned on massive holdings of Danish shares. These claims were all false—the shares did not exist, there were no dividends, and the pension plans that Stein and Lhote set up to submit the false claims had not suffered any withholding of tax on their non-existent shares. It was a complete scam. As SKAT paid these false claims, Stein and Lhote doubled down on the scheme. They ditched their business partners and Solo Capital and acquired a German bank which they used to issue more false certificates to support more—many more—false tax refund applications to SKAT and keep an even bigger portion of the fraudulent proceeds.

When SKAT discovered the fraud and threatened suit, Stein, Lhote, and Luke McGee (who had joined the scheme) were among the first to settle with SKAT, securing all the advantages of a "first mover" settlement. SKAT agreed to release its claims if Stein, Lhote, and McGee returned the proceeds that they (and their associates and controlled entities) received from SKAT. Settlement on these terms avoided exposure to joint and several liability for the entirety of the loss they caused SKAT, saving them from paying back the hundreds of millions of dollars that ended up in the hands of others, such as Solo Capital's principal Sanjay Shah. Just how favorable this settlement was for Stein, Lhote, and McGee was recently confirmed when a jury found the former business partners of Stein and Lhote liable on all SKAT's claims

(including, by clear and convincing evidence, fraud), and Judge Kaplan entered judgments holding them liable for the full amounts that SKAT had paid based on their fraudulent applications. The settlement spared Stein, Lhote, and McGee a similar fate; all they had to do was pay back every dollar of SKAT's money that they and their associates pocketed for themselves—not a dollar more, and not a Danish Kroner less.

Even better, SKAT agreed to give Stein, Lhote, and McGee years to pay back the proceeds of their fraud. Stein, Lhote, and McGee honored the initial payments due under the settlement, a breach of which could have revived SKAT's underlying claims, but stonewalled SKAT's efforts to conclude the complicated (but not *that* complicated) process of "truing up" the calculation of the exact amount of proceeds due under the settlement and defaulted in making the final payment. To add insult to injury, Stein and Lhote filed claims against SKAT, as cover for their default.

SKAT seeks to hold Stein, Lhote, and McGee to the settlement they agreed to, and in particular to its most fundamental requirement—that they repay every dollar that they obtained from SKAT. SKAT seeks entry of the confession of judgment that Stein, Lhote, and McGee signed to secure their now-breached obligations under the extended payment terms of the parties' May 2019 settlement agreement.

After having collectively paid SKAT only approximately DKK 1 billion of the total approximately DKK 1.6 billion settlement, Stein and Lhote now say that they no longer have to pay the remainder because SKAT had supposedly materially breached the agreement. But they kept their intention to have their cake and eat it too a secret from SKAT. They waited years— until March 2023, when the final settlement payment was almost due, to commence this action seeking a partial rescission of the agreement, exempting them from the inconvenience of

honoring the payment terms to which they agreed, while preserving their full enjoyment of the settlement release for which they were supposed to pay.

SKAT is entitled to judgment at bottom because SKAT did not breach the agreement, materially or otherwise. The record evidence shows that, consistent with section 8(f) of the agreement, SKAT, in writing and around the time it was executed, brought the settlement agreement and its terms to the attention of SØIK (the Danish State Prosecutor for Serious Economic and International Crime), and provided SØIK with a list of the settling parties and the language of section 8(f), which states that the agreement reflected the settling parties' good faith negotiations, that their cooperation under the agreement could lead to the recovery of additional funds, and that the agreement was in SKAT's best interests. SKAT provided this and similar information in emails to SØIK's highest officials and in drafts of its press release announcing the settlement that it shared with SØIK. And on top of that, SKAT officials had numerous phone calls and meetings with the SØIK prosecutors, both before and after the agreement was signed, during which they reiterated these settlement principles to SØIK and kept it abreast of the settlement and Stein, Lhote, and McGee's performance thereunder.

And even if, contrary to the record, a plausible argument could be made that SKAT technically breached the agreement, any such breach would have been immaterial. That some of SKAT's communications were not in writing or were sent just before, not promptly after, the agreement was signed hardly goes to the heart of the settlement agreement, which was SKAT's release of its claims in exchange for the settling parties return of their net proceeds from the fraud. And Stein, Lhote, and McGee have received the substantial benefit of SKAT's performance, *i.e.*, SKAT's release of its claims and communications with SØIK. Moreover, as a matter of Danish law, Stein, Lhote, and McGee's settlement with SKAT could not have had any

impact on SØIK's decision whether to indict them.  In Denmark, restitution and cooperation are relevant only to sentencing.  And there is no doubt that SKAT provided to SØIK, in writing, all that it was obligated to provide under section 8(f) before any sentencing of Stein, Lhote, or McGee, none of whom has yet been tried.

Arguments that any confession of judgment is "invalid" or "unenforceable" are likewise meritless.  CPLR § 3218's New York residency requirement does not apply in this action.  The confession of judgment states precisely the methodology by which the judgment amount is to be calculated in accordance with what the parties agreed in the settlement.  And it states concisely the facts out of which the debt arises.  The settlement agreement authorizes SKAT to seek entry by this Court of the confession of judgment if Stein, Lhote, and McGee fail to pay the full settlement when due, which they indisputably failed to pay.  Thus, the Court should enter judgment in SKAT's favor in the amount of DKK 1,044,675,980, in accordance with the parties' agreement.

## **PROCEDURAL HISTORY**

Plaintiffs Stein and Lhote commenced this action on March 24, 2023, alleging that SKAT breached the parties' May 28, 2019 settlement agreement and seeking a declaratory judgment that the 2021 confession of judgment they, along with counterclaim defendant McGee, executed is invalid under New York law.  (*See generally* ECF No. 11.)[1]

For their breach of contract claim, plaintiffs seek partial rescission of the settlement agreement.  In particular, plaintiffs allege that the approximately 1.6 billion Danish Kroner

---

1.  On March 6, 2024, Stein and Lhote amended their complaint to, among other things, add a few additional factual allegations and name McGee as a nominal defendant.  (ECF No. 94, "Am. Compl.".)  SKAT and McGee both answered Stein and Lhote's amended complaint on June 5, 2024.  (ECF Nos. 122, 123.)  Citations to Stein and Lhote's pleading are to their operative March 6, 2024 First Amended Complaint.

("DKK") settlement agreement was divided into two phases, a first phase wherein Stein, Lhote, McGee and others agreed to pay SKAT DKK 950 million in exchange for a release of SKAT's claims, and a second phase wherein Stein, Lhote, and McGee agreed to pay SKAT at least an additional DKK 600 million and to cooperate with SKAT in exchange for SKAT agreeing to make certain written representations to SØIK (the Danish State Prosecutor for Serious Economic and International Crime)[2] and to maintain the settlement agreement as confidential.  (Am. Compl. ¶¶ 3-5, 46-69.)  Plaintiffs allege that SKAT breached the supposed second phase of the agreement by failing to make the requisite written representations to SØIK and seek rescission of just the purported second phase of the agreement—and only that phase of the agreement.  (*Id.* ¶¶ 70-82, Prayer for Relief ¶¶ v, viii, ix.)

On June 15, 2023, SKAT filed its amended answer, affirmative defenses, and counterclaims.  (ECF No. 48, "SKAT's Answer & Counterclaims.")  In its answer, SKAT denied plaintiffs' allegations that it had breached the settlement agreement.  (*See generally id.* ¶¶ 1-106.)[3]  And in its counterclaims, SKAT alleged that plaintiffs, along with counterclaim defendant McGee, whom SKAT joined to the action, breached the agreement by failing to pay SKAT the settlement as and when due.  (*See generally id.* ¶¶ 123-91.)  To remedy counterclaim defendants' breach, SKAT seeks entry of the 2021 confession of judgment, or in the alternative, entry of judgment for breach of contract damages in the same amount as provided for in the confession of judgment.  (*Id.* ¶¶ 188-89.)

---

2.  SØIK ceased to exist at the end of 2021.  Effective January 1, 2022, the newly established National Unit for Special Crime (NSK) took over the responsibilities related to the dividend case.  (Statement of Steen Bechmann Jacobsen, dated April 7, 2025 ("Bechmann Jacobsen Stmt.") ¶ 3 n.1.)  SKAT uses "SØIK" to refer to the relevant Danish prosecutor's office herein, as that is what it was called during the relevant time.

3.  SKAT's answer to the amended complaint likewise denied plaintiffs' claims.  (*See generally* ECF No. 122.)

On February 1, 2024, the Court denied counterclaim defendants' motion to dismiss SKAT's counterclaims. *See Stein v. Skatteforvaltningen*, No. 23 Civ. 2508 (NRB), 2024 WL 382091 (S.D.N.Y. Feb. 1, 2024). And on March 4 and 6, 2024, McGee and Stein and Lhote, respectively, filed their answers to SKAT's counterclaims, in which they each asserted as defenses that SKAT materially breached the settlement agreement and that the 2021 confession of judgment is invalid. (*See generally* ECF Nos. 93, 94.)

## PROPOSED FINDINGS OF FACT

### I.    The Parties.

1.     Defendant-counterclaim plaintiff SKAT is the ministerial authority of the Kingdom of Denmark charged with the assessment and collection of Danish taxes. (SKAT's Answer & Counterclaims ¶ 16; Am. Compl. ¶ 16.)

2.     Plaintiff-counterclaim defendant Matthew Stein is a citizen of the State of New York. (Am. Compl. ¶ 14.)

3.     Plaintiff-counterclaim defendant Jerome Lhote is a citizen of the State of Florida. (Am. Compl. ¶ 15.)

4.     Nominal defendant and counterclaim defendant Luke McGee is a citizen of the State of Florida. (Am. Compl. ¶ 17.)

### II.    The underlying fraudulent scheme.

5.     From 2012 to 2015, Stein, Lhote, and McGee participated in a supposed dividend arbitrage scheme that involved U.S. pension plans submitting claims to SKAT (which SKAT alleges were fraudulent) for refunds of taxes supposedly withheld at source from dividends Danish companies issued to their shareholders. (Statement of Gry Ahlefeld-Engel, dated April 7, 2025 ("Ahlefeld-Engel Stmt.") ¶¶ 9-10.) In 2012 and 2013, Stein and Lhote participated in the scheme with Richard Markowitz and John van Merkensteijn, their partners in a company called

Argre Management.  (*Id.* ¶ 9.)  During this period, the Argre partners used Solo Capital Partners, a brokerage owned by Sanjay Shah, as their pension plans' purported custodial bank to generate myriad "dividend credit advices" representing falsely that the plans owned Danish shares, received dividends on those shares, and suffered withholding taxes on the dividends, which dividend credit advices the Argre partners submitted to SKAT to support their fraudulent tax refund claims.  (*Id.*)  In late 2013 or early 2014, Stein and Lhote split from Markowitz, van Merkensteijn, and Shah, and along with McGee, bought a German bank called North Channel Bank which served as the custodian to generate more false dividend credit advices to submit to SKAT.  (*Id.* ¶ 10.)  From 2014 through August 2015, when SKAT uncovered the fraud, the three of them used a new, larger group of pension plans to submit the false tax refund claims to SKAT. (*Id.*)  In total, across both periods, Stein, Lhote, McGee and their co-conspirators defrauded SKAT out of approximately DKK 2.9 billion in purported refunds of tax that was never paid or owed in the first place.

6.      In September 2019, North Channel Bank pleaded guilty to criminal fraud in Denmark for its role in creating the false dividend credit advices.  (*Id.*; Declaration of Marc A. Weinstein, dated April 7, 2025 ("Weinstein Decl.") Ex. 526.)  In December 2024, a Danish court found Shah guilty of criminal fraud and sentenced him to 12 years' imprisonment, the highest possible sentence for a fraud conviction in Denmark.  (Weinstein Decl. Ex. 510.)  And in February 2025, a jury in the Southern District of New York found Markowitz and van Merkensteijn liable to SKAT to the tune of over $310 million USD each, including amounts for which they are jointly and severally liable, for their respective roles in the fraudulent scheme. That fraud verdict included Argre-era plans in which Stein and Lhote were participants, and the

judgment amounts reflect credits against an even higher amount based on the payments made by the parties with whom SKAT settled, including Stein, Lhote, and McGee.

### III.    The settlement agreement and the letter agreement.

7.    On May 28, 2019, SKAT entered into a settlement agreement with over 50 individuals and over 100 pension plans, partnerships, and other entities, collectively defined in the agreement as the "Covered Parties," including Stein, Lhote, and McGee, whom the agreement defined as the "Covered Parties' Designees." (Weinstein Decl. Ex. 501 (Settlement Agreement, dated May 28, 2019 ("Settlement Agreement")) §§ 1(i), (j).) On that same date, *i.e.*, May 28, 2019, SKAT and Stein, Lhote, McGee, and two other Covered Parties entered into a letter agreement to "supplement and amend terms of the" contemporaneously executed settlement agreement. (Weinstein Decl. Ex. 502 (Letter Agreement, dated May 28, 2019 ("Letter Agreement")) § 1.)

8.    As the settlement agreement recounts, the agreement was "intended by the Parties to fully, finally, and forever resolve, discharge, settle and dismiss the Settled Matters," *i.e.*, "any and all Claims [SKAT] has or may have against the Covered Parties in any way arising out of, in connection with or relating to the Reclaim Applications and the related trading by the Covered Parties in Danish company shares," "upon and subject to the terms and conditions" set forth in the agreement. (Settlement Agreement at 2, § 1(bb).)[4]

9.    Thus, the relevant background included in the agreement explained that SKAT "believes that it has meritorious Claims . . . against the Covered Parties," who, in turn, "believe that they have meritorious defenses to [SKAT's] Claims." (*Id.* Recitals B, C.) And that "after

---

4.    The "Reclaim Applications" were defined in the settlement agreement to mean "the applications filed with [SKAT] to reclaim taxes withheld from dividends paid on Danish company shares owned or allegedly owned by the Pension Plans between 2012 and 2015." (*Id.* § 1(z).)

extensive and good faith negotiations, the Parties desire to settle all Settled Matters . . . based on the terms and conditions set forth in this Agreement." (*Id.* Recital D.)  It was "the Parties' understanding and a fundamental principle on which th[e] Agreement [was] based that" under the agreement the Covered Parties would be "paying to [SKAT] the full amount of the Net Proceeds . . . that the Covered Parties received directly or indirectly from Reclaim Applications . . . made to" SKAT. (*Id.* Recital F.)[5]

### A.   The Final Settlement Amount.

10.     In keeping with that fundamental principle, the "Final Settlement Amount" that the Covered Parties agreed to pay SKAT to settle the Settled Matters could not be less than their Net Proceeds and the Covered Parties' "obligation to pay th[at] Final Settlement Amount is absolute and unconditional." (*Id.* §§ 1(q), 2(c).)  Because the amount of the Net Proceeds was uncertain at the time the agreement was executed, the parties agreed on a "Preliminary Settlement Amount" of DKK 1.55 billion, as an estimate of the Covered Parties' Net Proceeds, and a true-up process to determine the actual amount of Net Proceeds. (*Id.* §§ 1(y), 2(e).)

11.     "In the event that" the true-up process "establishe[d] that the Net Proceeds are greater than the Preliminary Settlement Amount," then SKAT also is entitled to a "True-Up Amount" "equal to the difference between the Net Proceeds and the Preliminary Settlement Amount." (*Id.* § 2(e)(iii).)  On the other hand, if the true-up process "establishe[d] that the Net Proceeds are less than the Preliminary Settlement Amount, the Covered Parties" are "entitled to

---

5.   The Covered Parties' "Net Proceeds" from Reclaim Applications is defined in the settlement agreement as "(A) Gross Reclaims," *i.e.*, the amount SKAT paid on the Reclaim Applications, "less (B) all of the Covered Parties' expenses associated with Reclaim Applications for which [SKAT] made payments, specifically as follows: (1) reclaim agent fees, (2) tax reclaim advisory service fees, (3) brokerage fees and commissions, (4) custodial and clearing fees, (5) trading expenses, and (6) financial institution account charges and less (C) any other portion of Gross Reclaims received by parties excluded from the releases" in the agreement "that were not otherwise subsequently provided to any Covered Party." (*Id.* § 2(e).)

no adjustment in the Preliminary Settlement Amount." (*Id.* § 2(e)(ii).) Thus, the settlement agreement defined the Final Settlement Amount as "the sum of (i) the Preliminary Settlement Amount; (ii) any True-Up Amount;" and (iii) "the interest, if any, accrued" under the agreement (discussed below). (*Id.* § 1(q).) And the Covered Parties' Designees, *i.e.*, Stein, Lhote, and McGee, represented to SKAT that "the Preliminary Settlement Amount plus the True-Up Amount equals or exceeds the Net Proceeds received by the Covered Parties, directly or indirectly, from the Reclaim Applications." (*Id.* § 2(f).)

**B.     The Final Settlement Amount payment deadline.**

12.     The settlement agreement established a "Final Settlement Payment Date" by which the Final Settlement Amount had to be paid in full, along with interim deadlines along the way and interest to accrue if amounts remained unpaid past a certain point. (*Id.* §§ 1(r), 2(d).) The settlement agreement set the Final Settlement Payment Date as May 28, 2022, *i.e.*, "the date that is up to and including [36] months from the [May 28, 2019] Effective Date." (*Id.* §§ 1(n), (r).) And under the letter agreement, the Final Settlement Payment Date was "automatically . . . extended by one . . . additional year," *i.e.*, until May 28, 2023, "unless the gross proceeds from the sale of North Channel Bank," the German bank owned by Stein, Lhote, McGee and the other two Covered Parties that were parties to the letter agreement, equaled or exceeded a certain amount. (Letter Agreement § 6.)

13.     Payment of the Preliminary Settlement Amount was divided into a DKK 950 million "Initial Cash Payment" and a DKK 600 million "Additional Cash Payment." (Settlement Agreement §§ 2(a), (b).) The Covered Parties were obligated to make the DKK 950 million Initial Cash Payment no later than July 26, 2019, and the DKK 600 million Additional Cash Payment "over time . . . as the deadlines for payment occur" and, in any event, no later than the Final Settlement Payment Date. (*Id.* §§ 2(a), (b).) Aside from the Final Settlement Payment

Date, those deadlines were set forth in the letter agreement, under which, Stein, Lhote, and

McGee agreed "to use their best efforts" to liquidate certain "Illiquid Assets" and "apply such

proceeds within ten . . . Business Days[] to make payments . . . up to, and in no event greater

than, the Final Settlement Amount." (Letter Agreement § 5.) "Upon the completion of the

Initial Cash Payment," SKAT's release of its claims against the Covered Parties arising from the

Settled Matters became effective. (Settlement Agreement § 4(a).)

### C. <u>Interest on the Final Settlement Amount.</u>

14.    "In the event that the" Additional Cash Payment and the True-Up Amount,

collectively defined as the "Subsequent Cash Payment Amount," were not "paid in full to

[SKAT] within [24] months from the Effective Date," *i.e.*, by May 28, 2021, "Applicable

Interest" at the rate of 8.05 percent "simple interest per annum" would "accrue on the remaining

unpaid amount of the Subsequent Cash Payment Amount, until the Final Settlement Payment

Date or the Subsequent Cash Payment Amount has been paid in full." (*Id.* §§ 1(c), 1(dd),

2(d)(ii)(1).) Stein, Lhote, and McGee, *i.e.*, the Covered Parties' Designees, were required to pay

all such interest, along with the full Subsequent Cash Payment Amount, no later than the Final

Settlement Payment Date. (*Id.* §§ 2(d)(i), 2(d)(iii).) And Stein, Lhote, and McGee represented

to SKAT that "on payment of the full amount of the Subsequent Cash Payment Amount, the

Covered Parties will have paid back to [SKAT] the Net Proceeds that they received, directly or

indirectly, from the Reclaim Applications," in accordance with the parties' understanding and the

fundamental principle on which the settlement was based. (*Id.* § 2(f).)

### D. <u>Event of Default.</u>

15.    Under sections 2(a) and (b) of the settlement agreement, all the Covered Parties,

not just Stein, Lhote, and McGee, were obligated to pay the Preliminary Settlement Amount.

(*Id.* §§ 2(a)-(b).) Section 2(c), however, provides that if the Covered Parties timely make the

Initial Cash Payment, then only Stein, Lhote, and McGee, as the Covered Parties' Designees, would be liable for a failure to pay the rest, *i.e.*, SKAT's "sole remedy" in those circumstances would be filing the confessions of judgment Stein, Lhote, and McGee were required to execute under the agreement (discussed below). (*Id.* § 2(c).) As such, section 2(d) provides that the Covered Parties' Designees alone are required to pay the Subsequent Cash Payment Amount and any interest accrued thereon no later than the Final Settlement Payment Date. (*Id.* § 2(d).)

16.    Under section 5(a), if the Covered Parties' Designees, *i.e.*, Stein, Lhote, and McGee, failed to "make any payment as and when required by th[e] Agreement," then they would "be in default." (*Id.* § 5(a).) "Upon such [a] default," SKAT was required to provide a "Default Notice," *i.e.*, "written notice . . . of the breach," and if the Covered Parties' Designees failed to make the "required payment within ten . . . Business Days from receipt of the Default Notice," that constitutes an "Event of Default," with the "Default Date" being "the eleventh . . . Business Day after which the Covered Parties' Designees receive[d] the Default Notice." (*Id.* §§ 5(b), (c).)

17.    Upon such an Event of Default, Stein, Lhote, and McGee, as the Covered Parties' Designees, are required to pay SKAT: (i) the "unpaid portion of the Subsequent Cash Payment Amount," *i.e.*, the DKK 600 million Additional Cash Payment and any True-Up Amount; (ii) any interest accrued on the Subsequent Cash Payment Amount pursuant to section 2(d)(ii); and (iii) additional default interest, at the rate of 8.05 percent, "on the unpaid amount of the Subsequent Cash Payment Amount as of the Default Date, for the period starting January 1, 2014 and running until the earlier of the Default Date or [24] months from the Effective Date," *i.e.*, May 28, 2021. (*Id.* §§ 5(d)(i), (ii), (iii).)

      E.      **The confessions of judgment.**

18.    As security for SKAT in case of an Event of Default, the agreement required Stein, Lhote, and McGee to "together provide an executed and notarized Affidavit of Confession of Judgment . . . to SKAT" "[s]imultaneously with the . . . Initial Cash Payment" and "a new Confession of Judgment" "[w]ithin ten . . . Business Days of the second . . . anniversary of the Effective Date," *i.e.*, May 28, 2021, both in the form attached as exhibits to the agreement.  (*Id.* § 4(c).)

19.    The confessions of judgment exhibited to the agreement provided for Stein, Lhote, and McGee to confess judgment "jointly and severally and in favor of" SKAT in the amount they were obligated to pay in case of an Event of Default under section 5(d) of the agreement, *i.e.*, "(a) the Subsequent Cash Payment Amount," comprised of the DKK 600 million Additional Cash Payment and the True-Up Amount, "(b) less any payments made through the Default Date to fund the Subsequent Cash Payment Amount," "(c) plus Applicable Interest" on the Subsequent Cash Payment Amount "calculated pursuant to Section 2(d)(ii)," "(d) plus" the default interest "calculated pursuant to Section 5(d)(iii)."  (*Id.* Exs. 4, 5.)

20.    The settlement agreement authorized SKAT to "file or otherwise execute upon a Confession of Judgment in any of the New York Courts," defined as "the federal and state courts of the State of New York," "only if an Event of Default, as defined in Section 5, has occurred." (*Id.* §§ 4(c), 12; *see also id.* § 5(c) ("On the Default Date, [SKAT] shall be authorized to file the Confession of Judgment and to seek and enforce the judgment that the Court enters.").)

**IV.**    **The true-up process.**

21.    Under section 2(e)(i) of the settlement agreement, "[t]he Covered Parties agree[d] to use their best efforts to provide [SKAT] with documentation sufficient to establish the total amount of Net Proceeds received by the Covered Parties directly or indirectly from the Reclaim

Applications." (*Id.* § 2(e)(i).) And the parties agreed to "cooperate to establish the Gross Reclaims and the Net Proceeds received by each Pension Plan." (*Id.*)[6] Under the agreement, only the Covered Parties' expenses "associated with Reclaim Applications for which [SKAT] made payments" may be deducted from the Gross Reclaims to determine the Net Proceeds the Covered Parties received. (*Id.* § 2(e).) Thus, expenses associated with the Covered Parties' refund claims for which SKAT did not make payment, such as those refund claims that were pending when SKAT discovered the fraud in August 2015, do not count for the purpose of calculating the Covered Parties' Net Proceeds from the Gross Reclaims that SKAT did pay.

22.     In accordance therewith, the Covered Parties, assisted by their attorneys at Wachtell, Lipton, Rosen & Katz ("Wachtell"), provided to SKAT 80 spreadsheets, one for each of the 80 U.S. pension plans that submitted Reclaim Applications covered by the settlement agreement, collectively setting forth their calculation of the Covered Parties' Net Proceeds. (Statement of Marc E. Landy, dated April 7, 2025 ("Landy Statement") ¶ 6.) Each spreadsheet included a summary tab setting forth the respective plan's "Gross Reclaims" (*i.e.*, the amounts SKAT paid on the plan's Reclaim Applications) and the amounts of the different expenses deducted to arrive at the Net Proceeds for that plan, and additional tabs with the details for each category of deductions. (*Id.*)[7] By Wachtell's calculation, the Covered Parties' Net Proceeds

---

6. "Gross Reclaims" is defined in the settlement agreement to mean "all reclaim amounts from [SKAT] received by or on behalf of the Pension Plans in respect of applications to reclaim taxes withheld or allegedly withheld from dividends paid on Danish company shares the Pension Plans owned or allegedly owned between 2012 and 2015." (Settlement Agreement § 1(s).)

7. The "expenses associated with Reclaim Applications" that the agreement permits to be deducted from the Gross Reclaims to calculate the Covered Parties' Net Proceeds are "(1) reclaim agent fees, (2) tax reclaim advisory service fees, (3) brokerage fees and commissions, (4) custodial and clearing fees, (5) trading expenses, and (6) financial institution account charges." (Settlement Agreement § 2(e).)

totaled DKK 1,576,008,293.39, *i.e.*, DKK 26,008,293.39 more than the Preliminary Settlement Amount. (*Id.* ¶ 9.)

23.    SKAT retained AlixPartners, LLP ("AlixPartners") to assist in investigations and legal matters relating to the dividend arbitrage scheme. As part of that engagement, AlixPartners analyzed the spreadsheets and supporting documents Wachtell and the Covered Parties produced. (*Id.*, ¶¶ 1, 4, 6.) Based on that review, AlixPartners identified six issues with the Covered Parties' calculation of their Net Proceeds that resulted in an understatement of that amount by DKK 27,593,713.67. (*Id.*, ¶¶ 17, 23, 31, 35, 36, 40, 42.) As such, the True-Up Amount that Stein, Lhote, and McGee owe SKAT is DKK 53,602,007.06, exclusive of interest, *i.e.*, the DKK 26,008,293.39 that Wachtell calculated plus the additional DKK 27,593,713.67 from AlixPartners' analysis.[8]

### A.    Post-reclaim custodial fees.

24.    First, the Covered Parties deducted "custodial fees" that were not associated with the Reclaim Applications for which SKAT made payments in that they were incurred by the pension plan after SKAT paid the last of that plan's Gross Reclaims. (Landy Statement ¶¶ 12-17.) In furtherance of the scheme, the pension plans that submitted the Reclaim Applications maintained accounts at securities custodians where they purported to custody Danish shares, each of which custodians charged a monthly or quarterly custodial fee. (*Id.* ¶ 12.) Certain of the plans continued to maintain those accounts, and incur fees, for months or even years after SKAT's last payment, including after SKAT's announcement in August 2015 of suspected fraud

---

8.    SKAT withdraws its claim that Stein, Lhote, and McGee's Net Proceeds calculation improperly deducted DKK 55 million in fees paid to North Channel Bank because those fees were subsequently paid back to them in the form of dividends based on their ownership of the bank. (*See* SKAT's Answer & Counterclaims at ¶¶ 158-60.) SKAT, however, maintains its claim that Stein, Lhote, and McGee's calculation improperly deducted portions of North Channel Bank fees for the reasons stated below.

and suspension of any reclaim payments.  (*Id.* ¶¶ 13, 15.)  For instance, one of the Covered Party plans maintained an account at the custodian Lindisfarne.  (*Id.* ¶ 15.)  SKAT made its last payment to that plan's Lindisfarne account on July 13, 2015, but the plan paid DKK 638,112.16 to Lindisfarne for custodial fees for more than three years thereafter, through December 2018, which fees the Covered Parties deducted in calculating the plan's Net Proceeds.  (*Id.*)  In a few instances, the Covered Parties also deducted custodial fees paid to custodians that were not associated with any Reclaim Application.  (*Id.* ¶ 16.)  Across all pension plans, the Covered Parties deducted DKK 19,624,912.18 in custodial fees paid after SKAT's last payment or to custodians otherwise unassociated with the plan's Reclaim Applications paid by SKAT.  (*Id.* ¶ 17.)

### B.    Incorrect calculation of Ganymede fees.

25.    Second, the Covered Parties miscalculated the amount of "tax reclaim advisory services fees" certain of the pension plans paid to an entity in the Cayman Islands owned and controlled by Sanjay Shah called Ganymede.  (*Id.* ¶¶ 18-23.)  Under their agreements with Ganymede, the pension plans paid Ganymede 66.67 percent of the net refund the plan received after the reclaim agent that the plan hired to submit the refund claim took its fee.  (*Id.* ¶¶ 20-21.)[9] In their Net Proceeds calculation, however, Wachtell and the Covered Parties calculated the Ganymede tax reclaim advisory fees based on the gross amounts of SKAT's refund payments, without first taking out the reclaim agent fees.  (*Id.* ¶ 20.)  Taking those reclaim agent fees into account, the Covered Parties deducted DKK 3,709,941.25 too much in Ganymede fees.  (*Id.* ¶ 23.)

---

9.    The reclaim agent fees were separately accounted for and deducted in the Covered Parties' calculation of Net Proceeds.  (*Id.* ¶ 25.)

**C.**    **Allocation of Solo Capital fees between Danish and Belgian trading.**

26.    Third, the Covered Parties deducted trading fees paid to Solo Capital in their calculation of Net Proceeds without properly allocating the portion of those fees which were not associated with the Reclaim Applications for which SKAT made payments because they related to purported trading in Belgian shares in the same accounts. (*Id.* ¶¶ 24-32.) In their true-up spreadsheets, Wachtell and the Covered Parties allocated trading fees between Danish and Belgian trading based on the relative amount of the respective plan's supposed trading in Belgian and Danish shares. (*Id.* at ¶¶ 25-26.) But in doing so, Wachtell and the Covered Parties failed to account for all the supposed Belgian trading. (*Id.* ¶¶ 27-30.) Taking that omitted Belgian trading into account, Wachtell and the Covered Parties erroneously deducted DKK 2,465,236.37 in fees related to Belgian trading. (*Id.* ¶ 31.)

27.    For the purposes of this litigation, however, Stein, Lhote, and McGee have backtracked on allocating any amount of the trading fees to Belgian trading, and now take the position that the full amount of all Solo Capital fees should be deducted. (*Id.* ¶ 32.) Thus, on top of the DKK 2,465,236.37 in Belgian fees they missed during the true-up process, Stein, Lhote, and McGee now seek to deduct an additional DKK 21,599,845.40 in Solo Capital trading fees that they previously acknowledged should not be deducted. (*Id.* ¶ 26.)

**D.**    **Allocation of Lindisfarne and North**
**Channel Bank fees between Danish and Belgian trading.**

28.    As with the Solo Capital fees, Wachtell and the Covered Parties made some effort during the true-up process to allocate trading fees paid to the custodians Lindisfarne and North Channel Bank between Danish and Belgian trading. (*Id.* ¶ 33.) In their spreadsheets, Wachtell and the Covered Parties allocated a total of DKK 317,693.06 in Lindisfarne and North Channel Bank fees to Belgian trading (and did not deduct that amount from the Gross Reclaims). (*Id.*

17

¶ 33.)  But they again failed to account for the entirety of the supposed Belgian trading by deducting certain custodial fees paid to Lindisfarne and North Channel Bank in full, without allocating any portion of those fees based on the supposed Belgian trading in the accounts. Allocating those fees based on the plans' trading in Danish versus Belgian shares, Wachtell and the Covered Parties erroneously deducted DKK 702,357.74.  (*Id.* ¶¶ 35-36.)

29.    Now, however, Stein, Lhote, and McGee disclaim the true-up spreadsheets on these fees as well and take the position that some or all of the DKK 317,693.06 in Lindisfarne and North Channel Bank fees they previously acknowledged were associated with Belgian trading should be deducted fully in calculating the Net Proceeds.  (*Id.* ¶ 37.)

30.    In summary, across all custodians, *i.e.*, Solo Capital, Lindisfarne, and North Channel Bank, Stein, Lhote, and McGee now seek to improperly deduct as much as DKK 25,085,132.57, including (i) the DKK 21,599,845.40 in Solo Capital fees and some or all of the DKK 317,693.06 in Lindisfarne and North Channel Bank fees that the Covered Parties including Stein, Lhote, and McGee, previously acknowledged should not be deducted in their true-up spreadsheets, (ii) an additional DKK 2,465,236.37 in Solo Capital fees and DKK 702,357.74 in Lindisfarne and North Channel Bank fees to adjust for Belgian trading not accounted for in the Covered Parties' true-up spreadsheets.  (*Id.* ¶¶ 26, 31, 35-36.).

### E.    Use of inaccurate foreign exchange rates.

31.    Fourth, the Covered Parties' calculation of Net Proceeds used average annual foreign exchange rates rather than the applicable exchange rate on the date of each expense where such information was available, and as a result erroneously deducted DKK 686,817.00 from the Net Proceeds.  (*Id.* ¶¶ 38-41.)

F. **Double-counted expenses.**

32.     Finally, the Covered Parties' Net Proceeds calculation double-counted certain expenses, which resulted in an understatement of the Net Proceeds by DKK 404,449.13.  (*Id.* ¶ 42.)

V. **Stein, Lhote, and McGee's confessions of judgment.**

33.     In accordance with section 4(c) of the settlement agreement, Stein, Lhote, and McGee provided SKAT with an executed and notarized confession of judgment, dated May 28, 2019, and a new confession of judgment (the "2021 Confession of Judgment") executed by Lhote on June 9, 2021, and by Stein and McGee on June 10, 2021.  (Weinstein Decl. Exs. 503, 504.)

34.     As with the confessions of judgment exhibited to the settlement agreement, the 2021 Confession of Judgment authorized entry of judgment against Stein, Lhote, and McGee jointly and severally and in favor of SKAT in the amount they were required to pay SKAT in case of an Event of Default under section 5(d) of the agreement: (a) the Subsequent Cash Payment Amount, (b) less any payments of the Subsequent Cash Payment Amount through the Default Date, (c) plus interest accrued on the Subsequent Cash Payment Amount under section 2(d)(ii) of the agreement, (d) plus default interest accrued on the Subsequent Cash Payment Amount pursuant to section 5(d)(iii) of the agreement.  (Weinstein Decl. Ex. 503 ¶ 2.)  Stein, Lhote, and McGee further agreed in the 2021 Confession of Judgment that the judgment amount would be set forth in an affidavit or affirmation by SKAT or its attorney, respectively, attached to the confession of judgment at the time of entry.  (*Id.* ¶ 3.)

35.     In the 2021 Confession of Judgment, Stein stated that he resided in New York County; Lhote stated that he resided in Orange County, Florida and authorized entry of the confession of judgment in New York County; and McGee stated that he resided in Philadelphia

County, Pennsylvania and authorized entry of the confession of judgment in New York County. (*Id.* ¶ 1.)[10]

36.    In August 2019, in between when Stein, Lhote, and McGee executed the 2019 and 2021 confessions of judgment, CPLR § 3218 was amended to provide, in relevant part, that "a judgment by confession may be entered, without an action . . . upon an affidavit executed by the defendant . . . stating the county where the defendant resides" and that "it may be filed . . . only with the clerk of the county where the defendant's affidavit stated that the defendant resided when it was executed or where the defendant resided at the time of filing."  CPLR §§ 3218(a), (b).  Before the 2019 amendment, CPLR § 3218 required that the affidavit of confession of judgment state "the county where the defendant resides or, if he is a non-resident, the county in which entry is authorized," and permitted it to be filed "with the clerk of the county where the defendant stated in his affidavit that he resided when it was executed or, if the defendant was then a non-resident, with the clerk of the county designated in the affidavit."  *See* S.B. 6395, 2019-2020 Reg. Sess. (N.Y. 2019).

37.    McGee "understood" that New York law had changed in this respect before executing the 2021 Confession of Judgment.[11]  Despite knowing about that change in the law, in the 2021 Confession of Judgment, McGee nevertheless authorized entry of the confession of judgment against himself in New York County.  (Weinstein Decl. Ex. 507 at ¶ 1.)  Lhote

---

10. In the 2019 confession of judgment, Stein and Lhote stated that they resided in New York County, and McGee stated that he resided in Philadelphia County and authorized entry of the confession of judgment in New York County.  (Weinstein Decl. Ex. 504 ¶ 1.)

11. *See* Weinstein Decl. Ex. 507 (McGee Dep. Tr.) 30:18-31:7 (Q: "Did you have any reason to believe it was unenforceable when you signed it?" A: "Not specifically, no." Q: "How about generally?" A: "Generally, I understood there's some change in New York law." . . . Q: "When do you recall was the first time that you heard about a change in New York law that may have some impact on the Affidavit of Confession of Judgment?" A: "Likely sometime in 2021.").

likewise was "made aware" of the change in the law.[12]  But he too nonetheless authorized entry of the 2021 Confession of Judgment against himself in New York County.  (Weinstein Decl. Ex. 508 at ¶ 1.)

## VI.    SKAT performed under section 8(f) of the settlement agreement.

38.    Section 8(f) of the agreement provides that "[n]otwithstanding the confidentiality obligations" in the agreement, "promptly upon [its] execution," SKAT "will, in writing, bring to the attention of the Danish Public Prosecutor for Serious Economic and International Crime ('SØIK') this Agreement and its terms, and represent, in writing that this Agreement reflects good-faith negotiation by the Covered Parties, that the Covered Parties' cooperation may result in the recovery by [SKAT] of additional funds from third parties and that this Agreement is in the best interests of [SKAT]."  (Settlement Agreement § 8(f).)[13]

39.    In accordance therewith, SKAT communicated to SØIK the existence and relevant terms of the agreement leading up to its May 28, 2019 execution and in the weeks following, including providing to SØIK in writing the specific things it was obligated to represent under section 8(f).  During the relevant period, SKAT communicated with SØIK concerning the settlement through its Antifraud Unit, primarily Gry Ahlefeld-Engel (department

---

12.  *See* Weinstein Decl. Ex. 508 (Lhote Dep. Tr.) 16:1-18:7 (Q: "At the time you signed this updated Affidavit of Confession of Judgment, did you believe it was enforceable?" A: "I don't recall whether or not I believed at the time . . . it was enforceable.  If I signed it, probably, yes." . . . Q: "And at the time you signed the updated affidavit, did the fact that you were living in Florida, in your view, impact the enforceability of the document?" A: "I don't recall that.  I was just made aware that I was informed that it might." Q: So you were . . . informed that it might impact whether it was an enforceable document?" A: "Correct." . . . Q: "What about this updated Affidavit of Confession of Judgment, in your mind, made it possible that it wasn't enforceable at the time you signed it?" A: "Again, my recollection, I had no specific recollection of being made aware that my lawyer mentioned to me that being a Florida resident may affect the validity of the document.").

13.  Under section 7 of the agreement, the Covered Parties agreed to "fully cooperate with the investigation by [SKAT] of third parties not subject to the releases set forth" in the agreement, *i.e.*, SKAT's investigation of non-Covered Parties whom SKAT believed submitted or helped others submit fraudulent tax refund claims.  (*Id.* § 7.)

head and then Director of the Antifraud Unit), who was SKAT's main contact with SØIK, and her supervisor Steen Bechmann Jacobsen (Deputy General Director of the Antifraud Unit). (Ahlefeld-Engel Stmt. ¶¶ 1, 8, 16-19; Bechmann Jacobsen Stmt. ¶¶ 1, 6-8.)

40.     Mr. Bechmann Jacobsen joined SKAT on February 15, 2018, and Ms. Ahlefeld-Engel on June 1, 2018.  (Bechmann Jacobsen Stmt. ¶ 1; Ahlefeld-Engel Stmt. ¶ 8.)  Before their arrival, SKAT made reports to SØIK in 2015, 2016, and 2017 that it had been the victim of massive fraud via false claims for refunds of dividend withholding tax.  (Ahlefeld-Engel Stmt. ¶ 20.)  The Antifraud Unit was "tasked with" "primary responsibility" at SKAT "for the dividend withholding tax fraud case," including for SKAT's civil claims arising from the fraud and overseeing SKAT's investigation.  (Bechmann Jacobsen Stmt. ¶ 5; Ahlefeld-Engel Stmt. ¶ 16.)

41.     SKAT's Antifraud Unit "coordinated closely with SØIK, within the confines of Danish law, on the dividend withholding tax cases, including settlements."  (Bechmann Jacobsen Stmt. ¶ 8.)  SØIK, as the prosecutorial authority, "is largely restricted in providing information to SKAT," so the coordination consisted mainly of SKAT providing information to SØIK.  (*Id.*)  Nevertheless, SKAT "believed it was particularly important to keep SØIK well informed."  (*Id.*)  For one thing, SKAT did not want to do anything that would impact "any aspect of SØIK's investigation."  (*Id.*)  And for another, the "dividend withholding tax refund cases and investigations were highly prominent cases in Denmark and had a significant impact on Danish society."  (*Id.*)

42.     Thus, as negotiations progressed with the Covered Parties, "it was SKAT's intent to keep SØIK informed about the terms of the potential Settlement Agreement, and ultimately about the execution of and performance under the Settlement Agreement."  (Ahlefeld-Engel Stmt. ¶ 26.)  For instance, on February 26, 2019, Mr. Bechmann Jacobsen wrote to "management

personnel" at the Ministry of Taxation, which oversees SKAT, "that SKAT 'regularly inform[s] SØIK about the progress in the [dividend] cases, including as well in relation to any settlement possibilities, and provided that the current negotiations," *i.e.*, the negotiations with the Covered Parties, "should lead to a specific proposal, we will of course coordinate this with SØIK as well.'"  (Bechmann Jacobsen Stmt. ¶ 10 (quoting Weinstein Decl. Ex. 528).)

43.    In the Danish government, "interagency communications," such as communications between SKAT and SØIK, generally occur between officials of the same or comparable seniority or position at their respective agencies.  (Bechmann Jacobsen Stmt. ¶ 6.) Thus, Ms. Ahlefeld-Engel, as the department head and then Director of SKAT's Antifraud Unit, communicated about the settlement primarily with Per Fiig, who was the Chief Prosecutor at SØIK at the time.  (Ahlefeld-Engel Stmt. ¶ 22; Bechmann Jacobsen Stmt. ¶ 6.)  And Mr. Bechmann Jacobsen, as Deputy General Director and Ms. Ahlefeld-Engel's supervisor, communicated primarily with Morten Jakobsen, who was the State Attorney at SØIK and Mr. Fiig's supervisor.  (Ahlefeld-Engel Stmt. ¶ 22; Bechmann Jacobsen Stmt. ¶ 6.)

44.    "Most of SKAT's communications with SØIK" about the settlement negotiations and eventual agreement with the Covered Parties were at interagency meetings or on phone calls. (Ahlefeld-Engel Stmt. ¶ 24.)  Ms. Ahlefeld-Engel, SKAT's primary point of contact with SØIK, attended "approximately ten meetings with SØIK prior to the [May 28, 2019] execution of the Settlement Agreement," at which the potential agreement, and particularly any proposed terms "that could potentially impact or be perceived to impact SØIK or its separate criminal investigation," were discussed.  (*Id.* ¶ 23.)

45.    On April 24, 2019, approximately one month before the settlement, Ms. Ahlefeld-Engel sent Mr. Fiig (the Chief Prosecutor at SØIK) an email to arrange such a meeting to discuss

the settlement.  (Ahlefeld-Engel Stmt. ¶ 27.)  The "settlement negotiations" with the Covered

Parties "ha[d] picked up again," Ms. Ahlefeld-Engel explained, and "would culminate in a 'final

negotiation meeting' in New York," at which SKAT would "likely" need "to give a nod" to the

agreement, "subject only to final formal approval and signature."  (*Id.*; Weinstein Decl. Ex. 529

at SKAT_MAPLEPOINT_00000431_T_R.)  "[B]ased on that," Ms. Ahlefeld-Engel wrote,

"there is a need for us to meet next week so that we are completely aligned between our

authorities with respect to the terms of the agreement."  (Weinstein Decl. Ex. 529 at

SKAT_MAPLEPOINT_00000431_T_R.)  Ms. Ahlefeld-Engel and Mr. Fiig scheduled the

meeting for April 29.  (Weinstein Decl. Ex. 531.)

46.     The day after Ms. Ahlefeld-Engel's email to Mr. Fiig, *i.e.*, on April 25, Mr. Fiig

emailed back raising a question asked by the attorney for North Channel Bank about the "the

ultimate owners (the US shareholders)" of the bank (referring to Stein, Lhote, and McGee) and

the "connection between the civil case" settlement and the "criminal investigation" of them.

(Ahlefeld-Engel Stmt. ¶ 28.)  Ms. Ahlefeld-Engel responded, "If your question is whether we

release [Stein, Lhote, and McGee] from criminal liability with the settlement, the answer is no.

They hope their cooperation in the civil track will have a mitigating effect in the criminal, but

nothing more."  (*Id.* (quoting Weinstein Decl. Ex. 530).)

47.     From May 12 to 17 and from May 27 to May 29, 2019, Ms. Ahlefeld-Engel was

in New York for the final negotiations of the settlement agreement.  (*Id.* ¶ 31.)  On May 15, she

spoke with Mr. Fiig on the phone about the settlement agreement.  (*Id.*)  Following that call, Ms.

Ahlefeld-Engel sent Mr. Fiig an email with "the relevant passages from the settlement text that

directly or indirectly concern SØIK," including almost all of what would become section 8(f). (Ahlefeld-Engel Stmt. ¶¶ 32-33; Weinstein Decl. Ex. 532.)[14]

48.     Ms. Ahlefeld-Engel's May 15 email to Mr. Fiig referenced an earlier discussion about whether the confidentiality provisions of the agreement would permit SKAT to share the settlement agreement and "cooperation material" with SØIK, making clear that SØIK was aware that the settling parties committed to cooperate pursuant to the settlement agreement.  (Weinstein Decl. Ex. 532 at SKAT_MAPLEPOINT_00000027_T_R.)  Ms. Ahlefeld-Engel explained in her email that "[w]ith respect to disclosing the settlement agreement itself along with any cooperation material to SØIK," she would "have to definitively clear it with the settlement parties . . . that [the draft of section 8(f)] is able to cover that."  (Ahlefeld-Engel Aff. ¶ 33 (quoting Weinstein Decl. Ex. 532).)

49.     On May 16, Mr. Bechmann Jacobson spoke with Mr. Jakobsen (the State Attorney at SØIK), who told Mr. Bechmann Jacobson that "the text snippets" Ms. Ahlefeld-Engel sent in her May 15 email, including section 8(f), had been approved by SØIK and the Ministry of Justice.  (Bechmann Jacobson Stmt. ¶ 15; Weinstein Decl. Ex. 556.)  Both Mr. Jakobsen and Mr. Fiig thus were aware by that time that the settling parties would be providing "cooperation material" to SKAT under the proposed agreement because Ms. Ahlefeld-Engel wrote that she would ask whether SKAT could provide such material to SØIK under section 8(f) and the draft of section 8(f) she sent to Mr. Fiig included that "the Covered Parties' cooperation may result in the recovery by [SKAT] of additional funds from third parties."  (Ahlefeld-Engel Stmt. ¶ 33; Weinstein Decl. Ex. 532 at SKAT_MAPLEPOINT_00000027_T_R.)

---

14. On September 20, 2019, Ms. Ahlefeld-Engel resent Mr. Fiig her May 15 email including the text of what would become section 8(f).  (Ahlefeld-Engel Stmt. ¶ 49; Weinstein Decl. Ex. 543.)

50.    The parties subsequently revised section 8(f) to include a provision at the end that "[u]pon request by SØIK, [SKAT] may provide and/or disclose the entirety of this Agreement to SØIK." (Settlement Agreement § 8(f).) Aside from that, the draft of section 8(f) that Ms. Ahlefeld-Engel sent to Mr. Fiig on May 15 was the same as the final version in the agreement. (*Compare id. with* Weinstein Decl. Ex. 532.) The Covered Parties, however, did not agree that SKAT could provide any "cooperation material" to SØIK. (Ahlefeld-Engel Stmt. ¶ 33.) Instead, the Covered Parties produced such material pursuant to a subpoena issued in SKAT's multidistrict litigation and designated almost all such material "highly confidential" under the protective order governing discovery in that litigation, thus effectively precluding SKAT from sharing it with SØIK. (*Id.*)[15]

51.    On May 21, 2019, a week before the agreement was signed, Ms. Ahlefeld-Engel sent Mr. Fiig a list of the parties to the settlement agreement, including Stein, Lhote, and McGee. (*Id.* ¶ 35; Weinstein Decl. Ex. 533.) There were no changes to the list of the Covered Parties in the final settlement agreement. (*Compare id. with* Settlement Agreement at Exs. 1, 2; *see also* Ahlefeld-Engel Stmt. ¶ 35.)

52.    "SKAT also coordinated with SØIK concerning" the May 2019 press release that it issued announcing the settlement. (*Id.* ¶¶ 36-39; Weinstein Decl. Exs. 534, 535, 536, 537, 538.) For instance, on May 20, 2019, Mr. Bechmann Jacobson sent Mr. Jakobsen (the State Attorney at SØIK) "the final draft of the press release" for SØIK's approval. (Ahlefeld-Engel

---

15. Nothing in the settlement agreement required SKAT to provide SØIK with a copy of the agreement. And the agreement did not permit SKAT to provide SØIK with any "cooperation material" provided pursuant to the agreement. Further, nothing in the agreement precluded Stein, Lhote, or McGee from providing SØIK with a copy of the agreement or any of the cooperation material. (*See, e.g.*, Settlement Agreement § 8(e) ("The Covered Parties may disclose this Agreement or the contents thereof . . . to any law enforcement authority investigating Reclaim Applications or related matters, even if such disclosure is not compelled by operation of law or regulation or by a final non-appealable court order.").)

Stmt. ¶ 39; Bechmann Jacobsen Stmt. ¶ 19; Weinstein Decl. Ex. 537 at

SKAT_MAPLEPOINT_00000420_T_R.)  The May 2019 press release described the settlement

agreement as a "decisive victory" and "the right strategy" for SKAT.  (Ahlefeld-Engel Stmt.

¶¶ 41; Bechmann Jacobsen Stmt. ¶ 22; Weinstein Decl. Exs. 538, 537 at

SKAT_MAPLEPOINT_00000421_T_R.)  It explained the general payment terms of the

settlement agreement, including that the settling parties were repaying their approximately DKK

1.6 billion in net proceeds from the scheme and that the agreement would result in the immediate

payment of approximately DKK 950 million and subsequent payments totaling approximately

DKK 650 million.  (Ahlefeld-Engel Stmt. ¶ 43.)[16]  In subsequent calls and meetings, SKAT

made clear to SØIK that only Stein, Lhote, and McGee were obligated to make the subsequent

payments of approximately DKK 650 million.  (Ahlefeld-Engel Stmt. ¶ 43.)  The May 2019

press release also described that "the settling parties committed to an obligation to cooperate and

assist SKAT's efforts in the remaining cases."  (*Id.* ¶ 44.)  SØIK also would have been aware of

these details from SKAT's September 2019 press release and SØIK's involvement in preparing

an ultimately unpublished November 2019 joint press release concerning the settlement

agreement.  (Ahlefeld-Engel Stmt. ¶¶ 50-56.)

  53. Further, Ms. Ahlefeld-Engel and Mr. Bechmann Jacobsen, along with other

SKAT personnel, discussed the settlement agreement and its terms with SØIK during in person

meetings and phone conversations both before and after the execution of the settlement

agreement.  (Ahlefeld-Engel Stmt. ¶¶ 22, 23, 25-27, 35, 57-61; Bechmann Jacobsen Stmt. ¶¶ 15,

---

16. The DKK 650 million in the press release was referring to the DKK 600 million Additional Cash Payment and that Stein, Lhote, and McGee agreed in the letter agreement that upon and from the proceeds of the sale of North Channel Bank, the greater of DKK 50 million or the amount of the fees the bank received for participating in the fraud would be paid to SKAT.  (Settlement Agreement § 2(b); Letter Agreement § 7.)

19, 20, 24.)  For example, on May 16, 2019, Mr. Bechmann Jacobsen spoke with Mr. Jakobsen regarding the language in the draft settlement agreement that pertained to SØIK.  (Bechmann Jacobsen Stmt. ¶ 15; Weinstein Decl. Ex. 556.)  And about a month after the agreement was executed, at a June 27, 2019 meeting, officials from SKAT and SØIK discussed the settlement agreement, including the status, amount and timing of payments under the agreement, and the efforts of Stein, Lhote, and McGee to provide information and assistance to SKAT.  (Ahlefeld-Engel Stmt. ¶¶ 46-48; Bechmann Jacobsen Stmt. ¶ 24.)

54.    In January 2021, SØIK sent SKAT two letters with a series of questions concerning the settlement agreement.  SØIK's January 6, 2021 letter recounted that "the Danish Tax Agency," i.e., SKAT, had "disclosed" to SØIK in May 2019 that it had "entered into a settlement with 61 US pension plans and a number of related individuals and companies" and that "[a]ccording to the information [SKAT] provided, the settlement agreement means that the 61 pension plans etc. must pay an amount of DKK 1.6 billion to the Danish state."  (Weinstein Decl. Ex. 569.)  SKAT already had answered some of SØIK's questions in its letter less formally around the time the agreement was executed.  For example, SKAT already had told SØIK that Stein, Lhote, and McGee were parties to the settlement agreement, the effect of the settlement agreement on SKAT's civil claims against them, and that all three had been actively cooperating with SKAT's investigation of and claims against others.  (E.g. Ahlefeld-Engel Stmt. ¶¶ 62-66; Weinstein Decl. Exs. 548, 550, 551.)

55.    As part of its January 19, 2021 response to SØIK's inquiries, SKAT directed SØIK to section 8 of the settlement agreement governing confidentiality and sent the text of that section to SØIK, including, again, section 8(f).  (Ex. 548 at SKAT MAPLEPOINT 00000787.)  And as part of its February 3, 2021 response, SKAT confirmed that "the settlement parties

helped contribute documents for use in the collection of [SKAT's] claims against individuals or entities not covered by the settlement;" "that the settlement parties consented to [SKAT's] use of [the] provided materials against [those] individuals or entities;" "that the settlement parties helped contribute information and answer questions from [SKAT] for the identification of and collection of [SKAT's] claims;" and that SKAT's "legal counsel receives quarterly updates about the sales process for a number of assets . . . that the settlement parties are expected to co-finance the outstanding portion of the settlement sum." (Ahlefeld-Engel Stmt. ¶ 65.)

56.    Finally, on April 12, 2023, after Stein and Lhote commenced this action and for the first time alleged that SKAT had not complied with section 8(f), SKAT sent another letter to SØIK's Chief Prosecutor "Regarding [SKAT's] settlement with certain parties in the dividend case." (Ahlefeld-Engel Stmt. ¶¶ 74-75.) That letter informed SØIK that Stein and Lhote commenced the present action against SKAT based on their allegation that SKAT breached section 8(f) of the settlement agreement and reiterated that SKAT "has regularly informed SØIK" of Stein, Lhote, and McGee's performance under the agreement and repeated each of the representations set out in section 8(f). (*Id.* ¶ 76; Weinstein Decl. Ex. 554 at SKAT_MAPLEPOINT_00000930_T_R.)

**VII.    Stein and Lhote decided to stop performing
under the settlement agreement without notice.**

57.    In May and June 2020, then-counsel for Stein, Lhote, and McGee were informed that each of them had been criminally charged by the Danish police in connection with the reclaim scheme. (Weinstein Decl. Exs. 512, 513, 514.)[17] SØIK then attempted to schedule

---

17. In the Danish legal system, the decision to charge a criminal suspect is made by the police, but may be done with Prosecution Service cooperation in larger cases. (Weinstein Decl. Ex. 505 (Expert Report of Per Justesen, dated September 6, 2024 ("Per Justesen Report")) ¶ 18; Bechmann Jacobsen Stmt. ¶ 31.) Formal charges require the Danish police to find "circumstances, clues, etc. which on an objective basis and reasonably may indicate [the suspect's] possible guilt" and affords the suspect the right to retain a defense attorney, among other

interviews with each of them, at first unsuccessfully with respect to Stein and Lhote.  In

September 2020, the SØIK prosecutor sent Stein and Lhote's respective counsel emails noting

that in the four months since SØIK requested the interviews, neither Stein nor Lhote had

responded.  (Weinstein Decl. Exs. 512, 513, 516.)  Ultimately, SØIK interviewed McGee in

January 2021 and Stein and Lhote in March 2021.  (Weinstein Decl. Exs. 517, 519.)

58.     During their interviews, Stein and Lhote came to believe that SKAT had breached

its obligations under section 8(f) of the settlement agreement.  For instance, Stein testified that he

"was surprised," during his interview, "that they," *i.e.*, the prosecutors, "didn't have the

agreement, that they didn't understand the details of the agreement and that they didn't . . . have

the knowledge that they should have had, had Skat complied with its contractual obligation."

(Weinstein Decl. Ex. 509 (Stein Dep. Tr.) 32:4-23.)  And it "wasn't just" that SØIK did not seem

to have the settlement agreement, it was "did [SKAT] put in a good word for us like they were

supposed to" and "do all the things they were supposed to do in the . . . settlement agreement."[18]

Lhote testified that during his interview, "when [he] mentioned the existence of the agreement,

the amounts involved, the [cooperation] involved," the SØIK prosecutors "were surprised,

basically, of what [he] was referring to," which "lead [him] to believe they had no knowledge of

---

rights.  (Per Justesen Report ¶¶ 19-20; *see also* Bechmann Jacobsen Stmt. ¶ 32 ("[T]he determination of whether to proceed criminally is based on the weight of the evidence.").)  Stein was charged on May 13, 2020, Lhote was charged on May 21, 2020, and McGee was charged on June 11, 2020.  (Weinstein Decl. Exs. 512, 513, 514.)  Charging, under Danish law, is a preceding step to indictment by the Prosecution Service.  (Per Justesen Report ¶ 23.)

18. *See id.* 34:24-35:23 (Q: "So during the interrogation with SØIK, when you were under the impression they were not familiar with the terms of the settlement agreement, did you instruct anyone to provide SØIK with the settlement agreement?" A: "My recollection is that it wasn't just the settlement agreement.  It was, Hey, did . . . they put in a good word for us like they were supposed to, you know, do all the things they were supposed to do in the . . . settlement agreement.  It wasn't just showing them the agreement.  It wasn't a notice provision.  It was a . . . Hey, these guys are doing what they can to help us, provision.  So it was more about, whoa, they didn't do what they were supposed – they didn't do what they said they were going to do.  That was . . . the tenor of the reaction.  It wasn't just, Hey, do you have the agreement.  I think them not having the agreement, it was like, whoa, they don't even have the agreement.").

the document." (Weinstein Decl. Ex. 508 (Lhote Dep. Tr.) 63:19-64:14.) Thus, by the end of

the interview, he believed that SKAT had not performed its obligations under the settlement

agreement.[19] Stein and Lhote claim that, following their interviews, "there was" an "effort" on

their behalf "to determine whether Skat had complied with its obligations under Section 8F of

the settlement agreement." (*Id*. at 87:6-11.)

59.    On April 13, 2021, SØIK indicted Stein, Lhote, and McGee. (Weinstein Decl.

Ex. 520.) Stein, Lhote, and McGee's indictments were signed by Per Fiig, the SØIK Chief

Prosecutor to whom Ms. Ahlefeld-Engel had sent the text of section 8(f) and the list of settling

parties in May 2019, and with whom she had otherwise been communicating in 2019 about the

settlement agreement and its terms. (*Id.* at STEIN_LHOTE0001238; Ahlefeld-Engel Stmt.

¶¶ 63-64.) After Stein, Lhote, and McGee were indicted, on April 16, 2021, SKAT's counsel

and Stein, Lhote, and McGee's counsel had a call, and the next day, Stein, Lhote, and McGee's

counsel followed up in an email, asking SKAT's counsel, in relevant part, "can you send us a

copy of the written communication that SKAT sent to SØIK in conformity with its obligation

under Section 8f of the Settlement Agreement?" (Weinstein Decl. Ex. 521 at

STEIN_LHOTE0001412.)

60.    A few days later, on April 21, Stein and Lhote's counsel sent a letter to SØIK

enclosing a copy of the settlement agreement. (Weinstein Decl. Ex. 560.) The letter explained

that in Stein and Lhote's view, "it was unclear" during their interviews "whether SØIK had been

made aware of the terms of the settlement agreement," but that a copy of the agreement was

attached "to ensure that SØIK has full visibility into the Settlement Agreement and its terms."

---

19. *Id.* at 68:3-7 (Q: "By the end of your interview with SØIK, did you believe that SKAT had not performed its obligations under the settlement agreement?" A: "Yes.").

(*Id.* at STEIN_LHOTE0009685.)  The letter further explained the "fundamental principle" of the agreement that the Covered Parties "were agreeing to repay SKAT the 'full amount of the Net Proceeds'" and that "the Covered Parties also agreed . . . 'to use their best efforts and full cooperation to assist SKAT' in proceedings against other parties that have not reached any settlement with SKAT."  (*Id.* at STEIN_LHOTE0009685-86.)  The letter closed by stating that since the agreement was executed, the Covered Parties "have acted in conformity with its terms and that "[g]oing forward, the Covered Parties are committed to continuing their work to ensure full repayment of the Net Proceeds to complete their obligations under the Settlement Agreement."  (*Id.* at STEIN_LHOTE0009686.)

61.    On June 18, 2021, SKAT's counsel confirmed for Stein, Lhote, and McGee's counsel that SKAT "informed SØIK on a senior level immediately after the signing of the May[] 2019 settlement agreement of all relevant sections of the agreement including the sections on good faith negotiations and the obligation to provide information and cooperation."  (Weinstein Decl. Ex. 522.)  Further, SKAT's counsel explained, "SKAT has briefed SØIK on a rolling basis of the settling parties' fulfillment of their obligations under the settlement agreement, including the extent to which they have until now provided information and cooperation," and that "[t]his briefing has taken place both in meetings and in phone conversations."  (*Id.*)

62.    Lhote thought SKAT's counsel's email was "wishy-washy" and that it "wasn't clear" from it "what had been or not done by Skat."  (Weinstein Ex. 508 (Lhote Dep. Tr.) 89:19-90:1.)  After June 2021, neither Stein nor Lhote "learn[ed] any other information about whether Skat had complied with Section 8F."  (*Id.* at 90:2-8.)  Nevertheless, Lhote determined "[s]ometime between March of '21 and . . . beginning of 2022" that he no longer had any obligations under the settlement agreement because of SKAT's supposed breach.  (*Id.* at 73:4-

75:1.)  And Stein likewise decided that he would no longer make the required payments under the settlement agreement.[20]  Neither Stein nor Lhote, nor anyone on their behalf, informed SKAT prior to the filing of this suit in March 2023 that it was their position that they no longer had any obligations under the settlement agreement because of a supposed breach by SKAT.

## VIII.    <u>Stein, Lhote, and McGee failed to pay the Final Settlement Amount.</u>

63.    North Channel Bank was never sold (Am. Compl. ¶ 160), so under section 6 of the letter agreement, the Final Settlement Payment Date was "automatically . . . extended" to May 28, 2023.  (Letter Agreement § 6.)  Thus, the Covered Parties were obligated to pay by that date the full Final Settlement Amount, comprised of the (i) DKK 1.55 billion Preliminary Settlement Amount, (ii) DKK 53,602,007 True-Up Amount, and (iii) interest accrued on the unpaid portion of the Subsequent Cash Payment Amount, *i.e.*, the DKK 600 million Additional Cash Payment and DKK 53,602,007 True-Up Amount, under section 2(d)(ii) of the Agreement.  (Settlement Agreement §§ 1(q), 2(d)(i), 2(d)(iii).)

64.    The Covered Parties paid the DKK 950 million Initial Cash Payment by August 8, 2019.  (Am. Compl. ¶ 128.)  But by the Final Settlement Payment Date, Stein, Lhote, and McGee, as the Covered Parties' Designees, had paid only DKK 60,424,596 of the DKK 653,602,007 Subsequent Cash Payment Amount in the amounts and on the dates set forth below.  (Weinstein Decl. Ex. 525 at Response No. 6 (admitting to amount of total payments to SKAT under settlement agreement); Ex. 524 at Response No. 8 (same), Ex. 523 at Response No. 8 (same).)

---

20.  Weinstein Decl. Ex. 509 (Stein Dep. Tr.) 57:23-58:8 (Q: "Did there come a time where you decided you would no longer make further payments to Skat?" A: "Yes." Q: "And do you recall approximately when that was?" A: "No." Q: "Why did you decide to no longer make further payments to Skat?" A: "Because they didn't comply with their contractual obligation.").

| Payment Date | Payment Amount (DKK) |
|---|---|
| June 3, 2020 | DKK 30,799,787.14 |
| July 21, 2020 | DKK 4,506,857,56 |
| August 3, 2020 | DKK 1,037.44 |
| January 29, 2021 | DKK 3,301,560.00 |
| March 23, 2021 | DKK 19,916,383.95 |
| June 8, 2021 | DKK 1,409,332.89 |
| June 16, 2021 | DKK 205,020.00 |
| April 19, 2022 | DKK 284,617.32 |

65.    And because Stein, Lhote, and McGee did not pay the Subsequent Cash Payment Amount in full by May 28, 2021, DKK 97,750,313.93 in interest accrued on the unpaid balance under section 2(d)(ii) of the settlement agreement, none of which interest Stein, Lhote, and McGee paid by the Final Settlement Payment Date.  (Settlement Agreement § 2(d)(ii); Weinstein Decl. ¶ 79.)[21]

## IX.    Stein, Lhote, and McGee defaulted under the settlement agreement.

66.    In accordance with section 5 of the settlement agreement, on May 29, 2023, SKAT sent Stein, Lhote, and McGee a written Default Notice via email to their counsel, explaining that they were in default under the agreement because they had failed to pay the full Final Settlement Amount by the May 28, 2023 Final Settlement Payment Date.  (Ahlefeld-Engel

---

21.  Under section 2(d)(ii)(2) of the settlement agreement, "[a]ny payments made to [SKAT] to fund any remaining unpaid amounts of the Subsequent Cash Payment Amount after [24] months from the Effective Date," *i.e.*, the date when interest began to accrue, "shall be applied (x) first to the principal balance of any remaining unpaid amount of the Subsequent Cash Payment Amount, until the Subsequent Cash Payment Amount has been paid in full, and (y) only thereafter to the amount of interest due and owing pursuant to Section 2(d)(ii)(1)." (Settlement Agreement § 2(d)(ii)(2).)  Because Stein, Lhote, and McGee never paid the Subsequent Cash Payment Amount in full, all of their post-May 28, 2021 payments count towards the principal balance of the Subsequent Cash Payment Amount.

Stmt. ¶ 15; Weinstein Decl. Ex. 527.)  Neither Stein, Lhote, nor McGee cured the default (or

otherwise made any payments to SKAT) by June 13, 2023, *i.e.*, ten Business Days after SKAT

sent its Default Notice.[22]  And as such, an Event of Default occurred under the agreement, with

the Default Date being June 14, 2023, *i.e.*, the eleventh Business Day after Stein, Lhote, and

McGee received SKAT's Default Notice.  (Settlement Agreement §§ 5(b), (c).)

67.    Because of the Event of Default, in addition to the unpaid portion of the

Subsequent Cash Payment Amount and interest accrued thereon under section 2(d)(ii), Stein,

Lhote, and McGee also are required to pay SKAT DKK 353,748,255.77 in additional default

interest under section 5(d)(iii), representing 8.05 percent simple interest per annum "on the

unpaid amount of the Subsequent Cash Payment Amount as of the Default Date, for the period

starting January 1, 2014 and running until . . . [24] months from the Effective Date," *i.e.*, May

28, 2021.  (Settlement Agreement § 5(d)(iii); Weinstein Decl. ¶ 79.)

68.    And because of the Event of Default, SKAT is authorized "to file the [2021]

Confession of Judgment and to seek and enforce the judgment that the Court enters."  (*Id.*

§ 5(c).)  The "Judgment Amount" of the 2021 Confession of Judgment is DKK 1,044,675,980,

comprised of (a) the DKK 653,602,007 "Subsequent Cash Payment Amount, which is the sum

of" the DKK 600 million Additional Cash Payment and the DKK 53,602,007 "True-Up Amount

determined pursuant to Section 2(e)(iii) of the Settlement Agreement, (b) less" DKK 60,424,596

in "payments made through the Default Date to fund the Subsequent Cash Payment Amount

pursuant to the Settlement Agreement, (c) plus" DKK 97,750,313.93 in "Applicable Interest,

---

22. A "Business Day" is defined in the settlement agreement to mean "any day other than a Saturday, Sunday, any day that is a federal legal holiday in Denmark or in the United States or any day on which banking institutions in Copenhagen, Denmark or New York, New York are authorized or required by law or executive order to be closed."  (Settlement Agreement § 1(d).)

calculated pursuant to section 2(d)(ii) of the Settlement Agreement, as of the Default Date,

(d) plus" DKK 353,748,255.77 in "Applicable Interest, calculated pursuant to Section 5(d)(iii) of

the Settlement Agreement." (Weinstein Decl. ¶ 79; *see also* Landy Stmt. ¶¶ 17, 23, 31, 35, 36,

40, 42.)

## PROPOSED CONCLUSIONS OF LAW

### I.    Counterclaim defendants are liable for breach of the settlement agreement.

69.    "To prevail on a breach-of-contract claim in New York, a plaintiff must prove:

(1) the existence of a contract, (2) performance by the party seeking recovery,

(3) nonperformance by the other party, and (4) damages attributable to the breach." *Moreno-*

*Godoy v. Kartagener*, 7 F.4th 78, 85 (2d Cir. 2021) (internal quotation omitted).[23]

70.    There is no dispute that a valid contract, *i.e.*, the settlement agreement, exists.[24]

Nor can there be any genuine dispute that Stein, Lhote, and McGee failed to perform their

collective obligation under the agreement to pay SKAT the Final Settlement Amount in full by

the Final Settlement Payment Date. (*See supra*, Proposed Findings of Fact §§ VII-VIII.)[25]  And

it likewise cannot be disputed that SKAT suffered damages because of Stein, Lhote, and

---

23. The settlement agreement provides that it "shall be governed by, construed and interpreted in accordance with the internal laws of the State of New York, without giving effect to the conflict of laws principles thereof." (Settlement Agreement § 12.)

24. Settlement Agreement § 16 ("This Agreement and the acknowledgments contained herein shall be binding upon, and shall inure to the benefit of, the Parties hereto and their respective legal heirs, successors and assigns."); *see also, e.g.*, Am. Compl. ¶ 39 ("On or about May 28, 2019, Stein, Lhote, McGee, and others entered into a settlement agreement with SKAT . . . ."); SKAT's Answer & Counterclaims ¶ 149 ("On May 28, 2019, SKAT entered into the settlement agreement with Stein, Lhote, McGee, and the other Covered Parties . . . ."); ECF No. 94, ("McGee's Answer") ¶ 149 ("McGee admits only that on or about [M]ay 28, 2019, Stein, Lhote, McGee and certain others defined as Covered Parties entered into a settlement agreement with SKAT . . . .").

25. *See also Stein v. Skatteforvaltningen*, No. 23 Civ. 2508 (NRB), 2024 WL 382091, at *5 n.11 (S.D.N.Y. Feb. 1, 2024) (noting that "[a]t oral argument, [Stein and Lhote's] counsel acknowledged that if SKAT is not found to have materially breached the Settlement Agreement, then Stein, Lhote, and McGee would be in breach for failing to make their requisite payments under the Agreement").

McGee's failure to perform (though the parties dispute the amount of such damages with respect to the True-Up Amount). *Cf. Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 110 (2d Cir. 2007) ("'Certainty,' as it pertains to general damages, refers to the *fact* of damage, not the amount."). Counterclaim defendants dispute only that SKAT, *i.e.*, the party seeking recovery, performed its obligation under section 8(f) of the agreement.

### A.    SKAT did not breach section 8(f) of the settlement agreement.

71.    "Under New York law, a party's performance under a contract is excused where the other party has substantially failed to perform its side of the bargain or, synonymously, where that party has committed a material breach." *Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 186 (2d Cir. 2007) (citation omitted). "The burden of proof on the issue of whether" counterclaim defendants' "performance is excused because of a material breach by" SKAT "is on" the counterclaim defendants. *Sasson v. Mann*, No. 15-CV-6601 (CS), 2019 WL 3532155, at *10 (S.D.N.Y. Aug. 2, 2019) (collecting cases).[26]

72.    As an initial matter, counterclaim defendants have failed to show that SKAT breached section 8(f) of the agreement at all, materially or otherwise. Under section 8(f), SKAT was obligated, "promptly upon the execution of th[e] Agreement," to, "in writing, bring to the attention of [SØIK] th[e] Agreement and its terms, and represent, in writing, that th[e] Agreement reflects good-faith negotiation by the Covered Parties, that the Covered Parties' cooperation may result in the recovery by [SKAT] of additional funds from third parties and that th[e] Agreement is in the best interests of" SKAT. (Settlement Agreement § 8(f.).)

---

26.    *See also Barton Grp., Inc. v. NCR Corp.*, 796 F. Supp. 2d 473, 498 (S.D.N.Y. 2011) ("when a defendant alleges that a plaintiff's breach of a warranty contained in the contract excuses the defendant's nonperformance, the defendant has the burden of proving that defense").

73.    And that is precisely what SKAT did.  (*See Supra*, Findings of Fact § VI.)  For instance, Ms. Ahlefeld-Engel sent SØIK's Chief Prosecutor what became section 8(f) itself just before the agreement was signed, which included the requisite representations that the agreement "reflects good-faith negotiation by the Covered Parties, that the Covered Parties' cooperation may result in the recovery by [SKAT] of additional funds from third parties and that the Agreement is in the best interests of" SKAT.  (Ahlefeld-Engel Stmt. ¶ 32; Bechmann Jacobsen Stmt. ¶¶ 12-13; Weinstein Decl. Ex. 532 at SKAT_MAPLEPOINT_00000027_T_R, SKAT_MAPLEPOINT_00000028_T_R.)  In that same email, Ms. Ahlefeld-Engel referred to the "cooperation material" that the Covered Parties would provide to SKAT under the agreement.  (Ahlefeld-Engel Stmt. ¶ 33; Bechmann Jacobsen Stmt. ¶ 13.)  And Ms. Ahlefeld-Engel re-sent that written communication with the language of section 8(f) to SØIK in September 2019.  (Ahlefeld-Engel Stmt. ¶ 49; Weinstein Decl. Ex. 543.)  Ms. Ahlefeld-Engel informed SØIK in writing that Stein, Lhote, and McGee were agreeing to cooperate with SKAT "in the civil track" in the hope that it would "have a mitigating effect in the criminal" and discussed with SØIK whether the "cooperation material" Stein, Lhote, and McGee were agreeing to provide could be shared with SØIK.  (Ahlefeld-Engel Stmt. ¶¶ 28, 33; Weinstein Decl. Ex. 530.)  And on May 21, 2019, she also identified to SØIK in writing the names of the Covered Parties to the settlement agreement, including Stein, Lhote, and McGee.  (Ahlefeld-Engel Stmt. ¶ 35; Bechmann Jacobsen Stmt. ¶ 16; Weinstein Decl. Ex. 533 at SKAT_MAPLEPOINT_00000047, SKAT_MAPLEPOINT_00000048.)

74.    And were there any doubt whether SØIK was aware of it already, SKAT sent SØIK drafts of its May 2019 press release, thereby bringing to SØIK's attention the agreement and its terms, including the Covered Parties' payment obligations under the agreement and that

they had agreed to cooperate with SKAT in its investigation of potential claims against others. (Ahlefeld-Engel Stmt. ¶ 36-37; Bechmann Jacobsen Stmt. ¶¶ 17-20.)  The press release described the settlement as a "decisive victory" and the "right strategy," thereby making clear that SKAT believed the agreement to be in its best interests.  (Ahlefeld-Engel Stmt. ¶ 41; Bechmann Jacobsen Stmt. ¶ 22; Weinstein Decl. Ex. 539.)  Not to mention the phone calls and meetings SKAT had with SØIK both before and after the agreement was executed to discuss its terms and the Covered Parties' performance of their obligations thereunder.  (Ahlefeld-Engel Stmt. ¶ 22, 23, 25-27, 35, 57-61; Bechmann Jacobsen Stmt. ¶ 15, 19, 20, 24.)

> **B.**    **Any breach of the settlement agreement by SKAT was immaterial.**

75.    Even assuming for the sake of argument that SKAT technically breached the agreement because some of its written communications were sent just before, not promptly after, the agreement or other communications were not in writing, any such breach was immaterial and so did not relieve counterclaim defendants of their obligations under the agreement.  "For a breach to be material, it must go to the root of the agreement between the parties." *New Windsor Volunteer Ambulance Corps, Inc. v. Meyers*, 442 F.3d 101, 117 (2d Cir. 2006) (internal quotation omitted).  "If a breach is only partial, it may entitle the non-breaching party to damages for the breach, but it does not entitle him simply to treat the contract as at an end." *Id.* (citation omitted).  Thus, "[a] party's obligation to perform under a contract is only excused where the other party's breach of the contract is so substantial that it defeats the object of the parties in making the contract." *Frank Felix Assocs., Ltd. v. Austin Drugs, Inc.*, 111 F.3d 284, 289 (2d Cir. 1997) (citations omitted).

76.    The factors courts consider in determining whether a breach is material include (i) "the ratio of the performance already rendered to that unperformed," (ii) "the quantitative character of the default," (iii) "the degree to which the purpose behind the contract has been

frustrated," (iv) "the willfulness of the default," and (v) "the extent to which the aggrieved party

has already received the substantial benefit of the promised performance." *Hadden v. Consol.*

*Edison Co. of N.Y.*, 312 N.E.2d 445, 449 (N.Y. 1974).

77.     All these factors weigh against finding any supposed breach by SKAT material.[27]

SKAT's purported breach of section 8(f) did not go to the root of the settlement agreement or

defeat the object of the parties in making the agreement. *See, e.g.*, *Cherniak v. Trans-High*

*Corp.*, No. 18 Civ. 7734 (AT), 2020 WL 1047884, at *5 (S.D.N.Y. Mar. 4, 2020) ("root" of

settlement agreement "was the payment" by defendant "in return for Plaintiffs' releasing their . .

. claims"). The "root of" the settlement agreement "was the mutual obligation it imposed" on the

Covered Parties to pay the Final Settlement Amount in exchange for SKAT's release of its

claims against the Covered Parties. *Wechsler v. Hunt Health Sys., Ltd.*, 330 F. Supp. 2d 383, 414

(S.D.N.Y. 2004). After all, that was the "fundamental principle" on which the agreement was

based, *i.e.*, "that the Covered Parties are paying to [SKAT] the full amount of the Net Proceeds."

(Settlement Agreement Recital F.) Nor would SKAT's supposed breach have frustrated the

purpose of the agreement to "fully, finally and forever resolve, discharge, settle and dismiss the

Settled Matters." (Settlement Agreement at 2.) Thus, counterclaim defendants "cannot establish

that" SKAT's supposed breach of section 8(f) "goes to the essence of the agreement or

deprive[d] [them] of the benefit of [the] bargain." *Times Mirror Mags., Inc. v. Field & Stream*

*Licenses Co.*, 103 F. Supp. 2d 711, 734 (S.D.N.Y. 2000).

---

27. Counterclaim defendants' argument that SKAT's supposed breach of section 8(f) was material is premised on
their argument, divorced entirely from the agreement itself, that the parties' intent was that the settlement
agreement really be two agreements, one in which the Covered Parties paid SKAT the DKK 950 million Initial
Cash Payment in exchange for a release of SKAT's claims and another in which Stein, Lhote, and McGee paid
SKAT the remainder of the Final Settlement Amount essentially in exchange for SKAT's section 8(f) obligation
to communicate with SØIK. As explained below, counterclaim defendants plainly are wrong that the settlement
agreement is divisible in this or any other way. (*Infra*, § VI(A).)

78.     The ratio of the performance already rendered to that allegedly unperformed tips decidedly against finding any supposed breach material.  There is no dispute that SKAT released its substantial fraud claims against the Covered Parties totaling over DKK 2.9 billion (before the imposition of any prejudgment interest, which itself would have been substantial).  (Settlement Agreement § 4(a).)  And both before and after the agreement was signed, SKAT brought the agreement and its terms to SØIK's attention and made all the requisite representations to SØIK, both in writing and orally.  (*Supra*, Proposed Findings of Fact § VI.)  For the same reasons, counterclaim defendants have already received the substantial benefit of SKAT's performance. *See NSI Int'l, Inc. v. Mustafa*, No. CV 12-5528 (AKT), 2014 WL 12539347, at *9 (E.D.N.Y. Feb. 25, 2014) (former employer's failure to provide a reference letter under the settlement agreement was not a material breach in part because defendant "'ha[d] already received the substantial benefit of the promised performance,' *i.e.*, the $60,000 to compensate her for the alleged employment discrimination").

79.     The "quantitative character" of SKAT's supposed breach is non-existent.  Not only did SKAT communicate to SØIK all it was required to communicate but, as a matter of Danish law, neither the fact of the settlement agreement itself nor the representations SKAT made under section 8(f) could have had any impact on SØIK's determination whether to indict counterclaim defendants for fraud in Denmark.  Under Danish law, only the prosecutors "can decide whether to indict a person, and they will indict if they believe there is enough evidence to convict." (Justesen Report ¶ 27.)  That follows from "Section 96(1) of the [Danish] Administration of Justice Act," which "imposes a duty on the Prosecution Service to file an indictment if the conditions for a conviction are met."  (*Id.* ¶ 29.)  "[F]actors such as the" defendant's "payment of compensation" to the victim or "assistance in the investigation are not

relevant factors for the Prosecution Service to consider in deciding whether to indict." (*Id.* ¶ 31; *see also id.* ¶¶ 45-86.)  Rather, under Danish law, those sorts of factors are "only relevant to the sentencing if, after a person is indicted, the person is convicted by the court." (*Id.* ¶ 31.)  Even setting aside SKAT's communications with SØIK around the time of the settlement, SKAT provided SØIK with another slew of written representations concerning Stein, Lhote, and McGee's performance under the agreement in January and February 2021, before they were even indicted.  (Ahlefeld-Engel Stmt. ¶¶ 62-66; Bechmann Jacobsen Stmt. ¶¶ 25-29.)  And there is no dispute that SKAT provided SØIK the exact sort of written representations counterclaim defendants allege were required in April 2023 before any sentencing.  (Ahlefeld-Engel Stmt. ¶¶ 73-77.)  Counterclaim defendants' trial in Denmark has not even begun.

80.    Finally, whatever the extent, if any, of SKAT's supposed breach, it was not "willful in the legal sense, that is, in disregard of [counterclaim defendants'] contractual rights." *Levy v. Young Adult Inst., Inc.*, No. 13-CV-2861 (JPO), 2017 WL 1929505, at *3 (S.D.N.Y. May 9, 2017).  SKAT believed at the time (and still believes) that it performed its section 8(f) obligations.  (*See generally* Ahlefeld-Engel Stmt.; Bechmann Jacobsen Stmt.)

### C.    Counterclaim defendants are obligated to pay SKAT the full Final Settlement amount even if SKAT materially breached the agreement.

81.    Further, even assuming *arguendo* that SKAT did materially breach the settlement agreement, counterclaim defendants still are obligated to pay SKAT the full Final Settlement Amount.  That is because under section 2(c) of the agreement, the parties agreed that the "Covered Parties' obligation to pay the Final Settlement Amount is absolute and unconditional." (Settlement Agreement § 2(c).)  Thus, "the adequacy of" SKAT's "performance" is "irrelevant" to counterclaim defendants' obligation to pay the Final Settlement Amount because in agreeing that the obligation was "absolute and unconditional," counterclaim defendants agreed to pay that

amount "regardless of" SKAT's "performance." *Xerox Corp. v. Bus-Let, Inc.*, No. 18-CV-6725-FPG, 2019 WL 2514855, at *2, 4 (W.D.N.Y. June 18, 2019) (internal quotations omitted).[28]

## II.    SKAT is entitled to entry of the 2021 Confession of Judgment.

82.    Because of counterclaim defendants' default, SKAT is "authorized to file" the 2021 Confession of Judgment in this Court "and to seek and enforce the judgment that the Court enters." (Settlement Agreement § 5(c); *see also id.* §§ 4(c), 12.) And this Court has "the power and authority to enter a judgment pursuant to a confession of judgment as long as subject matter jurisdiction exists and the confession of judgment was voluntarily, knowingly and intelligently made." *Ream v. Berry-Hill Galleries, Inc.*, No. 16 Civ. 7462 (SLC), 2020 WL 5836437, at *3 (S.D.N.Y. Oct. 1, 2020) (internal quotation omitted).

83.    As an initial matter, there is no doubt that counterclaim defendants made the confession of judgment voluntarily, knowingly, and intelligently.[29] Thus, it is "disingenuous, at best, for" counterclaim defendants "to have negotiated the terms of the Settlement Agreement as well as the Confession of Judgment . . . and to have freely executed all of the accompanying

---

28. *Cf. Wells Fargo Bank, N.A. v. BrooksAmerica Mortg. Corp.*, 419 F.3d 107, 110 (2d Cir. 2005) ("The hell or high water clause at issue here makes BrooksAmerica's obligation to pay rent absolute and unconditional," *i.e.*, "the lessee must make payments regardless of defective performance on the part of the lessor, that is, 'come hell or high water.'") (citation omitted).

29. Weinstein Decl. Ex. 509 (Stein Dep. Tr.) 67:16-68:8 (Q: "Exhibit 10B, is that the updated Affidavit of Confession of Judgment that you signed?" A: "Yes." Q: "You signed that on June 10th of 2021?" A: "Yes." Q: "Did you sign that pursuant to the May 2019 settlement agreement?" A: "Yes." Q: "At the time you signed the updated affidavit in June of 2021, did you believe that it was enforceable?" A: "I don't remember what I believed." Q: "Do you recall having a belief that when you signed it, it was a meaningless piece of paper?" A: "I don't remember."); Ex. 508 (Lhote Dep. Tr.) 15:15-16:6 (Q: "Now, if you turn to Exhibit 10B . . . is that an updated Affidavit of Confession of Judgment that you signed?" A: "It says that, yes." . . . Q: "When did you sign it?" A: "It says here June 9, 2021." Q: "At the time you signed this updated Affidavit of Confession of Judgment, did you believe it was enforceable?" A: "I don't recall whether or not I believed at the time, I mean, whether it was enforceable. If I signed it, probably, yes."); Ex. 507 (McGee Dep. Tr.) 29:13-30:17 (Q: "Do you recognize what Exhibit 10B is?" A: "It's titled, 'Updated Affidavit of Confession of Judgment.'" Q: "Did you sign that document as well?" A: "Yes, sir." Q: "When did you sign it?" A: "My signature is dated the 10th day of June, 2021." . . . Q: "Was this document signed by you also pursuant to the settlement agreement with Skat?" A: "My understanding is, it was a requirement of the settlement agreement." Q: "When you signed it, did you believe it was an enforceable document?" A: "I'm not a lawyer, sir. I can't speak to enforceability.").

documents, and now, after partial payment, to adopt the posture that the Confession of Judgment

is unenforceable." *Gonzalez v. Trees R US Inc.*, No. CV 14-7487 (AKT), 2021 WL 7283081, at

*4 (E.D.N.Y. Mar. 31, 2021).[30]

84.      And notwithstanding counterclaim defendants' arguments to the contrary, the

2021 Confession of Judgment complies with the requirements of CPLR § 3218.  *See Rodrigues*

*v. Corona Advances, Inc.*, No. 15-CV-6815 (BCM), 2018 WL 4043149, at *2 (S.D.N.Y. Aug.

24, 2018) ("state law (in this case CPLR § 3218(a)) governs the adequacy of the affidavits of

confession of judgment").  Thus, the Court should enter the 2021 Confession of Judgment and

dismiss Stein and Lhote's claim for a declaratory judgment that the 2021 Confession of

Judgment is unenforceable.

### A.      CPLR § 3218's residency requirement does not apply in this action and if it did, Lhote and McGee waived it.

85.      Lhote and McGee (but not Stein, who resided in New York when he executed his

confession of judgment) argue that the 2021 Confession of Judgment is invalid because of the

2019 amendment to CPLR § 3218 providing that the affidavit of confession of judgment must

state "the county where the defendant resides" and can be filed only in "the county where the

defendant's affidavit stated that the defendant resided when it was executed or where the

defendant resided at the time of filing."  CPLR § 3218(a) & (b).  Lhote and McGee, the

argument goes, respectively resided in Florida and Pennsylvania when they executed their

respective confessions of judgment and both reside in Florida now, so there is no New York

county where SKAT can file their affidavits confessing judgment.

---

30. *See also Stein*, 2024 WL 382091, at *7 n.14 ("Additionally, at a high level, the Court has noted that the logical import of Stein, Lhote, and McGee's position is that the confessions of judgment provided to SKAT were, in effect, completely worthless.").

86.     But even if that were true, Lhote and McGee overlook that CPLR § 3218's new

residency requirement applies only where the plaintiff files the confession with the county clerk

"without an action."  CPLR § 3218(a).  Thus, "New York courts have found that the newly

added residency requirement . . . does not apply in cases like this one where a party seeks entry

of a confessed judgment by filing an action."  *Stein v. Skatteforvaltningen*, No. 23 Civ. 2508

(NRB), 2024 WL 382091, at *6 (S.D.N.Y. Feb. 1, 2024).[31]  For instance, in *Express Trade Cap.,

Inc. v. Horowitz*, the First Department held that the "2019 amendment to CPLR 3218(a)(1)" was

"inapplicable" because "[i]t concerns entry of a judgment against a nonresident without an

action" and the plaintiff had "filed an action under CPLR 3213" by motion for summary

judgment in lieu of complaint.  198 A.D.3d 529, 530 (1st Dep't 2021); *see also*, *e.g.*, *New Tech

Cabling LLC v. Hyper 30 Inc.*, No. 651675/2023, 2024 WL 2982076, at *1 n.1 (Sup. Ct. N.Y.

Cnty. June 11, 2024) (quoting *Express Trade Cap.*, 198 A.D.3d at 530) ("2019 amendment to

CPLR 3218(a)(1) is inapplicable" where the plaintiff commences an action).  The same is true

here.  The 2019 amendment is "inapplicable" because SKAT seeks entry of the 2021 Confession

of Judgment as part of this action.

87.     Further, even if CPLR § 3218's new residency requirement did apply, Lhote and

McGee waived it by authorizing entry of judgment against themselves in New York County in

the 2021 Confession of Judgment.  *See Stein*, 2024 WL 382091, at *6.  "It is well established that

parties are permitted to intelligently and voluntarily waive statutory and/or constitutional rights,

unless such waiver contravenes public policy considerations."  *Brooklyn Union Gas Co. v. City*

---

31.  "This conclusion is sensible because when a confession of judgment is filed 'without an action,' a clerk of court
     enters it immediately and thus the nonresident debtor would receive no notice of such judgment until after it is
     entered."  *Id.* at *6 n.12 (citing CPLR §§ 3218(a), (b)).  "However, when a confession of judgment is enforced
     through the filing of an action, the nonresident debtor necessarily receives notice that judgment may be entered
     against him in New York and thus is afforded an opportunity to contest it."  *Id.*

*of New York*, 104 Misc.2d 441, 444 (Sup. Ct. N.Y. Cnty. 1980).[32]  No public policy

consideration precludes Lhote and McGee's waiver of CPLR § 3218's new residency

requirement, "which was added at least in part for the purpose of protecting nonresident debtors

with no connection to New York from having a judgment unknowingly entered against them."

*See Stein*, 2024 WL 382091, at *6.  And both Lhote and McGee, each acting with the advice of

sophisticated counsel, intelligently and voluntarily waived the residency requirement by

expressly authorizing "the entry of [the 2021] Confession of Judgment in New York County,"

despite knowing about the change in the law.  (*See* Weinstein Decl. Ex. 503 at ¶ 1; Ex. 508

(Lhote Dep. Tr.) 16:18-17:3 (agreeing he was informed that living in Florida "might impact

whether it was an enforceable document"); Ex. 507 (McGee Dep. Tr.) 30:18-31:7 ("I understood

there's some change in New York law.").)

### B.    The 2021 Confession of Judgement
####        <u>states the sum for which judgment may be entered.</u>

88.    Nor is there any merit to counterclaim defendants' argument that the 2021

Confession of Judgment is invalid because it does not state a sum certain.  "Although CPLR

3218(a)(1) requires an affidavit of confession of judgment to 'state the sum for which judgment

may be entered,' courts have interpreted this requirement to allow parties to fill in exact amounts

at a later date in accordance with calculations or methodology to which they agreed." *Stein*,

2024 WL 382091, at *7 (citation omitted).  Thus, there is nothing "impermissible in"

counterclaim defendants "permitting" SKAT "to fill in the amount due (calculated pursuant to

---

32.  *See also MQDC, Inc. v. Steadfast Ins. Co.*, No. 12-CV1424 (ERK), 2013 WL 6388624, at *13 (E.D.N.Y. Dec.
    6, 2013) ("Significantly, under New York law, a man may waive any right that he has, whether secured to him
    by contract, conferred upon him by statute or guaranteed him by the Constitution.") (quotation omitted); *Schatz
    v. Cellco P'ship*, 842 F. Supp. 2d 594, 611-12 (S.D.N.Y. 2012).

the terms of the [settlement agreement]).”  *Jiras v. McKay*, 202 A.D.2d 640, 641 (2d Dep't 1994).

89.    Indeed, most confessions of judgment provide as much to account for payments made and interest accrued (among other things) after the affidavit is signed.  *See, e.g.*, *Xerox Corp. v. W. Coast Litho, Inc.*, 251 F. Supp. 3d 534, 537, 539 (W.D.N.Y. 2017) (entering confession of judgment for settlement amount “or that amount less than [the settlement amount] that remains due and owing . . . on the date the confession of judgment is presented . . . whichever is less, plus costs and attorneys’ fees”).  “Here, the 2021 Confession of Judgment sets forth the precise methodology for determining the Judgment Amount and expressly contemplates—and in fact requires—that the Judgment Amount be set forth in an affidavit to be executed by the plaintiff or in an affirmation by such plaintiff’s attorney, which shall be attached hereto at the time of entry of this Affidavit of Confession of Judgment.”  *Stein*, 2024 WL 382091, at *7 (emphasis and internal quotation omitted).

**C.    The 2021 Confession of Judgment states the facts out of which the debt arose.**

90.    Finally, CPLR § 3218 requires that “if the judgment to be confessed is for money due or to become due,” the affidavit state “concisely the facts out of which the debt arose and showing that the sum confessed is justly due or to become due.”  CPLR § 3218(a)(2).  Without much, if any, explanation, Stein and Lhote allege that the 2021 Confession of Judgment is invalid because it “misstates the facts out of which the claimed debt might arise and the legal basis for any such debt.”  (Am. Compl. ¶ 101.)  But the affidavits state concisely that the judgment amount arises from the settlement agreement in which SKAT agreed to release its

claims against them arising from the Reclaim Applications.  *Cf. Xerox Corp.*, 251 F. Supp. 3d at 539.[33]

## III.   **The True-Up Amount.**

91.     Under New York law, "the objective of contract interpretation is to give effect to the expressed intentions of the parties."  *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989).  And "[w]here," as here, "the terms of a contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract, and the words and phrases used by the parties must be given their plain meaning."  *Flynn v. McGraw Hill LLC*, 120 F.4th 1157, 1165 (2d Cir. 2024) (internal quotation omitted).  "Contracts must be read as a whole, and if possible, courts must interpret them to effect the general purpose of the contract."  *Postlewaite v. McGraw-Hill, Inc.*, 411 F.3d 63, 67 (2d Cir. 2005).

92.     The "fundamental principle" on which the settlement agreement was "based" is that "the Covered Parties are paying to [SKAT] the full amount of the Net Proceeds . . . that the Covered Parties received directly or indirectly from Reclaim Applications . . . made to" SKAT. (Settlement Agreement, Recital F.)  Thus, to the extent the Covered Parties' Net Proceeds were greater than the DKK 1.55 billion Preliminary Settlement Amount, Stein, Lhote, and McGee owe SKAT a True-Up Amount.  (*Id.* § 2(e)(iii).)  And the Covered Parties' Net Proceeds means, in relevant part, the "Gross Reclaims" SKAT paid on the Reclaim Applications less "the Covered Parties' expenses associated with Reclaim Applications for which [SKAT] made payments."  (*Id.* § 2(e).)

---

33. And in any event, counterclaim defendants cannot challenge the sufficiency of the description of the facts out of which the confessed sum arose in the 2021 Confession of Judgment that they themselves signed.  *See Regency Club at Wallkill LLC v. Bienish*, 95 A.D.3d 879, 879 (2d Dep't 2012) ("statutory requirement that an affidavit of confession of judgment state concisely the facts out of which the debt arose and show that the sum confessed is justly due is designed for the protection of third persons who might be prejudiced in the event that a collusively confessed judgment is entered, and not for the protection of the defendant") (quotations omitted).

93.     As such, under the agreement only those expenses "associated" with Reclaim Applications on which SKAT made payments are relevant to determining the Net Proceeds.  And that makes sense because the starting point for the calculation is the Gross Reclaims, *i.e.*, "all reclaim amounts from [SKAT] received by or on behalf of the Pension Plans."  (*Id.* § 1(s).) Custodial fees incurred after SKAT paid the last of the Gross Reclaims to a pension plan are not "associated" with any Reclaim Applications on which SKAT made payment.  (*Supra*, Proposed Findings of Fact § IV(A).)  "Associated" in the relevant sense means "related" or "connected."[34] Those custodial fees that the Covered Parties incurred after they received the Gross Reclaims are not related or connected to any Reclaim Application on which SKAT made payment.  Nor are custodial fees paid to custodians unassociated with any Gross Reclaim.

94.     Likewise, expenses that the Covered Parties paid that were associated with their purported Belgian trading and reclaims are not associated with any Danish Reclaim Applications.  (*Supra*, Proposed Findings of Fact §§ IV(C)-(D).)  Recognizing as much, Stein, Lhote and McGee themselves did not deduct the portions of the fees attributable to the supposed Belgian trading in their Net Proceeds spreadsheets during the true-up process.  (*Supra* ¶ 26.) And counterclaim defendants' newfound litigation position that those fees should be deducted in full is contrary to the plain meaning of the settlement agreement and its fundamental principle.

95.     Further, the settlement agreement allows only the Covered Parties' "expenses" to be deducted from the Gross Reclaims.  (Settlement Agreement § 2(e).)  Thus, plainly, only the actual amount of those expenses, *e.g.*, of the tax reclaim advisory services fees the Covered Parties paid to Ganymede, should be deducted.  (*Supra*, Proposed Findings of Fact § IV(B).)

---

34.  Associated, Meriam-Webster, https://www.merriam-webster.com/dictionary/associated (last visited Apr. 1, 2025).

The amounts of the expenses should be determined using the most accurate exchange rates available from the supporting documents. (*Supra*, Proposed Findings of Fact § IV(E).)  And the Covered Parties cannot deduct the same expenses twice. (*Supra*, Proposed Findings of Fact § IV(F).)

96.     Thus, the Covered Parties' Net Proceeds, *i.e.*, Gross Reclaims less only the actual amount of expenses associated with Reclaim Applications on which SKAT made payment, are DKK 1,603,602,007, and as such, the True-Up Amount is DKK 53,602,006.54, *i.e.*, the difference between the Covered Parties' DKK 1,603,602,007 in Net Proceeds and the DKK 1.55 billion Preliminary Settlement Amount.

## IV.    Even if the confession of judgment were invalid, the Court should enter judgment in the same amount.

97.     Even assuming for argument's sake that the 2021 Confession of Judgment were invalid, the Court should enter judgment in SKAT's favor against Stein, Lhote, and McGee for the same amount as to which they confessed judgment based on their breach of the settlement agreement.  Counterclaim defendants' argument that the "sole remedy" provision in section 2(c) of the settlement agreement precludes SKAT from asserting its breach of contract claims against them is contrary to the plain meaning of the agreement.

98.     In construing its meaning, the sole remedy provision must be "examined" in "the context of the entire" settlement agreement. *Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 139 (2d Cir. 2000) (internal quotation omitted).  And the settlement agreement must "be construed so as to give full meaning and effect to all of its provisions." *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1199 (2d Cir. 1996) (internal quotation omitted).  In other words, to determine its meaning, the Court "looks to all corners of the [settlement agreement] rather than viewing sentences or clauses in isolation." *CCR Int'l, Inc. v. Elias Grp., LLC*, No. 15 Civ. 6563

(PAE), 2020 WL 7629325, at *9 (S.D.N.Y. Dec. 22, 2020).  Thus, the settlement agreement "must be read as a whole to ensure undue emphasis is not placed upon particular words or phrases" and "with every part interpreted with reference to the whole." *PrecisionWorks MFG, LLC v. Union Funding Source*, No. 22 Civ. 8290 (LGS), 2022 WL 16857360, at *2 (S.D.N.Y. Oct. 25, 2022).

99.    Viewed in the context of the entire settlement agreement and interpreted with reference to the provisions to which it relates, the sole remedy provision does not preclude SKAT from suing counterclaim defendants for breach of contract if, as came to pass, the Covered Parties make the Initial Cash Payment, but Stein, Lhote, and McGee fail to pay the Subsequent Cash Payment Amount.  Rather, it just means that in the event of such a breach, SKAT's recourse is limited to proceeding against Stein, Lhote, and McGee, as the Covered Parties' Designees, and not the rest of the over 100 Covered Parties, consistent with the provisions of the agreement making it the Covered Parties' Designees' obligation alone to pay the Subsequent Cash Payment Amount and damages if they fail to pay that amount.

100.    The so-called "sole remedy" provision in section 2(c) is situated right in the middle of section 2, called "Payment."  (Settlement Agreement § 2.)  Before it, sections 2(a) and (b) provide that all the Covered Parties, not just Stein, Lhote, and McGee, must pay the DKK 1.55 billion Preliminary Settlement Amount by the agreed upon deadlines, the DKK 950 million Initial Cash Payment by July 2019, and the DKK 600 million Additional Cash Payment "as the deadlines for payment occur."  (*Id.* §§2 (a), (b).)  Section 2(c), however, clarifies, that if "the Covered Parties timely complete the Initial Cash Payment pursuant to Sections 2(a)(i) and 2(a)(ii)," then only the Covered Parties' Designees will be liable for the failure to pay the rest of the Final Settlement Amount, *i.e.*, SKAT's "sole remedy" "shall be the filing of the Affidavits of

Confessions of Judgment against the Covered Parties' Designees as set forth in Section 5(c)." (*Id.* § 2(c).)

101.    Thus, immediately following it, section 2(d) provides that the Covered Parties' Designees only, and not the rest of the Covered Parties, "shall pay" the Subsequent Cash Payment Amount and interest accrued thereon, *i.e.*, the rest of the Final Settlement Amount, "no later than the Final Settlement Payment Date." (*Id.* § 2(d).) And section 5(a) provides that "if the Covered Parties' Designees do not make any payment as and when required," *i.e.*, make the payments on the Subsequent Cash Payment Amount when due, then the Covered Parties' Designees alone "shall be in default." (*Id.* § 5(a).) And should they not cure that default, sections 5(c) and 5(d), respectively, provide that SKAT "shall be authorized to file" the confessions of judgment against the Covered Parties' Designees and they alone "shall be required to pay an amount equivalent to" the unpaid part of the Subsequent Cash Payment Amount, interest already accrued thereon, and additional default interest. (*Id.* §§ 5(c), (d).)

102.    Counterclaim defendants' contrary interpretation under which the sole remedy provision would deprive SKAT of any remedy at all if, as they argue, the confession of judgment is invalid and cannot be enforced, is contrary "to the reasonable expectations of the parties" in entering the agreement. *Landmark Ventures, Inc. v. Wave Sys. Corp.*, No. 11 Civ. 8440(PAC), 2012 WL 3822624, at *3 (S.D.N.Y. Sept. 4, 2012) ("The Court must avoid interpreting a contract in a manner that would be absurd, commercially unreasonable, or contrary to the reasonable expectations of the parties." (internal quotation omitted)).[35] Indeed, the fundamental principle of the settlement was that the Covered Parties would repay SKAT their Net Proceeds

---

[35] *See also Metro. Life Ins. Co. v. Noble Lowndes Int'l, Inc.*, 643 N.E.2d 504, 508 (1994) (internal quotation omitted) ("A court will endeavor to give the contract construction most equitable to both parties instead of the construction which will give one of them an unfair and unreasonable advantage over the other.").

from the fraud.  It is wholly implausible "to impute to the parties any such intent to dispense"

with any remedy for SKAT in such circumstances because "there is no logical reason to assume

that" SKAT "would have agreed to forego" one.  *Katzman v. Helen of Troy Texas Corp.*, No. 12

Civ. 4220(PAE), 2013 WL 1496952, at *6 (S.D.N.Y. Apr. 11, 2013).

## V.    Even if counterclaim defendants' interpretation of the sole remedy provision were right, the Court should still enter judgment in SKAT's favor.

103.    And even assuming that Stein, Lhote, and McGee were correct in both their

interpretation of the sole remedy provision and that the 2021 Confession of Judgment is invalid,

the Court should still enter judgment on SKAT's breach of contract claims.

104.    If counterclaim defendants were to prevail in establishing that SKAT is precluded

from seeking judgment based on their confessions of judgment, then dismissing SKAT's contract

and damages claims would leave SKAT with no remedy at all: Stein, Lhote, and McGee would

then be able to renege on their settlement agreement and leave SKAT to whistle in the wind.  In

that event, the "sole remedy" provision would prove illusory—it would be no remedy at all.

Indeed, enforcing the sole remedy provision in such circumstances would cause the parties'

entire settlement agreement to fail its essential purpose and "fundamental principle," which was

to return to SKAT all the proceeds that the Covered Parties netted from their fraud.

105.    In that event, the Court should award SKAT a judgment in damages for

everything that Stein, Lhote, and McGee still owe SKAT (*i.e.*, a judgment no different in

amount, scope or nature from the remedy agreed upon by Stein, Lhote, and McGee through the

confessed judgments).  For instance, under Article 2 of the Uniform Commercial Code, "[w]here

circumstances cause an exclusive or limited remedy to fail of its essential purpose," other

remedies may be had.  U.C.C. § 2-719(2).  While Article 2 is not applicable to the settlement

agreement, in *Orix Real Estate Cap. Mkt., LLC v. Superior Bank, FSB*, the court predicted that

"New York courts would allow" the defense that a sole remedy provision "fails of its essential

purpose" outside of the Article 2 context.  127 F. Supp. 2d 981, 983 (N.D. Ill. 2000); *see also*

*Deutsche Bank Nat'l Trust Co. v. Morgan Stanley Mortg. Cap. Holdings LLC*, 289 F. Supp. 3d

484, 503 (S.D.N.Y. 2018) ("Although the failure of essential purpose doctrine is not directly

applicable here, it is nonetheless instructive for purposes of this Court's equitable consideration."

(internal quotation omitted)).

106.    Similarly, "while a provision providing for equitable relief as the sole remedy will

generally foreclose alternative relief, where granting of equitable relief appears to be impossible

or impracticable, equity may award damages in lieu of the desired equitable remedy."  *Nomura*

*Home Equity Loan, Inc., Series 2006-FM2 v. Nomura Credit & Cap., Inc.*, 133 A.D.3d 96, 106

(1st Dep't 2015) (internal quotation omitted).  In *GEM Holdco, LLC v. RDX Techs. Corp.*, the

court noted in *dicta* that this principle too "would arguably be applicable" if an agreement

provided for a sole remedy of a confession of judgment that could not be entered.  No.

653694/2015, 2017 WL 1281811, at *5 n.8 (Sup. Ct. N.Y. Cnty. Apr. 6, 2017).

107.    Further, entry of a judgment in the amount to which Stein, Lhote, and McGee

confessed will not deprive them of the benefit of the bargain they struck in the sole remedy

provision.  Whether SKAT's "remedy is characterized as" entry of the confession of judgment or

breach of contract damages "has little practical significance given that the form of the relief" and

the amount "is the same in each case: the payment of money to make [SKAT] whole."  *Deutsche*

*Alt-A Secs. Mortg. Loan Trust, Series 2006-OA1 v. DB Structured Prods, Inc.*, 958 F. Supp. 2d

488, 501 (S.D.N.Y. 2013).  The alternative remedy of damages SKAT seeks by its breach of

contract claims is "limit[ed]. . . to an amount that is commensurate with the sole remedy clause"

providing for entry of the confessed judgment.  *MASTR Adjustable Rate Mortgs. Trust 2006-*

*OA2 v. UBS Real Estate Secs. Inc.*, No. 12 Civ. 7322(HB), 2013 WL 4399210, at *4 (S.D.N.Y. Aug. 15, 2013).[36]

## VI.    Stein and Lhote's request for partial rescission of the settlement agreement is in any event meritless.

108.    "Under New York law, rescission is an extraordinary remedy, appropriate only where the breach is found to be material and willful, or, if not willful, so substantial and fundamental as to strongly tend to defeat the object of the parties in making the contract." *Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 143 (2d Cir. 2000) (internal quotation omitted). "Because it is an equitable remedy, rescission is available only if damages would not be a complete and adequate remedy and the status quo may be substantially restored by equitable relief." *Pyskaty v. Wide World of Cars, LLC*, 856 F.3d 216, 227 (2d Cir. 2017) (internal quotation omitted).

109.    As an initial matter, Stein and Lhote's request for partial rescission of the settlement agreement fails at the first step because they failed to meet their burden to show any breach of the settlement agreement by SKAT, let alone a "material and willful" one or one so "substantial and fundamental" that it strongly tends to defeat the purpose of the contract. (*See Supra*, Proposed Findings of Fact § VI.) But even if that were not the case, the partial rescission remedy Stein and Lhote seek is unavailable because the settlement agreement is indivisible, they waited too long to seek rescission, and they cannot rescind their absolute and unconditional payment obligation.

---

36. *See also Ace Secs. Corp. Home Equity Loan Trust, Series 2007-HE3 ex rel. HSBC Bank USA, Nat'l Ass'n v. DB Structured Prods., Inc.*, 5 F. Supp. 3d 543, 555 (S.D.N.Y. 2014) ("sole remedy clauses . . . preclude[d] Plaintiff from recovering types of damages—such as consequential damages—beyond what would be commensurate with the sole remedy clause" (internal quotation omitted)).

###### A.    <u>The settlement agreement is not divisible.</u>

110.    Stein and Lhote's breach of contract claim seeking rescission of just the purported "second phase" of the settlement agreement is meritless because New York law does not allow partial rescission of a contract unless the contract is divisible, and the settlement agreement unambiguously was not divided into two "phases" as the plaintiffs allege. "A contract may only be partially rescinded if it is divisible," which, in turn, depends "on whether the parties intended all of the contract's parts and the consideration therefore to be common each to the other and interdependent or susceptible of division and apportionment." *Great Am. Ins. Co. v. Zelik*, No. 19-cv-1805 (JSR), 2020 WL 85102, at *4 (S.D.N.Y. Jan. 6, 2020) (internal quotation omitted). Where, as here, "the contract is unambiguous in this respect, the issue of divisibility can be decided as a matter of law." *Samba Enter., LLC v. iMesh, Inc.*, No. 06 Civ. 7660(DC), 2009 WL 705537, at *5 (S.D.N.Y. Mar. 19, 2009).

111.    "Generally, a contract will not be regarded as severable unless (1) the parties' performances can be apportioned into corresponding pairs of partial performances, and (2) the parts of each pair can be treated as agreed equivalents." *Ginett v. Computer Task Grp., Inc.*, 962 F.2d 1085, 1098 (2d Cir. 1992). "The factors for a court to consider in determining whether a contract is divisible include whether the parties entered into one or multiple agreements, whether the agreement, in referring to itself, uses singular or plural nouns (*e.g.*, 'this Agreement' or 'these Agreements'), whether there is a severability clause, whether there is an obvious unit-for-unit transaction, and whether there is a way to determine the consideration for each part of the contract." *Samba Enter., LLC*, 2009 WL 705537 at *6.

112.    The settlement agreement unambiguously is a single, indivisible agreement, wherein SKAT agreed to, among other things, release its claims in return for, among other things, the Covered Parties repaying SKAT their Net Proceeds from the Reclaim Applications.

*Cf. Mun. Cap. Appreciation Partners, I, L.P. v. Page*, 181 F. Supp. 2d 379, 395 (S.D.N.Y. 2002) (settlement agreement was not "severable" where parties "made various interdependent concessions in order to come to a final resolution of their differences"). That was the "fundamental principle" on which the agreement was based. (Settlement Agreement Recital F.) Thus, the Covered Parties agreed to pay SKAT a Final Settlement Amount of at least their Net Proceeds, *i.e.*, the Preliminary Settlement Amount plus any True-Up Amount. (*Id.* § 1(q).) And the Covered Parties' Designees represented to SKAT that "the Preliminary Settlement Amount plus the True-Up Amount equals or exceeds the Net Proceeds" and that "on payment of the full amount of the Subsequent Cash Payment Amount, the Covered Parties will have paid back to [SKAT] the Net Proceeds." (*Id.* § 2(f).)

113.    Nothing in the agreement supports Stein and Lhote's claim that the parties intended it to be divisible into two phases of independent obligations, a first wherein SKAT agreed to settle its claims against the Covered Parties in exchange for DKK 950 million and a second wherein SKAT agreed to make certain written representations to SØIK in exchange for at least an additional DKK 600 million. (Am. Compl. ¶¶ 3-5.) The parties entered into one single settlement agreement, not two agreements, and that single settlement agreement refers to itself exclusively in the singular as "this Agreement" throughout.[37] The second sentence of the agreement provides that "[t]his Agreement is intended by the Parties to fully, finally, and forever resolve, discharge, settle and dismiss the Settled Matters . . . upon and subject to the terms and conditions hereof." (Settlement Agreement at 2.) And the preamble to the agreement recites that

---

37.  *See, e.g.*, Settlement Agreement § 1 ("In this Agreement, the following terms shall have the following respective meanings . . . ."); § 2(e) ("For purposes of this Agreement, "Net Proceeds" shall be . . . ."); § 12 ("This Agreement shall be governed by, construed and interpreted in accordance with the internal laws of the State of New York . . . ."); § 18 ("This Agreement constitutes the entire agreement between and among the Parties relative to the subject matter hereof.").

"in consideration of the mutual promises and covenants in this Agreement . . . the parties agree as follows." (*Id.*)

114.    Even the agreement's severability clause evidences the parties' intent that "all of the contract's parts and the consideration therefore . . . be common each to the other and interdependent." *Great Am. Ins. Co.*, 2020 WL 85102, at *4. That provision states that if any part of the agreement is found to be "invalid" or "unenforceable," the rest of the agreement will remain "in full force and effect," but only "*so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party hereto*." (Settlement Agreement § 17 (emphasis added).) Otherwise, the parties are required to "negotiate in good faith to modify th[e] Agreement in accordance with the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the fullest extent possible." (*Id.*)

115.    Nor is there any "obvious unit-for-unit transaction" or "way to determine the consideration for each" purported "part" of the agreement. *Samba Enter., LLC*, 2009 WL 705537 at *6. Stein and Lhote's attempt to divide the settlement agreement into two temporal phases makes no sense, even on its own terms. For instance, under section 8(f), SKAT was obligated to communicate with SØIK "promptly upon the execution of th[e] Agreement," (Settlement Agreement § 8(f)), *i.e.*, around the same time that the Covered Parties were required to make the Initial Cash Payment and SKAT's release of its claims became effective, which Stein and Lhote claim constituted "phase one" of the agreement. (Am. Compl. ¶¶ 46-52; Settlement Agreement §§ 2(a), 4(a).) But because it does not suit their claim, Stein and Lhote argue that SKAT's section 8(f) performance actually was part of the second phase to occur after

phase one was complete.  (Am. Compl. ¶ 64.)  Likewise, the Covered Parties' Designees'
cooperation obligations that Stein and Lhote place in their artificially created phase two, (Am.
Compl. ¶ 55), arose immediately upon the execution of the agreement.  (Settlement Agreement
§ 7.)  So did SKAT's confidentiality and non-disparagement obligations that were part of the
purported second phase.  (Am. Compl. ¶¶ 62-69; Settlement Agreement §§ 8, 9.)

116.     The reason that the Final Settlement Payment Date by which Stein, Lhote, and
McGee were required to pay the Subsequent Cash Payment Amount was three or four years after
the agreement was signed, depending on the amount of the proceeds from the sale of North
Channel Bank, was not because the parties intended the agreement to be divided into two phases.
Rather, it was to give Stein, Lhote, and McGee time to liquidate the "Illiquid Assets" identified
in the letter agreement to pay the Final Settlement Amount.  Thus, under the letter agreement,
Stein, Lhote, and McGee received an extra year to pay the Subsequent Cash Payment Amount,
unless the proceeds from the sale of North Channel Bank exceeded a certain threshold amount.
(Letter Agreement § 6.)  And as each Illiquid Asset was liquidated, the Covered Parties'
Designees were required to pay the proceeds "up to . . . the Final Settlement Amount" to SKAT
within ten Business Days.  (*Id.* § 5.)

**B.      Stein and Lhote failed to promptly seek rescission.**

117.     "It is well established in New York law that a party can waive any right to rescind
a contract on a theory of breach when the allegedly injured party has failed to promptly assert its
claim[.]"  *Nimbus Therapeutics, LLC v. Celgene Corp.*, 570 F. Supp. 3d 100, 118 (S.D.N.Y.
2021).  Thus, "an action for rescission must be initiated without unreasonable delay."  *Ballow
Brasted O'Brien & Rusin P.C. v. Logan*, 435 F.3d 235, 240 (2d Cir. 2006) (internal quotation
omitted).

118.    "Full and complete knowledge of an alleged . . . breach of contract is not essential to impose upon the would-be rescinder the necessity of acting promptly and diligently if he wishes to assert a rescission." *Banque Arabe Et Internationale D'Investissement v. Maryland Nat'l Bank*, 850 F. Supp. 1199, 1211 (S.D.N.Y. 1994).  Rather, "[i]t is enough that he has notice of the facts as would impel a reasonable man in his position to make inquiry." *Id.*  The "[p]romptness" requirement "is an element of a *prima facie* rescission action and the burden of proof is on [the] plaintiff." *Id.*

119.    Stein and Lhote cannot show that they initiated this action without unreasonable delay because they were on notice of SKAT's purported breach at least as far back as March 2021, when they came to believe that SKAT had breached during their interviews with SØIK, and they never learned anything further about SKAT's performance after June 2021.  (*Supra* ¶¶ 58, 61-62.)  Yet, they nonetheless waited almost two years, until towards the end of March 2023, when the Final Settlement Payment Date was rapidly approaching, to commence this action.

### C.    Stein and Lhote cannot rescind their absolute and unconditional payment obligation.

120.    Plaintiffs' partial rescission claim also fails because the Covered Parties agreed in the settlement agreement that their obligation to pay the Final Settlement Amount, including the payment obligations Stein and Lhote now seek to rescind, is "absolute and unconditional," *i.e.*, the Covered Parties agreed to pay the Final Settlement Amount "regardless of [SKAT's] performance." *Xerox Corp. v. Bus-Let, Inc.*, No. 18-CV-6725-FPG, 2019 WL 2514855, at *2, 4 (W.D.N.Y. June 18, 2019) (internal quotation omitted).  As such, Stein and Lhote may not seek rescission, in whole or in part, of their "absolute and unconditional" payment obligations based on SKAT's purported breach. *See Wells Fargo Bank Minnesota, N.A. v. Nassau Broad.*

*Partners, L.P.*, No. 01 Civ. 11255(HB), 2003 WL 22339299, at *7 (S.D.N.Y. Oct. 10, 2003) (defendant "never had the right to assert . . . an action" seeking rescission because its payment obligation was "absolute and unconditional").

## CONCLUSION

For the reasons set forth above, judgment should be entered on SKAT's breach of contract counterclaims in the amount of DKK 1,044,675,980, pursuant to the 2021 Confession of Judgment or, in the alternative, as breach of contract damages, Stein and Lhote's breach of contract and declaratory judgment claims should be dismissed with prejudice, and the Court should award any other further relief it deems just and proper.


Dated: New York, New York
        April 7, 2025

                                    HUGHES HUBBARD & REED LLP

                                    By:___/s/ Marc A. Weinstein_____
                                        William R. Maguire
                                        Marc A. Weinstein
                                        Neil J. Oxford
                                        Gregory C. Farrell
                                    One Battery Park Plaza
                                    New York, New York 10004-1482
                                    Telephone: (212) 837-6000
                                    Fax:  (212) 422-4726
                                    bill.maguire@hugheshubbard.com
                                    marc.weinstein@hugheshubbard.com
                                    neil.oxford@hugheshubbard.com
                                    gregory.farrell@hugheshubbard.com

                                    *Counsel for Defendant / Counterclaim
                                    Plaintiff Skatteforvaltningen*