**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

MATTHEW STEIN and JEROME LHOTE,

    Plaintiffs/Counterclaim-Defendants,

           *v.*

SKATTEFORVALTNINGEN,

    Defendant/Counterclaim-Plaintiff,

           *v.*

LUKE MCGEE,

        Counterclaim-Defendant.

No. 23 Civ. 02508 (NRB)

---

**STATEMENT OF STEEN BECHMANN JACOBSEN**

I, Steen Bechmann Jacobsen, declare as follows:

1.      I am currently Deputy Director of Public Prosecutions at the Director of Public Prosecutions.  From February 15, 2018, until August 31, 2024, I was the Deputy General Director of the Antifraud Unit of the Danish Tax Agency, Skatteforvaltningen (<u>"SKAT"</u>), Defendant/Counterclaim-Plaintiff in this action.

    **I.**    <u>**Background of Steen Bechmann Jacobsen.**</u>

2.      Prior to my employment at SKAT, I spent the entirety of my career in law enforcement.  I received my law degree in 1999 from the University of Copenhagen.  From 1999 until 2015, I served as a legal officer with the Danish National Police (Rigspolitiet), and as a prosecutor at the Copenhagen Police and the Police district of Sydsjælland and Lolland-Falster.

3.      From January 1, 2015, until February 14, 2018, I served as Deputy State

Attorney at the Danish State Prosecutor for Serious Economic and International Crime ("SØIK").[1] During this time, I had management responsibilities in various areas, including as Chief of Staff and as the head of the money laundering service and certain tax divisions. Among other investigations, I had a management role with respect to the criminal investigation relating to the dividend withholding tax fraud scheme against SKAT.[2] I was appointed Senior Chief Prosecutor/Head of the Prosecution Service in January 2016. While at SØIK, I reported directly to Morten Jakobsen, the State Attorney. The State Attorney was the highest official at SØIK.

4.    I left SØIK to join SKAT in 2018. After I left SØIK, Per Fiig was appointed Chief Prosecutor, and he reported to the State Attorney, Morten Jakobsen.

## II.    SKAT's Antifraud Unit and key personnel.

5.    During my time at SKAT, I was the head of the Antifraud Unit. The Antifraud Unit handled, among other things, the civil claims arising from the dividend withholding tax fraud scheme perpetrated against SKAT. I appointed Gry Ahlefeld-Engel as the department head (*kontorchef*), and then the Director (*underdirektør*) of the Antifraud Unit tasked with primary responsibility for the dividend withholding tax fraud case. As a result of my supervisory position, I was not responsible for daily case handling. I was Ms. Ahlefeld-Engel's direct supervisor, and my direct supervisor was Merete Agergaard, Director General of the Tax Agency.

---

[1]  SØIK ceased to exist at the end of 2021. Effective January 1, 2022, the newly established National Unit for Special Crime (NSK) took over the relevant responsibilities related to the dividend case. I will in the witness statement refer to this entity as SØIK, as it was known during the time of the events described herein.

[2]  As I mentioned at my deposition in this action, I am subject to a duty of confidentiality not to disclose information concerning investigations to which I was privy during my time at SØIK.

### III.    **SKAT's communications with SØIK about the Settlement Agreement.**

6.      Ms. Ahlefeld-Engel was SKAT's primary contact with SØIK concerning civil claims and settlements after I appointed her to the Antifraud Unit.  It would generally have been Ms. Ahlefeld-Engel and her team that handled communications with SØIK.  It is a common practice in Denmark that interagency communications occur between officials at the same managerial level.  For example, as Deputy Director General at SKAT, with respect to the dividend withholding tax cases, I communicated directly with Morten Jakobsen, the State Attorney at SØIK.  Ms. Ahlefeld-Engel generally communicated with Per Fiig at SØIK.

7.      When I first started working at SKAT, there had already been settlement discussions between SKAT and a large group of pension plans and persons associated with those pension plans.  Eventually, a group associated with approximately half of those pension plans dropped out of the settlement discussions because SKAT would not and could not offer any sort of impunity from criminal prosecution as part of any civil settlement agreement with SKAT.  SKAT ultimately executed a settlement agreement on May 28, 2019, (the "Settlement Agreement") with the remaining 61 pension plans and persons associated with those pension plans, including Matthew Stein ("Stein"), Jerome Lhote ("Lhote"), and Luke McGee ("McGee").

8.      Throughout my time at SKAT, we coordinated closely with SØIK, within the confines of Danish law, on the dividend withholding tax cases, including settlements.  Because SØIK is largely restricted in providing information to SKAT, this coordination primarily consisted of providing information about SKAT's investigation to SØIK, responding to inquiries from SØIK, and providing SØIK with updates about the status of civil cases and settlements.  One of the purposes of providing information to SØIK about civil settlements was to ensure that SKAT was not adversely impacting any aspect of SØIK's investigation.  The dividend withholding tax

refund cases and investigations were highly prominent cases in Denmark and had a significant impact on Danish society because the Danish state had been defrauded, it involved an extremely large amount of money, and it involved a complex financial fraud perpetrated by many participants around the globe.  For these reasons, SKAT believed it was particularly important to keep SØIK well informed.

9.    I am aware that members of SKAT's Antifraud Unit, including myself, provided information about the Settlement Agreement to SØIK both before and after the execution of the Agreement on May 28, 2019.  These communications occurred during interagency meetings, phone calls, and emails.  However, at this point in time, for the most part I do not recall the details of the communications, including those in which I participated.  For example, some of the emails described below make clear that I spoke with Morten Jakobsen, the State Attorney, about aspects of the Settlement Agreement, but while I do recall generally having had such discussions and emails with Mr. Jakobsen, I do not recall any specifics of such discussions or emails.  As another example, although it is clear from the email communications that I edited SKAT's press release concerning the Settlement Agreement, I do not recall any details concerning those revisions.  I do generally remember having discussed and edited draft press releases as the head of the Antifraud Unit.

10.    As reflected in Exhibit 528, on February 26, 2019, I noted in an email to management personnel from Skatteministeriet (the Ministry of Taxation), that SKAT "regularly inform[s] SØIK about the progress in the [dividend] cases, including as well in relation to any settlement possibilities, and provided that the current negotiations should lead to a specific proposal, we will of course coordinate this with SØIK as well."  (Weinstein Decl. Ex. 528 at SKAT_MAPLEPOINT_00000174_T_R.)  This email is consistent with my general recollection

that SKAT kept SØIK updated about the Settlement Agreement in part to ensure that SKAT would not cause complications with SØIK's criminal cases. *Id.* In addition, SØIK was generally interested in being aware of the status of the civil track of cases.

11.     As reflected in an email dated May 15, 2019, Ms. Ahlefeld-Engel and I discussed by email sending to SØIK passages from the draft Settlement Agreement text, including language that was ultimately included in Section 8(f) of the Settlement Agreement. (Weinstein Decl. Ex. 555 at SKAT_MAPLEPOINT_00000257_T_R.) In these messages, Ms. Ahlefeld-Engel discussed with me "removing any doubt that the settlement affects any criminal claims." (*Id.* at SKAT_MAPLEPOINT_00000256_T_R.) I asked for her confirmation as to whether the draft text passages could be shared with SØIK, and whether Mr. Jakobsen from SØIK could share them with the Ministry of Justice. *Id.*

12.     After my email exchange with Ms. Ahlefeld-Engel, later on May 15, 2019, she sent on behalf of SKAT an email to Per Fiig, copying me, that included passages from the draft Settlement Agreement text, including language that was ultimately included in Section 8(f) (the "May 15 Email") of the Settlement Agreement. (Weinstein Decl. Ex. 532 at SKAT_MAPLEPOINT_00000027_T_R.)

13.     The May 15 Email furnished SØIK with the passages from the Settlement Agreement text that impacted SØIK. The May 15 Email also referred to "cooperation material" that SKAT would be receiving from the settling parties as part of the Settlement Agreement. (Weinstein Decl. Ex. 532 at SKAT_MAPLEPOINT_00000027_T_R.)

14.     Shortly after Ms. Ahlefeld-Engel sent SØIK the May 15 Email, she and I corresponded concerning additional developments relating to the dividend withholding tax cases, including a press release concerning the Settlement Agreement. (Weinstein Decl. Ex. 556 at

SKAT_MAPLEPOINT_00000176_T_R-SKAT_MAPLEPOINT_00000179_T_R.)    I noted to Ms. Ahlefeld-Engel that once that press release "is as clear as it can be, I will have it directed over to Morten [Jakobsen], so he can clear it with the Ministry of Justice (which he will probably do in the same manner as with the submission of the [Section 8(f)] text excerpts below)."    (*Id.* at SKAT_MAPLEPOINT_00000177_T_R.)    Ms. Ahlefeld-Engel and I also discussed that she had been in contact with Per Fiig of SØIK about the Settlement Agreement, and we planned to stay in touch when there were further updates.    (Weinstein Decl. Ex. 536 at SKAT_MAPLEPOINT_00000194_T_R.)

15.    As reflected later in that same email chain, I spoke with Morten Jakobsen on May 16, 2019, concerning the draft Settlement Agreement text within the May 15 Email, which included the language in Section 8(f), and he stated that "the[se] text snippets . . . were approved by the public prosecutor and the Ministry of Justice."    (Weinstein Decl. Ex. 556 at SKAT_MAPLEPOINT_00000176_T_R.)    Additionally, Mr. Jakobsen and I discussed that I would send him the draft press release once it was ready.  *Id.*

16.    As reflected in an email on May 21, 2019, Ms. Ahlefeld-Engel sent, on behalf of SKAT, an email to Per Fiig, copying me, titled "The parties to the settlement agreement" with an attachment identifying the Covered Parties to the Settlement Agreement, including covered individuals    and    pension    plans.    (Weinstein    Decl.    Ex.    533    at SKAT_MAPLEPOINT_00000040_T_R-SKAT_MAPLEPOINT_00000050_T_R.)    Mr. Stein, Mr.    Lhote,    and    Mr.    McGee    were    listed    in    this    attachment.    (*Id.*    at SKAT_MAPLEPOINT_00000047_T_R, SKAT_MAPLEPOINT_00000048_T_R.)

17.    SKAT also coordinated with SØIK concerning SKAT's May 2019 press release about the Settlement Agreement (the "May 2019 Press Release").  I had an active role in

the processes leading to publication of the May 2019 Press Release.

18.    <u>First</u>, as reflected in email communications from that time, I reviewed and edited the draft press release, and Ms. Ahlefeld-Engel revised the draft in accordance with my feedback. (*See* Weinstein Decl. Ex. 557 at SKAT_MAPLEPOINT _00000017_T_R.)

19.    <u>Second</u>, I coordinated with Morten Jakobsen at SØIK concerning the contents of the May 2019 Press Release. As referenced above, Mr. Jakobsen and I exchanged emails and also had telephone calls concerning these subjects. The purpose of this back-and-forth dialogue concerning the press release was both to ensure that SKAT's press release would not adversely impact SØIK's criminal investigations and also to keep SØIK involved in, and abreast of, the developments in the civil action. Emails which I sent or received at the time reflect the following:

a.    On May 14, 2019, I sent a message to Ms. Ahlefeld-Engel, informing her that I had been in contact with Mr. Jakobsen concerning whether the press release would address solely "the civil track" or whether it would also include the "criminal law track." (Weinstein Decl. Ex. 557 at SKAT_MAPLEPOINT _00000017_T_R.) I wrote, "we may exclude the criminal aspect from the press release, especially considering that SØIK has significant concerns if the criminal track is perceived as part of a settlement, which is not the case." *Id.*

b.    The following day, May 15, 2019, I sent Ms. Ahlefeld-Engel a follow-up message, noting that after the May 2019 Press Release was updated, I would send it to Mr. Jakobsen, to get approval from

the Ministry of Justice. (Weinstein Decl. Ex. 536 at SKAT_MAPLEPOINT00000195_T_R.)

c.   On May 16, 2019, I provided to Mr. Jakobsen the draft press release, noting that there would likely be revisions over the next several days as the settling parties would review and provide comments on the release. (Weinstein Decl. Ex. 558 at SKAT_MAPLEPOINT_00000904_T_R.) Mr. Jakobsen reviewed the draft and responded later that day, "Looks good. We probably don't have anything as, of course, there is no trace of anything relating to criminal law. Will get finally back to you later." *Id*. It was my understanding that Mr. Jakobsen's statement that "there is no trace of anything relating to criminal law" meant that there was no reference to anything within the draft press release that concerned or would impact the "criminal law track" at SØIK. *Id*.

d.   On May 20, 2019, I shared with Mr. Jakobsen the final draft of the May 2019 Press Release, as well as the principles for communication to adhere to the Settlement Agreement's non-disparagement terms. (Weinstein Decl. Ex. 537 at SKAT_MAPLEPOINT_00000420_T_R.) I noted once again that we would share the final draft of the release with the settling parties for them to review. SØIK did not have any comments on the draft Press Release. (Weinstein Decl. Ex. 538 at SKAT_MAPLEPOINT00000069_T_R.) It is clear from this email

that I spoke with Mr. Jakobsen several times about these issues.

20.    Third, as referenced above, I coordinated with Morten Jakobsen at SØIK concerning the non-disparagement principles for communication, which governed communications under the Settlement Agreement.    (Weinstein Decl. Ex. 535 at SKAT_MAPLEPOINT00000072_T_R.)  This was part of SKAT's effort to ensure that SKAT complied with and followed its obligations under the Settlement Agreement.  On May 21, 2019, I emailed Morten Jakobsen concerning these "Principles," and noted that, per "our telephone conversation" were certain principles governing communications in order to "take care not to risk a breach of the settlement." (Weinstein Decl. Ex. 559 at SKAT_MAPLEPOINT_00000003_T_R.) Again, I do not recall the details of that phone conversation with Mr. Jakobsen, but the email makes clear that it happened.  I also included in my email text from the "Non-Disparagement" section of the Settlement Agreement.  *Id.*  Later that same day, I again emailed Mr. Jakobsen, noting that SKAT had edited the principles in accordance with Mr. Jakobsen's feedback.  (Weinstein Decl. Ex. 535 at SKAT_MAPLEPOINT_00000072_T_R.)  I further noted to Mr. Jakobsen in this correspondence that "Gry [Ahlefeld-Engel] will also discuss the actual text of the agreement with Per [Fiig] as they have previously talked about." *Id.*

21.    Based on my general recollection of events concerning the Settlement Agreement and my review of my emails from the time, it was and remains my understanding that the top officials of SØIK were aware at the time the Settlement Agreement was executed that the parties to the settlement would be cooperating with SKAT in accordance with their responsibilities under the Settlement Agreement.

22.    The May 2019 Press Release described the Settlement Agreement as a "decisive    victory    for    SKAT.    (Weinstein    Decl.    Ex.    539    at

SKAT_MAPLEPOINT●●●●●●●1_T_R.)  In the Press Release itself I stated that "[t]he settlement agreement is a major step that we have worked hard to achieve for a long period of time," and that "the settlement confirms that we have chosen the right strategy." (*Id.* at SKAT_MAPLEPOINT●●●●●●●2_T_R.)  My statements could not have been clearer that SKAT believed that the Settlement Agreement was in SKAT's best interests.

23.    On May 29, 2019, I attended the Ministry of Taxation's press conference at which the Ministry announced that the Settlement Agreement had been reached.  The main themes in the May 2019 Press Release were reiterated at the press conference: among other things, the settlement amount, that the settlement was a positive development for Denmark, and that the settling parties would assist the Tax Agency by providing information, which was important for SKAT's efforts to recover money from other participants in the scheme. (*See* Weinstein Decl. Ex. 539 at SKAT_MAPLEPOINT_●●●●●●●1_T_R.)  The press conference was covered heavily by the media.

24.    Based on documents from the time, on June 27, 2019, officials from SKAT and SØIK met to discuss, among other things, the Settlement Agreement.  (*See* Weinstein Decl. Ex. 541 at SKAT_MAPLEPOINT_●●●●●44●_T_R, Weinstein Decl. Ex. 542 at SKAT_MAPLEPOINT_●●●●●942_T_R.)  I believe I attended the meeting, but do not recall the meeting itself.  However, the agenda for the meeting included discussion of the Settlement Agreement. (Weinstein Decl. Ex. 541 at SKAT_MAPLEPOINT_●●●●●44●_T_R.)  At that point in time, the relevant aspects of the Settlement Agreement to discuss were the amount and timing of payments under the Settlement Agreement and the status of such payments, and the efforts of Stein, Lhote, and McGee to provide information to SKAT under the Agreement and to assist SKAT in its efforts to pursue others to recover from the fraud.

IV.    **Responses to SØIK's 2021 Inquiries.**

25.    In early 2021, SØIK sent to SKAT formal written inquiries requesting SKAT's responses to numbered questions.

26.    On January 14, 2021, one of the employees who Ms. Ahlefeld-Engel supervised, Bettina Spang, provided for my review draft responses to SØIK's inquiries.  As reflected in the documents, I reviewed the draft responses the same day, and responded to Ms. Spang, Ms. Ahlefeld-Engel, and others noting that while the overall answers were fine, I had a concern about confidentiality based on the accessibility of settlement information through SØIK's criminal case. (Weinstein Decl. Ex. 552 at SKAT_MAPLEPOINT_00000075_T_R.)  I wrote in that email that I had:

> one concern in particular . . . namely that both our answer . . . and the attached appendices will essentially be entered as part of the files of the criminal case when it is forwarded to SØIK, whereby it will be subject to the access/right to inspect documents of the accused and their defense, cf. section 729(a) et seq. of the Administration of Justice Act. The information will thereby come to the knowledge of the charged/defense counsel and could in addition to be presented during the main hearings in the upcoming criminal cases, unless a ruling to the contrary is issued, cf. section 729(c) of the Administration of Justice Act (which is a matter for the prosecuting authorities and the courts, and thus not something we have influence over or access to, when the information is sent).

*Id.*

27.    The concerns that I voiced included that criminal defendants, including those who were not party to the Settlement Agreement, would gain access to its confidential information.  This was concerning because it could impact SKAT's future investigations and the likelihood of entering into future settlement agreements with other parties.  I was also concerned that any broader sharing of the Settlement Agreement could be perceived as a potential breach of its confidentiality requirement.

28.    My concerns were rooted in part in the fact that I did not know who was

charged criminally by SØIK, and I did not know the degree of overlap between the parties to the Settlement Agreement and individuals who were or could in the future be criminally charged.

29.    Subject to my team addressing my confidentiality concerns with SKAT's counsel, I authorized that the responses to SØIK's January 6, 2021 requests be submitted to SØIK. I have come to learn that SKAT also received, and responded to, a second set of numbered requests from SØIK.    (Weinstein Decl. Ex. 550 at SKAT_MAPLEPOINT_00000743_T_R- SKAT_MAPLEPOINT_00000746_T_R.)  I do not recall having a role in SKAT's responses to those requests.

V.    **Criminal charging decisions in Denmark.**

30.    I have substantial familiarity, based on my career in law enforcement, with the manner in which the prosecuting authority decides to lodge criminal charges or indictments.

31.    In Denmark, it is the police who determine whether someone will be charged (*sigtet*) initially and then the prosecution who determines whether to proceed with indictment (*tiltale*).

32.    For both charging by the police (*sigtelse*) and the subsequent indictment by the prosecution (*tiltale*), the determination of whether to proceed criminally is based on the weight of the evidence, that is, whether there is an adequate basis to determine that the person should be charged or indicted.  In my experience, neither the determination of whether an individual shall be charged by the police or indicted by the prosecution, or not, may be influenced by whether the individual has provided restitution or is party to a civil settlement relating to the offense.  Nor is the potential for restitution to the victims in a criminal case part of the decision of whether to charge or indict a suspect.

33.    In my experience in law enforcement, that an individual has settled civilly

in relation to the criminal offense is only a consideration for the court at the sentencing stage, not on the decision of whether or not that individual shall be charged or indicted.

34.    Although at the time that SØIK decided to indict Mr. Stein, Mr. Lhote, and Mr. McGee I did not know what factors SØIK considered in making those decisions, in my experience SØIK could not have taken into account that Stein, Lhote, and McGee were parties to the Settlement Agreement.  Now that each has been charged criminally, it is SØIK's obligation to bring to the Court's attention any potential mitigating factors at sentencing, including relevant information provided by SKAT about the Settlement Agreement, should any of them be convicted.


Wherefore, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

14

By:_____
Steen Bechmann Jacobsen

Executed on
this _7_ day of April 2025