# Exhibit 508

Jerome Lhote - May 16, 2024

Page 1

```
 1                UNITED STATES DISTRICT COURT
 2                SOUTHERN DISTRICT OF NEW YORK
 3
 4   _____
                                              )
 5   MATTHEW STEIN and JEROME LHOTE,          )
                                              )
 6              Plaintiffs,                   )
                                              )
 7         -against-                          )
                                              )   Case No.
 8   SKATTEFORVALTNINGEN,                     )   1:23-cv-02508-NRB
                                              )
 9              Defendant/Counterclaim-       )
                Plaintiff,                    )
10                                            )
           -against-                          )
11                                            )
     LUKE MCGEE,                              )
12                                            )
                Counterclaim-Defendant.       )
13   _____)
14
15
16
17
18      VIDEOTAPED DEPOSITION UNDER ORAL EXAMINATION OF
19                       JEROME LHOTE
20                    DATE: May 16, 2024
21
22
23
24      REPORTED BY:  CHARLENE FRIEDMAN, CCR, RPR, CRR
25
```

1        VIDEO OPERATOR:  We are on the
2  record.
3        Today's date is May 16, 2024.  The
4  time on the video is 9:06 a.m.
5        This is video 1 in the deposition
6  of Jerome Lhote, in the matter of Matthew
7  Stein, et al., versus Skatteforvaltningen
8  versus Luke McGee, in the U.S. District
9  Court, Southern District of New York, Case
10  Number 23-CV-2508 (NRB).
11        This deposition is taking place at
12  1 Battery Park Plaza, New York, New York.
13        The videographer is Dimitry
14  Zvonkov.  The court reporter is Charlene
15  Friedman, both with Gregory Edwards.
16        All appearances will be noted on
17  the stenographic record.
18        Will the reporter please swear in
19  the witness.
20
21
22  J E R O M E  L H O T E,
23        called as a witness, having been first duly
24  sworn according to law, testifies as follows:
25

Jerome Lhote - May 16, 2024

Page 15

```
 1        Q    At the time that you signed this
 2   Affidavit of Confession of Judgment, did you
 3   believe it was enforceable?
 4        A    Yes.
 5        Q    Did there come a time when you
 6   believed that this particular Affidavit of
 7   Confession of Judgment was no longer
 8   enforceable?
 9        A    I don't recall any -- I mean a
10   specific amount of time.
11        Q    As of the time that you signed this
12   Affidavit of Confession of Judgment, you were
13   living in New York City?
14        A    On the 28th of May 2019, yes.
15        Q    Okay.  Now, if you turn to Exhibit
16   10B --
17        A    Okay.
18        Q    -- is that an updated Affidavit of
19   Confession of Judgment that you signed?
20        A    It says that, yes.
21        Q    Okay.  That's -- on page 4, that's
22   your signature?
23        A    Yes.
24        Q    When did you sign it?
25        A    It says here June 9, 2021.
```

1       Q    At the time you signed this updated
2   Affidavit of Confession of Judgment, did you
3   believe it was enforceable?
4       A    I don't recall whether or not I
5   believed at the time, I mean, whether it was
6   enforceable.  If I signed it, probably, yes.
7       Q    Okay.  Do you recall having a
8   different view of this updated Affidavit of
9   Confession of Judgment when you signed it
10  than you had when you signed the original
11  one?
12      A    I remember that I had to modify the
13  document to mention I was a Florida resident.
14      Q    So at the time you signed this
15  updated affidavit, you were then living in
16  Florida?
17      A    Correct.
18      Q    All right.  And at the time you
19  signed the updated affidavit, did the fact
20  that you were living in Florida, in your
21  view, impact the enforceability of the
22  document?
23      A    I don't recall that.  I was just
24  made aware that I was informed that it might.
25      Q    So you were -- you were informed

Jerome Lhote - May 16, 2024

Page 17

1     that it might impact whether it was an
2     enforceable document?
3         A    Correct.
4         Q    Do you recall personally informing
5     anyone at Skat or any representative of Skat
6     that the affidavit -- the updated affidavit
7     you signed might not be enforceable?
8         A    I don't recall having ever a
9     conversation with Skat directly.  So if it
10    had been done, that would have been through
11    my lawyers, but I don't personally -- never
12    had any discussion with Skat.
13        Q    Do you know, one way or the other,
14    if you're lawyers --
15        A    No.
16        Q    -- had such a discussion?
17        A    No, I don't know, one way or the
18    other.
19        Q    Okay.  Did you instruct your
20    lawyers to have such a conversation with
21    Skat?
22        A    No, I don't recall having --
23    instructing them.
24        Q    What about this updated Affidavit
25    of Confession of Judgment, in your mind, made

Jerome Lhote - May 16, 2024

Page 18

```
1    it possible that it wasn't enforceable at the
2    time you signed it?
3         A    Again, my recollection, I had no
4    specific recollection of being made aware
5    that my lawyer mentioned to me that being a
6    Florida resident may affect the validity of
7    the document.
8              But again, until I was reminded of
9    the -- this conversation with the lawyers, I
10   was not -- I had no recollection of -- of
11   that conversation.
12        Q    Okay.  So other than being informed
13   that your residence might impact its
14   enforceability, did you have any other reason
15   to believe that -- let me just finish, sorry.
16        A    Umm-hmm.
17        Q    Did you have any other reason to
18   believe at the time you signed it that it was
19   not enforceable?
20        A    I don't recall any other reason.
21             (Reporter clarification.)
22             MR. WEINSTEIN:  And maybe, just to
23   be clear, Dan, with you on the record, I
24   don't intend to ask him about conversations
25   with lawyers.
```

1    have been the sole Danish representation at
2    the time, but I -- I'm not a hundred percent
3    sure.
4           Again, there was discussion and
5    conflict and separation.  So I don't remember
6    exactly at what time they stopped
7    representing us.
8        Q   So the second firm, that's the one
9    you don't recall the name of, the firm
10   itself?
11       A   Correct.
12       Q   All right.  The first firm that
13   ultimately went with the Argre --
14       A   Partners.
15       Q   -- Partners was Nyborg?
16       A   Yes.  I believe so, yeah.
17           I mean, I would have to look to
18   find the names.
19       Q   Do you recall when your interview
20   with S☐IK took place?
21       A   I believe it was in March of 2021.
22       Q   So as of the day that you first
23   went in for that interview, was it your
24   belief that S☐IK was familiar with the
25   settlement terms?

Jerome Lhote - May 16, 2024

Page 64

```
1       A    Yes.
2       Q    Did anything happen during your
3    interview with S☐IK that lead you to change
4    that belief?
5       A    Yes.
6       Q    What happened?
7       A    They -- when I mentioned the
8    existence of the agreement, the amounts
9    involved, the corporation involved, they had
10   no reaction, no question, no -- I mean, they
11   were surprised, basically, of what I was
12   referring to and had -- that lead me to
13   believe they had no knowledge of the
14   document.
15      Q    You were interviewed over the
16   course of a number of days.
17           Is that right?
18      A    Three days.
19      Q    It's not a test, but do you happen
20   to recall during which day you got that
21   impression?
22      A    I don't recall the whole
23   discussion.  I know I mentioned the agreement
24   multiple times, because again, it was
25   extremely important and I wanted to stress
```

Jerome Lhote - May 16, 2024

Page 68

1       what happened.
2               So anything is possible.
3          Q    By the end of your interview with
4       S☐IK, did you believe that Skat had not
5       performed its obligations under the
6       settlement agreement?
7          A    Yes.
8          Q    Did you instruct anyone, on your
9       behalf, to provide notice of a breach of the
10      settlement agreement to S☐IK -- to Skat?
11         A    I don't recall.
12         Q    Did you ever, at any point in time,
13      instruct anyone on your behalf to provide to
14      Skat notice of a breach of the settlement
15      agreement?
16         A    I -- what I recall is, again, that
17      after the interview, I felt that Skat had
18      breached the agreement and that further
19      analysis was required.
20         Q    I'm sorry, further --
21         A    Further analysis.
22         Q    Analysis, thank you.
23              Prior to the filing of this lawsuit
24      on your behalf, are you aware of anyone on
25      your behalf providing Skat with notice that

Jerome Lhote - May 16, 2024

Page 73

1      the agreement," you're referring to what you
2      learned during the course of your interview?
3           A    That is correct.
4           Q    Did there come a time where you
5      were no longer committed to ensuring full
6      repayment under the settlement agreement?
7           A    Once it was established -- and
8      again, I don't know.
9                I mean, after analysis and
10     discussion with counsel, it was clear that
11     Skat had breached.  So we were relieved from
12     all obligations because they had breached the
13     agreement, which was you do this, I do this.
14     If you don't do this, I don't do that.
15               So yes, when it came -- again, we
16     never do anything without thinking and
17     without proper legal analysis.  So I don't
18     know when it came, but yes, there was a time
19     when it was clear that we should not continue
20     because Skat had breached the agreement and
21     didn't respect what was its obligations.  So
22     our -- we were relieved from our obligations.
23          Q    Can you put any approximate time
24     frame on when you had come to the belief that
25     you had no obligations from anything under

Jerome Lhote - May 16, 2024

Page 74

```
1      the settlement agreement?
2          A    Sometime between March of '21 and
3      end of -- beginning of 2022, around -- around
4      those dates, but no precise date, no.
5          Q    So at some point between March of
6      '21 and the beginning of 2022, did you make a
7      conscious decision to stop making payments to
8      Skat under the settlement agreement?
9               MR. LEVY:  Objection to form.
10     Assumes facts not in evidence.
11              THE WITNESS:  So what did you just
12     say, sir?
13              MR. LEVY:  I said, assumes facts
14     not in evidence.
15         A    So can you repeat the question?
16         Q    Yeah, I'll -- I'll -- give you a
17     new question.
18         A    Okay.
19         Q    There -- did there come a time when
20     you made a decision to stop making payments
21     to Skat under the settlement agreement?
22         A    Yes.
23         Q    When was that?
24         A    Again, sometime between March of
25     '21 and January of 2022, beginning of 2022,
```

Jerome Lhote - May 16, 2024

Page 75

1     but I cannot give you an exact date.
2          Q    Were there any other obligations
3     under the settlement agreement that you made
4     a decision to stop doing?
5          A    Again, my view is once the breach,
6     all obligations -- we were relieved of all
7     our obligations as per the agreement.  The
8     agreement was give and take.  I do that, you
9     do this.  You don't do that, I don't do all
10    of that.
11              So yes, so there were -- everything
12    that had been agreed was null and void from
13    the moment they had breached.
14         Q    Did you provide Skat with any
15    notice that you were no longer complying with
16    the settlement agreement because, in your
17    view, Skat had breached the agreement?
18         A    I don't recall what was -- the
19    process to -- that led to the litigation, to
20    the lawsuit.
21              So I -- no, I don't recall whether
22    or not something was submitted to Skat other
23    than there was an -- eventually a lawsuit
24    that was filed.
25         Q    So other than the filing of the

Jerome Lhote - May 16, 2024

Page 87

1       page 13.
2          A    Okay.
3          Q    Was there -- do you recall that
4       there was effort after your interview --
5       withdrawn.
6               Do you recall that there was effort
7       at some point after your interview to
8       determine whether Skat had complied with its
9       obligations under Section 8F of the
10      settlement agreement?
11         A    Yes.
12         Q    And do you recall what was able to
13      be determined about whether Skat had complied
14      with Section 8F of the agreement?
15              MR. WEINSTEIN:  Objection to form.
16         Q    You may answer.
17         A    Oh, sorry.
18              My recollection is that Marshall
19      Miller received an e-mail from Skat counsel
20      that -- very obscure, but some discussion
21      that had happened between Skat and S☐IK.
22         Q    And do you recall whether it was --
23      it was clear from that communication that
24      Skat had or had not complied with Section 8F?
25         A    No.

Jerome Lhote - May 16, 2024

Page 89

```
1                MR. LEVY:  Thank you.
2                MR. WEINSTEIN:  Yeah, I just have a
3       few follow-up.
4                MR. LEVY:  I'm going to hang up on
5       you, Dan, so you can then get back onto the
6       Zoom.
7                MR. NEWMAN:  Okay.
8       CONTINUED EXAMINATION BY MR. WEINSTEIN:
9            Q   Mr. Lhote, in response to the
10      questions from your counsel, you referred to
11      a communication from Skat's lawyers regarding
12      Section 8F.
13               Do you recall that?
14           A   Yes.
15           Q   Do you recall when -- approximately
16      when that communication was received?
17           A   I believe that was beginning of the
18      summer 2021.
19           Q   All right.  And after you reviewed
20      that communication, did you continue to have
21      the view that Skat had breached the
22      settlement agreement?
23           A   It wasn't clear.  The e-mail was
24      very -- I don't know if it's proper to --
25      wishy-washy, so it wasn't clear from the
```

Jerome Lhote - May 16, 2024

Page 90

| | |
|---|---|
| 1 | e-mail what had been or not done by Skat. |
| 2 | Q    Okay.  And subsequent to that |
| 3 | communication in the summer of 2021 and up |
| 4 | until the filing of this lawsuit, did you |
| 5 | learn any other information about whether |
| 6 | Skat had complied with Section 8F? |
| 7 | A    I don't believe we received any |
| 8 | other information. |
| 9 | Q    So the totality of information that |
| 10 | you had about whether Skat complied with |
| 11 | Section 8F was based on information that you |
| 12 | had on or before receiving that e-mail from |
| 13 | Skat's counsel. |
| 14 | Is that right? |
| 15 | A    What happened was, as I mentioned |
| 16 | during my interview with S☐IK, it came clear |
| 17 | that Skat had not submitted the agreement, |
| 18 | the settlement agreement to S☐IK. |
| 19 | And then there was this e-mail that |
| 20 | counsel or my counsel reached out to Skat |
| 21 | counsel to get information about what had |
| 22 | been done, if anything.  And again, that was |
| 23 | in the summer of 2021.  I don't remember |
| 24 | exactly the date. |
| 25 | Q    Okay.  And so based on those two |