# Exhibit 510

The court in Glostrup



**Transcript of the**

**judgment book D O M**

delivered on December 12, 2024

Court No DL-906/2021
Police No. SØK-76141-00005-15

Prosecutor's Office vs.
<u>Defendant 1</u>
<u>CPR no. (Born 1970)</u>

Pursuant to section 12(8) of the Danish Administration of Justice Act, two legal judges and three judges have participated in the processing of this case.

The indictment was received on January 11, 2021.

<u>Defendant 1 </u>is charged with

**1.**

**Fraud of a particularly serious nature according to section 279 of the Danish Criminal Code, cf. section 286(2),**
in the period 2012-2015, as owner and director and/or actual manager of the British companies <u>Virksomhed LLP (formerly Virksomhed Ltd.), Virksomhed PLC, Virksomhed Ltd. 1 </u>and <u>Virksomhed LLP ("Group"), </u>in order to obtain unjustified gain for himself or others, having caused, on behalf of 189 American pension companies and 24 <u>island companies </u>("the investors"), 3,239 applications for refund of Danish dividend tax to be made unlawfully and on incorrect grounds,

> by arranging for the development, organization and operation of a closed trading system under the auspices <u>of the Group </u>through which investors entered into agreements to purchase Danish listed shares at a time when the shares were traded with a right to dividends, which trades were fictitious or of such a nature that the investors did not thereby receive dividends from the share issuer or a right thereto, in that
> 1) the defendants constructed a series of trades in which agreements to buy/sell or borrow/lend shares were concluded in predetermined circular constellations between parties who did not already own shares, and where the share positions bought by each investor and sold by each short seller were identical to the share positions lent by the same investor and borrowed by the same short seller, so that no money or shares were exchanged in connection with the trades, and

2) the agreements to acquire the shares sold by the short sellers to the investors via two stockbrokers were not entered into by the short sellers until after the day on which the shares were traded with the right to dividends, whereby the shares in question were not dividend-bearing, which is why neither the investors nor the short sellers were liable for dividend tax in relation to these shares,

as the amounts credited to the investors' client accounts with <u>the Group</u> as share dividends arose solely on the basis of a corresponding debiting the short-sellers' client accounts with the <u>Group,</u> regardless of the fact that the short-sellers had neither received share dividends nor paid dividend tax, but only had an amount corresponding to the share dividends available in their client accounts as a result of a constructed profit on the above-mentioned trading transactions where the short-sellers and the investors acted as each other's real counterparties,

<u>the Group</u> issued 3,239 dividend notes to the investors on the basis of the above-mentioned trading agreements, which incorrectly stated that the investors, by virtue of their ownership of the traded shares, had received share dividends from which Danish dividend tax of 27% had been withheld, and

as these dividend notes, with the defendant's knowledge via reclaim agents, were submitted to the Danish Tax Agency (then SKAT) as documentation for the investors' right under the double taxation treaties between Denmark and the USA and Malaysia to be refunded the 27% dividend tax that appeared from the dividend notes,

whereby employees at the Danish Tax Agency were misled into believing that the investors in question were entitled to receive the tax refund applied for and therefore paid a total of DKK 9,025,205,871 in accordance with the applications, resulting in a corresponding loss of assets for the Danish Tax Agency, of which amount the defendant received at least 80%.

## 2.

**Attempted fraud of a particularly serious nature under** section **279 of the Danish Criminal Code, cf.** section **286(2),**

by having in 2015, under the same conditions and in the same manner as described in point 1, unlawfully and on an incorrect basis caused, on behalf of 71 US pension companies and 4 <u>island companies</u> (the "investors"), 160 applications for refunds of Danish dividend tax to be made unlawfully and on an incorrect basis in order to mislead employees at the Danish Tax Agency (then SKAT) into believing that the investors in question were entitled to be paid the tax refunds applied for totaling DKK 553.346,302, resulting in a corresponding loss of wealth for the Danish Tax Agency, which failed, however, as the Danish Tax Agency in August 2015 stopped payments of the refund of dividend tax.

> *does not comply with the tax authorities' request, the tax authorities entitled to interrupt the payout period according to the proposed*
> *§ Section 69 B(1) of the Withholding Tax Act.*
> *...*
> *It can be expected that the tax authorities will in the future increase the focus and control of withholding tax refunds. This should be done to ensure that no undue refunds are made to a foreign taxpayer.*
> *recipient who is not deemed to be the beneficial owner. The proposed section 69 B of the Withholding Tax Act will apply to requests for repayment that has not been decided by the Customs and Tax Administration by June 30, 2012, cf. section 10(1) of the bill.*
> *..."*

**The Court's reasoning and decision**

***Procedural objections***

*Regarding violation of the presumption of innocence*

<u>Defendant 1</u> has claimed acquittal as the presumption of innocence in the case against him must be considered violated due to a number of public statements made by, among others, ministers and an acting head of SØIK, and as <u>Defendant 1's</u> right to a fair trial has therefore been violated. <u>Defendant 1</u> has referred to the Charter of Fundamental Rights of the European Union, Article 47, which states that everyone has the right to a fair and public hearing within a reasonable time by an independent court previously established by law, and Article 48, which states that everyone charged with a criminal offense shall be presumed innocent until proven guilty according to law, and the European Convention on Human Rights (ECHR), Article 6(2), which states that everyone has the right to a fair trial. 2, which states that everyone charged with a criminal offense shall be presumed innocent until proved guilty according to law.

According to the case law of the European Court of Human Rights, statements by public officials referring to suspected persons as guilty may violate Article 6(2) of the ECHR.

The same issue was tried on the basis available at the time during the preparation of this case pursuant to section 846(1) of the Danish Administration of Justice Act, where <u>Defendant 1</u> claimed the case was dismissed.

On December 14, 2023, the Eastern High Court upheld the High Court of Glostrup's decision of September 29, 2023, according to which the claim for dismissal was not upheld.

The High Court found that regardless of whether the statements in question may involve a violation of Article 6(2) of the ECHR and/or a violation of the procedural rules of law,

section 1016a or section 1017(2)(3) of the Act, also in view of the procedural safeguards provided by the Administration of Justice Act and sections 3, 62 and 64 of the Constitution, according to the nature of the statements, that it could not be assumed on the present basis that Defendant 1 would not receive a fair trial. The High Court noted that the question of inadmissibility could be raised again during the main hearing, cf. section 862(4) of the Danish Administration of Justice Act.

In connection with the main hearing, the same statements are documented as were documented in connection with the court hearing during the trial regarding this issue. In addition, a statement of December 6, 2023 from Foreign Minister Person 115 to Politiken is documented. Based on the available information, the Court of Appeal finds that some of the statements from ministers in the period from November 17, 2015 through April 3, 2023 are of such a nature that they may be perceived as or may leave the impression that the ministers in question consider Defendant 1 guilty of a criminal act in connection with the refund of dividend tax, which statements could constitute a violation of Defendant 1's rights under Article 6(2) ECHR.

However, after an overall assessment of the available information and the course of the case, the Court of Appeal finds, also in view of the procedural safeguards provided by the Administration of Justice Act and sections 3, 62 and 64 of the Danish Constitution, that Defendant 1 will be able to receive and has received a fair trial before an independent and impartial court.

The Court of Appeal therefore finds that Defendant 1's claim for acquittal with reference to Articles 47 and 48 of the Charter of Fundamental Rights of the European Union and Article 6(2) of the ECHR cannot be upheld.

Regardless of whether there may have been public statements made by some ministers that could involve a violation of Defendant 1's rights under Article 6(2) of the ECHR, the District Court notes that the issue of any compensation as a consequence of a possible violation cannot be dealt with in the present case, which has not been either. At the same time, it is noted that any claim by Defendant 1 for compensation would have to be brought in a separate case brought by Defendant 1 against the State.

*About the specialty principle*

Defendant 1 has also claimed acquittal with reference to the fact that Defendant 1, as a result of the principle of speciality stated in, inter alia, sections 17 and 51 of the Extradition Act, which Act has implemented the EU Framework Decision on the European Arrest Warrant, and with reference to Executive Order No. 10 of 13 October 2022 of the Treaty of 17 March 2022 on Extradition between the United Arab Emirates and the Kingdom of Denmark,

Article 10, cannot be prosecuted for aggravated fraud and attempted fraud in the present case. Defendant 1 has referred to the fact that the basis for extradition of Defendant 1 from the United Arab Emirates to Denmark is the letter of October 4, 2023 to the central authority in the Kingdom of Denmark from the Ministry of Justice in the United Arab Emirates, which according to Defendant 1 must be considered the competent authority, in which letter reference is made to the fact that Defendant 1 is requested to be extradited on the basis of a case concerning money laundering. Defendant 1 has also stated that he cannot be prosecuted for an offense other than the one for which he was originally extradited. It is further stated that Denmark has not made any requests for changes to the decision of October 4, 2023 from the United Arab Emirates.

It is not disputed by Defendant 1 that the request for extradition of Defendant 1 to Denmark has been processed by the courts in the United Arab Emirates on the basis of a European arrest warrant issued by the Court in Glostrup, in which the stated indictment for aggravated fraud and attempted fraud, including the claim for increased punishment under section 88 of the Danish Criminal Code, is identical to the charge brought in this case, and it is not disputed by Defendant 1 that the courts in the United Arab Emirates have made a final decision on the extradition of Defendant 1 on this basis.

According to the available information, the District Court assumes that the lease was made in accordance with local law in the United Arab Emirates and in accordance with a bilateral agreement concluded between the United Arab Emirates and Denmark, cf. the stated in the letter of October 4, 2023.

On the basis of the information available, the Court of Appeal also assumes that the courts in the United Arab Emirates have made a final decision that Defendant 1 must be extradited to Denmark on the basis of the European Arrest Warrant issued by the Court in Glostrup, which states the charge of aggravated fraud and attempted fraud and a reference to section 88 of the Danish Criminal Code.

Based on the nature, content and what has emerged about the background to the letter of October 4, 2023 from the Ministry of Justice of the United Arab Emirates to the central authority in the Kingdom of Denmark, the Court of Appeal further finds that the letter must be regarded as an information letter (verbal note) to the Danish authorities about the status of the extradition of Defendant 1. In this connection, the District Court has emphasized that the letter of 4 October 2023 refers to the fact that a decision has been made to extradite the Defendant 1 to Denmark and that the extradition of the Defendant 1 will take place after the completion of the investigation regarding local pending cases against the Defendant 1.

Accordingly, based on the information available, it can be assumed that Defendant 1 was extradited on the basis that the courts in the

The United Arab Emirates has made a final decision on the extradition of
Defendant 1 on the basis of a European Arrest Warrant issued by the Court in
Glost-rup, in which the charge of aggravated fraud and attempted fraud, including
the claim for increased punishment under section 88 of the Danish Criminal Code,
is identical to the charge brought in this case, and that this basis cannot be
considered subsequently changed. Accordingly, and as the extradition fulfills the
conditions for extradition to Denmark in the Extradition Act, including sections 17
and 51, the District Court finds no basis for upholding Defendant 1's claim for
acquittal with reference to the basis for extradition.

### The court's assessment of guilt

*On the facts of the case*

According to the information in the case and the testimony of Defendant 1, the
court can assume that Defendant 1, under the auspices of Company LLP (formerly
Company Ltd.), Company PLC, Company Ltd. 1 and Company LLP (Group) as
custodian bank, was responsible for setting up a trading structure through which the
participants entered into agreements on the purchase and sale of certain shares,
respectively loans/lending of shares and forwards or futures to hedge risk in
predetermined constellations between parties who were not already in possession of
shares.

The content of the trades was predetermined before the first trade and followed a
predetermined structure for the execution of the trades, which was communicated
to the participants through instructions from, among others, Witness 1, formerly
Defendant 2, and when the trades were automated in System 3 through the
algorithm programmed therein.

In the trading structures, the investors (US pension plans and island companies)
appeared as the ultimate buyers of the shares and the short sellers as the ultimate
sellers of the shares. In the trading structures, the investors' agreements to buy
shares were concluded in 2012 and 2013 through one broker and then, for the
remainder of trading period, through two brokers as intermediaries. Similarly, share
lending agreements were concluded through first one and then two share lenders.

The trades were structured so that the sum of the equity positions that the investors
agreed to buy and the short sellers agreed sell was identical to the sum of the equity
positions that the same investors lent and the same short sellers borrowed, so that
no money or shares were exchanged in the trades.

It can further be assumed that the amounts credited to the investors' client
accounts at the Group as net share dividends for the traded shares arose from a
corresponding debiting of the short-sellers' client accounts at the Group. It is
undisputed that the short-sellers did not receive

dividend and did not pay dividend tax, but had an amount equal to the dividend booked with the Group as a result of a profit on the above-mentioned trading transactions.

Furthermore, it can be assumed that, on the basis of the above-mentioned trading processes, the Group issued Dividend Credit Advice (DCAs) to the investors corresponding to the net dividend and caused 3,239 applications for refund of dividend tax of DKK 9,025,205,871.00 to be submitted by the investors in the period 2012-2015 under section 69 B of the Withholding Tax Act, to which the said DCAs were attached. Defendant 1 has confirmed that the only funds received from outside the trading structure were payments received when the tax authorities granted the applications for refund of dividend tax.

Finally, it can be assumed that in 2015, the Group in the same way caused an application for refund of Danish dividend tax totaling DKK 553,346,302.00 to be submitted on behalf of the investors in another 160 cases, which, however, was not paid as the tax authorities stopped the payments in August 2015.

The number of transactions, the actors involved and the amount of the reclaimed withholding tax and attempts to do so, cf. counts 1 and 2 of the indictment, are undisputed by Defendant 1 and supported by the information in the case. It is also undisputed and supported by the documented cash flows that at least 80% of the total reclaimed dividend tax was subsequently paid to Defendant 1 or to companies controlled by him.

Regarding the processing of the applications for refund of dividend tax, the court can, based on Witness 5 and Witness 6's statements, assume that the processing was based on information in a form about who the dividend recipient and authorized representative, whether there was tax liability in a country with which a double taxation treaty had been concluded, and whether a note was attached stating that dividends had been paid to the recipient.

They have both explained, among other things, that in their opinion it was the entire basis and a prerequisite for the refund of dividend tax that dividends had been received and dividend tax had been paid or withheld.

Witness 6 has further explained that the basis for the refund of dividend tax was the double taxation agreement and the dividend note or DCA, which was a
3. man declaration confirming that dividend tax had been paid to the individual and the amount of the dividend. The system was based on this and on trust in the documents issued.

Finally, Witness 6 explained that, in relation to foreign custodian banks, they were unable to check whether the information in the dividend notes was correct.

*Regarding the tax consequences of the described business processes*

According to section 65(1) of the Withholding Tax Act applicable during the reporting period (Legislative Decree no. 1403 of December 7, 2010), a company that adopts or decides to pay or credit dividends on shares must withhold 27 percent of the total dividend (dividend tax).

It follows from section 69 B(1) of the Withholding Tax Act that taxpayers for whom withholding tax has been withheld under section 65 on, among other things, dividends that exceed the final tax under a double taxation treaty are entitled to a refund of the amount (dividend tax refund) within 6 months of receipt of the request for refund.

There is reason to assume that the investors, if they received dividends from Danish listed companies, were liable to pay tax in Denmark, cf. section 2(c) of the Danish Corporation Tax Act, cf. section 16 A of the Danish Tax Assessment Act. Furthermore, it can be that the involved US pension plans and island companies (the investors) were covered by the rules on tax exemption in the double taxation treaty between Denmark and the US and Malaysia respectively.

Defendant 1 has explained and argued that it was not dividends but dividend compensation that the short sellers paid to the investors and that the obligation arose as a result of a market convention, which meant that if agreements were made to purchase shares before or on the day of the general meeting which were subsequently settled, such a claim arose. Defendant 1 has further explained and claimed that he understood the Danish tax rules to mean that dividend compensation - regardless of whether it could be traced back to an actual dividend payment - in the Danish tax context was to be regarded as a taxed dividend and that the share buyer - the investor - was entitled to seek a refund of withheld dividend tax.

Defendant 1 has additionally argued that the in-vestor has a claim against the short seller for compensation for lost dividend payments and that this claim for compensation has tax law consequences, regardless of whether shares from outside parties were included in the transactions. Reference is made to the fact that these are legally binding transactions, and Defendant 1 has referred to the principle of res judicata. It is argued that the investor's claim is actually claimed in the form of a dividend compensation payment, and that a claim for repayment of withholding tax arises all the more, cf. section 69 B(1) of the Withholding Tax Act.

The Court of Appeal finds that there is no support in the wording of section 69 B(1) of the Withholding Tax Act or in the preparatory works of the provision that the entitlement to a refund of dividend tax should arise *solely* as a result of a structured transaction where a share short seller as part of the transaction credits the share buyer with a dividend tax compensation corresponding to a calculated net dividend. Such a

understanding clearly contradicts the wording of the provision in section 69 B(1) of the Withholding Tax Act, which refers to "dividends... in which withholding tax has been withheld."

The Court of Appeal further notes that the conditions of the Withholding Tax Act are objective and that there must therefore also in reality be a dividend in which withholding tax has been withheld, and that the subjective perception of this by the person seeking a refund of withholding tax, regardless of whether it can be considered well-founded, is irrelevant.

The Court of Appeal further notes that if the entitlement to a refund of dividend tax were to arise *solely* as a result of a structured transaction where a share short seller as part of the transaction credits the share buyer with a dividend tax compensation corresponding to a calculated net dividend, it would mean that an unlimited number of applicants, completely independent of the total dividend distribution and the taxation thereof, would be entitled to a dividend tax refund.

The Court of Appeal thus finds that it is a necessary condition for the right to a dividend tax refund under section 69 B(1) of the Withholding Tax Act that the taxpayer requesting a refund has been paid a taxed dividend or has acquired the right to it from someone who has received such payment.

Regardless of whether it is assumed that, on the basis of the agreements entered into, the investors obtained the right to the dividend compensation payment explained <u>Defendant 1</u>, it must therefore be considered a necessary precondition for the right recover dividend tax that the investor obtains a legal claim to a dividend so taxed from someone who has received such a dividend.

As stated above, it must be assumed, in terms of evidence and otherwise undisputed, that objectively no one in the described transactions has received a taxed dividend or has entered into agreements to acquire shares from a third party who has received a taxed dividend.

Thus, the Court of Appeal must assume that the short sellers have not been in a position where they have been able to sell a share with the right to a taxed dividend. The condition in section 69 B(1) of the Withholding Tax Act concerning a "dividend... in which withholding tax has been withheld" is thus not met.

The Court of Appeal then finds it proven that the payments of dividend tax refunds as a result of the investors' applications have been made in violation of section 69 B(1) of the Danish Withholding Tax Act and the amounts have been wrongfully received by the investors.

*Regarding the question of violation of section 279 of the Penal Code*

According to the evidence, it can be assumed that the applications which in

the case in question,  formed the basis for the tax authorities' dividend tax payments, appeared from their content that the investors had received dividends on which dividend tax had been withheld in connection with dividend distributions, but that none of the companies had received a taxed dividend or had acquired rights over shares from outstanding third parties as part of or for use in the transactions.

According to the evidence, it can also be assumed that the applications that formed the basis for the tax authorities' dividend tax payments in this case thus contained incorrect information about dividend tax.

According to the evidence, including the statements of Witness 6 and Witness 5, it can further be assumed that, according to the ad-ministrative practice, the tax authorities required a DCA issued by the custodian bank as documentation that taxed dividend payments had been received from a Danish company, which together with a tax exemption declaration formed the basis for the decision on refund of dividend tax.

The Court of Appeal therefore finds it proven that the DCAs sent to the tax authorities in this case misled the tax authorities into believing that dividends had been received from a Danish company in which dividend tax had been withheld.

According to the legal basis which formed the basis for the processing of the applications for refund of withholding tax and which is supported by the statements from Witness 6 and Witness 5, the Court finds it proven that the tax authorities were thereby misled, which determined that payments were made in violation of section 69 B(1) of the Withholding Tax Act.

In this connection, the Court of Appeal notes that the Court finds that the tax authorities were not, based on the reports from attorney Person 101 in the summer of 2015, brought out of the misconception that forms the basis for the fraud.

In this connection, the Court of Appeal emphasized that it was a comprehensive trading system and that the content of the notifications required a number of further investigations before there was sufficient basis for stopping the payments of recovered dividend tax.

The Court of Appeal notes that it cannot lead to a different result that there is no basis to disregard Defendant 1's explanation that the mechanics "netting" and the construction of the settlement day made it possible to establish trading structures whereby settlement and registration mechanisms meant that an apparently large number of shares were traded over the general meeting day and that the trading structure in that connection could leave a paper trail confirming the transactions. Furthermore, the District Court finds it irrelevant whether the transactions between

the trades can otherwise be considered fictitious, as it has proven that the trades were of such a nature that the investors did not receive taxable dividends from the share issuer or a right thereto.

In this connection, the District Court has emphasized that, as previously established, it can be assumed, also according to Defendant 1's statement, that no shares or money were involved in the trading structures, and that the court must furthermore assume that what was "netted" was the respective parties' claims on each other without connection to the issued shares and without the parties contributing capital for the settlement of the transactions.

The District Court finds it proven that Defendant 1 has had a central and controlling role in connection with the construction, operation and development the trading system that led to the unjustified payments of the recovered dividend tax.

In this connection, the District Court has emphasized that, regarding the management of the Department business, Defendant 1 has explained, inter alia, that he was managing director of Company LLP (formerly Company Ltd.) until the end of 2013, and that Person 14 became managing director from January 2014, but that he was still in charge and that they had daily Skype meetings. Defendant 1 has further explained that he was involved in the Department business as part of the team and as owner and that he made a lot of money from the Department business.

With regard to the involvement of the Defendant 1, the District Court can, according to the evidence, also assume that the Defendant 1 had a central role in the continuous expansion of the number of participants in the structured trades and that the creation of the trading companies was to a significant extent initiated and financed by the Defendant 1 for the purpose of trading on the Department platform.

The District Court thus finds that the objective requirements for conviction under the indictment are met, noting that the number of players, the number of applications, the amounts recovered, and the amounts paid out and Defendant 1's share of the profits are proven by Defendant 1's statement and the other evidence.

The question is then whether the necessary intent exists.

Defendant 1 has explained, among other things, that these were real transactions with derived legal rights and obligations. Defendant 1 has further explained that it was and still is his opinion that dividend compensation payments can be equated with dividends and that the Group could issue DCAs to its customers, and that it was not unlawful or on an improper basis when the customers subsequently used these DCAs to apply for a refund of dividend tax.
Defendant 1 has further explained that everything took place within applicable legislation, regulation and market practice,

and that he ensured this by hiring highly competent people and getting the best advice, and that this was a legal loophole and that he was acting in good faith.

Defendant 1 has further explained, among other things, that the initiative to obtain a tax opinion in 2012 came from Person 8 and Person 6, which Defendant 1 had approved, but that he himself did not participate in the communication with Law Firm 2, but that Defendant 1 read the final version of this tax opinion. Defendant 1, when asked if they would not show the entire circuit, explained that his involvement was minimal and that Person 6 and Person 8 had decided that a tax opinion should include what appeared in the fact-pattern and that he could not answer authoritatively, whether Law Firm 2 was asked to answer whether a market claim under the circumstances as it was in the Department system would be considered eligible for dividend tax refunds under tax law, but that it was his opinion that it was not covered by the tax opinion that had been obtained.

Defendant 1, referring to the tax opinion of June 27, 2012, pages 7-9, and inquiring about the fact that it is stated as a prerequisite that it is real dividends that are passed on to the American pension fund, explained, among other things, that he did not look at the opinion, but relied on Person 6 and Person 8. Defendant 1 further explained that he did not contact the advisors personally and that he was told that dividend tax compensation was treated as taxed dividends. Defendant 1 further explained that Witness 10, who was asked to review the Department model, came to the same conclusion that it was a legal model as described by Defendant 1 and that the accounting of dividend tax compensation is considered dividend income.

Defendant 1 further asked why they did not ask whether the loophole was legal, explaining that the tax experts had the dialog with Danish experts and that he trusted Person 6 and Person 8 and would expect that they would have brought it up to him if there was something.

Witness 1, formerly Defendant 2, explained that he became aware of the trading structure at the end of 2013, when he saw that no dividends and shares were entering the system, and that he was concerned about this. It seemed to him that there was no real movement of shares and money. He is sure he spoke to Defendant 1, Person 6 and other senior employees about his concerns and also those who had created the share structure. The general response was that there was a legal opinion and that it was understood that there was a loophole. He was told in broad terms that the loophole was that if everyone used the same custodian bank, it could all be "netted". He knew that investors were reclaiming tax even if no dividend tax was paid, which was part of the general conversations he had with people.

In assessing the testimony of Defendant 1, the District Court has emphasized that he has read the final version of Law Firm 2's tax-legal opinion from 2012 and therefore had to be familiar with the stated prerequisites in at least this, where it is assumed that the investor should have full ownership rights over the shares, including the right to receive the dividend distributed on the day of dividend approval, as well as the condition that the dividend for which the investor will actually claim a refund of withholding tax is a dividend payment that the investor as shareholder has received from the dividend distributing Danish company. The District Court has also emphasized that Defendant 1 must also be aware that Law Firm 2 had not been asked to assess whether the accounting of dividend tax compensation is considered as dividend income, and thus has not been presented with Company LLP (formerly Company Ltd.)'s overall model that formed the basis for the payment of dividend tax.

Furthermore, the District Court emphasized that based on the testimony of Witness 1, former Defendant 2, it is assumed that Witness 1, former Defendant 2, had expressed concern about the trading structure, where shares and dividends were not entering the system, to Defendant 1, among others.

The District Court also emphasized that Law Firm 2 in their correspondence with Person 8 and Person 6 from June 2012 clearly emphasized the importance of the fact that it was actually dividends that the American pension plan had received from the dividend distributing company, that the Head of Compliance, Person 18, in the email of 16. July 2013 to Defendant 1 expressed concern that no lawyers had ever been asked to give an opinion on the Department Model in its entirety, that Person 117 in the board memo of April 16, 2015 stated that the lawyers who prepared the tax-opinion on Danish tax matters should be informed of the entire construction, the unusual elements and the size of the transactions, and that only with this information would they get a useful opinion, which knowledge the court assumes has come to the knowledge of Defendant 1.

Against this background, the Court of Appeal finds that Defendant 1's explanation that he merely relied on the employees who obtained advice and that he himself was convinced of the legality of the dividend tax refunds must be set aside.

Nevertheless, and in spite of the above, Defendant 1, after his testimony, failed to cause an investigation to be made as to whether, under the circumstances as they were in the Department system, dividend compensation would be considered eligible for dividend tax refunds from a tax law perspective when contacting advisors knowledgeable in Danish tax law or the authorities in Denmark, including also regardless of the unusual elements of the transactions and the amounts paid out in dividend tax refunds from the Danish state.

The Court of Appeal then finds that Defendant 1 had no basis for the opinion that recovery based on the booked transactions, which had no other purpose than to form the basis for applications for refund of dividend tax, could be lawful.

The Court of Appeal therefore finds that it must be assumed that Defendant 1 was aware of which parts of the model were likely to be "approved" if advice was obtained, while he was also aware that questions regarding other parts of the model, including in particular the overall trading structure, would most likely lead to the assessment made by the court above under the heading "*Regarding the tax law consequence of the described business processes*", and which appears unquestionable.

The Court of Appeal has also emphasized that the Afdeling model was structured in such a way that it consisted of complicated trading constellations between a number of actors, which were expanded with more actors along the way, and that a network of 288 smaller companies were involved as investors with very different names on whose behalf a total of 3,399 dividend notes were submitted.
In addition, it is emphasized that the trades on the Sub-Fund Platform and the individual investors' purchases etc. of shares were limited, including in relation to reporting obligations etc. and that Defendant 1 in connection with the establishment of investors for trading on the Sub-Fund Platform had strong views on naming etc. so that they appeared unconnected, just as the system was designed so that the trades were distributed among many players with an average equal distribution of trade sizes and profits.

The Court of Appeal has also emphasized that the participants were to a large extent former employees and other persons with whom the Defendant 1 had a personal relationship, and that the establishment of the trading companies, as previously stated, was to a significant extent initiated and financed by the Defendant 1 for the purpose of trading on the Department platform. The Court of Appeal finds that the atypical circumstances point towards a motive that Defendant 1 wanted the players to question the trades and the background for them as little as possible.

The District Court further finds that it further strengthens this assumption that Defendant 1, through its companies, paid very substantial bonuses to the players.

The Court of Appeal thus finds that these circumstances support that Defendant 1 was aware that his activities were of a nature where he did not want the attention of the regulatory , and that the model thus seems to be designed to conceal from the Danish tax authorities that the underlying transactions were without dividend tax reality, as neither shares nor dividend payments from Danish companies were involved.

Based on an overall assessment, the District Court finds it proven that Defendant 1 at least considered it highly probable that the applications for refund of dividend tax mentioned in the indictment were unjustified, and that the employees of the tax authorities were thus misled into believing that dividend tax was withheld in Denmark.

Against the above background, Defendant 1 is found guilty of aggravated fraud and attempted fraud, cf. section 279, cf. section 286(2), cf. section 21, in accordance with the indictment.

### *Sentencing*

The sentence is imprisonment for 12 years, cf. section 279 of the Danish Criminal Code, cf. section 286(2), cf. in part section 21.

The Court of Appeal has in particular emphasized the nature, scope and gravity of the offences, including that Defendant 1 was found guilty of fraud for DKK 9,025,205,871 and attempted fraud for DKK 553,346,302, and Defendant 1's central and controlling role in the crime, which was carefully planned and systematically organized and along the way further enhanced by the development of a software system that caused the crime to escalate dramatically, the cross-border nature of the crime by exploiting double taxation agreements and the trust in the custodian banks' third-party declarations, that the crime took place over a long period of approx. 3 years, and that Defendant 1 enriched himself with a large amount of billions, which constituted by far the largest part of the proceeds corresponding to at least 80 percent.

In addition, the court emphasized that the crime was only brought to an end when the tax authorities paused the payments in 2015 due to a suspicion of fraud.

In view of the above, the District Court finds that there are special aggravating circumstances and that there is thus a basis for applying section 88(1), second sentence, of the Danish Criminal Code.

The Court of Appeal has not attached particular importance to the fact that the crime was committed against the tax authorities, including the tax authorities' administration of the control of dividend tax refund applications has not been given importance in the sentencing.

Furthermore, the age of the offender and the length of the case processing time are not taken into account when determining the penalty given the nature, extent and course of the crime.

There are no circumstances that could lead to a lighter prison sentence.

The facts stated by Defendant 1 cannot lead to a different result.

Pursuant to section 86(5) of the Danish Criminal Code, a full reduction is granted for the deprivation of liberty of Defendant 1 in the United Arab Emirates on the assumption that the deprivation of liberty is based on the present case.

### *Disqualification*

The offenses were committed by Defendant 1 in his capacity as owner and director and/or beneficial manager of the UK companies Company LLP (formerly Company Ltd.), Company PLC, Company Ltd. 1 and Company LLP.

Accordingly, and in view of the nature and extent of the offenses, cf. the above under sentencing, the District Court finds that the conditions in section 79(2), second sentence, cf. section 79(1), cf. section 78(2), of the Danish Criminal Code for denying Defendant 1 the right to participate in the management of a business in Denmark or abroad without being personally and unlimitedly liable for the company's obligations are met.

For the reasons which, according to the above, lead to the stated disqualification, the Court of Appeal finds that the disqualification must take place until further notice, cf. the Danish Criminal Code.
§ Section 79(3).

### *Deportation*

Defendant 1 has been sentenced to imprisonment for 12 years for fraud of a particularly serious nature under section 279, cf. section 286(2) and attempted fraud, cf. section 21 of the Danish Criminal Code. The conditions for expelling Defendant 1 pursuant to section 24(1), cf. section 22(1) and (6), of the Danish Aliens Act are then met. Pursuant to section 26(2) of the Danish Aliens Act, Defendant 1 must thus be deported unless it would certainly be contrary to Denmark's international obligations.

It appears from Executive Order no. 1700 of 23 November 2020 on the implementation of certain provisions of the Withdrawal Agreement between the United Kingdom and the EU regarding the right to enter, stay and work in Denmark § Section 16(1), cf. Article 20(1) of the Withdrawal Agreement, that as the offenses charged were committed before 1 January 2021, Defendant 1's offenses must be sentenced as for foreigners covered by EU rules, as Defendant 1 is a British citizen.

Expulsion can then only take place if it is in accordance with the principles that apply under EU rules on restriction of the right to free movement, cf. section 26 b of the Danish Aliens Act.

According to Article 27(1) of Directive 2004/38/EC of 29 April 2004 (the Residence Directive), a restriction on the right of free movement and residence can only be justified on grounds of public policy, public security or public health and may not be based on economic considerations. According to Article 27(2), expulsion must be in accordance with the principle of proportionality and may be based solely on the personal conduct of the person concerned. The personal conduct must constitute a genuine, present and sufficiently serious threat affecting one of the fundamental interests of society.

Defendant 1 has been sentenced to 12 years' imprisonment for aggravated fraud and attempted fraud, and after an overall assessment of the nature and extent the crime committed, the District Court finds that the crime is an expression of conduct that constitutes a real, immediate and sufficiently serious threat affecting a fundamental interest of society, cf. Article 27(2), second indent of the Residence Directive.

On the basis of the available information about Defendant 1's circumstances, including that he has never lived in Denmark and has no family, professional or social ties to Denmark, together with the information about Defendant 1's ties to the United Kingdom, Defendant 1 does not have such a link to Denmark that deportation can be considered contrary to the principle of proportionality in Article 27(2), first indent, in conjunction with Article 28(1) of the Directive.

The Residence Directive can therefore not be assumed to prevent deportation, cf. Article 33(1) of the Directive and Section 26 b of the Aliens Act, cf. Section 2(3). Against this background, the claim for deportation pursuant to the provisions invoked is upheld as determined below.

For the reasons which, according to the above, lead to the expulsion of Defendant 1, the District Court finds that the expulsion of Defendant 1 must take place with a permanent entry ban pursuant to section 32(4)(7) of the Danish Aliens Act.

### *Confiscation*

*Confiscation from Defendant 1:*

*Regarding deposits on accounts with Varengold Bank:*

Defendant 1 has explained that the deposits originate from transfers from Company LLP (formerly Company Ltd.) and that he has no objection to the money being confiscated if he is found guilty. According to the documented information, the court finds it proven that the deposits originate from the transfers regarding refund of dividend tax that Company LLP (former Company Ltd.) received from the Danish tax authorities, then and according to the result of the evidence, the deposits must be confiscated under section 75(1), cf. section 76(1), of the Danish Criminal Code.

*Concerning the properties (1) Address 1, London, (2) Address 2, London, (3) Address 3, London, (4) Address 4, London, (5) Address 5, London, (7) Address 7, London, (8) Address 8, London, (9) Address 9, Harrow, (13) Address 11, London, (14) Address 12, London, (15) Address 13, London and (16) Address 14, London:*

Defendant 1 has explained that the properties were purchased with funds derived from the recovery of dividend tax from Denmark and Belgium and he accepts that the properties will be confiscated if he is found guilty. Hereafter, according to the documented information and taking into account that the properties were acquired during the period in which Defendant 1 has been found guilty of fraud for a billion DKK, the court finds that it is proven that the properties were acquired for funds derived from the refund of Danish dividend tax.

Thereafter, and after the result of the evidence, the properties must be confiscated in accordance with section 75(1) of the Penal Code, cf. section 76(1).

*Concerning the properties (10) Address 10, Plymouth, (17) Address 15, Plymouth and (18) Address 16, Plymouth:*

Based on the evidence, it can be assumed that the properties were acquired in 2008 and partly financed with loans that were repaid in 2015.

The District Court finds that the conditions in section 76a(1) of the Danish Criminal Code for confiscation are undoubtedly met, as the evidence shows that Defendant 1 has been convicted of an act of such a nature that it can yield substantial proceeds and that it is punishable by imprisonment for 6 years or more.

The question is whether Defendant 1 has proved that the properties were acquired in a lawful manner or by lawfully acquired means, cf. section 76a(4) of the Danish Criminal Code. The District Court notes that the properties were purchased in 2008 for GBP 149,995 each, according to the information provided, and that the loans were repaid with GBP 122,700.30 each in 2015. The financing of the property has thus been financed to a large extent with funds where it has been presumed

that they originate from the criminal offense.

On this basis, the District Court finds that <u>Defendant 1</u> has not proved that the properties were acquired in a lawful manner or for lawfully acquired funds, cf. section 76a(4) of the Danish Criminal Code, and the properties must therefore be confiscated in accordance with the prosecution's claim.

*Concerning the property (6) <u>Address 6, London:</u>*

Based on the evidence, it can be assumed that the property was acquired in 2008 and financed with loans that were repaid in 2015.

The District Court finds that the conditions in section 76a(1) of the Danish Criminal Code for confiscation are undoubtedly met, cf. the above.

The question is whether <u>Defendant 1</u> has proved that the property was acquired in a lawful manner or by lawfully acquired means, cf. section 76a(4) of the Danish Criminal Code. The District Court notes that the property was purchased in 2008 for 860,000 GBP, mortgaged with 970,000 GBP and the loan was repaid with 942,994.31 GBP in 2015. The financing of the property is thus, according to the information available, financed with funds that  presumed to have originated from the criminal offense.

On this basis, the District Court finds that the property must be confiscated in accordance with the prosecution's claim.

The District Court notes regarding the stated lifelong right of use for <u>Defendant 1's</u> sister and mother that it must depend on an assessment under English law whether this right can be enforced and that this has no bearing on whether the confiscation claim can be upheld.

*In respect of the property (19) <u>Defendant 1's</u> beneficial interest in <u>Address 17, Wembley:</u>*

Based on the evidence, it can be assumed that the property was acquired in 2007 and partly financed with loans that were repaid in 2015.

The District Court finds that the conditions in section 76a(1) of the Danish Criminal Code for confiscation are undoubtedly met, cf. the above.

The question is whether <u>Defendant 1</u> has proved that the property was acquired in a lawful manner or by lawfully acquired means, cf. section 76a(4) of the Danish Criminal Code. The District Court notes that the property was purchased in June 2007 without a purchase price being stated. <u>Defendant 1</u> repaid a loan on the property of GBP 125,000 in 2015. It is thus unclear

in the present case, whether the repayment of the loan involves repayment of a small part of the purchase price or whether the financing of the property is predominantly financed with funds that are presumably derived from the criminal offense.

On this basis, the District Court finds that Defendant 1 has not proved that the property was acquired in a lawful manner or by lawfully acquired means, cf. section 76a(4) of the Danish Criminal Code, and the property must therefore be confiscated in accordance with the prosecution's claim.

*Summary regarding confiscation from Defendant 1*

According to the result of the evidence, confiscation of DKK 7,220,164,697 (corresponding to 80% of DKK 9,025,205,871), including the assets alleged by the prosecution, can be made from Defendant 1, cf. section 75(1), cf. section 76(1) and section 76a(1) of the Danish Criminal Code.

*Confiscation at company SARL 1:*

Defendant 1 has explained that he owns the company, that the assets originate from, and that the shares are financed by funds from the refund of Danish dividend tax. He has stated that he has no objection to the assets being confiscated if he is found guilty. Hereafter and according to the documented information, the court finds it proven that the deposits originate from the transfers relating to the refund of dividend tax that Virksomhed LLP (formerly Virksomhed Ltd.) received from the Danish tax authorities and that the shares are financed by funds from refund of Danish dividend tax, hereafter and according to the evidence, the deposits and the shares must be confiscated under section 75(1), cf. section 76(1), of the Danish Criminal Code.

*Confiscation at Company Ltd. 2:*

Defendant 1 has explained that he owns the company, that the assets originate from, and that the shares are financed by funds from the refund of Danish dividend tax. He has stated that he has no objection to the assets being confiscated if he is found guilty. Accordingly, and based on documented information, the court finds it proven that the deposits originate from the transfers regarding refund of dividend tax that Virksomhed LLP (formerly Virksomhed Ltd.) received from the Danish tax authorities and that the shares are financed by funds from refund Danish dividend tax, therefore, and based on the evidence, the deposits and the shares must be confiscated under section 75(1), cf. section 76(1), of the Danish Criminal Code.

*Confiscation at Company Ltd. 3:*

Defendant 1 has explained that he owns the company and that the assets originate from the refund of Danish dividend tax. He has stated that he has no objection to the money being confiscated if he is found guilty. Based on this and the documented information, the court is satisfied that the deposits

derives from the transfers regarding refund of dividend tax that <u>Company LLP (formerly Company Ltd.)</u> received from the Danish tax authorities thereafter and after the result of the evidence, the deposits must be confiscated under section 75(1), cf. section 76(1), of the Danish Criminal Code.

*Confiscation at <u>Company Ltd. 4:</u>*

<u>Defendant 1</u> has explained that he owns the company and that the assets originate from the refund of Danish dividend tax. He has stated that he has no objection to the money being confiscated if he is found guilty. Accordingly, and based on the documented information, the court finds it proven that the deposits originate from the transfers regarding refund of dividend tax that <u>Virksomhed LLP (formerly Virksomhed Ltd.)</u> received from the Danish tax authorities.
Subsequently and after the result of the evidence, the deposits must be confiscated in accordance with section 75(1) of the Penal Code, cf. section 76(1).

*Confiscation at <u>Company Ltd. 5:</u>*

<u>Defendant 1</u> has explained that he owns the company and that the property was acquired with funds derived from a refund of Danish dividend tax. He has stated that he has no objection to the property being confiscated if he is found guilty. Accordingly and according to the documented information, the court is satisfied that the property was acquired with funds originating from the dividend tax refund transfers that <u>Virksomhed LLP (formerly Virksomhed Ltd.)</u> received from the Danish tax authorities. Hereafter and after the result of the evidence, the property must be confiscated under section 75(1) of the Danish Criminal Code, cf. § Section 76(1).

*Confiscation at <u>Company Ltd. 6:</u>*

<u>Defendant 1</u> has explained that he owns the company and that the property was acquired with funds derived from a refund of Danish dividend tax. He has stated that he has no objection to the property being confiscated if he is found guilty. Accordingly and according to the documented information, the court is satisfied that the property was acquired with funds originating from the dividend tax refund transfers that <u>Virksomhed LLP (formerly Virksomhed Ltd.)</u> received from the Danish tax authorities. Hereafter and after the result of the evidence, the property must be confiscated under section 75(1) of the Danish Criminal Code, cf. § Section 76(1).

*Confiscation at <u>Company Ltd. 7:</u>*

<u>Defendant 1</u> has explained that he owns the company and that the property was acquired with funds derived from a refund of Danish dividend tax. He has stated that he has no objection to the property being confiscated if he is found guilty. Accordingly and according to the documented information, the court is satisfied that the property was acquired with funds originating from the dividend tax refund transfers that <u>Virksomhed LLP (formerly Virksomhed Ltd.)</u> received from the Danish tax authorities. Hereafter and following the outcome of the evidence, the property

should be confiscated in accordance with section 75(1) of the Penal Code, cf. section 76(1).

*Confiscation at <u>Company Ltd. 8</u>:*

<u>Defendant 1</u> has explained that he owns the company and that the property was acquired with funds derived from a refund of Danish dividend tax. He has stated that he has no objection to the property being confiscated if he is found guilty. Accordingly and according to the documented information, the court is satisfied that the property was acquired with funds originating from the dividend tax refund transfers that <u>Virksomhed LLP (formerly Virksomhed Ltd.)</u> received from the Danish tax authorities. Hereafter and after the result of the evidence, the property must be confiscated under section 75(1) of the Danish Criminal Code, cf. § Section 76(1).

*Confiscation at <u>Company Ltd. 9</u>:*

<u>Defendant 1</u> has explained that he owns the company and that the property was acquired with funds derived from a refund of Danish dividend tax. He has stated that he has no objection to the property being confiscated if he is found guilty. Accordingly and according to the documented information, the court is satisfied that the property was acquired with funds originating from the dividend tax refund transfers that <u>Virksomhed LLP (formerly Virksomhed Ltd.)</u> received from the Danish tax authorities. Hereafter and after the result of the evidence, the property must be confiscated under section 75(1) of the Danish Criminal Code, cf. § Section 76(1).

*Confiscation at <u>Company Ltd. 10</u>:*

<u>Defendant 1</u> has explained that he owns the company and that the property was acquired with funds derived from a refund of Danish dividend tax. He has stated that he has no objection to the property being confiscated if he is found guilty. Accordingly and according to the documented information, the court is satisfied that the property was acquired with funds originating from the dividend tax refund transfers that <u>Virksomhed LLP (formerly Virksomhed Ltd.)</u> received from the Danish tax authorities. Hereafter and after the result of the evidence, the property must be confiscated in accordance with section 75(1), cf. section 76(1), of the Danish Criminal Code.

*Confiscation at <u>Company Ltd. 11</u>:*

<u>Defendant 1</u> has explained that he owns the company and that the property was acquired with funds derived from a refund of Danish dividend tax. He has stated that he has no objection to the property being confiscated if he is found guilty. Accordingly and according to the documented information, the court is satisfied that the property was acquired with funds originating from the dividend tax refund transfers that <u>Virksomhed LLP (formerly Virksomhed Ltd.)</u> received from the Danish tax authorities. Hereafter and after the result of the evidence, the property must be confiscated under section 75(1) of the Danish Criminal Code, cf. § Section 76(1).

*Confiscation at <u>Company SARL 2</u>:*

Defendant 1 has explained that he owns 58% of the company, that the assets originate from, and that the shares are financed by funds from the refund of Danish dividend tax. He has stated that he has no objection to the assets being confiscated if he is found guilty. Accordingly, and based on the documented information, the court finds it proven that the deposits originate from the dividend tax refund transfers that Virksomhed LLP (formerly Virksomhed Ltd.) received from the Danish tax authorities, and that the shares are financed by funds from the Danish dividend tax refund. Hereafter and after the result of the evidence, the deposits and the shares shall be confiscated pursuant to section 75(1), cf. section 76(1), of the Danish Criminal Code.

*Confiscation at Company Ltd. 13:*

Defendant 1 has explained that he owns the company and that the assets are financed by funds from the refund of Danish dividend tax. He has stated that he has no objection to the assets being confiscated if he is found guilty. Thereafter and according to the documented information, the court finds it proven that the assets are financed with funds from the transfers regarding refund of dividend tax that Virksomhed LLP (formerly Virksomhed Ltd.) received from the Danish tax authorities. Subsequently, and following the outcome of the evidence, the assets must be confiscated under section 75(1), cf. section 76(1), of the Danish Criminal Code.

*Confiscation at Company Ltd. 14:*

Defendant 1 has explained that he owns the company and that the receivable stems from payments he has made with funds from the refund of Danish dividend tax. He has stated that he has no objection to the assets being confiscated if he is found guilty. Accordingly and according to the documented information, the court finds it proven that the receivable originates from the transfers regarding refund of dividend tax that Virksomhed LLP (formerly Virksomhed Ltd.) received from the Danish tax authorities. Hereafter and after the result of the evidence, the asset must be confiscated under section 75(1), cf. section 76(1), of the Danish Criminal Code.

*Confiscation at Company Ltd. 16:*

Defendant 1 has explained that he owns the company and that the shares are financed by funds from the refund of Danish dividend tax. He has stated that he has no objection to the assets being confiscated if he is found guilty. Accordingly, and based on the documented information, the court is satisfied that the shares were acquired with funds from the dividend tax refund transfers that Virksomhed LLP (formerly Virksomhed Ltd.) received from the Danish tax authorities. Subsequently and following the result of the evidence, the shares must be confiscated under section 75(1), cf. section 76(1), of the Danish Criminal Code.

*Confiscation at Company Ltd. 17:*

Defendant 1 has explained that he owns the company and that the shares are financed by funds from the refund of Danish dividend tax. He has stated that he has no objection to the assets being confiscated if he is found guilty. Accordingly, and based on the documented information, the court is satisfied that the shares were acquired with funds from the dividend tax refund transfers that Virksomhed LLP (formerly Virksomhed Ltd.) received from the Danish tax authorities. Subsequently and following the result of the evidence, the shares must be confiscated under section 75(1), cf. section 76(1), of the Danish Criminal Code.

*Confiscation at Company Ltd. 19:*

Defendant 1 has explained that he owns the company and that the shares are financed by funds from the refund of Danish dividend tax. He has stated that he has no objection to the assets being confiscated if he is found guilty. Accordingly, and based on the documented information, the court is satisfied that the shares were acquired with funds from the dividend tax refund transfers that Virksomhed LLP (formerly Virksomhed Ltd.) received from the Danish tax authorities. Subsequently and following the result of the evidence, the shares must be confiscated under section 75(1), cf. section 76(1), of the Danish Criminal Code.

*Confiscation at foreign company 1:*

Defendant 1 has explained that he owns the company and that the shares are financed by funds from the refund of Danish dividend tax. He has stated that he has no objection to the assets being confiscated if he is found guilty. Accordingly, and based on the documented information, the court is satisfied that the shares were acquired with funds from the dividend tax refund transfers that Virksomhed LLP (formerly Virksomhed Ltd.) received from the Danish tax authorities. Subsequently and following the result of the evidence, the shares must be confiscated under section 75(1), cf. section 76(1), of the Danish Criminal Code.

*Confiscation at Person 1*

*Regarding Address 18, Wembley:*

As previously stated, the conditions in section 76a(1) of the Danish Criminal Code are undoubtedly met in relation to Defendant 1, and confiscation of the property of his wife Person 1 can then take place, unless the asset was acquired more than 5 years before the criminal offense that forms the basis for confiscation under paragraph 1, or the marriage, cohabitation or relationship did not exist at the time of acquisition.

The District Court must assume that the conditions for applying the above-mentioned exceptions are not met. Accordingly, and as there are no circumstances proving that the property was acquired by lawful means, cf. section 76a(4) of the Danish Criminal Code, confiscation of the property Address 18 from Person 1 must take place, cf. section 76a(2), cf. subsection 1.

*Concerning Person 1's beneficial interest in Address 17, Wembley:*

According to the available information, it must be assumed that the property was acquired no later than June 2007 and thus more than 5 years before the criminal charged, which is why the property cannot be confiscated under section 76a(2) of the Danish Criminal Code, cf. subsection 1.

In the alternative, it was argued during the main hearing that GBP 125,000 of the property's equity should be confiscated under section 76(4) of the Penal Code, as the amount used for redemption was received as a gift.

Regarding the claim for confiscation under section 76(4) of the Criminal Code, the Court must note that the provision is not mentioned in the confiscation notice served on Person 1. Accordingly, and as Person 1 has not been present during the hearing of the matter, the Court finds that confiscation cannot take place under this provision.

The court must then assess whether it has been established that the conditions in the more subsidiary claim under section 75(1), cf. section 76(1), of the Danish Criminal Code are met, and that it is thus a case of repayment with proceeds from the criminal , which has accrued directly to Person 1. The Court of Appeal finds that the prosecuting authority has not established such a direct connection between the refund of withholding tax and Person 1's repayment of the loan of GBP 125,000 that the conditions in section 75(1), cf. section 76(1), of the Danish Criminal Code can be considered fulfilled.

Finally, it has been claimed, most alternatively, that confiscation of an equity corresponding to the redeemed amount may take place under section 76a(2) of the Danish Criminal Code, cf. subsection 1.

The Court of Appeal must note that the redemption took place during the period of the offense and that the conditions for partial confiscation are thus, as previously stated, generally met. The Court of Appeal further finds that it has not been proven that the redemption was made from legal means, cf. section 76a(4) of the Danish Criminal Code. In this connection, the Court of Appeal has emphasized that the repayment of the loan on the property has thus, according to the available evidence, been made with funds which are presumed to have originated from the criminal offence.

On this basis, the District Court finds that GBP 125,000 of the property's equity must be confiscated, cf. section 76a(2) of the Danish Criminal Code, cf. subsection 1.

*Confiscation at Company Ltd. 12 (in liquidation):*

The liquidator of the company has confirmed that <u>Company Ltd. 14</u> contributed GBP 6,000,000 and was 80% owner of <u>Company Ltd. 12,</u> which built and owned the properties where 80% of the proceeds of sale are seized. The seized proceeds are administered by the liquidator.

<u>Defendant 1</u> has explained that he owns the company <u>Company Ltd. 14.</u> The District Court must therefore assume that <u>Defendant 1</u> is the ultimate owner of the proceeds administered by likvida-tor.

It can be assumed that the deposit of GBP 6,000,000 was paid during the deed period from a company owned by <u>Defendant 1.</u> On this basis, the District Court finds that the assets were transferred to a legal person over which <u>Defendant 1</u> has a controlling influence. Accordingly, and as the other conditions for confiscation under section 76a(1), cf. subsection (3), of the Danish Criminal Code are fulfilled, the prosecution's request for confiscation is granted.

The District Court has noted that the prosecution has no right to object to the liquidator's comments regarding fees, and further notes that settlement for the liquidator's work must depend on an assessment under English law of whether this right can be enforced, and that this has no bearing on whether the confiscation claim can be upheld.

*Confiscation at <u>Company SARL 3</u> (in bankruptcy):*

<u>Defendant 1</u> has explained that he was the last owner of the company before it went bankrupt and that the funds originate from a refund of Danish dividend tax. Thereafter and according to the documented information, the court finds it proven that the funds originate from the refund of dividend tax that <u>Company LLP (former Company Ltd.)</u> received from the Danish tax authorities. Hereafter and after the result of the evidence, the deposit must be confiscated under section 75(1), cf. section 76(1), of the Danish Criminal Code.

*Confiscation at <u>Company Ltd. 18:</u>*

<u>Witness 12</u> has explained in particular that he owns <u>Company Ltd. 18</u> He has disputed the confiscation claim and in particular argued that the transfers of funds documented by the prosecution originate from profits from currency trades. He has further explained that the account documented from was a joint account with <u>Company LLP (formerly Company Ltd.)</u> for several clients and that <u>Company LLP (formerly Company Ltd.)</u> was authorized to hold his funds in this account.

The Court of Appeal must initially note that it is incumbent on the prosecution to prove that the funds in question are funds that have directly accrued from the criminal offense, cf. section 75(1) of the Danish Criminal Code, or are proceeds received

in bad faith, cf. section 76(4) of the Penal Code.

The Court of Appeal finds that the prosecution, which has documented from account statements where a large amount is included from an account in Danish kroner, but which also show a number of other transactions and deposits that have not been accounted for, has not documented that the funds received by Company Ltd. 18 originated from the dividend tax fraud that Defendant 1 was found guilty of. Furthermore, the prosecution has not demonstrated that there are grounds to disregard Witness 12's testimony about the reason why he was entitled to a payment from Company LLP (formerly Company Ltd.).

On this basis, the prosecution's confiscation claim regarding confiscation at Company Ltd. 18 is not upheld.

**For it is known to be right:**

Defendant 1 is punished with imprisonment for 12 years.

Defendant 1 is temporarily deprived of the right to participate in the management of a business enterprise in this country or abroad without being personally and unlimitedly liable for the company's obligations.

Defendant 1 is expelled from Denmark with a permanent entry ban.

Defendant 1's property is confiscated:

**1.**
DKK 7,220,164,697 (corresponding to 80% of DKK 9,025,205,871) regarding relation 1 at **Defendant 1**, including confiscation of:

a. The following amounts plus accrued interest, which are held in seized accounts at Varengold Bank AG (Germany):
(1) EUR 512,227.19 on Account no. 1
(2) USD 99,985 on Account no. 2
(3) GBP 159,801.62 on Account no. 3
(4) AUD 14,100 on Account no. 4

b. The following seized immovable properties located in the United Kingdom: (1) Address 1, London
(2) Address 2, London
(3) Address 3, London
(4) Address 4, London
(5) Address 5, London

(6) <u>Address 6, London</u> (7) <u>Address 7, London</u> (8) <u>Address 8, London</u> (9) <u>Address 9, Harrow</u>
(10) <u>Address 10, Plymouth</u> (13) <u>Address 11, London</u> (14) <u>Address 12, London</u>
(15) <u>Address 13, London</u> (16) <u>Address 14, London</u> (17) <u>Address 15, Plymouth</u>
(18) <u>Address 16, Plymouth</u> (19) <u>Defendant 1's Address 17, Wembley</u>

**3.**
In **<u>Person 1</u>**, confiscate:

a. The following seized real property located in the United Kingdom: (1) <u>Address 18, Wembley</u>: (2) GBP 125,000 in equity in <u>Person 1's</u> beneficial interest in <u>Address 17, Wembley</u>

**8.**
At **<u>Company SARL 1</u>** is confiscated:

a. The following amounts, plus accrued interest, deposited in seized accounts at ING Luxembourg S.A. (Luxembourg)
(1) EUR 9,582.73 on account <u>Account no. 5</u> (2) GBP 121,700.58 on account <u>Account no. 6</u> c. the following seized shares in Varengold Bank AG (Germany):
(1) 160,000 shares on deposit/account <u>Account no. 7</u>

**9.**
At **<u>Company Ltd. 2</u>** is confiscated:

a. The following seized amounts plus accrued interest, which are deposited with Varengold Bank AG (Germany):
(1) EUR 7.650

b. The following amounts plus accrued interest, which are held in seized accounts at Varengold Bank AG (Germany):
(1) EUR 28,475.01 on <u>Account no. 8</u> (2) USD 18,996.55 on <u>Account no. 9</u>

c. The following seized shares in Varengold Bank AG (Germany): (1) 973,812 shares in custody account/account no. <u>Account no. 10</u> in Dero Bank AG

**10.**
At **<u>Company Ltd. 3</u>** is confiscated:

a. The following amounts plus accrued interest, which are held in seized accounts at Varengold Bank AG (Germany):
(1) EUR 168,142,082.43 on <u>Account no. 11</u>
(2) EUR 56,555.38 on <u>Account no. 12</u>
(3) GBP 14,999,916.63 on <u>Account no. 13</u>

**11.**
At **<u>Company Ltd. 4</u>** is confiscated:

a. The following amounts plus accrued interest, which are deposited in a seized account with Varengold Bank AG (Germany):
(1) EUR 50,100,000 on <u>Account no. 14</u>

**13.**
At **<u>Company Ltd. 5</u>** is confiscated:

a. The following seized real estate located in the United Kingdom: (1) <u>Address 19, London</u>

**14.**
At **<u>Company Ltd. 6</u>** is confiscated:

a. The following seized real estate located in the United Kingdom: (1) <u>Address 20, London</u>

**15.**
At **<u>Company Ltd. 7</u>** is confiscated:

a. The following seized real estate located in the United Kingdom: (1) <u>Address 21, London</u>

**16.**
At **<u>Company Ltd. 8</u>** is confiscated:

a. The following seized real estate located in the United Kingdom: (1) <u>Address 22, London</u>

**17.**
At **Company Ltd. 9** is confiscated:

a. The following seized real estate located in the United Kingdom: (1) Address 23, London

**18.**
At **Company Ltd. 10** is confiscated:

a. The following seized real estate located in the United Kingdom: (1) Address 24, London

**19.**
At **Company Ltd. 11** is confiscated:

a. The following seized real estate located in the United Kingdom: (1) Address 25, London

**21.**
At **Company Ltd. 12** is confiscated:

a. The reserved 80% of the proceeds from the sale of Company Ltd. 12's real properties located in the UK: (1) 1 to 13 (odd numbers) Road 1 and 58, 60, 62, 64, 66, 68 and 70 Road 2, London, No. 1

**23.**
At **Company SARL 2** is confiscated:

a. The following amounts plus accrued interest, which are held in a seized account at ING Luxembourg S.A. (Luxembourg):
(1) EUR 888,240.52 on Account no. 15 b. The following seized shares in Dero Bank AG (Germany): (1) 9,675,000 shares on deposit/account Account no. 16 in Dero Bank AG

**24.**
At **Company SARL 3** is confiscated:

a. The following amounts, plus accrued interest, deposited in a seized account with ING Luxembourg S.A. (Luxembourg)
(1) EUR 20,325.20 on Account no. 17

**27.**

At **Company Ltd. 13** is confiscated:

a. The following seized Contigent Convertible bonds of Varengold Bank AG (Germany):
(1) EUR 5,000,000 in deposit no. Account no. 18 Page 10

**28.**
At **Company Ltd. 14** is confiscated:

a. The following seized receivables plus accrued interest with Company Ltd. 15, which are held in the police deposit/account: (1) EUR 3,075,000

**30.**
At **Company Ltd. 16** is confiscated:

a. The following seized shares in Varengold Bank AG (Germany): (1) 176,963 shares on deposit/account Account no. 19 in Varengold Bank AG

**31.**
At **Company Ltd. 17** is confiscated:

a. The following seized shares in Varengold Bank AG (Germany): (1) 84,174 shares in custody account(s) Account no. 20/Account no. 21 in Varengold Bank AG

**32.**
**Company Ltd. 18** is acquitted of the claim for confiscation.

**33.**
At **Company Ltd. 19** is confiscated:

a. The following seized shares in Varengold Bank AG (Germany): (1) 160,000 shares on deposit/account Account no. 23 in Varengold Bank AG

**36.**
At **Foreign company 1** is confiscated:

a. The following seized shares in Varengold Bank AG (Germany): (1) 194,446 shares on deposit/account Account no. 24 in Varengold Bank AG

The defendant must pay the costs of the case.

Referee 1

Retten i Glostrup



**Udskrift af dombogen**

**D O M**

afsagt den 12. december 2024

Rettens nr. DL-906/2021
Politiets nr. SØK-76141-00005-15

Anklagemyndigheden
mod
Tiltalte 1
CPR nr. (Født 1970)

Der har i medfør af retsplejelovens § 12, stk. 8, medvirket to juridiske dommere
og tre domsmænd ved behandlingen af denne sag.

Anklageskrift er modtaget den 11. januar 2021.

Tiltalte 1 er tiltalt for

**1.**
**Bedrageri af særlig grov beskaffenhed efter straffelovens§ 279, jf. § 286,
stk. 2,**
ved i perioden 2012-2015 som ejer og direktør og/eller reel leder af de britiske
selskaber Virksomhed LLP (tidligere Virksomhed Ltd.), Virksomhed PLC,
Virksomhed Ltd. 1 og Virksomhed LLP ("Koncern"), for derigennem at skaffe
sig eller andre uberettiget vinding, at have foranlediget, at der på vegne af 189
amerikanske pensionsselskaber og 24 Ø-selskaber ("investorerne") i 3.239
tilfælde retsstridigt og på urigtigt grundlag blev ansøgt om refusion af dansk
udbytteskat,

idet han sørgede for udviklingen, organiseringen og driften af et lukket
handelssystem i regi af Koncern, hvorigennem investorerne indgik aftaler
om køb af danske børsnoterede aktier på et tidspunkt, hvor aktierne blev
handlet med ret til udbytte, hvilke handler var fiktive eller af en sådan
karakter, at investorerne ikke derved modtog aktieudbytte fra
aktieudstederen eller en ret hertil, idet
1) der var tale om nogle af tiltalte konstruerede handelsforløb, hvor aftaler
om køb/salg hhv. lån/udlån af aktier blev indgået i forudbestemte cirkulære
konstellationer mellem parter, der ikke i forvejen var i besiddelse af aktier,
og hvor de aktiepositioner, som den enkelte investor købte, og som den
enkelte short-sælger solgte, var identiske med de aktiepositioner, som
samme investor udlånte, og som samme short-sælger lånte, således at der
ikke i forbindelse med handlerne blev udvekslet penge eller aktier, og

2) aftalerne om erhvervelse af aktierne, som short-sælgerne via to børsmæglere solgte til investorerne, først blev indgået af short-sælgerne efter den dag, hvor aktierne blev handlet med ret til udbytte, hvorved de pågældende aktier ikke var udbyttebærende, hvorfor hverken investorerne eller short-sælgerne var udbytteskattepligtige i relation til disse aktier,

idet beløbene, som hos <u>Koncern</u> blev krediteret investorernes klientkonti som aktieudbytte, alene opstod på baggrund af en tilsvarende debitering af short-sælgernes klientkonti hos <u>Koncern,</u> uanset at short-sælgerne hverken havde modtaget aktieudbytte eller havde betalt udbytteskat, men alene havde et til aktieudbyttet svarende beløb til rådighed på deres klientkonti som følge af et konstrueret overskud på de ovenfornævnte handelsforløb, hvor short-sælgerne og investorerne indgik som hinandens reelle modparter,

idet <u>Koncern</u> på baggrund af ovenfor nævnte handelsaftaler udstedte 3.239 udbyttenotaer til investorerne, hvoraf urigtigt fremgik, at investorerne i kraft af deres ejerskab af de handlede aktier havde modtaget aktieudbytte, af hvilket der var indeholdt dansk udbytteskat på 27 %, og

idet disse udbyttenotaer med tiltaltes viden via reclaim-agenter blev indsendt til Skattestyrelsen (daværende SKAT) som dokumentation for investorernes ret til i henhold til dobbeltbeskatningsoverenskomster mellem Danmark og USA hhv. Malaysia at få refunderet den udbytteskat på 27 %, som fremgik af udbyttenotaerne,

alt hvorved ansatte hos Skattestyrelsen blev bragt i en vildfarelse om, at de pågældende investorer var berettiget til at få udbetalt den ansøgte skatterefusion og derfor i overensstemmelse med ansøgningerne udbetalte i alt DKK 9.025.205.871 med et tilsvarende formuetab for Skattestyrelsen til følge, af hvilket beløb tiltalte modtog minimum 80 %.

### 2.
### forsøg på bedrageri af særlig grov beskaffenhed efter straffelovens § 279, jf. § 286, stk. 2,

ved i 2015, under samme forudsætninger og på samme måde som beskrevet i forhold 1, retsstridigt og på urigtigt grundlag at have foranlediget, at der på vegne af 71 amerikanske pensionsselskaber og 4 <u>Ø</u>-selskaber ("investorerne") i 160 tilfælde retsstridigt og på urigtigt grundlag blev ansøgt om refusion af dansk udbytteskat med henblik på at bringe ansatte hos Skattestyrelsen (daværende SKAT) i en vildfarelse om, at de pågældende investorer var berettiget til at få udbetalt den ansøgte skatterefusion på i alt DKK 553.346.302 med et tilsvarende formuetab for Skattestyrelsen til følge, hvilket dog mislykkedes, idet Skattestyrelsen i august 2015 standsede udbetalinger af refusion af udbytteskat.

*modtageren ikke skattemyndighedernes anmodning, er skattemyndig-*
*hederne berettigede til at afbryde udbetalingsfristen efter den foreslå-ede*
*§ 69 B, stk. 1, i kildeskatteloven.*
*...*
*Det må forventes, at skattemyndighederne fremover vil øge fokuserin-gen*
*og kontrollen vedrørende tilbagebetaling af kildeskatter. Dette bør ske for*
*at sikre, at der ikke sker uretmæssig tilbagebetaling til en udenlandsk*
*modtager, som ikke anses for retmæssig ejer. Den foreslå-ede § 69 B i*
*kildeskatteloven har virkning for anmodninger om tilba-gebetaling, der*
*ikke er afgjort af told- og skatteforvaltningen senest den 30. juni 2012, jf.*
*lovforslaget § 10, stk. 1.*
*... ,,*

## Rettens begrundelse og afgørelse

### *Processuelle indsigelser*

### *Vedrørende krænkelse af uskyldsformodningen*

<u>Tiltalte 1</u> har nedlagt påstand om frifindelse, da uskyldsformod-ningen i sagen
mod ham må anses for krænket på grund af en række offentli-ge udtalelser
fremsat blandt andre af ministre og af en fungerende chef for SØIK, og da
<u>Tiltalte 1's</u> ret til en retfærdig rettergang derfor er krænket. <u>Tiltalte 1</u> har
herunder henvist til Den Europæiske Uni-ons charter om grundlæggende
rettigheder, artikel 47, blandt andet om, at enhver har ret til en retfærdig og
offentlig rettergang inden en rimelig frist for en uafhængig domstol, der
forudgående er oprettet ved lov, og artikel 48 om, at enhver, der anklages for en
lovovertrædelse, skal anses for uskyldig, indtil hans eller hendes skyld er bevist
i overensstemmelse med loven, og Den Europæiske
Menneskerettighedskonvention (EMRK), artikel 6, stk. 2, hvor-af fremgår, at
enhver, der anklages for en lovovertrædelse, skal anses for u-skyldig, indtil hans
skyld er bevist i overensstemmelse med loven.

Efter praksis fra Den Europæiske Menneskerettighedsdomstol kan udtalelser fra
myndighedspersoner, der omtaler mistænkte personer som skyldige inde-bære
en krænkelse af EMRK, artikel 6, stk. 2.

Samme spørgsmål blev på det da foreliggende grundlag prøvet under denne
sags forberedelse i medfør af retsplejelovens § 846, stk. 1, hvor <u>Tiltalte 1</u> påstod
sagen afvist.

Ved Østre Landsrets kendelse af 14. december 2023 stadfæstede landsretten
Retten i Glostrups kendelse af 29. september 2023, hvorefter påstanden om
afvisning ikke blev taget til følge.

Landsretten fandt, at uanset om de omhandlede udtalelser måtte indebære en
krænkelse af EMRK, artikel 6, stk. 2, og/eller en overtrædelse af retspleje-

lovens § 1016 a eller § 1017, stk. 2, nr. 3, også henset til de retssikkerheds-garantier, der følger af retsplejeloven og grundlovens §§ 3, 62 og 64, efter karakteren af udtalelserne, at det ikke på det foreliggende grundlag kunne antages, at Tiltalte 1 ikke ville kunne få en retfærdig rettergang. Landsretten bemærkede, at spørgsmålet om afvisning ville kunne rejses på ny under hovedforhandlingen, jf. retsplejelovens § 862, stk. 4.

I forbindelse med hovedforhandlingen er de samme udtalelser dokumenteret, som blev dokumenteret i forbindelse med retsmødet under sagens forbere-delse angående dette spørgsmål. Herudover er dokumenteret udtalelse af 6. december 2023 fra udenrigsminister Person 115 til Politiken. Domsmandsretten finder efter de foreliggende oplysninger, at nogle af de fremlagte udtalelser fra ministre i perioden fra 17. november 2015 til og med 3. april 2023 er af en sådan karakter, at de kan opfattes som eller kan efterla-de det indtryk, at de pågældende ministre anser Tiltalte 1 for skyl-dig i en kriminel handling i forbindelse med refusion af udbytteskat, hvilke udtalelser vil kunne indebære en krænkelse af Tiltalte 1's rettighe-der efter EMRK, artikel 6, stk. 2.

Domsmandsretten finder imidlertid efter en samlet vurdering af de foreliggende oplysninger og sagens forløb, også henset til de retssikkerhedsgaranti-er, der følger af retsplejeloven og grundlovens §§ 3, 62 og 64, at Tiltalte 1 vil kunne få eller har fået en retfærdig rettergang for en uafhængig og upartisk domstol.

Domsmandsretten finder allerede derfor, at Tiltalte 1's påstand om frifindelse med henvisning til Den Europæiske Unions charter om grundlæg-gende rettigheder, artikel 47 og 48, og EMRK, artikel 6, stk. 2, ikke kan ta-ges til følge.

Uanset om der måtte være fremsat offentlige udtalelser fra nogle ministre, der vil kunne indebære en krænkelse af Tiltalte 1's rettigheder efter EMRK, artikel 6, stk. 2 , bemærker domsmandsretten, at spørgsmålet om en eventuel godtgørelse som konsekvens af en eventuel krænkelse ikke findes at kunne behandles under nærværende sag, hvilket der heller ikke er nedlagt på-stand om. Det bemærkes samtidig, at en eventuel påstand fra Tiltalte 1 om godtgørelse vil skulle nedlægges under en af Tiltalte 1 selvstændig sag anlagt mod staten.

*Vedrørende specialitetsprincippet*

Tiltalte 1 har endvidere nedlagt påstand om frifindelse med hen-visning til, at Tiltalte 1 som følge af specialitetsprincippet anført i blandt andet udleveringslovens § 17 og § 51, hvilken lov har implementeret EU´s rammeafgørelse om den europæiske arrestordre, og med henvisning til bekendtgørelse nr. 10 af 13. oktober 2022 af traktat af 17. marts 2022 om udlevering mellem De Forenede Arabiske Emirater og Kongeriget Danmark,

artikel 10, ikke kan strafforfølges for groft bedrageri og forsøg herpå i nærværende sag. Tiltalte 1 har herunder henvist til, at grundlaget for udlevering af Tiltalte 1 fra De Forenede Arabiske Emirater til Dan-mark er brev af 4. oktober 2023 til den centrale myndighed i Kongeriget Danmark fra Justitsministeriet i De Forenede Arabiske Emirater, som ifølge Tiltalte 1 må anses for den kompetente myndighed, i hvilket brev der er henvist til, at Tiltalte 1 er begæret udleveret på baggrund af en sag, der omhandler hvidvask. Tiltalte 1 har herunder anført, at han ikke kan retsforfølges for en anden lovoverovertrædelse end den, som han oprindeligt blev udleveret for. Det er endvidere anført, at Danmark ikke har fremsat anmodninger om ændringer i afgørelsen af 4. oktober 2023 fra De Forenede Arabiske Emirater.

Det er ikke bestridt af Tiltalte 1, at anmodningen om udlevering af Tiltalte 1 til Danmark er behandlet ved domstolene i De Forenede Arabiske Emirater på grundlag af en europæisk arrestordre udstedt af Retten i Glostrup, hvori den anførte tiltale for groft bedrageri og forsøg herpå, her-under påstanden om straffforhøjelse efter straffelovens § 88, er identisk med den i denne sag rejste tiltale, ligesom det ikke er bestridt af Tiltalte 1, at domstolene i De Forenede Arabiske Emirater har truffet endelig af-gørelse om udlevering af Tiltalte 1 på dette grundlag.

Efter de foreliggende oplysninger lægger domsmandsretten til grund, at udle-veringen er sket i henhold til den lokale lov i De Forenede Arabiske Emirater og i henhold til en bilateral aftale indgået mellem De Forenede Arabiske Emi-rater og Danmark, jf. det anførte i brevet af 4. oktober 2023.

Domsmandsretten lægger efter de foreliggende oplysninger til endvidere grund, at domstolene i De Forenede Arabiske Emirater har truffet endelig af-gørelse om, at Tiltalte 1 skal udleveres til Danmark på grundlag af den Europæiske Arrestordre udstedt af Retten i Glostrup, hvori den rejste til-tale for groft bedrageri og forsøg herpå og en henvisning til straffelovens § 88 er anført.

Efter karakteren, indholdet og det fremkomne om baggrunden for brevet af 4. oktober 2023 fra Justitsministeriet i De Forenede Arabiske Emirater til den centrale myndighed i Kongeriget Danmark lægger domsmandsretten endvi-dere til grund, at skrivelsen må anses som orienteringsskrivelse (verbal note) til de danske myndigheder om status for udleveringen af Tiltalte 1. Domsmandsretten har i den forbindelse lagt vægt på, at brevet af 4. oktober 2023 henviser til, at der er truffet afgørelse om udlevering af Tiltalte 1 til Danmark, og at udlevering af Tiltalte 1 vil ske efter afslut-ningen af efterforskningen vedrørende lokale verserende sager mod Tiltalte 1.

Herefter og efter de foreliggende oplysninger, kan det lægges til grund, at Tiltalte 1 er udleveret på baggrund af, at domstolene i De Forenede

Arabiske Emirater har truffet endelig afgørelse om udlevering af Tiltalte 1 på grundlag af en europæisk arrestordre udstedt af Retten i Glost-rup, hvori den anførte tiltale for groft bedrageri og forsøg herpå, herunder påstanden om strafforhøjelse efter straffelovens § 88, er identisk med den i denne sag rejste tiltale, og at dette grundlag ikke kan anses for ændret efter-følgende. Herefter og da udleveringen opfylder betingelserne for udlevering til Danmark i udleveringsloven, herunder § 17 og § 51, finder domsmandsret-ten ikke grundlag for at tage Tiltalte 1's påstand om frifindelse med henvisning til udleveringsgrundlaget til følge.

**Rettens skyldvurdering**

*Vedrørende sagens faktiske omstændigheder*

Efter sagens oplysninger og forklaringen fra Tiltalte 1 kan retten lægge til grund, at Tiltalte 1 i regi af Virksomhed LLP (tidligere Virksomhed Ltd.), Virksomhed PLC, Virksomhed Ltd. 1 og Virksomhed LLP (Koncern) som depotbank stod for opbygningen af en handels-struktur, hvorigennem deltagerne indgik aftaler om køb og salg af bestemte aktier, henholdsvis lån/udlån af aktier samt forward eller futures til afdækning af risiko i forudbestemte konstellationer mellem parter, der ikke i forvejen var i besiddelse af aktier.

Indholdet i handlerne var forudbestemt inden første handel og fulgte en forud fastlagt struktur for handlernes gennemførelse, som blev meddelt aktørerne gennem instruktioner fra blandt andre Vidne 1, tidligere Tiltalte 2, og da hand-lerne blev automatiseret i System 3 gennem den heri programmerede algorit-me.

I handelsstrukturerne fremstod investorerne (US-pensionsplaner og Ø-selskaberne) som de ultimative købere af aktierne, og short-sælgerne de ulti-mative sælgere af aktierne. I handelsstrukturerne blev investorernes aftaler om køb af aktier indgået i 2012 og 2013 gennem en og siden i den resterende del af gerningsperioden gennem to børsmæglere som mellemled. På tilsvaren-de vis blev aftalerne om aktieudlån indgået gennem først en og siden to aktie-lånere.

Handlerne var struktureret således, at summen af aktiepositionerne, som in-vestorerne indgik aftaler om at købe, og som short-sælgerne indgik aftaler om at sælge, var identisk med summen af de aktiepositioner, som de samme investorer udlånte, og som de samme short-sælgere lånte, således at der ikke i forbindelse med handlerne blev udvekslet penge eller aktier.

Det kan endvidere lægges til grund, at beløbene, som hos Koncern blev krediteret investorernes klientkonti som nettoaktieudbytte for de handlede aktier, opstod på baggrund af en tilsvarende debitering af short-sælgernes kli-entkonti hos Koncern. Det er ubestridt, at short-sælgerne ikke modtog

aktieudbytte og ikke betalte udbytteskat, men havde et til aktieudbyttet sva-
rende beløb bogført hos Koncern, som følge af et overskud på de
ovenfornævnte handelsforløb.

Videre kan det lægges til grund, at Koncern på baggrund af de oven-for nævnte
handelsforløb udstedte Dividend Credit Advice (DCA'er) til inve-storerne
svarende til nettoudbyttet og foranledigede, at der i perioden 2012-2015 af
investorerne i 3.239 tilfælde blev indsendt ansøgninger om refusion af
udbytteskat på 9.025.205.871,00 kr. efter kildeskattelovens § 69 B, hvor de
nævnte DCA´er var vedlagt. Tiltalte 1 har bekræftet, at de ene-ste midler, som
tilgik handelsstrukturen udefra var indbetalinger, der indgik, når
skattemyndighederne imødekom ansøgningerne om refusion af udbyttes-kat.

Det kan endelig lægges til grund, at Koncern i 2015 på samme måde
foranledigede, at der på vegne af investorerne i yderligere 160 tilfælde blev
ansøgt om refusion af dansk udbytteskat på i alt 553.346.302,00 kr., hvilket
imidlertid ikke blev udbetalt, idet skattemyndighederne i august 2015 stands-
ede udbetalingerne.

Antallet af handler, de involverede aktører og den beløbsmæssige opgørelse af
den tilbagesøgte udbytteskat og forsøg herpå, jf. tiltalens forhold 1 og 2, er
ubestridt af Tiltalte 1 og understøttet af sagens oplysninger. Det er i den
forbindelse endvidere ubestridt og understøttes af de dokumenterede
pengestrømme, at mindst 80 % af den samlede tilbagesøgte udbytteskat siden
blev betalt til Tiltalte 1 eller til af ham kontrollerede selskaber.

Vedrørende behandlingen af ansøgningerne om refusion af udbytteskat kan
retten på baggrund af Vidne 5 og Vidne 6's forklaringer lægge til grund, at
behandlingen skete på baggrund af oplysninger i en blanket om, hvem der var
udbyttemodtager og befuldmægtiget, om der var skattepligt i et land, som der
var indgået dobbeltbeskatningsoverenskomst med, og om der var vedlagt en
nota om, at udbytte var betalt til modtageren.

De har begge forklaret blandt andet, at det efter deres opfattelse var hele
grundlaget og en forudsætning for refusion af udbytteskat, at der var modta-get
udbytte og betalt eller indeholdt udbytteskat.

Vidne 6 har yderligere forklaret, at grundlaget for refusionen af udbyt-teskat var
dobbeltbeskatningsoverenskomsten, og udbyttenotaen eller DCA'en, som var en
3. mandserklæring, der bekræftede, at der var udbetalt udbytteskat til
vedkommende af størrelsen af udbyttet. Systemet var baseret herpå og på tillid
til de udstedte dokumenter.

Vidne 6 har endelig forklaret, at de i forhold til udenlandske depot-banker var
uden mulighed for at kontrollere, om de oplysninger, som fremgik af
udbyttenotaerne, var korrekte.

*Vedrørende den skatteretlige konsekvens af de beskrevne handelsforløb*

Efter den i gerningsperioden gældende kildeskattelov § 65, stk. 1, (lovbe-kendtgørelse nr. 1403 af 7. december 2010), skal et selskab, der vedtager el-ler beslutter at udbetale eller godskrive udbytte af aktier, indeholde 27 pro-cent af det samlede udbytte (udbytteskat).

Det følger af kildeskattelovens § 69 B, stk. 1, blandt andet, at skattepligtige, for hvilke der efter § 65 er indeholdt kildeskat af blandt andet udbytte, som overstiger den endelige skat efter en dobbeltbeskatningsoverenskomst, er be-rettiget til at få tilbagebetalt beløbet (udbytteskatterefusion) inden 6 måneder fra modtagelsen af anmodningen af tilbagebetaling.

Der er grundlag for at antage, at investorerne, hvis de modtog udbytte fra danske børsnoterede selskaber, var skattepligtige til Danmark, jf. selskabs-skattelovens § 2, litra c, jf. ligningslovens § 16 A. Det kan endvidere lægges til grund, at de involverede US-pensionsplaner og Ø-selskaber (investorerne) var omfattet af reglerne om skattefritagelse i dobbeltbeskat-ningsoverenskomsten mellem Danmark og henholdsvis USA og Malaysia.

Tiltalte 1 har forklaret og gjort gældende, at det ikke var udbytte, men udbyttekompensation som shortsælgerne betalte til investorerne, og at forpligtelsen hertil opstod som følge af en markedskonvention, som indebar, at hvis der blev indgået aftaler om køb af aktier før eller på generalforsam-lingsdagen, som blev afregnet efterfølgende, opstod der et sådant krav. Tiltalte 1 har endvidere forklaret og gjort gældende, at han forstod de danske skatteregler sådan, at udbyttekompensation - uanset om den kunne spores tilbage til en faktisk udbyttebetaling - i dansk skattemæssig kontekst var at betragte som et beskattet udbytte, og at aktiekøberen - investoren -var berettiget til at søge refusion af indeholdt udbytteskat.

Tiltalte 1 har supplerende gjort gældende, at der er tale om, at in-vestoren har krav på short-sælgeren på en erstatning for mistet udbyttebeta-ling, og at dette erstatningskrav har skatteretlige konsekvenser, uanset, om der er indgået aktier udefra i handlerne. Der er henvist til, at der er tale om retlige bindende handler, og Tiltalte 1 har henvist til retserhvervel-sesprincippet. Det er gjort gældende, at investorens krav rent faktisk er ho-noreret i form af en udbyttekompensationsbetaling, og at der så meget desto mere opstår et krav på udbytteskattetilbagebetaling, jf. kildeskattelovens § 69 B, stk. 1.

Domsmandsretten finder, at det er uden støtte i ordlyden af kildeskattelovens § 69 B, stk. 1, eller i bestemmelsens forarbejder, at berettigelsen til tilbagebe-taling af udbytteskat, skulle opstå *alene* som følge af en struktureret handel, hvor en aktieshort-sælger som led i transaktionen godskriver aktiekøberen en udbytteskattekompensation svarende til et beregnet nettoudbytte. En sådan

forståelse strider klart mod ordlyden af bestemmelsen i kildeskattelovens § 69 B, stk. 1, som omtaler "udbytte…, hvori der er indeholdt kildeskat.

Domsmandsretten bemærker endvidere, at kildeskattelovens betingelser er objektive, og at der således også i realiteten skal være tale om et udbytte, hvori der er indeholdt kildeskat, og at den subjektive opfattelse heraf hos den der søger tilbagebetaling af udbytteskat, uanset om den kan anses for velbe-grundet, er uden betydning.

Domsmandsretten bemærker videre, at såfremt berettigelsen til tilbagebeta-ling af udbytteskat skulle opstå *alene* som følge af en struktureret handel, hvor en aktieshort-sælger som led i transaktionen godskriver aktiekøberen en udbytteskattekompensation svarende til et beregnet nettoudbytte, ville det medføre, at et ubegrænset antal ansøgere helt uafhængigt af den samlede ud-bytteudlodning og beskatningen heraf ville kunne gøre sig berettiget til ud-bytteskatterefusion.

Domsmandsretten finder således, at det er en nødvendig betingelse for retten til udbytteskatterefusion efter kildeskattelovens § 69 B, stk. 1, at den skat-tepligtige, som anmoder om tilbagebetaling, har fået udbetalt et beskattet ud-bytte, eller har erhvervet retten hertil fra nogen, som har modtaget en sådan betaling.

Uanset om det lægges til grund, at investorerne på baggrund af de indgåede aftaler opnåede den ret til udbyttekompensationsbetaling, som Tiltalte 1 har forklaret om, må det således anses for en nødvendig forudsætning for retten til tilbagesøgning af udbytteskat, at investoren opnår retskrav på et således beskattet udbytte fra en, som har modtaget et sådant udbytte.

Som anført ovenfor må det bevismæssigt og i øvrigt ubestridt lægges til grund, at der objektivt set ikke er nogen i de beskrevne transaktioner, der har modtaget et beskattet udbytte, eller har indgået aftaler om erhvervelse af ak-tier fra en tredjepart, der er har modtaget et beskattet udbytte.

Domsmandsretten må således lægge til grund, at shortsælgerne ikke har væ-ret i en position, hvor de har været i stand til at sælge en aktie med ret til et beskattet udbytte. Betingelsen i kildeskattelovens § 69 B, stk. 1, om et "udbytte…, hvori der er indeholdt kildeskat" , er dermed ikke opfyldt.

Domsmandsretten finder det herefter bevist, at udbetalingerne af udbyttes-katterefusion som følge af investorernes ansøgninger er sket i strid med kil-deskattelovens § 69 B, stk. 1, og beløbene er modtaget af investorerne med urette.

*Vedrørende spørgsmålet om overtrædelse af straffelovens § 279*

Det kan efter bevisførelsen lægges til grund, at de ansøgninger, der i nærvæ-

rende sag, dannede grundlag for skattemyndighedernes udbytteskattebetalin-ger, efter deres indhold fremstod således, at investorerne havde modtaget ud-bytte, hvori der var blevet indeholdt udbytteskat i forbindelse med udbyt-teudlodninger, men at ingen af selskaberne havde modtaget et beskattet ud-bytte, eller som led i eller til brug for transaktionerne havde erhvervet rettig-heder over aktier fra udestående tredjeparter.

Det kan efter bevisførelsen endvidere lægges til grund, at de ansøgninger, der i nærværende sag, dannede grundlag for skattemyndighedernes udbytteskat-tebetalinger således indeholdt urigtige oplysninger om indeholdt udbytteskat.

Det kan efter bevisførelsen, herunder forklaringerne for Vidne 6 og Vidne 5, videre lægges til grund, at skattemyndighederne efter den ad-ministrative praksis som dokumentation for, at der var modtaget beskattet udbyttebetaling fra et dansk selskab, krævede en DCA udstedt af depotban-ken, der sammen med en skattefritagelseserklæring udgjorde grundlaget for beslutningen om refusion af udbytteskat.

Domsmandsretten finder det herefter bevist, at de DCA'er, som blev frem-sendt til skattemyndighederne i nærværende sag, bragte skattemyndighederne i en vildfarelse om, at der var modtaget udbytte fra et dansk selskab, hvori der var indeholdt udbytteskat.

Efter det juridiske grundlag, der dannede grundlag for behandlingen af an-søgninger om refusion af udbytteskat, og som er understøttet af forklaringer-ne fra Vidne 6 og Vidne 5, finder retten det herefter bevist, at skattemyndighederne derved blev bragt i en vildfarelse, som var bestemmen-de for, at der skete udbetalinger i strid med kildeskattelovens § 69 B, stk. 1.

Domsmandsretten bemærker i den forbindelse, at retten finder, at skattemyn-dighederne ikke på baggrund af anmeldelserne fra advokat Person 101 i sommeren 2015 blev bragt ud af den vildfarelse, som danner grundlag for bedrageriet.

Domsmandsretten har i den forbindelse lagt vægt på, at der var tale om et omfattende handelssystem, og at anmeldelserne efter deres indhold krævede en række yderligere undersøgelser, før der var tilstrækkeligt grundlag for at stoppe betalingerne af tilbagesøgt udbytteskat.

Domsmandsretten bemærker, at det ikke kan føre til et andet resultat, at der ikke er grundlag for tilsidesætte Tiltalte 1's forklaring om, at meka-nismerne omkring "netting" og konstruktionen omkring afregningsdagen gav mulighed for, at der kunne etableres handelsstrukturer, hvorved afregnings-og registreringsmekanismer indebar, at et tilsyneladende stort antal aktier blev handlet over generalforsamlingsdagen, og at handelsstrukturen i den for-bindelse kunne efterlade et papirspor, der bekræftede handlerne. Doms-mandsretten finder det endvidere uden betydning, om handlerne mellem aktø-

rerne i øvrigt kan betragtes som fiktive, idet det efter det ovenfor anførte, er bevist, at handlerne var af en sådan karakter, at investorerne ikke derved modtog skattepligtigt aktieudbytte fra aktieudstederen eller en ret hertil.

Domsmandsretten har i den forbindelse lagt vægt på, at det, som tidligere fastslået, også efter Tiltalte 1's forklaring kan lægges til grund, at det ikke indgik aktier eller penge i handelsstrukturerne, og at retten endvide-re må lægge til grund, at det som blev "nettet" , var de respektive parters for-dringer på hinanden uden forbindelse til de udstedte aktier, og uden at parter-ne bidrog med kapital til afvikling af handlerne.

Domsmandsretten finder det bevist, at Tiltalte 1 har haft en helt central og kontrollerende rolle i forbindelse med opbygningen, driften og ud-viklingen af det handelssystem, som førte til de uberettigede udbetalinger af tilbagesøgt udbytteskat.

Domsmandsretten har i den forbindelse lagt vægt på, at Tiltalte 1 vedrørende ledelsen af Afdeling-forretningen har forklaret blandt andet, at han var administrerende direktør for Virksomhed LLP (tidligere Virksomhed Ltd.) indtil udgangen af 2013, og at Person 14 fra januar 2014 blev administrerende direktør, men at han fortsat var inde over, og at de havde daglige Skype-møder. Tiltalte 1 har endvidere forklaret, at han var involveret i Afdeling-forretningen som en del af teamet og som ejer, og at han tjente mange penge på Afdeling-forret-ningen.

Domsmandsretten kan vedrørende Tiltalte 1's involvering efter be-visførelsen tillige lægge til grund, at Tiltalte 1 havde en central rol-le i den løbende udvidelse af antallet af aktører i de strukturerede handler, og at oprettelsen af de handlende selskaber i betydeligt omfang var initiereret og finansieret af Tiltalte 1 til brug for handel på Afdeling-platformen.

Domsmandsretten finder således, at de objektive krav for domfældelse efter den rejste tiltale er opfyldt, idet det herunder bemærkes, at antallet af aktører, antallet af ansøgninger, de tilbagesøgte beløb, og de udbetalte beløb og Tiltalte 1's andel af overskuddet efter Tiltalte 1's forklaring og den øvrige bevisførelse findes bevist.

Spørgsmålet er herefter, om der foreligger det fornødne forsæt.

Tiltalte 1 har forklaret blandt andet, at der var tale om reelle hand-ler med der af afledte juridiske rettigheder og pligter. Tiltalte 1 har endvidere forklaret, at det var og fortsat er hans opfattelse, at udbyttekom-pensationsbetaling kan sidestilles med udbytte, og at Koncern kunne ud-stede DCA'er til sine kunder, samt at det ikke var retsstridigt eller på et uret-mæssigt grundlag, når kunderne efterfølgende anvendte disse DCA'er til at ansøge om refusion af udbytteskat. Tiltalte 1 har videre forklaret, at alt foregik inden for gældende lovgivning, regulering og markedspraksis,

og at han sikrede sig dette ved at ansætte særdeles kompetente folk og få den bedste rådgivning, og at der var tale om et lovligt juridisk "smuthul" , og at han var i god tro.

Tiltalte 1 har videre forklaret blandt andet, at initiativet til, at der blev indhentet en tax-opinion i 2012, kom fra Person 8 og Person 6, hvilket Tiltalte 1 havde godkendt, men at han ikke selv deltog i kommunikationen med Advokatfirma 2, men at Tiltalte 1 læste den endelige udgave af denne tax-opinion. Tiltalte 1 har forespurgt, om de ikke ville vise hele kredsløbet, forklaret, at hans involvering var minimal, og at Person 6 og Person 8 havde besluttet, at en tax-opinion skulle omfatte det, som fremgik af fact-pattern, og at han ikke kan svare autoritativt på, om Advokatfirma 2 blev bedt om at besvare, om et markedclaim under de omstændigheder, som det var i Afdeling-systemet, skatteretligt ville blive betragtet som, udbytteskatterefusions-berettiget, men at det var hans opfattelse, at det ikke var omfattet af den le-gal opinion, der var indhentet.

Tiltalte 1 har foreholdt tax-opnion fra 27. juni 2012, side 7-9, og forespurgt til, at det er anført som en forudsætning, at det er reelt udbytte, der videregives til den amerikanske pensionskasse, forklaret blandt andet, at han ikke kikkede på udtalelsen, men stolende på Person 6 og Person 8. Tiltalte 1 har videre forklaret, at han ikke tog sig af kontakt til rådgiverne personligt, og at han fik at vide, at udbytteskattekompensation blev behandlet som beskattet udbytte. Tiltalte 1 har videre forkla-ret, at Vidne 10, der blev bedt om at gennemgå Afdeling-modellen, kom til samme konklusion, at det var en lovlig model, som Tiltalte 1 har beskrevet, og at bogføring af udbytteskattekompensation anses som udbyt-teindtægt.

Tiltalte 1 har videre forespurgt, hvorfor de ikke har spurgt til om, hvorvidt smuthullet var lovligt, forklaret, at skatteeksperterne havde dialogen med danske eksperter, og at han stolede på Person 6 og Person 8 og ville forvente, at de ville have bragt det op overfor ham, hvis der var noget.

Vidne 1, tidligere Tiltalte 2 har herom forklaret blandt andet, at han i slutningen af 2013 blev opmærksom på handelsstrukturen, hvor han så, at der ikke kom udbytte og aktier ind i systemet, og at det var han bekymret for. Det så for ham ud til, at der ikke var reel bevægelse af aktier og penge. Han er sikker på, at han har talt med Tiltalte 1, Person 6 og andre overordnede ansatte om sin bekymring og også dem, som havde skabt han-delsskrukturen. Det generelle svar var, at der var en legal opinion, og at det var underforstået, at der var et smuthul. Han blev i brede vendinger forklaret om, at smuthullet bestod i, at hvis alle brugte samme depotbank, så kunne det hele "nettes" . Han vidste godt, at investorerne tilbagesøgte skat, selvom der ikke var betalt udbytteskat, hvilket var en del af de generelle samtaler, som han havde med folk.

Domsmandsretten har ved vurderingen af forklaringen fra Tiltalte 1 lagt vægt
på, at han har læst den endelige udgave af Advokatfirma 2's tax-legal opnion fra
2012 og derfor måtte være bekendt med de angive forudsæt-ninger i i hvert fald
i denne, hvor det blandt andet er forudsat, at investoren skulle have
fuldstændige ejerrettigheder over aktierne, herunder retten til at modtage det
udbytte, der udloddes på dagen for godkendelse af udbytte, li-gesom det er en
forudsætning, at det udbytte, som investoren rent faktisk vil kræve refusion af
udbytteskat for, er en udbyttebetaling, som investoren som aktionær har
modtaget fra det udbytteudloddende danske selskab. Doms-mandsretten har
desuden lagt vægt på, at Tiltalte 1 tillige måtte være bekendt med, at
Advokatfirma 2 ikke var blevet anmodet om at vur-dere, hvorvidt bogføring af
udbytteskattekompensation anses som udbyt-teindtægt, og således ikke er
forelagt Virksomhed LLP (tidligere Virksomhed Ltd.)s samlede model, der
dannede grundlag for udbetaling af udbytteskat.

Videre har domsmandsretten lagt vægt på, at det på baggrund forklaringen fra
Vidne 1, tidligere Tiltalte 2 lægges til grund, at Vidne 1, tidligere Tiltalte 2
havde ud-trykt bekymring for handelsstrukturen, hvor der ikke kom aktier og
udbytte ind i systemet, over for blandt andre Tiltalte 1.

Domsmandsretten har desuden lagt vægt på, at Advokatfirma 2 i deres kor-
respondance med Person 8 og Person 6 fra juni 2012 tydeligt understre-gede
vigtigheden af, at der rent faktisk var tale om udbytte, som den ameri-kanske
pensionsplan havde modtaget fra det udbytteudloddende selskab, at chefen for
Compliance, Person 18, i mailen af 16. juli 2013 til Tiltalte 1 udtrykte
bekymring for, at ingen advokater nogensinde var blevet bedt om at udtale sig
om Afdeling-modellen i sin helhed, at Person 117 i bestyrel-sesnotat af 16. april
2015 udtalte, at advokaterne, der udarbejdede tax-opini-on om danske
skatteforhold burde oplyses om hele konstruktionen, de usæd-vanlige elementer
og størrelsen af transaktionerne, og at de kun med disse oplysninger ville få en
brugbar opinion, hvilken viden retten antager er kom-met til Tiltalte 1's
kundskab.

Domsmandsretten finder på denne baggrund, at Tiltalte 1's forkla-ring om, at
han blot stolede på de medarbejdere, som indhentede rådgivning, og at han selv
var overbevist om lovligheden af udbytteskatterefusionerne, må tilsidesættes.

Alligevel og på trods af det ovenfor anførte undlod Tiltalte 1 efter sin forklaring
at foranledige, at der blev foretaget en undersøgelse af om ud-
byttekompensation under de omstændigheder, som det var i Afdeling-systemet,
skatteretligt ville blive betragtet som udbytteskatterefusionsberettiget ved
henvendelse til rådgivere, der var kyndige i dansk skatteret, eller til myndig-
hederne i Danmark, herunder også uanset de usædvanlige elementer i tran-
saktionerne og størrelsen af beløb, der blev udbetalt i udbytteskatterefusion fra
den danske stat.

Domsmandsretten finder herefter, at Tiltalte 1 ikke har haft noget grundlag for den opfattelse, at tilbagesøgning på baggrund af de bogførte transaktioner, der var uden andet formål end at danne grundlag ansøgninger om refusion af udbytteskat, kunne være lovlige.

Domsmandsretten finder derfor, at det må lægges til grund, at Tiltalte 1 var bekendt med hvilke dele af modellen, som der forventeligt ville bli-ve "godkendt", hvis der blev indhentede rådgivning, mens han tillige var be-kendt med, at spørgsmål til andre dele af modellen, herunder navnlig den samlede handelsstruktur, med overvejende sandsynlighed ville føre til den vurdering, som retten har foretaget ovenfor under overskriften *Vedrørende den skatteretlige konsekvens af de beskrevne handelsforløb*, og som frem-står utvivlsom.

Domsmandsretten har endvidere lagt vægt på, at Afdeling-modellen var opbyg-get således, at den bestod af komplicerede handelskonstellationer mellem en række aktører, der blev udvidet med flere aktører undervejs, og at der var in-volveret et netværk af 288 mindre selskaber som investorer med meget for-skellige navne på hvis vegne, der blev indsendt i alt 3.399 udbyttenotater. Herudover er der lagt vægt på, at handlerne på Afdeling-platformen og de enkel-te investorers køb mv. af aktier var begrænset, herunder i relation til indbe-retningspligter mv., og at Tiltalte 1 i forbindelse med etablering af investorer til handel på Afdeling-platformen havde stærke holdninger til navngiv-ning mv., således at de fremstod uden indbyrdes forbindelse, ligesom syste-met var konstrueret således, at handlerne blev fordelt på mange aktører med en gennemsnitlig ligelig fordeling af handelsstørrelser og overskud.

Domsmandsretten har desuden lagt vægt på, at aktørerne i vidt omfang var tidligere ansatte og andre personer, som Tiltalte 1 havde en per-sonlig relation til, og at oprettelsen af de handlende selskaber, som tidligere anført, i betydeligt omfang var initiereret og finansieret af Tiltalte 1 til brug for handel på Afdeling-platformen. Domsmandsretten finder, at de aty-piske forhold peger i retning af et motiv om, at Tiltalte 1 ønskede, at aktørerne i mindst muligt omfang satte spørgsmålstegn ved handlerne og baggrunden herfor.

Domsmandsretten finder endvidere, at det yderligere styrker denne antagelse, at Tiltalte 1 gennem sine selskaber betalte meget betydelige bonus-ser til aktørerne.

Domsmandsretten finder således, at disse forhold understøtter, at Tiltalte 1 var bevidst om, at hans aktiviteter havde en karakter, hvor han ikke ønskede opmærksomhed fra de regulerende myndigheder, og at modellen så-ledes synes opbygget for at sløre over for de danske skattemyndigheder, at de bagvedliggende transaktioner var uden udbytteskattemæssig realitet, idet der hverken indgik aktier eller udbyttebetaling fra danske selskaber.

Domsmandsretten finder det herefter efter en samlet vurdering bevist, at Tiltalte 1 i hvert fald har anset det som overvejende sandsynligt, at de i anklageskriftet nævnte ansøgninger om refusion af udbytteskat var ube-rettigede, og at medarbejderne i skattemyndighederne dermed blev bragt i en vildfarelse om, at der var indeholdt udbytteskat i Danmark.

På den anførte baggrund findes Tiltalte 1 herefter skyldig i groft bedrageri og forsøg herpå, jf. straffelovens § 279, jf. § 286, stk. 2, jf. til dels § 21, i overensstemmelse med anklageskriftet.

### Strafudmåling

Straffen fastsættes til fængsel i 12 år, jf. straffelovens § 279, jf. § 286, stk. 2, jf. til dels § 21.

Domsmandsretten har navnlig lagt vægt på lovovertrædelsernes karakter, omfang og grovhed, herunder at Tiltalte 1 er fundet skyldig i be-drageri for 9.025.205.871 kr. og forsøg på bedrageri for 553.346.302 kr., og Tiltalte 1's helt centrale og kontrollerende rolle i kriminaliteten, der var nøje planlagt og systematisk organiseret og undervejs yderligere effekti-viseret ved udvikling af et softwaresystem, der betød, at kriminaliteten eska-lerede voldsomt, kriminalitetens grænseoverskridende karakter ved udnyttel-se af dobbeltbeskatningsoverenskomster og tilliden til depotbankernes tredje-mandserklæringer, at kriminaliteten foregik over en lang periode på ca. 3 år, og at Tiltalte 1 berigede sig med et stort milliardbeløb, der udgjor-de langt den største del af udbyttet svarede til minimum 80 procent.

Herudover har domsmandsretten lagt vægt på, at kriminaliteten først blev bragt til ophør, da skattemyndighederne i 2015 som følge af en formodning om svindel satte udbetalingerne på pause.

Henset til det ovenfor anførte, finder domsmandsretten, at der foreligger sær-deles skærpende omstændigheder, og at der således er grundlag for at bringe straffelovens § 88, stk. 1, 2. pkt., i anvendelse.

Domsmandsretten har ikke tillagt det særskilt vægt, at kriminaliteten er begå-et overfor skattemyndighederne, herunder er skattemyndighedernes admini-stration af kontrollen med udbytteskatterefusionsansøgninger ikke blevet til-lagt betydning ved strafudmålingen.

Endvidere er forholdenes alder og sagsbehandlingstiden ikke tillagt betydning ved straffens fastsættelse henset til kriminalitetens karakter, omfang og for-løb.

Der foreligger ikke omstændigheder, som kan føre til en mildere fængsels-straf.

Det af Tiltalte 1 anførte kan ikke føre til andet resultat.

I medfør af straffelovens § 86, stk. 5, gives der fuld afkortning for frihedsbe-røvelsen af Tiltalte 1 i De Forenede Arabiske Emirater under for-udsætning af, at frihedsberøvelsen er på baggrund af nærværende sag.

***Rettighedsfrakendelse***

De strafbare forhold er af Tiltalte 1 begået i sin egenskab af ejer og direktør og/eller reel leder af de britiske selskaber Virksomhed LLP (tidligere Virksomhed Ltd.), Virksomhed PLC, Virksomhed Ltd. 1 og Virksomhed LLP.

Herefter og efter karakteren og omfanget af de pådømte forhold, jf. det an-ført ovenfor under strafudmålingen, finder domsmandsretten, at betingel-serne i straffelovens § 79, stk. 2, 2. pkt., jf. § 79, stk. 1, jf. § 78, stk. 2, for at frakende Tiltalte 1 retten til at deltage i ledelsen af en erhvervsvirk-somhed her i landet eller i udlandet uden at hæfte personligt og ubegrænset for virksomhedens forpligtelser er opfyldt.

Af de grunde, der efter det anførte fører til den anførte rettighedsfrakendelse, finder domsmandsretten, at frakendelsen skal ske indtil videre, jf. straffelo-vens § 79, stk. 3.

***Udvisning***

Tiltalte 1 er idømt fængsel i 12 år for bedrageri af særlig grov be-skaffenhed efter straffeloven § 279, jf. § 286, stk. 2 og forsøg derpå, jf. straf-felovens § 21. Betingelserne for at udvise Tiltalte 1 i medfør af ud-lændingelovens § 24, nr. 1, jf. § 22, nr. 1 og nr. 6, er herefter opfyldt. Efter udlændingelovens § 26, stk. 2, skal Tiltalte 1 således udvises, med-mindre det med sikkerhed vil være i strid med Danmarks internationale for-pligtelser.

Det fremgår af bekendtgørelse nr. 1700 af 23. november 2020 om gennemfø-relse af visse bestemmelser i udtrædelsesaftalen mellem Det Forenede Kon-gerige og EU for så vidt angår retten til indrejse, ophold og arbejde i Dan-mark § 16, stk. 1, jf. udtrædelsesaftalens artikel 20, stk. 1, at da de pådømte forhold er begået før 1. januar 2021, skal Tiltalte 1's forhold be-dømmes som for udlændinge, der er omfattet af EU-reglerne, da Tiltalte 1 er britisk statsborger.

Udvisning kan herefter kun ske, hvis det er i overensstemmelse med de prin-cipper, der gælder efter EU-reglerne for begrænsning af retten til fri bevæge-lighed, jf. udlændingelovens § 26 b.

Efter artikel § 27, stk. 1, i direktiv 2004/38/EF af 29. april 2004 (opholdsdirektivet), kan en begrænsning i retten til fri bevægelighed og op-hold kun begrundes i hensynet til den offentlige orden, sikkerhed eller sund-hed, og der må ikke lægges økonomiske betragtninger til grund. Efter artikel 27, stk. 2, skal udvisningen være i overensstemmelse med proportionalitets-princippet og kan udelukkende begrundes i vedkommendes personlige ad-færd. Det personlige adfærd skal udgøre en reel, umiddelbar og tilstrækkelig alvorlig trussel, der berører en grundlæggende samfundsinteresse.

Tiltalte 1 er straffet med fængsel i 12 år for groft bedrageri og for-søg derpå og domsmandsretten finder efter en samlet vurdering af karakteren og omfanget af den begåede kriminalitet, at kriminaliteten er udtryk for en adfærd, som udgør en reel, umiddelbar og tilstrækkelig alvorlig trussel, der berører en grundlæggende samfundsinteresse, jf. opholdsdirektivets artikel 27, stk. 2, 2. led.

Efter de foreliggende oplysninger om Tiltalte 1's forhold, herunder at han aldrig har boet i Danmark og ikke har nogen familiær, arbejdsmæssig eller social tilknytning hertil, sammenholdt med oplysningerne om Tiltalte 1's tilknytning til Storbritannien, at Tiltalte 1 ikke har en sådan tilknytning til Danmark, at udvisning kan anses for at stride mod pro-portionalitetsprincippet i direktivets artikel 27, stk. 2, 1. led, sammenholdt med artikel 28, stk. l.

Opholdsdirektivet kan derfor ikke antages at være til hinder for, at der sker udvisning, jf. herved direktivets artikel 33, stk. 1, og udlændingelovens § 26 b, jfr. § 2, stk. 3. På den baggrund tages påstanden om udvisning i medfør af de påberåbte bestemmelser til følge som nedenfor bestemt.

Af de grunde, der efter det anførte fører til, at Tiltalte 1 skal udvi-ses, finder domsmandsretten, at udvisningen af Tiltalte 1 skal ske med indrejseforbud for bestandigt efter udlændingelovens § 32, stk. 4, nr. 7.

**Konfiskation**

*Konfiskation hos Tiltalte 1:*

*Vedrørende indestående på konti i Varengold Bank:*

Tiltalte 1 har forklaret, at indeståenderne stammer fra overførsler fra Virksomhed LLP (tidligere Virksomhed Ltd.), og at han ikke har indvendinger mod, at pengene konfiskeres, hvis han findes skyldig. Efter de dokumenterede oplysninger finder retten det godtgjort, at indeståenderne stammer fra de overførsler vedrørende refusion af udbytteskat, som Virksomhed LLP (tidligere Virksomhed Ltd.) modtog fra de danske skattemyndigheder, herefter og efter bevisresultatet, skal indeståenderne konfiskeres efter § straffelovens § 75, stk. 1, jf. § 76, stk. 1.

*Vedrørende ejendommene (1) Adresse 1, London, (2) Adresse 2, London, (3) Adresse 3, London, (4) Adresse 4, London, (5) Adresse 5, London, (7) Adresse 7, London, (8) Adresse 8, London, (9) Adresse 9, Harrow, (13)Adresse 11, London, (14) Adresse 12, London, (15) Adresse 13, London og (16) Adresse 14, London:*

Tiltalte 1 har forklaret, at ejendommene er købt for midler, der stammer fra tilbagesøgning af udbytteskat fra Danmark og Belgien, og han accepterer, at ejendommene konfiskeres, såfremt han findes skyldig. Heref-ter, efter de dokumenterede oplysninger og under hensyn til, at ejendommene er erhvervet i den periode, hvor Tiltalte 1 efter bevisresultat er fun-det skyldig i bedrageri for et milliardbeløb, finder retten, at det er godtgjort, at ejendommene er erhvervet for midler, der stammer fra refusion af dansk udbytteskat.

Herefter og efter bevisresultatet, skal ejendommene konfiskeres efter straffe-lovens § 75, stk. 1, jf. § 76, stk. 1.

*Vedrørende ejendommene (10) Adresse 10, Plymouth, (17) Adresse 15, Plymouth og (18) Adresse 16, Plymouth:*

Efter bevisførelsen kan det lægges til grund, at ejendommene er erhvervet i 2008 og til dels lånefinansieret med lån, der blev indfriet i 2015.

Domsmandsretten finder, at betingelserne i straffelovens § 76 a, stk. 1, for at foretage konfiskation, utvivlsomt er opfyldt, idet Tiltalte 1 efter bevisresultatet er dømt for en handling af en sådan karakter, at den kan give betydeligt udbytte, og at den efter loven kan straffes med fængsel i 6 år eller derover.

Spørgsmålet er heroverfor, om Tiltalte 1 har godtgjort, at ejen-dommene er erhvervet på lovlig måde eller for lovligt erhvervede midler, jf. straffelovens § 76 a, stk. 4. Domsmandsretten bemærker hertil, at ejendom-mene er købt i 2008 efter det oplyste for hver 149.995 GBP, og at er lånene indfriet med hver 122.700,30 GBP i 2015. Finansieringen af ejendommen er således i langt overvejende grad finansieret for midler, hvor det har formod-

ningen for sig, at de stammer fra den strafbare handling.

Domsmandsretten finder på denne baggrund, at Tiltalte 1 ikke har godtgjort, at ejendommene er erhvervet på lovlig måde eller for lovligt er-hvervede midler, jf. straffelovens § 76a, stk. 4, og der skal derfor ske konfis-kation af ejendommene i overensstemmelse med anklagemyndighedens på-stand.

*Vedrørende ejendommen (6) Adresse 6, London:*

Efter bevisførelsen kan det lægges til grund, at ejendommen er erhvervet i 2008 og lånefinansieret med lån, der blev indfriet i 2015.

Domsmandsretten finder, at betingelserne i straffelovens § 76 a, stk. 1, for at foretage konfiskation, utvivlsomt er opfyldt, jf. det ovenfor anførte.

Spørgsmålet er heroverfor, om Tiltalte 1 har godtgjort, at ejen-dommen er erhvervet på lovlig måde eller for lovligt erhvervede midler, jf. straffelovens § 76 a, stk. 4. Domsmandsretten bemærker hertil, at ejendom-men er købt i 2008 efter det oplyste for 860.000 GBP, belånt med 970.000 GBP og lånet er indfriet med 942.994,31 GBP i 2015. Finansieringen af ejen-dommen er således efter det foreliggende finansieret for midler, hvor det har formodningen for sig, at de stammer fra den strafbare handling.

Domsmandsretten finder på denne baggrund, at der skal ske konfiskation af ejendommen i overensstemmelse med anklagemyndighedens påstand.

Domsmandsretten bemærker vedrørende det anførte om en livslang brugsret for Tiltalte 1's søster og mor, at det må bero på en vurdering efter engelsk ret, om denne ret kan ekstinkveres, og at dette ikke har nogen betyd-ning for, om konfiskationspåstanden kan tages til følge.

*Vedrørende ejendommen (19) Tiltalte 1's ideele anpart af Adresse 17, Wembley:*

Efter bevisførelsen kan det lægges til grund, at ejendommen er erhvervet i 2007 og til dels lånefinansieret med lån, der blev indfriet i 2015.

Domsmandsretten finder, at betingelserne i straffelovens § 76 a, stk. 1, for at foretage konfiskation, utvivlsomt er opfyldt, jf. det ovenfor anførte.

Spørgsmålet er heroverfor om Tiltalte 1 har godtgjort, at ejendom-men er erhvervet på lovlig måde eller for lovligt erhvervede midler, jf. straf-felovens § 76 a, stk. 4. Domsmandsretten bemærker hertil, at ejendommen er købt i juni 2007 uden, at der er oplyst en købspris. Tiltalte 1 har indfriet et lån i ejendommen med 125.000 GBP i 2015. Det er således uklart

efter det foreliggende, om indfrielsen af lånet ejendommen indebærer indfriel-se af en mindre del af købesummen, eller om finansieringen af ejendommen i langt overvejende grad er finansieret for midler, hvor det har formodningen for sig, at de stammer fra den strafbare handling.

Domsmandsretten finder på denne baggrund, at Tiltalte 1 ikke har godtgjort, at ejendommen er erhvervet på lovlig måde eller for lovligt erhver-vede midler, jf. straffelovens § 76a, stk. 4, og der skal derfor ske konfiskati-on af ejendommen i overensstemmelse med anklagemyndighedens påstand.

*Sammenfattende vedrørende konfiskation hos Tiltalte 1*

Efter bevisresultatet kan der herefter foretages konfiskation hos Tiltalte 1 af 7.220.164.697 kr. (svarende til 80 % af DKK 9.025.205.871) herunder i de aktiver, som anklagemyndigheden har påstået jf. straffelovens § 75, stk. 1, jf. § 76, stk. 1 og § 76 a, stk. 1.

*Konfiskation hos hos Virksomhed SARL 1:*

Tiltalte 1 har forklaret, at han ejer selskabet, at aktiverne stammer fra, og at aktierne er finansieret af midler fra refusion af dansk udbytteskat. Han har oplyst, at han ikke har indvendinger mod, at aktiverne konfiskeres, hvis han findes skyldig. Herefter og efter de dokumenterede oplysninger fin-der retten det godtgjort, at indeståenderne stammer fra de overførsler vedrø-rende refusion af udbytteskat, som Virksomhed LLP (tidligere Virksomhed Ltd.) modtog fra de danske skattemyndig-heder, og at aktierne er finansieret af midler fra refusion af dansk udbyttes-kat, herefter og efter bevisresultatet, skal indeståenderne og aktierne konfis-keres efter straffelovens § 75, stk. 1, jf. § 76, stk. 1.

*Konfiskation hos Virksomhed Ltd. 2.:*

Tiltalte 1 har forklaret, at han ejer selskabet, at aktiverne stammer fra, og at aktierne er finansieret af midler fra refusion af dansk udbytteskat. Han har oplyst, at han ikke har indvendinger mod, at aktiverne konfiskeres, hvis han findes skyldig. Herefter og efter dokumenterede oplysninger finder retten det godtgjort, at indeståenderne stammer fra de overførsler vedrørende refusion af udbytteskat, som Virksomhed LLP (tidligere Virksomhed Ltd.) modtog fra de danske skattemyndigheder, og at aktierne er finansieret af midler fra refusion af dansk udbytteskat, heref-ter og efter bevisresultatet, skal indeståenderne og aktierne konfiskeres efter straffelovens § 75, stk. 1, jf. § 76, stk. 1.

*Konfiskation hos Virksomhed Ltd. 3:*

Tiltalte 1 har forklaret, at han ejer selskabet, og at aktiverne stam-mer fra refusion af dansk udbytteskat. Han har oplyst, at han ikke har indven-dinger mod at pengene konfiskeres, hvis han findes skyldig. Herefter og efter de dokumenterede oplysninger finder retten det godtgjort, at indeståenderne

stammer fra de overførsler vedrørende refusion af udbytteskat, som Virksomhed LLP (tidligere Virksomhed Ltd.) modtog fra de danske skattemyndigheder herefter og efter bevisresultatet, skal indeståenderne konfiskeres efter straffelovens § 75, stk. 1, jf. § 76, stk. 1.

*Konfiskation hos Virksomhed Ltd. 4:*

Tiltalte 1 har forklaret, at han ejer selskabet, og at aktiverne stam-mer fra refusion af dansk udbytteskat. Han har oplyst, at han ikke har indven-dinger mod at pengene konfiskeres, hvis han findes skyldig. Herefter og efter de dokumenterede oplysninger finder retten det godtgjort, at indeståenderne stammer fra de overførsler vedrørende refusion af udbytteskat, som Virksomhed LLP (tidligere Virksomhed Ltd.) modtog fra de danske skattemyndigheder. Herefter og efter bevisresultatet, skal indeståenderne konfiskeres efter straffelovens § 75, stk. 1, jf. § 76, stk. 1.

*Konfiskation hos Virksomhed Ltd. 5:*

Tiltalte 1 har forklaret, at han ejer selskabet, og at ejendommen er erhvervet for midler, der stammer fra refusion af dansk udbytteskat. Han har oplyst, at han ikke har invendinger mod, at ejendommen konfiskeres, hvis han findes skyldig. Herefter og efter de dokumenterede oplysninger finder retten det godtgjort, at ejendommen er erhvervet for midler, der stammer fra de overførsler vedrørende refusion af udbytteskat, som Virksomhed LLP (tidligere Virksomhed Ltd.) modtog fra de danske skattemyndigheder. Herefter og efter bevisresultatet, skal ejendom-men konfiskeres efter straffelovens § 75, stk. 1, jf. § 76, stk. 1.

*Konfiskation hos Virksomhed Ltd. 6:*

Tiltalte 1 har forklaret, at han ejer selskabet, og at ejendommen er erhvervet for midler, der stammer fra refusion af dansk udbytteskat. Han har oplyst, at han ikke har invendinger mod, at ejendommen konfiskeres, hvis han findes skyldig. Herefter og efter de dokumenterede oplysninger finder retten det godtgjort, at ejendommen er erhvervet for midler, der stammer fra de overførsler vedrørende refusion af udbytteskat, som Virksomhed LLP (tidligere Virksomhed Ltd.) modtog fra de danske skattemyndigheder. Herefter og efter bevisresultatet, skal ejendom-men konfiskeres efter straffelovens § 75, stk. 1, jf. § 76, stk. 1.

*Konfiskation hos Virksomhed Ltd. 7:*

Tiltalte 1 har forklaret, at han ejer selskabet, og at ejendommen er erhvervet for midler, der stammer fra refusion af dansk udbytteskat. Han har oplyst, at han ikke har invendinger mod, at ejendommen konfiskeres, hvis han findes skyldig. Herefter og efter de dokumenterede oplysninger finder retten det godtgjort, at ejendommen er erhvervet for midler, der stammer fra de overførsler vedrørende refusion af udbytteskat, som Virksomhed LLP (tidligere Virksomhed Ltd.) modtog fra de danske skattemyndigheder. Herefter og efter bevisresultatet, skal ejendom-

men konfiskeres efter straffelovens § 75, stk. 1, jf. § 76, stk. 1.

*Konfiskation hos* <u>*Virksomhed Ltd. 8:*</u>

<u>Tiltalte 1</u> har forklaret, at han ejer selskabet, og at ejendommen er erhvervet for midler, der stammer fra refusion af dansk udbytteskat. Han har oplyst, at han ikke har indvendinger mod, at ejendommen konfiskeres, hvis han findes skyldig. Herefter og efter de dokumenterede oplysninger finder retten det godtgjort, at ejendommen er erhvervet for midler, der stammer fra de overførsler vedrørende refusion af udbytteskat, som <u>Virksomhed LLP (tidligere Virksomhed Ltd.)</u> modtog fra de danske skattemyndigheder. Herefter og efter bevisresultatet, skal ejendom-men konfiskeres efter straffelovens § 75, stk. 1, jf. § 76, stk. 1.

*Konfiskation hos* <u>*Virksomhed Ltd. 9:*</u>

<u>Tiltalte 1</u> har forklaret, at han ejer selskabet, og at ejendommen er erhvervet for midler, der stammer fra refusion af dansk udbytteskat. Han har oplyst, at han ikke har indvendinger mod, at ejendommen konfiskeres, hvis han findes skyldig. Herefter og efter de dokumenterede oplysninger finder retten det godtgjort, at ejendommen er erhvervet for midler, der stammer fra de overførsler vedrørende refusion af udbytteskat, som <u>Virksomhed LLP (tidligere Virksomhed Ltd.)</u> modtog fra de danske skattemyndigheder. Herefter og efter bevisresultatet, skal ejendom-men konfiskeres efter straffelovens § 75, stk. 1, jf. § 76, stk. 1.

*Konfiskation hos* <u>*Virksomhed Ltd. 10:*</u>

<u>Tiltalte 1</u> har forklaret, at han ejer selskabet, og at ejendommen er erhvervet for midler, der stammer fra refusion af dansk udbytteskat. Han har oplyst, at han ikke har indvendinger mod, at ejendommen konfiskeres, hvis han findes skyldig. Herefter og efter de dokumenterede oplysninger finder retten det godtgjort, at ejendommen er erhvervet for midler, der stammer fra de overførsler vedrørende refusion af udbytteskat, som <u>Virksomhed LLP (tidligere Virksomhed Ltd.)</u> modtog fra de danske skattemyndigheder. Herefter og efter bevisresultatet, skal i ejendom-men konfiskeres efter straffelovens § 75, stk. 1, jf. § 76, stk. 1.

*Konfiskation hos* <u>*Virksomhed Ltd. 11:*</u>

<u>Tiltalte 1</u> har forklaret, at han ejer selskabet, og at ejendommen er erhvervet for midler, der stammer fra refusion af dansk udbytteskat. Han har oplyst, at han ikke har indvendinger mod, at ejendommen konfiskeres, hvis han findes skyldig. Herefter og efter de dokumenterede oplysninger finder retten det godtgjort, at ejendommen er erhvervet for midler, der stammer fra de overførsler vedrørende refusion af udbytteskat, som <u>Virksomhed LLP (tidligere Virksomhed Ltd.)</u> modtog fra de danske skattemyndigheder. Herefter og efter bevisresultatet, skal ejendom-men konfiskeres efter straffelovens § 75, stk. 1, jf. § 76, stk. 1.

*Konfiskation hos* <u>*Virksomhed SARL 2:*</u>

Tiltalte 1 har forklaret, at han ejer 58 % af selskabet, at aktiverne stammer fra, og at aktierne er finansieret af midler fra refusion af dansk ud-bytteskat. Han har oplyst, at han ikke har indvendinger mod, at aktiverne konfiskeres, hvis han findes skyldig. Herefter og efter de dokumenterede op-lysninger finder retten det godtgjort, at indeståenderne stammer fra de over-førsler vedrørende refusion af udbytteskat, som Virksomhed LLP (tidligere Virksomhed Ltd.) modtog fra de danske skattemyndigheder, og at aktierne er finansieret af midler fra refusion af dansk udbytteskat. Herefter og efter bevisresultatet, skal indeståenderne og aktierne konfiskeres efter straffelovens § 75, stk. 1, jf. § 76, stk. 1.

*Konfiskation hos Virksomhed Ltd. 13:*

Tiltalte 1 har forklaret, at han ejer selskabet, at aktiverne er finan-sieret af midler fra refusion af dansk udbytteskat. Han har oplyst, at han ikke har indvendinger mod, at aktiverne konfiskeres, hvis han findes skyldig. He-refter og efter de dokumenterede oplysninger finder retten det godtgjort, at aktiverne er finansieret med midler fra de overførsler vedrørende refusion af udbytteskat, som Virksomhed LLP (tidligere Virksomhed Ltd.) modtog fra de danske skattemyndigheder. Herefter og efter bevisresultatet, skal aktiverne konfiskeres efter straffelovens § 75, stk. 1, jf. § 76, stk. 1.

*Konfiskation hos Virksomhed Ltd. 14:*

Tiltalte 1 har forklaret, at han ejer selskabet, og at tilgodehaven-det stammer fra betalinger, han har foretaget med midler fra refusion af dansk udbytteskat. Han har oplyst, at han ikke har indvendinger mod, at akti-vet konfiskeres, hvis han findes skyldig. Herefter og efter de dokumenterede oplysninger finder retten det godtgjort, at tilgodehavendet stammer fra de overførsler vedrørende refusion af udbytteskat, som Virksomhed LLP (tidligere Virksomhed Ltd.) modtog fra de danske skattemyndigheder. Herefter og efter bevisresultatet, skal aktivet konfiskeres efter straffelovens § 75, stk. 1, jf. § 76, stk. 1.

*Konfiskation hos Virksomhed Ltd. 16:*

Tiltalte 1 har forklaret, at han ejer selskabet, og at aktierne er fi-nansieret af midler fra refusion af dansk udbytteskat. Han har oplyst, at han ikke har indvendinger mod, at aktiverne konfiskeres, hvis han findes skyldig. Herefter og efter de dokumenterede oplysninger finder retten det godtgjort, at aktierne er erhvervet for midler fra de overførsler vedrørende refusion af udbytteskat, som Virksomhed LLP (tidligere Virksomhed Ltd.) modtog fra de danske skattemyndigheder. Herefter og efter bevisresultatet, skal aktierne konfiskeres efter straffelovens § 75, stk. 1, jf. § 76, stk. 1.

*Konfiskation hos Virksomhed Ltd. 17:*

Tiltalte 1 har forklaret, at han ejer selskabet, og at aktierne er fi-nansieret af midler fra refusion af dansk udbytteskat. Han har oplyst, at han ikke har indvendinger mod, at aktiverne konfiskeres, hvis han findes skyldig. Herefter og efter de dokumenterede oplysninger finder retten det godtgjort, at aktierne er erhvervet for midler fra de overførsler vedrørende refusion af udbytteskat, som Virksomhed LLP (tidligere Virksomhed Ltd.) modtog fra de danske skattemyndigheder. Herefter og efter bevisresultatet, skal aktierne konfiskeres efter straffelovens § 75, stk. 1, jf. § 76, stk. 1.

*Konfiskation hos Virksomhed Ltd. 19:*

Tiltalte 1 har forklaret, at han ejer selskabet, og at aktierne er fi-nansieret af midler fra refusion af dansk udbytteskat. Han har oplyst, at han ikke har indvendinger mod, at aktiverne konfiskeres, hvis han findes skyldig. Herefter og efter de dokumenterede oplysninger finder retten det godtgjort, at aktierne er erhvervet for midler fra de overførsler vedrørende refusion af udbytteskat, som Virksomhed LLP (tidligere Virksomhed Ltd.) modtog fra de danske skattemyndigheder. Herefter og efter bevisresultatet, skal aktierne konfiskeres efter straffelovens § 75, stk. 1, jf. § 76, stk. 1.

*Konfiskation hos Udenlandsk virksomhed 1:*

Tiltalte 1 har forklaret, at han ejer selskabet, og at aktierne er fi-nansieret af midler fra refusion af dansk udbytteskat. Han har oplyst, at han ikke har indvendinger mod, at aktiverne konfiskeres, hvis han findes skyldig. Herefter og efter de dokumenterede oplysninger finder retten det godtgjort, at aktierne er erhvervet for midler fra de overførsler vedrørende refusion af udbytteskat, som Virksomhed LLP (tidligere Virksomhed Ltd.) modtog fra de danske skattemyndigheder. Herefter og efter bevisresultatet, skal aktierne konfiskeres efter straffelovens § 75, stk. 1, jf. § 76, stk. 1.

*Konfiskation hos Person 1*

*Vedrørende Adresse 18,Wembley:*

Som tidligere anført er betingelserne i straffelovens § 76 a, stk. 1, utvivlsomt opfyldt i forhold til Tiltalte 1, og der kan herefter ske konfiskation af ejendommen hos hans hustru Person 1, medmindre formueaktivet er er-hvervet mere end 5 år før den strafbare handling, som danner grundlag for konfiskation efter stk. 1, eller ægteskabet, samlivsforholdet eller relationen ikke bestod på tidspunktet for erhvervelsen.

Domsmandsretten må lægge til grund, at betingelserne for at bringe de nævn-te undtagelser i anvendelse ikke er opfyldt. Herefter og idet der ikke er om-stændigheder, der godtgør, at ejendommen skulle erhvervet for lovlige mid-ler, jf. straffelovens § 76 a, stk. 4, skal der ske konfiskation hos Person 1 af ejendommen Adresse 18, jf. straffelovens § 76 a, stk. 2, jf. stk. 1.

*Vedrørende Person 1's ideelle anpart af Adresse 17, Wembley:*

Efter de foreliggende oplysninger må det lægges til grund, at ejendommen blev erhvervet senest i juni 2007 og således mere end 5 år før den strafbare handling, der er rejst tiltale for, hvorfor der ikke kan ske konfiskation af ejen-dommen efter straffelovens § 76 a, stk. 2, jf. stk. 1.

Subsidiært er det under hovedforhandlingen gjort gældende, at der skal ske konfiskation i ejendommens friværdi for 125.000 GBP efter straffelovens § 76, stk. 4, idet beløbet, der blev brugt til indfrielse, er modtaget som gave.

Domsmandsretten må vedrørende påstanden om konfiskation efter straffelo-vens § 76, stk. 4, bemærke, at bestemmelsen ikke er nævnt i den konfiskati-onstilkendegivelse, som er forkyndt for Person 1. Herefter og da Person 1 ikke har været til stede under behandlingen af spørgsmålet, finder ret-ten, at der ikke kan ske konfiskation efter denne bestemmelse.

Herefter må retten vurdere, om det er godtgjort, at betingelserne i den mere subsidiære påstand efter straffelovens § 75, stk. 1, jf. § 76, stk. 1, er opfyldt, og at der således er tale om indfrielse med udbytte fra den strafbare handling, som er tilfaldet Person 1 umiddelbart. Domsmandsretten finder, at anklage-myndigheden ikke har godtgjort en sådan direkte sammenhæng mellem refu-sionen af udbytteskat og Person 1's indfrielse af lånet med 125.000 GBP, at betingelserne i straffelovens § 75, stk. 1, jf. § 76, stk. 1, kan anses for op-fyldt.

Endelig er det mest subsidiært gjort gældende, at der kan ske konfiskation af en friværdi svarende til det indfriede beløb efter straffelovens § 76 a, stk. 2, jf. stk. 1.

Domsmandsretten må hertil bemærke, at indfrielsen er sket i gerningsperio-den, og at betingelserne for at foretage delvis konfiskation, således efter det som tidligere er anført, i udgangspunktet opfyldt. Domsmandsretten finder endvidere, at det heroverfor ikke er godtgjort, at indfrielsen er sket for lovli-ge midler, jf. straffelovens § 76 a, stk. 4. Domsmandsretten har herved lagt vægt på, at indfrielsen af lånet i ejendommen således efter det foreliggende er sket med midler, hvor det har formodningen for sig, at de stammer fra den strafbare handling.

Domsmandsretten finder på denne baggrund, at der skal ske konfiskation i ejendommens friværdi for 125.000 GBP, jf. straffelovens § 76 a, stk. 2, jf. stk. 1.

*Konfiskation hos Virksomhed Ltd. 12 (under likvidation):*

Likvidator i selskabet har bekræftet, at Virksomhed Ltd. 14 indskød 6.000.000 GBP og var 80 % ejer af Virksomhed Ltd. 12, som opførte og ejede de ejendomme, hvor 80 % af provenuet fra salget er beslaglagt. Det beslaglagte provenu administreres af likvidator.

Tiltalte 1 har forklaret, at han ejer selskabet Virksomhed Ltd. 14. Domsmandsretten må således lægge til grund, at Tiltalte 1 er den ultimative ejer af provenuet, der administreres af likvida-tor.

Det kan lægges til grund, at indskuddet på 6.000.000 GBP er indbetalt i ger-ningsperioden fra et selskab, som er ejet af Tiltalte 1. Domsmands-retten finder på denne baggrund, at der er tale om formueaktiver overdraget til en juridisk person, som Tiltalte 1 har en bestemmende indfly-delse på. Herefter, og da de øvrige betingelser for at foretage konfiskation efter straffelovens § 76 a, stk. 1, jf. stk. 3, efter det tidligere anførte er op-fyldt, tages anklagemyndigheden anmodning om konfiskation til følge.

Domsmandsretten har noteret sig, at anklagemyndigheden ikke har proteste-ret mod likvidators bemærkninger vedrørende honorar, og bemærker endvi-dere, at afregning for likvidators arbejde må bero på en vurdering efter en-gelsk ret af, om denne ret kan ekstinkveres, og at dette ikke har nogen betyd-ning for, om konfiskationspåstanden kan tages til følge.

*Konfiskation hos Virksomhed SARL 3 (under konkurs):*

Tiltalte 1 har forklaret, at han var seneste ejer selskabet inden det gik konkurs, og at midlerne stammer fra refusion af dansk udbytteskat. He-refter og efter de dokumenterede oplysninger finder retten det godtgjort, at midlerne stammer fra refusion af udbytteskat, som Virksomhed LLP (tidligere Virksomhed Ltd.) modtog fra de danske skattemyndigheder. Herefter og efter bevisresultatet, skal indeståen-det konfiskeres efter straffelovens § 75, stk. 1, jf. § 76, stk. 1.

*Konfiskation hos Virksomhed Ltd. 18:*

Vidne 12 har forklaret navnlig, at han ejer Virksomhed Ltd. 18 Han har bestridt konfiskationskravet og navnlig gjort gældende, at de overførsler af midler, som anklagemyndigheden har dokumenteret, stammer fra overskud fra valutahandler. Han har endvidere forklaret, at kontoen, som der er doku-menteret fra, var en samlekonto hos Virksomhed LLP (tidligere Virksomhed Ltd.) for flere klienter, og at Virksomhed LLP (tidligere Virksomhed Ltd.) havde tilladelse til at have hans midler stående på denne konto.

Domsmandsretten må indledningsvist bemærke, at det påhviler anklagemyn-digheden at bevise, at der er tale om midler, der umiddelbart er tilfaldet ved den strafbare handling, jf. straffelovens § 75, stk. 1, eller er udbytte modtaget

i ond tro, jf. straffelovens § 76, stk. 4.

Domsmandsretten finder, at anklagemyndigheden, der har dokumenteret fra kontooversigter, hvor et større beløb indgår fra en konto i danske kroner, men hvor der tillige fremgår en række andre transaktioner og indsættelser, som der ikke er redegjort for, ikke har dokumenteret, at de midler, som Virksomhed Ltd. 18 modtog, stammede fra det bedrageri med udbytteskat, som Tiltalte 1 er fundet skyldig i. Anklagemyndigheden har endvidere ikke godtgjort, at der er grundlag for at tilsidesætte Vidne 12's forklaring om baggrunden for, at han var berettiget til en udbetaling fra Virksomhed LLP (tidligere Virksomhed Ltd.).

På denne baggrund tages anklagemyndighedens konfiskationspåstand vedrørende konfiskation hos Virksomhed Ltd. 18 ikke til følge.

**Thi kendes for ret:**

Tiltalte 1 straffes med fængsel i 12 år.

Tiltalte 1 frakendes indtil videre retten til at deltage i ledelsen af en erhvervsvirksomhed her i landet eller i udlandet uden at hæfte personligt og ubegrænset for virksomhedens forpligtelser.

Tiltalte 1 udvises af Danmark med indrejseforbud for bestandigt.

Hos Tiltalte 1 konfiskeres:

**1.**
DKK 7.220.164.697 (svarende til 80 % af DKK 9.025.205.871) vedrørende forhold 1 hos **Tiltalte 1**, herunder konfiskation af:

a. Følgende beløb med tillæg af påløbne renter, som indestår på beslaglagte konti i Varengold Bank AG (Tyskland):
(1) EUR 512.227,19 på Konto nr. 1
(2) USD 99.985 på Konto nr. 2
(3) GBP 159.801,62 på Konto nr. 3
(4) AUD 14.100 på Konto nr. 4

b. Følgende beslaglagte faste ejendomme beliggende i Storbritannien: (1) Adresse 1, London
(2) Adresse 2, London
(3) Adresse 3, London
(4) Adresse 4, London
(5) Adresse 5, London

(6) Adresse 6, London (7) Adresse 7, London (8) Adresse 8, London (9) Adresse 9, Harrow
(10) Adresse 10, Plymouth (l3 ) Adresse 11, London (14) Adresse 12, London (15) Adresse 13, London (16) Adresse 14, London (17) Adresse 15, Plymouth (18) Adresse 16, Plymouth (19) Tiltalte 1's Adresse 17, Wembley

**3.**
Hos **Person 1** konfiskeres:

a. Følgende beslaglagte faste ejendom beliggende i Storbritannien: (1) Adresse 18,Wembley: (2) 125.000 GBP i friværdien i Person 1's ideelle anpart af Adresse 17,Wembley

**8.**
Hos **Virksomhed SARL 1** konfiskeres:

a. Følgende beløb med tillæg af påløbne renter, som indestår på beslaglagte konti i ING Luxembourg S.A. (Luxembourg):
(1) EUR 9.582,73 på konto Konto nr. 5 (2) GBP 12l. 700,58 på konto Konto nr. 6 c. følgende beslaglagte aktier i Varengold Bank AG (Tyskland): (1) 160.000 stk. på depot/konto Konto nr. 7

**9.**
Hos **Virksomhed Ltd. 2** konfiskeres:

a. Følgende beslaglagte beløb med tillæg af påløbne renter, som indestår på depot i Varengold Bank AG (Tyskland):
(1) EUR 7.650

b. Følgende beløb med tillæg af påløbne renter, som indestår på beslaglagte konti i Varengold Bank AG (Tyskland):
(1) EUR 28.475,01 på Konto nr. 8 (2) USD 18.996,55 på Konto nr. 9

c. Følgende beslaglagte aktier i Varengold Bank AG (Tyskland): (1) 973.812 stk. på depot/konto nr. Konto nr. 10 i Dero Bank AG

**10.**
Hos **Virksomhed Ltd. 3** konfiskeres:

a. Følgende beløb med tillæg af påløbne renter, som indestår på beslaglagte konti i Varengold Bank AG (Tyskland):
(1) EUR 168.142.082,43 på Konto nr. 11
(2) EUR 56.555,38 på Konto nr. 12
(3) GBP 14.999.916,63 på Konto nr. 13

**11.**
Hos **Virksomhed Ltd. 4** konfiskeres:

a. Følgende beløb med tillæg af påløbne renter, som indestår på beslaglagt konto i Varengold Bank AG (Tyskland):
(1) EUR 50.100.000 på Konto nr. 14

**13.**
Hos **Virksomhed Ltd. 5** konfiskeres:

a. Følgende beslagte faste ejendom beliggende i Storbritannien: (1) Adresse 19, London

**14.**
Hos **Virksomhed Ltd. 6** konfiskeres:

a. Følgende beslagte faste ejendom beliggende i Storbritannien: (1) Adresse 20, London

**15.**
Hos **Virksomhed Ltd. 7** konfiskeres:

a. Følgende beslagte faste ejendom beliggende i Storbritannien: (1) Adresse 21, London

**16.**
Hos **Virksomhed Ltd. 8** konfiskeres:

a. Følgende beslagte faste ejendom beliggende i Storbritannien: (1) Adresse 22, London

**17.**
Hos **Virksomhed Ltd. 9** konfiskeres:

a. Følgende beslagte faste ejendom beliggende i Storbritannien: (1) Adresse 23, London

**18.**
Hos **Virksomhed Ltd. 10** konfiskeres:

a. Følgende beslagte faste ejendom beliggende i Storbritannien: (1) Adresse 24, London

**19.**
Hos **Virksomhed Ltd. 11** konfiskeres:

a. Følgende beslagte faste ejendom beliggende i Storbritannien: (1) Adresse 25, London

**21.**
Hos **Virksomhed Ltd. 12** konfiskeres:

a. De beslagte 80 % af provenuet fra salg af Virksomhed Ltd. 12's faste ejendomme beliggende i Storbritannien: (1) 1 til 13 (ulige numre) Vej 1 samt 58, 60, 62, 64, 66, 68 og 70 Vej 2, London, Nr. 1

**23.**
Hos **Virksomhed SARL 2** konfiskeres:

a. Følgende beløb med tillæg af påløbne renter, som indestår på beslaglagt konto i ING Luxembourg S.A. (Luxembourg):
(1) EUR 888.240,52 på Konto nr. 15 b. Følgende beslaglagte aktier i Dero Bank AG (Tyskland): (1) 9.675.000 stk. på depot/konto Konto nr. 16 i Dero Bank AG

**24.**
Hos **Virksomhed SARL 3** konfiskeres:

a. Følgende beløb med tillæg af påløbne renter, som indestår på beslaglagt konto i ING Luxembourg S.A. (Luxembourg):
(1) EUR 20.325,20 på Konto nr. 17

**27.**

Hos **Virksomhed Ltd. 13** konfiskeres:

a. Følgende beslaglagte Contigent Convertible obligationer i Varengold Bank AG (Tyskland):
(1) EUR 5.000.000 i depot nr. Konto nr. 18 Side 10

**28.**
Hos **Virksomhed Ltd. 14** konfiskeres:

a. Følgende beslaglagte tilgodehavende med tillæg af påløbne renter hos Virksomhed Ltd. 15, som indestår på politiets depot/konto: (1) EUR 3.075.000

**30.**
Hos **Virksomhed Ltd. 16** konfiskeres:

a. Følgende beslaglagte aktier i Varengold Bank AG (Tyskland): (1) 176.963 stk. på depot/konto Konto nr. 19 i Varengold Bank AG

**31.**
Hos **Virksomhed Ltd. 17** konfiskeres:

a. Følgende beslaglagte aktier i Varengold Bank AG (Tyskland): (1) 84.174 stk. på depot/konti Konto nr. 20/Konto nr. 21 i Varengold Bank AG

**32.**
**Virksomhed Ltd. 18** frifindes for påstanden om konfiskation.

**33.**
Hos **Virksomhed Ltd. 19** konfiskeres:

a. Følgende beslaglagte aktier i Varengold Bank AG (Tyskland): (1) 160.000 stk. på depot/konto Konto nr. 23 i Varengold Bank AG

**36.**
Hos **Udenlandsk virksomhed 1** konfiskeres:

a. Følgende beslaglagte aktier i Varengold Bank AG (Tyskland): (1) 194.446 stk. på depot/konto Konto nr. 24 i Varengold Bank AG

Tiltalte skal betale sagens omkostninger.

Dommer 1