**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

MATTHEW STEIN and JEROME LHOTE,

    Plaintiffs/Counterclaim Defendants,

                *v.*

LUKE MCGEE,

    Nominal Defendant,

SKATTEFORVALTNINGEN,

    Defendant/Counterclaim Plaintiff,

                *v.*

LUKE MCGEE,

    Counterclaim Defendant.

No. 23-CV-02508 (NRB)

**DEFENDANT/COUNTERCLAIM PLAINTIFF**
**SKATTEFORVALTNINGEN'S PRETRIAL MEMORANDUM OF LAW**

HUGHES HUBBARD & REED LLP
William R. Maguire
Marc A. Weinstein
Neil J. Oxford
Gregory C. Farrell
One Battery Park Plaza
New York, New York 10004
(212) 837-6000

*Counsel for Defendant / Counterclaim*
*Plaintiff Skatteforvaltningen*

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ...................................................................................................1

ARGUMENT .............................................................................................................................2

     I.     McGee waived any unconscionability defense. ........................................................2

     II.    McGee's unconscionability defense is frivolous. ....................................................3

     III.   CPLR § 3218's residency requirement does not apply in this action. .......................7

     IV.   Counterclaim defendants' argument that SKAT must start from scratch on the True-Up Amount is contrary to the settlement agreement. .................................9

CONCLUSION........................................................................................................................13

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Bentivoglio v. Event Cardio Grp., Inc.*, No. 18-cv-2040 (PKC), 2021 WL 736811
(S.D.N.Y. Feb. 24, 2021) ...................................................................................................4

*Breco Env't Contractors, Inc. v. Town of Smithtown*, 307 A.D.2d 330 (2d Dep't
2003) ..................................................................................................................................2

*Don King Prods., Inc. v. Douglas*, 742 F. Supp. 778 (S.D.N.Y. 1990)...........................................4

*EMA Fin., LLC v. 5barz Int'l, Inc.*, No. 18-CV-4995 (VEC), 2019 WL 8503357
(S.D.N.Y. Sept. 18, 2019) .................................................................................................3

*Express Trade Cap., Inc. v. Horowitz*, 198 A.D.3d 529 (1st Dep't 2021)..............................1, 7, 8

*Gillman v. Chase Manhattan Bank, N.A.*, 73 N.Y.2d 1 (1988) ..................................................3, 5

*KLS Diversified Master Fund, L.P. v. McDevitt*, 532 F. Supp.3d 126 (S.D.N.Y.
2021) ..................................................................................................................................4

*In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liability Litig.*, 643 F. Supp. 2d
461 (S.D.N.Y. 2009) .........................................................................................................7

*Minuteman Press Int'l, Inc. v. Matthews*, 232 F. Supp.2d 11 (E.D.N.Y. 2002)............................3

*Mooney v. City of New York*, 219 F.3d 123 (2d Cir.2000) ............................................................2

*Shema Kolainu-Hear Our Voices v. ProviderSoft, LLC*, 832 F. Supp.2d 194
(E.D.N.Y. 2010)................................................................................................................7

*Sol Grp. Mktg. Co. v. Am. President Lines, LTD*, No. 14-Cv-9929 (SHS), 2016
WL 205444 (S.D.N.Y. Jan. 15, 2016) ...........................................................................3, 4

*Sommer v. Fed. Signal Corp.*, 79 N.Y.2d 540 (1992)....................................................................5

*Spinelli v. N.F.L.*, 903 F.3d 185 (2d Cir. 2018) ........................................................................3, 7

*Stein v. Skatteforvaltningen*, No. 23 Civ. 2508 (NRB), 2024 WL 382091
(S.D.N.Y. Feb. 1, 2024)....................................................................................................7

*Tokio Marine v. Macready*, 803 F. Supp.2d 193 (E.D.N.Y. 2011) ...............................................3

*Torres v. Monsalve*, No. 724211, 2021 N.Y. Misc. LEXIS 29744 (Sup. Ct.
Queens Cty. March. 31, 2021).........................................................................................8

*U.S. v. Rahmankulov*, No. 20-CR-653 (RA), 2025 WL 326495 (S.D.N.Y. Jan. 28, 2025) ..........................................................................................................7

*Upfront Megatainment, Inc. v. Thiam*, No. 652156, 2022 WL 20209718 (Sup. Ct. N.Y. Cty. Dec. 16, 2022) .............................................................................8

*Upfront Megatainment, Inc. v. Thiam*, 235 A.D.3d 516 (1st Dep't 2025) ................................7, 8

*VoiceAge Corp. v. RealNetworks, Inc.*, 926 F. Supp.2d 524 (S.D.N.Y. 2013) ..............................6

**Statutes and Rules**

CPLR § 3218 .............................................................................................................1, 7, 8

CPLR § 3218(a)(1) .............................................................................................................8

Defendant-counterclaim plaintiff Skatteforvaltningen ("SKAT") respectfully submits this pretrial memorandum of law in response to plaintiffs-counterclaim defendants Stein and Lhote's and counterclaim defendant McGee's Joint Preliminary Proposed Findings of Fact and Conclusions of Law (ECF No. 152, "Joint Proposed Findings") and McGee's Preliminary Proposed Supplemental Conclusions of Law (ECF No. 161, "McGee Supplement").

## PRELIMINARY STATEMENT

SKAT submits this pretrial memorandum of law to address three discrete legal issues raised in counterclaim defendants' joint proposed conclusions of law and McGee's supplemental conclusions of law.

First, McGee waived the unconscionability affirmative defense he raised for the first time in his supplemental conclusions of law by failing to plead it in his answer to SKAT's counterclaims. And even if he hadn't waived it, the defense has no merit. McGee was represented by two law firms during the negotiations that led to his signing the supposedly unconscionable settlement agreement—Wachtell, Lipton, Rosen & Katz, which jointly represented McGee, Stein, Lhote, and the other Covered Parties, and Akin, Gump, Strauss, Hauer & Feld LLP, which represented just McGee. And there is nothing unconscionable about McGee agreeing to be jointly and severally liable with Stein and Lhote for the Final Settlement Amount to settle SKAT's claims under which the three of them would have been jointly and severally liable for the full amount of SKAT's damages caused by their fraudulent refund scheme, which exceeded greatly the Final Settlement Amount.

Second, none of the cases on which counterclaim defendants rely contradicts the First Department's holding in *Express Trade Cap., Inc. v. Horowitz* that the New York residency requirement added to CPLR § 3218 in the 2019 amendment does not preclude entry of a confession of judgment against a nonresident as part of an action.

Finally, counterclaim defendants' argument, presented through Stein's witness statement, that SKAT must recreate the Covered Parties' true-up spreadsheets to prove the True-Up Amount is contrary to the true-up dispute resolution provisions in the agreement. The agreement provides for submitting discrete true-up disputes to, in this instance, the Court, not redoing the true-up process entirely in the event of a dispute. For those matters relevant to calculating the Covered Parties' Net Proceeds that were undisputed during the true-up process, there is nothing for the Court to decide.

## ARGUMENT

## I.    McGee waived any unconscionability defense.

McGee argues that the terms of the settlement agreement under which he agreed, together with Stein and Lhote, to pay SKAT the full Subsequent Cash Payment Amount and that the three of them would be jointly and severally liable for a failure to pay that amount are unconscionable. (*See generally* McGee Suppl. § A.) But even setting aside for a moment its utter lack of merit, McGee waived any such defense by failing to plead it in his answer to SKAT's counterclaims.

Unconscionability is an affirmative defense under New York law. *See, e.g.*, *Breco Env't Contractors, Inc. v. Town of Smithtown*, 307 A.D. 2d 330, 331 (2d Dep't 2003) (affirming denial of motion for leave to amend answer "to assert the affirmative defense of unconscionability"). And "a failure to plead an affirmative defense," such as unconscionability, "results in the waiver of that defense and its exclusion from the case." *Mooney v. City of New York*, 219 F. 3d 123, 127 n. 2 (2d Cir. 2000) (internal quotation omitted).

McGee's newfound unconscionability defense makes its first appearance in this case in his Proposed Supplemental Conclusions of Law. Nowhere in his answer to SKAT's counterclaims did McGee allege that the settlement agreement, letter agreement, or any term of either was unconscionable. (*See generally* McGee's Answer, Defenses, & Affirmative Defenses,

ECF No. 93.)  Nor does McGee offer any explanation for why he waited until now, a little over three weeks before trial, to first raise the defense.  "Because" McGee "failed to plead" the "unconscionability" "defense in [his] [a]nswer . . . and because [he] neither sought nor received consent from [SKAT] or the Court to assert it at this late stage, the defense has been waived and" should be "excluded from the case."  *EMA Fin., LLC v. 5barz Int'l, Inc.*, No. 18-CV-4995 (VEC), 2019 WL 8503357, at *7 (S.D.N.Y. Sept. 18, 2019).[1]

## II.    McGee's unconscionability defense is frivolous.

Even if McGee had not waived it—which he did—his new unconscionability defense is entirely meritless.  A contract or contractual provision may be deemed unconscionable "only where it is 'both procedurally and substantively unconscionable when made.'"  *Spinelli v. N.F.L.*, 903 F.3d 185, 208 (2d Cir. 2018) (quoting *Gillman v. Chase Manhattan Bank, N.A.*, 73 N.Y.2d 1, 10 (1988)).[2]  Procedural unconscionability "requires an examination of the contract formation process and the alleged lack of meaningful choice," while substantive unconscionability concerns "the substance of the bargain to determine whether the terms were unreasonably favorable to the party against whom unconscionability is urged."  *Gillman*, 73 N.Y.2d at 11-12.  McGee cannot show how the settlement agreement was either procedurally or substantively unconscionable.

---

1.  *See also, e.g.*, *Tokio Marine v. Macready*, 803 F. Supp.2d 193, 199 (E.D.N.Y. 2011) ("Because [defendants] failed to raise the affirmative defense" of unconscionability "in their answer, and have provided no cause for their failure to do so, it is waived."); *Minuteman Press Int'l, Inc. v. Matthews*, 232 F. Supp.2d 11, 17 (E.D.N.Y. 2002) ("Since Defendants failed to raise this [unconscionability] defense in their answer, and have provided no cause as to why it could not have been raised earlier, it is deemed waived and the Court will not consider this defense in deciding Plaintiff's motion for summary judgment.").

2.  *See also, e.g.*, *Sol Grp. Mktg. Co. v. Am. President Lines, LTD*, No. 14-Cv-9929 (SHS), 2016 WL 205444, at *7 (S.D.N.Y. Jan. 15, 2016) (plaintiff's "failure to allege procedural unconscionability and its status as a sophisticated party are enough to dismiss its request for a declaration that the liquidated damages clause is unenforceable").

For instance, "New York courts have found that procedural unconscionability does not exist where 'the party complaining is commercially sophisticated,'" such as where the party "was represented at negotiation by capable lawyers." *Bentivoglio v. Event Cardio Grp., Inc.*, No. 18-cv-2040 (PKC), 2021 WL 736811, at *6 (S.D.N.Y. Feb. 24, 2021) (quoting *Sol Grp.*, 2016 WL 205444 at *7).[3] McGee, himself a sophisticated party who at the time of the negotiations was the chief executive officer of a "medical supply company," was represented in the settlement negotiations by two sets of more than capable lawyers. (McGee Witness Statement, ECF No. 151, ¶¶ 3-12, 33-34.) Wachtell, Lipton, Rosen & Katz ("Wachtell") represented collectively McGee, Stein, Lhote and the other potential settling parties. (*Id.* ¶ 34.) And McGee himself was "individually represented" in the negotiations "by the law firm Akin, Gump, Strauss, Hauer & Feld LLP." (*Id.*)

And, even on his own telling, McGee did not lack a meaningful choice in deciding to enter the settlement. Represented by these two sets of sophisticated counsel, when SKAT "stated" "[t]owards the end of 2018 or the beginning of 2019" "that it would no longer continue settlement discussions that involved obtaining a commitment by SØIK," McGee "decided to continue the negotiations with SKAT out of a desire to solve any problems with the Danish government and to mitigate any criminal liability by showing [his] desire to return money to, and cooperate with, Danish authorities." (*Id.* ¶¶ 45-46.) But there was nothing unfair about SKAT refusing to condition the settlement on SØIK, a separate Danish government agency over which

---

3.  *See also, e.g., KLS Diversified Master Fund, L.P. v. McDevitt*, 532 F. Supp.3d 126, 137 (S.D.N.Y. 2021) ("McDevitt was represented by counsel, he engaged in arms-length negotiations, and the record shows that McDevitt was seeking investors and pursuing KLS as opposed to the other way around."); *Don King Prods., Inc. v. Douglas*, 742 F. Supp. 778, 780 (S.D.N.Y. 1990) (no procedural unconscionability where there was "no allegation here that deceptive or high-pressure tactics were employed in concluding the contracts, that contract terms were concealed in fine print, or that there was a gross asymmetry in the experience and education of the parties, each of whom was represented by counsel throughout the course of their arms-length negotiations").

SKAT has no authority, agreeing not to pursue criminal charges. McGee does not claim that SKAT used "deceptive or high-pressured tactics" or that the payment provisions in the agreement to which he now objects were "fine print in the contract." *Gillman*, 73 N.Y.2d at 11. And McGee offers no reason why he was not free to walk away from the negotiations at that or any other time and dispute SKAT's claims in litigation, as others did. Instead, McGee decided to enter the settlement, knowing full well that it did not cover his potential criminal liability and that under its terms, he may end up paying more than he received from the fraudulent scheme.

Nor do the agreement's provisions making Stein, Lhote and McGee jointly and severally liable for the Subsequent Cash Payment Amount come close to being substantively unconscionable, *i.e.*, "grossly unreasonable" or "outrageous." *Gillman*, 73 N.Y.2d at 10, 12. McGee did not, as he argues, receive "*grossly* inadequate consideration from SKAT in executing the Settlement Agreement." (McGee Suppl. at 10.) Before the settlement, McGee, along with Stein and Lhote, faced massive civil claims by SKAT seeking to hold the three of them jointly and severally liable for the full loss SKAT suffered from their fraudulent tax refund claims. *See, e.g.*, *Sommer v. Fed. Signal Corp.*, 79 N.Y.2d 540, 556 (1992) ("[T]ortfeasors generally are jointly and severally liable for a judgment, meaning that each is responsible for the full amount regardless of culpability."). Under the settlement, SKAT agreed to release those claims in exchange for repayment of just the Covered Parties' Net Proceeds from the scheme, *i.e.*, hundreds of millions of Danish kroner less than the damage they caused SKAT. And in exchange for that concession by SKAT, the parties agreed that all three of Stein, Lhote and McGee would be obligated to pay the Final Settlement Amount in full and would be jointly and severally liable if it were not paid, as they would have been on SKAT's claims if there were no settlement.

McGee thus misses the point in arguing that the agreement is "fundamentally unreasonable" because he supposedly received from the fraudulent scheme only what he now calls, in a gross understatement, "minor benefits," *i.e.*, tens of millions of dollars, "compared to Stein and Lhote." (McGee Suppl. at 11.) In exchange for McGee's promise of payment, SKAT agreed to release McGee from claims under which he could have been liable for much more than even the three of them received collectively, let alone just the amount he himself received. Nothing about McGee paying more than his share of the Net Proceeds, as he agreed to do to settle SKAT's claims, "shocks the conscience" or "confounds the judgment of any person of common sense." (McGee Suppl. at 12 (quotation and alterations omitted).) Just the opposite, it makes perfect sense that McGee's payment obligations under the settlement agreement are based on the amount of his potential liability to SKAT, not just the amount he personally netted from the fraud.

Nor is it of any moment that North Channel Bank was never sold or that McGee "lost his position as an officer and director with his company." (McGee Suppl. at 12-14.) The parties specifically agreed in the letter agreement "that a failure to liquidate an Illiquid Asset by the Final Settlement Payment Date or at a particular price shall not affect the Covered Parties' Designees' obligation to pay the Final Settlement Amount on or before the Final Settlement Payment Date." (Letter Agreement § 3, ECF No. 157-7.) Thus, McGee's "inability to use the proceeds from the liquidation of North Channel Bank and monies [he] would have earned from AdaptHealth" does not, as McGee argues, "frustrate[] the intent behind the execution of the joint and several payment provision." (McGee Suppl. at 14.)

That McGee now may regret agreeing to be jointly and severally liable with Stein and Lhote does not mean the agreement was unconscionable. A "bad bargain, even a terrible

bargain, is not *ipso facto* substantively unconscionable," and the settlement McGee struck was far from a bad bargain. *VoiceAge Corp. v. RealNetworks, Inc.*, 926 F. Supp.2d 524, 532 (S.D.N.Y. 2013).[4]  And, finally, even assuming *arguendo* that the agreement was unconscionable, McGee knowingly accepted the benefits of the agreement, including SKAT's release of its claims against him, with knowledge of its terms—including of the joint and several liability provisions—thereby ratifying the agreement. *See Spinelli*, 903 F.3d at 208.  For instance, contrary to his current position that he never anticipated paying more than his share of the Net Proceeds, in April 2021, when SØIK was considering whether to indict him, McGee's counsel touted to SØIK that McGee already had "fully repaid" the amount he received "to SKAT" and that "McGee is prepared to pay more than he received."  (Pl. Ex. 27, ECF No. 159-18.)[5]

### III.    CPLR § 3218's residency requirement does not apply in this action.

In denying counterclaim defendants' motion to dismiss SKAT's counterclaims, the Court noted that "New York courts have found that the newly added residency requirement" to CPLR § 3218 "only concerns the entry of judgment against a nonresident 'without an action' and does not apply in cases like this one where a party seeks entry of a confessed judgment by filing an action."  *Stein v. Skatteforvaltningen*, No. 23 Civ. 2508 (NRB), 2024 WL 382091, at \*6 (S.D.N.Y. Feb. 1, 2024) (citing *Express Trade Cap., Inc. v. Horowitz*, 198 A.D.3d 529, 530 (1st Dep't 2021)).  In their proposed conclusions of law, counterclaim defendants point to a single

---

4.    *See also Shema Kolainu-Hear Our Voices v. ProviderSoft, LLC*, 832 F. Supp.2d 194, 202 (E.D.N.Y. 2010) ("[E]ven a seemingly lopsided bargain is rarely enough, on its own, to void a contract's terms.").

5.    McGee provides no authority for his argument that the Court should rewrite the settlement agreement to apportion any judgment against him based on his supposed relative culpability compared to Stein and Lhote for the underlying fraud.  (McGee Suppl. at 15-16 (citing *U.S. v. Rahmankulov*, No. 20-CR-653 (RA), 2025 WL 326495, at \*7-10 (S.D.N.Y. Jan. 28, 2025) (criminal restitution liability); *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liability Litig.*, 643 F. Supp. 2d 461, 464-71 (S.D.N.Y. 2009) (tort liability)).)

decision—*Upfront Megatainment, Inc. v. Thiam*, 235 A.D.3d 516, 516 (1st Dep't 2025)—to argue that "*Express Trade* has not been uniformly followed." (Joint Proposed Findings ¶ 119.) But *Upfront* did not disagree with or otherwise consider the holding in *Express Trade* that "[t]he 2019 amendment to CPLR 3218(a)(1) is inapplicable" where the plaintiff had commenced an action against the nonresident signatory. *Express Trade Cap., Inc.*, 198 A.D.3d at 530.

The dispute in *Upfront* concerned the plaintiffs' entitlement to attorneys' fees in a plenary action to enforce a settlement agreement, not whether the judgment by confession, which may not even have been signed, could be entered. *See Upfront Megatainment, Inc. v. Thiam*, No. 652156, 2022 WL 20209718, at *1 (Sup. Ct. N.Y. Cty. Dec. 16, 2022). The First Department held that plaintiffs could not "rely on defendant's confession of judgment . . . to collect attorneys' fees" because of the amendment to CPLR 3218 and because "[t]he confession also was not an agreement to pay attorneys' fees." *Upfront Megatainment, Inc. v. Thiam*, 235 A.D.3d 516, 516 (1st Dep't 2025). Nor did the underlying settlement agreement entitle the plaintiffs to attorneys' fees in a plenary action to enforce the settlement agreement. *Id.* at 516-17. Here, by contrast, SKAT seeks entry of counterclaim defendants' confession of judgment in the amount they otherwise agreed to pay under the settlement agreement in case of an Event of Default and as authorized by the settlement agreement.

Counterclaim defendants also note that the court in *Torres v. Monsalve* denied entry of a confessed judgment based on the 2019 amendment. No. 724211, 2021 N.Y. Misc. LEXIS 29744 at *3 (Sup. Ct. Queens Cty. Mar. 31, 2021). But in *Torres*, the court just rejected the "plaintiff's assertion that the Confession of Judgment may be filed with the Clerk of the County designated in a nonresident defendant's affidavit" and did not consider whether the amendment precluded entry of the confession of judgment as part of an action. *See generally id.*

**IV.    Counterclaim defendants' argument that SKAT must start from scratch on the True-Up Amount is contrary to the settlement agreement.**

Under section 2(e) of the settlement agreement, the Covered Parties were required "to use their best efforts to provide" SKAT "with documentation sufficient to establish the total amount of Net Proceeds," the parties agreed to "cooperate to establish the Gross Reclaims and Net Proceeds received by each Pension Plan," and "[a]t the end of this process, the Covered Parties' Designees," *i.e.* Stein, Lhote and McGee, were supposed to "provide and certify the accuracy of a final list of Net Proceeds received by each Covered Party with respect to each Pension Plan." (Settlement Agreement § 2(e)(i).)

As part of this process, the Covered Parties, through their counsel at Wachtell, provided to SKAT true-up spreadsheets setting forth the Covered Parties' calculations for each plan's Gross Reclaims and supposed Net Proceeds. Each of the 80 excel spreadsheets contains dozens of tabs and thousands of separate line entries and calculations, including the Gross Reclaims for that plan (*i.e.*, the amount SKAT paid in total to that plan) and each expense the Covered Parties claimed that particular plan was entitled to deduct under Section 2(e). (*See* Witness Statement of Marc E. Landy ("Landy Stmt."), ECF No. 166, ¶ 6.) Through their true-up spreadsheets, the Covered Parties determined that their Net Proceeds amounted to DKK 1,576,008,293.39, or DKK 26,008,293.39 more than the initial DKK 1.55 billion Preliminary Settlement Amount. (*Id.*, ¶ 9.)

SKAT retained a consulting firm to review each line item in and the supporting documentation for the 80 true-up spreadsheets. Ultimately, SKAT determined that the true-up spreadsheets were in large measure accurate and supported by documentation, and that Wachtell had largely employed appropriate methodologies in making the calculations. SKAT identified

certain categories of expenses that in SKAT's view are not permissible deductions under Section 2(e), which amount to DKK 27,593,713.67.  (*See generally* Landy Stmt.; *id.*, at ¶ 43.)

The agreement contemplated that disputes may arise from this true-up process.  Section 10(a) provides that for "any claim, controversy or dispute that amount to less than [DKK 20 million] arising out of or relating to the True-Up process, . . . a 'True-Up Arbitrator' shall be appointed."  (Settlement Agreement, § 10(a).)  For disputes over DKK 20 million, the parties agreed that such matters "may by mutual agreement" be presented to a True-Up Arbitrator "or, failing such mutual agreement, any Party may pursue the resolution of such matter through other available remedies in a Selected Court," defined as this Court in the first instance.  (*Id.* §§ 10(a), 12.)

In his witness statement, Stein identifies four true-up disputes (Witness Statement of Matthew R. Stein ("Stein Stmt."), ECF No. 156, ¶ 76), and suggests that because the true-up process was never completed, *i.e.*, Stein, Lhote and McGee never certified a final list of Net Proceeds, SKAT must now start over to establish any True-Up Amount, even though Stein, Lhote and McGee admitted during the true-up process that the True-Up Amount was at least approximately DKK 26 million.  (*Id.*, ¶¶ 68-74.)  Thus, Stein complains that SKAT's expert's report did not "specify an amount of Gross Reclaims" or calculate the total amount of the Covered Parties' expenses or other amounts required to be deducted to determine the Net Proceeds, as if doing so were necessary to resolving the parties' disputes over the True-Up Amount.  (*Id.*, ¶ 70.)

But the true-up dispute resolution provisions in the agreement clearly contemplate that in the event of such a dispute, the True-Up Arbitrator or the Court would resolve just the dispute, not determine every amount necessary to calculate the Net Proceeds.  Thus, the agreement

provides for "any claim, controversy, or dispute" over DKK 20 million, "any Party may pursue

the resolution of such matter," *i.e.*, the claim, controversy, or dispute, "through . . . available

remedies" in this Court. (Settlement Agreement § 10(a).) Consistent with the agreement, SKAT

seeks the Court's determination of just what remained in dispute with respect to the True-Up

Amount when plaintiffs initiated this lawsuit. (*See* SKAT's Proposed Findings, ECF No. 163,

¶¶ 22-32.) The baseline is the true-up spreadsheets the Covered Parties produced to SKAT,

through their counsel at Wachtell, setting forth each plan's Gross Reclaims and supposed Net

Proceeds. To the extent the Gross Reclaims or a particular expense or other deduction is not in

dispute, both the agreement and common sense dictate that SKAT is not required to reinvent, and

the Court is not required to consider, the thousands of line entries and calculations underlying the

true-up spreadsheets. Not to mention the huge waste of the Court's and the parties' resources

that would entail were it otherwise. For example, while it is certainly true that SKAT's forensic

expert did not provide his own independent calculation of Gross Reclaims, *i.e.*, the starting point

for Net Proceeds, there was no need for him to do so because SKAT verified, and thus SKAT

does not dispute, the amount of the Gross Reclaims set forth in the Covered Parties' true-up

spreadsheets. The same is true for all the other Covered Parties' expenses and deductions that

SKAT does not dispute.

      Stein's argument that SKAT is somehow now required to recreate the Covered Parties'

own true-up spreadsheets to prove the True-Up Amount borders on the absurd. The agreement,

as only makes sense, imposed on the Covered Parties, not SKAT, the obligation to "use best

efforts" to produce documents "sufficient to establish the total amount of Net Proceeds."

(Settlement Agreement § 2(e)(i).) And if the parties were required to start the true-up process

over to resolve a true-up dispute, that would render the expedited arbitration provisions to which

the parties agreed entirely unworkable. For any true-up dispute submitted to a True-Up Arbitrator, the parties agreed that they would have only five business days "to make their respective submissions concerning the matter in dispute," "after which the True-Up Arbitrator . . . shall schedule a hearing to be held within" five business days. (*Id.* § 10(c).) Any hearing was required to be "concluded in a single day" and the True-Up Arbitrator required to issue the decision within five business days of receipt of the parties' submissions or the hearing date, whichever is later. (*Id.*) The parties obviously intended such expedited procedures to resolve discrete disputes, not determine the whole True-Up Amount.

Of the four purported true-up disputes identified by Stein, two involve claims that were never in dispute, and thus cannot be raised now. First, Stein takes issue with the allocation of fees between Denmark and Belgium for accounts where there was purported trading activity in both Danish and Belgian securities. (Stein Stmt., ¶ 76(b).) Yet the Covered Parties' own true-up spreadsheets provided to SKAT did just that—they allocated fees for accounts in which there was purported Danish and non-Danish trading. (Landy Stmt., ¶¶ 25-26, 33-34.) SKAT's expert, however, determined that the Covered Parties did not capture all Belgian trading activity and as a result over-allocated some of the fees to Denmark. (*Id.*, ¶¶ 27-32, 35-37.) Thus, the only dispute stemming from the true-up process for the Court to resolve is whether SKAT's additional calculation is correct or not. Second, Stein now claims that SKAT "makes a fundamental error" in connection with attributing certain expenses to non-covered parties in relation to pension plans for which Stein and Lhote, as well as two non-covered parties, were equal beneficiaries. (Stein Stmt., ¶ 76(c).) But once again, the Covered Parties calculated this very allocation of expenses to non-covered parties in their true-up spreadsheets based on the percentage ownership of each partner, and SKAT determined that they did so correctly. No dispute existed for this Court to

resolve on this issue. The Court should not consider either of these new arguments, as the true-up dispute resolution procedures in the Settlement Agreement do not permit one party to make up new disputes during the course of the resolution procedure.

## CONCLUSION

For the reasons set forth above and in SKAT's proposed findings of fact and conclusions of law, the Court should award judgment in favor of SKAT.

Dated: New York, New York          HUGHES HUBBARD & REED LLP
   April 16, 2025

            By: /s/ Marc A. Weinstein_____
              William R. Maguire
              Marc A. Weinstein
              Neil J. Oxford
              Gregory C. Farrell
              One Battery Park Plaza
              New York, New York 10004-1482
              Telephone: (212) 837-6000
              Fax: (212) 422-4726
              bill.maguire@hugheshubbard.com
              marc.weinstein@hugheshubbard.com
              neil.oxford@hugheshubbard.com
              gregory.farrell@hugheshubbard.com

              *Counsel for Defendant / Counterclaim*
              *Plaintiff Skatteforvaltningen*

282935835