UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MATTHEW STEIN and JEROME LHOTE,                  23 Civ. 2508 (NRB)

                          Plaintiffs,

                v.

SKATTEFORVALTNINGEN,

                          Defendant,
                and

LUKE MCGEE,

                          Nominal Defendant.

SKATTEFORVALTNINGEN,

                Counterclaim Plaintiff,

                v.

MATTHEW STEIN, JEROME LHOTE, and
LUKE MCGEE,

                Counterclaim Defendants.

## STEIN AND LHOTE'S POST-TRIAL PROPOSED
## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Daniel W. Levy
Olivia G. Visconti
MCKOOL SMITH P.C.
1301 Avenue of the Americas
32nd Floor
New York, New York  10019
Telephone: (212) 402-9400

*Attorneys for Plaintiffs-Counterclaim*
*Defendants Matthew Stein and*
*Jerome Lhote*

# **TABLE OF CONTENTS**

**Paragraphs**

Citation Conventions.................................................... 1

Evidentiary Objections Requiring Court Resolution ................................................. 2

SKAT's Objections Regarding Translations Offered By
Plaintiffs And McGee ........................................................ 8

**Proposed Findings of Fact**

Summary........................................................................ 17

The Parties ................................................................... 35

Events Leading Up to the May 2019 Settlement With SKAT .................... 44

The Settlement Agreement and the Letter Agreement................................. 77

Initial Performance by the Parties .................................................86

Obligations After the Initial Cash Payment
and the 2019 Affidavit of Confession of Judgment ....................................100

Section 8(f) of the Settlement Agreement .................................................. 115

SKAT's Written Communications with SØIK and May 2019
the Press Release........................................................ 124

SKAT's September 2019 Press Release.................................................... 156

The Unissued Joint November 2019 Press Release .................................... 170

Oral Communications................................................................... 182

SKAT Never Intended to Comply with Section 8(f)................................. 196

SØIK "Charges" Stein, Lhote, and McGee Under Danish Law ................ 211

The Efforts to Obtain Information from SKAT About
Compliance with Section 8(f) and SKAT's Failure to Provide It .............. 223

## TABLE OF CONTENTS (cont'd)

**Paragraphs**

The Indictment and the Further Efforts to Obtain
Information About SKAT's Compliance With Section 8(f) ...................... 254

Stein, Lhote, and McGee's Performance After the Initial Cash
Payment ..................................................................................................... 282

**Proposed Conclusions of Law**

The Claims and Defenses ............................................................................ 300

Stein and Lhote's Count I – Rescission...................................................... 306

SKAT Breached Section 8(f) of the Settlement Agreement ...................... 313

The Strong Circumstantial Evidence of A Breach of Section 8(f)............. 347

The "Absolute and Unconditional" Provision
Does Not Excuse SKAT's Breach of Section 8(f) ......................................358

SKAT's Contract Claims Fail For Another Reason ....................................371

SKAT's Breach Was Material ...................................................................... 392

Under Danish Practice and Procedure, SØIK Was *Required*
To Consider the Settlement Agreement In Determining
Whether To Indict ....................................................................................... 406

Stein and Lhote Sought Rescission Within A Reasonable Period
of Time........................................................................................................ 487

The Remedies of Rescission and Rescissory Damages Are
Appropriate ................................................................................................. 514

The Settlement Agreement Is Divisible ..................................................... 521

Stein and Lhote's Count II – Declaratory Judgment
As to The 2021 Affidavit of Confession of Judgment ............................... 535

Summary of the Net Proceeds Process and the
True-Up, if Any, Under the Settlement Agreement ................................... 587

## TABLE OF CONTENTS (cont'd)

**Paragraphs**

Net Proceeds Formula ................................................................. 590

The Course of the True-Up Process ........................................... 596

SKAT Failed To Prove The True-Up Amount............................. 614

The Specific True-Up Disputes Raised by the Parties ............... 624

    True-Up Dispute 1 – Fees Paid After SKAT Stopped
    Making Payments on Reclaim Applications ..................................... 629

    True-Up Dispute 2 - Allocation of Account-Level Fees for
    Accounts Where There Was Danish and Belgian Trading .............. 658

    True-Up Dispute 3 - Allocation of Net Proceeds by
    Ownership Percentage ........................................................................ 669

    True-Up Dispute 4 - Overlapping Adjustments ............................... 689

SKAT Failed To Prove Interest .................................................. 693

Conclusion ................................................................................. 702

# TABLE OF AUTHORITIES

**Paragraph(s)**

C<span>ASES</span>

*159 MP Corp. v. Redbridge Bedford, LLC,*
  160 A.D.3d 176 (2d Dep't 2018)....................................................686

*99 Wall Dev., Inc. v. Allied World Specialty Ins. Co.,*
  2021 WL 4460638 (S.D.N.Y. Sept. 29, 2021) ...............................660

*ACE Secs. Corp. Home Equity Loan Trust, Ser. 2007-HE3 v. DB Structured Prods, Inc.,*
  5 Supp. 3d 543 (S.D.N.Y. 2014)............................................378, 390

*AKF, Inc. v. AvantGarde Senior Living,*
  2021 WL 2662070 (N.D.N.Y. Apr. 29, 2021)................................389

*Ally Fin. Inc. v. Comfort Auto Grp. NY LLC,*
  2022 WL 3703955 (E.D.N.Y. Aug. 26, 2022) ...............................700

*Am. Home Assurance Co. v. Baltimore Gas & Electric Co.,*
  1987 WL 4928 (S.D.N.Y. May 20, 1987) .......................................222

*Apfel v. Prudential-Bache Sec. Inc.,*
  81 N.Y. 2d 470 (1993) ...................................................................404

*Babylon Assocs. v. Suffolk Cnty.,*
  101 A.D.2d 207 (2d Dep't 1984)....................................................410

*Ballow Brasted O'Brien & Rusin P.C. v. Logan,*
  435 F.3d 235 (2d Cir. 2006) ...................................................309, 489

*Bank of America, N.A. v. Greuner Med. P.C.,*
  2024 WL 182408 (S.D.N.Y. Jan. 17, 2024) ............................361, 362

*Bank of N.Y. Mellon v. WMC Mortg. LLC,*
  2015 WL 2449313 (S.D.N.Y. May 22, 2015) ................................386

*Bank of N.Y. Mellon Tr. Co. v. Morgan Stanley Mortg. Cap., Inc.,*
  2017 WL 698607 (S.D.N.Y. Feb. 10, 2017) ..................................216

*Banque Arabe et Internationale D'Investissement v. Maryland Nat. Bank,*
  850 F. Supp. 1199 (S.D.N.Y. 1994) .................................490, 493, 494

## TABLE OF AUTHORITIES (cont'd)

**Paragraph(s)**

*Bernstein v. O'Reilly*,
2019 WL 10995111 (S.D.N.Y. Mar. 5, 2019) .................................................649

*Brockhaus v. Basteri*,
188 F. Supp. 3d 306 (S.D.N.Y. 2016) ............................................................327

*Brueckner v. You Can Beam LLC*,
2021 WL 2158733 (S.D.N.Y. May 27, 2021) .................................................312

*Caisse Nationale de Credit Agricole-CNCA, N.Y. Branch v. Valcorp, Inc.*,
28 F.3d 259 (2d Cir. 1994) ...............................................................................404

*Caremark, L.L.C. v. New York Cancer & Blood Specialists*,
740 F. Supp. 3d 340 (S.D.N.Y. 2024) ..............................................................515

*CBF Industria de Gusa S/A v. AMCI Holdings, Inc.*,
850 F.3d 58 (2d Cir. 2017) ...............................................................................581

*CBS Broad. Inc. v. Jones*,
460 F. Supp. 2d 500 (S.D.N.Y. 2006) ..............................................................376

*CCR Int'l, Inc. v. Elias Grp., LLC*,
2020 WL 7629325 (S.D.N.Y. Dec. 22, 2020) .................................................382

*Century City Mall, LLC v. Waxman*,
193 A.D.3d 499 (1st Dep't 2021) ..........................................................363, 370

*Chapman v. Davis*,
165 N.Y.S.3d 818 (Pleasant Valley Town Ct. 2022) ..............................392, 393

*Christian v. Christian*,
42 N.Y.2d 63 (1977) .........................................................................................532

*CIT Grp./Commercial Servs., Inc. v. Prisco*,
640 F. Supp. 2d 401 (S.D.N.Y. 2009) ..............................................................362

*Citibank, N.A. v. Jacobsen*,
2020 WL 772497 (S.D.N.Y. Feb. 18, 2020) ...................................................681

## <u>TABLE OF AUTHORITIES (cont'd)</u>

**Paragraph(s)**

*Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*,
  70 N.Y.2d 382 (1987) ......................................................................506

*Cont'l Cas. Co. v. Marshall Granger & Co., LLP*,
  6 F. Supp. 3d 380 (S.D.N.Y. 2014) ..................................490, 491, 492

*Cooper v. Cooper*,
  2022 WL 2716333 (E.D.N.Y. July 12, 2022)..................................391

*Cottam v. Global Emerging Cap. Grp., LLC*,
  2020 WL 1528526 (S.D.N.Y. Mar. 30, 2020)........................682, 683

*Courchevel 1850 LLC v. Wisdom Equities LLC*,
  846 F. App'x 33 (2d Cir. 2021) ..............................................410, 411

*CS First Boston Ltd. v. Behar*,
  1996 WL 384893 (S.D.N.Y. June 4, 1996) ....................................329

*Cutler v. Stop & Shop Supermarket Co.*,
  513 F. App'x 81 (2d Cir. 2013) ......................................................622

*Dish Network Corp. v. Ace Am. Ins. Co.*,
  21 F.4th 207 (2d Cir. 2021) ..........................................................649

*Express Trade Cap., Inc. v. Horowitz*,
  198 A.D.3d 529 (1st Dep't 2021) ....................................542, 544, 547

*F & K Supply Inc. v. Willowbrook Dev't Co.*,
  288 A.D.2d 713 (3d Dep't 2001)....................................................586

*Faunus Grp. Intern., Inc. v. Ramsoondar*,
  2014 WL 2038884 (S.D.N.Y. May 16, 2014) ................................365

*Fed. Ins. Co. v. United States*,
  882 F.3d 348 (2d Cir. 2018) ..........................................................581

*First Nat'l Bank v. Ackerley Communs., Inc.*,
  2001 WL 15693 (S.D.N.Y. Jan. 8, 2001) ......................................329

## <u>TABLE OF AUTHORITIES (cont'd)</u>

**Paragraph(s)**

*Gap Inc. v. Ponte Gadea New York LLC*,
   524 F. Supp. 3d 224 (S.D.N.Y. 2021) ..............................................411

*Gimbel Bros., Inc. v. Brook Shopping Ctrs., Inc.*,
   118 A.D.2d 532 (2d Dep't 1986)..............................................391, 573

*Ginett v. Computer Task Grp., Inc.*,
   962 F.2d 1085 (2d Cir. 1992) ....................................................524

*Gleit v. Francois-Bodine*,
   2018 U.S. Dist. LEXIS 85038 (S.D.N.Y. May 18, 2018) ................514

*Great Am. Ins. Co. v. Zelik*,
   2020 WL 85102 (S.D.N.Y. Jan. 6, 2020) .......................................311

*Harbinger v. F&G, LLC v. OM Grp. (UK) Ltd.*,
   2015 WL 1334039 (S.D.N.Y. Mar. 18, 2015).................................335

*Indep. Energy Corp. v. Trigen Energy Corp.*,
   944 F. Supp. 1184 (S.D.N.Y. 1996) .......................................364, 365

*Integrity Real Est. Consultants v. Re/Max of New York, Inc.*,
   213 A.D.3d 815 (2d Dep't 2023).................................................370

*Int'l Motor Sports Grp., Inc. v. Gordon*,
   1999 WL 619633 (S.D.N.Y. Aug. 16, 1999)..................................494

*J. D'Addario & Co., Inc. v. Embassy Indus., Inc.*,
   20 N.Y.3d 113 (2012) ..............................................................376

*Katzman v. Helen of Troy Texas Corp.*,
   2013 WL 1496952 (S.D.N.Y. Apr. 11, 2013) .........................374, 381

*KJ Roberts & Co. Inc. v. MDC Partners, Inc.*,
   2014 WL 1013828 (S.D.N.Y. Mar. 14, 2014).................................586

*Krumme v. WestPoint Stevens Inc.*,
   238 F.3d 133 (2d Cir. 2000) ......................................................382

## TABLE OF AUTHORITIES (cont'd)

**Paragraph(s)**

*Landmark Ventures, Inc. v. Wave Systems Corp.*,
  2012 WL 3822624 (S.D.N.Y. Sept. 4, 2012) .................................................382

*Lazard Freres & Co. v. Crown Sterling Mgmt., Inc.*,
  901 F. Supp. 133 (S.D.N.Y. 1995) .......................................................522, 524

*Lenel Sys. Intl., Inc. v. Smtih*,
  34 A.D.3d 1284 (4th Dep't 2006).......................................................307

*Lipsky v. Commonwealth United Corp.*,
  551 F.2d 887 (2d Cir. 1976) ...........................................................394

*Loewenson v. London Mkt. Cos.*,
  351 F.3d 58 (2d Cir. 2003) .......................................................683, 686

*Mackinder v. Schawk, Inc.*,
  2005 WL 1832385 (S.D.N.Y. Aug. 2, 2005)...................................395

*Maloul v. Berkowitz*,
  2008 WL 2876532 (S.D.N.Y. July 23, 2008)...................................491

*Martinez v. Rockwood*,
  2025 WL 459893 (S.D.N.Y. Feb. 11, 2025) ...................................556

*Master-Halco, Inc. v. Scilia, Dowling & Natarelli, LLC*,
  2010 WL 1553784 (D. Conn. Apr. 19, 2010)...................................623

*Matter of Gaied v. New York State Tax Appeals Trib.*,
  22 N.Y.3d 592 (2014) ...............................................................544

*Matter of Obus v. New York State Tax Appeals Trib.*,
  206 A.D.3d 1511 (3d Dep't 2022)...................................................544

*Medinol Ltd. v. Bos. Sci. Corp.*,
  346 F. Supp. 2d 575 (S.D.N.Y. 2004) ...........................................367

*Metro. Life Ins. Co. v. Noble Lowndes Intl.*,
  84 N.Y.2d 430 (1994)...............................................................374

## <u>TABLE OF AUTHORITIES (cont'd)</u>

**Paragraph(s)**

*New York v. St. Francis Hosp.*,
    94 F. Supp. 2d 423 (S.D.N.Y. 2000) ................................................623

*Nomura Home Equity Loan, Inc., Series 2006-FM2 v. Nomura*
    *Credit & Cap., Inc.*,
    133 A.D.3d 96 (1st Dep't 2005),
    *modified*, 30 N.Y. 3d 572 (2017)............................................374, 388

*Nomura Home Equity Loan, Inc., Series 2006-FM2 v. Nomura*
    *Credit & Cap., Inc.*,
    30 N.Y.3d 572 (2017) ........................................374, 376, 388

*OneWest Bank N.A. v. Louis*,
    2016 WL 3552143 (S.D.N.Y. June 22, 2016) ................................700

*Orlander v. Staples, Inc.*,
    802 F.3d 289 (2d Cir. 2015) ................................................312, 395

*Pike Co., Inc. v. Tri-Krete Ltd.*,
    2025 WL 896579 (W.D.N.Y. Mar. 24, 2025) ................................581

*PrecisionWorks MFG, LLC v. Union Funding Source*,
    2022 WL 16857360 (S.D.N.Y. Oct. 25, 2022)................................382

*In re Pretty Girl, Inc.*,
    2022 WL 1051098 (S.D.N.Y. Bankr. Apr. 7, 2022) ........................623

*Pyskaty v. Wide World of Cars*, *LLC*,
    856 F.3d 216 (2d Cir. 2017) ................................................514

*Rebecca Broadway L.P. v. Hotton*,
    143 A.D.3d 71 (1st Dep't 2016) ................................................496

*Rekor Sys., Inc. v. Loughlin*,
    2022 WL 3138942 (S.D.N.Y. Aug. 5, 2022)................................556

*Republic Ins. Co. v. Masters, Mates & Pension Plan*,
    77 F.3d 48 (2d Cir. 1996) ................................................491

## <u>TABLE OF AUTHORITIES (cont'd)</u>

**Paragraph(s)**

*Reilly v. Natwest Mkts. Grp. Inc.*,
  181 F.3d 253 (2d Cir. 1999) ............................................................516

*Samba Enters., LLC v. iMesh, Inc.*,
  2009 WL 705537 (S.D.N.Y. Mar. 19, 2009)...........................................522, 533

*Sapon v. Hanbat Rest., Inc.*,
  2021 WL 621170 (S.D.N.Y. Feb. 16, 2021) .....................................556

*Sasson v. Mann*,
  2019 WL 3532155 (S.D.N.Y. Aug. 2, 2019)...................................521

*Stavinsky v. Prof-2013-S3 Legal Title Tr. by U.S. Bank Nat'l Ass'n,*
  *Fay Servicing*,
  77 N.Y.S.3d 287 (Sup. Ct. N.Y. Cty. 2018) ......................................683

*Supercom, Ltd. v. Sabby Volatility Warrant Master Fund Ltd.*,
  700 F. Supp. 3d 146 (S.D.N.Y. 2023) ...............................................216

*Syncora Guar. Inc. v. Countrywide Home Loans, Inc.*,
  935 N.Y.S.2d 858 (Sup. Ct. N.Y. Cty. 2012)...................................515

*Torres v. Monsalve*,
  2021 N.Y. Misc. LEXIS 29744
  (Sup. Ct. Queens Cty. Mar. 31, 2021) ....................................553, 554

*Treasure Chest Themed Value Mail, Inc. v. David Morris Int'l, Inc.*,
  2018 WL 3130601 (S.D.N.Y. June 26, 2018) .................................367

*Unanue v. Unanue*,
  141 A.D.2d 31 (2d Dep't 1988) ......................................................540

*United States v. Citron*,
  783 F.2d 307 (2d Cir. 1986) ...........................................................622

*United States v. All Funds on Deposit in Any Accts. Maintained*
  *at Merrill Lynch, Pierce, Fenner & Smith*,
  801 F. Supp. 984 (E.D.N.Y. 1992) ..................................................622

x

## <u>TABLE OF AUTHORITIES (cont'd)</u>

**Paragraph(s)**

*United States ex rel. Taylor v. Gabelli*,
    2005 WL 2978921 (S.D.N.Y. Nov. 4, 2005)...................................................515

*United States Liab. Ins. Co. v. WW Trading Co.*,
    813 F. App'x 636 (2d Cir. 2020) ......................................................................309

*Upfront Megatainment, Inc. v. Thiam*,
    235 A.D.3d 516 (1st Dep't 2025) ..................................................545, 546, 553

*V.S. Int'l, S.A. v. Boyden World Corp.*,
    862 F. Supp. 1188 (S.D.N.Y. 1994) ................................................................496

*Walcutt v. Clevite Corp.*,
    13 N.Y.2d 48 (1963) .........................................................................................363

*Wechsler v. Hunt Health Sys.*,
    330 F. Supp. 2d 383 (S.D.N.Y. 2004) ....................................................363, 393

*Wells Fargo Bank Minn., N.A. v. Nassau Broad. Partners, L.P.*,
    2003 WL 22339299 (S.D.N.Y. Oct. 10, 2003).......................................361, 369

*Wiseman v. ING Groep, N.V.*,
    2017 WL 4712417 (S.D.N.Y. Sept. 28, 2017) .................................................682

*Xerox Corp. v. Bus-Let, Inc.*,
    2019 WL 2514855 (W.D.N.Y. June 18, 2019)................................................360

# TABLE OF AUTHORITIES (cont'd)

**Paragraph(s)**

STATUTES, RULES, AND OTHER AUTHORITIES

28 U.S.C. § 2201 *et seq.* ................................................................

Fed. R. Civ. P. 44.1 ......................................................................

CPLR 3213 ..................................................................................

CPLR 3218 .........................................................................*passim*

Danish Administration of Justice Act § 721 ...............................

Danish Penal Code § 80 ...............................................................

Danish Penal Code § 82 ...............................................................

5 CORBIN ON CONTRACTS § 1068 ..............................................

BLACK'S LAW DICTIONARY (12th ed. 2024) ...............................

COLLINS ONLINE ENGLISH DICTIONARY ......................................

Hon. Mark C. Dillon, Practice Commentaries, CPLR C3218:3 (2021) .....................

Dobbs, LAW OF REMEDIES: DAMAGES, EQUITY, RESTITUTION § 4.3(6)
(2d ed. 1993) .........................................................................

FARNSWORTH ON CONTRACTS (3d ed.) § 8.16 ............................

2019 NY S.B. 6395 (NS), New York Committee Report & Sponsor
Memo (June 9, 2019) ..............................................................

RESTATEMENT (SECOND) CONTRACTS § 241 (2016)......................

RESTATEMENT (SECOND) OF CONTRACTS § 350 (2016) ................

SIEGEL'S N.Y. PRACTICE § 300 (6th ed. 2024) ..........................

SIEGEL'S N.Y. PRACTICE § 301 (6th ed. 2024) ..........................

WEINSTEIN'S FEDERAL EVIDENCE § 1006.08[4].........................

Following the trial, Plaintiffs-Counterclaim Defendants Matthew Stein ("Stein") and Jerome Lhote ("Lhote") respectfully submit these Post-Trial Proposed Findings of Fact and Conclusions of Law.

## CITATION CONVENTIONS

1.    This submission uses the following citation conventions:

    (a)    References to "[NAME]" are to the witness statements of the named witness filed with the Court and offered as the direct testimony of the witness.

    (b)    References to "PX" are to Exhibits offered by Stein, Lhote, and/or Nominal Defendant-Counterclaim Defendant Luke McGee ("McGee").

    (c)    References to "DX" are to Exhibits offered by Defendant-Counterclaim Plaintiff Skatteforvaltningen ("SKAT").

    (d)    References to "Tr." are to the transcript of the trial that occurred between April 29 and May 1, 2025.

    (e)    References to "PPSOF" are to these Post-Trial Proposed Findings of Fact and Conclusions of Law.

    (f)    References to "ECF No." are to the correspondingly numbered documents filed in this matter.

## EVIDENTIARY OBJECTIONS REQUIRING COURT RESOLUTION

2.    In advance of trial, Stein, Lhote, and McGee jointly interposed objections to:

    (a)    specific exhibits to be offered by SKAT; and

    (b)    specific paragraphs of direct testimony to be offered by SKAT.

*See* ECF No. 178.

3.    In advance of trial, SKAT interposed objections to exhibits to be offered by Stein, Lhote, and McGee.  These include SKAT's objections to translations of Danish-language documents offered by Stein, Lhote, and McGee.  These objections are discussed immediately below.

ECF No. 177-1.

4.    At trial, SKAT interposed objections to specific paragraphs of direct testimony of Stein, Lhote, and McGee.

    *See* Tr. 8:4-18 (objections to Stein direct testimony); Tr. 163:23-164:13 (objections to Lhote direct testimony); Tr. 233:3-9 (objections to McGee's direct testimony).

5.    SKAT objected to direct testimony of Marshall Miller ("Miller") on one topic.

    *See* Tr. 278:11-17.

6.    At trial, the Court indicated that it would review the parties' objections after the trial and, if it found those objections meritorious, would not rely on exhibits or testimony that it held to be inadmissible.

    *See* Tr. 5:1-15.

7.    Some of the parties' objections to the admission of various exhibits were resolved in advance of trial and have been withdrawn.

### SKAT'S OBJECTIONS REGARDING TRANSLATIONS OFFERED BY PLAINTIFFS AND MCGEE

8.    In a number of instances, the parties have offered different translations of the same original Danish-language documents.

9.    For example, Stein, Lhote, and McGee offered PX-103, a string of e-mails between SKAT and SØIK on April 25, 2019, including the Danish-language translation that SKAT itself produced; they bear a Bates number so indicating.  PX-103 was marked at the deposition of SKAT and there was testimony about PX-103 at the deposition.

    *See, e.g.*, PX-400-R at 107:9-110:12.

10.    SKAT has objected to use of the uncertified translations offered by Plaintiffs and McGee, even though SKAT itself produced the translations and they were the subject of deposition testimony reflected in PX-400.

2

11.    SKAT prefers new translations of these same documents, which it has offered at trial together with a certification.

12.    The Court need not resolve the issue of these competing translations and should overrule SKAT's objections to these exhibits on the basis of translation.

13.    For every one of Plaintiffs' Exhibits to which SKAT has objected on the basis of the translation, SKAT has offered the very same Danish-language document and a new, certified translation, such that the substantive evidence relied upon by Plaintiffs is before the Court.

14.    In addition, SKAT has not identified even one error in the translations offered by Plaintiffs, which themselves came from SKAT, let alone an error that meaningfully bears on any issue that the Court must determine.

15.    This issue applies to the following Plaintiffs' exhibits, each of which is noted with the corresponding SKAT exhibit:

PX-101 (DX-530); PX-103 (DX-555); PX-105 (DX-532); PX-106 (DX-540); PX-107 (DX-538); PX-108 (DX-533); PX-110 (DX-535); PX-113 (DX-541); PX-114 (DX-546); PX-115 (DX-544); PX-118 (DX-569); PX-120 (DX-552); PX-121 (DX-548); PX-124 (DX-550); PX-125 (DX-551); PX-137 (DX-554); PX-141, 141-T (DX-553).

16.    In these Post-Trial Proposed Findings of Fact and Conclusions of Law, Plaintiffs refer to the PX for these exhibits, except where otherwise noted.

## **PROPOSED FINDINGS OF FACT**

### **Summary**

17.    Starting in about 2012, two finance professionals began to engage, together with others, in an investment strategy known as dividend arbitrage trading.  As time went on, these two men were joined by a third and, together, they continued employing the investment strategy.

18.    At some point in 2015, the civil and criminal authorities in Denmark began to investigate whether this investment strategy was fraudulent.  When the three men learned of the investigation, they terminated their investment activities and retained counsel to assist them.  In 2017, and acting through

3

counsel, the three approached the Danish civil authorities to resolve the emerging dispute via a negotiated resolution. They did so in good faith.

19. Throughout those negotiations, their major concern was the possibility of being criminally charged in Denmark. Initially, the civil resolution under discussion would be predicated on their not being criminally charged. When that became impossible to achieve in a settlement, they continued the discussions nonetheless. They did so in good faith. Others who were involved in dividend arbitrage trading did not continue the discussions and litigated against the Danish civil authorities for another eight years.

20. As the three men continued the settlement discussions, they remained concerned about the possibility of being criminally charged in Denmark.

21. Ultimately, in 2019, they entered into a civil resolution with the Danish authorities to pay back everything that they had received from the dividend arbitrage trading. They agreed to cooperate in rather extensive fashion. They caused many others to enter into the same civil resolution. They agreed to pay back about 60% of what they received at the time of the settlement and to the pay the rest within a specific amount of time. They agreed to use their best efforts to liquidate specific assets to repay in a specific time frame the rest of what they agreed to pay, which they agreed to pay whether they could liquidate those assets or not. And they agreed to help determine precisely how much they had gotten as a result of the dividend arbitrage trading, so that the Danish civil authorities could be assured that they received everything back that the three men got.

22. To protect themselves to the extent possible and recognizing that they could not obtain immunity from criminal charges in a resolution with the Danish civil authorities, they bargained for *one thing* in return from the Danish civil authorities.

23. The Danish civil authorities were required to inform the Danish criminal authorities about the settlement agreement and its terms. And the Danish civil authorities were required to make some specific statements to the Danish criminal authorities about how the settlement was the result of good-faith negotiations, how cooperation required under the settlement might result in additional recoveries, and how the settlement was in the best interest of the Danish civil authorities. And the Danish civil authorities were required to do this in writing.

24.    This was a remarkably simple thing for the Danish civil authorities to do.  For example, they could have written a short letter to the Danish criminal authorities summarizing the key terms of the settlement agreement and making the representations required.  They did not.  They never even formulated any sort of plan for how they might comply with this very simple obligation under the settlement.  They have repeatedly claimed that they were coordinating with the criminal authorities.  But when it came to doing what they committed to do -- the one thing that they could do that might benefit the three men -- they failed.  They have never provided even the most basic explanation for why they did not write the simple and straightforward letter to the criminal authorities to satisfy virtually the only thing that they had to do once they were paid the first 60% of the money that the three men owed them.

25.    As time went on, the Danish criminal authorities continued their investigation.  So that they could put themselves in the best possible light, the three men, through their counsel and in good faith, tried to find out what the Danish civil authorities had said to the Danish criminal authorities.  Rather than answer these straightforward inquiries, the Danish civil authorities, through their U.S. lawyers, gave evasive promises about how they would get back to the three men's lawyers with answers.  They never did and never explained why they did not.  They certainly never said that they were not required to answer these questions.  And when the three men, through their lawyers, asked for the Danish civil authorities to outline for the Danish criminal authorities the extensive cooperation that the three men had provided, the civil authorities, through their U.S. lawyers, claimed that they would never do such a thing.  They failed to disclose that, in fact, the criminal authorities had been asking many detailed questions about all aspects of the settlement, including about the three men's cooperation.  And the civil authorities never once said that the criminal authorities had asked for a copy of the settlement agreement, even later on when they were asked that question point-blank.  Nor did they say that the civil authorities falsely told the criminal authorities that the civil authorities could not provide it.  In truth and in fact, the settlement permitted them to provide it, if they so chose.  The civil authorities simply chose not to provide it because they thought that doing so might make it harder for them to negotiate civil settlements with others.  This conduct belies their claims of close coordination with the criminal authorities.

5

26.    Ultimately, the three men -- the three people who had settled with the civil authorities and repaid half of what the civil authorities had recovered by that point -- were indicted in April 2021 by the Danish criminal authorities.

27.    Now for different reasons, the three men asked again for information about what the civil authorities had said to the criminal authorities and asked rather specifically how the civil authorities had complied with the very simple requirement under the settlement.  This question came at an inopportune time for the civil authorities.  Around this time, a mechanism that would make it easier for the civil authorities to collect from the three men what they had agreed to pay needed to be renewed under the settlement.  If the civil authorities answered the question honestly, the three men would know that the civil authorities had failed to do the very simple thing that they had promised to do.  When the civil authorities looked into what they had exchanged in writing with the criminal authorities that might constitute compliance with the settlement, all they assembled were communications from 2021, long after the time had passed to comply with the settlement.

28.    To avoid this sort of unpleasantness, the civil authorities waited an unusually long period of time to answer the question, extracted the renewal of the payment mechanism under these false pretenses, and only then, in June 2021, answered the question.

29.    What they said was astounding for a variety reasons.  The civil authorities did not point to any sort of written communication as required by the settlement.  All they pointed to were oral briefings and phone conversations.  They basically admitted the breach.

30.    Now that the civil authorities are forced to explain in this litigation precisely how it was that they complied with the simple requirements of the settlement, their story is rather different.  They claim now that they complied with the settlement by pointing to a handful of e-mails that they had with the criminal authorities *before* the settlement and to a press release, neither of which contains most of the important details about the settlement agreement, do not say that the three men had paid 60% of the money back, and do not contain a host of other details that could have impacted the decision-making of the criminal authorities.  And none of the communications that they had with the criminal authorities specified how the three men were required to liquidate more than $88 million of assets to repay the civil authorities or specified the nature of those assets.  In essence, the civil authorities have

6

cobbled together a paper trail that no one *ever* thought was compliance with the settlement agreement until this case began.

31.    Worse, the civil authorities have tried to justify their failure to comply by asserting that, under Danish law, the criminal authorities could never have even considered any of what the civil authorities were required to communicate.  The Danish civil authorities are incorrect.  And, if they are correct, then it would mean that one of the very most important things that the three men thought that they were getting out the settlement was illusory and that they got nothing out of that component of the settlement.  Along the way, they have suggested that the three men were the ones who should have communicated about the settlement with the criminal authorities.  This might make some sense if the civil authorities had been honest in telling the three men about their communications with the criminal authorities, but they were not.  In any event, it was the obligation of the civil authorities to communicate with the criminal authorities and the three men were well within their rights to assume that the civil authorities had done what they promised to do.

32.    After having reviewed the written direct testimony of eight witnesses and having presided over a three-day trial at which witnesses were cross-examined, the Court holds, as set forth more fully, that the unperformed obligations of the settlement should be rescinded, the three men should be released from further obligations under the settlement, and the civil authorities should be ordered to return to the three men some of the funds that they paid under the settlement agreement.

33.    All of the legal requirements for the remedy of rescission and rescissory damages are present.  The failure of the Danish civil authorities under the settlement was material and willful or, if not willful, so substantial as to strongly tend to defeat the object in entering into the settlement.

34.    As a result, the Court also holds that the claims of the civil authorities for the funds unpaid under the settlement should be dismissed.

## The Parties

35.    Stein is a citizen of the State of New York and, since about 1995, has resided in Manhattan.

*See* Stein ¶¶ 2, 5.

36.  Lhote is a citizen of the State of Florida.  Since approximately the middle of 2020, Lhote has resided in the city of Winter Park, which is in Orange County, Florida.

*See* Lhote ¶¶ 59-65.

37.  Prior to the middle of 2020, Lhote resided in Manhattan.  In about the middle of 2020, Lhote abandoned his residence in New York and ceased to be a resident of the State of New York for all purposes.

*See* Lhote ¶¶ 56-58, 59-65.

38.  McGee is a citizen of the State of Florida and, since approximately the middle of 2021, has resided in Palm Beach County, Florida.

*See* McGee ¶¶ 163-66.

39.  McGee was a citizen of the State of Pennsylvania between 2019 and 2021 when he and his family moved to Florida towards the end of 2021.

*See* McGee ¶¶ 160-62.

40.  Prior to January 2019, McGee was a citizen of the State of New York. McGee abandoned his residence in New York and ceased to be a resident of New York for all purposes when he moved to Pennsylvania.

*See* McGee ¶¶ 161-62.

41.  Since around 2014, McGee and his wife indirectly hold an interest a vacation home in Suffolk County, New York.  The home is not, and never has been, his and his wife's residence.  He is not a resident of New York for any purpose.

*See* McGee ¶ 167.

42.  Stein, Lhote, and McGee are finance professionals who hold university and/or post-university educations.  McGee has extensive experience in the healthcare field.

*See* Stein ¶¶ 3-6; Lhote ¶¶ 3-6; McGee ¶¶ 5-12.

43.    SKAT is the taxation authority of Denmark.

  *See* PX-104 at § 1(cc).

## Events Leading Up to the May 2019 Settlement With SKAT

44.    Starting in about 2012, Stein and Lhote and, later on, McGee began to be
       involved with an investment strategy known as dividend arbitrage.

  *See* Stein ¶ 13; Lhote ¶ 13; McGee ¶¶ 17-28.

45.    These activities started while Stein and Lhote were affiliated with Argre
       Management LLC ("Argre Management").  These activities continued after
       they separated from the other principals of Argre Management in 2013.

  *See* Stein ¶¶ 11-12; Lhote ¶¶ 11-12; McGee ¶ 26; Tr. 30:1-12 (Stein).

46.    These activities continued through 2015 while Stein, Lhote, and McGee
       were affiliated with Maple Point LLC ("Maple Point").  Stein, Lhote, and
       McGee's percentage ownership interests in Maple Point were 46%, 36%,
       and 18%, respectively.

  *See* Stein ¶¶ 11-12; Lhote ¶¶ 11-12; McGee ¶ 24.

47.    It was Stein, Lhote, and McGee's belief and understanding that the dividend
       arbitrage trading strategy employed by them was legal.

  *See* Stein ¶¶ 14-15; Lhote ¶¶ 14-15; McGee ¶¶ 17-28; Tr. 142:17-20 ("Q:
  Let me ask you, let's just clear the air about this.  Did you ever believe that
  what you were doing in connection with this activity was fraud?  A: No.")
  (Stein).

48.    For example, Stein, Lhote, and others involved in the dividend arbitrage
       trading sought out, received, and/or relied upon extensive legal advice on a
       variety of topics that the trading at issue complied with applicable law.  Law
       firms that provided such legal opinions included Bech Bruun, a Danish law
       firm, and Jones Day.

  Stein ¶ 15(d); Lhote ¶ 15(d); *see also* Tr. 33:21-34:22 (Stein); PX-130-R at
  15-19.

9

49. McGee, who became involved in the dividend arbitrage trading, was aware that Stein and Lhote worked with various law firms that his employer had also worked with. That fact gave him comfort that the dividend arbitrage strategy that Stein and Lhote intended to employ was entirely legal.

   McGee ¶¶ 8, 23, 143(e).

50. Stein and Lhote deny that they defrauded anyone with respect to the dividend arbitrage trading, that they had any criminal intent whatsoever, and that they ever believed that they were engaging in anything other than lawful behavior.

   Stein ¶ 15(b-c); Lhote ¶ 15(b-c); Tr. 142:17-20, 143:3-144:3 (Stein).

51. McGee asserts, in substance, the same thing.

   McGee ¶ 143.

52. Persons connected to the pension plans that had a role in the dividend arbitrage trading strategy, as sponsors of those person plans, were known to, for example, Stein. These people included Stein's family, his parents, his brother, professional associates, law school classmates.

53. Stein, Lhote, and McGee did not knowingly get these people involved in a fraud.

   Tr. 143:1-144:3 (Stein); PX-104 at Exh. 1; *see also* Tr. 199:16-200:3 (Lhote).

54. The dividend arbitrage trading activity involved applications for tax refunds withheld on dividends paid by Danish companies made on behalf of U.S. pension plans ("Reclaim Applications") to SKAT, which resulted in payments by SKAT to the pension plans.

   *See* Stein ¶ 14(a); Lhote ¶ 14(a); McGee ¶ 21; PX-104 at § 1(z); Tr. 11:8-11 (Stein).

55. SKAT alleges that the activity of Stein, Lhote, McGee, and others in relation to dividend arbitrage trading and the Reclaim Applications were part of a fraud on SKAT.

   PX-104 at Recital B, § 1(e); Tr. 43:2-13 (Stein).

10

56.     Stein, Lhote, and McGee were indicted in April 2021 by Danish prosecutors
        for their role in causing the payments by SKAT on Reclaim Applications.

        *See* DX-520; Tr. 41:16-20 (Stein); Tr. 220:17-18 (Lhote); Tr. 241:20-22
        (McGee).

57.     For the purposes of resolving the claims and defenses of Stein, Lhote,
        McGee, and SKAT (collectively, the "Parties") in this action, no resolution
        of whether Stein, Lhote, and McGee engaged in fraud, either under a
        criminal or civil standard, is necessary.

58.     At trial, the Court indicated that it "ha[s] no intention of becoming the
        criminal court in Denmark and making any findings about whether Mr. Stein
        or the other indicted individuals are guilty" and that doing so was "not [its]
        job."

        Tr. 146:14-18.

59.     Because resolution of the matters before the Court does not require the Court
        to resolve whether Stein, Lhote, and McGee engaged in any sort of fraud,
        the Court regards the testimony elicited on cross-examination of Stein about
        the formation and ownership of pension plans, details regarding the trading
        in shares of Belgian companies, details regarding the trading in shares of
        Danish companies, what Stein knew about another trial that occurred in this
        District, and what Stein knew about a criminal proceeding involving North
        Channel Bank ("NCB") as not probative of the issues required for the Court
        to resolve the claims and defenses of the Parties.

        *See, e.g.*, Tr. 10:10-43:1.

60.     As a result, the Court need not make any factual finding regarding these
        issues.

61.     In late summer 2015, Stein, Lhote, and McGee became aware that SKAT
        was investigating Reclaim Applications, including their involvement with
        them. Upon learning of the investigation, Stein, Lhote, and McGee ceased
        engaging in further dividend arbitrage or Reclaim Applications even though
        they had previously not had any reason to believe that engaging in this
        activity was improper.

        *See* Stein ¶ 16; Lhote ¶ 16; McGee ¶¶ 29-30; Tr. 43:2-13 (Stein).

11

62. Through counsel, Stein, Lhote, and McGee approached SKAT in about 2017 in order to attempt to resolve matters being investigated by SKAT via a settlement.

   *See* Stein ¶¶ 17-19; Lhote ¶ 17-19; McGee ¶¶ 32-34; Tr. 43:25-44:2 (Stein); Tr. 192:20-21 (Lhote).

63. They had counsel in United States and Denmark to assist them.

   *See* Stein ¶ 18; Lhote ¶ 18; McGee ¶¶ 33-34; Tr. 43:18-21 (Stein); Tr. 170:17-171:14 (Lhote).

64. Many others who might be parties to a settlement participated in the settlement discussions, also through U.S. and Danish counsel.

   *See* Stein ¶ 18; Lhote ¶ 18; McGee ¶¶ 33-34; Tr. 43:25-44:8 (Stein).

65. In connection with the settlement discussions, Stein, Lhote, and McGee were motivated substantially by the possibility of criminal exposure in Denmark. It was around the second half of 2015 that they became concerned about the possibility of a criminal investigation in Denmark.

   *See* Stein ¶ 21; Lhote ¶ 21; McGee ¶¶ 36-38; Tr. 43:14-17, 51:13-15 (Stein); Tr. 170:17-21, 192:12-13 (Lhote); Tr. 240:18-24 (McGee).

66. From the beginning, the settlement under discussion involved as a condition that the prosecutor in Denmark -- the Danish Public Prosecutor for Serious Economic and International Crime ("SØIK") -- not initiate criminal charges against any of the parties to the settlement then under discussion.

   *See* PX-2 at § 2.3 & Clause 3; Stein ¶ 22; Lhote ¶ 22; McGee ¶¶ 40-44.

67. From the beginning, the settlement under discussion also involved as a condition that SKAT "bring to the attention of SØIK in writing the Agreement and its terms, and represent that the Agreement reflects good faith negotiations by the Pension Plans, that the Pension Plans' cooperation may result in the recovery by SKAT of additional funds from unrelated third parties, and that the Agreement is in the best interests of SKAT."

   PX-2 at § 2.3.

12

68.  Towards the end of 2018 or the beginning of 2019, SKAT determined that it
     would not agree to any such condition.

     *See* Stein ¶ 22(c); Lhote ¶ 22(c); McGee ¶ 45; Bechmann ¶ 7; Tr. 295:12-22
     (Bechmann).

69.  As a result of that determination, many of those who had been participating
     in the settlement discussions dropped out of the discussions.

     Stein ¶ 22(d); Lhote ¶ 22(d); McGee ¶¶ 45-46; Bechmann ¶ 7; Tr. 44:9-11
     (Stein).

70.  Stein, Lhote, and McGee nonetheless continued the settlement discussions,
     but were determined to obtain in any settlement some protection in relation
     to the possibility of criminal charges by SØIK, even if this was not the best
     option.

     Stein ¶ 22(d); Lhote ¶ 22(d); McGee ¶¶ 45-46; Tr. 296:3-10; 295:24-296:10
     (Bechmann).

71.  Stein, Lhote, and McGee's intent and principal goal in proceeding with the
     settlement negotiations was to ensure that any settlement agreement with
     SKAT mitigate potential criminal liability and provide them some protection
     or assistance in relation to the possibility of criminal proceedings that might
     be initiated by SØIK.

     *See* Stein ¶ 22(e); Lhote ¶ 22(e); McGee ¶¶ 45-48.

72.  During these early settlement negotiations, in addition to conditioning
     settlement on a commitment from SØIK not to initiate criminal charges, the
     Parties were also negotiating a provision that would require SKAT to bring
     certain facts to the attention of SØIK and make certain representations to
     SØIK.

     *See* Stein ¶¶ 22(e-f); Lhote ¶¶ 22(e-f); McGee ¶¶ 40-44.

73.  Reflecting the continuing importance of this to Stein, Lhote, and McGee,
     this concept was ultimately included in the settlement that was agreed to in
     May 2019 and is at the heart of this dispute.

     *See* PX-104 at § 8(f).

74. If the ultimate settlement did not include at least the requirement that SKAT bring certain facts to the attention of SØIK and that SKAT make certain specific representations to SØIK, Stein, Lhote, and McGee would not have continued the settlement discussions and would not have ultimately settled with SKAT.

    *See* Stein ¶ 22(h); Lhote ¶ 22(h); McGee ¶ 48; *see* PX-2 at § 2.3.

75. The direct testimony of Stein, Lhote, and McGee on this crucial point was unimpeached at trial.

76. In the course of the negotiations, SKAT became aware that Stein, Lhote, and McGee were hoping that their cooperation in the resolution of SKAT's civil claims would have a mitigating effect in connection with SØIK's investigation.

    *See* PX-101 (Ahlefeld-Engel to SØIK on April 25, 2019, "They hope their cooperation in the civil law track will have a mitigating effect in the criminal, but nothing more."); PX-400-R at 67:2-9; Tr. 301:20-25 ("I think it's fair to say that they would hope to achieve some benefits"), 304:10-15 ("my opinion was that they thought they could benefit in some way in criminal proceedings in general") (Bechmann).

## The Settlement Agreement and the Letter Agreement

77. On or about May 28, 2019, Stein, Lhote, McGee, and others entered into a settlement agreement with SKAT. The settlement agreement had several exhibits to it and is referred to collectively as the "Settlement Agreement."

    *See* PX-104.

78. The group of individuals and entities that entered into the Settlement Agreement and that are released by SKAT, including Stein, Lhote, and McGee, are referred to in the Settlement Agreement as the "Covered Parties."

    *See* PX-104 at § 1(i) & Exh. 1 & 2; Stein ¶ 23(c); Lhote ¶ 23(c); McGee ¶ 50(a).

79. Stein, Lhote, and McGee are Covered Parties, but they undertook special obligations under the Settlement Agreement that the remaining Covered Parties did not. Stein, Lhote, and McGee are referred to in the Settlement

Agreement as the "Covered Parties' Designees."

*See* PX-104 at § 1(j); Stein ¶ 23(d); Lhote ¶ 23(d); McGee ¶ 51.

80.    Stein, Lhote, and McGee undertook those special obligations because of their role in the conduct underlying the pension plans and the Reclaim Applications was considerably different than that of most of the other Covered Parties.

*See* PX-104 at § 1(j); Stein ¶ 23(d); Lhote ¶ 23(d); McGee ¶ 51; Tr. 199:5-200:3 (Lhote).

81.    Stein, Lhote, and McGee expended considerable effort to cause others to enter into the Settlement Agreement.  These efforts created a meaningful benefit for SKAT because their efforts increased SKAT's recovery and the number of pension plans, individuals, and entities with which SKAT had resolved its claims and, thereby, ensured that SKAT would not need to initiate litigation against them.

*See* Stein ¶¶ 23(a-b), 33(d)(iv)(b); Lhote ¶¶ 23(a-b), 33(d)(iv)(b); McGee ¶¶ 50, 103.

82.    As of the end of 2023, more than 55% of SKAT's recovery related to the losses that it asserts from dividend arbitrage trading and reclaim applications that it paid was the result of payments made under the Settlement Agreement.

Stein ¶¶ 23(a-b), 33(d)(iv)(b); Lhote ¶¶ 23(a-b), 33(d)(iv)(b); *see* Tr. 379:25-380:12 (updating amount recovered by SKAT) (Bechmann).

83.    A considerable number pension plans, individuals, and entities who were initially part of the settlement negotiations ultimately did *not* consummate a settlement with SKAT.  SKAT has been continuously litigating with many of them since 2018.  It has also litigated related matters in the United Kingdom, Dubai, and elsewhere against other parties that did not settle.

*See* Stein ¶ 20; Lhote ¶ 20; McGee ¶ 35.

84.    On or about the same day as they entered into the Settlement Agreement, Stein, Lhote, McGee, and others executed a letter agreement, which has one attachment (collectively, the "Letter Agreement").

15

*See* PX-109; Stein ¶ 24; Lhote ¶ 24; McGee ¶ 53.

85.  The Settlement Agreement and Letter Agreement are both governed by New York law.

    *See* PX-104 at § 12; PX-109 at § 10.

**<u>Initial Performance by the Parties</u>**

86.  Within a short period after the Effective Date of the Settlement Agreement, the Covered Parties' were required to pay SKAT 950 million Danish kroner ("DKK") (the "Initial Cash Payment").

    *See* PX-104 at §§ 1(n) (defining "Effective Date"), 2(a).

87.  The Covered Parties completed the Initial Cash Payment by about August 8, 2019.

    *See* PX-3; Stein ¶ 26(g); Lhote ¶ 26(g); McGee ¶ 71.

88.  In exchange for the Initial Cash Payment, SKAT broadly released the Covered Parties and related persons and entities from "any and all claims" that SKAT "has or may have against the Covered Parties in any way arising from, in connection with or relating to Reclaim Applications and the related trading by the Covered Parties in Danish company shares . . . including any administrative claims [SKAT] has brought or could bring in Denmark in connection with [certain paid Reclaim Application]."

    *See* PX-104 at §§ 4(a) (setting out SKAT's release), 1(bb) (defining "Settled Matters"); Tr. 74:3-5, 142:23-143:2 (Stein); Tr. 196:20-21 (Lhote).

89.  In essence, the Settlement Agreement reflects that, in exchange for SKAT's release of claims against the Covered Parties, the Covered Parties paid SKAT DKK 950 million.

    *See* PX-104 at § 4(a).

90.  Simultaneously with the Initial Cash Payment, the Covered Parties' Designees were required to provide an affidavit of confession of judgment in a form specified in the Settlement Agreement.

    *See* PX-104 at § 4(c) & Exh. 4.

16

91.   On August 8, 2019, the Covered Parties' Designees provided this document
      (the "2019 Affidavit of Confession of Judgment").

      *See* PX-10A; Stein ¶ 26(e); Lhote ¶ 26(e); McGee ¶ 71.

92.   The purpose of the 2019 Affidavit of Confession of Judgment was to
      facilitate the payment of the remaining amounts to be paid under the
      Settlement Agreement.  The remaining payments were the "Additional Cash
      Payment," the "True-Up Amount," if any, and interest, if any.  The sum of
      those payments was defined in the Settlement Agreement as the "Subsequent
      Cash Payment."

      *See* PX-104 at §§ 1(dd), 2(b), 2(e), 4(c) & Exhibits 4-5; Stein ¶ 26(e)(ii);
      Lhote ¶ 26(e)(ii); McGee ¶ 72; PX-400-R at 157:2-9; Tr. 352:1-6, 352:21-
      353:6 (Jacobsen).[1]

93.   Because an affidavit of confession of judgment expires after three years, the
      Settlement Agreement required the Covered Parties' Designees to provide an
      updated one.

      PX-104 at § 2(c) & Exh. 5; CPLR 3218(b).

94.   All Parties have referred to the 2019 Affidavit of Confession of Judgment as
      a form of "security."

      ECF No. 163 at ¶ 18 (SKAT: "As *security* for SKAT in case of an Event of
      Default, the agreement required Stein, Lhote, and McGee to "together
      provide an executed and notarized Affidavit of Confession of Judgment . . .
      to SKAT") (emphasis added); Stein ¶ 26(e)(ii) ("In short, once Phase I was
      complete, SKAT could only proceed against me, Jerome, and Luke and
      could only do so by utilizing the *security* that we had provided to them.")
      (emphasis added);  Lhote ¶ (same); McGee ¶ 72 ("The purpose of the 2019
      Affidavit of Confession of Judgment was to provide *security* for the further
      payments required under Phase II.") (emphasis added).

95.   Although an affidavit of confession of judgment facilitates the payment of a

---

[1] A graphical representation of the various payments required under the
Settlement Agreement is set out in ECF No. 54 at 9 and attached as Exhibit A to
these Post-Trial Proposed Findings of Fact and Conclusions of Law.

debt and provides greater assurance that a debt will be paid by facilitating enforcement of the debt, it is not technically a form of security in the sense of a pledged asset.

CPLR 3218; *see, e.g.*, Tr. 169:9-11 (Lhote).

96.   The effect of an affidavit of confession of judgment are matters of New York law and whatever terminological imprecision in SKAT, Plaintiffs, and McGee's descriptions of it is not significant.

97.   Once the Covered Parties made the Initial Cash Payment, the Settlement Agreement afforded SKAT with one sole remedy for the failure to make the Subsequent Cash Payment

> [SKAT's] sole remedy for the Covered Parties' failure to pay the remainder of the Final Settlement Amount shall be the filing of the Affidavit of Confessions of Judgment against the Covered Parties' Designees as set forth in Section 5(c).

*See* PX-104 at § 2(c); Stein ¶ 26(e)(iv); Lhote ¶ 26(e)(iv); McGee ¶¶ 73-74.

98.   SKAT concedes that, once the Initial Cash Payment was made, only the Covered Parties' Designees, and not the other Covered Parties, had any payment obligation to SKAT.

*See* PX-400-R at 188:15-20, 22, 188:24-189:6, 189:8-12, 189:19-25.

99.   The 2019 Affidavit of Confession of Judgment accurately reflected the residences of Stein, Lhote, and McGee at the time it was executed.

*See* PX-10A; Stein ¶¶ 2, 5; Lhote ¶¶ 57-58; McGee ¶¶ 125-126, 160-62.

**Obligations After the Initial Cash Payment**
**and the 2019 Affidavit of Confession of Judgment**

100.   After the Initial Cash Payment and the provision of the 2019 Affidavit of Confession of Judgment, the Settlement Agreement and the Letter Agreement imposed a second series of obligations that were almost entirely upon the Covered Parties and mostly upon the Covered Parties' Designees. There was very little required of SKAT under the Settlement Agreement after it received the Initial Cash Payment.

*See* Stein ¶ 27; Lhote ¶ 27; McGee ¶¶ 78-88.

101.  The obligations imposed under the Settlement Agreement after the making of the Initial Cash Payment and the provision of the 2019 Affidavit of Confession of Judgment included:

    (a)    cooperation with SKAT in a form specified in some detail;

    (b)    making the Additional Cash Payment of DKK 600 million;

    (c)    paying interest, if any;

    (d)    determining and paying the "True-Up Amount"; and

    (e)    dismissal by SKAT of one specific civil case that SKAT had brought against one of the Covered Parties, Adam LaRosa.

*See* PX-104 at §§ 1(a), 2(b), 2(d)(ii), 2(e), 3(a), 7; Stein ¶ 27; Lhote ¶ 27; McGee ¶¶ 78-80.

102.  The "True-Up Amount" represented, in general, the difference between the "Preliminary Settlement Amount" of DKK 1.55 billion and what was defined in the Settlement Agreement as the "Net Proceeds."

*See* PX-104 at §§ 1(ff), 2(e); Stein ¶¶ 25(f), 27(a)(iii-v), 58-60.

103.  The need for any True-Up Amount at all reflected the fact that the total amount to be paid under the Settlement Agreement could only be estimated at the time that the Settlement Agreement was executed.

*See* Stein ¶ 27(a)(iii); Lhote ¶ 27(a)(iii); McGee ¶ 80; ECF No. 163 at ¶ 10.

104.  The parties to the Settlement Agreement controlled for the fact that Net Proceeds might be less than the Preliminary Settlement Amount. Specifically, the Settlement Agreement provides that, if Net Proceeds were less than DKK 1.55 billion, the Covered Parties would *not* be entitled an adjustment to the Preliminary Settlement Amount of DKK 1.55 billion to a lower amount.  In essence, the Settlement Agreement provided for a minimum payment of DKK 1.55 billion regardless of facts developed later on.

*See* PX-104 at § 2(e)(ii).

19

105.   Calculation of the True-Up Amount is the subject of a series of disputes between the parties that are legal in nature that relate to how, under the Settlement Agreement, Net Proceeds and related terms in Section 2(e) of the Settlement Agreement are to be interpreted.

106.   The Settlement Agreement provides a specific formula for the calculation of Net Proceeds.  The Court discusses this formulate in greater detail below.

   *See* PX-104 at § 2(e).

107.   Only the Covered Parties' Designees -- and not the remainder of the Covered Parties -- were obligated to make payments as part of the second series of obligations.

   *See id.* at § 2(d)(i); PX-400-R at 188:15-189:6, 189:8-12, 189:19-25.

108.   Payments after the Initial Cash Payment were to be made by May 28, 2023. The original 36-month period in which to make the payments that was set out in the Settlement Agreement was, in effect, extended to 48 months by operation of the Letter Agreement.

   *See* PX-104 at §§ 1(r), 2(d)(i); PX-109 at § 6; Stein ¶ 27(b)(ii); Lhote ¶ 27(b)(ii); McGee ¶ 81.

109.   The Letter Agreement also imposed a series of special obligations on the Covered Parties' Designees, primarily that:

   (a)    they liquidate certain assets and provide the proceeds to SKAT;

   (b)    they provide quarterly progress reports to SKAT about the liquidation efforts; and

   (c)    they facilitate payments to be derived from the sale of one of the assets to be liquidated.

   *See* PX-109 at §§ 3, 4, 5, 7 & Annex A; Stein ¶ 27(b)(i, iii-vi); Lhote ¶ 27(b)(i, iii-vi); McGee ¶¶ 83-86.

110.   The most valuable of the assets to be liquidated were interests in North Channel Bank.  At the time of the Settlement Agreement, the Covered Parties' Designees expected to generate DKK 322 million. This amount was more than half of the Additional Cash Payment of DKK 600 million.

*See* PX-109 at § 7, Annex A; PX-104 at §§ 1(a), 2(b); Stein ¶ 27(b)(iii); Lhote ¶ 27(b)(iii); McGee ¶ 86.

111.  The expectation that the interests of the Covered Parties' Designees in North Channel Bank would generate DKK 322 million was determined by reference to the book value of the bank and the expectation that the bank would be sold for DKK 322 million.

*See* Tr. 217:19-218:14 (Lhote).

112.  The Settlement Agreement also had a confidentiality provision.

*See* PX-104 at § 8; Stein ¶¶ 28(a); Lhote ¶¶ 28(a); McGee ¶ 66.

113.  There were various exceptions to the confidentiality provision, including one to permit SKAT to announce the Settlement Agreement, which SKAT did in late May 2019.

*See* PX-104 at § 8(b); PX-106 (press release); Stein ¶¶ 28(a)(ii-iii); Lhote ¶¶ 28(a)(ii-iii); McGee ¶¶ 89-90.

114.  The confidentiality provision did not permit publication of the names of any of the parties that entered into the Settlement Agreement.

*See* PX-104 at § 8(b); Stein ¶ 28(a)(iv); Lhote ¶ 28(a)(iv); McGee ¶¶ 66, 89, 123.

## Section 8(f) of the Settlement Agreement

115.  One exception to the confidentiality provision is contained in Section 8(f) of the Settlement Agreement required SKAT to take certain actions with respect to SØIK:

> Notwithstanding the confidentiality obligations of this Section 8, promptly upon the execution of this Agreement, [SKAT] will, in writing, bring to the attention of [SØIK] this Agreement and its terms, and represent, in writing, that this Agreement reflects good-faith negotiation by the Covered Parties, that the Covered Parties' cooperation may result in the recovery by [SKAT] of additional funds from third parties and that this Agreement is in the best interests of [SKAT].  Upon request by SØIK, [SKAT]may provide and/or disclose the entirety of this Agreement to SØIK.

21

PX-104 at § 8(f).

116. Compliance with Section 8(f) was essentially SKAT's only material obligation under the Settlement Agreement after receiving the Initial Cash Payment, which triggered the releases. There was very little required of SKAT after payment of the Initial Cash Payment.

Stein ¶¶ 27(a-b); Lhote ¶¶ 27(a-b).

117. SKAT's compliance with Section 8(f) was the only substantial benefit that Stein, Lhote, and McGee were to obtain under the Settlement Agreement after the Initial Cash Payment was made and the releases resulting from the Initial Cash Payment were obtained.

*See* Stein ¶¶ 30, 32; Lhote ¶¶ 30, 32.

118. To Stein and Lhote, the inclusion of Section 8(f) was "the most important provision of the Settlement Agreement because it was, as a practical matter, the only significant promise that SKAT made that held out any prospect of helping [them] avoid being charged or indicted by SØIK."

Stein ¶ 32; Lhote ¶ 32.

119. According to McGee, if SØIK had known that he agreed to repay an amount greater than he had been accused of benefitting from the Reclaim Applications, that a substantial amount of additional funds were to be returned to the Danish treasury, and that McGee agreed to cooperate, "SØIK might have determined that the civil resolution was sufficient and that its extensive, multi-national investigation could have been expedited by leveraging his cooperation and not charging [McGee]."

McGee ¶¶ 87-93; Tr. 242:1-7.

120. After Stein and Lhote's names were revealed in the Danish press, there was *no* other meaningful benefit received by Stein and Lhote after making the Initial Cash Payment and obtaining the releases from SKAT.

*See* PX-5; Stein ¶ 30; Lhote ¶ 30.

121. Section 8(f) was of such importance to Stein, Lhote, and McGee that, without its inclusion in the Settlement Agreement, they would not have entered into it.

*See* Stein ¶ 32; Lhote ¶ 32; McGee ¶ 91.

122. Stein, Lhote, and McGee's testimony about the importance of Section 8(f) to their decisions to enter into the Settlement Agreement and whether they would have entered into the Settlement Agreement without such a term was unimpeached at trial.

123. The Court sets out below in its Conclusions of Law its interpretation of Section 8(f), including which terms SKAT was required to bring to SØIK's attention.

*See* PPSOF at ¶¶ 313-346.

### SKAT's Written Communications with SØIK and May 2019 Press Release

124. Whether SKAT fulfilled its obligations under Section 8(f) is at the heart of this dispute.

*See* Stein ¶¶ 29, 32; Lhote ¶¶ 29, 32; McGee ¶¶ 56-59.

125. SKAT asserts that it complied with Section 8(f) as a result of a series of written communications leading up to, and culminating with, the public announcement of the Settlement Agreement at the end of May 2019.

*See* PX-101, PX-105, PX-106, PX-107, PX-108, PX-110; DX-537, DX-538, DX-558; PX-400-R at 110:16-111:9, 111:11, 111:21-112:15, 112:17-19.

126. To resolve whether SKAT breached Section 8(f), the Court is required to review all of the communications to which SKAT points as evidence of its compliance and to which Stein, Lhote, and McGee point as evidence of SKAT's failure to comply.

127. Between April 24, 2019, and April 25, 2019, Gry Ahlefeld Engel ("Ahlefeld-Engel"), a SKAT official, communicated with Per Fiig ("Fiig"), a senior SØIK official, through e-mail about the status of the settlement negotiations.

*See* PX-101.

128. The April 24, 2019, through April 25, 2019, e-mail chain includes:

    (a)    Fiig requesting clarification about the Letter of Intent;

(b)     Ahlefeld-Engel confirming that the owners of North Channel Bank (Stein, Lhote, and McGee) are not released from criminal liability under the Settlement Agreement;

(c)     Ahlefeld-Engel confirming that Stein, Lhote, and McGee hope that "their cooperation in the civil track will have a mitigating effect in the criminal, but nothing more"; and

(d)     Ahlefeld-Engel confirming that she has not heard that Stein, Lhote, and McGee are "pleading guilty and seeking a full resolution like the bank."

*See* PX-101.

129.  The April 24, 2019, through April 25, 2019, e-mail chain includes no specific information about the Settlement Agreement other than that Stein, Lhote, and McGee would not be released from criminal liability under the Settlement Agreement, but they hoped their cooperation would potentially have an effect on the criminal track.

*See* PX-101.

130.  On May 15, 2019, Ahlefeld-Engel sent a to Fiig an e-mail by which SKAT communicated, among other things, part of what would become the final text of Section 8(f) and was then referred to as Section 8(d).

*See* PX-105.

131.  The final sentence of Section 8(f) -- "Upon request by SØIK, [SKAT] may provide and/or disclose the entirety of this Agreement to SØIK" -- was *not* provided to SØIK.  As noted below, SØIK was unaware for more than 18 months that SKAT was permitted to disclose the Settlement Agreement upon request.

PX-104, 105, 122; PX-400-R at 135:8-17, 138:4-11, 337:11-338:20; Tr. 331:2-4 (Bechmann).

132.  In sum, the May 15, 2019, e-mail also informed SØIK that:

(a)     the Settlement Agreement only relates to civil claims;

24

(b)    it was still under discussion whether SKAT would be able to share the agreement and the cooperation material with SØIK; and

(c)    under the draft Letter Agreement, if North Channel Bank has to pay a fine, the amount paid will be credited to the amount due under the Settlement Agreement.

*See* PX-105.

133.    The May 15, 2019, e-mail reflects that SKAT would only provide limited information about the agreement.

*Id.* ("I am aware that it is difficult to read without context.").

134.    The May 15, 2019, e-mail did not inform SØIK of at least the following terms of the Settlement Agreement and Letter Agreement, which were the most central to the nature of the bargains contained in them:

(a)    the payments to be made and the timeframe in which they would be made;

*See* PX-104 at §§ 2(a-d) (outlining payment terms, timing of payments, and interest).

(b)    the nature of the cooperation obligations undertaken in the Settlement Agreement, including the great extent of the information to be provided, the manner in which the cooperation obligations would be invoked (primarily by a mere request of SKAT), and the requirement that Stein, Lhote, and McGee use best efforts to ensure that their cooperation was meaningful and productive, with best efforts having a known legal meaning under New York law;

*See id.* at §§ 1(g) (defining "Cooperation Information"), 7(a) (providing the Covered Parties will provide Cooperation Information), 7(b) (providing the Covered Parties will provide attorney proffers at SKAT's request), 7(g) (providing the covered Parties will use their best efforts to ensure cooperation with SKAT is "meaningful and productive"); Tr. 326:18-327:5, 328:20-23 (acknowledging May 15, 2019, e-mail does not contain information about cooperation obligations) (Bechmann); Tr. 415:21-416:13 (same) (Ahlefeld-Engel).

25

(c)    the nature of the assurances of payment that Stein, Lhote, and McGee would be providing to SKAT in the form of the 2019 Affidavit of Confession of Judgment and the requirement to provide an updated affidavit of confession of judgment, which would have the effect of extending those assurances;

*See* PX-104 at § 4(c) (undertaking obligation to execute affidavit of confession of judgment and updated affidavit of confession of judgment).

(d)    the special payment obligations that Stein, Lhote, and McGee, as Covered Parties' Designees, distinct from the remainder of the Covered Parties, undertook, for example to pay interest and additional interest in the event of a default;

*See id.* at §§ 1(j) (identifying Stein, Lhote, and McGee as the "Covered Parties' Designees"), 2(c) (undertaking obligation to pay interest), 2(d)(i) (undertaking obligation to pay Subsequent Cash Payment Amount), 2(d)(iii) (undertaking obligation to pay interest), 5 (undertaking obligation to pay in an Event of Default).

(e)    the requirement that Stein, Lhote, and McGee produce records sufficient to establish Net Proceeds and that they certify the accuracy of the Final Net Proceeds List;

*See id.* at § 2(e)(i).

(f)    the certain illiquid assets that Stein, Lhote, and McGee undertook to liquidate to pay the Subsequent Cash Payment Amount, other than North Channel Bank;

*See* PX-109 at § 3, Annex A; Tr. 339:21-340:6, 341:14-16 (Bechmann).

(g)    the requirement to provide quarterly progress reports regarding their efforts to liquidate the assets;

*See* PX-109 at § 4.

(h)    the best efforts obligations that Stein, Lhote, and McGee undertook to liquidate the assets;

26

*See id.* at § 5, Annex A; Tr. 341:5-12 (Bechmann).

(i)     the requirement to apply the proceeds of liquidation of such assets to the Final Settlement Amount; and

*See* PX-109 at § 5, Annex A.

(j)     the requirement that proceeds of the sale of North Channel Bank be paid to SKAT, which, to the detriment of Stein, Lhote, and McGee, would not be applied to the payments required by the Settlement Agreement.

*See id.* at § 7, Annex A.

135.    The May 15, 2019, e-mail, as well as any other communication between SKAT and SØIK prior to May 28, 2019, could not represent that the Settlement Agreement reflected good-faith negotiation by the Covered Parties because:

(a)     the Settlement Agreement had not yet been executed;

(b)     the Initial Cash Payment had not been made, which would have confirmed that the Covered Parties were complying with the Settlement Agreement in good faith; and

(c)     no releases had been secured under the Settlement Agreement.

*See* Tr. 318:8-17; 320:4-5 ("Q: This is a provision of an unsigned agreement, correct? A: Yes."), 333:16-334:9 ("Q: The negotiations were ongoing at this point, correct? A: Yes.  Q: And so at that point in time on May 5 - May 15, could it be said that the agreement reflects good faith negotiations if the agreement had not been signed, . . . and if the negotiations were still ongoing?"), 336:26-337:2 (SKAT stipulating no payments were made by May 15 and the releases were not given as of May 15), 338:12-339:4 ("Q: It would bear negatively on the covered parties' good faith if the 950 wasn't paid, correct?  THE COURT: It would be the end of the deal is what it would be.  Q:  It would be end of the deal, right?  A:  (In Danish) Not totally.  That it would be a breach of all the agreement.  Q: But that too, correct?  A: (In Danish) Yes, but that would be the most significant thing to SKAT.  There would be agreement then.  Q: And it would suggest bad faith on the part of the covered parties, right? A: (In Danish) It would be a lot of

27

things.  All of that.  There would have been no reason to negotiate to begin with.") (Bechmann).

136.  After the execution of the Settlement Agreement, these conditions would not occur until the completion of the Initial Cash Payment.

*See* Stein ¶ 33(a)(i); Lhote ¶ 33(a)(i); Tr. 320:6-21 (Bechmann).

137.  On September 20, 2019, Ahlefeld-Engel forwarded to Fiig the same May 15, 2019, e-mail.  At this point, the Settlement Agreement was executed, however the e-mail still does not identify, at a minimum, the terms of the Settlement Agreement and Letter Agreement identified above.  The September 20, 2019, e-mail does not comply with Section 8(f) any more or less than the May 15, 2019, e-mail does.

*See* DX-543; PPSOF at ¶¶ 134(a-j); Tr. 430:1-431:8 (Ahlefeld-Engel).

138.  On May 16, 2019, Steen Bechmann Jacobsen ("Bechmann"), a SKAT official, sent an e-mail to Morton Niels Jakobsen ("Jakobsen"), a SØIK official, attaching a draft of the press release that SKAT intended to issue to announce the Settlement Agreement.

*See* DX-558.

139.  The May 16, 2019, e-mail is part of a larger chain of internal e-mails within SKAT and does not include the attachment that was sent to SØIK.

140.  The May 16, 2019, e-mail states:

(a)  possible quotes from the Minister of Justice are missing from the draft press release;

(b)  "the department will draft some s-called principles within which the Minister's possible quotes will be";

(c)  SKAT will send to SØIK the principles once they are received; and

(d)  SKAT anticipates there will be a number of changes to the press release in the next few days, especially because the settling parties will receive and review it.

28

141. In the absence of the draft press release that was provided to SØIK, there is no information in this e-mail consistent with the representations SKAT was required to make to SØIK pursuant to Section 8(f).

142. On May 20, 2019, Bechmann sent an e-mail to Jakobsen attaching a further draft of the press release that SKAT intended to issue to announce the Settlement Agreement and a set of principles that SKAT intended as guides for public comments on the settlement.

   *See* DX-537; DX-538 (substantially similar to DX-537); PX-107; PX-400-R at 163:10-13, 163:25-164:13.

143. The May 20, 2019, e-mail from Bechmann sent to Jakobsen, and the attached draft press release and principles for communication, stated that:

   (a)    SKAT entered into a Settlement Agreement with "61 American pension plans and a number of associated individuals and companies";

   (b)    SKAT expected the pension plans, individuals, and companies to return to the Danish state "approximately DKK 1.6 billion" that the "parties agree to repay";

   (c)    the Settlement Agreement resolved "the Danish State's civil law claims against the settlement parties";

   (d)    the 61 pension plans "committed themselves to cooperating and assisting in [SKAT]'s efforts in the remaining cases";

   (e)    the Settlement Agreement is confidential;

   (f)    the "settlement amount consists of an immediate payment of approximately DKK 950 million and a balance of DKK 650 million, payable over a period of up to four years."

   (g)    the parties to the Settlement Agreement will refer to each other without reference to intentional fraudulent behavior by the Pension Plans and associated individuals and companies;

   (h)    the parties to the Settlement Agreement agree the subject of the case is not referred to as fraud, but counterparties to the Settlement Agreement have agreed to repay the amount;

29

(i)    the Settlement Agreement is not an acknowledgement by the Pension Plans that they knew they were not entitled to apply for dividend refunds; and

(j)    the Settlement Agreement is an expression that the counterparties agree to pay the amount back to the Danish state.

*See* DX-537; DX-538 (substantially similar to DX-537); PX-107.

144.    The May 20, 2019, e-mail and its attachments do not disclose to SØIK:

(a)    the nature of the cooperation obligations undertaken in the Settlement Agreement, including the great extent of the information to be provided, the manner in which the cooperation obligations would be invoked (primarily by a mere request of SKAT), and the requirement that Stein, Lhote, and McGee use best efforts to ensure that their cooperation was meaningful and productive, with best efforts having a known legal meaning under New York law;

(b)    the nature of the assurances of payment that Stein, Lhote, and McGee would be providing to SKAT in the form of the 2019 Affidavit of Confession of Judgment and the requirement to provide an updated affidavit of confession of judgment, which would have the effect of extending those assurances;

(c)    the special payment obligations that Stein, Lhote, and McGee, as Covered Parties' Designees, distinct from the remainder of the Covered Parties, undertook, for example to pay interest and additional interest in the event of a default;

(d)    the requirement that Stein, Lhote, and McGee produce records sufficient to establish Net Proceeds and that they certify the accuracy of the Final Net Proceeds List;

(e)    the certain illiquid assets that Stein, Lhote, and McGee undertook to liquidate to pay the Subsequent Cash Payment Amount;

(f)    the requirement to provide quarterly progress reports regarding their efforts to liquidate the assets;

(g)    the best efforts obligations that Stein, Lhote, and McGee undertook to liquidate the assets;

30

(h)     the requirement to apply the proceeds of liquidation of such assets to the Final Settlement Amount; and

(i)     the requirement that proceeds of the sale of North Channel Bank be paid to SKAT, which, to the detriment of Stein, Lhote, and McGee, would not be applied to the payments required by the Settlement Agreement.

*See* PPSOF at ¶¶ 134(b-j).

145.    On May 21, 2019, Bechmann sent Jakobsen an e-mail providing the text of what would become Section 9 of the Settlement Agreement, which, in general, prohibits the parties to the Settlement Agreement from making disparaging remarks about any other party, subject to certain exceptions. One of the purposes of the e-mail was to give Jakobsen comfort that SKAT officials would be able to assist SØIK in connection with future criminal prosecutions.

*See* PX-110; PX-400-R at 183:17-184:10; PX-104 at § 9; Tr. 343:25-344:4 (Bechmann).

146.    The May 21, 2019, e-mail from Bechmann to Jakobsen did not disclose to SØIK:

(a)     the payments to be made and the timeframe in which they would be made;

(b)     the nature of the cooperation obligations undertaken in the Settlement Agreement, including the great extent of the information to be provided, the manner in which the cooperation obligations would be invoked (primarily by a mere request of SKAT), and the requirement that Stein, Lhote, and McGee use best efforts to ensure that their cooperation was meaningful and productive, with best efforts having a known legal meaning under New York law;

(c)     the nature of the assurances of payment that Stein, Lhote, and McGee would be providing to SKAT in the form of the 2019 Affidavit of Confession of Judgment and the requirement to provide an updated affidavit of confession of judgment, which would have the effect of extending those assurances;

31

(d)   the special payment obligations that Stein, Lhote, and McGee, as Covered Parties' Designees, distinct from the remainder of the Covered Parties, undertook, for example to pay interest and additional interest in the event of a default;

(e)   the requirement that Stein, Lhote, and McGee produce records sufficient to establish Net Proceeds and that they certify the accuracy of the Final Net Proceeds List;

(f)   the certain illiquid assets that Stein, Lhote, and McGee undertook to liquidate to pay the Subsequent Cash Payment Amount;

(g)   the requirement to provide quarterly progress reports regarding their efforts to liquidate the assets;

(h)   the best efforts obligations that Stein, Lhote, and McGee undertook to liquidate the assets;

(i)   the requirement to apply the proceeds of liquidation of such assets to the Final Settlement Amount; and

(j)   the requirement that proceeds of the sale of North Channel Bank be paid to SKAT, which, to the detriment of Stein, Lhote, and McGee, would not be applied to the payments required by the Settlement Agreement.

*See* PPSOF at ¶¶ 134 (a-j).

147.   On May 21, 2019, Ahlefeld-Engel sent an e-mail to Fiig attaching a draft list of the Covered Parties.

*See* PX-108; PX-400-R at 114:18-22, 114:24-115:5, 174:21-25, 175:24-176:11.

148.   The May 21, 2019, e-mail providing the list of the Covered Parties informed SØIK that:

(a)   the list of Covered Parties is not expected to change; and

(b)   the list of Covered Parties is to be kept confidential.

*See* PX-108.

32

149. It did not distinguish the Covered Parties' Designees from the Covered Parties.

   *Id.*; Tr. 345:19-346:10 (Bechmann).

150. The May 21, 2019, e-mail, and the attached list of Covered Parties, did not disclose to SØIK:

   (a)   the payments to be made and the timeframe in which they would be made;

   (b)   the nature of the cooperation obligations undertaken in the Settlement Agreement, including the great extent of the information to be provided, the manner in which the cooperation obligations would be invoked (primarily by a mere request of SKAT), and the requirement that Stein, Lhote, and McGee use best efforts to ensure that their cooperation was meaningful and productive, with best efforts having a known legal meaning under New York law;

   (c)   the nature of the assurances of payment that Stein, Lhote, and McGee would be providing to SKAT in the form of the 2019 Affidavit of Confession of Judgment and the requirement to provide an updated affidavit of confession of judgment, which would have the effect of extending those assurances;

   (d)   the special payment obligations that Stein, Lhote, and McGee, as Covered Parties' Designees, distinct from the remainder of the Covered Parties, undertook, for example to pay interest and additional interest in the event of a default;

   (e)   the requirement that Stein, Lhote, and McGee produce records sufficient to establish Net Proceeds and that they certify the accuracy of the Final Net Proceeds List;

   (f)   the certain illiquid assets that Stein, Lhote, and McGee undertook to liquidate to pay the Subsequent Cash Payment Amount;

   (g)   the requirement to provide quarterly progress reports regarding their efforts to liquidate the assets;

   (h)   the best efforts obligations that Stein, Lhote, and McGee undertook to liquidate the assets;

33

(i)    the requirement to apply the proceeds of liquidation of such assets to the Final Settlement Amount; and

(j)    the requirement that proceeds of the sale of North Channel Bank be paid to SKAT, which, to the detriment of Stein, Lhote, and McGee, would not be applied to the payments required by the Settlement Agreement.

*See* PPSOF at ¶¶ 134(a-j); Tr. 346:11-21 (Bechmann); Tr. 416:18-417:15 (Ahlefeld-Engel).

151.    On May 21, 2019, there was a second e-mail from Bechmann to Jakobsen that attached an edited version of the principles that SKAT intended as guides for its minister in publicly commenting on the settlement.

*See* PX-110; PX-400-R at 183:17-184:10.

152.    The second May 21, 2019, e-mail from Bechmann to Jakobsen and the attached draft principles for communication:

(a)    forwarded to SØIK the text of what would become Section 9 of the Settlement Agreement that was previously provided in the first May 21, 2019, e-mail;

*See* PX-110.

(b)    explained that the principles of communication have been amended; and

(c)    provided in the principles of communication that:

(i)    the parties to the Settlement Agreement will refer to each other without reference to intentional fraudulent behavior by the Pension Plans and associated individuals and companies;

(ii)    the parties to the Settlement Agreement agree the subject of the case is not referred to as fraud, but counterparties to the Settlement Agreement have agreed to repay the amount, without prejudice to any possible criminal actions;

(iii)    the Settlement Agreement is not an acknowledgement of the Pension Plans that they knew they were not entitled to apply for

34

dividend refunds;

(iv)    the Settlement Agreement is an expression that the counterparties agree to pay amount back to the Danish state, without prejudice to any possible criminal actions; and

(v)    the Settlement Agreement does not prevent the Minister of Taxation or representatives of SKAT from commenting appropriately on the progress of law enforcement authorities, including charges, indictments, or any subsequent criminal convictions.

*See* PX-110.

153.    The second May 21, 2019, e-mail and the attached draft principles for communication did not disclose to SØIK:

(a)    the payments to be made and the timeframe in which they would be made;

(b)    the nature of the cooperation obligations undertaken in the Settlement Agreement, including the great extent of the information to be provided, the manner in which the cooperation obligations would be invoked (primarily by a mere request of SKAT), and the requirement that Stein, Lhote, and McGee use best efforts to ensure that their cooperation was meaningful and productive, with best efforts having a known legal meaning under New York law;

(c)    the nature of the assurances of payment that Stein, Lhote, and McGee would be providing to SKAT in the form of the 2019 Affidavit of Confession of Judgment and the requirement to provide an updated affidavit of confession of judgment, which would have the effect of extending those assurances;

(d)    the special payment obligations that Stein, Lhote, and McGee, as Covered Parties' Designees, distinct from the remainder of the Covered Parties, undertook, for example to pay interest and additional interest in the event of a default;

(e)    the requirement that Stein, Lhote, and McGee produce records sufficient to establish Net Proceeds and that they certify the accuracy of the Final Net Proceeds List;

(f)    the certain illiquid assets that Stein, Lhote, and McGee undertook to liquidate to pay the Subsequent Cash Payment Amount;

(g)    the requirement to provide quarterly progress reports regarding their efforts to liquidate the assets;

(h)    the best efforts obligations that Stein, Lhote, and McGee undertook to liquidate the assets;

(i)    the requirement to apply the proceeds of liquidation of such assets to the Final Settlement Amount; and

(j)    the requirement that proceeds of the sale of North Channel Bank be paid to SKAT, which, to the detriment of Stein, Lhote, and McGee, would not be applied to the payments required by the Settlement Agreement.

*See* PPSOF at ¶¶ 134(a-j).

154.    There was the final press release SKAT issued on May 29, 2019, by which SKAT announced the Settlement Agreement, which was substantially similar to the draft press release provided to SØIK on May 20, 2019 and did not include any additional information required to be disclosed under Section 8(f).

*See* PX-106; PX-400-R at 172:4-11; PPSOF at ¶¶ 134 (b-j); Tr. 349:23-351:10, 351:13-14, 353:24-354:10 (Bechmann); Tr. 418:25-419:25 (Ahlefeld-Engel).

155.    On cross-examination, SKAT elicited testimony about the fact that drafts of the May 29, 2019 press release were provided to Stein, Lhote, and McGee's counsel for review. The Court finds this testimony irrelevant. There is no evidence in the record that counsel for Stein, Lhote, or McGee were informed that the May 29, 2019 press release was a mode by which SKAT was intending to comply with Section 8(f). This is nothing more than a red herring.

*See* Tr. 178:15-179:5 (Lhote); 386:2-7 (Bechmann); DX-558.

36

**SKAT's September 2019 Press Release**

156.  There was a lack of clarity on SKAT's part about whether it contends that a communication between it and SØIK in September 2019 constitutes compliance, or even partial compliance, with Section 8(f).

*See* ECF No. 163 at ¶ 52; PX-115; Ahlefeld-Engel ¶ 50-52.

157.  The Court concludes that it does not.

158.  In the time between May 29, 2019 and September 2019, the Covered Parties made 9 payments to SKAT to satisfy the Initial Cash Payment. The final payment was made on August 8, 2019. Nothing in any of the documents SKAT identifies, including the press releases, discusses or references the actual payments made in that time, totaling DKK 950 million.

*See* PX-3; Tr. 182:13-20 (Lhote).

159.  On September 25, 2019, SKAT circulated a draft press release within SKAT that was aimed at addressing information about the Settlement Agreement in the press that SKAT believed was inaccurate. Indeed, Ahlefeld-Engel testified that she did not recall if the draft press release was provided to SØIK.

*See* PX-115; DX-544; Tr. 407:5-22, 424:7-18, 425:2-16, 426:1-7 ("THE COURT: Just before you go to 545, with respect to 544, the September release, did you share that, a draft of that with SØIK before it was published? THE WITNESS: I don't recall if we did or not. I don't believe it was recovered in my inbox. I can't attest to whether or not our press department shared a copy with SØIK or not.").

160.  The September 25, 2019 draft press release explained:

(a)    there are not "terms of impunity" offered as part of the Settlement Agreement;

(b)    the Settlement Agreement does not provide for a "discount equivalent to approximately DKK 2.5 billion";

(c)    the total refund amount for the 61 Pension Plans is approximately DKK 2.9 billion;

37

(d)    the parties to the Settlement Agreement are required to "'pay back the portion of [the DKK 2.9 billion] that they received, directly or indirectly'";

(e)    19 U.S. pension plans that were not part of the Settlement Agreement have recovered approximately DKK 1.2 billion, which, added to the DKK 2.9 billion, equals DKK 4.1 billion;

(f)    legal action against these 19 U.S. pension plans is being undertaken by SKAT;

(g)    the assertion that these 19 U.S. pension plans are part of the Settlement Agreement and that the total is DKK 4.1 billion is incorrect;

(h)    the parties to the Settlement Agreement have "not committed to pay back the total refund amount of approximately DKK 2.9 million, but only the amount that the parties directly or indirectly received of the total refund amount";

(i)    the Settlement Agreement is an indication that SKAT agreed to "stop the legal proceedings against" only the parties to the Settlement Agreement "in exchange for repayment of the DKK 1.6 billion that they received, and for fulfillment by the parties to the settlement of the other obligations on cooperation, etc. . . . which strengthens [SKAT]'s ability to bring action against the other actors in the case for the remaining amount";

(j)    this is not a tax claim, but a civil action for damages and SKAT has not given the parties to the Settlement Agreement any "preferential treatment";

(k)    the Settlement Agreement represents SKAT trying to "recoup as much as possible of the DKK 12.7 billion for the Danish state"; and

(l)    the Settlement Agreement does not affect the criminal track of the case.

*See* PX-115.

161. Whether SKAT contends that the September 2019 press release constitutes full or partial compliance with Section 8(f), the press release did not disclose:

    (a)    the timeframe in which payments would be made;

    (b)    the nature of the cooperation obligations undertaken in the Settlement Agreement, including the great extent of the information to be provided, the manner in which the cooperation obligations would be invoked (primarily by a mere request of SKAT), and the requirement that Stein, Lhote, and McGee use best efforts to ensure that their cooperation was meaningful and productive, with best efforts having a known legal meaning under New York law;

    (c)    the nature of the assurances of payment that Stein, Lhote, and McGee would be providing to SKAT in the form of the 2019 Affidavit of Confession of Judgment and the requirement to provide an updated affidavit of confession of judgment, which would have the effect of extending those assurances;

    (d)    the special payment obligations that Stein, Lhote, and McGee, as Covered Parties' Designees, distinct from the remainder of the Covered Parties, undertook, for example to pay interest and additional interest in the event of a default;

    (e)    the requirement that Stein, Lhote, and McGee produce records sufficient to establish Net Proceeds and that they certify the accuracy of the Final Net Proceeds List;

    (f)    the certain illiquid assets that Stein, Lhote, and McGee undertook to liquidate to pay the Subsequent Cash Payment Amount;

    (g)    the requirement to provide quarterly progress reports regarding their efforts to liquidate the assets;

    (h)    the best efforts obligations that Stein, Lhote, and McGee undertook to liquidate the assets;

    (i)    the requirement to apply the proceeds of liquidation of such assets to the Final Settlement Amount;

(j)     the requirement that proceeds of the sale of North Channel Bank be paid to SKAT, which, to the detriment of Stein, Lhote, and McGee, would not be applied to the payments required by the Settlement Agreement; and

(k)     that the Settlement Agreement reflects good-faith negotiation by the Covered Parties.

*See* PPSOF at ¶¶ 134(a-j); PX-104 at § 8(f).

162.    SKAT's September 25, 2019, press release was issued at about the same time that SØIK issued a press release. SKAT and SØIK's press releases were issued about six week after the Covered Parties completed the Initial Cash Payment.

*See* PX-167; PX-3 at 9 (final payment toward Initial Cash Payment was paid on August 8, 2019).

163.    Ahlefeld-Engel did not recall that SØIK had issued a press release at about the same time as SKAT. She recalled only forwarding her May 15, 2019, e-mail in response to a telephone call from Fiig.

*See* Tr. at 430:13-19; 469:5-7, 470:5-20; PX-543; Ahlefeld-Engel ¶ 49.

164.    Significantly, SØIK's press release indicates the status of SØIK's investigations of the dividend arbitrage trading as of the end of September 2019. It reflects that:

(a)     the investigations were ongoing and were intended "to clarify whether there are grounds for prosecuting operators or individuals in the dividend case";

(b)     the investigations were being conducted "broadly" and "on multiple fronts";

(c)     the investigations included "networks of people and companies" that were "involved in the recovery of dividend tax from the Danish state";

(d)     the investigations required handling "a number of independent cases of considerable scope and complexity"; and

(e)     the investigations were multi-national and required establishing "investigative teams" that included "tax authorities and international partners"; and

(f)     the cases remain a high priority at SØIK " both in order to clarify whether there are grounds for prosecuting persons and companies, and in order to seize proceeds from the suspected fraud."

*See* PX-167.

165.    In addition, SØIK's press release notes that it was not until that week that SØIK received the first criminal decision in the dividend case, about four years after SØIK's investigations had started.

*See id.*; Tr. 43:2-7, 51:13-15 (Stein); Tr. 170:17-21, 192:17-19 (Lhote).

166.    SØIK's press release reflects a number of important considerations that bear on the Court's consideration of whether SKAT's conduct constitutes a material breach of Section 8(f), including:

(a)     In September 2019, SØIK was still "clarify[ing] whether there are grounds for prosecution" of various individuals and companies;

(b)     SØIK's goal was both the prosecution of responsible persons and the seizure of the proceeds;

(c)     SØIK was investigating "several different networks of people and companies" involved in the underlying conduct; and that

(d)     SØIK's investigation was particularly complicated.

PX-167.

167.    It was in the weeks following payment of the Initial Cash Payment in early August 2019 that, under Section 8(f), SKAT should have communicated with SØIK.

168.    This is why Stein and Lhote correctly stated that it would have been important for SKAT to have told SØIK that the payment had been made. This is why it was a crucial failing of SKAT that there is no written communication that the DKK 950 million had been paid.

*See* Stein ¶ 33(a)(ii)(a); Lhote ¶ 33(a)(ii)(a).

169.  It was also just at this time that, as SØIK's own press release reflects, its investigation was at an inflection point, such that the communications required by Section 8(f) might have had a material impact.  SØIK itself indicated that it was at the stage of "clarifying" the role of various actors in the underlying conduct.

      *See* PX-167 ("SØIK is investigating several different networks of people and companies that have been involved in the recovery of dividend tax from the Danish state.  SØIK's investigation is thus being conducted broadly and is happening on multiple fronts. This means that SØIK is handling a set of cases with a number of independent cases of considerable scope and complexity.").

**The Unissued Joint November 2019 Press Release**

170.  There was a lack of clarity on SKAT's part about whether it contends that a press release that it proposed be issued jointly by it and SØIK in November 2019 constitutes compliance, or partial compliance, with Section 8(f).

      *See* ECF No. 163 at ¶ 52; DX-545; Ahlefeld-Engel ¶¶ 53-56.

171.  Like the September 2019 press release, the Court concludes it does not.

172.  In November 2019, SKAT prepared a press release that was aimed to address what SKAT believed was incorrect information about the Settlement Agreement in the press.  The press release was never issued by either SØIK or SKAT.

      *See* DX-545; Tr. 407:23-408:4, 425:17-21, 428:22-423:4 (Ahlefeld-Engel).

173.  The November 2019 draft joint press release explained:

      (a)   SKAT and SØIK reject the interpretation of the Settlement Agreement in the media, including whether the parties to the Settlement Agreement may deduct expenses from the amount they have to pay to Denmark and whether SKAT agreed to pay a fine to a German bank;

      (b)   the media coverage of the Settlement Agreement gives a "very wrong impression" of the Settlement Agreement and SKAT's objective in the case;

(c)     the parties to the Settlement Agreement cannot deduct expenses paid to advisors;

(d)     the parties to the Settlement Agreement are behind 61 pension plans that participated in receiving approximately DKK 2.9 billion, of which they received approximately DKK 1.6 billion that must be repaid;

(e)     the remaining DKK 1.3 billion was received by others who are not parties to the Settlement Agreement and SKAT is suing them to recover it;

(f)     the parties to the Settlement Agreement never had the approximately DKK 2.9 billion because others took their share of the money before the parties to the Settlement Agreement got any;

(g)     SKAT did not pay a fine imposed on a German bank that is owned by some of the parties to the Settlement Agreement;

(h)     the fine is a criminal sanction that the bank must pay on its own and the Settlement Agreement entails part of the sum to be paid can be made up of the fine if the bank is sold;

(i)     if the parties to the Settlement Agreement are also fined under criminal law, the fine will be added to the DKK 1.6 billion;

(j)     there is a fact sheet published by SKAT about the Settlement Agreement;

(k)     no courts or authorities have ruled that the parties to the Settlement Agreement owe SKAT any money;

(l)     the only reason the parties to the Settlement Agreement are paying SKAT is because of the Settlement Agreement;

(m)     the question of whether anyone can be held criminally liable lies with SØIK and the law enforcement authorities in other countries;

(o)     SØIK rejects all accusations that SKAT and SØIK misinform each other; and

(p)     the media's portrayal of the Settlement Agreement harms Denmark's chances of succeeding in many foreign lawsuits SKAT was pursuing to get the rest of the DKK 12.7 billion returned.

174.    The press release did not disclose:

(a)     the timeframe in which payments would be made;

(b)     the nature of the cooperation obligations undertaken in the Settlement Agreement, including the great extent of the information to be provided, the manner in which the cooperation obligations would be invoked (primarily by a mere request of SKAT), and the requirement that Stein, Lhote, and McGee use best efforts to ensure that their cooperation was meaningful and productive, with best efforts having a known legal meaning under New York law;

(c)     the nature of the assurances of payment that Stein, Lhote, and McGee would be providing to SKAT in the form of the 2019 Affidavit of Confession of Judgment and the requirement to provide an updated affidavit of confession of judgment, which would have the effect of extending those assurances;

(d)     the special payment obligations that Stein, Lhote, and McGee, as Covered Parties' Designees, distinct from the remainder of the Covered Parties, undertook, for example to pay interest and additional interest in the event of a default;

(e)     the requirement that Stein, Lhote, and McGee produce records sufficient to establish Net Proceeds and that they certify the accuracy of the Final Net Proceeds List;

(f)     the certain illiquid assets that Stein, Lhote, and McGee undertook to liquidate to pay the Subsequent Cash Payment Amount;

(g)     the requirement to provide quarterly progress reports regarding their efforts to liquidate the assets;

(h)     the best efforts obligations that Stein, Lhote, and McGee undertook to liquidate the assets;

(i)     the requirement to apply the proceeds of liquidation of such assets to the Final Settlement Amount;

44

     (j)    that the Settlement Agreement reflects good-faith negotiation by the Covered Parties.

*See* PPSOF at ¶¶ 134(a-i); PX-104 at § 8(f).

175.    The draft November 2019 press release contained a quote that SKAT drafted for SØIK by which SKAT proposed that SØIK publicly state that SKAT and SØIK "cooperate closely to ensure optimal progress in both the civil law and criminal law tracks. The two authorities are therefore coordinating efforts on an ongoing basis, which has also been the case in relation to the concluded settlement."

*See* DX-545.

176.    Ahlefeld-Engel testified at trial that she believed this statement, along with the other statements in the draft press release, were accurate.

*See* Tr. 427:3-429:16.

177.    Notwithstanding this "close cooperation," SKAT did not offer any testimony from anyone at SØIK about what SØIK knew.

178.    And SKAT testified that it made decisions in its own interest, regardless of whether information that SKAT had may have been pertinent or useful for SØIK to know, or if the information SKAT had should, or could, have been disclosed to SØIK under the Settlement Agreement.

*See* Tr. 379:17-19 ("Q: In your view, was it in SKAT's interest to provide the Settlement Agreement to SØIK or anyone else when asked? A: No."); 393:19-394:22 (Bechmann); DX-553.

179.    The written evidence of what Ahlefeld-Engel proposed that SØIK publicly assert -- close cooperation between SKAT and SØIK -- is far more equivocal and, indeed, suggests the opposite.

180.    For example, after execution of the Settlement Agreement on May 28, 2019, and prior to the draft November 2019 press release, there was a single meeting between SKAT and SØIK and only poor recollection of what occurred at the meeting.

*See* PX-113; Ahlefeld-Engel ¶¶ 47-48 (explaining what was generally discussed at the meeting is her "best belief"); PX-400-R at 238:18-23; Tr. 486:23-487:13 (Ahlefeld-Engel).

181.   As set forth more fully below, the record evidence of what SKAT claimed was close cooperation after the draft November 2019 press release is similarly sparse.  For example:

(a)   The only written evidence of *any* further meetings after November 2019 between SKAT and SØIK is that there was one meeting in July 2020.

   *See* PX-114.

(b)   There is no written evidence of any meetings or telephone calls between SKAT and SØIK before 2022.  There are no e-mails or other documents setting up any telephone calls or meetings, no notes or summaries of any telephone calls or meetings, no documents referring to any telephone calls or meetings.

(c)   In obtaining from a Danish court orders to seize real property and bank accounts of Stein, Lhote, and McGee in April 2020, SØIK did not mention the Settlement Agreement or payments that Stein, Lhote, or McGee had made pursuant to it.  Under Danish practice and procedure, SØIK should have, and would be expected to have, disclosed and explained to the court that was considering the seizure orders how the Settlement Agreement bore on its application for seizure orders.  This is because the legal issues associated with whether a court should grant a seizure order require a determination of the necessity of the seizure order.  But at the lower court level, facts regarding the Settlement Agreement were not presented.  When the seizure orders were appealed, the prosecutor stated to the appellate court that "that there is no agreement or coordination with the tax authorities regarding the request for seizure."

   PX-14-R, 131; Stein ¶¶ 48-50; Lhote ¶¶ 48, 50; PX-300 at 8-10.

(d)   When SØIK requested a copy of the Settlement Agreement from SKAT in January 2021, SKAT officials initially believed that the agreement should be provided to SØIK, but ultimately asserted that "the settlement and the individual appendices are fundamentally

46

confidential based on the content of the agreements" and that SKAT "[could not] share the material without informing the parties to the agreement." This was false. Section 8(f) permitted SKAT to provide or disclosed the entirety of the Settlement Agreement to SØIK upon request by SØIK. And, in any event, SKAT never requested that the Covered Parties permit SKAT to share the Settlement Agreement with SØIK.

PX-131 (Jan. 22, 2021, e-mail and letter from SØIK), 122 (Bechmann Jan. 22, 2021, 10:29 e-mail; Ahlefeld-Engel Jan. 22, 2021, 10:33 e-mail), 141, 141-T; PX-104 at § 8(f); PX-403-R at Interrogatory Nos. 13 ("SKAT is unaware of any requests made to the Covered Parties to share the Settlement Agreement with SØIK."); Tr. 359:11-13 ("Q: And SKAT was permitted under the settlement agreement to provide the settlement agreement to SØIK if it asked, correct? A: Yeah.") (Bechmann).

(e)     In February 2021, SØIK sought to obtain from SKAT all of the materials that Stein, Lhote, and McGee had provided regarding three other targets of SØIK's investigation. SKAT did not respond to the request, let it sit, and, long after Stein, Lhote, and McGee were indicted, SØIK regarded the inquiry as no longer relevant.

*See* PX-125 (referring to SKAT's answers to SØIK questions 20-22); 124 (setting out questions to SKAT), 15-R; PX-400-R at 349:10-350:12.

## Oral Communications

182.    Though SKAT had oral communications with SØIK related to the Settlement Agreement, SKAT concedes that any oral communications that it may have had with SØIK, either before or after the Settlement Agreement was executed, do not constitute compliance with Section 8(f).

*See* Ahlefeld-Engel ¶ 24 ("Most of SKAT's communications with SØIK about the Settlement Agreement were oral, either through phone calls or in meetings."); PX-400-R at 114:6-115:9; Tr. 317:20-23 ("Q: You agree with me, sir, that the oral communications between SKAT and SØIK, those are not compliance with Section 8F either, are they? A: Correct.") (Bechmann); Tr. 402:5-11 ("Q: In those ten meetings, they all occurred prior to the execution of the settlement, correct? A: Correct. Q: So you will agree with

47

me that you are not here testifying that anything that occurred in any of those ten meetings was compliance with Section 8F of the settlement, correct?  A: Correct."), 402:16-19 ("Q: And you also agree with me that SKAT does not view any oral communications as being compliant with Section 8F of the settlement agreement, correct?  A: Correct.") (Ahlefeld-Engel).

183. Beyond this concession on SKAT's part and as set forth more fully below, given the emphatic nature in which Section 8(f) calls for written communications, oral communications in this case cannot constitute a form of substantial compliance with Section 8(f).

184. Section 8(f) is clear in that it requires SKAT communicate with SØIK "*in writing.*"  The writing requirement was important for several reasons, including:

    (a)    to ensure that the information SKAT imparted to SØIK would become part of the official records of SØIK and could be communicated easily and widely within SØIK;

    (b)    to ensure that any new or different SØIK personnel would have access to the same information regarding Stein, Lhote, and McGee's obligations and the representations made as required by Section 8(f);

    (c)    to ensure that SKAT's compliance with Section 8(f) could be verified if there were ever a dispute over SKAT's compliance with Section 8(f) and what information SKAT provided to SØIK pursuant to Section 8(f), thereby eliminating any uncertainly about whether SKAT complied.

*See* Stein ¶¶ 33(b)(i-vi); Lhote ¶¶ 33(b)(i-vi).

185. In this regard, what Stein, Lhote, and McGee bargained for in Section 8(f) was the certainty of a writing.  Conversely, they bargained to avoid the uncertainty about SKAT's lack of compliance with Section 8(f) that has been the subject of this litigation.

186. As a result, the Court need not make detailed findings regarding SKAT's testimony about its oral communications with SØIK.

187. In sum, the Court finds the testimony about all dimensions of SKAT's meetings and telephone calls with SØIK -- primarily when they occurred, with whom, and what was said -- to be insufficiently reliable to find that they constituted a form of substantial compliance with Section 8(f).

188. A few examples support this conclusion.

189. First, there was no testimony that anyone at SKAT orally -- either at a meeting or in a telephone call -- informed SØIK of the "terms" of the Settlement Agreement and the Letter Agreement's "terms" as the Court interprets that phrase in Section 8(f).

190. Second, Ahlefeld-Engel explained in her direct testimony that there were "approximately ten meetings with SØIK prior to the execution of the Settlement Agreement," but she could not recall when they were or the details of the meetings.  For example, she agreed that she had no detailed information about telling SØIK about the nature of the cooperation that SKAT anticipated receiving under the Settlement Agreement.

    *See* Ahlefeld-Engel ¶ 23; Tr. 401:12-15 ("Q: You cannot tell us here today under oath that you relayed in one of those meetings the cooperation you anticipated receiving under the settlement agreement, correct?  A: Not specifically, no.").

191. The record is also completely devoid of any notes, calendar appointment, summaries, or any other forms of evidence that might show that these meetings occurred, who attended them, or what was said.

192. For example, Ahlefeld-Engel also explained in her direct testimony that she could not recall:

    (a)    the details of the meetings or phone calls with SØIK on April 29, 2019, May 15, 2019, or September 20, 2019;

    (b)    other discussions in or around May 2019; or

    (c)    the June 27, 2019 meeting.

    *See* Ahlefeld-Engel ¶¶ 29, 31, 37, 47-49.

193. Bechmann's recollection is similarly poor.

49

*See* Bechmann ¶¶ 9 (failure of recollection about "interagency meetings, phone calls, and emails"), 20 (failure of recollection about telephone call with SØIK, 24 (failure of recollection of meeting with SØIK), 29 (failure of recollection of role in responding to SØIK's 2021 requests for information from SKAT).

194. Regardless of whether Ahlefeld-Engel or Bechmann could recall the details of these phone calls and meetings with SØIK, the only records that SKAT points to of what SKAT may have communicated to SØIK about the Settlement Agreement are two agendas, dated June 27, 2019, and July 3, 2020. One is three lines long and the other is not a record of what was said at the meeting, but rather a summary that was prepared *before* the meeting occurred.

*See* PX-113, 114; PX-400-R at 237:10 (explaining that PX-114 "is not a summary. This is an annotated agenda being prepared before the meeting"), 237:18-23 (confirming that there are no other written agenda relating to meetings between the beginning of 2019 and June 2021).

195. SKAT agreed that it regrets that it did not create a single writing to SØIK that informed SØIK of all of the information required by Section 8(f). If they had done so, the uncertainty about SKAT's compliance with Section 8(f) could have been avoided.

*See* Tr. 464:8-12 ("Q: Why is there not one single communication that covers all the requirements of section 8F? A: At this – in hindsight, I wish there was, but we – we never believed we were not in compliance. We complied with the communications we sent.") (Ahlefeld-Engel).

## SKAT Never Intended to Comply with Section 8(f)

196. The documents and testimony before the Court demonstrate by a preponderance of the evidence that SKAT breached Section 8(f) and, even if oral communications could be a form of substantial compliance, there is insufficient reliable evidence on which to find that SKAT orally communicated everything that was required to be communicated under Section 8(f).

197. The record evidence that SKAT breached Section 8(f) is further supported by what SKAT has itself said about its compliance with Section 8(f).

198. First, there is the fact that SKAT never formulated a plan about how it intended to comply with Section 8(f).

PX-400-R at 110:16-18 ("Q: Did [SKAT] ever formulate a plan about how it was intending to comply with Section 8(f)? A: No."); Tr. 323:15-18 ("Q: So as you understand it, there was a plan at the time of how to comply with Section 8F, correct?  A: (In Danish) No, I wouldn't say that there was an actual plan for 8F.") (Bechmann); 402:12-15 ("Q: Now, I'm correct, am I, that SKAT had never formulated a plan on how it was going to specifically comply with Section 8F of the settlement agreement, correct?  A: Correct.") (Ahlefeld-Engel).

199. When SKAT sent one of very first communications that it contends demonstrate compliance with Section 8(f), the May 15, 2019, e-mail from Ahlefeld-Engel to Fiig containing most, but not all, of the text of what became Section 8(f), it did not believe or think, at the time, that doing so was a form of compliance with Section 8(f).

*See* PX-400-R at 109:11-16, 115:10-116:16; *see* PX-105.

200. The same is true regarding the communications with SØIK about the press release that SKAT would issue upon announcement of the Settlement Agreement or the press release itself:  no one at SKAT ever believed or thought at the time that these communications were a form of compliance with Section 8(f).

*See* PX-400-R at 172:12-173:11; *see* PX-103, 106, 107, 110; DX-537, 558.

201. As set forth in more detail below, starting in, at the latest, November 2020, Stein, Lhote, and McGee's counsel was pressing SKAT to disclose to them the nature of SKAT's communications with SØIK regarding Stein, Lhote, and McGee's cooperation with SØIK.

*See generally* Miller ¶¶ 8-16.

202. These efforts culminated on Saturday, April 17, 2021, with Stein, Lhote, and McGee's counsel asking U.S. counsel for SKAT a simple and straightforward question:

First, can you send us a copy of the written communication that SKAT sent to SØIK in conformity with its obligations under Section 8(f) of the Settlement Agreement? That would be helpful for us to understand the record on this issue.

Miller ¶¶ 20-24; PX-127.

203.    Within days, Ahlefeld-Engel and two SKAT employees who reported to her, one of whom had a law degree, engaged in an effort to gather everything that had been exchanged in writing between SKAT and SØIK.  Indeed, Ahlefeld-Engel's employees engaged in this effort at least separate three times (on April 20, April 21, and April 22) in order to ensure that they had assembled a "complete package" of what had been exchanged with SØIK.

*See* PX-164, 165, 166, 169; Tr. 449-65.

204.    Despite engaging in the effort to gather a "complete package" of everything that had been "exchanged with SØIK," Ahlefeld-Engel and her two subordinates never included *any* of the written communications to which SKAT now points as evidence of its compliance with Section 8(f).  In April 2021, when she and her subordinates were seeking to compile evidence of compliance, Ahlefeld-Engel never thought that the communications to which she points now as evidence of compliance were, in fact, compliance.

*See* PX-164, 165, 166, 169; Tr. 449-65.

205.    Nearly two months later, SKAT provided the answer to Miller's question in the form of an e-mail from its U.S. counsel.

*See* Miller ¶ 30(a); PX-128; PX-401 at Request Nos. 14, 15; PX-402 at Request Nos. 18, 19; PX-403-R at Interrogatory Nos. 16, 17; PX-404-R at Interrogatory No. 12.

206.    When SKAT answered Miller's questions, it *never* pointed to any of the things to which it now points as evidence of its compliance with Section 8(f).  Specifically, the answer to Miller's question about the nature of written communication that SKAT sent to SØIK in conformity with its obligation under Section 8(f) of the Settlement Agreement does not refer to a single written document at all.  It points only to oral communications.  And it does not point to any of the communications between SKAT and SØIK prior to execution of the Settlement Agreement:

52

We can confirm that Skattestyrelsen informed SØIK on a senior level immediately after the signing of the Maya [sic] 2019 settlement agreement of all relevant sections of the agreement including the sections on good faith negotiations and the obligation to provide information and cooperation.  Subsequently, SKAT has briefed SØIK on a rolling basis on the settling parties' fulfillment of their obligations under the settlement agreement, including the extent to which they have until now provided information and cooperation.  This briefing has taken place both in meetings and in phone conversations.

PX-128; *see* PX-400-R at 358:9-20; Tr. 466:24-467:21 (Ahlefeld-Engel).

207.  Ahlefeld-Engel reviewed this communication, PX-128, before it was sent by U.S. counsel for SKAT in order to "verify whether or not that was a fair representation of [SKAT's] dialogue with SOIK."  Ahlefeld-Engel was asked if it "was a fair representation, if the contents of the email was correct."

PX-400-R at 355:13-19, 356:22-357:2.

208.  PX-128 is, in effect, an admission that SKAT had breached Section 8(f). SKAT's answer in June 2021 to the question of how it complied with Section 8(f) pointed to not a single written communication between SKAT and SØIK and pointed to nothing that occurred prior to execution of the Settlement Agreement.

209.  PX-128 is also starkly inconsistent with the assertions now that SKAT makes now that its compliance with Section 8(f) occurred as a result of a series of written communications prior to and leading up to the announcement of the Settlement Agreement.  Its June 2021 explanation of its claimed compliance pointed only to conduct "*after* the signing of the Maya [sic] 2019 settlement agreement" and to briefing that occurred "[s]ubsequently."

*Compare* PX-128 *with* ECF No. 163 at ¶ 39.

210.  The fact that SKAT never, prior to initiation of this litigation, identified any of the communications on which it now relies as evidence of compliance with Section 8(f) tends to strongly show that it never intended to comply with Section 8(f), its breach of Section 8(f) was willful, and that what is now

points to as evidence of compliance is an after-the-fact effort to paper over what was a plain breach of Section 8(f).

## SØIK "Charges" Stein, Lhote, and McGee Under Danish Law

211.  In or about May 2020, Stein, Lhote, and McGee were "charged" under Danish criminal law.  In doing so, SØIK inquired of Stein, Lhote, and McGee whether they would submit to a voluntary interview.

*See* PX-1; PX-17; Stein ¶ 44; Lhote ¶ 44; McGee ¶ 131.

212.  To be "charged" under Danish criminal law means to be informed of the nature of the charges that are being investigated and of certain rights under Danish law.

*See* Tr. 303:10-304:2 (Bechmann); PX-300 at 2 ("By 'charge,' [Madsen] refer[s] to the process by which the police identify the crimes under investigation to a subject of the investigation and inform the subject of certain rights that the subject has.").

213.  There was a considerable amount of cross-examination about the period of time in the months after Stein, Lhote, and McGee were charged in May 2020.  Among other things, there was cross-examination about, whether, during that period, Stein, Lhote, and McGee "reached out" to SØIK to expedite the scheduling of an interview or provided the Settlement Agreement to SØIK.

*See* Tr. 45:11-48:12, 52:23-25 (Stein); Tr. 172:7-173:10, 176:10-15 (Lhote); Tr. 238:21-239:13, 244:24-245:8 (McGee); *see* DX-512, 513, 516.

214.  The Court regards this testimony elicited on cross-examination as largely not relevant to the issues required for the Court to resolve the claims and defense of Stein, Lhote, and McGee.

215.  Stein, Lhote, and McGee were not required to inform SØIK of the Settlement Agreement.  Whether they did, could have, or should have does not matter in determining whether SKAT has breached Section 8(f).  It was *SKAT's* obligation to bring to the attention of SØIK the Settlement Agreement and its terms and to make certain representations to SØIK.

*See* PX-104 at § 8(f).

216.  In addition, Stein, Lhote, and McGee were permitted to assume that SKAT had complied with Section 8(f), such that they were not required to engage in a form of "self help."  Indeed, Stein testified that he and those acting on his behalf did, in fact, assume that SØIK had the Settlement Agreement, an assumption that was reasonable in light of the requirement under Section 8(f) that SKAT inform SØIK of the "terms" of the Settlement Agreement."

*See* Tr. 49:6-21 ("Q: In the ten-month period from May 2020, when SØIK first contacted you or your lawyers, through your interview in March 2021, did anyone on your behalf provide to SØIK a copy of the settlement agreement with SKAT? A: No. Because we assumed they had it.") (Stein); *Bank of N.Y. Mellon Tr. Co. v. Morgan Stanley Mortg. Cap., Inc.*, 2017 WL 698607, *1 (S.D.N.Y. Feb. 10, 2017) ("party to a contract has a right to expect performance" with contract by counter-party); *Supercom, Ltd. v. Sabby Volatility Warrant Master Fund Ltd.*, 700 F. Supp. 3d 146, 171 (S.D.N.Y. 2023) (same).

217.  Furthermore, Stein, Lhote, and McGee were not required to engage in any mitigation efforts until they actually became aware of SKAT's breach of Section 8(f).  *See* RESTATEMENT (SECOND) OF CONTRACTS § 350 (2016) ("The injured party is expected to arrange a substitute transaction within a reasonable time *after he learns of the breach*.") (emphasis added).

218.  The Court's view of this line of cross-examination is informed by the conduct of SKAT, including through its U.S. counsel, in responding to Stein, Lhote, and McGee's requests for information about SKAT's compliance with Section 8(f) and, more generally, about SKAT's communications with SØIK.

219.  Beginning around November 2020, Stein, Lhote, and McGee made considerable efforts to determine whether and how SKAT had complied with Section 8(f) and, more generally, about SKAT's communications with SØIK.  Those efforts and SKAT's responses are described more fully below.

220.  SKAT was not required, under the terms of the Settlement Agreement, to inform Stein, Lhote, or McGee how it had complied with Section 8(f).

221.  However, as set forth more fully below, SKAT agreed to provide to Stein, Lhote, and McGee information about its compliance with Section 8(f) and its communications with SØIK.  And it did not invoke the Settlement Agreement as part of a refusal to provide information.  In essence, it agreed

55

to communicate on this subject.

222. Once it chose to speak on this subject, SKAT was not permitted, consistent with the obligation of good faith and fair dealing implied under every contract under New York law, to mislead Stein, Lhote, and McGee about whether and how they complied with Section 8(f). SKAT violated this obligation.

*See Am. Home Assurance Co. v. Baltimore Gas & Electric Co.*, 1987 WL 4928, at *4 (S.D.N.Y. May 20, 1987) ("'[G]ood faith' in law implies conduct both honest and reasonable in the circumstances.").

**The Efforts to Obtain Information from SKAT About Compliance with Section 8(f) and SKAT's Failure to Provide It**

223. At the latest, starting in November 2020, Stein, Lhote, and McGee's counsel was pressing SKAT to disclose to them the nature of SKAT's communications with SØIK regarding Stein, Lhote, and McGee's cooperation with SØIK.

*See* PX-7; Stein ¶ 41; Lhote ¶ 41.

224. By that point, Stein, Lhote, and McGee had been "charged" by SØIK, meaning that, under Danish criminal procedure, they had been informed that they were under investigation for a specific offense and informed of certain rights.

*See* PX-1, 17; Stein ¶ 33(a)(iv); Lhote ¶ 33(a)(iv); PX-300 at 2.

225. SØIK was, around this time, seeking to interview Stein, Lhote, and McGee.

*See* PX-1, 17; Stein ¶¶ 43, 44; Lhote ¶¶ 44, 45; Miller ¶ 8.

226. It was important, as a matter of strategy and from their counsel's perspective, that Stein, Lhote, and McGee appear to SØIK in the best possible light prior to the interviews.

*See* Miller ¶ 9.

227. For example, it was important that SØIK be aware of the nature of Stein, Lhote, and McGee's cooperation with SKAT. Counsel for Stein, Lhote, and McGee's informed view was that it was important that the information about

cooperation come from SKAT itself and that a communication of this information from SKAT -- as opposed to a communication from Stein, Lhote, and McGee's counsel -- would be meaningfully more effective.

*See id.* ¶¶ 9(a-c); Stein ¶ 33(d)(vi); Lhote ¶ 33(d)(vi).

228. On November 10, 2020, Marshall Miller ("Miller") asked U.S. counsel for SKAT about what SØIK knew about the Settlement Agreement. U.S. counsel for SKAT indicated that he "understood that SKAT had informed SØIK of the Settlement Agreement," but disclaimed detailed knowledge about the nature of SKAT's communications with SØIK. U.S. counsel for SKAT offered to provide more information.

*See* Miller ¶ 10; Stein ¶ 41; Lhote ¶ 41.

229. Miller's colleague, Christopher Le Coney, followed up later in November 2020, and U.S. counsel for SKAT indicated that it was working on the request and hoped to have an update shortly.

*See* PX-7; Miller ¶¶ 10(b-c); Stein ¶ 41; Lhote ¶ 41.

230. In mid-January 2021, Miller again attempted to ensure that SKAT had communicated with SØIK about the Settlement Agreement and the cooperation provided pursuant to it.

*See* PX-7; Miller ¶ 11; Stein ¶ 41; Lhote ¶ 41.

231. He went so far as to draft a proposed communication for SKAT to send to SØIK. SKAT did not do so.

*See* PX-7; Miller ¶¶ 11(b-d).

232. In about mid-February 2021, Miller against sought to obtain information about whether SKAT would be open to sending a written communication to SØIK confirming the level of cooperation that had been provided by Stein, Lhote, and McGee pursuant to the Settlement Agreement.

*See* Miller ¶ 13; Stein ¶ 41; Lhote ¶ 41.

233. U.S. counsel for SKAT indicated that SKAT was not comfortable with such a communication and that such a communication is not something that SKAT would consider no matter who was making the request.

*See* Miller ¶ 13; PX-612-C-R (Miller's summary of his conversation with U.S. counsel for SKAT).

234.  By this point in mid-February 2021, SØIK had written to SKAT multiple times asking SKAT numerous questions about the Settlement Agreement and related matters, including asking about cooperation provided pursuant to the Settlement Agreement.  The letters made many requests for information.

*See* PX-118, 124.

235.  These letters by which SØIK asked these questions began on January 6, 2021 -- the same day that McGee began participating in a voluntary interview with SØIK and during which he mentioned the Settlement Agreement and the return of funds to SKAT pursuant to it.

*See* PX-118; McGee ¶¶ 132-34.

236.  The questions asked in SØIK's letters are basic questions about the Settlement Agreement, including: (a) who the parties are; (b) what refunds are covered; (c) what comprises the settlement sum; (d) whether SKAT had been provided with security for the payments to be made; and (e) what the nature of resolution between the parties and SKAT is.

*See* PX-118.

237.  SØIK also inquired about the nature of confidentiality clauses in the Settlement Agreement.

*See* PX-118.

238.  SØIK also asked whether the parties to the Settlement Agreement "helped contribute documents for use in the prosecution of the [SKAT]'s claims against individuals or entities not covered by the settlement" and whether they "helped contribute information and answer questions from the [SKAT] for the identification of and prosecution of the [SKAT]'s claims against individuals or entities not covered by the settlement."

*See* PX-123, 131.

239.  By that point, SKAT had provided written responses to SØIK's prior letters, but the responses provided very little detail about the nature of the Covered Parties' Designees' cooperation.

*See* PX-121, 124, 131, 141.

240.  At no time did U.S. counsel for SKAT inform Miller about these communications, either SØIK's questions or SKAT's answers.

*See* Miller ¶¶ 15-16; *see* PX-612-C-R.

241.  In one of the communications that SØIK made to SKAT, dated January 22, 2021, SØIK requested that SKAT provide a copy of the Settlement Agreement.  In the request, SØIK noted that it had obtained several seizure orders that it surmised were directed towards individuals who were part of the Settlement Agreement and that those seizure orders have now been appealed "with reference to the [S]ettlement [A]greement."

*See* PX-131.

242.  SØIK's reference to an appeal of seizure orders concerned seizure orders that SØIK had obtained *ex parte* in about April 2020 that permitted seizure of fifty percent interests in Stein and Lhote's homes, as well as bank accounts associated with Stein, Lhote, and McGee.

*See* PX-14-R, 131; Stein ¶¶ 48-50; Lhote ¶¶ 48, 50.

243.  There is strong evidence that SØIK did not inform the court that granted the seizure orders about the Settlement Agreement or payments that Stein, Lhote, or McGee made pursuant to it.  There also exists strong circumstantial evidence that, only when the seizure orders were appealed, was any Danish court informed about the Settlement Agreement or payments made under it.

*See* PX-14-R; PX-300 at 8-10.

244.  Several months before, in November 2020, SØIK, referring to itself by the acronym of its name translated into English ("SEIC") sought assistance of the United States Department of Justice in enforcing the seizure orders.

*See* PX-12.

245.  In the course of doing so, SØIK inquired about the impact of the Settlement Agreement on U.S. enforcement of the seizure orders.  SØIK wrote to the United States Department of Justice:

The State Prosecutor for Serious Economic and International Crime (SEIC) investigates a number of cases concerning presumed fraud committed against the Danish tax authorities (SKAT). The total amount that has been defrauded from SKAT is more than DKK 12.000.000.000 (~ USD 1,912,000,000). *SEIC is aware that SKAT has reached a settlement with an unknown number of parties regarding the amount of DKK 2.900.000.000 (~ USD 462,000,000) related to 61 US pension plans. SEIC are not in possession of the settlement and has no knowledge of any details in it, including who is involved, besides the amount and the number of pension plans.* The reason for this is a non-disclosure clause in the settlement. Is the settlement an obstacle in relation to our request for seizure made against the suspects in the US? It should be noted that if/when the case goes to court, SKAT will have to present the claim for compensation, including the amount thereof. If they have received money from the defendants, the claim will be deducted accordingly.

*See id.* at 4-5 (11/20/2020 email) (emphasis added).

246. SKAT responded to SØIK's January 22, 2021, request for the Settlement Agreement referred to above in paragraph 241 by indicating that, among other things, SKAT cannot "share the material without informing the parties to the agreement."

*See* PX-141.

247. This was false. The Settlement Agreement expressly provides that "[u]pon request by SØIK, [SKAT] may provide and/or disclose the entirety of this Agreement to SØIK," but SKAT never informed SØIK of this. Under the Settlement Agreement, SKAT was permitted to provide the Settlement Agreement to SØIK.

*See* PX-104 at § 8(f); PX-131 (Jan. 22, 2021, e-mail and letter from SØIK), 122 (Bechmann Jan. 22, 2021, 10:29 e-mail; Ahlefeld-Engel Jan. 22, 2021, 10:33 e-mail), 141, 141-T; PX-104 at § 8(f); PX-403-R at Interrogatory Nos. 13 ("SKAT is unaware of any requests made to the Covered Parties to share the Settlement Agreement with SØIK."); Tr. 359:11-13 ("Q: And SKAT was permitted under the settlement agreement to provide the settlement agreement to SØIK if it asked, correct? A: Yeah.") (Bechmann).

248.  SØIK sought still more information from SKAT at the end of February 2021.  Specifically, SØIK indicated that, based on SKAT's response to SØIK's  January 28, 2021 letter, it appeared that "the three main shareholders in North Channel Bank have assisted in obtaining documents for use in the prosecution of the [SKAT]'s claims against individuals or entities that are not included in the settlement."  The "three main shareholders" reference was to Stein, Lhote, and McGee.

*See* PX-123, 125.

249.  After noting this observation, SØIK requested "all materials concerning," among other people, "Rajen Shah, Anupe Dhorajiwala, and Graham Horn that [SKAT] or [SKAT]'s counsel might be in possession of."

PX-125.

250.  SØIK's request for information concerned, among others, three people who were eventually indicted together with Stein, Lhote, and McGee in April 2021.  The clear inference is that SØIK was seeking information to assist it in bringing charges against these three people.

*See id.*; Stein ¶ 14(e); Lhote ¶ 14(e).

251.  SKAT did not provide the requested information to SØIK.

*See* PX-400-R at 349:10-350:12.

252.  Starting in March 2021, Stein and Lhote were interviewed over multiple days.  During their interviews, it became apparent to them and to their U.S. counsel that SØIK did not have a copy of the Settlement Agreement.

*See* Stein ¶¶ 46-47; Lhote ¶¶ 46-47; Miller ¶¶ 17-18.

253.  In fact, SKAT did not end up providing SØIK a copy of the Settlement Agreement until after this litigation was initiated in late March 2023.

*See* PX-400-R at 90:3-22; Tr. 429:19-23 (Ahlefeld-Engel).

**The Indictment and the Further Efforts to Obtain**
**Information About SKAT's Compliance With Section 8(f)**

254. SØIK indicted Stein, Lhote, and McGee in early April 2021 together with Rajen Shah, Anupe Dhorajiwala, and Graham Horn, the three people about whom SØIK, earlier in 2021, had asked SKAT for information that SØIK understood, from SKAT's responses in 2021, "the three main shareholders in North Channel Bank" had provided.

   *See* PX-123, 125; DX-520; Stein ¶ 14(e); Lhote ¶ 14(e); McGee ¶ 143.

255. The indictment asserted that Stein, Lhote, and McGee were responsible for losses of about DKK 1.135 billion.

   *See* Stein ¶ 14(b); Lhote ¶ 14(b); DX-520.

256. By the time of the indictment, Stein, Lhote, and McGee had paid DKK more than DKK 1 billion pursuant to the Settlement Agreement and the Letter Agreement.

   PX-3, 6; McGee ¶ 141.

257. By the time of the indictment, Stein, Lhote, and McGee had at least another DKK 540 million to pay under the Settlement Agreement.

   *See* PX-104 at § 2(a-b).

258. The indictment had a severe negative impact on, among other things, Stein, Lhote, and McGee's ability to liquidate the most valuable of the assets required to be liquidated under the Letter Agreement, interests in North Channel Bank.

259. North Channel Bank was, at the time of the execution of the Settlement Agreement and the Letter Agreement, expected to realize approximately DKK 322 million.  In fact, in entering the Settlement Agreement, Stein, Lhote, and McGee expected these assets to be sold in order to make the Additional Cash Payment.

   *See* Stein ¶¶ 28(a)(viii)(a-c); Lhote ¶¶ 28(a)(viii)(a-c); McGee ¶¶ 86, 147, 149; PX-109 at Annex A; Tr. 217:24-218:14 (describing manner in which estimate of sale value of DKK 322 million was determined) (Lhote).

260.  After the Settlement Agreement and Letter Agreement were executed, there were indications of interest in buying the bank at around €42.5 million Euros.

    *See* Tr. 219:20-220:16 (Lhote).

261.  After the April 2021 indictment of Stein, Lhote, and McGee, the German regulators of the bank took action to limit the ability of the bank to engage in its core lending business and, ultimately, forced the bank into liquidation. The ultimate owners of nearly all of the bank -- Stein, Lhote, and McGee -- were deemed not fit and proper to own the bank.

    *See* Tr. 221:22-222:9, 224:2-16 (Lhote).

262.  The expected value of the bank in liquidation is zero.

    *See* Tr. 224:17-21 (Lhote).

263.  The root cause of the decline in value of the bank was the indictment of Stein, Lhote, and McGee and, later on, subsequent actions by SKAT.

    *See* Tr. 224:22-225:19 (Lhote).

264.  To this day, North Channel Bank has not been sold and is in liquidation.

    *See* Stein ¶¶ 28(a)(viii)(a-c); Lhote ¶¶ 28(a)(viii)(a-c); McGee ¶¶ 86, 147, 149; PX-109 at Annex A.

265.  And to this day, there remain funds in accounts frozen at North Channel Bank by court order.  These accounts were to be, and could still be, liquidated in order to satisfy the Additional Cash Payment.  Over the course of multiple quarterly reports provided pursuant to the Letter Agreement, Stein, Lhote, and McGee repeatedly requested that SKAT provide an update regarding these accounts, which were intended to be used to satisfy the Additional Cash Payment.  SKAT never provided one.

    *See* PX-109 at Annex A (estimating value of pension plan accounts at North Channel Bank and another custodian at DKK 30 million); Tr. 127:12-18, 128:13-132:16 (Stein); PX-210-R (Danish court order concerning seizure of accounts at North Channel Bank); PX-211-R (reciprocal German court order concerning seizure of accounts at North Channel Bank).

63

266.  The indictment also had a severe negative impact on McGee's ability to earn money to make payments under the Settlement Agreement.  For example, the indictment resulted in McGee losing his position as an officer and director of AdaptHealth LLC, depriving him of substantial compensation. The indictment similarly frustrated McGee's ability to gain comparable employment since 2021.  The indictment also negatively impacted Lhote's income earning possibilities.

*See* McGee ¶¶ 151-54; *see* Lhote ¶ 29(a)(viii)(d).

267.  The indictment caused Miller to be immediately concerned that Stein and Lhote might be extradited to Denmark and detained there.

*See* Miller ¶ 21.

268.  As a result, it was important to be able to demonstrate to a Danish court that Stein and Lhote had made commitments under the Settlement Agreement and were abiding by those commitments, such that extradition and, if extradition occurred, pre-trial detention were not warranted under the circumstances.

*See* Miller ¶ 22(a).

269.  Accordingly, starting very shortly after the April 2021 indictment, Miller repeatedly sought to have U.S. counsel for SKAT respond to the following two specific questions, among others:

> "1.  First, can you send us a copy of the written communication that SKAT sent to SØIK in conformity with its obligations under Section 8f of the Settlement Agreement?  That would be helpful for us to understand the record on this issue.
>
> 2.  Relatedly, based on our conversation, it's unclear to us whether a request was ever made by SØIK to SKAT for a copy of the full agreement, as contemplated in Section 8f.  Can you confirm whether such a request was made by SØIK, and if so, by whom, so that we know where to direct our conversations within SØIK?"

*See* Miller ¶¶ 23-28; PX-127.

270. A few weeks after Miller began to ask these questions, in early June 2021, Stein, Lhote, and McGee provided SKAT with an updated affidavit of confession of judgment (the "2021 Affidavit of Confession of Judgment").

*See* Miller ¶ 29; Lhote ¶ 67; McGee ¶¶ 126, 162; PX-129.

271. The 2021 Affidavit of Confession of Judgment reflects that, by that point, McGee resided in Philadelphia and Lhote resided in Florida.

*See* Lhote ¶ 67; McGee ¶¶ 126, 162; PX-129; Tr. 166:25-167:8 (Lhote); *see also* PX-104 at Exh. 5.

272. By this point, New York law regarding the enforceability of affidavits of confession of judgment executed by persons who were not residents of New York had changed such that, in general, such affidavits of confessions of judgment were not effective.

*See* CPLR 3218; SIEGEL'S N.Y. PRACTICE § 300 (6th ed. & Supp.).

273. U.S. counsel for SKAT did not raise the impact of the change in law with U.S. counsel for Stein or Lhote.

*See* Miller ¶ 29.

274. SKAT itself, as distinct from its U.S. counsel, had no knowledge of the change in law.

*See* PX-400-R at 362:13-19, 362:25-363:13, 364:13-20.

275. The Settlement Agreement contained a requirement that the Parties negotiate in good faith to modify the Settlement Agreement in accordance with the original intent of the parties if any aspect of the Settlement Agreement was held by a court or other authority to be "invalid, void, or unenforceable."

*See* PX-104 at § 17.

276. In late June 2021, SKAT responded to Miller's e-mail about SKAT's compliance with Section 8(f):

> We can confirm that Skattestyrelsen informed SØIK on a senior level immediately after the signing of the Maya [sic] 2019 settlement agreement of all relevant sections of the agreement including the

sections on good faith negotiations and the obligation to provide information and cooperation. Subsequently, SKAT has briefed SØIK on a rolling basis on the settling parties' fulfillment of their obligations under the settlement agreement, including the extent to which they have until now provided information and cooperation. This briefing has taken place both in meetings and in phone conversations.

*See* Miller ¶ 30(a); PX-128; PX-401 at Request Nos. 14, 15; PX-402 at Request Nos. 18, 19; PX-403-R at Interrogatory Nos. 16, 17; PX-404-R at Interrogatory No. 12.

277.  As set forth above, SKAT's late June 2021 answer is fundamentally inconsistent with its sworn testimony regarding the manner that it claimed at deposition to have complied with Section 8(f), which largely is based on a handful of written communications that occurred in the weeks culminating with the execution of the Settlement Agreement and its announcement by SKAT.

*See* PX-128; PX-400-R at 110:16-111:9, 111:11, 111:21-112:15, 112:17-19.

278.  SKAT's late June 2021 answer is also fundamentally inconsistent with a communication that it sent after this litigation was initiated.  On April 21. 2023, U.S. counsel for SKAT wrote to counsel for Stein and Lhote and asserted that two specific pieces of correspondence established that SKAT made the representations required under Section 8(f).

*See* PX-9, 11, 128.

279.  One of the writings to which U.S. counsel for SKAT referred was one of the letters that SKAT wrote to SØIK in January 2021, more than 18 months after execution of the Settlement Agreement, and only after SØIK began to inquire about the Settlement Agreement.

*See* PX-9, 11, 118.

280.  SKAT disclaims and does not contend that its 2021 written communications to SØIK satisfy Section 8(f).

*See* PX-400-R at 110:16-111:9, 111:11, 111:21-112:15, 112:17-19.

281. Miller's testimony about his interactions with U.S. counsel for SKAT was unimpeached at trial.

Tr. 269:17-25, 274:6-24.

## Stein, Lhote, and McGee's Performance After the Initial Cash Payment

282. After making the Initial Cash Payment and providing the 2019 Affidavit of Confession of Judgment, Stein , Lhote, and McGee made further payments to SKAT over time.

*See* PX-6; Stein ¶ 37; Lhote ¶ 37; McGee ¶ 137.

283. Specifically, between about June 3, 2020 and April 19, 2022, Stein and Lhote paid SKAT a total of approximately DKK 37,849,584.

*See* PX-6; Stein ¶ 37; Lhote ¶ 37.

284. In March 2021, McGee paid SKAT approximately DKK 19,916 383.95.  In the end, McGee has contributed more towards paying back SKAT than he personally received.

*See* PX-6; Stein ¶ 38; Lhote ¶ 38; McGee ¶¶ 136, 138.

285. By April 2022, SKAT had been paid more than DKK 1 billion.

*See* PX-3, 6; Stein ¶ 40; Lhote ¶ 40; McGee ¶ 141.

286. Stein, Lhote, and McGee went to great lengths to cooperate with SKAT as required by the Settlement Agreement, including to aid SKAT in its litigation efforts against those who had not settled with SKAT.  Together with their counsel and among other things, they reviewed and produced many thousands of documents, responded to requests to use documents that they had produced to aid SKAT's litigation efforts against those who had not settled, and responded to specific factual questions from SKAT.

*See* PX-200; Stein ¶¶ 35(a-d); Lhote ¶¶ 35(a-d); McGee ¶¶ 78, 127-34.

287. Stein, Lhote, and McGee provided quarterly progress reports to SKAT pursuant to the Letter Agreement up to late January 2022.

*See* Stein ¶¶ 27(b)(iv), 47(i); Lhote ¶¶ 27(b)(iv), 47(j).

67

288. The first quarterly report that Stein, Lhote, and McGee did not provide was due to be provided at the end of April 2022.

*See* Stein ¶¶ 27(b)(iv), 47(i); Lhote ¶¶ 27(b)(iv), 47(j).

289. Earlier in April 2022, however, Stein retained a Columbia Law School professor to evaluate whether there was a basis to initiate an action against SKAT.

*See* Stein ¶ 27(b)(v); Lhote ¶ 27(b)(v).

290. Starting at the end of June 2022, Stein began searching for litigation counsel to represent Stein and Lhote with respect to seeking relief against SKAT with respect to the Settlement Agreement and the Letter Agreement.

*See* Stein ¶ 27(b)(vi).

291. Stein and Lhote initiated this litigation towards the end of March 2023. McGee decided not to proceed as a plaintiff on Stein and Lhote's claims in the hope to be able to reach a reasonable resolution of the civil and criminal disputes with the Danish government.  McGee is a nominal defendant to Stein and Lhote's claims for rescissionary remedies.

*See* Stein ¶ 51; Lhote ¶ 51; McGee ¶ 158; ECF Nos. 93, 123.

292. Counsel for Stein, Lhote, and McGee had provided to SKAT, pursuant to the obligations under Section 2(e)(i), many spreadsheets containing information about each of the Pension Plans covered by the releases in the Settlement Agreement.

*See* PX-201; Stein ¶ 71(b).

293. They did so between about September 2019 and June 2020.  They were provided under certain conditions that were agreed to orally by U.S. counsel for SKAT and U.S. counsel for Stein, Lhote, and McGee.

*See* PX-201; Stein ¶ 71(b); Tr. 134:5-135:12 (Stein).

294. The purpose of these spreadsheets was to determine the amount of Net Proceeds and whether that amount was greater than the Preliminary Settlement Amount of DKK 1.55 billion, such that there was, under the Settlement Agreement, a True-Up Amount to be paid.

*See* PX-201; Stein ¶¶ 67, 69, 71(b)(ii)(a); PX-104 at § 2(e)(iii).

295. The Settlement Agreement provided for a process by which the parties would cooperate such there would be an agreed upon "Final Net Proceeds List" and, thereafter, the Covered Parties' Designees would certify the Final Net Proceeds List.

*See* Stein ¶¶ 66-67; PX-104 at § 2(e)(i).

296. Despite considerable efforts to arrive at a final calculation of Net Proceeds, this process was never completed and there never was a Final Net Proceeds List certified by Stein, Lhote, and McGee.

*See* Stein ¶¶ 68, 71-74; Tr. 137:4-11 (Stein); PX-104 at § 2(e)(i).

297. SKAT never treated the spreadsheets provided by Stein, Lhote, and McGee as final.

*See* Stein ¶¶ 72-73; ECF No. 172 at 9-10.

298. The Court describes these spreadsheets and the disputes concerning them in more detail below.

299. In short, the disputes for the Court to resolve do not concern the *data* and information contained in the spreadsheets.  Rather, the disputes concern the proper methodology for calculating Net Proceeds, given the data in the spreadsheets.

Tr. 88:3-90:4 (Stein).

## PROPOSED CONCLUSIONS OF LAW

### The Claims and Defenses

300. Stein and Lhote allege two causes of action in the First Amended Complaint (the "Stein FAC").  They allege causes of action for: (a) breach of contract, specifically breach of the obligations under Section 8(f) of the Settlement Agreement; and (b) a declaratory judgment under 28 U.S.C. § 2201 *et seq.* in relation to the 2021 Affidavit of Confession of Judgment.

ECF No. 94 at ¶¶ 103-117.

301. On Count I, Stein and Lhote seek the remedy of rescission of the unperformed obligations of the Settlement Agreement and the Letter Agreement and rescissory damages in the amount of the funds that were paid after the Initial Cash Payment, approximately DKK 57,765,968.  McGee raises various affirmative defenses to SKAT's claims that are consistent with Stein and Lhote's assertions that SKAT breached its obligation under the Settlement Agreement.  All parties necessary for the Court to order the rescissionary remedies sought by Stein and Lhote are present before the Court.

*Id.* at ¶¶ 103-112 & pp.28-29; PX-6; ECF No. 93 at pp.8-9 (asserting, among other things, affirmative defense of SKAT's breach of Section 8(f)); ECF No. 123 at ¶¶ 104-17; 5/21/24 Tr. at 8-14 (Stein).

302. On Count II, Stein and Lhote seek a declaration that the 2021 Affidavit of Confession of Judgment is unenforceable.  McGee asserts an affirmative defense to SKAT's claims that seeks, in effect, the same relief.

ECF No. 94 at ¶¶ 113-117; PX-129; ECF No. 93 at pp.8-9 (asserting, among other things, that the 2021 Affidavit of Confession of Judgment is unenforceable).

303. If the Court orders that the provisions of the Settlement Agreement and Letter Agreement containing unperformed obligations should be rescinded, then it need not resolve Stein and Lhote's Count II or either of SKAT's causes of action.

304. SKAT alleges two causes of action in its First Amended Answer, Affirmative Defenses & Counterclaims ("SKAT Counterclaims" or "SKAT Countercl.").  SKAT alleges causes of action for: (a) breach of contract in relation to the unpaid portion of the Additional Cash Payment plus interest on this amount; and (b) breach of contract in relation to the True-Up amount plus interest on this amount.

ECF No. 48 at ¶¶ 174-187.

305. With respect to both breach of contract claims, SKAT seeks relief in the form of entry of the 2021 Affidavit of Confession of Judgment in an amount to be determined by the Court and, as alternative relief, contract damages in the same amount.

ECF No. 48 at ¶¶ 188-189.

## Stein and Lhote's Count I – Rescission

306. In order to resolve Stein and Lhote's Count I, the claim for rescission based on SKAT's breach of the Settlement Agreement, the Court must resolve several issues. The Court first describes them briefly and then resolves each.

307. First, the Court must determine whether SKAT *breached* the Settlement Agreement, in particular, whether SKAT failed to comply with Section 8(f).

   *See Lenel Sys. Intl., Inc. v. Smtih*, 34 A.D.3d 1284, 1285 (4th Dep't 2006).

308. Second, the Court must determine whether SKAT's breach, if any, was *material*.

   *See id.*

309. Third, the Court must determine whether the requirements for the remedy of rescission have been met. This requires the Court to resolve whether Stein and Lhote sought rescission for a material breach within a *reasonable period of time* after performance under the Settlement Agreement and the Letter Agreement was suspended.

   *See United States Liab. Ins. Co. v. WW Trading Co.*, 813 F. App'x 636, 638-39 (2d Cir. 2020); *Ballow Brasted O'Brien & Rusin P.C. v. Logan*, 435 F.3d 235, 238 (2d Cir. 2006).

310. Stein and Lhote do not seek rescission of the entire Settlement Agreement and Letter Agreement. For example, they do not seek to upset the releases that were granted in the Settlement Agreement or the return of the Initial Cash Payment of DKK 950 million. Rather, Stein and Lhote seek rescission of the unperformed obligations of the Settlement Agreement and the Letter Agreement.

   *See ECF No. 94 at ¶ 111 & p. 29.*

311. In determining whether this relief is available, the Court must determine whether the obligations are *divisible*.

   *See Great Am. Ins. Co. v. Zelik*, 2020 WL 85102, at *4-5 (S.D.N.Y. Jan. 6, 2020), *on reconsideration in part*, 439 F. Supp. 3d 284 (S.D.N.Y. 2020).

71

312. Even if the Court finds Stein and Lhote are not entitled to the remedy of rescission, SKAT must still be able to establish each of the elements of its counterclaims in order to prevail.

     *See, e.g.*, *Brueckner v. You Can Beam LLC*, 2021 WL 2158733, at *6 (S.D.N.Y. May 27, 2021) ("because [defendant] cannot establish its own adequate performance under the Agreement . . . [t]his is fatal to [defendant]'s breach of contract counterclaim"); *Orlander v. Staples, Inc.*, 802 F.3d 289, 298 (2d Cir. 2015) ("The materiality or non-materiality of a breach of contract only goes to the question of the type of remedy that may be allowed, not to the issue of liability.") (cleaned up).

## SKAT Breached Section 8(f) of the Settlement Agreement

313. Section 8(f) required that SKAT communicate with SØIK in a specific *timeframe*, in a specific *manner*, and about specific *subject matters*.

     *See* Exh. 104 at § 8(f).

314. The Court finds that SKAT breached its obligations under Section 8(f) of the Settlement Agreement.

315. First, SKAT was required to make the required communications "promptly" upon the execution of the Settlement Agreement.  In this context, the Court interprets the requirement of promptness to mean that SKAT had to have completed the representations required by Section 8(f) when it had received the Initial Cash Payment.

     *See* Exh. 104 at §§ 2(a), 8(f); PPSOF ¶ 116.

316. The Parties could not have expected that SKAT would, for example, make the representations required by Section 8(f), if the Covered Parties did not even take the most basic initial step associated with the Settlement Agreement -- payment of the Initial Cash Payment -- and if the Covered Parties did not even obtain the releases provided for by Section 4 of the Settlement Agreement, which were triggered only by the Initial Cash Payment.  After all, if the Initial Cash Payment had not been made, there would have been no releases and, in effect, no settlement at all.  And Stein, Lhote, and McGee could not have believed themselves entitled to the benefit of Section 8(f) if they did not make the Initial Cash Payment.

*See* Stein ¶ 33(a)(i); Lhote ¶ 33(a)(i); Tr. 333:16-334:9, 336:26-337:2, 338:12-339:4 (Bechmann); PPSOF ¶ 116.

317.  This interpretation of the temporal requirement of promptness is consistent with the short timetable required for the payment of the Initial Cash Payment and the timetable for provision of the 2019 Affidavit of Confession of Judgment.

   *See* PX-104 at §§ 2(a)(i-ii), 4(c); PX-10A.

318.  None of SKAT's communications *prior* to execution of the Settlement Agreement were made promptly *upon execution* of the Settlement Agreement.  Communications made in contemplation that there would be an executed settlement are not *promptly upon* execution of the Settlement Agreement.  And these were not made after the main point of the Settlement Agreement -- or, indeed, the main point of any settlement agreement -- was achieved, specifically, the release of claims against Stein, Lhote, McGee, and the other parties.

   *See* PX-103, 105, 106, 107, 108, 110.

319.  SKAT's communications with SØIK starting in January 2021, PX-121, 124, 131, 141, which were in response to SØIK's written questions about the Settlement Agreement, PX-118, 123, 125, 131, clearly do not satisfy the timing requirement of Section 8(f).

   *See* PX-104 at § 8(f).

320.  Communications sent more than 19 months after execution of the Settlement Agreement in late May 2019, and about 17 months after the Initial Cash Payment was completed, cannot reasonably be characterized as "promptly" upon execution of the Settlement Agreement.

   *See* PX-3, 121, 124, 131, 141; PX-104 at § 8(f).

321.  What Stein, Lhote, and McGee bargained for was a communication that would be made sufficiently early such that it would have a greater chance of positively influencing SØIK's investigation.  Communications made so much later were *not* what they bargained for.

   *See* PX-104 at § 8(f); Stein ¶¶ 33(a)(ii)(a-e), 33(a)(iii); Lhote ¶¶ 33(a)(ii)(a-e), 33(a)(iii).

322. Stein, Lhote, and McGee also bargained for SKAT's communication with SØIK to be in a specific manner, that is, "in writing" and that the communication come from SKAT, not from anyone else -- even Stein, Lhote, or McGee, which would not, in any event, have had the same effect as a communication from SKAT.

   PX-104 at § 8(f); Stein ¶ 33(b); Lhote ¶ 33(b).

323. To the extent SKAT relies on oral communications to satisfy Section 8(f), such reliance is misplaced. SKAT was required to bring to the attention of SØIK *in writing* the Settlement Agreement and its terms. And SKAT was required to make several specific representations to SØIK and also to do so *in writing*. Stein, Lhote, and McGee bargained for written communications. Section 8(f) emphatically provided for communications "in writing."

   *See* PX-104 at § 8(f); PX-2.

324. While it is possible to envision a circumstance in which an oral communication could constitute substantial compliance with a requirement of a writing, the factual circumstances present here do not allow for the finding of substantial compliance with the writing requirement in Section 8(f). Any oral communications to which SKAT might point are not compliance with Section 8(f).

   *See* PX-104 at § 8(f); Stein ¶¶ 33(b)(i-vi); Lhote ¶¶ 33(b)(i-vi); McGee ¶¶ 99-101.

325. SKAT has presented no reliable evidence concerning its purported oral communications. SKAT has very sparse, if any recollection of *what* was represented orally to SØIK, *by whom*, and *when*. And SKAT has almost no notes, records of telephone calls, or meetings to pinpoint who said what to whom and when.

   PX-113, 114, 128; PX-400-R at 240:8-11; PX-403-R at Interrogatory Nos. 4, 16, 17; PX-404-R at Interrogatory Nos. 1, 12.

326. As the Court set forth above, SKAT's testimony about meeting and telephone calls is simply too unreliable a basis on which to find that its oral communications are a form of substantial compliance with Section 8(f).

PPSOF ¶¶ 187-195 (detailing failure of recollection of meetings and telephone calls by Bechmann and Ahlefeld Engel).

327.    Stein, Lhote, and McGee bargained for the certainty of a writing, which alone evidences their intent to avoid any ambiguity or mistake about what SKAT informed SØIK of pursuant to Section 8(f).

*See Brockhaus v. Basteri*, 188 F. Supp. 3d 306, 317 (S.D.N.Y. 2016) ("A contractual requirement for a writing evinces an intent to avoid ambiguity or mistake.  Here, the parties agreed that oral communications regarding termination would not be enough."); Stein ¶¶ 33(b)(i-vi); Lhote ¶¶ 33(b)(i-vi); McGee ¶¶ 99-101.

328.    The requirement of a writing ensured that the information imparted by SKAT to SØIK would become part of the official records of SØIK and could be communicated easily and widely within SØIK.  Such a writing would also ensure that any new or different SØIK personnel would have access to the same information regarding our obligations and the representations required by Section 8(f).  A writing is also undeniable evidence of the communication, unlike an oral communication.  An oral communication is not, and could not be, a reasonable a substitute.

*See* Stein ¶¶ 33(b)(i-vi); Lhote ¶¶ 33(b)(i-vi); McGee ¶¶ 99-101; Tr. 243:1-23 (McGee).

329.    Even if SKAT *could* recall, or point to evidence of, what was represented orally to SØIK, by whom, and when, the Settlement Agreement is clear that compliance with Section 8(f) must be done in writing.

*See, e.g.*, *CS First Boston Ltd. v. Behar*, 1996 WL 384893, at *5-6 (S.D.N.Y. June 4, 1996) (language of contract was "clear and unambiguous—where it sa[id] written notice or notice in writing, it mean[t] written notice; where it d[id] not so specify, the communication need not be in writing"); *First Nat'l Bank v. Ackerley Communs., Inc.*, 2001 WL 15693, at *4 (S.D.N.Y. Jan. 8, 2001) ("It is hornbook law that when the terms of a written contract are clear and unambiguous and those terms require written notification in a particular manner then such notification can be given only in that manner.").

330.    As McGee stated:

> The importance of the communication being in writing, in my
> business career, when things aren't in writing, they often get
> misconstrued. There can be whisper down the lane.
>
> SØIK and SKAT are big organizations. People leave jobs. People
> come and so. We specifically negotiated a provision that the
> agreement – the terms of the agreement and our good faith
> cooperation and negotiation be, you know, conveyed in writing to
> avoid the potential for any – or for the avoidance of people not
> understanding the extent of that cooperation and of the agreement.

Tr. 260:4-13.

331.    Third, SKAT's communications with SØIK, such as they are, fail to bring to
the attention of SØIK the Settlement Agreement *and* its terms. SKAT's
communications with SØIK about the fact of the Settlement Agreement, for
example, in sending SØIK drafts of a press release, PX-107, and in sending
SØIK the final press release, PX-106, cannot satisfy the requirement to bring
to the attention of SØIK the *terms* of the Settlement Agreement.

332.    Given the final sentence of Section 8(f), the Court does not find that, to
comply with the obligation to bring the terms of the Settlement Agreement
to the attention of SØIK, SKAT was required to provide the actual
Settlement Agreement.

*See* PX-104 at § 8(f).

333.    The Court concludes that the requirement that SØIK bring to the attention of
SØIK the terms of the Settlement Agreement requires that SØIK have
communicated with SØIK at least the following terms of the Settlement
Agreement, which were the ones most central to the nature of the bargains
reflected in the Settlement Agreement:

(a)    the payments to be made and the timeframe in which they would be
made;

(b)    the nature of the cooperation obligations undertaken in the Settlement
Agreement, including the great extent of the information to be
provided, the manner in which the cooperation obligations would be

invoked (primarily by a mere request of SKAT), and the requirement that Stein, Lhote, and McGee use best efforts to ensure that their cooperation was meaningful and productive, with best efforts having a known legal meaning under New York law;

(c)    the nature of the assurances of payment that Stein, Lhote, and McGee would be providing to SKAT in the form of the 2019 Affidavit of Confession of Judgment and the requirement to provide an updated affidavit of confession of judgment, which would have the effect of extending those assurances;

(d)    the special payment obligations that Stein, Lhote, and McGee, as Covered Parties' Designees, distinct from the remainder of the Covered Parties, undertook, for example to pay interest and additional interest in the event of a default;

(e)    the requirement that Stein, Lhote, and McGee produce records sufficient to establish Net Proceeds and that they certify the accuracy of the Final Net Proceeds List; and

(f)    the certain illiquid assets that Stein, Lhote, and McGee undertook to liquidate to pay the Subsequent Cash Payment Amount, other than North Channel Bank.

*See* PX-104 at §§ 1(g), 1(j), 2(a-e), 4(c), 5, 7(a), 7(b), 7(g).

334.    The Court further concludes that the reference to "this Agreement and its terms" necessarily includes the most central terms of the Letter Agreement. The Letter Agreement was "intended to and [did] *supplement and amend* the terms of the Settlement Agreement with respect to the subject matter" of the Letter Agreement

*See* PX-104 at § 18; PX-109 at § 1 (emphasis added).

335.    Accordingly, SKAT was required under Section 8(f) to bring to the attention of SØIK the terms most central to the nature of the bargains reflected in the Letter Agreement, including:

(a)    the certain illiquid assets that Stein, Lhote, and McGee undertook to liquidate to pay the Subsequent Cash Payment Amount, other than North Channel Bank;

(b)     the requirement to provide quarterly progress reports regarding their efforts to liquidate the assets;

(c)     the best efforts obligations that Stein, Lhote, and McGee undertook to liquidate the assets;

(d)     the requirement to apply the proceeds of liquidation of such assets to the Final Settlement Amount; and

(e)     the requirement that proceeds of the sale of North Channel Bank be paid to SKAT, which, to the detriment of Stein, Lhote, and McGee, would not be applied to the payments required by the Settlement Agreement.

*See* PX-109 at §§ 3-8 & Annex A; *Harbinger v. F&G, LLC v. OM Grp. (UK) Ltd.*, 2015 WL 1334039, at *28 (S.D.N.Y. Mar. 18, 2015) ("term 'best efforts' has been interpreted to require that a party use all reasonable means to achieve the contractual object at issue").

336.   The Court concludes that Section 8(f)'s requirement to bring the terms of the Settlement Agreement, including the terms of the Letter Agreement, to the attention of SØIK required SKAT to identify to SØIK in writing the Covered Parties *and* the Covered Parties' Designees.

*See* PX-104 at § 8(f).

337.   For example, if SØIK were not informed who the Covered Parties' Designees were, then SØIK would not be informed which specific individuals -- Stein, Lhote, and McGee -- had undertaken all of the special obligations that only apply to the Covered Parties' Designees.

*See* PX-104 at §§ 1(j), 2(c), 2(d), 2(e)(i), 2(f), 2(h), 4(c), 5, 7(c); PX-109 at §§ 3, 4, 5, 7.

338.   In addition to bringing the terms of the Settlement Agreement to SØIK's attention, there is a requirement of Section 8(f) that SKAT make a set of representations to SØIK, specifically, that:

(a)     "this Agreement reflects good-faith negotiation by the Covered Parties";

(b)    "the Covered Parties' cooperation may result in the recovery by [SKAT] of additional funds from third parties"; and

(c)    "this Agreement is in the best interests of [SKAT]."

PX-104 at § 8(f).

339.    None of the writings to which SKAT might point, either individually or collectively, satisfies these standards for *what* SKAT was supposed to communicate to SØIK.  There is far too little about the terms of the Settlement Agreement and the Letter Agreement to satisfy the requirements of Section 8(f).  SKAT has not satisfied its obligations under Section 8(f).

*See* PX-103, 105, 106, 107, 108, 110.

340.    Some specific comments on a few of the communications that SKAT might seek to rely upon are in order.

341.    Though SKAT did provide to SØIK a list of the Covered Parties about eight days before execution of the Settlement Agreement, crucially, neither that document, nor any other writing, identified the Covered Parties' Designees.  This communication did not satisfy Section 8(f) on its own and, together with the other communications relied upon by SKAT, did not satisfy Section 8(f).

*See* PPSOF ¶¶ 147-150; PX-103, 105, 106, 107, 108, 110.

342.    SKAT provided to SØIK most of the text that would come to be embodied in Section 8(f), which was then contained in Section 8(d) of the then-existing draft settlement agreement, about two weeks before execution of the Settlement Agreement.  At most, however, this communication can be seen as an indication that, at some point after the Settlement Agreement would be executed, SKAT would make certain representations to SØIK.  It was not in and of itself the required representations.

PPSOF ¶¶ 130-134; PX-105.

343.    This communication did not satisfy the requirement that SKAT actually make these representations.  The Court cannot, on the record before it, conclude that sending this text and, at best, informing SØIK of what SKAT was committed to saying in the future is functionally the same as actually making the representation.

344.  Beyond that, the timing of the communication of the text of what would become Section 8(f) was before execution of the Settlement Agreement and before the making of the Initial Cash Payment.  There is little reason to believe that, had the Initial Cash Payment never been made and the broad releases in the Settlement Agreement never been triggered, SKAT would have made any of the representations required by Section 8(f).  This renders an e-mail like Plaintiffs' Exhibit 105 even further removed from actual from compliance with Section 8(f).

*See* PX-104 at § 8(f); PX-105; PPSOF ¶ 135.

345.  Finally, there are the e-mails with SØIK regarding the press release that SKAT intended to issue when the Settlement Agreement would be executed and the actual press release itself.

*See* PPSOF ¶¶ 138-144, 151-153; PX-106, 107, 110.

346.  Individually and taken together with everything else that SKAT might cobble together as evidence of compliance with Section 8(f), these e-mails and draft and final press releases contain, for example, very little detail about the terms of the Settlement Agreement, nothing about who the Covered Parties' Designees are, no sense of the breadth of the cooperation obligations of the Covered Parties, nothing about the obligations of the Covered Parties' Designees with respect to the True-Up Amount, no meaningful detail about the Letter Agreement, and, in generally, are far removed from the several specific representations required by Section 8(f), such as the one about good faith negotiations.

*See* PX-104 at § 8(f); PX-103, 105, 106, 107, 110.

## The Strong Circumstantial Evidence of A Breach of Section 8(f)

347.  A review of the writings between SKAT and SØIK confirms that SKAT did not comply with Section 8(f).

*See* PX-104 at § 8(f); PX-103, 105, 106, 107, 110.

348.  There is, in addition, very strong circumstantial evidence that SØIK was not aware of many aspects of the Settlement Agreement, which supports the conclusion that SKAT failed to comply with Section 8(f).

349. First, there is the fact that, in obtaining from a Danish court orders to seize real property and bank accounts of Stein, Lhote, and McGee in April 2020, SØIK did not mention the Settlement Agreement or payments that Stein, Lhote, or McGee had made pursuant to it.

   *See* PPSOF ¶ 181(c).

350. Under applicable Danish law procedure, it is likely that, had SØIK known of the Settlement Agreement and the Initial Cash Payment, it would have so indicated in seeking the seizure orders.

   *See* PX-300 at 10.

351. And SØIK itself stated in a November 2020 communication to the United States Department of Justice that SØIK is "not in possession of the settlement and has no knowledge of any details in it, including who is involved, besides the amount and the number of pension plans."

   PX-12; PPSOF ¶¶ 244-245.

352. Furthermore, beginning on the very day that McGee mentioned the Settlement Agreement to SØIK in his interview, SØIK began asking SKAT a series of very basic questions about the Settlement Agreement that, had SKAT complied with Section 8(f)'s requirement that it inform SØIK of the terms of the Settlement Agreement and the Letter Agreement, SØIK would not have had to ask.

   *See* PPSOF ¶ 235; PX-118.

353. The questions indicate just how little SØIK knew of the terms of the Settlement Agreement and, as a result, the extent to which SKAT had breached Section 8(f):

   "1.    Which natural or legal persons has the Danish Tax Agency entered into the referenced settlement with?

   2.    Which refunds are covered by the settlement (for example by indication of SKAT's batch number)?

   3.    How is the settlement sum composed (does it include for example reimbursement of expenses other than the received dividend refunds)?

81

4.    How much of the total settlement sum of DKK 1.6 billion has been paid to the Danish Tax Agency, and when does the remaining amount fall due for payment?

5.    Which claims are the payments written off against [sic]

6.    Are claims beyond the settlement amount waived, and if so in what manner?

7.    Is the settlement an expression of a final decision in the civil case, or will further compensation claims against the settlement parties arise later?

8.    Has the Danish Tax Agency been provided with security for fulfillment of the settlement, including guarantees, collateral or the like? In such event, has the Danish Tax Agency undertaken any form of perfection in this regard?

9.    Has the Danish Tax Agency pursued a compensation claim in the case, and if so, against whom and for what amount?"

PX-118; PPSOF ¶ 236.

354.    The questions posed in the letters from SØIK from January 2021 and into February 2021 strongly indicate that, prior to these questions and answers, SØIK did not have the knowledge of the Settlement Agreement or the Letter Agreement that compliance with Section 8(f) would have caused it to have. Conversely, if SØIK did have the knowledge of the Settlement Agreement and the Letter Agreement that compliance with Section 8(f) would have resulted in its having, SØIK would not have had to ask these questions, many of which sought very basic information about the nature of the settlement.

See PX-123, 125, 131; PPSOF ¶¶ 234-239.

355.    In addition to SØIK's questions, there is the affirmative statement that a SØIK official made to the United States Department of Justice in 2020 in which the official disclaimed knowledge of the Settlement Agreement that, had SKAT complied with Section 8(f), SØIK would have had.

PX-12.

356.  And there is also the lack of any mention of the payments made pursuant to the Settlement Agreement in SØIK's efforts to obtain seizures of property of Stein, Lhote, and McGee.

See PX-14-R; PX-300 at 8-10.

357.  This circumstantial evidence strongly supports a finding of breach.

**The "Absolute and Unconditional" Provision**
**Does Not Excuse SKAT's Breach of Section 8(f)**

358.  During this litigation, SKAT has suggested that the claim for rescission fails as a matter of law because whether SKAT breached Section 8(f) does not matter.  The argument here is that, because the Settlement Agreement provides that "[t]he Covered Parties' obligation to pay the Final Settlement Amount is absolute and unconditional," SKAT's performance under Section 8(f) is irrelevant and rescission may not be had, even if SKAT breached Section 8(f).

*See* ECF Nos. 116, 118-19 (letter-briefing on SKAT's prospective motion for judgment on the pleadings); PX-104 at § 2(c).

359.  SKAT is wrong as a matter of law.  "Absolute and unconditional" clauses are emphatically not a license for the party asserting such clauses to breach a contract and, notwithstanding the breach, demand that the other party still perform.  In this case, SKAT cannot breach Section 8(f) and, notwithstanding the breach, demand that Stein, Lhote, and McGee still pay under the Settlement Agreement.

360.  "Absolute and unconditional" language is also known as a "hell or high water clause."

*See, e.g.*, *Xerox Corp. v. Bus-Let, Inc.*, 2019 WL 2514855, at *2, *4 (W.D.N.Y. June 18, 2019).

361.  "Hell or high water" clauses may be enforceable.

*See Bank of America, N.A. v. Greuner Medical P.C.*, 2024 WL 182408, at *5 (S.D.N.Y. Jan. 17, 2024); *Xerox Corp.*, 2019 WL 2514855, at *4; *Wells Fargo Bank Minn., N.A. v. Nassau Broad. Partners, L.P.*, 2003 WL 22339299, at *7 (S.D.N.Y. Oct. 10, 2003).

362.  Such clauses are not, however, enforceable over a claim that the party seeking to enforce the clause has failed to perform, that is, when it has failed to provide the consideration required under the applicable agreement.

*Greuner Med. P.C.*, 2024 WL 182408, at *5 (citing *CIT Grp./Commercial Servs., Inc. v. Prisco*, 640 F. Supp. 2d 401, 410 (S.D.N.Y. 2009) (noting that under New York law, the only affirmative defenses that are not waived by an absolute and unconditional guaranty are payment and lack of consideration)).

363.  Under well-established New York law, when there is a breach by the party seeking to enforce "absolute and unconditional" language, the clause is unenforceable if there has been a "failure of consideration."

*See Century City Mall, LLC v. Waxman*, 193 A.D.3d 499, 499 (1st Dep't 2021) (reversing grant of motion for summary judgment because guaranty was not "absolute and unconditional" when plaintiff failed to deliver leased premises to tenant, *i.e.*, failure of consideration); *Walcutt v. Clevite Corp.*, 13 N.Y.2d 48, 56 (1963) ("Where the consideration fails, either partially or entirely, neither the principal nor the guarantor is accountable for anything which has not been received.").

364.  "[F]ailure of consideration exists wherever one who has promised to give some performance fails without his or her fault to receive in some material respect the agreed quid pro quo for that performance.  Failure of consideration gives the disappointed party the right to rescind the contract."

*Indep. Energy Corp. v. Trigen Energy Corp.*, 944 F. Supp. 1184, 1199 (S.D.N.Y. 1996).

365.  "An action for rescission based on failure of consideration lies '[w]here a plaintiff has received little or nothing of value.'"

*Faunus Grp. Intern., Inc. v. Ramsoondar*, 2014 WL 2038884, at *3 (S.D.N.Y. May 16, 2014) (quoting *Indep. Energy*, 944 F. Supp. at 1199)); *see also* PPSOF ¶¶ 410-486.

366.  SKAT failed to comply with its obligation under Section 8(f), which was the most important provision of the Settlement Agreement to Stein, Lhote, and McGee and the key consideration for which they bargained.  Because SKAT breached Section 8(f), that is, it did not provide the bargained-for

consideration, SKAT cannot enforce the "absolute and unconditional" language in the Settlement Agreement.

*See* PPSOF ¶ 314.

367.    For the same reasons, a finding of a breach by SKAT necessarily means that SKAT cannot recover on either of its two breach of contract claims. SKAT *must* prove that it performed.

*See Treasure Chest Themed Value Mail, Inc. v. David Morris Int'l, Inc.*, 2018 WL 3130601, at *3 (S.D.N.Y. June 26, 2018), *aff'd*, 785 F. App'x 1 (2d Cir. 2019); *Medinol Ltd. v. Bos. Sci. Corp.*, 346 F. Supp. 2d 575, 618 (S.D.N.Y. 2004) ("As a general principle of contract law, a material breach excuses the other party's nonperformance.").

368.    SKAT has not performed and cannot so demonstrate; it has breached. Its contract claims fail as a result.

369.    SKAT's citation to *Wells Fargo Bank Minnesota, N.A. v. Nassau Broadcasting Partners L.P.* Most importantly, this case does not suggest that, if a party does not perform, it may still enforce a counter-party's obligation that is, by contract, "absolute and unconditional." *Nassau Broadcasting* simply never had the occasion to consider whether a non-performing party can enforce an absolute and unconditional obligation of a counter-party because, in that case, the party enforcing the absolute and unconditional obligation had, indeed, performed. Here, in contrast, SKAT has not performed under Section 8(f) of the Settlement Agreement and, having failed to perform, it cannot enforce the Stein, Lhote, and McGee's obligation to perform.

*See* ECF No. 163 at ¶ 120 (citing *Nassau Broadcasting*, 2003 WL 22339299, at *1-4).

370.    As set out above, PPSOF ¶ 359, "absolute and unconditional" clauses are not a license for the party asserting such clauses to breach a contract and, notwithstanding the breach, demand that the other party still perform.

*See, e.g.*, *Integrity Real Est. Consultants v. Re/Max of New York, Inc.*, 213 A.D.3d 815, 818 (2d Dep't 2023) (because "evidence at trial demonstrated that [defendant] materially breached the franchise agreement by failing to fulfill its contractual obligation . . ., the plaintiff was excused from

continuing to perform under the agreement, and [defendant] therefore was not entitled to recover the unpaid franchise fees"); *Century City Mall*, 193 A.D.3d at 499 (1st Dep't 2021) (guaranty was not "absolute and unconditional" where plaintiff failed to deliver leased premises to tenant, that is, failed to provide the agreed-upon consideration).

## SKAT's Contract Claims Fail For Another Reason

371.    Another reason that SKAT's contract claims fail is because, in the Settlement Agreement, SKAT bargained away the right to assert a breach of contract claim.

372.    The Settlement Agreement's terms are clear and unambiguous: SKAT's "sole remedy for the Covered Parties' failure to pay the remainder of the Final Settlement Amount shall be the filing of the Affidavit of Confessions of Judgment against the Covered Parties' Designees as set forth in Section 5(c)."

PX-104 at § 2(c); *see also id.* at §§ 5(c), 10(e) (contemplating same sole remedy of filing of affidavit of confession of judgment).

373.    "Sole remedy" provisions, such as the one that the parties to the Settlement Agreement bargained for, are fully enforceable under New York law and, indeed, are routinely enforced.

374.    They are enforced because "sole remedy" provisions are "sufficiently clear to establish that no other remedy was contemplated by the parties at the time the contract was formed, for purposes of that portion of the transaction."

*Nomura Home Equity Loan, Inc., Series 2006-FM2 v. Nomura Credit & Cap., Inc.*, 30 N.Y.3d 572, 581-582, 584 (2017) (explaining that sole remedy "provisions represent the parties' [bargained-for] agreement on the allocation of risk" associated with a potential breach of the contract and holding "sole remedy" provision was enforceable and precluded general contract damages); *see Katzman v. Helen of Troy Texas Corp.*, 2013 WL 1496952, at *6 (S.D.N.Y. Apr. 11, 2013) (distinguishing situations where parties "expressly anticipated a particular form of breach . . . and agreed upon an exclusive remedy for that breach" from those in which a party "did not unmistakably manifest an intent" to limit its available remedy); *see generally Metro. Life Ins. Co. v. Noble Lowndes Intl.*, 84 N.Y.2d 430, 436 (1994) (in case involving contractual limitation on type of damages that non-

breaching party could obtain, noting that "[p]arties sometimes make agreements and expressly provide that they shall not be enforceable at all, by any remedy legal or equitable. They may later regret their assumption of the risks of non-performance in this manner; but the courts let them lie on the bed they made.") (quoting 5 CORBIN ON CONTRACTS § 1068 at p. 386).

375.   The parties to the Settlement Agreement, including SKAT, were all represented by able counsel and the final text of the Settlement Agreement was the result of "extensive and good faith negotiations."

PX-104 at pp. 2, 19-29.

376.   These factors confirm what the unambiguous language already demonstrates, *i.e.*, that the "sole remedy" provision in Section 2(c) is fully enforceable.

*See* PX-104 at § 2(c); *Nomura*, 30 N.Y.3d at 582 ("Contract terms providing for a 'sole remedy' are sufficiently clear to establish that no other remedy was contemplated by the parties at the time the contract was formed, for purposes of that portion of the transaction, 'especially when entered into at arm's length by sophisticated contracting parties.'") (internal citations omitted); *J. D'Addario & Co., Inc. v. Embassy Indus., Inc.*, 20 N.Y.3d 113, 116-19 (2012) (affirming that "sole remedy" provision, negotiated at "arm's length" with each party represented by counsel, was enforceable); *CBS Broad. Inc. v. Jones*, 460 F. Supp. 2d 500, 505 (S.D.N.Y. 2006) (dismissing complaint for breach of contract damages because agreement provided only for termination of future payments, not additional damages).

377.   SKAT argues that the "sole remedy" provision does not preclude SKAT from asserting breach of contract claims, but instead, only limits against whom SKAT may seek recourse, *i.e.*, Stein, Lhote, and McGee. This is preposterous and is entirely inconsistent with how sole remedy provisions are interpreted.

*See* ECF No. 163 at ¶¶ 97-102.

378.   In interpreting a contract, the Court's "role is limited to ensuring that the parties receive the benefit of their bargain, and does not extend to granting relief that the [Settlement Agreement] explicitly do[es] not contemplate."

*ACE Secs. Corp. Home Equity Loan Trust, Ser. 2007-HE3 v. DB Structured Prods, Inc.*, 5 Supp. 3d 543, 555 (S.D.N.Y. 2014).

379.  Reading Section 2(c) of the Settlement Agreement in such a way that it only limits *against whom* SKAT can seek recourse against and not *what* that recourse is, is entirely at odds with the plain text of the Settlement Agreement.

380.  Indeed, the Settlement Agreement provides in at least three places that the sole remedy available to SKAT is the filing of the Affidavit of Confession of Judgment.

     *See* PX-104 at §§ 2(c) (providing SKAT's sole remedy is filing affidavit of confession of judgment), 5(c) (providing that remedy for default is filing affidavit of confession of judgment), 10(e) (referring to "remedies available to [SKAT] upon the occurrence of an Event of Default *pursuant to Section 5*" with respect to the True-Up Amount) (emphasis added).

381.  Read together, it is clear that SKAT bargained for a particular form of relief if the Final Settlement Amount was not paid: filing the Affidavit of Confession of Judgment against the Covered Parties' Designees.  SKAT cannot avoid that now by attempting to rewrite the plain terms of the Settlement Agreement.

     *See Katzman*, 2013 WL 1496952, at *6 (S.D.N.Y. Apr. 11, 2013) (party cannot avoid "exclusive remedy" for breach that it "expressly anticipated").

382.  SKAT's recitation of case law concerning largely uncontestable contract interpretation standards does not further its argument.  None of this case law addresses the question before the Court, how to interpret the sole remedy provision of the Settlement Agreement.

     *See Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 135 (2d Cir. 2000) (analyzing "fee-shifting provision" and general release); *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1196 (2d Cir. 1996) (interpreting arbitration clause); *CCR Int'l, Inc. v. Elias Grp., LLC*, 2020 WL 7629325, at *8 (S.D.N.Y. Dec. 22, 2020) (analyzing breach of contract claims, not including a "sole remedy" provision); *PrecisionWorks MFG, LLC v. Union Funding Source*, 2022 WL 16857360, at *2 (S.D.N.Y. Oct. 25, 2022) (interpreting arbitration clause); *Landmark Ventures, Inc. v. Wave Systems Corp.*, 2012 WL 3822624, at *2 (S.D.N.Y. Sept. 4, 2012) (analyzing breach of contract

claims, not including a "sole remedy" provision); ECF No. 163 at ¶ 98.

383. Alternatively, SKAT argues that if the sole remedy provision is enforceable and the 2021 Affidavit of Confession of Judgment is unenforceable, the Court should nonetheless enter judgment on SKAT's breach of contract claims because, otherwise, SKAT would be left with no remedy at all. Not so.

*See* ECF No. 163 at ¶¶ 103-107.

384. The Parties have already determined how to proceed under these circumstances and what they bargained for is not to have Court rewrite the Settlement Agreement.

385. Section 17 of the Settlement Agreement provides that:

> If any term, provision, covenant or restriction of [the Settlement] Agreement is held by a court of competent jurisdiction or other authority to be invalid, void or enforceable, the remainder of the terms, provisions, covenants and restrictions of th[e Settlement Agreement] shall remain in full force and effect and shall in no way be affected, impaired or invalidated so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party hereto. *Upon such a determination the Parties shall negotiate in good faith to modify th[e Settlement] Agreement in accordance with the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the fullest extent possible.*

PX-104 at § 17 (emphasis added).

386. The parties did not provide, and there is no precedent for, the Court rewriting a contract to provide a remedy that a party bargained away.

*See Bank of N.Y. Mellon v. WMC Mortg. LLC*, 2015 WL 2449313, at *2 (S.D.N.Y. May 22, 2015) (court may not redraft clear and unambiguous contractual term to bring it in accord with the court's view of equity) (cleaned-up).

387.  The Parties bargained for the sole remedy of filing the Affidavit of Confession of Judgment, and, if that failed, a good faith negotiation to modify the Settlement Agreement in accordance with the Parties' original intent.

   *See* PX-104 at §§ 2(c), 17.

388.  It is true that there are circumstances where parties to a contract have provided for a form of equitable relief as a "sole remedy," but a court, exercising its equitable authority, awards monetary damages in lieu of the equitable remedy because the equitable remedy is "impossible or impracticable" to grant.  The Court finds this doctrine cannot apply in this case.

   *Nomura Home Equity Loan, Inc., Ser. 2006-FM2 v. Nomura Credit & Cap., Inc.*, 133 A.D.3d 96, 105-06 (1st Dep't 2005), *modified*, 30 N.Y. 3d 572 (2017).

389.  First, the parties have *not* provided for a form of *equitable* relief as a sole remedy that now cannot be fulfilled.  Rather, the parties provided for the payment of *money damages* for any failure to pay.

   *See AKF, Inc. v. AvantGarde Senior Living*, 2021 WL 2662070, at *5 (N.D.N.Y. Apr. 29, 2021) (money damages are "the classic form of legal, not equitable, relief").

390.  As a result, cases cited by SKAT do not support rewriting the Settlement Agreement or the Court exercising its equitable authority to provide SKAT a new mechanism to be awarded money damages (a breach of contract action or what SKAT now seeks, the entry of a money damages award) when they have already bargained for a specific mechanism to enforce the Settlement Agreement (filing of the Affidavit of Confession of Judgment).

   *ACE Secs.*, 5 F. Supp. 3d at 555 (court's role in contract interpretation is to ensure that "parties receive the benefit of their bargain," not to grant relief that parties "explicitly d[id] not contemplate"); see ECF No. 163 at ¶ 107 & n.36.

391.  Second, if the 2021 Affidavit of Confession of Judgment is deemed unenforceable because SKAT made a mistake of law regarding its enforceability by failing to consider the import in the change of law to CPLR

3218, the Court will not reform a contract as a result of mistakes of law, particularly mistakes of law made by the party seeking reformation.

*See* PPSOF at ¶¶ 383-387; *Cooper v. Cooper*, 2022 WL 2716333, at *5 (E.D.N.Y. July 12, 2022) ("well settled" that "equity will not grant reformation for a mistake of law"); *Gimbel Bros., Inc. v. Brook Shopping Ctrs., Inc.*, 118 A.D.2d 532, 536 (2d Dep't 1986) (party showing "marked lack of due diligence" in determining contractual rights not entitled to equitable relief).

## SKAT's Breach Was Material

392. A breach of contract is material if it "substantially defeats the purpose of an agreement in such a fundamental way as to defeat the object of the parties in making the contract," and occurs where the breaching party fails to perform a substantial part of the agreement that induced the non-breaching party to enter the agreement.

*See Chapman v. Davis*, 165 N.Y.S.3d 818, 826 (Pleasant Valley Town Ct. 2022) (cleaned up); FARNSWORTH ON CONTRACTS (3d ed.) § 8.16 ("In order for a breach to justify the injured party's suspension of performance, the breach must be significant enough to amount to the nonoccurrence of a constructive condition of exchange. Such a breach is termed 'material.'").

393. To determine if a breach is material, courts typically consider the factors set out in Section 241(a) of the Restatement (Second) of Contracts:

(a)    the purpose of the contract;

(b)    the extent to which the injured party will be deprived of the benefit it reasonably expected or damaged by the lack of full performance;

(c)    the extent to which the injured party can be adequately compensated for the part of the benefit that it will not receive;

(d)    the extent to which the party failing to perform will suffer forfeiture;

(e)    the likelihood that the party failing to perform will cure its failure, taking into account all of the circumstances including any reasonable assurances; and

(f)    the extent to which the behavior of the party failing to perform comports with the standards of good faith and fair dealing.

*Chapman*, 165 N.Y.S.3d at 826 (citing *Wechsler v. Hunt Health Sys.*, 330 F. Supp. 2d 383, 415 (S.D.N.Y. 2004)); *see generally* RESTATEMENT (SECOND) OF CONTRACTS § 241(a).

394.    Stated another way, the relevant question is: "Would the [non-breaching] party have agreed to enter the contract without the inclusion of the disputed clause?"  If the answer is no, the breach is material.

*Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 895 (2d Cir. 1976).

395.    Materiality of a breach is ordinarily a question of fact.

*Orlander*, 802 F.3d at 298; *Mackinder v. Schawk, Inc.*, 2005 WL 1832385, at *9 (S.D.N.Y. Aug. 2, 2005).

396.    Applying the standard under New York law for materiality, the Court finds that, as a matter of fact, SKAT's breach of Section 8(f) of the Settlement Agreement was material.  The factors that must be considered strongly weigh in favor a finding of materiality:

397.    It is uncontested that Stein, Lhote, and McGee would not have entered into the Settlement Agreement without the inclusion of Section 8(f).  Their testimony on this subject is clear and was unimpeached and unrebutted.

*See* Stein ¶¶ 22(h), 32; Lhote ¶¶ 22(h), 32; McGee ¶¶ 48, 91-92.

398.    Stein, Lhote, and McGee were motivated to seek provisions substantially identical to those that came to be embodied in Section 8(f) long before the Settlement Agreement was even entered into.  They were even more motivated to obtain such protections when SKAT would not agree to a settlement that had, as a condition, that SØIK would not charge them.

*Compare* PX-2 at § 2.3, & Clause 3 *with* PX-104 at § 8(f); PPSOF ¶¶ 66-73; Stein ¶¶ 22(a-h); Lhote ¶¶ 22(a-h); McGee ¶¶ 45-47.

399.    Stein and Lhote would not have continued the settlement discussions in late 2018 or early 2019 if provisions like Section 8(f) were not going to be included in the ultimate agreement.

*See* PPSOF ¶ 74; Stein ¶ 22(h); Lhote ¶ 22(h).

400. The same is true of McGee, although he is not a plaintiff on Count I of the Stein FAC.

*See* McGee ¶ 47.

401. Stein, Lhote, and McGee were entirely deprived of the benefit of Section 8(f) when SKAT failed to perform.

402. There is no possible cure now for SKAT's failure to comply with Section 8(f). There is simply no way to wind back the clock on SØIK's investigation to August 2019, have SØIK consider the Section 8(f) information as if it were still August 2019, and then have SØIK decide anew whether to charge, and then indict, Stein, Lhote, and McGee.

*See* PPSOF ¶ 321; Stein ¶¶ 33(a)(ii)(a-e), 33(a)(iii); Lhote ¶¶ 33(a)(ii)(a-e), 33(a)(iii); PX-300 at 2; PX-306 at 14.

403. In Section 8(f), Stein, Lhote, and McGee bargained for the possible impact that SKAT's performance would have on SØIK. The apt analogy that Stein and Lhote used in their Witness Statements was to a life-saving medicine that has some chance of having the desired effect. SKAT deprived them of that chance.

*See* Stein ¶ 32(c); Lhote 32 ¶ (c).

404. In determining whether a material breach has occurred, courts do not look at whether the consideration exchanged is of equal monetary value or whether the consideration of which a party has been deprived is of great monetary value. There is no requirement that what Stein, Lhote, and McGee agreed to pay after the Initial Cash Payment -- at least DKK 600 million -- be equal in value to the consideration provided by Section 8(f) by any measure.

*Caisse Nationale de Credit Agricole-CNCA, N.Y. Branch v. Valcorp, Inc.*, 28 F.3d 259, 265 (2d Cir. 1994) ("It is well established that the 'slightest consideration is sufficient to support the most onerous obligation;'" "courts are not to inquire into the adequacy of consideration."); *Apfel v. Prudential-Bache Sec. Inc.*, 81 N.Y. 2d 470, 475 (1993) ("[P]arties to a contract are free to make their bargain, even if the consideration exchanged is grossly unequal or of dubious value.").

405.    Whether SKAT would suffer forfeiture depends on the remedy to be
        provided.  Discharging Stein, Lhote, and McGee from the remaining
        obligations under the Settlement Agreement and the Letter Agreement and
        ordering SKAT to return the amounts paid after the Initial Cash Payment do
        not qualify as "forfeitures" under this Restatement factor.  The equitable
        unwinding of an agreement that one side has breached, rather, returns the
        parties to the *status quo ante*.

        RESTATEMENT (SECOND) CONTRACTS § 241, cmt. d.

## Under Danish Practice and Procedure, SØIK Was *Required* To Consider the Settlement Agreement In Determining Whether To Indict

406.    In opposing a finding of materiality, SKAT asserts that, as a matter of law,
        SØIK could *not* have taken into account the information that SKAT was
        required to communicate under Section 8(f) in determining whether to indict
        Stein, Lhote, and McGee and that SKAT only included it in the Settlement
        Agreement because Stein, Lhote, and McGee wanted it.

        *See* 5/21/24 Tr. at 16-20; ECF No. 163 at ¶ 79.

407.    The idea here is, if there was a breach, it could not have been material
        because the consideration to be provided -- performance under Section 8(f) -
        - could not possibly have impacted in any respect the Danish prosecutor's
        decision to indict.

        *Id*.

408.    The import of SKAT's argument is that the clause of the Settlement
        Agreement that was so material to Stein, Lhote, and McGee such that
        without it, they would not have entered into the Settlement Agreement, was,
        as a matter of law, worthless.

409.    The Court has previously considered this argument:

        So that means that when [SKAT] included this provision in this
        agreement, it was illusory at the outset.  And [SKAT], being the
        Danish side of it, understood that whatever SKAT said to SØIK was
        just immaterial.  That SØIK could not consider, as part of its charging
        decision, the fact that the country had been either made whole or close
        to whole or significantly better by virtue of the moneys that the

94

wrongdoers had paid over and would pay over.

*Id.* at 17:11-18; *see* Stein ¶¶ 22(h), 32; Lhote ¶¶ 22(h), 23; McGee ¶¶ 48, 91.

410. If, in fact, SKAT is correct that the benefit that Stein, Lhote, and McGee sought in the form of Section 8(f) is, as a matter of Danish law, worthless, then this would be an additional ground for ordering the remedy of rescission.

*See Courchevel 1850 LLC v. Wisdom Equities LLC*, 846 F. App'x 33, 35 (2d Cir. 2021) (contract may be rescinded for failure of consideration or for such a breach as substantially defeats its purpose, including breaches that were "so substantial and fundamental as to strongly tend to defeat the object of the parties in making the contract); *Babylon Assocs. v. Suffolk Cnty.*, 101 A.D.2d 207, 215 (2d Dep't 1984) ("In order to justify the intervention of equity to rescind a contract, a party must allege fraud in the inducement of the contract; failure of consideration; an inability to perform the contract after it is made; or a breach in the contract which substantially defeats the purpose thereof"); *see also* PPSOF ¶¶ 413-414.

411. Failure of consideration occurs "[w]here the consideration appears to be valuable and sufficient, but turns out to be wholly false, or a mere nullity . . . the consideration wholly fails . . . and the party paying or depositing money upon it can recover it back."

*Courchevel 1850*, 846 F. App'x at 35; *Gap Inc. v. Ponte Gadea New York LLC*, 524 F. Supp. 3d 224, 238 (S.D.N.Y. 2021) (failure of consideration exists wherever one who has promised to give some performance fails without his or her fault to receive in some material respect the agreed *quid pro quo* for that performance and gives the disappointed party the right to rescind the contract) *see also* PPSOF ¶¶ 413-414.

412. When pressed, SKAT's rather cavalier attitude to inclusion in the Settlement Agreement something that was extraordinarily important to Stein, Lhote, and McGee was "no harm, no foul." That is, it cost SKAT nothing to include Section 8(f) in the Settlement Agreement because it was "something [Stein, Lhote, and McGee] wanted."

5/21/24 Tr. at 17:19-23.

413.  SKAT has continued to advance that proposition, asserting that "as a matter of Danish law, Stein, Lhote, and McGee's settlement with SKAT could not have had any impact on SØIK's decision whether to indict them.  In Denmark, restitution and cooperation are relevant only to sentencing."

ECF 163 at 3-4; *id.* at ¶ 79 ("as a matter of Danish law, neither the fact of the settlement agreement itself nor the representations SKAT made under section 8(f) could have had any impact on SØIK's determination whether to indict counterclaim defendants for fraud in Denmark")

414.  Relatedly, SKAT asserts that:

> "[F]actors such as the" defendant's "payment of compensation" to the victim or "assistance in the investigation are not relevant factors for the Prosecution Service to consider in deciding whether to indict." Rather, under Danish law, those sorts of factors are "only relevant to the sentencing if, after a person is indicted, the person is convicted by the court."

ECF 163 at ¶ 79 (citation omitted)

415.  The Court has previously expressed serious doubt about this as a matter of commonsense.

*See* 5/21/24 Tr. at 17:24-18:3 ("That seems a little hard to totally comprehend because every charging decision involves many factors.  So why would paying back the stolen moneys, returning the crown jewels, or whatever, why would that not count?  Why would any prosecutor be so limited?").

416.  The Court's initial impression has been confirmed by the expert testimony offered in advance of, and during, the trial.

417.  The Court's determination of Danish law is "treated as a ruling on a question of law."

Fed. R. Civ. P. 44.1.

418.  Consideration of the steps associated with a Danish prosecutor's exercise of his or her discretion leads to the conclusion that, as a matter of law, SØIK would have considered the Settlement Agreement, representations made pursuant to Section 8(f) of the Settlement Agreement, the fact that Stein,

Lhote, and McGee had made substantial payments in restitution pursuant to the Settlement Agreement, and had committed to cooperate with SKAT in determining whether to indict Stein, Lhote, and McGee.

419.  At the highest level of generality, in determining whether to indict or whether to abandon, either in whole or in part, a case in which the subject has already been charged within the meaning of Danish law, a Danish prosecutor would have to make a prediction of the expected penalty. And the penalty to be expected would *necessarily* be reduced because of the payment of restitution and cooperation. As such, a *necessary* factor in the prosecutor's indictment decision would *have* to be the payment of restitution and cooperation.

420.  To explain this conclusion, the Court considers, first, Danish sentencing practice and, second, the factors to be considered by a Danish prosecutor in determining whether to indict.

421.  In arriving at this conclusion, the Court relies on the testimony of the two Danish law experts proffered by the Parties:

(a)    Professor Lasse Lund Madsen; and

(b)    Per Justesen.

PX-300, 301 (Madsen report and rebuttal report); DX-505-R, 506-R (Justesen report and rebuttal report).

422.  The Court also relies on the text of various Danish statutes pertinent to these matters.

PX-306, 307.

423.  Professor Madsen's report states with precision the legal question that the Court must decide:

> The primary issue to which this Report is directed concerns the question of *whether the police and the prosecution, under certain circumstances, have the possibility to completely or partially refrain from initiating charges and whether the prosecution has, under certain circumstances, the possibility of dismissing or not pursuing charges that have been initiated and what considerations would be relevant and appropriate to weigh in these contexts.* As part of my

97

consideration of this question, I discuss whether and when Danish police and prosecutors could have taken into consideration in exercising their discretion information that [SKAT] was required to provide in writing under a settlement agreement that is the subject of this litigation (the "Settlement Agreement").

PX-300 at 1 (emphasis added); Tr. 550:3-13.

424.    This is the question raised by SKAT's assertion that, under Danish law, the information that Section 8(f) required be communicated to SØIK could not have been taken into account in its decision about whether to indict Stein, Lhote, and McGee.

*See* 5/21/24 Tr. at 16:17-19:3; ECF No. 163 at ¶ 79.

425.    Under Danish law, the principal statute used at sentencing is Section 80 of the Penal Code.  In general, that provision of law requires the sentencing court to consider the gravity of the offense and information about the offender, while ensuring consistency in the application of the law.

*See* Tr. 574:22-575:21 (Justesen); PX-306 at § 80(1).

426.    When assessing the gravity of the offense under Section 80, a Danish sentencing court considers "the injury, damage, danger and infringement pertaining to the offence and what the offender realised or should have realised must be taken into account."

Tr. 575:14-577:2 (Justesen); PX-306 at § 80(2).

427.    "When assessing information on the offender, his general personal and social circumstances, his situation before and after the act and his motives for committing the act must be taken into account."

Tr. 575:14-577:2 (Justesen); PX-306 at § 80(2).

428.    Under Danish law, it is a mitigating circumstance at sentencing:

"(10)    that the perpetrator has provided information that is crucial for the clarification of criminal acts committed by others; [or]

(11)    that the perpetrator has remedied or attempted to remedy the damage caused by the criminal act."

98

PX-306 at § 82(10-11); *see generally* PX-300 at 20-21; PX-301 at 7; Tr. 529:23-530:4 (Madsen); Tr. 569:16-570:6 (Justesen).

429. The provision making cooperation a mitigating factor -- Section 82(10) -- does not require that the information provided as part of cooperation be provided to the prosecution. Rather, it could be information available to the prosecution, but provided to another governmental authority.

*See* Tr. 574:12-20 (Justesen).

430. The provision making restitution a mitigating factor -- in Section 82(11) -- includes even attempts to make a victim whole. This includes when "the perpetrator has tried to the best of their ability to remedy the damage caused but has not been able to" and also includes partially repaying a victim of financial harm.

*See* Tr. 571:2-15 (Justesen); PX-300 at 24; PX-301 at 7-8; Tr. 524:3-6 (Madsen).

431. When the Section 82(10) and 82(11) factors are present, the key question is not *whether* these factors are mitigating, but rather *by how much* they are mitigating.

Tr. 570:22-25 (Justesen); PX-300 at 24.

432. In determining how much the presence of one of these mitigating factors should reduce a sentence, there is no limit to the discretion of a Danish court at sentencing.

Tr. 573:14-17 (Justesen); PX-300 at 24 (referencing the "balance between resources and expected punishment").

433. Section 721 of the Administration of Justice Act sets out the conditions or circumstances in which a Danish prosecutor can decide not to indict a person who has already been "charged" or can decide to indict such a person with fewer or less serious offenses.

Tr. 577:9-14 (Justesen); PX-300 at 13-16.

434.  Section 721(1) provides, in relevant part:

>    Prosecution in a case can be completely or partially abandoned in cases
>
>    (1)    where the charge has proved unfounded,
>
>    (2)    where further prosecution, moreover, cannot be expected to lead to the accused being found guilty,
>
>    (3)    where Criminal Code Sections 10 b or 89 would be applicable if the accused were to be found guilty, when it is estimated that no or only a negligible penalty would be imposed and that conviction would not be of significant importance either, or
>
>    (4)    where the conduct of the case would entail difficulties, costs, or processing times that are not reasonably proportionate to the significance of the case and the penalty that can be expected to be imposed.

PX-306 at § 721.

435.  For the purposes of this case, Section 721(1)(4) is the most important subsection.

*See* PX-300 at 11; Tr. 560:11-22 (Madsen); Tr. 577:4-19 (Justesen).

436.  Section 721(1)(4) applies after a person has been "charged," that is, informed of the crimes under investigation and of his or her rights and guides the discretion of the prosecution in making indictment decisions.

*See* PX-300 at 13-15; Tr. 560:11-22 (Madsen); 577:4-19 (Justesen).

437.  Section 721(1)(4) "in essence, requires the prosecution to balance one set of considerations against another set of considerations" in deciding whether to exercise its discretion to not indict a person, to indict a person for only a subset of offenses, or to indict a person for less serious offenses.

Tr. 577:16-19 (Justesen); PX-300 at 11; *see, e.g.*, *id.* at 24-25; PX-301 at 8-9.

438. Specifically, 721(1)(4) permits the prosecution to completely or partially abandon a case based on its weighing of:

> difficulties, costs, or processing times
>
>> against
>
> the significance of the case and the penalty that can be expected to be imposed.

PX-300 at 14; PX-301 at 3-4; PX-306 at 5; Tr. 541:6-17 (Madsen); Tr. 577:16-19 (Justesen).

439. Some parts of this statutory text merit specific discussion.

440. Costs refers generally to expenses associated with the investigation and prosecution and include the impact of the initiation of charges on the ability of Stein, Lhote, and McGee to make further payments under the Settlement Agreement because such payments were to be made to the Danish treasury.

PX-300 at 24; Tr. 582:10-18, 583:3-6 (Justesen).

441. Processing times refers generally to the length of time that the case could last. Longer processing times generally result in a lower sentence.

PX-300 at 16; PX-301 at 8 (referring to Penal Code § 82 provision regarding mitigating effect of longer processing times); PX-306 at 19 (Section 82(13) providing that it is a mitigating factor at sentencing "that so much time has passed since the criminal act was committed that the imposition of a usual sentence is unnecessary").

442. Processing times also refers to the rights of the defendant to a speedy trial.

PX-301 at 12 ("It is important also to note that "processing times" requires consideration of not just resources available to the prosecution, but also the rights of a defendant. . . . It is well established under Danish law, and it is confirmed by the European Convention on Human Rights (the 'Convention'), art. 6, subsection 1, that a defendant has a right to a speedy trial.").

443. In Professor Madsen's assessment, and it is substantially unrebutted by SKAT's Danish law expert:

> Many circumstances fairly fall within the rubric of "difficulties, costs or processing times."
>
> These include, among other factors that might be relevant to the prosecution in considering how to proceed with respect to Stein, *et al.*, the challenges, delays, and expenses associated with:
>
> (1) locating those to be prosecuted;
>
> (2) extraditing those to be prosecuted;
>
> (3) obtaining evidence and other law enforcement assistance from numerous foreign countries;
>
> (4) trying those to be prosecuted in a single trial of significant length;
>
> (5) conducting multiple trials of significant length if all those to be prosecuted could not be made to participate in a single trial and the implications for the rights of defendants under those circumstances;
>
> (6) recovering assets and obtaining restitution in order to remedy any harm as a result of the conduct to be prosecuted, including the extent to which Stein, *et al.*, had agreed to cooperate in this effort; and
>
> (7) investigating a complicated set of facts, including the extent to which Stein, et al., had agreed to cooperate in this effort.

PX-301 at 10-11 (indentation added for ease of reference); *see* PX-300 at 16; Tr. 578:12-20 (Justesen).

444. The phrase "the penalty that can be expected to be imposed" requires the prosecutor, at the time that he or she decides whether to indict, to make a prediction about what penalty could be expected at sentencing.

*See* PX-301 at 4; Tr. 515:19-25, 522:18-523:14 (Madsen); Tr. 585:23-586:2 (Justesen).

445. This prediction must be made taking into account the mitigating factors that the prosecutor knows to be present in the case. This prediction is *not* made on the basis of the maximum possible sentence.

Tr. 529:23-530:12, 564:17-565:15 (Madsen); Tr. 585:23-586:2 (Justesen).

446. The phrase "reasonably proportionate" explicitly permits the prosecution to exercise its discretion in weighing "difficulties, costs, or processing times" against "the significance of the case and the penalty that can be expected to be imposed"

PX-301 at 4 ("Section 721, subsection 1, number 4, by its terms requires the prosecution to engage in a process of balancing, or weighing, one set of considerations . . . against another set of considerations"); Tr. 560:24-561:8 (Madsen); Tr. 590:16-25 (Justesen).

447. Having considered each of the parts of Section 721(1)(4) and their interplay with Section 82, the Court concludes that, under Danish law, SØIK could have considered the information required to be disclosed under Section 8(f) in determining whether to indict Stein, Lhote, and McGee.

448. The capacious phrases "difficulties, costs, or processing times" and "the significance of the case and the penalty that can be expected to be imposed" would permit SØIK, in determining whether to indict Stein, Lhote, and McGee, to have considered the following items, which could rationally have borne on the exercise of SØIK discretion under Section 721(1)(4):

(a)    the payments to be made under the Settlement Agreement and the timeframe in which they would be made;

(b)    the nature of the cooperation obligations undertaken in the Settlement Agreement, including the great extent of the information to be provided, the manner in which the cooperation obligations would be invoked (primarily by a mere request of SKAT), and the requirement that Stein, Lhote, and McGee use best efforts to ensure that their cooperation was meaningful and productive, with best efforts having a known legal meaning under New York law;

(c)    the nature of the assurances of payment that Stein, Lhote, and McGee would be providing to SKAT in the form of the 2019 Affidavit of Confession of Judgment and the requirement to provide an updated

103

affidavit of confession of judgment, which would have the effect of extending those assurances;

(d)    the special payment obligations that Stein, Lhote, and McGee, as Covered Parties' Designees, distinct from the remainder of the Covered Parties, undertook, for example to pay interest and additional interest in the event of a default;

(e)    the requirement that Stein, Lhote, and McGee produce records sufficient to establish Net Proceeds and that they certify the accuracy of the Final Net Proceeds List;

(f)    the certain illiquid assets that Stein, Lhote, and McGee undertook to liquidate to pay the Subsequent Cash Payment Amount;

(g)    the requirement to provide quarterly progress reports regarding their efforts to liquidate the assets;

(h)    the best efforts obligations that Stein, Lhote, and McGee undertook to liquidate the assets;

(i)    the requirement to apply the proceeds of liquidation of such assets to the Final Settlement Amount;

(j)    the requirement that proceeds of the sale of North Channel Bank be paid to SKAT;

(k)    SKAT's representation that the Settlement Agreement reflects good-faith negotiation by the Covered Parties;

(l)    SKAT's representation that the Covered Parties' cooperation may result in the recovery by SKAT of additional funds from third parties; and

(m)    SKAT's representation that the Settlement Agreement is in the best interests of SKAT.

449.    It merits some discussion regarding *how* these items could have impacted SØIK's balancing of "difficulties, costs, or processing times" against "the significance of the case and the penalty that can be expected to be imposed."

450. For example, from SØIK's perspective:

(a)     The efforts and progress that Stein, Lhote, and McGee had already made to remedy damage caused by their conduct could be mitigating factors under Penal Code Section 82(11), such that the "penalty that can be expected to be imposed" would necessarily be reduced.

(b)     The fact that Stein, Lhote, and McGee had committed to making future payments to SKAT could be further mitigating factors under Penal Code Section 82(11), such that the "penalty that can be expected to be imposed" would necessarily be reduced.

(c)     Stein, Lhote, and McGee's particularly extensive obligations to cooperate with SKAT could be deemed mitigating factors under Penal Code Section 82(10) ("the perpetrator has provided information that is crucial for the clarification of criminal acts committed by others"), such that the "penalty that can be expected to be imposed" would necessarily be reduced.

(d)     A rational prosecutor could have determined that an indictment of Stein, Lhote, and McGee might have negatively impacted their cooperation with SKAT and, thereby, reduced SKAT's ability to recover funds from others.

(e)     The impact of an indictment on Stein, Lhote, and McGee's ability to make payments under the Settlement Agreement could increase costs to the Danish treasury.

(f)     For example, a rational prosecutor, aware of the extent to which future payment obligations were impacted by the liquidation of Stein, Lhote, and McGee's interests North Channel Bank, could have determined that an indictment of Stein, Lhote, and McGee could jeopardize their ability to realize DKK 322 million from the sale.

(g)     Under these circumstances, a rational prosecutor could have factored into his or her balancing under Section 721(1)(4) potential costs to the Danish treasury of DKK 322 million.  A rational prosecutor would know that an indictment of the owners of a bank could meaningfully impair its value and negatively impact the ability to monetize it to repay the Danish treasury.  A rational prosecutor could have determined that an indictment of Stein, Lhote, McGee might cost the

105

Danish treasury DKK 600 million (the minimum amount of the Subsequent Cash Payment).

(h)    A prosecutor scrutinizing the terms of the Settlement Agreement might have been influenced in his or her assessment of the extent of the remediation provided and agreed to be provided by Stein, Lhote, and McGee by SKAT's representation that the Settlement Agreement was in the best interests of SKAT and SKAT's representation that the Settlement Agreement reflected good-faith negotiation.

451.    The Court need not exhaustively recite the myriad ways that the facts required to be communicated under Section 8(f) might have been considered by SØIK. The point is that the information required to be communicated under Section 8(f) *could* have been considered under Section 721(1)(4) and, as Stein, Lhote, and McGee expected when they bargained for Section 8(f), a communication of the information pursuant to Section 8(f) would have been substantially in favor of Stein, Lhote, and McGee and, if considered by SØIK, would make an indictment at least somewhat less likely.

Stein ¶¶ 30, 32, 33(a)(ii-iii), 33(d); Lhote ¶¶ 30, 32, 33(a)(ii-iii), 33(d); McGee ¶¶ 92-110.

452.    The Court need not decide *how much* less likely an indictment would have been if SØIK had been provided the information required to be imparted under Section 8(f). The point is simply that Stein, Lhote, and McGee bargained for the chance to positively influence SØIK and SKAT's failure to comply with Section 8(f) deprived them of the benefit of that bargain.

453.    Contrary to SKAT's assertion, SØIK could have taken into account what Section 8(f) required SKAT to communicate at the stage when SØIK was deciding whether to indict Stein, Lhote, and McGee. These facts were not only relevant at the sentencing phase, contrary to the suggestion of SKAT's Danish law expert.

DX-505-R at ¶ 31; PX-300 at 25; PX-301 at 13-14.

454.    This is because, as the Court has explained, in making the decision to indict, the prosecutor must make a prediction of the sentence and weigh the predicted sentence, together with the significance of the case, against considerations of costs, difficulties, and processing times. And the predicted sentence *must* take account of the mitigating factors known to be present. In

addition, the calculus under Section 721(1)(4) requires a consideration of costs.

455.  Contrary to the suggestion of SKAT's expert in his report, SØIK was not *required* to indict Stein, Lhote, and McGee if the conditions for a conviction are met.  Indeed, it is difficult for the Court to imagine a regime of criminal prosecution that does not given the prosecutor a measure of discretion to chose whom to indict.  The expert testimony offered by both sides confirms that Section 721(1) provides that discretion and that, in this case, Section 721(1)(4), at the very least, permitted consideration of the facts that Section 8(f) required be communicated by SKAT to SØIK.

*See* DX-505-R at ¶ 29.

456.  The fact that the Danish criminal justice system does not require an indictment if the conditions for a conviction are met is confirmed by what happened in this case, in particular, with respect to parties involved in dividend arbitrage trading who were not charged.  Among those who were not charged by SØIK are:

   (a)  Richard Markowitz and John van Merkensteijn:  Markowitz and van Merkensteijn were partners with Stein and Lhote for several years starting from the beginning of the dividend arbitrage trading.  Although they participated in settlement discussion at the beginning, they dropped out and, in the end, never settled with SKAT and litigated with SKAT, including SKAT's claims of fraud, for about eight years.

   (b)  Adam LaRosa:  Adam LaRosa played a key role in the underlying dividend arbitrage trading and acted on behalf of two dozen pension plans.  SKAT sued LaRosa alleging his participated in the fraud.  LaRosa signed the Settlement Agreement and is a Covered Party.

   (c)  Bech Bruun:  Bech Bruun was a law firm that provided Danish law opinions associated with dividend arbitrage trading.  Bech Bruun's conduct concerns exactly the same pension plans and the same claimed losses as those at issue in the indictment of Stein, Lhote, and McGee.  Bech Bruun was ordered by the highest court in Denmark to pay SKAT DKK 400 million on SKAT's claims that Bech Bruun participated in a fraud.

*See* Tr. 10-14, 21, 24-25, 29, 73 (Stein); Tr. 590:5-7 (Justesen); PX-4 at ¶¶ 9(a), 18, 41; PX-403-R, Response to Interrogatory No. 7 (outlining DKK 1,135,775,442.18 of refunds at issue with Bech Bruun); DX-520 (indictment alleging that Stein, Lhote, and McGee fraudulently caused payout of DKK 1,135,775,447.99); PX-130-R at 15-19 (describing conduct of Bech Bruun proven in litigation initiated by SKAT in Denmark).

457.    Indeed, the cross-examination of SKAT's Danish law expert revealed that he substantially agreed that Section 721(1)(4) requires exactly the sort of balancing that Professor Madsen described:

Q:    This is the principal statute that governs the considerations of the prosecutor after a person has been charged under Danish law but not yet indicted, correct?

A:    This provision is about the conditions or circumstances in which the prosecution service can decide not to, shall we say, press charges or not to indict a person.

Q:    Thank you.

And Subsection 4, in essence, requires the prosecution to balance one set of considerations against another set of considerations, correct?

A.    That's correct.

Tr. 577:9-19.

458.    And SKAT's Danish law expert further admitted that factors relevant to sentencing -- such as remediation and cooperation -- would need to considered by the prosecutor in determining "the penalty that can be expected to be imposed" at the pre-indictment stage:

Q:    Is it fair some say that if a factor is a consideration for the Court at sentencing, then the prosecutor would need to make it a part of his or her prediction about what the penalty is that can be expected?

A.    Yes.

Tr. 585:23-586:2; *see* Tr. 570:2-571:17 (discussing mitigating factors relevant to sentencing, including remediation, attempted remediation, and cooperation).

108

459. Further, SKAT's Danish law expert admitted that the phrase in Section 721(1)(4) "that are not reasonably proportionate" requires exactly the balancing that Professor Madsen described and that this balancing does not take into account the strength of the evidence:

> Q:    And the phrase I want you to focus on is where it indicates "that are not reasonably proportionate."
>
> . . . .
>
> Q:    This requires the prosecutor in applying this section to engage in a balancing, correct?
>
> A:    That's correct.
>
> Q:    And you told me before that it doesn't depend on the strength of the evidence?
>
> A:    That's correct.
>
> Q:    So it's simply a question of difficulties, costs, or processing times balanced against the significance of the case and the penalty that can be expected, correct?
>
> A:    I agree with that.

460. SKAT's Danish law expert also admitted that the prosecutor's discretion is reviewable only within the prosecution service and not by any other authority.

Tr. 592:16-593:1.

461. Finally, SKAT's Danish law expert admitted in his report that the prosecutor's discretion permits the choice not to indict:

> the prosecutor has the option of dropping the prosecution based on resource considerations, but even then a balance must also be made in relation to the importance of the case and the expected punishment.

PX-505-R at ¶ 55.

462.   There is plainly a viable legal path for SØIK to have not indicted Stein, Lhote, and McGee, even if SØIK believed that Stein, Lhote, McGee were guilty of crimes under Danish law.  And that legal path would be informed by consideration of all of the information that SKAT was required to communicate to SØIK under Section 8(f), something that the Parties agree was permitted under Section 721(1)(4).

463.   And this is precisely what Stein, Lhote, and McGee bargained for under Section 8(f).  They bargained for SKAT to impart to SØIK certain information in a specific manner and in a specific timeframe.

464.   And Stein, Lhote, and McGee's purposes behind that bargain were unimpeached, as Stein succinctly stated in his direct testimony:

(a)    I recognized then, and recognize now, of course, that SKAT's compliance with Section 8(f) would not guarantee that Jerome, Luke, or I would not be charged by SØIK.

(b)    But, in my view, Section 8(f) increased the chances that I would not be charged or indicted by SØIK, even if SØIK was otherwise inclined to charge or indict.

(c)    It was much like a potentially life-saving medicine. It was not guaranteed to have the desired effect, but it represented an important chance to achieve a result that was favorable and extraordinarily important to me.

(d)    SKAT's failure to comply with Section 8(f) stole from me that chance, which was practically the only thing that I was to receive in Phase II.

Stein ¶¶ 32(a-d); *see* Lhote ¶¶ 32(a-d).

465.   The only serious cross-examination of Professor Madsen concerned the extent to which examples of the exercise of a prosecutor's discretion under Section 721(1)(4) could be cited.

466.   This hardly detracted from the basic agreement between Professor Madsen and SKAT's Danish law expert on the operation of Administration of Justice Section 721(1)(4) and its interaction with Penal Code Section 82(10-11).

467. As Professor Madsen explained, there would logically not be a body of public information about a prosecutor's decision to entirely forgo charges under Section 721 or publicly available information about the prosecutor's decision-making.

Tr. 535:19-536:1 ("you must also understand when it comes to these decisions not to charge, not to initiate an investigation or not to indict, this is often not -- especially when you are on the most early stage of the case of not initiating an investigation or not to press charges, there are no -- of no record of these cases because its decision on such an early stage"), 542:12-17 (explaining how prosecutor's decision to not indict certain persons in a particularly large case under Section 721(1)(4) became known because prosecutor chose to speak openly about it); PX-300 at 9-10 (discussing Operation Greed).

468. This is roughly analogous to the manner in which the Department of Justice does not typically disclose the reasons that it chose not to indict a person. And, this is roughly analogous the practice of the Department of Justice to not identify uncharged persons as having engaged in criminal activity.

United States Department of Justice Manual, Justice Manual § 9-27.760, Limitation on Identifying Uncharged Parties Publicly (available here).

469. Having considered the expert reports, the Court finds that, under Danish law, SØIK had considerable discretion to consider the information to be provided under Section 8(f) in deciding whether to indict Stein, Lhote, and McGee.

470. As Stein, Lhote, and McGee's Danish criminal law expert explains:

> There is no doubt that section 721, subsection 1, no. 4 of the Administration of Justice Act provides the legal basis for the prosecution, in exercising its discretion, to drop, or not indict, a case based on its balancing of difficulties, costs, or processing times as against the significance of the case and the penalty that can be expected to be imposed.
>
> There can also be no doubt that, in this assessment, the prosecution can consider whether the accused has compensated the victim or has cooperated with the authorities. This is because the difficulties, costs, or processing times in conducting the case must be weighed against the expected punishment, and since these considerations

111

(compensation and cooperation) will, all else being equal, lead to a more lenient sentencing, the prosecution must already take this into account before indicting to make a fair and usable estimate of the expected punishment.

It is quite common for the prosecution to make significant reductions in the case based on the considerations set forth in section 721, subsection 1, no. 4. This often happens based on plea bargaining-like agreements with the defense attorney. As stated in Report No. 1066 of 1986, p. 192 (cited in Madsen Rep. 15), it is assumed that there may be prunings that converted into a percentage corresponds to the case being cut by 50-75%.

Although it is not typical for the prosecution to drop a case in its entirety, even though the law allows for this possibility, there is nothing typical about this case when it comes to difficulties, costs, and processing times, which can easily be described as exorbitant and unprecedented in Denmark.

. . . .

Ultimately, it is solely up to the prosecution to decide whether or not to indict. But to claim in this case that they had no options other than to indict is incorrect. The prosecution in this case could have chosen another solution. It is established that there is a legal basis for this in section 721, subsection 1, no. 4 of the Administration of Justice Act.

PX-300 at 13-15; *see also* PX-300 at 23-25.

471.    In the end, the principal problem of the testimony of SKAT's Danish language expert is that he answered the wrong question. As Professor Madsen stated:

The prosecution surely had the legal authority under section 721, subsection 1, no. 4, to not indict Stein, et al., based on all of the circumstances present and after weighing the difficulties, costs, and processing times against the significance of the case and the penalty that could be expected to be imposed. The furthest that Mr. Justesen could reasonably go is to indicate that, based on what he knows about the case and his experience, he **would have** proceeded to indict Stein, *et al.* But, as mentioned above, it is simply incorrect to state that "the

112

investigation and eventual charges against Stein, Lhôte and McGee **could not** have been dropped under" section 721, subsection 1, no. 4.

PX-301 at 10 (emphasis in original).

472.  SKAT's Danish law expert directed himself to a reassessment of the factors that SØIK might have considered, not whether, as a matter of law, SØIK could have chosen not to indict Stein, Lhote, and McGee under Section 721(1)(4).

473.  Even if the question that SKAT's Danish law expert answered were the correct question, his opinion on it is not well-founded.

474.  After admitting that Section 721(1)(4) gives prosecutors considerable discretion, SKAT's Danish law expert indicates what he believes the outcome of the prosecutor's decision-making under Section 721(1)(4) would have been:

> In my opinion, the investigation and eventual charges against Stein, Lhote and McGee could not have been dropped under subsection (4) because there are not resource constraints in pursuing an economic crime of this magnitude and for which the Danish government was the victim, the case is too important to the country to be dropped, and the potential penalties are significant.

PX-501 at ¶ 58; *see id.* at ¶ 55.

475.  Even accepting that the question that SKAT's Danish law expert answered was the correct question, SKAT's Danish law expert answer to the question was not reliable.  The Court so concludes because Justesen did not have a sufficient factual basis to render this conclusion.

476.  SKAT's Danish law expert conceded that he did not have access to all of the information that would allow for a redetermination of how Section 721(1)(4) might be applied.

Tr. 593:3-12 ("Q: Did you have access to all of the information about difficulties, costs, and processing times in connection with the prosecution of Mr. Stein, Mr. Lhote, and Mr. McGee?  A: No, I did not.")

477.  Nonetheless, SKAT's Danish law expert claimed that he had "significant information" that would allow him to make an assessment of the penalty that can be expected in a prosecution of Stein, Lhote, and McGee.

Tr. 593:21-594:4.

478.  The Court does not regard this testimony as reliable.

479.  Most importantly, SKAT's Danish law expert did *not* consider what would likely be one of the *most* important pieces of information that a Danish prosecutor would have in making the determination of the expected penalty under Section 721(1)(4).

480.  Specifically, SKAT's Danish law expert did not consider the *nine days* of interviews that Stein, Lhote, and McGee, in total, gave to SØIK.

DX-517 (beginning Bates number STEIN_LHOTE0009749); DX-518 beginning Bates number STEIN_LHOTE0009847); DX-519 (beginning Bates number MCGEE_000037).

481.  The list of documents that SKAT's Danish law expert used in his report -- both the Appendices to his report and the list of other materials considered in drafting his report -- does *not* include the interviews of Stein, Lhote, and McGee.

*See* DX-505-R, List of Appendices and List of Other Documents Considered.

482.  SØIK was anxious to have those interviews occur and those interviews were obviously crucial to the prosecutor's decision-making.

PX-1 at 1-2; PX-17 at 2; DX-516 (e-mail from SØIK to McGee's Danish criminal counsel; "Further to our telephone call today, I can re-confirm my previous statement to you that SØIK does not intend to make any decision on whether to prosecute Mr. Luke McGee or not prior to him being interviewed").

483.  Those interviews were also crucial because they gave Stein, Lhote, and McGee an opportunity to present themselves in the best possible light to SØIK.

*See, e.g.*, Miller ¶ 9.

114

484. During the three-day interview of Stein and the three-day interview of Lhote, they answered "all of SØIK's questions on every aspect of [Stein and Lhote's] conduct and the conduct of others about which SØIK inquired."

Stein ¶ 46; Lhote ¶ 46.

485. During the three-day interview of McGee, he "answered all questions to the best of [his] knowledge, including regarding various entities, pension funds, and individuals associated with the Danish Reclaim Trading, and otherwise about the conduct that SØIK was investigating."

McGee ¶ 133.

486. Without having considered this information, SKAT's Danish law expert could not have reliably reassessed the likely outcome of SØIK's decision-making under Section 721(1)(4).

## Stein and Lhote Sought Rescission Within A Reasonable Period of Time

487. The Court must now determine whether Stein and Lhote sought rescission with a reasonable time period.

488. The Court finds that, under the applicable standards, they did.

489. The determination of reasonableness depends on the unique facts and circumstances present.

*See United States Liab. Ins.*, 813 F. App'x at 638-39; *Ballow*, 435 F.3d at 240.

490. Upon learning information that the defendant may have breached a contract, the suspecting party is entitled to a reasonable period of time to investigate.

*See Cont'l Cas. Co. v. Marshall Granger & Co., LLP*, 6 F. Supp. 3d 380, 394 (S.D.N.Y. 2014); *Banque Arabe et Internationale D'Investissement v. Maryland Nat. Bank*, 850 F. Supp. 1199, 1211 (S.D.N.Y. 1994).

491. There is no bright-line rule as to what length of time is reasonable for an investigation by the non-breaching party. Courts consider, among other things, the difficulty associated with undertaking the investigation and the amount of information that is necessary to determine whether there are sufficient grounds for rescission.

*See Cont'l Cas. Co.*, 6 F. Supp. 3d at 396 (collecting cases) (citing *Republic Ins. Co. v. Masters, Mates & Pension Plan*, 77 F.3d 48, 53-54 (2d Cir. 1996)); *Maloul v. Berkowitz*, 2008 WL 2876532, at *2 (S.D.N.Y. July 23, 2008).

492. If and when the non-breaching party obtains knowledge of facts sufficient to conclude there are grounds for rescission, only then does the non-breaching party have to seek a remedy within a reasonable time.

*See Cont'l Cas. Co.*, 6 F. Supp. 3d at 394.

493. There are events that may suspend the reasonable time by which the non-breaching party must seek rescission.

*See Banque*, 850 F. Supp. at 1211.

494. For example, where the parties are discussing a resolution, rescission need not be sought until the negotiations collapse, even if the non-breaching party has knowledge sufficient to conclude there are grounds for rescission.

*See id.*; *Int'l Motor Sports Grp., Inc. v. Gordon*, 1999 WL 619633, at *5 (S.D.N.Y. Aug. 16, 1999).

495. In determining whether Stein and Lhote sought rescission within a reasonable time after suspending performance, the Court also considers the purpose of the requirement to seek rescission within a reasonable time after suspending performance.

496. The purpose of requiring the non-breaching party to act within a reasonable period of time under the circumstances is to ensure that the non-breaching parties (in this case, Stein and Lhote) do not continue to receive benefits from the breaching party (in this case, SKAT) and, after continuing to receive those benefits for an unreasonably long period of time, only *then* brings an action for rescission.

*See V.S. Int'l, S.A. v. Boyden World Corp.*, 862 F. Supp. 1188, 1196 (S.D.N.Y. 1994); *Rebecca Broadway L.P. v. Hotton*, 143 A.D.3d 71, 80-81 (1st Dep't 2016).

497. Stein and Lhote suspended their performance around the end of April 2022. It was at that time that they made their last payment and ceased providing quarterly progress reports.

*See* PX-6; PPSOF ¶¶ 285-288.

498.  The next time that SKAT raised the issue of the quarterly progress reports under the Letter Agreement was in February 2023, which tends to show that SKAT regarded them as relatively unimportant.  Indeed, SKAT itself, as distinct from its U.S. counsel, did not even review them.

*See* Stein ¶ 27(b)(iv); Lhote ¶ 27(b)(iv); PX-400-R at 275:20-276:11, 276:22-277:22.

499.  Stein and Lhote initiated this action about 11 months later.

*See* PPSOF ¶ 291; Stein ¶ 51; Lhote ¶ 51.

500.  The final payment under the Settlement Agreement was not required until May 2023.

*See* PX-104 at §§ 1(r), 2(d); PX-109 at § 6.

501.  During this 11-month period, there were no benefits under either the Settlement Agreement or the Letter Agreement provided to Stein or Lhote, or even McGee.  This case cannot be analogized to a person who, for example, rents a piece of equipment, suspends his or her performance and ceases to pay the required rent, but keeps the equipment.  Here, there was no benefit that SKAT was providing to Stein, Lhote, or McGee during the period between April 2022 and May 2023, at which point Stein and Lhote sued.

502.  Because the difficulty of investigating whether SKAT had breached Section 8(f) must be assessed, the Court considers the behavior of SKAT's U.S. counsel in responding to Stein and Lhote's requests for information related to its compliance with Section 8(f), which bore on what they knew in April 2022 when they ceased performing.

503.  The behavior was troubling and it extended over a lengthy period of time.  The behavior of SKAT's U.S. counsel consisted of evasiveness in responding to inquiries and, ultimately, outright falsehoods that misled Stein and Lhote about what SKAT had communicated to SØIK:

(a)  Marshall L. Miller, Stein and Lhote's U.S. counsel, and himself an experienced former prosecutor, began to inquire from U.S. counsel for SKAT about the nature of SKAT's communications with SØIK in

117

November 2020.

*See* Miller ¶¶ 10(a-b); PX-7.

(b) Over the course of two months, U.S. counsel for SKAT did not provide any meaningful information, despite promising to do so and the likely ease with which U.S. counsel for SKAT could have obtained such information.  There is no evidence that SKAT ever claimed that it would not provide such information because it was not required to do so under the Settlement Agreement.

*See* Miller ¶¶ 10(c-e); PX-7.

(c) In January 2021, Miller again pressed for SKAT to communicate with SØIK about Stein and Lhote's cooperation with SKAT and the terms of the Settlement Agreement.

*See* Miller ¶ 11; PX-7.

(d) U.S. counsel for SKAT did not respond.

*See* Miller ¶ 12.

(e) When U.S. counsel for SKAT did respond to Miller's proposal in about mid-February, U.S. counsel for SKAT falsely stated, among other things, that SKAT would not communicate to SØIK in writing on the subject of Stein, Lhote, and McGee's cooperation provided pursuant to the Settlement Agreement.

*Compare id.* ¶ 13 and PX-612-C-R *with, e.g.*, PX-124 (SKAT's answers to questions 20 and 22 from SØIK).

(f) U.S. counsel for SKAT did not disclose, either because it did not know or because it chose not to, that as of about mid-January, SØIK had, in fact, been responding to SØIK's written inquiries about the terms of the Settlement Agreement and cooperation pursuant to it.

*See* PX-118 (SØIK Jan. 6, 2021, questions), 121 (SKAT Jan. 19, 2021, answers), 123 (SKAT Jan. 28, 2021, answers to SØIK Jan. 19, 2021, questions), 141-T (SKAT Jan. 22, 2021, response to SØIK Jan. 22, 2021, request for Settlement Agreement), 124 (SKAT Feb. 3, 2021, answers to SØIK Jan. 28, 2021, questions).

118

(g)     After Stein, Lhote, and McGee were indicted in April 2021, the stakes for their being able to obtain visibility into SKAT's communications with SØIK, and the resulting need for that information, were raised considerably. Miller now asked U.S. counsel for SKAT point-blank how SKAT had complied with Section 8(f):

> In connection with our discussion of the confidentiality/disclosure provisions of the Settlement Agreement, we wanted to follow up with you on a few items:
>
> 1.      First, can you send us a copy of the written communication that SKAT sent to SØIK in conformity with its obligations under Section 8f of the Settlement Agreement? That would be helpful for us to understand the record on this issue.
>
> 2.      Relatedly, based on our conversation, it's unclear to us whether a request was ever made by SØIK to SKAT for a copy of the full agreement, as contemplated in Section 8f. Can you confirm whether such a request was made by SØIK, and if so, by whom, so that we know where to direct our conversations within SØIK?
>
> *See* Miller ¶¶ 23-28; PX-127.

(h)     U.S. counsel did not respond until mid-June 2021. When that response was provided, U.S. counsel for SKAT did not refer to *any* of the writings on which it now relies as evidence of its compliance with Section 8(f), did not mention any of those writings, and did not mention the series of letters by which SKAT answered SØIK's rather basic questions about the Settlement Agreement in January and February 2021, let alone the timing of them. That is, SKAT failed to disclose that SØIK had been making inquiries to SKAT starting on January 6, 2021, the first day of McGee's interview, during which he mentioned the Settlement Agreement as a substantial mitigating factor.

> *See* Miller ¶¶ 26-30; PX-118, 128.

119

(i)    Nor did U.S. counsel for SKAT inform Miller, in response to his direct question about whether SØIK had asked SKAT for a full copy of the Settlement Agreement that, SØIK had, in fact, asked for a copy and that SKAT had falsely indicated that it was not permitted to provide it.

*See* Miller ¶ 24; PX-141, 141-T ("The background to our wish is that the settlement and the individual appendices are fundamentally confidential based on the content of the agreements.  We cannot therefore share the material without informing the parties to the agreement, which is why it would be helpful in this regard if you could give us some context."); *see* PX-104 at § 8(f) ("Upon request by SØIK, [SKAT] may provide and/or disclose the entirety of this Agreement to SØIK."); PX-400-R at 90:3-22.

504.    Under the circumstances present here, including the difficulty that Stein and Lhote had encountered in obtaining truthful information about SKAT's compliance with Section 8(f) and the fact that Stein and Lhote were not receiving meaningful benefits under the Settlement Agreement during this period, the Court finds that the period of time from late April 2022 when they suspended performance until late March 2023 when they sued for rescission was not unreasonable.

505.    The other factual circumstances bearing the reasonableness of the timeframe in which Stein and Lhote sought rescission is the fact that the Parties were engaged in extended negotiations about a resolution of the True-Up Amount through February 2023.  At that point, SKAT provided notice that it was initiating arbitration of the True-Up Amount.  The seeking of rescission in March 2023, a very short period after the notice of arbitration, supports the reasonableness of the time period in which Stein and Lhote sought rescission.

Tr. 137:18-142:11 (Stein); Stein ¶ 73; *Banque*, 850 F. Supp. at 1211; *Int'l Motor Sports Grp.*, 1999 WL 619633 at *5.

506.    SKAT argues that Stein and Lhote were on notice of SKAT's purported breach as far back as March 2021, when they came to believe that SKAT had breached during their interviews with SØIK.  The idea here is that Stein and Lhote were required to seek rescission in March 2021.  This argument begins the time period to seek rescission too early because it ignores the fact

that Stein, Lhote, and McGee continued to perform long after March 2021 and did not suspend their performance until about April 2022. A party, even in the face of a breach about which he or she is certain, has the option to continue to perform and seek rescission later on, as long as it has continued to perform.

Stein ¶¶ 47(h-i); Lhote ¶¶ 47(h-i); *see, e.g.*, *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 389 (1987).

507. Beyond that, SKAT's assertion ignores the very substantial difficulties surrounding Stein's and Lhote's efforts to gather information about whether SKAT had in fact complied with Section 8(f).

*See* ECF No. 163 at ¶ 119.

508. As set forth above, Stein and Lhote had been pressing SKAT for accurate information for months, were obstructed in their effort to obtain it and were not provided truthful information, asked SKAT again in April 2021 about its communications with SØIK, and received information in June 2021 that, it turns out, in stark contrast to what SKAT now contends the true facts are.

Miller ¶¶ 8-16, 22-24, 27-28, 30; PX-128.

509. During Stein's and Lhote's interviews with SØIK in March of 2021, Stein and Lhote both concluded that it was clear SØIK did not have a copy of the Settlement Agreement.

*See* Stein ¶¶ 46-47(c); Lhote ¶¶ 46-47(a); Tr. 57:10-21 (Stein); Tr. 176:16-177:8 (Lhote).

510. At the end of his interview, Lhote believed that SKAT had breached by not providing SØIK a copy of the Settlement Agreement. He later came to understand that was incorrect because the Settlement Agreement does not require SKAT to provide a copy of the Settlement Agreement to SØIK.

*See* Lhote ¶¶ 47(b-c); Tr. 177:9-18; PX-104 at § 8(f) ("Upon request by SØIK, Skatteforvaltningen *may* provide and/or disclose the entirety of this Agreement to SØIK.") (emphasis added).

511. Stein and Lhote both testified in their direct examination that, after their interviews, they concluded that further analysis was required to determine whether or not SKAT had breached. Indeed, it was during this time that Miller was still trying to seek answers from SKAT about whether, and to what extent, SKAT had complied with Section 8(f).

   See Stein ¶ 47(d); Lhote ¶ 47(d); PPSOF ¶¶ 202, 225-233.

512. In fact, both Stein and Lhote continued to perform up to and until April 2022, when they suspended performance. This is consistent with Lhote's testimony on cross-examination that it was sometime in 2022 that Stein and Lhote concluded SKAT had breached.

   See Stein ¶¶ 47(i-j); Lhote ¶¶ 47(i-j); Tr. 195:14-196:8 (Lhote).

513. As a result, there is nothing in the record to support that Stein and Lhote were on notice of SKAT's breach in March 2021 such that the reasonable time in which Stein and Lhote were required to sue began in March 2021.

## The Remedies of Rescission and Rescissory Damages Are Appropriate

514. New York law provides for the remedy of rescission arising from either fraud or breach of contract, but only where the breach is found to be material and willful, or, if not willful, so substantial and fundamental as to strongly tend to defeat the object of the parties in making the contract.

   See Pyskaty v. Wide World of Cars, LLC, 856 F.3d 216, 227 (2d Cir. 2017); Gleit v. Francois-Bodine, 2018 U.S. Dist. LEXIS 85038, at *21 (S.D.N.Y. May 18, 2018).

515. New York courts are also authorized to award rescissory damages, in essence, the disgorgement of benefits conferred under a contract prior to rescission. The purpose of doing so is to restore the parties to the *status quo ante*. Where rescission cannot completely return a party to the *status quo ante*, rescissory damages may also be awarded.

   See Caremark, L.L.C. v. New York Cancer & Blood Specialists, 740 F. Supp. 3d 340, 361-62 (S.D.N.Y. 2024); United States ex rel. Taylor v. Gabelli, 2005 WL 2978921, at *5 n.10 (S.D.N.Y. Nov. 4, 2005) (citing DOBBS, LAW OF REMEDIES: DAMAGES, EQUITY, RESTITUTION § 4.3(6) (2d ed. 1993)); Syncora Guar. Inc. v. Countrywide Home Loans, Inc., 935 N.Y.S.2d 858,

869-70 (Sup. Ct. N.Y. Cty. 2012).

516.  Rescission of a contract extinguishes it as if it had never been made.

*See Reilly v. Natwest Mkts. Grp. Inc.*, 181 F.3d 253, 264 (2d Cir. 1999) ("A rescission amounts to the unmaking of a contract, or an undoing of it from the beginning, and not merely a termination.") (cleaned up).

517.  In light of the importance of Section 8(f) to the decisions of Stein, Lhote, and McGee to enter into the Settlement Agreement and the Letter Agreement, and the manner in which SKAT's conduct frustrated the intent of the parties, the Court finds that rescission is appropriate and that an award to Stein, Lhote, and McGee of rescissory damages in the amount that they paid after the Initial Cash Payment is appropriate.  Indeed, on this matter of fact, their testimony was unimpeached.

*See* Stein ¶¶ 22(h), 32; Lhote ¶¶ 22(h), 32; McGee ¶¶ 48, 91-92.

518.  On the full factual record before the Court, the Court finds that SKAT's breach material and willful or was so substantial and fundamental as to strongly tend to defeat the object of Stein, Lhote, and McGee in entering into the Settlement Agreement.

PPSOF ¶¶ 313-370.

519.  The willfulness of SKAT is further supported by SKAT's conduct in frustrating the intent of Stein, Lhote, and McGee that SØIK have information about the Settlement Agreement as required by Section 8(f), specifically:

(a)  SKAT's frustrating Stein, Lhote, and McGee's efforts to obtain accurate information about SKAT's communications with SØIK, for example, the repeated offers to provide Miller with information about SKAT's communications with SØIK and the protracted failure to do so;

Miller ¶¶ 10-14.

(b)  falsely stating to Miller that SKAT's communicating with SØIK about the cooperation that Stein, Lhote, and McGee had provided pursuant to the Settlement Agreement was not something that SKAT would

consider doing while -- at the very same time -- SKAT was communicating, in fact, with SØIK about Stein, Lhote, and McGee's cooperation under the Settlement Agreement;

*Compare* Miller ¶¶ 11-15, PX-612-R-C *with* PX-118, 120, 121, 122, 123, 124, 125.

(c)     SKAT's failure to inform Miller, in response to his direct inquiries on these subjects, that, in fact, SØIK was inquiring about the Settlement Agreement, cooperation under the Settlement Agreement, and documents provided pursuant to Stein, Lhote, and McGee's cooperation obligations and that SKAT was communicating with SØIK about these subjects;

*Compare* Miller ¶¶ 11-15, PX-612-R-C *with* PX-118, 120, 121, 122, 123, 124, 125.

(d)     falsely indicating to SØIK that SKAT was not permitted to provide the Settlement Agreement to SØIK and falsely indicating to SØIK that the settling parties had to approve the provision of the Settlement Agreement to SØIK; and

PX-131 (Jan. 22, 2021, e-mail and letter from SØIK), 122 (Bechmann Jan. 22, 2021, 10:29 e-mail; Ahlefeld-Engel Jan. 22, 2021, 10:33 e-mail), 141, 141-T; PX-104 at § 8(f); PX-403-R at Interrogatory Nos. 13 ("SKAT is unaware of any requests made to the Covered Parties to share the Settlement Agreement with SØIK.").

(e)     responding to the direct question about how SKAT had complied with Section 8(f) with a recounting that is starkly inconsistent with the facts known at the time.

PX-128.

520.    That amount of rescissory damages is determined by reference to the records of payments after August 2019.  The amount is approximately DKK 57,765,968.

*See* PX-6.

124

**The Settlement Agreement Is Divisible**

521. Whether a contract is divisible is a question of intent, determined from the language of the contract and the circumstances under which it was made.

*Sasson v. Mann*, 2019 WL 3532155, at *11 (S.D.N.Y. Aug. 2, 2019).

522. This is typically a matter of law.

*Samba Enters., LLC v. iMesh, Inc.*, 2009 WL 705537, at *5 (S.D.N.Y. Mar. 19, 2009); *Lazard Freres & Co. v. Crown Sterling Mgmt., Inc.*, 901 F. Supp. 133, 136-37 (S.D.N.Y. 1995).

523. If the parties' intent is not clear from the contract itself, however, it is a question of fact to be determined after discovery.

*Sasson*, 2019 WL 3532155, at *11.

524. "A contract is divisible where '(1) the parties' performances can be apportioned into corresponding pairs of partial performances, and (2) the parts of each pair can be treated as agreed equivalents.'"

*Lazard Freres*, 901 F. Supp. at 136 (quoting *Ginett v. Computer Task Grp., Inc.*, 962 F.2d 1085, 1098 (2d Cir. 1992)).

525. The Settlement Agreement's terms show that it is divisible.  For example:

(a)    There was a clear demarcation of what consideration was exchanged in what phase of the Settlement Agreement: in exchange for the Initial Cash Payment of DKK 950 million, SKAT broadly released the Covered Parties from claims relating generally to Reclaim Applications.

*See* PX-104 at § 4(a).

(b)    After that, the Covered Parties had no payment obligations and only the Covered Parties' Designees did, further separating the performance of the parties.

*See* PX-400-R at 188:15-20, 188:22, 188:24-189:6, 189:8-12, 189:19-25, 190:2-11.

(c)   Only the Covered Parties' Designees had payment obligations thereafter and only the Covered Parties' Designees were required to liquidate assets under the Letter Agreement.  And only the Covered Parties' Designees had the obligation to provide and certify the accuracy of the final list of Net Proceeds so that the True-Up Amount could be determined, and only the Covered Parties' Designees' to pay the Final Settlement Amount.

*See* PPSOF ¶¶ 109-111, 134(e-f).

(d)   SKAT's remedies for any failure to pay were against only the Covered Parties' Designees, not against the Covered Parties.  Once the Initial Cash Payment was complete, SKAT could only proceed against Stein, Lhote, and McGee and could only do so by means of the Affidavit of Confession of Judgment.  That is, once the Initial Cash Payment was complete, all Covered Parties except Stein, Lhote, and McGee would be released from further liability.

*See* Stein ¶ 25(g); Lhote ¶ 25(g).

526.   If there is any question of divisibility from the text of the Settlement Agreement and the Letter Agreement, the Court can resort to Stein, Lhote, and McGee's testimony on this subject.

527.   Stein's, Lhote's, and McGee's testimony on this subject and their understanding of the manner in which performance of the obligations under the Settlement Agreement was divided was unimpeached at trial.  This testimony supports the Court's finding of divisibility.

*See* Stein ¶¶ 25-27, 37-39; Lhote ¶¶ 25-27, 37-39; McGee ¶¶ 54-64; *see Sasson*, 2019 WL 3532155, at *11.

528.   SKAT's arguments do not compel a different conclusion for several reasons.

*See* ECF No. 163 at ¶¶ 110-116.

529.   First, SKAT asserts that, under the Settlement Agreement, SKAT agreed to release its claims against the Covered Parties "in return for, among other things, the Covered Parties repaying SKAT their Net Proceeds from the Reclaim Applications."  This is an entirely inaccurate summary of the Settlement Agreement's terms.

*See* ECF No. 163 at ¶ 112.

530.  The releases provided by SKAT are expressly conditioned on the completion of only the *Initial Cash Payment*, *not* the repayment of the Final Settlement Amount.

    *See* PX-104 at § 4(a); Exh. A (diagram of payment obligations).

531.  Second, SKAT's argument that there is only one agreement and the Settlement Agreement refers to itself singularly as "this Agreement" does not "outweigh the compelling evidence suggesting that the parties intended to enter into a divisible contract." Such a conclusion "would permit form to swallow substance."

    *See Samba Enter.*, 2009 WL 705537, at *6 (cleaned up).

532.  Third, SKAT's suggestion that the Settlement Agreement's severability clause rebuts a conclusion that the Settlement Agreement is divisible misstates the impact of severability clauses on the issue of divisibility. The opposite of SKAT's argument is the law in New York. The presence of a severability clause directly evidences that the parties intended to make an agreement *divisible*.

    *See id.* (concluding that the agreement's severability clause "evidence[d] that the parties intended to make the [a]greement divisible"); *Christian v. Christian*, 42 N.Y.2d 63, 73 (1977) ("Here the parties had a right to and did, by expressly stipulating that if any provision of the separation agreement be held invalid or unenforceable all other shall nevertheless continue in full force, make the agreement within reasonable limits divisible, and there is little room for construction.").

533.  Fourth, it is clear from the text of the Settlement Agreement that there is a "way to determine the consideration for each part of the contract."

    *See Samba Enter.*, 2009 WL 705537, at *6; PPSOF at ¶¶ 86-99 (outlining the initial performance required); 100-123 (outlining obligations after receipt of the Initial Cash Payment).

534.  The uncontested testimony and construction of the Settlement Agreement confirm the Court's conclusion that the Settlement Agreement is divisible.

**Stein and Lhote's Count II – Declaratory Judgment**
**As to The 2021 Affidavit of Confession of Judgment**

535.  If the Court does not rescind the unperformed obligations of the Settlement Agreement and the Letter Agreement, then it must decide whether the 2021 Affidavit of Confession of Judgment is enforceable.

536.  Given the strength of the evidence on Stein and Lhote's Count I for rescission and the relief granted on Stein and Lhote's Count I, and McGee's defense in the form of the assertion of SKAT's prior breach, the Court need not decide this complicated issue of first impression in federal court.

537.  Pursuant to CPLR 3218(b), an affidavit of confession of judgment may be only filed "with the clerk of the county where the defendant's affidavit stated that the defendant resided when it was executed or where the defendant resided at the time of filing."  CPLR 3218 was amended, effective as of the end of August 2019, to preclude the use of affidavits of confession of judgment with respect to those residing outside of the State of New York at the time of execution of the affidavit of confession of judgment or at the time of filing.  The amendment also eliminated the ability of a non-resident of the State of New York to authorize the entry of judgment in any county in New York and the ability of a non-resident to designate any county in New York in which an affidavit of confession of judgment may be filed.

   *Dillon*, C3218:3, McKinney's Practice Commentaries (2021).

538   CPLR 3218 does not define residence.

   *See id.*

539.  By June 2021, when the 2021 Affidavit of Confession of Judgment was executed, Lhote had abandoned his New York residence.

   *See* PX-129; Lhote ¶¶ 59-65.

540.  McGee, through an entity, has owned a second home in New York since about 2014.  Since September 2021, he has maintained his permanent and primary home in Florida.  He was not a resident of New York under various New York law definitions of resident when the 2021 Affidavit of Confession of Judgment was executed.

   McGee ¶¶ 162, 167; *Matter of Obus v. New York State Tax Appeals Trib.*,

206 A.D.3d 1511, 1514 (3d Dep't 2022) (vacation home did not result in residency for purposes of New York tax law); *Matter of Gaied v. New York State Tax Appeals Trib.*, 22 N.Y.3d 592, 597 (2014) (discussing domicile and residence); *Unanue v. Unanue*, 141 A.D.2d 31, 40-41 (2d Dep't 1988) (considering various factors such as school attendance, payment of taxes, maintenance of bank accounts, and driver's license issuance in determining residence for purposes of New York Domestic Relations Law).

541.  The Court has previously considered, without deciding, whether CPLR 3218(b)'s provisions apply in connection with enforcing an affidavit of confession of judgment by means of an action under CPLR 3213, a state court procedure by which a plaintiff can seek summary judgment in lieu of complaint that does not exist in federal court.

    *See* ECF No. 87 at 16-18; CPLR 3213.

542.  In doing so, the Court relied on *Express Trade Capital, Inc. v. Horowitz* to suggest that, if a party seeking to enforce an affidavit of confession of judgment brings an action, the filing limitation of CPLR 3218(b) to the New York county of residence of the affiant is inapplicable.

    *See* ECF No. 87 at 17-18 (citing *Express Trade Cap., Inc. v. Horowitz*, 198 A.D.3d 529, 530 (1st Dep't 2021)).

543.  The Second Circuit has not yet decided this question.  Nor has the New York Court of Appeals.

544.  And no court has considered whether *Express Trade*'s holding would apply in an action under CPLR 3213 where, for example, an out-of-state defendant does not appear, which would be a substantial loophole in the protection put in place by the New York Legislature in amending CPLR 3218(b) in the first place.

545.  The limited case law on this issue reflects that *Express Trade* has not been uniformly followed, directly or indirectly.

    *See, e.g.*, *Upfront Megatainment, Inc. v. Thiam*, 235 A.D.3d 516, 516 (1st Dep't 2025) (refusing to enforce affidavit of confession of judgment against non-resident where an action had been brought).

546.  While *Upfront Megatainment* may be factually distinct, the court's ruling was based firstly on the fact that "the Legislature amended CPLR 3218 to prohibit a party from enforcing a confession of judgment against a nonresident of New York State such as defendant."

 *Id.*; *see* ECF No. 172 at 8.

547.  Beyond that, *Express Trade* does not concern the circumstances present in this case.  Specifically, *Express Trade* did not concern an affidavit of confession of judgment that was executed *after* the effective date of the amendment to CPLR 3218(b) and, as such, by its terms, the amendment to CPLR 3218(b) was not applicable.  The 2019 amendment to CPLR 3218, by its terms, only applies "to judgments by confession filed on or after the [August 2019] effective date" of the amendment.  *Express Trade*'s holding about the manner that CPLR 3218(b) may be avoided by bringing an action under CPLR 3213 was classically *dicta*.

548.  The Court also considered, but did not decide, whether Lhote and McGee had waived the protections of CPLR 3218.

 *See* ECF No. 87 at 17.

549.  Stein and Lhote have previously argued, among other things, that the new language of CPLR 3218 does not permit there to be a waiver of the protections of CPLR 3218 to out-of-state residents.

 12/21/23 Tr. at 6 ("I think the new language of 3218 does not permit there to be a waiver."), 8 ("Because under the statute it's not waivable").

550.  Likewise, McGee argued that a rule that the new protections of CPLR 3218 can be waived "may create a rule of law that will be exploited mercilessly by lenders."  If there were such a rule, McGee argued, there would come to "be a new form affidavit of confession of judgment in the State of New York.  There will be lenders writing in 'I knowingly acknowledge and waive the requirement that the clerk can only enter judgment in this particular county,' and it's going to, in effect, gut the legislative purpose of the statute if one were to argue that a party can knowingly waive that requirement, assume just for the sake of argument."

 *Id.* at 55-56.

551.  No court has held that the protections of CPLR 3218(b) are waivable.  A finding of a waiver in the absence of any provision of CPLR 3218(b) or legislative history of the change to CPLR 3218 suggesting waivability would be without precedent.

552.  There is no legislative history or scholarly commentary suggesting that the prohibition on the use affidavits of confessions of judgment involving out-of-state persons enacted in 2019 as part of amendments to CPLR 3218(b) are waivable.

See, e.g., Hon. Mark C. Dillon, Practice Commentaries, CPLR C3218:3 (2021); 2019 NY S.B. 6395 (NS), New York Committee Report & Sponsor Memo (June 9, 2019) (available here or here); SIEGEL'S N.Y. PRACTICE § 300 (6th ed. 2024) (available here); id. § 301 (available here).

553.  One New York state court that has interpreted the 2019 amendment to CPLR 3218 where there was an action under CPLR 3213 denied the entry of a confession of judgment that was executed by a non-New York resident.  See Torres v. Monsalve, 2021 N.Y. Misc. LEXIS 29744, at *1, *3 (Sup. Ct. Queens Cty. Mar. 31, 2021).  Notably, that court did not find that authorizing entry of the confession of judgment in "Queens County, New York" was a waiver of the residency requirement imposed by the 2019 amendment to CPLR 3218.  Id. at *3; see also Upfront Megatainment, 235 A.D.3d at 516.

554.  In addition, in Torres, the plaintiff did file an action under CPLR 3213 for summary judgment in lieu of complaint.  However, the court did not consider the question of whether the 2019 amendment to CPLR 3218 precluded entry of the confession of judgment as part of an action because the court treated the conclusion that the confession of judgment could not be executed by a non-New York resident as dispositive.

See ECF No. 172 at 8; Torres, 2021 N.Y. Misc. LEXIS 29744, at *3.

555.  The waivability of CPLR 3218(b) is, at the very least, an unsettled question that no court has definitively answered.

556.  But even if the protections were waivable, the waiver would have to be knowing and voluntary.

*See Martinez v. Rockwood*, 2025 WL 459893, at *4 (S.D.N.Y. Feb. 11, 2025) (federal court "'has the power to enter a confession of judgment where subject matter jurisdiction exists and the confession of judgment was made knowingly and voluntarily'") (citing *Sapon v. Hanbat Rest., Inc.*, 2021 WL 621170, at *1 (S.D.N.Y. Feb. 16, 2021)); *see Rekor Sys., Inc. v. Loughlin*, 2022 WL 3138942, at *5 (S.D.N.Y. Aug. 5, 2022) (considering waiver of jury trial rights and holding that contractual waivers of such rights "are narrowly construed, and the requirement of knowing, voluntary, intentional waiver is strictly applied" and that party "seeking to enforce the jury waiver clause bears the burden of showing that the waiver was knowing and voluntary").

557. There is little, if anything, in the record to establish that Lhote and McGee knowingly and voluntarily waived the protections of CPLR 3218.

558. The most detailed information on this subject is that McGee knew about the change in CPLR 3218 regarding residency some time in 2021, but did not know whether that was before or after signing the 2021 Affidavit of Confession of Judgment. McGee testified that at the time he signed the 2021 Affidavit of Confession of Judgment, he testified he had no reason to believe that it was unenforceable. This would not be a sufficient basis on which to find a knowing and intentional waiver, if the protections of CPLR could even be waived.

*See* Tr. 254:4-21, 268:24-269:4; PX-104 at § 18 (waiver of rights under Settlement Agreement must be in writing).

559. As for Lhote, he signed the 2021 Affidavit of Confession of Judgment knowing, at a very high level, that his residence in Florida at the time may have impacted its enforceability.

*See* Tr. 167:9-25.

560. Lhote's signing the 2021 Affidavit of Confession of Judgment was based on his assumption that SKAT knew what it was doing when sending it to him.

*See* Tr. 168:1-6.

561. If the Court finds that the requirements of CPLR 3218 are, as matter of law, waivable despite no statutory language suggesting waivability, it could do so only by exercising its equitable authority and, as set forth more fully below,

it would need to consider whether SKAT is entitled to the benefit of a waiver.

562. Leading up to Stein, Lhote, and McGee's provision of the 2021 Affidavit of Confession of Judgment in early June 2021, Miller was in the midst of pressing U.S. counsel for SKAT to explain whether and how SKAT had complied with Section 8(f).  At no point did SKAT raise the issue of how the change in law bore on an important aspect of the Settlement Agreement, specifically, the assurances that SKAT had against the payment obligations of Stein, Lhote, and McGee.

*See* Miller ¶¶ 27-30.

563. SKAT could have initiated a discussion about how to proceed in light of the uncertainty generated by the amendment or availed itself of the remedy of Section 17 of the Settlement Agreement by initiating a discussion about how to resolve the uncertainty associated with CPLR 3218(b)'s impact on the affidavit of confession of judgment.

564. Indeed, on cross-examination, SKAT itself suggested that Lhote should have attempted to find a "workaround" to the fact that there were questions about the enforceability of the 2021 Affidavit of Confession of Judgment.

Tr. 168:1-16.

565. If a "workaround" was something that SKAT contends that Lhote should have identified as a remedy in light of the questions about the enforceability of the 2021 Affidavit of Confession of Judgment, then it is equally something that *SKAT* should have identified.  After all, the 2021 Affidavit of Confession of Judgment existed for SKAT's benefit, not Lhote's.

566. Section 17 of the Settlement Agreement provides a remedy if any aspect of the Settlement Agreement is rendered void or unenforceable.  It requires the parties to negotiate in good faith for a mutually acceptable alternative provision.

*See* PX-104 at § 17.

567. SKAT did not invoke Section 17 and did not otherwise raise the issue of the enforceability of an affidavit of confession of judgment by a non-New York resident.

Miller ¶ 29(a).

568.  The factual record on this point is not well developed, in part, because SKAT has not provided any reasons for its failure to raise the issue of the impact of the 2019 change in CPLR 3218 and because discovery on whether U.S. counsel for SKAT even knew about the change in law was not taken. To put a finer point on it, despite inquiring of Lhote why he did not seek a "workaround" to put to rest questions about the enforceability of the 2021 Affidavit of Confession of Judgment, SKAT has not provided any information as to why it did not do the same thing.

569.  For the Court to determine whether to exercise the Court's equitable authority to find waiver by Lhote and/or McGee, the Court would need to consider SKAT's knowledge of the change in CPLR 3218 and SKAT's reasons for its conduct and whether, all things considered, equitable considerations should result in a benefit for SKAT and a detriment to Lhote and/or McGee.

      *See* ECF Nos. 136, 138-40, 143.

570.  SKAT itself, as distinct from its U.S. counsel, had no knowledge of the change in law and admitted that *only* its U.S. counsel had such knowledge.

      *See* PX-400-R at 362:4-19, 362:23-363:13, 364:13-20.

571.  As a result, the factual record to determine whether SKAT is entitled to the equitable relief of a finding that Lhote and McGee waived the protections of CPLR 3218 is not well developed.

572.  One of two inferences about why SKAT did not seek to identify what it called a "workaround" or to resolve questions about the impact of the 2019 change in law to CPLR 3218 on the 2021 Affidavit of Confession of Judgment is available.

573.  First, if SKAT's U.S. counsel did not know about the change in law, then the Court's exercise of its equitable authority in favor of SKAT to find that Lhote and McGee waived some protection would be foreclosed. Mistakes of law do not entitle a party to equitable relief.

      *See Gimbel Bros.*, 118 A.D.2d at 535-36.

574. There is a second -- and more likely -- inference about why SKAT did not seek to resolve questions about the impact of the 2019 change in law to CPLR 3218 on the 2021 Affidavit of Confession of Judgment.

575. The 2021 Affidavit of Confession of Judgment was due to be provided by early June 2021, within ten business days of the two-year anniversary of the May 28, 2019, effective date of the Settlement Agreement.

    *See* PX-104 at § 4(c); *id.*, § 1(n) (defining "Effective Date").

576. Some weeks before the due date and on April 17, 2021, Miller had continued his efforts to obtain information about SKAT's compliance with Section 8(f) of the Settlement Agreement.  On this date, Miller asked point-blank for SKAT to provide evidence that it had complied with Section 8(f).

    *See* PX-127 at 2 ("can you send us a copy of the written communication that SKAT sent to SØIK in conformity with its obligations under Section 8f of the Settlement Agreement?").

577. The answer that SKAT provided about two months later -- on June 18, 2021 -- is an admission that SKAT had breached Section 8(f).  SKAT points only to communications made immediately after the signing of the Settlement Agreement.  All that SKAT points to as evidence of compliance are oral conversations.  SKAT refers to no writings at all.  SKAT has admitted that oral conversations do not comply with Section 8(f).

    PX-128; Tr. 317:20-23 ("Q: You agree with me, sir, that the oral communications between SKAT and SØIK, those are not compliance with Section 8F either, are they?  A. Correct.") (Bechmann), 402:16-19 ("Q: And you also agree with me that SKAT does not view any oral communications as being compliant with Section 8F of the settlement agreement, correct?  A: Correct.") (Ahlefeld-Engel).

578. The Court can infer from the available evidence that had SKAT raised with Lhote and McGee the issue of the impact of the 2019 change to CPLR 3218 in the lead-up to the due date for the 2021 Affidavit of Confession of Judgment, Miller would have pressed for an answer of his then-pending request for information about SKAT's compliance with Section 8(f) before providing it.

135

579. Miller had been pressing for this information for months.  As an experienced criminal defense lawyer, it is fair to infer that, if SKAT were asking for a "workaround" to the change in law to CPLR 3218, Miller would have considerably greater leverage to require an answer to his then-pending question about SKAT's compliance with Section 8(f).

Miller ¶¶ 2-4, 10-11, 13-14.

580. And, had SKAT's eventual answer come before provision of the 2021 Affidavit of Confession of Judgment, there is every reason to doubt that Stein, Lhote, and McGee would have provided the 2021 Affidavit of Confession of Judgment.  After all, SKAT's June 18, 2021, answer to Miller's inquiry, at the very least, would have raised considerable questions about whether SKAT had complied with Section 8(f).

*See* PX-128.

581. In short, the Court can safely conclude that, on the basis of the available evidence, that SKAT chose not raise the issue of the change to CPLR 3218 for strategic and self-protective reasons and chose to delay providing an honest response to Miller's inquiry in order to ensure that, before responding, Stein, Lhote, and McGee had provided the 2021 Affidavit of Confession of Judgment.  Under these circumstances, the Court declines to exercise of equitable authority to find a waiver in SKAT's favor and to the detriment of Stein, Lhote, and McGee.

*See Pike Co., Inc. v. Tri-Krete Ltd.*, 2025 WL 896579, at *13 (W.D.N.Y. Mar. 24, 2025) (under New York law, party seeking a finding of waiver must prove entitlement to such relief); *Fed. Ins. Co. v. United States*, 882 F.3d 348, 371-72 (2d Cir. 2018) (under New York law, court may deny equitable relief to a party with unclean hands); *CBF Industria de Gusa S/A v. AMCI Holdings, Inc.*, 850 F.3d 58, 78 (2d Cir. 2017) (court's equitable power should "never be exerted [o]n behalf of one who has acted fraudulently, or who by deceit or any unfair means has gained an advantage") (cleaned-up).

582. As for the enforceability of the 2021 Affidavit of Confession of Judgment against Stein, who was a New York resident at the time of its execution, it is infirm for a different reason.

136

583. The Court has suggested, but not decided, that the 2021 Affidavit of Confession of Judgment does, in compliance with CPLR 3218, state a sum certain because parties can "fill in exact amounts at a later date in accordance with calculations or methodology to which they agreed."

*See* ECF No. 87 at 18.

584. In this case, there is not, as the Court previously suggested, "a precise methodology for determining the Judgment Amount." There are considerable disputes about the methodology for determining the amount that would be filled into the 2021 Affidavit of Confession of Judgment.

ECF No. 87 at 18-19; Stein ¶¶ 57-97.

585. SKAT's forensic expert has no ability to testify about whether one or another methodology is a correct interpretation of the term Net Proceeds. The manner in which the Settlement Agreement requires calculation of Net Proceeds is a question of law.

586. As set forth below, there is a lack of definiteness in the manner of calculating Net Proceeds reflected in the considerable methodological disputes between the Parties and, as a result, about the calculability of the amount to be inserted in the 2021 Affidavit of Confession of Judgment.

*KJ Roberts & Co. Inc. v. MDC Partners, Inc.*, 2014 WL 1013828, at \*9-\*10 (S.D.N.Y. Mar. 14, 2014) ("[W]here missing or indefinite terms cannot be substituted by reference to an objective standard, [an] agreement leaves no room for legal construction or resolution of ambiguity therefore is unenforceable.") (cleaned-up), *aff'd*, 605 F. App'x 6 (2d Cir. 2015); *F & K Supply Inc. v. Willowbrook Dev't Co.*, 288 A.D.2d 713 (3d Dep't 2001) (ambiguous payment terms resulted "in only an unenforceable agreement to agree").

**Summary of the Net Proceeds Process and the
True-Up, if Any, Under the Settlement Agreement**

587. The Parties agreed that the Covered Parties were to pay SKAT "the full amount of the Net Proceeds . . . that the Covered Parties received directly or indirectly from Reclaim Applications . . . made to [SKAT]." PX-104 at p.1, Recital F.

137

588. "Net Proceeds" are defined in the Settlement Agreement as the funds received by the Covered Parties as a result of Reclaim Applications after expenses.

*See id.* at §§ 1(u), 2(e).

589. Reflecting that stated intent, the Parties agreed that the estimated amount Net Proceeds was DKK 1.55 billion, the Preliminary Settlement Amount. The Settlement Agreement also provided for a formula and a process to determine if Net Proceeds was in fact greater than DKK 1.55 billion.

*See id.* at § 1(u), 1(y), 2(a-b), 2(e).

**Net Proceeds Formula**

590. Section 2(e) of the Settlement Agreement provides a formula for how to calculate Net Proceeds:

For the purposes of this Agreement, "**Net Proceeds**" shall be

(A)    **Gross Reclaims**

**less**

(B)    **all of the Covered Parties' expenses associated with Reclaim Applications** for which [SKAT] made payments, specifically as follows:

(1)    reclaim agent fees,

(2)    tax reclaim advisory service fees,

(3)    brokerage fees and commissions,

(4)    custodial and clearing fees,

(5)    trading expenses, and

(6)    financial institution account charges and

**less**

138

(C) **any other portion of Gross Reclaims received by parties excluded from the releases as set forth in Section 4 herein**, including without limitation, those parties listed on Exhibit 3 ('Non-exhaustive list of parties excluded from release'), that were not otherwise subsequently provided to any Covered Party.

PX-104 at § 2(e) (emphasis added and indentation added for ease of reference); *see* Stein ¶ 62.

591. Written out as a more simplified mathematical formula, this is:

Net Proceeds = [A] Gross Reclaims – [B] Covered Parties' Expenses – [C] Gross Reclaims Received by Non-Covered Parties

*See* Stein ¶ 63; PX-104 at § 2(e); *see* Stein ¶ 63.

592. Broken out, the three elements of the Net Proceeds formula are defined as:

(a) **[A] Gross Reclaims**, which is "all reclaim amounts from [SKAT] received by or on behalf of the Pension Plans in respect of applications to reclaim taxes withheld or allegedly withheld from dividends paid on Danish company shares the Pension Plans owned or allegedly owned between 2012 and 2015." The Pension Plans were listed in Exhibits 1A and 2 to the Settlement Agreement.

*See* PX-104 at §§ 1(s), 1(x), 2(e)(A).

(b) **[B] Covered Parties' Expenses**, which is "all of the Covered Parties expenses associated with Reclaim Applications for which [SKAT] made payments, specifically as follows: (1) reclaim agent fees, (2) tax reclaim advisory service fees, (3) brokerage fees and commissions, (4) custodial and clearing fees, (5) trading expenses, and (6) financial institution account charges." These six categories are not defined in the Settlement Agreement and there is no methodology provided in the Settlement Agreement to determine them.

(i) The only requirement is that they be expenses of the Covered Parties and that they be "associated with Reclaim Applications for which [SKAT] made payments."

*See id.* at § 2(e)(B).

139

(c)    **[C] Gross Reclaims Received by Non-Covered Parties**, which is the "portion of Gross Reclaims received by parties excluded from the releases as set forth in Section 4 [of the Settlement Agreement], including without limitation, those parties listed in Exhibit 3 . . . , that were not otherwise subsequently provided to any Covered Party."

*Id.* at § 2(e)(C).

593.   If Net Proceeds turned out to be *less* than DKK 1.55 billion, there would not be a downward adjustment to the DKK 1.55 billion to be paid to SKAT.

*Id.* at § 2(e)(ii).

594.   If the Final Net Proceeds List established that Net Proceeds was greater than the estimated DKK 1.55 billion, the Covered Parties agreed to pay SKAT the difference.  This amount, if any, is the "True-Up Amount."

*See id.* at § 2(e)(iii).

595.   There was never an agreed-upon or certified Final Net Proceeds List that established the final amount of Net Proceeds.

*See* Stein ¶ 68; Tr. 137:4-11 (Stein).

## The Course of the True-Up Process

596.   The Settlement Agreement outlines a multi-step process that the Covered Parties, including Stein, Lhote, and McGee, were to comply with in order to aid in determining Net Proceeds:

(a)    The Covered Parties would "use their best efforts to provide [SKAT] with documentation sufficient to establish the total amount of Net Proceeds received by the Covered Parties directly or indirectly from the Reclaim Applications, with the expectation that such exchange and review shall be completed no later than six (6) months after the Effective Date" of May 28, 2019;

(b)    The Parties would "cooperate to establish the Gross Reclaims and the Net Proceeds received by each Pension Plan"; and

(c)    "At the end of this process, the Covered Parties' Designees" were required to "provide and certify the accuracy of a final list of Net Proceeds received by each Covered Party with respect to each Pension Plan" in the form of a "Final Net Proceeds List."

*See* PX-104 at §§ 1(n) (defining Effective Date), 1(p), 2(e)(i); *see* Stein ¶ 66.

597.    As part of this process, Stein, Lhote, and McGee, on behalf of Maple Point, conducted an extensive search and review of documents and produced nearly 100,000 documents (the "MPSKAT Documents") between about August 2019 and about July 2021.

*See* Stein ¶ 71(a); PX-200; Tr. 83:8-14 (Stein).

598.    There was a considerable amount of cross-examination about the fact that the MPSKAT Documents were produced to SKAT in response to a subpoena and were designated as confidential or highly confidential pursuant to a protective order.

*See* Tr. 83:15-18, 158:12-20 (Stein); Tr. 209:3-212:1 (Lhote); Tr. 252:22-253:4 (McGee).

599.    SKAT sought to elicit this testimony to attempt to show that the subpoena and protective order governing the exchange of the MPSKAT Documents was done in an attempt to prevent SØIK from receiving the MPSKAT Documents and limit the scope of the Covered Parties' cooperation.

*See* Tr. 158:12-160:6 (Stein); Tr. 211:1-212:1 (Lhote).

600.    The Court regards this testimony elicited on cross-examination as largely not relevant to the issues required for the Court to resolve the claims and defense of Stein, Lhote, and McGee.

601.    During redirect examination, it became clear that the subpoena was the mechanism negotiated and agreed upon by counsel for the exchange of the MPSKAT Documents and that there was a potential confidentiality obligation owed to others that were referred to in the MPSKAT Documents.

*See* 157:4-8, 157:20-158:1 (Stein).

602. It also became clear that it was never the intent of Stein to prevent SØIK from having the MPSKAT Documents.  Rather, the subpoena and protective order were means by which Stein, Lhote, and McGee could know what SKAT was providing to SØIK.

    *See* 155:13-19, 157:9-17.

603. In addition, there was no requirement in the Settlement Agreement for Stein, Lhote, and McGee to provide the MPSKAT Documents to SØIK.

    *See* Tr. 158:4-160:6 (Stein).

604. Counsel for Stein, Lhote, and McGee also provided to SKAT more than 100 spreadsheets (the "True-Up Spreadsheets") containing information about each of the Pension Plans covered by the releases in the Settlement Agreement between about September 2019 and June 2020.

    Stein ¶ 71(b); PX-201; Tr. 77:4-25 (Stein); Tr. 169:25-170:3 (Lhote).

605. The True-Up Spreadsheets were provided under certain agreed-upon conditions.

    *See* PX-201; Tr. 133:15-135:12 (Stein).

606. Stein testified that the True-Up Spreadsheets were provided to SKAT to cooperate and resolve the True-Up Process "amicably," and at a time when there was an "accommodative kind of posture" being taken with SKAT.

    *See* Tr. 87:18-24, 135:17-24.

607. Indeed, at the time Stein, Lhote, and McGee provided the final set of True-Up Spreadsheets to SKAT in or about June of 2020, Stein, Lhote, and McGee believed that SKAT has complied with Section 8(f).

    *See* PX-201; Tr. 132:22-133:4.

608. After SKAT received the True-Up Spreadsheets, the parties negotiated for several years about the calculations in the True-Up Spreadsheets and SKAT went so far as to hire an accounting firm to audit the True-Up Spreadsheets.

    *See* Stein ¶¶ 72-73; Tr. 137:14-22 (Stein); ECF No. 172 at 9.

609.  By February of 2023, the Parties were still far away from a resolution as to the True-Up Amount and SKAT issued a notice of arbitration to Stein, Lhote, and McGee.  The notice of arbitration reflected that SKAT was seeking several additional categories of adjustments to the True-Up Amount that SKAT ultimately never sought in this case or that SKAT sought in this case and then abandoned by SKAT.

    *See* Tr. 137:18-138:7, 139:21-140:25, 141:22-142:17 (Stein); Tr. 623:9-15 (Landy).

610.  The True-Up adjustments that SKAT was seeking in its notice of arbitration were three or four times the amount that the Parties had been previously discussing.  The adjustments sought by SKAT in its notice of arbitration were about DKK 150 million, much larger than the DKK 53.6 million currently sought by SKAT.

    Tr. 138:4-7, 140:3:7, 140:15-141:2 (Stein); Landy ¶ 43; ECF No. 48 at ¶¶ 158-60 (alleging that True-Up Amount should be adjusted upward by DKK 55 million).

611.  In essence, SKAT regarded the back-and-forth of the True-Up process as a negotiation in the same way that Stein, Lhote, and McGee did.

    *See* Tr. 137:18-138:7, 139:21-140:25, 141:22-142:17 (Stein); Tr. 623:9-15 (Landy).

612.  SKAT's audit of the True-Up Spreadsheets is what informs SKAT's Counterclaims and the testimony of Marc E. Landy, on which SKAT relies to establish the True-Up Amount.

    *See* Stein ¶ 74.

613.  SKAT asserts the True-Up Amount, exclusive of interest, is DKK 53,602,007.06, consisting of the DKK 26,008,293.39 derived from the True-Up Spreadsheets and DKK 27,593,713.67 in alleged impermissible deductions identified by SKAT's expert.

    *See* Landy ¶ 43; DX-657.

## SKAT Failed To Prove The True-Up Amount

614. It is SKAT's burden to prove damages on its contract claim and to show that its calculation of the True-Up Amount is consistent with the terms of the Settlement Agreement.

615. Whatever assertions SKAT made about discovery about the True-Up Amount and its constitutive elements (the extent to which Net Proceeds is greater than the Preliminary Settlement Amount of DKK 1.55 billion, with Net Proceeds being made up of Gross Reclaims less various other items), it is, in the end, SKAT's burden to prove the True-Up Amount with competent evidence. SKAT has failed to do so.

*See* PX-104 at § 2(e).

616. There are three layers of evidence that can be used to support the calculation of the True-Up Amount:

    (a)  The nearly 100,000 MPSKAT Documents that are the source documents for the True-Up Spreadsheets;

    (b)  The more than 100 True-Up Spreadsheets containing calculations of Net Proceeds for each of the Pension Plans covered by the releases in the Settlement Agreement, which are effectively summaries of the MPSKAT Documents; and

    (c)  Summaries of the MPSKAT Documents or the True-Up Spreadsheets prepared consistent with the Federal Rules of Evidence.

*See* Stein ¶¶ 71(a-b); PX-200, 201; Tr. 82:6-17 (Stein); Tr. 606:18-25 (Landy).

617. SKAT has failed to put forth any of the three layers of proof.

    (a)  SKAT did not offer the MPSKAT Documents as evidence;

    (b)  SKAT did not offer the True-Up Spreadsheets as evidence; and

    (c)  SKAT did not offer proper summaries of either the True-Up Spreadsheets or the MPSKAT Documents as evidence.

618.  The most that SKAT offered to prove the True-Up Amount were a handful of examples of MPSKAT Documents and excerpts from True-Up Spreadsheets attached to the witness statement of its forensic accounting expert.

*See generally* DX-578-79, 601E1 through E4, 602E1, 621E1, 646, 656.[2]

619.  It was a trivial matter for SKAT to have proven up, for example, Gross Reclaims by putting in a summary chart demonstrating how it was calculated by reference to the data contained, for example, in the True-Up Spreadsheets.  SKAT claims that the total amount is DKK 4,047,897,436.  To support that calculation, SKAT should have, and easily could have, put in a chart setting out how that amount was calculated.

DX-657.

620.  SKAT has complained that holding it to the standard of proof required of any party asserting damages is somehow inappropriate.  It complains more specifically that it should not be required to "start over."  This is not Stein and Lhote's point at all.  SKAT need not "start over" to establish the True-Up Amount, nor does the Court need to consider each line of the True-Up Spreadsheets and the calculations underlying them.  But SKAT still must provide competent evidence to support the elements necessary to calculate Net Proceeds.  The evidence need not be on a transaction-by-transaction basis.  Again, it could have been, for example, a properly authenticated summary chart adding up Post-Reclaim Custodian Fees for each of the Pension Plans.  For whatever reasons, this is not how SKAT chose to proceed.

*See* ECF No. 172 at 11; PX-104 at § 2(e); DX-657.

621.  SKAT then makes reference to the arbitration provisions of the Settlement Agreement to suggest that it should somehow be exempt from having to prove up the True-Up Amount.  The arbitration provision in the Settlement Agreement provides for an expedited procedure to determine disputes of a certain size.  The arbitration provision does not apply here at all.  It simply

---

[2] DX-560 through 568, which are referred to the witness statement of Landy, were not received at trial.  Tr. 601:8-9.  As such, the Court need not consider any testimony about these exhibits.  Landy ¶¶ 18, 19, 21, 28, 29, 32.

does not alter the most basic element of contract law, that the claimant prove its calculation of damages by competent evidence.

*See* ECF No. 172 at 10-12; PX-104 at § 10(c).

622. During the trial, SKAT offered Exhibit 657 in an attempt to cure some deficiencies in the testimony of Landy. However, Exhibit 657, and Landy's testimony related to it, do not cure SKAT's failure of proof because they rely on information in the True-Up Spreadsheets, none of which are in the record, and do not identify where in the True-Up Spreadsheets the information used to calculate the values in Exhibit 657 comes from.

*See* Tr. 642:10-643:5; *Cutler v. Stop & Shop Supermarket Co.*, 513 F. App'x 81, 83 (2d Cir. 2013) (rejecting testimony about contents of documents because underlying documents were not in the record); *United States v. Citron*, 783 F.2d 307, 316-317 (2d Cir. 1986) (summary chart that is a "product of calculation" requires an explanation of how the figure was derived from underlying evidence); *United States v. All Funds on Deposit in Any Accts. Maintained at Merrill Lynch, Pierce, Fenner & Smith*, 801 F. Supp. 984, 997 (E.D.N.Y. 1992) (expert testimony summarizing evidence is sufficient only if the evidence is already in the record).

623. Similarly, the "excerpts" of the True-Up Spreadsheets SKAT offered as evidence are insufficient as a matter of law under Federal Rules of Evidence 1002, 1004, and 1006.

*See* Tr. 600:21-25 (explaining Exhibits 601E1-E4, 602E1, 621E1, 646E1, 656E1 are "excerpts" of the True-Up Spreadsheets); *New York v. St. Francis Hosp.*, 94 F. Supp. 2d 423, 428 (S.D.N.Y. 2000) (disregarding testimony because documents are "best evidence of their contents"); *In re Pretty Girl, Inc.*, 2022 WL 1051098, at *7 (S.D.N.Y. Bankr. Apr. 7, 2022) (a summary chart "is only useful when it is tied to the underlying evidence"); *Master-Halco, Inc. v. Scilia, Dowling & Natarelli, LLC*, 2010 WL 1553784, at *4 (D. Conn. Apr. 19, 2010) ("expert witnesses may not testify, or utilize charts, summaries, pedagogical aids, and/or any other kind of demonstrative aid that references evidence not otherwise already admitted *unless* the adverse party opens the door by eliciting testimony on these matters during cross-examination") (emphasis in original); WEINSTEIN'S FEDERAL EVIDENCE § 1006.08[4] (explaining it is error to admit a chart or summary as evidence-in-chief when it can only properly be used to aid understanding).

146

## The Specific True-Up Disputes Raised by the Parties

624. Even if SKAT had put in sufficient proof, there are four main areas of dispute that Stein identified with regard to the calculation of Net Proceeds and the True-Up Amount for the Court to resolve.

*See* Stein ¶¶ 76(a-d).

625. On the cross-examination of Stein, SKAT sought to impeach Stein with his testimony at his deposition that he did not have knowledge sufficient to explain the entries in the True-Up Spreadsheets, and now is the only person for Plaintiffs challenging the True-Up Amount.

*See* Tr. 80:20-81:7.

626. The Court regards this testimony as irrelevant. The disputes Stein identifies are methodological in nature; they are not about the accuracy of data, for example, data contained in the True-Up Spreadsheets. They depend on Stein's knowledge of the manner in which the accounts operated, which he plainly had. Resolution of these disputes requires the Court to determine how, and to what extent, certain amounts should be deducted from Gross Reclaims under Section 2(e) of the Settlement Agreement. They do not reference or require an analysis of the data contained in the True-Up Spreadsheets.

*See generally* Stein ¶¶ 57-95.

627. The Court must interpret the contract to determine whether certain expenses under Section 2(e)(B) of the Settlement Agreement should, or should not, be deducted as Covered Parties' Expenses.

628. SKAT's ability to prove up the deductibility or non-deductibility of various expenses is limited because the Settlement Agreement does not explain, in any level of detail, how certain expenses should or should not be calculated; it merely provides the categories of expenses that may be deducted. And it refers to the categories of expenses in a manner lacking in detail.

*See* Tr. 611:17-19 ("[T]here are certain expenses that are deductible and certain expenses that are not deductible. All the agreement does is it tells us which expenses are deducted.") (Landy).

629. **True-Up Dispute 1 – Fees Paid After SKAT Stopped Making Payments on Reclaim Applications.** The issue for the Court to decide is whether custodial fees paid after SKAT made the last payment to a Pension Plan for a Reclaim Application are "expenses *associated with* Reclaim Applications for which [SKAT] made payments," and therefore deductible as Covered Parties' Expenses under the Settlement Agreement.

    *See* Stein ¶ 88; PX-104 at § 2(e)(B).

630. The Settlement Agreement makes clear that "custodial and clearing fees" may be deducted as Covered Parties' Expenses if they are "associated with" the Reclaim applications for which SKAT made payments.

    *See* PX-104 at § 2(e)(B)(4).

631. However, the Settlement Agreement does not include a definition of "associated with."

    *See generally id.*

632. It is SKAT's position that fees paid after SKAT stopped making payments on Reclaim Applications ("Post-Reclaim Fees") are not "associated with" the Reclaim Applications for which SKAT made payments and cannot be deducted under Section 2(e)(B).

    *See* Landy ¶ 14.

633. In order to identify the Post-Reclaim Fees, SKAT suggests that the Settlement Agreement requires identifying a "Cut-off Date," which is the date upon which a Pension Plan received the last payment for a Reclaim Application from SKAT.

    *See* Landy ¶ 14; Tr. 604:17-20 (Landy).

634. The date upon which each Pension Plan received the last payment from SKAT for a Reclaim Application is different for each Pension Plan.

    *See* Tr. 610:7-22 (Landy).

635. The "Cut-off Date" is not the date of SKAT's decision to stop making payments on Reclaim Applications on or about August 25, 2015. Rather, it is based on the date on which each particular Pension Plan received the final

payment from SKAT for a Reclaim application.

*See* Landy ¶¶ 13 (explaining SKAT announced it stopped making payment on Reclaims Applications on or about August 25, 2015), 15 (identifying the Cut-off Date as July 13, 2015).

636. Once that date was determined for each Pension Plan by Landy, SKAT asserts that any custodial fees incurred by the Pension Plan after that date are not "associated with" the Reclaim Applications.

*See* Landy ¶ 14.

637. The Settlement Agreement does not include any language related to a "Cut-off Date" or the concept of a "Cut-off Date."

*See* PX-104 at §§ 1, 2(e)(B); Stein ¶ 78; Tr. 604:21-605:5 ("Q: And is there any part of this section of the settlement agreement that refers to a cutoff date?  A: Well, there is nothing in the agreement that talks about a cutoff date, but a cutoff date is implied by the definition."), 611:8-11 ("Q: And within that definition your testimony was that the date on which SKAT made the last payment for a reclaim application to a pension plan is the cutoff date? A: Yes. That's correct."), 611:13-16 (Q: That particular conclusion is not directly provided for in the text of section 2(e)(b), is that correct? A: I'm sorry.  There is – if you're asking me if there is a cutoff date in 2(b)(e) [sic], no, it doesn't specify cutoff date.") (Landy).

638. Custody accounts were opened for each of the Pension Plans with a custodian, be it North Channel Bank, Indigo, and/or Lindisfarne, and the purpose was for the account to receive payments from SKAT for Reclaim Applications or from the Belgian tax authority for similar trading in shares of Belgian companies.

*See* Stein ¶ 79; Tr. 115:13-24 (Stein).

639. For example, 10CC Pension Plan Partnership ("10CC") opened a custody account on October 27, 2014.

*See* Stein ¶ 80; PX-203; Tr. 115:13-24 (Stein).

640. After the custody accounts were opened, the custodians charged custodial fees in various amounts and at various increments.  These fees were charged regardless of whether there was activity on the account.

*See* Stein ¶ 79(c); Tr. 608:13-25 (Landy).

641.  As a result, in some cases, custodial fees were incurred *before* SKAT made any payments to the Pension Plan for Reclaim Applications.

*See* Stein ¶ 84; PX-203.

642.  SKAT asserts that if a Pension Plan incurred a custodial fee, and later received a payment from SKAT for a Reclaim Application, the custodial fee paid before receipt of the payment from SKAT is "associated with" a Reclaim Application and may be deducted as a Covered Party Expense.

*See* Landy ¶ 14 (identifying the Post-Reclaim Fees as only those that were "paid by each Pension Plan after that Pension Plan's Cut-off Date(s)").

643.  For example, in 2015 10CC incurred and paid custodial fees in the amount of €1,500 to North Channel Bank on April 22, 2015, July 22, 2015, and October 22, 2015:

| 4/22/2015 | 1,500.00 € | 1.1096 | $ | 1,664.40 | custody charges |
| 7/22/2015 | 1,500.00 € | 1.1096 | $ | 1,664.40 | custody charges |
| 10/22/2015 | 1,500.00 € | 1.1096 | $ | 1,664.40 | custody charges |

PX-203 at 2.

644.  10CC did not receive begin to payments from SKAT for Reclaim Applications until May 13, 2015:

| TAX RECLAIM RECEIVED | | |
|---|---|---|
| 5/13/2015 | 4,763,248.19 | 4,763,248.19 |
| 6/8/2015 | 129,993.27 | 129,993.27 |

PX-203 at 4.

645.  SKAT asserts that only the custodial fee incurred on April 22, 2015 is "associated with" the Reclaim Applications and may be deducted as a Covered Party Expense because it is the only custodial fee incurred *before* the final payment from SKAT for a Reclaim Application on June 8, 2015.

150

*See* Landy ¶ 14; Tr. 609:9-19 (Landy).

646.    However, the account continued to hold the proceeds of the Reclaim Application after June 8, 2015, when the custodial fees paid by 10CC on July 27, 2015, and October 22, 2015, were paid.  There is an obvious logical relationship between the custodial fees paid on July 27, 2015, and October 22, 2015: These fees were paid to hold open an account that contained the proceeds of a Reclaim Application and were paid out of the proceeds of the Reclaim Application.

*See* Stein ¶ 85; PX-203.

647.    This is also true of the custodial fees incurred by 10CC in 2016 and 2017. They too were paid to hold open an account that contained the proceeds of a Reclaim Application and were paid out of the proceeds of the Reclaim Application.

*See* Stein ¶¶ 85(a-b); PX-203, PX-205, PX-206, PX-207.

648.    To determine whether the Post-Reclaim Fees are "associated with" the payments made by SKAT for the Reclaim Applications, the Court must determine what "associated with" means.

649.    To interpret the meaning of "associated," the Court can look to dictionary definitions of the term.

*Dish Network Corp. v. Ace Am. Ins. Co.*, 21 F.4th 207, 211 (2d Cir. 2021) ("Courts may refer to the dictionary to determine the 'plain and ordinary meaning' of contract terms."); *Bernstein v. O'Reilly*, 2019 WL 10995111, *7 (S.D.N.Y. Mar. 5, 2019) ("When a term is not defined in the contract, courts have looked to other authorities like Black's Law Dictionary as a source of definition.")

650.    "Associated with" is a common phrase that can be easily understood to mean that two things are connected or related in some way.

*See Associate*, BLACK'S LAW DICTIONARY (12th ed. 2024) ("to view as somehow related"); *Associated*, COLLINS ONLINE ENGLISH DICTIONARY, https://www.collinsdictionary.com/us/dictionary/english ("two things are connected with each other").

651. There is a clear and obvious logical connection between fees paid by a Pension Plan that received a payment from SKAT for a Reclaim Application, and, thereafter, the custody account for that Pension Plan holding the proceeds from the payment from SKAT for a Reclaim Application.

652. If a custody account holding the proceeds from the Reclaim Applications for which SKAT made payments incurs custodial fees, and that custody account was opened, at least in part, to receive payments from SKAT for the Reclaim Applications, those custodial fees are "associated with" or related to the Reclaim Applications. This is true regardless of *when* the custodial fees were incurred, be they incurred before or after the account received the proceeds of a Reclaim Application.

   *See, e.g.*, Stein ¶¶ 79(a-d), 85(a-b); PX-203, 205, 206, 207.

653. SKAT has failed to satisfy its burden to show that DKK 19,624,912 in Post-Reclaim Fees should not be deducted as Covered Parties' Expenses under the Settlement Agreement.

654. Indeed, it would be inconsistent with the Settlement Agreement for them to not be deducted. Stein, Lhote, and McGee did not receive these fees, and the overarching principle of the Settlement Agreement was that the Covered Parties would pay SKAT back the full amount of funds that they received.

   PX-104 at p.2, Recital F.

655. SKAT sought to elicit on cross-examination testimony that the funds in the custody accounts could have been moved to bank accounts where they would -- somehow -- not have to pay custodial fees.

   *See* Tr. 123:15-125:5 (Stein).

656. The Court regards this testimony elicited on cross-examination as largely not relevant to the issues required for the Court to resolve the claims and defense of Stein, Lhote, and McGee.

657. The funds received from SKAT for the Reclaim Applications were kept in the custody accounts in order to be able to return them to SKAT. In addition, the Danish government ordered the proceeds from the Reclaim Applications in many of the custody accounts to be seized in or about

152

February 2017. The court in Germany permitted Denmark to seize the funds in or about May of 2017. This effectively made it impossible for the funds to be moved.

*See* Stein ¶¶ 87(a-d); PX-210-R; 211-R; Tr. 123:9-14, 127:12-18 (Stein).

658. **True-Up Dispute 2 - Allocation of Account-Level Fees for Accounts Where There Was Danish and Belgian Trading.** The issue for the Court to decide is whether the Settlement Agreement requires that account-level fees must be allocated in some proportion between Belgian and Danish trading or securities and, if so, what methodology, if any, the Settlement Agreement provides to determine the proper allocation.

659. The Settlement Agreement makes no mention of the concept of allocation or any methodology related to allocation.

*See generally* PX-104; Stein ¶ 89.

660. Custodial fees are expressly permitted to be deducted under the Settlement Agreement and SKAT cannot show that its interpretation of the Settlement Agreement that reads in an allocation principle is the correct -- or the only -- methodology that can be used to determine whether, and to what extent, certain custodial fees should be considered Covered Parties' Expenses. Therefore, it is for the Court to decide which methodology is consistent with the Settlement Agreement's terms.

*See* PX-104 at § 2(e)(B)(4); *99 Wall Dev., Inc. v. Allied World Specialty Ins. Co.*, 2021 WL 4460638, at *9 (S.D.N.Y. Sept. 29, 2021) (where a methodology is not "necessarily mandated" by the plain language of a contract, it is for the "factfinder to ultimately determine which interpretation of the contract is the best one").

661. It is SKAT's position that account-level custodial fees should be allocated in some proportion to each Pension Plans' trading in Danish and Belgian securities.

*See* Landy ¶¶ 32, 34.

662. SKAT's expert conceded at the trial that "[a]ccount-level fees are fees that are not specifically identified to a particular transaction."

Tr. 615:2-8.

153

663.  SKAT's expert also conceded that account-level fees incurred by the
      Pension Plans, on a monthly or quarterly basis, were not associated with the
      volume of trading, if any, in Danish securities, Belgian securities, or both.

      *See* Tr. 617:21-618:7 ("Q: Is it your understanding that the monthly or
      quarterly custodial fees that were incurred on accounts at [North Channel
      Bank] or Lindisfarne were associated with the volume of Danish, Belgian, or
      some combination of the two trading that was occurring on the account? A:
      The base monthly fee was the base monthly fee or, in the case of [North
      Channel Bank, it was a quarterly fee. Q: The answer to my question is that
      these fees were not associated with the volume of trading in Danish or
      Belgian or some combination of the two securities that was occurring on the
      account. Is that fair? A: Yeah, that's correct.").

664.  This is consistent with the account statements offered by Plaintiffs that show
      account-level fees being charged on a periodic basis by each custodian,
      rather than in relation to trading in any particular shares.  For example,
      North Channel Bank charged a quarterly €1,500 custodial fee.

| 4/22/2015 | 1,500.00 € | 1.1096 | $ | 1,664.40 | custody charges |
| 7/22/2015 | 1,500.00 € | 1.1096 | $ | 1,664.40 | custody charges |
| 10/22/2015 | 1,500.00 € | 1.1096 | $ | 1,664.40 | custody charges |

PX-203.

665.  Lindisfarne charged a monthly €2,000 custodial fee.

| LFP Global Custodian Monthly Charge | | | 2000 |

PX-212 at 2.

666.  And Solo Capital charged a monthly €1,250 custodial fee.

| Custody Fee | |
| Custody fees for the month | € 1,250.00 |

PX-212 at 3.

667.  If a custody account, opened and maintained to receive payments from SKAT for Reclaim Applications, incurred account-level fees that are not identified to a particular transaction, those custodial fees should not be allocated under the terms of the Settlement Agreement.

*See* Tr. 615:2-8 ("[a]ccount-level fees are fees that are not specifically identified to a particular transaction") (Landy).

668.  SKAT's expert calculated that if the Court were not ordering rescission, the True-Up Amount would be reduced by DKK 2,014,905 accordingly.

*See* Ex. 657 at 3; Tr. 644:13-24 ("Q: And what's on this document? A: So this document is the same as the previous document with one change.  So there's a number in red, two million fourteen point nine thousand kroner. And that is the amount of account level fees that were allocated to Belgium, that if the court were to find that account level fees should not be allocated to Belgium, those are the amounts that would be reduced from net proceeds. So rather than net proceeds being 1.6 billion, 1.603 billion that we see on the previous page, they would be 1.601 billion.  So an adjustment of 2 million kroner for account level fees that would no longer be allocated to Belgium. They would be allocated to Denmark."), 645:3-7 ("Q: And is this adjustment based on [Stein's] proposed methodology for how account level fees should be handled?  A: As far as I understand it, yes.").

669.  **True-Up Dispute 3 - Allocation of Net Proceeds by Ownership Percentage.**  The issue for the Court to decide is how to interpret Item [C] of Net Proceeds and how to calculate it accordingly.

*See* PPSOF at ¶¶ 591, 592(c).

670.  The final element of the Net Proceeds Formula permits subtraction of the "portion of *Gross Reclaims* received by parties excluded from the releases as set forth in Section 4 herein, including without limitation, those parties listed on Exhibit 3 ('Non-exhaustive list of parties excluded from release'), that were not otherwise subsequently provided to any Covered Party."

PX-104 at § 2(e)(C) (emphasis added).

671.  There was significant cross-examination concerning the trading and the ownership structures of the Pension Plans, including how the ownership structure related to individuals that are not parties to the Settlement

155

Agreement.

*See, e.g.*, Tr. 21:3- 33:16 (Stein).

672.  In accordance with partnership agreements for certain Pension Plans that were owned by Stein, Lhote, McGee and individuals that are not parties to the Settlement Agreement, payments made by SKAT for Reclaim Applications were distributed according to the ownership percentage.

*See* Stein ¶ 93(b); Tr. 86:7-87:5, 87:15-17 (Stein).

673.  Stated another way, what was divided according to the ownership percentage was the payments made by SKAT for Reclaim Applications *after* the payment of any fees, not before.

*See* Tr. 91:1-22 (Stein).

674.  The Settlement Agreement states that the second element to be subtracted in the Net Proceeds Formula is the "portion of *Gross Reclaims*" received by parties that are not parties to the Settlement Agreement, not some other different amount.

*See* PX-104 at § 2(e)(C); *see* PPSOF at ¶¶ 591, 592(c).

675.  The Parties do not dispute what Gross Reclaims means or how it is calculated.

*See* Tr. 84:3-5 ("Q: You understand that the gross reclaims are the amounts that SKAT paid to each of the 80 pension plans?  A: I do, yes."), 84:13-16 ("Q: As you sit here today, do you dispute the gross reclaims numbers that your lawyers provided to SKAT in the True-Up spreadsheets? A: No, I don't dispute them.") (Stein).

676.  Indeed, as the Court noted during the trial, "Gross Reclaims" is a defined term in the Settlement Agreement.  "Gross Reclaims" means "all reclaim amounts from [SKAT] received by or on behalf of the Pension Plans in respect of applications to reclaim taxes withheld or allegedly withheld from dividends paid on Danish company shares the Pension Plans owned or allegedly owned between 2012 and 2015."

*See id.* at § (1)(s); Tr. 626:8-9 ("THE COURT: Rather gross reclaims is a defined term in this.").

156

677. The dispute before the Court is a question of methodology and what is required under the terms of the Settlement Agreement to determine "the portion of Gross Reclaims" received by individuals that are not parties to the Settlement Agreement.

See Tr. 102:14-18 ("Q: And your suggestion that under C, you should deduct out 50 percent of that number? A: That's what the agreement says. Q: Okay. That's what the agreement says in your view? A: That's what the agreement said."), 103:11-12 ("Q: Well, that's your methodology? A: Well, that's what the agreement says.") (Stein).

678. The formula provided for in the text of the Settlement Agreement is:

Net Proceeds = [A] Gross Reclaims – [B] Covered Parties' Expenses – [C] Gross Reclaims Received by Non-Covered Parties

See PPSOF at ¶¶ 590-91; Stein ¶ 63; PX-104 at § 2(e).

679. The formula that SKAT advances is:

Net Proceeds = [A] Gross Reclaims – [B] Covered Parties' Expenses – [C] *Net Proceeds* Received by Non-Covered Parties

See DX-657 at 4.

680. SKAT elicited testimony from Stein on cross-examination that the methodology suggested by Stein does not make sense because the mathematical outcome of allocating the total Gross Reclaims received by each Pension Plan in Section 2(e)(C) would result in negative Net Proceeds. SKAT also provided an example of this calculation in Exhibit 657, along with an example of the calculation it purports is correct.

See Tr. 102:6-104:1 (Stein); Tr. 645:2-648:17 (Landy); DX-657 at 4.

681. A defined contract term does not "become ambiguous simply because one party is dissatisfied with its position under the plain terms of the agreement."

See Citibank, N.A. v. Jacobsen, 2020 WL 772497, at *8 (S.D.N.Y. Feb. 18, 2020) (holding a term that is plainly defined is not ambiguous).

682. Nor does an unfavorable outcome meet the high bar for a contract term to be considered absurd.

*See Wiseman v. ING Groep, N.V.*, 2017 WL 4712417, at *6 (S.D.N.Y. Sept. 28, 2017) ("only contracts that very nearly produce the opposite effect of what the parties likely desired will be held to be absurd"); *Cottam v. Global Emerging Cap. Grp., LLC*, 2020 WL 1528526, at *6 (S.D.N.Y. Mar. 30, 2020) ("While it may have been unwise for [d]efendants to effect the reverse splits before the execution . . . or for [d]efendants not to address that possibility . . . that, by itself, does not render the result here absurd.") (cleaned up).

683.  SKAT also cannot rewrite or modify a methodology provided for in the contract and agreed to by the parties simply because it yields an unfavorable result.

*See Loewenson v. London Mkt. Cos.*, 351 F.3d 58, 62-63 (2d Cir. 2003) ("[W]e do not believe that reformation is available for the use of a methodology explicitly agreed to by the parties, even though that methodology is flawed."); *Cottam*, 2020 WL 1528526, at *9 ("[W]hile the Subscription Agreement conversion ratio may not make good economic sense for [d]efendants in light of the reverse stock splits, this alone is not sufficient for reformation."); *Stavinsky v. Prof-2013-S3 Legal Title Tr. by U.S. Bank Nat'l Ass'n, Fay Servicing*, 77 N.Y.S.3d 287, 292 (Sup. Ct. N.Y. Cty. 2018) ("modification" by the court is "not legally available in a contract action").

684.  At the time the Settlement Agreement was being negotiated and executed, the Parties were estimating that the amount ultimately to be paid to SKAT was DKK 1.55 billion, but neither SKAT nor the Covered Parties knew the exact number.

*See* Stein ¶¶ 25(f), 27(a)(iii); Lhote ¶¶ 25(f), 27(a)(iii).

685.  This is why the Parties agreed to a process to establish Net Proceeds and the True-Up Amount.  Indeed, the Settlement Agreement reflects that the Parties specifically contemplated that the Net Proceeds process might result in Net Proceeds being less than DKK 1.55 billion.  They did so by providing that, if Net Proceeds was less than the Preliminary Settlement Amount of DKK 1.55 billion, there would be no downward adjustment.  Beyond that, for there to be a True-Up Amount of zero is not the absurd result that SKAT would have the Court believe.  The Parties contemplated such a result.

158

*See* PX-104 at §§ 2(e)(ii) (if Net Proceeds is less than DKK 1.55 billion, there is no adjustment to the Preliminary Settlement Amount), 2(e)(iii) (if Net Proceeds is more than DKK 1.55 billion, the difference is the True-Up Amount).

686.   SKAT cannot now claim, in hindsight, that because the Net Proceeds formula may create a negative result for certain Pension Plans it creates an unexpected and unfair outcome.

*See Loewenson*, 351 F.3d at 62 (agreeing that the methodology in the agreement "artificially inflat[ed] the amount of the unearned premium," but "it cannot be said that a flawless methodology was shown to have been intended by the parties"); *159 MP Corp. v. Redbridge Bedford, LLC*, 160 A.D.3d 176, 190 (2d Dep't 2018) ("The fact that with the benefit of hindsight, a party believes that it had agreed to an unfavorable contractual term, does not provide courts with authority to rewrite the terms of a contract or to extricate parties from poor bargains.").

687.   Accordingly, Section 2(e)(C) requires that the portion of Gross Reclaims received by a Pension Plan should be allocated according to the ownership percentage of the individuals that are not parties to the Settlement Agreement.

688.   If the Court does were not ordering rescission, then Stein, Lhote, and McGee would be entitled to an adjustment of the True-Up Amount that would require an adjustment to the Net Proceeds calculated for the Pension Plans partially owned by individuals that are not parties to the Settlement Agreement.

689.   **True-Up Dispute 4 - Overlapping Adjustments.**  The issue for the Court to decide is whether, and to what extent, any of the fees that are implicated by True-Up Disputes 1 and 2 are overlapping such that there needs to be further adjustments to the Net Proceeds calculation.

690.   SKAT admitted that the potential for an overlap between the fees in the True-Up calculations may exist.

*See* PX-401 at 11 (SKAT's admission that "to the extent that the Court awards SKAT the full amount of damages it seeks in both paragraphs 158 and 161 of the First Amended Answer, Affirmative Defenses, and Counterclaims, then the total award of damages should be reduced by DKK

1,912,698 due to overlap between these two categories.").

691.   Indeed, SKAT's expert conceded as much at the trial.

See Tr. 621:16-622:2 ("A: Is it fair to say in your hypothetical, once the Court decides that it's not a post reclaim custodial fee or custody fee, then it's just a fee but it's no longer an excluded expense? Q: Correct. A: So if you're asking me if expenses that are not excluded should be allocated – if account-level – we are talking about account-level expenses that are permitted under the agreement. Q: Correct. A: It depends on the facts and circumstances. But if there was trading on both, it would seem to make sense to allocate.").

692.   If the Court were not ordering rescission, then to the extent the Court's ruling implicate\ds fees that overlap with one another, Stein, Lhote, and McGee would be entitled to a further adjustment of the True-Up Amount.

## SKAT Failed To Prove Interest

693.   SKAT seeks to recover interest on the Subsequent Cash Payment Amount, which consists of the Additional Cash Payment Amount and the True-Up Amount, in the amount of DKK 451,498,570.

See ECF No. 168 ¶¶ 64-68, 80.

694.   Interest under the Settlement Agreement is calculated at 8.05% simple interest per annum.

See PX-104 at § 1(c).

695.   The Settlement Agreement provides that interest on the Subsequent Cash Payment Amount, or any remainder thereof, shall accrue in two instances and in two different ways.

See PX-104 at §§ 2(d)(ii), 5(d)(iii).

696.   First, if the Subsequent Cash Payment Amount is not paid in full "within twenty-four (24) months from" May 28, 2019:

(a)     "Applicable Interest . . . accrue[s] on the remaining unpaid amount of the Subsequent Cash Payment Amount, until the Final Settlement Payment Date or the Subsequent Cash Payment Amount has been paid

in full, whichever is earlier."

(b)    Any payments made to SKAT after May 28, 2021 toward the Subsequent Cash Payment Amount are first applied "to the principal balance of any remaining unpaid amount of the Subsequent Cash Payment Amount, until the Subsequent Cash Payment Amount has been paid in full, and [ ] only thereafter to the amount of interest due and owing pursuant to Section 2(d)(ii)(1)."

(c)    Any payments made to SKAT "to pay any portion of the Subsequent Cash Payment Amount, Applicable Interest" accrues "in accordance with Section 2(d)(ii)(1), on the remaining unpaid amount of the Subsequent Cash Payment Amount."

*See* PX-104 at §§ 2(d)(ii)(1-3).

697.    Second, in an Event of Default, Stein, Lhote, and McGee, as the Covered Parties' Designees, are "required to pay":

(a)    "Applicable Interest owed pursuant to Section 2(d)(ii) as of the Default Date";

(i)    The "Default Date" is "the eleventh (11th) Business Day after which the Covered Parties' Designees receive [a] Default Notice."

(b)    "Applicable Interest on the unpaid amount of the Subsequent Cash Payment Amount as of the Default Date, for the period starting January 1, 2014 and running until the earlier of the Default Date or twenty-four (24) months from the Effective Date," May 28, 2021.

*See* PX-104 at §§ 1(c), 1(l), 5(c), 5(d)(ii-iii).

698.    The only evidence of how SKAT calculated interest under the Settlement Agreement is in paragraph 80 the Declaration of Marc A. Weinstein, which was not offered or received as evidence.

*See* ECF No. 168.

699.    Even if it were offered and received as evidence, SKAT has not satisfied its burden under applicable law.

700. In general, a party seeking to recover accrued interest under an agreement has the burden of demonstrating how it calculated it.

*See Ally Fin. Inc. v. Comfort Auto Grp. NY LLC*, 2022 WL 3703955, at *14 n.24 (E.D.N.Y. Aug. 26, 2022) (party failed to explain calculation of interest pursuant to commercial loan documents); *OneWest Bank N.A. v. Louis*, 2016 WL 3552143, at *9 (S.D.N.Y. June 22, 2016) (affidavit outlining accrued interest was insufficient because party did not provide *explanation* of how it calculated accrued interest under loan modification agreement).

701. SKAT's calculation of interest in the Weinstein Declaration is insufficient as a matter of law for the purposes of SKAT's breach of contract claim and the 2021 Affidavit of Confession of Judgment because it does not identify, with sufficient specificity, the methodology for SKAT's calculation of interest, for example, the amount of time during which interest has accrued.

*See* Weinstein Decl. ¶ 80.

## <u>Conclusion</u>

702. For the reasons set forth above, the Court finds that the unperformed obligations of the Settlement Agreement and the Letter Agreement should be rescinded and that Stein, Lhote, and McGee are entitled to rescissory damages in the amount of the payments that were made to SKAT after the Initial Cash Payment with interest thereon, the U.S. dollar equivalent of DKK 57,765,968 together with pre-judgment interest from the date of each payment to the date of judgment and post-judgment interest from the date of judgment until payment.

703. Based on the foregoing, the Court need not decide whether SKAT is entitled to judgment on its Counts I and II because the contractual provisions under which it seeks to recover are rescinded. Those counts are to be dismissed with prejudice.

Dated:        New York, New York
              June 2, 2025

                              Respectfully submitted,

                              McKool Smith P.C.

                                  /s/
                          By: _____
                              Daniel W. Levy
                              dlevy@mckoolsmith.com
                              Olivia G. Visconti
                              ovisconti@mckoolsmith.com
                              1301 Avenue of the Americas
                              New York, New York  10019
                              Telephone: (212) 402-9400

                              *Attorneys for Plaintiffs-Counterclaim
                              Defendants Matthew Stein and
                                  Jerome Lhote*

163

## CERTIFICATE OF SERVICE

DANIEL W. LEVY, pursuant to Title 28, United States Code, Section 1746, declares under the penalty of perjury:

1.    I am an attorney licensed to practice law in the State of New York and admitted to practice before this Court.  I am principal in the law firm of McKool Smith P.C. and counsel of record for Matthew Stein and Jerome Lhote.

2.    On June 2, 2025, I caused a true and correct copy of the foregoing JOINT POST-TRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW[, together with the Exhibit attached thereto] to be served via ECF, upon the following attorneys, who are filing users in connection with the above-referenced case:

> William R. Maguire
> Marc Alan Weinstein
> Neil John Oxford
> John Thomas McGoey
> Dustin Philip Smith
> Gregory C. Farrell
> Kiran H. Rosenkilde
> Hughes Hubbard & Reed LLP
>
> *Attorneys for Defendant-Counterclaim*
> *Plaintiff Skatteforvaltningen*
>
> Robert H. Pees
> Anne M. Evans
> Ilana R. Roberts
> Akin Gump Strauss Hauer & Feld LLP

Daniel S. Newman
Justin B Kaplan
Edgar A. Neely IV
Nelson Mullins Riley & Scarborough LLP

*Attorneys for Counterclaim Defendant*
*Luke McGee*

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on June 2, 2025, at New York, New York.

/s/
_____
Daniel W. Levy

2

STEIN AND LHOTE'S POST-TRIAL
PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW,
dated June 2, 2025


# Exhibit A

3.     <u>Summary of Payment Obligations Under the Settlement Agreement</u>

A graphical summary of the payments due under the Settlement Agreement, with references to the applicable sections, as alleged by SKAT, is outlined below:

| | | |
|---|---|---|
| **Final Settlement Amount**<br>§ 1(q) | **Initial Cash Payment**<br>DKK 950,000,000<br>§§ 1(t), 2(a) | **At least DKK 500,000,000**<br>§ 2(a)(i) |
| | | **Remainder of the Initial Cash Payment**<br>§ 2(a)(ii) |
| | **Subsequent Cash Payment Amount**<br>§§ 1(dd), 2(d) | **Additional Cash Payment**<br>DKK 600,000,000<br>§§ 1(a), 2(b) |
| | | **True-Up Amount, If Any**<br>To be calculated based on Net Proceeds<br>§§ 1(ff), 2(e)(iii) |
| | | **Interest, If Any, On Unpaid Amount of Additional Cash Payment and True-Up Amount**<br>§§ 1(c), 2(d)(ii) |

V.     <u>The Affidavits of Confession of Judgment</u>

A.     <u>The 2019 Affidavit of Confession of Judgment</u>

"Simultaneously with the execution of the Initial Cash Payment, the Covered Parties' Designees," Stein, Lhote, and McGee, were required to "together provide an executed and notarized Affidavit of Confession of Judgment . . . to [SKAT] in the form attached [to the Settlement Agreement] as Exhibit 4." Levy Decl., Exh. A at § 4(c) & Exh. 4; SKAT Countercl. ¶¶ 131, 172. The purpose of the affidavit of confession of judgment was "to aid SKAT in enforcing the Settlement Agreement." SKAT Countercl. ¶¶ 9, 47.

As set forth more fully below, *see* Section IV, *infra*, an affidavit of confession of judgment is a creature of New York law, specifically CPLR 3218. A copy of CPLR 3218 is

9