UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - )
MATTHEW STEIN and JEROME LHOTE, )
Plaintiffs, ) Case No.:
v. ) 23 Civ. (NRB)
SKATTEFORVALTNINGEN, )
Defendant. )
and )
LUKE MCGEE, )
Nominal Defendant. )
- - - - - - - - - - - - - - - - - )
SKATTEFORVALTNINGEN, )
Counterclaim Plaintiff, )
v. )
MATTHEW STEIN, JEROME LHOTE, )
and LUKE MCGEE, )
Counterclaim Defendants. )
- - - - - - - - - - - - - - - - )

VIDEOTAPED 30(b)(6) DEPOSITION OF SKATTEFORVALTNINGEN by GRY AHLEFELD-ENGEL

Reported by: Kim M. Brantley
Job No: J11294056

Thursday, May 30, 2024
Time: 9:36 a.m.

Videotaped 30(b(6) deposition of SKATTEFORVALTNINGEN, by GRY AHLEFELD-ENGEL, held at Hughes Hubbard & Reed, One Battery Park Plaza, New York, New York, before Kim M. Brantley, Court Reporter and Notary Public of the State of New York.

APPEARANCES:

For Plaintiffs/Counterclaim Defendants Matthew Stein and Jerome Lhote:
MCKOOL SMITH, PC
1301 Avenue of the Americas 32nd FL
New York, New York 10019
(212) 402-9412
Email: dlevy@mckoolsmith.com
ovisconti@mckoolsmith.com
BY: DANIEL LEVY, ESQUIRE
OLIVIA VISCONTI, ESQUIRE

For Defendant/Counterclaim Plaintiff Skatteforvaltningen:
HUGHES HUBBARD & REED, LLP
One Battery Park Plaza
New York, New York 10004
(212) 837-6843
Email: marc.weinstein@hugheshubbard.com
neil.oxford@hugheshubbard.com
kiran.rosenkilde@hugheshubbard.com
BY: MARC A. WEINSTEIN, ESQUIRE
NEIL J. OXFORD, ESQUIRE
KIRAN ROSENKILDE, ESQUIRE

APPEARANCES CONTINUED:

For Nominal Defendant/Counterclaim Defendant Luke McGee:
NELSON MULLINS RILEY & SCARBOROUGH, LLP
2 S Biscayne Blvd. - 21st Floor
Miami, Florida 33131
(305) 373-9400
Email: dan.newman@nelsonmullins.com
justin.kaplan@nelsonmullins.com
edgar.neely@nelsonmullins.com
BY: DANIEL NEWMAN, ESQUIRE
JUSTIN B. KAPLAN, ESQUIRE
EDGAR A. NEELY, IV, ESQUIRE (Georgia)
(Attending via Zoom)

ALSO PRESENT:
Counsel from Kammeradvokaten (Denmark)
KATRINE HENCKEL HARLOFF, ESQUIRE
ANNE CHRISTINE K. EGHOLM, ESQUIRE
MIKKEL D. FANO, ESQUIRE
(Attending via Zoom)
and
MATTHEW STEIN, Plaintiff
JEROME LHOTE, Plaintiff
(Attending via Zoom)

23 Civ. 2508 (NRB)
PLAINTIFFS' EXHIBIT
400-R





APPEARANCES CONTINUED:

CATLIN MYERS, Hughes Hubbard & Reed

and

ANETTE CHRISTENSEN, Interpreter of Danish
(Appearing via Zoom)

and

CHARLES BOWMAN, Legal Video Specialist
Esquire Deposition Solutions

THE COURT REPORTER: And could you raise your right hand, please. I'm going to swear you in --

First, let me swear the interpreter. I will swear the interpreter. I cannot see the interpreter, but I will ask her to please raise her right hand. Ms. Christensen, can you please raise your right hand --

THE INTERPRETER: Yes.

THE COURT REPORTER: So that I can

swear you in.

ANETTE CHRISTENSEN,

called as the official interpreter of Danish, did swear to translate the questions in this case from English to Danish, and the answers from Danish to English, to the best of her ability.

(Note that interpreter will only interpret the proceedings upon request by the witness and the attorneys.)

GRY AHLEFELD-ENGLE,

called as a witness by Counsel for the Plaintiffs, and, after having been first duly sworn by the Notary Public, was examined and testified as follows:



GRY AHLEFELD-ENGEL 30(b)(6)

MR. LEVY: Very good. Thank you.
And the plaintiffs have no objection to the manner of the taking of the -- of the oath of the interpreter, who's located outside the United States, correct?
MR. WEINSTEIN: Well, you're the plaintiffs, but it's correct that we -- we do not.
MR. LEVY: I'm -- I'm saying that the plaintiffs have no objection to the taking of the oath of the interpreter.
MR. WEINSTEIN: Yeah.
MR. LEVY: Who's located outside the United States. I'm saying that for the record on behalf of the plaintiffs.
MR. WEINSTEIN: Yes.
MR. LEVY: And I'm going to ask you to indicate the same.
MR. WEINSTEIN: Yes.
MR. LEVY: Okay, very good. Thank you. And you confirm she's not located in the United States?
MR. WEINSTEIN: Correct.

And you're here as a representative -- testifying as a -- in your -- in a representative capacity on behalf of an entity, correct?
A. Yes.
Q. And could you identify the name of the entity that you're testifying on behalf of?
A. Skatteforvaltningen.
Q. Very good. If -- if I just refer to that as "Skatte," can we agree that that's the correct entity?
A. We can agree on that, yes.
Q. Okay. Is it commonly known as Skatte?

GRY AHLEFELD-ENGEL 30(b)(6)

A. It used to be.
Q. Okay. And -- and is it known something -- by something else now?
A. Skatteforvaltningen.
Q. Okay. People don't refer to -- to it in common parlance as -- as Skatte?
A. Well, the -- yes, a Danish person would refer to it as "Skatte".

[redacted]

[redacted]

[redacted]

[redacted]

ESQUIRE
DEPOSITION SOLUTIONS

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

GRY AHLEFELD-ENGEL 30(b)(6)

Q. And did Skatte have communications with SOIK about the settlement negotiations prior to April 24th, 2019?

A. I do believe that we on a regular basis notified SOIK in general that we were having negotiations with a group of people regarding the case that we had previously reported to SOIK.

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

GRY AHLEFELD-ENGEL 30(b)(6)

Q. Prior to this time, April 2019 -- April 25th, 2019 --
A. Yes.
Q. -- had SOIK been provided by Skatte anything in writing concerning the settlement negotiations relative to the ultimate settlement agreement?
A. Not to my knowledge, no.

[redacted]

Page 54

GRY AHLEFELD-ENGEL 30(b)(6)

MR. LEVY: I'm going to ask you to -- I'm going to ask the reporter to mark this as Exhibit 101.

(Email chain was marked Skatte Exhibit 101, for identification.)

(Witness reviews document.)

BY MR. LEVY:

Q. Have you had a moment to look at that?

A. Yes.

Q. You've seen it before?

Page 55

GRY AHLEFELD-ENGEL 30(b)(6)

A. Yes.

Q. Okay. This is a continuation of the same series of emails that we were looking at in Exhibit 100.

(Witness nods head in the affirmative.)

Q. You have to answer audibly.

A. Oh, I'm so sorry. Yes.

Q. That's okay. Thank you.

And I want to just move up from the end of that string and start where Mr. Fiig indicates, "Hopner also raised". I'd give you the Bates number, but they're not Bates numbered in a way that is frankly productive.

A. Is that the one where he says, "Yes, but Hopner had supplementary -- supplemental questions," or further up?

Q. It's the email April 25th, 2019 at 13:01.

A. Yes.

Q. Okay, perfect. Great.

Page 56

GRY AHLEFELD-ENGEL 30(b)(6)

So Mr. -- Mr. Fiig indicates in substance that Hopner also raised the question, "If the ultimate owners, the U.S. shareholders, got clarified their overall relationship in connection with the settlement. He indicated that would also cover the question of their position in relation to the criminal case. Have you heard anything about that?"

So do you -- do you understand to whom Mr. Fiig was referring when he refers to "the U.S. shareholders"?

A. Yes.

Q. Who's?

A. Mr. Stein, Mr. Lhote, and Mr. McGee.

Q. Okay. Were there any other U.S. shareholders of -- of -- to which he's referring?

A. To my knowledge -- well, he's not specific on who he's -- he's referring, but to my knowledge, those were the three majority shareholders in NCB.

Q. And Mr. Fiig, as far as you understand, is not referring to any other U.S. shareholders?

A. Not as far as --





Page 57

GRY AHLEFELD-ENGEL 30(b)(6)

THE WITNESS: -- far as I understand.

BY MR. LEVY:

Q. Okay. And why do you think that he knew -- why would he refer to those three specifically?

THE WITNESS: I don't know that I can testify to why Mr. Fiig referred to how he did in his email.





GRY AHLEFELD-ENGEL 30(b)(6)

So -- so Mr. Hopner -- withdrawn.
Mr. Fiig recounts what he learned from Mr. Hopner. Is that a fair summary?

THE WITNESS: That's what it says, that he's -- Hopner has raised the question. But again I don't -- I can't bear testimony to his dialogue with Hopner.

Q. And -- and he raises something in relation to the criminal case. Is that a fair summary?

GRY AHLEFELD-ENGEL 30(b)(6)

A. -- "that clarified their overall relationship in connection with the settlement."
So I read it as him referring to the settlement, but then again, I would like to point out that --
Q. You didn't understand the question.
A. I didn't understand the question. I'm not sure I understand it better today.
Q. Fair enough.
And then in the next sentence he relates -- he -- he says "something about the criminal case"?
A. Yes.
Q. Okay. And then you indicate in substance that you don't understand the question?
A. Yes.
Q. Then he insults you?
A. Yes.
Q. Or you hope was being --
A. I think he's being --
Q. Joking.
A. He's joking.

GRY AHLEFELD-ENGEL 30(b)(6)

Q. And then you respond?
A. Yes.
Q. This is April 25th, 2019 at 17:38?
A. Yes.
Q. And you point out the delightful nature of his -- of his use of a conceivably insulting word?
A. Yes.
Q. And then you -- you write after that, "If your question is whether we release them interest criminal liability with the settlement, the answer is no."
A. Yes.
Q. And that's -- and why do you say -- what's the basis for your having said that?
A. That that would not be within our mandate.
Q. Skatte didn't have the authority to do that?
A. We would not have the authority to release them -- release anybody from any criminal liability. That is not within our tasks as an authority. We have no control over that process, if any.



Page 67

GRY AHLEFELD-ENGEL 30(b)(6)

THE WITNESS: We knew that it was a hope that it could have an impact, but my recollection of the time is we were very clear on the fact that we had no influence on that.

BY MR. LEVY:

Q. But -- but you knew what they were hoping to get out of the settlement agreement?

Page 66

GRY AHLEFELD-ENGEL 30(b)(6)

Q. Okay. And then the next sentence is "they," begins "they"?

A. Yes.

Q. The same set of people?

A. Yes.

Q. Mr. Stein, Mr. Lhote, Mr. McGee?

A. Yes, I would -- I would say so.

Q. Okay. Do you have any doubt that -- about that?

A. No.

Q. Okay. "They hope their cooperation in the civil law track will have a mitigating effect in the criminal, but nothing more."

A. Yes.

Q. So, Skatte knew what Mr. Stein, and Mr. Lhote, and Mr. McGee were seeking as part of the settlement agreement?

BY MR. LEVY:

Q. Correct?



Page 69

GRY AHLEFELD-ENGEL 30(b)(6)

BY MR. LEVY:

Q. Do you want me to clarify the question?

A. No, I'm just not sure I agree, because I'm saying I have no influence whatever as Skatteforvaltningen on any criminal liability case that might or might not be there.

So -- so, the effect of the settlement, I -- I can't -- I'm not sure I understand how I can affect that with the settlement.

I know that they were hoping that their cooperation with the settlement would have some effect.

Page 70

GRY AHLEFELD-ENGEL 30(b)(6)

Q. You wrote about that "They hope their cooperation in the civil law track will have a mitigating effect in the criminal," right?

A. Yes.

Q. And you were saying what you understood their hope was, correct?

THE WITNESS: I understand it more as that they understood I had no influence on that.

BY MR. LEVY:

Q. You wrote, "They hope".

A. Yes.

Q. And you wrote what they were hoping

Page 71

GRY AHLEFELD-ENGEL 30(b)(6)

for, correct?

A. Yes, I wrote what they were hoping for.

Q. Yeah, so you had some understanding what they were hoping for?

A. Yes.

Q. Okay. And how did you have that understanding?

A. My recollection is that that was verbalized during the negotiations of the settlement.

Q. And by whom?

A. By their counsel at the time.

Q. And the -- what they were hoping for is that their cooperation in the civil law track would have a mitigating effect in the criminal?

A. Yes.

Q. And what did you -- what did you understand -- or what did you mean -- withdrawn.

What did Skatte mean when you said "have a mitigating effect"?

A. I understand my words as meaning having any sort of impact.

Q. And -- and did you have in your head at the time an idea of what potential mitigation

Page 72

GRY AHLEFELD-ENGEL 30(b)(6)

might result?

A. I'm not a criminal expert, so, no. But typically in a Danish context, that would be -- if there was at some point a criminal case, that would be -- could be taken into consideration with -- in regard to a sentencing if a guilty sentence was -- would be -- if that would be the judgment.

Q. Were they also hoping that it would have an impact on the prosecutor's possible charging decision?

THE WITNESS: I -- I don't -- I don't have a knowledge about that, but that would not be the -- that would not be the most possible outcome or a possible outcome in Danish law.

BY MR. LEVY:

Q. You don't know one way or the other?

THE WITNESS: I don't know one way or the other what their -- their hopes were; more to the effect of an impact, not what specific impact they were hoping for.



Page 73

GRY AHLEFELD-ENGEL 30(b)(6)

Q. Fair enough.
You -- were you aware that in prior discussions that Skatte was involved in that they -- Mr. Stein, Mr. Lhote, and Mr. McGee -- were seeking that they be immunized from criminal prosecution in connection with the settlement agreement?
A. Yes.

Q. Sure. You understood that in -- in earlier negotiations relating to the settlement agreement --
A. Yes.
Q. -- there was discussion about Mr. Stein, Mr. Lhote, and Mr. McGee, and others, being

Page 74

GRY AHLEFELD-ENGEL 30(b)(6)

immunized in connection with -- from criminal prosecution?
A. I understand, not that there were negotiations about it, because I don't believe we -- again, as I said, we don't have that mandate as an authority, so we cannot negotiate on that subject.
I understand that it had been put forward at earlier negotiations as a wish for a term in the -- in the settlement.





Page 77

GRY AHLEFELD-ENGEL 30(b)(6)

Q. And right below that, I want to direct your attention to that again and just ask you for what the -- for how it is that you came to know what hopes Mr. Stein, and Mr. Lhote, and Mr. McGee had and that are reflected in the sentence that you wrote after that?

A. Okay. I believe that was expressed during the negotiations.

Q. By whom?

A. By the three persons' counsel at the time.

Q. And do you remember who that was?

A. Ralph Levine I believe his name was.

Q. And did -- was that expressed to you -- to -- to you personally?

A. No. I was present during most of the negotiations up 'till the end.

Q. And do you remember in what context it was expressed?

A. No.

Page 78

GRY AHLEFELD-ENGEL 30(b)(6)

Q. But you remember it was Mr. Levine?

A. I believe he was the one primarily doing the talking during the negotiations.

Q. And who was the person doing the talking on behalf of Skatte?

A. Mr. Weinstein to my left and Bill McGuire I believe.

Q. And do you remember anything more about what Mr. Levine said?

A. No, not in -- not in detail.

Q. Do you remember whether Mr. Levine gave a sense of how important this -- this hope was to Mr. Stein, and Mr. Lhote, and Mr. McGee?

A. Not the degree of importance, but I did understand that it was of importance.

Q. You don't have a sense of how important?

A. No, I don't -- I can't say to what degree.

Q. It was important; you can't say how important?

A. No.

Q. Is that a fair summary?

A. That's a fair summary.

ESQUIRE
DEPOSITION SOLUTIONS

[redacted]

[redacted]

[redacted]

[redacted]

GRY AHLEFELD-ENGEL 30(b)(6)

Q. Was there ever a process by which any drafts of the settlement agreement were communicated from Skatte to SOIK?

A. I don't believe so, no. We didn't send



the drafts of the settlement agreement to SOIK.

Q. Okay. Why not?

A. SOIK was not a -- a part of the -- of the settlement agreement. There was no -- I don't think there was a -- again, I don't know at what point -- I don't know -- again before my personal knowledge, so before I came in, I didn't know what the discussions were back then. There was a confidentiality to consider, the confidentiality of the agreement, and we informed them on what they needed to know and should know about the settlement and where it was in process.

Q. And what -- what did Skatte believe SOIK needed to know about the settlement agreement?

A. As I told you before, what we on a continually basis told them at that time and during the settlement agreements I believe earlier on in the negotiations, it would have been more along the lines of process: This is where the settlement is going; we are in negotiations with the group of people, and the closer we got to the final date, it would have been more along the lines of the general terms of the -- of the

settlement.

Q. Did -- did Skatte ever provide to SOIK a copy of the settlement agreement after it was executed?

A. Not to my knowledge, no.

Q. Never?

A. No.

Q. Why not?

A. Oh -- excuse me. I think we actually did when it was made -- when it went into the case and it was made public here in the states. I think we provided it to SOIK at that time.

Q. When was that?

A. That must have been sometime in 2023.

Q. When you say "the case," do you mean in connection with this litigation?

A. Yes, this litigation. Yes.

Q. So prior to that you're not aware of an instance in which Skatte provided to SOIK a copy of the settlement agreement?

A. No.





GRY AHLEFELD-ENGEL 30(b)(6)

BY MR. LEVY:
Q. In the -- in about the period we're talking about, which is the first half of 2019, to whom did you personally report to?
A. Steen Jacobsen -- Bechmann Jacobsen.
Q. Okay. And to whom did he report?
A. Merete Agergaard.
Q. And who is she?
A. She's the -- I'm just looking for the English title. She's the -- she's the director general. That's the right title for her, of the whole of Skattestyrelsen.
Q. She's the most senior official within --
A. Skattestyrelsen.

Q. Was she actively involved in supervising Mr. Bechmann in connection with this settlement?
A. Not actively. It was -- it was -- it



GRY AHLEFELD-ENGEL 30(b)(6)

was Steen who would make the call on any decision that was to be made, and then he would typically inform her and -- yeah, so that -- that would be.

Q. And how do you know that?

A. Because that is how we typically -- we're -- we're our own unit, the antifraud unit, and Steen is the top official of that unit. So it has some autonomy.

But this is a big case, so of course it's of interest to Merete. But any case work, if you can say it like that, that would be done by Steen and myself.

Q. The ultimate decision maker on the settlement agreement is it fair to say was Mr. Bechmann?

A. No, it was Merete who signed it. So I mean, the ultimate decision of enter into it or not, that was hers, but the specifics underneath, if that makes sense.

Q. Okay. I'm going to show you what I'm going to ask the reporter to mark as Exhibit 103.

[redacted]

[redacted]

[redacted]

[redacted]

ESQUIRE
DEPOSITION SOLUTIONS

Q. Okay. And are you aware that Wachtel gave its consent?

A. That is my understanding, that they did, yes.

Q. Okay, and how do you know that?

MR. WEINSTEIN: Just consent to what?

BY MR. LEVY:

Q. Did you understand the question?

A. It was consent to sharing of this?

Q. Okay, great.

A. No, I'm asking you a question.

Q. Okay, you want me to clarify the question?

A. Yes, please.

Q. Okay, fair enough. Consent to share this text, the -- the one, two three components of the settlement agreement that are reflected in Exhibit 103.

A. I believe that they did.

Q. Okay.

A. Because I do actually share it at a later point.

Q. Okay. And when you did share it, was it Skatte's intent that that be a way of fully complying with section 8(f)?

A. If it was our intent?

Q. At the time that the sharing of this text was the means by which Skatte actually complied with the obligations of 8(f).

A. I don't remember what our intent was at the time, but the fact was that we did share it,

and I do find that we were complying by that.

Q. Was it Skatte's plan at the time that the sharing of -- of the text of 8(f) was actually compliant with section 8(f)?

Q. At the time.

A. I -- I -- again, as I said, mine or our intent at the time, I don't remember if we did share it, and I do find that by sharing it we are complying with 8(f).

Q. But when you say you do find, what do you mean?

A. That's what -- that's how I find that we, among other, comply with 8(f) and our obligations under 8(f).

Q. When the first time you believed that by sharing the text of 8(f) Skatte had complied with section 8(f)?

A. When was the first time I believed it?

Q. Uh-huh.

A. I don't know when was the first time I believed it. I think being posed the question whether or not I'm complying with 8(f), I believe

GRY AHLEFELD-ENGEL 30(b)(6)

that I am.

Q. You have no recollection that in Skatte's mind Skatte intended to comply with section 8(f) by sharing the text of 8(f)?

A. No, I have no recollection of me at the time thinking when I'm doing this, I'm complying with 8(f).

Q. And did anyone else?

A. I don't know.

Q. Well, you're here as a representative of Skatte, right?

A. Yeah.

Q. Okay. So did you talk to anyone in order to find out the answer about what others thought the sharing of section 8(f) meant?

A. In preparing for this?

GRY AHLEFELD-ENGEL 30(b)(6)

Q. Uh-huh.

A. No, I haven't talked to anybody about the -- what they thought about the sharing of this.

Q. Other than looking in documents and meeting with your counsel, did you talk to anyone in preparation for your testimony?

A. No, I didn't talk to anybody in preparation about the subject matters --

Q. Okay.

A. -- of my deposition, no.

Did Skatte ever formulate a plan about how it was intending to comply with Section 8(f)?

A. No.

Q. And -- and tell me, ma'am, when Skatte did comply with Section 8(f).

A. When did it comply with Section 8(f)?

Q. Uh-huh.

A. I think we complied with Section 8(f) by several -- several communications to SOIK, one being me sending the text of this email to Per

GRY AHLEFELD-ENGEL 30(b)(6)

Fiig. I think it was in or around April 20th, I'm sending Per Fiig the excerpts. I don't know if it's exactly the same as these, but an excerpt about the -- about the former -- was it 8(d) at the time that became 8(f) on -- I don't know if on the same day or at a later date, but in close connection to I sent Per Fiig the list of the covered parties --

Q. Mm-hmm.

A. -- of the -- of the settlement.

Q. And at the time that occurred, did --

MR. WEINSTEIN: Just sorry. Were you done with your answer?

THE WITNESS: Not completely done with --

BY MR. LEVY:

Q. Please go ahead. Sorry.

A. -- the whole -- the whole --

Q. Sure, give me your list.

A. I'm giving you my list.

In the days up to the final execution of the settlement or the signing of the settlement, there is -- as you pointed out yourself earlier -- correspondence going back and

GRY AHLEFELD-ENGEL 30(b)(6)

forth between Steen, and Morten, and SOIK about the press release that is later in fact executed on May 29th after the settlement was signed in which we list the main terms of the settlement -- settlement amount; number of settling parties that I have previously sent to Mr. Fiig; what the settled amount represents -- it is what the settling parties received out of the total sum of the 2.9 -- that the settling parties have agreed to cooperate with Skatte about its ongoing cases; that we find that this settlement is a victory for Skatte. It's a good settlement.

So that is the total of -- of how I find that we do comply --

Q. And when you say --

A. -- with 8(f).

Q. Are you done?

A. Now I'm done.

And when you say you find that, when was the first time that you concluded that sending the text of these provisions -- I'm going to show you the email in a moment.

A. Yeah.



Page 113

GRY AHLEFELD-ENGEL 30(b)(6)

Q. -- sending the list of the covered parties and the press release resulted in Skatte's having complied with Section 8(f)?

When was the first time that anyone at Skatte's ever believed that that was the case?

THE WITNESS: I don't think that I can give you a time that when we believed that this was the specific document that we found complied with it. I don't think we were at ever -- at any point ever -- that we ever doubted that we had complied with it.

There was so much communications, in writing, reaffirmed by -- in meetings, reaffirmed in communications by phone call. We were in continually dialogue with SOIK at the time.

So I don't think we ever doubted that we were not in compliance.

Page 114

GRY AHLEFELD-ENGEL 30(b)(6)

Q. So any of the -- do -- does Skatte have the view now that any of the oral communications are compliant with section 8(f)?

A. No. I have the view that the oral communications that we had with SOIK, that's reaffirmations of the -- the communications we also had with SOIK in -- in writing.

So I mean that what we communicated to SOIK, it's both in writing, and we did reaffirm it in telephone conversations, and ending up I think at a meeting in June at some point we tied the final knots about the settlement at that point.

Q. But the -- the writings that you say you find resulted in compliance with section 8(f) are the sending of the text, the sending of the list of covered parties, and the press release on May 29th, correct?

THE WITNESS: I'm saying I rely on yes the text with the wording of what later

Page 115

GRY AHLEFELD-ENGEL 30(b)(6)

became 8(f), the list of the covered parties, the press releases and the contents of that press release, which were in fact in writing, yes.

Q. Those are the means by which, according to you, Skatte complied with 8(f)?

A. Yes.

Q. Okay. Did anyone ever communicate at any point in time within Skatte that Skatte had complied with section 8(f)?

A. Communicate to who?

Q. Within Skatte, any one part of Skatte -- any one person within Skatte communicated to any other person at Skatte, we've done what we're required to do under say section 8(f)?

A. We possibly said to each other, now we have complied? No, because there was never any doubt that we had complied. That would be a dialogue between me and Steen, because we were the ones involved in this, nobody else.

Q. You -- you and Mr. Bechmann were the -- were the only people who were responsible for

Page 116

GRY AHLEFELD-ENGEL 30(b)(6)

complying with section 8(f).

A. We were the ones --

Q. Is that your testimony?

A. We were the ones responsible for the settlement, and -- well, per default, yes.

Q. Did anyone ever think at the time that providing the text of section 8(f) to SOIK was a means of complying with section 8(f)? Did you have -- did you personally ever have that thought?

A. That "Now I'm hereby complying with 8(f)"?

Q. Or complying in part with -- with section 8(f).

A. No, I don't believe I had that positive thought.

Q. Okay. And do you remember the first time you ever thought that?

A. No, I don't recall the first time I thought that. I mean --

Q. Was it in connection with this litigation --

MR. WEINSTEIN: Just, I'm not sure she was done. Were you done? You said, I mean --





GRY AHLEFELD-ENGEL 30(b)(6)

BY MR. LEVY:

Q. I didn't hear that. I apologize. Were you finishes with your answer?

A. No, I would like to elaborate a little bit, actually.

Q. Please.

A. At the time, as I said, we were not in doubt whether or not we had complied. Of course, in preparing for this case, I'm delving more in the material of the case, so this material supports my understanding of us complying with it back then.

If you're again asking me whether or not I thought at the time, so now I'm sending SOIK the wording of 8(f), that is me complying with 8(f), I don't think I did that positive connection at the time.

Q. Mm-hmm.

A. But again back to being we were not in doubt on whether or not we had complied, because the communication with SOIK was numerous, it was continually over the -- from the two weeks, and even before, but picking up a lot the two weeks up to the execution of the settlement and afterwards

GRY AHLEFELD-ENGEL 30(b)(6)

as well.

Q. The writings are the means of compliance with section 8(f), correct?

A. That is -- that is what I'm saying, that I'm relying on that as my --

Q. Right, that is the only means of complying with 8(f), correct?

A. That is how I complied with it, yes.

GRY AHLEFELD-ENGEL 30(b)(6)

Q. But you're positive that you had no doubt that you can complied with section 8(f)?

A. Yes.

Q. That you're -- that you're certain of?

A. Yes.

Q. But the -- but the -- but the means --

A. That was -- that was --

Q. Go ahead, please, finish your answer.

A. But we -- we were never in doubt about it. The communication was there. It was in writing. It was also in supplement to that we had meetings. We had telephone dialogues. It was continually in the period up to the execution of the settlement and in the period after.

So, it was never a question of whether we had complied or not. We had. We did.



Page 121

GRY AHLEFELD-ENGEL 30(b)(6)

In the middle of the last page of the email by which you're checking with Mr. Bechmann about sending the text to SOIK --

A. Yes.

Q. -- it refers to "sharing the agreement and the cooperation material with SOIK".

Page 122

GRY AHLEFELD-ENGEL 30(b)(6)

Q. Okay. What are you referring to when you -- when you refer to cooperation material?

A. I'm referring to material, any material that might come out of -- come out of the cooperation obligation that the settling parties have agreed to in the settlement.

Page 123

GRY AHLEFELD-ENGEL 30(b)(6)

Q. Did -- did Skatte receive cooperation material from the covered parties?

A. Skatte's representatives received material from the -- or for the covered parties, yes.

Q. And did it share that material with SOIK?

A. No.

Q. Why not?

A. We have not -- I don't think we have an obligation to share it, and we have not shared it with SOIK.

Page 124

GRY AHLEFELD-ENGEL 30(b)(6)

Q. Do you know whether SOIK ever asked for it to be shared with it?

A. Not on top of mind. I don't remember if it is in any of the questions following up in 2021. I don't recall.

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

GRY AHLEFELD-ENGEL 30(b)(6)

(Email chain was marked Skatte Exhibit 105, for identification.)

(Witness reviews document.)

BY MR. LEVY:

Q. Ready?

(Witness nods head in the affirmative.)

Q. This is the email that you made reference to before as one of the means by which Skatte complied with 8(f) in -- in your view?

A. Yes.





Page 138

GRY AHLEFELD-ENGEL 30(b)(6)

Do you -- was there any other instance of the text of the settlement agreement or part of the text of the settlement agreement being sent by Skatte to SOIK?

A. Other than this?

Q. Other than this.

A. I believe that I re-sent actually this email in September of that same year.

Page 140

GRY AHLEFELD-ENGEL 30(b)(6)

I'm going to show you what I'm going to ask the reporter to mark as Exhibit 106.

(Press release was marked Skatte Exhibit 106, for identification.)

BY MR. LEVY:

Q. Do you recognize that?

(Witness reviews document.)

A. Yes, I do. I believe it's the press release I referred to earlier.



Page 143

GRY AHLEFELD-ENGEL 30(b)(6)

So could I ask you to look at section 2(e).

A. Of the settlement?

Q. Of the settlement agreement. It's on page six.

A. Yes.

Page 144

GRY AHLEFELD-ENGEL 30(b)(6)

Q. And is it -- is it fair to say that the -- the initial paragraph of 2(e) permits the deduction of expenses?

A. Yes, some expenses.

Q. Not all?

A. As defined in --

Q. A defined set of expenses?

A. A defined set of expenses, agreed.

Q. And the -- the things that are contained in 2(e)(b) less B, those are all expenses?

A. All of the covered parties' expenses associated with reclaims applications for which Skatteforvaltningen made payments.

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

GRY AHLEFELD-ENGEL 30(b)(6)

.

Does the press release say that the settlement agreement is in the best interest of Skatte?

A. It doesn't say in those exact words, but it -- I -- the -- the -- the effect of that is -- I think there are several places. Let me just find them.

A. So it says in paragraph four, "The settlement is a" -- I don't know how to -- can I just have a word translated?

Q. Of course.

THE WITNESS: (Through the interpreter) It's a decisive victory.

(In English) It's a decisive victory

GRY AHLEFELD-ENGEL 30(b)(6)

or a big victory. That's the intent of the word, right?

(Through the interpreter) Material, considerable.

(In English) The concept of it is it's a big win for Denmark. It's a big win is what that says. The settlement should be seen as a big win.

So that's one part where it says, and then further down in the quotation of Merete Agergaard, it says, "I'm very happy with the work that's been put in. Trying to bring home the 12.7B has paid out," or "given a result."

And then again, further on, quoting Steen I think it is, "The settlement agreement is a big step."

So I don't believe the exact wording is in the best interest of Skatte, but that's the effect of it, those, those --

BY MR. LEVY:

Q. In -- in your opinion?

A. In my opinion.



GRY AHLEFELD-ENGEL 30(b)(6)

Does the -- does the press release indicate that the -- there had been provided by the covered parties' designees a form of security for payment of the final settlement amount?

A. The confessions of judgment?

Q. Uh-huh.

A. No, that doesn't --

Q. Okay.

A. -- refer to that in the press release.

Q. And does it say that the covered parties' designees would pay interest under certain circumstances?

(Witness reviews document.)

A. No, I don't believe it says in this one. It's -- I think that's at a -- a later point I think one of the press releases are addressing the interest. I don't think this one addresses the interest.

A. So these press releases, they were not sent out by us solely. They were run through your

GRY AHLEFELD-ENGEL 30(b)(6)

clients' lawyers at the time. So this was an agreed line of communication with them as well.

I just want that fact to be reflected as well.

Q. And did you ever tell Mr. Stein, and Mr. Lhote, and McGee's -- and Mr. McGee's lawyers that at the time the press release was the means -- was one of the means by which Skatte was going to comply with section 8(f)?

A. No.

Q. Did -- did Skatte communicate that to anyone outside of Skatte ever?

A. I don't believe we did, no.

Does the -- does the press release explain the process by which the true-up amount would be calculated and then obtained?

(Witness reviews document.)

A. No.

Q. And -- and other than the paragraph that we looked at before about the cooperation, does the settlement agreement describe in any -- in any other way the various requirements that the -- that the covered parties took on relative

GRY AHLEFELD-ENGEL 30(b)(6)

to cooperation?

A. Anywhere in the press release?

Q. Uh-huh.

A. Or in the settlement?

Q. No, in the press release. Does it describe any other aspects of cooperation?

A. No, not other than the ones we've been through.

Does the press release say that Skatte will communicate with SOIK certain things that are set out in section 8(f)?

A. No.

Q. Why not?

A. That would be an unnatural place to put that we would communicate that to SOIK.

Q. The -- the -- there was an awful lot of energy spent communicating with SOIK about what would and wouldn't be in the press release.

Is that fair to say?

THE WITNESS: That is fair.

BY MR. LEVY:

Q. And a lot of that effort involved

GRY AHLEFELD-ENGEL 30(b)(6)

clarifying the relationship between Skatte and the criminal endeavor that SOIK was engaged in, correct?

A. The -- the fact that we didn't have any influence on the criminal endeavor. We couldn't undertake any obligations towards the criminal -- any criminal endeavor that there might be based on the reports that we filed to SOIK.

Q. Right, but they -- the one time -- the one instance in the settlement agreement that does actually relate to the relationship between Skatte and SOIK is not present in the -- in the press release, correct?

A. Correct.

Q. And -- fair enough.

And other than the -- the part of the press release that relates to the four years and the 650, which consists of 650, does the settlement agreement -- withdrawn -- does the press release refer to any aspect of the letter agreement?

A. No.

Q. Does it make reference to the fact that the -- that there would need to be liquidated

ESQUIRE
DEPOSITION SOLUTIONS



certain assets in order to repay amounts committed to be repaid?
A. No, I don't believe we do that in this one, but let me read through it again, just to make sure.
(Witness reviews document.)
A. No.

Does -- does the press release say that the cooperation by the covered parties may result in the recovery by Skatte of additional funds from third parties?
A. No.

A F T E R N O O N S E S S I O N
(Whereupon at 1:59 p.m. the videotaped 30(b)(6) deposition of Skatteforvaltningen by Gry Ahlefeld-Engel resumed and she further testified as follows.)
THE LEGAL VIDEO SPECIALIST: We are on the record at 1:59 p.m.
BY MR. LEVY:
Q. I'm going to show you what I'm going to ask the reporter to mark as Exhibit 107.
(Email chain was marked Skatte Exhibit 107, for identification.)

So this is May 20th, 2019. So it's

very close to when the settlement agreement ends up being executed?
A. Correct.
Q. Correct? And this is one of the communications or -- or relates to one of the communications back and forth between Skatte and SOIK concerning the press release.
A. Correct.
Q. And that -- and that's one of the three modes by which Skatte believes that it complied with 8(f)?
A. Correct.
Q. The press release, the covered parties, and sending the text of what would become 8(f)?
A. Correct.
Q. And that's it, right?
A. Correct.

[redacted]

[redacted]

[redacted]

[redacted]

GRY AHLEFELD-ENGEL 30(b)(6)

BY MR. LEVY:

Q. It is the back and forth between Skatte and SOIK leading up to the press release and the press release itself --

A. That's what all the back and forth with SOIK is about. That's the contents of the press release.

So it's both the back and forth, and the contents of the press release.

Q. And is there anyone who at the time that those -- those email interchanges were occurring who believed that that was a means of complying with 8(f)?

A. I have answered that as well, I believe, numerous times.

Q. And the answer is no, correct?

A. The answer is we didn't again say, "So we hereby comply to 8(f)," but it is my belief that by doing so we did in fact comply with 8(f).

Q. Did you believe that at the time?

A. I don't know how to answer your question.

Q. It's a very simple question.



Page 173

GRY AHLEFELD-ENGEL 30(b)(6)

A. I -- and I have answered it many times now.

Q. And the answer is no, you did not think that at the time?

.

THE WITNESS: My answer is I did not at the time say, "So I'm hereby complying with 8(f)."

We had no reason to believe at the time that we were not complying. We were.

BY MR. LEVY:

Q. But no one thought that at the time?

THE WITNESS: Again, I think I've answered your questions.

BY MR. LEVY:

Q. You may answer.

A. I have answered that.

Q. The answer is no one thought that at the time, correct?

THE WITNESS: I'm sorry, I don't know how to phrase it any way else than what I have phrased it.

Page 174

GRY AHLEFELD-ENGEL 30(b)(6)

At the time I did not have a thought in my mind saying -- I don't believe I did have a thought in my mind saying, "I hereby comply to 8(f) by doing this."

A. The fact of the matter is I rely on that, in doing so, we complied with 8(f).

Q. Now you're relying on that?

A. That's what I'm are relying on, yes.

Q. Let me show you what I'm going to ask the reporter to mark as 108.

A. Yes.

(Email chain was marked Skatte Exhibit 108, for identification.)

Page 175

GRY AHLEFELD-ENGEL 30(b)(6)

BY MR. LEVY:

Q. Do you have Exhibit 108 in front of you?

Page 176

GRY AHLEFELD-ENGEL 30(b)(6)

A. I do.

Q. Okay. This is an email from -- from you to Mr. Fiig?

A. Yes.

Q. From May 21st, 2019?

A. Correct.

Q. And this is what you've referred to before as the means by which Skatte provided the list of covered parties to Mr. Fiig?

A. Yes.

Q. Okay. Let me just make sure I understand what's attached.

The first page lists various exhibits, but all those exhibits are not what was sent to Mr. Fiig?

(Witness reviews document.)

A. No, I believe it's only Exhibit 1 is there, Exhibit 1B is there, 1C is there, Exhibit 2 is there, Exhibit 3, 3A, 3B, 3C.

Q. Okay.

A. Exhibit 4 and 5 are not attached to this.

Q. Okay, were not provided to Mr. Fiig. Okay.

ESQUIRE
DEPOSITION SOLUTIONS



And does the -- does the set of exhibits that's attached as part of Exhibit 108, does it define who the covered parties' designees are in it?

(Witness reviews document.)

A. Not that I can tell.

Q. Is there any way that you could figure out who the covered parties' designees are from this exhibit -- withdrawn.

Is there any way that you could figure out who the covered parties' designees are from the attachment to the email contained in Exhibit 108?

A. No, not that I can tell.

(Letter agreement was marked Skatte Exhibit 109, for identification.)

BY MR. LEVY:

Q. And I'm going to direct your attention to the first substantive paragraph of 109. And before I ask you, this is the letter agreement?

A. This is the letter agreement.

Q. Okay. And then in the first paragraph it defines something called the "letter agreement parties".

See that there?

A. Yes.

Q. And the letter agreement parties are Mr. Lhote, Mr. Stein, Mr. McGee, and then Umar Alberto Rodriguez, common spelling, and Jaime Ryan Sahara, J-a-m-i-e, Ryan, R-y-a-n, Sahara, S-a-h-a-r-a. And it defines those five people as

the letter agreement parties.

A. That's what it says, yes.

Q. Okay. And the letter agreement parties have in general in the letter agreement some special obligations relating to for example NCB?

A. Correct.

Q. Do you -- do you -- does Skatte know why Mr. Rodriguez and Ms. Sahara were named as parties to the letter agreement?

A. Not that I recall, no, now.

Q. You don't know?

A. No, I don't know.

Q. But the letter agreement parties have some special obligations in the letter agreement, correct?

A. Yes.

Q. Are you able to tell from the attachment to the email contained in Exhibit 108 who the letter agreement parties are?

A. No.

Q. Thank you.

I'm going to show you what I'm going to ask the reporter to mark as Exhibit 110.

(Email chain and attachments was marked Skatte Exhibit 110, for identification.)

BY MR. LEVY:

Q. Why don't you take a look at that for a a moment, and look up when you're done.



Page 181
GRY AHLEFELD-ENGEL 30(b)(6)

Q. The last page of the document is -- consists of something that's referred to in the email as the "principals."
A. Yes.
Q. Do you see that there?
A. Yes.
Q. What was the purpose of this document?
A. My recollection of this document is something that we, between the settling parties, agreed on on how Skatte could communicate about the settlement. Because it was quite obvious that we would need to communicate to some extent, so what principals could we agree on -- agree on to be able to communicate; what were the key points that we needed to take into consideration when we were communicating.
Still, there was the whole process following any communications, that when we did it in writing we would seek the consent of -- of the

Page 182
GRY AHLEFELD-ENGEL 30(b)(6)

counsel of the three gentlemen, or of the settling parties. But this was the principals that we agreed on that's how we would communicate.

Page 183
GRY AHLEFELD-ENGEL 30(b)(6)

How was this document used by Skatte?
A. It was used as the framework of any communications that we had regarding the settlement in the days following the settlement.
It -- it's the guiding principals on how we can communicate.
Q. And it's separate from the press release?

Page 184
GRY AHLEFELD-ENGEL 30(b)(6)

A. This would be the guiding principals on how the press release would be drafted. So it's a framework it should be understood as, so we would not -- we agreed on speaking about each other respectfully and without any reference to fraud. That's one principal, right. So that you can see that reflected in the press release. Nowhere in the press release do we talk about the -- I'm just going to -- I need a translation of a Danish word.

(In English) Yeah, the issues, the resolution of the issues between us, we would not talk about it as fraud. So that was one principal. And again you can see that reflected in the press release.

ESQUIRE
DEPOSITION SOLUTIONS



Page 185

GRY AHLEFELD-ENGEL 30(b)(6)

If I could ask you to refer to Exhibit 104, the settlement agreement.

A. Yes.

Q. And in particular the definition -- a couple of the definitions contained on page three.

A. I'm there.

Q. Yes. And in particular in the middle it defines "covered parties," and then right below it it defines "covered parties' designees."

A. Yes.

Q. And you agree with me that the covered parties' designees are also covered parties?

A. Yes.

Q. The covered parties is a large set of -- of people and entities, and three of them are covered parties' designees?

A. I agree with you on that.

Q. Okay, great.

Page 186

GRY AHLEFELD-ENGEL 30(b)(6)

So if I refer to the covered parties --

A. Sorry.

Q. That's okay. I'm going to stop, because I want to make sure you hear the question and give you time.

So if I refer to the covered parties that are not covered parties' designees, you would understand to whom I'm referring?

A. Covered parties that are not covered parties' designees? That would be everybody but Jerome Lhote, Matthew Stein, and Luke McGee, yes.

Q. Everyone who -- who is a party to the settlement agreement minus --

A. Minus the three.

Q. Yes.

A. Yes.

Q. Can we agree upon that?

A. That we can agree upon.

Q. Okay, great.

Do the covered parties that are not covered parties' designees have any present obligation to make any payments under the settlement agreement?

Page 187

GRY AHLEFELD-ENGEL 30(b)(6)

Do the covered parties that are not covered parties' designees have any present obligation to make any payments under the settlement agreement?

THE WITNESS: I think I need you to be more specific. I haven't memorized the settlement agreement, so.

Page 188

GRY AHLEFELD-ENGEL 30(b)(6)

Did the covered parties that are not covered parties' designees -- everyone who signed the settlement agreement, less Mr. Stein, Mr. Lhote, and Mr. McGee -- do they have any obligation to pay any money to Skatte under the settlement agreement?

MR. WEINSTEIN: Objection.

THE WITNESS: Yes.

BY MR. LEVY:

Q. Yes?

A. Yes. They had an obligation -- the --



Page 189

GRY AHLEFELD-ENGEL 30(b)(6)

the whole of the covered party had an obligation to pay the initial cash payment, and my understanding is that the subsequent cash payment was an obligation placed on Stein, Lhote, and McGee.

So the initial cash payment has been paid?

A. Correct.

Q. Okay. And it was paid in 2019?

A. Yes.

Presently, right now, do the covered parties that are not covered parties' designees, have a payment obligation to Skatte under the settlement agreement?

A. That's not my understanding, no.

Q. No.

A. Correct.

Page 190

GRY AHLEFELD-ENGEL 30(b)(6)

Q. Okay. Thank you. I'll ask it a simpler way now.

At this pint in time only the covered parties -- only the covered parties -- withdrawn. I'm going to ask the converse question, but the same point that I'm trying to make sure I understand is, at this point in time, currently, only the covered parties' designees owe money to Skatte under the settlement agreement?

A. That is my understanding, yes.

Q. Thank you. I'm going to ask you to look at paragraphs 160 and 161 of the -- of Exhibit 111.

A. One eleven, 160 and 161.







Page 194

GRY AHLEFELD-ENGEL 30(b)(6)

Q. And do you know what the relationship between the assets in those accounts -- withdrawn.
Do you know what -- what -- whether there was a relationship between the assets in those accounts and refunds paid by Skatte?

THE WITNESS: Specifically if I knew?

Page 195

GRY AHLEFELD-ENGEL 30(b)(6)

BY MR. LEVY:
Q. Do you know whether -- withdrawn.
Yes.
A. If I knew specifically in --
Q. If you know now.
A. Well, the -- let me just -- so the whole point of this, as I understand it, is making the determination of the final settlement amount. In doing that, we were provided, as I understand it, with documentation showing the transactions from Skatte into accounts in NCB and what fees were paid on those accounts.
So, it would reason to say that the money in those accounts were, if not all of it, then at least some of it came from the Danish dividend refunds, or alleged dividend refunds.
Q. So the -- the -- the funds in the account were associated with refund claims paid by Skatte?
A. I don't know if they were solely from refunds from Skatte, but again, it would stand to reason that at least some of it was, or it would not make any sense that we were calculating what sort of fees that were paid on such accounts.

Page 196

GRY AHLEFELD-ENGEL 30(b)(6)

Q. Okay. So there is an association between the assets in the account and the refund claims?

THE WITNESS: At least to some extent, yes.

Q. Okay. Very good. Thank you.
Let me ask you to look at --
A. And just to be sure, I'm saying that without having insight into the exact account and the movements in and out of the account.
Q. But you prepared yourself to testify to the concepts that are reflected in paragraph 161?
A. Of the concepts, yes.

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

ESQUIRE
DEPOSITION SOLUTIONS

Page 225

GRY AHLEFELD-ENGEL 30(b)(6)

(Annotated agenda was marked Skatte Exhibit 114, for identification.)

Page 226

GRY AHLEFELD-ENGEL 30(b)(6)

Q. It indicates in English -- you'll look at the -- the Danish, it says "Executive Secretary at Special Control"?

A. Yes.

Q. Is that the unit that you personally are employed in?

A. Yes.

Page 227

GRY AHLEFELD-ENGEL 30(b)(6)

Q. What -- I'll jump ahead and I'm going to show you these materials later on, but were they some of the people who drafted some of the correspondence between -- withdrawn, some of the correspondence from Skatte to SOIK in early 2021?

Page 228

GRY AHLEFELD-ENGEL 30(b)(6)

A. It was, yes.

Q. And -- and is it the same procedure whereby they might draft something and you would edit it, and they would redraft and you would re-edit it?

A. Yes.

Q. So you were personally involved in drafting those -- those letters in response to SOIK's inquiries?

A. Yes.

Q. Was that something that happened -- was -- do you -- do you remember the -- the drafting of those letters well?

A. I remember the letters of them, the process of drafting them to some extent, yes.

Q. But you remember being personally involved in --

A. Yes.

Q. -- in the drafting?

A. Yes.





GRY AHLEFELD-ENGEL 30(b)(6)

Had that kind of inquiry been made by SOIK on any other occasion that you can remember?
A. In any other case?
Q. Yeah.
A. Not in my time, but I've only had the one case in -- in my time. The rest of my work is a different type of work.
Q. And since those pieces of correspondence, was there any other inquiry like

GRY AHLEFELD-ENGEL 30(b)(6)

that from SOIK?
A. In this case or in any case?
Q. In any -- in any other case.
A. Again, not to my personal knowledge.
I -- I only have the responsibility of this one case. I'm not a case -- my department is not a case-producing department. I have an analytic department, I have a management secretary, and I have a financial secretary that controls all of the money we have in the -- in the -- in the -- in the unit, the antifraud unit.
So I have one case. That's the dividend case. So I wouldn't have anything to compare it to is my point.

GRY AHLEFELD-ENGEL 30(b)(6)

Are there other annotated agendas like this for other meetings that occurred between Skatte and SOIK?
A. At any time or?
Q. In relation to the dividend case, your one case.
A. Yeah, there might be on different topics, but pertaining to -- to the period that we're talking to, I'm only aware of this one.
Q. And -- and do you recall why this particular meeting was -- was summarized in the detail that's contained in this Exhibit 114?
A. Well, I believe we were in the middle of COVID at this point, so everybody was attending the meeting from different places. We were not communicating in the same manner as we used to.
Back in 2019 when we entered into the settlement, that was the -- we were very involved

GRY AHLEFELD-ENGEL 30(b)(6)

in it. That was what -- what was primarily happening at that time. We were talking together all the time. We were working in the same office. At this point in time we were not any more. So we had to, you know, correspond in -- in different ways, prepare in different ways.
So I assume that is why we do it in -- in this manner at this -- at this point in time.
Q. And was there -- was there any update about the performance pursuant to the agreement by the covered parties?
A. The performance of?
Q. By the covered parties under the agreement.
MR. WEINSTEIN: Can I just ask for clarification. Do you mean at this meeting or --
MR. LEVY: Yes.
MR. WEINSTEIN: -- just general? Okay.
MR. LEVY: And then I'll get more general. Thank you.
THE WITNESS: About the performance. Performance of payment? Performance of -- any specifics?



GRY AHLEFELD-ENGEL 30(b)(6)

BY MR. LEVY:

Q. The covered parties were required to do a series of things after the initial payment.

A. Yeah.

Q. Correct?

A. Yes.

Q. And that series of things included quarterly reports, correct?

A. Yes.

Q. And cooperation?

A. Yes.

Q. And if possible the making of payments, correct?

A. Yes.

Q. Okay. And was there anything that Skatte was required to do that you can remember after the signing of the settlement agreement?

A. That we were required to do after the signing?

Q. Yeah, besides comply with 8(f), which we've talked about.

Was there anything specific that you remember being an obligation of -- of Skatte?

GRY AHLEFELD-ENGEL 30(b)(6)

A. It's -- it's very broadly phrased. Can you be more specific and point me in the right direction of what you're --

Q. Sure.

A. -- getting at?

Q. I just want to understand sort of what -- what is observed is a bit of quiet in terms of the documents that we've seen by way of things that Skatte had to do after the signing of the settlement agreement and the payment of the initial money.

We don't see a lot of documents concerning things that Skatte had to do under the settlement agreement.

A. What things?

Q. That's what I'm asking you.

What things did Skatte have to do under the settlement agreement after the initial payment?

THE WITNESS: Again, I'm not sure what you're getting at specifically. I don't -- I haven't memorized the settlement agreement for this, so I would need you to point me in

GRY AHLEFELD-ENGEL 30(b)(6)

the right direction.

Is there any specific obligation that you are referring to whether or not that we reported on in the meetings with SOIK?

So is there anything that you recall reporting to SOIK that Skatte was required to do under the settlement agreement after the signing of it?

A. I think we're going a little bit around in circles here.

Q. Let me see if I can start -- let me see if I can start with the covered parties first, and then we'll return to SOIK.

A. Yes.

Q. So, after the signing of the settlement agreement and the payment of the initial cash payment...

A. Mm-hmm.

Q. The covered parties have to cooperate, right?

GRY AHLEFELD-ENGEL 30(b)(6)

A. Yes.

Q. They have to provide some quarterly reports, correct?

A. Yes.

Q. And there may have been some payments?

A. Yes.

Q. Correct? Was there -- were there any meetings where those things were reported on with -- where SOIK was -- was present?

A. I don't have a specific recollection of it, but that would have been something we reported to SOIK, that we had gotten the initial cash payment. That would have been reported. If we at that point had received cooperation, that would have been told to SOIK.

But, again, asking about my specific recollection of it, I don't have that, five years later on.

Q. You're guessing about what -- what would have been reported?

A. I am giving a qualified assessment of what we would naturally have told SOIK.

Q. You don't have any recollection that you actually did?



Page 237

GRY AHLEFELD-ENGEL 30(b)(6)
A. Not specifically, no.
Q. Okay. And are there any agendas, either the abbreviated agendas like we saw in Exhibit 113 --
A. Mm-hmm.
Q. Where it's just a list of bullet points.
A. Mm-hmm.
Q. Or a more detailed summary of a meeting like what we see in Exhibit 114.
A. This is not a summary. This is an annotated agenda being prepared before the meeting, just to be clear on -- on what format this is.
So this is in preparation, internal preparation in Skatte before a meeting on what points we, as a minimum, should get into in a meeting with SOIK.
Q. This is before the meeting occurs?
A. This is prepared before the meeting occurs, yes. I am not aware of any other specifics pertaining to this than this one and that abbreviated agenda, as you called it, in the period that we are -- are discussing here.

Page 238

GRY AHLEFELD-ENGEL 30(b)(6)
Q. Okay. And you're defining that period as what?
A. As the period that's described in the -- in the -- what -- discovery I believe is the right word, right?
Q. In the topics that --
A. Yes.
Q. -- we used to help you prepare --
A. Yes.
Q. -- to be deposed --
A. Yes.
Q. -- as a representative of Skatte?
A. Yes.
Q. Okay. From roughly the beginning of 2019 to roughly June of 2021?
A. Yes.
Q. Okay. You're not aware of any other written agendas in this form, the form set out in 113, or in this form, 114?
A. No. Then it would have been the discovery material.
Q. Okay. Okay. Thank you.

Page 239

GRY AHLEFELD-ENGEL 30(b)(6)
Q. So I just want to make sure I understand.
So the English translation says "Steen opens with a short update." And then the beginning of the next paragraph, "Boris adds to this a general update."
The way a native English speaker would read that -- withdrawn.
The way a native English speaker could read that is to suggest that that is what actually happened at the meeting and that this is a report on what happened at the meeting.
A. This is not minutes from the meeting.
MR. WEINSTEIN: Just, I didn't realize

Page 240

GRY AHLEFELD-ENGEL 30(b)(6)
THE WITNESS: This is not meetings from the meeting. This is in preparation of the meeting.
BY MR. LEVY:
Q. Okay. So there's no summary of what actually happened at the meeting?
A. Correct.
Q. Okay. Now I have it. Thank you.

[redacted]

Page 249

GRY AHLEFELD-ENGEL 30(b)(6)

MR. LEVY: One fifteen.

(Email chain was marked Skatte Exhibit 115, for identification.)

Page 250

GRY AHLEFELD-ENGEL 30(b)(6)

Q. Okay. Esbin is the deputy director, chief of staff. Is that an okay translation of the Danish for -- for his title?

A. Well formally deputy director, it's a director because -- well, just running you through the hierarchy, so Merete Agergaard is director general; Steen would be assistant director general; I would be a director; Esbin the same.

That's the -- in my signature, that's what I would write, if I wrote my signature in English.

Q. Very good. Thank you.

And he writes to Cecily, Cecily?

Page 251

GRY AHLEFELD-ENGEL 30(b)(6)

Q. About "gladly sending the attached," and then he appears to solicit from you your final comments. And then there appears to be a press release attached.

Is this either the final or something close to the final?

A. This would be something close to the final.

Q. Is it possible that it is the final?

A. It is possible that it is the final.

Q. Okay, so it's either close or actually the final?

A. Yes.

Q. Okay. We had some difficulty locating the actual final. So that's why I wanted to make sure --

A. Yes.

Q. -- that we are -- we are at least in the ballpark.

A. Yeah.

Q. Okay.

Page 252

GRY AHLEFELD-ENGEL 30(b)(6)

A. I'm saying that with --

THE INTERPRETER: "Reservations".

THE WITNESS: Again, I haven't done an exact side by side of the exact final one, but presumably it is.

BY MR. LEVY:

Q. Okay. Well, it was -- it was -- do you remember it being issued on September 25th?

A. In or around September 25th.

Q. Yeah. An email --

A. I think is -- is correct.

Q. An email was sent on the morning of September 25th.

A. Yeah.

Q. So does that help you remember -- does that -- does that help you remember with greater -- greater clarity that this is either the final or close to final?

A. Well, I haven't read through the text. I don't remember the final text. So again to be certain of that, I would --

Q. Okay.



A. -- have to see them side by side. So that's what my reservation concerns.

Q. Fair enough. Thank you. Does -- does this help you -- does this refresh your recollection about the criticisms -- withdrawn.

Does this refresh your recollection about the criticisms that were out in the media that generated the need perceived by Skatte to issue this press release?

A. Yes, it does.

Q. Okay.

A. I haven't read through the whole thing yet, but, just reading through the first paragraph, and it's along the lines that what I said before. It's talking about large discounts that we gave to the settling parties, that we had promised them criminal immunity.

Q. Let me direct your attention to the -- to the Danish --

A. Mm-hmm.

Q. -- for one second.

A. Mm-hmm.

Q. The third line down in the Danish of the first substantive paragraph that refers to

"DV2"?

A. Yes.

Q. There's a word -- and I'm going to spell it for the reporter: S-t-r-a-f-f-r-i-h-e-d, and that has been translated as "impunity".

A. I don't know the word "impunity".

Q. Okay, I'm -- that's exactly what I wanted to get at. So I want -- I just want you to explain what the Danish concept that's captured in the Danish is referring to.

A. It's referring to -- well, what is alleged by the media is that Skatte has promised immunity from criminal liability and large discounts.

Q. And that was not true?

A. That was not true? No.

Q. From your perspective, that's not true?

A. No.

Q. This is not, as you understand it, what the settlement agreement does?

A. No, correct.

Q. And -- and the purpose of this -- one of the purposes of the press release is to clarify what the relationship between the settlement and

the criminal case is, correct?

A. One of the -- yes, one of the purposes of its righting and obvious wrong as we saw the stories, the medias were pushing at the time.

Q. And do you remember whether this press release was also -- withdrawn.

Do you remember whether this press release was provided in draft form to counsel for the covered parties?

A. I believe all press releases were. All communications were, as I said earlier, was provided to the settling parties' counsel.

Q. It doesn't say anything about 8(f), does it?

A. Then I need to read through the whole thing.

Q. Fair enough.

A. Yes.

Q. Okay. The -- the press release doesn't say that in the settlement agreement Skatte committed to making certain things -- withdrawn.

It doesn't say in the press release that pursuant to the settlement agreement Skatte had committed to communicating certain things in a certain way to SOIK?

A. In this press release?

Q. Yes.

A. No, that wouldn't have been the context -- wouldn't have made sense in the context.

This is rebutting critique from the media about the settlement. So that's what we argued against. That was the -- the main purpose of this press release, was saying, so the media is saying this is not true because of this. They're saying number two, this, it's not true because of this.

So that's how the whole press release





Page 257

GRY AHLEFELD-ENGEL 30(b)(6)

is constructed or designed.

Page 258

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

Page 274

GRY AHLEFELD-ENGEL 30(b)(6)

One of the obligations of the -- set out in the letter agreement was to provide quarterly reports. Do you remember that?
A. Yes, I remember.
Q. Do you want to look at the --
A. Yeah.
Q. -- the provision of this -- of the letter agreement that discusses that?
Have we marked the letter agreement?
A. I think we did.

Page 275

GRY AHLEFELD-ENGEL 30(b)(6)

Q. Okay. It's 109.
A. Yes, I have it in front of me.
Q. And it's paragraph four.
(Witness reviews document.)
A. I've read through it.
Q. Did Skatte receive the quarterly reports?
A. I've been made aware that we did receive quarterly reports up until a point, I believe.
Q. And when you say you've been made aware.
A. It's not reports that has gone directly to me. It's gone do my --
Q. Gone to counsel.
A. Gone to counsel, and then again preparing for this, I would -- I was provided that knowledge.
Q. And -- and did -- did -- did you -- have you seen the quarterly reports?
A. No.
Q. Neither at the time that they were generated, nor in prep -- withdrawn.
You didn't see them at the time they --

Page 276

GRY AHLEFELD-ENGEL 30(b)(6)

they were received?
A. No.
Q. Did anyone else in Skatte receive them at the time that they were -- that they were provided?
A. I believe no.
Q. They were only provided to Skatte's counsel?
A. Yes.
Q. And do you know what Skatte's counsel did with them?

THE WITNESS: Yeah, no.
BY MR. LEVY:
Q. Do you remember having occasion to have a discussion within Skatte about the content of





GRY AHLEFELD-ENGEL 30(b)(6)

any of the quarterly reports?

A. No.

Q. Do you remember having -- ever having questions about anything you learned about in relation to the quarterly reports?

A. No.

Q. Do -- do you remember that there came a time when the quarterly reports stopped coming?

A. I have been made aware that they did in fact stop coming at some point.

Q. But Skatte was not aware -- withdrawn.

When were you made aware of that?

A. In preparation of this deposition.

Q. It -- it's one of the things you -- you learned about to be able to testify?

A. Yes.

Q. But you were not -- you personally were not aware of that prior to preparing for your testimony?

A. No.

Q. Thank you.

GRY AHLEFELD-ENGEL 30(b)(6)

Q. Still looking at paragraph four, and you'll see about seven lines down the sentence beginning "failure to provide"?

A. Yes.

Q. Do you -- and it relates to failure to provide notice of sale of assets would be an event of default, and then the next sentence relates to providing notice of a default?

A. Yes.

Q. Do you -- are you aware whether Skatte ever sent a notice of default concerning the failure to provide notice of -- as required in section four?

A. I'm sorry, I -- I don't -- I don't remember. I know that I've been through this in my preparation, but as of this moment I -- I don't

GRY AHLEFELD-ENGEL 30(b)(6)

remember, to answer the question.

MR. WEINSTEIN: We'll just say on the record, we've not provided a notice under paragraph four.

(Email chain was marked Skatte Exhibit 118, for identification.)





GRY AHLEFELD-ENGEL 30(b)(6)

THE LEGAL VIDEO SPECIALIST: Thank you. The time is 5:11 p.m. That concludes today's deposition. We are off the record.

(Whereupon at 5:11 p.m. the videotaped 30(b)(6) deposition of Skatteforvaltningen by Gry Ahlefeld-Engel stood in recess until Friday, May 31, 2024 at 9:00 a.m.)

GRY AHLEFELD-ENGEL 30(b)(6)

I N D E X

30(b)(6) DEPOSITION OF GRY AHLEFELD-ENGEL

| EXAMINATION BY: | | PAGE: |
|---|---|---|
| Mr. Levy | | 11 |

INDEX OF DEPOSITION EXHIBITS:

| SKATTE EXHIBITS: | | PAGE: |
|---|---|---|
| Skatte Exhibit 100 | Email chain | 24 |
| Skatte Exhibit 101 | Email chain | 54 |
| Skatte Exhibit 102 | Email chain | 84 |
| Skatte Exhibit 103 | Email chain | 98 |
| Skatte Exhibit 104 | Settlement agreement | 98 |
| Skatte Exhibit 105 | Email chain | 135 |
| Skatte Exhibit 106 | Press release | 140 |
| Skatte Exhibit 107 | Email chain | 163 |
| Skatte Exhibit 108 | Email chain | 174 |
| Skatte Exhibit 109 | Letter agreement | 178 |
| Skatte Exhibit 110 | Email chain and attachments | 180 |
| Skatte Exhibit 111 | Skatte's pleading | 187 |
| Skatte Exhibit 112 | Email chain | 201 |
| Skatte Exhibit 113 | Tentative meeting agenda | 210 |



GRY AHLEFELD-ENGEL 30(b)(6)
Stein v Skatteforvaltningen

May 30, 2024
285–288

Page 285

GRY AHLEFELD-ENGEL 30(b)(6)

INDEX OF DEPOSITION EXHIBITS CONTINUED:

| SKATTE EXHIBITS: | | PAGE: |
|---|---|---|
| Skatte Exhibit 114 | Annotated agenda | 225 |
| Skatte Exhibit 115 | Email chain | 249 |
| Skatte Exhibit 116 | Email chain | 261 |
| Skatte Exhibit 117 | Email chain | 272 |
| Skatte Exhibit 118 | Email chain | 279 |
| Skatte Exhibit 119 | Email chain | 279 |

(Exhibits attached to original transcript.)

Page 286

GRY AHLEFELD-ENGEL 30(b)(6)

ERRATA SHEET FOR THE TRANSCRIPT OF:

Case Name: Matthew Stein and Jerome Lhote vs. Skatteforvaltningen.
Dep. Date: May 30, 2024
Deponent: 30(b)(6) of Skatteforvaltningen by Gry Ahlefeld-Engel

CORRECTIONS:

| Pg. | Ln. | Now Reads | Should Read | Reason |
|---|---|---|---|---|
| ___ | ___ | __________ | ____________ | _____________ |
| ___ | ___ | __________ | ____________ | _____________ |
| ___ | ___ | __________ | ____________ | _____________ |
| ___ | ___ | __________ | ____________ | _____________ |
| ___ | ___ | __________ | ____________ | _____________ |
| ___ | ___ | __________ | ____________ | _____________ |
| ___ | ___ | __________ | ____________ | _____________ |
| ___ | ___ | __________ | ____________ | _____________ |
| ___ | ___ | __________ | ____________ | _____________ |
| ___ | ___ | __________ | ____________ | _____________ |
| ___ | ___ | __________ | ____________ | _____________ |
| ___ | ___ | __________ | ____________ | _____________ |
| ___ | ___ | __________ | ____________ | _____________ |
| ___ | ___ | __________ | ____________ | _____________ |
| ___ | ___ | __________ | ____________ | _____________ |
| ___ | ___ | __________ | ____________ | _____________ |
| ___ | ___ | __________ | ____________ | _____________ |
| ___ | ___ | __________ | ____________ | _____________ |
| ___ | ___ | __________ | ____________ | _____________ |
| ___ | ___ | __________ | ____________ | _____________ |
| ___ | ___ | __________ | ____________ | _____________ |
| ___ | ___ | __________ | ____________ | _____________ |

_____________________
Signature of Deponent

SUBSCRIBED AND SWORN BEFORE ME
THIS____DAY OF_____________, 2024

________________________
(Notary Public)

MY COMMISSION EXPIRES: ________________________

Page 287

GRY AHLEFELD-ENGEL 30(b)(6)

ACKNOWLEDGEMENT OF WITNESS

I, GRY AHLEFELD-ENGEL, do hereby acknowledge that I have read and examined the foregoing testimony, and the same is a true, correct and complete transcription of the testimony given by me, and any corrections appear on the attached Errata sheet signed by me.

__________________ ______________________________
(DATE) (SIGNATURE)

Page 288

GRY AHLEFELD-ENGEL 30(b)(6)

C E R T I F I C A T E

STATE OF NEW YORK )
: Ss.
COUNTY OF NEW YORK )

I, Kim M. Brantley, Shorthand Reporter, and Notary Public within and for the State of New York, do hereby certify:

That GRY AHLEFELD-ENGEL, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by the witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 2nd day of June, 2024.

*Kim M. Brantley*
Kim M. Brantley

My Commission expires May 31, 2026.

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com



Page 289

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - )
MATTHEW STEIN and JEROME LHOTE, )
Plaintiffs, ) Case No.:
v. ) 23 Civ. (NRB)
SKATTEFORVALTNINGEN, ) Vol. 2
Defendant. )
and )
LUKE MCGEE, )
Nominal Defendant. )
- - - - - - - - - - - - - - - - - )
SKATTEFORVALTNINGEN, )
Counterclaim Plaintiff, )
v. )
MATTHEW STEIN, JEROME LHOTE, )
and LUKE MCGEE, )
Counterclaim Defendants. )
- - - - - - - - - - - - - - - - )

CONTINUED VIDEOTAPED 30(b)(6) DEPOSITION OF SKATTEFORVALTNINGEN by GRY AHLEFELD-ENGEL

Reported by: Kim M. Brantley
Job No: J11294061

Page 290

GRY AHLEFELD-ENGEL 30(b)(6)

Friday, May 31, 2024
Time: 9:13 a.m.

Continued videotaped 30(b)(6) deposition of SKATTEFORVALTNINGEN, by GRY AHLEFELD-ENGEL, held at Hughes Hubbard & Reed, One Battery Park Plaza, New York, New York, before Kim M. Brantley, Court Reporter and Notary Public of the State of New York.

Page 291

GRY AHLEFELD-ENGEL 30(b)(6)

APPEARANCES:

For Plaintiffs/Counterclaim Defendants
Matthew Stein and Jerome Lhote:
MCKOOL SMITH, PC
1301 Avenue of the Americas 32nd FL
New York, New York 10019
(212) 402-9412
Email: dlevy@mckoolsmith.com
ovisconti@mckoolsmith.com
BY: DANIEL LEVY, ESQUIRE
OLIVIA VISCONTI, ESQUIRE

For Defendant/Counterclaim Plaintiff
Skatteforvaltningen:
HUGHES HUBBARD & REED, LLP
One Battery Park Plaza
New York, New York 10004
(212) 837-6843
Email: marc.weinstein@hugheshubbard.com
neil.oxford@hugheshubbard.com
kiran.rosenkilde@hugheshubbard.com
BY: MARC A. WEINSTEIN, ESQUIRE
NEIL J. OXFORD, ESQUIRE
KIRAN ROSENKILDE, ESQUIRE

Page 292

GRY AHLEFELD-ENGEL 30(b)(6)

APPEARANCES CONTINUED:

For Nominal Defendant/Counterclaim Defendant
Luke McGee:
NELSON MULLINS RILEY & SCARBOROUGH, LLP
2 S Biscayne Blvd. - 21st Floor
Miami, Florida 33131
(305) 373-9400
Email: dan.newman@nelsonmullins.com
justin.kaplan@nelsonmullins.com
edgar.neely@nelsonmullins.com
BY: DANIEL NEWMAN, ESQUIRE
JUSTIN B. KAPLAN, ESQUIRE
EDGAR A. NEELY, IV, ESQUIRE (Georgia)
(Attending via Zoom)

ALSO PRESENT:
Counsel from Kammeradvokaten (Denmark)
KATRINE HENCKEL HARLOFF, ESQUIRE
ANNE CHRISTINE K. EGHOLM, ESQUIRE
MIKKEL D. FANO, ESQUIRE
(Attending via Zoom)
and
MATTHEW STEIN, Plaintiff
JEROME LHOTE, Plaintiff
(Both attending via Zoom)



Page 293

GRY AHLEFELD-ENGEL 30(b)(6)

APPEARANCES CONTINUED:

ANETTE CHRISTENSEN, Interpreter of Danish (Appearing via Zoom)

and

CHARLES BOWMAN, Legal Video Specialist Esquire Deposition Solutions

Page 294

GRY AHLEFELD-ENGEL 30(b)(6)

P R O C E E D I N G S

THE LEGAL VIDEO SPECIALIST: We are now on the record. The time is 9:13 a.m. on May 31st, 2024.

This is the continuation of the videotaped deposition of Gry Ahlefeld-Engel, taken in the matter of Stein and Lhote v. Skatteforvaltningen, in the United States District Court, Southern District, New York.

My name is Charlie Bowman, and I'm your videographer today. The court reporter is Kim Brantley. We are representing Esquire Deposition Solutions.

Would counsel please introduce yourselves and affiliations, and then the witness will be sworn in.

MR. LEVY: Good morning. Daniel Levy, and Olivia Visconti from McKool Smith for Mr. Stein and Mr. Lhote.

MR. NEWMAN: Dan Newman from Nelson Mullins on behalf of Luke McGee.

MR. KAPLAN: Justin Kaplan from Nelson Mullins on behalf of Luke McGee.

MR. WEINSTEIN: Mark Weinstein, Hughes

Page 295

GRY AHLEFELD-ENGEL 30(b)(6)

Hubbard Reed, for Skatte.

MS. HARLOFF: Katrine Henckel Harloff, for Kammeradvocaten, Skatte.

MS. EGHOLM: Anne Kristine Egholm, Kammeradvokaten, Skatte.

MR. ROSENKILDE: Kiran Rosenkilde, Hughes Hubbard & Reed, for Skatte.

MR. LEVY: Can I ask the videographer to identify those who are present by Zoom.

THE LEGAL VIDEO SPECIALIST: Yes, sir. Anette Christensen, Edgar Neely --

THE INTERPRETER: Yes.

THE LEGAL VIDEO SPECIALIST: -- Edgar Neely, Matt Stein, Mikkel D. Fano.

MR. LEVY: There's no one else?

THE LEGAL VIDEO SPECIALIST: That's it.

MR. LEVY: Okay, very good. Thank you.

And Mr. Neely is from Nelson Mullins on behalf of Mr. McGee.

ANETTE CHRISTENSEN,

called as the official interpreter of Danish, did swear to translate the questions in this case from English to Danish, and the answers from Danish to English, to the best of her ability.

Page 296

GRY AHLEFELD-ENGEL 30(b)(6)

GRY AHLEFELD-ENGLE,

called as a witness by Counsel for the Plaintiffs, and, after having been first duly sworn by the Notary Public, was examined and testified as follows:

ESQUIRE
DEPOSITION SOLUTIONS



[redacted]

[redacted]

[redacted]

[redacted]

ESQUIRE
DEPOSITION SOLUTIONS





[redacted]

GRY AHLEFELD-ENGEL 30(b)(6)

[redacted]

Q. Let me ask you to put in front of you Exhibit 118, which we marked yesterday. You have it --

A. I do.

[redacted]

Do you recognize this?

A. I do.

Q. What is this?

A. Well, the front page of it is a email from a case worker in SOIK to Camilla Lindrum Bay at Skatte with an attached request for information from Skatte about the settlement agreement. And then it's an email continuation where Camilla sends the request, forwards the request to myself and Bettina saying that, "We got a number of questions from SOIK relating to the settlement."

[redacted]

Page 305

GRY AHLEFELD-ENGEL 30(b)(6)

Did you know in -- did Skatte know in advance of receiving this letter that such a letter was going to be sent?
A. No, not to my recollection we didn't. We had no knowledge.
Q. It came -- it came to Skatte without Skatte's having any advanced notice?
A. Not that I recall.
Q. You're here as -- on behalf of Skatte?
A. Yeah, I know.
Q. So Skatte has no information?
A. I have no information --
Q. -- to that effect?
A. -- and such a call would have been made to me if it was advised in advance, and I don't have the recollection of such a call being made to me.

Page 306

GRY AHLEFELD-ENGEL 30(b)(6)

So I -- I don't think we were advised in advance.
Q. Do you know what precipitated -- withdrawn.
Do you know what caused SOIK to send the letter?
A. Not other than what they're writing, that they're investigating the -- the report that we filed in 2015. The cases are being investigated by SOIK. This is our request for information. That's the extent of my knowledge.
Q. You remember reading it when you -- when Skatte -- do you remember reading it when Skatte received it?
A. Yes.

Page 308

GRY AHLEFELD-ENGEL 30(b)(6)

Q. Okay. She indicates in -- in substance that "SOIK is presenting a great number of questions about the settlement," and then she indicates in substance that she believes that, "We cannot/must not answer because of the settlement's confidentiality clauses."
Do you remember receiving this?
A. Yes.
Q. Did you have a reaction to her -- her indication that she believed that we cannot/must not answer?
A. No, I don't recall. I just recall



GRY AHLEFELD-ENGEL 30(b)(6)

putting the process in motion of having the questions answered to the extent that we could. But that wouldn't have been something we did on our own. That would be, you know, in dialogue with counsel, with our counsel how to answer the questions.

Q. And -- and when you say -- without knowing the nature of your consultations, when you say you consulted with counsel, which counsel?

A. Kammeradvokaten in Denmark.

Q. Okay. And did your -- did you consult with your U.S. counsel? Again, I don't want to know the nature of the consultation; just trying to find out.

A. The process when I consult with counsel, I consult with Kammeradvokaten, and any further consulting would be through Kammeradvokaten and any of our lawyers.

Q. Typically you would not consult directly with --

A. No.

Q. -- your U.S. counsel?

A. No. I consult with Kammeradvokaten.

GRY AHLEFELD-ENGEL 30(b)(6)

Q. The translation from Danish to English that we've been provided -- and again I don't know if it's accurate -- says, "I believe we cannot/must not answer." And I just want to make sure that you can look at the Danish and -- and give me a sense of whether that is a fair and -- fair -- fair translation. It's a formulation that people use in English, and I just want to make sure that it captures what is set out in the Danish.

THE WITNESS: If -- if I were to translate it, I would say that what she's writing is that, "A number of the questions I don't think" -- referring to her -- "can be answered or we are allowed to answer under the clauses of the settlement."







GRY AHLEFELD-ENGEL 30(b)(6)

(Email chain was marked Skatte Exhibit 120, for identification.)

Q. Okay. Did Skatte have any concerns about potential negative implications that might result from responding to SOIK's inquiry?

GRY AHLEFELD-ENGEL 30(b)(6)

.

Q. Okay. Why don't you look at Mr. Bechmann's email dated January 14th, 2021.

A. Yes.

Q. In it he refers to some provisions of the -- what he calls the civil procedure code.

A. The Danish Administrations Act.

Q. Are you familiar with those provisions?

A. Yes.



GRY AHLEFELD-ENGEL Vol. 2 30(b)(6)
STEIN and LHOTE vs SKATTEFORVALTNINGEN

May 31, 2024
317–320

Page 317

GRY AHLEFELD-ENGEL 30(b)(6)

Q. What generally is -- is -- is the concern being articulated by Mr. Bechmann?

A. That when we send these answers to -- or our answers to SOIK, they will be made available to any indicted persons in the case and will not be able to kept -- be kept confidential unless such a provision being imposed on the documents by way of section 729 of the Danish Administrations Act.

Q. And do you know what -- what limitations can be imposed under that provision?

A. I don't recall it that well, that provisions, so I would have to have it in front of me.

Q. Okay.

A. It's a very extensive binder of law.

Q. And -- and you referred to it as the Danish Administrations Code?

A. Danish Administrations Act. That's what it's translated to directly.

Q. Is it the same -- is it known as the Administration of Justice Act?

A. I only know it as the Danish Administrations Act I think it's called.

Page 318

GRY AHLEFELD-ENGEL 30(b)(6)

Q. Okay. Very good. Thank you.

And then in the English, around the middle, he begins, "The information will thereby come to the knowledge of the accused/defense and will also be able to be presented during the main hearings in the upcoming criminal cases."

A. Yes.

Q. And then he continues about, "unless a contrary ruling is -- is issued."

A. Mm-hmm.

Q. Does Skatte know what Mr. Bechmann was referring to when he -- he referred to "upcoming criminal cases"?

A. I believe it's a generalization, any criminal casing -- cases coming up from our report to the police.

Q. And what was Skatte's knowledge of what cases might be upcoming at this point in January of 2021?

A. Just what they're saying in the letter, that they're investigating "the" case. That's the whole point of their concern. They're investigating "the" case. We don't know what specific part of the case this is pertaining to,

Page 319

GRY AHLEFELD-ENGEL 30(b)(6)

just that it's "the" case.

So, when we allow information to go out, we have to be aware that we lose control of the information, and we don't know who is on the other side of that information. We don't know if there are a hundred people being charged, two people being charged, ten people being charged. Their defense lawyers would have access to the information that we're sending out.

So the concern is, that being a fact, are we going to be in breach of the confidentiality clause of the -- of the settlement.

Q. This is an inquiry from a component of the Danish government, correct?

A. Correct.

Q. Okay. Was there any constraint in the settlement agreement about responding to governmental inquiries?

A. But that's the whole point. We can't control that it only goes to the -- to the -- to SOIK. Because when it's within SOIK's sphere, they -- and if there's a case, which they say that there is, then it will go into that case file.

Page 320

GRY AHLEFELD-ENGEL 30(b)(6)

That's -- that's how it -- that's how the rules are.

Put on the case, and everybody who is involved in that case -- the prosecutors within SOIK, but also defense lawyers if there are in fact such defense lawyers, people who are charged, if there are such persons -- they have access to that same information.

Q. So --

A. So we don't just give the information to SOIK. We are aware that we are giving the information potentially to a large number of people.

Q. And that was the nature of the concern about breaching the confidentiality clause --

A. That's how I'm --

Q. Let me just finish.

A. Sorry.

Q. Yep -- responding to an inquiry to SOIK, and then the concern was that it may become available thereafter. That was -- that was the concern about the breach that generated -- that was the set of facts that concerned -- that generated the concern about the breach of the

800.211.DEPO (3376)
EsquireSolutions.com



Page 321

GRY AHLEFELD-ENGEL 30(b)(6)

confidentiality clause?

A. That's what's expressed --

[redacted].

THE WITNESS: -- in that sentence that you referred to from Bechmann, Steen Bechmann.

BY MR. LEVY:

Q. Does he make reference, as far as you understand it, to the confidentiality clause?

A. No, but I remember the discussions we had about this concern.

Q. Tell me about those discussions.

A. But that is what I just told you; that we were aware that when we would give off information to SOIK, it would not just -- it would be out of our control, the information, and the information would potentially be disseminated to far more people than just SOIK.

Q. And -- and Skatte was worried that if SOIK was required to disseminate the information, that could be a breach of the confidentiality clause on the part of Skatte?

A. That's how I recall it, yes.

Q. Did you -- you discussed that with Mr.

Page 322

GRY AHLEFELD-ENGEL 30(b)(6)

Bechmann?

A. I discussed the -- I discussed the concern that he is referring to here, that that is a fact, that when you give off information in this regard, or in this context, that is what happens.

Q. And that that dissemination by SOIK of the information could result in a breach by Skatte --

A. Yes.

Q. -- of the confidentiality clause?

[redacted]

Q. That was the nature of your discussion with Mr. Bechmann?

A. Our worries was that we would breach, we would be in breach if the information was out of our control and disseminated to a larger amount of people.

Q. As a result of a response to a governmental inquiry?

A. Yes.

[redacted]

With -- with -- other than that discussion with Mr. Bechmann, did you discuss with

Page 323

GRY AHLEFELD-ENGEL 30(b)(6)

him the nature of the -- anything else relating to the request from SOIK?

A. My recollection is that we of course discussed the nature of our answers, but nothing more than that we had again a normal process over the drafting of the answers and -- and what they needed to contain, what is nature of the -- what is -- what are we being asked, and are we responding to that properly.

[redacted]





Page 325

GRY AHLEFELD-ENGEL 30(b)(6)

Q. I'm going to show you what I'm going to ask the reporter to mark as Exhibit 121.

(Answers were marked Skatte Exhibit 121, for identification.)

THE WITNESS: Thank you.

(Witness reviews document.)

Page 326

GRY AHLEFELD-ENGEL 30(b)(6)

Q. Have you now had a moment to review the answers of the questions that are set out in the last pages of Exhibit 121?

A. I have.

Q. Okay. So let me see if I can ask you the general question again, and then maybe we can go into some of the more specifics.

Having now reviewed the answers, is there any -- anything specific about the answers that was a concern of Skatte's that might result in a breach of the settlement agreement by responding to a governmental inquiry from Skatte -- from SOIK?

THE WITNESS: But not just a concern that responding to a -- to a governmental institution. The concern again was not the governmental institution. The concern was everybody other than the government or SOIK. That's the concern.

It's not SOIK in itself. It's who it will be disseminated to by SOIK as part of

Page 327

GRY AHLEFELD-ENGEL 30(b)(6)

their case, which we have no insight into. So we don't know who is on the other side.

Does it make sense? So SOIK in itself is not the problem. They're -- they're asking us to answer some questions. We can answer that. The concern is who else will have access to those answers, because we don't know who's on the other side of their case. We don't know if it's 200 defense lawyers, 200 charged people, or one, or any. So that's the concern.

The concern is not answering SOIK. The concern is that answer being out of our control when given to SOIK to a number of other people --

Q. But the --

A. -- potentially.

Q. But the concern is that disclosure by SOIK to some unidentified set of people could be a breech of the confidentiality provisions of the settlement agreement.

Is that your testimony?

A. Correct.

Page 328

GRY AHLEFELD-ENGEL 30(b)(6)

Q. You -- you've testified that Skatte was concerned about a possible breach of



Page 329

GRY AHLEFELD-ENGEL 30(b)(6)

the confidentiality agreement if it responded to these inquiries because the information may be disclosed by SOIK later on.

Do I have it correct?

A. As a general concern, yes.

Q. When you say "as a general concern," what -- what do you mean?

A. We haven't done into the specifics. So I'm saying the concern was in general we had -- we needed to be aware that we were not just giving the information to SOIK. We were potentially disclosing the information to a number of people on the other side.

Q. And that that could be a breach of the settlement agreement by Skatte?

A. To certain terms -- or to certain information about the settlement, yes.

Q. Was there also a concern on the part of Skatte about simply the other people having the information from SOIK, not -- and not that it might be a breach of the settlement agreement, but simply they would have information that you didn't want them to have?

A. Why would we have such a -- such a

Page 330

GRY AHLEFELD-ENGEL 30(b)(6)

concern?

I mean, we have in general the more -- and now I'm not sure -- I'm not sure I understand your question. What would our concern be towards?

Q. Did Skatte not want some unidentified set of people to know the information set out in the answers?

A. I don't think we had that kind of concern.

Q. So the only concern about -- about responding was that it might be a breach of the settlement agreement?

A. Yes.

Q. Thank you.







GRY AHLEFELD-ENGEL 30(b)(6)

(Email chain was marked Skatte Exhibit 122, for identification.)



Page 337

GRY AHLEFELD-ENGEL 30(b)(6)

Q. And Ms. Spang writes to Mr. Bechmann and to you, and in substance Ms. Spang indicates that, "Skatte has now gotten back to the response and sent them on Monday, see attached, and SOIK now wants to be provided the entire settlement agreement."
Do you remember that?
[redacted]
A. Yes, I see what it says.
Q. Did -- did Skatte provide the settlement agreement to SOIK?
A. No.
Q. At this time?
A. Correct.
Q. In response to this request?
A. Correct.
Q. And at any other time?
A. I don't believe we provided it to SOIK before it was made public in the court docket regarding this case.
Q. And -- and did SOIK ask for it at that point?
A. They did.
Q. And did Skatte provide it at that

Page 338

GRY AHLEFELD-ENGEL 30(b)(6)

point?
A. No.
Q. Why not?
A. Because we again were not -- we were worried about who would -- the concern was we wouldn't just be giving it to SOIK. We would be giving it to a number of people. And also I believe we were not obligated to, so we decided not to.
Q. And what were the concerns -- despite not being obligated to, why didn't Skatte provide it to SOIK?
A. I believe I've answered that.
There was a concern that we would disseminate it to a larger audience of people than just to SOIK. We had provided SOIK with information. SOIK didn't contextualize to us to what extent it was to be used or where it was to be used. So we decided not to.
Q. Even though it had become substantially public at that point?
[redacted]
THE WITNESS: What had become substantially public?

Page 339

GRY AHLEFELD-ENGEL 30(b)(6)

[redacted]
Q. The settlement agreement.
A. The settlement agreement as such I don't think has become substantially public at this point.
Q. You're not aware that -- that the settlement agreement was filed substantially in public forum as a result of this case?
MR. WEINSTEIN: I'm sorry, I think you guys have now been talking about different time periods then for some period of time, if that's what you're talking about.
BY MR. LEVY:
Q. Are you aware that in connection with the filing of this litigation --
A. Yes.
Q. -- the settlement agreement was -- was made public to a substantial degree?
A. In 2023.
Q. Uh-huh.
A. Yes.
Q. And did Skatte ask -- did SOIK ask for the settlement agreement at that point?

Page 340

GRY AHLEFELD-ENGEL 30(b)(6)

A. No. At that point we, of our own accord, sent it to SOIK.
Q. In -- in unredacted or redacted form?
A. In the version that was in the -- in the -- in the case files over here.
[redacted]
(Additional Request for Information by SOIK was marked Skatte Exhibit 123, for identification.)

[redacted]

BY MR. LEVY:
Q. Do you recognize that?
A. Yes.
Q. What's that?
A. That's an Additional Request For Information by SOIK.
Q. It's a follow-up to the questions that they had been asking in the prior letters that we saw?
A. Correct.
Q. And it's actually numbered sequentially?
A. Yes.
Q. And do you remember responding to that?
A. I remember responding to that, yes.
Q. And you were personally involved in crafting the responses?
A. I was personally involved in the process of approving the drafting.
Q. You edited some of the responses that were drafted by others for example?
A. I typically do, yes.
Q. Okay. Do you remember doing so in this

case?
A. If I made any specific editing in it? No, I don't remember if I did.
Q. I'm not asking about the specific edits. I'm just asking whether you remember making any edits?
A. No, I don't remember making --
Q. Okay.
A. -- edits to it.
Q. You're just testifying that it would be your typical process to do so?
A. Yes.

[redacted]

(Response to the Following Questions was marked Skatte Exhibit 124, for identification.)

BY MR. LEVY:
Q. Do you recognize that?
A. I do.
Q. What is that?
A. That is our response to the following questions.

Q. To Exhibit 123?
A. To Exhibit 123, yes.

[redacted]

Let me direct your attention to questions -- the answers to questions 20 through 22. That is -- those are questions that -- withdrawn.

Is it fair to say in general that the answers to those questions concern cooperation being provided by the settlement parties?

[redacted]

A. Yes.
Q. And -- and were you aware that around this time in February of 2021 Matt and Jerome were requesting that Skatte communicate to SOIK the nature of the cooperation that they had provided to Skatte?
A. If I was aware that --
Q. If Skatte was aware.
A. That?
Q. That Matt and Jerome were requesting

that Skatte communicate to SOIK the nature of the cooperation that they had provided.
A. What you're referring to is an email sent to my counsel?
Q. No.

[redacted]

Q. I'm asking if you are aware that Matt and Jerome were requesting that Skatte communicate to SOIK the nature of the cooperation that they had provided?
A. I was -- I aware that at some point Stein, Lhote, and McGee, or that -- I don't know if it was all three of the -- of the principals, or just some of them -- I know that they at some point requested us to provide information into what extent we had cooperated with -- or provided information to SOIK. But I don't know the exact date of it on the top of my mind.
Q. You're -- you're -- you're aware that Matt, and Jerome, and Luke had asked that Skatte communicate to SOIK --
A. To what regard?

[redacted]

Page 345

GRY AHLEFELD-ENGEL 30(b)(6)

Q. Was Skatte aware that around this time in February of 2021 Matt and Jerome were requesting that Skatte communicate to SOIK the nature of the cooperation that Matt and Jerome had provided to Skatte.

(Interpreter interprets question.)

THE WITNESS: (In English) No, I don't

Page 346

GRY AHLEFELD-ENGEL 30(b)(6)

think that I'm aware.

Page 348

GRY AHLEFELD-ENGEL 30(b)(6)

THE COURT REPORTER: "I will represent to you that Matt and Jerome's counsel were told by Skatte's U.S. counsel.

"Answer: Okay.

"Question: -- that Skatte was uncomfortable communicating to SOIK about Matt and Jerome's cooperation.

"Was Skatte aware of that in substance?"

THE WITNESS: No.

BY MR. LEVY:

Q. Thank you. And was Skatte aware that Skatte's U.S. counsel indicated in substance that communicating with SOIK about cooperation was simply something that Skatte does not do?

A. No.





GRY AHLEFELD-ENGEL 30(b)(6)

(Request from SOIK was marked Skatte Exhibit 125, for identification.)

(Witness reviews document.)

BY MR. LEVY:

Q. Do you recognize that?

A. Yes.

Q. What in substance was SOIK asking Skatte for?

A. It's a -- a follow-up of the last response that we were discussing. So that would be our response to Exhibit 124. And they're asking us, "It appears from the Danish Tax Agency -- Tax Agency response to question 20 to 22 in our letter of January 28th that the three main shareholders in North Channel Bank have assisted in obtaining documents for use in the prosecution

GRY AHLEFELD-ENGEL 30(b)(6)

of the Danish Tax Agency's claim against the individual entities that are not included in the settlement.

"Regarding this, SOIK kindly asks you -- asks you to receive the material concerning" -- and then for specific names, "that the Danish Tax Agency or the Danish Tax Agency's counsel might be in possession of."

Q. Did -- did Skatte respond to this request?

A. I don't believe that we did.

Q. Why not?

A. I don't think we were permitted to disclose that information.

Q. Did -- did Skatte communicate that to SOIK in some way?

A. That we were not permitted to? I don't recall.

Q. How did Skatte determine that it was not able to respond to this inquiry?

GRY AHLEFELD-ENGEL 30(b)(6)

A. Well, anything we did we did in the process with our counsel.

Q. So without telling me what the advice was, the reason for the non response was the result of advice from counsel?

A. Yes, I believe so.



Page 353

GRY AHLEFELD-ENGEL 30(b)(6)

[redacted]

(Email chain was marked Skatte Exhibit 127, for identification.)

BY MR. LEVY:

Q. Do you recognize this?

A. I recognize the document, yes.

Q. Do you remember -- do you personally remember seeing it at or about the time that it was sent?

A. No.

[redacted]

Q. Do you know who sent this email?

A. Yes, Marshall Miller.

Q. Yeah.

A. I can see that.

Page 354

GRY AHLEFELD-ENGEL 30(b)(6)

Q. Do you know on whose behalf he was acting?

A. I don't know the specific persons, if it's all three of them, or just -- if it's both Stein, Lhote, and McGee, or just one or two.

Q. You know -- you know sitting here today that he was acting on behalf of -- of one or more of the covered parties' designees?

A. Yes.

Q. And -- and in substance Mr. Miller is asking for a copy of the communication that Skatte sent to SOIK in conformity with its obligations under section 8(f) of the agreement?

A. Yes.

Q. Was Skatte aware that counsel for one or more of the covered parties' designees was pressing Skatte to provide information about its compliance with section 8(f)?

[redacted]

A. I have not, as I said, seen the substance of the email before my preparation for

Page 355

GRY AHLEFELD-ENGEL 30(b)(6)

this deposition.

Q. Were you aware at the time that was occurring?

A. No, I wasn't aware of the specific questions.

Q. Were you aware --

A. At the time.

Q. Were you aware of generally that counsel for one or more of the covered parties was pressing Skatte to provide some information?

A. I can tell you what I was aware of.

Q. Please.

A. Because at some point I was asked to verify that the answer that -- is that -- I don't know if it's here or if the answer that eventually goes from Marc to Kathleen Hegler, I was asked to verify whether or not that was a fair representation of our dialogue with SOIK.

[redacted]

Page 356

GRY AHLEFELD-ENGEL 30(b)(6)

[redacted]

(Email chain was marked Skatte Exhibit 128, for identification.)

[redacted]

Q. And -- and what is this -- what is intended to represent?

A. Again, as I said, I was asked if this was a fair representation, if the contents of the



Page 357

GRY AHLEFELD-ENGEL 30(b)(6)
email was correct.
Q. Was -- was it intended to evident -- to provide some evidence of Skatte's compliance with section 8(f)?
A. I have no knowledge of what it was intended. I know it was an email that was to be sent.
Q. And you reviewed this email prior to its being sent?
A. I was asked if the consents thereof was a fair representation, if that was true, and I said yes.
Q. It -- it refers to "good faith negotiations and the obligation to provide information in cooperation," correct?
(Witness reviews document.)
A. That's what it says, yes.
Q. And those are terms that are used in section 8(f)?
A. Correct.
Q. Do you have any doubt that this was sent by counsel for Skatte in order to provide some evidence that 8(f) had been complied with?
A. Again, I don't --

Page 358

GRY AHLEFELD-ENGEL 30(b)(6)
MR. WEINSTEIN: Objection.
THE WITNESS: I don't -- as I said, I don't know what it was -- the specific questions it was in answer to. I was asked to -- if this was true to my knowledge, and I said yes.
BY MR. LEVY:
Q. It doesn't refer to your providing Mr. Fiig's -- Fiig with the text of section 8(f) prior to the signing of the settlement agreement, does it?
A. No, it does not.
Q. And it doesn't refer to your providing to Mr. Fiig a copy of the covered parties -- a list of the covered parties prior to the execution of the settlement agreement, correct?
A. Not specifically, no.
Q. And it doesn't refer to anything in relation to the press release, correct?
A. Not specifically, no.
Q. This is intended to mislead Matt and Jerome's counsel, is it not?
[redacted]
THE WITNESS: That's your opinion. Why

Page 359

GRY AHLEFELD-ENGEL 30(b)(6)
is it -- why is it --
[redacted]
Q. I'm asking you if this was crafted with the intent of misleading Matt and Jerome's counsel?
A. No.
[redacted]
Q. Who would know the -- what the intent behind this email was?
[redacted]n.
THE WITNESS: I don't know how to answer that.
BY MR. LEVY:
Q. Well, would the writer of the -- of the email know the intent?
[redacted]
THE WITNESS: What the intent of it was? We were -- again, I was asked to provide information if this was true to the best of my knowledge, and I said yes.
The intent behind it, I have -- I have

Page 360

GRY AHLEFELD-ENGEL 30(b)(6)
no way to testify towards that.
BY MR. LEVY:
Q. Only the author of the -- the email would know, correct?
[redacted].
THE WITNESS: I don't know how to answer that question. I can't testify to it.
[redacted]
(Affidavit of Confession of Judgment was marked Skatte Exhibit 129, for identification.)
BY MR. LEVY:

Page 361

GRY AHLEFELD-ENGEL 30(b)(6)

Q. Do you recognize this?
A. Yes, I do.
Q. It's dated in or about June 2021?
A. Where do I see the date?
Q. It's towards the back?
A. Yes.

Did you see this at the time that it was executed -- withdrawn.
Did Skatte see this at the time that it was executed?
A. Skatte's counsel did, I presume, but I don't know that we saw it, the document itself.
Q. Skatte the entity your not sure. How do you -- how do you know that Skatte's counsel did?
A. I suppose it's related to the case. It's the Confession of Judgment. But again, that's not something we would typically get.
Q. Why not?
A. In Skatte.
Q. Why not?
A. Because that's an -- that's a -- we

Page 362

GRY AHLEFELD-ENGEL 30(b)(6)

called in representation counsel for that. That would not go to us.
Q. Was -- was Skatte aware that -- that Mr. Lhote's residence had changed in between the time when the settlement agreement was executed and this agreement was executed?
A. At the time?
Q. Yeah.
A. No.
Q. You're aware of that now?
A. I'm aware of that now, yes.
Q. And at the time in or about June 2021, was Skatte aware that the law relating to affidavits of confession of judgment had changed?
A. No.
Q. You're aware now that the law relating to affidavits of confession of judgment had changed?

BY MR. LEVY:
Q. You may answer.
A. I have been made aware.
Q. When have you been made aware?

Page 363

GRY AHLEFELD-ENGEL 30(b)(6)

A. In preparation of this deposition.
Q. And Skatte was not aware prior to that?
A. No.
Q. And Skatte was not aware at the time that this was executed that the change in law relating to affidavits of confession of judgment could impact the enforceability of this agreement -- withdrawn.
Skatte was not aware at the time that this was executed that the -- that the change in law could impact the enforceability of the affidavit of confession of judgment?

Page 364

GRY AHLEFELD-ENGEL 30(b)(6)

THE WITNESS: (In English) No, I was not aware of American law at the time.
BY MR. LEVY:
Q. Any knowledge of the change in law and is impact on the enforceability of the affidavit of confession of judgment would be possessed by your U.S. and Danish counsel?
A. Correct.

ESQUIRE
DEPOSITION SOLUTIONS

[redacted]

ESQUIRE
DEPOSITION SOLUTIONS

[redacted]

[redacted]

ESQUIRE
DEPOSITION SOLUTIONS

[redacted]

ESQUIRE
DEPOSITION SOLUTIONS

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

GRY AHLEFELD-ENGEL 30(b)(6)

(Email chain was marked Skatte Exhibit 131, for identification.)

BY MR. NEWMAN:

Q. So with regard to Exhibit 131 -- first

GRY AHLEFELD-ENGEL 30(b)(6)

of all, do you recognize the document?

A. I do.

Q. Okay. And what do you recognize it as?

A. So this contains an email dated January 19th where Bettina sends, Bettina from Skatte sends to SOIK the response to the first series of questions that SOIK posed to Skatte.

Q. Right.

A. And then a new -- the new request from SOIK, or the follow-up request from SOIK to that first response.

Q. Right, correct.

A. Which Bettina sends on by email to Steen.

GRY AHLEFELD-ENGEL 30(b)(6)

Q. With regard to that -- first of all, do





GRY AHLEFELD-ENGEL 30(b)(6)
you recognize this document? It's dated January 22nd, 2021, "Request to Forward the Settlement Agreement"?
A. Yes.
Q. Okay. And that's a document that the State Prosecutor for Special Economic International Crime, SOIK, requested certain information, right?
A. Right.
Q. And the bottom paragraph, I just want to turn your attention to that. Do you see that last paragraph that starts, "In this regard"?
A. Yes.
Q. Okay. It says, "In this regard it is noted that as part of the investigation several seizure orders have been obtained."
And it says, "Based on the Danish Tax Agency's responded date, January 19th, 2021, it can be concluded that several seizure orders have been directed towards individuals who are part of the settlement agreement."
Do you see that?
A. I do.
[redacted]

GRY AHLEFELD-ENGEL 30(b)(6)
With regard to the seizure orders, are you familiar with the seizure orders referenced in this document?
A. No.
Q. Okay. Did you -- so as you sit here today, you're not familiar with what the prosecutor's office is referring to in -- in this particular paragraph?
A. No, they're not identifying which -- what seizure orders and towards what.
[redacted]

GRY AHLEFELD-ENGEL 30(b)(6)
[redacted]
Q. Are you aware of any seizure orders that were requested by a government agency in Denmark to be executed on individuals or entities in the United States as it pertains to parties to this case?
A. I think I at some point became aware that there were some seizure orders, criminal seizure orders to parties in this case, but I don't remember at what point in time and from

GRY AHLEFELD-ENGEL 30(b)(6)
where I got the knowledge sitting here now.
Q. Okay. Do you recall ever having internal discussion within Skatte -- I don't want to know any discussions with counsel -- about questions as to why seizure orders -- the ones that you recall knowing about -- were requested.
A. No.
[redacted]
With regard to the seizure orders that you testified you are aware of, did Skatte ever consult with SOIK regarding the seizure orders that you did become aware of?
A. No.
[redacted]

GRY AHLEFELD-ENGEL 30(b)(6)

Before these responses went out, you had reviewed the responses. Is that correct?

A. Correct.

Q. And you were in agreement with the responses, correct?

THE WITNESS: I think I need to clarify again on the process, because all the knowledge going into these responses didn't come from Skatte as an organization. Some of the responses we were drawing in answers to from our counsel, and this question -- that's why it was bothering me before, I was

GRY AHLEFELD-ENGEL 30(b)(6)

answering to the extent of it -- this is not an answer that would have been drafted by us. Do you -- does that make sense?

So we gather in the -- the information. So, correct, I approved the contents of it, and to the extent that -- that the -- the information came from other parties, including my counsel, that's what I would have -- what I would have stood on.

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

GRY AHLEFELD-ENGEL 30(b)(6)

Okay, so with regard to 106, this is



Page 417

GRY AHLEFELD-ENGEL 30(b)(6)

the press release you were referring to.
Is that fair?
A. That is the final press release that executed, correct.
Q. Okay. And that's the one you were referring to in response to Mr. Levy's question when you talked about compliance, as it relates to the press release?
A. Yes, and every -- every other -- the press release went back and forth in early -- so this is -- what I'm saying is this is the final executed one, which might be different from the attachment that went back and forth in the email, because they were continuously being revised.
Q. Understood. But this is the final press release you're referring to?
A. That is the final press release.
Q. And with regard to -- at -- at no time prior to the filing of the lawsuits by Mr. Stein and Mr. Lhote did Skatte ever contend -- am I correct -- did Skatte ever claim that the defendant -- or the parties, defendant parties in this lawsuit that Skatte is suing ever failed to cooperate.

Page 418

GRY AHLEFELD-ENGEL 30(b)(6)

Is that correct?
Skatte never claimed that they didn't cooperate with Skatte. Is that correct?
MR. WEINSTEIN: Objection.
THE WITNESS: We didn't claim prior to the lawsuit that they didn't cooperate?
BY MR. NEWMAN:
Q. Yeah, correct.
A. Not to my knowledge.

[redacted]

[redacted]

[redacted]

ESQUIRE
DEPOSITION SOLUTIONS

Page 434

GRY AHLEFELD-ENGEL 30(b)(6)

Q. Do you recognize Exhibit 137?

A. I do.

Q. What do you recognize this as?

A. A letter from Skatte to SOIK.

Q. Okay, were you involved in the creation of this letter?

A. I was -- yes, I was involved in the sending of this letter.





GRY AHLEFELD-ENGEL 30(b)(6)

A F T E R N O O N S E S S I O N

(Whereupon at 1:42 p.m. the videotaped 30(b)(6) deposition of Skatteforvaltningen by Gry Ahlefeld-Engel resumed, and she further testified as follows.)

THE LEGAL VIDEO SPECIALIST: We're on the record at 1:42 p.m.

ESQUIRE
DEPOSITION SOLUTIONS

[redacted]

Page 445

GRY AHLEFELD-ENGEL 30(b)(6)

Q. Okay. All right. I'm going to hand you what will be marked Exhibit 141.

Page 447

GRY AHLEFELD-ENGEL 30(b)(6)

Q. Can you -- if you look at the first paragraph.

A. Yes.

Q. She writes -- and I'm reading the English, so please read the Danish if you need to see if that's correct -- "The background to our wish is that the settlement and the individual appendices are fundamentally confidential based on the content of the agreements.

"We cannot therefore share the material without informing the parties to the agreement, which is why it would be helpful in this regard if you can give us some context."

Do you see that?

A. I do.

Q. Okay. And were you part of the process within Skatte that led to the sending of this email?

A. I would have been, yes.

Q. All right. And what's the -- do you have an understanding of what -- in that paragraph what concern she is referencing?

Page 448

GRY AHLEFELD-ENGEL 30(b)(6)

A. Yes, that we -- SOIK had asked us to provide, in one of the requests to provide the settlement agreement without telling us in -- to what context we would indeed be sending it.

Referring back to what we spoke about earlier, we didn't know the context to which we would be providing it. So, she's asking for SOIK to supply more context as to the reason why they want the settlement agreement.

So that's the, yeah, the essence of that.

[redacted]

[redacted]

[redacted]

[redacted]

GRY AHLEFELD-ENGEL 30(b)(6)

Q. Can I ask you to look at 141.
A. Yes.

GRY AHLEFELD-ENGEL 30(b)(6)

Q. This is the email from Ms. Spang at Skatte back to SOIK that's part of the string of emails concerning the provision of the settlement agreement, correct?
A. Correct.
Q. And without telling me the content of the discussions, did Skatte receive legal advice in connection with formulating its -- its response back to SOIK that's set out in Exhibit 141?
A. I don't remember specifically if we had advice, but as a general process that is always followed within my system, whenever we release any information about anything concerning the case, we seek advice from counsel.
Q. So it -- so it's fair to surmise that Skatte would receive legal advice about the content of Exhibit 141?

THE WITNESS: It's fair to assume that we would have conferred with our legal advisors regarding the contents of information we provide.





GRY AHLEFELD-ENGEL 30(b)(6)

Q. And -- and is that -- is that more likely to have been the case where the content of the email concerns interpretation of the settlement agreement?

A. That would be --

.

THE WITNESS: In general we would -- we will always confer with our counsel before we release any information regarding any part of this case.

GRY AHLEFELD-ENGEL 30(b)(6)

concludes the 30(b)(6) deposition of Skatte.

THE LEGAL VIDEO SPECIALIST: Okay, thank you. The time is 2:08 p.m. We are now off the record.

(Whereupon at 2:08 p.m. the videotaped 30(b)(6) deposition of Skatteforvaltningen by Gry Ahlefeld-Engel concluded.)

GRY AHLEFELD-ENGEL 30(b)(6)

I N D E X

30(b)(6) DEPOSITION OF GRY AHLEFELD-ENGEL

| EXAMINATION BY: | PAGE: |
|---|---|
| Mr. Levy | 296, 455 |
| Mr. Newman | 365 |
| Mr. Weinstein | 439 |

INDEX OF DEPOSITION EXHIBITS:

| SKATTE EXHIBITS: | PAGE: |
|---|---|
| Skatte Exhibit 120. Email chain | 315 |
| Skatte Exhibit 121. Answers | 325 |
| Skatte Exhibit 122. Email chain | 336 |
| Skatte Exhibit 123. Additional Request for Information by SOIK | 340 |
| Skatte Exhibit 124. Response to the Following Questions | 342 |
| Skatte Exhibit 125. Request from SOIK | 349 |
| Skatte Exhibit 126. Email chain | 351 |
| Skatte Exhibit 127. Email chain | 353 |
| Skatte Exhibit 128. Email chain | 356 |
| Skatte Exhibit 129. Affidavit of Confession of Judgment | 360 |

GRY AHLEFELD-ENGEL 30(b)(6)

INDEX OF DEPOSITION EXHIBITS CONTINUED:

| SKATTE EXHIBITS: | PAGE: |
|---|---|
| Skatte Exhibit 130. Denmark Supreme Court verdict | 366 |

INDEX OF DEPOSITION EXHIBITS CONTINUED:

| SKATTE EXHIBITS: | PAGE: |
|---|---|
| Skatte Exhibit 131. Email chain | 394 |
| Skatte Exhibit 132. Collection of documents | 408 |
| Skatte Exhibit 133. Document | 409 |
| Skatte Exhibit 134. Document | 410 |
| Skatte Exhibit 135. Document | 410 |
| Skatte Exhibit 136. Document | 411 |
| Skatte Exhibit 137. Letter from Skatte to SOIK | 433 |
| Skatte Exhibit 138. Subpoena to MaplePoint | 440 |
| Skatte Exhibit 139. 8/6/19 letter | 441 |
| Skatte Exhibit 140. Stipulated protective order | 442 |
| Skatte Exhibit 141. Email chain | 445 |
| Skatte Exhibit 141T. English translation of Skatte Exhibit 141 | 445 |

(Exhibits attached to original transcript.)

GRY AHLEFELD-ENGEL 30(b)(6)

ERRATA SHEET FOR THE TRANSCRIPT OF:

Case Name: Matthew Stein and Jerome Lhote vs. Skatteforvaltningen.
Dep. Date: May 31, 2024
Deponent: Continued 30(b)(6) of Skatteforvaltningen by Gry Ahlefeld-Engel

CORRECTIONS:

| Pg. | Ln. | Now Reads | Should Read | Reason |
|---|---|---|---|---|
| ___ | ___ | ___ | ___ | ___ |
| ___ | ___ | ___ | ___ | ___ |
| ___ | ___ | ___ | ___ | ___ |
| ___ | ___ | ___ | ___ | ___ |
| ___ | ___ | ___ | ___ | ___ |
| ___ | ___ | ___ | ___ | ___ |
| ___ | ___ | ___ | ___ | ___ |
| ___ | ___ | ___ | ___ | ___ |
| ___ | ___ | ___ | ___ | ___ |
| ___ | ___ | ___ | ___ | ___ |
| ___ | ___ | ___ | ___ | ___ |
| ___ | ___ | ___ | ___ | ___ |
| ___ | ___ | ___ | ___ | ___ |
| ___ | ___ | ___ | ___ | ___ |
| ___ | ___ | ___ | ___ | ___ |
| ___ | ___ | ___ | ___ | ___ |
| ___ | ___ | ___ | ___ | ___ |
| ___ | ___ | ___ | ___ | ___ |
| ___ | ___ | ___ | ___ | ___ |
| ___ | ___ | ___ | ___ | ___ |
| ___ | ___ | ___ | ___ | ___ |
| ___ | ___ | ___ | ___ | ___ |

____________________
Signature of Deponent

SUBSCRIBED AND SWORN BEFORE ME
THIS____DAY OF_____________, 2024

____________________
(Notary Public)

MY COMMISSION EXPIRES: ______________________

GRY AHLEFELD-ENGEL 30(b)(6)

ACKNOWLEDGEMENT OF WITNESS

I, GRY AHLEFELD-ENGEL, do hereby acknowledge that I have read and examined the foregoing testimony, and the same is a true, correct and complete transcription of the testimony given by me, and any corrections appear on the attached Errata sheet signed by me.

_________________ ____________________________
(DATE) (SIGNATURE)



C E R T I F I C A T E

STATE OF NEW YORK )
: Ss.
COUNTY OF NEW YORK )

I, Kim M. Brantley, Shorthand Reporter, and Notary Public within and for the State of New York, do hereby certify:

That GRY AHLEFELD-ENGEL, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by the witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 2nd day of June, 2024.

Kim M. Brantley

My Commission expires May 31, 2026.

