UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------X
MATTHEW STEIN AND JEROME LHOTE,

     Plaintiffs/Counterclaim-
     Defendants,

       - against –

SKATTEFORVALTNINGEN,

     Defendant/Counterclaim-
     Plaintiff,

       - against –

LUKE MCGEE

     Nominal Defendant/
     Counterclaim-Defendant.

------------------------------X

**OPINION AND ORDER**

23 Civ. 2508 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

## Table of Contents

I.   Introduction ........................................... 2

II.  Background ............................................. 6

  A.  The Parties and Relevant Entities .................... 6

  B.  Tax Refund Scheme .................................... 7

III. The Parties' Agreements and Compliance ................ 11

  A.  Negotiation of the Parties' Agreements .............. 11

  B.  Settlement Agreement and Letter Agreement ........... 13

  C.  SKAT's Obligations under Section 8(f) of the Settlement
     Agreement ........................................... 14

  D.  Designees' Payment Obligations ...................... 28

  E.  Designees' Confessions of Judgment .................. 38

IV.  The Parties' Claims and Defenses ...................... 42

  A.  Plaintiffs' Claims .................................. 42

B.   SKAT's Counterclaims and Defenses .................... 44

C.   Designees' Defenses .................................. 44

V.   Discussion .......................................... 45

A.   Alleged Breach of Section 8(f) of Settlement Agreement 45

B.   2021 Confession of Judgment ......................... 65

C.   McGee's Unconscionability Defense ................... 79

D.   Conclusion on Breach of the Agreements .............. 85

E.   Damages Owed to SKAT ................................ 85

Conclusion................................................. 115

## I.   Introduction

Between 2012 and 2015, Matthew Stein, Jerome Lhote, and Luke McGee (collectively, "designees") allegedly participated in one of the largest frauds perpetrated against the country of Denmark.[1] Specifically, Stein, Lhote, and McGee submitted fraudulent tax refund applications to the Danish tax authority Skatteforvaltningen ("SKAT") using U.S. pension plans they helped form in the names of their wives, friends, family members, business partners, and other associates. These tax refund applications falsely represented to SKAT that: (1) the pension plans owned large quantities of stock in Danish companies; (2) the pension plans received dividends from Danish companies; (3) Danish taxes had

---

[1]     In accordance with the Court's direction, the parties presented their witnesses' direct testimony via affidavit. In their respective affidavits, Stein, Lhote, and McGee all deny that their actions constitute fraud. See ECF Nos. 151 (McGee Pretrial Statement) ¶ 143(d); 155 (Lhote Pretrial Statement) ¶ 15(b); 156 (Stein Pretrial Statement) ¶ 15(b). While this litigation does not require us to make any substantive ruling on the underlying conduct which led to the parties' agreements given that this litigation focuses on post-execution breaches of the parties' agreements, we will simply refer to the scheme without reciting the adjective "alleged" each time.

been withheld on the dividends; and (4) the pension plans were thus owed refunds of the withheld taxes.  Once SKAT paid these pension plans, Stein, Lhote, and McGee took the lion's share of the proceeds, leaving a small fraction for the pension plans' named beneficiaries.  Ultimately, as a result of this scheme, SKAT paid approximately 4 billion Danish Kroner ("DKK"), or roughly $580 million, in tax refunds that were never actually owed, though this amount is not all attributable to designees.

In 2017, after learning of criminal and civil investigations into reclaim applications, designees, represented by well-regarded counsel, approached SKAT in an effort to reach a settlement.  The proposed terms conditioned the settlement on a commitment by Danish criminal authorities not to initiate criminal charges against them.  However, even after learning that such a quid pro quo was not possible, designees continued to negotiate a possible resolution to SKAT's civil claims.

In May 2019, SKAT, Stein, Lhote, McGee, and others entered into a Settlement Agreement and Letter Agreement to resolve SKAT's civil claims regarding the tax refund scheme.  SØIK, the Danish criminal authority, was not a party to either agreement.  Pursuant to these agreements, Stein, Lhote, McGee, and those associated with the pension plans were required to pay SKAT the "Net Proceeds" of the tax refunds they received from SKAT.  To ensure that these payment obligations were fulfilled, Stein, Lhote, and McGee were

-3-

required to provide an affidavit of confession of judgment. Meanwhile, SKAT was required to notify SØIK of the existence and terms of the Settlement Agreement. However, designees, still hoping to avoid criminal prosecution, limited the information that SKAT could provide to SØIK about the scheme and Agreement, even while trying to obtain a benefit vis-à-vis SKAT's communications with SØIK.

In April 2021, SØIK indicted Stein, Lhote, and McGee in connection with their roles in the refund scheme. It is undisputed that SØIK's indictment of Stein, Lhote, and McGee does not constitute a breach of the parties' agreements. Designees have not yet been tried in Denmark in relation to the criminal charges against them.

This litigation ensued approximately two years later and is limited to claims concerning the parties' agreements.[2] On March 24, 2023, Stein and Lhote (but not McGee) sued SKAT, claiming that

---

[2]    SKAT brought actions against the individuals who did not enter into the Settlement Agreement along with various others who allegedly participated in the fraudulent scheme. See In re Customs & Tax Admin. of the Kingdom of Denmark (SKAT) Tax Refund Litig., No. 18 MDL 2865 (LAK), 2024 WL 3184978, at *1 (S.D.N.Y. June 26, 2024). The Judicial Panel on Multidistrict Litigation transferred all of the cases brought by SKAT in other districts to the Southern District of New York. Id. After a five-week jury trial before Judge Kaplan, a jury found that certain individuals involved in the scheme were liable pursuant to three theories: "(a) fraud; (b) negligent misrepresentation; and (c) unjust enrichment, money had and received and money paid by mistake." See No. 18-MD-2865, ECF Nos. 1416, 1526. Judge Kaplan entered judgment on SKAT's fraud claims against these individuals for approximately $78 million. See id. Pursuant to New York General Obligations Law § 15-108, the jury found Stein and Lhote, nonparties in the MDL, were each six percent at fault for SKAT's injury during the period of 2012 to 2015. See No. 18-MD-2865, ECF No. 1416 at 22.

SKAT breached the Settlement Agreement by failing to notify SØIK of the existence and terms of the Agreement. Stein and Lhote also claim that SKAT's sole contractual remedy is the entry of a confession of judgment, which they simultaneously assert is unenforceable.[3] In response, SKAT asserted counterclaims against Stein, Lhote, and McGee, claiming that they had failed to pay SKAT the amount they agreed to pay pursuant to the Agreement.[4]

The Court held a bench trial between April 29, 2025 and May 1, 2025, in which it received testimony from nine witnesses[5] regarding the parties' claims and defenses. The following opinion constitutes our findings of fact and conclusions of law. See Fed. R. Civ. P. 52(a). Having considered all of the evidence, we find in favor of SKAT on all counts.

---

[3]    As discussed below, McGee asserts defenses to SKAT's counterclaims that largely track Stein and Lhote's claims. See ECF No. 93 at 8, 9; infra pp. 42-45.

[4]    On February 1, 2024, the Court denied Stein, Lhote, and McGee's motion to dismiss SKAT's counterclaims in a twenty-page decision. See Stein v. Skatteforvaltningen, No. 23 Civ. 2508 (NRB), 2024 WL 382091 (S.D.N.Y. Feb. 1, 2024), ECF No. 87.

[5]    In accordance with the Court's direction requesting the presentation of direct testimony by affidavit, the parties submitted the direct testimony of nine witnesses via affidavit and presented eight witnesses for live cross-examination at trial. Eight witnesses testified: Matthew Stein, Jerome Lhote, Luke McGee, Gry Ahlefeld-Engel (the former Director of SKAT's Antifraud Unit), Steen Bechmann Jacobsen (the former Deputy General Director of SKAT's Antifraud Unit), Lasse Lund Madsen (Danish law expert on behalf of Stein, Lhote, and McGee), Per Justesen (SKAT's Danish law expert who testified remotely), and Marc Landy (SKAT's damages expert). On consent of both parties, one witness submitted direct testimony via affidavit but was not cross-examined: Marshall Miller (former counsel for Stein, Lhote, and McGee).

## II.  Background

### A.   The Parties and Relevant Entities

As previewed above, SKAT is the authority of the Kingdom of Denmark charged with the assessment and collection of Danish taxes. Pl. Ex. 104 (Settlement Agreement) § 1(cc).[6]  SØIK was the Danish State Prosecutor for Serious Economic and International Crime. ECF No. 164 (Jacobsen Pretrial Statement) ¶ 3.[7]

Matthew Stein is a New York resident and lawyer who obtained a Juris Doctor degree from the University of Minnesota Law School and a Master of Laws degree in taxation from New York University School of Law.  ECF No. 156 (Stein Pretrial Statement) ¶¶ 2, 4-7. Jeremy Lhote is a Florida resident who obtained a business law degree from the Unversité Paris I Sorbonne in 1996.  ECF No. 155 (Lhote Pretrial Statement) ¶¶ 4, 59-65.  Luke McGee graduated from Duke University with a Bachelor of Science degree in Economics and is now a Florida resident after residing in Pennsylvania between 2019 and 2021 and in New York prior to 2019.  ECF No. 151 (McGee Pretrial Statement) ¶¶ 5, 160-67.

---

[6]    Pl. Ex. refers to exhibits offered by Stein, Lhote, and McGee while SKAT Ex. refers to SKAT's exhibits.  After the trial, the parties submitted a list identifying the exhibits received into evidence and the objections to any exhibits not received into evidence.  See ECF No. 198-1; see also ECF No. 204-1 (updated list with references to docket).  To the extent that the Court refers to any evidence to which a party objected, the objection is overruled.

[7]    SØIK ceased to exist at the end of 2021, and the newly established National Unit for Special Crime took over the relevant responsibilities related to the dividend case effective January 1, 2022.  Jacobsen ¶ 3 n.1.  The Court follows the parties' lead and refers to this entity as SØIK, as it was known during the relevant time period.  Id.; Stein ¶ 14.

B.    **Tax Refund Scheme**

Between 2012 and 2015, Stein, Lhote, and McGee participated in an investment strategy, which they refer to as "dividend arbitrage." ECF No. 152 ("Designees' Pre-Trial Findings of Fact") ¶¶ 10, 15.

The parties dispute the lawfulness of this strategy.  See id. ¶ 14; ECF No. 163 ("SKAT's Pre-Trial Br.") ¶ 5; ECF No. 193 ("SKAT's Post-Trial Br.") ¶ 5; ECF No. 194 ("McGee's Post-Trial Br.") ¶ 15; ECF No. 195 ("Plaintiffs' Post-Trial Br.") ¶ 47.[8]

SKAT contends that this is one of the largest frauds ever perpetuated against the Danish state.  See SKAT's Post-Trial Br. ¶ 99; Trial Tr. 364:17-365:17 (Jacobsen).[9]  According to SKAT's allegations, this scheme resulted in SKAT paying approximately 4 billion DKK, or $580 million, in purported tax refunds that were never in fact owed, though this amount is not all attributable to Stein, Lhote, and McGee.  ECF No. 48 (SKAT Compl.) ¶ 124; see also

---

[8]    Prior to the commencement of trial, the Court asked for, and received, proposed findings of fact and conclusions of law from the parties.  After the completion of trial, Stein, Lhote, and McGee elected to file brand new briefs instead of annotating their previously submitted proposed findings of fact and conclusions of law with references to the transcript and/or exhibits.  For example, Luke McGee made two submissions prior to trial: (1) he joined with the brief filed by Messrs. Stein and Lhote, ECF No. 152, and (2) he filed a supplemental set of conclusions of law, ECF No. 161.  After trial, Mr. McGee elected to file his own proposed findings of fact and conclusions of law without joining Messrs. Stein and Lhote's submission.  See ECF No. 194.  SKAT's post-trial submission, ECF No. 193, largely tracks its pre-trial submissions, ECF Nos. 163, 172, and adds responses to a few arguments that were raised during trial.  The Court refers to all submissions throughout this opinion.

[9]    "Trial Tr. _" refers to the trial transcripts, see ECF Nos. 187, 189, 191.

SKAT's Post-Trial Br. ¶ 6; Trial Tr. 72:24-73:4 (Stein), 196:22-25 (Lhote); Pl. Ex. 129 (2021 Confession of Judgment) ¶ 4; SKAT Ex. 544.

How this scheme worked is relatively simple.  When a Danish company issues a dividend to its shareholders, it is required to withhold a portion of the dividend as a tax and transfer the tax to SKAT.  See In re Customs & Tax Admin. of the Kingdom of Denmark (SKAT) Tax Refund Litig., No. 18 Civ. 7824, 2024 WL 3937599, at *1 (S.D.N.Y. Aug. 26, 2024).  U.S. pension plans are entitled to a full refund of this tax in accordance with a double taxation treaty between Denmark and the United States.[10]  Id.  To receive a full refund pursuant to this treaty, a U.S. pension plan must submit an application, along with a "dividend credit advice" from its broker-custodian, to SKAT representing that the U.S. pension plan held Danish shares, received a dividend on those shares, and was taxed on the dividend.  Id. at *1-2; ECF No. 167 (Ahlefeld-Engel Pretrial Statement) ¶ 9.

Stein, Lhote, and McGee helped set up U.S. pension plans in the names of their wives, friends, family members, business partners, and other associates.  See Trial Tr. 23:9-18, 25:9-22 (Stein), 199:19-200:3 (Lhote); Stein ¶ 26(d); Lhote ¶ 26(d); SKAT's

---

[10]    Protocol Amending Tax Convention with Denmark, U.S.-Den., art. 10, ¶ 3(c), May 2, 2006, S. Treaty Doc. No. 109-19 (amending Convention and Protocol Between the United States and Denmark for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income, U.S.-Den., Aug. 19, 1999, S. Treaty Doc. No. 106-12).

Post-Trial Br. ¶ 8; Plaintiffs' Post-Trial Br. ¶ 52.  Stein, Lhote,
and McGee then had the "pension plans submit scores of . . .
dividend withholding tax reclaim applications to SKAT in which the
pension plans falsely stated that the plans owned large quantities
of stock in Danish public companies, had received dividends from
those stocks, and had suffered withholding tax on the dividends."
Ahlefeld-Engel ¶ 9.  Once SKAT paid these pension plans, designees
took the lion's share of the proceeds, leaving a small fraction
for the named beneficiaries of the pension plans.  Trial Tr. 24:5-
10, 25:9-27:2, 151:15-24 (Stein), 203:15-25 (Lhote), 237:1-16
(McGee).  For example, although Stein set up a pension plan for
his brother, only five percent of the proceeds from the plan's
trading actually went to Stein's brother while the remaining 95
percent went to Stein, Lhote, and two of Stein's other business
partners pursuant to a partnership agreement executed by Stein,
Stein's brother, and Stein's business partners.  Id. 25:9-22
(Stein).

The scheme proceeded in two phases.  In the first phase,
starting in August 2012 and through 2013, Stein, Lhote, along with
other business partners, "caused a group of pension plans to be
formed, each of which submitted false reclaim applications" to
SKAT.  Ahlefeld-Engel ¶ 9.  During this same time period, these
individuals used Solo Capital Partners, an English brokerage owned

by an individual named Sanjay Shah,[11] to generate the necessary "false dividend credit advices." Ahlefeld-Engel ¶¶ 9, 10. In the second phase, starting in approximately late 2013 or early 2014, Stein and Lhote split from their former business partners and replaced Solo Capital with a bank they, along with McGee, purchased in Germany called North Channel Bank.[12] Id. ¶ 10. Between 2014 and August 2015, "Stein, Lhote, and McGee [purportedly] caused a larger group of pension plans to submit false reclaim applications to SKAT," and "the majority of" which "were generated by North Channel Bank." Id.; see also ECF No. 165 (Landy Pretrial Statement) ¶ 8 (similar).

In May and June 2020, Danish police criminally charged Stein, Lhote, and McGee in connection with their roles in the refund scheme. SKAT's Pre-Trial Br. ¶ 57; Plaintiffs' Post-Trial Br. ¶ 211; Pl. Exs. 1, 17; SKAT Ex. 514. Under Danish law, the "decision to initiate preliminary charges is made by the police" but "[a]fter a person has been preliminarily charged, it is the Prosecution Service that decides whether an indictment should be brought."

---

[11]    Sanjay Shah, a foreign national who lived in Dubai, was later extradited, tried, and sentenced for his role in this scheme. Trial Tr. 527:18-528:9, 544:9-13 (Madsen). Although Denmark did not have an extradition treaty with Dubai, Denmark negotiated an extradition treaty with Dubai to enable Denmark to extradite Shah to Denmark for trial. Id. 528:5-9 (Madsen). In December 2024, a Danish court found Shah guilty of criminal fraud and sentenced him to 12 years' imprisonment, the highest possible sentence for a fraud conviction in Denmark. Id. 544:9-13 (Madsen); Ahlefeld-Engel ¶ 9.

[12]    In September 2019, North Channel Bank pled guilty to criminal fraud in Denmark for its role in creating the false dividend credit advices. See Ahlefeld-Engel ¶ 10; Trial Tr. 35:10-36:2 (Stein), 229:21-24 (Lhote).

SKAT Ex. 505 ("Justesen Report") ¶¶ 18, 23; see also Jacobsen ¶ 31
(similar).  In April 2021, SØIK indicted Stein, Lhote, and McGee
for their roles, and they currently await trial in Denmark.  See
SKAT's Pre-Trial Br. ¶ 59; Designees' Pre-Trial Findings of Fact
¶ 111; SKAT's Post-Trial Br. ¶ 99.

## III. The Parties' Agreements and Compliance

We address the parties' agreements and the parties' conduct
in the following manner.  We first review the negotiations
culminating in the agreements between the parties.  We then set
forth the relevant contractual provisions and detail the parties'
actions corresponding to each set of obligations.  Three particular
sets of obligations are pertinent to the litigation before us: (1)
SKAT's obligations under Section 8(f) of the Settlement Agreement;
(2) the designees' payment obligations; and (3) the designees'
confessions of judgment.

### A.    Negotiation of the Parties' Agreements

In August 2015, after SKAT learned that "pension plans were
submitting fraudulent refund applications, SKAT announced that it
had stopped paying refunds of withheld dividend tax" and began
investigating reclaim applications.  Landy ¶ 13; Designees' Pre-
Trial Findings of Fact ¶ 15; see also Stein ¶ 87 (similar).  Around
this time, Danish criminal authorities also began investigating
reclaim applications.  See Trial Tr. 43:14-17 (Stein); Plaintiffs'
Post-Trial Br. ¶ 18.  Upon learning of these civil and criminal

investigations, Stein, Lhote, and McGee ceased all reclaim applications. See Designees' Pre-Trial Findings of Fact ¶ 15; Plaintiffs' Post-Trial Br. ¶ 18.

In 2017, counsel[13] for Stein, Lhote, and McGee approached SKAT in an attempt to reach a resolution via settlement. See Designees' Pre-Trial Findings of Fact ¶ 16. According to Stein's unrebutted testimony, negotiations between the parties initially "involved conditioning a settlement on an undertaking by SØIK not to initiate criminal charges against [Stein] and others." Stein ¶ 22. However, "[t]owards the end of 2018 or the beginning of 2019, SKAT would no longer continue settlement discussions that involved conditioning the settlement on a commitment by SØIK relating to criminal charges." Id. ¶ 22(c). "As a result of that determination, many of those who had been participating in the settlement discussions dropped out of the discussions." Plaintiffs' Post-Trial Br. ¶ 69.[14] Stein, Lhote, and McGee nonetheless continued the settlement discussions with SKAT. See Designees' Pre-Trial Findings of Fact ¶ 22; Plaintiffs' Post-Trial

---

[13]     Wachtell, Lipton, Rosen & Katz ("Wachtell") collectively represented McGee, Stein, Lhote, and other potentially settling parties during this process. McGee ¶ 34; Stein ¶ 19. In addition, Akin Gump Strauss Hauer & Feld LLP ("Akin Gump") represented Mr. McGee individually. McGee ¶ 34. Mr. Lhote was also represented by Milbank, Tweed, Hadley & McCloy LLP. Stein ¶ 19.

[14]     Richard Markowitz and John van Merkensteijn, two partners of Stein and Lhote, dropped out of settlement discussions and never settled with SKAT. See Plaintiffs' Post-Trial Br. ¶ 456. They were among the defendants in the trial referenced in footnote 2 before Judge Kaplan. After a five-week jury trial, Judge Kaplan entered judgment against Markowitz and Merkensteijn for over $36 million each. See No. 18-MD-2865, ECF Nos. 1416, 1526.

Br. ¶ 70.

**B.    Settlement Agreement and Letter Agreement**

On May 28, 2019, SKAT and the "Covered Parties" entered into the Settlement Agreement to resolve SKAT's claims against the Covered Parties arising from the tax refund scheme.  See Designees' Pre-Trial Findings of Fact ¶ 28; Settlement Agreement.  In addition to Stein, Lhote, and McGee, the Covered Parties included "over 100 pension plans, partnerships, and other entities" as well as more than fifty individuals, such as their wives, family members, friends, business partners, associates who were involved in the underlying scheme.  SKAT's Post-Trial Br. ¶ 8; SKAT's Pre-Trial Br. ¶ 7; see also Settlement Agreement § 1(i), Exs. 1, 2.  The Settlement Agreement identified Stein, Lhote, and McGee as the Covered Parties' Designees, Settlement Agreement § 1(j), because they recruited the others to participate in the scheme and received the vast majority of the proceeds, see Trial Tr. 24:5-10, 25:9-27:2, 142:21-143:19, 151:15-24 (Stein), 199:5-200:3, 203:15-25 (Lhote), 237:1-12 (McGee).

On the same date, SKAT, Stein, Lhote, McGee, and others executed a letter agreement, which has one attachment.  See Designees' Pre-Trial Findings of Fact ¶ 33; Pl. Ex. 109 ("Letter Agreement").  SØIK was not a party to either the Settlement Agreement or the Letter Agreement.

### C.   SKAT's Obligations under Section 8(f) of the Settlement Agreement

We first review SKAT's contractual obligations pursuant to Section 8(f) of the Settlement Agreement and SKAT's corresponding actions.

#### 1.    Section 8(f) of the Settlement Agreement

Section 8(f) of the Settlement Agreement reads as follows:

> Notwithstanding the confidentiality obligations of this Section 8, promptly upon the execution of this Agreement, [SKAT] will, in writing, bring to the attention of [SØIK] this Agreement and its terms, and represent, in writing, that this Agreement reflects good-faith negotiation by the Covered Parties, that the Covered Parties' cooperation may result in the recovery by [SKAT] of additional funds from third parties and that this Agreement is in the best interests of [SKAT]. Upon request by SØIK, [SKAT] may provide and/or disclose the entirety of this Agreement to SØIK.

Settlement Agreement § 8(f).  Stated otherwise, SKAT was required: (a) "promptly upon the execution of this Agreement"; (b) to "bring to the attention of [SØIK] this Agreement and its terms" "in writing"; and (c) "represent, in writing that this Agreement reflects [i] good-faith negotiation by the Covered Parties, [ii] that the Covered Parties' cooperation may result in the recovery of additional funds from third parties, and [iii] that this Agreement is in the best interests of SKAT." Id.

Three points about SKAT's obligations are worth addressing before we continue.  First, the Agreement does not require SKAT to provide SØIK with the Settlement Agreement if SØIK requested it.

-14-

Id. However, if SØIK made such a request, SKAT "may provide and/or disclose the entirety of this Agreement to SØIK." Id. (emphasis added).[15] Second, the Covered Parties did not agree that SKAT could provide any "cooperation material" to SØIK. See Ahlefeld-Engel ¶ 33; SKAT's Post-Trial Br. ¶ 60.[16] Indeed, Lhote admitted that he "didn't want SØIK to have the documents unless and until they had agreed not to prosecute" because "that's what any reasonable person would do." Trial Tr. 211:22-25 (Lhote).[17] Third, the Covered Parties had the right to disclose the Agreement and Cooperation Information directly to SØIK. See Settlement

---

[15]    Mr. McGee testified that counsel for the designees tried to negotiate a provision that said SKAT was required to hand over the Agreement if SØIK requested it, but the final agreement does not include such a provision. See Trial Tr. 244:4-19 (McGee). SKAT had a reason for negotiating the agreement in this manner. If SKAT sent SØIK the Settlement Agreement, it would become part of SØIK's "case file" and could "be disseminated amongst the defense counsel in the case[;] [a]nd . . . [other] defendees would have access to it." Trial Tr. 434:2-15 (Ahlefeld-Engel).

[16]    See also Settlement Agreement § 7(h) ("The Cooperation Information that the Covered Parties provide to [SKAT] pursuant to this Section 7 may be used by [SKAT] in any proceedings relating to any reclaim applications in the United States, . . . any other jurisdiction where such Cooperation Information will be subject to customary confidentiality protections, such as a protective order governing the handling of confidential information in any such proceeding, and [SKAT] shares in advance a copy of such confidentiality protections. Provided that the terms of this Section 7(h) are fully satisfied, [SKAT] may use the Cooperation Information pursuant to this Section 7(h), notwithstanding the confidentiality restrictions in Section 8."); id. § 8 ("The Parties agree that this Agreement is, and is intended to be maintained as, confidential to the fullest extent possible under Danish law, New York law or the Law applicable in any jurisdiction in which [SKAT] seeks to use Cooperation Information and agree to use their respective best efforts to maintain such confidentiality consistent with the terms set forth in this Section 8.").

[17]    In fact, the Covered Parties "effectively preclud[ed] SKAT from sharing [the cooperation material] with SØIK" by producing "all the cooperation material pursuant to a subpoena issued in SKAT's pending multidistrict litigation and designat[ing] almost all such material 'highly confidential' under the protective order governing discovery in that litigation." SKAT's Post-Trial Br. ¶ 60 (citations omitted; emphasis added).

-15-

Agreement § 8(e) ("The Covered Parties may disclose this Agreement or the contents thereof . . . to any law enforcement authority investigating Reclaim Applications or related matters, even if such disclosure is not compelled by operation of law or regulation or by a final non-appealable court order.").

Fully understood, the Settlement Agreement was designed to strike a delicate balance between the designees' intent to obtain a benefit vis-à-vis SKAT's communications with SØIK with the designees' desire to avoid providing SØIK with information that could be used against designees in a criminal proceeding. We now turn to address SKAT's actions relating to its contractual obligations.

### 2.    SKAT's Communications with SØIK

At trial, two witnesses from SKAT, Gry Ahlefeld-Engel and Steen Bechmann Jacobsen, testified regarding SKAT's communications with SØIK. Ms. Ahlefeld-Engel was head of SKAT's Antifraud Unit and served as SKAT's primary contact with SØIK during the relevant time period, while Mr. Bechmann Jacobsen was Ms. Ahlefeld-Engel's supervisor at SKAT and served as SKAT's Deputy Director General. Jacobsen ¶ 6; Ahlefeld-Engel ¶¶ 17, 18, 22. The designees cross-examined both witnesses and cited additional circumstantial evidence as well as expert testimony to support their position that SKAT breached the Settlement Agreement.

The Court addresses SKAT's communications with SØIK as follows.  First, the Court will evaluate the credibility of Ms. Ahlefeld-Engel and Mr. Jacobsen.  Next, the Court will focus on the interagency communications between SKAT and SØIK, which occurred in three distinct time periods: (i) April through May 28, 2019, i.e., prior to the execution of the Settlement Agreement on May 28, 2019; (ii) between May and November 2019, i.e., after the execution of the Settlement Agreement; and (iii) following May 2020, i.e., after the designees were criminally charged due to their alleged roles in the tax refund scheme.  Finally, the Court will address the designees' proffered circumstantial evidence.

>    i.    Credibility Assessments of SKAT's Witnesses

To begin, the Court finds the testimony of Ms. Ahlefeld-Engel and Mr. Bechmann Jacobsen, regarding the extensive oral and written communications between SKAT and SØIK about the Settlement Agreement, to be credible.  Both witnesses stated that: "[i]t is a common practice in Denmark that interagency communications occur between officials at the same managerial level."  Jacobsen ¶ 6; see also Ahlefeld-Engel ¶ 22 (similar).  Therefore, Ms. Ahlefeld-Engel, who was head of SKAT's Antifraud Unit and served as SKAT's primary contact with SØIK, communicated with SØIK's Chief Prosecutor Per Fiig, while Mr. Bechmann Jacobsen, who was Ms. Ahlefeld-Engel's supervisor at SKAT and served as SKAT's Deputy

Director General, communicated with SØIK's State Attorney Morten Jakobsen.  Jacobsen ¶ 6; Ahlefeld-Engel ¶¶ 17, 18, 22.

Although Ms. Ahlefeld-Engel could not remember whether certain communications occurred before or after the execution of the Settlement Agreement, the Court credits Ahlefeld-Engel's testimony that SKAT complied with the requirements of Section 8(f), as she made SØIK aware that the Settlement Agreement reflected a good-faith negotiation by the Covered Parties, that the Covered Parties' cooperation may result in the recovery of additional funds from third parties, and that this Agreement is in the best interests of SKAT.  Trial Tr. 487:14-488:16 (Ahlefeld-Engel).  Ms. Ahlefeld-Engel also testified that SKAT kept SØIK apprised of the designees' cooperation as well as the Initial Cash Payment and McGee's subsequent payment.  Id. 488:4-16 (Ahlefeld-Engel).  We credit this testimony as well.

### ii. April-May 28, 2019: Prior to the Settlement Agreement

As for the period between April and May 28, 2019, Ms. Ahlefeld-Engel testified that she attended "approximately ten meetings with SØIK prior to the execution of the Settlement Agreement," where "the Settlement Agreement was discussed multiple times."  Ahlefeld-Engel ¶ 23.  "In particular, SKAT made sure that SØIK was aware of any proposed term of the draft Settlement Agreement that could potentially impact or be perceived to impact

SØIK or its separate criminal investigation into the dividend case more generally." Id.  We find this testimony to be credible.

On April 24, 2019, Ms. Ahlefeld-Engel emailed Mr. Per Fiig, the Chief Prosecutor at SØIK, advising him that "settlement negotiations have picked up again" and requesting a meeting with him "so that we are completely aligned between our authorities with respect to the terms of the [A]greement."  SKAT Ex. 529. Separately, in response to a question from Mr. Fiig, Ms. Ahlefeld-Engel answered "If your question is whether we release them from criminal liability with the settlement, the answer is no.  They hope their cooperation in the civil track will have a mitigating effect in the criminal, but nothing more."  SKAT Ex. 530.[18]

On May 15, 2019, Ms. Ahlefeld-Engel discussed the draft Settlement Agreement by phone with Per Fiig.  Ahlefeld-Engel ¶ 31; SKAT Ex. 532.  The same day, Ms. Ahlefeld-Engel emailed Per Fiig passages from the draft Settlement Agreement, including a draft version of what would ultimately become Section 8(f).  SKAT Ex. 532.  The only difference in language between what was emailed and the final version of Section 8(f) is the last sentence of Section 8(f): "Upon request by SØIK, [SKAT] may provide and/or disclose

---

[18]    SKAT Ex. 530 corresponds to Pl. Ex. 101.  See ECF No. 204-1 at 10; Plaintiffs' Post-Trial Br. ¶¶ 8-15.  Plaintiffs submitted uncertified translations of documents while SKAT submitted certified translations.  Unless otherwise indicated, to the extent there is both a certified and uncertified translation of a particular trial exhibit, the Court relies upon the certified version.

the entirety of this Agreement to SØIK." Designees' Pre-Trial Findings of Fact ¶ 62; compare Settlement Agreement § 8(f) with SKAT Ex. 532. Shortly thereafter, on May 21, 2019, Ms. Ahlefeld-Engel emailed Mr. Fiig a list of the Covered Parties to the Settlement Agreement. SKAT Ex. 533; Designees' Pre-Trial Findings of Fact ¶ 65.

Other undisputed written communications between SKAT and SØIK focused on the press release SKAT would issue upon execution of the Settlement Agreement. On May 16, 2019, Mr. Bechmann Jacobsen provided Mr. Jakobsen a draft press release, to which Mr. Jakobsen responded "Looks good." SKAT Ex. 558. On May 20, 2019, Mr. Bechmann Jacobsen shared with Mr. Jakobsen the final draft of the May 2019 Press Release. SKAT Ex. 537. SØIK did not have comments on the draft press release. SKAT Ex. 538; Pl. Ex. 107.[19]

> *iii. May 28-November 2019: Immediately Following the Execution of the Settlement Agreement*

SKAT and SØIK continued their communications in the period immediately following the execution of the Settlement Agreement. For instance, SKAT issued a press release on May 28, 2019, which announced that it had entered into "a new settlement agreement, this time with 61 American pension plans and a number of approximately DKK 1.6 billion to the Danish state." SKAT Exs.

---

[19]    Plaintiffs lodge a baseless hearsay within hearsay objection to the admission of SKAT Ex. 538, but concede that SKAT Ex. 538 corresponds with their own uncertified exhibit, Pl. Ex. 107, which they do not have an objection to, see ECF No. 204-1 at 4, 11. The Court overrules plaintiffs' objection.

539, 540.  This is the same press release that SØIK reviewed prior
to the execution of the Agreement.  SKAT Exs. 537, 538.  The press
release states that Tax Minister Karsten Lauritzen "sees the
settlement as a decisive victory and praises" SKAT as a result.
SKAT Exs. 539, 540.  The press release adds: "The Danish Tax Agency
therefore continues the lawsuits already filed against others
involved in the dividend case, including 242 other US pension plans
and related parties.  The 61 pension plans and others have
committed themselves to cooperating and assisting in the Danish
Tax Agency's efforts in the remaining cases."  Id.  The press
release quotes Mr. Jacobsen as stating, "the settlement confirms
that we have chosen the right strategy."  Id. (internal quotation
marks omitted).

In June 2019, SKAT and SØIK officials again met to discuss
the Settlement Agreement.  SKAT Exs. 541, 542; Ahlefeld-Engel ¶¶
46-48.  On September 20, 2019, following a phone call, Ms.
Ahlefeld-Engel sent Mr. Fiig the email she had previously sent him
on May 15, 2019, which contained passages from the draft Settlement
Agreement and included a draft version of what would ultimately
become Section 8(f).  SKAT Ex. 543; Ahlefeld-Engel ¶ 49.

Around this time, the Danish press began criticizing SKAT and
SØIK based on the press's understanding of the Settlement
Agreement.  See Ahlefeld-Engel ¶ 50; Trial Tr. 424:11-14 (Ahlefeld-
Engel).  For example, the Danish press criticized SKAT for settling

for less than it was entitled to receive.  See Trial Tr. 428:4-10, 485:15-23 (Ahlefeld-Engel).  SKAT believed that the Danish media was misrepresenting the Settlement Agreement.  See Trial Tr. 425:6-8 (Ahlefeld-Engel); Ahlefeld-Engel ¶ 50.

To correct the misleading news reports, SKAT issued a press release in September 2019.  SKAT Ex. 544; Ahlefeld-Engel ¶ 50; Trial Tr. 425:2-16 (Ahlefeld-Engel).  This press release clarified that: (1) the Settlement Agreement did not include "terms of impunity;" (2) the "total refund amount for the 61 pension plans, etc., is approximately DKK 2.9 billion;" (3) the parties to the Settlement Agreement were required to pay back what they had received; and (4) legal action had been "brought against the 19 pension plans and other actors who received" approximately DKK 1.2 billion in refund amounts but who were not parties to the Settlement Agreement.  SKAT Ex. 544.  At trial, Ms. Ahlefeld-Engel testified that she did not recall if SKAT's press department shared a copy of the press release with SØIK.  Trial Tr. 426:1-10 (Ahlefeld-Engel).

In September 2019, SØIK also issued a press release.  Pl. Ex. 167.  This press release stated that "SØIK is investigating intensively to clarify whether there are grounds for prosecuting operators or individuals in the dividend case" and that the case "remain[ed] a very high priority at SØIK."  Id.  The press release

also clarified that SØIK "has not signed any agreements on impunity in relation to the dividend case."  Id.

In November 2019, after additional news coverage, SKAT drafted, but ultimately did not publish, a joint press release with SØIK concerning the Settlement Agreement.  Ahlefeld-Engel ¶¶ 53-56; SKAT Ex. 545.  Ms. Ahlefeld-Engel testified that she shared this draft press release with her SØIK counterpart, Per Fiig, in November 2019, Ahlefeld-Engel ¶ 54, and we find this testimony to be credible.  This draft press release restates that the parties to the settlement must repay the approximately DKK 1.6 billion which they themselves received and asserts that the "settlement is an expression of the solution that is assessed to put Denmark in the best possible position."  SKAT Ex. 545.  It also defends the Agreement and the parties' negotiations by correcting the record as to how much the settling parties received in tax refunds and arguing that those at SKAT "actually know what we are doing."  Id. The draft press release also quotes Per Fiig from SØIK as stating that SKAT and "SØIK cooperate closely to ensure optimal progress in both the civil law and criminal law tracks.  The two authorities are therefore coordinating efforts on an ongoing basis, which has also been the case in relation to the concluded settlement.  I can therefore clearly reject all speculation that we misinform each other; quite the contrary."  Id.

> iv. *After May 2020: Designees Are Criminally Charged*

In May and June 2020, Danish police criminally charged Stein, Lhote, and McGee in connection with their roles in the refund scheme. <u>See</u> SKAT's Pre-Trial Br. ¶ 57; Plaintiffs' Post-Trial Br. ¶ 211; Pl. Exs. 1, 17; SKAT Ex. 514.

SKAT and SØIK communicated regarding the tax refund scheme, as the SØIK sought "information to assist it in bringing charges against these three people." Designees' Pre-Trial Findings of Fact ¶ 111. In July 2020, there was a meeting between SKAT and SØIK concerning the Settlement Agreement. SKAT Ex. 546. In January 2021, SØIK interviewed McGee. SKAT's Pre-Trial Br. ¶ 57. Around that same time, "[i]n January 2021, SØIK sent SKAT two letters with a series of questions concerning the [S]ettlement [A]greement." <u>Id.</u> ¶ 54; <u>see also</u> Designees' Pre-Trial Findings of Fact ¶ 95 (similar). In one letter, SØIK noted that it obtained "several seizure orders" that were "directed towards individuals who are part of the [S]ettlement [A]greement." Pl. Ex. 131 at 15. Because "those seizure orders have now been appealed to the Danish High Court," SØIK requested a copy of the Settlement Agreement. <u>Id.</u>

Before SKAT responded to SØIK, SKAT's employees had an internal discussion as to whether they should disclose the Settlement Agreement to SØIK. Pl. Ex. 122; Trial Tr. 359:15-360:4

-24-

(Jacobsen). SKAT "didn't know how broad" the group of defendants was and if SKAT sent SØIK the Settlement Agreement, it would become part of SØIK's "case file" where it could "be disseminated amongst the defense counsel in the case[;] [a]nd . . . [other] defendees would have access to it." Trial Tr. 434:2-15 (Ahlefeld-Engel). Thus, SKAT believed that "a wider sharing with any possible defendants etc. can harm the Danish Tax Agency's financial interests both specifically and in general, including that it may weaken the Tax Agency's future opportunities to enter into settlement, as future settlement parties . . . will hold anonymity as an essential prerequisite for entering into a settlement." SKAT Ex. 553; see also Trial Tr. 378:23-379:19 (Jacobsen credibly testifying to similar concerns).

While SKAT did not provide the Settlement Agreement to SØIK at this time, Trial Tr. 429:19-23 (Ahlefeld-Engel), SKAT's responses to SØIK in January and February 2021 provided more detail about the Settlement Agreement, SKAT's Pre-Trial Br. ¶ 55. At the end of February 2021, SØIK sought more information from SKAT concerning the "three main shareholders in North Channel Bank," referencing Stein, Lhote, and McGee. Designees' Pre-Trial Findings of Fact ¶ 109. In March 2021, SØIK interviewed Stein and Lhote over multiple days. SKAT's Pre-Trial Br. ¶ 57; Designees' Pre-Trial Findings of Fact ¶ 112.

In April 2021, SØIK indicted Stein, Lhote, and McGee. <u>See</u> SKAT's Pre-Trial Br. ¶ 59; Designees' Pre-Trial Findings of Fact ¶ 111. The indictments "were signed by Per Fiig, the SØIK Chief Prosecutor with whom Ms. Ahlefeld-Engel" communicated concerning the Settlement Agreement. SKAT's Pre-Trial Br. ¶ 59. It is undisputed that SØIK's indictment of Stein, Lhote, and McGee does not constitute a breach of the parties' agreements. Trial Tr. 50:14-16 (Stein).

> v. *Circumstantial Evidence regarding SKAT's Communications with SØIK*

At trial, the designees cited circumstantial evidence to support their position that SKAT failed to communicate with SØIK concerning the Settlement Agreement. Designees' circumstantial evidence is focused on the period following the decision to charge them in May and June 2020. For example, in November 2020, counsel for Stein, Lhote, and McGee asked U.S. Counsel for SKAT about what SØIK knew about the Settlement Agreement. <u>See</u> Designees' Pre-Trial Findings of Fact ¶ 89. He and a colleague followed up with U.S. counsel for SKAT in November 2020, January 2021, February 2021, and April 2021. <u>See</u> <u>id.</u> ¶¶ 90-94, 122. The response of U.S. counsel for SKAT in June 2021 did not cite any specific written communications but stated that briefings "ha[ve] taken place both in meetings and in phone conversations." <u>Id.</u> ¶ 129.

Meanwhile, in November 2020, a line prosecutor from SØIK emailed an attorney at the U.S. Department of Justice, stating that SØIK was "not in possession of the settlement and has no knowledge of any details in it, including who is involved, besides the amount and the number of pension plans." Pl. Ex. 12.[20]  Mr. Jacobsen credibly testified that the SØIK prosecutor who wrote this email worked in the "asset recovery group in SØIK" and was not one of the prosecutors investigating whether to indict Stein, Lhote, and McGee.  Trial Tr. 386:11-21 (Jacobsen).

Stein and Lhote testified to their impression that SØIK did not know about the Agreement when they were interviewed in March 2021.  Plaintiffs' Post-Trial Br. ¶ 252; Trial Tr. 57:13-16 (Stein), 177:9-18 (Lhote).  However, at no time during their interviews or in the approximately one to three-month period between the interviews and their indictment did Stein, Lhote, McGee or anyone on their behalf provide SØIK with the Settlement Agreement.  Trial Tr. 57:22-59:19 (Stein).

As noted later, infra pp. 52-53, this circumstantial evidence does not disprove that SKAT communicated with SØIK regarding the Settlement Agreement.

---

[20]    SKAT objects to the admission of these emails on relevance, hearsay, and foundation grounds.  ECF No. 204-1 at 2.  We overrule these objections.

### D.   Designees' Payment Obligations

We turn next to designees' payment obligations under the relevant agreements and the designees' corresponding actions.

#### 1.    Designees' Payment Obligations Under the Settlement Agreement and Letter Agreement

As mentioned earlier, SKAT entered the Settlement Agreement with the "Covered Parties" which included Stein, Lhote, McGee, "over 100 pension plans, partnerships, and other entities" as well as more than fifty individuals whom Stein, Lhote, and McGee recruited into the scheme.  SKAT's Post-Trial Br. ¶ 8; SKAT's Pre-Trial Br. ¶ 7; see also Settlement Agreement § 1(i), Exs. 1, 2. Stein, Lhote, and McGee were identified as the Covered Parties' Designees, Settlement Agreement § 1(j), because, in part, they received the vast majority of the proceeds, see Trial Tr. 24:5-10, 25:9-27:2, 142:21-143:19, 151:15-24 (Stein), 199:5-200:3, 203:15-25 (Lhote), 237:1-12 (McGee).

A "fundamental principle" of the Settlement Agreement is that the Covered Parties must pay SKAT the "Net Proceeds" of the tax refunds they received from SKAT.  Settlement Agreement Recital F.[21]

---

[21]    The Settlement Agreement defines "Net Proceeds" as (A) "Gross Reclaims," i.e., the total amount SKAT paid out under the scheme, less (B) "all of the Covered Parties' expenses associated with Reclaim Applications," i.e., the expenses that the parties' incurred when filing the refund applications with SKAT, such as "(1) reclaim agent fees, (2) tax reclaim advisory service fees, (3) brokerage fees and commissions, (4) custodial and clearing fees, (5) trading expenses, and (6) financial institution account charges," and less (C) "any other portion of Gross Reclaims received by parties excluded" from the Settlement Agreement.  Settlement Agreement § 2(e).

-28-

Because the full amount of the Net Proceeds was uncertain at the time of the Agreement, the Covered Parties agreed to a formula and a true-up process to determine the total amount of Net Proceeds. See id. §§ 1(y), 1(q), 2(e).    However, while the Settlement Agreement provides that "[t]he Covered Parties' obligation to pay the Final Settlement Amount is absolute and unconditional," the Agreement requires the Covered Parties' Designees to pay certain components of what is owed to SKAT.    Id. §§ 2(c), 4(a); see also SKAT's Post-Trial Br. ¶¶ 18, 139; Plaintiffs' Post-Trial Br. ¶ 98.

A summary of the payments due to SKAT under the Settlement Agreement and who is responsible for which payment is depicted graphically in the table below:

| Payments | | Payer |
|---|---|---|
| Preliminary Settlement Amount of DKK 1.55 billion | Initial Cash Payment of DKK 950 million | Covered Parties |
| | Additional Cash Payment of DKK 600 million | Designees |
| True-Up Amount, if any | | Designees |
| Accruing Interest, if any | | Designees |
| Default Interest, if any | | Designees |

Below we further describe each component of the payment structure and who is required to make each payment.

**Preliminary Settlement Amount.**  The Covered Parties agreed on a "Preliminary Settlement Amount" of DKK 1.55 billion as an estimate of the Covered Parties' Net Proceeds.  Settlement Agreement § 1(y); Stein ¶ 58.  This amount was due in two tranches: (1) an "Initial Cash Payment" of DKK 950 million "on or before

July 26, 2019[;]" and (2) an "Additional Cash Payment" of DKK 600 million in accordance with the deadlines set forth in the Settlement Agreement and in the Letter Agreement. Settlement Agreement §§ 1(a), 1(n), 1(r), 1(t), 2(a)-(b); Letter Agreement §§ 5-6.

Under the terms of the Settlement Agreement, "[i]n the event that the Covered Parties timely complete the Initial Cash Payment pursuant to Sections 2(a)(i) and 2(a)(ii)," then only the Covered Parties' Designees would be liable for the remaining payments pursuant to the Settlement Agreement, as SKAT "shall forever and finally generally release, waive, and discharge the Covered Parties . . . from and in respect of all Settled Matters" and SKAT's "sole remedy" "shall be the filing of the Affidavits of Confessions of Judgment against the Covered Parties' Designees as set forth in Section 5(c)." Settlement Agreement §§ 2(c), 4(a); see also SKAT's Post-Trial Br. ¶¶ 18, 139; Plaintiffs' Post-Trial Br. ¶ 98.

**True-Up Process and Amount.** The Covered Parties agreed to a "true-up" process to determine whether the Covered Parties received more than the estimated Preliminary Settlement Amount of DKK 1.55 billion. See Settlement Agreement §§ 1(ff), 2(e). As part of this true-up process, the Covered Parties agreed to "cooperate to establish the Gross Reclaims and the Net Proceeds received by each Pension Plan" by "provid[ing] [SKAT] with

documentation sufficient to establish the total amount of Net Proceeds received" within six months after the Agreement was executed.  Id. § 2(e)(i).  "At the end of this process, the Covered Parties' Designees" were required to "provide and certify the accuracy of a final list of Net Proceeds received . . . with respect to each Pension Plan."  Id.

If the true-up process established that the "Net Proceeds [were] greater than the Preliminary Settlement Amount" (DKK 1.55 billion), then SKAT was "entitled to . . . the difference between the Net Proceeds and the Preliminary Settlement Amount," which is referred to as the "True-Up Amount".  Id. § 2(e)(iii).  If the true-up process established that the "Net Proceeds [were] less than the Preliminary Settlement Amount" (DKK 1.55 billion), then the Covered Parties were "entitled to no adjustment in the Preliminary Settlement Amount" and the Covered Parties' Designees were still obligated to pay the remaining portion of the DKK 1.55 billion.  Id. §§ 2(c), 2(e)(ii).[22]

**Accruing Interest.**  The True-Up Amount, in combination with the Additional Cash Payment of DKK 600 million, is referred to as

---

[22]    The Settlement Agreement also contemplates a process by which the parties could resolve disputes regarding the True-Up Amount.  Settlement Agreement § 10. For any "claim, controversy or dispute arising out of or relating to the True-Up process [that] exceeds [DKK 20 million]," the parties may first present the matter to an arbitrator and, if that fails, "any Party may pursue the resolution of such matter through other available remedies in a Selected Court."  Id. § 10(a).  The term "Selected Court" is defined as meaning the Southern District of New York, which is where any disputes must be brought "in the first instance."  Id. § 12.

-31-

the "Subsequent Cash Payment Amount." <u>Id.</u> § 1(dd). If the Covered Parties' Designees failed to pay SKAT the Subsequent Cash Payment Amount by May 28, 2021, interest would accrue at a rate of "8.05% . . . per annum" "on the remaining unpaid amount of the Subsequent Cash Payment Amount, until the Final Settlement Payment Date or the Subsequent Cash Payment Amount has been paid in full, whichever is earlier." <u>Id.</u> §§ 1(c), 1(dd), 2(d)(ii)(1). The Covered Parties' Designees, not the Covered Parties, were required to pay all such interest, along with the full Subsequent Cash Payment Amount, no later than May 28, 2023. <u>Id.</u> §§ 2(c), 2(d)(i), 2(d)(iii); Letter Agreement § 6.

**Default Interest.** The "Covered Parties' Designees shall be in default" if they "have not delivered to [SKAT] a new and fully executed Confession of Judgment as and when required pursuant to Section 4(c) of this Agreement, or if [they] do not make any payment as and when required by this Agreement." Settlement Agreement § 5(a). SKAT is required to provide a written notice of any such breach to the Covered Parties' Designees and if the designees fail to cure the default within ten business days from receipt of the notice, the eleventh business day after they received the default notice is considered the "Default Date." <u>Id.</u> §§ 5(b), 5(c).

In the event of a default, the Covered Parties' Designees are required to pay "(i) [t]he unpaid portion of the Subsequent Cash

Payment Amount as of the Default Date, plus (ii) Applicable
Interest owed pursuant to Section 2(d)(ii) as of the Default Date,
plus (iii) Applicable Interest on the unpaid amount of the
Subsequent Cash Payment Amount as of the Default Date, for the
period starting January 1, 2014 and running until the earlier of
the Default Date or twenty-four (24) months from the Effective
Date." Id. § 5(d). The latter Applicable Interest, item (iii) in
the above list, is referred to as "Default Interest."

**Formula.** To summarize the foregoing, by July 26, 2019, the
Covered Parties were responsible for paying the Initial Cash
Payment of DKK 950 million. Id. §§ 1(n), 1(t), 2(a). By May 28,
2021, if the Covered Parties' Designees failed to pay SKAT the
Subsequent Cash Payment Amount, interest would begin accruing at
a rate of "8.05% . . . per annum" "on the remaining unpaid amount
of the Subsequent Cash Payment Amount." Id. §§ 1(c), 1(dd),
2(d)(ii)(1).

By May 28, 2023,[23] the Covered Parties' Designees were
responsible for paying the sum of: (i) the "Additional Cash
Payment" of DKK 600 million; "(ii) any True-Up Amount[;] . . . and
(iii) the interest, if any, accrued on the unpaid amount of the
Subsequent Cash Payment Amount." Settlement Agreement §§ 1(a),

---

[23]    The Settlement Agreement set the "Final Settlement Payment Date" as
"thirty-six (36) months from" May 28, 2019, Settlement Agreement §§ 1(n), (r),
which was "automatically extended" by one year since "the gross proceeds from
the sale of North Channel Bank" did not equal or exceed a set figure, Letter
Agreement § 6.

1(n), 1(q), 1(r), 2(b), 2(c), 2(d).  If payment was not made by May 28, 2023, the Covered Parties' Designees were also responsible for paying "Applicable Interest on the unpaid amount of the Subsequent Cash Payment Amount as of the Default Date, for the period starting January 1, 2014 and running until the earlier of the Default Date or twenty-four (24) months from the Effective Date."  Id. §§ 2(c), 5(d)(iii).

Ultimately, as there is no dispute that the Covered Parties paid the first tranche of the Preliminary Settlement Amount, SKAT's Pre-Trial Br. ¶ 64, the sum of what the designees may owe is comprised of (a) the Subsequent Cash Payment Amount, which is the sum of the Additional Cash Payment and the True-Up Amount; (b) plus any Applicable Interest, calculated pursuant to Settlement Agreement § 2(d)(ii); (c) plus any Default Interest, calculated pursuant to Settlement Agreement § 5(d)(iii); and (d) less any payments made to-date.

### 2. Designees' Actions Relating To Their Payment Obligations

We now review designees' actions in relation to their payment obligations.

#### i.  Payments Made To-Date

In total, payments of DKK 1,010,024,596 have been made to-date in accordance with the relevant agreements.  See SKAT's Pre-Trial Br. ¶ 64.  The Covered Parties paid the first part of the

Preliminary Settlement Amount, the DKK 950 million Initial Cash Payment, in August 2019.  See id.; Settlement Agreement § 2(a). Since then, the Covered Parties' Designees have paid an additional DKK 60,424,596.  See SKAT's Pre-Trial Br. ¶ 64.

ii.  *True-Up Process*

The parties started the True-Up Process in September 2019. Wachtell served as counsel for the Covered Parties, including Stein, Lhote, and McGee, and "provided to SKAT more than 100 spreadsheets (the 'True-Up Spreadsheets') containing information about each of the Pension Plans covered by the releases in the Settlement Agreement" between about September 2019 and June 2020. Stein ¶ 71(b); SKAT's Pre-Trial Br. ¶ 22.  Each spreadsheet "included a summary tab setting forth the respective plan's 'Gross Reclaims' (i.e., the amounts SKAT paid on the plan's Reclaim Applications) and the amounts of the different expenses deducted to arrive at the Net Proceeds for that plan, and additional tabs with the details for each category of deductions."  SKAT's Pre-Trial Br. ¶ 22.  "By Wachtell's calculation, the Covered Parties' Net Proceeds totaled DKK 1,576,008,293.39, i.e., DKK 26,008,293.39 more than the Preliminary Settlement Amount."  Id.

SKAT hired an accounting firm, AlixPartners, LLP ("AlixPartners"), to audit the True-Up Spreadsheets.  Stein ¶ 72; Landy ¶¶ 1, 4, 9.  A partner from AlixPartners, Marc E. Landy, identified multiple issues with Wachtell's calculation of Net

Proceeds, and SKAT asserts that the "True-Up Amount that Stein, Lhote, and McGee owe SKAT is DKK 53,602,007.06, exclusive of interest, i.e., the DKK 26,008,293.39 that Wachtell calculated plus the additional DKK 27,593,713.67 from AlixPartners' analysis." SKAT's Pre-Trial Br. ¶ 23; SKAT's Post-Trial Br. ¶ 30; Landy ¶¶ 1, 9.

"[T]here were extensive and protracted discussions of many issues raised by the True-Up Spreadsheets." Stein ¶ 73. Ultimately, "no final agreed-upon numbers were arrived at and no numbers were certified by" Stein, Lhote, or McGee. Stein ¶ 74(d). As discussed below, the parties presented ten issues at trial regarding the designees' payment obligations, certain of which related to the validity and accuracy of the True-Up Spreadsheets. Infra pp. 85-115.

### iii. Default

Stein, Lhote, and McGee did not pay SKAT close to the full amount required under the Settlement Agreement by the May 28, 2023 payment deadline. Supra pp. 34-35. Accordingly, on May 29, 2023, SKAT sent Stein, Lhote, and McGee written notice of the breach and a ten-business-day opportunity to cure in accordance with Section 5 of the Settlement Agreement. SKAT's Pre-Trial Br. ¶ 66. As the Covered Parties' Designees made no further payment by the time the ten-day period expired on June 13, 2023, the default date is June 14, 2023. Id.

*iv.  Interest Accrued*

It is undisputed that interest accrued pursuant to the Settlement Agreement.  Trial Tr. 160:16-161:3 (Stein).  Given that designees failed to pay SKAT the Subsequent Cash Payment Amount by May 28, 2021, interest accrued at a rate of "8.05% . . . per annum" "on the remaining unpaid amount of the Subsequent Cash Payment Amount, until the Final Settlement Payment Date or the Subsequent Cash Payment Amount has been paid in full, whichever is earlier." Settlement Agreement §§ 1(c), 2(d)(ii)(1).

Similarly, because Stein, Lhote, and McGee defaulted on June 14, 2023, the Covered Parties' Designees are required to pay the Default Interest "on the unpaid amount of the Subsequent Cash Payment Amount as of the Default Date, for the period starting January 1, 2014 and running until the earlier of the Default Date or twenty-four (24) months from the Effective Date."  Id. § 5(d).

SKAT calculates the interest under Settlement Agreement based, in part, on its disputed True-Up Amount.  The Court reproduces a chart that SKAT's counsel provided regarding its calculation of the appropriate interest:

| Date | Principal Amount Outstanding (DKK) | § 2.d.ii Interest Accrued Between Payment Dates (DKK) | § 5.d.iii Default Interest Accrued (DKK) | |
|---|---|---|---|---|
| May 28, 2021 | 595,076,380.97 | – | – | |
| June 8, 2021 | 593,667,048.08 | 1,443,671.60 | – | |
| June 16, 2021 | 593,462,028.08 | 1,047,456.38 | – | |
| April 19, 2022 | 593,177,410.76 | 40,182,257.07 | – | |
| May 28, 2023 | 593,177,410.76 | 52,852,919.87 | – | |
| June 14, 2023 | 593,177,410.76 | 2,224,009.00 | 353,748,255.77 | |
| **TOTAL** | | 97,750,313.93 | 353,748,255.77 | **1,044,675,980.46** |

ECF No. 168 (Weinstein Decl.) ¶ 80.  Designees did not provide their own calculation of interest.

We address in the conclusions of law whether the Court adopts SKAT's calculation of interest.  Infra pp. 112-115.

**E.  Designees' Confessions of Judgment**

To ensure their payment obligations were fulfilled, Stein, Lhote, and McGee were required under the Settlement Agreement to provide SKAT an affidavit of confession of judgment at the time of the DKK 950 million Initial Cash Payment and an updated confession of judgment roughly two years later.  See Settlement Agreement §§ 2(c), 4(c), 5(c).

As discussed further in the corresponding legal discussion section, infra pp. 65-79, the Court conducted a "preliminary assessment" of this contractual obligation when it denied designees' motion to dismiss SKAT's counterclaims in an earlier opinion.  See Stein v. Skatteforvaltningen, No. 23 Civ. 2508 (NRB), 2024 WL 382091 (S.D.N.Y. Feb. 1, 2024), ECF No. 87.

Nevertheless, for the sake of completeness, we review again designees' contractual obligation to provide a confession of judgment requirement and designees' actions in the section below.

### 1. Confessions of Judgment Under the Settlement Agreement

Section 2(c) provides that "[i]n the event that the Covered Parties timely complete the Initial Cash Payment" of DKK 950 million, which there is no dispute they did, then SKAT's "sole remedy for the Covered Parties' failure to pay the remainder of the Final Settlement Amount shall be the filing of the Affidavit of Confessions of Judgment against the Covered Parties' Designees as set forth in Section 5(c)." Settlement Agreement § 2(c). Section 5(c), in turn, provides that if the Covered Parties' Designees fail to make any payment as and when required by this Agreement, SKAT "[s]hall be authorized to file the Confession of Judgment and to seek and enforce the judgment that the Court enters." Id. § 5(c); see also id. § 5(a) (defining events of default). The Settlement Agreement specifies that SKAT "may file or otherwise execute upon" the 2021 Confession of Judgment "in any of the New York Courts," which are defined as "the federal and state courts of the State of New York." Id. §§ 4(c), 12.[24]

---

[24]    The Settlement Agreement also contained a requirement that the parties negotiate in good faith to modify the Settlement Agreement in accordance with the original intent of the parties if any aspect of the Settlement Agreement was held by a court or other authority to be "invalid, void, or unenforceable." Settlement Agreement § 17.

### 2.    Designees' 2019 and 2021 Confessions of Judgment

In accordance with the timing requirements set forth in section 4(c) of the Settlement Agreement, Stein, Lhote, and McGee provided SKAT an initial confession of judgment, dated May 28, 2019 (the "2019 Confession of Judgment"), and an updated confession of judgment executed by Lhote on June 9, 2021, and by Stein and McGee on June 10, 2021 (the "2021 Confession of Judgment"). See Pl. Ex. 10A (2019 Confession of Judgment); Pl. Ex. 129 (2021 Confession of Judgment); SKAT's Post-Trial Br. ¶ 43; Plaintiffs' Post-Trial Br. ¶¶ 539, 575.

The 2019 Confession of Judgment recites that Stein and Lhote both "reside[] in New York County" and that McGee "resides in Philadelphia County" but "authorizes entry of this Confession of Judgment in New York County." 2019 Confession of Judgment ¶ 1.

The 2021 Confession of Judgment, the operative confession of judgment for our purposes, states: (1) Stein "resides in New York County;" (2) Lhote now "resides in Orange County, Florida and authorizes entry of this Confession of Judgment in New York County;" and (3) McGee "resides in Philadelphia County, Pennsylvania" and continues to "authorize[] entry of this Confession of Judgment in New York County." 2021 Confession of Judgment ¶ 1.

In both Confessions of Judgment, Stein, Lhote, and McGee authorized entry of judgment "jointly and severally" in favor of

-40-

SKAT for the "Judgment Amount," which is defined as any unpaid portion of the Subsequent Cash Payment Amount plus applicable interest. 2019 Confession of Judgment ¶ 2; 2021 Confession of Judgment ¶ 2. The Confessions of Judgment define the Subsequent Cash Payment Amount as (1) "the sum of [600] million Danish Kroner"; and (2) "the True-Up Amount determined pursuant to Section 2(e)(iii) of the Settlement Agreement," which was attached as an exhibit. 2019 Confession of Judgment ¶ 2; 2021 Confession of Judgment ¶ 2. Stein, Lhote, and McGee further agreed that the Judgment Amount "shall be set forth in an affidavit to be executed by [SKAT] or an affirmation by [SKAT's] attorney, which shall be attached hereto at the time of entry of this Affidavit of Confession of Judgment." 2019 Confession of Judgment ¶ 3; 2021 Confession of Judgment ¶ 3.

### 3.    2019 Amendment of CPLR 3218

Between designees' execution of the 2019 and 2021 confessions of judgment, the statute governing confessions of judgment, N.Y. C.P.L.R. § 3218 ("CPLR 3218"), was amended. See ECF No. 152 ("Designees' Pre-Trial Conclusions of Law") ¶ 111; SKAT's Pre-Trial Br. ¶ 36. The amendment limits the application of the confession of judgment statute to debtors who have a residence in New York at the time their affidavits are executed and "was added at least in part for the purpose of protecting nonresident debtors

with no connection to New York from having a judgment unknowingly entered against them." Stein, 2024 WL 382091, at *6.

As discussed further below, designees argue that the 2019 amendment of CPLR 3218 renders the 2021 Confession of Judgment invalid and unenforceable as to Lhote and McGee because they were not New York residents at the time of execution. Infra pp. 66-71. Yet, before executing the 2021 Confession of Judgment, Lhote was "aware" of the change in the law and signed it anyways, "knowing that the change in [his] residence may have impacted the enforceability of the confession of judgment." Trial Tr. 166:1-167:12 (Lhote). McGee could not recall whether he learned about the change in law prior to signing the 2021 Confession of Judgment, but testified that he did not have any reason to believe it was not enforceable when he signed it. Trial Tr. 254:4-21 (McGee).

## IV. The Parties' Claims and Defenses

We now summarize the parties' claims and defenses.

### A.   Plaintiffs' Claims

On March 24, 2023, just over three months before the Final Settlement Payment Date of May 28, 2023,[25] Stein and Lhote (but not McGee) sued SKAT alleging that it materially breached the Settlement Agreement by failing to promptly notify Danish criminal

---

[25]   As we mentioned before, the Settlement Agreement set the "Final Settlement Payment Date" as "thirty-six (36) months from" May 28, 2019, Settlement Agreement §§ 1(n), (r), which was "automatically extended" by one year since "the gross proceeds from the sale of North Channel Bank" did not equal or exceed a set figure, Letter Agreement § 6.

authorities of the Agreement and its terms.  ECF No. 11 (Compl.)
¶¶ 67-69; <u>see also</u> ECF No. 94 (Am. Compl.) ¶¶ 70-74.  Based on
SKAT's alleged breach, Stein and Lhote seek partial recission of
the Settlement Agreement and to be discharged from any further
obligations under the Agreement.  Compl. ¶¶ 8, 93-100; Am. Compl.
¶¶ 8, 104-12.

Additionally, Stein and Lhote claim that the 2021 Confession
of Judgment is invalid and unenforceable and seek a declaratory
judgment to that effect.  Compl. ¶¶ 81-91, 102-06; Am. Compl. ¶¶
91-102, 114-17.  Specifically, as will be discussed below, Stein
and Lhote allege that the 2021 Confession of Judgment is (1)
unenforceable as to Lhote because at the time of its execution,
Lhote resided outside of New York; and (2) unenforceable as to
both Stein and Lhote because it does not state a specific sum for
which judgment may be entered.  Compl. ¶¶ 81-91, 102-06; Am. Compl.
¶¶ 91-102, 114-17.

In their amended complaint, plaintiffs Stein and Lhote added
McGee as a Nominal Defendant "to bring all necessary parties before
the court."  Am. Compl. ¶ 17.[26]

---

[26]    In his answer, McGee asserts defenses to SKAT's counterclaims that largely
track Stein and Lhote's claims.  <u>See</u> ECF No. 93 at 8 (asserting affirmative
defense "because, among other things, SKAT breached its material obligations
under paragraph 8(f) of the Settlement Agreement"); <u>id.</u> at 9 (asserting
affirmative defense that "SKAT is not entitled to entry of confession of
judgment as to McGee because the Affidavit of Confession of Judgment is not
valid and enforceable under C.P.L.R. 3218").

**B.    SKAT's Counterclaims and Defenses**

On June 15, 2023, SKAT filed its First Amended Answer, Affirmative Defenses, and Counterclaims in which SKAT denied Stein and Lhote's allegations that it breached the Settlement Agreement. ECF No. 48 (SKAT Compl.) ¶¶ 92-106.    SKAT asserted two counterclaims styled as breach of contract claims against Stein, Lhote, and McGee for their failure to pay SKAT the Additional Cash Payment of approximately DKK 600 million plus applicable interest and the True-Up Amount plus applicable interest.    Id. ¶¶ 174-87. As relief for both its counterclaims, SKAT seeks the "entry of [the 2021 Confession of Judgment], or alternatively, damages in the [same] amount."    Id. ¶¶ 188-89.[27]

**C.    Designees' Defenses**

Stein, Lhote, and McGee denied SKAT's allegations, and asserted an affirmative defense that SKAT breached its obligations under Section 8(f) of the Settlement Agreement.    See ECF No. 94 (Stein and Lhote's Answer) at 39; ECF No. 93 (McGee Answer) at 8. All three also asserted an affirmative defense based on the invalidity of the confession of judgment.    See Stein and Lhote's Answer at 39; McGee Answer at 9.

---

[27]    On February 1, 2024, the Court denied Stein, Lhote, and McGee's motion to dismiss SKAT's counterclaims.    See Stein v. Skatteforvaltningen, No. 23 Civ. 2508 (NRB), 2024 WL 382091 (S.D.N.Y. Feb. 1, 2024), ECF No. 87.

## V.  Discussion

We address the legal issues raised by the pleadings and the parties in the following order.  First, we address whether SKAT breached Section 8(f) of the Settlement Agreement.  We then decide whether the 2021 Confession of Judgment is enforceable.  Next, we resolve McGee's belated unconscionability defense, which was first raised shortly before trial.  Lastly, we determine whether Stein, Lhote, and McGee breached their payment obligations under the parties' agreements, and if so, how much SKAT is owed.

### A.  Alleged Breach of Section 8(f) of Settlement Agreement

Designees bear the burden of proving that (1) SKAT breached Section 8(f) of the Settlement Agreement and (2) SKAT's breach was material.[28]

---

[28]    Designees pursue two similar, albeit different, theories based on SKAT's alleged breach of Section 8(f) of the Settlement Agreement.  First, assuming a breach, Stein and Lhote seek partial recission of the Settlement Agreement and to be discharged from any further obligations under the Agreement.  Am. Compl. ¶¶ 8, 70-74, 104-12.  Similarly, Stein, Lhote, and McGee raise an affirmative defense based on SKAT's "breach[] [of] its material obligations under paragraph 8(f) of the Settlement Agreement."  McGee Answer at 8; see also Stein and Lhote's Answer at 39 (similar).

Designees' burden of proof is similar under either theory.  See Graham v. James, 144 F.3d 229, 238 (2d Cir. 1998) ("New York law does not presume the rescission or abandonment of a contract and the party asserting rescission or abandonment has the burden of proving it."); Sasson v. Mann, No. 15 Civ. 6601 (CS), 2019 WL 3532155, at *10 (S.D.N.Y. Aug. 2, 2019) ("The burden of proof on the issue of whether Defendant's performance is excused because of a material breach by Plaintiff is on Defendant."); Lenel Sys. Int'l, Inc. v. Smith, 34 A.D.3d 1284, 1285 (4th Dep't 2006) ("[R]escission of a contract . . . is not permitted for a slight, casual, or technical breach, but . . . only for such as are material and willful, or, if not willful, so substantial and fundamental as to strongly tend to defeat the object of the parties in making the contract." (cleaned up)); Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc., 500 F.3d 171, 186 (2d Cir. 2007) ("Under New York law, a party's performance under a contract is excused where the other party has substantially failed to perform

1.      **SKAT's Nonexistent Breach of Section 8(f) of the Settlement Agreement**

Under Section 8(f) of the Settlement Agreement, SKAT was required: (a) "promptly upon the execution of this Agreement"; (b) to "bring to the attention of [SØIK] this Agreement and its terms" "in writing"; and (c) "represent, in writing that this Agreement reflects [i] good-faith negotiation by the Covered Parties, [ii] that the Covered Parties' cooperation may result in the recovery of additional funds from third parties, and [iii] that this Agreement is in the best interests of SKAT." Settlement Agreement § 8(f).

The Court finds that SKAT complied with this provision. Shortly after executing the Settlement Agreement, SKAT issued a press release that SØIK had previously reviewed, which announced the Agreement, its terms, and the parties' commitment to "cooperating and assisting in the Danish Tax Agency's efforts in the remaining cases." SKAT Exs. 539, 540; supra pp. 20-24. The press release also trumpeted the Agreement as a "decisive victory," making it clear that SKAT believed the Agreement to be in its best interests. Id. Moreover, a November press release, which was shared with SØIK but never published, makes clear that this Agreement reflects the good-faith negotiation by the Covered Parties. See Ahlefeld-Engel ¶¶ 53-56; SKAT Ex. 545; supra pp. 20-

_____

its side of the bargain or, synonymously, where that party has committed a material breach.").

-46-

24.    Again, we also credit Ms. Ahlefeld-Engel's testimony that SKAT complied with the requirements of Section 8(f), as she made SØIK aware that the Settlement Agreement reflected a good-faith negotiation by the Covered Parties, that the Covered Parties' cooperation may result in the recovery of additional funds from third parties, and that this Agreement is in the best interests of SKAT.  Trial Tr. 487:14-488:16 (Ahlefeld-Engel).

Designees' argument to the contrary is based on a distorted interpretation of the Settlement Agreement and a misreading of the circumstantial evidence in this action.  We address each argument in turn.

> i.  Designees' Flawed Interpretation of the Settlement Agreement

According to designees, "Section 8(f) required that SKAT communicate with SØIK in a specific timeframe, in a specific manner, and about specific subject matters." ECF No. 194 ("McGee's Post-Trial Conclusions of Law") ¶ 5; see also Plaintiffs' Post-Trial Br. ¶ 313 (same).  Designees offer a flawed interpretation of the timeframe and subjects covered by Section 8(f).[29]

As for the timeframe required by Section 8(f), designees now argue that SKAT had to communicate with SØIK "after receiving the

---

[29]    Designees' interpretation of the specific manner required by Section 8(f) is correct.  Designees are correct that "SKAT was required to bring to the attention of SØIK in writing the Settlement Agreement and its terms." Plaintiffs' Post-Trial Br. ¶ 323 (emphasis omitted).

Initial Cash Payment" in August 2019. Designees' Pre-Trial Findings of Fact ¶¶ 37, 57; see also McGee's Post-Trial Conclusions of Law ¶ 6; Plaintiffs' Post-Trial Br. ¶¶ 116, 136, 315-17. This post-hoc rewriting of the Settlement Agreement directly contradicts Section 8(f)'s language -- "promptly upon the execution of this Agreement" -- and is obviously designed to invalidate the extensive communications between SKAT and SØIK between the execution of the Settlement Agreement in May 2019 and the Covered Parties' Initial Cash Payment in August 2019.[30]  It is also belied by the designees' own arguments, claiming that what they "bargained for was a communication that would be made sufficiently early that it would have a greater chance of positively influencing SØIK's investigation." Designees' Pre-Trial Conclusions of Law ¶ 21; see also McGee's Post-Trial Conclusions of Law ¶ 13 (same); Plaintiffs' Post-Trial Br. ¶ 321 (same). The Court rejects designees' made-for-litigation interpretation of the timeframe required by Section 8(f).

_____

[30]    Notably, in plaintiffs' allegations, plaintiffs emphasized that SKAT was "required by Section 8(f) of the Settlement Agreement to provide the writing specified in that section 'promptly upon the execution of th[e Settlement] Agreement,' which occurred on or about May 28, 2019." Compl. ¶ 80; see also Am. Compl. ¶¶ 4, 68, 70, 71, 90 (similar).

Even if designees' distorted interpretation of the Settlement Agreement was correct (it is not), designees cannot refute the interagency communications after August 2019, including a September 2019 email and the November 2019 Press release. Supra pp. 20-24.

As for the subjects covered by Section 8(f), designees now argue that Section 8(f)'s reference to "this Agreement and its terms" means that SKAT had to communicate with SØIK about approximately eleven terms within the Settlement Agreement and the Letter Agreement.  Plaintiffs' Post-Trial Br. ¶¶ 333-37; McGee's Post-Trial Conclusions of Law ¶¶ 7-11.[31]

Designees' laundry list of terms is amorphous and logically inconsistent.  Designees contend that SKAT had to inform SØIK about the terms "most central to the nature of the bargains reflected in the Settlement Agreement," Plaintiffs' Post-Trial Br. ¶ 333; see also McGee's Post-Trial Conclusions of Law ¶ 7 (similar), but provide no standard, other than their say-so, for determining which terms should be considered the "most central."  For example, according to designees, SKAT was required to communicate that the designees were obligated "to pay interest and additional interest in the event of a default."  Plaintiffs' Post-Trial Br. ¶ 333(d); see also McGee's Post-Trial Conclusions of Law ¶ 7(b) (similar).  At the same time, designees argue that in Section 8(f), they "bargained for the chance to positively influence SØIK."  Plaintiffs' Post-Trial Br. ¶ 452; McGee's Post-Trial Conclusions of Law ¶ 56 (similar).  It's unclear why SKAT would be required to communicate to SØIK about Default Interest, which would only apply

---

[31]    Many of these terms were not included in plaintiffs' initial or amended complaints alleging that SKAT's breach of Section 8(f) was material.  Compl. ¶¶ 61-65, 67-68; Am. Compl. ¶¶ 4, 68, 70, 71, 90.

in the event that Stein, Lhote, and McGee failed to comply with the Settlement Agreement, if the purpose of Section 8(f) was to positively influence SØIK as to designees' efforts to remedy the underlying scheme.

Designees' laundry list of terms is also unsupported by the text of Section 8(f). For example, because the Letter Agreement supplemented and amended certain terms of the Settlement Agreement, designees argue that SKAT had to disclose the "terms most central to the . . . Letter Agreement." Plaintiffs' Post-Trial Br. ¶¶ 334-35; McGee's Post-Trial Conclusions of Law ¶¶ 8-9. This assertion contradicts the plain text of Section 8(f), which states that SKAT had to "bring to the attention of [SØIK] **this** Agreement and its terms." Settlement Agreement § 8(f) (emphasis added). The parties, represented by sophisticated counsel, could have negotiated for SKAT to disclose the terms of the contemporaneously signed Letter Agreement, but the Settlement Agreement does not contain such a term. Moreover, designees acknowledge that SKAT was not required to provide the entirety of the Settlement Agreement to SØIK,[32] see Plaintiffs' Post-Trial Br. ¶ 332; McGee's Post-Trial Conclusions of Law ¶ 7, meaning SKAT had the discretion to disclose only certain terms of the Settlement

---

[32]    McGee testified at trial that counsel for the designees tried to negotiate a provision that said SKAT was required to hand over the Agreement if SØIK requested it, but the final agreement does not include such a provision. See Trial Tr. 244:4-19 (McGee).

Agreement to SØIK, see Settlement Agreement § 8(f) (SKAT "may provide and/or disclose the entirety of this Agreement to SØIK" (emphasis added)).[33]

    As we've previewed earlier, each side had reasons not to make the Settlement Agreement and the Cooperation Information fully available to SØIK. If SKAT sent SØIK the Settlement Agreement, it would become part of SØIK's "case file" and could "be disseminated amongst the defense counsel in the case[;] [a]nd . . . the [other] defendees would have access to it." Trial Tr. 434:2-15 (Ahlefeld-Engel). On the other hand, the Covered Parties "effectively preclud[ed] SKAT from sharing [the cooperation material] with SØIK" by producing "all the cooperation material pursuant to a subpoena issued in SKAT's pending multidistrict litigation and designat[ing] almost all such material 'highly confidential' under the protective order governing discovery in that litigation." SKAT's Post-Trial Br. ¶ 60 (citations omitted; emphasis added). Thus, the confidentiality clause and the production of material designated as highly confidential reduced the amount and substance of information known to SØIK. Indeed, the failure of designees to promptly give SØIK the Settlement Agreement and the Letter

---

[33]    SKAT's discretion of which terms of the Settlement Agreement to disclose to SØIK was limited by another phrase in Section 8(f) requiring SKAT to "represent, in writing, that this Agreement reflects good-faith negotiation by the Covered Parties, that the Covered Parties' cooperation may result in the recovery by [SKAT] of additional funds from third parties and that this Agreement is in the best interests of [SKAT]." Settlement Agreement § 8(f).

Agreement when they formed the view that SØIK did not have a copy is telling as it is consistent with the conflicting concerns of designees.  See Trial Tr. 57:22-59:19 (Stein).

> ii. *Designees' Reliance on Weak, Circumstantial Evidence*

Designees also cite weak, circumstantial evidence to argue that SØIK and SKAT did not communicate about the Settlement Agreement.  For example, designees rely on the failure of U.S. counsel for SKAT to cite any specific written communications when asked, in June 2021, how SKAT complied with section 8(f).  See Designees' Pre-Trial Findings of Fact ¶ 129; Plaintiffs' Post-Trial Br. ¶ 208.  Instead, U.S. counsel for SKAT stated that briefings "ha[ve] taken place both in meetings and in phone conversations."  Id.  Designees also cite to a November 2020 email from a SØIK prosecutor to an attorney at the U.S. Department of Justice, stating that SØIK was "not in possession of the settlement and has no knowledge of any details in it, including who is involved, besides the amount and the number of pension plans."  Designees' Pre-Trial Findings of Fact ¶¶ 105-06 (citing Pl. Ex. 12); see also Plaintiffs' Post-Trial Br. ¶¶ 244-45 (same).

However, testimony and exhibits presented at trial establish that SØIK and SKAT had extensive communications about the Settlement Agreement.  While U.S. counsel for SKAT may not have known about all of the communications between SØIK and SKAT in

June 2021, see Designees' Pre-Trial Findings of Fact ¶ 129, and the line prosecutor who sent the email to the U.S. Department of Justice may have disclaimed any knowledge of the Settlement Agreement, see Pl. Ex. 12, the senior prosecutor who signed the designees' indictments was the same individual who communicated with Ms. Ahlefeld-Engel by phone and email about the Settlement Agreement, and thus possessed the relevant information required by Section 8(f), see Designees' Pre-Trial Conclusions of Law ¶ 26; SKAT's Pre-Trial Br. ¶ 59; SKAT Exs. 529, 530, 532; Ahlefeld-Engel ¶ 31. In addition, the Court credits Mr. Jacobsen's testimony that the SØIK prosecutor who wrote the email to the U.S. Department of Justice worked in the "asset recovery group in SØIK" and was not one of the prosecutors investigating whether to indict Stein, Lhote, and McGee, see Trial Tr. 386:11-21 (Jacobsen), which undermines designees' assertion that SØIK officials were not aware of the Settlement Agreement, see Designees' Pre-Trial Conclusions of Law ¶¶ 51-53.

### 2.    Materiality of SKAT's Nonexistent Breach

Even if we assume that SKAT technically breached Section 8(f) because some of its communications with SØIK occurred orally and before the execution of the Agreement, supra pp. 18-20, SKAT's breach was not material.

Under New York law, a "breach is material if it 'go[es] to the root of the agreement between the parties [and] is so

substantial that it defeats the object of the parties in making the contract.'" VFS Fin., Inc. v. Falcon Fifty LLC, 17 F. Supp. 3d 372, 379-80 (S.D.N.Y. 2014) (citation omitted; alteration in original).[34]  Conversely, a breach is not material and "the other party's performance is not excused," "[i]f the party in default has substantially performed." Hadden v. Consol. Edison Co. of New York, 312 N.E.2d 445, 449 (N.Y. 1974); see also Barbagallo v. Marcum LLP, 925 F. Supp. 2d 275, 287 (E.D.N.Y. 2013) (similar), aff'd, 552 F. App'x 102 (2d Cir. 2014).  "There is no simple test for determining whether substantial performance has been rendered," Hadden, 312 N.E.2d at 449, and the analysis of substantial performance "turns on several factors, such as the absolute and relative magnitude of default, its effect on the contract's purpose, willfulness, and the degree to which the injured party has benefitted under the contract," Process Am., Inc. v. Cynergy Holdings, LLC, 839 F.3d 125, 136 (2d Cir. 2016) (citation omitted); see also Designees' Pre-Trial Conclusions of Law ¶¶ 71-72 (similar); Plaintiffs' Post-Trial Br. ¶ 393 (similar); McGee's Post-Trial Conclusions of Law ¶ 36 (similar).

---

[34]    See also Awards.com v. Kinko's, Inc., No. 603105/03, 2006 WL 6544391 (N.Y. Sup. Ct. Jan. 17, 2006) ("A material breach is generally regarded as a breach which 'substantially defeats' the purpose of an agreement in such a fundamental way as to 'defeat the object of the parties in making the contract,' and otherwise occurs where a party fails to perform a substantial part of the agreement." (quoting Callanan v. Powers, 199 N.Y. 268, 284 (1910)); Frank Felix Assocs., Ltd. v. Austin Drugs, Inc., 111 F.3d 284, 289 (2d Cir. 1997) ("Under New York law, for a breach of a contract to be material, it must 'go to the root of the agreement between the parties.'" (citation omitted)).

Significantly, the Settlement Agreement here was <u>not</u> conditioned on "a commitment by SØIK relating to criminal charges," Stein ¶ 22(c); <u>supra</u> pp. 11-13, and it is undisputed that SØIK's indictment of Stein, Lhote, and McGee does not constitute a breach of the parties' agreements, Trial Tr. 50:14-16 (Stein). Instead, the Settlement Agreement, fully understood, was designed to strike a delicate balance between the designees' intent to obtain a benefit vis-à-vis SKAT's communications with SØIK with designees' desire to avoid providing SØIK with information that could be used against designees in a criminal proceeding. <u>See</u> <u>supra</u> pp. 14-16. On the one hand, SKAT could not provide any "cooperation material" to SØIK, <u>see</u> <u>supra</u> pp. 14-16, and SKAT was not required to provide SØIK with the Settlement Agreement if SØIK requested it, <u>see</u> Settlement Agreement § 8(f). On the other hand, the Covered Parties had the right to disclose the Agreement and Cooperation Information directly to SØIK. <u>See</u> Settlement Agreement § 8(e).

Simply stated, the root of the bargained-for benefit, as defined by designees, was "the possible impact that SKAT's performance would have on SØIK," <u>i.e.</u>, "the chance to impact SØIK's decision-making." Designees' Pre-Trial Conclusions of Law ¶¶ 75(g), 79; <u>see also</u> Plaintiffs' Post-Trial Br. ¶ 403 (same); McGee's Post-Trial Conclusions of Law ¶ 56 (similar).

Considering the record as a whole, the Court has little trouble concluding that SKAT substantially complied with the

Settlement Agreement by communicating to SØIK before, and after, the execution of the Settlement Agreement. Supra pp. 16-28. SØIK was clearly aware of the Settlement Agreement, given that SØIK and SKAT had "approximately ten meetings" prior to its execution, and at least one meeting after its execution, to discuss the Agreement. SKAT Exs. 541, 542; Ahlefeld-Engel ¶¶ 23, 47, 48. SØIK was also aware of the terms of the Settlement Agreement, as Ms. Ahlefeld-Engel emailed Mr. Fiig a list of the Covered Parties to the Settlement Agreement, SKAT Ex. 533; Designees' Pre-Trial Findings of Fact ¶ 65,[35] and Mr. Jakobsen signed off on a draft of the May 2019 press release which detailed the terms of the agreement, SKAT Exs. 537, 538, 558. Moreover, SKAT clearly communicated that this Agreement represented a good-faith negotiation, the Covered Parties' cooperation may result in the recovery of additional funds from third parties, and that this Agreement is in the best interests of SKAT, through the draft versions of the May 2019 press release, the draft November 2019 press release, as well as other written and oral communications. See SKAT Exs. 539, 540, 545; Ahlefeld-Engel ¶¶ 36-45, 53-56; supra pp. 16-28. SKAT made these

---

[35] On September 20, 2019, following a phone call, Ms. Ahlefeld-Engel sent Mr. Fiig the email she had previously sent him on May 15, 2019, which contained passages from the draft Settlement Agreement and included a draft version of what would ultimately become Section 8(f). SKAT Exs. 532, 543; Ahlefeld-Engel ¶ 49. The only difference in language between what was emailed and the final version of Section 8(f) is the last sentence of Section 8(f), which had no impact on SØIK's awareness of other Section 8(f) terms.

representations directly to SØIK, see id., and publicly, see, e.g., SKAT Ex. 544.

Designees benefitted from SKAT's performance and any technical breach on SKAT's part was not willful. SKAT's vigorous private and public defense of the Settlement Agreement, SKAT Exs. 544, 545; Ahlefeld-Engel ¶¶ 50, 53-56, undermines any assertion that SKAT willfully violated the Settlement Agreement and instead indicates that SKAT strongly believed the Agreement to be in the best interests of SKAT and that it communicated this belief to SØIK. The Court also credits Ms. Ahlefeld-Engel's testimony that she has no doubt that SKAT complied with the Section 8(f) requirements, as she made SØIK aware that the Settlement Agreement reflected a good-faith negotiation by the Covered Parties, that the Covered Parties' cooperation may result in the recovery of additional funds from third parties, and that this Agreement is in the best interests of SKAT. Trial Tr. 487:14-488:16 (Ahlefeld-Engel).

Accordingly, designees cannot demonstrate that SKAT materially breached the Agreement. See NSI Int'l, Inc. v. Mustafa, No. 12 Civ. 5528 (JFB) (AKT), 2014 WL 12539347, at *9 (E.D.N.Y. Feb. 25, 2014) (finding no material breach where aggrieved party "already received the substantial benefit of the promised performance" (citation and quotation marks omitted)), report and recommendation adopted, No. 12 Civ. 5528 (JFB) (AKT), 2014 WL

-57-

1232941 (E.D.N.Y. Mar. 26, 2014), aff'd, 613 F. App'x 84 (2d Cir. 2015).[36]

Designees' arguments to the contrary are based on an internally inconsistent reading of the benefits they received from the Settlement Agreement and a misreading of Danish law. We review each in turn.

### i. Designees' Inconsistent Interpretation of Settlement Agreement's Benefits

Designees' post-hoc reading of the benefits they were due under the Settlement Agreement is internally inconsistent. On the one hand, designees contend that (1) SKAT's communication must have been made "sufficiently early [so it] . . . would have a greater chance of positively influencing SØIK's investigation,"

---

[36] Even assuming that SKAT's breach was material, Stein and Lhote must establish they sought rescission within a reasonable period of time after performance under the Settlement Agreement and the Letter Agreement was suspended. See Ballow Brasted O'Brien & Rusin P.C. v. Logan, 435 F.3d 235, 240 (2d Cir. 2006); Allen v. WestPoint-Pepperell, Inc., 945 F.2d 40, 47 (2d Cir. 1991) (citation omitted). Stein and Lhote stopped fulfilling their contractual obligations in April 2022 when they stopped providing quarterly reports to SKAT pursuant to the Letter Agreement, see Plaintiffs' Post-Trial Br. ¶¶ 287-88, and filed their lawsuit in March 2023, id. ¶ 291; ECF No. 1. Plaintiffs Stein and Lhote provided no credible reason at trial for why they waited eleven months to bring this action and thus, the Court finds that Stein and Lhote did not seek rescission within a reasonable period of time. See Plaintiffs' Post-Trial Br. ¶¶ 503-13.

In his post-trial brief, Mr. McGee contends that SKAT breached the implied covenant of good faith and fair dealing by "injuring McGee's right to receive the fruits of the Settlement Agreement, i.e., SKAT's compliance with Section 8(f)," McGee's Post-Trial Conclusions of Law ¶¶ 65-79, an issue which was not briefed prior to trial. We reject this affirmative defense for substantially the same reasons listed above. The "implied covenant of good faith and fair dealing 'cannot add to, detract from, or alter the terms of the contract itself,'" Body Glove IP Holdings, LP v. Exist, Inc., No. 1:21 Civ. 1181 (JLR), 2023 WL 3568955, at *19 (S.D.N.Y. May 17, 2023) (citation omitted), and we have found that SKAT substantially performed under the contract.

Designees' Pre-Trial Conclusions of Law ¶ 21, (2) it was important to "ensure that . . . SØIK personnel would have access to the same information regarding our obligations and the representations required by Section 8(f)," id. ¶ 26, and (3) communications to SØIK must include information about "the breadth of the cooperation obligations of the Covered Parties," id. ¶ 42. On the other hand, designees argue that they did not benefit from (1) any communications to SØIK personnel before they made their cash payment in August 2019, id. ¶ 75(f), (2) oral communications made to SØIK personnel who possessed the ability to indict them, id. ¶ 24, and (3) communications regarding their cooperation, id. ¶¶ 41-42.

Stein, Lhote, and McGee cannot have it both ways. The Court imputes great weight to communications from SKAT which were made "sufficiently early" such that they "would have a greater chance of positively influencing SØIK's investigation." Id. ¶ 21; see also McGee's Post-Trial Conclusions of Law ¶ 13 (same); Plaintiffs' Post-Trial Br. ¶ 321 (same). That some of these communications occurred orally, as opposed to "in writing," does not mean SKAT materially breached the agreement, as the senior prosecutor who signed the designees' indictment was the same individual who possessed the "same information regarding [designees'] obligations and the representations required by Section 8(f)." Designees' Pre-Trial Conclusions of Law ¶ 26; SKAT's Pre-Trial Br. ¶ 59; SKAT

-59-

Exs. 529, 530, 532; Ahlefeld-Engel ¶ 31.[37]  Moreover, the Court credits Ms. Ahlefeld-Engel's testimony that SKAT kept SØIK apprised of the designees' cooperation as well as both the Initial Cash Payment and the designees' subsequent payment.  Trial Tr. 488:4-16 (Ahlefeld-Engel).

Designees' contention that SKAT did not provide SØIK ample information about their cooperation is particularly contradictory. SKAT could not provide any "cooperation material" to SØIK under the terms of the Agreement, Ahlefeld-Engel ¶ 33; see supra pp. 14-16, and Lhote admitted that he "didn't want SØIK to have the documents unless and until they had agreed not to prosecute" because "that's what any reasonable person would do," Trial Tr. 211:22-25 (Lhote).  Mr. Stein also testified that "[w]e could have handed them to SØIK if we wanted SØIK to have them."  Trial Tr. 159:5-6 (Stein).  Indeed, the Covered Parties "effectively preclud[ed] SKAT from sharing [the cooperation material] with SØIK" by producing "all the cooperation material pursuant to a subpoena issued in SKAT's pending multidistrict litigation and designat[ing] almost all such material 'highly confidential' under

---

[37]    As designees analogize, Section 8(f) was "a life-saving medicine that ha[d] some chance of having the desired effect."  Designees' Pre-Trial Conclusions of Law ¶ 75(g).  To use the same analogy, the Court finds that it makes little difference whether the medicine was delivered in a glass vial or a plastic cup -- that is, it is immaterial that some of SKAT's communications were oral as opposed to "in writing."

the protective order governing discovery in that litigation."
SKAT's Post-Trial Br. ¶ 60 (citations omitted; emphasis added).

### ii.  Designees' Misreading of Danish Law

Designees also distort Danish law to avoid the common-sense
conclusion that SKAT substantially complied with the Settlement
Agreement.[38]  Relying on the expert testimony of Professor Lasse
Lund Madsen, designees argue that (a) "SØIK had discretion in its
decision to indict Stein, Lhote, and McGee," McGee's Post-Trial
Conclusions of Law ¶ 54; see also Plaintiffs' Post-Trial Br. ¶ 455
(similar); (b) "SØIK could have taken into account what Section
8(f) required SKAT to communicate at the stage when SØIK was
deciding whether to indict Stein, Lhote, and McGee," Plaintiffs'
Post-Trial Br. ¶ 453; see also McGee's Post-Trial Conclusions of
Law ¶ 50 (similar); (c) the information SKAT failed to provide
pursuant to Section 8(f), "if considered by SØIK, would make an
indictment at least somewhat less likely," Plaintiffs' Post-Trial
Br. ¶ 451; see also McGee's Post-Trial Conclusions of Law ¶¶ 56-
58 (similar); and (d) therefore, SKAT's failure to comply with
Section 8(f) deprived the designees of their bargain, Plaintiffs'
Post-Trial Br. ¶ 452; McGee's Post-Trial Conclusions of Law ¶¶ 57-
58 (similar).[39]

---

[38]    The Court's determination of Danish law is "treated as a ruling on a
question of law."  Fed. R. Civ. P. 44.1.

[39]    Plaintiffs' post-trial briefing goes even further than Mr. Madsen's
reports and testimony.  One of the section headers in plaintiffs' post-trial

The Court agrees with the first two propositions but strongly disagrees with designees' latter two propositions.  We begin by addressing the first two propositions.  The Court finds that (a) SØIK had discretion in its decision to indict the designees and (b) SØIK could have taken into account the information that SKAT provided to SØIK.  According to Mr. Madsen, Section 721 of the Administration of Justice Act sets out the conditions or circumstances in which a Danish prosecutor can decide not to indict a person.  See Plaintiffs' Post-Trial Br. ¶ 433.  In particular, Section 721(1)(4) of the Administration of Justice Act provides that "[p]rosecution in a case can be completely or partially abandoned in cases . . . where the conduct of the case would entail difficulties, costs, or processing times that are not reasonably proportionate to the significance of the case and the penalty that can be expected to be imposed."  Id. ¶ 434.  In essence, Mr. Madsen contends that a Danish prosecutor can balance one set of considerations against another before deciding to indict a target. Id. ¶ 457.

However, the Court finds designees' arguments —- in

_____

brief indicates that under "Danish [p]ractice and [p]rocedure, SØIK [w]as [r]*equired* [t]o [c]onsider the Settlement Agreement [i]n [d]etermining [w]hether [t]o [i]ndict." Plaintiffs' Post-Trial Br. at pp. 94 (emphasis in original).  However, Professor Madsen's reports do not support this conclusion, see id. ¶¶ 421-70; Pl Exs. 300, 301, and notably Mr. McGee, who also relies on Mr. Madsen's reports and testimony, does not make the same assertion, McGee's Post-Trial Conclusions of Law ¶¶ 50-54.  As discussed above, the Court does not conclude that SØIK was required to consider the Settlement Agreement under Danish law, only that SØIK could consider the information provided to them by SKAT when deciding whether to indict Stein, Lhote, and McGee.

particular, that the information SKAT allegedly failed to provide "would make an indictment at least somewhat less likely," Plaintiffs' Post-Trial Br. ¶ 451 -- to be implausible.  Mr. Madsen could not point to a single case, including any from his extensive experience, in which SØIK did not charge certain people because they had repaid a victim or cooperated.  Trial Tr. 539:10-540:10, 541:24-543:13 (Madsen); see also id. 557:9-10 ("But I never said that there's a direct connection in the sense that, you pay, you get off.").  In addition, Mr. Madsen testified that a prosecutor could consider the role of general deterrence and specific deterrence when deciding whether to indict someone, because one of the listed factors in 721(1)(4) is the "significance of the case." Id. 551:21-554:6 (Madsen).  Mr. Madsen agreed with the Court that: "the notion that . . . this case . . . apparently is the largest fraud ever committed on the country of Denmark" "would play a role" in SØIK's decision to indict.  Id. 552:24-553:3 (Madsen).

Moreover, Denmark's efforts to prosecute Sanjay Shah, who owned an English brokerage firm which generated the necessary false dividend credit advices for the first phase of the scheme, Ahlefeld-Engel ¶ 9; supra pp. 7-11, demonstrates how significant SØIK believes this case to be.  Sanjay Shah was a foreign national who was living in Dubai.  Trial Tr. 527:8-528:4 (Madsen).  Although Denmark did not have an extradition treaty with Dubai, Denmark negotiated an extradition treaty with Dubai to enable Denmark to

extradite Shah for trial. Id. 528:5-9 (Madsen). According to Mr. Madsen, designees' own expert, that's how seriously SØIK treated this tax-withholding case. Id. 528:10-16 (Madsen). It is common sense that SØIK could have determined that the "significance of the case" outweighed any countervailing interest when deciding whether to indict the individuals involved in the alleged scheme. See Plaintiffs' Post-Trial Br. ¶ 474 (quoting SKAT's Danish law expert that "'there are not resource constraints in pursuing an economic crime of this magnitude . . . the case is too important to the country to be dropped'").[40]

In summary, SØIK's decision-making was up to SØIK. That SØIK ultimately decided to indict Stein, Lhote, and McGee does not mean that SKAT breached, let alone that the breach was material. To conclude otherwise would be to reason backwards. As noted earlier, supra pp. 60 n.37, designees analogize that Section 8(f) was "a life-saving medicine that ha[d] some chance of having the desired effect." Designees' Pre-Trial Conclusions of Law ¶ 75(g). The fact that the "life-saving medicine," SKAT's communications to SØIK, did not have its "desired effect" is not evidence of a material breach. Instead, it may signify that that the underlying

---

[40]    That other individuals in the alleged scheme were not indicted says nothing about SØIK's discretion, if any, concerning whether to indict Stein, Lhote, and McGee because they were not similarly situated to the designees. See SKAT's Post-Trial Br. ¶ 99 n.44.

condition, designees' allegedly fraudulent activities, could not be cured by any "medicine."

## B.    2021 Confession of Judgment

Stein, Lhote, and McGee claim that the 2021 Confession of Judgment is invalid and unenforceable. Am. Compl. ¶¶ 91-102, 114-17 (Stein and Lhote's request for a declaratory judgment to that effect); Stein and Lhote's Answer at 39 (Stein and Lhote's affirmative defense to that effect); McGee Answer at 9 (McGee's assertion of affirmative defenses to that effect).

Specifically, Stein, Lhote, and McGee contend that the 2021 Confession of Judgment is (1) unenforceable as to Lhote and McGee because at the time of its execution, Lhote and McGee resided outside of New York; and (2) unenforceable as to all designees because it does not state a specific sum for which judgment may be entered. Designees' Pre-Trial Conclusions of Law ¶¶ 109-37; McGee's Post-Trial Conclusions of Law ¶¶ 85-103; Plaintiffs' Post-Trial Br. ¶¶ 535-86.[41]

At an earlier stage in this litigation, the Court conducted a "preliminary assessment" of designees' arguments and denied designees' motion to dismiss SKAT's counterclaims. Stein v. Skatteforvaltningen, No. 23 Civ. 2508 (NRB), 2024 WL 382091 (S.D.N.Y. Feb. 1, 2024), ECF No. 87. We found then that these

---

[41]    Following the completion of trial, the parties proposed, and the Court so-ordered, a stipulation that extended the deadline for SKAT to file the 2021 Confession of Judgment, as they had on previous occasions. ECF Nos. 196, 197.

arguments were "subject to serious challenge," but we did "not pass ultimate judgment on the merits" of the enforceability of designees' confessions of judgment at that early juncture. Id. at *7.

The Court remains unpersuaded by designees' arguments.

### 1.    Residency Requirement

First, designees argue that the 2021 Confession of Judgment is invalid and unenforceable as to Lhote and McGee because they are not New York residents. Designees cite the 2019 amendment to CPLR 3218, which limited the application of the confession of judgment statute to debtors who had a residence in New York at the time their affidavits are executed. See Designees' Pre-Trial Conclusions of Law ¶ 111 (citing Hon. Mark C. Dillon, Practice Commentaries, CPLR C3218:3 (2021)). This amendment "was added at least in part for the purpose of protecting nonresident debtors with no connection to New York from having a judgment unknowingly entered against them." Stein, 2024 WL 382091, at *6.

As the Court explained previously, the newly added residency requirement "does not apply in cases like this one where a party seeks entry of a confessed judgment by filing an action." Id. That is because "when a confession of judgment is enforced through the filing of an action, the nonresident debtor necessarily receives notice that judgment may be entered against him in New York and thus is afforded an opportunity to contest it." Id. at

-66-

*6 n.12.   On the other hand, "when a confession of judgment is
filed 'without an action,' a clerk of court enters it immediately
and thus the nonresident debtor would receive no notice of such
judgment until after it is entered."  Id. (citing CPLR 3218(a)-
(b)).  As a result, "New York courts have found that the newly
added residency requirement only concerns the entry of judgment
against a nonresident 'without an action.'"  Id. at *6 (citing
Express Trade Cap., Inc. v. Horowitz, 152 N.Y.S.3d 821, 821-22
(App. Div. 2021)).

Designees provide no reason to deviate from this common-sense
conclusion.  They concede that the Second Circuit and the New York
Court of Appeals have not specifically decided this question,
Designees' Pre-Trial Conclusions of Law ¶ 117; McGee's Post-Trial
Conclusions of Law ¶ 91; Plaintiffs' Post-Trial Br. ¶ 543, and
cite two lower court cases assertedly to the contrary: Upfront
Megatainment, Inc. v. Thiam, 235 A.D.3d 516, 516 (1st Dep't 2025),
and Torres v. Monsalve, No. 724211/2020, 2021 N.Y. Misc. LEXIS
29744, at *1, *3 (Sup. Ct. Queens Cty. Mar. 31, 2021), Designees'
Pre-Trial Conclusions of Law ¶¶ 119, 123; McGee's Post-Trial
Conclusions of Law ¶¶ 90, 96; Plaintiffs' Post-Trial Br. ¶¶ 545-
47, 553.

Neither of designees' cited cases squarely contradict this
Court's prior analysis.  Plaintiffs concede that the first case,
Upfront Megatainment, is "factually distinct."  Plaintiffs' Post-

Trial Br. ¶ 546.  Indeed, plaintiffs in Upfront Megatainment were not seeking to "enforc[e] [a] confession of judgment," but instead they "brought [a] plenary action to enforce [a] settlement agreement" and collect attorneys' fees.  235 A.D.3d at 517.  The court there cited the 2019 amendment and held that "Plaintiffs may not rely on defendant's confession of judgment, executed on May 28, 2020, to collect attorneys' fees," as "[t]he confession . . . was not an agreement to pay attorneys' fees, [and] at most was merely evidence of an agreement."  Id. at 516.  The court concluded "[a]bsent any agreement, statute, or rule allowing plaintiffs to collect attorneys' fees for enforcing the settlement agreement, plaintiffs cannot not obtain them."  Id. at 517.

Meanwhile the factual circumstances in Torres present the exact reason for the amendment: a plaintiff sought entry of a confession of judgment against a non-resident debtor who did not appear before an action was decided.  Torres, 2021 N.Y. Misc. LEXIS 29744, at *1.  The court thus cited the 2019 amendment of CPLR 3218 and held that the plaintiff could "not file the Confession of Judgment in Queens County" against a New Jersey resident.  Id. at *3.  In other words, unlike here, the Torres court did not have an occasion to decide whether the amendment precluded entry of the confession of judgment as part of an action.  Id.  Thus, neither the Upfront Megatainment court nor the Torres cases address the

circumstances here, where a party seeks entry of a confessed judgment by filing an action.

Other lower court cases support this Court's prior analysis. See, e.g., New Tech Cabling LLC v. Hyper 30 Inc., No. 651675/2023, 2024 WL 2982076, at *1 n.1 (N.Y. Sup. Ct. June 11, 2024) ("The 2019 amendment to CPLR 3218(a)(1) is inapplicable.  It concerns entry of a judgment against a nonresident without an action." (citation and quotation marks omitted)).

Moreover, Lhote and McGee waived the residency requirement. "Significantly, under New York law, 'a man may waive any right that he has, whether secured to him by contract, conferred upon him by statute or guaranteed him by the Constitution.'"  MQDC, Inc. v. Steadfast Ins. Co., No. 12 Civ. 1424 (ERK) (MDG), 2013 WL 6388624, at *13 (E.D.N.Y. Dec. 6, 2013) (citation omitted).  This waiver must be knowing and voluntary when made.  See Martinez v. Rockwood, 2025 WL 459893, at *4 (S.D.N.Y. Feb. 11, 2025).  That Lhote and McGee's waiver was knowing and voluntary is confirmed by the language of the 2021 Confession of Judgment, wherein they expressly "authorize[d] the entry of this Confession of Judgment in New York County" despite living outside the state and being aware of the 2019 Amendment.  See 2021 Confession of Judgment ¶ 1. In addition, at trial, Mr. Lhote testified that he was "aware that there had been a change of law with respect to the residency

requirement" "before signing the second or updated confession to judgment."  Trial Tr. 166:8-16 (Lhote).[42]

In any event, as we observed in our 2024 decision, even if designees succeeded on this argument, the 2021 Confession of Judgment would be enforceable as to Mr. Stein, who is a New York resident and is jointly and severally liable.  See Stein, 2024 WL 382091, at *6 n.13 (citing ECF No. 76 (Motion to Dismiss Oral Argument Tr.) 14:22-25).  In addition, Mr. McGee owns "through an LLC a vacation property in New York."  McGee ¶ 167.  "Notably, the amendment to CPLR 3218 uses the term 'residence' rather than 'domicile' in defining the debtors that may confess judgments under the statute."  Hon. Mark C. Dillon, Practice Commentaries, CPLR C3218:3 (2021).  Thus, where "a New York debtor has residences in

---

[42]    At trial, Mr. McGee testified that he was not sure whether he knew of the change in law prior to signing it, but that he learned about the change in law "[s]ometime in 2021."  Trial Tr. 254:4-21 (McGee).  Even if Mr. McGee learned of the change in law after signing the 2021 Confession of Judgment and had doubts about its enforceability, Mr. McGee had an obligation under the Settlement Agreement to negotiate a substantially similar requirement to replace the confession of judgment.  See Settlement Agreement § 17 ("If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction or other authority to be invalid, void or unenforceable . . . . the Parties shall negotiate in good faith to modify this Agreement in accordance with the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the fullest extent possible.").

Separately, the Court rejects plaintiffs' speculation that SKAT did not raise the impact of the 2019 change to CPLR 3218 because SKAT was trying to cover up for its non-compliance with the Settlement Agreement.  Plaintiffs' Post-Trial Br. ¶¶ 574-81.  Contrary to plaintiffs' assertion that this inference is "more likely" than the inference that SKAT's U.S. counsel did not know about the change in law, id. ¶ 574, plaintiffs' arguments are baseless, unsupported, and circular.  Similarly, plaintiffs' assertion that "SKAT Never Intended to Comply with Section 8(f)," Plaintiffs' Post-Trial Br. at pp. 50, is pure, unsupported speculation.

multiple states, CPLR 3218 may . . . continue to be used by filing the debtor's affidavit in a designated county within New York where a residence exists."  Id.

    **2.    Definite Methodology**

Second, Stein, Lhote, and McGee argue that the 2021 Confession of Judgment is invalid because it fails to state a sum certain. See Designees' Pre-Trial Conclusions of Law ¶¶ 134-37.

This argument is baseless as well.  As we stated previously, "[a]lthough CPLR 3218(a)(1) requires an affidavit of confession of judgment to 'stat[e] the sum for which judgment may be entered,' courts have interpreted this requirement to allow parties to fill in exact amounts at a later date in accordance with calculations or methodology to which they agreed."  Stein, 2024 WL 382091, at *7 (citation omitted).  The 2021 Confession of Judgment here "sets forth the precise methodology for determining the Judgment Amount and expressly contemplates -- and in fact requires -- that the Judgment Amount 'be set forth in an affidavit to be executed by the plaintiff or [in] an affirmation by such plaintiff's attorney, which shall be attached hereto at the time of entry of this Affidavit of Confession of Judgment.'"  Id. (quoting 2021 Confession of Judgment ¶ 3 (emphasis added in Stein)).

Designees only devoted four paragraphs to this argument in their pre-trial briefing, see Designees' Pre-Trial Conclusions of Law ¶¶ 134-37, and only plaintiffs raise the issue in their post-

trial briefing, see Plaintiffs' Post-Trial Br. ¶¶ 582-86, as Mr. McGee omits the argument from his separate post-trial memorandum, see McGee's Post-Trial Conclusions of Law ¶¶ 85-103.  In short, designees contend that the 2021 Confession of Judgment is infirm because there are "considerable disputes about the methodology for determining" the True-Up Amount, including a "substantial question about the enforceability of some of the terms comprising the definition of Net Proceeds."  Designees' Pre-Trial Conclusions of Law ¶¶ 134-37; Plaintiffs' Post-Trial Br. ¶¶ 582-86.[43]

Designees' methodology argument is a false construct, and in any event, any disputes about the application of the methodology set out in the Settlement Agreement were addressed at trial and will be resolved below, infra pp. 85-115.  Such disputes do not invalidate the 2021 Confession of Judgment.

### 3.    Breach of Contract Damages In the Alternative

Lastly, even assuming arguendo that the 2021 Confession of Judgment is invalid, SKAT is nevertheless entitled to breach of contract damages in the alternative.[44]

---

[43]    Plaintiffs also add that "SKAT's forensic expert has no ability to testify about whether one or another methodology is a correct interpretation of the term Net Proceeds," as it is "a question of law."  Plaintiffs' Post-Trial Br. ¶ 585.  Even if we were to accept plaintiffs' argument, a question of law does not mean that the methodology is uncertain.

[44]    As discussed in more detail below, it is undisputed that if SKAT did not materially breach the Agreement, then Stein, Lhote, and McGee are liable for breach and owe some payment to SKAT.  Trial Tr. 160:16-22 (Stein); Motion to Dismiss Oral Argument Tr. 3:5-8.

Under New York law, unless a contract provides that "a delineated remedy is the 'sole remedy' against a particular breaching party, that breaching party may be held liable for the usual damages recoverable on a breach of contract claim, regardless of whether a specific remedy is provided for in the contract itself." <u>GEM Holdco, LLC v. RDX Technologies Corp.</u>, No. 653694/2015, 2017 WL 1281811, at *5 (N.Y. Sup. Ct. Apr. 06, 2017) (collecting cases). For example, in <u>GEM Holdco</u>, the Court held that plaintiff was not precluded from "simply suing for damages" where the operative settlement agreement stated that the plaintiff "'may' file the confession of judgment in the event of a breach" and the "confession of judgment was [later] held to be unenforceable." <u>Id.</u>

The Settlement Agreement here does not preclude SKAT from suing for damages if the confession of judgment is held to be unenforceable. The Settlement Agreement specifies that SKAT "**<u>may file or otherwise execute upon</u>**" the 2021 Confession of Judgment "in any of the New York Courts only if an Event of Default, as defined in Section 5, has occurred." Settlement Agreement § 4(c) (emphasis added). Section 5(c) of the Settlement Agreement, in turn, states: "On the Default Date, [SKAT] **<u>shall be authorized</u>** to file the Confession of Judgment and to seek and enforce the judgment that the Court enters." <u>Id.</u> § 5(c) (emphasis added).

Even if the Settlement Agreement did delineate SKAT's sole remedy, the Court may award damages in lieu of the Settlement Agreement's sole remedy.  Under New York law, "while a provision providing for equitable relief as the sole remedy will generally foreclose alternative relief, where the granting of equitable relief appears to be impossible or impracticable, equity may award damages in lieu of the desired equitable remedy."  GEM Holdco, 2017 WL 1281811, at *5 (citation and quotation marks omitted).  For example, in Gem Holdco, the Court stated that this rule "would arguably be applicable here if [the relevant section of the settlement agreement] was construed as a sole remedy clause given [plaintiff's] inability to enter the confession of judgment."  Id. at *5 n.8.  The same result applies here: the Court may award damages in lieu of entry of the designees' confession of judgment if the requested relief appears to be impossible or impracticable.

Designees raise three arguments to the contrary: (1) a selective interpretation of Section 2(c) of the Settlement Agreement; (2) a misleading invocation of Section 17 of the Agreement; and (3) an absurd interpretation of the parties' expectations.

### i.  Designees' Flawed Interpretation of Section 2(c) of the Settlement Agreement

First, designees say that the Settlement Agreement delineates SKAT's sole remedy based on their reading of Section 2(c).  Section

2(c) of the Settlement Agreement provides:

> The Covered Parties' obligation to pay the Final
> Settlement Amount is absolute and unconditional. . . .
> In the event that the Covered Parties timely complete
> the Initial Cash Payment pursuant to Sections 2(a)(i)
> and 2(a)(ii), then [SKAT's] sole remedy for the Covered
> Parties' failure to pay the remainder of the Final
> Settlement Amount shall be the filing of the Affidavit
> of Confessions of Judgment against the Covered Parties'
> Designees as set forth in Section 5(c).

Settlement Agreement § 2(c).  Designees narrowly focus on the last

sentence of Section 2(c) and assert that "SKAT bargained for a

particular form of relief if the Final Settlement Amount was not

paid: filing the Affidavit of Confession of Judgment against the

Covered Parties' Designees."  Plaintiffs' Post-Trial Br. ¶ 381;

see also McGee's Post-Trial Conclusions of Law ¶¶ 80-84 (similar).

However, designees' interpretation contradicts New York

contract law, which states that an agreement "must be read as a

whole to ensure undue emphasis is not placed upon particular words

or phrases" and "with every part interpreted with reference to the

whole."  PrecisionWorks MFG, LLC v. Union Funding Source, No. 22

Civ. 8290 (LGS), 2022 WL 16857360, at *2 (S.D.N.Y. Oct. 25, 2022).

In other words, when interpreting a contract, the Court must "give

full meaning and effect to all of its provisions."  Chesapeake

Energy Corp. v. Bank of N.Y. Mellon Tr. Co., 773 F.3d 110, 114 (2d

Cir. 2014) (citation and quotation marks omitted).

The Settlement Agreement here, when read as a whole, plainly

does not comport with designees' narrow reading.  A "fundamental

principle" of the Settlement Agreement is that the Covered Parties must pay SKAT the "Net Proceeds" of the tax refunds they received from SKAT.  Settlement Agreement Recital F.  To this end, Section 2(c) limits <u>whom</u> SKAT may seek a remedy against but does not <u>mandate</u> a particular form of relief.  This interpretation is obvious once one contrasts the first sentence of Section 2(c), which makes clear that all Covered Parties were obligated to pay the Final Settlement Amount, with the last sentence of Section 2(c), which plainly states that SKAT can file an Affidavit of Confessions of Judgment against only the Covered Parties' Designees if the Covered Parties timely complete the Initial Cash Payment.  <u>See</u> Settlement Agreement § 2(c).  This reading is also supported by Section 5(a), which specifies that "if the Covered Parties' Designees do not make any payment as and when required by this Agreement," only "the Covered Parties' Designees shall be in default."  <u>Id.</u> § 5(a).

> ii.  *Designees' Misleading Invocation Of Section 17 Of The Settlement Agreement*

Designees' invocation of Section 17 of the Settlement Agreement is not persuasive either.  Designees argue that pursuant to Section 17 of the Settlement Agreement, if the Confession of Judgment is invalid, then SKAT must negotiate in good faith with the parties to modify the Settlement Agreement, as opposed to the Court granting a remedy of damages.  <u>See</u> Plaintiffs' Post-Trial

Br. ¶¶ 379-91; McGee's Post-Trial Conclusions of Law ¶¶ 99-103. However, Section 17 is inapplicable, because even assuming <u>arguendo</u> that the Court determined that the 2021 Confession of Judgment was invalid pursuant to CPLR 3218, the Court would not be rendering Section 2(c) "invalid, void, or unenforceable." Settlement Agreement § 17. Take, for instance, designees' first argument as to why the Confession of Judgment was invalid: that the 2021 Confession of Judgment is unenforceable as to Lhote and McGee because they are not New York residents. Even if this is true, the 2021 Confession of Judgment would be enforceable as to Stein, who is a New York resident, and therefore, Section 2(c) would not be invalid.

### iii. Plaintiffs' Absurd Interpretation of the Parties' Expectations

It is well-established that the Court "must avoid interpreting a contract in a manner that would be absurd, commercially unreasonable, or contrary to the reasonable expectations of the parties." <u>Cambridge Capital LLC v. Ruby Has LLC</u>, 565 F. Supp. 3d 420, 470 (S.D.N.Y. 2021) (citation and quotation marks omitted).

Interpreting the Settlement Agreement to permit SKAT to pursue a breach of contract claim is consistent with the parties' reasonable expectations. The "fundamental principle" of the Settlement Agreement is that the Covered Parties must pay SKAT

"the full amount of the Net Proceeds." Settlement Agreement Recital F. To remove all doubt, the Agreement specifies that "[t]he Covered Parties' obligation to pay the Final Settlement Amount is absolute and unconditional." Id. § 2(c). To this end, Stein, Lhote, and McGee were required to execute the 2021 Confession of Judgment so that SKAT, as its "sole remedy," could "file or otherwise execute upon" it in the event of default. Id. §§ 2(c), 4(c), 5(c). As such, SKAT's reasonable expectation in entering the Settlement Agreement was that it would have at least one remedy to recover the amount owed in the event of a default.

To avoid this sensible result, plaintiffs resort to an internally inconsistent description of the parties' expectations. On the one hand, plaintiffs argue that the parties "provided for the payment of money damages for any failure to pay" and therefore, the Court cannot exercise its equitable authority to award monetary damages. Plaintiffs' Post-Trial Br. ¶¶ 388-90. On the other hand, they argue that the Court should interpret the Settlement Agreement restrictively so that SKAT is effectively left without monetary damages. Id. ¶¶ 381-87. Such an absurd outcome is plainly contrary to the reasonable expectations SKAT had when it entered the Settlement Agreement.

By contrast, allowing SKAT to assert its breach of contract claims in this action is entirely consistent with Stein, Lhote, and McGee's reasonable expectations when they entered the

Settlement Agreement.  Pursuant to that Agreement, Stein, Lhote, and McGee twice authorized the entry of judgment against themselves and in favor of SKAT for any unpaid portion of the Subsequent Cash Payment Amount.  See 2019 Confession of Judgment ¶ 2; 2021 Confession of Judgment ¶ 2.  This amount (plus the applicable interest) is all that SKAT seeks as relief for its two breach of contract claims, and therefore there can be no argument that the relief SKAT seeks is contrary to Stein, Lhote, and McGee's reasonable expectations.

### C.  McGee's Unconscionability Defense

Shortly before trial, McGee raised an unconscionability defense for the first time.  ECF No. 161 ("McGee's Pre-Trial Conclusions of Law") ¶ 1.  Specifically, McGee contends that, if SKAT prevails on its claims, "he should not be held jointly and severally liable for SKAT's damages along with Stein and Lhote on the grounds that the Settlement and Letter Agreements' joint and several liability provisions are unconscionable."  Id.; McGee's Post-Trial Conclusions of Law ¶¶ 104-24.  As a result, he asserts that "the interest of fairness and equity" requires the Court "to apportion liability as to McGee that is proportional to his 17.6 percent ownership interest in" the relevant entity.  McGee's Pre-Trial Conclusions of Law ¶ 39; McGee's Post-Trial Conclusions of Law ¶¶ 125-28.

Unconscionability is an affirmative defense.  See <u>AP Links, LLC v. Glob. Golf, Inc.</u>, No. 08 Civ. 3602 (TCP) (AKT), 2010 WL 11629613, at *3 (E.D.N.Y. Oct. 4, 2010); <u>see also</u> <u>Tarpon Bay Partners LLC v. Zerez Holdings Corp.</u>, 79 F.4th 206, 217 (2d Cir. 2023) (referring to unconscionability as an affirmative defense). "[F]ailing to plead affirmative defenses in the answer will result in their waiver."  <u>AP Links</u>, 2010 WL 11629613, at *3 (citation omitted); <u>see also</u> <u>Mooney v. City of New York</u>, 219 F.3d 123, 127 n.2 (2d Cir. 2000) (similar).

McGee did not plead unconscionability as an affirmative defense, <u>see</u> McGee Answer, and has therefore waived this affirmative defense, <u>see</u> <u>EMA Fin., LLC v. 5barz Int'l, Inc.</u>, No. 18 Civ. 4995 (VEC), 2019 WL 8503357, at *7 (S.D.N.Y. Sept. 18, 2019) ("Because Defendants failed to plead [an unconscionability] defense in their Answer, . . . the defense has been waived and is excluded from the case." (citation omitted)).[45]

Assuming <u>arguendo</u> that McGee had not waived this defense, he must prove that the Settlement Agreement and Letter Agreement are both procedurally and substantively unconscionable, as is required.  See <u>Ragone v. Atl. Video at Manhattan Ctr.</u>, 595 F.3d

---

[45]    Notably, Mr. McGee's only response to this argument in his post-trial briefing is to state that his pre-trial briefing was a "request to amend his Affirmative Defenses" that should be granted "in the interests of justice." McGee's Post-Trial Conclusions of Law ¶ 105 n.3. We reject Mr. McGee's belated post-trial request, as the interest of justice does not favor an untimely amendment to his Answer.

115, 121 (2d Cir. 2010) ("Generally, there must be a showing that such a contract is both procedurally and substantially unconscionable."). Procedural unconscionability "concerns the contract formation process and the alleged lack of meaningful choice," while substantive unconscionability "looks to the content of the contract[.]" Id. at 121–22 (citation and quotation marks omitted). McGee can do neither.

First, McGee has not established how the Settlement Agreement was procedurally unconscionable. "New York courts have found that procedural unconscionability does not exist where 'the party complaining is commercially sophisticated,'" such as where the party "was represented at negotiation by capable lawyers," Bentivoglio v. Event Cardio Grp., Inc., No. 18 Civ. 2040 (PKC), 2021 WL736811, at *6 (S.D.N.Y. Feb. 24, 2021) (citation omitted), and where there was "no allegation . . . that deceptive or high-pressure tactics were employed in concluding the contracts, that contract terms were concealed in fine print, or that there was a gross asymmetry in the experience and education of the parties," Don King Prods., Inc. v. Douglas, 742 F. Supp. 778, 780 (S.D.N.Y. 1990).

McGee was represented in the settlement negotiations by two sets of extremely capable lawyers. Wachtell collectively represented McGee, Stein, Lhote, and other potentially settling parties. McGee ¶ 34. In addition, another prominent law firm,

Akin Gump, represented Mr. McGee individually.  Id.  McGee also had a meaningful choice in that he decided to continue negotiating with SKAT after SKAT made it clear to him that it would not condition the settlement on a commitment by SØIK regarding criminal charges.  See Designees' Pre-Trial Findings of Fact ¶¶ 20-22.  Indeed, others "who had been participating in the settlement discussions dropped out of the discussions" at this point in the negotiations.  Plaintiffs' Post-Trial Br. ¶ 69.  As Mr. McGee appropriately acknowledges in his own post-trial briefing, "[t]he parties to the Settlement Agreement . . . were all represented by able counsel and the final text of the Settlement Agreement was the result of 'extensive and good faith negotiations.'"  McGee's Post-Trial Conclusions of Law ¶ 84 (citation omitted).

Second, McGee has not established that the Settlement Agreement was substantively unconscionable.  McGee complains that he received "a far lesser share of the monies received from the Danish Reclaim Applications than Stein and Lhote" but has "contributed more than the total amount he received from all of the Danish Reclaim Applications with which he may have been associated."  McGee's Pre-Trial Conclusions of Law ¶ 26 (emphasis omitted).  However, "a bad bargain, even a terrible bargain, is not ipso facto substantively unconscionable."  VoiceAge Corp. v. RealNetworks, Inc., 926 F. Supp. 2d 524, 532 (S.D.N.Y. 2013).  This provision is not "so outrageous that [the] contract [must] be

rendered    unenforceable    on    the    ground    of    substantive unconscionability alone." Ortiz v. Dep't of Educ. of NYC, No. 11 Civ. 6027 (SLT) (SMG), 2015 WL 5518176, at *16 (E.D.N.Y. Sept. 16, 2015) (cleaned up).

Mr. McGee testified at trial that there was an "understanding among the principals that they will each pay back sums in proportion to the amount each received." Trial Tr. 247:4-11 (McGee). However, Mr. McGee conceded that this understanding was "not part of the [S]ettlement [A]greement" and that there was no "memorialized written agreement to that effect." Id. 247:12-20 (McGee). Mr. McGee also chose to pay back more than he received from the scheme. At trial, Mr. McGee testified that he made voluntary payments to SKAT so he could represent to SØIK that he returned all proceeds that he received from the scheme. See id. 266:17-267:7 (McGee). He also paid back "a little bit of money to help get this across the finish line." Id. 267:10-18 (McGee).

It would be unconscionable to make SKAT absorb the consequences of McGee's decision to participate in the refund scheme with Stein and Lhote, and for SKAT to absorb the consequences of an alleged agreement between McGee, Stein, and Lhote which no one suggests was signed, made known to SKAT, or part of the Settlement Agreement or the Letter Agreement. Moreover, any disproportion in payments is easily attributable to the decision of Stein and Lhote to stop paying their joint

obligations to SKAT and McGee's decision to continue making payments, no doubt in the hopes of avoiding prosecution or receiving a lighter sentence if convicted.

Nor is there any basis to conclude that designees were not well-represented, as the Settlement Agreement was in many significant ways favorable to them. Two are prominent. First, the Settlement Agreement was not the equivalent of a full cooperation agreement. Designees were not required to provide any cooperation material that SØIK could use against them in a future criminal proceeding. See Ahlefeld-Engel ¶ 33; SKAT's Post-Trial Br. ¶ 60; Settlement Agreement §§ 7(h), 8. Nor did the Covered Parties "agree to be interviewed by SKAT, testify in any proceedings, or provide any Cooperation Information to any governmental authority other than SKAT." SKAT's Post-Trial Br. ¶ 25. When providing Cooperation Information to SKAT, the Covered Parties did not "waive any attorney-client privilege, work-product protections or other evidentiary privileges under state, federal or foreign law." Settlement Agreement § 7(e). Second, on an economic basis, the Settlement Agreement was less harsh than it could have been. Specifically, the Agreement permitted designees to deduct certain expenses they incurred in perpetrating the alleged fraud rather than require the full amount of the loss to Denmark. See Settlement Agreement § 2(e).

In conclusion, McGee has failed to establish that the Settlement Agreement was unconscionable, and Stein, Lhote, and McGee remain jointly and severally liable pursuant to the Settlement Agreement.

**D.    Conclusion on Breach of the Agreements**

It is undisputed that if SKAT did not materially breach the Agreement, then Stein, Lhote, and McGee are liable for breach of the Settlement Agreement.  Trial Tr. 160:16-22 (Stein); Motion to Dismiss Oral Argument Tr. 3:5-8.  Given that the Court finds that SKAT did not materially breach the Settlement Agreement, pp. 45-65, the Court finds that Stein, Lhote, and McGee are liable for breach.

**E.    Damages Owed to SKAT**

Having found that designees breached the agreement, we turn to the amount owed to SKAT by the designees.  It is undisputed that Stein, Lhote, and McGee owe at least DKK 539,975,404 to SKAT, given that the Preliminary Settlement Amount is DKK 1.55 billion, Settlement Agreement § 1(y), and payments of DKK 1,010,024,596 have been made so far, <u>supra</u> pp. 34-35.  In addition, it is undisputed that Stein, Lhote, and McGee owe interest accruing for their failure to pay the Subsequent Cash Payment Amount by May 28, 2021, as well as interest accruing for default.  Trial Tr. 160:16-22 (Stein); Settlement Agreement §§ 1(c), 2(d)(ii)(1), 5(d)(i), (ii), (iii).

-85-

However, the parties dispute the calculation of a "True-Up Amount," i.e. how much designees owe in addition to the Preliminary Settlement Amount. This dispute, of course, affects the appropriate calculation of interest as well.

Before this litigation began, Wachtell, as then-counsel for Stein, Lhote, and McGee, provided "True-Up Spreadsheets" to SKAT calculating the True-Up Amount as DKK 26,008,293.39. Supra pp. 35-36; Stein ¶ 71(b); SKAT's Pre-Trial Br. ¶ 22; Stipulated Calculations (SKAT Ex. 657); Plaintiffs' Post-Trial Br. ¶ 604. SKAT hired Marc E. Landy, an AlixPartners partner, to audit the True-Up Spreadsheets and he identified multiple issues with Wachtell's calculation of Net Proceeds. See Stein ¶ 72; Landy ¶¶ 1, 4, 9; SKAT's Pre-Trial Br. ¶ 23; SKAT's Post-Trial Br. ¶ 30.

Even without a breach, the Settlement Agreement contemplates a process by which the parties could resolve any dispute regarding the True-Up Amount. See Settlement Agreement § 10. While that process began, it was not completed in advance of trial. See Plaintiffs' Post-Trial Br. ¶¶ 296, 505.

At trial, both parties rejected portions of Wachtell's analysis and plaintiffs claimed that Wachtell's analysis should not be used at all on the True-Up issue. SKAT relied upon the testimony of its expert, Marc E. Landy, while designees relied upon the testimony of plaintiff Stein.

On the amount owed, SKAT contends that the True-Up Amount is

DKK 53,602,007.06, or DKK 27,593,713.67 more than Wachtell's analysis. See SKAT's Post-Trial Br. ¶ 30; Stipulated Calculations (SKAT Ex. 657). In contrast, designees did not provide any number for the correct True-Up Amount. See Trial Tr. 160:23-161:3 (Stein).[46]

Ultimately, designees raise two threshold arguments to prevent the calculation of damages, which must be resolved before the Court addresses the proper calculation of damages.

### 1. Designees' Threshold Arguments

Designees contend that damages cannot be calculated at all because: (1) the designees never certified a final list of Net Proceeds, see Designees' Pre-Trial Br. ¶ 82; Plaintiffs' Post-Trial Br. ¶ 296; Stein ¶¶ 68-74; and (2) SKAT failed to provide sufficient evidence to support the calculation of the True-Up Amount, see Plaintiffs' Post-Trial Br. ¶¶ 614-23. We address each argument in turn.

### i. Certification of Net Proceeds

The first threshold argument concerns the certification of net proceeds. At the end of the True-Up Process, Stein, Lhote, and McGee were obligated to "provide and certify the accuracy of a final list of Net Proceeds received by each Covered Party with respect to each Pension Plan." Settlement Agreement § 2(e)(i).

---

[46]    SKAT's expert, Mr. Landy, later provided calculations based on Stein's testimony. See Stipulated Calculations (SKAT Ex. 657).

It is undisputed that designees never certified the True-Up Spreadsheets created by Wachtell, their counsel, which contained a calculation of Net Proceeds. Stein ¶ 74(d); Trial Tr. 137:6-11 (Stein). As a result, designees suggest that SKAT cannot rely on the True-Up Spreadsheets as a baseline and cannot prove that there even is a True-Up Amount, as SKAT's expert did not re-calculate "Gross Reclaims," separate and apart from the True-Up Spreadsheets. Stein ¶¶ 68-74. Designees make this argument based on Mr. Stein's testimony, even though Mr. Stein testified at trial that he did not dispute the gross reclaims numbers that his lawyers provided to SKAT in the True-Up Spreadsheets. See Trial Tr. 84:6-16 (Stein).

Designees cannot rely on their own failure to certify the True-Up Spreadsheets to avoid paying the True-Up Amount. Under New York law, "[t]he prevention doctrine excuses the non-occurrence of a condition precedent if the party seeking to invoke that condition 'was instrumental in preventing or frustrating its occurrence.'" St. Christopher's, Inc. v. JMF Acquisitions, LLC, No. 20-3808-CV, 2021 WL 6122674, at *4 (2d Cir. Dec. 28, 2021); see also Consolidated Edison, Inc. v. Northeast Utilities, 426 F.3d 524, 528 (2d Cir. 2005) ("[A] party may not avoid performance of a contractual duty by preventing the occurrence of a condition precedent[.]"); Tang Cap. Partners, LP v. BRC Inc., No. 22 Civ. 3476 (RWL), 2024 WL 4716315, at *34 (S.D.N.Y. Nov. 8, 2024) (same).

In addition, the Settlement Agreement explicitly permits this Court to resolve "any claim, controversy or dispute arising out of or relating to the True-Up process [which] exceeds twenty million (20,000,000) DKK." Settlement Agreement § 10(a). This scenario would only occur if certification did not occur. As discussed earlier, the Court must "give full meaning and effect to all of its provisions," Chesapeake Energy Corp., 773 F.3d at 114, and plaintiffs' interpretation would run afoul of this maxim.

### ii. Evidence Used to Calculate True-Up Amount

The second threshold argument concerns what admissible evidence qualifies as adequate to support the calculation of the True-Up Amount. See Plaintiffs' Post-Trial Br. ¶¶ 614-23. Stein and Lhote, but not Mr. McGee, contend that SKAT did not provide "competent evidence to support the elements necessary to calculate Net Proceeds." Id. ¶ 620. Specifically, plaintiffs define competent evidence as: (a) "nearly 100,000 MPSKAT Documents that are the source documents for the True-Up Spreadsheets;" (b) "more than 100 True-Up Spreadsheets," each of which have over 20 tabs, as they are "effectively summaries of the MPSKAT Documents;" and (c) "Summaries of the MPSKAT Documents or the True-Up Spreadsheets prepared consistent with the Federal Rules of Evidence." Id. ¶ 616.

It is baffling to the Court why plaintiffs and plaintiffs' counsel believe this is a proper objection, as the Court has

-89-

addressed this issue multiple times, and the parties ultimately stipulated to a document that outlined the relevant calculations, see Stipulated Calculations (SKAT Ex. 657); Trial Tr. 638:17-641:11; ECF No. 204-1 at 16 (identifying no objection to admission); Fisher v. First Stamford Bank & Tr. Co., 751 F.2d 519, 523 (2d Cir. 1984) ("[A] stipulation of fact that is fairly entered into is controlling on the parties and the court is bound to enforce it."); Fed. R. Evid. 1006 ("The court may admit as evidence a summary, chart, or calculation offered to prove the content of voluminous admissible writings, recordings, or photographs that cannot be conveniently examined in court, whether or not they have been introduced into evidence."). Moreover, SKAT's expert testified as to the calculation of the True-Up Amount, and pursuant to Rule 705 of the Federal Rules of Evidence, "an expert may state an opinion — and give the reasons for it — without first testifying to the underlying facts or data." Fed. R. Evid. 705; Trial Tr. 637:1-638:5.

Nevertheless, for the sake of completeness, we will now detail the extensive procedural history related to this issue before resolving plaintiffs' arguments for the final time.

### a.  Procedural History

At the pre-trial conference on January 30, 2025, plaintiffs' counsel noted that issues related to the True-Up Amount "could be complicated" and "take a long amount of time" if the Court did not

bifurcate the trial.  The parties noted that they had disagreements about which categories of expenses could be deducted from Net Proceeds pursuant to the Settlement Agreement.  The Court stated that it could "say this category is in and this one is out" and the parties would "figure out the math."  Plaintiffs' counsel agreed that "if the concepts behind the categories fade away, the math becomes easier."  SKAT's counsel explained that the parties were negotiating a stipulation, which outlined what the math would be depending on the Court's determination of what categories were in or out.  Plaintiffs' counsel added that he believed there could be a stipulation that "tees up the conceptual issues."

Yet, the promised stipulation remained elusive, and the trial date arrived without one.  Instead, the Court received conflicting submissions.  Stein filed a pre-trial statement outlining four disputes with Landy's deductions of certain expenses in Landy's previously proffered expert report.  See Stein ¶¶ 70, 75-95. Simultaneously, SKAT filed Landy's pre-trial statement which described and quantified six categories of impermissible deductions made by Wachtell in the True-Up Spreadsheets.  See Landy ¶¶ 11-42.[47]  A few days later, designees filed objections to multiple paragraphs of Landy's direct testimony, arguing that

---

[47]    In accordance with the Court's direction regarding direct testimony, Landy submitted his direct testimony via affidavit.  The Court understands Landy's affidavit differs from Landy's prior expert report in this matter, see Stein ¶ 70, and only refers to Landy's affidavit as his direct testimony.

these paragraphs "lack[ed] foundation under Rule 602, are not proper expert testimony under Rule 702, violate[d] the best evidence rule under Rule 1002, and/or consist[ed] of improper summaries under Rule 1006." ECF No. 179 at 4. Despite noting that some of these objections did not apply to every objectionable paragraph, see id. ("and/or" (emphasis added)), designees did not identify which objections applied to which paragraphs and provided a threadbare explanation for why these objections were lodged at all. See id. SKAT filed a response a day before trial, noting that Mr. Landy's affidavit "describes in detail how he performed the various calculations related to the true-up disputes" and how designees' objections to their own True-Up Spreadsheets were baseless. ECF No. 180 at 4-5.

With this issue in mind, on the first day of trial during Mr. Stein's testimony, the Court asked Mr. Stein "if today SKAT said we'll take the Wachtell numbers, there would be no more dispute about the remaining monies owed on the True-Up Amount, is that right?" To which Mr. Stein replied: "I think that's right." Trial Tr. 89:10-17 (Stein). SKAT's counsel asked Mr. Stein whether he "dispute[d] the gross reclaims numbers that your lawyers provided to SKAT in the True-Up spreadsheets" and Mr. Stein confirmed that he did not dispute them. Id. 84:6-16 (Stein). Mr. Stein also confirmed that Wachtell provided these spreadsheets with his authorization. Id. 77:14-20 (Stein). Mr. Stein further testified

-92-

that he "ha[s] no dispute with the math" that Wachtell did, but rather he claimed that Wachtell's numbers were "an offer kind of made in compromise had methodology which I disagree with today." Id. 98:16-21 (Stein).  Mr. Stein later acknowledged, in response to a question from the Court, that there was no document that describes those spreadsheets as an offer in compromise.  Id. 107:14-19 (Stein).[48]

The night before the last day of trial, after the Court sent the court reporters home for some much-needed rest, plaintiffs' counsel raised the True-Up Amount issue again.  However, this time, he argued off-the-record that because SKAT had not introduced the True-Up Spreadsheets or the voluminous underlying documents, SKAT had wholly failed to carry its burden of proof on damages.  The Court asked how plaintiffs could back away from the True-Up Spreadsheets prepared by Wachtell and why Landy could not just rely on the figures provided in those spreadsheets.  The Court also repeated that it could resolve the broad issues about the right general approach and then leave the parties to "worry about the numbers."  In response, plaintiffs' counsel stated that there was no information about how SKAT's expert, Landy, arrived at the

---

[48]    Plaintiffs' counsel directed Mr. Stein to Plaintiffs' Exhibit 201, which is Wachtell's letter to SKAT's counsel providing the True-Up Spreadsheets, in an effort to show that there were conditions placed on the provision of the spreadsheets.  Trial Tr. 133:15-135:24 (Stein).  However, this letter never indicates that the spreadsheets were cloaked with the protection of Federal Rule of Evidence 408.  See Pl. Ex. 201.

-93-

numbers he put in his pre-trial statement,[49] and that SKAT should
have assembled competent evidence.  SKAT's counsel stated that he
has provided Landy's underlying calculations repeatedly over the
years, and that this dispute was not necessary if plaintiffs had
just agreed to the stipulation that had been repeatedly sent.  At
the end, the Court repeated that it could just decide the
categorical disputes and the parties could figure out the math.

The next morning on the last day of trial, when we were back
on the record, Mr. McGee's counsel stated that his client would
stipulate to the True-Up Spreadsheets:

> As the Court knows, I represent Luke McGee, the counter
> defendant.  During colloquy or conversation yesterday
> with Mr. Levy, you asked whether his clients would
> stipulate to the Wachtell spreadsheets.  My client will,
> and I want to let the Court know that before any
> testimony is taken on that issue.

Trial Tr. 491:3-8.  Plaintiffs' counsel stated that they would
"focus on the conceptual issues" in their cross-examination of Mr.
Landy.  Trial Tr. 597:12-14.

Following plaintiffs' cross-examination, SKAT's counsel
stated that Mr. Landy was prepared on re-direct to "identify for
each of the categories . . . the simple math" so "if your Honor
rules one way or the other, here's the number."  Trial Tr. 626:13-

---

[49]    The Court explained the next day that this argument was misleading.  See
Trial Tr. 640:4-10 ("I thought based on the conversation yesterday, and I didn't
go back and reread Mr. Landy's statement, but you left the impression with me
that the numbers were not in his statement.  But I've been able to find I think
almost every one of them.  I just haven't necessarily found all of them yet.
But I think I've gotten four out of five pretty quickly.")

627:5.  SKAT's counsel continued: "There's no need for a whole other . . . trial on this."  Trial Tr. 628:11-629:1.  According to SKAT's counsel, Mr. Landy has:

> done the numbers a million times. They're in his expert statement. I could proffer to the Court after how many times we've provided [designees' counsel] the underlying spreadsheets. He put in his expert report.  They didn't put in an expert report.  They didn't put in a rebuttal report.  They didn't take his deposition, and none of their fact witnesses in the case when deposed had any clue about the numbers.  It's essentially what he's done is undisputed.

Id.  In response, plaintiffs' counsel incredulously stated that he was "not sure what numbers are being discussed" and that "I have never seen it.  Or I may have seen it, I just don't know what it is."  Trial Tr. 629:2-21.  After SKAT's counsel offered to make a record of what plaintiffs' counsel had received, plaintiffs' counsel backtracked: "I did not say we never got spreadsheets. What I did say they were never attached to Mr. Landy's witness statement and never attached to his expert report."  Trial Tr. 630:4-7.  SKAT's counsel then laid out on the record, which went undisputed, as to how plaintiffs' counsel had the underlying True-Up calculations for almost two years "in order to facilitate a potential stipulation."  Trial Tr. 631:3-635:19.  Plaintiffs' counsel even had an hour-long call with Mr. Landy so Mr. Landy could walk through the numbers with them.  Id.  Tellingly, plaintiffs' counsel, for all of the bluster off the record, did not rebut SKAT's counsel on the record when given the opportunity,

only stating that they have cooperated in good faith.   Trial Tr. 635:20-636:3.

The Court then stated to plaintiffs' counsel: "What [SKAT's counsel is] basically saying is let the witness testify to his numbers." Trial Tr. 636:6-7.  Plaintiffs' counsel objected saying: "there's no more evidence to be offered.   The evidence is in. We've had cross-examination.   So I don't see if there's anything more to offer." Trial Tr. 636:8-12.  The Court then set out why Mr. Landy could rely upon the underlying spreadsheets and testify to the numbers, pursuant to Rules 705, 703, and 702 of the Federal Rules of Evidence.  Trial Tr. 637:1-23.  Plaintiffs' counsel again raised that he didn't understand SKAT to be offering additional evidence of the calculations, Trial Tr. 637:24-638:6, but "[i]f there's a document, it would help to see it now.  Because we may just stipulate that it comes in," id. 639:2-4.

SKAT's counsel then proffered a document, which we refer to as "Stipulated Calculations" or SKAT Ex. 657, that outlined the calculations resulting from the parties' categorical disputes, including calculations if the Court decided to adopt Mr. Stein's interpretation of the Net Proceeds formula.  Mr. McGee's counsel immediately stated that he would stipulate to the document.  Trial Tr. 639:9-14.  After taking a moment to review it, plaintiffs' counsel stipulated to the document and agreed to let Mr. Landy testify about the document.  Trial Tr. 639:22-24, 640:15-16.  The

Court stated that it would prefer the document to be memorialized as an exhibit, then received SKAT Ex. 657 into evidence.  Trial Tr. 641:1-11; see ECF No. 204-1 at 16 (identifying no objection to admission).   Mr. Landy then testified about the Stipulated Calculations on redirect examination.  See Trial Tr. 642:5-648:23 (Landy).  Plaintiffs' counsel and McGee's counsel each elected not to cross-examine Mr. Landy on the Stipulated Calculations.  See Trial Tr. 648:24-649:3.

* * *

   To summarize, the parties represented to the Court at the initial pre-trial conference that a stipulation setting out the relevant calculations underlying the True-Up Amount would allow the Court to focus on the categorical disputes regarding the proper application of the Net Proceeds formula under the Settlement Agreement.  At trial, plaintiff Stein testified that he authorized the True-Up Spreadsheets to be disclosed to SKAT and that he did not dispute the calculations performed by his former counsel in the True-Up Spreadsheets.  On the last day of trial, plaintiffs' current counsel, Mr. McGee's counsel, and SKAT's counsel entered into a stipulation on the record which set out the calculations underlying the parties' categorical disputes based on the True-Up Spreadsheets.

### b.  Resolution of the Issue

Now, with barely any reference to the foregoing extensive procedural history, plaintiffs' counsel again attempts to argue that there is no competent evidence of the calculations underlying the True-Up Amount.  See Plaintiffs' Post-Trial Br. ¶¶ 614-23. Plaintiffs' arguments are unpersuasive.

As for the Stipulated Calculations, SKAT Ex. 657, plaintiffs argue that "SKAT offered Exhibit 657 in an attempt to cure some deficiencies in the testimony of Landy" but this exhibit and Landy's testimony "do not cure SKAT's failure of proof because they rely on information in the True-Up Spreadsheets, none of which are in the record, and do not identify where in the True-Up Spreadsheets the information used to calculate the values in Exhibit 657 come from."  Plaintiffs' Post-Trial Br. ¶ 622 (citations omitted).

Plaintiffs' argument is seriously flawed.  Not only do plaintiffs grossly mischaracterize the record but even more significantly, plaintiffs fail to reference the on-the-record stipulation by plaintiff's counsel.  See Plaintiffs' Post-Trial Br. ¶ 622; Trial Tr. 639:22-24, 640:15-16.  In short, plaintiffs cannot avoid the Stipulated Calculations, SKAT Ex. 657.

This case is similar, though not identical, to a Second Circuit case: Fisher v. First Stamford Bank & Tr. Co., 751 F.2d 519 (2d Cir. 1984).  There, the trial court entered a damages award

for plaintiff based on a stipulation placed in the record at the close of the evidence.  Id. at 523.  On appeal, the defendant argued that "the trial court should have considered plaintiff's duty to mitigate damages under Connecticut law" despite the stipulation's silence on the issue of mitigation and as a result, the defendant should be relieved from the effects of the stipulation to avoid manifest injustice.  Id. at 523–24.  The Second Circuit held that it "would have been an improvident exercise of discretion for the trial court to set aside the stipulation and . . . it was not unreasonable to require defendant's attorney to have anticipated the mitigation issue at the time of the damage stipulation."  Id. at 524.

Here, plaintiffs' counsel entered a stipulation, on the record, following several in-court exchanges wherein the parties stated that a stipulation would be entered regarding the calculations of damages.  There is no manifest injustice in holding plaintiffs to their word when there is no proffered dispute about the accuracy of the underlying calculations and that the plaintiffs have had the underlying documents in their possession for years.[50]

---

[50]    In addition, the designees are bound by the representations made by their former lawyers in the True-Up Spreadsheets.  Under New York law, "it is well-settled a client is bound by her attorneys' acts and/or omissions."  Kegg v. Truck-Rite Distribution Sys. Corp., 215 N.Y.S.3d 275, 286 (N.Y. Sup. Ct. 2024) (collecting cases).  "In a civil action the admissions by a party of any fact material to the issue are always competent evidence against him, wherever, whenever or to whomsoever made."  Id. at 289 (citations omitted).

Moreover, the Stipulated Calculations are admissible pursuant to Rule 1006 of the Federal Rules of Evidence, which allows the court to "admit as evidence a summary, chart, or calculation offered to prove the content of voluminous admissible writings, recordings, or photographs that cannot be conveniently examined in court, whether or not they have been introduced into evidence" if the proponent "make[s] the underlying originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place."  Both prongs are satisfied here.[51] First, the underlying writings cannot be conveniently examined in Court as they include "nearly 100,000 MPSKAT Documents that are the source documents for the True-Up Spreadsheets;" and "more than 100 True-Up Spreadsheets," each of which have over 20 tabs. Plaintiffs' Post-Trial Br. ¶ 616.  Secondly, as was made painfully clear on the record, SKAT's counsel provided Landy's underlying calculations to the designees' counsel multiple times over the

---

[51]    Plaintiffs' citations are inapposite.  See Plaintiffs' Post-Trial Br. ¶ 622.  First, plaintiffs' citation of Cutler v. Stop & Shop Supermarket Co., 513 F. App'x 81, 83 (2d Cir. 2013) is unpersuasive as a party there, unlike here, did not "produce [the underlying] time sheets for the summary judgment record." Id.  Similarly, plaintiff's second citation found that the best evidence rule "has no application to the testimony of an expert witness summarizing and analyzing evidence already in the record," and here the best evidence rule has been satisfied as well.  United States v. All Funds on Deposit in Any Accts. Maintained at Merrill Lynch, Pierce, Fenner & Smith, 801 F. Supp. 984, 997 (E.D.N.Y. 1992), aff'd sub nom. United States v. Daccarett, 6 F.3d 37 (2d Cir. 1993).  Plaintiffs' last citation is inapposite because it involves admission of evidence before a jury, while this was, obviously, a bench trial.  See United States v. Citron, 783 F.2d 307, 316 (2d Cir. 1986) (denying admission of summary chart pursuant to Fed. R. Evid. 403 because without an explanation of how the figure was derived from underlying evidence, the chart is "more likely to confuse or mislead the jury").

years.   Trial Tr. 631:3-635:19.   Additionally, the underlying MPSKAT Documents and True-Up Spreadsheets, which Landy's calculations were based on, were produced by plaintiffs in the first place.  See Stein ¶ 71.

* * *

The Court finds that there is sufficient competent evidence to support a calculation of the True-Up Amount, given (a) the stipulated document outlining the relevant calculations and summarizing the voluminous underlying original documents, see Stipulated Calculations (SKAT Ex. 657), and (b) the testimony of SKAT's expert, Mr. Landy, providing the basis for the relevant calculations.

### 2.    Disputes Concerning the Calculation of Damages

Having resolved the two threshold arguments in favor of SKAT, we now turn to the amount of damages owed to SKAT.  As we discussed already, the True-Up Amount is calculated in accordance with the Settlement Agreement's definition of "Net Proceeds," Settlement Agreement § 2(e)(iii), and a "fundamental principle" of the Agreement is that the Covered Parties must pay SKAT the "Net Proceeds" of the tax refunds they received from SKAT, id. Recital F.  The Settlement Agreement defines "Net Proceeds" as (A) "Gross Reclaims," i.e., the total amount SKAT paid out under the scheme, less (B) "all of the Covered Parties' expenses associated with Reclaim Applications," i.e., the expenses that the parties'

incurred when filing the refund applications with SKAT, such as
"(1) reclaim agent fees, (2) tax reclaim advisory service fees,
(3) brokerage fees and commissions, (4) custodial and clearing
fees, (5) trading expenses, and (6) financial institution account
charges," and less (C) "any other portion of Gross Reclaims
received by parties excluded" from the Settlement Agreement.  Id.
§ 2(e).

The parties raise eight issues pertaining to the proper
application of the Net Proceeds formula.  We address each issue in
turn.

### i.  Post-Reclaim Custodial Fees

The first issue concerns the deduction of "custodial . . .
fees" under Settlement Agreement § 2(e)(B).  This deduction refers
to the fees that Covered Parties paid to "purported securities
custodians that generated the trading documentation that the
Pension Plans submitted to SKAT in support of their reclaim
applications."  Landy ¶ 12.  To be deductible, these fees needed
to be "associated with Reclaim Applications for which [SKAT] made
payments."  Settlement Agreement § 2(e)(B).

SKAT stopped paying refunds of withheld dividend taxes in
August 2015.  Landy ¶ 13; Stein ¶ 87.  However, certain pension
plans continued to maintain accounts at securities custodians, and
"incur fees, for months or even years after SKAT's last payment."
SKAT's Pre-Trial Br. ¶ 24; see also Stein ¶ 79(d) (similar).

SKAT's expert, Mr. Landy, calculates that Wachtell incorrectly deducted DKK 19,624,912.18 in custodial fees either because they were paid after SKAT's last payment or to custodians unassociated with the plan's Reclaim Applications paid by SKAT. See Landy ¶¶ 12-17; Stipulated Calculations at 2.

Mr. Stein, on the other hand, argues that "custodial fees paid after SKAT made the last payment to a Pension Plan for a Reclaim Application are 'associated with' the Reclaim Applications for which SKAT made payments." Stein ¶ 88. He testified that the reason the accounts "were kept open through 2017 was for SKAT's potential benefit . . . so that we could potentially return the funds to SKAT if we ever had to." Stein ¶ 87(a). We do not credit Mr. Stein's testimony on this point nor do we agree with his reading of the Settlement Agreement: fees incurred after SKAT made the last payment for a Reclaim Application and fees paid to custodians unassociated with the plan's Reclaim Applications are plainly not "associated with Reclaim Applications for which [SKAT] made payments." Settlement Agreement § 2(e)(B).

Accordingly, we find that the Covered Parties incorrectly deducted DKK 19,624,912.18 in custodial fees that were not associated with the reclaim applications for which SKAT made payments.

### ii. Tax Reclaim Advisory Service Fees

The second issue concerns "tax reclaim advisory service fees," which Covered Parties could deduct from Net Proceeds pursuant to Settlement Agreement § 2(e)(B). Specifically, certain of the pension plans paid these fees to an entity in the Cayman Islands, owned and controlled by Sanjay Shah called Ganymede. SKAT's Pre-Trial Br. ¶ 25. Ganymede received "66.67 percent of the net refund the plan received after the reclaim agent that the plan hired to submit the refund claim took its fee." Id.

As SKAT's expert establishes, Wachtell incorrectly calculated the Ganymede fees on a gross, rather than net, basis, meaning the Covered Parties deducted DKK 3,709,941.25 too much from Net Proceeds. Id.; Landy ¶¶ 18-23; Stipulated Calculations at 2. Designees do not contest Mr. Landy's calculation. See Plaintiffs' Post-Trial Br.; McGee's Post-Trial Br.; Tr. 84:17-85:11 (Stein). Accordingly, we find that the Covered Parties incorrectly deducted DKK 3,709,941.25 from Net Proceeds.

### iii. Allocation of Account-Level Fees Between Danish and Belgian Trading

The third issue concerns trading fees, which are deductible from Net Proceeds pursuant to Settlement Agreement § 2(e)(B), as "custodial and clearing fees," "brokerage fees and commissions," "trading expenses," and "financial institution account charges." Given that certain pension plans engaged in trading of both Danish

and Belgian securities,[52] the issue is two-fold: (1) whether these
account-level trading fees must be allocated in some proportion
between Danish and Belgian trading and, (2) if so, what methodology
must be utilized.  See Stein ¶¶ 90, 91.  The parties disagree on
the first point of whether account-level trading fees must be
allocated, but ultimately, designees do not dispute Landy's
allocation methodology, should the first point not be resolved in
their favor.  See Plaintiffs' Post-Trial Br.; McGee's Post-Trial
Br.; Tr. 84:17-85:11 (Stein).

Specifically, designees contend that the account-level
trading fees need not be proportionally allocated and the Covered
Parties may deduct all of the Covered Parties' Expenses because
"[a]ccount-level fees were incurred whether these plans traded in
only Danish, or both Danish and Belgian securities, and regardless
of the source of the funds in the account or activity on the
account."  Stein ¶ 90(a).  Under designees' current approach, all
account-level trading fees should be deducted and the True-Up
Amount "would be reduced by DKK 2,014,905 accordingly."
Plaintiffs' Post-Trial Br. ¶ 668 (citing Stipulated Calculations

---

[52]    As Mr. Stein states, "[s]ome, but not all, of the Covered Parties
conducted trading involving Danish and Belgian securities through custody
accounts held at Solo Capital, North Channel Bank or Lindisfarne."  Stein ¶ 90.
For example, "during the month of October 2013," one particular pension plan
"only executed purported trades in Belgian securities, and therefore only
incurred trading fees in its Solo Capital account related to Belgian trading,"
but "the Covered Parties deducted the entire amount of the [pension plan's]
monthly custody fee for the month of October 2013 in calculating Net Proceeds."
Landy ¶ 32.

at 3; Trial Tr. 644:13-24, 645:3-7 (Landy)).

Designees' current position differs from their former counsel's calculations, which attempted to "allocate[] trading fees between Danish and Belgian trading based on the relative amount of the respective plan's supposed trading in Belgian and Danish shares." SKAT's Pre-Trial Br. ¶ 26. As a result, Wachtell's calculation deducted "DKK 21,599,845.40 in Solo Capital fees and some or all of the DKK 317,693.06 in Lindisfarne and North Channel Bank fees." Id. ¶ 30.

SKAT agrees with Wachtell's approach but disagrees with its calculations. Specifically, SKAT asserts that the Covered Parties incorrectly deducted "DKK 3,167,594 of Belgian trading fees." SKAT's Post-Trial Br. ¶ 35; see also Landy ¶¶ 24-37; Stipulated Calculations at 2. Again, as mentioned before, designees do not contest Mr. Landy's calculations. See Plaintiffs' Post-Trial Br.; McGee's Post-Trial Br.; Tr. 84:17-85:11 (Stein).

We agree with Wachtell and SKAT's approach on the allocation issue. The "fundamental principle" of the Agreement is that the Covered Parties must pay SKAT the "Net Proceeds" of the tax refunds they received from SKAT. Settlement Agreement Recital F. The Settlement Agreement specifically limits Covered Parties' deductions, in part, to those fees "associated with Reclaim Applications." Id. § 2(e)(B). Belgian trading is not "associated" with the reclaim applications that SKAT paid. Id. Through the

provision of the True-Up Spreadsheets, designees bound themselves to the principle that division was applicable. See Kegg, 215 N.Y.S.3d at 285, 289. Moreover, we accept Mr. Landy's undisputed calculations for allocating trading fees between Danish and Belgian trading.

### iv. Foreign Exchange Rates

The fourth issue concerns foreign exchange rates. Pension plans involved in the scheme sometimes "paid fees to entities in other currencies." Landy ¶ 38. However, the True-Up Spreadsheets "used an annual exchange rate for the year in which the transaction took place (as opposed to the exchange rate on the date of the actual transaction)." Id. Mr. Landy calculates that "the Covered Parties erroneously deducted DKK 686,817.00 from Net Proceeds [as a consequence of] us[ing] less accurate, annual exchange rates instead of daily exchange rates." Id. ¶ 40; Stipulated Calculations at 2. Designees do not dispute this calculation. See Plaintiffs' Post-Trial Br.; McGee's Post-Trial Br.; Tr. 84:17-85:11 (Stein). Given that the Settlement Agreement only permits deduction of "expenses" and "fees" "associated with Reclaim Applications," Settlement Agreement § 2(e), we agree with SKAT that the more accurate daily exchange rates should be used.

### v. Duplicate Deductions

The fifth issue concerns double-counted expenses. Mr. Landy identified multiple instances where the True-Up Spreadsheets

deducted one fee twice.  <u>See</u> Landy ¶ 42.  He calculates that "DKK 404,449.13 was incorrectly deducted from Net Proceeds" as a result. <u>Id.</u>; Stipulated Calculations at 2.  Designees do not dispute this calculation.  <u>See</u> Plaintiffs' Post-Trial Br.; McGee's Post-Trial Br.; Tr. 84:17-85:11 (Stein).  Given that the parties do not dispute Landy's calculations on double-counted expenses and given that double-counting expenses is obviously unacceptable, we will apply the Landy calculation of DKK 404,449.13 when determining the final calculation of damages.

*vi. Allocation of Net Proceeds by Ownership Percentage*

The sixth issue involves the Gross Reclaims received by Non-Covered Parties, <u>i.e.</u> those parties who decided not to participate in the Settlement Agreement.  This dispute, however, does not involve a dispute about mathematical calculations as Landy is using Wachtell's numbers and they are not challenged.  <u>See</u> Stipulated Calculations; Trial Tr. 87:10-89:17 (Stein), 645:8-648:22 (Landy). Rather, the dispute concerns the reading of clause (C) in the Net Proceeds formula, which permits the Covered Parties to deduct "any other portion of Gross Reclaims <u>received</u> by parties excluded" from the Settlement Agreement.  Settlement Agreement § 2(e) (emphasis added).

Simply stated, the issue is whether the Gross Reclaims <u>received</u> by non-settling parties is to be deducted from the Gross

-108-

Reclaims before or after allowable expenses are deducted from the Gross Reclaims obtained by the Covered Parties. As discussed earlier, the Settlement Agreement defines "Net Proceeds" as (A) "Gross Reclaims," i.e., the total amount SKAT paid out under the scheme, minus (B) "all of the Covered Parties' expenses associated with Reclaim Applications," i.e., the expenses that the parties' incurred when filing the refund applications with SKAT, and minus (C) "any other portion of Gross Reclaims received by parties excluded" from the Settlement Agreement. Settlement Agreement § 2(e).

Mr. Stein contends that "SKAT makes a fundamental error" because it miscalculates "the portion of Gross Reclaims Received by Non-Covered Parties." Stein ¶¶ 76(c), 92-94. However, Landy simply uses Wachtell's calculations for his analysis and Wachtell's calculations are binding on Stein. See Kegg, 215 N.Y.S.3d at 285, 289. Therefore, no adjustment of Mr. Landy's calculation is warranted.

Moreover, the Court is not persuaded by Stein's interpretation of the Settlement Agreement. According to Stein, pension plans "received payments from SKAT for Reclaim Applications" and distributed those proceeds, after the payment of fees, according to each plan's ownership percentage. Stein ¶ 93(b). However, Stein contends that the Settlement Agreement allows the Covered Parties to deduct the percentage of proceeds

owed to non-settling parties without deducting the associated expenses, as the Covered Parties could deduct the "portion of Gross Reclaims received" by the non-settling parties. Plaintiffs' Post-Trial Br. ¶ 670 (citation, quotation marks, and emphasis omitted); see also id. ¶¶ 674, 677-80 (similar).

The absurdity of Stein's reading, which even his lawyer concedes does not make any sense,[53] is easily illustrated by the following example: Suppose a pension plan received 1 million dollars from SKAT in gross reclaims, owed $660,000 in expenses associated with the Reclaim Applications to a non-Covered Party, and non-Covered Parties owned 50% of the pension plan. See Trial Tr. 99:23-103:10 (Stein). Under Mr. Stein's interpretation of the Settlement Agreement, the Net Proceeds formula would be calculated as follows: (A) 1,000,000 in Gross Reclaims, minus (B) 660,000 in expenses, and minus (C) 500,000 the non-Covered Parties would be owed due to their 50% ownership of the pension plan. Id. This would result in negative 170,000 in Net Proceeds. Id.

However, actually calculating Net Proceeds is as easy as (A), (B), (C). Applying the numbers in the order of the paragraphs

---

[53] As written in his own counsel's post-trial briefing, "SKAT elicited testimony from Stein on cross-examination that the methodology suggested by Stein does not make sense because the mathematical outcome of allocating the total Gross Reclaims received by each Pension Plan in Section 2(e)(C) would result in negative Net Proceeds." Plaintiffs' Post-Trial Br. ¶ 680 (citing Tr. 102:6-104:1 (Stein); Tr. 645:2-648:17 (Landy); Stipulated Calculations at 4). Instead, plaintiffs try to argue that the parties are still bound by this absurd interpretation. See Plaintiffs' Post-Trial Br. ¶¶ 669-88. Nothing in the language of the Settlement Agreement dictates such an untenable result.

listed in the Net Proceeds formula leads to the sensible order of deductions, as the Settlement Agreement states that the Covered Parties could deduct "any <u>other</u> portion of Gross Reclaims <u>received</u> by parties excluded" from the Settlement Agreement. Settlement Agreement § 2(e)(C) (emphases added). Thus, to use the same example as before, the Net Proceeds would be a positive 170,000 under a rational reading of the Settlement Agreement: (A) 1,000,000 in Gross Reclaims, minus (B) 660,000 in expenses, and minus (C) 170,000 the non-Covered Parties received following expenses due to their 50% ownership of the pension plan.

To conclude, Stein's proposed reading of the Settlement Agreement conveniently ignores the "fundamental principle" of the Settlement Agreement, which is that the Covered Parties must pay SKAT the "Net Proceeds" of the tax refunds they received from SKAT. Settlement Agreement Recital F.

### vii. Overlapping Adjustments

The seventh issue concerns the potential for "whether any of the adjustments to Net Proceeds are overlapping, such that there needs to be further adjustments to the Net Proceeds calculation." Stein ¶ 95. Stein notes that further adjustments may be necessary if the Court resolves certain issues in SKAT's favor, and others in designees' favor. <u>See</u> <u>id.</u> However, as we do not resolve any issues in designees' favor, there is no need for further adjustments to Landy's methodology and calculations to determine

the True-Up Amount.

*viii.    Calculation of Interest*

The last issue concerns the appropriate calculation of interest. As discussed earlier, the Settlement Agreement provides that interest shall accrue in two different ways. <u>Supra</u> pp. 28-34; Plaintiffs' Post-Trial Br. ¶ 695. First, if the Covered Parties' Designees failed to pay SKAT the Subsequent Cash Payment Amount by May 28, 2021, interest would accrue at a rate of "8.05% . . . per annum" "on the remaining unpaid amount of the Subsequent Cash Payment Amount, until the Final Settlement Payment Date or the Subsequent Cash Payment Amount has been paid in full, whichever is earlier." Settlement Agreement §§ 1(c), 1(dd), 2(d)(ii)(1); <u>see also</u> Plaintiffs' Post-Trial Br. ¶ 696 (similar). Second, following the default date of June 14, 2023, <u>see</u> SKAT's Pre-Trial Br. ¶ 66, the Covered Parties' Designees were required to pay "Applicable Interest on the unpaid amount of the Subsequent Cash Payment Amount as of the Default Date, for the period starting January 1, 2014 and running until the earlier of the Default Date or twenty-four (24) months from the Effective Date," Settlement Agreement § 5(d); <u>see also</u> Plaintiffs' Post-Trial Br. ¶ 697 (similar).

On April 8, 2025, prior to the commencement of trial, SKAT provided its calculation of interest in the declaration of SKAT's

-112-

counsel.  See Weinstein Decl. ¶ 80.  The Court reproduces SKAT's
calculation of interest below:

| Date | Principal Amount Outstanding (DKK) | § 2.d.ii Interest Accrued Between Payment Dates (DKK) | § 5.d.iii Default Interest Accrued (DKK) | |
|---|---|---|---|---|
| May 28, 2021 | 595,076,380.97 | – | – | |
| June 8, 2021 | 593,667,048.08 | 1,443,671.60 | – | |
| June 16, 2021 | 593,462,028.08 | 1,047,456.38 | – | |
| April 19, 2022 | 593,177,410.76 | 40,182,257.07 | – | |
| May 28, 2023 | 593,177,410.76 | 52,852,919.87 | – | |
| June 14, 2023 | 593,177,410.76 | 2,224,009.00 | 353,748,255.77 | |
| TOTAL | | 97,750,313.93 | 353,748,255.77 | 1,044,675,980.46 |

Id.  Designees did not provide their own calculation of interest
and the issue was not raised at trial.

However, Plaintiffs now argue that SKAT "has the burden of
demonstrating how it calculated [interest]," Plaintiffs' Post-
Trial Br. ¶ 700 (citations omitted), and that SKAT has not done so
"because it does not identify, with sufficient specificity, the
methodology for SKAT's calculation of interest, for example, the
amount of time during which interest has accrued," id. ¶ 701.  This
issue was raised for the first time in plaintiffs' post-trial
briefing.  See id. ¶¶ 693-701.

We reject plaintiffs' argument.  SKAT's calculation of
interest is sufficiently detailed and is easily verifiable.
Contrary to plaintiffs' assertion, SKAT's calculation of interest
does identify "the amount of time during which interest has
accrued" in the left column.  Id. ¶ 701; Weinstein Decl. ¶ 80.

At the same time, we do not fully accept SKAT's calculation of interest.  Under § 2(d)(ii)(1) of the Settlement Agreement, the interest accrued until the "Final Settlement Payment Date or the Subsequent Cash Payment Amount has been paid in full, **whichever is earlier**."  Settlement Agreement § 2(d)(ii)(1) (emphasis added). The Final Settlement Payment Date is May 28, 2023,[54] whereas the default date is June 14, 2023, see supra pp. 36-37.  Thus, pursuant to the Settlement Agreement § 2(d)(ii)(1), the interest should have stopped accruing as of May 28, 2023, not June 14, 2023.

We thus produce the appropriate calculation of interest in graphical form below:

| Date | Principal Amount Outstanding (DKK) | § 2.d.ii Interest Accrued Between Payment Dates (DKK) | § 5.d.iii Default Interest Accrued (DKK) | |
|---|---|---|---|---|
| May 28, 2021 | 595,076,380.97 | – | – | |
| June 8, 2021 | 593,667,048.08 | 1,443,671.60 | – | |
| June 16, 2021 | 593,462,028.08 | 1,047,456.38 | – | |
| April 19, 2022 | 593,177,410.76 | 40,182,257.07 | – | |
| May 28, 2023 | 593,177,410.76 | 52,852,919.87 | – | |
| June 14, 2023 | 593,177,410.76 | – | 353,748,255.77 | |
| **TOTAL** | | 95,526,304.93 | 353,748,255.77 | **1,042,451,971.45** |

---

[54]    As we mentioned before, the Settlement Agreement set the "Final Settlement Payment Date" as "thirty-six (36) months from" May 28, 2019, Settlement Agreement §§ 1(n), (r), which was "automatically extended" by one year since "the gross proceeds from the sale of North Channel Bank" did not equal or exceed a set figure, Letter Agreement § 6; see also SKAT's Post-Trial Br. ¶ 77 (identifying May 28, 2023 as the Final Settlement Payment Date); Plaintiffs' Post-Trial Br. ¶ 108 (similar).

As indicated in the chart, the appropriate interest accrued under Settlement Agreement § 2(d)(ii) is DKK 95,526,304.93, not DKK 97,750,313.93.

### 3.    Calculation of Damages

To summarize the foregoing, we adopt SKAT's calculation that the True-Up Amount is DKK 53,602,007, in light of our resolution of the issues listed above, supra pp. 101-112. We also partially adopt SKAT's calculation of the appropriate interest: DKK 95,526,304.93 in "Applicable Interest, calculated pursuant to section 2(d)(ii) of the Settlement Agreement, as of the Default Date" and DKK 353,748,256 in "Applicable Interest, calculated pursuant to Section 5(d)(iii) of the Settlement Agreement." Weinstein Decl. ¶ 80; supra pp. 112-115.

Thus, the correct judgment amount is DKK 1,042,451,971.45, comprised of (a) the DKK 653,602,007 Subsequent Cash Payment Amount, which is the sum of the DKK 600 million Additional Cash Payment and the DKK 53,602,007 True-Up Amount; (b) plus DKK 95,526,304.93 in Applicable Interest, calculated pursuant to Settlement Agreement § 2(d)(ii); (c) plus DKK 353,748,256 in Default Interest, calculated pursuant to Settlement Agreement § 5(d)(iii); and (d) less DKK 60,424,596 in payments made already.

### Conclusion

For the reasons stated above, judgment should be entered on SKAT's breach of contract counterclaims in the amount of DKK

1,042,451,971.45, pursuant to the 2021 Confession of Judgment or,
in the alternative, as breach of contract damages.  In addition,
plaintiffs' breach of contract and declaratory judgment claims are
dismissed with prejudice.

Dated:     September 22, 2025
           New York, New York

_____
       NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE